AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NY, NY | ) |
| | ) |

**14 MAG   2766**

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK AND INSIDE THE LOCKED AND CLOSED ITEMS CONTAINED THEREIN

located in the _____Southern District____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized)*:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 846 | Conspiracy to Distribute Narcotics |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

AUSA BROOKE E. CUCINELLA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/10/14

_____
*Judge's signature*

City and state:  New York, New York

HON. RONALD L. ELLIS
*Printed name and title*

14 MAG          2766

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE PREMISES KNOWN AND DESCRIBED AS THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK AND INSIDE THE LOCKED AND CLOSED ITEMS CONTAINED THEREIN | TO BE FILED UNDER SEAL<br><br>REQUEST FOR THE ISSUANCE OF A SEARCH WARRANT |

STATE OF NEW YORK          )
COUNTY OF NEW YORK         :     ss.:
SOUTHERN DISTRICT OF NEW YORK )

Brooke E. Cucinella, an Assistant United States Attorney in the Southern District of New York, being duly sworn, states:

1.    I am an Assistant United States Attorney in the Office of Preet Bharara, the United States Attorney for the Southern District of New York, and as such I am an "attorney for the government" within the meaning of Federal Rule of Criminal Procedure 41(b).

2.    I am one of the Assistant United States Attorneys primarily responsible for the investigation described in the affidavit of Detective Victor Lebron which is attached hereto as Exhibit A (the "Affidavit").  Pursuant to Federal Rule of Criminal Procedure 41(d)(2)(A), I hereby present the Affidavit

in support of the request for the search warrant described therein.

*Brooke E. Cucinella*

Brooke E. Cucinella
Assistant United States Attorney
Southern District of New York
(212) 637-2477

2

# EXHIBIT A

GEN_0000024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE PREMISES KNOWN AND DESCRIBED AS THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK AND INSIDE THE LOCKED AND CLOSED ITEMS CONTAINED THEREIN | TO BE FILED UNDER SEAL<br><br>AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT |

STATE OF NEW YORK          )
NEW YORK COUNTY            ) ss.:
SOUTHERN DISTRICT OF NEW YORK   )

VICTOR LEBRON, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

1.    I am a Detective with the NYPD, and I have been personally involved in the investigation of this matter. I have been with the NYPD for over 22 years. For the last approximately 7 years, I have also been a member of the Drug Enforcement Administration Task Force ("DEA Task Force"). During my tenure with the NYPD and the DEA Task Force, I have received training in narcotics investigations and been involved in numerous such investigations.

2.    I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, conversations I have had

with others about this matter, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the premises described below, I have not included herein the details of every aspect of the investigation.   Where actions, conversations and statements of others, and the contents of documents are related herein, they are related in substance and in part, except where otherwise indicated.

3.   I respectfully submit this affidavit in support of an application for warrants to search THE PREMISES KNOWN AND DESCRIBED AS THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK AND INSIDE THE LOCKED AND CLOSED ITEMS CONTAINED THEREIN (collectively, the "PREMISES").  As described further below, there is probable cause to believe the PREMISES contain evidence of the distribution of, and possession with intent to distribute, controlled substances, and conspiracy and attempts to do the same, in violation of 21 U.S.C. §§ 841 and 846 (the "TARGET OFFENSES"), committed by MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," and others known and

2

unknown (the "TARGET SUBJECTS").  Such evidence is expected to
be found, including the items set forth in Attachment B to the
Search Warrant.

4.   On December 9, 2014, a Grand Jury sitting in this
District returned an indictment against 11 defendants, including
the TARGET SUBJECTS, charging them and others with participating
in a conspiracy to distribute oxycodone that is centered in and
around the PREMISES. See United States v. MOSHE MIRILISHVILI, et
al., 14 Cr. 810, attached as Exhibit 1 and incorporated herein
by reference (the "Indictment").

## THE PREMISES

5.   I have personally observed the area near and around
PREMISES.  The PREMISES is a ground-floor medical office
attached to a residential building at 450 WEST 162nd STREET, in
the Manhattan, New York.  The outside entrance to the office,
which is on West 162nd Street, has a ramp that leads down to the
entrance way and a glass front window with a glass door.  The
PREMISES, which can be accessed by entering through the front
door, consists principally of a large front waiting area with
seating for approximately 20 individuals, a reception desk
station on the left, bathroom facilities to the right, the
private medical office of the physician across the room from the
reception desk, past reception station and to the left is a

3

physical therapy room and finally a smaller back room which
contains a rear exit to the office space.

## PROBABLE CAUSE

### The Investigation

6.    Probable cause to search the PREMISES is extensively
described in the Indictment.  See Exhibit 1.  The Indictment was
obtained after an 23-month investigation by the DEA and NYPD,
which has involved the use of cooperating witnesses, cooperating
sources, and confidential informants, as well as extensive
surveillance by law enforcement.  The information below is based
on my participation in this case, including conversations with
other law enforcement officers, review of consensual records,
and debriefings of confidential witnesses, sources and
informants, who have provided reliable information that has been
corroborated by law enforcement.

7.    As described more fully in the attached Indictment,
Oxycodone is a highly addictive, prescription-strength narcotic
used to treat severe and chronic pain conditions.  Every year
more than 13 million Americans abuse oxycodone, with the misuse
of prescriptions painkillers such as oxycodone leading to as
many as 500,000 annual emergency room visits.  Oxycodone
prescriptions have enormous cash value to street level drug
dealers, who can fill the prescriptions at most pharmacies and

4

GEN_0000028

resell the resulting pills at vastly inflated rates.  Indeed, a single prescription for 90 30-milligram oxycodone pills has an average resale value in New York City of $2,700 or more.

8.       From approximately January 2012 until December 2014, the drug distribution ring operated at various purported medical clinics in Manhattan and the Bronx, including the PREMISES, which is the office of MOSHE MIRILISHVILI (the "Clinic").  At the PREMISES, MIRILISHIVILI, a Board certified, state licensed doctor, wrote thousands of medically unnecessary prescriptions for large quantities of oxycodone in exchange for cash payments.  MIRILISHVILI typically charged $200 in cash for "patient visits" that typically involved little, if any, actual examination and almost always resulted in the issuance of a prescription for a large quantity of oxycodone, typically 90 30-milligram tablets.

9.       Virtually none of these "patients" had any medical need for oxycodone, nor any legitimate medical records documenting an ailment for which oxycodone would be prescribed.  Instead, most of these individuals were members of "crews" – that is, they were recruited and paid by high-level drug traffickers (the "Crew Chiefs"), to pose as "patients" in order to receive medically unnecessary prescriptions.  The Crew Chiefs then obtained these prescriptions and arranged for them to be

5

filled various pharmacies so that the oxycodone pills thereby obtained could be resold on the streets of New York.

10.    Various Clinic employees participated in and profited from the scheme, charging Crew Chiefs cash fees for scheduling "patient visits" necessary to obtain these oxycodone prescriptions (the "Office Staff").   The Office Staff also profited by creating fake documents such as MRI reports purporting to reflect injuries or urinalysis reports ostensibly documenting that the patient was taking rather than selling the oxycodone, all of which MIRILISHVILI would frequently request in an effort to evade detection by law enforcement.

11.    To maximize their profits, many of the Crew Chiefs involved in this scheme also sent their "patients" to see other doctors operating out of similar fraudulent medical clinics, including a clinic on Southern Boulevard in the Bronx, New York and a clinic in Upper Manhattan.   Between January 2012 and the present, doctors at these clinics wrote more than 35,000 oxycodone prescriptions, virtually none of them medically necessary, and resulting in the unlawful distribution of millions of oxycodone tablets.

12.    In total, between October 2012 and December 2014, MIRILISHVILI wrote more than 13,000 medically unnecessary prescriptions for oxycodone, comprising nearly 1.2 million

6

GEN_0000030

oxycodone tablets with a street value of $36,000,000 or more.
MIRILISHIVILI collected more than $2.6 million in fees for
"doctor visits" during this time period.

### THE PREMISES

13.   As described above and detailed further in the
Indictment, the TARGET SUBJECTS and others known and unknown,
conspired to distribute more than 1.2 million pills of the
Schedule II controlled substance oxycodone, a highly addictive
pain medication.   The operations of the distribution ring
comprised of the TARGET SUBJECTS and others were centralized at
PREMISES, which, as described above, was a purported pain
management clinic.

14.   The PREMISES bears little resemblance to a standard
medical office.   See the photograph attached as Exhibit 2.   On a
daily basis, crowds of people gather outside the PREMISES,
clamoring to see the Doctor and thereby get a prescription for
oxycodone.

15.   At various times relevant to this Indictment, MOSHE
MIRILISHVILI, the defendant, oversaw the day-to-day operations
at the Clinic, including hiring and supervising the Office
Staff, and collecting the thousands of dollars in cash payments
the Clinic received daily.   As the Clinic's sole licensed
practitioner, MIRILISHVILI saw all of the Clinic's "patients" –

7

dozens of individuals each day, many of them Crew Members working at the direction of Crew Chiefs – personally collecting a $200 cash fee from each of these "patients" before writing each of them an identical prescription for 90 30-milligram oxycodone tablets.  Indeed, MIRILISHVILI was so dependable, the Clinic was referred to by co-conspirators as the "90 spot." Between in or around October 2012 when MIRILISHVILI first opened the Clinic and in or around December 2014, MIRILISHVILI wrote nearly 14,000 oxycodone prescriptions, averaging more than one hundred prescriptions a week, and writing as many as 46 identical 90-tablet prescriptions in a single day.

   16.  At various times relevant to this Indictment, DAMON LEONARD and JOMARIS JAVIER, the defendants, held various titles, including "office manager," at the Clinic.  LEONARD and JAVIER both used their roles as Office Staff to control access to MIRILISHVILI and the medically unnecessary prescriptions he wrote, reaping thousands of dollars themselves by charging Crew Chiefs cash fees – typically several hundred dollars or more – to generate fake MRI reports, fake urinalysis reports, or otherwise facilitate "patient visits" so that the Crew Chiefs could obtain and then fill medically unnecessary prescriptions.

   17.  As detailed in Exhibit 1, a substantial portion of the illegal activities related to the narcotics conspiracy charged

GEN_0000032

in the Indictment is centered in and immediately around the PREMISES. Examples include, but are not limited to, the following:

        a.   On or about January 16, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote a prescription for a confidential source ("CS-1") who was posing as a "patient" and had no medical need for oxycodone.   During this "patient visit" CS-1 informed MIRILISHVILI that he/she had "no pain" and then handed MIRILISHVILI $200 in cash before receiving, in return, a prescription for 90 30-milligram oxycodone tablets.

        b.   On or about February 20, 2014, CS-1 returned to the Clinic in New York, New York and provided $400 in cash to JOMARIS JAVIER, the defendant, as payment for assistance in obtaining "patient visits" with MIRILISHVILI, like the one on January 16, 2014, as described above.

        c.   On or about January 20, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote 46 prescriptions for oxycodone in a single day, each for 90 30-milligram oxycodone tablets.

18.  Based on my training and experience, my personal participation in this and other investigations involving illegal drug activity, and conversations with other law enforcement

GEN_0000033

officers who are knowledgeable of drug-trafficking investigations, I know that:

    a.   Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, money counters, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

    b.   Drug traffickers routinely conceal in their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions. It is also common for drug traffickers to maintain at the same

10

locations papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

      c.   It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, packaging materials, cutting agents, pots, dishes and other containers for preparing controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

      d.   Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization, as well as telephone answering machines, electronic calendars and address/telephone devices. These individuals often utilize telephones, including cellular telephones, to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers, and electronic devices are often found in places used by drug traffickers to conduct their drug distribution activity;

      e.   Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their

11

places of residence, or the residences of family members,
friends or associates, in their business locations, or in the
places used by drug traffickers to conduct their drug
distribution activity;

   f.    Drug traffickers often own, possess and use
weapons to facilitate their illegal drug trafficking activities.
These weapons are most often secreted in their places of
residence, or the residences of family members, friends or
associates, in their business locations, or in the places used
by drug traffickers to conduct their drug distribution activity;

   g.    Drug traffickers often use safe deposit boxes to
amass, retain and conceal their illegal proceeds to avoid
detection.  Deposits to bank accounts create an accessible
record of deposits, withdrawal and transfer of funds and banks
are required to report cash transactions in excess of $10,000 to
the Internal Revenue Service.  Safe deposit boxes, which are
readily accessible to drug traffickers, provide a "safe haven"
for illegal drug proceeds where there is no such accounting; and

   h.    Computer hardware, software, documentation,
passwords, data security devices, and data may be integral tools
of narcotics trafficking and money laundering and may constitute
the means of committing these and other crimes.  Traffickers
often keep computers and computer related equipment in their

12

homes, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, mills, or safe houses and utilize the equipment to keep detailed records of their narcotics transactions.  Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking.  In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

## PREMISES TO BE SEARCHED AND EVIDENCE TO BE SEIZED

19. Based on the foregoing, my involvement in this investigation, and my training and experience, it is my belief that there is probable cause that the PREMISES has been and is continuing to be used to store instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 841 and 846, including, but not limited to, controlled

13

substances, narcotics proceeds, ledgers, patient files, prescriptions for controlled substances, driver's licenses and other identification documents, and other items listed in ATTACHMENT B.

20.   Based on my training, experience, participation in other investigations concerning narcotics trafficking, and discussions with other law enforcement agents, I know that individuals who distribute narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in ATTACHMENT B in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.  This warrant and search procedures specifically include a search of any closed containers or cabinets, including doors to rooms within the PREMISES, locked or unlocked, found within the PREMISES.

21.   Based on my training and experience, and based on conversations that I have had with other agents, I am familiar with the practices and methods of persons who prescribe narcotics outside the course of professional practice and their reliance on computer technology, including laptop computers, to commit this criminal offense. Such individuals often create and maintain false records relating to hide their criminal conduct,

14

including correspondence, invoices, medical records, bank account and financial information, and the names of victims and coconspirators, on electronic databases on computers or internet or cloud-based storage depots, stored in electronic or magnetic form. Furthermore, users of computer equipment often create and maintain records of computer ownership and subscriptions to Internet services. Based on this information, and on the facts set forth above, there is probable cause to believe that computer-related equipment containing evidence of the crimes described above will be found at the PREMISES.

22.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data may remain on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or unallocated space - that is, in space on the hard drive that is

15

GEN_0000039

not allocated to an active file or that is unused after a file
has been allocated to a set block of storage space - for long
periods of time before they are overwritten. In addition, a
computer's operating system may also keep a record of deleted
data in a "swap" or "recovery" file. Similarly, files that have
been viewed via the Internet are automatically downloaded into a
temporary Internet directory or "cache." The browser typically
maintains a fixed amount of hard drive space devoted to these
files, and the files are only overwritten as they are replaced
with more recently viewed Internet pages. Thus, the ability to
retrieve residue of an electronic file from a hard drive depends
less on when the file was downloaded or viewed than on a
particular user's operating system, storage capacity, and
computer habits.

23.  Based upon my training and experience and information
related to me by agents and others involved in the forensic
examination of computers, I know that computer data can be
stored on a variety of systems and storage devices including
hard disk drives, floppy disks, compact disks, thumb drives,
magnetic tapes and memory chips. I also know that during a
search it is not always possible to search computer equipment
and storage devices for data for a number of reasons, including
the following:

GEN_0000040

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it

17

will be highly impractical to search for data during the execution of the physical search of a site containing a computer system and/or storage devices. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 250 million pages of data, which, if printed out, would result in a stack of paper over ten miles high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or 450,000 songs.

      d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can

GEN_0000042

conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file that cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it contains evidence, contraband or instrumentalities of a crime.

24. In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence described.

25. Based upon my experience, training, and conversations with other law enforcement agents, I know that persons who commit the TARGET OFFENSES frequently have records of their activities and items that enable them to conduct their activities, including but not limited to the items described in Attachment B, attached hereto.

26. This warrant and search procedures specifically exclude a search of any kind of unopened electronic mail. No

19

search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause.

27.   In light of the confidential nature of the continuing investigation, the Government respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued, authorizing the search and seizure of the items listed in Attachment B, all of which constitute evidence of violations of Title 21, United States Code, Sections 841 and 846.

VICTOR LEBRON, Detective
New York City Police Department
DEA Task Force Officer

Sworn to before me this
10th day of December 2014

THE HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

20

# EXHIBIT 1

GEN_0000045

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :        SEALED
                                                     INDICTMENT
          - v. -                            :
                                                     14 Cr.
MOSHE MIRILISHVILI,                          :
DAMON LEONARD,
JOMARIS JAVIER,                              :
RAY WILLIAMS,
     a/k/a "Obama,"                          :       14 CRIM 810
DORIAN AVERY,
     a/k/a "Bo,"                             :
TASHEEN DAVIS,
     a/k/a "Hollywood,"                      :
GANEENE GOODE,
     a/k/a "Big Gina,"                       :
THOMAS WHITE,
     a/k/a "Black,"                          :
CAROLYN MIDDLETON,
JOSEPH GRAY,                                 :
     a/k/a "Dogs,"
KEVIN FRYE,                                  :
     a/k/a "Pretty Kev,"
     a/k/a "PK,"                             :

               Defendants.                   :

- - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Distribute Narcotics)

     The Grand Jury charges:

### Introduction

     1.   From in or about January 2012, up to and
including in or about December 2014, in the Southern District of
New York and elsewhere, MOSHE MIRILISHVILI, DAMON LEONARD,
JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a

"Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendants, and others known and unknown, conspired to distribute more than a million pills of the Schedule II controlled substance Oxycodone, a highly addictive pain medication available by prescription only.

2.   As detailed further below, the scheme was centered at purported medical offices in Manhattan and the Bronx, including the office of MOSHE MIRILISHVILI, the defendant (the "Clinic"), where MIRILISHIVILI, a Board certified, state licensed doctor, wrote thousands of medically unnecessary prescriptions for large quantities of oxycodone in return for cash payments.  Once written, these prescriptions were then filled at pharmacies by other co-conspirators who, in turn, resold and distributed these illegitimately and unlawfully obtained oxycodone tablets at significantly inflated prices.

3.   In total, between in or around October 2012 and in or around December 2014, MOSHE MIRILISHVILI, the defendant, wrote more than 13,000 medically unnecessary prescriptions resulting in the unlawful distribution of nearly 1.2 million oxycodone tablets and for which MIRILISHVILI collected nearly $2.6 million in cash payments.

GEN_0000047

## BACKGROUND ON OXYCODONE

4.    Oxycodone, a highly addictive, narcotic-strength opioid is used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.  Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in 5 to 30 milligram tablets to patients.

5.    Every year more than 13 million Americans abuse oxycodone, with the misuse of prescription painkillers such as oxycodone leading to as many as 500,000 annual emergency room visits.  As a result, the distribution of oxycodone is heavily regulated.  For example, prescriptions for oxycodone cannot exceed a 30-day supply, and cannot allow for "refills." Instead, a patient who has exhausted his or her initial prescription must see his or her doctor again each month and be re-evaluated before obtaining a new prescription from the doctor.  Similarly, to curb any potential for abuse, pharmacies are required to track and report all prescriptions filled for oxycodone, and by law, no patient is supposed to be able to fill a prescription for oxycodone more than once every 30 days, even if written by a different doctor.

3

6.    Oxycodone prescriptions have enormous cash value to drug dealers.  Oxycodone prescriptions can be filled at virtually any pharmacy and the oxycodone tablets can then be resold on the street for thousands of dollars.  For example, thirty milligram oxycodone tablets have a street value of approximately $30 per tablet in New York City, with prices ranging even higher in other parts of the country such as Massachusetts, Vermont, and Maine.  In other words, a single prescription for 90 30-milligram tablets of oxycodone can net the distributor $2,700 in cash or more.

### THE SCHEME TO DISTRIBUTE OXYCODONE

7.    The defendants charged herein collectively made millions of dollars through a scheme to write and fill thousands of medically unnecessary prescriptions for oxycodone, before reselling those unlawfully obtained pills at high prices to individuals addicted to oxycodone, among others.

8.    Essential to this illegal distribution conspiracy are corrupt, Board certified, state licensed doctors like MOSHE MIRILISHVILI, the defendant, who, in exchange for cash, was willing to write medically unnecessary prescriptions for large quantities of oxycodone.  MIRILISHVILI operates out of a purported medical office – *i.e.*, the Clinic – and charges cash fees for his participation in the scheme.  Specifically, MIRILISHVILI typically charges approximately $200 in cash –

4

GEN_0000049

insurance is rarely, if ever, accepted – for "doctor visits"
that usually involve little physical examination and almost
always result in the issuance of a prescription for large doses
of oxycodone, typically 90 30-milligram tablets.  To protect
against the possibility of detection by law enforcement,
MIRILISHVILI sometimes asks the "patients" for medical
documentation, such as MRI reports, purporting to document
injuries, or urinalysis reports purporting to show that the
"patient" was taking oxycodone (and thus not obtaining it for
the purpose of distribution).  As discussed below, fake MRI
reports and urinalysis reports were sold by members of the
conspiracy to "patients," typically inside or nearby the Clinic.

        9.    The Clinic attracts a high volume of "patients,"
who came to see MOSHE MIRILISHVILI, the defendant, and to get a
prescription for oxycodone.  The overwhelming majority of these
individuals have no medical need for oxycodone, nor any
legitimate medical record documenting an ailment for which
oxycodone would be prescribed.  Instead, most of these
individuals were members of "crews" (the "Crew Members") – that
is, they were recruited and paid by large-scale oxycodone
distributors (the "Crew Chiefs") to pose as "patients" in order
to receive medically unnecessary prescriptions from
MIRILISHVILI.

                                5

10.   To facilitate these visits, Crew Chiefs provide their Crew Members with the cash fees that MOSHE MIRILISHVILI, the defendant, requires, which, as noted are typically $200 per "patient," and after the Crew Members obtained a medically unnecessary oxycodone prescription from MIRILISHVILI, the Crew Chiefs then arrange for these Crew Member to fill the oxycodone prescription at a nearby pharmacy - that is to obtain the oxycodone tablets - which the Crew Chiefs then take possession of and ultimately resell.  Crew Members were paid by Crew Chiefs for their services and for obtaining and handing over the oxycodone tablets they obtained as a result of their visit to the Clinic.

11.   Crew Chiefs also paid certain of the Clinic's employees (the "Office Staff") hundreds of dollars in cash at a time to get their Crew Members into the Clinic to see MIRILISHVILI.  In particular, the Office Staff typically profited by selling fake MRI reports, urine samples or urinalysis reports to these "patients" and Crew Chiefs.  The Office Staff similarly profited by selling oxycodone prescriptions or loose pills directly to Crew Chiefs.  Many of these transactions occurred inside the Clinic.

### The Additional Clinics

12.   To maximize their profits, Crew Chiefs frequently sent Crew Members to see not only MOSHE MIRILISHVILI, the

GEN_0000051

defendant, but also other doctors who ran similar fraudulent
medical practices and who would similarly write medically
unnecessary prescriptions for large doses of oxycodone in
exchange for cash payments.  For example, many of the Crew
Chiefs who participated in this scheme also sent "patients" to a
similar fraudulent clinic on Southern Boulevard (the "Southern
Boulevard Office") where a doctor not named as a co-conspirator
herein ("DOCTOR-2") saw dozens of "patients" each day – many of
them Crew Members working for Crew Chiefs – before writing each
of these "patients" medically unnecessary prescriptions for a
large quantity of oxycodone.  Between June 2012 and January
2014, DOCTOR-2 wrote more than 17,000 oxycodone prescriptions,
averaging several hundred oxycodone prescriptions per week, and
writing as many as 126 oxycodone prescriptions in a single day.

        13.   Crew Chiefs participating in this scheme also
sent Crew Members to see another doctor not named as a defendant
herein ("DOCTOR-3") who ran a similar fraudulent medical
practice in Upper Manhattan (the "Doctor-3 Office").  As that
Office's sole licensed practitioner, DOCTOR-3 saw all of the
Office's "patients" – dozens of individuals each day, many of
them Crew Members working at the direction of Crew Chiefs –
before writing each of them a medically unnecessary prescription
for a large quantity of oxycodone.  Between in or around January
2012 and in or around December 2014, DOCTOR-3 wrote more than

                              7

15,000 oxycodone prescriptions, averaging more than one hundred
prescriptions a week, and writing as many as 59 oxycodone
prescriptions in a single day.

### The Defendants' Participation in the Drug Distribution Conspiracy

14.   As discussed in part above, a variety of
individuals played distinct roles in the conspiracy.

### The Mirilishvili Clinic

a.   At various times relevant to this Indictment,
MOSHE MIRILISHVILI, the defendant, was a licensed medical doctor
and the owner and operator of the Clinic, which is located on
162nd Street in Manhattan.  In that capacity, MIRILISHIVILI
oversaw the day-to-day operations at the Clinic, including
hiring and supervising the Office Staff, and collecting the
thousands of dollars in cash payments the Clinic received daily.
As the Clinic's sole licensed practitioner, MIRILISHVILI saw all
of the Clinic's "patients" – dozens of individuals each day,
many of them Crew Members working at the direction of Crew
Chiefs – personally collecting a $200 cash fee from each of
these "patients" before writing each of them an identical
prescription for 90 30-milligram oxycodone tablets.  Indeed,
MIRILISHVILI was so dependable, the Clinic was referred to by
co-conspirators as the "90 spot."  Between in or around October
2012 when MIRILISHVILI first opened the Clinic and in or around

8

GEN_0000053

December 2014, MIRILISHVILI wrote nearly 14,000 oxycodone prescriptions, averaging more than one hundred prescriptions a week, and writing as many as 46 identical 90-tablet prescriptions in a single day.

b.   At various times relevant to this Indictment, DAMON LEONARD and JOMARIS JAVIER, the defendants, held various titles, including "office manager," at the Clinic.   LEONARD and JAVIER both used their roles as Office Staff to control access to MIRILISHVILI and the medically unnecessary prescriptions he wrote, reaping thousands of dollars themselves by charging Crew Chiefs cash fees – typically several hundred dollars or more – to generate fake MRI reports, fake urinalysis reports, or otherwise facilitate "patient visits" so that the Crew Chiefs could obtain and then fill medically unnecessary prescriptions.

### The "Crew Chiefs"

c.   At various times relevant to this Indictment, RAY WILLIAMS, a/k/a "Obama," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which WILLIAMS then resold for profit.   While WILLIAMS and his Crew operated at multiple clinics, WILLIAMS was one of the most active Crew Chiefs operating at the Clinic, bringing in approximately 30 "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

GEN_0000054

d.   At various times relevant to this Indictment, DORIAN AVERY, a/k/a "Bo," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which AVERY then resold for profit.  AVERY and his Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, bringing approximately 20-30 "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

e.   At various times relevant to this Indictment, TASHEEN DAVIS, a/k/a "Hollywood," the defendant, was a Crew Chief who recruited and paid more than a dozen of her own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which DAVIS then resold for profit.  DAVIS and her Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, bringing more than a dozen "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.  As part of her participation in the scheme, DAVIS also frequently posed as a "patient" herself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from both MIRILISHVILI and DOCTOR-2, among others.

f.   At various times relevant to this Indictment, GANEENE GOODE, a/k/a "Big Gina," the defendant, was a Crew Chief

10

who recruited and paid more than a dozen of her own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which GOODE then resold for profit.  GOODE and her Crew operated at multiple clinics, including the Doctor-3 Office, the Southern Boulevard Office, and the Clinic, bringing more than a dozen "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

g.   At various times relevant to this Indictment, THOMAS WHITE, a/k/a "Black," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which WHITE then resold for profit.  While WHITE and his Crew operated at multiple clinics, including the Doctor-3 Office, the Southern Boulevard Office, and the Clinic, WHITE was one of the most active Crew Chiefs operating at the Clinic, bringing in approximately 30 "patients" a month to obtain medically unnecessary prescriptions from MIRILISHVILI.

h.   At various times relevant to this Indictment, WHITE was assisted by CAROLYN MIDDLETON, the defendant, who, among other things, helped WHITE bring his Crew Members into the clinics and assisted in transporting those Crew Members to area pharmacies so that their prescriptions could be filled and the pills obtained and resold.  MIDDLETON, who was paid by WHITE for her work, also posed as a "patient" herself, simultaneously

11

GEN_0000056

obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI, DOCTOR-2, and DOCTOR-3, among others.

   i. At various times relevant to this Indictment, JOSEPH GRAY, a/k/a "Dogs," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which GRAY then resold for profit.  While GRAY and his Crew operated at multiple clinics, including the Southern Boulevard Office and the Clinic, GRAY was one of the most active Crew Chiefs operating at the Clinic, bringing in more than 30 "patients" a month to obtain medically unnecessary prescriptions from MIRILISHVILI.  As part of his participation in the scheme, GRAY also frequently posed as a "patient" himself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI and DOCTOR-2, among others.

   j. At various times relevant to this Indictment, KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which FRYE then resold for profit.  FRYE and his Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, and FRYE also frequently posed as a

12

"patient" himself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI and DOCTOR-2, among others.

### STATUTORY ALLEGATIONS

15.  From in or about January 2012, up to and including in or about December 2014, in the Southern District of New York and elsewhere, MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree, together and with each other, to violate the narcotics laws of the United States.

16.  It was a part and an object of the conspiracy that MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

13

GEN_0000058

17.   The controlled substance that MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, conspired to distribute and possess with the intent to distribute was mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C).

<u>OVERT ACTS</u>

18.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   Between in or around August 2012 and in or around February 2013, in New York, New York, MOSHE MIRILISHVILI and RAY WILLIAMS, a/k/a "Obama," the defendants, spoke by phone approximately 19 times.  In each instance, MIRILISHVILI used his home phone to connect with WILLIAMS via a cellphone under WILLIAMS' control.

b.   On or about May 3, 2013 and May 28, 2013, at the Clinic in New York, New York and the Southern Boulevard Office in the Bronx, New York, respectively, TASHEEN DAVIS, a/k/a "Hollywood," the defendant, received medically unnecessary

14

GEN_0000059

oxycodone prescriptions written in her own name, for a total of 270 30-milligram oxycodone tablets in a single month.

c.   On or about May 6, May 14, and May 22, 2013, at the Clinic in New York, New York; the Southern Boulevard Office in the Bronx, New York; and the Doctor-3 Office in New York, New York, respectively, CAROLYN MIDDLETON, the defendant, obtained medically unnecessary oxycodone prescriptions in her own name written by MIRILISHVILI, DOCTOR-2, and DOCTOR-3 for a total of 420 30-milligram oxycodone tablets in a single month.

d.   On or about May 10 and May 24, 2013 at the Southern Boulevard Office in the Bronx, New York, and the Clinic in New York, New York, respectively, KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendant, obtained medically unnecessary oxycodone prescriptions in his own name written by DOCTOR-2 and MIRILISHVILI, for a total of 270 30-milligram oxycodone tablets in a single month.

e.   On or about June 17 and June 21, 2013 at the Southern Boulevard Office in the Bronx, New York, and the Clinic in New York, New York, respectively, JOSEPH GRAY, a/k/a "Dogs," the defendant, obtained medically unnecessary oxycodone prescriptions in his own name written by DOCTOR-2 and MIRILISHVILI, for a total of 270 30-milligram oxycodone tablets in a single month.

15

f.   In or around July 2013, in Queens, New York, MIRILISHIVILI caused a series of cash deposits totaling $195,800.00 to be made into an account under his control, representing funds collected by MIRILISHVILI at the Clinic that month in exchange for writing medically unnecessary oxycodone prescriptions.

g.   On or about October 2, 2013, at the Southern Boulevard Office in the Bronx, New York, FRYE participated in a physical attack on a co-conspirator not named as a defendant herein who was, at the time, a member of the Office Staff ("CC-1"), in retaliation for CC-1's refusal to allow FRYE's Crew Members, all posing as "patients," to cut the line to see DOCTOR-2.

h.   On or about January 16, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote a prescription for a confidential source ("CS-1") who was posing as a "patient" and had no medical need for oxycodone.   During this "patient visit" CS-1 informed MIRILISHVILI that he/she had "no pain" and then handed MIRILISHVILI $200 in cash before receiving, in return, a prescription for 90 30-milligram oxycodone tablets.

i.   On or about February 20, 2014, CS-1 returned to the Clinic in New York, New York and provided $400 in cash to JOMARIS JAVIER, the defendant, as payment for assistance in

16

obtaining "patient visits" with MIRILISHVILI, like the one on
January 16, 2014, as described above.

        j.   On or about January 20, 2014, at the Clinic in
New York, New York, MIRILISHVILI wrote 46 prescriptions for
oxycodone in a single day, each for 90 30-milligram oxycodone
tablets.

        k.   On or about May 15, 2014, in New York, New York,
GANEENE GOODE, a/k/a "Big Gina," the defendant, offered to sell
two prescriptions, including an oxycodone prescription, written
for "patients" in GOODE's Crew for $1,440 in cash.

        l.   On or about July 10, 2014, at the Clinic in New
York, New York, DAMON LEONARD, the defendant, told a cooperating
witness ("CW-1") that LEONARD works with DORIAN AVERY, a/k/a
"Bo," the defendant, and GRAY, among others, to get "patients"
in to see MIRILISHVILI.  During the same conversation, LEONARD
discussed the possibility of selling oxycodone tablets for $18
per pill.

        m.   On or about July 23, 2014, at the Clinic in New
York, New York, MIDDLETON and THOMAS WHITE, a/k/a "Black," the
defendant worked together to get "patients" in to see
MIRILISHVILI to obtain medically unnecessary oxycodone
prescriptions.

        n.   On or about September 11, 2014, at the Clinic in
New York, New York, LEONARD told CW-1 that AVERY was now working

17

more directly with JAVIER to get AVERY's "patients" in to see MIRILISHVILI.

      o.   On or about September 15, 2014, in and around the Clinic in New York, New York, LEONARD brokered the sale of 180 30-milligram oxycodone tablets – all of which were obtained pursuant to medically unnecessary prescriptions written for "patients" by MIRILISHVILI – for $3,240 in cash.

      p.   On or about September 16, 2014, in and around the Clinic in New York, New York, WILLIAMS discarded "patient" paperwork prepared by LEONARD and ostensibly documenting urine tests performed on these "patients" whom WILLIAMS had sent in to the clinic to obtain medically unnecessary oxycodone prescriptions from MIRILISHVILI.

      q.   On or about October 13, 2014, at the Clinic in New York, New York, WILLIAMS told CS-1 that LEONARD could get new "patients" in to see MIRILISHVILI if CS-1 had all of the "paperwork" in order.  During the same conversation, LEONARD confirmed to CS-1 that LEONARD would get new "patients" in and would not charge CS-1 for so doing because CS-1 was a friend of WILLIAMS.

      r.   On or about October 13, 2014, in New York, New York, WILLIAMS drove three of his Crew Members from the Clinic to a pharmacy on Webster Avenue in the Bronx, New York.

18

GEN_0000063

s.   On or about October 28, 2014, in New York, New York, DAVIS collected multiple Crew Members from the Clinic and drove them to local pharmacies so that their oxycodone prescriptions could be filled.

<u>FORFEITURE ALLEGATION</u>

19.   As a result of committing the controlled substance offense alleged in Count One of this Indictment, MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting or derived from any proceeds the defendants obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One of this Indictment.

<u>SUBSTITUTE ASSETS PROVISION</u>

20.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

a.   cannot be located upon the exercise of due diligence;

19

GEN_0000064

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 853)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

MOSHE MIRILISHVILI, DAMON LEONARD,
JOMARIS JAVIER, RAY WILLIAMS, a/k/a
"Obama," DORIAN AVERY, a/k/a "Bo,"
TASHEEN DAVIS, a/k/a "Hollywood,"
GANEENE GOODE, a/k/a "Big Gina," THOMAS
WHITE, a/k/a "Black," CAROLYN MIDDLETON,
JOSEPH GRAY, a/k/a "Dogs," and KEVIN
FRYE, a/k/a "Pretty Kev" a/k/a "PK,"

Defendants.

SEALED INDICTMENT

14 Cr.

(21 U.S.C. §§ 846 and 853.)

PREET BHARARA
United States Attorney.

A TRUE BILL

_____
Foreperson.

EXHIBIT 2

GEN_0000067



GEN_0000068

## ATTACHMENT A

The PREMISES to be searched are:

(1)   THE PREMISES KNOWN AND DESCRIBED AS THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK, AND LOCKED CONTAINERS LOCATED THEREIN.   The PREMISES is a ground-floor medical office located in a commercial building at 450 WEST 162 STREET, in the Bronx, New York.   The outside entrance to the office, which is on West 162nd Street, has a ramp that leads down to the entrance way and a glass front window with a glass door.   THE PREMISES, which can be accessed by entering through the front door, consists principally of a large front waiting area with seating for approximately 20 individuals, a reception desk station on the left, bathroom facilities to the right, the private medical office of the physician across the room from the reception desk, past reception station and to the left is a physical therapy room and finally a smaller back room which contains a rear exit to the office space.

GEN_0000069

ATTACHMENT B

Evidence to be searched and seized from THE PREMISES KNOWN AND DESCRIBED AS THE MIRILISHVILI CLINIC, LOCATED AT 450 WEST 162 STREET, NEW YORK, NEW YORK AND INSIDE THE LOCKED AND CLOSED ITEMS CONTAINED THEREIN:

Instrumentalities, evidence, and fruits of violations of 21 U.S.C. §§ 841 and 846, including:

(a) Any and all controlled substances, including, but not limited to, oxycontin and oxycodone, substances and mixtures containing oxycontin and oxycodone, traces of oxycontin and oxycodone, equipment used to package controlled substances, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

(b) Books, records, invoices, receipts, records of real estate transactions, patient files, bank statements and related records, passbooks, money drafts, money orders, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

(c) United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, and precious metals and other valuables used to purchase controlled substances or equipment used to manufacture controlled substances, or which represent the proceeds of criminal activity;

(d) Photographs, including still photographs, negatives, videotapes, surveillance video and equipment, film, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, assets and/or controlled dangerous substances;

(e) Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

2

(f)   Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales, baggies, pill counters, and glassines;

(g)   Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

(h)   Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any records or receipts pertaining to firearms and ammunition;

(i)   Cellular telephones and pagers, as well as any information contained therein; and

(j)   Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and video storage devices;

(k)   Records, of medical treatments and test, other records related to the patient care;

(l)   Notes and correspondence related to medical billing, equipment, and treatment related to the Clinic's practice;

(m)   Records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries, and reference materials;

(n)   Records, in whatever form, pertaining to accounts held with the Internet Service Providers or of internet use;

(o)   As used herein, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including audio recordings and electronic media;

(p)   In order to search for the items described above that may be maintained in electronic media, law enforcement

3

GEN_0000071

personnel are authorized to search, copy, image and seize the following items for offsite review:

1.  Any computer equipment and storage device capable of being used to commit, further or store evidence of the federal criminal offense of healthcare fraud;

2.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors,

3.  printers, plotters, encryption devices, and optical scanners;

4.  Any magnetic, electronic or optical storage device capable of storing data, such as floppydisks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

5.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

6.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

7.  Any physical keys, encryption devices, dongles and similar physical items that may be necessary to gain access to the computer equipment, storage devices or data;

8.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

9.  Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, and router configuration software.

4

## SEALING ORDER

Brooke E. Cucinella affirms as follows:

1.   I am an Assistant United States Attorney in the Office of Preet Bharara, United States Attorney for the Southern District of New York, and, as such, I am familiar with this matter and the instant application.

2.   In light of the confidential nature of the continuing criminal investigation, I respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, in order to avoid premature disclosure of the investigation, except that the Government may without further Order of this Court provide copies of the warrants and affidavits as need be to personnel assisting it in the investigation and prosecution of this matter, and may disclose these materials as necessary to

comply with discovery and disclosure obligations in any

prosecutions related to this matter.


Dated:      New York, New York
            December 10, 2014


                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

                    By:     _____
                              BROOKE E. CUCINELLA
                              Assistant United States Attorney
                              Southern District of New York

SO ORDERED:

_____
THE HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


                              2

GEN_0000074