UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

                   :

UNITED STATES OF AMERICA     :        14 Cr. 810 (CM)

                   :

      – v. –             :

                   :

MOSHE MIRILASHVILI, et al.    :

                   :

          Defendants.    :

                   :

-------------------------------------------------------X

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS OF DEFENDANTS MIRILASHVILI, DAVIS, AND GOODE**

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America

EDWARD B. DISKANT
BROOKE E. CUCINELLA
Assistant United States Attorneys
    - Of Counsel -

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                      :

UNITED STATES OF AMERICA        :        14 Cr. 810 (CM)
                                 :

        – v. –                :

                                 :

MOSHE MIRILASHVILI, et al.     :

                                 :

                Defendant.     :

---------------------------------------------------------X

### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS OF DEFENDANTS MIRILASHVILI, DAVIS, AND GOODE

The Government respectfully submits the following in opposition to the motions of

defendants Moshe Mirilashvili, Tasheen Davis, and Ganeene Goode, who, along with eight other

defendants have been charged with one count of conspiring to distribute oxycodone.

Mirilashvili moves principally to suppress the fruits of searches, conducted pursuant to search

warrants, of (1) his purported medical clinic located at 450 West 162nd Street (the "Clinic"), and

(2) his residence in Great Neck, New York, on the basis of a lone, allegedly misleading sub-

paragraph, in search warrant applications for both locations.   Davis moves principally to

suppress the fruits of a search, conducted pursuant to a contemporaneously executed consent-to-

search form, of her apartment at the time of her arrest, on the basis that her consent was coerced

and thus not voluntary.   Mirilashvili, Davis, and Goode additionally move for severance and for

a bill of particulars; and Davis moves for notice, pursuant to Rule 404(b), of any "uncharged

crimes" about which the Government intends to introduce evidence at trial, as well as disclosure

of all impeachment evidence at least 60 days before trial.  For the reasons set forth below, the motions should be denied as meritless or premature.[1]

## I.      BACKGROUND

### A.      The Charged Conspiracy and the Indictment

On December 11, 2014 Indictment 14 Cr. 810 (CM) was unsealed (the "Indictment").  As alleged in the Indictment, a copy of which is attached hereto as Exhibit A, the eleven named defendants are all alleged to have participated in a massive scheme to unlawfully obtain and then redistribute oxycodone, a highly addictive pain medication available by prescription only.   (Ex. A ¶ 1.)   The unlawful scheme was centered at purported medical offices in Manhattan and the Bronx, including the office Moshe Mirilashvili, the defendant – *i.e.*, the Clinic – where Mirilashvili, a Board certified, state licensed doctor, is alleged to have written thousands of medically unnecessary prescriptions for large quantities of oxycodone in return for cash payments.  (Ex. A ¶ 2.)   Specifically, on a daily basis at the Clinic, Mirilashvili wrote dozens of identical prescriptions for 90 30-milligram oxycodone tablets for essentially every "patient" who walked in the door and in return for $200 in cash.   (*Id.* ¶ 8.)  Indeed, over the course of the charged conspiracy, Mirilashvili wrote more than 13,000 prescriptions for oxycodone – all in the Clinic itself, where he also collected the $200 cash payment – and substantially all for identical dosages of oxycodone.  (*Id.* ¶ 3.)

---

[1] Defendants Jomaris Javier, Raymond Williams, a/k/a "Obama," and Damon Leonard have all sought, by letter motion, to join in all applicable motions filed by co-defendants. Because none of these additional defendants would appear to have standing to join in any of the motions to suppress the various searches, and since none has made any sort of particularized argument in support of severance, the Government believes they are only able to join insofar as certain defendants have sought early 404(b) notice and production of *Giglio* material and a bill of particulars.

Mirilishvili was not the only defendant alleged to have used the Clinic as a base of operations for unlawful activity.  As detailed more fully in the Indictment, most of the "patients" seen at the Clinic had no medical need for that oxycodone – indeed, many are were not "patients" at all but instead worked for large scale drug traffickers, or "Crew Chiefs," including defendants Tasheen Davis and Ganeene Goode – who operated at and around the Clinic and who recruited these individuals to pose as "patients," paid the $200 fee required by Mirilashvili, and then collected the prescriptions, once written, so that it could be filled and the pills ultimately resold.  (*Id.* ¶¶ 9-10.)

Additionally named as defendants in the Indictment were certain Clinic employees, including defendants Damon Leonard and Jomaris Javier, who are alleged to have collected hundreds of dollars in cash fees or bribes from Crew Chiefs, and generated fake MRI reports and related documents, all within the Clinic itself, to facilitate these sham "patient" visits.  (*Id.* ¶ 11.)

### B.     The Searches

On December 11, 2014, the Indictment was unsealed, and most of the named defendants were arrested and search warrants were executed on two locations – the Clinic, and Mirilashvili's personal residence, located at 320 East Shore Road, Apartment 5C, Great Neck, New York (the "Mirilashvili Residence").  Copies of the applications for those warrants, which were presented to and approved by two different magistrate judges in two different districts, are attached hereto as Exhibits B and C.

Within the Clinic, where defendant Damon Leonard was arrested on the morning of December 11, 2014, agents recovered various computers and surveillance video recordings, office paperwork, notebooks, and the like.

Within the Mirilashvili Residence, where Mirilashvili himself was arrested, agents recovered more documents and records relevant to the scheme, along with a number of computers believed to have been used by the defendant in furtherance of the scheme.   Agents also found more than $1.7 million in U.S. currency, all stored in a series of zip lock bags found in the defendant's bedroom and in second bedroom within the Residence.   Photographs of that currency are attached hereto as Exhibits D and E.

*        *        *

On December 11, 2014 defendant Davis was also arrested in her residence at 300 Park Street, Apartment 3A, Hackensack, New Jersey (the "Davis Apartment").  Consistent with the arresting agents' written reports of the search, copies of which are attached hereto as Exhibits F and G, and the factual affidavit submitted by Davis in connection with the instant motion, there is no dispute that agents knocked on the front door to the Davis Apartment, identified themselves as law enforcement, and informed Davis that they had a warrant for her arrest.  (*E.g.*, Ex. F ¶ 2; Davis Aff.  7-9.)  The agents, who did not have their weapons drawn and did not immediately place Davis in handcuffs, secured the Davis Apartment, and then presented Davis with a standard, DEA consent to search form, a copy of which is attached hereto as Exhibit H.  (Ex. F ¶ 2 ; Davis Aff. ¶¶ 8, 10.)  That consent form expressly stated, among other things, that "I have not been threatened, nor forced in any way" and that "I freely consent to this search."  (Ex. H)  Davis consented to the search and signed the form.   (Davis Aff. ¶ 13-14.)   During the ensuing search of the Apartment, agents recovered, among other things, a prescription for oxycodone written by a Dr. Hip-Flores of "Medical Associates of Central Jersey" from the defendant's living room coffee table and a green notebook from the defendant's bedroom.   (Ex. G; Nelson Aff. ¶¶ 16-17.)  Agents also took a photograph of a plastic bag of urine sample containers – the type used by

scheme participants to submit false and fraudulent "urine samples" – on Davis' kitchen counter. A copy of that photograph is attached as Exhibit I.

      **C.**      **The Pending Motions**

      On August 7, 2015, Mirilashvili filed a motion to suppress the fruits of the searches of the Clinic and the Mirilashvili Residence on the grounds of alleged "intentional and/or reckless material falsehoods in the affidavits" underlying the search warrants for both locations. (Mirilashvili Br. at 2.)  Specifically, Mirilashvili identifies just one alleged "material falsehood" – namely a subparagraph that appears in both affidavits and describes what the Government alleges to be a sham patient visit conducted by Mirilashvili in January 2014 and recorded by a confidential source (the "CS") posing as a "patient" at the direction of law enforcement. According to Mirilashvili, this sub-paragraph, while accurately representing that the CS (1) told Mirialshvili he had "no pain," (2) nonetheless got a prescription for oxycodone, and (3) paid $200 in cash directly to Mirilashvili for that prescription "purposefully omit[s] important context" including the facts that the CS visited Mirilashvili on multiple occasions, not just once; that during the initial visit, Mirilashvili determined that the CS had "pain in his lower back and extremities" for which the oxycodone was purportedly prescribed; and that during other visits Mirilashvil had discussed surgery and various forms of therapy.  (*Id.* at 5-6.)  Mirilashvili does not otherwise challenge any factual allegation in either affidavit – both of which contain substantial amounts of additional relevant facts and both of which attach and incorporate the returned Indictment – but contends the allegedly misleading nature of this lone sub-paragraph in both applications "fatally undermined the Magistrate Judge's finding of probable cause to conduct" both searches.  (*Id.* at 3.)

On August 20, 2015, defendant Davis filed a motion to suppress the fruits of the search of

the Davis Apartment.  While Davis cannot dispute that she signed a written consent form

authorizing the agents to conduct a search of the Apartment, Davis contends that consent was not

"voluntary" but was instead that she was "coerced" into signing the consent-to-search-form by

agents who allegedly told Davis that if she "cooperated the search would be quick and easy" but

if she did not consent they would "obtain a search warrant" and then "tear the apartment apart."

(Davis Aff. ¶ 12.)  Alternatively, Davis contends that even if voluntary given, the consent to

search did not extend to her bedroom, where the notebook was recovered, because she "did not

provide specific consent for the search of any containers, bags or bags containing private

documents contained within her bedroom."  (Nelson Aff. ¶ 18.)

Finally, one or more of the moving defendants seeks severance on the grounds that

statements of co-defendants, if offered at trial, would be unduly prejudicial, *see generally Bruton*

v. *United States*, 391 U.S. 123 (1968), or based on differences in the strength and nature of the

evidence to be offered against various defendants at trial.   Additionally, one or more of the

moving defendants seeks to a bill of particulars, and Davis moves for notice, pursuant to Rule

404(b), of any "uncharged crimes" about which the Government intends to introduce evidence at

trial, as well as disclosure of all impeachment evidence at least 60 days before trial.

## II.   DISCUSSION

### A.  The Davis Motion to Suppress

#### 1.  <u>Relevant Facts</u>

As detailed above, relatively few of the facts regarding the search of the Davis

Apartment, material or otherwise, are in dispute:  on December 11, 2014, approximately nine

federal agents appeared at the door to the Davis Apartment for the purpose of placing Davis

under arrest pursuant to an arrest warrant issued in this District.   The agents, who did not have their weapons drawn, knocked on the door, identified themselves as law enforcement and informed Davis that she was under arrest.  Agents then attempted to "sweep" or secure the Apartment, and brought the Apartment's two other occupants – the defendant's boyfriend, Kim Williams, and her 20-year-old son, Deshawn Davis, into the living room.   (Davis Aff.  ¶¶ 6, 10.)  The defendant, Williams, and Deshawn Davis were all taken to living room where, in "plain view" on the coffee table, agents could observe an oxycodone prescription written in the name of the defendant.  (Nelson Aff.¶ 27)

After securing the Apartment, one or two of the agents escorted Davis to the kitchen. (Davis Aff. ¶ 11. )  In the kitchen, those agents, who could at that point also observe a bag of plastic urine sample cups on the counter (*e.g.*, Ex. I), discussed with Davis a further search of the Apartment.   According to Davis, the agents informed her that if she did not consent to the search, they would obtain a search warrant.   Davis further alleges that that the agents stated that, if she did not consent, they would "tear the apartment apart."  (Davis. Aff.  ¶ 12.)

There is no dispute that, during this conversation in which the agents allegedly made the above statements, Davis was presented with a consent to search form which she signed.   On the form, the premises to be searched was described as the entire Davis Apartment, that is, as "300 Park Street, Apt. 3A, Hackensack, NJ," and Davis, in signing the form, acknowledged that "I have not been threatened, nor forced in any way" and that "I freely consent to this search." While Davis does not dispute that she, in fact, signed the form, she contends that she "does not *recall*" reading the form or "being advised of my right to refuse to consent to the search."  (Davis Aff. ¶ 13.)

8

After Davis signed the consent form, agents then proceeded to search the apartment which consisted of "a kitchen, dining room, living room and two bedrooms." (Davis Aff.¶ 6.) In the living room, as noted, agents recovered an oxycodone prescription written for Davis by a New Jersey-based doctor not named in the Indictment.  In Davis' bedroom, agents recovered a green notebook.

### 2.  Applicable Law

"It is well settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'" *United States* v. *Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (quoting *United States* v. *Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)).   In evaluating the voluntariness of the consent, courts consider multiple factors, including "the individual's age, intelligence and educational background, the length and nature of the questioning and whether the law enforcement officials engaged in coercive behavior."  *United States* v. *Jones*, 154 F. Supp.2d 617, 621 (S.D.N.Y. 2001) (citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226-27 (1973)).  Those factors, however, are merely guideposts because in evaluating voluntariness, courts look to the "totality of all the circumstances," *Schneckloth* v. *Bustamonte*, 412 U.S. at 227; *United States* v. *Peterson*, 100 F.3d 7, 11 (2d Cir. 1996); *United States* v. *Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) – and generally, no single factor will be sufficient on its face to merit a finding of involuntariness, *see Schneckloth*, 412 U.S. at 226-27.

The inquiry is guided by an "objective standard," and thus the ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search."  *United States* v. *Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (citations omitted); *see Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a

suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). "'[T]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken].'" *United States* v. *Garcia*, 56 F.3d at 422 (quoting *Florida* v. *Jimeno*, 500 U.S. at 249).

As noted, no single factor is typically sufficient to merit a finding of involuntariness. *See Schneckloth*, 412 U.S. at 226-27, and the Second Circuit has specifically rejected – as insufficient to vitiate the voluntariness of consent – the fact that a defendant was in custody or handcuffs at the time of the consent; that multiple officers were present or had their guns drawn; or that there law enforcement apprised a defendant of certain advantages of providing consent. *See, e.g.*, *United States* v. *Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (finding consent voluntary where apartment of defendant's girlfriend was forcibly entered by SWAT team, defendant and girlfriend were initially handcuffed, and law enforcement agents raised the possibility that they would take the two into custody and place the girlfriend's young daughter in protective custody); *United States* v. *Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (consent to search valid where defendant was arrested by five or six officers who had previously pulled their guns and placed the defendant in handcuffs); *United States* v. *Ceballos*, 812 F. 2d 42, 51 (2d Cir. 1987) (consent to search was voluntary where defendant forcibly arrested, given *Miranda* warnings, questioned for period of hours, told that the agents would obtain a search warrant if consent was not given, and offered low bail and help in retaining job before giving consent).

Critically, for present purposes, the Second Circuit has also repeatedly made clear that "advising a person of the fact that a search warrant can be obtained does not constitute coercion."

*United States* v. *Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983); *United States* v. *Tutino*, 883 F.2d 1125, 1137 (2d Cir. 1989) ("merely advising a person that a search warrant can be obtained does not constitute coercion); *United States* v. *Vasquez*, 638 F.2d 507, 528-29 (2d Cir. 1980) (noting that the Second Circuit "has upheld consent in circumstances where officers stated that they could apply for a warrant and would 'no doubt' obtain one," so long as there was no trickery or deceit by law enforcement agents in making the assertion).

    The Government must show that consent was voluntary by a preponderance of the evidence. *United States* v. *Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States* v. *Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).   However, a defendant seeking a hearing bears the burden of demonstrating – typically through an affidavit filed by a person with first-hand knowledge – that there are material facts in dispute, that is, facts which, if proven through a hearing, would require the granting of relief.   *United States* v. *Warren*, 453 F.2d 738, 743 (2d Cir. 1972); *United States* v. *Culotta*, 413 F.2d 1343, 1345-46 (2d Cir. 1969); *United States* v. *Dames*, 380 F. Supp. 2d 270, 276 (S.D.N.Y. 2005).

    **3.   Discussion**

    Here, as an initial matter, there is no dispute that the defendant provided consent – the defendant executed a written consent to search form, one that, by its terms, expressly applied to the entire Apartment.[2]   Instead, the defendant contends that consent was involuntary because the agents told her they would otherwise (1) obtain a warrant, and (2) "tear the apartment apart."[3]

------

[2] For these reasons, the defendant's argument that the search exceeded the scope of the consent is spurious.   The form plainly and unambiguously indicates that it applies to the entire Apartment, one which was not particularly large, and the defendant provides no reason – aside from the bare assertion to the contrary – why her own bedroom would be beyond the scope of that consent.   As the Supreme Court has long made clear, "[t]he standard for measuring the scope of a [defendant's] consent under the Fourth Amendment is that of 'objective'

Even assuming those allegations – the latter of which, in particular, the Government would contest at a Hearing – to be true, they are nonetheless insufficient to establish that the written consent was coerced rather than voluntarily given.   With respect to the former – *i.e.*, the agents' alleged statement that they would obtain a warrant – as noted above, it is well established that "advising a person of the fact that a search warrant can be obtained does not constitute coercion."  *United States* v. *Calvente*, 722 F.2d at 1023; *see also United States* v. *Tutino*, 883 F.2d at 1137 ("merely advising a person that a search warrant can be obtained does not constitute coercion); *Faruolo*, 506 F.2d at 495 ("The well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion."); *United States* v. *Todd*, 2013 U.S. Dist. LEXIS 19455, at *21-22 (S.D.N.Y. Jan. 28, 2013)(RJS) ("[T]he Second Circuit has repeatedly held that a statement by a government agent or law enforcement offer indicating that, absent consent, the government would obtain a search warrant, does not render the subsequent consent invalid, coerced, or involuntary.") (collecting cases).

---

reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991), here the agents had every reason to believe the consent form, once signed by the defendant, applied to the entire Apartment, and certainly to the defendant's bedroom which was an obvious area of interest and was, of course, within the Apartment.

[3] The defendant additionally alleges that she "do[es] not recall . . . being advised of my right to refuse to consent to the search."  (Davis Aff. ¶ 13.)   As an initial matter, "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness," *United States* v. *Garcia*, 56 F.3d at 422 23.  More important, thought, the claim is rendered implausible by the defendant's own Affidavit which, even if fully credited, is premised on the allegation that the agents presented her with *a choice* – either consent to search, in which case "the search would be quick or easy," or "refuse[ ] to consent" and the agents would then obtain a warrant.   Finally, the claim is contradicted by the form itself – one the defendant conveniently "do[es] not recall" reading before signing but which is prominently labeled a "*consent* to search" form expressly states that "I have not been threatened, nor forced in any way" and "I freely consent to this search."

In seeking to circumvent that substantial body of the law, the defendant, contends, in the instant motion, that the agents representation that they could obtain a warrant was "false." (Nelson Aff. ¶ 26.)   That assertion, however, is belied by other aspects of the defendant's own submission which itself highlights the fact that the agents had already observed "in plain view" a prescription for oxycodone which, in and of itself, "would certainly lead one to believe . . . that some form of incriminating evidence would be discovered" in the remainder of the Apartment. (*Id.* ¶ 27.)   Indeed, not only had the agents already observed the prescription, but agents had also already observed, in plain view in the kitchen, a bag of plastic cups used to provide urine samples – items for which Davis had no legitimate basis to possess, and themselves strong evidence of Davis' involvement in the charged conspiracy (Ex. I) – all of which would have led the agents to plausibly believe, at the time they provided the consent to search form to Davis, that they had a basis for seeking a search warrant had she not consented.[4]

With respect to the second allegation – *i.e.,* that the agents allegedly threatened to "tear the apartment apart" had Davis not consented – even if fully credited, is equally in insufficient in and of itself to render the ensuing consent invalid.   *See United States* v. *Porras-Quintero*, No. 07 Cr. 228 (RPP), 2007 U.S. Dist. LEXIS 94047, 2007 WL 4531552, at *8 (S.D.N.Y. Dec. 21,

---

[4] Davis additionally contends that the allegation was "false" because the Government, while obtaining search warrants for the Clinic and the Mirilashvili Residence, did not elect to obtain one for the Davis Apartment as well.  (Nelson Aff. ¶ 26.)  The argument overlooks the timing of the Government's discovery of probable cause to search the Davis Apartment.  While the Government does not dispute that it lacked probable cause to obtain a search warrant for the Apartment *before* the arrests – *i.e.*, at the time same it obtained warrants for the Clinic and the Mirilashvili Residence – the agents then discovered probable cause to obtain such a warrant once lawfully entering the Apartment to effect the arrest.  Indeed, as noted above, the defendant does not appear to dispute that the additional oxycodone prescriptions – written for the defendant and by yet another doctor than the three identified in the Indictment – would have given both Davis and the agents "reason to believe that some form of incriminating evidence would be discovered" in the rest of the Apartment.  (Nelson Aff. ¶ 27.)

2007) (holding that even if the court were to find that the police threatened "to detain" the defendant and to "destroy" his apartment if they had to get a search warrant, this alone would not make the granting of consent involuntary); *see also United States* v. *Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987) (holding that consent to search was voluntarily given by defendant even after the "agents forcibly removed [defendant] from his place of work in handcuffs[;]" "the agents sought to persuade Ceballos to consent to a search and to confess[;]" "[t]hey warned him of the disruption to his household of execution of a court-ordered search warrant[;]" and "[t]hey promised him aid in obtaining low bail and retaining his job if he cooperated"); *United States* v. *Wilkerson*, 76 Fed. Appx. 657 (6th Cir. 2003) (upholding a finding of voluntary consent when police stated they would "tear the car apart" meaning the car would be searched exhaustively); *United States* v. *Wilkinson*, 926 F.2d 22, 25 (1st Cir. 1991) (affirming district court finding that the officers' threat to "tear the place apart" amounted to "no more than a permissible promise to search the house thoroughly"), *overruled on other grounds*, *Bailey* v. *United States*, 516 U.S. 137 (1995); *cf. United States* v. *Bartee*, 2013 U.S. Dist. LEXIS 166366, 32-33 (S.D.N.Y. Nov. 12, 2013) (such "alleged 'threat[s]' to damage [the defendant's] property . . . are rarely dispositive of the issue of whether consent was given voluntarily" because "courts look to the broader context in which the statement[s] w[ere] made.")

That is particularly true given that the allegation here, even credited, is not accompanied by *any* additional facts or circumstances that would in favor of a finding of involuntariness. Certainly the defendant makes no argument that her "age, intelligence [or] educational background," weigh against a finding of voluntariness, nor does she suggest "the length and nature of the questioning" weighs in her favor. To the contrary, the defendant, a 37-year old adult clearly very capable of reading and writing in the English language, was taken into the

14

kitchen and away from family members and privately presented with a standard consent form by two agents, which she freely executed.  No guns were drawn; no threats of physical harm to the defendant or family members were made;[5] and the defendant was not even in handcuffs at the time the form was signed.  Indeed, the defendant was pulled away from her boyfriend and son so that she could discuss the consent to search form privately with several agents in her kitchen.  The defendant points no authority for the proposition that these facts would warrant a finding of coercion – even if the defendant's additional allegations, as detailed are fully credited – nor is the Government aware of any.

As such, the Government believes the motion can and should denied without a hearing.[6]

---

[5] The defendant does generally allege that she was concerned about the "safety of [my] son."  (Davis Aff. 17.)  It is not clear what the basis for this alleged fear is.  Her son, who is a 20-year old adult, was never placed under arrest, never threatened with arrest, and the defendant does not allege that the agents, in any way, suggested that her son would be affected in any fashion by her consent, or refusal to consent, to a search.

[6] In the alternative, should the Court believe a factual hearing to be necessary, the Government anticipates calling two of the agents involved in the arrest that day and who witnessed the defendant's execution of the consent-to-search form.  The Government anticipates these agents would testify, in substance, that no threats of any kind were made to the defendant who was provided with the consent to search form, which she reviewed, before executing it.  The Government further anticipates these agents would testify that the defendant's primary concern that day was not her son but her boyfriend, Kim Williams, for whom there was an outstanding warrant at the time and who thus provided the agents with a false name and identification card.  Williams was subsequently arrested by the local law enforcement agents and taken for booking in Hackensack, New Jersey.  A copy of that arrest report is attached hereto as Exhibit J.   As the report makes clear, the agents could detect the odor of marihuana and Williams then provided the agents with narcotics, all of which would have given the agents yet another reason to believe they had a basis for obtaining a search warrant.

**B.  The Mirilashvili Motion to Suppress**

**1.  Relevant Facts**

On December 10, 2014 a magistrate judge in the Southern District of New York

approved a search warrant for the Clinic.  On the same date, a magistrate judge in the Eastern

District of New York approved a search warrant for the Mirilashvili Residence.   Both affidavits

contained lengthy factual narratives detailing the background of the investigation, the grand

jury's indictment of Mirilashvili and ten co-defendants, and detailed factual allegations relevant

to the Government's position that there existed probable cause to search both locations.

**<u>The Clinic Application</u>**

 The application to search the Clinic, which is attached as Exhibit B, was approximately

20 pages long and attached a copy of the Indictment which had just been returned by a grand jury

in this District.  The application was sworn to by Det. Victor Lebron, one of the lead case agents

on the investigation, and was approved by the Honorable Ronald L. Ellis.

The application included, in addition to a detailed description of the premises, a brief

overview of the investigation which it noted spanned nearly two years and involved "the use of

cooperating witnesses, cooperating sources, and confidential informants, as well as extensive

surveillance by law enforcement."  (Ex. B ¶ 6.)  Moreover, it expressly noted that because the

affidavit did "not include[] . . . the details of every aspect of the investigation."  It further noted

that where "conversations and statements of others . . . are related . . . they are related in

substance and in part."  (*Id.* ¶ 2.)

As the application made clear, the Government's view of probable cause to search the

Clinic stemmed from the fact that "a substantial portion of the illegal activities related to the

Indictment [were] centered in and around" the Clinic.  (*Id.* ¶ 17.)  Specifically, and among other

16

things, the application alleged that Mirilashvili wrote thousands of medically unnecessary prescriptions for oxycodone at the Clinic; that Mirilashvili collected millions in cash payments, rather than the insurance typically used to cover medical costs, in return for these prescriptions at the Clinic; and that substantially every patient seen by the doctor received an identical prescription for 90 30-milligram oxycodone tablets, all at the Clinic.  (*Id.* ¶ 8.)  The affidavit further alleged that high-level drug traffickers, referred to as "Crew Chiefs," congregated at the Clinic on a daily basis, collecting many of the prescriptions being generated by Mirilashvili so that the pills could be resold.  Moreover, the affidavit attached the Indictment which identified at least 8 such "Crew Chiefs" and specifically alleged that each was involved in drug trafficking activities in and around the Clinic.  (*E.g.*, Ex A ¶¶ 14(c)-(j)).   Indeed, based on those facts, the affidavit alleged that the "operations of [this] drug distribution ring .  .  . were centralized at the" Clinic.  (Ex. B ¶ 13.)

 In addition to Mirilashvili and the Crew Chiefs, the application and accompanying Indictment also specified that members of the Office Staff were believed to be committing crimes in and around the Clinic.   For example, the application alleged that Mirilashvili's employees, and co-defendants in this case, "used their roles as Office Staff" to reap "thousands of dollars . . . by charging Crew Chiefs cash fees – typically several hundred dollars or more – to generate fake MRI reports, fake urinalysis reports, or otherwise facilitate" operation of the scheme.  (Ex. B ¶ 16.)

 The application then identified several examples of specific acts that had occurred in the Clinic.   Among others, the application highlighted a January 16, 2014 "patient" visit made by a CS in which, as alleged in the application, "CS-1 informed MIRILASHVILI that he/she had 'no pain'" but still received an oxycodone prescription after "hand[ing] MIRILASHVILI $200 in

cash."  (*Id.* ¶ 17(a)).   As another example – and as further evidence of the fraudulent nature of

this "patient visit" – the application alleges that several weeks later, CS-1 returned to the Clinic

and paid Mirilashvili's office worker, Jomaris Javier, $400 in cash for arranging for the patient

visit.  (*Id.* ¶ 17(b)).

The attached Indictment elaborated further on these acts, identifying numerous additional

bases for finding probable cause to believe the Clinic would contain evidence of the charged

crime.  For example, the Indictment alleged that "[t]he Office Staff . . . profited by selling

oxycodone prescriptions or loose pills directly to Crew Chiefs.  *Many of these transactions*

*occurred inside the Clinic*."  (Ex. A ¶ 11.)  The Indictment named eight Crew Chiefs, alleging

that each brought up to 30 "patients" each month to obtain medically unnecessary oxycodone

prescriptions at the Clinic.  (*Id.* ¶ 14(c)-(j)).

The Indictment also identified approximately nineteen specific acts in furtherance of the

conspiracy, virtually all of which were directly tied to the Clinic.   For example, the Government

identified specific dates on which particular Crew Chiefs obtained medically unnecessary

prescriptions at the Clinic; on which cash bribes were paid to the Office Staff at the Clinic in

return for assistance in obtaining medically unnecessary prescriptions; and on which defendants

offered to sell oxycodone pills and arranged narcotics transactions in and around the Clinic.

(*E.g.*, Ex. A ¶ 18(b)-(d); (i), (k) & (o).)

Based on the above, Magistrate Judge Ellis approved the warrant, which was executed on

December 11, 2014.

### The Mirilashvili Residence Search Warrant

The application to search the Mirilashvili Residence, which is attached as Exhibit C, was

approximately 20 pages long and also attached a copy of the Indictment which had just been

returned by a grand jury in this District.  The application was sworn to by Detective Matthew Del Rosario, and was approved by the Honorable Vera M. Scanlon, Chief Magistrate Judge in the Eastern District of New York.

Much as with the application to search the Clinic, this application also highlighted the length and scope of the investigation, and the fact that a grand jury in this District had just indicted Mirialshvili along with ten others for conspiring to distribute narcotics.  This application also expressly made clear that the affiant had "not included herein the details of every aspect of the investigation" and that "[w]here . . . conversations and statements of others . . , are related herein, they are related in substance and in part."  (Ex. C ¶ 2.)

The application began with a background section on the background of the investigation and included general background on the Clinic – a premises not a subject of this application – but which included some of the same factual allegations contained in the application for the Clinic, as described above.  Of particular relevance to the instant motions, this application included the January 16, 2014 visit by a "CS" to see Mirilashvili in which "CS-1 informed MIRILASHVILI that he/she had 'no pain'" but still received an oxycodone prescription after "hand[ing] MIRILASHVILI $200 in cash."   (*Id.* ¶ 16(a)).   As another example – and as further evidence of the fraudulent nature of this "patient visit" – the application alleges that several weeks later, CS-1 returned to the Clinic and paid Mirilashvili's office worker, Jomaris Javier, $400 in cash for arranging for the patient visit.  (*Id.* ¶ 17(b)).

With respect to the Residence itself, the affidavit focused on the Government's belief that Mirilashvili was likely storing crime proceeds and patient notes or files in the Residence, all of which would be evidence of the charged conspiracy.   These factual allegations, none of which

are challenged by the defendant, formed the basis of the Government's application with respect to the Residence.

For example, the affidavit noted based on debriefings of confidential sources, among other things, that "it was MIRILASHVILI's practice to place the cash fees he had collected from 'patients' in a small black bag, which he would then transport from the clinic to" the Residence. (*Id.* ¶ 17.)  The affidavit further noted that on multiple occasions over a six-month period, law enforcement agents had observed Mirilashvili transporting what appeared to be a bag of cash from the Clinic to the Residence.   The affidavit identified five specific such dates and included, as attachments, photographs of Mirilashvili taken by law enforcement conducting surveillance. (*Id.* ¶ 18(a)-(e)).

Based on the above, Chief Magistrate Judge Scanlan approved the warrant, which was executed on December 11, 2014.

### **The Investigation and the UC Visits**

As detailed in both applications, the Indictment, arrest, and search warrants were the result of a 23-month investigation that entailed the use of confidential sources, cooperating witnesses, and law enforcement surveillance.  As one component of that investigation, on approximately eight occasions, law enforcement sent a confidential source – identified in the applications as "CS-1" – into the Clinic, posing as a patient, to see Mirilashvili.  The first visit occurred on June 27, 2013, and CS-2 then returned on essentially a monthly basis for "follow up" visits on August 12, 2013; September 12, 2013; October 18, 2013; November 20, 2013; January 16, 2014; February, 25, 2014; and March 25, 2014.   On each occasion, CS-1 saw the defendant, paid $200 in cash, and received the same 90 tablet oxycodone prescription that every

other "patient" going into the Clinic received.[7]   Draft Transcripts of all but the last of these

visits are attached hereto as Exhibits K-Q.

　　　While the application highlighted just one of these visits as fraudulent, all bore

substantial indicia of fraud.  CS-1, of course, had no legitimate medical need for oxycodone, nor

had he obtained the appointment with the defendant through legitimate means—on the contrary,

as noted in the application, CS-1 obtained his appointments with Mirilashvili by bribing

individuals controlling access to the doctor, including members of the office staff, paying

Jomaris Javier, for example, up to $400 on various occasions in return for getting in.

　　　During the initial patent visit, which occurred on June 27, 2013, Mirilashvili opened the

appointment, before evening introducing himself, by demanding his payment.  "He has to pay for

the visit," Miriashvili said to his bouncer/security guard who was present and serving as a

Spanish-language interpreter.  Mirilashvili then asked CS-1 a series of questions about his

medical history, and, consistent with the instructions of law enforcement, CS-1 provided very

---

[7] On one occasion, in April 2014, agents used a second confidential source ("CS-2") to similarly pose as a patient and see Mirilashvili.  During that visit, which lasted approximately ten minutes, CS-2, like CS-1, received an identical, 90-tablet oxycodone prescription from Mirilashvili in return for a $200 cash payment.  However, for reasons unrelated to this investigation, CS-2's work was discontinued in the Spring of 2014 and thus the Government did not include, or in any way seek to rely, on CS-2's lone "patient" visit in either application.  While the Government believes the CS-2 visit was substantively similar to the visits by CS-1, even assuming the defendant could establish that it "legitimate visit," its exclusion would be of no particular relevance here because "evidence of noncriminal conduct" on some occasions "to negate the inference of criminal conduct [on others] is generally irrelevant." *United States* v. *Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. May 21, 2003) () (quoting *United States* v. *Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978)); *see also United States* v. *Scarpa*, 897 F.2d 63 (2d Cir. 1990) (surveillance tapes in which no incriminating statements were made not relevant because "[a] defendant may not seek to establish his innocence… through proof of the absence of criminal acts on specific occasions"); *United States* v. *Vilar*, 2007 WL 1075041, at *29-30 (S.D.N.Y. Apr. 4, 2007) (denying *Franks* motion in securities fraud case where Government omitted that some of the defendant's victims-investors were able to make profits off of the scheme because "there is no basis to believe that [these facts] were necessary to the probable cause determination").

basic answers that should have caused any legitimate doctor to inquire further.   Specifically, CS-1 told Mirilashvili he had general pain in his back and legs from falling during a basketball game approximately eight months earlier.   When Mirilashvili asked CS-1 if he was taking medication for the pain, CS-1 responded "M30" using a common street name for 30-milligram oxycodone tablets. *Cf. Sand*, Mod. Fed. Jury Instructions § 3-56 (listing "[u]sing street slang rather than medical terminology for the drugs prescribed" as a factor to be consider in evaluating legitimacy of physician's conduct").   Mirilashvili did not ask CS-1 where he was getting "M30s" from, what doctor was prescribing them, or why CS-1 was now seeing Mirilashvili for that medication when he presumably already had a prescribing doctor.   Mirilashvili also did not ask CS-1 what dosage he was currently taking, or how long he had been taking "M30s."   Instead, Mirilashvili purported to diagnose CS-1 with "chronic pain" and provided CS-1 with prescriptions for four kinds of powerful pain medication, including a prescription for 90 30-milligram oxycodone tablets.

CS-1 then returned to see Mirilashvili during a series of six follow up visits, including one on January 16, 2014.   These visits, each of which lasted approximately five minutes, bore additional indicia of fraud.  In each, Mirilashvili collects his $200 cash fee from CS-1 and provides CS-1 with a prescription for 90 30-milligram oxycodone tablets.  During each of these visits, Mirilashvili specially asks CS-1 whether he still has pain and the answer is the same each time – "no pain."   Notwithstanding those answers, CS-1 continued to receive the same prescriptions for the same quantities of medications.  Mirilashvili never reduced the dosage, nor does he stop writing oxycodone prescriptions.

Moreover, during these follow up visits, the perfunctory nature of what the defendant describes as "actual medical visits" becomes all the more apparent.   For example, despite the

fact that CS-1 tells Mirilashvili as of the second appointment in August 2013, that he has "no pain," Mirilashvili continues – for months thereafter – to open each patient the same way, by telling CS-1 that "When I saw him the last time, he was complaining of lower back pain, lower extremity pain."   That, of course, was not true.  Indeed, as of the January 2014 patient visit described in the Indictment – which Mirilashvili begins the same way – CS-1 had in fact been regularly telling Mirilashvili that he had "no pain" since August 2013.   Similarly, while as the defendant notes in the instant submission, Mirilashvili tells CS-1 in the initial visit in June 2013 that he needs to "*have surgery* as soon as possible" (Def. Br at 6), over the next eight months, CS-1 repeatedly tells Mirilashvili that he has not even seen a surgeon.   For example, in that January 2014 meeting – some six months after Mirilashvili ostensibly recommended surgery "as soon as possible" – CS-1 reports he still has not even seen a surgeon but has an appointment in "two months."  Mirialishvili, nonetheless continues to write prescriptions.  That information is clearly neither recorded by Mirilashvili, nor particularly important to him, because when he asks the same question in the February 2014 appointment, CS-1 tells Mirilashvili he has no appointment and does not intend to make one because "I'm waiting til I get vacation from work." At the end of this visit, Mirilashvili writes another 90-tablet oxycodone prescription.  Indeed, during the February 2014, Mirilashvili appears to forget about surgery altogether, telling CS-1 that all he has to do is "continue your medicine and your therapy to completely recover."

During some of these "patient visits," Mirilashvili also purports to conduct cursory physical exams.  Indeed, when subjected to even the slightest scrutiny, the troubling nature of these "examinations" becomes readily apparent.  For example, and notwithstanding a purported diagnosis of lower back and lower extremity pain, during an August 2013 patient visit, and notwithstanding CS-1's purported diagnosis of pain "below the waist," Mirilashvili asks CS-1 if

he is doing *hand* exercises.  Similarly, in a February 2014 visit, Mirilashvili appears to be examining CS-1's elbows.  Moreover, during at least some of these visits, including the January 2014 visit, Mirilashvili appears to write the prescription for oxycodone *before* conducting the cursory physical exam.

Additionally, during each visit, Mirilashvili focuses carefully on the pharmacy at which CS-1 will seek to fill the prescription, which changes from visit to visit.  *Cf. Sand*, Mod. Fed. Jury Instructions § 3-56 (listing sending "patients to fill prescriptions at different drug stores" as a factor to be considered in evaluating legitimacy of physician's conduct").  Indeed, the pharmacies selected by Mirilashvili for this "patient" would make no sense for any legitimate doctor or patient.  For example, notwithstanding the fact that CS-1 reports to live in Harlem, is seeing Mirilashvili at the Clinic on 162nd Street in Manhattan, and specifically asks Mirilashvili for a pharmacy in Manhattan, Mirilashvili sends CS-1 to a pharmacy in Queens.  During subsequent visits – visits in which CS-1 tells Mirilashvili he is too busy to do things like therapy or see a specialist – Mirilashvili subsequently transfers CS-1 to a pharmacy in lower Manhattan, south of Canal Street, and miles away from the Clinic and CS-1 reported home.

## 2.  Applicable Law

In deciding whether a search warrant is supported by probable cause, a court must determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States* v. *Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  "In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically."  *Id.*  A court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," *id.*, and must accord "considerable deference to the probable cause determination of the issuing magistrate," *Walczyk*

24

v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citing 462 U.S. 213, 238-39 (1983)).  So long as there

is a substantial basis for concluding that probable cause existed, "the resolution of doubtful or

marginal cases . . . should be largely determined by the preference to be accorded to warrants."

*United States* v. *Ventresca*, 380 U.S. 102, 109 (1965).

      A defendant seeking to challenge the validity of a warrant on the basis of alleged errors

or inaccuracies in the application faces a high bar.  *See generally Franks* v. *Delaware*, 438 U.S.

154, 155-156 (1978).   Pursuant to *Franks*, evidence will not be suppressed unless both "(1) the

claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless

disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the

[issuing] judge's probable cause finding.'" *Canfield*, 212 F.3d at 717-718 (citing *Franks*, 438

U.S. at 164-72).

      With respect to the first, the defendant bears the burden of establishing that "the claimed

inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard

for the truth."  *United States* v. *Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000); *see also Martin*,

426 F.3d at 73 (defendant must show that "the affidavit contained 'a false statement knowingly

and intentionally, or with reckless disregard for the truth.'") (quoting *Franks*, 438 U.S. at 156).

Moreover, because "every decision not to include certain information in the affidavit is

'intentional' insofar it is made knowingly," the "mere intent to exclude information is  . . .

insufficient," *Awadallah*, 349 F.3d at 67-68.  Instead, a defendant must demonstrate omissions

that "are designed to mislead, or that are made in reckless disregard of whether they would

mislead, the magistrate." *Awadallah*, 349 F.3d at 68.  Reckless disregard for the truth of

statements set forth in the warrant "may be inferred where the omitted information was 'clearly

critical' to the probable cause determination." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d

Cir. 1991).

With respect to the second prong – *i.e.*, the materiality of the allegedly false statement --

under *Franks*, materiality is "gauge[d] . . . by a process of subtraction: To determine if the false

information was necessary to the issuing judge's probable cause determination, *i.e.*, material, a

court should disregard the allegedly false statements and determine whether the remaining

portions of the affidavit would support probable cause to issue the warrant.  If the corrected

affidavit supports probable cause, the inaccuracies were not material to the probable cause

determination and suppression is inappropriate."  *Awadallah*, 349 F.3d at 64 (internal quoations

omitted); *see also Canfield*, 212 F.3d at 718; *see also Franks*, 438 U.S. at 171-172 ("If, when

material that is the subject of the alleged falsity or reckless disregard is set to one side, there

remains sufficient content in the warrant affidavit to support a finding of probable cause, no

hearing [to challenge the sufficiency of the affidavit] is required.")

The standard of probable cause applied to a warrant, once it has been stripped of the

alleged inaccuracies, or once omitted information is included, is the same practical standard

applied in other contexts.  That is, the warrant affidavit must be sufficient to provide a

"'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."

*Gates*, 462 U.S. at 233 (quoting *Jones* v. *United States*, 362 U.S. 257, 271 (1960)); *see also*

*United States* v. *Smith*, 9 F.3d 1007 (2d Cir. 1993); *Rivera*, 928 F.2d at 602.  "[T]he resolution of

doubtful or marginal cases in this area should be largely determined by the preference to be

accorded to warrants."  *Id.* at 602 (quoting *Ventresca*, 380 U.S. at 109).

The defendant bears the burden of establishing both components - *i.e.*, materiality and

intent - by a preponderance of the evidence.  *See United States* v. *Klump*, 536 F.3d 113, 119 (2d

Cir. 2008).  Making this showing is not an easy task because, as the Second Circuit has observed,

"[t]he *Franks* standard is a high one." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991). Moreover, to even be entitled to a hearing on a claim raised pursuant to *Franks*, a defendant must make a "substantial preliminary showing" on both *Franks* elements. *Id.*

### 3. Discussion

Here, no hearing on the pending motion is required because the defendant does not meet his burden of making a "substantial preliminary showing" with respect to either prong of the *Franks* standard.   With respect to the first prong of the *Franks* standard, and as an initial matter, the defendant does not dispute that the affidavit correctly documents that on CS-1 saw Mirilashvili on January 16, 2014; that during that visit, CS-1 told Mirilashvili he had "no pain"; that CS-1 paid Mirilashvili $200 in cash during that visit; and that CS-1 received an oxycodone prescription.   Instead, the defendant contends the affidavit "purposefully omit[s] important context" such as the fact that during prior encounters, the defendant had been told that "CS-1 had pain in his lower back and lower extremities" and that, during that meeting, CS-1 indicated he had "no pain" as a result of taking the oxycodone.   (Def. Br. at 4).

There is no question that, with respect to the January 2014 visit, both applications contain only a very brief summary of a longer encounter.   Indeed, as both applications make clear, representations of conversations are reproduced in "substance and in part" for the limited purpose of providing the reviewing magistrate judge with an overview of the investigation. However, that brief summary was not intended to mislead the reviewing magistrate judge.   It was instead intended to succinctly convey the substance of the encounter – namely, a "sham" patient visit in which a confidential source, with no legitimate need for pain medication, nonetheless received an oxycodone prescription, identical to those provided to every other "patient" of the defendant, in return for $200 in cash.

None of the "context" cited by the defendant with respect to that January 2014 visit undercuts the accuracy of that factual allegation.  For example, the defendant's brief suggests that the affiants "omitted" from the applications that fact that Mirilashvili  had been "told by CS-1 during prior appointments . . . that CS-1 had pain in his lower back and lower extremities," (Def.  Brief at 7.)   In fact, as of the January 2014 visit in question, CS-1 had been telling the defendant repeatedly since at least August – *i.e.*, for some five months – that he had *no* pain. Nonetheless, the defendant began the January 2014 visit – as he began every visit – by telling CS-1 that "[w]hen I saw him the last time he was complaining of lower back, lower extremity pain."  That, of course, was not true.  Omitting the defendant's own false statement thus could not have mislead the reviewing magistrate.  Similarly, the fact that CS-1 told Mirilashvili that he had "no pain" as a result of taking the medication ostensibly prescribed at the last visit, does not alter the fact that Mirilashvili continued to prescribe oxycodone month after month for a patient with "no pain" without making any effort to reduce the medication or wean the patient off of it.[8] That is particularly true in light of some of the other circumstances surrounding that visit, many of which are also included the affidavit, such as the fact that CS-1 was paying cash for the prescription, had no actual need for the medication, and was additionally paying Mirilashvili's office manager, Jomaris Javier, an additional $400 in cash just to make the appointment.

Nor does any of the other "context" cited by the defendant in the instant motion – namely the additional visits by CS-1 or statements made therein – undermine the accuracy of the representation in the affidavit that the January 2014 visit was fraudulent.   As discussed

_____

[8] To the contrary, the Government expects to call, at trial, one or more experts who will testify that it is unusual and generally outside of the accepted standard of care to have patients – let alone large numbers of patients -- on an essentially endless course of a high dosage oxycodone, particularly when their ostensive pain stems from nothing more than a fall during a basketball game.

extensively above, all of the additional visits by CS-1 to Mirilashvili bore significant indicia of fraud, beginning with an initial visit in which CS-1 tells the defendant he is already taking "M30s" obtained from an unidentified source, while paying cash to obtain a new prescription that he is then sent by the defendant to a pharmacy miles away in Queens to fill.   Moreover, and as discussed above, references to "referrals" or "surgery" during these visits appeared, at best, pretextual – while Mirilashvili did raise these topics in various visits, the answers CS-1 gave seemed irrelevant, and the defendant did not seem to record or even care about the answers provided to those questions.  Indeed, as detailed above, the defendant essentially asked the same series of questions during each brief visit, while not noticing (or caring) when CS-1 gave negative, or even different or contradictory answers.  Similarly, the brief "physical examinations" conducted by the defendant – in visits, that as noted, typically last about five minutes in total – seemed equally perfunctory and sometimes made no sense given the ostensive diagnosis.

In short, none of this "context" undermines the accuracy of the allegation in the Indictment – that the January 2014 visit by CS-1 was, at core, fraudulent.  Nor does it undermine the accuracy of the application as a whole – that is, that there was probable cause to believe that criminal activity was occurring in the Clinic.   The application alleges – and the defendant does not dispute – that crowds gathered every day at the Clinic, where the defendant accepted cash payments in return for writing identical prescriptions for 90 30-milligram oxycodone tablets for every patient who walked in the door, writing as many as 46 of these prescriptions in a single day.   The application alleges – and the defendant does not dispute – that blatant drug transactions were being negotiated and brokered within and immediately around that Clinic. The application alleges – and the defendant does not dispute – that high-level drug traffickers, or

"Crew Chiefs," congregated at the Clinic daily, and used it as base of operations for their drug trafficking activities.  And with respect to the Residence, in particular, the application alleges – and the defendant does not dispute – that he carried bags full of cash, earned from writing all of these prescriptions, home in one of his Mercedes each night.

That the defendant is likely to offer an innocent explanation for components of his conduct at trial does not render the Government's affidavit misleading.  *Cf. United States* v. *Fama*, 758 F.2d 834, 838 (2d Cir. 1985)  ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.").[9]  However, and critically in this regard, it bears mention that the Government *did* expressly disclose to both reviewing magistrates that (1) the defendant frequently took seemingly "legitimate" steps like requesting certain medical records during the course of the scheme, and (2) that "patients" frequently provided the defendant with fake and false information in response.   For example, in both applications, the Government noted that "The Office Staff . . . profited by creating fake documents such as MRI reports purporting to reflect injuries or urinalysis reports ostensibly documenting the patient was taking rather than selling the oxycodone, all of which Mirilashvili would frequently request in an effort to evade detection by law enforcement."   (Ex. B ¶ 10).   Similarly, in the Indictment, which was attached to both applications, the Government disclosed

---

[9]  It bears mention that substantially all of the defendant's arguments – which, as noted, focus effectively on a lone sentence in each of the two applications – center on an issue not before the reviewing magistrate, nor before the Court, namely whether the CS-1 recordings at issue, on their own, establish the defendant's guilt beyond a reasonable doubt.   That, of course, is neither a requirement for obtaining the warrant, nor a basis a vacating for suppressing its fruits. *Cf. United States* v. *Martin*, 426 F.3d 68, 76 (2d Cir. 2005) (reversing and calling it a "defect" to "conflate[] evidence of probable cause to sustain a warrant with proof of a prima facie case.") Instead, in crafting these applications and reviewing them, the issue was whether the Government's evidence, on the whole, established probable cause to search each *premises*.  *See id.* ("Simply put, probable cause is a 'relaxed standard,' not a legal determination of guilt or liability.") (quoting *United States* v. *Leon*, 468 U.S. 897, 958 (1984)).

that "to protect against the possibility of detection by law enforcement, MIRILASHVILI

sometimes asks the 'patients' for medical documentation, such as MRI reports purporting to

document injuries, or urinalysis reports purporting to show that the "patient" was taking

oxycodone and thus not obtaining it for the purpose of distribution."  (Ex. A ¶ 8.)   And with

respect to the CS-1 visit in January 2014, in particular, the applications specifically disclosed that

CS-1 was paying the defendant's employee $400 in cash to "facilitate" the visit.   To the extent

the defendant thus highlights aspects of the CS-1 visits in which he took purportedly "legitimate"

steps or was provided untrue information by the "patients" seeing him, there is no basis for

concluding that the affiants deliberately withheld that information.  To the contrary, that conduct

by the defendant was disclosed in both applications.

     As such, the Government submits the defendant has not met his burden of making a

"substantial preliminary showing" that the applications, considered as a whole, were drafted with

a reckless disregard for the truth or with the intention of deliberately misleading the magistrate.

Nor has he demonstrated that the affiants "omitted information was clearly critical to assessing

the legality of the search."   *United States* v. *Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal

quotation marks omitted).  That alone warrants denial of the motion without need for a hearing.

     However, the Court ultimately need not resolve that issue, because even assuming the

defendant could make such a showing with respect to the first prong, the motion would

nevertheless fail because the defendant makes no showing at all with respect to the second prong

of the *Franks* standard – that is, that the lone sub-paragraph at issue was "necessary" to the

probable cause determinations made by each magistrate.  Applying the applicable standard – that

is, "set[ting] to one side" the "material that is the subject of the alleged falsity or reckless

disregard" there can be no serious dispute that "there remains sufficient content in the warrant to

support a finding of probable cause," *Franks*, 438 U.S. at 171-172, and such "no hearing is

required," *id.* at 172, and "suppression is inappropriate," *Awadallah*, 349 F.3d at 64.[10]

Here, setting aside the lone sub-paragraph at issue, there is ample basis for concluding

that there "remains sufficient content in the warrant to support a finding of probable cause."

With respect to the Clinic, the remaining allegations still establish a long-running drug

distribution ring centered at the Clinic; that Mirilashvili had written nearly 14,000 identical

prescriptions for oxycodone in a two-year period, writing as many as 46 in a single day; the

defendant personally collected cash payments for substantially all of these prescriptions; that

drug-traffickers known as "Crew Chiefs" congregated at the Clinic on a daily basis; that

members of the Office Staff created false documents in the Clinic; and that various defendants

engaged in and brokered drug sales in and around the Clinic.  The application and attached

Indictment specified exact dates on which many of these activities occurred at the Clinic, over a

_____

[10] The defendant, at times, appears to suggest that the Court should, instead of subtracting the allegedly offending paragraph, consider how the application would have read "had the affiants provided in their affidavits a complete and honest account of CS-1's appointment with Dr. Mirilashvili and the relevant context contained in the other recordings."  (Def. Br. at 7). While *Franks* itself – which is the only case directly relied upon by the defendant – speaks only of the subtraction standard, the Second Circuit has recently noted, in collecting law from other Circuits, that "'the literal *Franks* approach [does not] seem[ ] adequate because, by their nature, omissions cannot be deleted'; therefore '[a] better approach . . . would be to . . . insert the omitted truths revealed at the suppression hearing,'" *United States* v. *Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States* v. *Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)). The *Rajaratnam* panel, however, did not have occasion to apply that standard, simply affirming the judgment below "for substantially the reasons stated in the District Court's analysis of the issue."  *Id.* at 157.

While the Government believes the governing standard remains one of subtraction as articulated in *Franks* itself, here, the outcome would be no different, because as detailed extensively above, the alleged "context" from the January recording and other recordings, even if included in full, is entirely consistent with a finding of probable cause to search the Clinic and Residence.  It certainly not would negate the abundant evidence of illegal activity at the Clinic, in particular, including the drug sales occurring and being arranged in the Clinic itself, the creation of false and fraudulent documents in furtherance of the conspiracy in the Clinic, and the like.

substantial period of time leading up to the application.  And the application attached a detailed

Indictment reflecting a Grand Jury's finding of probable cause to believe the eleven named

defendants were engaged in a drug-trafficking conspiracy "centered at" the Clinic.  The

defendant challenges none of these additional allegations, all of which amply established "a fair

probability that contraband or evidence of a crime will be found" in the Clinic.  *United States* v.

*Salameh*, 152 F.3d at 113; *cf. United States* v. *Travisano*, 724 F.2d 341, 346 (2d Cir. 1983)

(evidence supporting probable cause need not be overwhelming: "it is only a probability, and not

a prima facie showing of criminal activity, that is the standard for probable cause.").  Indeed,

aside from a bare conclusory assertion, the defendant advances no serious or detailed argument

to the contrary.

  With respect to the Mirilashvili Residence, the argument that the sub-paragraph in

question was "necessary" to the issuance of the warrant is even weaker, because that sub-

paragraph, while included in the general background section of the application, was not directly

relied on by the Government as probable cause for the Residence.  Instead, the Government

relied on information from sources, corroborated by agent surveillance, that the defendant was

transporting cash derived from his illegal activities at the Clinic to the Residence, along with

records of "patients" seen at the Clinic, all of which was, in fact, found at the Residence during

the search.  The application for the Residence detailed specific dates on which the defendant had

been observed traveling in one of his Mercedes from the Clinic to the Residence carrying a little

black bag used to store the cash on multiple occasions over a nearly six-month period leading up

to the search, including just days before the application was made.  As such, it is very clear that

even after removing the sub-paragraph regarding the January 2014 visit by CS-1, "the remaining

portions of the affidavit would support probable cause to issue the warrant" and thus the alleged

"inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Awadallah*, 349 F.3d at 64.   Once again, the defendant makes no serious or detailed argument to the contrary.

As such, the defendant has failed to make the required "substantial preliminary showing" that the allegedly inaccurate information was necessary to the probable cause determination on either application.  He therefore has not established his right to a hearing on the motion, let alone relief pursuant to it.

### C.  The Motions for Severance

Defendants Goode and Davis have moved for severance, and defendants Mirashivili, Javier, Williams, and Leonard have joined in the motion to the extent it inures to their benefit. Specifically, Davis seeks severance pursuant to *Bruton* v. *United States,* 391 U.S. 123 (1968), citing concerns about hypothetical post-arrest statements of co-defendants, and Goode seeks severance because of "the significant unfair and unjustifiable prejudice that she will face if she stands trial alongside her ten codefendants."  (Goode Br. at 5).  Because—as each of the defendants, to some extent, acknowledge—the motions for severance are premature at this time, they should be denied on that ground and revisited, as appropriate, closer to trial.

### 1.  Applicable Law

The Supreme Court has made plain that there is a "preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993). This preference reflects a settled precept in criminal law: joint trials "play a vital role in the criminal justice system." *Richardson* v. *Marsh*, 481 U.S. 200, 209 (1987).  They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210; *Zafiro*, 506 U.S. at 537.  Joint trials of defendants indicted

together also serve to "conserve prosecutorial resources, diminish inconvenience to witnesses, and avoid delays in the administration of criminal justice." *Richardson*, 481 U.S. at 217 (1987) (Stevens, J., dissenting).  The *Richardson* Court explained:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability ─ advantages which sometimes operate to the defendant's benefit.

*Id*. at 210 (footnote omitted).  Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." *United States* v. *Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).

The presumption in favor of joint trials is so strong that the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).  Indeed, "[t]he decision whether to sever multi-defendant trials is committed to the sound discretion of the trial court and is 'virtually unreviewable.'" *United States* v. *Lasanta*, 978 F.2d 1300, 1306 (2d Cir. 1992) (abrogated on other grounds) (quoting *United States* v. *Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991)).  A defendant seeking severance therefore shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial.  *United States* v. *Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks omitted).

"[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials"). Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211); *see also United States v. Freyer*, 333 F.3d 110, 114 (2d Cir. 2003).

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). *See also Freyer*, 333 F.3d at 114 (holding that joinder of defendants is "proper when the alleged acts are 'unified by some substantial identity of facts or participants and a common plan.'")(quoting *United States* v. *Attenasio*, 870 F.2d 809, 815 (2d Cir. 1989))); *United States* v. *Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." )

Even where evidence is admissible against only one defendant in a multi-defendant case, severance is not automatically granted. The Second Circuit has repeatedly recognized that "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance." *United States* v. *Carson*, 702 F.2d 351, 367 (2d Cir. 1983); *see also United States* v. *Losada*, 674 F.2d 167, 171 (2d Cir. 1982); *United States* v. *Lyles*, 593 F.2d

36

182, 190 (2d Cir. 1979).  Any spillover prejudice that may occur is generally corrected by the

Court's instruction that the jury consider the guilt of each defendant individually – an instruction

that jurors are presumed to be able to follow. *United States* v. *Potamitis*, 739 F.2d 784, 790 (2d

Cir. 1984); *see also Lasanta*, 978 F.2d at 1307 (2d Cir. 1992) ("[t]he district court countered any

possible spillover with specific instructions to the jury . . . that the jury should consider the

evidence separately against each defendant"); *United States* v. *Zackson*, 6 F.3d 911, 922 (2d Cir.

1993).

        **2.**       **Discussion**

In light of the above, while the Government ultimately believes severance may be

improper, given the need for a heavily fact-specific inquiry, the Government respectfully submits

that the motion for severance is, at this point, premature and should be denied as such.  As an

initial matter, the Government is actively engaged in plea discussions with many of the

remaining defendants and it is impossible to tell, at this point in time, which of the remaining

defendants will proceed to trial in February 2016.   As such, it is simply impossible at this point

to meaningfully assess (1) whether any post-arrest statements (of which there are few) would be

offered at trial, (2) whether any such statements pose any issues under *Bruton*, and (3) if so,

whether they are susceptible to redaction.   Indeed, even where such statements are offered, it is a

commonplace practice in this district (and a practice that has been repeatedly upheld by the

Second Circuit) to redact or make curative substitutions in co-defendant statements and

confessions that would otherwise implicate those concerns.  *See United States* v. *Tutino*, 883

F.2d 1125, 1135 (2d Cir.1989) (approving substitution of neutral words "others," "other people,"

and "another person" for names of co-defendants in confession of non-testifying defendant); *see*

*also, e.g.,  United States* v. *Yousef*, 327 F.3d 56, 149 (2d Cir.2003) (upholding redaction of co-

defendant's name to "my neighbor"); *United States* v. *Kyles*, 40 F.3d 519, 526 (2d Cir.1994) (upholding redaction of co-defendant's name to "he"); *United States* v. *Williams*, 936 F.2d 698, 701 (2d Cir.1991) (upholding redaction of co-defendant's name to "this guy"); *United States* v. *Benitez*, 920 F.2d 1080, 1087 (2d Cir.1990) (upholding redaction of co-defendant's name to "friend"). The Second Circuit recently reaffirmed this line of cases and this practice in *United States* v. *Jass*, 569 F.3d 47, 61 (2d Cir . 2009).

For substantially the same reasons, it is simply impossible to meaningfully evaluate at this point the risk of any other form of allegedly undue prejudice should one or more of the remaining defendants, including Goode, be tried with any of the others. Accordingly, the Court should deny defendants motions to sever at this time, and the issue should be revisited closer to trial.

### D. The Motions for a Bill of Particulars

Defendants Mirilashvili, Goode, and Davis have all moved for a bill of particulars, with Javier, Williams, and Leonard joining in the motion to the extent it inures to their benefit. Because the Government here has provided the defendants with ample notice of the nature of the charges against them through a detailed Indictment and extensive discovery, the motion for a bill of particulars is baseless.

### 1. Applicable Law

Federal Rule of Criminal Procedure 7(f) gives the Court the discretion to order filing of a bill of particulars in an appropriate case.[11]  The purpose of a bill of particulars is "to provide a

---

[11] Local Criminal Rule 16.1 states that "no motion addressed to a bill of particulars or any discovery matter shall be heard unless counsel for the moving party files in or simultaneously with the moving papers an affidavit certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion

defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added); *Mitlof*, 165 F. Supp. 2d at 569 ("The ultimate test must be whether the information sought is necessary, not whether it is helpful."). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

"The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (*quoting United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States* v. *Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994).  Moreover, "given that a bill of particulars confines the Government's proof to particulars furnished," a request for a bill of

---

without the intervention of the Court and has been unable to reach agreement."  While none of the moving parties here have complied with this requirement—and this failure, alone, provides a basis for denying defendants' motions, *see United States* v. *Ahmad*, 992 F.Supp. 682, 684–85 (S.D.N.Y. 1998), the Government nonetheless addresses the substantive arguments presented.

particulars should not be granted "where the consequence would be to restrict unduly the Government's ability to present its case . . . or permit the defendant to tailor her testimony to explain away the Government's case." *Id.* (citation omitted); *see also United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

In applying this guidance, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States* v. *Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial). Rather, "[i]f the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars in required. *United States* v. *Binday*, No. 12 Cr. 152, 2012 WL 6135013, at *11 (S.D.N.Y. Dec. 10, 2012) (citing *Bortnovsky*, 820 F.2d at 574 (2d Cir. 1987)); *see also United States* v. *Jimenez*, No. 10 Cr. 316 (VM), 2011 WL 308401, at *7 (S.D.N.Y. Jan. 28, 2011) (denying bill of particulars motion in narcotics conspiracy case because "the Superseding Indictment is straightforward, and, coupled with the discovery provided by the Government and ample time to review that discovery, 'discloses sufficient information to inform the defendants adequately of the charges against them'") (citation omitted).*see also United States* v. *Samsonov*, 2009 WL 176721, at *4 (denying bill of

particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *Henry*, 861 F. Supp. at 1198 ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

2. **Discussion**

Here, the defendants here have made no showing that a bill of particulars is either necessary or required under law.  The Indictment—a detailed, 20-page document— clearly identifies the nature of the charge, the time period, the key participants, and the central locations. With respect to each defendant, it carefully and in some detail identifies their role in the scheme, and in some cases, the names of specific co-defendants with whom they worked directly.   The Indictment further identifies approximately nineteen specific acts in furtherance of the conspiracy, including specific dates on which particular Crew Chiefs obtained medically unnecessary prescriptions at the Clinic; dates on which cash bribes were paid to the Office Staff at the Clinic in return for assistance in obtaining medically unnecessary prescriptions; and dates on which defendants offered to sell oxycodone pills and arranged narcotics transactions in and around the Clinic.  While every transaction is not detailed in the Indictment, certainly the means and methods by which the conspiracy worked, and the key participants, along with core dates and locations are clearly detailed in the Indictment.

Moreover, the information contained in the Indictment has been supplemented by vast, organized discovery that the Government has produced and assisted the defendants in navigating. Specifically, the Government has produced state records documenting precise dates and locations at which each defendant obtained and filled prescriptions; thousands of surveillance photographs

(generally organized by defendant) in which the defendants are shown associating with other conspirators; recordings produced by date and participant in which certain defendants engage in narcotics transactions or narcotics-related discussions; phone records identified by defendant, along with the full contents of phones recovered from certain defendants, again identified by defendant; as well as all of the documents recovered from the Clinic and Mirilashvili residence. With each of these productions the Government has summarized the materials being provided and has additionally worked, with any attorney who has asked – including the attorneys for defendants Goode and Davis, in particular – to help them identify the most relevant materials to their client.  And of course, the Government remains happy to continue working with any defense attorney who seeks additional guidance in navigating the materials provided through discovery.

Notwithstanding the above, defendants Goode, Davis and Mirilahvili each make specific demands that generally exceed the Government's obligations under the law, or are simply inappropriate in this case.  For example, Davis requests, among other things, "the specific date the Government alleges Davis joined the conspiracy," "the date she is alleged to have left the conspiracy," the names of all crew members the Government alleges Davis recruited for the scheme, and the specific dates those crew members visited the clinic and/or filled prescriptions. Mirilashvili seeks, among other things (many of which are already spelled out in the Indictment), the names of all patients alleged to be part of the charged conspiracy, and the identities of unnamed co-conspirators and confidential sources.  These are not disclosures to which the defendant is entitled, and courts in the Second Circuit have repeatedly so held.  *See*, *e.g.*, *United States* v. *Paredes-Cordova*, No. 03 Cr. 987 (DAB), 2009 WL 1585776, at *2 (S.D.N.Y. Jun. 8, 2009) ("Courts have been highly reluctant to require a Bill of Particulars when a defendant has

asked for specific identities of co-conspirators or others allegedly involved."); *United States* v. *Henry*, 861 F. Supp. at 1198 (noting that requests such as those made here, which "demand to know the 'whens,' 'wheres,' and 'with whoms' of acts and participation in the charged conspiracy" are "routinely denied in the Second Circuit").  Indeed, the defendants cite no authority for the proposition that they are entitled to the level of detail they now seek – particularly in the face of the lengthy, detailed Indictment and substantial discovery already produced – nor is the Government aware of any.  *Cf. United States* v. *Johnson*, 21 F. Supp. 2d 329, 339 (S.D.N.Y. 1998) (noting that a "bill of particulars is not an investigative tool for the defendants") *United States* v. *Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) ("The important question is whether the information sought is *necessary*, not whether it is helpful.") (emphasis in original).

In sum, the Government believes the Indictment and discovery in this case are more than sufficient to put the defendants on notice of the nature of the charges against them and to allow them to prepare for trial.  The request for a bill of particulars should thus be denied.

### E.  The Motion for Early Production of Other Bad Act Evidence, *Brady* and *Gigilio*

Finally, Defendant Davis moves for the early production of any evidence that the Government seeks to introduce pursuant to Rule 404(b) of the Federal Rules of Evidence "in such sufficient and reasonable time that the defendant may move . . . to preclude the introduction of such evidence." (Davis Br. at 10).  Davis also seeks the disclosure of *Brady* and *Gigilio* information 60 days before trial, well before the time that is the practice in this district.  These requests should be denied.

With respect to the former, the Government intends to provide timely notice of all evidence it seeks to offer pursuant to Rule 404(b) closer to trial and pursuant to whatever schedule the Court sets for such disclosures.   The Government respectfully submits that a date approximately 30 days in advance of trial should be sufficient to permit any remaining defendant to "move . . . to preclude" any such evidence, if appropriate.

With respect to the latter request, the Government recognizes its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), is making continuous efforts to ensure that it is in full compliance with them, and has and will continue to produce any *Brady* material immediately upon discovery.  However, with respect to material that could be used solely to impeach Government witnesses, *i.e.*, so-called *Giglio* and Jencks Act or "3500" material, such material need only be produced "in time for its effective use at trial," *United States* v. *Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting authorities), which the Second Circuit has repeatedly construed as shortly before the witness is expected to actually testify, generally several days before trial.  *See, e.g.*, *United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Such a timeframe is appropriate because "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *see also United States* v. *Coppa*, 267 F.3d at 146 ("[A]s a general rule, *Brady* and its progeny do not require *immediate* disclosure of all exculpatory and impeachment material upon request by a defendant.") (emphasis added).

Courts in this District adhere to these principles – disclosure of such material the Friday before trial, or several days prior to that, is the common and well-established practice in this District.  *See, e.g.*, *United States* v. *Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *10-11 (S.D.N.Y. Aug. 16, 2012) (Swain, J.) (declining to order early disclosures under the

*Jencks* Act and *Giglio* where the Government intended to make such material available to defense counsel one week before trial); *United States* v. *Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) (Sand, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States* v. *Tranquillo*, 606 F. Supp. 2d 370, 382-83 (S.D.N.Y. 2009) (Robinson, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States* v. *Noble*, No. 07 Cr. 284 (RJS), 2008 WL 1990707, at *9 (S.D.N.Y. May 7, 2008) (Sullivan, J.) (denying request for early disclosure of *Giglio* and 3500 material where the Government agreed to turn over such materials the Friday before trial); *United States* v. *Greyling*, 2002 U.S. Dist. LEXIS 4502, at *15-16 (S.D.N.Y. Mar. 18, 2002) (Casey, J.) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States* v. *Trippe*, 171 F. Supp. 230, 237-38 (S.D.N.Y. 2001) (Kram, J.) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify.").

Consistent with the standard practice of this District and the law of the Second Circuit, the Government intends to disclose to the defense much closer to trial – likely one week before trial begins – all *Giglio* and Jencks Act materials.

I.      **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the defendants'

motions be denied.

Dated:  New York, New York
        September 9, 2015

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York

                    By:     _____/s/_____
                             Edward A. Diskant / Brooke E. Cucinella
                            Assistant United States Attorneys
                            (212) 637-2294 / 2477