JP:PB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

14 M 1054

- - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR THE LOCATION
KNOWN AND DESCRIBED AS THE
RESIDENCE LOCATED AT 320 EAST SHORE
ROAD, APT. 5C, GREAT NECK, NEW YORK,
AND ANY LOCKED OR CLOSED ITEMS
CONTAINED THEREIN

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH
WARRANT

- - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

MATTHEW DEL ROSARIO, being duly sworn, deposes and states that he is a

Detective with the New York City Police Department ("NYPD") and a Task Force Officer with

the United States Drug Enforcement Administration ("DEA"), duly appointed according to law

and acting as such.

Upon information and belief, there is probable cause to believe that, located in

THE PREMISES KNOWN AND DESCRIBED AS THE RESIDENCE LOCATED AT 320

EAST SHORE ROAD, APT. 5C, GREAT NECK, NEW YORK, AND ANY LOCKED OR

CLOSED ITEMS CONTAINED THEREIN (the "SUBJECT PREMISES"), further described in

Attachment A, there are items described in Attachment B, which constitute evidence, fruits, and

instrumentalities of the distribution of, and possession with intent to distribute, controlled

substances, and conspiracy and attempts to do the same, in violation of 21 U.S.C. §§ 841 and 846

(the "TARGET OFFENSES"), committed by MOSHE MIRILISHVILI, DAMON LEONARD,

JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo,"

1

TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS

WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," KEVIN

FRYE, a/k/a "Pretty Kev," a/k/a "PK," and others known and unknown (the "TARGET

SUBJECTS").

      The source of your deponent's information and the grounds for his belief are as

follows:[1]

## INTRODUCTION

    1.    I am a Detective with the NYPD, and I have been personally involved in

the investigation of this matter. I have been with the NYPD for over 23 years. For the last 2

years, I have also been a member of the DEA Task Force. During my tenure with the DEA and

the DEA Task Force, I have received training in narcotics investigations and been involved in

numerous such investigations.

    2.    I have participated in the investigation of this matter, and I am familiar

with the information contained in this affidavit based on my own personal participation in the

investigation, my review of documents, conversations I have had with others about this matter,

and my training and experience. Because this affidavit is being submitted for the limited purpose

of establishing probable cause to search the premises described below, I have not included herein

the details of every aspect of the investigation. Where actions, conversations and statements of

others, and the contents of documents are related herein, they are related in substance and in part,

except where otherwise indicated.

    3.    On December 9, 2014, a Grand Jury sitting in this District returned an

---

1    Because this affidavit is submitted for the limited purpose of establishing probable cause for a
search warrant, I have not set forth each and every fact learned during the course of the investigation

indictment against 11 defendants, including the TARGET SUBJECTS, charging them and others

with participating in a conspiracy to distribute oxycodone that is centered in and around a

purported medical clinic located at 450 West 162nd Street. See United States v. MOSHE

MIRILISHVILI, et al., 14 Cr. 810, attached as Exhibit 1 and incorporated herein by reference

(the "Indictment").

### THE SUBJECT PREMISES

4.      I have personally observed the area near and around SUBJECT

PREMISES.  The SUBJECT PREMISES is a residential apartment located at 320 East Shore

Road, 5C, in Great Neck, New York.  The building is a three story red-brick building with

balconies on the upper floors.  The front of the building is glass with the number 320 posted on

the glass with a brown overhang.  One reaches the front entrance by driving or walking up a

horseshoe driveway.  The apartment building also has a basement garage where MIRILISHVILI

parks his vehicle, a white Mercedes Benz with New York license plate number CSD 9943.  The

garage has two doors, one for entry and one for exit.  The entry and exits for the garage are on

either side of the horseshoe driveway.  A photograph of the exterior of the apartment building is

attached hereto as Exhibit 2.  To enter the building, there are two glass doors:  the first is an outer

door into a small foyer where a 24-hour guard is stationed; the second leads into the lobby.

There are two elevators directly in front of the second glass door.  Once inside, the hallways in

the building run left to right with apartments.  The first floor is floor "A," the second floor is

floor "B" and the third floor is floor "C."  To reach the SUBJECT PREMISES, apartment 5C,

one takes the elevator to the 3rd floor and exits to the right.  At the intersection of the next

hallway, the SUBJECT PREMISES is to the right, and is the last apartment on the right side

wall. The SUBJECT PREMISES can be accessed through the front door, which is blue in color

and clearly labeled with "5C" in gold letters.  The SUBJECT PREMISES has no peep hole, but

has a shiny metallic decorative piece on it.  A picture of the entrance to the SUBJECT

PREMISES is attached hereto as Exhibit 3.

## PROBABLE CAUSE

A.    *The Investigation*

5.    The Indictment was obtained after a 23-month investigation by the DEA

and NYPD, which has involved the use of cooperating witnesses, cooperating sources, and

confidential informants, as well as extensive surveillance by law enforcement.  The information

below is based on my participation in this case, including conversations with other law

enforcement officers, review of consensual records, and debriefings of confidential witnesses,

sources and informants, who have provided reliable information that has been corroborated by

law enforcement.

6.    As described more fully in the attached Indictment, Oxycodone is a highly

addictive, prescription–strength narcotic used to treat severe and chronic pain conditions.  Every

year more than 13 million Americans abuse oxycodone, with the misuse of prescriptions

painkillers such as oxycodone leading to as many as 500,000 annual emergency room visits.

Oxycodone prescriptions have enormous cash value to street level drug dealers, who can fill the

prescriptions at most pharmacies and resell the resulting pills at vastly inflated rates.  Indeed, a

single prescription for 90 30-milligram oxycodone pills has an average resale value in New York

City of $2,700 or more.

7.      From approximately January 2012 until December 2014, the drug distribution ring operated at various purported medical clinics in Manhattan and the Bronx, including the office of MOSHE MIRILISHVILI (the "Clinic"). At the Clinic, MIRILISHVILI, a Board certified, state licensed doctor, wrote thousands of medically unnecessary prescriptions for large quantities of oxycodone in exchange for cash payments. MIRILISHVILI typically charged $200 in cash for "patient visits" that typically involved little, if any, actual examination and almost always resulted in the issuance of a prescription for a large quantity of oxycodone, typically 90 30-milligram tablets.

8.      Virtually none of these "patients" had any medical need for oxycodone, nor any legitimate medical records documenting an ailment for which oxycodone would be prescribed. Instead, most of these individuals were members of "crews" – that is, they were recruited and paid by high-level drug traffickers (the "Crew Chiefs"), to pose as "patients" in order to receive medically unnecessary prescriptions. The Crew Chiefs then obtained these prescriptions and arranged for them to be filled various pharmacies so that the oxycodone pills thereby obtained could be resold on the streets of New York.

9.      Various Clinic employees participated in and profited from the scheme, charging Crew Chiefs cash fees for scheduling "patient visits" necessary to obtain these oxycodone prescriptions (the "Office Staff"). The Office Staff also profited by creating fake documents such as MRI reports purporting to reflect injuries or urinalysis reports ostensibly documenting that the patient was taking rather than selling the oxycodone, all of which MIRILISHVILI would frequently request in an effort to evade detection by law enforcement.

10.     To maximize their profits, many of the Crew Chiefs involved in this scheme also sent their "patients" to see other doctors operating out of similar fraudulent medical clinics, including a clinic on Southern Boulevard in the Bronx, New York and a clinic in Upper Manhattan.   Between January 2012 and the present, doctors at these clinics wrote more than 35,000 oxycodone prescriptions, virtually none of them medically necessary, and resulting in the unlawful distribution of millions of oxycodone tablets.

11.     In total, between October 2012 and December 2014, MIRILISHVILI wrote more than 13,000 medically unnecessary prescriptions for oxycodone, comprising nearly 1.2 million oxycodone tablets with a street value of $36,000,000 or more.   MIRILISHVILI collected more than $2.6 million in fees for "doctor visits" during this time period.

B.      *The Clinic*

12.     As described above and detailed further in the Indictment, the TARGET SUBJECTS and others known and unknown, conspired to distribute more than 1.2 million pills of the Schedule II controlled substance oxycodone, a highly addictive pain medication.   The operations of the distribution ring comprised of the TARGET SUBJECTS and others were centralized at Clinic, which, as described above, was a purported pain management clinic.

13.     The Clinic bears little resemblance to a standard medical office.   On a daily basis, crowds of people gather outside the Clinic, clamoring to see the Doctor and thereby get a prescription for oxycodone.

14.     At various times relevant to this Indictment, MOSHE MIRILISHVILI, the defendant, oversaw the day-to-day operations at the Clinic, including hiring and supervising the Office Staff, and collecting the thousands of dollars in cash payments the Clinic received daily.

As the Clinic's sole licensed practitioner, MIRILISHVILI saw all of the Clinic's "patients" –

dozens of individuals each day, many of them Crew Members working at the direction of Crew

Chiefs – personally collecting a $200 cash fee from each of these "patients" before writing each

of them an identical prescription for 90 30-milligram oxycodone tablets.  Indeed,

MIRILISHVILI was so dependable, the Clinic was referred to by co-conspirators as the "90

spot."  Between in or around October 2012 when MIRILISHVILI first opened the Clinic and in

or around December 2014, MIRILISHVILI wrote nearly 14,000 oxycodone prescriptions,

averaging more than one hundred prescriptions a week, and writing as many as 46 identical 90-

tablet prescriptions in a single day.

      15.    At various times relevant to this Indictment, DAMON LEONARD and

JOMARIS JAVIER, the defendants, held various titles, including "office manager," at the Clinic.

LEONARD and JAVIER both used their roles as Office Staff to control access to

MIRILISHVILI and the medically unnecessary prescriptions he wrote, reaping thousands of

dollars themselves by charging Crew Chiefs cash fees – typically several hundred dollars or

more – to generate fake MRI reports, fake urinalysis reports, or otherwise facilitate "patient

visits" so that the Crew Chiefs could obtain and then fill medically unnecessary prescriptions.

      16.    As detailed in Exhibit 1, a substantial portion of the illegal activities

related to the narcotics conspiracy charged in the Indictment is centered in and immediately

around the Clinic.  Examples include, but are not limited to, the following:

      a.    On or about January 16, 2014, at the Clinic in New York, New

York, MIRILISHVILI wrote a prescription for a confidential source ("CS-1") who was posing as

a "patient" and had no medical need for oxycodone.   During this "patient visit" CS-1 informed

MIRILISHVILI that he/she had "no pain" and then handed MIRILISHVILI $200 in cash before receiving, in return, a prescription for 90 30-milligram oxycodone tablets.

   b. On or about February 20, 2014, CS-1 returned to the Clinic in New York, New York and provided $400 in cash to JOMARIS JAVIER, the defendant, as payment for assistance in obtaining "patient visits" with MIRILISHVILI, like the one on January 16, 2014, as described above.

   c. On or about January 20, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote 46 prescriptions for oxycodone in a single day, each for 90 30-milligram oxycodone tablets.

  C. *The Subject Premises*

   17. Based on my participation in the investigation, including my involvement in surveillance, and my conversations with other task force agents involved in surveillance and who spoken with cooperating witnesses, and agents who have reviewed recorded meetings and spoken with confidential sources, I have learned that it was MIRILISHVILI's practice to place the cash fees he had collected from "patients" in a small black bag, which he would then transport from the clinic to the SUBJECT PREMISES.

   18. On multiple occasions, I and other members of the Task Force have observed, and photographed, MIRILISHVILI carrying a small, black bag from the clinic to a white Mercedes Benz, New York license plate number CSD 9943, including but not limited to the following:

   a. On or about July 8, 2014, photographs attached as Exhibit 4;

   b. On or about September 16, 2014, photograph attached as Exhibit 5;

    c.      On or about September 24, 2014, photograph attached as Exhibit 6;

    d.      On or about October 20, 2014, photograph attached as Exhibit 7;

    e.      On or about December 2, 2014, photograph attached as Exhibit 8.

19.      Based on my participation in the investigation, including my involvement in surveillance, and my conversations with other task force agents involved in surveillance and who spoken with cooperating witnesses, and agents who have reviewed recorded meetings and spoken with confidential sources, I believe that MIRILISHVILI takes notes on a small yellow notepad during "patient examinations" and that it is his practice to gather those notes at the end of the day and transport them, along with the cash collected from the "patients," to the SUBJECT PREMISES. It is believed that once at the SUBJECT PREMISES, MIRILISHVILI often inputs the information into a computer database. It is unknown at this time whether MIRILISHVILI uses a desktop or a laptop computer.

20.      Based on my training and experience, my personal participation in this and other investigations involving illegal drug activity, and conversations with other law enforcement officers who are knowledgeable of drug-trafficking investigations, I know that:

    a.      Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, money counters, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods.

9

It is also common practice for drug traffickers to utilize safes within their clinics or residences to safeguard and facilitate the concealment of the above described items;

        b.      Drug traffickers routinely conceal in their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions. It is also common for drug traffickers to maintain at the same locations papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

        c.      It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, packaging materials, cutting agents, pots, dishes and other containers for preparing controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

        d.      Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization, as well as telephone answering machines, electronic calendars and address/telephone devices. These individuals often utilize telephones, including cellular telephones, to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers, and electronic devices are often found in places used by drug traffickers to conduct their drug distribution activity;

        e.      Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in

their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

    f.  Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities.  These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

    g.  Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection.  Deposits to bank accounts create an accessible record of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service.  Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting; and

    h.  Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes.  Traffickers often keep computers and computer related equipment in their homes, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, mills, or safe houses and utilize the equipment to keep detailed records of their narcotics transactions.  Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking.  In addition, because information can be easily hidden

in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

## PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

21.     Based on the foregoing, my involvement in this investigation, and my training and experience, it is my belief that there is probable cause that the SUBJECT PREMISES has been and is continuing to be used to store instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 841 and 846, including, but not limited to, controlled substances, narcotics proceeds, ledgers, patient files, prescriptions for controlled substances, driver's licenses and other identification documents, and other items listed in ATTACHMENT B.

22.     Based on my training, experience, participation in other investigations concerning narcotics trafficking, and discussions with other law enforcement agents, I know that individuals who distribute narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in ATTACHMENT B in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. This warrant and search procedures specifically include a search of any closed containers or cabinets, including doors to rooms within the SUBJECT PREMISES, locked or unlocked, found within the SUBJECT PREMISES.

12

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

23.      As described above and in Attachment B, this application seeks permission to search for items constituting evidence, fruits or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 that might be found at the SUBJECT PREMISES, in whatever form they are found.  One form in which the documents might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

24.      Based on my training and experience, and on conversations that I have had with other agents, I am familiar with the practices and methods of persons who prescribe narcotics outside the course of professional practice and their reliance on computer technology, including laptop computers, to commit this criminal offense. Such individuals often create and maintain false records relating to hide their criminal conduct, including correspondence, invoices, medical records, bank account and financial information, and the names of victims and coconspirators, on electronic databases on computers or internet or cloud-based storage depots, stored in electronic or magnetic form. Furthermore, users of computer equipment often create and maintain records of computer ownership and subscriptions to Internet services. Based on this information, and on the facts set forth above, there is probable cause to believe that computer-related equipment containing evidence of the crimes described above will be found at the SUBJECT PREMISES.

25.      I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or

13

storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26.      As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant

15

at a residence.  For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

   c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

   d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent

   27.  In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.  This is true because of the time required for

examination, technical requirements, and the variety of forms of electronic media, as explained below:

      a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable. Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.    The variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools

      28.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant

I am applying for would authorize seizing, imaging, or otherwise copying computers and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29.     Because MIRILISHVILI may share use of the SUBJECT PREMISES with his wife, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

30.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that the SUBJECT PREMISES, which is described in Attachment A, contains the items set forth in Attachment B, which constitute evidence, fruits, and instrumentalities of, inter alia, the aforementioned violations of federal laws. I request that a search warrant be issued, authorizing me and other law enforcement officers to search the SUBJECT PREMISES, as described in Attachment A, for the items listed in Attachment B.

31.     I further request that this affidavit and the accompanying application be placed under seal. This is necessary to protect the integrity of the ongoing investigation. Premature disclosure of the contents of this affidavit would frustrate this investigation because it

could result in, among other things, destruction of evidence and/or alerting the TARGET

SUBJECTS and any unindicted co-conspirators to the full scope of the government's ongoing

investigation.

WHEREFORE, your deponent respectfully requests that the requested search

warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS THE RESIDENCE

LOCATED AT 320 EAST SHORE ROAD, APT. 5C, GREAT NECK, NEW YORK, AND

ANY LOCKED OR CLOSED ITEMS CONTAINED THEREIN.

IT IS FURTHER REQUESTED that all papers submitted in support of this

application, including the application and the search warrant, be sealed until further order of the

Court.

Matthew Del Rosario
Detective
New York City Police Department
DEA Task Force Officer

Sworn to before me this
10th day of December, 2014.

THE HONORABLE VERA M. SCANLON
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

19

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA           :        **SEALED**
                                            **INDICTMENT**
          - v. -                   :
                                            14 Cr.
MOSHE MIRILISHVILI,                :
DAMON LEONARD,
JOMARIS JAVIER,                    :
RAY WILLIAMS,
     a/k/a "Obama,"               :
DORIAN AVERY,
     a/k/a "Bo,"                   :
TASHEEN DAVIS,
     a/k/a "Hollywood,"            :
GANEENE GOODE,
     a/k/a "Big Gina,"             :
THOMAS WHITE,
     a/k/a "Black,"                :
CAROLYN MIDDLETON,
JOSEPH GRAY,                       :
     a/k/a "Dogs,"
KEVIN FRYE,                        :
     a/k/a "Pretty Kev,"
     a/k/a "PK,"                   :

          Defendants.             :

- - - - - - - - - - - - - - - - X

## COUNT ONE
### (Conspiracy to Distribute Narcotics)

The Grand Jury charges:

### Introduction

1.   From in or about January 2012, up to and

including in or about December 2014, in the Southern District of

New York and elsewhere, MOSHE MIRILISHVILI, DAMON LEONARD,

JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a

"Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendants, and others known and unknown, conspired to distribute more than a million pills of the Schedule II controlled substance Oxycodone, a highly addictive pain medication available by prescription only.

2.   As detailed further below, the scheme was centered at purported medical offices in Manhattan and the Bronx, including the office of MOSHE MIRILISHVILI, the defendant (the "Clinic"), where MIRILISHIVILI, a Board certified, state licensed doctor, wrote thousands of medically unnecessary prescriptions for large quantities of oxycodone in return for cash payments. Once written, these prescriptions were then filled at pharmacies by other co-conspirators who, in turn, resold and distributed these illegitimately and unlawfully obtained oxycodone tablets at significantly inflated prices.

3.   In total, between in or around October 2012 and in or around December 2014, MOSHE MIRILISHVILI, the defendant, wrote more than 13,000 medically unnecessary prescriptions resulting in the unlawful distribution of nearly 1.2 million oxycodone tablets and for which MIRILISHVILI collected nearly $2.6 million in cash payments.

## BACKGROUND ON OXYCODONE

4.   Oxycodone, a highly addictive, narcotic-strength opioid is used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.  Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in 5 to 30 milligram tablets to patients.

5.   Every year more than 13 million Americans abuse oxycodone, with the misuse of prescription painkillers such as oxycodone leading to as many as 500,000 annual emergency room visits.  As a result, the distribution of oxycodone is heavily regulated.  For example, prescriptions for oxycodone cannot exceed a 30-day supply, and cannot allow for "refills." Instead, a patient who has exhausted his or her initial prescription must see his or her doctor again each month and be re-evaluated before obtaining a new prescription from the doctor.  Similarly, to curb any potential for abuse, pharmacies are required to track and report all prescriptions filled for oxycodone, and by law, no patient is supposed to be able to fill a prescription for oxycodone more than once every 30 days, even if written by a different doctor.

6.   Oxycodone prescriptions have enormous cash value
to drug dealers.  Oxycodone prescriptions can be filled at
virtually any pharmacy and the oxycodone tablets can then be
resold on the street for thousands of dollars.  For example,
thirty milligram oxycodone tablets have a street value of
approximately $30 per tablet in New York City, with prices
ranging even higher in other parts of the country such as
Massachusetts, Vermont, and Maine.  In other words, a single
prescription for 90 30-milligram tablets of oxycodone can net
the distributor $2,700 in cash or more.

### THE SCHEME TO DISTRIBUTE OXYCODONE

7.   The defendants charged herein collectively made
millions of dollars through a scheme to write and fill thousands
of medically unnecessary prescriptions for oxycodone, before
reselling those unlawfully obtained pills at high prices to
individuals addicted to oxycodone, among others.

8.   Essential to this illegal distribution conspiracy
are corrupt, Board certified, state licensed doctors like MOSHE
MIRILISHVILI, the defendant, who, in exchange for cash, was
willing to write medically unnecessary prescriptions for large
quantities of oxycodone.  MIRILISHVILI operates out of a
purported medical office – *i.e.,* the Clinic – and charges cash
fees for his participation in the scheme.  Specifically,
MIRILISHVILI typically charges approximately $200 in cash –

4

insurance is rarely, if ever, accepted — for "doctor visits"
that usually involve little physical examination and almost
always result in the issuance of a prescription for large doses
of oxycodone, typically 90 30-milligram tablets.  To protect
against the possibility of detection by law enforcement,
MIRILISHVILI sometimes asks the "patients" for medical
documentation, such as MRI reports, purporting to document
injuries, or urinalysis reports purporting to show that the
"patient" was taking oxycodone (and thus not obtaining it for
the purpose of distribution).  As discussed below, fake MRI
reports and urinalysis reports were sold by members of the
conspiracy to "patients," typically inside or nearby the Clinic.

        9.    The Clinic attracts a high volume of "patients,"
who came to see MOSHE MIRILISHVILI, the defendant, and to get a
prescription for oxycodone.  The overwhelming majority of these
individuals have no medical need for oxycodone, nor any
legitimate medical record documenting an ailment for which
oxycodone would be prescribed.  Instead, most of these
individuals were members of "crews" (the "Crew Members") — that
is, they were recruited and paid by large-scale oxycodone
distributors (the "Crew Chiefs") to pose as "patients" in order
to receive medically unnecessary prescriptions from
MIRILISHVILI.

10.   To facilitate these visits, Crew Chiefs provide their Crew Members with the cash fees that MOSHE MIRILISHVILI, the defendant, requires, which, as noted are typically $200 per "patient," and after the Crew Members obtained a medically unnecessary oxycodone prescription from MIRILISHVILI, the Crew Chiefs then arrange for these Crew Member to fill the oxycodone prescription at a nearby pharmacy – that is to obtain the oxycodone tablets – which the Crew Chiefs then take possession of and ultimately resell.   Crew Members were paid by Crew Chiefs for their services and for obtaining and handing over the oxycodone tablets they obtained as a result of their visit to the Clinic.

11.   Crew Chiefs also paid certain of the Clinic's employees (the "Office Staff") hundreds of dollars in cash at a time to get their Crew Members into the Clinic to see MIRILISHVILI.   In particular, the Office Staff typically profited by selling fake MRI reports, urine samples or urinalysis reports to these "patients" and Crew Chiefs.   The Office Staff similarly profited by selling oxycodone prescriptions or loose pills directly to Crew Chiefs.   Many of these transactions occurred inside the Clinic.

### The Additional Clinics

12.   To maximize their profits, Crew Chiefs frequently sent Crew Members to see not only MOSHE MIRILISHVILI, the

6

defendant, but also other doctors who ran similar fraudulent
medical practices and who would similarly write medically
unnecessary prescriptions for large doses of oxycodone in
exchange for cash payments.  For example, many of the Crew
Chiefs who participated in this scheme also sent "patients" to a
similar fraudulent clinic on Southern Boulevard (the "Southern
Boulevard Office") where a doctor not named as a co-conspirator
herein ("DOCTOR-2") saw dozens of "patients" each day – many of
them Crew Members working for Crew Chiefs – before writing each
of these "patients" medically unnecessary prescriptions for a
large quantity of oxycodone.  Between June 2012 and January
2014, DOCTOR-2 wrote more than 17,000 oxycodone prescriptions,
averaging several hundred oxycodone prescriptions per week, and
writing as many as 126 oxycodone prescriptions in a single day.

     13.  Crew Chiefs participating in this scheme also
sent Crew Members to see another doctor not named as a defendant
herein ("DOCTOR-3") who ran a similar fraudulent medical
practice in Upper Manhattan (the "Doctor-3 Office").  As that
Office's sole licensed practitioner, DOCTOR-3 saw all of the
Office's "patients" – dozens of individuals each day, many of
them Crew Members working at the direction of Crew Chiefs –
before writing each of them a medically unnecessary prescription
for a large quantity of oxycodone.  Between in or around January
2012 and in or around December 2014, DOCTOR-3 wrote more than

15,000 oxycodone prescriptions, averaging more than one hundred
prescriptions a week, and writing as many as 59 oxycodone
prescriptions in a single day.

### The Defendants' Participation in the Drug Distribution Conspiracy

14.  As discussed in part above, a variety of
individuals played distinct roles in the conspiracy.

### The Mirilishvili Clinic

a.   At various times relevant to this Indictment,
MOSHE MIRILISHVILI, the defendant, was a licensed medical doctor
and the owner and operator of the Clinic, which is located on
162nd Street in Manhattan.  In that capacity, MIRILISHVILI
oversaw the day-to-day operations at the Clinic, including
hiring and supervising the Office Staff, and collecting the
thousands of dollars in cash payments the Clinic received daily.
As the Clinic's sole licensed practitioner, MIRILISHVILI saw all
of the Clinic's "patients" – dozens of individuals each day,
many of them Crew Members working at the direction of Crew
Chiefs – personally collecting a $200 cash fee from each of
these "patients" before writing each of them an identical
prescription for 90 30-milligram oxycodone tablets.  Indeed,
MIRILISHVILI was so dependable, the Clinic was referred to by
co-conspirators as the "90 spot."  Between in or around October
2012 when MIRILISHVILI first opened the Clinic and in or around

8

December 2014, MIRILISHVILI wrote nearly 14,000 oxycodone prescriptions, averaging more than one hundred prescriptions a week, and writing as many as 46 identical 90-tablet prescriptions in a single day.

b.   At various times relevant to this Indictment, DAMON LEONARD and JOMARIS JAVIER, the defendants, held various titles, including "office manager," at the Clinic.   LEONARD and JAVIER both used their roles as Office Staff to control access to MIRILISHVILI and the medically unnecessary prescriptions he wrote, reaping thousands of dollars themselves by charging Crew Chiefs cash fees – typically several hundred dollars or more – to generate fake MRI reports, fake urinalysis reports, or otherwise facilitate "patient visits" so that the Crew Chiefs could obtain and then fill medically unnecessary prescriptions.

### The "Crew Chiefs"

c.   At various times relevant to this Indictment, RAY WILLIAMS, a/k/a "Obama," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which WILLIAMS then resold for profit.   While WILLIAMS and his Crew operated at multiple clinics, WILLIAMS was one of the most active Crew Chiefs operating at the Clinic, bringing in approximately 30 "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

       d.   At various times relevant to this Indictment, DORIAN AVERY, a/k/a "Bo," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which AVERY then resold for profit.  AVERY and his Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, bringing approximately 20-30 "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

       e.   At various times relevant to this Indictment, TASHEEN DAVIS, a/k/a "Hollywood," the defendant, was a Crew Chief who recruited and paid more than a dozen of her own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which DAVIS then resold for profit.  DAVIS and her Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, bringing more than a dozen "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.  As part of her participation in the scheme, DAVIS also frequently posed as a "patient" herself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from both MIRILISHVILI and DOCTOR-2, among others.

       f.   At various times relevant to this Indictment, GANEENE GOODE, a/k/a "Big Gina," the defendant, was a Crew Chief

10

who recruited and paid more than a dozen of her own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which GOODE then resold for profit. GOODE and her Crew operated at multiple clinics, including the Doctor-3 Office, the Southern Boulevard Office, and the Clinic, bringing more than a dozen "patients" each month to obtain medically unnecessary prescriptions from MIRILISHVILI.

g. At various times relevant to this Indictment, THOMAS WHITE, a/k/a "Black," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which WHITE then resold for profit. While WHITE and his Crew operated at multiple clinics, including the Doctor-3 Office, the Southern Boulevard Office, and the Clinic, WHITE was one of the most active Crew Chiefs operating at the Clinic, bringing in approximately 30 "patients" a month to obtain medically unnecessary prescriptions from MIRILISHVILI.

h. At various times relevant to this Indictment, WHITE was assisted by CAROLYN MIDDLETON, the defendant, who, among other things, helped WHITE bring his Crew Members into the clinics and assisted in transporting those Crew Members to area pharmacies so that their prescriptions could be filled and the pills obtained and resold. MIDDLETON, who was paid by WHITE for her work, also posed as a "patient" herself, simultaneously

obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI, DOCTOR-2, and DOCTOR-3, among others.

i.    At various times relevant to this Indictment, JOSEPH GRAY, a/k/a "Dogs," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which GRAY then resold for profit.  While GRAY and his Crew operated at multiple clinics, including the Southern Boulevard Office and the Clinic, GRAY was one of the most active Crew Chiefs operating at the Clinic, bringing in more than 30 "patients" a month to obtain medically unnecessary prescriptions from MIRILISHVILI.  As part of his participation in the scheme, GRAY also frequently posed as a "patient" himself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI and DOCTOR-2, among others.

j.    At various times relevant to this Indictment, KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendant, was a Crew Chief who recruited and paid dozens of his own Crew Members for the purpose of obtaining and filling oxycodone prescriptions, which FRYE then resold for profit.  FRYE and his Crew operated at multiple clinics, including the Clinic and the Southern Boulevard Office, and FRYE also frequently posed as a

12

"patient" himself, simultaneously obtaining medically unnecessary prescriptions for large quantities of oxycodone each month from MIRILISHVILI and DOCTOR-2, among others.

## STATUTORY ALLEGATIONS

15. From in or about January 2012, up to and including in or about December 2014, in the Southern District of New York and elsewhere, MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree, together and with each other, to violate the narcotics laws of the United States.

16. It was a part and an object of the conspiracy that MOSHE MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

17.   The controlled substance that MOSHE MIRILISHVILI,
DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a "Obama,"
DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a "Hollywood,"
GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE, a/k/a "Black,"
CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and KEVIN FRYE,
a/k/a "Pretty Kev" a/k/a "PK," the defendants, conspired to
distribute and possess with the intent to distribute was
mixtures and substances containing a detectable amount of
oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C).

### OVERT ACTS

18.   In furtherance of the conspiracy, and to effect
the illegal object thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a.   Between in or around August 2012 and in or around
February 2013, in New York, New York, MOSHE MIRILISHVILI and RAY
WILLIAMS, a/k/a "Obama," the defendants, spoke by phone
approximately 19 times.  In each instance, MIRILISHVILI used his
home phone to connect with WILLIAMS via a cellphone under
WILLIAMS' control.

b.   On or about May 3, 2013 and May 28, 2013, at the
Clinic in New York, New York and the Southern Boulevard Office
in the Bronx, New York, respectively, TASHEEN DAVIS, a/k/a
"Hollywood," the defendant, received medically unnecessary

14

oxycodone prescriptions written in her own name, for a total of 270 30-milligram oxycodone tablets in a single month.

c.   On or about May 6, May 14, and May 22, 2013, at the Clinic in New York, New York; the Southern Boulevard Office in the Bronx, New York; and the Doctor-3 Office in New York, New York, respectively, CAROLYN MIDDLETON, the defendant, obtained medically unnecessary oxycodone prescriptions in her own name written by MIRILISHVILI, DOCTOR-2, and DOCTOR-3 for a total of 420 30-milligram oxycodone tablets in a single month.

d.   On or about May 10 and May 24, 2013 at the Southern Boulevard Office in the Bronx, New York, and the Clinic in New York, New York, respectively, KEVIN FRYE, a/k/a "Pretty Kev," a/k/a "PK," the defendant, obtained medically unnecessary oxycodone prescriptions in his own name written by DOCTOR-2 and MIRILISHVILI, for a total of 270 30-milligram oxycodone tablets in a single month.

e.   On or about June 17 and June 21, 2013 at the Southern Boulevard Office in the Bronx, New York, and the Clinic in New York, New York, respectively, JOSEPH GRAY, a/k/a "Dogs," the defendant, obtained medically unnecessary oxycodone prescriptions in his own name written by DOCTOR-2 and MIRILISHVILI, for a total of 270 30-milligram oxycodone tablets in a single month.

15

f.    In or around July 2013, in Queens, New York,
MIRILISHIVILI caused a series of cash deposits totaling
$195,800.00 to be made into an account under his control,
representing funds collected by MIRILISHVILI at the Clinic that
month in exchange for writing medically unnecessary oxycodone
prescriptions.

g.    On or about October 2, 2013, at the Southern
Boulevard Office in the Bronx, New York, FRYE participated in a
physical attack on a co-conspirator not named as a defendant
herein who was, at the time, a member of the Office Staff ("CC-
1"), in retaliation for CC-1's refusal to allow FRYE's Crew
Members, all posing as "patients," to cut the line to see
DOCTOR-2.

h.    On or about January 16, 2014, at the Clinic in
New York, New York, MIRILISHVILI wrote a prescription for a
confidential source ("CS-1") who was posing as a "patient" and
had no medical need for oxycodone.   During this "patient visit"
CS-1 informed MIRILISHVILI that he/she had "no pain" and then
handed MIRILISHVILI $200 in cash before receiving, in return, a
prescription for 90 30-milligram oxycodone tablets.

i.    On or about February 20, 2014, CS-1 returned to
the Clinic in New York, New York and provided $400 in cash to
JOMARIS JAVIER, the defendant, as payment for assistance in

16

obtaining "patient visits" with MIRILISHVILI, like the one on January 16, 2014, as described above.

j.  On or about January 20, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote 46 prescriptions for oxycodone in a single day, each for 90 30-milligram oxycodone tablets.

k.  On or about May 15, 2014, in New York, New York, GANEENE GOODE, a/k/a "Big Gina," the defendant, offered to sell two prescriptions, including an oxycodone prescription, written for "patients" in GOODE's Crew for $1,440 in cash.

l.  On or about July 10, 2014, at the Clinic in New York, New York, DAMON LEONARD, the defendant, told a cooperating witness ("CW-1") that LEONARD works with DORIAN AVERY, a/k/a "Bo," the defendant, and GRAY, among others, to get "patients" in to see MIRILISHVILI.  During the same conversation, LEONARD discussed the possibility of selling oxycodone tablets for $18 per pill.

m.  On or about July 23, 2014, at the Clinic in New York, New York, MIDDLETON and THOMAS WHITE, a/k/a "Black," the defendant worked together to get "patients" in to see MIRILISHVILI to obtain medically unnecessary oxycodone prescriptions.

n.  On or about September 11, 2014, at the Clinic in New York, New York, LEONARD told CW-1 that AVERY was now working

more directly with JAVIER to get AVERY's "patients" in to see MIRILISHVILI.

  o. On or about September 15, 2014, in and around the Clinic in New York, New York, LEONARD brokered the sale of 180 30-milligram oxycodone tablets – all of which were obtained pursuant to medically unnecessary prescriptions written for "patients" by MIRILISHVILI – for $3,240 in cash.

  p. On or about September 16, 2014, in and around the Clinic in New York, New York, WILLIAMS discarded "patient" paperwork prepared by LEONARD and ostensibly documenting urine tests performed on these "patients" whom WILLIAMS had sent in to the clinic to obtain medically unnecessary oxycodone prescriptions from MIRILISHVILI.

  q. On or about October 13, 2014, at the Clinic in New York, New York, WILLIAMS told CS-1 that LEONARD could get new "patients" in to see MIRILISHVILI if CS-1 had all of the "paperwork" in order.  During the same conversation, LEONARD confirmed to CS-1 that LEONARD would get new "patients" in and would not charge CS-1 for so doing because CS-1 was a friend of WILLIAMS.

  r. On or about October 13, 2014, in New York, New York, WILLIAMS drove three of his Crew Members from the Clinic to a pharmacy on Webster Avenue in the Bronx, New York.

s.   On or about October 28, 2014, in New York, New

York, DAVIS collected multiple Crew Members from the Clinic and

drove them to local pharmacies so that their oxycodone

prescriptions could be filled.

## FORFEITURE ALLEGATION

19.  As a result of committing the controlled

substance offense alleged in Count One of this Indictment, MOSHE

MIRILISHVILI, DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, a/k/a

"Obama," DORIAN AVERY, a/k/a "Bo," TASHEEN DAVIS, a/k/a

"Hollywood," GANEENE GOODE, a/k/a "Big Gina," THOMAS WHITE,

a/k/a "Black," CAROLYN MIDDLETON, JOSEPH GRAY, a/k/a "Dogs," and

KEVIN FRYE, a/k/a "Pretty Kev" a/k/a "PK," the defendants, shall

forfeit to the United States, pursuant to Title 21, United

States Code, Section 853, any and all property constituting or

derived from any proceeds the defendants obtained directly or

indirectly as a result of the offense and any and all property

used or intended to be used in any manner or part to commit and

to facilitate the commission of the offense alleged in Count One

of this Indictment.

## SUBSTITUTE ASSETS PROVISION

20.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants,

a.   cannot be located upon the exercise of due

diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 853)

FOREPERSON

PREET BHARARA
United States Attorney

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MOSHE MIRILISHVILI, DAMON LEONARD,
JOMARIS JAVIER, RAY WILLIAMS, a/k/a
"Obama," DORIAN AVERY, a/k/a "Bo,"
TASHEEN DAVIS, a/k/a "Hollywood,"
GANEENE GOODE, a/k/a "Big Gina," THOMAS
WHITE, a/k/a "Black," CAROLYN MIDDLETON,
JOSEPH GRAY, a/k/a "Dogs," and KEVIN
FRYE, a/k/a "Pretty Kev" a/k/a "PK,"

Defendants.

SEALED INDICTMENT

14 Cr.

(21 U.S.C. §§ 846 and 853.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

# EXHIBIT 2



# EXHIBIT 3



# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6



# EXHIBIT 7

# EXHIBIT 8

