UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA         :        14 Cr. 810 (CM)

     - against -                            :        (Electronically Filed)

MOSHE MIRILASHVILI,                  :

                       Defendant.   :
-------------------------------------------------------X

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DR. MOSHE MIRILASHVILI'S PRE-TRIAL MOTIONS

                                                                    JOSHUA L. DRATEL
                                                                    JOSHUA L. DRATEL, P.C.
                                                                    29 Broadway, Suite 1412
                                                                  New York, New York 10006
                                                                    (212) 732-0707

                                                                *Attorneys for Defendant Moshe Mirilashvili*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney Schlimbach

TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

POINT I

THE COURT SHOULD SUPPRESS THE EVIDENCE OBTAINED
AS A RESULT OF THE SEARCHES OF DR. MIRILASHVILI'S
HOME AND OFFICE AS A MATTER OF LAW UNDER *FRANKS
V. DELAWARE*, 438 U.S. 154 (1978), BECAUSE OF INTENTIONAL
AND/OR RECKLESS MATERIAL FALSEHOODS IN THE
AFFIDAVITS UNDERLYING THOSE SEARCH WARRANTS      . . . . . . . . . . . . . . . . . . . . . 1

      A.     *Applicable Law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.     *CS-1's Appointments with Dr. Mirilashvili*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TABLE OF AUTHORITIES

CASES

*Franks v. Delaware*, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 6

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66 (2d Cir. 2002). . . . . . . 4

*United States v. Sugar*, 606 F. Supp. 1134 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OTHER

*Sand*, Mod. Fed. Jury Instructions § 56-18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Introduction

This Reply Memo of Law is submitted on behalf of defendant Moshe Mirilashvili in support of his pretrial motions. Much of the government's opposition, having been addressed and/or anticipated in Dr. Mirilashvili's Initial Memo of Law, does not require rejoinder. As a result, this Reply will focus on particular points to illustrate the fundamental and fatal flaws in the government's arguments.

ARGUMENT

POINT I

**THE COURT SHOULD SUPPRESS THE EVIDENCE OBTAINED AS A RESULT OF THE SEARCHES OF DR. MIRILASHVILI'S HOME AND OFFICE AS A MATTER OF LAW UNDER *FRANKS V. DELAWARE*, 438 U.S. 154 (1978), BECAUSE OF INTENTIONAL AND/OR RECKLESS MATERIAL FALSEHOODS IN THE AFFIDAVITS UNDERLYING THOSE SEARCH WARRANTS**

A.   *Applicable Law*

In arguing that probable cause was sufficiently alleged in the applications for the warrants to search Dr. Mirilashvili's medical offices at 450 West 162nd Street, New York, New York (hereinafter "the Clinic") and Dr. Mirilashvili's residence, the government contends that the defense has not satisfied the first prong of the *Franks v. Delaware*, 438 U.S. 154 (1978), standard requiring that the "inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000).

In an attempt to support that argument, the government maintains not only that Dr. Mirilashvili "does not dispute that the affidavit correctly documents that on CS-1 saw Mirilashvili on January 16, 2014; that during that visit, CS-1 told Mirilashvili he had 'no pain';

1

that CS-1 paid Mirilashvili $200 in cash during that visit; and that CS-1 received an oxycodone prescription," but also asserts that "none of the 'context' cited . . . undercuts the accuracy of" the allegation that the visit was a "sham." Memorandum of Law, Government Response to Defendant Moshe Mirilashvili's Pre-Trial Motions (hereinafter "Gov't Memorandum of Law"), at 27-28.

While Mr. Mirilashvili does not challenge that the appointment occurred January 16, 2014, that the words "no pain" were spoken during the appointment, that Dr. Mirilashvili was paid $200, or that CS-1 received an oxycodone prescription, the presentation of just those facts does not describe a crime.

It is only the applications' pejorative spin, provided in a manner, as detailed **post** at 5, and which constituted an "inaccurac[y] or omission[]" amounting to a "deliberate falsehood or reckless disregard for the truth[,]" *Franks*, 438 U.S. at 164-72, that could raise what happened at that appointment – preserved in CS-1's recording – to the level of criminal conduct and justify the issuance of the warrant(s).

In addition, the full and obvious context of that appointment (from a fair and complete review of it as memorialized in the draft transcript provided by the government as Exhibit J to its papers), as set forth in detail in Dr. Mirilashvili's Memo of Law, at 4-7, not only undermines the impression of a one-time perfunctory money-for-prescription exchange, but, as detailed **post** at 5-11, renders the government's description (at 20-24 of its Memo of Law) of CS-1's additional appointments so discrepant from the events themselves – as demonstrated in the draft transcripts attached as Exhibits K-Q to the government's response – that the intentional nature of the "inaccuracies or omissions[]" in the applications is manifest. *Canfield*, 212 F.3d at 717-18.

2

The government also argues that, regardless of whether the first prong has been satisfied, the standard of materiality for a *Franks* determination or hearing has not been met. *See* Gov't Memorandum of Law, at 32. In support, the government notes that "a substantial portion of the illegal activities related to the Indictment" were "centered in and around" the Clinic, including the congregation of "Crew Chiefs" at the Clinic and the Dr. Mirilashvili's staff's alleged participation in drug trafficking through collecting fees for appointments and falsified documents. *See* Government Memorandum of Law, at 17.

Regarding the separate search of Dr. Mirilashvili's home, the government also relies upon the allegation that he was seen "transporting" cash and patient records from the Clinic to his home on "multiple occasions." *See* Government Memorandum of Law, at 33.

However, the Indictment included allegations of criminal activity occurring at two other clinics, wholly unrelated to Dr. Mirilashvili's practice. Also, the majority of the factual allegations in the Indictment and the warrant applications related to criminal activity occurring *outside* the Clinic. *See* Indictment, attached as Exhibit 1 to Defendant Moshe Mirilashvili's Pre-Trial Motions, at ¶¶ 12-13, 14(c)-(j); *see also* Search Warrant Application for the Clinic (hereinafter "Clinic Application"), attached as Exhibit 2 to Dr. Mirilashvili's Pre-Trial Motions, at ¶17(a); Search Warrant Application for Dr. Mirilashvili's Residence (hereinafter "Residence Application"), attached as Exhibit 3 to Dr. Mirilashvili's Pre-Trial Motions, at ¶ 16(a).

Absent the identical allegation in the warrant applications that Dr. Mirilashvili wrote thousands of "medically unnecessary" prescriptions, supported only by the perfunctory, conclusory, and misleading description of CS-1's January 2014 appointment with Dr. Mirilashvili and the fact that many patients paid in cash, the allegations of criminal activity

3

which, arguably, took place *in* the Clinic, namely that office staff collected additional fees in exchange for appointments and falsified documents,[1] would be insufficient to provide probable cause to conduct a wholesale search of the Clinic, let alone Dr. Mirilashvili's residence.

Therefore, the impression that Dr. Mirilashvili's entire practice (or a sufficient portion thereof) was illegitimate and could therefore justify a search – a conclusion, as demonstrated **post**, and in Dr. Mirilashvili's initial Memo of Law, that is insupportable – was undoubtedly *necessary* to the findings of probable cause to search his office and home.

Furthermore, to the extent the government intended to rely on the number of prescriptions issued over the course of the conspiracy, or even in a single day, as sufficient evidence of criminal activity, such assertions are meaningless absent any indication of the standards in the relevant field of medical practice. Additionally, reliance upon the cash amounts that Dr. Mirilashvili transported between his home and office is similarly insufficient. *See United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 88 (2d Cir. 2002) ("[c]urrency—that is to say, cash—is of course accrued by all types of legitimate businesses, often in small denominations, and though for a business to choose to keep (and transport) over half a million dollars of its proceeds in cash form would be, to say the least, foolhardy,[2] it would not necessarily

---

[1] It should be noted that, in the search warrant applications, the allegation that the office staff collected fees for providing falsified paperwork is supported by only two vaguely described incidents in the Indictment.   Clinic Application, at ¶ 16; Residence Application, at ¶ 15. For instance, the claims were that September 16, 2014, "WILLIAMS discarded 'patient' paperwork prepared by LEONARD and ostensibly documenting urine tests performed on these 'patients' whom WILLIAMS had sent in to the clinic to obtain medically unnecessary oxycodone," and that October 13, 2014, "WILLIAMS told CS-1 that LEONARD could get new 'patients' in to see MIRILISHVILI if CS-l had all of the 'paperwork' in order." Indictment, at ¶¶ 18(p)-(q).

[2] Given the 2008 financial institution crash, after which FDIC insurance provided protection on claims up to only $100,000, it is maybe not so "foolhardy," or even

be indicative of criminality—foolishness not yet being a crime").

For example, in *United States v. Sugar*, 606 F. Supp. 1134 (1985), the Court affirmed a finding of probable cause on the grounds that there was "substantial evidence" that the defendant doctor was not "conducting his practice according to" the "standards for conducting a proper medical practice in the [relevant] field . . ., and for dispensing [the relevant] drug," as set forth in the warrant application. *Id.*, at 1150.

Accordingly, as set forth in Dr. Mirilashvili's initial Memo of Law, at 3, the applications' description of CS-1's January 16, 2014, appointment is not merely a reproduction of actual events in "substance and part," but an *intentional* attempt to create the impression that Dr. Mirilashvili's entire medical practice was such a sham as to remove any doubt of his involvement in the criminal activities occurring *outside* it, which in turn was essential to a finding of probable cause to search his home and office.

B.     *CS-1's Appointments with Dr. Mirilashvili*

Initially, the only appointment referenced in the warrant applications was that which occurred January 16, 2014, and it is described in rather summary terms.[3]  However, the draft

---

unconventional, in the current climate to maintain business income in cash form.

[3] The text is as follows:

> [o]n or about January 16, 2014, at the Clinic in New York, New York, MIRILISHVILI wrote a prescription for a confidential source ("CS-1") who was posing as a "patient" and had no medical need for oxycodone.  During this "patient visit" CS-1 informed MIRILISHVILI that he/she had "no pain" and then handed MIRILISHVILI $200 in cash before receiving, in return, a prescription for 90 30-milligram oxycodone tablets.

Clinic Application, at ¶ 17(a);  Residence Application, at ¶ 16(a).

transcripts, and the recordings themselves, do *not* indicate that CS-1 first told Dr. Mirilashvili he had "'no pain' *and then* handed [Dr. Mirilashvili] $200 in cash before receiving, *in return*, a prescription for 90 30-milligram oxycodone tablets." Clinic Application, at ¶ 17(a) (emphasis added).

Instead, the substance of the recording of that visit is set forth in Dr. Mirilashvili's initial Memo of Law, at 4-5, and the draft transcript attached to the government's response as Exhibit J, further contradicts the false impression created in the search warrant applications.

Certainly, the extremely, and intentionally, misleading summary of the January 2014 appointment in the warrant applications is sufficient on its own to warrant suppression of the evidence seized. *See Franks*, 438 U.S. at 169. However, the government's response provides additional descriptions of CS-1's other appointments, in an attempt to demonstrate the "substantial indicia of fraud" which accompanied all of the appointments, and in doing so, not only demonstrates the extent of the discrepancy between the descriptions and reality, but also emphasizes how significant the legitimacy (or alleged illegitimacy) of Dr. Mirilashvili's medical practice is to a finding of probable cause. Government Memorandum of Law, at 21.

First, the government describes the answers given by CS-1 during his initial visit as "very basic," concluding that "any legitimate doctor" would have inquired further, and states that at the end of the visit, Dr. Mirilashvili "purported" to diagnose CS-1 with chronic pain. Government Memorandum of Law, at 21-22.

However, in the draft transcript in Government Exhibit L, CS-1 described pain on both sides when sitting, and when pressed by Dr. Mirilashvili to be more specific, CS-1 replies that the pain on the left side is worse, that it travels down to his ankle (which is mistranslated to Dr.

6

Mirilashvili), along the inside of his leg, and that the pain feels like electricity and shocks. Government Exhibit L, at 10-12. At no point is the pain described, by anyone, as "general," notwithstanding law enforcement efforts to coach CS-1 into providing that impression.

Furthermore, as the transcript demonstrates, Dr. Mirilashvili followed his questions with a thorough physical examination, during which he observes that CS-1 had less motor function on the left side than the right, but less sensory response on the right side. Government Exhibit L, at 21-22. Significantly, the only time Dr. Mirilashvili mentions "chronic pain" is when he explains to CS-1 that pain lasting more than six months is "chronic." Government Memorandum of Law, at , at 24. The government then criticizes Dr. Mirilashvili's provision of medication to CS-1, incorrectly stating that he provided "prescriptions for four kinds of powerful pain medication." Government Exhibit L, at 22. In fact, although the three non-oxycodone medications play a role in reducing pain, Elavil is an anti-depressant, Robaxin is a muscle relaxant, and Neurontin (incorrectly transcribed as "Duranten") is an anti-convulsant.

The government's response also points to CS-1's reference to oxycodone by its street name, "M30s," citing a jury instruction which includes use of "street slang rather than medical terminology" as a factor to consider when evaluating whether a physician's medical practice is legitimate. Government Memorandum of Law, at 22. While it is true that CS-1 refers to his medication as "M30s" during his initial visit, Dr. Mirilashvili's response is "oxycodone," making clear that Dr. Mirilashvili merely recognized the street name for oxycodone. Government Exhibit L, at 14. Dr. Mirilashvili did not, nor is there any allegation that he did, at any point, use street slang to describe the medications he prescribed. *See Sand*, Mod. Fed. Jury Instructions § 56-18 (the listed factors are addressed to *physician*, not patient, behavior).

Citing another factor to consider when determining legitimacy – "sending" patients to different pharmacies - the government response concludes that Dr. Mirilashvili's careful focus on the pharmacy where the prescriptions are to be filled, and the fact that pharmacies "change[] from visit to visit," further demonstrates his sham medical practice.  Government Memorandum of Law, at 24.  The response then opines that the pharmacies "selected" by Dr. Mirilashvili are out of the patient's way, and thus, indicative of illegitimacy.   Government Memorandum of Law, at 24.

In fact, the transcripts establish the *opposite*.  The draft transcripts are devoid of *any* transcripts indications that Dr. Mirilashvili selected the pharmacies from which CS-1 picked up his prescriptions.  Nor does any other evidence support the government's assertion.  For example, June 27, 2013, Dr. Mirilashvili asked "which pharmacy does he want to go to pick up this medication," and August 12, 2013, Dr. Mirilashvili asked "which pharmacy he's using."  Government Exhibit L, at 28; Government Exhibit M, at 7.  Similarly, September 12, 2013, Dr. Mirilashvili asked "do you want to send the medication to the same pharmacy," and the next month, he asked "which pharmacy you want to go."  Government Exhibit N, at 6; Government Exhibit O, at 7.  In November 2013, Dr. Mirilashvili not only told CS-1 "any pharmacy you want," but also asked "which pharmacy" and in February 2014, "which pharmacy he wants to go."  Government Exhibit P, at 3, 6; Government Exhibit Q, at 8.  In January 2014, Dr. Mirilashvili tells CS-1 "any pharmacy" is acceptable, and then, although the question posed by Dr. Mirilashvili is "unintelligible," CS-1's answer is "no, no, the last pharmacy," followed by

8

dialogue about the address of that pharmacy. Government Exhibit J, at 4, 7-8.[4] Thus, as demonstrated by the draft transcripts, CS-1 is entirely responsible for the selection of the pharmacy, making the applications' characterization of this aspect of Dr. Mirilashvili's practice patently false, and utterly misleading.

The government's response also turns to CS-1's follow-up appointments with Dr. Mirilashvili, noting that the doctor "collects his $200 cash fee from CS-1 and provides CS-1 with a prescription [for oxycodone]," *but without also noting that the entirety of the appointment, including discussion of CS-1's progress, referrals for other treatment, and a physical examination* occurred between those two bookending events.   Government Memorandum of Law, at 22.

The government also characterizes Dr. Mirilashvili's attitude toward the surgery referrals as dismissive and "pretextual," despite the fact that the draft transcripts of *every single* follow up visit include Dr. Mirilashvili asking CS-1 whether he had used the referrals in.  Government Exhibits K-Q.

To counter Dr. Mirilashvili's consistent inquiries into whether CS-1 has used the referrals, the government's response notes that in January 2014, CS-1 told Dr. Mirilashvili he had an appointment with the surgeon in two months, but a subsequent conversation during the February 2014, appointment, "clearly" indicates to the government that Dr. Mirilashvili did not record CS-1's statement during the previous appointment, or that is was "particularly important to him."   Government Memorandum of Law, at 23.  That conclusion was based on CS-1's

---

[4] Of course, the exchanges between Dr. Mirilashvili and CS-1 occurred through a Clinic staff member acting as a Spanish translator.

response during the February 2014 appointment that he was "waiting until [he got] vacation from work" to see the surgeon, from which the government also apparently somehow gleans that CS-1 "does not intend to make" an appointment. Government Exhibit Q, at 5; Government Memorandum of Law, at 23.

The government next refers to a statement by Dr. Mirilashvili that "all [CS-1] has to do is 'continue your medicine and your therapy to completely recover'," which indicates that Dr. Mirilashvili "appears to forget about surgery altogether." Government Memorandum of Law, at 23, *quoting* Government Exhibit Q, at 9. In fact, Dr. Mirilashvili's statement to CS-1 is "[s]o you have to continue your medicine and your therapy to completely recover," in a conversation about "keep[ing CS-1's] inflammation under control." Government Exhibit Q, at 8-9.

Repeatedly, the government response refers to CS-1's indication to Dr. Mirilashvili that he is experiencing "no pain" in support of the contention that Dr. Mirilashvili's practice was illegitimate, because he "never reduced the dosage, nor [did] he stop writing the oxycodone prescriptions." Government Memorandum of Law, at 22. Additionally, the government takes issue with Dr. Mirilashvili's summary statement at the beginning of follow up visits that CS-1 was "complaining of lower back pain, lower extremity pain" at his prior appointments, concluding that CS-1's statement that he was experiencing "no pain" renders Dr. Mirilashvili's statement patently false. Government Memorandum of Law, at 23. In doing so, the government simply ignores both that Dr. Mirilashvili consistently asks whether CS-1 has this pain *after* taking his medication, and also that CS-1 sometimes agreed with Dr. Mirilashvili's assessment of the pain complaints CS-1 had registered at his prior appointments. Government Exhibit J, at 3;   Government Exhibit M, at 3;   Government Exhibit N, at 3;   Government

Exhibit O, at 3;  Government Exhibit P, at 3;   Government Exhibit Q, at 4.

In attacking the physical examinations conducted during follow up visits as "troubling," the government response states that, despite diagnoses of pain below the waist, Dr. Mirilashvili asked CS-1 if he is doing "*hand* exercises."  Government Memorandum of Law, at 24. (emphasis in original).  However, in addition to the fact that the government provides absolutely no basis for concluding that hand exercises are incongruous with Dr. Mirilashvili's diagnosis of CS-1, Dr. Mirilashvili in fact asked CS-1 during the appointment if he was "doing the exercise *with that hand*," a statement that is completely meaningless without further context (of which there is none).  Government Exhibit M, at 7.

In addition, the government points to a passing reference to CS-1's elbows during the February 2014 visit as evidence that the physical examinations were pre-textual and unrelated to the diagnosis, although Dr. Mirilashvili was clearly just telling CS-1 to "bend over on [his] elbows" during the physical examination.  Government Exhibit Q, at 7.

Along the same lines, the government is concerned that Dr. Mirilashvili "appears" to have written prescriptions before conducting physical examinations during some of the visits. Government Memorandum of Law, at 24.  As the government refers only to the January 2014 appointment as an example, this is presumably based on the fact that Dr. Mirilashvili told CS-1 during that appointment to put "[his] paper" away in his pocket.  Government Exhibit J, at 5. Yet, even that ambiguous moment does not occur until after the mid-point of the appointment, following an earlier discussion of symptoms and pain.  *See* Government Exhibit J.

It is apparent from the government's own Exhibits, as well as the recordings on which they are based, that the description of CS-1's appointment in the warrant is so misleading as

11

compared to actual events, as to confirm an intentional attempt to create the impression that Dr. Mirilashvili's entire medical practice was illegitimate, providing essential support to the conclusion that probable cause existed to search his home and office.

Accordingly, the evidence obtained from the searches of Dr. Mirliashvili's home and office must be suppressed, and/or in the alternative, the Court should conduct an evidentiary hearing to determine whether a good faith and reasonable basis existed for the affiants' allegations.

## Conclusion

Accordingly, for all the reasons set forth above, as well as those in Dr. Mirilashvili's Iinitial Memo of Law, it is respectfully submitted that Dr. Mirilashvili's motions should be granted in their entirety.

Dated: 24 September 2015
        New York, New York

Respectfully submitted,

 /S/ Joshua L. Dratel
JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

*Attorneys for Defendant Moshe Mirilashvili*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney Schlimbach