UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

UNITED STATES OF AMERICA,

    - v. -

MOSHE MIRILISHVILI, et al.,

        Defendants.

—————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10|2|15

14 Cr. 810 (CM)

## DECISION AND ORDER ON DEFENDANTS' PRETRIAL MOTIONS

McMahon, J.:

The eleven named defendants are charged in a single-count indictment with conspiring to distribute oxycodone. Defendants Moshe Mirilishvili, Tasheen Davis, and Ganeene Goode have filed pretrial motions, specifically:

Mirilishvili moves to suppress the fruits of searches, conducted pursuant to warrants, of (1) his medical clinic located at 450 West 162nd Street (the "Clinic"), and (2) his residence in Great Neck, New York, on the basis of a lone, allegedly misleading sub-paragraph, in search warrant applications for both locations.

Davis moves to suppress the fruits of a search of her apartment at the time of her arrest, on the basis that her consent (she signed a written consent form) was coerced and thus not voluntary.

Mirilishvili, Davis, and Goode each move to sever their case from their codefendants' cases.

1

Mirilishvili, Davis, and Goode for a bill of particulars; and Davis moves for notice,

pursuant to Rule 404(b), of any "uncharged crimes" about which the Government intends to

introduce evidence at trial, as well as disclosure of all impeachment evidence at least 60 days

before trial.

Defendants Jomaris Javier, Raymond Williams, and Damon Leonard have all sought, by

letter motion, to join in the motions filed by co-defendants, to the extent any particular motion is

relevant to their respective cases.[1]

Background

*The Charged Conspiracy and the Indictment*

The Indictment alleges that the eleven named defendants participated in a massive

scheme to unlawfully obtain and then redistribute oxycodone, a highly addictive pain medication

available by prescription only.  (Indictment ¶ 1.)  The unlawful scheme was centered at

purported medical offices in Manhattan and the Bronx, including the office (Clinic) of Moshe

Mirilishvili, a Board certified, state licensed doctor.  Mirilishvili is alleged to have written

thousands of medically unnecessary prescriptions for large quantities of oxycodone in return for

cash payments.  (*Id.* ¶ 2.)  Mirilishvili wrote dozens of identical prescriptions every day for 90

30-milligram oxycodone tablets for essentially every "patient" who walked in the door of his

clinic, charging each patient $200, payable in cash only.  (*Id.* ¶ 8.)

---

[1] The Court has considered the motions filed as pertaining to the "joining" defendants, where the relief sought in any motion was relevant to one or more of the joining defendants.

Over the course of the charged conspiracy, Mirilishvili wrote more than 13,000 prescriptions for oxycodone – all in the Clinic itself, where he also collected the $200 cash payment – and substantially all for identical dosages of oxycodone. (*Id.* ¶ 3.)

Mirilishvili was not the only defendant alleged to have used the Clinic as a base of operations for unlawful activity. As detailed more fully in the Indictment, most of the "patients" seen at the Clinic had no medical need for that oxycodone – indeed, many are were not "patients" at all but instead worked for large scale drug traffickers, or "Crew Chiefs," including defendants Tasheen Davis and Ganeene Goode – who operated at and around the Clinic and who recruited individuals to pose as "patients," paid the $200 fee required by Mirilishvili, and then collected the prescriptions, filled them and resold the pills. (*Id.* ¶¶ 9-10.)

Additionally named as defendants in the Indictment were certain Clinic employees, including defendants Damon Leonard and Jomaris Javier, who are alleged to have collected hundreds of dollars in cash fees or bribes from Crew Chiefs, and generated fake MRI reports and related documents, all within the Clinic itself, to facilitate these sham "patient" visits. (*Id.* ¶ 11.)

### *The Searches*

Three searches are being challenged by defendants.

On December 11, 2014, most of the named defendants were arrested, and search warrants were executed on two locations – the Clinic, and Mirilishvili's personal residence, located at 320 East Shore Road, Apartment 5C, Great Neck, New York. The search of the Clinic yielded various computers, surveillance video recordings, office paperwork, notebooks, and the like. At the Mirilishvili Residence, agents recovered documents and records, as well as a number of computers they believed to have been used by the defendant in furtherance of the scheme.

Agents also found more than $1.7 million in U.S. currency, all stored in a series of zip lock bags found in the defendant's bedroom and in second bedroom within the Residence.

On December 11, 2014 defendant Davis was arrested in her apartment, located at 300 Park Street, Apartment 3A, Hackensack, New Jersey. Consistent with the arresting agents' written reports of the search, and the factual affidavit submitted by Davis in connection with the instant motion, there is no dispute that agents knocked on the front door to the Davis Apartment, identified themselves as law enforcement, and informed Davis that they had a warrant for her arrest. (*E.g.*, Govt. Ex. F ¶ 2; Davis Aff. 7-9.) The agents, who did not have their weapons drawn and did not immediately place Davis in handcuffs, secured the Davis Apartment, and then presented Davis with a standard DEA consent to search form, a copy of which is attached to the moving affidavit as Exhibit H. (Govt. Ex. F ¶ 2 ; Davis Aff. ¶¶ 8, 10.) Davis signed the consent form and the agents proceed to search the apartment (Davis Aff. ¶ 13-14.), recovering, among other things, a prescription for oxycodone written by a Dr. Hip-Flores of "Medical Associates of Central Jersey" from the defendant's living room coffee table and a green notebook from the defendant's bedroom. (Govt. Ex. G; Nelson Aff. ¶¶ 16-17.) Agents also took a photograph of a plastic bag of urine sample containers – the type used by scheme participants to submit false and fraudulent "urine samples" – on Davis' kitchen counter. (*See* Govt. Ex. I.)

Davis's Motion to Suppress

Davis argues that, even though she signed a consent to search form provided to her by the agents, giving them permission to search her apartment, her consent was actually involuntary because the agents told her that if she did not consent they would obtain a warrant, and "tear the

4

apartment apart." She also argues that the scope of the actually search exceeded that authorized in the consent form.

"It is well settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'" *United States* v. *Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (quoting *United States* v. *Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)). In evaluating the voluntariness of the consent, courts consider multiple factors, including "the individual's age, intelligence and educational background, the length and nature of the questioning and whether the law enforcement officials engaged in coercive behavior." *United States* v. *Jones*, 154 F. Supp.2d 617, 621 (S.D.N.Y. 2001) (citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226-27 (1973)). Those factors, however, are merely guideposts because in evaluating voluntariness, courts look to the "totality of all the circumstances," *Schneckloth* v. *Bustamonte*, 412 U.S. at 227; *United States* v. *Peterson*, 100 F.3d 7, 11 (2d Cir. 1996); *United States* v. *Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) – and generally, no single factor will be sufficient on its face to merit a finding of involuntariness, *see Schneckloth*, 412 U.S. at 226-27.

The inquiry is guided by an "objective standard," and thus the ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search." *United States* v. *Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (citations omitted); *see Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). "'[T]he Fourth Amendment is satisfied when, under the circumstances, it is

5

objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken].'" *United States* v. *Garcia*, 56 F.3d at 422 (quoting *Florida* v. *Jimeno*, 500 U.S. at 249).

As noted, no single factor is typically sufficient to merit a finding of involuntariness. *See Schneckloth*, 412 U.S. at 226-27, and the Second Circuit has specifically rejected – as insufficient to vitiate the voluntariness of consent – the fact that a defendant was in custody or handcuffs at the time of the consent; that multiple officers were present or had their guns drawn; or that there law enforcement apprised a defendant of certain advantages of providing consent. *See, e.g.*, *United States* v. *Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (finding consent voluntary where apartment of defendant's girlfriend was forcibly entered by SWAT team, defendant and girlfriend were initially handcuffed, and law enforcement agents raised the possibility that they would take the two into custody and place the girlfriend's young daughter in protective custody); *United States* v. *Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (consent to search valid where defendant was arrested by five or six officers who had previously pulled their guns and placed the defendant in handcuffs); *United States* v. *Ceballos*, 812 F. 2d 42, 51 (2d Cir. 1987) (consent to search was voluntary where defendant forcibly arrested, given *Miranda* warnings, questioned for period of hours, told that the agents would obtain a search warrant if consent was not given, and offered low bail and help in retaining job before giving consent).

Critically, for present purposes, the Second Circuit has also repeatedly made clear that "advising a person of the fact that a search warrant can be obtained does not constitute coercion." *United States* v. *Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983); *United States* v. *Tutino*, 883 F.2d 1125, 1137 (2d Cir. 1989) ("merely advising a person that a search warrant can be obtained does

6

not constitute coercion); *United States* v. *Vasquez*, 638 F.2d 507, 528-29 (2d Cir. 1980) (noting

that the Second Circuit "has upheld consent in circumstances where officers stated that they

could apply for a warrant and would 'no doubt' obtain one," so long as there was no trickery or

deceit by law enforcement agents in making the assertion).

The Government must show that consent was voluntary by a preponderance of the

evidence. *United States* v. *Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States* v. *Calvente*,

722 F.2d 1019, 1023 (2d Cir. 1983). However, a defendant seeking a hearing bears the burden

of demonstrating – typically through an affidavit filed by a person with first-hand knowledge –

that there are material facts in dispute, that is, facts which, if proven through a hearing, would

require the granting of relief. *United States* v. *Warren*, 453 F.2d 738, 743 (2d Cir. 1972);

*United States* v. *Culotta*, 413 F.2d 1343, 1345-46 (2d Cir. 1969); *United States* v. *Dames*, 380 F.

Supp. 2d 270, 276 (S.D.N.Y. 2005).

There is no dispute that Davis executed a written consent to search her Apartment. (Davis

Aff. ¶ 14.) However, defendant argues that her consent was not given voluntary. She says that:

> One of the law enforcement officers then advised me that the agents intended to
> conduct a search of the entire residence. I was informed in sum and substance
> that if I cooperated the search would be quick and easy but that if I refused to
> consent to a search thereby requiring the agents to acquire a search warrant they
> would tear the apartment apart. I was then presented with a Consent to Search
> Form. I do not recall the form being read to me, my reading the form or my being
> advised of my right to refuse to consent to the search. . . . I did not knowingly and
> voluntarily consent to the search of my apartment. Nor did I consent to search of
> the contents of any of the personal papers contained within my bedroom. Rather
> at the time [I] signed the Consent Form I did so out of fear for the destruction of
> my apartment, and the safety of [my] son. As a result, I acquiesced to the show of
> authority to avoid having my son held and my apartment destroyed by the police.

(Davis Aff. ¶¶ 12, 13, 16, 17.)

7

The alleged statements by law enforcement officers about what would happen if she did not consent to search do not vitiate voluntariness. "Advising a person of the fact that a search warrant can be obtained does not constitute coercion." *United States* v. *Calvente*, 722 F.2d at 1023; *see also United States* v. *Tutino*, 883 F.2d at 1137 ("merely advising a person that a search warrant can be obtained does not constitute coercion); *United States* v. *Todd*, 2013 U.S. Dist. LEXIS 19455, at *21-22 (S.D.N.Y. Jan. 28, 2013)(RJS) ("[T]he Second Circuit has repeatedly held that a statement by a government agent or law enforcement offer indicating that, absent consent, the government would obtain a search warrant, does not render the subsequent consent invalid, coerced, or involuntary.") (collecting cases).

Davis argues that even if it were permissible for law enforcement to tell a defendant that they could obtain a warrant in the absence of a consent to search, such a representation is not permissible if in fact there was no basis to obtain a warrant. (Nelson Aff. ¶ 26.)  However, defendant's own submission highlights the fact that the agents had already observed "in plain view" a prescription for oxycodone which, in and of itself, "would certainly lead one to believe . . . that some form of incriminating evidence would be discovered" in the remainder of the Apartment.  (*Id.* ¶ 27.)  The agents say that they had also observed—"in the kitchen, in plain view"—a bag of plastic cups used to provide urine samples, evidence of Davis' involvement in the charged conspiracy.  What the agents could see without conducting a search would undoubtedly have provided the agents with a basis for seeking a search warrant – especially given the long-standing investigation into the operations of the Clinic.

Similarly, the court is unmoved by Davis' assertion that the text of the consent to search form was not read to her and she does not recall reading it. Failure to review the form, if in fact

8

that occurred, was Davis' choice; she admits that it was given to her. By her own testimony, Davis was not in physical danger; no guns were drawn; she was under arrest but not yet cuffed or confined. She was undoubtedly upset, but that does not excuse her failure (if failure there was) to sign a form without reading it.

This leaves the agents' purported threat to "tear the apartment apart" if they obtained a warrant – something the Government contends never happened. Such a statement does not in and of itself render her consent involuntary. Courts must evaluate threatening statements in the broader context in which they were made, considering how the words would reasonably be interpreted. *See United States* v. *Porras-Quintero*, No. 07 Cr. 228 (RPP), 2007 U.S. Dist. LEXIS 94047, 2007 WL 4531552, at *8 (S.D.N.Y. Dec. 21, 2007) (holding that even if the court were to find that the police threatened "to detain" the defendant and to "destroy" his apartment if they had to get a search warrant, this alone would not make the granting of consent involuntary); *United States v. Ceballos,* 812 F.2d 42, 51 (2d Cir.1987) (holding that consent to search was voluntarily given by defendant even after the "agents forcibly removed [defendant] from his place of work in handcuffs [;]" "the agents sought to persuade Ceballos to consent to a search and to confess[;]" "[t]hey warned him of the disruption to his household of execution of a court-ordered search warrant[;]" and "[t]hey promised him aid in obtaining low bail and retaining his job if he cooperated"))); *United States v. Wilkinson,* 926 F.2d 22, 25 (1st Cir.1991) (affirming district court finding that the officers' threat to "tear the place apart" amounted to "no more than a permissible promise to search the house thoroughly"), *overruled on other grounds, Bailey v. United States,* 516 U.S. 137 (1995). There are cases from in which consent was deemed tainted because of threats to "tear your house up and won't fix it," *United States v. Wilcox,* 357 F.Supp.

9

514, 520-521 (E.D.Pa.1973); to "get the SWAT team in, with police dogs, and tear the house apart," *Speese v. Beyer,* No. 11 Civ. 0519, 2012 WL 4018003(MEM), at *5 (M.D.Pa. Aug. 8, 2012); or even "the search warrant [would give] us the authority to tear the paneling off the walls." *United States v. Kampbell,* 574 F.2d 962, 963 (8th Cir.1978). However, the court is constrained to note of the age of two of those cases and the fact that none of them is from this Circuit.

The Government says that it would contest at a hearing that the "tear the place apart" words were ever uttered, but argues that, even if those words were spoken, the motion should be denied without a hearing, because the threat "to tear the apartment apart" could not have overborne the voluntariness of defendant's consent given her "age, intelligence [or] educational background." *Schneckloth* v. *Bustamonte, supra.,* 412 U.S. at 227. The Government says that if the Court were to insist on a hearing, it would call two of the agents involved in the arrest who witnessed Davis execute the consent-to-search form. The Government says that the agents would testify, *inter alia,* "that no threats of any kind were made to the defendant who was provided with the consent to search form, which she reviewed, before executing it."

The Government's arguments in favor of denying Davis's motion are persuasive under Second Circuit precedent. However, the prudent course of action here is to hold a full evidentiary hearing to develop the record before the Court rules.

### Mirilishvili's Motion to Suppress

On December 10, 2014 a magistrate judge in the Southern District of New York approved a search warrant for Dr. Mirilishvili's clinic. On the same date, a magistrate judge in the Eastern District of New York approved a search warrant for Mirilishvili's Residence. Both

10

affidavits contained similar, lengthy, factual narratives detailing the background of the
investigation, the grand jury's indictment of Mirilishvili and ten co-defendants, and detailed
factual allegations relevant to the Government's position that there existed probable cause to
search both locations.

Mirilishvili argues, principally, that the identical allegations in ¶ 16(a) of the affidavit in
support of the application for the warrant to search his office, and ¶ 17(a) of the affidavit
underlying the warrant to search his home -- allegations that "a confidential source ('CS-1') who
was posing as a 'patient' . . . informed MIRILISHVILI that she/he had 'no pain' and then handed
MIRILIASHVILI $200 in cash before receiving, in return, a prescription for 90 30-milligram
oxycodone tablets" -- constituted the sort of intentional and/or reckless material falsehoods in
search warrant affidavits that violate the rule of *Franks* v. *Delaware*, 438 U.S. 154 (1978),
thereby requiring the court, as a matter of law, to suppress the evidence obtained as a result of
those searches. (Mirilishvili Br. At 2-3.)

### *The Clinic Application*

The application to search the Clinic was approximately 20 pages long, and attached a
copy of the Indictment. The application was sworn to by Det. Victor Lebron, one of the lead
case agents on the investigation.

The application included a detailed description of the premises and a brief overview of
the investigation which it noted spanned nearly two years and involved "the use of cooperating
witnesses, cooperating sources, and confidential informants, as well as extensive surveillance by
law enforcement." (Govt. Ex. B ¶ 6.) The affidavit made clear that it did "not include[] . . . the

11

details of every aspect of the investigation." It further noted that where "conversations and statements of others . . . are related . . . they are related in substance and in part." (*Id.* ¶ 2.)

The Government's view that probable cause existed to search the Clinic stemmed from the fact that "a substantial portion of the illegal activities related to the Indictment [were] centered in and around" the Clinic. (*Id.* ¶ 17.) Among other things, the application alleged that Mirilishvili wrote thousands of medically unnecessary prescriptions for oxycodone at the Clinic; that Mirilishvili collected millions in cash payments, rather than the insurance typically used to cover medical costs, in return for these prescriptions at the Clinic; and that substantially every patient seen by the doctor received an identical prescription for 90 30-milligram oxycodone tablets, all at the Clinic. (*Id.* ¶ 8.) The affidavit further alleged that high-level drug traffickers, referred to as "Crew Chiefs," congregated at the Clinic on a daily basis, collecting many of the prescriptions being generated by Mirilishvili so that the pills could be resold. Moreover, the affidavit attached the Indictment which identified at least 8 such "Crew Chiefs" and specifically alleged that each was involved in drug trafficking activities in and around the Clinic. (*E.g.*, Govt. Ex A, Indictment ¶¶ 14(c)-(j)). Indeed, based on those facts, the affidavit alleged that the "operations of [this] drug distribution ring . . . were centralized at the" Clinic. (Govt. Ex. B ¶ 13.)

In addition to Mirilishvili and the Crew Chiefs, the application and accompanying Indictment also specified that members of the Office Staff were believed to be committing crimes in and around the Clinic. For example, the application alleged that Mirilishvili's employees, and co-defendants in this case, "used their roles as Office Staff" to reap "thousands of dollars . . . by charging Crew Chiefs cash fees – typically several hundred dollars or more – to

12

generate fake MRI reports, fake urinalysis reports, or otherwise facilitate" operation of the
scheme.  (Govt. Ex. B ¶ 16.)

      The application then identified several examples of specific acts that had occurred in the
Clinic.  Among others, the application highlighted a January 16, 2014 "patient" visit made by a
CS in which, as alleged in the application, "CS-1 informed MIRILISHVILI that he/she had 'no
pain'" but still received an oxycodone prescription after "hand[ing] MIRILISHVILI $200 in
cash."  (*Id.* ¶ 17(a)).[2]  As another example – and as further evidence of the fraudulent nature of
this "patient visit" – the application alleges that several weeks later, CS-1 returned to the Clinic
and paid Mirilishvili's office worker, Jomaris Javier, $400 in cash for arranging for the patient
visit.  (*Id.* ¶ 17(b)).

      The attached Indictment elaborated further on these acts, identifying numerous additional
bases for finding probable cause to believe the Clinic would contain evidence of the charged
crime.  For example, the Indictment alleged that "[t]he Office Staff . . . profited by selling
oxycodone prescriptions or loose pills directly to Crew Chiefs.  *Many of these transactions
occurred inside the Clinic*."  (Ex. A ¶ 11.)  The Indictment named eight Crew Chiefs, alleging
that each brought up to 30 "patients" each month to obtain medically unnecessary oxycodone
prescriptions at the Clinic.  (*Id.* ¶ 14(c)-(j)).

      The Indictment also identified approximately nineteen specific acts in furtherance of the
conspiracy, virtually all of which were directly tied to the Clinic.  For example, the Government
identified specific dates on which particular Crew Chiefs obtained medically unnecessary

---

[2] It is this paragraph in the Clinic warrant application that defendant says misrepresents the facts and renders the
warrant application unlawful.

prescriptions at the Clinic; on which cash bribes were paid to the Office Staff at the Clinic in

return for assistance in obtaining medically unnecessary prescriptions; and on which defendants

offered to sell oxycodone pills and arranged narcotics transactions in and around the Clinic.

(*E.g.*, Ex. A ¶ 18(b)-(d); (i), (k) & (o).)

Based on the above, Magistrate Judge Ellis approved the warrant, which was executed on

December 11, 2014.

### *The Mirilishvili Residence Search Warrant*

The application to search the Mirilishvili Residence was also approximately 20 pages

long, and attached a copy of the Indictment. The application was sworn to by Detective Matthew

Del Rosario.

Much as with the application to search the Clinic, this application highlighted the length

and scope of the investigation, and the fact that a grand jury in this District had just indicted

Mirialshvili along with ten others for conspiring to distribute narcotics. This application also

made clear that the affiant had "not included herein the details of every aspect of the

investigation" and that "[w]here . . . conversations and statements of others . . , are related herein,

they are related in substance and in part." (Govt. Ex. C ¶ 2.)

The application began with a background section on the background of the investigation

and included general background on the Clinic – a premises not a subject of this application –

but which included some of the same factual allegations contained in the application for the

Clinic, as described above. This application included the January 16, 2014 visit by a "CS" to see

Mirilishvili in which "CS-1 informed MIRILISHVILI that he/she had 'no pain'" but still

received an oxycodone prescription after "hand[ing] MIRILISHVILI $200 in cash." (*Id.* ¶

14

16(a)).[3]  As another example – and as further evidence of the fraudulent nature of this "patient visit" – the application alleges that several weeks later, CS-1 returned to the Clinic and paid Mirilishvili's office worker, Jomaris Javier, \$400 in cash for arranging for the patient visit.  (*Id.* ¶ 17(b)).

With respect to the Residence itself, the affidavit focused on the Government's belief that Mirilishvili was likely storing crime proceeds and patient notes or files in the Residence, all of which would be evidence of the charged conspiracy.

The affidavit noted based on debriefings of confidential sources, among other things, that "it was MIRILISHVILI's practice to place the cash fees he had collected from 'patients' in a small black bag, which he would then transport from the clinic to" his home.  (*Id.* ¶ 17.)  The affidavit further noted that on multiple occasions over a six-month period, law enforcement agents had observed Mirilishvili transporting what appeared to be a bag of cash from the Clinic to the Residence.  The affidavit identified five specific such dates and included, as attachments, photographs of Mirilishvili taken by law enforcement conducting surveillance.  (*Id.* ¶ 18(a)-(e)).

Based on the above, Chief Magistrate Judge Scanlan approved the warrant, which was executed on December 11, 2014.

### *The Applicable Law*

In deciding whether a search warrant is supported by probable cause, a court must determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States* v. *Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  "In

---

[3] It is this paragraph in the application for a warrant to search Mirilishvili's residence that defendant says misrepresents the facts and renders the warrant application unlawful.

15

assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically." *Id.* A court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," *id.*, and must accord "considerable deference to the probable cause determination of the issuing magistrate," *Walczyk* v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citing 462 U.S. 213, 238-39 (1983)). So long as there is a substantial basis for concluding that probable cause existed, "the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965).

A defendant seeking to challenge the validity of a warrant on the basis of alleged errors or inaccuracies in the application faces a high bar. *See generally Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978). Pursuant to *Franks*, evidence will not be suppressed unless both "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" *Canfield*, 212 F.3d at 717-718 (citing *Franks*, 438 U.S. at 164-72).

With respect to the first, the defendant bears the burden of establishing that "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States* v. *Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000); *see also Martin*, 426 F.3d at 73 (defendant must show that "the affidavit contained 'a false statement knowingly and intentionally, or with reckless disregard for the truth.'") (quoting *Franks*, 438 U.S. at 156). Moreover, because "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly," the "mere intent to exclude information is . . .

16

insufficient," *Awadallah*, 349 F.3d at 67-68. Instead, a defendant must demonstrate omissions that "are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *Awadallah*, 349 F.3d at 68. Reckless disregard for the truth of statements set forth in the warrant "may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991).

With respect to the second prong – *i.e.*, the materiality of the allegedly false statement -- under *Franks*, materiality is "gauge[d] . . . by a process of subtraction: To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant. If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Awadallah*, 349 F.3d at 64 (internal quoations omitted); *see also Canfield*, 212 F.3d at 718; *see also Franks*, 438 U.S. at 171-172 ("If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing [to challenge the sufficiency of the affidavit] is required.")

The standard of probable cause applied to a warrant, once it has been stripped of the alleged inaccuracies, or once omitted information is included, is the same practical standard applied in other contexts. That is, the warrant affidavit must be sufficient to provide a "'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 233 (quoting *Jones* v. *United States*, 362 U.S. 257, 271 (1960)); *see also*

17

*United States* v. *Smith*, 9 F.3d 1007 (2d Cir. 1993); *Rivera*, 928 F.2d at 602. "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* at 602 (quoting *Ventresca*, 380 U.S. at 109).

The defendant bears the burden of establishing both components - *i.e.*, materiality and intent - by a preponderance of the evidence. *See United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008). Making this showing is not an easy task because, as the Second Circuit has observed, "[t]he *Franks* standard is a high one." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991). Moreover, to even be entitled to a hearing on a claim raised pursuant to *Franks*, a defendant must make a "substantial preliminary showing" on both *Franks* elements. *Id.*

### *Mirilishvili Has Not Met His Burden Under Franks*

With respect to the first prong of the *Franks* standard, Mirilishvili does not dispute that the affidavit correctly documents that CS-1 saw Mirilishvili on January 16, 2014; that during that visit, CS-1 told Mirilishvili he had "no pain"; that CS-1 paid Mirilishvili $200 in cash during that visit; and that CS-1 received an oxycodone prescription. Instead, the defendant contends the affidavit "purposefully omit[s] important context" such as the fact that during prior encounters, the defendant had been told that "CS-1 had pain in his lower back and lower extremities" and that, during that meeting, CS-1 indicated he had "no pain" as a result of taking the oxycodone. (Def. Br. at 4; Def. Reply Br. at 2.)

> It is only the applications' pejorative spin, provided in a manner, as detailed post at 5, and which constituted an "inaccurac[y] or omission[]" amounting to a "deliberate falsehood or reckless disregard for the truth[,]" *Franks*, 438 U.S. at 164-72, that could raise what happened at that appointment – preserved in CS-1's recording – to the level of criminal conduct and justify the issuance of the warrant(s).

18

(Def. Reply Br. at 2.)

There is no question that, with respect to the January 2014 visit, both applications contain only a very brief summary of a longer encounter. However, both applications made clear that representations of conversations are reproduced in "substance and in part" for the limited purpose of providing the reviewing magistrate judge with an overview of the investigation. Defendant says that the affiants purposely "omitted" from the applications the fact that Mirilishvili had been "told by CS-1 during prior appointments . . . that CS-1 had pain in his lower back and lower extremities," thereby putting a "pejorative spin" on an otherwise lawful encounter between patient and doctor. (Def. Brief at 7.) However, this argument is belied by the Government's proffer that CS-1 had been telling the defendant repeatedly since at least August – *i.e.*, for some five months – that he had *no* pain. Nonetheless, Mirilishvili began the January 2014 visit – as he began every visit – by telling CS-1 that "[w]hen I saw him the last time he was complaining of lower back, lower extremity pain." Apparently, Mirilishvili's false description of CS-1's "clinical condition" was part of the scam; omitting his false statement from the search warrant application would not have mislead the reviewing magistrate.

In any event, the fact that CS-1 told Mirilishvili that he had "no pain" as a result of taking the medication ostensibly prescribed at the last visit, does not alter the fact that Mirilishvili continued to prescribe oxycodone month after month for a patient with "no pain" without making any effort to reduce the medication or wean the patient off of it. That is particularly true in light of some of the other circumstances surrounding that visit, many of which are also included the affidavit, such as the fact that CS-1 was paying cash for the prescription, had no actual need for

19

the medication, and was additionally paying Mirilishvili's office manager, Jomaris Javier, an additional $400 in cash just to make the appointment.

Nor does any of the other "context" cited by the defendant in the instant motion – namely, the additional visits by CS-1 or statements made therein – undermine the accuracy of the representation in the affidavit that the January 2014 visit was fraudulent. All of the additional visits by CS-1 to Mirilishvili bore significant indicia of fraud, beginning with an initial visit in which CS-1 tells the defendant he is already taking "M30s" obtained from an unidentified source, while paying cash to obtain a new prescription that he is then sent by the defendant to a pharmacy miles away in Queens to fill.

In short, none of this "context" undermines the accuracy of the allegation in the Indictment that the January 2014 visit by CS-1 was, at core, fraudulent. Nor does it undermine the accuracy of the application as a whole – that is, that there was probable cause to believe that criminal activity was occurring in the Clinic. The application alleges that: crowds gathered every day at the Clinic, where the defendant accepted cash payments in return for writing identical prescriptions for 90 30-milligram oxycodone tablets for every patient who walked in the door, writing as many as 46 of these prescriptions in a single day; blatant drug transactions were being negotiated and brokered within and immediately around that Clinic; high-level drug traffickers, or "Crew Chiefs," congregated at the Clinic daily, and used it as base of operations for their drug trafficking activities. And with respect to the Residence, the application alleges that he carried bags full of cash, earned from writing all of these prescriptions, home in one of his Mercedes each night.

20

That the defendant is likely to offer an innocent explanation for components of his conduct at trial does not render the Government's affidavit misleading. *Cf. United States* v. *Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."). In this regard, it bears mention that the Government did in fact disclose to both reviewing magistrates that (1) the defendant frequently took seemingly legitimate steps like requesting certain medical records during the course of the scheme, and (2) that patients frequently provided the defendant with fake and false information in response.

For example, in both applications, the Government noted that "The Office Staff . . . profited by creating fake documents such as MRI reports purporting to reflect injuries or urinalysis reports ostensibly documenting the patient was taking rather than selling the oxycodone, all of which Mirilishvili would frequently request in an effort to evade detection by law enforcement." (Govt. Ex. B ¶ 10). Similarly, in the Indictment, which was attached to both applications, the Government disclosed that "to protect against the possibility of detection by law enforcement, MIRILISHVILI sometimes asks the 'patients' for medical documentation, such as MRI reports purporting to document injuries, or urinalysis reports purporting to show that the "patient" was taking oxycodone and thus not obtaining it for the purpose of distribution." (Govt. Ex. A ¶ 8.) And with respect to the CS-1 visit in January 2014, in particular, the applications specifically disclosed that CS-1 was paying the defendant's employee $400 in cash to "facilitate" the visit – not something that legitimate patients normally do.  To the extent the defendant thus highlights aspects of the CS-1 visits in which he took purportedly "legitimate" steps or was provided untrue information by the "patients" seeing him, there is no basis for concluding that

21

the affiants deliberately withheld that information. To the contrary, that conduct by the defendant was disclosed in both applications.

Accordingly, Mirilishvili has not met his burden of making a "substantial preliminary showing" that the applications, considered as a whole, were drafted with a reckless disregard for the truth or with the intention of deliberately misleading the magistrate.

Even assuming Mirilishvili made a showing with respect to the first prong (he has not), the motion would nevertheless fail because the defendant has not satisfied the second prong of the *Franks* standard – that is, that the paragraph defendant believes to have mislead the magistrates was "necessary" to the probable cause determinations made by each magistrate. The applicable standard is that after "set[ting] to one side" the "material that is the subject of the alleged falsity or reckless disregard" there can be no serious dispute that "there remains sufficient content in the warrant to support a finding of probable cause." *Franks*, 438 U.S. at 171-172.

The defendant's argument appears to suggest that the Court should, instead of subtracting the allegedly offending paragraph (the normal *Franks* process), consider how the application would have read "had the affiants provided in their affidavits a complete and honest account of CS-1's appointment with Dr. Mirilishvili and the relevant context contained in the other recordings." (Def. Br. at 7). While *Franks* itself – which is the only case directly relied upon by the defendant – speaks only of the subtraction standard, the Second Circuit has recently noted, in collecting law from other Circuits, that "'the literal *Franks* approach [does not] seem[ ] adequate because, by their nature, omissions cannot be deleted'; therefore '[a] better approach . . . would be to . . . insert the omitted truths revealed at the suppression hearing,'" *United States* v.

22

*Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States* v. *Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)).  The *Rajaratnam* panel, however, did not have occasion to apply that standard, simply affirming the judgment below "for substantially the reasons stated in the District Court's analysis of the issue."  *Id.* at 157.

While the governing standard remains one of subtraction as articulated in *Franks* itself, the outcome would be no different whether the offending paragraph were subtracted or if the additional content suggested by defendant were added to the search applications.  In either case, a finding of probable cause to search the Clinic and residence would be justified.

The additional recordings suggested by defendant would not undermine a finding of probable cause to search the Clinic and Residence.  Those recordings would not negate the abundant evidence of illegal activity at the Clinic, including that Mirilishvili had written nearly 14,000 identical prescriptions for oxycodone in a two-year period, writing as many as 46 in a single day; the defendant personally collected cash payments for substantially all of these prescriptions; that drug-traffickers known as "Crew Chiefs" congregated at the Clinic on a daily basis; that members of the Office Staff created false documents in the Clinic; and that various defendants engaged in and brokered drug sales in and around the Clinic.  The application and attached Indictment specified exact dates on which many of these activities occurred at the Clinic, over a substantial period of time leading up to the application.  And the application attached a detailed Indictment reflecting a Grand Jury's finding of probable cause to believe the eleven named defendants were engaged in a drug-trafficking conspiracy "centered at" the Clinic.  Those averments are more than sufficient to establish probable cause to search the Clinic.  Indeed, the totality of these allegations, some of which (i.e., the number of identical

23

prescriptions) were supported by the existence of state-mandated records, provide the context in which the conversation between doctor and patient – even reproduced in full – looks damning.

With respect to the Mirilishvili Residence, the argument that the additional content would have negated probable cause is even weaker, since the general background section of the application was not directly relied on by the Government as providing probable cause for the Residence. Instead, the Government relied on information from confidential sources that the defendant was transporting cash derived from his illegal activities at the Clinic to the Residence, along with records of "patients" seen at the Clinic – which information was corroborated by agent surveillance. Although the fact that all of these things were found at the Residence during the search could not logically have established probable cause prior to the search, it does corroborate the truthfulness of the informants' information.   The application for the Residence detailed specific dates on which the defendant had been observed on multiple occasions over a six month period – including just days prior to the making of the application for a warrant -- traveling in one of his Mercedes from the Clinic to the Residence, carrying the little black bag that he used to store the cash.  Thus, Mirilishvili has failed to make the required showing that the alleged omissions affected the probable cause determination on either application.

Mirilashvil's motion to suppress is denied in its entirety.

Severance Motions

Defendants Goode and Davis have moved for severance.  Defendants Mirashivili, Javier, Williams, and Leonard have formally asked to join in those motions, and the court has considered the motions as to those defendants.

Goode seeks severance because of "the significant unfair and unjustifiable prejudice that she will face if she stands trial alongside her ten codefendants." (Goode Br. at 5).

Davis seeks severance pursuant to *Bruton* v. *United States,* 391 U.S. 123 (1968), citing concerns about post-arrest statements of co-defendants. The Government acknowledges that various defendants made statements implicating various other defendants; those statements have not been disclosed, and the court does not presently know who may have implicated whom.

Under Rule 8(b) Offenses and defendants are properly joined where the criminal acts of two or more persons are "'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" *United States v. Attansio*, 870 F.2d 809, 815 (2d Cir. 1989); Fed. R. Crim. P. 8(b).

Rule 14 of the Federal Rules of Criminal Procedure permits severance in certain circumstances: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

A defendant seeking severance must show that he would be so prejudiced by joinder that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." *Zafiro v. United States*, 506 U.S. 534, 540 (1993). "A district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.*

Even in those rare instances where a defendant establishes a "high" risk of prejudice,

"less drastic measures, such as limiting instructions, often will suffice to cure any risk of

prejudice." *Id.* at 539 (citing *Richardson*, 481 U.S. at 211); *see also United States v. Freyer*, 333

F.3d 110, 114 (2d Cir. 2003). Courts have repeatedly recognized that any potential prejudice

caused by a joint trial can be effectively mitigated by instructing the jury to consider separately

each individual defendant and each charge, and consider only the evidence that has been

admitted against each defendant. *See Zafiro*, 506 U.S. at 540-41; *United States v. Hernandez*, 85

F.3d 1023, 1029-30 (2d Cir. 1996); *United States v. Romero*, 54 F.3d 56, 60 (2d Cir. 1995).

Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice

attendant in a joint trial are presumptively outweighed by the conservation of time, money, and

scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351,

366 (S.D.N.Y. 1993).

All of the defendants in the indictment are charged with participating in a single

conspiracy to distribute oxycodone. Thus, defendants are properly joined under Rule 8. Fed. R.

Crim. P. 8(b).

The only ground for Goode's motion is that she fears she will suffer unfair and

unjustifiable prejudice if tried alongside her ten codefendants. Goode does not identify any

specific reason why she would suffer any particular prejudice from having her case joined with

the case of any particular co-defendant.

Goode's motion is denied. Her fear of non-specific prejudice is insufficient to overcome

the heavy presumption in favor of joint trial with her alleged co-conspirators. The Court is

satisfied that any prejudice resulting from being tried along with her codefendants would be

26

offset by a properly instructed jury. The jurors at a joint trial will be instructed that it is their

sworn duty: to give separate consideration to the case of each individual defendant; to consider

the evidence separately as it applies, or fails to apply, to each defendant; apply each instruction

on the law separately as to each defendant; to return a separate verdict for each defendant, and

that; those verdicts need not be the same.

No other defendant who has joined in the motion has articulated a more specific basis for

believing that he/she will be prejudiced by a joint trial. Therefore, all motions for severance on

this ground are denied.

As for Davis's severance motion predicated on a possible *Bruton* issue: *Bruton v. United

States*, 391 U.S. 123 (1968) held that a defendant's confrontation clause rights are violated when

a non-testifying codefendant's confession naming the defendant as a participant in the crime is

introduced at their joint trial, even if the jury is instructed to consider the confession only against

the defendant. *See also Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987) (so stating the rule).

Later cases modified *Bruton* and held that the confrontation clause is not violated by the

admission of a non-testifying codefendant's confession if: (1) a proper limiting instruction is

given and (2) the confession is redacted to eliminate not only the defendant's name but also any

reference to his or her existence. *Richardson*, 481 U.S. at 208, 211; *see also* Gray v. Maryland,

523 U.S. 185, 189-91 (1998). This is true even if other evidence admitted at trial links the

defendant to the confession. *Richardson,* 481 U.S. 200. A problem arises, however, when a

statement is not amenable to redaction and the Government is not prepared to forgo its

introduction.

27

The Government argues that such a motion is premature because at this stage—five months prior to the scheduled trial date—since it is unclear which defendants, if any, will actually go to trial, and therefore, no way to know if any of the statements the Government might seek to introduce will create a *Bruton* issue. The court agrees. The motion for severance is denied without prejudice to renewal closer to the date of the trial.

The Government must provide defendants with notice—at least 90 days in advance of trial—of any incriminating statement, made by another defendant who remains to be tried, that the Government intends to offer at trial, together with proposed redactions to that statement that will, in the Government's view, cure any *Bruton* problem. Any defendant that would be affected by the introduction of the proposed statement will have seven days to seek severance, redaction or any other appropriate relief.

### Bill of Particulars

Defendants Mirilishvili, Goode, and Davis have all moved for a bill of particulars, with Javier, Williams, and Leonard joining in the motion.

The proper scope and function of a bill of particulars is to furnish facts, supplemental to those contained in the indictment, necessary to apprise the defendants of the charges against them with sufficient precision so as to enable them to prepare a defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984). If the information the defendant seeks "is provided in the indictment or in some acceptable alternate

28

form," such as discovery or other correspondence, no bill of particulars is required. *Bortnovsky*, 820 F.2d at 572; *D'Amico*, 734 F. Supp. 2d at 335; *United States v. Spy Factory*, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997). Accordingly, the ultimate test is whether the information sought is necessary, not whether it is helpful. *See United States v. Lauersen*, No. 98 Cr. 1134 (WHP), 1999 WL 440619, *3 (S.D.N.Y. June 28, 1999); *United States v. Percan*, No. 98 Cr. 392 (AGS), 1999 WL 13040, *5 (S.D.N.Y. Jan. 13, 1999).

In the present case, the Indictment—a detailed, 20-page document— clearly identifies the nature of the charge, the time period, the key participants, and the central locations. With respect to each defendant, it carefully and in some detail identifies their role in the scheme, and in some cases, the names of specific co-defendants with whom they worked directly. The Indictment further identifies approximately nineteen specific acts in furtherance of the conspiracy, including specific dates on which particular Crew Chiefs obtained medically unnecessary prescriptions at the Clinic; dates on which cash bribes were paid to the Office Staff at the Clinic in return for assistance in obtaining medically unnecessary prescriptions; and dates on which defendants offered to sell oxycodone pills and arranged narcotics transactions in and around the Clinic. While every transaction is not detailed in the Indictment, certainly the means and methods by which the conspiracy worked, and the key participants, along with core dates and locations are clearly detailed in the Indictment.

The Government represents that it has also provided the defendants with a "vast" amount of "organized discovery," including: state records documenting precise dates and locations at which each defendant obtained and filled prescriptions; thousands of surveillance photographs (generally organized by defendant) in which the defendants are shown associating with other

29

conspirators; recordings produced by date and participant in which certain defendants engage in narcotics transactions or narcotics-related discussions; phone records identified by defendant, along with the full contents of phones recovered from certain defendants, again identified by defendant; as well as all of the documents recovered from the Clinic and Mirilishvili residence.

The Government also represents that it has summarized the materials it provided and has worked with any attorney who has asked (including the attorneys for defendants Goode and Davis), and that it remains happy to continue working with any defense attorney who seeks additional guidance in navigating the materials provided through discovery.

In light of the forgoing, the Court is satisfied that the Indictment and the discovery provided defendants sufficient to apprise each defendant of the charges against him or her, with enough precision to enable them to prepare their defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *Torres*, 901 F.2d at 234.

Accordingly, the Government need not furnish defendants with a bill of particulars.

### 404(b), *Brady, Giglio,* & other Disclosures

Defendant Davis moves for the early production of any evidence that the Government seeks to introduce pursuant to Rule 404(b) of the Federal Rules of Evidence "in such sufficient and reasonable time that the defendant may move . . . to preclude the introduction of such evidence." (Davis Br. at 10). Davis also seeks the disclosure of *Brady* and *Giglio* information 60 days before trial.

In regard to the Government's *Brady* and *Giglio* obligation, the Government states that it is aware of its obligation and has made and will continue to make all required disclosures.

(Gov't Memo at 45). Accordingly, the Court need not take any action in this regard, other than to warn the Government that it acts at its peril if it fails in its *Brady* or *Giglio* obligations by taking too narrow a view of what constitutes "exculpatory" evidence.

The Government is to provide the defendants with the Jencks Act material two weeks prior to trial.

The Government is directed to give notice of its intention to use other crimes evidence pursuant to Federal Rule of Evidence 404(b) and of the general nature of such evidence by January 15, 2016. Any defense motion predicated on such notice would be due by January 25, 2016. All other *in limine* motion—whether from the Government or the defense—are due January 25, 2016. Responses to all *in limine* motions are due February 5, 2016.

The Government will provide defendant with a list of the witnesses it intends to call on the Friday before the trial week those witnesses are scheduled to testify. Should any defendant elect to call witnesses, that defendant will reciprocate by providing the Government with similar notice of the witnesses to be called. I expect the parties to give each other at least two days' notice of when a particular witness is likely to be called.

Proposed *voir dire* questions and all request to charge are due on the date of the final pretrial conference, which will be held on February 18, 2016, at 4:00 p.m.

This constitutes the decision and order of the Court.

October 1, 2015

U.S.D.J.

BY HAND AND ECF TO ALL COUNSEL

31