UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                        :

UNITED STATES OF AMERICA         :         14 Cr. 810 (CM)

        – v. –                 :

MOSHE MIRILASHVILI,          :

               Defendant.    :

--------------------------------------------------------X

 

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America

EDWARD B. DISKANT
BROOKE E. CUCINELLA
Assistant United States Attorneys
    - Of Counsel -

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                      :

UNITED STATES OF AMERICA          :         14 Cr. 810 (CM)
                                        :

          – v. –                 :

                                        :

MOSHE MIRILASHVILI               :

                                        :

                   Defendant.        :

-------------------------------------------------------X

## THE GOVERNMENT'S MOTION *IN LIMINE*

The Government respectfully submits this memorandum of law in support of its motion, which seeks a ruling in advance of trial, scheduled to begin February 29, 2016, permitting it to offer evidence of : (1) the expulsion of Moshe Mirilashvili (the "defendant") from the New York State Medicaid Program for fraudulent billing practices in 1993;  (2) the revocation of the defendant's medical license in 1996 based on findings of professional misconduct and gross negligence in his treatment of patients; and (3) the terms of the probationary period the defendant was placed as a requirement to regain his license to practice medicine, as well as the conduct giving rise to those prior state actions (collectively, the "State Actions").[1]  Although they may have begun 20 years ago, the State Actions continued to directly restrict and impact the defendant through December 2010, or just a year before the period of the charged conspiracy, and are highly relevant to what the Government expects will be the core issue in dispute at trial, namely the

---

[1] In addition, the Government is aware that shortly after the State Actions, the State of New Jersey and the State of Pennsylvania also revoked the defendant's licenses to practice in those states.   Those revocations were based entirely on the findings of misconduct in New York – that is, on the findings in the State Actions.

defendant's knowledge and intent with respect to his issuance of more than 13,000 identical oxycodone prescriptions to substantially every purported "patient" he saw.

In particular, and as detailed herein, the State Actions indisputably put the defendant on notice that much of the conduct relevant to this case – including a pattern of prescribing a very similar of pain medication to every patient while failing to adequately evaluate the patient or document the patient's medical need for that pain medication – constituted substandard care, and in some cases gross negligence, and was outside of the scope of the legitimate practice of medicine.  Moreover, the State Actions – which as noted above and detailed further herein stemmed from an insurance audit of the defendant's practice – provide critical background for the defendant's decision to focus on cash payments (and decline to accept most forms of insurance) while engaging in a medical practice the Government expects to establish at trial was criminal and unable to withstand the sort of scrutiny an insurance company would, and historically has, imposed on the defendant.

As such, the Government submits that evidence of the State Actions, as well as the conduct underlying those Actions, is properly admissible as direct evidence and necessary background of the charged conspiracy.  Additionally, or in the alternative, the State Actions should be admitted pursuant to Rule 404(b) as relevant and important evidence of the defendant's knowledge and intent and to rebut any claims to the contrary by the defendant.

I.      **RELEVANT FACTS**

A. Background

On December 11, 2014 the defendant and ten co-conspirators were charged by Indictment 14 cr. 810 (CM) with one count of conspiring to distribute oxycodone.[2]  As alleged in detail in the Indictment, the charged conspiracy centered at a purported pain management run by the defendant and located in upper Manhattan (the "Clinic"), where every day, crowds of "patients" gathered and waited for an appointment with the defendant, appointments that almost always resulted in the issuance of an identical prescription for 90 30-milligram oxycodone tablets.  While the defendant accepted a limited number of insurance plans, the vast majority of the "patients" at the Clinic paid cash – $200 handed directly to the defendant at the beginning of each "patient" visit – for an essentially guaranteed prescription for oxycodone.  In total, between October 2012 when the Clinic opened, and December 2014, the defendant wrote more than 13,000 oxycodone prescriptions, substantially all for 90 30-milligram tablets.  The defendant also collected millions in cash fees and, at the time of his arrest, the defendant was found to have approximately $1.75 million in cash stored in zip lock bags in various locations in his residence.

As detailed in the Indictment, substantially all of the "patients" who obtained oxycodone prescriptions from the defendant were not legitimate patients at all but worked instead as part of "crews" run by Crew Chiefs who paid people to pose as "patients" and collect oxycodone prescriptions so that the prescriptions could be filled and the pills resold.  In furtherance of the conspiracy, these Crew Chiefs and others who worked with them frequently created sham or fake documents required by the defendant, including fake MRI reports purporting to document injuries

---

[2] Shortly after this motion is filed, the Government anticipates seeking a superseding indictment which will charge the defendant with an additional count of distribution of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

for which pain management might be appropriate.  Crew Chiefs also typically provided their "patients" with the $200 in cash that the defendant charged for the medically unnecessary oxycodone prescriptions and collected at the beginning each "patient" visit.

In addition to the cash fees and identical oxycodone prescriptions, the Government anticipates offering evidence at trial regarding other illegitimate aspects of the defendant's practice.  For example, the Government anticipates establishing at trial that the defendant took little, if any, by way of a "patient history" for each patient seen, while conducting only cursory examinations.[3]   The Government expects to show that the defendant never ordered diagnostic testing of his own (such as an MRI or X-ray), nor did he ever request or examine the actual scans or testing ostensibly done by others, much less the full patients' files from the referring physicians. Instead, the defendant typically collected at most an MRI "report" documenting what another physician, typically a radiologist, purported to have detected on the scan.

With respect to those MRI reports, the Government expects its evidence to establish not only that many of these documents were fake, but that they were visibly and demonstrably so – female patients were referred to as "males" on MRI reports, for example; fonts for the patient name and DOB were visibly different from the rest of the document, reflecting the clear alteration of the original; and the phone numbers listed for the referring doctors or radiology labs were frequently fake.   The same documents reveal that "patients" with home addresses near Coney

---

[3] For example, and as the Court may recall from the briefing attendant to the defendant's motion to dismiss, during a recorded patient visit in June 2013, the defendant writes an 90 30-milligram oxycodone prescription for a new "patient" who informed the defendant that he was already taking "M 30s" – a street term of 30-milligram oxycodone tablets – without even asking even basic follow-up questions such as where the "patient" had obtained "M30s," what dosages or quantities the prescribing doctor had written the patient, and why the patient was not returning to that prescribing doctor instead of seeing the defendant.

Island or Far Rockaway were regularly traveling all the way to Upper Manhattan to see the defendant who did not take their State benefits but instead demanded cash payments.

Finally, the Government anticipates calling at least one expert to testify at trial to the accepted standards of care for treating pain management patients, including, among other things, the need to fully evaluate and diagnose a patient and to explore alternatives to opiate pain medication such as oxycodone.

B.  The State Actions

Based on materials obtained from the State of New York and produced in discovery, the Government is aware of the following:

The defendant, who received his medical training in the former Soviet Republic of Georgia, received a license to practice medicine in the United States from the State of New York in 1986. While the defendant's specialty appears to have been in anesthesia and general medicine, the defendant's practice focused on "pain management."

In 1992, the New York State Department of Financial Services ("DFS"), which administers the state Medicaid program, launched an investigation into the defendant's practice based on concerns that the defendant was fraudulently billing for services not provided and using an unlicensed and unauthorized individual to provide medical services to patients (services the defendant was then billing the Medicaid system for).  In particular, the defendant's billing records to Medicaid indicated that he was personally seeing as many as 90 patients a day, many of whom were receiving the same course of "nerve block" treatment.  In truth, DFS determined that the defendant was using a second individual – someone without a medical license or any authority to treat patients – to see these patients but then billing DFS under the defendant's name.  That

6

practice was fraudulent and in violation of state regulations and, as a result, in November 1993, DFS expelled the defendant from the Medicaid program.

In addition to expelling the defendant from the Medicaid program, DFS made a referral to the New York State Department of Health Office of Professional Medical Conduct ("OPMC"), which is responsible for the licensure of all medical doctors in the state.  That referral included approximately 25 representative patient files maintained by the defendant.   The OPMC, with the assistance of experts in the field, examined those files and determined that the defendant had not only been fraudulently billing the Medicaid program but had been providing substandard – and in some cases grossly negligent – medical care to his patients.   In particular, OPMC determined that the defendant had engaged in a practice of providing many if not all of his patients with the same form of pain medication – a treatment known as a "nerve block" which is typically administered by injection – without engaging in the sort of diagnostic or evaluative steps necessary to properly treat the patient.

The OPMC investigation included, among other things, a review of the defendant's records by outside experts, interviews of some of the patients whose treatment was reflected in those records, and ultimately an evidentiary hearing at which the defendant was present and represented by counsel and afforded an opportunity to call witnesses of his own.  At the conclusion of those proceedings, the OPMC revoked the defendant's license, finding that on each of the occasions specifically studied by the State, the defendant's conduct had been negligent or grossly negligent. The State further found that the defendant had failed to properly keep records and had violated state law by engaging in the fraudulent Medicaid billing practices described above.

As summarized by the State Peer Review Board in a report attached hereto as Exhibit A, the OPMC investigation concluded that:

> The patients came to the [defendant] with symptoms of pain and/or numbness which, in most instances, were treated by the [defendant] with nerve blocks or, in one case a steroid treatment.  The factual findings . . . for each patient concluded that the [defendant's] records for the initial patient history were inadequate and lacking in specified items of information essential for a history of a patient presenting these symptoms.  The [defendant] was found to have done an inadequate or inappropriate examination for the circumstances presented.  He was also found  . . . in his use of pain managing agents, [to have] addressed surface symptoms and not the possible underlying etiology of the patient's conditions.   He was also, in many instances, found not to have performed the appropriate follow-up to find the underlying etiology.

Ex. A at 3-4.  In particular, as detailed further in the State findings, the OPMC in consultation with its retained experts concluded that the defendant had too often provided pain medication in the form of a nerve block to his patients without: (1) properly taking a patient history or engaging in a full physical examination of the patient; (2) ordering diagnostic testing such as an X-ray, or properly reviewing existing diagnostic testing; or (3) properly documenting a diagnosis and treatment plan, including a justification for the pain medication being provided to the patient.  As summarized by one of the OPMC's outside expert, Dr. Maurice Carter, in a report attached as Exhibit B:

> [N]ot one of the charts . . . contains any notable element of physical examination to support the alleged diagnoses.  The results of x-rays are quoted second hand from the patient and no mention is made of having actually reviewed the x-rays, or at the very least, of seeing the radiologist's reports.  In so far as I can determine, in not a single case, has Dr. Mirilashvili actually ordered x-rays or other significant diagnostic imaging of his patients.

Exhibit B at 1.

A second expert retained by the state evaluated six patient files and concluded that, in each instance, the defendant had provided pain medication – primarily in the form of one or more pain blocks – that was not appropriate for the patient and not properly justified by the defendant's notes of the patient visits.   Among other things, the expert noted in a report attached hereto as Exhibit C that in several instances the patient reported having been previously treated by another physician

but the defendant apparently did not inquire into the "name . . . approximate date" or that treatment or "what that treatment was." Ex. C at 2, 3. In other cases, the defendant provided high and repetitive quantities of medication without exploring alternatives. With respect to one, for example, the expert report listed approximately fifteen dates on which the same patient received a cortisone shot within a two-month period, noting that "[s]tandard care allows three or fewer Cortisone shots in any one year. The charts show no evidence of evaluation of this problem once on or two shots had not improved the situation. At no point is a neurologic exam done." *Id.* at 2.

As noted above, in October and November 1995, the OPMC Hearing Committee held hearings on 13 specifications of professional misconduct lodged against the defendant, including allegations of practicing with gross negligence, practicing with negligence on more than one occasion, failure to maintain records, and the fraudulent Medicaid billing practices described above. At that hearing, at which the defendant was present, Dr. Gidumal testified to his findings as detailed in the report excerpted above. The defendant also called an expert but, as noted by the Committee in its written findings, "[i]n many instances the [defendant's] own expert witness found his medical practices to be lacking. Of particular significant was the witness' testimony that he would not have provided the same treatment as the Respondent." Ex. D at 14.

On January 26, 1996, the OPMC issued a written opinion which was mailed directly to the defendant and his attorney. That opinion included both findings of fact and conclusions, including its finding that the defendant had provided pain medication to patients without properly diagnosing them or justifying that course of treatment.   In particular, the State opinion concluded that:

> "[The defendant's] pattern of practice was such that he did not identify clinical entities nor did he collect enough historical and analytical data to support a diagnosis. [The Defendant] only treated symptoms and never sought nor treated causes. *The care [the Defendant] provided was inadequate and did not meet acceptable standards of practice.*"

Ex. D at 14. (emphasis added).  The State thus revoked the defendant's medical license.

The defendant appealed that determination and, on June 7, 1996, the OPMC Administrative Review Board affirmed the decision of the Hearing Committee.

In April 2001, the defendant sought to have his medical license reinstated.  By decision dated September 9, 2003, that application was granted, subject to a term of Probation during which the defendant was required to work at a state-run facility and prohibited from engaging in private or unsupervised practice.   That term of probation ended on December  30, 2010, or approximately one year before the commencement of the charged criminal conduct.

## II.    APPLICABLE LAW

### A.    Rule 404(b)

It is well established that evidence of otherwise uncharged conduct is admissible, without regard to Rule 404(b), when it constitutes intrinsic or direct proof of the charged crimes.  *See, e.g.*, *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States* v *Gonzalez*, 110 F.3d 936,942 (2d Cir. 1997).   Indeed, the Circuit has frequently observed that such evidence "is not considered other crimes evidence under Rule 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *Id.* (internal quotation marks omitted) (quoting *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Consistent with the above, evidence of otherwise uncharged conduct may be admitted without regard to 404(b) to provide the jury with "background information" on the charged conspiracy, *United States* v. *Alcaide*, 112 F.3d 505, 1997 WL 225121, at *2 (2d Cir. 1997) ("[B]ackground information is routinely admitted to explain the origins of a conspiracy."), or to complete the story of, or provide context relevant to, the crimes charged, *United States* v. *Inserra,* 34 F.3d 83, 89 (2d Cir.1994) ( "[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."); *see also* Weinstein's Fed. Evid., § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").   In such circumstances, the uncharged crime evidence is appropriately treated as "part of the very act charged," or, at least, proof of that act. *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).

Alternatively, Evidence of prior acts is admissible under Rules 404(b) and 403 if it is (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) if requested, admitted subject to a limiting instruction. *See United States* v. *Brand*, 467 F.3d 179, 196 (2d Cir. 2006); *accord United States* v. *Laflam*, 369 F.3d 153, 156 (2d Cir. 2004); *United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States* v. *Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).  Rule 404(b)(2) identifies the proper purposes for the admission of other act evidence, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *Id.*

The Second Circuit takes an "'inclusionary' approach" to the admission of other-act evidence, under which "'evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity,' as long as it is 'relevant to some disputed

11

issue in the trial' and satisfies the probative-prejudice balancing test of Fed. R. Evid. 403." *United States* v. *Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (citations omitted).  The District Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See United States* v. *Inserra*, 34 F.3d 83 at 89. Indeed, the admission of prior bad acts in conspiracy cases is an area where the "Second Circuit has afforded significant leeway."  *United States* v. *Nektalov*, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004) (collecting cases).

And while any evidence offered pursuant to Rule 404(b) is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial.  *See, e.g., United States* v. *Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States* v. *Williams*, 205 F.3d 23, 3334 (2d Cir. 2000); *see also United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("[B]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

## B. Distribution of Narcotics By a Medical Professional

Title 21, United States Code, Section 841 prohibits the unlawful distribution of controlled substances, including oxycodone.  Where, however, the defendant is a medical professional authorized by law to prescribe "drugs in the regular course of a legitimate medical practice," the Government's burden is to establish not only that the defendant dispensed (or caused the dispensation of) the controlled substances but that the defendant "dispensed the drug[s] other than for a legitimate medical purpose and not in the usual course of medical practice."  Sand, Modern

Federal Jury Instructions, § 56.02; *see also United States* v. *Lowe*, 14 Cr. 055 (LGS); *United States* v. *Wiseberg et al.*, 13 Cr. 794 (AT); *United States* v. *Wexler*,  03 Cr. 1150 (LAP).

Juries are also typically instructed that a medical professional-defendant has a "good faith" affirmative defense, whereby if defendant can establish that he "acted in accordance with (what he reasonably believed to be) the standard of medical practice generally recognized and accepted in the United States" then he may be said to have acted in "good faith . . . If you find that the defendant acted in good faith in dispensing the drugs, then you must find him not guilty."   Sand, Modern Federal Jury Instructions § 56.19.

## III.   DISCUSSION

Here, the defendant's prior course of conduct – including his expulsion from the Medicaid Program, the revocation of his state license, and his time on probation – is highly relevant at a trial that is almost certain to focus on the defendant's knowledge that his practice was improper and, in particular, that the more than 13,000 oxycodone prescriptions written by the defendant at the Clinic were not part of the legitimate practice of medicine.   As detailed above, the State Actions unequivocally put the defendant on notice that much of same conduct at issue here – including the frequent use of pain medication without proper justification or diagnosis, and the lack of comprehensive examinations or consideration of alternative treatments – was *not* considered the legitimate practice of medicine and was instead grounds for professional discipline and ultimately the loss of his license.   Additionally, those prior proceedings also provide important background and context for the charged conspiracy, including the defendant's unwillingness to accept most forms of insurance and thereby subject himself and his practice to the sort of scrutiny that had led to the loss of his license previously.   As such, evidence of the prior State Actions and the conduct underlying them should come in as background of the charged conspiracy or, in the alternative,

pursuant to Rule 404(b) as evidence of the defendant's knowledge and intent with respect to the conduct giving rise to the charged conspiracy.

*First*, the defendant's prior disciplinary record provides important context and background for the charged conduct in a number of ways and should thus be admissible as direct evidence. For example, the fact that the State Actions commenced with a Medicaid audit provides important context for the jury's evaluation of the defendant's decision, with respect to the Clinic, to accept very few insurance plans (or patients with insurance at all) and to instead primarily take patients with cash. In particular, the Government believes it should be allowed to argue to the jury – consistent with the course of the State Actions – that the defendant was well aware that insurance programs such as Medicaid monitor doctor behavior, and thus, the defendant, in running the Clinic, sought to insulate himself against detection by primarily taking cash. As such, the prior State Actions provide important "context" and "background" for the charged conspiracy. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). *United States* v. *Canales*, 718 F. Supp. 2d 327, 328 (S.D.N.Y. 2010) (admitting evidence of defendant's participation in similar conduct prior to the indictment "as direct evidence of the charged conspiracy" because it was offered "for the purpose of explaining the background of the alleged conspiracy" as well as to "complete the story of the crime charged"). Similarly, the fact that the defendant had previously lost his license for engaging in professional misconduct – a fact readily available to anyone with access to the Internet – and was only permitted to re-enter private practice in December 2010, is highly relevant to the jury's evaluation of the plausibility that by October 2012, the defendant was such a popular physician

that (1) crowds of "patients" who lived all over the city and state traveled to the Clinic each day , and (2) were willing to pay cash to see a doctor who would not accept their insurance.[4]

*Second*, the State Actions should be admissible pursuant to Rule 404(b) to show the defendant's knowledge and intent with respect to the more than 13,000 oxycodone prescriptions giving rise to the instant charge.  *Cf. United States* v. *Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue"); *see also United States* v. *Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989)  (defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded those elements of the offenses charged).

As detailed above, at trial, the Government expects to prove that the defendant was engaged in a practice of prescribing large quantities of oxycodone to substantially all of his patients, without engaging in any sort of thorough evaluations or review of the patient's history. Indeed, the evidence will show that the defendant provided the same course of pain management "treatment" – a prescription for 90 30-milligram oxycodone tablets – to essentially all of his patients.   Moreover, as described above, the Government believes that its trial evidence will establish that the defendant ordered no diagnostic testing of his own but instead relied on MRI reports that were, in many cases, obviously fraudulent.   The Government will then bear the burden of proving to the jury that, in engaging in the conduct above – and, in particular, in writing those

---

[4] For example, the Government will offer documents from the defendant's Clinic showing that the defendant's "patients" frequently used their New York State Medicaid cards as an ID at the Clinic before paying the defendant $200 in cash for the appointment and oxycodone prescription.  The same records will establish that many of the defendant's "patients" had addresses in parts of the city that were an hour or further away from the defendant's Clinic.

oxycodone prescriptions – the defendant knew he was not engaged in the "legitimate practice of medicine."

With respect to that issue, evidence of the State Actions is clearly relevant as it establishes that the defendant was put on notice, as early as 1996, that much of the very conduct giving rise to the instant case  was not legitimate practice but was instead "inadequate" and "did not meet acceptable standards of practice."  Ex. D at 14.  In particular, as a result of the State Actions, the defendant unequivocally informed that the following was *not* the part of the legitimate practice of medicine:

- Repeatedly prescribing pain medication as the primary treatment for patients without justifying the need for the medication or properly diagnosing the cause of the underlying pain (*E.g.*, Ex A at 3-4);

- Repeatedly re-prescribing pain medication for the same patients without exploring alternative methods of treatments (*E.g.*, Ex. C at 2);

- Failing to take thorough patient histories, including basic information on prior treatment provided such as the name of the provider and date of treatment (*E.g.*, Ex. C at 2-3);

- Failing to order any diagnostic testing of his own or to evaluate the actual X-rays or other imaging generated at the request or other physicians (*E.g.*, Ex. B at 1).

As such, and at a trial that will focus on the defendant's knowledge and intent in engaging in conduct substantively identical to the above, evidence that the defendant was professionally disciplined for this conduct – and thus clearly put on notice that it fell beyond the established norms of his profession – is directly and highly relevant.  *Cf. United States* v. *Curley*, 639 F.3d 50, 57 (2d Cir.2011) ("To satisfy the relevance inquiry, the evidence must be 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated by the proponent of the evidence.'") (quoting *United States* v. *Peterson*, 808 F.2d 969, 974 (2d. Cir. 1987) (alteration in original); *United States* v. *Brand*, 467 F.3d 179, 197

16

(2d Cir.2006) ("The government is required to establish only a similarity or some connection to establish that a prior act is relevant to one of the elements (in this case, intent) of the crime charged.") (internal quotations omitted).

That is particularly true should the defendant seek to argue to the jury, through counsel or otherwise, that he believed he was acting in "good faith" in engaging in the course of writing more 13,000 oxycodone prescriptions during the period of the charged conspiracy. *See United States* v. *Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."); *see also United States* v. *Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (same).  As noted above, the accepted standard for a good faith defense requires establishing that the defendant "acted in accordance with (what he reasonably believed to be) the standard of medical practice generally recognized and accepted in the United States." Here, should the defendant seek to make such an argument at trial, the Government should be entitled to present evidence of the State Actions, evidence that would directly bely the notion that the defendant could possibly have any such "good faith" belief.  As such, the evidence of the State Action falls squarely outside Rule 404(b)'s prohibition; rather, the purposes for which the evidence of the State Actions is being offered are expressly countenanced by Rule 404(b).

That the conduct giving rise to the State Actions occurred approximately 20 years ago does not diminish its probative value in this context for at least two reasons.  First, given the significance of the State Actions to the defendant – that is, the loss of his ability to work as a medical doctor – and the Government's proffered basis for relevance, namely the defendant's knowledge of those Actions and the reasons therefore, the passage of time is of limited significance.   In particular, and on these facts, it is highly unlikely that the defendant would have

somehow "forgotten" being expelled from the Medicaid program or having his professional license revoked for a period of nearly eight years simply because of the passage of time.  *Cf. United States* v. *Curley*, 639 F.3d at 59. (Noting, for similar reasons in the context of instances of domestic abuse, that "temporal remoteness of ... acts does not preclude their relevancy."); *United States* v. *Larson*, 112 F.3d 600, 605 (2d Cir. 1997) (same).  Second, and as noted above, the defendant remained on probation as a result of the State Actions through December 2010, or just shortly before the period of the charged conduct.  As such, there is all the more reason to conclude the defendant would have remained acutely aware of the State Actions – and the reason for those State Actions – through at least the end of his probationary term in December 2010, another factor that weighs strongly in favor of the probative value of the evidence the Government seeks to offer notwithstanding the passage of time.

Finally, application of the balancing test set forth in Rule 403 only counsels further in favor of admitting the evidence of the State Actions.   As detailed above, the evidence is highly probative in this context – particularly should the defendant seek of offer any legitimate explanation for the more than 13,000 oxycodone prescriptions giving rise to this case – and is no "more sensational or disturbing than the crimes with which [the defendant] is charged." *See United States* v. *Pitre*, 960 F.2d at 1120 (internal quotations omitted).  To the contrary, the evidence in question establishes only professional misconduct, not criminal action, and is being offered for the limited purpose of establishing the defendant's knowledge of the norms and standards of his profession, not for any impermissible purpose.   Moreover any residual prejudice concern would be addressed by a limiting instruction (should the defense request one). *See United States* v. *Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction typically sufficient to preclude prejudice to defendant); *see generally Parker* v. *Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'— indeed,

the premise upon which the system of jury trials functions under the American judicial system—'is that juries can be trusted to follow the trial court's instructions.'").

**IV.**   <u>**CONCLUSION**</u>

For the reasons set forth above, the Government respectfully requests that its motion to offer evidence of the State Actions, as well as the conduct underlying those actions, be granted.

Dated:  New York, New York
        January 25, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:   _____/s/_____

 Edward B. Diskant/Brooke E. Cucinella
Assistant United States Attorneys
(212) 637-2294/2477