565

F4NSLOW1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4         v.              14 Cr. 55 (LGS)

5
    KEVIN LOWE,
6
                           Trial
7           Defendant.

8   ------------------------------x

9                          New York, N.Y.
                          April 23, 2015
10                       9:30 a.m.

11
   Before:
12
               HON. LORNA G. SCHOFIELD,
13
                       District Judge
14                     -and a jury-

15                APPEARANCES

16   PREET BHARARA
        United States Attorney for the
17        Southern District of New York
   EDWARD B. DISKANT
18   TATIANA R. MARTINS
        Assistant United States Attorneys
19
   FRANK PAONE
20       Attorney for Defendant
   WILLIAM O. FOWLKES
21
   ALSO PRESENT:
22   MARK ROMAN, DEA Agent
   ANNIE CHEN, Paralegal
23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                       727
        F4NSLOW3                    Terdiman - recross

1               THE WITNESS:  Thank you.

2               (Witness excused)

3               THE COURT:  Your next witness.

4               MS. MARTINS:  The government calls Dr. Christopher

5    Gharibo.

6     CHRISTOPHER GHARIBO, M.D.,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9               MS. MARTINS:  May I proceed, your Honor?

10              THE COURT:  Yes, you may.

11   DIRECT EXAMINATION

12   BY MS. MARTINS:

13   Q.  What do you do for a living?

14   A.  I'm a pain medicine physician.

15   Q.  You're a medical doctor?

16   A.  Yes.

17   Q.  You specialize in pain medicine?

18   A.  Correct.

19   Q.  Are you any other type of doctor?

20   A.  I'm an anesthesiologist.

21   Q.  Generally speaking, what is pain management?  What is the

22   practice of pain management?

23   A.  The practice of pain medicine, pain management, is

24   receiving patients with mostly chronic pain problems, such as

25   nerve pain, arthritis, low back pain, neck and arm pain, and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F4NSLOW3                    Gharibo - direct

1    then working them up as far as where their pain may be coming
2    from.  That involves talking with the patient, examining the
3    patient, ordering diagnostic tests, and then coming up with a
4    treatment plan that incorporates physical therapy, injections,
5    medications that are nonopioids, like antiinflammatories,
6    muscle relaxants, or nerve pain medications sometimes in
7    combination with opioids.
8    Q.  We will go back over that more slowly later.  First let's
9    talk a little bit about your background.
10       What's your educational background?
11   A.  I went to Rutgers University in New Jersey.  That was
12   followed by attending New Jersey Medical School, which is now
13   Rutgers Medical School, also in New Jersey.  That was followed
14   by one year of medical internship at Robert Wood Johnson
15   University Hospital in New Brunswick, New Jersey.  That was
16   followed by NYU Medical Center anesthesiology residency, which
17   was followed by one year of pain medicine fellowship in
18   Philadelphia.
19   Q.  You mentioned you had a residency in anesthesiology?
20   A.  Yes.
21   Q.  How long was that?
22   A.  Three years.
23   Q.  Followed by an additional one-year fellowship in pain
24   management?
25   A.  Yes.

729
F4NSLOW3                        Gharibo - direct

1    Q.  Are you board certified in any fields?

2    A.  Yes.

3    Q.  What are those fields?

4    A.  I am board certified in anesthesiology and pain medicine.

5    Q.  What does it mean to be board certified?

6    A.  It depends on the specialty.  What it means within my

7    specialty is it requires getting anesthesiology boarded first,

8    which is a written exam.  You need to meet certain

9    qualification to take the exam, such as, for example, graduated

10   from a residency.  If you do, you take the written exam.  If

11   you pass that, then you go on to take an oral exam, which is a

12   conversational exam.  If you pass that, you're anesthesiology

13   board certified.  To be board certified in pain medicine, you

14   have to take a separate written exam and pass it.

15   Q.  Are you currently a practicing pain management specialist?

16   A.  Yes, I am.

17   Q.  Are affiliated with any hospital or institution?

18   A.  Yes.

19   Q.  Which one?

20   A.  I am affiliated what NYU Hospital for Joint Diseases, NYU

21   Langone Medical Center, and Bellevue Hospital Center.

22           MR. FOWLKES:  What was the second one?

23           THE WITNESS:  NYU Langone Medical Center.

24   BY MS. MARTINS:

25   Q.  You mentioned you're a practicing pain management

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4NSLOW3                     Gharibo - direct

1   specialist?

2   A.  Yes.

3   Q.  Do you practice at the hospital that you're affiliated

4   with?

5   A.  I practice at the hospital, but mostly at the office.

6   Q.  When you say "the office," do you have your own medical

7   practice?

8   A.  Yes.

9   Q.  Is that a solo practice, or are you in a group practice?

10  A.  It is a group practice.

11  Q.  How many other physicians are in that practice?

12  A.  There are about ten other doctors.

13  Q.  Where is that practice located?

14  A.  My office is located on 38th Street, between 1st and 2nd.

15  Q.  Is that in Manhattan?

16  A.  Yes.

17  Q.  How many years have you been practicing pain management?

18  A.  About 16, 17 years.

19  Q.  How many patients do you treat every day?

20  A.  It ranges from day to day.  I would say the range would be

21  anywhere from 15 patients to about 40 patients max.

22  Q.  When you say 15 to 40 patients, is that at your group

23  practice typically?

24  A.  Yes.

25  Q.  What are the hours of your practice?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  We start at 8:00 until we are done.  It could be -- we are

2    usually done somewhere between four to five p.m.

3    Q.  When you say 15 to 40 patients, are all those patients

4    being seen for the same type of treatment or different types of

5    treatments?

6    A.  Different types of treatments.

7    Q.  In addition to your practice and your hospital affiliation,

8    do you also hold academic positions?

9    A.  Yes.

10   Q.  Which ones?

11   A.  I am an associate professor of anesthesiology and

12   orthopedics.

13   Q.  Of anesthesiology orthopedics?

14   A.  Yes.

15   Q.  Is that at NYU as well?

16   A.  Yes.

17   Q.  Have you published academic papers in the areas of

18   anesthesiology and pain management?

19   A.  Yes.

20   Q.  Are you a member of any professional organizations?

21   A.  Yes.

22   Q.  Can you just give us some examples of those organizations?

23   A.  Anesthesiology and pain medicine societies.  American

24   Society of Intervention Pain Physicians, American Society of

25   Anesthesiologists, New York State Society of Anesthesiologists,

732

F4NSLOW3                          Gharibo - direct

1    New York State Society of Intervention Pain Physicians,

2    International Association of Anesthesia Research, International

3    Association for the Study of Pain.   There are probably a couple

4    of other societies there, too.

5    Q.  Have you been qualified as a medical expert in court

6    before?

7    A.  Yes.

8    Q.  In what area or areas have you been qualified as an expert?

9    A.  Generally, my field of practice, pain medicine.

10           MS. MARTINS:  Your Honor, at this point we move to

11   qualify Dr. Gharibo as an expert in the practice of pain

12   management.

13           THE COURT:  Any objection?

14           MR. FOWLKES:  No objection.

15           THE COURT:  He is qualified.

16   BY MS. MARTINS:

17   Q.  Dr. Gharibo, did there come a time when you were contacted

18   by the government in connection with the prosecution of Kevin

19   Lowe?

20   A.  Yes.

21   Q.  What were you asked to do?

22   A.  I was asked to review records.

23   Q.  Were you asked to form certain opinions or asked whether

24   you had opinions based on those records?

25   A.  Yes.

733
F4NSLOW3                    Gharibo - direct

1    Q.  Did you, in fact, develop opinions based on the records

2    that you reviewed?

3    A.  Yes.

4    Q.  What records generally were you asked to review?

5    A.  I was asked to review an MRI report, Dr. Lowe's evaluation

6    of an individual, and the documentation of that, Bureau of

7    Narcotic Enforcement prescription logs and the summary of those

8    logs, as well as office records of two separate physicians at

9    the Astramed pain office.

10   Q.  Had you heard of any of those people before?

11   A.  No.

12   Q.  Where did you get the records that you reviewed?

13   A.  They were provided by e-mail.

14   Q.  Were they provided to you by the government?

15   A.  Yes.

16   Q.  Are you being compensated for your work in connection with

17   this trial?

18   A.  Yes.

19   Q.  Do you know approximately how much your fee will be for

20   your work today?

21   A.  The court appearance will be $4,000.

22   Q.  Did you have to cancel patients today to be here in court?

23   A.  Yes.

24           MS. MARTINS:  Your Honor, may I hand some exhibits?

25           THE COURT:  Yes.  Give them to Mr. Street.

734

F4NSLOW3                        Gharibo - direct

1    BY MS. MARTINS:

2    Q.  Dr. Gharibo, you have in front of you Government Exhibits

3    56A and B, as well as Government Exhibits 804A and B.  Do you

4    see those?

5    A.  Yes.

6    Q.  Are those some of the records that you reviewed in

7    connection with this case?

8    A.  Yes.

9    Q.  You also described some other records called BNE records.

10   Do you recall describing those?

11   A.  Yes.

12   Q.  What are those records?

13   A.  Those are listings of prescriptions that were written by an

14   individual doctor that provides details on when they were

15   written and what was written, with expected medications, and

16   how it was prescribed and where it was filled.

17   Q.  Are you aware that prescriptions for controlled substances

18   are tracked by the state?

19   A.  Yes.

20   Q.  Are those records basically the lists of controlled

21   substances prescribed by the particular doctors, Dr. Terdiman

22   and Dr. Virey?

23   A.  Yes, they are.

24   Q.  Are those voluminous?

25   A.  Yes.

735

F4NSLOW3                          Gharibo - direct

1    Q.  I don't have them printed in front of you, but you recall
2    reviewing those?
3    A.  Yes.
4    Q.  Did you also review a summary chart that summarized some of
5    the information in the BNE records?
6    A.  I did.
7    Q.  Is it your understanding that these are records of the
8    Astramed clinics?
9    A.  Yes.
10   Q.  Now you said you formed opinions based on the review of
11   those records, correct?
12   A.  Yes.
13   Q.  Backing up for a minute, were you also provided with
14   certain information about the Astramed clinics?  For example,
15   were you provided with information about how many patients, the
16   range of patients seen at the clinic, on a typical day?
17   A.  Yes.
18   Q.  Based on everything you reviewed, did you form an opinion
19   about the number of patients being seen at the Astramed
20   clinics?
21   A.  Yes.
22   Q.  Did you form opinions about the medical necessity of the
23   prescriptions for oxycodone being written out of Astramed?
24   A.  Yes.
25   Q.  Did you also form an opinion about the legitimacy of

736
F4NSLOW3                        Gharibo - direct

1    certain records you reviewed, including a referral by Dr. Lowe

2    to a confidential source, for pain management?

3    A.  I did.

4    Q.  Before we get into your opinions, I just want to ask you to

5    help us understand a few general things.  Can you explain to

6    the jury how a doctor goes about making a diagnosis?

7    A.  For a new patient, initially there is a conversation.  The

8    way we are taught, it starts with what is called the chief

9    complaint.  That is the primary report that the patient tells

10   you as far as what the medical problem is.  So for us, it is

11   almost always some type of pain.

12          Then we get into further details about that pain:  The

13   location of that pain, what that pain feels like, the character

14   of the pain, whether if it is constant or comes and goes, what

15   makes it better, what makes it worse, is it something that is

16   sort of positional, orthopedic, or is this something that is

17   neurological in nature, what is the effect on their daily

18   function, effect on their sleep, and what has been tried with

19   respect to that chief complaint and the presentation.

20          Usually patients come to us referred from other

21   physicians where they have had pain for quite some time.  Often

22   they are able to give us what they tried, what has not worked,

23   why it hasn't worked, for example, such as due to side effects,

24   as well as what has been somewhat effective but not completely

25   effective.  That is why they are there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

737

F4NSLOW3                    Gharibo - direct

1          Sometimes they would tell us what the diagnosis may
2    have been and what the other doctors may have thought in terms
3    of what is causing that pain.  That is extremely important
4    because that sort of anchors what the focus is going to be on
5    from that point on as far as what the doctor is going to focus
6    on.
7          Then there is a physical exam that is done that could
8    be reasonably targeted or much more comprehensive.  Usually on
9    the initial visit it is much more comprehensive, therefore we
10   direct the physical exam around the area of the pain.  If
11   somebody has low back pain going down the leg, you will examine
12   the spine, the muscles, the hips, the knees, the range of
13   motion, neurologically speaking, from a blood flow perspective
14   and so on.
15         In addition to that, we ask for information that is
16   presentation specific, depending on what the patient conveyed
17   to us.  We also get a past medical history, because whatever we
18   do also depends on what the general medical condition of the
19   patient is as well.  We gather medical history, past medical
20   history, and existing medical history.  That could be heart
21   conditions, lung conditions, diabetes, asthma, and so on, as
22   well as a past surgical history, back surgery, orthopedic
23   surgery, family history, as well as social history, smoking,
24   alcohol, etc., as well as what is called a review of systems.
25         What a review of systems is a review of body systems.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4NSLOW3                    Gharibo - direct

1    It is pretty much from head to toe orthopedically, medically

2    speaking, cardiovascularly, from a lung perspective, kidney

3    perspective, gastrointestinal perspective, so on and so forth.

4    We also review -- sometimes patients bring information with

5    them diagnostically speaking; could be X-rays, MRIs, CAT-scans,

6    any tests, and so on.  All of that information is gathered

7    together and then you can come up with a single diagnosis.  If

8    it is rather clear, and sometimes it is, we will put down the

9    diagnosis and come up with a treatment plan, or it can be a

10   differential diagnosis where there is a list of things that the

11   pain could be coming from but requires more information.  We

12   will order further diagnostic tests to help sort things out

13   further.

14   Q.  You just gave us a lot of information.  Is it fair to say

15   that what you just told us prescribes three pain types of

16   considerations that go into a diagnosis?  You look at, you

17   said, the chief complaint and history that you take from the

18   patient, you also described conducting a physical exam, that

19   sort of tries to anatomically identify what may be causing the

20   complaints, and then you also mentioned that you review, if

21   available, diagnostic tests, such as MRIs, etc.  Is that a fair

22   characterization of the three main things?

23   A.  Yes, it is.

24   Q.  Does a doctor typically try to correlate a patient's

25   complaints with the physical examination and the diagnostic

F4NSLOW3                      Gharibo - direct

1   imaging?

2   A.  Yes.

3   Q.  What does it mean to correlate?

4   A.  Well, the history determines a lot in terms of what we need

5   to do with the physical exam as well as with the imaging

6   studies.  For example, in an imaging study, you will find a lot

7   of different findings at times that may or may not be relevant.

8   For example, let's say for sure six separate findings, but five

9   of them, let's say, have nothing to do with the patient's

10  presentation and where their pain is and what their complaints

11  are.  Therefore, we are not going to focus on those five out of

12  six things on the MRI, because all that their physical findings

13  on the MRI are really not responsible for the patient's

14  symptoms and for the patient's pain and the difficulty they

15  have on a day-to-day basis.  We are going to correlate it to

16  focus on the problem, on the MRI that we see, that we believe

17  is causing the problem.  So that is the correlation.

18  Q.  Correlating a complaint with a physical finding, for

19  example, trying to match them up, correct?

20  A.  Yes.

21  Q.  When you see a patient for the first time, approximately

22  how long does it take to properly take a patient's history and

23  conduct a physical exam and all the things that you just

24  described you do?

25  A.  The first visit can take from 20 to 60 minutes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

740

F4NSLOW3                    Gharibo - direct

1    Q.  What about a followup visit, if you see a patient again

2    after that initial visit, approximately how long do those

3    visits last?

4    A.  I would say followup, depending on the complexity, could be

5    anywhere from 17 minutes to 30 minutes.

6    Q.  What do you do on a followup visit?

7    A.  On a followup visit, you see what kind of response they had

8    to the treatment that was prescribed.  So medications, physical

9    therapy, injections, let's say, as well as if any additional

10   tests were ordered, what those test results are, and you kind

11   of focus on is there any improvement in function with what

12   you're prescribed or what you gave with an injection and so on,

13   is there an improvement in quality of life, and you're focused

14   on what is the trend.

15           There is a certain degree of improvement, let's say,

16   from the prior treatment.  Is it still trending better and

17   getting better and better, have you sort of reached a plateau.

18   Q.  Do you conduct physical examinations and followup visits?

19   A.  Yes.

20   Q.  Incidentally, when you were describing earlier that you

21   take a history of the patient and you conduct a physical

22   examination, you might look at some tests as well, both in the

23   new visits and in the followup visits, is that something

24   specific to pain management, or is that general practice of

25   physicians that you learned in medical school?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

741
F4NSLOW3                        Gharibo - direct

1    A.  That is just practice for almost all doctors.
2    Q.  How do you document a patient visit?
3    A.  It usually goes into the computer.  I think it can range
4    anywhere from writing it down to documenting it into the
5    computer.
6    Q.  What types of information do you put whether you write it
7    down or you put it in the computer?  What are the types of
8    things that you are documenting after a patient visit?
9    A.  We document, during the patient visit, what the patient
10   tells us while we are talking with the patient.  The record
11   starts to focus on location of the pain, the character of the
12   pain, alleviating facts, inciting factors, how it all started,
13   what kind of treatments they had.  All of that goes into the
14   medical record, the past medical, the past surgical history,
15   and physical exam.
16          I mean, not everything that is talked about goes into
17   the medical record, because that would be -- you know, that is
18   all the doctor would be doing, but I think some categorical
19   information certainly goes in that is medically relevant.
20   Q.  Why is it important to document the history or the physical
21   exams that you do?
22   A.  It is extremely important.  It helps you collect your
23   thoughts together.  Sometimes in the midst of the conversation
24   you forget what the patient may have said.  Whatever the
25   patient says, you are sort of creating a logical construct

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

742

F4NSLOW3                    Gharibo - direct

1     within the history that is going to help you make a diagnosis.
2     As the patient is conveying the information to you, you are
3     referencing your note that you created during that visit
4     itself.  Then you are documenting your history, and really at
5     the end of that interview, you are putting it all together and
6     coming up with an assessment, with a diagnosis.  That is one
7     purpose of documentation.
8             The other purpose is for other doctors to see what you
9     gathered from the patient clinically and how the patient
10    responded to your treatment, sort of creating a timeline of
11    what worked, what didn't work, what your diagnosis was, and
12    what the diagnostic tests revealed.  And also I think for your
13    own purpose as well, when the patient comes back to you for
14    followup, you have a reference point to see how they did during
15    that month time frame, for example, between the visits.  Well,
16    you couldn't walk more than two blocks before, you can't sit
17    for more than ten minutes, plus you couldn't sleep at night.
18    Are those things better now?  It kind of gives you a reference
19    point to see if you improved the patient's condition.
20    Q.  Do you have access to your old notes when you see a patient
21    again?
22    A.  Yes.
23    Q.  Now, as part of your training and experience, do you
24    prescribe oxycodone?
25    A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

743

F4NSLOW3                         Gharibo - direct

1   Q.   What type of medication is oxycodone?

2   A.   Oxycodone is an opioid, a morphine-like medication.  Some

3   people also call it a narcotic.  It is a morphine-like

4   medication.  It is like Percocet, basically, without the

5   Tylenol.

6   Q.   It is an opioid or a morphine-like medication, is that what

7   you said?

8   A.   Yes.

9   Q.   Are you familiar with illegal drugs that are opioids?

10  A.   Yes.

11  Q.   What is a type of an illegal drug that is an opioid?

12  A.   Heroin would an example of that.

13  Q.   Oxycodone has the same active ingredient, but the same

14  molecular structure, I guess, as heroin, for example?

15  A.   It is in the same class.

16  Q.   It is in the same class of drugs?

17  A.   Yes.

18  Q.   How does oxycodone work, just generally speaking?

19  A.   Oxycodone works by binding to different parts of the brain

20  and the spinal cord.  There are different types of opioid

21  receptors in the body.  Oxycodone binds all of them to a

22  certain degree, as well as an area in the body that can be

23  responsible for some of the side effects and some of the

24  mind-altering effects of morphine-like medications such as

25  oxycodone, instead of this broad binding to a whole variety of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

744

F4NSLOW3                          Gharibo - direct

1   different opioid receptors.

2   Q.  I guess what you are saying is that, in addition to binding

3   to the opioid receptors, which I guess is the pain-relieving

4   properties of oxycodone, correct?

5   A.  Yes.

6   Q.  It has other effects as well, and you mentioned

7   mind-altering effects?

8   A.  Yes.

9   Q.  What do you mean by that?

10  A.  The mind-altering effects of opioids such as oxycodone

11  varies from person to person.  For example, a common side

12  effect could be being dizzy and drowsy and really very groggy

13  from the effects of the oxycodone.  There is also a potential

14  very excitatory and very feel-good effects, sort of this high,

15  if you will, where the patient is actually enjoying the effects

16  of the opioids, such as oxycodone, where there is what we call

17  the euphoria, an excitatory feeling that is very -- it can be

18  very enjoyable to the patient.

19          It is followed by withdrawal from that, which can be

20  sort of the sense of doom and gloom and a sense of panic and

21  anxiety and a lot of uncomfortable and disturbing side effects.

22  Some patients also feel what is called dysphoria.  Instead of

23  being euphoric, I feel wonderful and great, I have a great

24  high, they can also feel dysphoric, where they literally get

25  depressed and there is this sense of impending doom and there

F4NSLOW3                    Gharibo - direct

1    is this sense of fear and apprehension that something very bad

2    is happening to them.  That, also, in itself can exacerbate

3    underlying psychological or psychiatric conditions.

4    Q.  What type of conditions is oxycodone used to treat?

5    A.  Oxycodone is used to treat acute and chronic pain.

6    Q.  When you say acute, what does acute pain mean?

7    A.  Postoperative, after surgery, after trauma.

8    Q.  Pain that theoretically lasts a short -- severe pain that

9    lasts a short amount of time?

10   A.  Correct.

11   Q.  Chronic pain, what is chronic pain?

12   A.  Chronic pain, that goes beyond the acute healing phase.

13   Let's say something has healed, but the area still hurts.

14   There is nothing going on, there is no infection.  Everything

15   looks good, but there is persistent pain there.  An example of

16   that is osteoarthritis.  There is wear-and-tear on the body

17   that hurts.  It hurts after a while and that can be chronically

18   painful, although everything is reasonably healed and

19   stabilized.

20   Q.  Is oxycodone a first-line medication?

21   A.  No.

22   Q.  What does that mean to be a first-line type medication?

23   A.  First-line medication sort of takes into account the

24   efficacy of the medication, the good effect on the patient, the

25   safety of the medication, everything.  The safety of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746
F4NSLOW3                      Gharibo - direct

1    medication on the patient, the tolerability as far as side

2    effects go, and patient convenience.

3              First-line medications tend to be more practical

4    medications and some are even over the counter.  For example,

5    Tylenol is a first-line medication.  Many inflammatories can be

6    first-line medications.  Just for example, Motrin or Naprosyn.

7    Q.  As a doctor, when you are presented with a patient that has

8    some type of condition, do you first try first-line medications

9    before you move to more serious medications?  Is that a typical

10   pattern?

11   A.  Yes.

12   Q.  Is oxycodone addictive?

13   A.  Yes.

14   Q.  In addition to its addictive properties, you also mentioned

15   it has mind-altering properties, right?

16   A.  Yes.

17   Q.  Do you consider it a dangerous medication?

18   A.  It can be, yes.

19   Q.  In what way?

20   A.  It can be dangerous for a whole variety of ways.  There is

21   a -- I mean, one of the most common ways is respiratory

22   depression.  Those patients that are on oxycodone chronically,

23   they become dependent on oxycodone, because oxycodone becomes

24   part of their biochemistry.  They need oxycodone to feel

25   normal.  And then what they find -- and what they discover is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

747

F4NSLOW3                      Gharibo - direct

1    that when they take more oxycodone, let's say I am going to a
2    wedding tonight, let me just double up on my oxycodone.  What
3    happens is that a greater peak develops in the blood and they
4    get a high associated with that, that they begin to enjoy over
5    time.  Those side effects that they initially had are no longer
6    there, but what they notice is that when they take oxycodone,
7    they actually like the feeling of it.
8              Then that stays for a couple of hours and then they
9    crash afterwards, because oxycodone comes into the bloodstream
10   and then dissipates from the bloodstream.  And when they crash,
11   they feel this abdominal cramping, erection of their hair,
12   general sense of sweating.  I feel not myself, I just don't
13   feel good.  The only way they feel normal again is if they take
14   another oxycodone just to feel normal.
15             They say, I felt really good with that, let me get
16   that high again.  They take a greater amount of oxycodone.  It
17   is sort of this physiological quicksand.  The more dependent,
18   the more tolerant your body becomes to oxycodone, the greater
19   dose you need to get that higher.
20             In an effort to get that high, you can also overshoot.
21   Because if you overshoot, then oxycodone begins to suppress
22   your breathing where it may --
23             MR. FOWLKES:  Suppress?  I'm sorry.
24             THE WITNESS:  Suppress your breathing where it -- they
25   say, let's have a really good time today.  Let's take ten at a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

748

F4NSLOW3                    Gharibo - direct

1   time, whereas the last dose was three pills at a time.  And
2   let's also say they decide to combine it with something else,
3   something as simple as alcohol, for example.  That could be a
4   very dangerous combination because the alcohol is going to
5   solubilize and melt the oxycodone and it is going to facilitate
6   the absorption of the oxycodone.  All of a sudden you will get
7   this rush directly into the bloodstream that is going to
8   overwhelm the body, and it is going to knock the patient out
9   and they are going to stop breathing as a consequence of that.
10          If somebody not so much as takes ten, let me take not
11  take ten, let me take six and crush it, they pulverize it, by
12  crushing it, it becomes an even quicker agent.  If you take it
13  with alcohol, it becomes even more faster absorbed.  There
14  comes a point where you just fade away, it knocks you out.  And
15  if there is nobody there to wake you up and resuscitate you and
16  give you oxygen, you would be dead in less than ten minutes.
17  Q.  You can overdose?
18  A.  Yes.
19  Q.  Given all this that you just described, when you are
20  considering whether to prescribe oxycodone to a patient, do you
21  evaluate a certain risk factors of particular patients?
22  A.  Yes.
23  Q.  What type of risk factors do you take into account when
24  deciding whether to prescribe oxycodone?
25  A.  Well, the decision to prescribe oxycodone or any opioid is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

749

1    complex.  First, you have got to make sure they have tried
2    other measures, injections, physical therapy, non-morphine,
3    non-oxycodone like medications, and a combination of them.
4    That could be a muscle relaxant, antiinflammatories, let's say
5    a back injection, muscle injection, an epidural, physiotherapy,
6    other measures are tried first.
7           Regardless, almost, of the pain severity, you can do a
8    lot for the patient that doesn't take -- that doesn't involve
9    oxycodone.  If a decision is made to prescribe oxycodone, it
10   needs to be well-founded from a diagnosis standpoint.  It can't
11   just be any diagnosis.  Some diagnoses don't do well with
12   opioids.  You can't be -- let's say someone has headaches or
13   somebody had irritable bowel syndrome or somebody with
14   fibromyalgia.  Those are conditions that are not acceptable to
15   treat with oxycodone, but it could be a condition such as
16   osteoarthritis or failed back surgery or nerve pain, peripheral
17   neuropathy, cancer pain, spinal stenosis, neck stenosis,
18   cervical stenosis.  Those are some acceptable conditions.  That
19   in itself is still not enough.
20          Just having a good indication is not adequate, because
21   you also need an appropriate psychological circumstances and
22   social circumstances.  From a psychological perspective, it
23   needs to be somebody who is medically reasonably okay.  You
24   can't be somebody who is psychotic, you can't be somebody who
25   is borderline, somebody who has anxiety disorder, where the

F4NSLOW3                        Gharibo - direct

1    withdrawals from the oxycodone between the doses is going to

2    flare up their anxiety.

3              It can't be somebody who is not compliant or is

4    difficult in keeping their medication complexity, who has

5    difficulty being compliant with an already complex regimen.  It

6    needs to be somebody that has been in your office that you have

7    been treating for some time that you trust, who goes with the

8    plan as far as keeping their appointments and getting the

9    appropriate tests done, and following up with other clinicians

10   that could also be treating them.  But the psychological part

11   is also by itself not enough.  That used to be appropriate, but

12   the social circumstances also need to be acceptable as well.

13   Q.  Let me just interrupt you, Doctor, just because there is a

14   lot of information.

15             When you are evaluating the risk factors, let me see if I

16   understood what you said.  You make sure that the actual

17   complaint is something that is susceptible to oxycodone, the

18   treatment?

19   A.  Yes.

20   Q.  A headache, for example, you don't treat with oxycodone, is

21   that what you said?

22   A.  Yes.

23   Q.  You said you also do a psychological evaluation, because of

24   what you earlier described as some of the side effects in terms

25   of anxiety, etc., mind-altering properties, is that correct?

751
F4NSLOW3                    Gharibo - direct

1   A.  Correct.

2   Q.  Then I think you said you also do a social evaluation, is

3   this somebody who is going to be compliant with the regimen.

4   This is a serious drug, is this somebody who has a history of

5   coming back to me, actually taking their medication, correct?

6   A.  Correct.

7   Q.  How many of your patients are on oxycodone or what

8   percentage?

9   A.  The oxycodone percentage is probably about one or two

10  percent.

11  Q.  One or two percent of your patients receive oxycodone?

12  A.  Yes.

13  Q.  Are these chronic pain patients?

14  A.  Yes.

15  Q.  Do you have patients who are on other types of opioids?

16  A.  Yes.

17  Q.  Would are other common opioids?

18  A.  The opioids that are also commonly used, hydrocodone is

19  another one.  For example, that is Vicodin, as an example, the

20  other one is morphine.  That is long and short acting.  The

21  other one is called Dilaudid, methadone, as well as there is

22  also the fentanyl patch.

23  Q.  Oxycodone is not the only type of opioid?

24  A.  Right.  There is also Opana is also one, correct.

25  Q.  In your work as a pain management specialist, have you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   become familiar with whether there is an illegal market for

2   certain types of medications?

3   A.  Yes.

4   Q.  Are you familiar with whether or not certain medications

5   are more desirable in that market than others?

6   A.  Yes.

7   Q.  Are all opioids created equal with respect to the

8   desirability on the street?

9   A.  No.

10  Q.  In your experience, what is the most desirable opioid?

11  A.  Oxycodone is the most desirable.

12  Q.  When evaluating whether or not a patient should be put on

13  opioids versus other types of treatment, is the value of

14  oxycodone in the blood work something that you consider?

15  A.  Yes.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

F4nWlow4                      Gharibo - direct

1    BY MS. MARTINS:

2    Q.  Would you put different patients on different opioids, for

3    example, if an opioid is needed, that you think may not pass

4    your sort of social/psychological evaluation of the patient?

5    A.  I may, yes.

6    Q.  Now, we've been talking about opioids, but just to be

7    clear, as a pain management specialist, do you only treat

8    patients with opioids?

9    A.  No.

10   Q.  Briefly speaking, what are other types of treatments that

11   you provide patients who are suffering from chronic pain?

12   A.  One of the main reasons that people come to pain

13   specialists is that we offer more than just mono therapy with a

14   particular molecule like oxycodone, for example.  In our

15   training, we learn antiinflammatories, muscle relaxants,

16   anticonvulsant medications like, for example, gabapentin,

17   Lyrica, or pregabalin, local anesthetics, and some

18   psychological medications like Cymbalta can be used to treat

19   musculoskeletal pain as well.  Tricyclic antidepressants can

20   also be used to treat musculoskeletal pain and nerve pain;

21   infusions of medications, like local anesthetic infusions, like

22   lidocaine or ketamine infusions, as well as injections.  In

23   fact, a lot of pain doctors are trained in how to do

24   injections, in combination with physical therapy and variety of

25   different medications.  That can range from muscle injections,

754

F4nWlow4                    Gharibo - direct

1   joint injections, spinal injections, like epidural-type
2   injections, as well as implantables.
3   Q.  Is it fair to say that oxycodone is one in a vast menu of
4   options you have even when treating chronic pain?
5   A.  Yes.
6   Q.  If you do decide to prescribe oxycodone to a particular
7   patient, what are typical dosages of oxycodone that you
8   prescribe in your practice?
9   A.  What I prescribe in my practice is to keep the doses low
10  because as far as morbidity and mortality from opioids, it's
11  very much dose-driven.  There is plenty of data on that.  The
12  more you increase the pill count and the more you increase the
13  daily milligrams, the higher the probability that the patient
14  is going --
15  Q.  If you could, speak a little slower and louder.
16  A.  Sure.  You lower the probability that the patient is going
17  to get hurt or somebody around the patient, such as another
18  loved one or somebody visiting also may get hurt because of
19  their access to the medication.  So you got to keep the doses
20  low and the pill counts low, so generally speaking, I will,
21  common prescription would be, for example, oxycodone, it could
22  be five milligrams once, twice, maybe three times a day.  The
23  daily dose would not go beyond, let's say, 40 milligrams a day.
24  And if I am approaching that, I would switch it to something
25  else to keep the doses low.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4nWlow4                      Gharibo - direct

1   Q.  When you say a five-milligram tablet of oxycodone,

2   oxycodone comes in different strengths?

3   A.  Yes.

4   Q.  So there are five-milligram tablets, ten-milligram tablets.

5   Are there 20-milligram tablets?

6   A.  No.  I think it's 30.

7   Q.  So it goes five, ten, 30?

8   A.  Yes. It could be a 15 too.

9   Q.  And a 15?

10  A.  Yes.

11  Q.  You said you typically start patients at five milligrams

12  three times a day?

13  A.  Yes.  Twice a day.

14  Q.  I'm sorry.  Twice a day.  Do you have any patients to whom

15  you prescribe over 120 pills in a month?

16  A.  No.

17  Q.  And even at the five, ten, 15 level?

18  A.  Correct.

19  Q.  You consider that a high dosage of oxycodone?

20  A.  Clearly, it begins to become a problem.  Five milligrams

21  per se is not high, but if you bump up that base dose to 30

22  milligrams and you give 120 pills, now you got major daily

23  dosing.

24  Q.  And you said that at some point if you feel like the pill

25  count is starting to get a little bit high with respect to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

756

F4nWlow4                          Gharibo - direct

1    oxycodone, you switch to a different type of medication, is
2    that correct?
3    A.  As the daily dose is getting high, I switch to a different
4    medication, and I don't let the pill counts get too high.
5    Q.  And why is that?  What does that signal to you if they're
6    getting higher and higher?
7    A.  It's a signal to me I should prescribe something long
8    acting so that I want to minimize withdrawals so I don't want
9    the patient taking a medication four times a day, for example,
10   because that's strong pain reliever and four withdrawals
11   associated with that, and what the high pill counts create is
12   that some patients at some point realize that they could sell
13   the medication and divert it.  So that creates the motivation
14   for them to come to you requesting more pills.  So the more
15   units they have, what the market tells us and, you know, some
16   detectives, and it has come up in some conferences, patients
17   that are diverting medications prefer high pill counts because
18   they don't want broken-up pills.  They want clean pills that
19   are unaltered, and somebody getting 240 pills or 300 pills
20   allow for a diversion of a part of that.  You can still take
21   some part of it and divert the rest of it.  There have been
22   patients that have been making a living with doing that.
23   Q.  When you say divert, you mean divert to the illegal market?
24   A.  Yes.
25   Q.  Sell the pills?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

757

F4nWlow4                        Gharibo - direct

1   A.  Correct.

2   Q.  Now let's talk about some of the opinions you developed

3   based on the information you've reviewed.  You mentioned that

4   based on the files you reviewed and the information you

5   received, you formed an opinion about the number of patients

6   that Dr. Terdiman was seeing at Southern Boulevard.

7   A.  Yes.

8   Q.  What is that opinion?

9   A.  That opinion is that I think anything that goes beyond 30

10  to 40 a day, it pretty, comes close to physically being

11  impossible to see on a medical basis.  So, for a doctor to be

12  able to perform a medical evaluation, a history, and a physical

13  and come up with diagnosis and discuss the treatment plan with

14  the patient, anything that goes beyond about 40, 50 or so

15  becomes pretty much impossible and is not consistent with good

16  medical care.

17          MS. MARTINS:  One moment, your Honor.

18  Q.  And did the BNE records that you reviewed in connection

19  with the prescriptions by Dr. Virey and Dr. Terdiman also

20  include pill counts and strength of dosage for oxycodone?

21  A.  It did.

22  Q.  Did you form a medical opinion about the pill counts and

23  the dosage that were being dispensed out of the Astramed

24  clinics by those two doctors?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

758

F4nWlow4                         Gharibo - direct

1    Q.  What is your opinion?

2    A.  The opinion is that the daily milligram dosing was

3    excessive and the pill counts were excessive.

4    Q.  And when you say excessive, have you seen anything like

5    that before?

6    A.  Only under problematic circumstances.

7    Q.  Only under, I'm sorry?

8    A.  Problematic circumstances.  When the practice is outside

9    the standard of care.

10   Q.  Did you also notice anything in the BNE records with

11   respect to whether other types of opioids were being

12   prescribed?

13   A.  Very sparse.  Essentially, these were oxycodone practices.

14   Q.  And are you familiar with any legitimate pain management

15   clinics that only prescribe oxycodone?

16   A.  No.

17   Q.  Now let me ask you, in your practice, do you take urine

18   samples from patients?

19   A.  If -- yes.

20   Q.  Do you take urine samples, for example, from patients who

21   are taking controlled substances?

22   A.  Yes.

23   Q.  Why do you do that?

24   A.  At certain dose, you begin to become concerned to, there

25   needs to be some surveillance program in place to ensure that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

759
F4nWlow4                    Gharibo - direct

1    they're taking what's prescribed.  So if a dose can be past a
2    certain threshold, you get a urine drug test on them to make
3    sure there is oxycodone metabolized in the urine, that they are
4    taking what's prescribed and also to make sure that they're not
5    taking other medications that are potentially illicit or not
6    prescribed.  Like, for example, if you find cocaine in the
7    system, that would be a problem.  Or if you found other
8    medications, other opioids that you don't prescribe also in the
9    patient's urine, that would be problematic as well.  That's the
10   surveillance part.
11   Q.  Did you review certain urine reports in connection with the
12   documentation from the Astramed clinics that you were provided?
13   A.  I did.
14        MS. MARTINS:  Let's just pull up an example, Ms. Chen.
15   I think 56A will probably have them.  Go a few pages down.
16   Q.  Incidentally, 56A that we're looking at up there, are these
17   some of the records that you've reviewed?
18   A.  Yes.
19        MS. MARTINS:  If we look at a urine report here, can
20   you just pull up beginning with a patient to make sure the
21   doctor's looking at the same one.
22   Q.  Are you looking at Dwyer?
23   A.  Yes.
24   Q.  O.K.
25   A.  Dyer.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

760
F4nWlow4                        Gharibo - direct

1    Q.  Dyer.  I'm sorry.  I can't read it from here.

2        Did anything about these urine reports strike you?

3    A.  Yes.

4    Q.  Can you explain what you noticed?

5    A.  What struck me about these urine reports is that they were

6    positive for opioids but for oxycodone specifically and not the

7    metabolites of oxycodone, because what these urine reports will

8    usually report is the presence of metabolites.  For example,

9    oxymorphone would be one of that.  Here, we're not seeing a

10   positive result for oxymorphone, which is the metabolite for

11   oxycodone but more positive oxycodone.  So that could be

12   consistent, for example, with somebody taking the oxycodone

13   pills and literally just pulverizing it and then melting it

14   into the urine, so then you have direct oxycodone without the

15   metabolites of oxycodone.

16   Q.  What are the metabolites of oxycodone?

17   A.  Metabolites are chemicals that the body produces after it

18   goes through the liver and it goes through the blood and the

19   gut.  So those are, that's what the, let's say, oxycodone is

20   broken into, as the body processes the medication.

21   Q.  So if a urinalysis is giving results of the metabolites of

22   oxycodone, it's able to tell you whether or not the pill was

23   actually, for example, ingested as opposed to crushed up and

24   put into a urine sample, correct?

25   A.  Correct.

761
F4nWlow4                        Gharibo - direct

1    Q.  Is that something that would be important to you in

2    evaluating whether a patient is complying with their regimen as

3    opposed to diverting their medication?

4    A.  Yes, very much.

5    Q.  Now, you also testified earlier that you formed an opinion

6    about the reasonableness of the findings reached by

7    Dr. Terdiman based on the notes that you reviewed.

8    A.  Yes.

9    Q.  Is that correct?

10   A.  Yes.

11           MS. MARTINS:  Let's just look at some of those notes

12   again, 56A, 56B, starting with 56A here.  And you can just

13   scroll down, Ms. Chen.  Just sort of paginate through so we can

14   see that these are similar types of notes.

15   Q.  And these are the files you reviewed, correct?

16   A.  Yes.

17   Q.  Based on your practice as a physician, how did these notes

18   on patients compare to patient notes that you've seen in your

19   practice and that you yourself take?

20   A.  So, just to give you background, I look at a lot of medical

21   records.  I would say from the northeast, I'm familiar with a

22   lot of different pain practices and the documentation standards

23   in the area.  These don't compare well at all because I don't,

24   they don't come across to me as medical notes.  Whether if it's

25   for a new patient standard or for a follow-up patient standard,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F4nWlow4                        Gharibo - direct

1    I don't think they're appropriate for either circumstance.

2    Q.  Why not?

3    A.  Almost across the board, they lack medical information and

4    clinical information.  Just to take an example, they state

5    where the pain is, let's say low back pain or shoulder pain or

6    elbow pain, and there is no physical exam done on all of them

7    that I've looked at here, and then they go right on to

8    treatment.  And that treatment almost always incorporated

9    oxycodone, and that's the end of it.  There's no other clinical

10   context, effect on function, past medical history.  What if the

11   patient suffers from sleep apnea that contraindicates the

12   opioid or somebody has a breathing problem that contraindicates

13   the opioid, allergic reaction to oxycodone?  None of that is

14   mentioned.

15   Q.  With respect to the thoroughness of these reports, the

16   thoroughness of the documentation of what we described earlier

17   and you're talking about now, the history, the physical exam,

18   is your opinion based on your specialized training as a pain

19   physician, or just as a doctor?

20   A.  I don't think they meet either standard.  I think if you

21   look at any other specialty and the documentation for that

22   specialty, this is below the, any standard of care that I've

23   seen for any specialty, not just a pain specialty.

24   Q.  So you don't have to be a specialist to realize these notes

25   aren't really telling you anything?

763
F4nWlow4                    Gharibo - direct

1    A.  Correct.

2    Q.  Now, based on these documents, did you form an opinion

3    about the extent to which Dr. Terdiman made a necessary

4    objective finding to support his diagnoses?

5    A.  I did.

6    Q.  What is that opinion?

7    A.  In none of these notes is the treatment indicated from a

8    medical perspective.  These are completely inappropriate

9    prescriptions because they're based on a completely lacking

10   clinical foundation.  It is not supported by any type of valid

11   diagnosis.  They are grossly inappropriate in any medical

12   practice to even prescribe Motrin to, let alone to prescribe

13   oxycodone to.

14   Q.  In your professional opinion, is it possible to evaluate a

15   patient for pain or really anything else without doing a

16   physical examination?

17   A.  It's not possible.

18   Q.  Is it possible to evaluate a patient for pain or anything

19   else without taking a complete history?

20   A.  It's not possible.

21   Q.  And that's as a general matter in the medical profession?

22   A.  Yes.

23   Q.  Were you provided information about how patients at the

24   Southern Boulevard clinic paid for their visits?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

764
F4nWlow4                        Gharibo - direct

1    Q.  And who gave you that information?

2    A.  In conversations with you.

3    Q.  The government?

4    A.  Yes.

5    Q.  And were you informed that patients paid with a $300 money

6    order for visits?

7    A.  Yes.

8    Q.  Did you form an opinion about that fact in light of the

9    other materials that you reviewed in connection with this case?

10   A.  Yes.

11   Q.  And what is your opinion of that?

12   A.  It's an outlier.  I would say $300 for a, for some of these

13   visits is not supported by the extent of the medical input and

14   the medical expertise that's in the record here.  And it's also

15   interesting that it's a money order, and it sort of raises red

16   flags as far as the appropriateness of what's done here.

17   Q.  Now, Dr. Gharibo, you mentioned earlier that you're

18   affiliated with NYU hospital, correct?

19   A.  Yes.

20   Q.  Is that a teaching hospital?

21   A.  Yes.

22   Q.  Does that mean that you sometimes act as an attending

23   physician to residents, to medical residents?

24   A.  Yes.

25   Q.  You're a teacher, basically?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    765
       F4nWlow4                    Gharibo - direct

1    A.  Yes.

2    Q.  Does that mean that you sometimes supervise other doctors?

3    A.  Yes.

4    Q.  If you were in charge of a doctor that provided you with

5    these notes and these notes reflected prescriptions for

6    oxycodone on every single one of them for 150 to 180 pills,

7    what would be your opinion of that doctor?

8    A.  They probably would be reported to the medical center and

9    to the state.

10   Q.  Now, you mentioned that you were also asked by the

11   government to analyze certain documents that were provided to

12   Dr. Lowe and that Dr. Lowe provided in return in connection

13   with a confidential source.  Do you remember that?

14   A.  Yes.

15   Q.  If I turn your attention to Government Exhibit 804A --

16           MS. MARTINS:  Your Honor, with permission, I'd like to

17   hand it out to the jury because I know it's difficult to see.

18           THE COURT:  Yes.

19           MS. MARTINS:  I'm going to hand to Mr. Street 804A and

20   804B.

21   Q.  Dr. Gharibo, if we look at 804A, which is also up on the

22   screen, if it's easier for you, whatever's easier, is this one

23   of the documents that you were provided with?

24   A.  Yes.

25   Q.  And what is this document?

766
F4nWlow4                    Gharibo - direct

1    A.  This is an MRI report of the, of the lower back.

2    Q.  Are you familiar with Lynbrook Open MRI?

3    A.  No.

4    Q.  Incidentally, are you familiar with an Orange Street in

5    Manhattan?

6    A.  No.

7    Q.  If you look at this MRI, it says it's an MRI of the

8    lumbosacral spine.  What is the lumbosacral spine?

9    A.  Lumbosacral is the tailbone and the lower back.

10   Q.  It's an MRI of the lower back that goes through the

11   tailbone?

12   A.  Correct.

13        MS. MARTINS:  Now, the first asterisk, Ms. Chen, if

14   you could bold that up; if you could actually magnify that, it

15   says there is evidence of a transitional vertebrae noted in the

16   lumbar spine.

17   Q.  Do you see that?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  Normally our back is divided into lumbar vertebra, so

21   there's five of them from L1 to L5.  And then there is a

22   tailbone called a sacrum, and I think in most of us, probably

23   in the 70 to 80 percent of the population, they look different.

24   Lumbar spine vertebra look in a specific configuration and the

25   tailbone will look in a totally distinct and separate

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

767
F4nWlow4                        Gharibo - direct

1   configuration.  When you have a transitional vertebra, you have
2   one vertebra between the lumbar vertebra and the tailbone that
3   sort of has pieces of both in it.  It kind of looks a little
4   bit like the tailbone and a little bit like the lumbar spine
5   when you look at it on the imaging.
6   Q.  Is that a normal variation?
7   A.  Yes.
8   Q.  Now, if you look at the asterisk below that one, it talks
9   about the different vertebrae as you just described, L1 through
10  L5, right?
11  A.  Yes.
12  Q.  And it says for each of those that a disc space
13  demonstrates normal height and signal intensity without disc
14  bulge or disc herniation.  What does that mean?
15  A.  So what that means is, the normal height means that there
16  is a good height.  It is considerable.  It's tall enough that
17  it's plump, that the signal intensity refers to the -- disc is
18  sort of like a jelly donut.  There is a soft inner liquid part
19  and there's an outer fibrous layer, and the signal intensity is
20  consistent with that.  You can see the jelly portion, the shock
21  absorber portion, and you can see the outer fibrous layer.
22  That's the signal intensity part.  Without disc bulge or
23  herniation, that means it is contained.  It's not protruding
24  out, it is not leaking.  It is normal and sealed.
25  Q.  Does this just mean that it's normal?

768

F4nWlow4                    Gharibo - direct

1   A.  Yes.

2   Q.  There's no hernia, there's no bulge; it's a normal

3   vertebrae?

4   A.  Correct.

5   Q.  And that's true, at least according to this MRI, for all of

6   the vertebrae that are being imaged here in the lower back,

7   correct?

8   A.  Correct.

9   Q.  It also says neural foramina, very bottom, and exiting

10  nerve roots are normal in appearance, right?

11  A.  Yes.

12  Q.  So as a general matter, what does this MRI say?

13  A.  It's normal.

14  Q.  It's a normal MRI?

15  A.  Correct.

16  Q.  And again, the little paragraph talks about various things

17  being found as normal or not abnormal or unremarkable.  Again,

18  this is all consistent with just a normal MRI?

19  A.  Correct.

20  Q.  And that the impression, what is an impression?

21  A.  Impression is opinion.

22  Q.  The opinion of the person who created this report?

23  A.  Yes.

24  Q.  And it says unremarkable MRI of lumbar spine with

25  transitional vertebrae of the lumbosacral junction noted.  What

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

769
F4nWlow4                        Gharibo - direct

1    does that mean?

2    A.  The MRI's normal.

3    Q.  Now, you were also asked to review a referral for a patient

4    named Wallace Morris.  That's the second page of that document.

5    A.  Yes.

6    Q.  And this is a referral to pain management, it looks like?

7    A.  Yes.

8    Q.  Are you familiar with the doctor on here, Sebastian

9    Burneston?

10   A.  No.

11   Q.  Again, are you familiar with the existence of an Orange

12   Street in Manhattan?

13   A.  No.

14   Q.  So here, this referral says complaint, lower back pain, and

15   again, this is for Wallace Morris.  And it says diagnosis,

16   lumbar spine disc herniation.  Do you see that?

17   A.  Yes.

18   Q.  That's a hernia of one of the vertebrae?

19   A.  Yes.

20   Q.  Is this referral consistent with what's on the MRI?

21   A.  It's not consistent.

22   Q.  Is a lumbar spine disc herniation an anatomical finding?

23   A.  Yes.

24   Q.  What does that mean?

25   A.  It is a diagnostic finding.  People who have herniated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

770

F4nWlow4                    Gharibo - direct

1   discs may, for example, have sciatica that goes along with

2   that, back and leg pain, for example.

3   Q.  Does an anatomical finding also mean that it's something

4   you could verify on MRI?

5   A.  Yes.

6   Q.  So if you have a lumbar spine disc herniation, that's going

7   to show up on an MRI, correct?

8   A.  Correct.

9   Q.  And we just discussed the MRI is totally normal and says

10  there are no herniations, correct?

11  A.  Correct.

12  Q.  So this is inconsistent with that, you're saying?

13  A.  Inconsistent.

14  Q.  Now, if you received this referral with an anatomical

15  finding and an MRI report that appears to have no anatomical

16  abnormalities, what would be your opinion of that?

17  A.  I would explore it further, talk with the patient and see

18  what their complaints are.

19  Q.  So, if we look at the Government Exhibit 804B, what is your

20  understanding of what this document is?

21  A.  This is a patient visit document.

22  Q.  I'm sorry.

23  A.  It's a patient visit document.

24  Q.  And what is a patient visit document?  Who fills out a

25  patient visit document?

F4nWlow4                        Gharibo - direct

1    A.  The doctor fills it out.

2    Q.  So here the date is March 25, 2013.  To pain management.

3    Do you see that?

4    A.  Yes.

5    Q.  And it says dear pain management, I'm referring Wallace

6    Morris, 48 years old, to you for further consultation.  He was,

7    the patient was seen and assessed in my office on March 25,

8    2013.  Enclosed is a visit note.  What's a visit note?

9    A.  A follow-up note or some office encounter note or a new

10   patient note.

11   Q.  That's filled out by the doctor?

12   A.  Yes.

13   Q.  And incidentally, this is a document from Astramed

14   Physicians, right?

15   A.  Yes.

16   Q.  And it's signed by Dr. Kevin Lowe?

17   A.  Yes.

18   Q.  Now, if we look at chief complaints, it says patient for

19   checkup and referral, patient is here for physical exam.  Had a

20   stab wound in the lower back in 2010, since which time he has

21   had lower back.  Do you see that?

22   A.  Yes.

23   Q.  How does this description compare to what you were

24   describing with respect to the notes taken of a history?

25   A.  This is basically only a chief complaint with no further

772

F4nWlow4                        Gharibo - direct

1    elaboration essentially.  This is not a product of a clinical
2    interview, because a clinical interview focuses on the type of
3    pain, aggravating, alleviating factors, when the pain is the
4    worst.  It gets into a lot more history and detail as far as
5    the potential source of that pain, whether if it's
6    neurological, whether if it's musculoskeletal, any numbness,
7    weakness, bowel, bladder changes and the type of treatments
8    that have been tried.  And there's a lot more effort made to
9    see where the pain is coming from during the history itself.
10   So this is essentially a lacking history.  You know, all it
11   tells us is that there's low back pain and nothing beyond that.
12   That low back pain could be somebody with an abdominal aortic
13   aneurysm.  That low back pain could be somebody with a kidney
14   stone, or somebody with muscle pain or somebody with an
15   infection in their back.  It could be anything.
16   Q.  So you would expect to see something more thorough in that
17   area, is that correct?
18   A.  Yes.
19   Q.  Then it says problem list, lumbar radiculopathy.  What's
20   lumbar radiculopathy?
21   A.  Lumbar radiculopathy is nerve pain that emanates from one
22   of the nerves in the low back.  For example, sciatica is a type
23   of lumbar radiculopathy.  It's often pain that's in the back
24   and goes down the leg, back of the leg or front of the leg.
25   Q.  Have you heard of something called radicular pain?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

773
F4nWlow4                    Gharibo - direct

1    A.  Yes.

2    Q.  What is radicular pain?

3    A.  Radicular pain means the pain is coming from inflammation

4    of the nerve in the spine.  So that could be, for example, if

5    L5 is inflamed, it would be pain in the back that goes down the

6    side of the leg to the top of the foot.  So that pain is in the

7    distribution of the L5 nerve, and if it is, it's called

8    radicular pain.

9    Q.  Just as an easy way to think about it, it's pain that

10   typically radiates into the legs?

11   A.  Correct, and drops below the knee.

12   Q.  And drops below the knee?

13   A.  Yes.

14   Q.  If you look at the next page, it says radiology.  I think

15   the page, at the bottom, says order and radiology up on top,

16   EMG lower.  Did you form an opinion about whether, based on the

17   documents you reviewed, an EMG lower is an appropriate test?

18   A.  I did.

19   Q.  And what is that?

20   A.  It's an inappropriate test.

21   Q.  Why?

22             MR. FOWLKES:  Sorry?

23             THE WITNESS:  Inappropriate.

24   A.  Because there's no leg pain.  You order a leg EMG if

25   there's pain going down the leg and you're trying to sort out

774

F4nWlow4                    Gharibo - direct

1    is the leg pain coming from the femoral nerve, a leg nerve or a

2    back nerve, like a spine nerve.  You order the EMG to sort out

3    is the pain from the spine or some peripheral nerve.  Here

4    there's only back pain, so it's not going to be very helpful

5    for that.

6    Q.  Does that mean EMG of the lower extremity?

7    A.  Yes.

8    Q.  And then we see physical examination.  Do you see that?

9    A.  Yes.

10   Q.  What is your impression of this physical examination?

11   A.  I don't get this physical examination because there's

12   almost no history except there's low back pain and a stab wound

13   sometime in the back, yet there's no marking of any type of a

14   stab wound, for example, and it is extremely, quite a mismatch

15   with the history that was taken that just revealed low back

16   pain, where all these systems are examined, where it's almost

17   inappropriate and a violation of the patient's dignity to

18   perform such a comprehensive physical exam that includes a

19   rectal exam when all the patient is reporting to you is low

20   back pain.  So it makes me suspect the integrity of this

21   physical exam that's documented here.

22   Q.  And if you notice the abdomen, for example, says no

23   apparent scars, and I think there are no other scars noted on

24   this exam.  Did the patient complain or did the patient

25   complaint indicate a stab wound?

F4nWlow4                          Gharibo - direct

1    A.  Yes.

2    Q.  Would you expect to at least find a scar --

3    A.  Yes.

4    Q.  -- if you conducted a physical exam?

5    A.  Yes.  In fact, it was documented.  Sometimes there are scar

6    neuromas and that's where the back pain may be coming from.

7    But there's no indication of that here.

8    Q.  And then it says, well, let me look at the neurological

9    systems.  It says that straight leg raising positive on the

10   right at 60 degrees and on the left at 40 degrees.  What is a

11   positive finding for a straight leg raising?  What is straight

12   leg raising; what type of test is that?

13   A.  Straight leg raises is when the patient is lying down or

14   sitting, they just lift up their leg or lift up their foot, and

15   what that indicates is inflammation of the lower lumbar spine.

16   It usually suggests either L5 radiculopathy, L4 or S1.  If the

17   patient reports a pain somewhere between 30 to 80, 90 degrees

18   or so, that indicates that that nerve may be inflamed.

19              THE COURT:  Would now be an O.K. time to take a break?

20              MS. MARTINS:  Sure, yes.

21              THE COURT:  Unless we're very close to the end of the

22   direct.

23              MS. MARTINS:  We're close, but probably mentally for

24   people it would be good to break.

25              THE COURT:  Why don't we do that.  Ten minutes.

F4nWlow4                       Gharibo - direct

1           (Jury excused)

2           THE COURT:  We'll break for ten minutes.

3           (Recess)

4           THE COURT:  Welcome back.

5           Ms. Martins, you may proceed.

6           MS. MARTINS:  Thank you, your Honor.

7           THE COURT:  You understand you're still under oath.

8           THE WITNESS:  Yes.

9    BY MS. MARTINS:

10   Q.  Dr. Gharibo, I think we were looking at the physical exam

11   on Government Exhibit 804B, and just shortly before the break,

12   I believe you testified that if this, in fact, had occurred it

13   would be an inappropriate exam.  Correct?

14   A.  Yes.

15   Q.  And then you described the positive leg raise finding?

16   A.  Yes.

17   Q.  And I think you were describing the fact that the type of

18   pain associated with that finding would originate in a nerve in

19   the lower back.  Is that correct?

20   A.  Correct.

21   Q.  Is that the type of finding that could show up on an MRI?

22   A.  If it's due to a herniated disc, it would.

23   Q.  And then if you just go down, it says that there's a

24   diagnosis of lumbar radiculopathy?

25   A.  Correct.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

777
F4nWlow4                    Gharibo - direct

1   Q.  Based on this exam, this purported exam and the MRI, and

2   the complaints as described by Dr. Lowe in this exam, is that

3   diagnosis of lumbar radiculopathy supported by these documents?

4   A.  It's not supported.

5   Q.  Could you describe why not?

6   A.  Because there's no documentation of leg pain, and the

7   straight leg raise that's positive doesn't correlate with the

8   patient's presentation when it comes to the history and where

9   their pain is.

10  Q.  So it's inconsistent with other aspects of a physical

11  examination and the patient history as described by Dr. Lowe?

12  A.  Correct.

13  Q.  Now, are there occasions when a patient's complaint of back

14  pain, for example, does not match up with the results of an

15  MRI?

16  A.  Yes.

17  Q.  What's the best practice in that situation?

18  A.  You can treat it conservatively and work it up further in

19  the meantime.

20  Q.  What do you mean by work it up further?

21  A.  You can get a bone scan, for example.  You can get

22  flexion/extension films to see if there's any motion or

23  instability, or is the pain coming from the abdomen, is it

24  referred from an abdominal structure.

25  Q.  Are you talking about things that a pain specialist would

778
F4nWlow4                        Gharibo - direct

1    do or if a patient presented with certain pain to a general

2    practitioner, for example, that wasn't consistent with an MRI

3    or physical exam?

4    A.  It can be done by either.

5    Q.  So is it fair to say that you would investigate further?

6    A.  Yes.

7    Q.  In your professional opinion, would your first reaction be

8    to refer that patient to pain management?

9    A.  If, no.  I mean, it needs more information for me to be

10   able to answer that decision -- that question, but based on

11   this, on the record, that would definitely not be the thing to

12   do, refer to a pain management.  It needs more information, and

13   there's probably a lot there that can be done to the patient,

14   treatmentwise.

15   Q.  Are pain management specialists sort of the first line of

16   defense for somebody with pain?

17   A.  No.

18   Q.  Who is that?

19   A.  It's usually primary care doctor.

20   Q.  By the time you see a patient, has that patient typically

21   tried different forms of therapies with their primary care

22   doctor?

23   A.  Almost always.

24   Q.  And when we talk about a primary care doctor, that's often

25   an internist?

779
F4nWlow4                    Gharibo - direct

1   A.  Yes.

2           MS. MARTINS:  Nothing further, your Honor.

3           THE COURT:  Cross.

4           MR. FOWLKES:  Yes, your Honor.

5   CROSS-EXAMINATION

6   BY MR. FOWLKES:

7   Q.  Good afternoon, Dr. Gharibo.

8   A.  Good afternoon.

9   Q.  My name is William Fowlkes.  I represent Dr. Lowe.  I'll be

10  asking a few questions.  If you don't understand them, please

11  let me know and I will rephrase them.  O.K.?

12  A.  O.K.

13  Q.  You said that you have testified before in court cases,

14  correct?

15  A.  Correct.

16  Q.  And can you tell us how many times you've testified before

17  in court cases?

18  A.  Probably have testified about 40 to 60 times before.

19  Q.  40 to 60 times before?

20  A.  Yes.

21  Q.  And do you have an understanding of whether or not when you

22  testified you were testifying for the government or for the

23  defendant?

24  A.  I've testified for plaintiff and defense.  Rarely have I

25  testified for the government.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1   Q.  And in this instance, you're testifying for the government?

2   A.  Yes.

3   Q.  And you're being paid for that, right?

4   A.  Correct.

5   Q.  And just so we're clear, the $4,000 that you're receiving

6   today is for your time here today?

7   A.  Correct.

8   Q.  Now, your expertise is pain management, correct?

9   A.  Yes.

10  Q.  So let's talk about pain for a moment.  Is pain sometimes

11  hard to diagnose?

12  A.  It can be.

13  Q.  It can be, right?

14  A.  Yes.

15  Q.  So sometimes a patient can be experiencing pain and

16  everything seems normal, right?

17  A.  It's possible.

18  Q.  Including an MRI, right?

19  A.  It's possible.

20  Q.  And when that happens, the doctor can do a number of

21  things, right?

22  A.  Yes.

23  Q.  He can try and get some more information?

24  A.  Yes.

25  Q.  He can try and do some additional tests?

781
F4nWlow4                    Gharibo - cross

1   A.  He can do multiple things at the same time.

2   Q.  Or he can refer it to someone else to do, right?

3   A.  It depends.

4   Q.  It depends on the doctor, correct?

5   A.  It depends on if you're going to refer or not, needs more

6   information.

7   Q.  And it depends because, like other professions, doctors are

8   specifically independent, would that be fair to say?

9   A.  It depends based on the information you're gathering which

10  determines if you're going to refer or not.

11  Q.  O.K.  My question to you was about the specific

12  independence of doctors.  So doctors are specifically

13  independent, right?

14  A.  They're -- can you rephrase that.

15  Q.  Yes.  You're held accountable for specific acts that

16  individual doctors make, correct?

17  A.  They're held accountable, yes.

18  Q.  So, for example, you are part of a practice, correct?

19  A.  Yes.

20  Q.  And there are things and decisions that you can make that

21  might affect the practice, right?

22  A.  Yes.

23  Q.  But there are also decisions and things that you can make

24  that would have nothing to do with the practice, right?

25  A.  It's possible.

782
F4nWlow4                    Gharibo - cross

1    Q.  Now, since you are in a group setting, would it be fair to
2    say that there are decisions that doctors make that are medical
3    decisions and decisions that doctors make that are maybe
4    administrative decisions?
5    A.  Yes.
6    Q.  And would it be fair to say that the administrative
7    decisions are the types of decisions that would affect the
8    whole practice, whereas the individual medical decisions are
9    the types of decisions that just would affect that particular
10   doctor?  Would that be fair to say?
11   A.  Depends on the administrative decision.  There are some
12   decisions that can affect a single doctor too.
13   Q.  I'm not saying an unfair thing, right?
14   A.  Depends on the decision.
15   Q.  Depends, right?
16   A.  Right.
17   Q.  All right.  Now, you remember giving testimony about the
18   number of patients that are seen, right?
19   A.  Yes.
20   Q.  And you said that in your opinion or in your experience, 40
21   patients would be the max?
22   A.  Depends on the time period that we're referring to for a
23   typical workday.  But 40 to 50, I believe, is what I said.
24   Q.  40 to 50, O.K.  Have you, in your experience, ever heard of
25   higher?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  I haven't heard of over 50, I would say.

2   Q.  You would say?

3   A.  Yeah.  I don't recall hearing anything over 50 a day.

4   Q.  O.K.  Now, you are familiar with internal medicine, the

5   specialty or the indication or the subset amongst physicians

6   about internal medicine, right?

7   A.  Yes, I am.

8   Q.  And internal medicine includes all the varied things that

9   could happen inside, right?

10  A.  In, O.K., yes.

11  Q.  And one of the things that would be included in internal

12  medicine would be pain, yes?

13  A.  Yes.

14  Q.  Back pain?

15  A.  Yes.

16  Q.  All right.  Now, you talked about reviewing certain records

17  in this case.  Do you remember?

18  A.  Yes.

19  Q.  And you said BNE records?

20  A.  Yes.

21  Q.  What is BNE records?

22  A.  Bureau of Narcotic Enforcement records.

23  Q.  And did you access those records?

24  A.  Yes.

25  Q.  You accessed them independently of the government?

F4nWlow4                    Gharibo - cross

1    A.  Yes.

2    Q.  And how did you do that?

3    A.  They were emailed to me and I accessed the file.

4    Q.  Where did the file come from?

5    A.  It was sent to me by the, the attorney.

6    Q.  So there was no system that you punched in your code and

7    you got these records off the system?

8    A.  I did not log in to the system.  It was a file, an Excel

9    file.

10   Q.  Could you have logged in to the BNE system?

11   A.  I don't think so.

12   Q.  When you say you don't think so, you think that it's

13   possible to log, for individual doctors to log in to the BNE

14   system?

15   A.  No, because I'm thinking of the prescription-monitoring

16   program.  No, I could not have logged into the BNE system.

17   Q.  Now, let's talk about the prescription-monitoring program

18   for a moment.  Can you describe that program for the jury?

19   A.  That is a program where you go to a specific Web site and

20   you put in your user name and password and you get a history of

21   what has been prescribed to the patient that is a controlled

22   substance.

23   Q.  Can you also or do you also order your prescription pads

24   from that?

25   A.  Well, that's the separate New York State Department of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4nWlow4                    Gharibo - cross

1    Health section of the similar Web site.
2    Q.  Is it the same Web site, or are you saying it's a different
3    Web site?
4    A.  It may be different, but my secretary orders the
5    prescriptions and I haven't done them for quite some time, so I
6    don't know.
7    Q.  You don't know.  So, in your case, your secretary orders
8    your prescription pads?
9    A.  Yes.
10   Q.  Let me just clarify that.  Each doctor who writes
11   prescriptions has to have a registration number, correct?
12   A.  Yes.
13   Q.  A DEA registration number, right?
14   A.  Correct.
15   Q.  And that's specific to each doctor?
16   A.  Yes.
17   Q.  And they use that to log in to this new New York State
18   tracking system, right?
19   A.  No.
20   Q.  They use something else?
21   A.  Yes.
22   Q.  A pass code of some kind?
23   A.  There is a user name provided by the state.
24   Q.  And that user name is specific for a particular
25   registration number, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

786
F4nWlow4                    Gharibo - cross

1    A.  Correct.

2    Q.  So if you have a registration number, your user name is not

3    shared by anyone else who has a registration number, right?

4    A.  That's correct.

5    Q.  And when you log on to that system, you use your password

6    or your user ID to get in to the system, correct?

7    A.  Correct.

8    Q.  And then you order your prescription pads?

9    A.  I'm assuming that's where you order it from, based on your

10   question.  I can make that assumption, if you want.

11   Q.  Well, you're the expert.  When you first get your pads, are

12   they filled out?

13   A.  With what?

14   Q.  Your name, patient's name, and stuff like that.  When you

15   get your pads from New York State, are they filled out?

16   A.  They're filled out with my name, not the patient's name.

17   Q.  So each pad, your understanding, has the doctor's name

18   already on the pad?

19   A.  It may not.  It depends on the type of pad that's ordered.

20   Q.  All right.

21   A.  There are some pads that have no name on it.

22   Q.  In fact, there are pads that just have a number on it,

23   right?

24   A.  They all have a number on them.

25   Q.  They all have numbers, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

787
F4nWlow4                    Gharibo - cross

1   A.   Yes.

2   Q.   Because the state wants to keep track of all of these,

3   correct?

4   A.   I don't know the reason.  They all have a number on them.

5   Q.   All right.  So you end up putting your information on those

6   papers when you write a prescription, correct?

7   A.   You may or may not.  You can also e-prescribe too.

8   Q.   I'm sorry?

9   A.   You can also electronically send a prescription as well.

10  Q.   Well, if you electronically -- with respect, if you

11  electronically send your prescription, you're not writing it,

12  are you?

13  A.   Correct.

14  Q.   All right.  So my question to you was when you write a

15  prescription, you fill in that information on that piece of

16  paper.  Correct?

17  A.   Technically, we never write a prescription then.  I mean,

18  if you're going to get into the definitions of prescriptions,

19  we don't write prescriptions, we type it in.

20  Q.   When you say we don't write prescriptions, you're not

21  talking about all doctors, right?

22  A.   You're referring to my practice, I assume.

23  Q.   O.K.  In your experience as an expert, when doctors write

24  prescriptions, they write in the information, like the patient,

25  what the drug's going to be, and they sign their name, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4nWlow4                    Gharibo - cross

1    A.  Yes.

2    Q.  And then that prescription goes, if it's in the normal

3    course of things, to a pharmacy, right?

4    A.  Yes.

5    Q.  And that pharmacy sees this prescription, puts it into

6    their system, correct?

7    A.  Yes.

8    Q.  And that then somehow gets transmitted to the state system?

9    A.  That's my understanding.

10   Q.  And that's how the state tracks each prescription that

11   every doctor it has registered writes, correct?

12   A.  That sounds reasonable.

13   Q.  You don't know for sure?

14   A.  I don't know the exact workings of the system, but what

15   you're telling me sounds reasonable.

16   Q.  How long have you been using the system?

17   A.  I've been prescribing to the system for about 15 years.

18   Q.  15 years?

19   A.  Yes.

20   Q.  And it's your testimony here today that you're not sure how

21   the process works?

22           MS. MARTINS:  Objection, your Honor.

23           THE COURT:  I'll allow it.  He can answer the

24   question.

25   A.  As far as the specific communication between the pharmacy

F4nWlow4                        Gharibo - cross

1   and state, I'm not involved in that part of the communication.

2   Q.  You are aware that the state tracks every prescription?

3   A.  Yes, I am.

4   Q.  Aren't you?

5   A.  Yes, I am.

6   Q.  Now, you said that the first thing that a good doctor would

7   do when they are seeing a patient is they would ask questions

8   of the patient, right?

9   A.  You ask questions or the patient communicates it to you.

10  Q.  O.K.

11  A.  As far as what their complaints are, the chief complaint.

12  Q.  Right.  So you ask questions of the patient, correct?

13  A.  At some point you do.

14  Q.  At the beginning, right?

15  A.  Usually do, or you may not.  The patient just may tell you

16  why they're there.

17  Q.  You may ask questions all through the exam, but when you

18  first see the individual, isn't the first phase to ask

19  questions?

20  A.  You do ask questions.

21  Q.  All right.  So that was my question.  When you first speak

22  to a patient, you ask them questions first, right?

23  A.  It depends.  Some patients just tell me what their, what

24  bothers them and why they're there.  I think the first thing

25  that we do is that if that information is relevant, I let them

790
F4nWlow4                    Gharibo - cross

1   just communicate it to me without asking questions and

2   interrupting.

3   Q.  So you may or may not ask questions, yes?

4   A.  In the beginning, I let them tell me what their --

5   Q.  Here's my question.  You may or may not ask questions

6   according to what you just said.  Is that true?

7   A.  During the whole course of the interview, I will ask

8   questions.  Your question initially was regarding the

9   beginning, and that beginning, I may or may not ask questions.

10  Q.  All right.  And based on the answers that your patient

11  gives you, you then have an idea of where the rest of the visit

12  goes, right?

13  A.  Correct.

14  Q.  If they give you certain information, it will take one

15  track, is that fair to say?

16  A.  Yes.

17  Q.  But if they give you other information, it may take a

18  completely different track, fair to say?

19  A.  Yes.

20  Q.  So the track that you go down in the course of this visit

21  depends upon the information that the patient is providing to

22  you, fair to say?

23  A.  Yes.

24  Q.  Now, you said as well the next thing you would do would be

25  a physical exam, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4nWlow4                    Gharibo - cross

1    A.  Yes.

2    Q.  And that physical exam is designed to verify or discover

3    new things that the patient may be complaining about, right?

4    A.  No.

5    Q.  All right.  One of the things the physical exam is supposed

6    to do is to verify the information that he just relayed to you

7    in the questions?

8    A.  No.

9    Q.  No?  At any point in time, are you looking to verify the

10   information that the patient is giving you?

11   A.  You may check the monitoring program to verify the

12   historical information, but what the patient says, states, is

13   what the patient states.  We don't see to verify it.  A

14   physical exam has a different purpose.

15   Q.  So what the patient states you take at face value?

16   A.  Yes.

17   Q.  You don't seek to verify it?

18   A.  Not through a physical exam.

19   Q.  Now, past medical history is the next thing that you

20   mentioned, right?

21   A.  Yes.

22   Q.  And you --

23   A.  Past medical history is after the history.

24   Q.  And you ask your patients about their past medical history,

25   right?

F4nWlow4                    Gharibo - cross

1    A.  Yes.

2    Q.  Unless they volunteer it on their own, right?

3    A.  Yes.

4    Q.  All right.  And the past medical history sheds some light

5    on everything else in the exam, right?

6    A.  Not in the physical exam.

7    Q.  Well, in the visit that the patient makes with you, his

8    past medical history sheds some light on that visit, correct?

9    A.  On the medical condition.

10   Q.  On his medical condition, right?

11   A.  Yes.

12   Q.  And next, you said you do a review of systems.  Do you

13   remember saying that?

14   A.  When we say next, I just want to be clear, that's usually

15   not next, but at some point we do.

16   Q.  All right.  What would you be doing a physical exam for?

17   A.  The physical exam is a, kind of like a discovery process on

18   where the pain may be coming from.  Depending on the history.

19   Q.  It's a discovery process of where the pain is coming from?

20   A.  May be coming from.

21   Q.  May be coming from?

22   A.  Right.

23   Q.  A discovery process of where the pain may be coming from?

24   A.  Correct.

25   Q.  And you do that not in light of what they told you when you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4nWlow4                    Gharibo - cross

1   were asking questions?

2   A.  Well, you keep that in mind.

3   Q.  You keep that in mind?

4   A.  The two go hand in hand.

5   Q.  So you keep in mind what they told you when you were asking

6   questions while you're doing the physical exam, right?

7   A.  Correct.

8   Q.  Now, what is a review of systems?

9   A.  Review of systems is a review of different organ systems of

10  the body, like heart, lung, and so on.

11  Q.  And when you do that, how do you do that?

12  A.  You go through a battery of symptoms with the patient:

13  Fevers, weight loss, night sweats, chest pain, cough, and so

14  on.

15  Q.  You ask them that?

16  A.  Yes.

17  Q.  So the review of systems is also something where you're

18  asking the patient for information, right?

19  A.  Correct.

20  Q.  Now, you also said review -- all right.  Just up until that

21  point, well -- withdrawn.

22          The entire visit, would it be fair to say, is

23  contingent upon the answers to those questions, in the first

24  questions that you ask them, the past medical history, and the

25  review of symptoms?  Would it be fair to say that?

794
F4nWlow4                    Gharibo - cross

1    A.  The entire visit is contingent on the questions?

2    Q.  Yes, yes.  The answers to those questions.

3    A.  As far as what, what's examined and what's decided, yes.

4    Q.  Now, you said that you also would review documents or

5    medical exams, like MRIs, urinalysis, and things like that,

6    right?

7    A.  Correct.

8    Q.  And it is not always the case that an MRI or whatever the

9    document that you're looking at correlates or corresponds to

10   what the information is you're getting from your patient,

11   right?

12   A.  Correct.

13   Q.  I mean, that's not unusual, right?

14   A.  It happens regularly.

15   Q.  It happens regularly.

16             And then based on all of those things, you said you

17   come up with a treatment plan?

18   A.  Yes.

19   Q.  If any of those things were something that a patient lied

20   to you about or specifically deceived you about, that would

21   affect the treatment plan that you give them, right?

22   A.  It can.

23   Q.  So your treatment plan then might be incorrect?

24   A.  There is potential for that.

25   Q.  And then you said once you come up with a treatment plan,

F4nWlow4                    Gharibo - cross

1    you order some tests?

2    A.   May or may not.

3    Q.   You may or may not.  You could order some tests?

4    A.   Yes.

5    Q.   It's not unusual to order tests, right?

6    A.   Correct.

7    Q.   And those tests would be to, you know, more information, it

8    would be to, maybe they don't have an MRI, maybe you order one,

9    right?

10   A.   Yes.

11   Q.   And just so we're clear and to remind everybody about the

12   pain issue, you can do all of these things and not discover on

13   the paperwork, the MRIs and things like that, anything that you

14   see wrong and the person could still be experiencing pain,

15   right?

16   A.   They may be having pain from another structure that needs

17   to be found out.

18   Q.   They may need some other tests or analysis, correct?

19   A.   Correct.  Or it could be a nonimagable diagnosis, like

20   muscle pain.

21   Q.   Let's talk about that.  What do you mean by nonimagable

22   pain?

23   A.   If somebody has back pain, they may not have radiculopathy,

24   for example, as a diagnosis, but it could be a muscle sprain.

25   Q.   It could be a muscle sprain?  And a muscle sprain, how

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

796

F4nWlow4                    Gharibo - cross

1    quickly can someone get a muscle sprain?

2    A.  Immediately.

3    Q.  Immediately.  And do they always have to know when they get

4    a muscle sprain?

5    A.  Do they always have to know what?

6    Q.  In other words, isn't it possible to get a muscle sprain

7    and you didn't know it and you wake up the next day with some

8    pain or something?  Isn't that possible?

9    A.  If you have a muscle sprain, you would know.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4NSLOW5                    Gharibo - cross

1    BY MR. FOWLKES:

2    Q.  You would know immediately when you have a muscle sprain?

3    A.  Yes.

4    Q.  All right.  So is it possible that if you had a muscle

5    sprain and you knew that immediately, it wouldn't come up on

6    your MRI?

7    A.  Correct.

8    Q.  Really all this talk about the MRI is sort of just like

9    extra information, right?

10   A.  Potentially useful information.  The talk was about the

11   diagnosis --

12   Q.  Potentially useful?

13   A.  Not radiculopathy.

14   Q.  Potentially useful?

15   A.  Potentially useful.

16   Q.  But it may not be?

17   A.  But it may not be.

18   Q.  You said that -- that is all, we just finished going

19   through all the first visit?

20   A.  Yes.

21   Q.  You said that on followup visits, you may not do all of

22   that?

23   A.  It was not all.  There was also family history, social, and

24   surgical history, too.

25   Q.  Are you referring to the first visit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

798

F4NSLOW5                    Gharibo - cross

1   A.  Yes.

2   Q.  I want to move to the second visit, but thank you.

3       On the second visit, you don't have to do all of that,

4   right?

5   A.  Correct.

6   Q.  You said that sometimes they can take from seven minutes,

7   you said specifically seven or eight minutes to 30 minutes,

8   right?

9   A.  Yes.

10  Q.  The purpose of the followup visit is to see a response to

11  the treatment?

12  A.  Yes.

13  Q.  You focus on if you can document the response of the

14  treatment, you do that, and you also focus on quality of life,

15  do you remember saying that?

16  A.  Those are some of the purposes, yes.

17  Q.  When you talk about the response to treatment, that is

18  something like when you get the urinalysis report to see if you

19  have prescribed oxycodone to someone, and they come back to you

20  for a followup visit, you might look at the urinalysis report

21  to see if they have the oxycodone metabolites in their system?

22  A.  That is not a response to treatment.

23  Q.  Right?  That is not in the response to the treatment part?

24  A.  Correct.

25  Q.  That is not in the followup part?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

799
F4NSLOW5                    Gharibo - cross

1   A.  That is in the followup part.

2   Q.  It is not in the response to treatment part?

3   A.  Correct.

4   Q.  That is just something outside of that.  You also mentioned

5   quality of life, right?

6   A.  Yes.

7   Q.  How do you ascertain with your patient their quality of

8   life?

9   A.  We get into physical function, like social function,

10  walking, sitting, standing, getting around, going out to

11  dinner.  So the initial visit serves as a foundation as to how

12  their quality of life is compromised, including sleep, and then

13  we follow up on that with what is compromised on the followup.

14  Q.  Once again, you are asking the patient for information,

15  correct?

16  A.  Correct.

17  Q.  You expect and anticipate that this patient is going to

18  tell you something that is true, right?

19  A.  Yes.

20  Q.  If they don't tell you something that's true, that could

21  affect your future actions with regard to them, right?

22  A.  Yes.

23  Q.  You were asked about how to document patient visits, do you

24  remember that?

25  A.  Yes.

800

F4NSLOW5                        Gharibo - cross

1    Q.  You said that that usually goes into a computer?

2    A.  Yes.

3    Q.  You talked about how you could be inputting things in the

4    computer during the time that you're having this visit, right?

5    A.  Correct, or writing.

6    Q.  Or writing it out, that's really what I wanted to get to.

7    Thank you.

8         If you are somebody who doesn't use a computer, would you

9    would be writing that down, right?

10   A.  Correct.

11   Q.  The reason why it is important, as you testified, to

12   document these things is because you want to track what the

13   patient has told you in the past, right?

14   A.  Yes.

15   Q.  With what he is telling you now, right?

16   A.  Correct.

17   Q.  So that you can make a diagnosis?

18   A.  One of the reasons.

19   Q.  Or you can alter the treatment plan, or do what you need to

20   do with the treatment plan?

21   A.  That, too.

22   Q.  Now you talked about oxycodone and how it works in the

23   body.  Do you remember that?

24   A.  Yes.

25   Q.  Can you tell us some of the things opiates treat, are

801
F4NSLOW5                    Gharibo - cross

1    prescribed to treat?

2    A.  They're used to treat acute and chronic pain.

3    Q.  Well, when you say acute and chronic pain, you're talking

4    about the length and severity of the pain?  You are talking

5    about the length of the pain, right?

6    A.  Correct.

7    Q.  Because you can have acute severe pain and you can have

8    acute nonsevere pain, right?

9    A.  Correct.

10   Q.  And you can have chronic severe pain and you can have

11   chronic nonsevere pain, right?

12   A.  Yes.

13   Q.  That distinction is just talking about the length of time

14   that you experience pain, right?

15   A.  Generally, yes.

16   Q.  Now what I was asking you is, what types of things would

17   opiates like oxycodone be prescribed to treat?

18   A.  They are used to treat musculoskeletal orthopedic

19   conditions and nerve pain conditions that have failed other

20   treatment approaches where the pain is severe enough to

21   indicate an opioid.

22   Q.  Let's talk about nerve pain for a minute.  Would it be fair

23   to say that nerve pain can be difficult to diagnose?

24   A.  Yes.

25   Q.  Is nerve pain always something that shows up on an MRI?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4NSLOW5                        Gharibo - cross

1    A.  No.

2    Q.  Oftentimes someone is experiencing nerve pain and it

3    doesn't show up on the normal battery of tests, is that fair to

4    say?

5    A.  Frequently, yes.

6    Q.  Oxy is sometimes prescribed for that type of pain, if it is

7    severe enough, right?

8    A.  It can be.

9    Q.  If all the other things are met that you said needed to go

10   before you even prescribe oxy, right?

11   A.  Yes, or it is combination therapy with other agents.

12   Q.  Let's get to that.  One of the things that you discussed

13   was muscle relaxers, right?

14   A.  Yes.

15   Q.  Can you explain why a muscle relaxer might be prescribed

16   along with oxy?

17   A.  Muscle relaxants are -- they work at the level of the brain

18   in the brain stem to relax the muscles, and it is -- it could

19   be part of combination pain relief, but there are some pros and

20   cons to it.  It could be part of the combination plan.

21   Q.  Would a muscle relaxer be Flexeril?

22   A.  Yes.

23   Q.  You talked about oxy being addictive.  Is Flexeril

24   addictive?

25   A.  It can be.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4NSLOW5                    Gharibo - cross

1    Q.  You also talked about other conditions of pain.  You

2    mentioned fibromyalgia.  Do you remember saying that?

3    A.  Yes.

4    Q.  Can you describe what that is to the jury?

5    A.  Fibromyalgia is a condition of generalized body pain due to

6    pain sensitivity in the brain.  So those patients complain of

7    pain at the four quadrants of the body, generally speaking,

8    that is also associated with fatigue, poor sleep, anxiety, and

9    depression.

10   Q.  So that pain originates in the brain?

11   A.  That's one of the prevailing theories about it.  There is

12   nothing orthopedically or musclewise --

13           THE COURT:  Mr. Fowlkes, why are we asking about

14   fibromyalgia?

15           MR. FOWLKES:  Well, he raised it as something that he

16   may treat in the course of --

17           THE COURT:  Can we move on to something more pertinent

18   to the case?

19           MR. FOWLKES:  Well, I submit that my line of

20   questioning is pertinent with the defense, but okay.

21           THE COURT:  Thank you.

22           MR. FOWLKES:  I will do the best I can.

23   BY MR. FOWLKES:

24   Q.  Suffice it to say, fibromyalgia won't show up on an MRI,

25   right?

804
F4NSLOW5                    Gharibo - cross

1    A.  Correct.

2    Q.  It won't show up in the usual -- those types of tests,

3    exams, right?

4    A.  Yes.

5    Q.  If there are psychological things that are causing pain,

6    that won't show up either, right?

7    A.  On imaging studies, correct.

8    Q.  You said that the records that you received led you to

9    conclude that the daily dosage and the pill counts were

10   excessive?

11   A.  Yes.

12   Q.  If you had received that information, you would lower those

13   pill counts and daily dosages?

14   A.  I would.

15   Q.  Would you necessarily, if you knew that information, change

16   the prescription?

17   A.  I would change the molecule to another opioid.

18   Q.  If you were consulting with another doctor, you might tell

19   him that this is a red flag?

20   A.  The percentage of prescriptions that is oxycodone is

21   definitely a big red flag here.

22   Q.  Just so that we are clear, you are an expert in the field,

23   right?

24   A.  Yes.

25   Q.  You have been doing this for years, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4NSLOW5                    Gharibo - cross

1   A.  Yes.

2   Q.  You teach other doctors, right?

3   A.  Yes.

4   Q.  Because the other doctors don't know everything you know,

5   right?

6   A.  They may or may not.

7   Q.  They might, but they might not, right?

8   A.  Yes.

9   Q.  You talked about the report, the urinalysis report, was

10  wrong or there was a problem with it because it showed the

11  presence of oxycodone but not the presence of metabolites.  Do

12  you remember saying that?

13  A.  Correct.

14  Q.  The metabolites are what the body produces when it is using

15  or when oxycodone is placed in it, right?

16  A.  Yes.

17  Q.  That wouldn't be the case if it was crushed in, right?

18  A.  Yes.

19  Q.  Those reports, that was based on reports that you received

20  from the government, right?

21  A.  Correct.

22  Q.  You aren't aware of whether you saw all the urinalysis

23  reports, right?

24  A.  Correct.

25  Q.  You aren't aware of whether you evaluated all of the

806
F4NSLOW5                    Gharibo - cross

1    patients, correct?

2    A.  Correct.

3    Q.  You talked about the exhibit which discussed a transitional

4    vertebrae, right?

5    A.  Yes.

6    Q.  You discussed how a transitional vertebrae is the

7    connection or sometimes fusion of our tailbone with that last

8    backbone, spine, last bone in the spine, right?

9    A.  Connection.

10   Q.  The connection.  You said that was a normal variation or a

11   normal thing to see, right?

12   A.  It is nonpathological.

13   Q.  What does that mean?

14   A.  It doesn't have to cause a problem.  It can just be there.

15   It is a normal variant.

16   Q.  When you say it didn't have to cause a problem, can it

17   cause a problem?

18   A.  I think anything can cause a problem.

19   Q.  Good.  If you see something like that and your patient is

20   telling you, I am experiencing back pain, it could be because

21   of a transitional vertebrae, correct?

22   A.  Generally not.

23   Q.  Generally not?  What does that mean, that ungenerally, so

24   there are times when that could be correct, right?

25   A.  Not the way this MRI reads, because everything else is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

807

F4NSLOW5                    Gharibo - cross

1   normal.  There is nothing to suspect that there is spinal pain

2   based on this MRI.

3   Q.  Yet there could be pain anyway, right?

4   A.  There could be pain from the muscle that surrounds it, for

5   example.  There could be nonspinal pain generators.

6   Q.  That all depends on what the patient says to you, right?

7   A.  Coupled with the physical exam.

8   Q.  You talked about the leg raise test, right?

9   A.  Yes.

10  Q.  You said that that test can be performed either laying down

11  or sitting down?

12  A.  Yes.

13  Q.  What you're trying to do when you do that test is you are

14  trying to find where the pain is and what the pain is doing,

15  right?

16  A.  The pattern of the pain as the leg is raised.

17  Q.  The pattern of the pain, right?  So when do you that test,

18  you tell the patient to raise his or her leg, correct?

19  A.  No.

20  Q.  No.  You don't direct the patient to raise their legs?

21  A.  Correct.

22  Q.  How do you do a raise leg test?

23  A.  They relax the muscle, the doctor raises the leg.

24  Q.  So you tell the patient to relax?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

808
F4NSLOW5                    Gharibo - cross

1    Q.  Then you lift up their leg?

2    A.  Correct.

3    Q.  Do you also inform them to tell you when they feel pain, or

4    do you just assume that you are going to know that?

5    A.  I look at their facial grimace.

6    Q.  You don't tell them, let me know when you feel pain?

7    A.  I may or may not.

8    Q.  So you lift the leg, and when you discover that there is

9    pain, whether it be they tell you or you look at their face,

10   you then stop raising the leg?

11   A.  Yes.

12   Q.  Then you sort of estimate the degree that you raised it,

13   right?

14   A.  Correct.

15   Q.  When it indicates a degree from the leg test, just that

16   simple thing says that someone went through that procedure,

17   correct?

18   A.  Correct.

19   Q.  And at some point in time the person said, oh, that hurt?

20   A.  Correct.

21   Q.  Now if someone was being deceptive with regard to that,

22   then that would just be a test that was irrelevant, right?

23   A.  It can be.

24   Q.  It would lead you to the wrong conclusions, wouldn't it?

25   A.  It's possible.

809
F4NSLOW5                    Gharibo - cross

1   Q.  Just so we are clear, the MRI that you reviewed was prior,
2   days prior, to the visit that you were told about, right?
3   A.  Yes.
4   Q.  A back injury or pain can happen between that time,
5   correct?
6   A.  Yes.
7   Q.  You testified that if that were the case, you would explore
8   further, right?
9   A.  Yes.
10  Q.  Doctor, are you familiar with Bertolotti syndrome?
11  A.  Bertolotti syndrome?
12  Q.  Bertolotti syndrome.
13  A.  No.
14  Q.  Are you familiar with that?
15  A.  No.
16  Q.  In your opinions that you delivered today, one of the
17  things that was key was that you said that there was no leg
18  pain.  Do you remember that?
19  A.  Correct, on the history.
20  Q.  On the history.  However, a leg raise test is designed to
21  discover the pattern of the pain, right?
22  A.  That's a provocative test.  It is not a history.
23  Q.  If the person is telling you that the pain is running down
24  the back of their leg, would that be something that might be
25  probed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

810

F4NSLOW5                          Gharibo - cross

1    A.  That is part of the physical exam and a provocative test.

2    That doesn't necessarily relate to the history and the

3    complaints that the patients are giving you, because we put the

4    patient through provocative maneuvers that hurt.  It doesn't

5    mean that that is what they are reporting to us.  Those are

6    findings that don't correlate.

7    Q.  Right.  So your opinion was narrowly tailored to the

8    information that you got from the government, right?

9    A.  To what we received, right.

10   Q.  You didn't talk to Dr. Lowe, correct?

11   A.  Correct.

12   Q.  You didn't talk to Dr. Terdiman?

13   A.  Correct.

14   Q.  You didn't interview any doctors involved, right?

15   A.  That's correct.

16   Q.  You regularly have consultations with other lawyers, right?

17   A.  I do.

18   Q.  I'm sorry, withdrawn.

19       You regularly have consultations with other doctors?

20   A.  Yes.

21   Q.  Those consultations don't necessarily mean that the doctors

22   are ordering you to do a particular thing, right?

23   A.  Correct.

24   Q.  You can do something different than the consensus of your

25   ten doctors in your office, correct?

811
F4NSLOW5                         Gharibo - cross

1   A.  Correct.

2              MR. FOWLKES:  I have no further questions, your Honor.

3              THE COURT:  Any redirect?

4              MS. MARTINS:  One moment, your Honor.

5              THE COURT:  Okay.

6              MS. MARTINS:  Nothing further, your Honor.

7              THE COURT:  Ladies and gentlemen, we are breaking for

8    the weekend.  I wish you a good day tomorrow and the rest of

9    the weekend.  I will see you back here the same time, same

10   place, on Monday.  Please don't think about the case, talk

11   about the case, speak to anyone or communicate with anyone

12   about it.  Please don't look anything up.  Enjoy your weekend

13   doing other things.

14              Thank you.

15              (Jury excused)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25