996

Faedwis1
Trial

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                           13 Cr. 0794(AT)

5  PAUL WISEBERG and ROBERT
   KALABA,
6
                   Defendants.
7  ------------------------------x

8
                                         October 14, 2015
9                                        8:59 a.m.

10 Before:

11                 HON. ANALISA TORRES,

12                                        District Judge

13
                       APPEARANCES
14
   PREET BHARARA
15      United States Attorney for the
        Southern District of New York
16 BY:  DANIEL B. TEHRANI
        EDWARD B. DISKANT
17      SHAWN G. CROWLEY
            Assistant United States Attorneys
18
   NEIL B. CHECKMAN
19 SAM A. SCHMIDT
   KAREN H. CHARRINGTON
20      Attorneys for Defendant Paul Wiseberg

21 DAVID N. FISHER
   JANE H. FISHER-BYRIALSEN
22      Attorneys for Defendant Robert Kalaba

23        - also present -

24 Elizabeth Joynes, Government Paralegal
   Task Force Officer Brian Hammarstrom
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis3                    Winsley - direct

1   WILLIAM WINSLEY,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4             THE CLERK:  Would you please state your name and spell

5   it for the record.

6             THE WITNESS:  William D. Winsley, W-i-n, as in Nancy,

7   s-l-e-y.

8             THE CLERK:  Thank you.

9             THE COURT:  You may inquire.

10   DIRECT EXAMINATION

11   BY MR. TEHRANI:

12   Q.  Good morning, Mr. Winsley.

13   A.  Good morning.

14   Q.  How are you employed?

15   A.  Well, I'm now retired.  I'm a pharmacist by training.  I

16   worked as a pharmacist for 14 years and then I worked for the

17   Ohio State Board of Pharmacy.  The last 13 years I was there, I

18   was the Executive Director of the Board.

19   Q.  And when did you retire?

20   A.  The end of 2011.

21   Q.  What have you been doing since then?

22   A.  Well, I have been doing consulting.  I have now been giving

23   talks around the country along with DEA and other talks as

24   well.

25   Q.  Could you please describe your educational background?

Faedwis3                    Winsley - direct

1    A.  Yes.  I have a bachelor's degree in pharmacy and a master's

2    degree in hospital pharmacy administration, both from the Ohio

3    State University.  During my bachelor's process I did an

4    internship at the pharmacy owned by my mother and father, who

5    were both pharmacists.  So I had the on-the-job training that

6    was required for licensure.  And then after my master's degree,

7    I served a residency at Riverside Methodist Hospital in

8    Columbus, Ohio.

9    Q.  Did you ever become a licensed pharmacist?

10   A.  I did.  In 1974, after I graduated with my bachelor's

11   degree, I took the licensure examinations to become a

12   pharmacist and passed them.

13   Q.  Can you describe the licensure examination a little bit?

14   A.  Yes.  Pharmacists take two examinations.  One is a clinical

15   exam to test knowledge of drugs, disease states, uses of drugs

16   in disease states, doses, and things like that.  The second

17   examination is a law exam on drug laws, both state and federal.

18   Q.  Then I think you testified that you were a practicing

19   pharmacist for approximately 14 years?

20   A.  Yes.  I worked in primarily hospitals for 14 years before I

21   joined the Board of Pharmacy.

22   Q.  And what was your role initially when you joined the Board

23   of Pharmacy?

24   A.  I joined the Board first as a compliance specialist, which

25   meant I was a pharmacist in the field doing inspections and

Faedwis3                    Winsley - direct

1   investigations.  The Board of Pharmacy in Ohio is not only a

2   licensing agency but is also a law enforcement agency.  Since

3   Ohio does not have a state police, so the Pharmacy Board was

4   charged with enforcing the criminal drug laws as well.  So I

5   did investigations of not only pharmacists, pharmacy interns,

6   but also doctors, nurses, general public, and I also then did

7   inspections of all licensed sites.  That was when I was a

8   compliance specialist.

9            Two years later I was brought into the office as

10  Assistant Executive Director, and then seven years after that,

11  in 1998, when my predecessor retired, I was appointed by the

12  Board to be the Executive Director, and I served as Exec for 13

13  years until I retired

14  Q.  Could you describe some of your duties and responsibilities

15  as Executive Director of Ohio Board of Pharmacy?

16  A.  As the Executive Director, I was, of course, responsible

17  for the operation of the Board, which meant I oversaw all of

18  the day-to-day operations, including the field staff and their

19  investigations and inspections.  I was responsible for

20  developing the budget, presenting it to the legislature and the

21  governor, of course, and basically answering phone calls with

22  questions from practitioners, not only pharmacists but doctors,

23  veterinarians, dentists.  We got a lot of phone calls with

24  questions about drug laws, and so a lot of my day was taken up

25  with answering those.

Faedwis3                    Winsley - direct

1   Q.  Did you have any affiliation with the National Association

2   of Boards of Pharmacy?

3   A.  Yes.  The National Association of Boards of Pharmacy, more

4   commonly called "NABP", is an association of all of the boards

5   of pharmacy not only in the United States but also some outside

6   of the United States as well.  It is an association that was

7   set up to assist the Boards in carrying out their mission,

8   which is primarily protect the health and safety of patients.

9   And during my tenure as Executive Director, I spent four years

10  on the NABP Executive Committee, which is their way of calling

11  it; that's what they called their Board of Directors.  Then I

12  became Treasurer of NABP.  The next year I was President Elect,

13  then President and then Chairman of the Executive Committee,

14  Chairman of the Board.  I finished that role as Chairman in May

15  of 2012.

16  Q.  Have you published in the field of pharmacy practice?

17  A.  Well, the Board of Pharmacy publishes a quarterly -- excuse

18  me -- publishes a quarterly newsletter that goes out to all of

19  our licensees plus other people who have asked to be put on the

20  mailing list, and I was responsible, as Executive Director, for

21  writing that newsletter, and I did that continuously from --

22  actually, the first one would have been February of 1999 until

23  I retired at the end of 2011.

24  Q.  Can you describe some of the topics that you might have

25  covered or that you covered in some of your publications?

Faedwis3                    Winsley - direct

1    A.  Yes.  Quite frequently, over the years I would revisit the

2    issue of corresponding responsibility of pharmacists and

3    physicians, which I think we'll get into later.  I also covered

4    other practice-related issues that came about because of

5    questions I would receive.

6           We are responsible, of course, for making the rules

7    that govern the practice of pharmacy as well as some in

8    medicine, dentistry and nursing.  So anytime there were changes

9    to the rules I would also write those so that pharmacists that

10   got our newsletter would be kept up to date on changes to the

11   law.  And I addressed other practice-related issues, electronic

12   prescribing and prescriptions when that was relatively new.

13   When nurse practitioners got prescribing, we covered their

14   rules and regs.  So, generally, a broad range of topics but all

15   of them related in one way or the other to the practice of

16   pharmacy.

17   Q.  Have you spoken in the field of pharmacy practice?

18   A.  Yes.  I've given well over 500 talks, both State of Ohio

19   and nationally, to a variety of groups, pharmacists,

20   physicians, nurses, veterinarians, dentists, general public,

21   just about all of them on drug laws, rules and regulations as

22   they relate to the particular practice that I was addressing.

23   Q.  Do you speak at any pharmacy continuing education seminars?

24   A.  Yes.  In addition to those talks, most of which were

25   continuing education, at least the pharmacy talks that I gave,

Faedwis3                    Winsley - direct

1    since I retired, I have been going around the country with DEA

2    doing pharmacy diversion awareness conferences where we go into

3    a state, and the pharmacists gather and we have a day-long

4    seminar that we present to the pharmacists on various

5    practice-related issues.  My assignment at these is to talk to

6    them as one pharmacist to a group on what corresponding

7    responsibility really means and give them some examples of

8    cases that demonstrate that issue and talk about a few other

9    practice-related issues like prescription monitoring programs

10   and so forth.

11   Q.  Have you testified before any legislative bodies on the

12   subject of pharmacy practice?

13   A.  Yes.  I've as Executive Director -- well, as Assistant

14   Executive Director and Executive Director, I have had a large

15   amount of contact with our state legislature in Ohio.  Most any

16   bill that involved drug laws and some drug therapy issues, we

17   were either consulted about or we would go over and initiate

18   the discussion.  I testified numerous times on bills in front

19   of the Ohio legislature.  In addition to that, I did testify in

20   front of a Congress -- a Congressional committee on the Ryan

21   Haight Act, which was a bill to deal with the Internet drug

22   problem.

23   Q.  Have you testified in any court proceedings as an expert in

24   the field of pharmacy practice?

25   A.  I have testified during my tenure as a compliance

Faedwis3                    Winsley - direct

1   specialist.  As I said, I was involved in criminal

2   investigations as well as administrative ones, and I testified

3   numerous times in state criminal court on those cases that

4   either I had investigated myself or that I was brought in as a

5   pharmacist expert by the other agents in order to testify.  In

6   addition, I have testified twice in federal court.  This will

7   be my third time.  So, yes, I've testified in court hearings as

8   well as administrative hearings.

9           MR. TEHRANI:  Your Honor, at this time we move to

10  qualify Mr. Winsley as an expert in the field of professional

11  standards relating to pharmacy practice.

12          THE COURT:  Any objection?

13          MR. FISHER:  No objection.

14          MR. SCHMIDT:  If I may, your Honor?

15          THE COURT:  All right.

16  VOIR DIRE EXAMINATION

17  BY MR. SCHMIDT:

18  Q.  You were involved in setting standards in the State of

19  Ohio, is that right?

20  A.  As Executive Director, yes.  In my role with NABP, we

21  developed standards that are to be used by states nationwide.

22  Q.  Those rules nationwide are suggestions to individual state

23  board of pharmacies?

24  A.  They are model pharmacy rules and laws, yes, sir.

25          MR. SCHMIDT:  Your Honor, with only the limitation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis3                        Winsley - direct

1    that his expertise I believe covers the State of Ohio and

2    general expertise but only in the State of Ohio -- I withdraw.

3    I have no objection.

4              THE COURT:  I so qualify him.

5    DIRECT EXAMINATION (Resumed)

6    BY MR. TEHRANI:

7    Q.  Mr. Winsley, in what city are you based?

8    A.  I now live in a town called Millfield, Ohio since I have

9    retired.  The Board of Pharmacy was based in Columbus, Ohio,

10   and that's where I worked during my tenure with the Board.

11   Q.  And who paid for your travel to New York and your

12   accommodations while you are here?

13   A.  The U.S. Attorney's Office.

14   Q.  And are you being compensated by the government in any

15   other way?

16   A.  I am being compensated for work performed.

17   Q.  And how much are you being compensated?

18   A.  $250 an hour for work actually performed plus, of course,

19   travel expenses here and back home.

20   Q.  Mr. Winsley, are pharmacies regulated?

21   A.  Yes.  Pharmacies are very highly regulated.  They are

22   regulated federally primarily by the DEA, the Drug Enforcement

23   Administration, and the Food and Drug Administration, the FDA,

24   but primarily they are regulated by their individual state

25   boards of pharmacy where the practice rules and regulations are

Faedwis3                    Winsley - direct

1    documented.  Of course, they are also regulated by a lot of,

2    you know, health departments and local tax authorities and so

3    forth.  But the primary regulators of pharmacy practice are the

4    state boards of pharmacy, the DEA and the Food and Drug

5    Administration.

6    Q.  Are you familiar with the term "controlled substance"?

7    A.  Yes, I am.  A controlled substance is a drug that is

8    subject to either abuse or addiction potential or both.

9    Controlled substances are divided into five schedules, Schedule

10   I through Schedule V.  Schedule I controlled substances are

11   those that are what we term illicit drugs, the street drugs,

12   that have no medicinal use, drugs like heroin, LSD, and several

13   others of a stimulant variety.

14          Schedules II through V all have medical uses, but

15   Schedule II has the highest addiction liability or abuse

16   potential plus a medical use, all the way down then it

17   diminishes until Schedule V drugs, which have lowest of the

18   controlled substances in terms of abuse and addiction

19   potential.

20   Q.  Can you describe to the jury what oxycodone is?

21   A.  Oxycodone is a pain medication, an opiate, that is a

22   Schedule II controlled substance because of its high degree of

23   abuse potential and addiction liability, but it also has a

24   medicinal use in the treatment of pain.

25   Q.  Based on your training and experience, what risks are

Faedwis3                    Winsley - direct

1    associated with oxycodone usage?

2    A.  Well, primarily addiction to the drug.  Overdoses of the

3    drug can lead to respiratory arrest, which means you quit

4    breathing and you die if you don't get treatment in a hurry.

5    But those are the two worst, the addiction being something

6    that's very prevalent in this country.

7    Q.  Is oxycodone chemically similar to any Schedule I

8    controlled substance?

9    A.  Well, it's an opiate, as is heroin.  And because of the

10   cost on the street of oxycodone, we now have a problem with a

11   lot of patients transferring from oxycodone to heroin because

12   heroin on the street right now is a whole lot cheaper.

13   Q.  Are there different types and dosages of oxycodone?

14   A.  Yes.  There are both what we call immediate release, which

15   are drugs -- think of an aspirin tablet.  You take it, it

16   dissolves, it gets into the bloodstream right away, and

17   hopefully it takes care of your headache or whatever pain.  And

18   then there are forms that are long-acting, controlled release

19   where you take a dose and it dissolves slowly and releases drug

20   slowly into your system so that you don't have to take it quite

21   so often -- once every 12 hours, for example, versus one every

22   four to six for an immediate release.  And oxycodone is

23   available in both forms.

24   Q.  And can you describe some of the immediate release forms of

25   oxycodone?

Faedwis3                    Winsley - direct

1   A.  Well, there are several strengths of immediate release.

2   The two most popular, if you will, on the street are oxycodone

3   15-milligram and 30-milligram immediate release.  Those have

4   replaced the former drug that was very popular, which was

5   OxyContin, when it first came out, and now the oxycodone

6   immediate release seems to be the drug of choice that's being

7   abused more.

8   Q.  We'll get to OxyContin in a moment, but are you also

9   familiar with Percocet?

10  A.  Yes.  Percocet also contains oxycodone, but it's mixed with

11  acetaminophen, or Tylenol, so it is a combination product.

12  It's also lower strength than most of the oxycodone pure that's

13  available.

14  Q.  Do you know what Roxicodone is?

15  A.  It's oxycodone.  It is a brand name.

16  Q.  So you mentioned a little bit about OxyContin.  What is

17  OxyContin?

18  A.  Well, OxyContin -- excuse me --

19  Q.  Bless you.

20  A.  Thank you.  OxyContin is a form of oxycodone, but it's a

21  sustained release, prolong release dosage form that was

22  released in the '90s, the idea being that it was to be used for

23  patients who had been on pain medication for a while whose

24  dosage was pretty well stabilized but they didn't want to take

25  so many doses during the day.  OxyContin when it first came out

Faedwis3                    Winsley - direct

1   became very popular on the street because the way it was

2   manufactured, the tablets could be crushed and then either

3   dissolved and injected, snorted like cocaine, smoked.  There

4   are a variety of ways to abuse it.  The problem being that you

5   are talking potentially 80 milligrams of oxycodone and that's

6   potentially a lethal dose all at once in somebody who is not

7   used to it.

8           So a few years after it came out, the drug company did

9   revise their formulation.  They made it into a tamper-proof

10  substance.  You could no longer smash it and snort it, smash it

11  and then inject it.  The only way that it is abusable now is to

12  take it orally and obviously take more than you are supposed

13  to.  But that's what led to the increase in the immediate

14  release oxycodone 15s and 30s.

15  Q.  So you have been talking about things like crushing

16  oxycodone, snorting oxycodone.  Is that a form of diversion?

17  A.  Yes, it is.  The oxycodone was prepared to be taken by

18  mouth.  That was the only way it was intended to be taken, and

19  so when it's used outside of the normal channels of

20  distribution and use outside of adequate medical advice, that

21  would be a form of diversion of drugs.

22  Q.  And in your experience, are you aware of whether oxycodone

23  is a controlled substance that is typically diverted?

24  A.  Yes, it is.  In many states oxycodone is second only to

25  hydrocodone and in some states it is rapidly overtaking

Faedwis3                    Winsley - direct

1   hydrocodone as being the popular drug on the street.

2   Q.  Can you just describe a little bit what it means for

3   oxycodone to be diverted?

4   A.  I'm not sure.  Can you rephrase that?  I'm sorry.

5   Q.  Let me ask you a better question.

6           How does oxycodone get diverted?

7   A.  OK.  Thank you.  That I understand.

8           There are a variety of ways that oxycodone gets out to

9   be abused.  One is that we have doctors who will write

10  prescriptions for cash.  They are not doing the normal doctor

11  things that our doctors all do to us.  They don't do all the

12  indignities of the poking, prodding, nosy questions.  That it's

13  basically what drug do you want, how much money do you have.

14          We also have pharmacies that will sell the drug

15  knowing that the prescriptions were bad.  We have drugs that

16  get stolen and are then available on the street.  And so it

17  gets diverted quite a few ways.

18          Surveys done by the federal government and the White

19  House National Drug Control Group have shown that the most

20  common way that our kids get ahold of drugs is out of the

21  medicine cabinet, either their own or their friends', but, of

22  course, that begs the question how did they get in the medicine

23  cabinet in the first place, and that was due to either illegal

24  prescribing or overprescribing on the part of the various

25  prescribers.

1080

Faedwis3                       Winsley - direct

1   Q.   And you mentioned the fact that diverted oxycodone can find

2   its way onto the street.   Is there a black market for diverted

3   oxycodone?

4   A.   Well, selling it on the street basically is a black market.

5   If it's sold any way other than the doctor writes the

6   prescription, the pharmacist fills it and the patient takes it,

7   then it is diverted, and so you would refer to that also as a

8   black market.

9   Q.   And it's bought and sold?

10  A.   It's bought and sold.

11  Q.   Do you know what the street value of oxycodone is?

12  A.   Well, the street value of oxycodone runs in most places --

13           MR. SCHMIDT:   Objection, your Honor.   Beyond the scope

14  of his expertise.

15           THE COURT:   If you have expertise in knowing the

16  street value, you may answer.

17  A.   As I said earlier, I have been giving talks with DEA all

18  around the country.   Part of those talks include local police

19  force talking about the drugs that are available on the streets

20  in those states.   We have been to, I'm sorry, I can't remember,

21  26 states or so.   The overwhelming majority of those police

22  officers have stated that oxycodone runs about $1 a milligram

23  for the dosage form.

24  Q.   And so for a 30-milligram pill, what would that equal?

25  A.   It runs around 30 to $40 a tablet, again, depending upon

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis3                      Winsley - direct

1   where in the country you are.

2   Q.  And we were talking earlier about OxyContin.  Was OxyContin

3   previously a form of oxycodone that was commonly diverted?

4   A.  OxyContin was diverted almost immediately after it hit the

5   market because of the fact that the people who were abusing it

6   discovered it was easily crushed, it was easy to circumvent the

7   tamper-resistant, supposedly, or the nontamper-resistant

8   dosages form, and they were able to get a much higher dose of

9   oxycodone than the tablet's design intended.

10  Q.  And then --

11          THE COURT:  All right.  We have reached our break, and

12  so we'll take a half-an-hour break.

13          Remember that you are not allowed to discuss the case

14  amongst yourselves or with anyone else.  Don't permit anyone to

15  discuss the case in your presence.

16          (Jury not present)

17          THE COURT:  You may step down.

18          THE WITNESS:  Thank you.

19          (Recess)

20          (Continued on next page)

21

22

23

24

25

FAE9WIS4                    Winsley - direct

1    (Trial resumed; jury not present)

2         THE COURT:  May we have the witness back on the stand.

3         MR. TEHRANI:  Just want to raise one quick issue

4    before we brought the witness out and just because we don't

5    want to have -- we want to limit the number of sidebars that we

6    have while the witness is on the stand and while the jury is

7    here.

8         It appears from the cross-examination of Mr. Brown

9    that Mr. Schmidt intends a very wide-ranging inquiry on topics

10   that as far as I can tell have nothing to do with this case,

11   including internet pharmacy regulations, regulations in Florida

12   that postdated the events in question.  There was some lengthy

13   testimony about DEA administrative procedures.  None of that is

14   relevant to this case.  None of that is relevant to the direct

15   testimony of the witness and, frankly, is wasting not just the

16   witness's time but also the jury's time.  So we object to that

17   line of questioning.  And we don't want to have sidebars on

18   that so we just wanted to raise it with your Honor.

19        MR. SCHMIDT:  Your Honor, first, I recall that it was

20   the government that first raised the issue of the internet

21   pharmacy because they're the ones that want to put in our

22   client's, or have put in, our client's previous conviction that

23   involved internet pharmacy without really putting any

24   information in the background of what that really meant.  So

25   they're the ones who put that into this case.  We did not.  We

1   wanted to keep it out of the case.  The government put it into

2   the case.

3          All of the topics that I am raising are topics that

4   have been raised by the government.  It goes to both the

5   qualifications of the witness and their knowledge of certain

6   things that they're testifying about.

7          There are a few other issues that, obviously, I would

8   at this point do not want to alert the government of some of

9   our strategic reasons but, if necessary, I would ask for an ex

10  parte hearing so we can put the additional reasons on.

11         I do not think I've strayed afield from the areas that

12  the witnesses have testified to.

13         THE COURT:  Well he does make a good point, that you

14  brought out the issue of the internet -- the prior internet

15  misconduct.

16         MR. TEHRANI:  Your Honor, the defendant pled guilty to

17  that.  We're not putting in evidence of that.  We're not

18  establishing what he did or did not do.  He pled guilty to a

19  846, 841 offense.

20         We're putting that in because it's relevant to his

21  knowledge with respect to this particular case, his intent with

22  respect to this particular case, and the fact that he is now

23  relying or claiming to the jury to rely on people that were

24  arrested with him in connection with that prior offense.

25         We are not offering any evidence about internet

FAE9WIS4                    Winsley - direct

1    pharmacies, about the regulations of internet pharmacies.  We

2    now have had testimony from numerous witnesses who frankly were

3    not competent to be testifying about internet pharmacies.  To

4    the extent there was a point to be made, I still don't know

5    what it is, but the point has been made.  We just don't need to

6    belabor this point with additional witnesses on a subject that

7    is not relevant to the jury.

8         THE COURT:  I think it's fine to make an inquiry as to

9    whether or not internet pharmacies were legal at that time.  I

10   don't know how much more is relevant.

11        MR. SCHMIDT:  Your Honor, the simple answer is the

12   government wants to use our client's conviction for

13   participating in an internet pharmacy as some part of their

14   proof and argument and, therefore, we should be allowed to

15   educate the jury what an internet pharmacy consisted of and

16   what it meant so the jury will understand that when they're

17   referring to an internet pharmacy and our client's conviction

18   that they can understand how, if they want to accept the

19   government's interpretation of what it means, or they want to

20   accept our interpretation of what it means.  That's all I'm

21   doing.

22        THE COURT:  So it's appropriate to inquire as to

23   whether internet pharmacies are legal per se because just

24   having been involved in the internet pharmacy business does not

25   amount to criminality.  Of course your client did plead guilty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS4                    Winsley - direct

1   to criminal conduct in connection with an internet pharmacy.

2        MR. SCHMIDT:  Your Honor, the problem with the

3   internet pharmacies, some of the internet pharmacies as existed

4   at that time was the nature of how they ran; that there was no

5   doctor/patient contact.  That was what the basis of our

6   client's conviction was -- that was the basis of the

7   prosecutions for the internet pharmacy, and that's all it

8   meant.  And that's what we're trying to do, is just make it

9   clear to the jury that, indeed, what it meant was that you must

10  have a doctor/client relationship.

11       THE COURT:  So then you can ask a leading question on

12  that issue.

13       MR. SCHMIDT:  I have.  On cross-examination.

14       THE COURT:  I think that you can be more economic with

15  your question and I think you can also pose them at a faster

16  pace.

17       MR. SCHMIDT:  Your Honor, the witness that testified

18  prior to this witness we just found out that he was testifying

19  a couple of days ago and a lot of the stuff that is relevant

20  material, even though it was short but it gave me an idea of

21  what he was going to be testifying to, I received last night.

22  So, yes, I'm much less prepared for that last witness than I am

23  for the other witness that I cross-examined and I expect this

24  witness who I will cross-examine.

25       MR. TEHRANI:  We'll leave it at that, your Honor.

```
                                                            1086
     FAE9WIS4                      Winsley - direct
```

1   Thank you.

2           THE COURT:  Have the jurors come in, please.

3           WILLIAM WINSLEY, resumed.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  You may be seated.

3    Remember, sir, that you're still under oath.

4    MR. TEHRANI:  May I inquire?

5    THE COURT:  You may continue the inquiry, yes.

6    DIRECT EXAMINATION CONTINUED

7    Q.  Now Mr. Winsley, before we broke you were talking a little

8    bit about Oxycontin.  Do you remember?

9    A.  Yes.

10   Q.  And you had testified that Oxycontin at one point was a

11   form of oxycodone that was typically diverted?

12   A.  That is correct.

13   Q.  And you also testified that at some point the formulation

14   for Oxycontin changed?

15   A.  Yes.

16   Q.  What was the purpose of that change?

17   A.  In order to deal with the diversion that was occurring, to

18   render the dosage form less liable to crushing and therefore

19   abuse by snorting, injecting, smoking, so forth.

20   Q.  And how did that formulation change affect the prevalence

21   of Oxycontin as a form of oxycodone that was typically

22   diverted?

23   A.  It's gone down because of the fact that the new formulation

24   is harder to abuse.  It's still abused, as I said earlier,

25   because people still take it orally.  They just take more than

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   they should.  But at the point that it became difficult to

2   abuse, that's when patients started switching or physicians

3   that were writing started switching to oxycodone 30 and

4   15-milligram; primarily 30 because that's the highest dose.

5   Q.  Do you know what morphine sulfate is?

6   A.  Morphine sulfate is also a Schedule II controlled

7   substance.  It's also an opiate.  It's also used for pain.  In

8   fact, it's one of the oldest pain medications that we have.

9   Q.  What about hydromorphone?

10  A.  Hydromorphone was originally marketed, I believe, by the

11  tradename Dilaudid; also a Schedule II opiate.

12          And before the oxycodone single, you know, the

13  oxycodone immediate release and Oxycontin came out, Dilaudid or

14  hydromorphone was and still is widely used for pain typically

15  in hospitals.

16  Q.  What about hydrocodone?

17  A.  Hydrocodone is now a Schedule II controlled substance.

18  It's the most widely abused drug still on the street in most

19  areas of the country.  It's also the most prescribed

20  prescription drug in the United States.  More hydrocodone is

21  prescribed than any blood pressure medication, heart

22  medication, any other drug.  Hydrocodone has been for several

23  years the most prescribed prescription drug in the United

24  States.

25  Q.  And all three of those hydrocodone, hydromorphone, morphine

FAE9WIS4                     Winsley - direct

1    sulfate they are all painkillers?

2    A.  They all are used for the treatment of pain and they all

3    derive from the same source.  They are all opiates.

4    Q.  Does that mean that they are perfectly interchangeable?

5    A.  No.  They are not perfectly interchangeable.  They have

6    different doses, different strengths of action.  So one dose is

7    not interchangeable.  They have slightly different methods of

8    action that a patient might develop tolerance for one and not

9    the other.  So they're not perfectly interchangeable but

10   they're all used for pain and if a physician knows what he or

11   she is doing they can switch from one to the other.

12            MR. SCHMIDT:  Objection, your Honor.

13            THE COURT:  Overruled.

14   Q.  How does a pharmacy order Schedule II controlled

15   substances?

16   A.  For quite some time they've been able to order -- well

17   since the beginning of the controlled substance process they've

18   been able to order on a special government form known as a DEA

19   222 form to those of us that have had to deal with them.  But

20   that's a form that is -- was formulated by DEA and that

21   everybody had to use.  Until recently DEA also developed an

22   electronic system by a computer that they call a controlled

23   substance ordering system or CSOS.  So now pharmacies and other

24   people that need Schedule IIs can either use the paper form or

25   they can use the computer version.

FAE9WIS4                    Winsley - direct

1  Q.  Referring to the old school paper method of ordering

2  Schedule IIs, who is supposed to sign the DEA 222?

3  A.  Initially it's the person who originally applied for the

4  DEA registration.  However, DEA has processes in place to allow

5  that person to grant power of attorney to someone else within

6  the organization in order to sign those.  And DEA has specified

7  the form and the wording of that power of attorney.

8  Q.  I'd like to switch gears a little bit and talk to you about

9  pharmacy practice more generally.

10        According to professional standards, the practice of a

11  pharmacy, what responsibility did a pharmacist have before

12  filling a prescription?

13  A.  A pharmacist has a wide range of responsibilities.

14        When they're presented with a prescription, the first

15  thing they need to do is to verify that the prescription meets

16  all of the legal requirements:  Patient name, drug name, drug

17  strength, quantity, directions for use, in the case of a

18  Schedule II particularly the physician's signature on the piece

19  of paper, and there are other things as well.  So they have to

20  determine first of all that it meets all of the legal

21  requirements for a prescription.

22        Once they do that, they have to review a patient

23  profile that they're required to keep by the state that lists

24  all of the prescriptions that that patient has received from

25  that pharmacy as well as certain pertinent information about

FAE9WIS4                    Winsley - direct

1      the patient such as disease states, age, maybe weight, of

2      course name and address, that kind of stuff.  But they're

3      required to review the prescription against that profile in

4      order to determine that there's not something unreasonable

5      about it and that, in fact, the prescription is appropriate for

6      that particular patient.

7              Once they do that, then they're required to do what

8      states refer to as a drug utilization review, which means they

9      compare that drug to the other drugs that patient has received,

10     to the patient's disease states that the pharmacist knows or

11     should know about, and they're looking for overdose, underdose;

12     in other words, maybe the physician made an error on the

13     quantity of -- or on the strength, on the directions for use or

14     something.

15             They're required to look for drug interactions; in

16     other words, whether the drug that's being prescribed will

17     interact with another drug the patient is on and maybe cause

18     the patient harm.

19             They are required to look for allergies, drug

20     allergies, drug disease state contraindications.

21             And they're required to look for evidence of or

22     indications of misuse or abuse.

23             Once -- if they find any of those, or if they find

24     something else on the prescription that we refer to as a red

25     flag which are just some indications that the prescription

FAE9WIS4                    Winsley - direct

1   might not be all it seems to be on face value, they're required

2   to resolve those problems before they decide to fill it.

3           Resolving it may mean talking to the patient, may mean

4   talking to the doctor, may mean reviewing the history of either

5   the doctor or the patient.  It could be a variety of ways.  But

6   they're required to resolve the problems before they agree to

7   fill it.

8           Once that's done, the prescription can be processed.

9   That task can be done by ancillary personnel.  The pharmacist

10  does not have to count to 30 by 5s like you see on TV all the

11  time.

12          But at the end of the process the pharmacist is

13  accountable for doing the final checks of the finished product

14  and assuming responsibility and liability for that product.

15          Once that's done, the patient is -- has to be offered

16  counseling by the pharmacist on their drug.  That offer can be

17  made by other people.  But if the patient needs to talk to the

18  pharmacist about the drug it's a requirement that the

19  pharmacist be the one to go out and do that.

20          So there's a lot of duties that a pharmacist has to do

21  when presented with a prescription.  It's just not simply

22  counting to 30 by 5s.

23  Q.  Now you testified earlier about or used the phrase called

24  corresponding responsibility.  Is that what you've just been

25  talking about right now?

FAE9WIS4                        Winsley - direct

1    A.  Yes.

2    Q.  And is one of the things that a pharmacist is supposed to

3    look for in carrying out his or her corresponding

4    responsibility whether there's a valid patient/doctor

5    relationship?

6    A.  Yes.  That, of course, is a necessary thing for a

7    prescription to be issued by a physician.  There has to be a

8    valid doctor/patient relationship.

9            So the pharmacist needs to, if the pharmacist is

10   unfamiliar with the doctor or the patient or if there are other

11   problems, the pharmacist needs to ensure that the physician saw

12   the patient and, as I referred to earlier, does all of the

13   indignities that our doctors do to us rather than just write a

14   prescription.

15   Q.  And what are some of the things that a pharmacist might

16   look for to determine whether a valid doctor/patient

17   relationship exists?

18   A.  One would be distance.  Most doctor -- most patients go to

19   doctors that are somewhere in a reasonable geographic distance

20   from their home.  Now, I will grant you that some patients have

21   to go to specialists in major medical centers so obviously

22   that's an exception.  But most patients will not travel that

23   far to go and see their doctor.

24           The same would hold true for a retail pharmacy

25   standing on the street corner.  Most of their patients should

FAE9WIS4                    Winsley - direct

 1   be within a reasonable geographic distance because most

 2   patients aren't going to drive past 20 pharmacies to get to

 3   one.  So distance is one of the things that a pharmacist should

 4   look for.

 5          Another that a pharmacist should look for is the dose

 6   and quantity of the drugs involved, as to whether or not -- I

 7   mentioned before the pharmacist needs to look to see if the

 8   prescription is appropriate for the patient.  And so if it's

 9   for a large quantity of the highest strength of drug, very

10   rarely would patients need that much.  And so the pharmacist

11   would need to resolve that issue as well.

12          It depends upon the situation, what other items the

13   pharmacist might be concerned with, where the pharmacy is

14   located, but in general those are things that the pharmacist

15   would have to look into.

16   Q.  And so one of the things that you were just talking about

17   is the distance between the patient and the pharmacy?

18   A.  Yes.

19   Q.  And is that concern as significant in a mail order pharmacy

20   as opposed to what I'll refer to as a brick and mortar walk-in

21   pharmacy?

22   A.  That's one of the things that mail order specifically needs

23   to keep in mind; that patients still aren't traveling long

24   distances to get to most physicians and so that's something the

25   pharmacist can look at when filling the scrip.  I mean nowadays

1   if we have questions we can get on Google Maps or something and

2   find the distance and if it's a long way or particularly if

3   they're coming from one state to another that's certainly an

4   indication that we may have a problem here.

5   Q.  So I just want to make sure that we're clear on this.

6   There's two different distances at issue.  There's distance

7   between the patient and the pharmacy and the distance between

8   the patient and the prescribing physician?

9   A.  That is correct.  And for most pharmacies, most retail

10  pharmacies both of them play together because most retail

11  pharmacies, thinking of the CVS, Rite Aid, mom and pop

12  independents, their patients are located within a reasonable

13  geographic area as are most of their prescribers.

14  Q.  So why should a pharmacist be concerned if there's a

15  significant distance between a patient and the prescribing

16  physician?

17  A.  That would be one of those red flags that I mentioned.  Red

18  flags are not automatic nos.  But they are indications that

19  there may be a problem that needs to be resolved before we go

20  on.  So, it's something that the pharmacist should look into to

21  see what the reason is.  Again, maybe the physician is in a

22  major medical center and he or she is a specialist.  Okay, then

23  that probably resolves the issue.

24          If the pharmacist finds out that that's not the case,

25  and particularly if the pharmacist finds out or knows that lots

FAE9WIS4                    Winsley - direct

1   of patients are traveling distances to that physician, then

2   that puts it a little closer to the no-go situation.  So it's

3   something that they need to be aware of and look at.

4   Q.  Now you also talked a little bit about counseling

5   previously.  What is the purpose of counseling?

6   A.  Counseling was actually a federal requirement years ago and

7   counseling is a chance for the pharmacist to discuss the

8   patient's drug therapy either with that individual prescription

9   or drug therapy in total with the patient.  In some states it's

10  mandated.  If it's a new prescription, the pharmacist must go

11  out and talk to the patient.  In other states it's that the

12  offer must be made and if the patient accepts then the

13  pharmacist goes out.  There's also an expectation that in some

14  circumstances the pharmacist will go out and talk to the

15  patient without needing to ask the question.

16  Q.  Is counseling possible if patients are not allowed to visit

17  or contact the pharmacy?

18  A.  Not allowed?

19  Q.  They are not permitted to visit or contact the pharmacy?

20  A.  That would be very difficult for the pharmacist to counsel

21  if they can't talk to the patient.

22  Q.  Is a pharmacist required to call a prescribing physician?

23  A.  Not ordinarily they are not required to call a prescribing

24  physician.  They may choose to do so if they have questions or

25  concerns about the prescription.  That may be one way to deal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS4                    Winsley - direct

1   with those questions or concerns.

2   Q.  And does calling a doctor's office to verify a prescription

3   satisfy the pharmacist's obligation?

4   A.  No, not at all.

5        If a physician writes a scrip that is not legal and

6   the pharmacist calls, it's pretty obvious the physician is not

7   going to say, "You got me, don't fill it."  The physician is

8   going to verify that he wrote the scrip and it's for a valid

9   use even if the pharmacist should know better.

10       So the mere fact that the pharmacist called does not

11  relieve the pharmacist of his or her duty to fulfill their

12  corresponding responsibility requirements.

13  Q.  Is it consistent with a pharmacist's obligations to direct

14  a physician to prescribe a certain number of medications?

15  A.  Nobody should be directing a physician to prescribe.

16  That's the physician's prerogative by law.  The physician is

17  the prescriber.  And nobody else should be calling and telling

18  the physician:  Hey, you need to write for this drug, you need

19  to write for this drug.

20       There may be some suggestions particularly, as most of

21  us know, the insurance companies don't pay for every drug.  The

22  pharmacist may call and say the insurance won't pay for this,

23  they will pay for this, this, or this, which one would you

24  like.  But they certainly cannot -- it is not legal for them to

25  call and direct the physician to write a particular

1   prescription.

2   Q.  Can a pharmacist substitute a different dosage of the same

3   controlled substance without consulting a physician?

4   A.  If you're talking about going from one strength to the

5   other, no.  They can make that change after discussing the

6   change with the physician.

7          In other words, if they want to dispense tablets that

8   are half the strength of that prescribed or tablets that are

9   double the strength and then cut the dose in half, they have to

10  talk to the doctor before they make that change on a controlled

11  substance prescription.

12  Q.  So to use a concrete example, can a pharmacist fill a

13  prescription for 30 pills of eight milligrams of hydromorphone

14  with 60 pills of four milligrams of hydromorphone?

15  A.  Not without talking to the prescriber.

16         The reason for that being that a lot of patients

17  remember that the doctor said you're going to take one a day or

18  one every four or whatever.  Now the pharmacist gives them a

19  prescription that says you're going to take two or vice versa

20  instead of two you're going to take one.  The chances of error

21  of patients either taking too little or too much have occurred.

22  In my personal experience we've had several cases of that in

23  Ohio.

24         So, the pharmacist needs to make sure that the

25  physician is onboard, that the physician's records -- that the

FAE9WIS4                    Winsley - direct

```
1   physician knows that that change is occurring.  And then the
2   pharmacist, that's one of the indications where counseling
3   would be expected without asking the patient.
4   Q.  Now, we've been talking a little bit about mail order
5   pharmacies as opposed to walk-in brick and mortar pharmacies.
6   How, if at all, do the duties and obligations of a pharmacist
7   differ in a mail order pharmacy as opposed to a brick and
8   mortar pharmacy?
9   A.  Since the federal and state requirements, they're
10  identical.  There are no differences.  They have the same
11  issues of corresponding responsibility.  They have the same --
12  they need to go through the same process with the prescriptions
13  that I talked about before.
14  Q.  But is it fair to say that in a mail order pharmacy a
15  pharmacist is less likely to actually see a patient?
16  A.  If it's a true mail order pharmacy, which is closed door,
17  no patients coming in, then obviously they're not going to see
18  the patient.  There are some mail order pharmacies that also do
19  walk-in and so then there's a possibility.  But most mail order
20  pharmacies are closed door.  They're not going to see the
21  patient.
22  Q.  So in those circumstances how does a pharmacist carry out
23  his or her corresponding responsibility?
24  A.  Well they still are required to go through all of those
25  issues that we talked about.  They still have a profile of meds
```

1   that the patient has received.  They still are required to do

2   the utilization review that I talked about.  They still are

3   required to look for potential issues with the prescriptions

4   and resolve those issues before the prescription is filled.

5           And then the difference for mail order where the

6   patient is not there is they are required to send a written

7   offer of counseling along with a free-of-charge telephone

8   number and the hours when a pharmacist will be available so

9   that the patient can call and get the counseling or get their

10  questions answered.

11  Q.  Now if an owner of a pharmacy is not a pharmacist what

12  obligations does the owner have?

13  A.  The owner has to have a pharmacist in full and actual

14  charge of the pharmacy.  Only a pharmacist can dispense the

15  drugs.  If the owner is not a pharmacist, the owner has no

16  rights to be involved in the dispensing process.

17  Q.  What about a nonpharmacist store manager?

18  A.  Same for them.  Only a pharmacist can dispense.  Only a

19  pharmacist can make the professional judgments involved with

20  the act of dispensing.  Nonpharmacists cannot mandate anything

21  relating to those professional judgments.  Those are the sole

22  purview of the pharmacist.

23  Q.  Mr. Winsley are you familiar with the term pharmacist in

24  charge or supervising pharmacist?

25  A.  Yes.  Pharmacist in charge is a pretty common term that's

1   used around the country to define the pharmacist most of the
2   time who signed the pharmacy board license application.  That
3   pharmacist is the pharmacist that the board expects and holds
4   responsible for the practice of pharmacy within that particular
5   pharmacy itself, making sure that policies and procedures are
6   in place to avoid mistakes, to do things properly and legally.
7   And they're held accountable.  Maybe including with the actual
8   pharmacist if there's an error or something.  But the
9   pharmacist in charge is held accountable for seeing to it that
10  everything runs properly.
11  Q.  Are you familiar with the term pharmacy technician?
12  A.  Yes.  Pharmacy technicians are a group of -- you would call
13  them pharmacy helpers.  They are people who are allowed to be
14  in the pharmacy department, to participate in the filling of
15  the prescriptions, but they do the technical work.  They can
16  make no professional judgments.  That means they can count to,
17  as I say, 30 by 5s.  They can pour into the bottle.  They can
18  type the label if anybody still does that these days.  They can
19  prepare the dose for the pharmacist to do the final check.
20          But the pharmacist himself or herself has to be, at
21  the end of the line, has to make sure the right drug is in the
22  container, the label is proper, according to the prescription
23  and according to what the patient should get, and that it's
24  ready to go.  And then it's the pharmacist who assumes
25  responsibility and liability for the product, not the

FAE9WIS4                    Winsley - direct

1    technician.

2    Q.  Can a pharmacy technician dispense medication without a

3    pharmacist?

4    A.  No.  A pharmacist has to be physically present at all times

5    that drugs are dispensed out of a pharmacy.

6    Q.  So we've been talking a little bit about what you referred

7    to as red flags.  Can you describe just generally what you mean

8    by red flags?

9    A.  Those are indications that there may -- keyword being

10   may -- be a problem with the prescription.  I already mentioned

11   distance.  And I already mentioned the fact that there are

12   exceptions to the distance being a problem, if they're going to

13   a specialist in a big city or whatever.

14        And other red flags would be early refills or in the

15   case of Schedule IIs filling the scrips before the patient

16   should be nearly out of their old one.  And continual early

17   refills is a red flag.

18        A red flag that needs to be resolved, that's not an

19   indication of a diversion is very late filling of some of the

20   prescription drugs.  Because if you're taking blood pressure,

21   for example, you need to take it consistently.  So if you're

22   not taking it right that's a red flag that the pharmacist needs

23   to hold up, get ahold of whoever they need to get ahold of.

24        Another red flag is the doctor's prescribing practices

25   himself or herself.  If the doctor consistently writes the same

FAE9WIS4                    Winsley - direct

1   drugs for pain for all types of people, adults, teenagers,

2   male, female, elderly, the same strength, same quantities,

3   that's an indication of a problem.

4            The treatment of pain is not a cookbook treatment.  We

5   all react differently to pain.  Some of us need more treatment.

6   Some of us need less.  So if the doctor is consistently

7   writing, particularly for the highest strength of an opiate,

8   the highest strength of some of the other drugs, that's a

9   problem.

10           If the doctor is writing for combinations of drugs

11  that are known to be not -- no medical value such as an opiate

12  a benzodiazepine like Ativan or Valium and a muscle relaxant

13  like Carisoprodol or Flexeril, that combination of drugs is a

14  problem.  And so that's a red flag.  Particularly if the doctor

15  is writing it routinely for a lot of patients.

16           There are a lot of different issues that you can go

17  into with the prescriptions that might raise a pharmacist's

18  concern.

19  Q.  Are there any red flags associated with the quantities of

20  pills on a prescription?

21  A.  Well the quantities -- if you keep in mind that ordinarily

22  opiates are drugs of choice for short term relief of pain, if a

23  doctor consistently writes large quantities for a patient then

24  it's something that the pharmacist would certainly need to look

25  into.

FAE9WIS4                        Winsley - direct

1       There may be a reason, but for the majority of times

2  it's not indicated -- opiates are not indicated in large

3  quantities of high strengths for patients with chronic pain.

4  There are other methods of treating in addition to drugs.

5           MR. SCHMIDT:  Objection, your Honor.

6           THE COURT:  Overruled.

7  Q.  Were you finished?

8  A.  Yes.  I'm finished.

9  Q.  What about multiple patients at the same address receiving

10  the same medication.  Is that a red flag?

11  A.  If it's multiple, multiple patients, yes.  I mean it might

12  be, you know, two roommates.  But even so, as I said before,

13  treatment of pain is an individual thing.  If they're both

14  getting the same drugs at the same doses and there's multiple

15  people, three, four, five, that certainly is a major problem

16  that the pharmacist would have to pay a great deal of attention

17  to.

18  Q.  So it's not per se unlawful?

19  A.  I suppose if they lived in a rooming house or a dormitory

20  it might be possible but a normal street address it's highly

21  unusual.

22  Q.  It would be something that a pharmacist would look into?

23  A.  It would be what I would call a red flag which means it

24  would need to be resolved before the pharmacist moved on.

25  Q.  Does the concern -- does it address the concerns to just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS4                     Winsley - direct

1   send one of the prescriptions to a different address?

2   A.  No.  The address needs -- or the prescription needs to be

3   sent to the address of record and they can't be -- it can't be

4   shipped elsewhere.

5   Q.  And you were talking about just a little bit, are you

6   familiar with the term pain clinic?

7   A.  Yes.  Pain clinic is -- we use it, refers to legitimate

8   clinics that are run by specialists in pain medicine that deal

9   with patients that have chronic pain.  Legitimate pain clinics

10  use not only drugs but a variety of other methods, physical

11  therapy, heat, exercise --

12            MR. SCHMIDT:  Objection, your Honor.  May we approach?

13            THE COURT:  All right.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS4                    Winsley - direct

1        (At the sidebar)

2        MR. SCHMIDT:  Your Honor, he's a pharmacist.

3   Pharmacists have to know some drug interactions.  I do not

4   doubt that very much.  But he is not qualified for him to

5   testify as to what is appropriate at a pain clinic and what is

6   not appropriate at a pain clinic.  He is not a doctor.  He is

7   not a physician.  I think it's entirely inappropriate.

8        MR. TEHRANI:  Your Honor, I understand that's their

9   defense that a pharmacist has no obligation to know these

10  things or look into these things.

11       MR. SCHMIDT:  That's not what I said.

12       MR. TEHRANI:  He is an executive director of the Board

13  of Pharmacy.  He was the president of the National Association

14  of Boards of Pharmacy.  As he testified, this is one of the

15  things that a pharmacist is obligated to look into and to

16  satisfy him or herself about before fulfilling a prescription.

17  He's entitled to offer his opinion.  He can offer his basis for

18  that opinion, if Mr. Schmidt would like, about pain management,

19  about pain clinics, about pill mills and what types of

20  prescriptions that come to a pharmacy are legitimate or are

21  illegitimate.  That is well within his scope of expertise.

22       THE COURT:  So he is now describing what a pain clinic

23  is and it's appropriate for him to describe the various

24  therapies.  The application is denied.

25       (Continued on next page)

FAE9WIS4                    Winsley - direct

```
1              (In open court)

2              MR. TEHRANI:  Can we just have read back the last

3    portion of the answer before the objection.

4              (Record read)

5    Q.  Was there more to that answer that you wanted to provide?

6    A.  I was just going to add electric stimulation is commonly

7    used, conditions like back pain and so forth.

8    Q.  Are you familiar with the term pill mill?

9    A.  Yes.  Pill mills are what we use to refer to clinics that

10   call themselves pain management clinics but are not run by a

11   specialist.  They are run by a variety of other doctors and, in

12   fact, in many cases they are not owned by doctors.  They are

13   owned by other people who hire the doctors to work.  These are

14   clinics that specialize primarily in writing prescriptions,

15   large quantities, high doses for people that travel distances

16   in order to get there.  These are clinics that have been

17   documented as providing very little of the normal doctor

18   examinations.  Basically they are situations where what do you

19   want, how much had money do you have, and the prescription is

20   written.

21   Q.  Now as between legitimate pain clinics and pill mills,

22   would one or the other be more likely to prescribe tamper

23   resistant pain medication?

24   A.  If they were going to prescribe large doses of controlled

25   substances that had or -- not large doses but the higher doses,
```

1108

FAE9WIS4                     Winsley - direct

1    particularly higher strength, sorry, of controlled substances,

2    the pain management clinics, the legitimate specialists clinics

3    would be more likely to prescribe the drug that is more

4    difficult to abuse.

5    Q.  Would you expect a doctor at a legitimate pain clinic to

6    only prescribe the same Schedule II controlled substance to

7    every patient?

8    A.  No.  That would be opposite to what I've said a couple

9    times here during my testimony in that the treatment of pain is

10   an individualized thing.  Some patients can use lower doses of

11   drugs, much lower doses of drugs because the other ancillary

12   methods, the physical therapy, the electric stimulation or

13   whatever is helping them.  Some other patients who have a lower

14   pain tolerance may need a little higher dose.  But it would be

15   individualized patient, by patient, by patient.  It should not

16   be consistently the same drug at the same strength in the same

17   quantities for everybody, male, female, young, old.

18               (Continued on next page)

19

20

21

22

23

24

25

Faedwis5                    Winsley - direct

1    Q.  Are you familiar with the practice of doctors' involvement

2    in prescription diversion prescribing noncontrolled

3    prescriptions for every controlled prescription?

4    A.  Yes.  We've seen that quite a bit where they do that in

5    order to mask the fact that they're writing the prescriptions

6    for patients that are getting it for abuse.  Quite frequently,

7    in my experience, those noncontrolled substances that they're

8    writing are not related in any way to the need for the opiate,

9    and in my experience many times when the patients come into the

10   pharmacy, they ask for the controlled substance to be filled

11   but they don't want the other one.  That would be another one

12   of the red flags that I talked about for the pharmacist to

13   consider.

14   Q.  Would there be any red flags associated with a patient

15   receiving monthly prescriptions for 30 milligrams of oxycodone

16   at six per day?

17   A.  If that continued very long, certainly that's something

18   that the pharmacist would need to resolve because that would be

19   a very unusual dose.  Perhaps over a period of time for a

20   terminally ill cancer patient if they were still able to

21   swallow, perhaps.  Although I would expect the prolonged

22   release version to be used so that the patient wouldn't have to

23   swallow so many.  But it's unusual for a normal patient in pain

24   to be using the highest strength of an opiate in large

25   quantities for an extended period of time.

Faedwis5                    Winsley - direct

1   Q.  What about for a patient with back pain?

2   A.  Back pain.  Back pain is one of the disease states, number

3   one, that is very hard to diagnose, but, number two, is treated

4   in a variety of ways, not just with high-dose opiates.  All

5   those do is mask the symptoms.  They do nothing to help the

6   cause of the pain.  So there are other methods, again, as I

7   said before, to help patients with back pain.  So if back pain

8   is the diagnosis for every patient coming out of a doctor's

9   office and they're all getting high-dose opiates in large

10  quantities, that is a problem.

11  Q.  Are there any red flags associated with the form of

12  payment?

13  A.  Ordinary pharmacies have a very high percentage of

14  insurance.  Most of us in this country have some form of

15  insurance -- not everybody, there are patients who have to pay

16  cash.  But when we run across a pharmacy or a physician that's

17  a cash-only business, that tends to cause us to have some

18  concerns and indicates that maybe that particular pharmacist or

19  physician -- pharmacy, I'm sorry, needs to be looked into

20  further because that's very unusual to have a cash-only

21  business in a country where the majority of people have health

22  insurance.

23  Q.  Why would the fact that it is unusual be a red flag of

24  diversion?

25  A.  One of the reasons that's done is because the health

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis5                    Winsley - cross

1    insurance companies themselves do their own utilization review,

2    and they obviously don't want to pay for any more than they

3    have to, for one, but some of them also feel that they need to

4    help with the drug abuse crisis that we have and so they're

5    doing those reviews.  They're pushing the issue.  They're

6    calling doctors, they're calling pharmacists, and, in fact,

7    they're calling the enforcement agencies when they have

8    indications that there may be a problem with either a doctor or

9    a pharmacy.

10              MR. TEHRANI:  Your Honor, may I have a moment?

11              (Pause)

12              No further questions.

13              THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. SCHMIDT:

16   Q.  Is it Mr. Winsley or Dr. Winsley?

17   A.  Mister is fine.

18   Q.  What medical treatment -- what education in medicine have

19   you received?

20   A.  Since the term "medicine" applies to all aspects of

21   treating patients, including physicians, nurses and

22   pharmacists, I have had a great deal of training in the

23   pharmacy end of the medical field.  That includes the use of

24   drugs, the drugs themselves, the drugs used in disease states.

25   Of course, I had that education a long time ago.  But that's

Faedwis5                    Winsley - cross

1    what pharmacists receive, and in point of fact pharmacists

2    received --

3              THE COURT:  What do you mean by "drugs used in disease

4    states"?

5              THE WITNESS:  For example, if you come down -- I'm

6    sorry.  If a patient comes down with pneumonia, there are

7    certain drugs, antibiotics, and other drugs that would be used

8    depending upon where it is.  If a person has pain, there are

9    certain drugs that are used for pain and you wouldn't use an

10   antibiotic, for example, for pain.  So relating disease state,

11   what's wrong with the patient.  They have high blood pressure,

12   so there are medications used for blood pressure.  So that's

13   what I mean about drug disease state.

14             And in point of fact, pharmacists have more training

15   in the use of drugs and disease states than do physicians,

16   nurses, dentists, any of the others.  When they come out of

17   school, pharmacists have more training in the drugs themselves.

18   BY MR. SCHMIDT:

19   Q.  It's important for pharmacists to have training because

20   they are the professionals relating to the filling

21   prescriptions of all sorts of drugs, right?

22   A.  Yes.

23   Q.  And there is quite a bit of responsibility placed on the

24   pharmacist to make sure that the drugs that they're prescribing

25   is helpful to the patient and not harmful for the patient, is

Faedwis5                    Winsley - cross

1    that right?

2    A.  That is correct.

3    Q.  You are from Ohio.  Does Ohio have continuing pharmacy

4    education requirements?

5    A.  We have a higher requirement than any other state that I

6    know of.

7    Q.  So is the answer yes?

8    A.  The answer -- yes.

9    Q.  And how frequent are -- what must a pharmacist do in Ohio

10   to maintain his pharmacist license?

11   A.  They have to do their continuing education, which for us is

12   20 hours a year, three -- well, one of which per year.  We

13   report continuing education every three years, a third, a

14   third, a third every year.

15          THE COURT:  What do you mean by the term "continuing

16   education"?

17          THE WITNESS:  That's ongoing education.  Continuing

18   education is ongoing education that a licensed individual, be

19   it a physician, pharmacist, nurse, dentist, is required to do

20   in order to maintain their competence in their particular

21   field.  So it is not that they graduate and they're done, they

22   have to continue to try to keep up with the changes.  The

23   changes in the medical field are occurring rapidly, and so they

24   have to continue to go to classes, lectures, those types of

25   things in order to keep up.

Faedwis5                    Winsley - cross

1            Those are some of the lectures that I talked about me

2      doing with DEA going around the country.  The pharmacists get

3      credit for attending those classes that we put on, and that's

4      what most of my talks around the State of Ohio and other states

5      and nationally have been so that pharmacists or another

6      professional can get education credits.  That's what continuing

7      education is.

8      BY MR. SCHMIDT:

9      Q.  So how many credit hours either per year or every two years

10     must a pharmacist have to maintain his license -- his or her

11     license?

12     A.  In Ohio it is 60 hours every three years, three hours of

13     which have to be in Board of Pharmacy-approved law classes.

14     Q.  What about the State of New Jersey?

15     A.  I believe New Jersey is 30 hours every two years, if I

16     remember correctly.

17     Q.  Do you know about the State of Florida?

18     A.  No.

19     Q.  Do you know if they have a CLE requirement or not?

20     A.  No -- well, I don't know about "CLE."  They do have

21     pharmacy continuing education.

22     Q.  Excuse me.  You are an attorney.  I meant for pharmacy.

23            Do they have --

24     A.  Yes.

25     Q.  -- continuing pharmacy education?

1115

Faedwis5                    Winsley - cross

1   A.  Yes.

2   Q.  But you are not familiar with the amount, is that rights?

3   A.  No.  I don't know whether it is 15 hours a year.  Some

4   states are 15 every year.  Some are 30 every two years.  I only

5   know of Ohio being 60 every three being higher than any of the

6   other states that I know of.

7   Q.  If you can answer the question shorter, with a "yes" or

8   "no," please do.

9           What about the continuing educational requirements for

10  a nonpharmacist owner of a pharmacy, how many hours do they

11  take a year?

12  A.  None.

13  Q.  That is in Ohio, right?

14  A.  I don't know of any state that has requirements for that.

15  Q.  So it is fair to say that the nonowner pharmacy -- the

16  nonpharmacist owner or nonpharmacist manager of a drug store

17  must rely on his or her pharmacist to be up to date in all of

18  the rules and requirements, is that correct?

19  A.  Yes.  That's why the pharmacist in charge is mandated.

20  Q.  You said when you grew up you worked in your parents'

21  pharmacy?

22  A.  I did.

23  Q.  Nowadays there is not that many of them, especially in

24  larger cities, is that right?

25  A.  That is correct.

1116

Faedwis5                    Winsley - cross

1   Q.  Now, I don't know if it is in your knowledge or not, but if

2   it is in your knowledge, the manager of a CVS store or a

3   Walgreen's or a Rite Aid, they are not going to be a

4   pharmacist, are they?

5   A.  Not usually.

6   Q.  They will be -- you go into one of those chain stores, you

7   have a sign, usually in the back of the pharmacy, where it says

8   "Pharmacist in charge," doesn't it?

9   A.  Not -- I mean any pharmacy I have been in, it doesn't say

10  "pharmacist in charge."  Many of them have the wall

11  certificates of the pharmacists hanging there with their names

12  on them that were given to them when they passed their initial

13  examination.  But I don't know a pharmacist -- some individual

14  stores may say pharmacy manager or pharmacist in charge but

15  it's not a mandate that I know of.

16  Q.  Now, so for the many years, your years involving -- being

17  involved in the Ohio State Board of Pharmacy, you in many ways

18  were a law enforcement officer, is that right?

19  A.  Without arrest powers, yes.  The Board was a law

20  enforcement agency.

21  Q.  Now, you testified, I think, in federal court on a few

22  occasions?

23  A.  Yes.  Two.

24  Q.  And who did you testify on behalf of?

25  A.  One was the State of Ohio, the first one, and the second

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis5                    Winsley - cross

1    one was the Philadelphia U.S. Attorney's Office.

2    Q.  Are you aware of the ongoing discussion in the country

3    about generally the treatment of pain by opioids?

4    A.  Yes, I'm aware of the ongoing discussion.

5    Q.  And you do understand that part of that discussion is

6    indeed pain experts who are talking about that pain is not

7    being managed aggressively enough, is that right?

8    A.  Not since about 2000 -- or, yes, 2012, that's not correct.

9    Q.  Are you aware of the University of Wisconsin School of

10   Medicine Public Health?

11   A.  I know that they have one.

12   Q.  Are you aware of their involvement in the discussion of

13   whether or not pain is treated sufficiently aggressively?

14   A.  I know that they were early on.  I have not seen anything

15   from them recently.

16   Q.  Well, would it be fair to say that as late as 2013 -- 2014,

17   they published a quite substantial document that was entitled

18   "Achieving Balance in Federal and State Pain Policy, A Guide to

19   Evaluation"?

20   A.  I can't say whether they did or not.  I haven't seen it.

21   However, that doesn't correlate with your previous question

22   about pain not being adequately controlled.

23   Q.  I appreciate your full answer, but, please, just answer my

24   question and the government will have an opportunity to ask you

25   additional questions if you are not satisfied with the answer

Faedwis5                    Winsley - cross

1   to my question.  OK?

2   A.  I understand.

3            THE COURT:  In other words, answer the question

4   without volunteering additional information.

5            THE WITNESS:  OK.  I will do my best.

6   BY MR. SCHMIDT:

7   Q.  Are you aware of them publishing in 2014 -- 2013,

8   "Evaluation of Achieving Balance in Federal and State Pain

9   Policy"?

10  A.  No.

11           MR. SCHMIDT:  May I approach the witness?

12           THE COURT:  You may.

13  Q.  Have you ever seen that document?

14  A.  No, I have not.

15  Q.  Have you been following the discussion and articles that

16  are coming out from the University of Wisconsin School of

17  Medicine and Public Health in the last three years?

18  A.  I have not been following that, no.

19  Q.  So you are willing to tell us what you think is a

20  legitimate pain clinic without reviewing documents from --

21  withdrawn.

22           Isn't it a fact that the University of Wisconsin

23  School of Medicine and Public Health has published at times

24  joint statements with the Drug Enforcement Administration?

25  A.  That's a possibility.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1119

Faedwis5                    Winsley - cross

1    Q.  You don't know?

2    A.  Not as it relates to the University of Wisconsin.  I'm

3    familiar with early University of Wisconsin publications but

4    not in the timeframe you've asked about.

5    Q.  OK.  Let's not do the timeframes I've asked about.  Let's

6    start from the year 2000.  Did they publish the statements and

7    articles together with the DEA?

8    A.  I believe they did, yes.

9    Q.  Do you recall them?

10   A.  Not with DEA, no.

11   Q.  Do you recall a 2004 joint statement from 21 health

12   organizations and the Drug Enforcement Administration called

13   "Promoting Pain Relief and Preventing Abuse of Pain Medication,

14   A Critical Balancing Act"?

15   A.  I'm aware that something like that was put out.  I read it

16   back then.  That was a long time ago, so I don't remember all

17   of the particulars.

18   Q.  So is it your testimony now that there was a dispute about

19   what was necessary in pain management back in the early 2000s

20   but that is no longer an issue now?

21   A.  What I'm saying is that a lot of the people who were

22   addressing that concern and going around the country preaching

23   it have since recanted what they did.  Specifically one Russell

24   Portenoy in the Wall Street Journal in 2012, who said that he

25   and other pain management specialists erred in preaching the

Faedwis5                    Winsley - cross

1   doses and minimizing the side effects.  I'm also aware that

2   Congress was investigating a lot of those groups, many of whom

3   went out of business after they found out that they were funded

4   solely by the drug companies.  So that's why I said after 2012

5   that little -- that pressure has kind of died off of it being

6   undertreated.  Now, in fact, we have an epidemic due to

7   overtreatment.

8   Q.  Thank you, Mr. Winsley.

9            Were you told when you were testifying to try to get

10  as much information out as you could to every question --

11           MR. TEHRANI:  Objection, your Honor.

12  Q.  -- or is that on your own that you are doing that?

13           MR. TEHRANI:  Objection again, your Honor.

14           THE COURT:  Once again, I want you to stick to the

15  question that has been posed without offering or elaborating.

16           THE WITNESS:  Yes, ma'am.

17  BY MR. SCHMIDT:

18  Q.  So is it your testimony now that a pain clinic that

19  primarily provides opioids for its patients is not a legitimate

20  pain clinic?

21  A.  Usually, yes.

22  Q.  You used the word "usually."  Now, how many actual -- let's

23  say in Ohio.  How many pain clinics in Ohio have you actually

24  gone to in the last ten years prior to retirement?

25  A.  I don't have an exact number but I have been to several.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis5                    Winsley - cross

1    Q.  And did you examine their patient records?

2    A.  No.

3    Q.  Did you have a doctor examine the patient records?

4    A.  The doctor was familiar with the patient records.

5    Q.  Did you have a doctor other than the doctor at the pain

6    clinic examine the patient records?

7    A.  When it was a pain clinic that we were charging, yes.

8    Q.  So you wanted to have a doctor's opinion as to whether the

9    doctor thought that these records reflected the need for pain

10   medication, is that right?

11   A.  That was a requirement for a criminal case.

12   Q.  It wasn't a pharmacist that did it?

13   A.  Well, there were pharmacists involved, too.

14   Q.  It wasn't a pharmacist that made that determination, was

15   it; it was a doctor, because it was necessary, right?

16          MR. TEHRANI:  Objection, your Honor.  I'm not sure

17   what "that determination" is.

18          THE COURT:  Overruled.

19          You may answer.

20   A.  Can you run that past me again please, then?

21   Q.  You required -- when you were the head, Director of the

22   Ohio Board of Pharmacy that was law enforcement for the

23   violation of the drug laws in Ohio, before you brought a case,

24   you had a doctor examine the patient records of a pain clinic

25   doctor, is that right?

Faedwis5                    Winsley - cross

1    A.  Yes.

2    Q.  Did you examine any pain records -- excuse me.  Did you

3    examine any medical records in this case?

4    A.  No.

5    Q.  Now, there has been some very recent changes in the

6    chemical makeup of some of the oxycodone pills, is that right?

7    A.  Very recent?  No.

8    Q.  Let's start.  In 2013, the Federal Drug Administration came

9    out with guidance for the drug industry in order for them to

10   come up with extended-release oxycodone that limited the

11   euphoric effects of the oxycodone if crushed and used, is that

12   right?

13   A.  Not that I know of.  It was -- the formulation was changed

14   before 2013.

15   Q.  When are you aware of that it was changed before 2013?

16   A.  I'm sorry.  What am I aware?

17   Q.  When do you think the first time that the formulation of

18   oxycodone was changed for extended release to prevent the

19   euphoric effects of crushing and using those pills?

20   A.  I don't know exactly when it was.  It is my belief that it

21   happened before I retired.

22   Q.  What was the name of the drug?

23   A.  It was OxyContin.

24   Q.  Well, because the company came out with something pretty

25   special.  Didn't they have a name?

1123

Faedwis5                    Winsley - cross

1   A.  OxyContin was the name.  Oxycodone is the generic name.

2   Q.  The new extended release that was going to make it less

3   useful to divert it to crush it and get a high, right, did they

4   just put it out as a generic name?

5   A.  No, I don't recall the name.

6   Q.  Well, wasn't that some substantial change?

7   A.  It may have been.

8   Q.  But you don't remember the name?

9   A.  I don't remember the name.

10  Q.  Do you know the name of the manufacturer?

11  A.  No, if I don't remember the name.

12  Q.  In fact, as late as 2013, the National Institute of Health

13  was giving warnings about crushing extended release oxycodone

14  and using it that way, isn't that right?

15  A.  I believe you are correct.

16  Q.  Because they didn't want people to use it in 2013 because

17  it still would give a euphoric high and was dangerous, isn't

18  that right?

19  A.  Yes.

20  Q.  So if a prescription is written in 2011 or 2012, there was

21  extended-release oxycodone that was available that you could

22  crush and by crushing it you could still get the euphoric high

23  from it as you could for a nonextended release, isn't that

24  right?

25  A.  I don't believe so but I retired in 2011 and if something

Faedwis5                    Winsley - cross

1   came out after that, I may not have seen it.

2   Q.  So you stopped -- OK.  When you were at the Ohio Board of

3   Pharmacy, as the head of it, did you keep up to date with all

4   of the new controlled substances that were coming out?

5   A.  I tried.

6   Q.  And then once you retired you haven't really kept up nearly

7   as well, have you?

8   A.  Not as well.

9   Q.  But you've kept up enough to get paid to go around the

10  country and give lectures on diversion, is that right?

11  A.  And on corresponding responsibility, yes.

12  Q.  And you've gone around at times with representatives of the

13  Drug Enforcement Administration, is that right?

14  A.  That is correct.

15  Q.  And have you been paid for any of these lectures by the

16  Drug Enforcement Administration?

17  A.  They cover my travel expenses and that's it.  I have not

18  been paid for my time.

19  Q.  Now, you told us about how a legitimate pain clinic would

20  be a clinic that had a -- what's the language -- run by

21  specialists in pain management, is that right?

22  A.  Yes.

23  Q.  Now, are you aware of the Florida laws relating to pain

24  management?

25  A.  Yes.

1125

Faedwis5                    Winsley - cross

1   Q.  And that is because fairly recently you had a case where

2   you testified and you needed to know the Florida law?

3   A.  No.  The Florida laws originally were passed before I

4   retired, and Florida law was then used as a suggested language

5   in the State of Ohio, which we changed and we got our own

6   version passed in Ohio in the spring of 2011.

7   Q.  So before you retired at the end of 2011, was that?

8   A.  I retired, yes, at the end of 2011.

9   Q.  The Florida law was that a pain clinic had to be run by a

10  person who took some type of courses in pain management, is

11  that right?

12  A.  I believe it is.

13  Q.  And they had to be registered as such?

14  A.  Yes.

15  Q.  And there were certain penalties if it wasn't done that

16  way, is that right?

17  A.  Yes.

18  Q.  That included either fines or loss of license or even

19  prosecution?

20  A.  I believe all three.

21  Q.  When they passed those laws in relation to pain clinics, do

22  you know if Florida made any changes of the laws in relation to

23  pharmacies?

24  A.  Not that I am aware.

25  Q.  You've said that pharmacists have a corresponding duty, is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Faedwis5                    Winsley - cross

1   that correct?

2   A.  Responsibility, yes.

3   Q.  Responsibility, OK.

4           Now, when you say "corresponding," that means first

5   you look at the doctor, right, and then he had a similar

6   responsibility; would that be fair to say?

7           I will withdraw that question.

8   A.  Yeah.

9   Q.  I will withdraw that question.

10          So the doctor's responsibility for writing a

11  prescription, especially a controlled-substance prescription,

12  in Florida required a physical examination, is that right?

13  A.  Yes.

14  Q.  It requires a determination that the best treatment for

15  that particular patient is what the doctor recommends, is that

16  right?

17  A.  Yes.

18  Q.  And the doctor must keep the records of his treatment of

19  his patient, is that right?

20  A.  Yes.

21  Q.  And those records are available to the state boards, is

22  that right, for examination if they're inspecting the pain

23  clinic?

24  A.  Only those that have the right to those patient-protected

25  records.

Faedwis5                    Winsley - cross

1   Q.  The confidentiality?

2   A.  Right.

3   Q.  But for pain clinics, right, for inspections by Florida,

4   there was the right for the inspectors to review those records,

5   isn't that right?

6   A.  Yes, the records they needed.

7   Q.  Now, to issue a prescription of a controlled substance,

8   there are basically two general requirements -- one, that it's

9   medically necessary and the second, that it is in furtherance

10  of a professional practice, is that right?

11  A.  No.  There's a third one.

12  Q.  What is the third?

13  A.  It has to be a licensed prescriber, a practitioner.

14  Q.  Now, who defines what a -- withdrawn.  How is -- withdrawn.

15          Who defines what "medically necessary" is, the DEA or

16  the state board?

17  A.  Medically necessary?

18  Q.  Yes.

19  A.  Would be -- the ultimate determination would be the state

20  board of medicine in that particular state.

21  Q.  And do you know the definition of what is medically

22  necessary in Florida, or was necessary in Florida between 2011

23  and 2013?

24  A.  No.

25  Q.  The other part of that is -- withdrawn.

Faedwis5                    Winsley - cross

1          One is there has to be a licensed professional; that's

2    basically self-defined, right?

3    A.  A prescriber.

4    Q.  Yes.

5    A.  Yes.

6    Q.  And the other one, that it has to be in the professional

7    practice of the physician, is that right?

8    A.  Well, the usual course of professional practice of the

9    prescriber.

10   Q.  And who defines the usual course of the professional

11   practice of the prescriber in Florida, the Florida Board or the

12   DEA?

13   A.  No.  The State Legislature through the laws.

14   Q.  And what indeed is the definition of that in Florida?

15   A.  The definition of?

16   Q.  The usual course of a professional practice of the

17   prescriber.

18   A.  The usual course of professional practice is the practice

19   limits that are set by the state legislature and law.

20   Q.  And what are those in the State of Florida?

21   A.  For a physician, it would be treating humans.

22   Q.  Excuse me?

23   A.  For a physician, it would be treating humans.

24   Q.  OK.  And is it further defined?

25   A.  I don't know that Florida goes any further or whether they

Faedwis5                    Winsley - cross

1   do or not.

2   Q.  Does the DEA define that, that expression?

3   A.  No.  They defer to the state standard of practice that's

4   set by the state legislature.

5   Q.  What is the -- what are the -- how are the obligations of a

6   pharmacist defined in the State of Florida?

7   A.  The obligations?

8   Q.  Yes, before they fill a controlled substance prescription.

9   A.  Well, we went through the whole issue of corresponding

10  responsibility on direct, and so those obligations are there.

11  They also have to determine that the physician is authorized to

12  write that prescription.

13  Q.  So -- but the corresponding responsibility is to determine

14  that the prescription was written by a licensed professional,

15  that it was medically necessary in the normal course of his or

16  her professional practice, correct?

17  A.  Yes.  Legitimate medical purpose rather than medically

18  necessary, but yes.

19  Q.  Legitimate medical purpose --

20  A.  Right.

21  Q.  -- for the usual professional practice of the prescriber,

22  is that right?  Did I say it right?

23  A.  Close.

24  Q.  And where is that defined?

25  A.  There is a regulation on corresponding responsibility in

Faedwis5                    Winsley - cross

1    both the Code of Federal Regulations, Title 21 Section 1306.04,

2    which applies nationwide.

3    Q.  And what are those requirements?

4    A.  That a prescription must be issued for a legitimate medical

5    purpose by a prescriber or practitioner in the usual course of

6    professional practice.

7    Q.  Where is that further defined in the DEA regulations or the

8    rules, federal rules?

9    A.  It is -- that is the federal regulation.

10   Q.  So it is not further defined; is that what you're saying?

11   A.  Well, the rule goes on.  That's only the first sentence in

12   that -- in paragraph A of that rule.

13   Q.  Is "legitimate medical purpose" defined in the rule?

14   A.  No.

15   Q.  Is "in the usual course of professional practice" defined

16   in the rules?

17   A.  Not in the federal rule.

18   Q.  Is it defined in the State of Florida?

19   A.  Yes.  We've already said that's defined by the State

20   legislature.  They set up the standards for each profession.

21   Q.  And the most recent information was passed around the time

22   that you retired, is that right?

23   A.  That I'm familiar with, yes.

24   Q.  Do you know the corresponding responsibility of a

25   pharmacist in New Jersey?

Faedwis5                    Winsley - cross

1   A.  Yes.  I read their -- I read New Jersey's law on

2   corresponding responsibility.  It basically mimics under

3   federal language.

4   Q.  Now, what is the responsibility of the nonpharmacist owner

5   in New Jersey in relation to filling controlled substance

6   prescriptions?

7   A.  The obligation of the nonpharmacist owner in New Jersey --

8   Q.  Yes.

9   A.  -- is that they have to hire a pharmacist to be in full and

10  actual charge, and New Jersey law says that both the pharmacist

11  and the owner are subject to any violations of the pharmacy

12  practice laws.

13  Q.  When New Jersey finds that a pharmacist -- withdrawn.

14          If New Jersey finds that a pharmacist did not follow

15  all of the requirements that he is supposed to, the pharmacist

16  faces what kind of punishment in the State of New Jersey?

17  A.  Potentially two different kinds of punishment.  One would

18  be administrative in front of the Board of Pharmacy and one

19  potentially could be criminal.

20  Q.  That would depend, obviously, on the violations, is that

21  right?

22  A.  That is correct.

23  Q.  You seem to be very conversant about the diversion of a

24  controlled substance, isn't that right?

25  A.  Yes.

Faedwis5                    Winsley - cross

1    Q.  Now, are you also aware of the repeated regular complaints

2    coming out of chronic pain sufferers of the difficulty in

3    obtaining oxycodone?

4    A.  I am familiar with the media reports.

5    Q.  The media reports began when the DEA was cracking down on

6    what they said was illegitimate pain clinics, is that right?

7    A.  No.

8    Q.  It started before that?

9    A.  Yes.

10   Q.  Are you aware of CVS and Walgreens having conflicts with

11   the Drug Enforcement Administration in 2011, in 2012?

12   A.  Oh, yes, I am.

13   Q.  And that's because the pharmacists -- excuse me.  It

14   started I think in 2009, maybe.  Do you remember when exactly

15   it started?

16   A.  No.

17   Q.  OK.  That's because the pharmacists in those stores were

18   not doing what they were supposed to do in checking the

19   prescriptions of people coming in with oxycodone prescriptions,

20   isn't that right?

21   A.  Yes.  For the pharmacies, that was the situation.

22   Q.  And, in fact, Walgreen's paid an enormous fine to settle,

23   is that right?

24   A.  Yes.  Walgreen's paid a huge fine.

25   Q.  So did CVS, is that right?

Faedwis5                    Winsley - cross

1   A.  It runs in my mind they got their store's license or DEA

2   registrations revoked.  I could be --

3   Q.  I am going to get to that.

4   A.  OK.  Sorry.

5   Q.  They had to pay a fine as well?

6   A.  Yes.

7   Q.  And they had some stores revoke their licenses, is that

8   correct?

9   A.  Their registration with DEA, yes.

10  Q.  Which meant they could not fill controlled substances,

11  Schedule I through V, prescriptions for a period of time, is

12  that right?

13  A.  Schedule II through V.

14  Q.  Schedule II through V?

15  A.  Right.

16  Q.  Marijuana hasn't moved yet from I to II?

17  A.  No.

18  Q.  And that basically put those pharmacies out of business.

19  A.  It could have.

20  Q.  How many pharmacies are you familiar, in the State of Ohio

21  when you were running the Board, continued to function when

22  they did not have the ability to fill prescriptions of

23  controlled substances?

24  A.  I don't know that we had any that didn't have the ability

25  that we left them with a license to do anything.  So in that

1134

Faedwis5                      Winsley - cross

1   answer, I don't know of any because we revoked them as well.

2   Q.  It could be -- they could, you know, just fill

3   prescriptions for, I guess, amoxicillin and things like that

4   that would not be a financially rewarding business, would it?

5   A.  No, that's incorrect.

6   Q.  Now, as a result of the finding, as a result of the

7   agreements and the fines, you are aware that Walgreens and CVS

8   stopped filling lots of prescriptions that they used to fill,

9   is that right?

10  A.  I'm not aware that they stopped filling.

11  Q.  I will rephrase, then.

12          Now, one of the things that you talked about as a red

13  flag -- withdrawn.

14          One of the things you talked about that as a

15  pharmacist you do is you take a look at the past prescriptions

16  that were filled by a patient, is that right?

17  A.  Yes.

18  Q.  Now, for a new patient, that's not particularly practical,

19  is it?

20  A.  No.  For a new patient, obviously there is no history.

21  Q.  So for a mail-order pharmacy receiving a new prescription,

22  that's not something that they can really do, can they?

23  A.  Well, that's not quite correct.  I mean, they can't look at

24  the prescriptions that they have filled.

25  Q.  Well, that's the question.

1135

Faedwis5                    Winsley - cross

1   A.  OK.  They can't do that part of it, no.

2   Q.  Now, in fact, there was -- if a patient -- withdrawn.

3           Did you hear of pharmacies running out of oxycodone

4   before their next shipment was expected from their wholesaler?

5   A.  Yes.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FAE9WIS6                    Winsley - cross

1    Q.   And did you hear about wholesalers sending the order to

2    pharmacies including everything but the Schedule II controlled

3    substances?

4    A.   Not specifically.   I'm aware of problems.

5    Q.   Now are you familiar the National Community Pharmacist

6    Association?

7    A.   Yes.

8    Q.   How come you're familiar with that organization?

9    A.   They're the association of primarily the independent

10   pharmacists and pharmacies around the United States.   And I've

11   had numerous dealings with them both with the Board of Pharmacy

12   and when I was in the sequence through NABP.

13   Q.   They are a legitimate organization?

14   A.   Yes.

15   Q.   Legitimate pharmacists?

16   A.   Yes.   They're an organization that represents retail

17   pharmacy.

18   Q.   Well are you aware that they did a study in January --

19   excuse me, December 2013 about the problem of their

20   pharmacists, pharmacies receiving controlled substances from

21   their wholesalers?

22   A.   I am not aware of their study.   I am aware of the problem.

23   Q.   In being aware of the problem, are you aware that

24   approximately 75 percent of the members of the National

25   Community Pharmacists Association experienced three or more

1   delays of issues caused by stopped shipments of the controlled

2   substances over that past 18 months?

3            MR. TEHRANI:  Objection, your Honor.  He testified

4   he's not familiar with the study.

5            THE COURT:  Sustained.

6   Q.  Would a study -- how would that -- if a patient is coming

7   at the end of the month trying to get their pain meds and their

8   pharmacy says I'm sorry I don't have any left, that patient has

9   to choose between doing without or going to another pharmacy;

10  is that correct?

11  A.  Unless the pharmacy can obtain some quickly.  Yes.

12  Q.  And in Florida as a result of the DEA crackdown pharmacists

13  were reluctant to fill prescriptions of people who they've

14  never seen before appear at their pharmacy; isn't that right?

15  A.  Not completely.

16  Q.  Partly right?

17  A.  Partly right.

18  Q.  There are some people they would accept and some they

19  wouldn't?

20  A.  Some pharmacists would accept people and some pharmacists

21  would not.

22  Q.  Are you aware of the agent in charge of -- the DEA agent in

23  charge of South Florida appearing at a Board of Pharmacy

24  meeting down there and urging -- begging pharmacists to fill

25  prescriptions for oxycodone for patients who needed it?

FAE9WIS6                    Winsley - cross

1    A.  No.  I am not aware that that happened.

2    Q.  Do you think you might have been aware of that when you

3    were still with the Ohio Board of Pharmacy?

4    A.  Probably not.

5    Q.  Is that because that was in Florida?

6    A.  No.

7    Q.  You don't look at the internet?

8    A.  We had the same problems in Ohio with some individual

9    pharmacists.

10   Q.  The individual pharmacists were overly concerned with what

11   would happen to them if they filled all these prescriptions; is

12   that right?

13   A.  Overly concerned, yes.

14   Q.  Overly because you didn't think that their concerns with

15   what the DEA would do was a real concern; is that right?

16   A.  That's what we told our pharmacists, yes.

17   Q.  You testified that opioids should be used for treatment

18   only for the short term.

19   A.  I said indicated for the use, for the short term use.

20   Q.  Is that something different than should?

21   A.  Probably not different than should.

22   Q.  Isn't it a fact that many, many pain specialists have

23   determined that for some of their patients that opioid

24   medication is what works and allows these people to live a

25   fairly normal life?  Is that right?

1  A.  Some pain specialists in limited patients I would agree

2  with.

3  Q.  So you say limited.  So what percentage of the people with

4  severe and chronic pain, what percentage of that are the ones

5  where oxycodone is the only thing that's really going to make

6  it work?

7  A.  I don't have a percentage.

8  Q.  You have no idea, in other words?

9  A.  I do know what pain specialists have said and opiates are

10  not the method of choice.

11  Q.  And was the one who changed his mind?

12  A.  I beg your pardon.

13  Q.  You have no training -- withdrawn.

14          Have you ever examined a patient who was in pain?

15          MR. TEHRANI:  Objection, your Honor.  We've covered

16  this.

17          THE COURT:  Sustained.

18  Q.  Now, isn't it a fact that oxycodone is used in treatment

19  from moderate to severe pain?

20  A.  It's indicated that way in the package insert, the FDA

21  approved.

22  Q.  Do you agree with that?

23  A.  Not completely, but pretty much.  Usually more severe.

24  There are other products.

25  Q.  So you disagree with, to some extent, the FDA approval?

FAE9WIS6                    Winsley - cross

1   A.  Let me go back.  You were talking oxycodone by itself or

2   Oxycontin?  Is that the question that you asked me originally?

3   Q.  The question I asked you originally was oxycodone wasn't

4   just used for severe pain, it's also used for moderate pain?

5   A.  Okay.  I apologize.  In combination, such as the Percocet

6   product, in smaller doses, yes, it's used for moderate pain.

7   Q.  So you're saying that oxycodone without the other drugs

8   that are done in combination shouldn't be used for moderate

9   pain.  Is that your statement?

10  A.  Yes.

11  Q.  Do you have respect for the Mayo Clinic?  Are they a pill

12  mill?

13  A.  Not as far as I know.

14  Q.  And have you ever looked at their website to see what they

15  recommend oxycodone -- opioids for moderate to severe pain?

16  A.  No.  I have not looked at that website.

17  Q.  How about the National Institute of Health?  Have you

18  looked at their website as to the use of oxycodone for moderate

19  to severe pain?

20  A.  Not for that particular purpose.

21  Q.  Whose website have you looked at or have you looked at any

22  website in making your determination that oxycodone shouldn't

23  be used for moderate pain?

24  A.  I'm answering the question as a pharmacist who has been

25  involved with the pain management crisis for years.

FAE9WIS6                    Winsley - cross

1    Q.  The pharmacist is asking you?

2    A.  No.  I am answering as a pharmacist.

3         I will admit that the package inserts include moderate

4    which is where all of those websites got their -- got their

5    statements.

6    Q.  And those inserts are approved by the FDA; is that right?

7    A.  Yes.

8    Q.  And it's legal?

9    A.  Oh, yes.

10   Q.  And doctors who prescribe oxycodone for moderate pain is

11   legal?

12   A.  It is legal.

13   Q.  And pharmacists who fill prescriptions under the proper

14   circumstances of oxycodone for moderate pain is legal?  Is that

15   correct?

16   A.  Under the proper circumstances.

17   Q.  Have you reviewed the studies that talk about the risks of

18   dependency and addiction for oxycodone?

19   A.  I've reviewed some.

20   Q.  Could you tell us which studies you've reviewed?

21   A.  Not by name.

22   Q.  When was the last time you reviewed a study?

23   A.  Just recently.  Not a study.  It's also in the package

24   insert approved by the FDA.

25   Q.  So let's go back to studies.  What's the difference between

FAE9WIS6                    Winsley - cross

1    a packet insert and a study?

2    A.  Well a study is something that's done independently.  May

3    or not be published in a peer review journal.

4         The package insert is a compilation of the best

5    information available at the time to the FDA and to the

6    manufacturer.

7    Q.  A study is when a certain number, a valid number of

8    patients are given some type of medication and they check on

9    what the purpose of the study and come out with a result; is

10   that right?

11   A.  That's one kind of a study, yes.

12   Q.  When we're talking about pain medication, that's the kind

13   of studies that are done, to see if they're safe, to see if

14   they're addictive, to see what the side effects can be, right?

15   That's a study, right?

16   A.  That's a study.  There are multiple studies, multiple types

17   of studies.

18   Q.  But a study is basically where they actually do research on

19   people who actually use the substance, right?

20   A.  Yes.

21   Q.  Have you read any studies in the last ten years on the use

22   of oxycodone to treat pain management?

23   A.  Yes.

24   Q.  Could you tell me some that you've read?

25   A.  No.

1  Q.  Could you tell me the last study that you read; not insert,

2  study?

3  A.  It would have been before I retired in 2011.

4  Q.  Now, dependency and addiction are two different terms,

5  aren't they?  Not just in the words used but the meaning of

6  them; isn't that right?

7  A.  Yes.

8  Q.  Addiction means you have a physical reaction when you stop

9  using something; is that right?

10  A.  (No response).

11  Q.  Or it could be a psychological also, I guess.  Some kind of

12  reaction when you stop using it; is that right?

13  A.  That's part of the definition.

14  Q.  Why don't you give us a complete definition?

15  A.  Addiction is taken to mean also that the patient is to the

16  point where they will do other things in order to maintain

17  their drug.  So it's not just that they have withdrawal but an

18  addiction means that they're willing to go outside the law in

19  order to maintain their drug therapy or their drug intake.

20  That's usually the accepted definition of addiction that's been

21  widely accepted around the country.

22  Q.  And dependence is what?

23  A.  Well dependence means you still have a reaction if you

24  suddenly stop the drug.  Your body has gotten used to having

25  that level.  You're not yet to the point that you're going out

FAE9WIS6                    Winsley - cross

1   on the street corner and buying drugs or going to your

2   neighbor's house and getting into the medicine cabinet but you

3   still need the drug otherwise you're going to have a physical

4   reaction.

5   Q.  Now, when they do studies about the effect on use of

6   opioids one of the important things that they consider is what

7   happens to patients with a history of drug abuse and what

8   happens to patients who don't have a history of drug abuse; is

9   that right?

10  A.  Well really it depends on who they are and how the study is

11  done.  But that's one of the things that some people have

12  looked at, yes.

13  Q.  Are you familiar with the studies that show that, for

14  example, out of twelve thousand patients treated with opioids

15  who did not have a history of substance abuse only four

16  patients developed a dependence on the medication?

17  A.  No.  I'm not familiar with that study.

18          MR. TEHRANI:  Your Honor, may we be heard on this?

19          (Continued on next page)

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS6                    Winsley - cross

 1          (At the sidebar)

 2          MR. TEHRANI:  Your Honor, we haven't been objecting

 3     but this is exactly what we were talking about beforehand,

 4     about some wide-ranging inquiry about a host of topics that are

 5     not typically relevant.

 6          I also note on this last topic I find it curious that

 7     Mr. Schmidt wants to go into this topic given that they

 8     specifically objected to the testimony of Mr. Bishop and plenty

 9     of other evidence that we can present about the drug -- the

10     criminal histories of Plainfield's patients, that they did not

11     want us to present before the jury, that we did not present

12     before the jury, and now he's going into some study -- I don't

13     even know where the study is from, maybe we can be informed of

14     where the study is from -- but some study about the difference

15     between addiction and dependence and whether it correlates to

16     prior drug addiction or prior criminal history or whatever it

17     is that Mr. Schmidt is going into.  But this so far afield of

18     anything that is relevant to this case.

19          THE COURT:  I agree.  You have to move on.

20          MR. SCHMIDT:  If I may, your Honor.  I objected to

21     what I believed was this witness giving testimony about his

22     opinion that I thought that was reserved for physicians.  He

23     was able to testify to opinions and conclusions of what I

24     consider of something that would be in the purview of

25     physicians.  That's why I'm going into these areas.  That's why

FAE9WIS6                    Winsley - cross

1    I'm questioning on that.  Because I don't think he has a valid

2    basis of having these -- a valid expert basis of having these

3    opinions.

4            THE COURT:  So I disagree with you and I already told

5    you that.  And I want you to move on.

6            MR. SCHMIDT:  Okay.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FAE9WIS6                         Winsley - cross

1       (In open court)

2   Q.  Could you tell us what the word tolerance means?

3   A.  Tolerance means that the patient needs more of a drug to

4   achieve the same effect.

5   Q.  So for a person who has chronic severe pain -- withdrawn.

6           You told us that 30 milligrams of oxycodone was the

7   largest single dose -- dosage amount other than for extended

8   release?

9   A.  No.  Immediate release.

10  Q.  I said other than extended release.

11  A.  I'm sorry.  I didn't hear the "other than."  Yes.

12  Q.  So, a patient who has been in severe pain over the course

13  of many years and finds that oxycodone allows them to live a

14  relatively normal life can develop tolerance for the opioid; is

15  that right?

16  A.  Yes.

17  Q.  But that patient could not get more than 30 milligrams for

18  immediate release; is that correct?

19  A.  Well in one tablet.

20  Q.  That's right.  In one tablet.

21          So that might mean that the person who has been

22  suffering for a long time -- withdrawn.

23          You testified that for the immediate release oxycodone

24  that they are usually taken every four to six hours?

25  A.  That's the indication.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS6                      Winsley - cross

1   Q.  So, a person who has severe pain for a long time who is

2   developing some tolerance, right, is more likely to take it

3   every four than six -- rephrase that question.

4          It would likely mean that the person who has been --

5   the maximum that a doctor should prescribe pursuant to the

6   information within the insert for oxycodone 30 is one tablet

7   every four hours; is that right?

8   A.  I believe that's in the package insert.

9   Q.  So a patient who basically needs oxycodone because of their

10  severe pain finds that that's what works is not going to

11  receive or should not receive more than four -- more than four

12  hours -- withdrawn.

13         A person in severe pain, chronic pain should not

14  receive from the doctor more than 120 -- I apologize.

15         The maximum dosage should be six pills a day of 30

16  oxycodone; is that right, pursuant to the insert?

17  A.  Well if you go by the insert strictly, then if I remember

18  correctly that it is one every four; then, yes, it would be six

19  a day.

20  Q.  But it means that somebody who just started having severe

21  pain shouldn't be starting out like that; is that right?

22  A.  Yes.

23  Q.  They should be starting out lower doses as much as

24  possible; is that right?

25  A.  Yes.

FAE9WIS6                    Winsley - cross

1    Q.  As time goes by they may have to have increased doses; is

2    that right?

3    A.  Until they achieve effect.

4    Q.  When you're talking about chronic severe pain you're

5    talking about pain that lasts not for a short specific period

6    of time but is ongoing, right?

7    A.  Yes.  Or at least for a prolonged period.

8    Q.  And for the difference between -- withdrawn.

9         The advantage of the immediate release is that if you

10   go through a period of time where you really don't have severe

11   pain you don't need to take it, right?

12   A.  That would apply to both.

13   Q.  But immediate release is taken as needed; is that right?

14   A.  Not always.

15   Q.  Could be taken regularly as well?

16   A.  Quite frequently it is.

17        (Pause)

18        THE COURT:  Mr. Schmidt.

19        MR. SCHMIDT:  Yes, your Honor.

20        THE COURT:  Would you please pose a question.

21   Q.  You told us about red flags.  And you said that red flags

22   must be resolved.  Do you remember that?

23   A.  Yes.

24   Q.  Now could you tell me where in the instructions to

25   pharmacists in New Jersey would you find that red flags must be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS6                        Winsley - cross

1   resolved?

2   A.   In the corresponding responsibility rule.

3   Q.   Does the corresponding responsibility rule state that red

4   flags must be resolved?

5   A.   No.   It says legitimate medical purpose.

6   Q.   And so the red flag idea is an interpretation of the

7   corresponding responsibility; is that right?

8   A.   Yes.

9   Q.   And, in fact, you lecture on red flags, don't you?

10  A.   Yes.

11  Q.   And the DEA frequently talks about red flags, don't they?

12  A.   Yes.

13  Q.   But in the laws of the State of New Jersey, the law of the

14  United States, the Controlled Substance Act, there is nothing

15  in there that actually say anything about red flags; is that

16  right?

17  A.   That is correct.

18  Q.   But if you're a pharmacist who is taking their CLE -- their

19  continued pharmacy education courses, reading the journals,

20  professional newsletters, that they are likely to come up with

21  the phrase red flag?

22  A.   Yes.   It's been widely disseminated.

23  Q.   And the responsibility of taking the continuing pharmacy

24  education courses and keeping up with the newsletters and the

25  changes of law is on the pharmacist; is that right?

1151

FAE9WIS6                      Winsley - cross

1    A.  Yes.

2    Q.  Is it fair to say that the addition or subtraction of red

3    flags can occur any time that either the DEA or someone like

4    you at the Ohio Board of Pharmacy thinks that oh, this is

5    something else that a pharmacist should consider; is that

6    right?

7    A.  Well not just limited to those sources.

8    Q.  Well if the DEA thinks that Oh, we have another example

9    that might cause problems in diversion, they notify, I would

10   assume, the boards of pharmacy throughout the country?

11   A.  Yes.  As well as other organizations like NABP.

12   Q.  And you -- when you were the head of the Board of Pharmacy,

13   then you would send something out to the licensed pharmacists

14   in the state?

15   A.  If it was a potential problem I'd probably put it in the

16   newsletter.

17   Q.  It goes to the pharmacists?

18   A.  And other people, yes.

19   Q.  Now, you were asked questions about in your experience you

20   have found that when doctors write prescriptions for

21   noncontrolled substances they usually are not related to the

22   needs of the patient?

23           MR. TEHRANI:  Your Honor, that question

24   mischaracterizes the testimony.

25           THE COURT:  Sustained.

1   MR. SCHMIDT:  Characterize it correctly, please.  Did
2   you say something like that?
3           THE COURT:  Ask him a question.
4           MR. SCHMIDT:  Excuse me?
5           THE COURT:  Counsel, ask him a question.  I sustained
6   the objection.
7   Q.  Did you testify about the use -- the writing of
8   noncontrolled substances with the controlled substances by
9   physicians?
10  A.  Yes.  I addressed that issue as it related to -- tied in
11  with abuse.
12  Q.  And you stated, did you not, that usually those
13  noncontrolled substance prescriptions were not related?
14  A.  I said quite often, I believe.
15  Q.  So is constipation one of the frequent side effects of the
16  use of opioids?
17  A.  Yes.
18  Q.  So anything -- any prescription that related to relieving
19  constipation you would consider that a related prescription?
20  A.  It could be, yes.
21  Q.  Ibuprofen.  Now for people who are taking opioids and they
22  have some additional pain and they don't want to take another
23  opioid they would take a large dosage of ibuprofen, couldn't
24  they?
25  A.  Not real large but ibuprofen could be used for minor pain.

FAE9WIS6                    Winsley - cross

1    Q.  So ibuprofen would be related?

2    A.  Could be.

3    Q.  And Docusate and Colace are prescribed and used for the

4    treatment of constipation, aren't they?

5    A.  Docusate?

6    Q.  Excuse me?

7    A.  Docusate?

8    Q.  That the way you pronounce it?

9    A.  That's the way I do.

10   Q.  Then docusate and Colace?

11   A.  Yeah.

12   Q.  Now, you said that back pain is hard to diagnose.  Do you

13   remember saying that?

14   A.  Yes.

15   Q.  And obviously if somebody pulls a muscle that's going to

16   heal in a week or so oxycodone would not be the appropriate

17   medication for such a patient; is that right?

18   A.  Usually, yes.

19   Q.  If somebody has some kind of pain -- spinal pain and has

20   had it for a year or two years, that is a different kind of

21   back pain that may be more likely to be treated or should be

22   treated with oxycodone; isn't that right?

23   A.  Depending upon what's causing the pain that's a

24   possibility, yes.

25   Q.  Now, I guess there are some pharmacists that are nonprofit

1  but generally it's your experience that pharmacies are -- exist

2  as a moneymaking enterprise; is that right?

3  A.  Yes.

4  Q.  And there's nothing wrong with a pharmacist -- nothing

5  illegal with a pharmacist trying to make as much money as

6  possible as long as they do it legally; is that right?

7  A.  Yes.

8  Q.  Now, you have heard of a company that has bought some

9  limited type of medication and increased the cost of that

10  medication by five hundred times.  Have you read that recently?

11  A.  Yes.

12  Q.  That's not illegal, is it?

13  A.  No.

14  Q.  That's pretty nasty and perhaps unethical but it's not

15  illegal; is that right?

16  A.  That's correct.

17  Q.  Now, medical insurance companies, health insurance

18  companies, when they pay for prescriptions, do they pay for the

19  full retail cost of prescriptions or do they pay less than the

20  full retail cost of prescriptions?

21  A.  It depends on the contract between the pharmacy and the

22  insurance company.

23  Q.  Well if the pharmacy doesn't have a contract with the

24  insurance company, right, would that pharmacy accept the

25  insurance?

FAE9WIS6                    Winsley - cross

1    Don't answer that question.

2    Is there any law that prevents the pharmacy from

3    charging -- overcharging for -- withdrawn.

4    Is there any law in Ohio that prevents a pharmacy from

5    doubling or tripling its price for medication because there's a

6    shortage of medication and they're able to get that price?

7    A.  Not in the drug laws.  I'm not familiar with the financial

8    price gouging type laws.  Those are not in my area.

9    Q.  And is there anything that you know is illegal for a

10   physician to -- is there any -- withdrawn.

11   Is there anything illegal for a pharmacist or someone

12   who manages a pharmacy to inform a doctor that they're having

13   difficulty in obtaining a certain type of medication and will

14   only be able to do it if they get noncontrolled substance

15   prescriptions as well?

16   MR. TEHRANI:  Objection, your Honor.  If we could

17   rephrase the question on that.

18   THE COURT:  Yes.  If you'll rephrase the question.

19   Q.  Is there any -- is there any law that prevents anyone from

20   a pharmacy in suggesting to a doctor's office to prescribe

21   noncontrolled substances to help them obtain the necessary,

22   medically necessary controlled substances?

23   A.  I can't imagine --

24   Q.  That's a yes-or-no question, sir.

25   A.  No.  It's not a yes-or-no question.  I can't answer that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS6                    Winsley - cross

1    yes or no.

2    Q.  Answer this question.  Is it illegal for a doctor to

3    prescribe a non-medically necessary noncontrolled substance?

4    A.  In many states, yes, it is.

5    Q.  Is it illegal in Ohio?

6    A.  Yes.

7    Q.  What is the crime in Ohio?

8    A.  Corresponding responsibility rule again.  Legitimate

9    medical purpose.  In Ohio that applies to all prescriptions not

10   just controlleds.  So if it's not for a legitimate medical

11   purpose it's a false prescription which in Ohio happens to be a

12   felony.

13   Q.  Thank you.

14          Now is there any -- is that statute in the federal

15   law?

16   A.  Well DEA only deals with controlled substances, so.

17   Q.  So it may be a violation in Ohio but it's not a violation

18   under the Controlled Substance Act; is that correct?

19   A.  Federal, no.

20   Q.  Am I correct?

21   A.  Yes.

22   Q.  And do you know if it's illegal in Florida?

23   A.  No.

24   Q.  Do you know if it's illegal in New Jersey?

25   A.  No.  I do not know.

FAE9WIS6                    Winsley - cross

1     MR. SCHMIDT:  May I have just one moment, your Honor.

2     The Court's indulgence.

3          (Pause)

4     Q.  Now, the only time that you actually practiced as a

5     practicing pharmacist in a nonhospital setting was when you

6     worked at your parents' pharmacy; is that correct?

7     A.  Yes.

8          MR. SCHMIDT:  I have no further questions.

9          THE COURT:  Cross-examination on behalf of Mr. Kalaba.

10         MR. FISHER:  Thank you very much, your Honor.

11    CROSS-EXAMINATION

12    BY MR. FISHER:

13    Q.  Good afternoon, sir.

14    A.  Good afternoon.

15    Q.  How are you?

16    A.  I'm still here.

17    Q.  That you are.  I will try to make it not too much longer.

18         You talked a lot on direct examination about how

19    oxycodone can be abused and other substances like that can be

20    abused.  Do you remember that testimony?

21    A.  Yes.

22    Q.  Can you tell us in which ways -- what is oxycodone used

23    for?  What are its medical purposes?  Why do people need

24    oxycodone?

25    A.  For the treatment of pain.

FAE9WIS6                      Winsley - cross

1   Q.  What kinds of pain?

2   A.  As was previously covered, moderate to severe but in my

3   opinion more towards the severe end for straight Oxycontin --

4   oxycodone, excuse me.

5   Q.  I'm talking about what kinds of things cause patients to

6   need oxycodone?  I know pain.  But how do patients get the pain

7   that causes them --

8   A.  Cancer is the main one that causes very severe pain.

9   Q.  What else?

10  A.  Some types of prolonged injuries requiring frequent

11  surgeries or something else.

12          Severe pain is not a real common occurrence.

13  Q.  Didn't we just say earlier that it was actually moderate to

14  severe pain?

15  A.  That's what I said, that the package insert says moderate

16  to severe.

17  Q.  But you disagree with that?

18  A.  Pure oxycodone I do not think is as indicated now.  If

19  we're talking about the combination of oxycodone with

20  acetaminophen or Tylenol that's been widely used for moderate

21  pain and fairly effectively.  So it depends on the product

22  we're talking about.

23  Q.  Just to be clear about your answer.  Are you saying one

24  pill that contains both oxycodone and some other substances or

25  are you talking about several prescriptions?

FAE9WIS6                    Winsley - cross

1    A.  No.  I'm talking about the drug that -- I was asked about

2    on direct called Percocet which is a combination of the two

3    with lower doses of oxycodone in them.

4    Q.  Okay.  So let's get back to some of the things that can

5    cause a patient to need oxycodone.  If somebody had a surgery,

6    oxycodone might be helpful after the surgery, correct?

7    A.  It might.  I have not seen it widely used that way.  But it

8    could be post-op short term.

9    Q.  If somebody has severe pain in their neck, oxycodone could

10   be helpful, right?

11   A.  Depending upon what the cause was.  Short term, perhaps.

12   Q.  You mean you don't believe that oxycodone could be used at

13   all for long-term pain?

14   A.  I'm suggesting that the examples you've given me are also

15   amenable to other treatments as well.  So if we're talking

16   about a combination of all sorts of therapies, that's a

17   possibility.

18   Q.  But you don't believe oxycodone can be helpful for use for

19   long-term pain?

20   A.  Not by itself for certain kinds of long-term pain.

21        I think that we've already talked about tolerance,

22   dependence, addiction.  I know that the practice among pain

23   specialists is to alternate when tolerance develops.  On direct

24   I was asked about if the drugs were interchangeable.  I'm being

25   asked a question that really doesn't relate to what happens.

1160

FAE9WIS6                    Winsley - cross

1  And so, yeah, Oxycontin is useful for the treatment of pain.

2  That's what came --

3  Q.  I'm trying to get at -- and you gave me a really long

4  answer to a pretty short question -- I'm trying to get at if

5  somebody has long-term severe pain you don't think oxycodone

6  could be helpful to treat that?  It's a pretty yes-or-no

7  question.

8  A.  Okay.  It can.  Depends on the cause of the pain is what

9  I'm trying to get across.

10  Q.  If somebody has lumbar disk displacement, oxycodone could

11  be helpful to treat that kind of pain, correct?

12  A.  Short term, yes.

13  Q.  If somebody has neuralgia, oxycodone could be helpful to

14  treat that kind of pain, right?

15  A.  It could.

16  Q.  If somebody has neuritis, oxycodone could be helpful to

17  treat that kind of pain, correct?

18  A.  Yes.

19  Q.  If somebody has radic-- I'm going to spell it because I

20  can't pronounce it.  R-A-D-I-C-U-L-I-T-I-S.  Do you know how to

21  pronounce that?

22  A.  Radiculitis.

23  Q.  Radiculitis.  Is that something oxycodone can help with, if

24  somebody has pain from that?

25  A.  I hate to admit it but I can't remember what radiculitis

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAE9WIS6                         Winsley - cross

1    is.  So the answer is maybe.

2    Q.  That makes two of us on that one.  Neither of us are

3    doctors, right?

4    A.  That is correct.

5    Q.  Cervical disk displacement.  Is that something that

6    oxycodone can help with if somebody has a lot of pain from

7    cervical disk displacement?

8    A.  It can help.

9    Q.  Thoracic or lumbar neuritis?  Is that something oxycodone

10   can be helpful in the treatment of?

11   A.  It could.

12   Q.  Thank you.

13           You talked about on direct examination and also on

14   cross-examination about how pharmacists have certain

15   corresponding liability, correct?

16   A.  Yes.

17   Q.  But the pharmacy owner doesn't have that same corresponding

18   liability, correct?

19   A.  Under New Jersey law, yes, they are both equal -- the

20   pharmacist in charge, as I testified previously, the pharmacist

21   in charge and the owner are equally liable for violations of

22   the pharmacy practice.

23   Q.  But all of those things you talked about on direct

24   examination about all the things a pharmacist is trained in and

25   the responsibilities the pharmacist has and the continuing

FAE9WIS6                    Winsley - cross

1   education, those are all things that the pharmacist has to do

2   to stay abreast of the law, look at prescriptions, etc., etc.,

3   right?

4   A.  Yes.

5   Q.  The pharmacy owner doesn't have those same obligations,

6   correct?

7   A.  Not for the continuing education and those kind of things,

8   no.

9   Q.  And a manager of a pharmacy doesn't have the same kind of

10  obligations as a pharmacist in a pharmacy, correct?

11  A.  That is correct.

12  Q.  In fact, it's not illegal or against the law for a pharmacy

13  manager to manage a pharmacy even if he doesn't have prior

14  pharmaceutical experience, correct?

15  A.  Depends on what you mean by manage.

16  Q.  So it would be the day-to-day operational manager of a

17  pharmacy, if somebody is the day-to-day operational manager of

18  pharmacy they are not required to have prior pharmaceutical

19  experience in order to get a -- to run the pharmacy, correct?

20  A.  Not completely.

21  Q.  What do you mean by that, sir?

22  A.  Thank you for asking.

23  Q.  No problem.

24  A.  If we're talking financial aspects, I'll agree with you.

25  If we're talking about drug decision making, professional

FAE9WIS6                    Winsley - cross

1   decision making, no, they can't be involved in that.  And

2   that's all what takes place in managing a pharmacy.  So they

3   can be responsible for some of the areas.

4   Q.  Okay.  I'm saying it doesn't disqualify someone from being

5   a manager if they don't have prior pharmaceutical experience.

6   That's what I'm asking you.

7           MR. TEHRANI:  Your Honor, I believe he answered the

8   question.

9           THE COURT:  Sustained.

10          MR. FISHER:  Maybe I misunderstood.  Let me ask it a

11  different way then.

12  BY MR. FISHER:

13  Q.  So if somebody filled out a pharmacy application and said

14  the manager of the pharmacy has no prior pharmaceutical

15  experience, would that person automatically be barred from

16  managing the pharmacy?

17          THE COURT:  Counsel, I think that what the witness has

18  been saying is that it depends upon how you define manage.

19          MR. FISHER:  Oh, okay.

20  Q.  So, somebody who was -- let me withdraw that question for a

21  second.

22          You were a part of the Ohio Board of Pharmacy for some

23  time, right?

24  A.  Yes.

25          (Continued on next page)

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Faedwis7                    Winsley - cross

1   BY MR. FISHER:

2   Q.  So there would come times in your duties as being part of

3   the Ohio Board of Pharmacy that you would have to go to

4   particular pharmacies to investigate pharmacies, right?

5   A.  Yes.

6   Q.  To see if everything was being run properly, right?

7   A.  Yes.

8   Q.  If there were any problems in the way the pharmacy was

9   running, correct?

10  A.  Correct.

11  Q.  And if you came there and you learned that there were some

12  things that were happening which really weren't, you know, up

13  to standards, you would note that, correct?

14  A.  Yes.

15  Q.  And if you learned that, for instance, a pharmacy manager

16  didn't have a lot of experience running pharmacies, you would

17  note that, correct?

18  A.  There wouldn't -- in Ohio there would not have been one

19  that wasn't a pharmacist.

20  Q.  You mean in Ohio you have to be a pharmacist to be a

21  manager?

22  A.  Most states to be the person who signs that application

23  that you referred to, it has to be a pharmacist who serves as

24  the pharmacist in charge.

25  Q.  I don't mean the pharmacist in charge.

Faedwis7                    Winsley - cross

1    A.  We are back to -- I don't know what you mean by "manager,"

2    then, because the pharmacist in charge I've already testified

3    is responsible to see that the pharmacy is run in a legal,

4    professional manner, that the policies and procedures are in

5    place.  It's the pharmacist in charge that is charged with

6    that.

7    Q.  OK.  Maybe I misunderstood you.

8          So when I say "manager," I'm talking about somebody

9    who is in the pharmacy day to day.  Are you with me so far?

10   A.  Sure.

11   Q.  A layperson, not a pharmacist, not a doctor.  Are you with

12   me?

13   A.  Of course.

14   Q.  This person had some responsibility in the hiring and

15   firing of some of the employees in the pharmacy.

16   A.  OK.

17   Q.  Including cashiers, pharmacy techs.  Are you with me so

18   far?

19   A.  Yes.

20   Q.  Had some input in who was to become the pharmacist in

21   charge, right?

22   A.  OK.

23   Q.  Are you with me so far?

24          And is reporting back to the actual owner of the

25   pharmacy and taking directions from the owner of the pharmacy

Faedwis7                    Winsley - cross

1    but otherwise is managing all of the employees in the pharmacy.

2    Do you understand what I'm saying?

3    A.  Kind of like a human resources place.

4    Q.  I guess so, yes.

5    A.  OK.

6    Q.  OK.  And if you went to one of your inspections to one of

7    those pharmacies in Ohio and you found that that person who was

8    doing that management and that day-to-day activity didn't have

9    much experience in the pharmaceutical industry, would you note

10   that in your investigation?

11              MR. TEHRANI:  Objection.  Relevance.

12              THE COURT:  Overruled.

13              You may answer.

14   A.  That's a situation that is way too theoretical as far as

15   I'm concerned.  We hold the pharmacist in every state I know

16   of, hold the pharmacist accountable for what goes on in that

17   pharmacy department.  There may be a manager in there to do

18   some of the financial tasks, the human resources task, but the

19   ultimate decision on what goes in and comes out of that

20   pharmacy is assigned to the pharmacist in charge.

21              THE COURT:  Perhaps you should describe what are the

22   tasks of a pharmacist.

23              THE WITNESS:  That's basically what we went through on

24   direct.  In other words, being in charge of the prescription

25   process, and then the pharmacist in charge is responsible to

Faedwis7                    Winsley - cross

1   make sure the policies and procedures are in place, to make

2   sure that the pharmacy is operated legally and in the best

3   interest of the patients.  So -- and nobody is permitted to be

4   in the pharmacy unless the pharmacist is present.

5           THE COURT:  So what are key decisions made by a

6   pharmacist?

7           THE WITNESS:  It depends on the situation.  In some,

8   the pharmacist in charge is the one that basically decides what

9   drugs the pharmacy is going to stock, how they're going to --

10  how many they are going to purchase, what drugs, you know, get

11  dispensed.  They have personnel duties so that if their

12  technicians or pharmacists are not acting legally, they have

13  duties to see that that's taken care of.

14          Yeah, there are nonpharmacist managers in a lot of the

15  pharmacies that we are aware of that cover the store, the

16  pharmacy, but the actual decision making about drugs in the

17  pharmacy belongs to the pharmacist in charge.  That's why I'm

18  just getting a little confused on where we're going with

19  manager, nonpharmacist manager versus pharmacist.  That's just

20  not a situation in terms of decision making that I've ever

21  seen.  I've seen lots of situations where the store manager --

22  in fact, most of the time the store manager is not a

23  pharmacist, but the store manager has no ability to access the

24  pharmacy in the absence of a pharmacist.

25  BY MR. FISHER:

Faedwis7                    Winsley - cross

1    Q.  Understood.  Thank you.

2         Have you ever done one of these Board of Pharmacy

3    inspections and found out that some things were not right in

4    the running of the pharmacy, right?  We've already established

5    that, yes, that happened sometimes, right?

6    A.  Yes.

7    Q.  And did you ever find out that there are some things that

8    that pharmacy could be doing a lot better?

9    A.  Yes.

10   Q.  Did you ever educate the pharmacists or the technicians

11   about things that they could be doing to make that pharmacy run

12   smoother?

13   A.  Yes.

14   Q.  And educate them on things that they could be doing to

15   better verify prescriptions?

16   A.  Yes.

17   Q.  And educate them on things that they could be doing to try

18   to avoid diversion of medications?

19   A.  Yes.

20   Q.  I mean, that, in fact, is part of your duties and

21   responsibilities at the Board of Pharmacy, correct?

22   A.  It was for us, yes.

23   Q.  I mean, that's one of the most important goals of the

24   employees of the Board of Pharmacy is to do everything you can

25   to try to avoid diversion of medications, correct?

1169

Faedwis7                    Winsley - cross

1    A.  And to ensure compliance with the law, yes.

2    Q.  And by ensuring compliance, the ultimate goal is to try to

3    avoid diversion, right?

4    A.  Yes.

5    Q.  So if you could go in and do an inspection and try to

6    educate the people who are working there about things that they

7    could be doing better, that's something that you would do,

8    right?

9    A.  That's something we did quite frequently.

10   Q.  You would do it all the time?

11   A.  No.

12   Q.  Oh, I'm sorry.  Quite frequently?

13   A.  Yes.

14   Q.  And the main goal, again, is to stop diversion, right?

15   A.  Yes.

16   Q.  OK.  You testified on direct examination about a pharmacy

17   tech in the absence of a pharmacist is not allowed to dispense

18   medications, right?

19   A.  Yes.

20   Q.  That is against the rules, right?

21   A.  Yes.

22   Q.  It is actually breaking the law, right?

23   A.  It isn't allowed and I'm pretty sure elsewhere.

24   Q.  OK, state law?

25   A.  Yes.

Faedwis7                    Winsley - cross

1    Q.  Not federal law?

2    A.  Well, no, it is a violation of the federal regulations,

3    too.

4    Q.  OK.  So breaking of the rules breaking the law.  But if a

5    pharmacy tech dispenses meds without the pharmacist present,

6    does that automatically mean that that prescription was not

7    medically necessary?

8    A.  No.

9    Q.  No.  In fact, that could be a perfectly good medically

10   necessary prescription written by a perfectly good doctor,

11   correct?

12   A.  It could.

13   Q.  And that prescription if it was filled without the

14   pharmacist present, it doesn't automatically mean it was not

15   for medical necessity, correct?

16   A.  That's correct.

17   Q.  In fact, if you learned that, yes, the pharmacy tech filled

18   it but actually that doctor who wrote the medication was

19   licensed, right, what if you learned that?  That would help you

20   determine whether or not that script was for a medical

21   necessity or not, correct?

22   A.  If that's what I was looking for.

23   Q.  Well, that would be one thing you could look for, right?

24   A.  I could but I wouldn't.

25   Q.  What do you mean?

Faedwis7                    Winsley - cross

1   A.  If the tech dispensed it, the tech violated the law.

2   Q.  Yes.  Oh, so you don't care about medical necessity; is

3   that not important in the determination of what's going on?

4   A.  Not in the determination of whether that tech acted legally

5   or not.

6   Q.  So at the Board of Pharmacy, that's really the only thing

7   you are concerned about is whether the people at the pharmacy

8   are acting legal or not, or is the ultimate goal, again, to

9   prevent diversion?

10           MR. TEHRANI:  Objection, your Honor.

11           THE COURT:  Overruled.

12  A.  The Board of Pharmacy's role is to protect the health and

13  safety of the citizens of that particular state by ensuring

14  that people follow the laws and rules correctly, and if a

15  technician is dispensing drugs, they are violating the law and

16  the action would be taken against the technician.  The validity

17  or not of the prescription does not enter into that particular

18  decision.

19  Q.  I understand.  Did the government ask you as part of --

20  withdrawn.

21           Did you have to review a lot of documents to prepare

22  for this case?

23  A.  No.

24  Q.  None at all?

25  A.  No.

Faedwis7                    Winsley - cross

1   Q.  Did you have to meet with the government at all to prepare

2   for this case?

3   A.  Just last night when I got here.

4   Q.  Did you have to speak with them on the phone at all to

5   prepare?

6   A.  Yes, two phone conversations.

7   Q.  Did the government ask you to review any of the credentials

8   of the pharmacists in charge at Plainfield Pharmacy?

9   A.  No.

10  Q.  So as sit here today, you don't know whether or not, for

11  instance, Dan Podell had a valid license or not?

12  A.  I do not.

13  Q.  Or any of the other pharmacies involved in this case, did

14  you review any of those pharmacists' licenses to see if they

15  were actually a valid license or not?

16  A.  No, I did not.

17  Q.  Did the government ask you to check and see whether any of

18  the doctors who were prescribing prescriptions relating to this

19  case actually had valid medical licenses or not?

20  A.  No.

21  Q.  Did the government ask you, as part of your preparation for

22  this case, to review any of the medical charts of any of the

23  patients who received prescriptions in connection with this

24  case?

25  A.  No.

Faedwis7

1    Q.  Did the government ask you, in your preparation of this

2    case, to review any of the actual prescriptions filled in

3    connection with this case?

4    A.  No.

5    Q.  Just to be clear, I am talking about the paper

6    prescriptions that were used in this case, did the government

7    ask you to review any of those?

8    A.  No.

9    Q.  Did the government ask you to review any of the patients'

10   contracts having to do with this case?

11   A.  No.

12         MR. FISHER:  Judge, I am about to go into another

13   topic that is probably about 20 minutes or 30 minutes, so is it

14   OK if we end now?

15         THE COURT:  All right.  Members of the jury, we will

16   resume with this witness tomorrow at 9 a.m.

17         Remember that you are not allowed to discuss the case

18   amongst yourselves or with anyone else.  Don't permit anyone to

19   discuss the case in your presence.

20         Sir, you may step out.

21         THE WITNESS:  Thank you.

22         (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                        1177
        FAF9WIS1
                              Trial

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
2       -----------------------------x

3       UNITED STATES OF AMERICA,              New York, N.Y.

4                 v.                           13 Cr. 0794(AT)

5       PAUL WISEBERG and ROBERT
        KALABA,
6
                       Defendants.
7       -----------------------------x

8
                                              October 15, 2015
9                                             9:00 a.m.

10      Before:

11                        HON. ANALISA TORRES,

12                                            District Judge

13
                              APPEARANCES
14
        PREET BHARARA
15           United States Attorney for the
             Southern District of New York
16      BY:  DANIEL B. TEHRANI
             EDWARD B. DISKANT
17           SHAWN G. CROWLEY
                  Assistant United States Attorneys
18
        NEIL B. CHECKMAN
19      SAM A. SCHMIDT
        KAREN H. CHARRINGTON
20           Attorneys for Defendant Paul Wiseberg

21      DAVID N. FISHER
        JANE H. FISHER-BYRIALSEN
22           Attorneys for Defendant Robert Kalaba

23              - also present -

24      Elizabeth Joynes, Government Paralegal
        Task Force Officer Brian Hammarstrom
25
```

FAF9WIS1                    Winsley - cross

1    (Jury present)

2    THE COURT:  You may be seated.

3    Good morning, jurors.

4    I apologize for the 18-minute delay in getting

5    started.  There were certain things that I needed to take care

6    of before we started.  It's not the fault of either side.

7    We're going to continue with the cross-examination of

8    Mr. Winsley.

9    Remember that you're under oath.

10    Go ahead.

11    CROSS-EXAMINATION CONTINUED

12    BY MR. FISHER:

13    Q.  Good morning, Mr. Winsley.

14    A.  Good morning.

15    Q.  You spoke yesterday about controlled substances.  You have

16    to answer the question.

17    A.  I didn't know there was a question but yes, I did speak.

18    Q.  And you also spoke about noncontrolled substances?

19    A.  That I did.

20    Q.  There's a difference, obviously between controlled

21    substances and noncontrolled substances, right?

22    A.  Legal and pharmacologically, yes.

23    Q.  And before the controlled and noncontrolled substances make

24    their way to the pharmacy they have to come from the

25    distributor first, correct?

FAF9WIS1                    Winsley - cross

1   A.  Yes.  A distributor.  Either a wholesaler or manufacturer.

2   Q.  Now the distributor -- isn't it true that the distributor

3   also has certain rules and protocols that they follow on how

4   they distribute the drugs and to whom they distribute the

5   drugs?

6   A.  Yes.  They have legal requirements that they have to follow

7   as well.

8   Q.  If you can answer a question with a yes or a no, I would

9   appreciate that.

10          Do you understand?

11  A.  I understand that.

12  Q.  So let me just ask that question again.

13          Distributors have certain rules and protocols that

14  they need to follow and want to follow when they distribute

15  their drugs to the pharmacies, correct?

16  A.  Yes.

17  Q.  And one of those protocols and rules that have recently

18  come about is that there are some distributors who are making

19  actual policies about the percentages of controlled versus

20  noncontrolleds that they will distribute to pharmacies; isn't

21  that right?

22  A.  Partially.

23  Q.  So now you can explain what you mean, please?

24  A.  You said rules and protocols.  There are no rules that

25  mandate that they set percentages.  That is not a legal

FAF9WIS1                      Winsley - cross

1    requirement.  That is something that some of the wholesalers

2    have chosen to do on their own.

3    Q.  So they have initiated protocols but not rules?

4    A.  Well they can't promulgate rules but, yes, they have set up

5    their own policies and procedures to choose how they distribute

6    drugs.  But that's their doing.  It is not any legal

7    requirement.

8    Q.  So --

9                THE COURT:  Is that on an industrywide basis or is

10   that company by company?

11               THE WITNESS:  The legal requirement is that

12   wholesalers have to have a method to determine that a sale to a

13   pharmacy, for example, is legitimate.

14               THE COURT:  So my question is these protocols that

15   you're speaking of, is it an industry group that gets together

16   and they have joint protocols or is it individual companies

17   deciding on their own individual protocols?

18               THE WITNESS:  Can I say almost both.

19               There is an association of wholesalers, and they talk.

20   Each wholesaler has set up its own protocol which to my -- in

21   my experience has varied from pharmacy to pharmacy, from

22   location to location, but they have methods to try to determine

23   suspicious orders, which they are required to do.  It's just

24   that the percentages that he asked about are set by the

25   individual wholesalers on an individual customer basis.  It's

FAF9WIS1                    Winsley - cross

1    not something that is required and, in fact, if I may, it's led

2    to problems that I'm sure we'll address here shortly.

3    BY MR. FISHER:

4    Q.  Tell me what kinds of problems.

5    A.  The percentages have been set arbitrarily.  They are not

6    based upon any reason or basis of fact and they were set as a

7    result of some of the cases where wholesalers obviously failed

8    in their duty to report suspicious orders, and I speak from

9    personal experience in Ohio as well as knowledge of some of the

10   federal cases, having participated in some of those.

11   Q.  So is it fair to say that sometimes pharmacies are at the

12   mercy of these wholesalers who have these arbitrary rules set

13   in place -- in other words, if they want to get controlled

14   drugs from the distributors they're going to have to do it in

15   the arbitrary percentages that the distributors set up and make

16   those rules about?

17   A.  That's -- yes.  That's what has been happening.

18   Q.  So, in other words, they will -- just to be clear.  The

19   wholesalers will actually say to the pharmacies:  We will only

20   sell you X percentage of controlled versus X percentage of

21   noncontrolled?

22   A.  I haven't heard the relationship.

23        I've heard that they've put limits on the amount of

24   controlleds that they will sell.

25   Q.  They don't -- so limits on the amount of controlled being

FAF9WIS1                    Winsley - cross

1    that you can only get so many controlleds, right?  Percentages?

2    A.  You can only buy so many bottles of this drug at one time.

3    Q.  So you mean you've never heard of a situation where the

4    wholesaler is saying to the pharmacy:  You can only have, for

5    example, 20 percent controlled, 80 percent noncontrolled or you

6    could only have two controlled for every one noncontrolled or

7    vice versa?

8    A.  I've never had anybody complain to me about that particular

9    situation anywhere I've been in the country.

10   Q.  So it's the arbitrary limits on the number of pills that

11   pharmacies can get?

12   A.  All that I've ever heard about is, as an example, you can

13   have three bottles of Oxycontin a month and that's it; or you

14   can have five bottles or ten -- you know, whatever the

15   wholesaler has put on it.

16            But all of the complaints I have received all over the

17   country have been based upon buying controlled substances and

18   the number of bottles that the pharmacy can obtain.  And once

19   they reach their limit, the wholesalers have refused to sell

20   more to them.

21   Q.  And you would agree you've already said that those numbers

22   are set arbitrarily sometimes?

23   A.  And I've said that nationally in all my talks because it

24   comes up at every talk that we're at with pharmacists.

25   Q.  So you would agree with me that these kinds of arbitrary

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAF9WIS1                    Winsley - cross

1   limits can lead to patients who really need the medicines not

2   being able to get them?

3   A.  I have heard about that quite frequently, yes.

4   Q.  Filling mail order prescriptions is certainly not against

5   the law, correct?

6   A.  Correct.

7   Q.  It's not against the law in the State of Ohio?

8   A.  No.

9   Q.  It's not against the law in the State of Florida?

10  A.  No.

11  Q.  It's not against the law in the State of New Jersey?

12  A.  No.

13  Q.  You're aware that CVS has their own mail order program?

14  A.  Yes.

15  Q.  Can you tell us how their verification process works at CVS

16  for their mail order program?

17  A.  I've never been in Caremark.

18  Q.  Can you tell us how Walgreens' mail order prescription

19  works?

20  A.  I've been in Walgreens but not their mail order.

21  Q.  So do you know the verification procedures that they use to

22  verify these scrips for CVS or Walgreens?

23  A.  Not those two.

24  Q.  When a pharmacy receives a mail order prescription the

25  pharmacist does not -- I'm sorry.  Withdrawn.

FAF9WIS1                    Winsley - cross

1     When a pharmacy receives a mail order prescription the

2   pharmacist does have certain obligations, correct?

3   A.   Correct.

4   Q.   Specifically, the pharmacist filling the prescription has a

5   corresponding responsibility to insure the prescription he or

6   she is filling was written for a legitimate medical purpose and

7   in the course of the doctor's professional practice, correct?

8   A.   If you would substitute "practitioner" or "prescriber" for

9   "doctor," yes.

10   Q.   I could not hear you.

11   A.   If you would substitute "practitioner" or "prescriber" for

12   "doctor," yes, because it could be a dentist prescription.

13   Q.   There is no per se definition of the term legitimate

14   medical purpose, correct?

15   A.   Like federal rules and so forth?

16   Q.   Correct.

17   A.   No, there is not.

18   Q.   There is no per se definition of the term in the course of

19   the doctor's professional -- I'm sorry, in the course of the

20   practitioner's professional practice, correct?

21   A.   No -- I mean yes.  Correct.  No, there is not.

22   Q.   Although there are no per se definitions of these terms,

23   there are things that a pharmacist can do in order to fulfill

24   their obligations in this regard.  Would you agree with that?

25   A.   Yes.

FAF9WIS1                         Winsley - cross

1   Q.  And there are things that pharmacy staff can also do to

2   fulfill these same obligations, correct?

3   A.  No.

4   Q.  To help the pharmacist fulfill these same obligations?

5   A.  Yes.

6   Q.  In other words, when a pharmacy receives a mail order

7   prescription there are certain steps that can be taken to

8   attempt to insure that that prescription was written for a

9   legitimate medical purpose, correct?

10  A.  Yes, there are.

11  Q.  And in the course -- and also that the prescription was

12  written in the course of the practitioner's medical practice,

13  correct, or professional practice?

14  A.  Yes.

15  Q.  And there are certain protocols that can be used in order

16  to achieve this goal, correct?

17  A.  Yes.

18  Q.  So let's discuss what some of those protocols could be.

19  Are you with me?

20  A.  So far.  I'm still here.

21  Q.  The pharmacist and/or the pharmacy staff can check to see

22  that the doctor whose name appears on the prescription actually

23  has a valid medical license, right?

24  A.  Yes.  As long as that information is made available to the

25  pharmacist.  It's the pharmacist's ultimate decision.  So, yes,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

FAF9WIS1                    Winsley - cross

1   somebody can check.

2   Q.  So one of the things that they can do is to check to see if

3   the name that's written on the prescription, the doctor's name

4   actually has a valid medical license or not, correct?

5   A.  Correct.

6   Q.  And they can also -- the pharmacist and/or the pharmacy

7   staff can inspect the physical prescription itself to see that

8   it's not been tampered with in any way, correct?

9   A.  That's the ultimate responsibility of the pharmacist.

10  Q.  Okay.  But certainly -- when I ask these questions I mean a

11  pharmacy staff person might check it, show the doctor, tell the

12  doctor about any imperfections or problems, right?

13  A.  No.

14  Q.  I'm sorry.  When I said "doctor" I meant pharmacist.

15  A.  Yes, they can.  But the pharmacist needs to the verify

16  that.

17  Q.  It's the pharmacist that has the ultimate -- we get that,

18  sir.  It's the pharmacist that has the ultimate responsibility,

19  right?

20  A.  Absolutely.

21  Q.  And it's the pharmacist who should be trying to insure that

22  the prescription has not been forged, right?

23  A.  Yes.

24  Q.  And the pharmacist to some degree relies on their staff to

25  help them do a lot of these things, right?

FAF9WIS1                    Winsley - cross

1   A.  Yes.

2   Q.  And they -- the pharmacist also bears the responsibility to

3   insure the signature actually comes from that physician,

4   correct?

5   A.  To the best of their ability.

6   Q.  And the pharmacy and through the help of the -- the

7   pharmacist or through the help of the pharmacy staff can check

8   to see that the name on the prescription actually matches the

9   identification card of the patient who sent in the mail order

10  prescription, right?

11  A.  Yes.

12  Q.  That is one way to help determine whether or not this

13  prescription is valid, right?

14  A.  It's one of the steps, yes.

15  Q.  Now, all of these checks and balances I've mentioned to you

16  so far are not musts when it comes to filling mail order

17  prescriptions, correct?

18  A.  No.  That's not correct.

19  Q.  Well we've just established that there are no per se

20  federal rules in regard to what must be done to insure that a

21  prescription was filled for a legitimate medical purpose,

22  correct?

23  A.  They're not itemized.  But the pharmacist is responsible

24  for -- and that's not federal, that's state -- the pharmacist

25  is responsible to interpret the prescription to make sure it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAF9WIS1                    Winsley - cross

1    meets all legal requirements.  And all of those that you

2    mentioned are legal requirements.

3    Q.  Correct me if I'm wrong here.  When I'm asking these

4    questions, I'm going on the premise that we've already

5    established that there are no federal rules or lists of musts

6    or dos and don'ts, right, for how a pharmacist is supposed to

7    achieve these goals, correct?

8    A.  Almost.  There are rules about what a legitimate

9    prescription must contain.

10   Q.  That's correct.  But there are no rules under the federal

11   rules that you know about, right, the federal rules that govern

12   pharmacies, right, the federal rules promulgated by the DEA,

13   there are no federal rules about what must be done to make sure

14   that a prescription is written for a legitimate medical

15   purpose, correct?

16   A.  That itemize step by step?

17   Q.  Yes.

18   A.  No.

19   Q.  So all these things we've been talking about, these

20   protocols, these are not musts under the federal rules,

21   correct?

22   A.  I think we're playing with words there.  We have a rule

23   that specifies --

24        MR. FISHER:  Your Honor, I move to strike the

25   witness's testimony as nonresponsive and ask you to instruct

1200
FAF9WIS1                    Winsley - cross

1    the witness to please answer the questions that I pose to him.

2             THE COURT:  The answer is stricken.  Please just

3    answer the question.

4    Q.  These are not musts, correct?  Under the federal rules

5    these are not musts?

6    A.  These are not itemized in the federal rules.

7    Q.  Thank you.

8             That being said, this is my next question, that being

9    said, all of these things we have just gone through would be

10   helpful or useful for the pharmacist and/or the pharmacy staff

11   to do in order to fulfill their corresponding responsibility

12   under the law, right?

13   A.  Almost.

14   Q.  These are good ideas, correct?

15   A.  I think that you need to insert the word "necessary."If you

16   do, my answer is yes.  "Helpful" doesn't make it.

17   Q.  These are things that are useful or helpful in order for a

18   pharmacist to fulfill his corresponding responsibility under

19   the law, correct?

20            MR. TEHRANI:  Your Honor, he's answered the question.

21            MR. FISHER:  I don't believe that he has.

22            THE COURT:  I agree that he has not answered the

23   question.

24            Mr. Winsley, answer the request.

25            THE WITNESS:  The way you worded the question my

FAF9WIS1                    Winsley - cross

1  answer is no.

2  Q.  So these are not things that would be helpful or useful for

3  that pharmacist to determine whether or not the prescription

4  was written by a -- for a legitimate medical purpose?  Is that

5  what you're saying?

6  A.  I'm saying it depends on who did them.  So my answer is yes

7  or no, depending upon who did them.

8          I'm not sure where we're going here.

9          MR. FISHER:  Move to strike that portion of the

10  witness's testimony that is nonresponsive to my question, your

11  Honor.

12          THE COURT:  I will strike everything from "I'm not

13  sure."

14  Q.  So, again -- let me ask you this.  So you're not sure

15  whether it is useful or helpful for the pharmacist to undergo

16  this checklist of things we just talked about in order to

17  determine whether or not this prescription was filled pursuant

18  to a legitimate medical necessity?

19  A.  Thank you.  I will say that it is.

20  Q.  These things are helpful or useful to do?

21  A.  The way you just expressed that, yes, sir, you are correct.

22  Q.  Let's talk about some additional things a pharmacist can do

23  in order to fulfill their corresponding responsibility under

24  the law.  Are you with me?

25  A.  Yes.

FAF9WIS1                    Winsley - cross

1   Q.  The pharmacist -- if the pharmacist has additional

2   questions about the prescriptions, one thing they can do is to

3   call the doctor's office, correct?

4   A.  Yes.

5   Q.  And when calling the doctor's office they can further

6   verify the legitimacy of the prescription in various ways.

7   Would you agree with me?

8   A.  Yes.

9   Q.  And also the pharmacist can have a pharmacy staff member

10  call these doctors' offices to gain some information, correct?

11  A.  Partially.

12  Q.  And the pharmacist and/or the pharmacy staff can try to

13  verify that the prescription they receive was actually written

14  by the doctor listed on the prescription, correct?

15  A.  Yes.

16  Q.  And they can try to verify with the doctor's office that

17  the patient listed on the prescription was actually seen by

18  that doctor, correct?

19  A.  Yes.

20  Q.  And they can verify that the medicine written on the

21  prescription matches the records at the doctor's office,

22  correct?

23  A.  The pharmacist can do that?

24  Q.  Correct.

25  A.  Yes.

1203

FAF9WIS1                        Winsley - cross

1    Q.  Or the pharmacy tech can call up and find that information

2    out and tell the pharmacist?

3    A.  If there's a question about drugs, no, sir.  The pharmacist

4    can do that.

5    Q.  So would it not be helpful or useful for the pharmacist to

6    learn from the pharmacy tech that I just called the doctor's

7    office and I spoke to so and so at the doctor's office and they

8    told me that, yes, oxycodone 30 milligrams was prescribed,

9    would that be helpful or useful for the pharmacist in making

10   the determination about whether or not these medicines were

11   prescribed for a legitimate medical purpose?

12   A.  No, it would not.

13   Q.  That information would not help the doctor out, is that --

14   or, I'm sorry, the pharmacist out?

15   A.  Not if the tech did it.

16   Q.  The pharmacist and/or the pharmacy tech can find out

17   whether the number of pills matches what's on the doctor's

18   records, correct?

19   A.  Yes.

20   Q.  And the pharmacy tech or the pharmacist can call up and

21   find out whether the strength or the milligrams is also a

22   match?

23   A.  Perhaps with the tech.

24   Q.  And, again, all of these checks and balances I've mentioned

25   so far are not musts or absolute requirements under the federal

FAF9WIS1                    Winsley - cross

1   regulations, they are not promulgated somewhere when filling

2   mail or prescriptions, correct?

3   A.  That's correct.

4   Q.  That being said, all of these steps we've just gone through

5   would be helpful for the pharmacist in order to be able to

6   determine whether or not he is fulfilling his corresponding

7   liability under the law?

8   A.  Given my previous answers of probably and no, yes.

9            MR. FISHER:  Your Honor, I move to strike the

10  witness's testimony, please.

11           THE COURT:  The answer is stricken.

12           MR. FISHER:  Thank you.

13  Q.  Can you try to answer that question again, please.

14  A.  If you'll ask the question better, yes.

15  Q.  That being said, all of these steps we have just gone

16  through would be helpful for the pharmacist and the pharmacy

17  staff to do in order to fulfill the pharmacist's corresponding

18  liability under the law?

19  A.  The way that's worded my answer has to be no.

20  Q.  Why is that?

21  A.  You throw in "pharmacy techs" and I've already said that

22  some of the duties the pharmacist needs to do himself or

23  herself.  I cannot agree to a sentence that has both.

24  Q.  So just to be clear you're saying it wouldn't be helpful or

25  useful for the pharmacy tech to relay some information he's

1   learned to the pharmacist?

2   A.  May I explain?

3   Q.  Can you answer that question with a yes or no?

4   A.  No.

5   Q.  Okay.  Go ahead and explain.

6   A.  Some of the items that you have asked about, the tech has

7   the ability to call and ask.  When it gets down to the drug

8   names, strength, directions for use, if there's a question

9   there, that's the pharmacist's responsibility.

10           If the pharmacist made that call, yes.

11           If the tech says "the doctor's office said this," the

12  pharmacist can't really use that if the pharmacist had a

13  question.  The pharmacist is -- it's necessary to make that

14  call because if there is a correction or a change the

15  pharmacist has to speak with the prescriber in order to do

16  that.

17  Q.  What if the pharmacy tech says there is no correction or

18  change, tells him I called the doctor's office, they tell them

19  this is exactly what they wrote?

20  A.  If the pharmacist had a question, then they'd still have to

21  call.  If there was no questioner anywhere then, sure,

22  that's -- I mean that doesn't -- it's a meaningless

23  conversation at that point.

24  Q.  It's meaningless because -- I don't understand.  Why is it

25  meaningless?

FAF9WIS1                    Winsley - cross

1   A.  If the pharmacist has questions, they have to deal with

2   them.  Just calling the doctor's office to verify that it was

3   written, we already discussed during my direct, is not useful

4   in any way.

5   Q.  So calling the doctor's office to verify this doctor

6   actually wrote that prescription is not useful information for

7   the pharmacist?

8   A.  No.  Because the doctor's office will verify if they wrote

9   it.

10  Q.  Why do pharmacists ever call doctors' offices to verify

11  these things?

12  A.  If they have questions.

13  Q.  Should the pharmacist actually go down to the doctor's

14  office and inspect the doctor's office himself?

15  A.  No.

16  Q.  Should they be -- should they request to be there during

17  the medical examination?

18  A.  No.

19  Q.  Right.  They call doctors' offices all the time to try to

20  verify prescriptions, right?

21  A.  No.  They call to get information to clarify prescriptions.

22  Q.  So when pharmacists in the normal course of their duties

23  call to doctors' offices they are not asking the doctor's

24  office:  Does this scrip in my hand comport with what your file

25  said?

FAF9WIS1                      Winsley - cross

1    A.  Not unless they have a concern or a question, there is no

2    need for them to do that.

3    Q.  Right.  They don't even call up at all if they have no

4    concern or question, correct?

5    A.  That's correct.

6    Q.  But one of the things that can be useful is to make sure

7    when they call up this scrip is actually the same as what the

8    doctor wrote, right?  It wasn't altered or changed?

9    A.  (No response).

10   Q.  Right?

11   A.  If they thought it was altered or changed they'd call and

12   that would be the pharmacist's responsibility.

13   Q.  Right.

14   A.  Okay.

15   Q.  Try to call or verify that it wasn't altered or changed,

16   right?

17   A.  If he had a suspicion that it was.

18   Q.  If he didn't have a suspicion he wouldn't call at all,

19   correct?

20   A.  Correct.

21   Q.  Let's talk about some additional checks and balances a

22   pharmacist and/or pharmacy staff can do to comply with the

23   pharmacist's corresponding responsibility under the law.  Okay.

24       The pharmacy can require that the doctor's office

25   forward a letter of medical necessity for the patient who is

FAF9WIS1                    Winsley - cross

1    attempting to fill the prescription, correct?

2    A.  No.  I don't know that that's a requirement.

3    Q.  I'm not saying it's a requirement.  I'm saying this is

4    another additional step a pharmacy can do to try to meet its

5    corresponding liability under the law?

6    A.  They can try that.

7    Q.  This is another step they can undergo, right?

8    A.  Yes.

9    Q.  And the pharmacy can require that the doctor's office

10   provide the pharmacy with a signed patient agreement form,

11   correct?

12   A.  Yes, they can.

13   Q.  And/or a patient contract signed by the patient, right?

14   A.  They can.

15   Q.  The pharmacy staff can also keep an incident log at their

16   pharmacy, correct?

17   A.  Would you explain.

18   Q.  Sure.  A record they -- they can keep a record at the

19   pharmacy noting doctors or patients or prescriptions or

20   doctors' offices that they have found to have red flags in the

21   past, they can keep that incident log on file so as to look out

22   for those kinds of things in the future?

23   A.  Yes.

24   Q.  That is a check and balance that a pharmacy can do in order

25   to try to fulfill its corresponding liability under the law,

FAF9WIS1                    Winsley - cross

1    correct?

2    A.  Corresponding responsibility, yes.

3    Q.  Thank you.

4           Now, all of these things we have talked about are

5    steps that a pharmacy can take to try to meet their

6    professional obligations, correct?

7    A.  Yes.

8    Q.  Now, again, none of these things we have gone through are

9    absolute requirements for filling mail order prescriptions

10   under the federal law, correct?

11   A.  Yes.

12   Q.  Nor have we gone through an exhaustive and a comprehensive

13   list of all of the steps a pharmacy and/or a pharmacy staff can

14   take to verify the legitimacy of a mail order prescription,

15   correct?

16   A.  Yes.

17   Q.  Because, of course, a pharmacist and/or a pharmacy staff

18   could always do more to verify prescriptions, right?

19   A.  Yes.

20   Q.  But the law does not require a pharmacy or a pharmacist --

21   I'm sorry.  Let me withdraw that.

22           The law does not require a pharmacist or a pharmacy

23   staff to do everything possible to insure the legitimacy of

24   prescriptions received at their pharmacy, correct?

25   A.  Correct.

FAF9WIS1                      Winsley - redirect

1    Q.  And the law does not require a pharmacist or pharmacy staff

2    to take every conceivable measure to insure the legitimacy of

3    the prescription that they fill, correct?

4    A.  Correct.

5            MR. FISHER:  Thank you.  No further questions.

6            THE COURT:  Will there be redirect?

7            MR. TEHRANI:  Briefly, your Honor.

8    REDIRECT EXAMINATION

9    BY MR. TEHRANI:

10   Q.  Good morning, Mr. Winsley.

11   A.  Good morning.

12   Q.  Does federal law impose requirements on pharmacists?

13   A.  Yes.

14   Q.  Were those the requirements that you testified extensively

15   about on direct?

16   A.  Yes.

17            (Continued on next page)

18

19

20

21

22

23

24

25

Fafdwis2                    Winsley - redirect

1   Q.  And must the pharmacist comply with those obligations?

2   A.  Yes.

3   Q.  You were asked questions just now about verification of

4   prescriptions.  What do you understand "verification" to mean?

5   A.  Verification is a lot more than we just covered.

6   Verification means that the pharmacist needs to assure himself

7   or herself that it is for a legitimate medical purpose and

8   then, the rest of it, written by a practitioner in the usual

9   course of professional practice.  But verification is much more

10  than the nuts and bolts that we just went through about do

11  you -- did you write this prescription and so forth.  I mean,

12  in my personal experience, if a physician is writing --

13          MR. SCHMIDT:  Objection, your Honor.  He is testifying

14  as an expert.

15          MR. TEHRANI:  I believe he is, your Honor.

16          THE COURT:  Overruled.

17          You may answer.

18          THE WITNESS:  I'm sorry?

19          THE COURT:  You may continue.

20  A.  In my experience, every bad pharmacy that we took out, one

21  of the things -- I take that back, I'm sorry, not every.  The

22  majority of the bad pharmacies that we investigated, one of

23  their defenses was we always called the doctor.  Well, of

24  course if the doctor is writing bad prescriptions, they're

25  going to say I wrote it.  They're not going to say it's a bad

Fafdwis2                    Winsley - redirect

1    prescription.  So calling and verifying is not adequate.  The

2    pharmacist has to go further.

3    Q.  You were asked some questions yesterday, I believe by

4    Mr. Schmidt, about whether a pharmacy would be able to look at

5    patient prescribing records for a new patient.  Do you remember

6    those questions?

7    A.  Yes.

8    Q.  And I believe your testimony was that from the pharmacy's

9    own records, they of course would not be able to see anything

10   about that particular patient because, by definition, the

11   patient is new?

12   A.  That is correct.

13   Q.  Are there other ways for a pharmacy to review the

14   prescribing history for a new patient?

15   A.  Yes, there are.

16   Q.  Could you please explain what those are?

17   A.  Most states have a prescription monitoring program in place

18   that collects prescriptions filled for citizens of that state

19   for controlled substances.  It does not collect information on

20   noncontrolleds -- blood pressure, antibiotics, and so forth,

21   but it does collect information on controlled substances.  So a

22   pharmacist has -- pharmacists and physicians have access to

23   that database where they can verify if the patient has been

24   going elsewhere within that state.

25            Now there is, through the National Association of

Fafdwis2                    Winsley - redirect

1   Boards of Pharmacy, there is a prescription monitoring program,

2   Interconnect Program, in place where not only can a pharmacist

3   get information from their own state but in 30 states, so far,

4   they can get information from other states as well.  So the

5   example I'm most familiar with is an Ohio pharmacist can now

6   check to see if a patient has also got controlled substances in

7   West Virginia, Kentucky, Indiana or Michigan so they can get a

8   wider appreciation of that patient's activities.  New Jersey is

9   included in that Interconnect Program.

10  Q.  You were also asked some questions about the argument that

11  there is an undertreatment of pain in the United States.  Do

12  you remember those questions?

13  A.  Yes, I do.

14  Q.  Where does the United States rank in the dispensing of

15  hydrocodone with respect to the rest of the world?

16  A.  Hydrocodone -- I'm sorry, the United States uses 99 percent

17  of the world's supply of hydrocodone.

18  Q.  And you were also asked some questions about pharmacists

19  being unwilling to dispense controlled substances.  Do you

20  remember those questions?

21  A.  Yes, I do.

22  Q.  Is that a prevalent problem?

23  A.  It is not prevalent.  It does exist in with individual

24  pharmacists.

25  Q.  Is the abuse of pain medication a prevalent problem in the

Fafdwis2                    Winsley - redirect

1    United States?

2    A.  It is a huge problem.  In 2013 we had 16,000 people die of

3    accidental overdose due to opiates alone.

4    Q.  Is the abuse of oxycodone specifically a prevalent problem

5    in the United States?

6    A.  It's -- oxycodone is one of the major drugs involved in

7    that problem.  Florida particularly had major problem with

8    this.  They had well over a thousand deaths from accidental

9    oxycodone over the last -- each year for several years in a

10   row.

11   Q.  What is your basis of knowledge of that problem?

12   A.  Well, the death reports in Florida come from the Florida

13   medical examiners who do -- who gather statistics.  The 16,000

14   deaths has actually been reported by Centers for Disease

15   Control and several other organizations that collect data.  The

16   90 percent comes from the international organization

17   responsible for monitoring the flow of opiates throughout the

18   world, and all major countries report their purchases and sales

19   through that International Narcotics Control Board.  I'm sorry.

20   I meant to include that.

21   Q.  What about in your personal experience as the Executive

22   Director of the Ohio Board of Pharmacy?

23          MR. FISHER:  Judge, I object to this continued line of

24   questioning under 403 grounds.

25          THE COURT:  Will you step up, please.

Fafdwis2                    Winsley - redirect

1          (At the sidebar)

2          THE COURT:  Don't explain your objections.

3          MR. FISHER:  I'm just saying this talk about all the

4    people that are dying from oxycodone use, to go into detail has

5    some slight probative value in this case about whether our

6    clients were actually filling medically necessary

7    prescriptions, but the prejudice is huge and it really does not

8    have much probative value to the contested issues of facts in

9    this case.  So to keep going on and on about that I think is

10   enough.

11         MR. TEHRANI:  Your Honor, the defense has presented

12   this case as their clients being the white knights --

13         MR. FISHER:  No, we haven't.

14         MR. TEHRANI:  -- who stepped in to address a

15   significant overreaction by the DEA which has resulted in

16   pharmacists being unwilling to dispense medication, wholesalers

17   being unable to supply medication, and people with intractable

18   chronic pain being unable to address that pain.

19         This expert witness is qualified and entitled to

20   testify about what the real issues related to abuse because of

21   pain medication in the United States are.

22         THE COURT:  Do you have much more on this?

23         MR. TEHRANI:  No.

24         THE COURT:  Overruled.

25         (Continued on next page)

Fafdwis2                    Winsley - redirect

1       (In open court)

2           THE COURT:  Continue.

3   BY MR. TEHRANI:

4   Q.  Mr. Winsley, I had asked you about whether there was

5   anything in your personal experience as the Executive Director

6   of the Ohio Board of Pharmacy that informed your knowledge of

7   the problem of pain killer abuse in the United States.

8   A.  Absolutely we had a major problem, still do, in Ohio.  The

9   Ohio River corridor of West Virginia, Kentucky and Ohio several

10  years ago was known as the OxyContin capital of the world.  We

11  have whole communities in northern Kentucky and southern Ohio

12  where everybody abuses hydrocodone or oxycodone.  We had

13  multiple cases of our own dealing with doctors who set up

14  operations.  One in particular, a doctor in northeast Ohio --

15          MR. CHECKMAN:  Your Honor, I am going to object to

16  this as improper redirect examination.

17          THE COURT:  Overruled.

18          You may continue.

19          THE WITNESS:  Thank you.

20  A.  A doctor who set up operations in northeast Ohio.  We

21  monitored the parking lot initially.  80 percent of the

22  patients were from Kentucky.  They drove 250 miles one way to

23  get there.  The doctor wrote prescriptions for hydrocodone.

24  They wrote in such quantities that they were so busy they would

25  call the prescriptions to the pharmacy.  The pharmacy had

Fafdwis2                    Winsley - redirect

1    blanks preprinted as either green hydrocodone or blue

2    hydrocodone, the preference choice, and the doctor was

3    convicted of drug trafficking.  The pharmacists were subjected

4    to --

5              MR. FISHER:  Your Honor, I object to the specific

6    incident that is not what we are here for.

7              THE COURT:  So the witness is explaining the basis of

8    his knowledge.  Of course, what he is describing has no direct

9    bearing on this particular case.  He is not discussing the

10   individuals in this case.  It is a wholly unrelated case, but

11   he is just giving background so that you may understand his

12   conclusions.

13   A.  I'll just talk about a couple of other things, then.  We

14   also had nine pill mills located in a small town in Portsmouth,

15   Ohio, called Portsmouth Ohio.  Several of the doctors that we

16   investigated had started in Florida and moved to Ohio, and one

17   of them moved out of Portsmouth up to another city in Ohio.

18   The end result of that was that we in Ohio, our legislature

19   passed a pain management bill, and the result of that was the

20   nine pill mills disappeared.  Two of them had -- were

21   convicted, the others moved out.

22             But we've had a major problem with opiates in Ohio.

23   Huge quantities of hydrocodone and oxycodone coming through our

24   prescription monitoring program, so we know how many doses are

25   being prescribed to patients in Ohio.  Just as an example, for

Fafdwis2                    Winsley - redirect

1    hydrocodone, for several years there has been over 250 million

2    doses prescribed of hydrocodone for our 11 million population

3    and that's everybody in the state.  There were several counties

4    down along that Ohio River corridor where the consumption on

5    average by county was huge.

6            So, yes, I have a great amount of personal experience

7    with the opiate epidemic that's going on.

8    Q.  Mr. Winsley, in your expert opinion, is that epidemic of

9    drug abuse more or less of a problem than pharmacists being

10   unwilling to dispense oxycodone?

11           MR. FISHER:  Objection.

12           THE COURT:  Overruled.

13           You may answer.

14   A.  It is way more of a problem.  As I mentioned, the 16,000

15   deaths in the country from accidental overdose, the fact that

16   opiate abuse is an epidemic.  I do know that we have some

17   pharmacists who, I am ashamed to say, don't think about their

18   patients first and refuse to fill, but I also know that there

19   are an overwhelming number of pharmacists who put their

20   patients first and fill the prescriptions that their patients

21   need.

22           THE COURT:  So, again, members of the jury, the

23   witness is not discussing the facts in this case.  He is

24   talking about his knowledge and giving examples.  But there are

25   no allegations in this case involving the death of a patient.

Fafdwis2                    Winsley - recross

1   And so when listening to his testimony, understand that he is

2   speaking about other matters that are not related specifically

3   to this case.

4           MR. TEHRANI:  No further questions, your Honor.

5           THE COURT:  Recross.

6   RECROSS-EXAMINATION

7   BY MR. SCHMIDT:

8   Q.  Mr. Winsley, isn't it a fact that there are approximately

9   25 million Americans who suffer from chronic pain on a daily

10  basis?

11  A.  I can't verify that.

12  Q.  Oh, OK.  You cited statistics that apparently you read from

13  other places.  So I'm not asking you to verify that.  I'm

14  asking you, have you read that anywhere during the course of

15  your preparation for testifying in cases or as a director of

16  the Ohio Board of Pharmacy?

17  A.  No.

18  Q.  Have you read anywhere about how many people in our country

19  suffer from chronic pain on a daily basis?

20  A.  I have not read numbers.

21  Q.  Are you saying that numbers don't exist out there or that

22  you haven't made an effort to read numbers?

23  A.  Neither.  I mean, I have not read any specific numbers.

24          MR. SCHMIDT:  May I have a moment, your Honor?

25          (Pause)

Fafdwis2                    Winsley - recross

1   Q.  Have you ever heard of an organization called Public Health

2   Watch?

3   A.  Yes.

4   Q.  Could you tell us what that organization is?

5   A.  I've heard of them.  I don't know what their background is.

6   Q.  Have you read anything that they have published?

7   A.  Not that I recall.

8   Q.  You've testified in criminal cases for the prosecution,

9   haven't you?

10  A.  Yes.

11  Q.  And you have been -- and you provided us with details of

12  the terrible problem with drug abuse in our country, haven't

13  you?

14  A.  Yes.

15  Q.  Have you made any effort to examine the information of the

16  other side, the people who are suffering?

17  A.  I have read articles.

18  Q.  And it is your testimony you have read not a single article

19  that put a general number on the people in this country who

20  have suffered from chronic pain on a daily basis?

21  A.  Not that I recall.

22  Q.  And besides chronic pain, right, have you read about the

23  number of people who have severe pain but they suffer it less

24  likely, being approximately 40 million people?

25         MR. TEHRANI:  Objection, your Honor.  Can we have that

Fafdwis2                    Winsley - recross

1    reasked?

2              THE COURT:  Can you rephrase that, please?

3    BY MR. SCHMIDT:

4    Q.  Have you seen any data that indicates that approximately 40

5    million Americans suffer from severe pain but not on a daily

6    basis?

7    A.  No.

8    Q.  Wouldn't it be Ohio Board -- withdrawn.

9              Have you gone to any of the Florida Board of Pharmacy

10   meetings in the last ten years?

11   A.  No.

12   Q.  Have you gone to any county Board of Pharmacy in Florida in

13   the last ten years?

14   A.  There is no such thing that I know of.

15   Q.  You have never heard of Broward County Board of Pharmacy?

16   A.  No.

17   Q.  Have you talked to -- withdrawn.

18             Now, there are some very specific requirements that an

19   actual prescription must have on it, is that correct?

20   A.  Yes.

21   Q.  When we were talking -- when you were being questioned and

22   answering questions on cross-examination of Mr. Fisher, what

23   you tried to make clear was that there are certain things that

24   are necessary and certain things that are a good idea, right?

25             (Pause)

1222
Fafdwis2                        Winsley - recross

1         Do you want me to rephrase the question?

2   A.  Yes.  I think you had better, please.

3   Q.  Making sure that certain information on a prescription is

4   necessary and required, is that right?

5   A.  Yes.

6   Q.  And those things are actually listed?

7   A.  Yes.

8   Q.  They are listed in the DEA, right?

9   A.  The Code of Federal Regulations, yes.

10  Q.  But how to determine whether the prescription is written

11  for a legitimate medical purpose in the usual course of

12  professional practice is not written in that Code, right?

13  A.  How to determine?

14  Q.  Yes.

15  A.  No, it is not.

16  Q.  Now, it's your testimony that it really is a waste of time

17  to call a doctor -- a doctor's office, or even the doctor, to

18  verify the prescription because every doctor is going to say,

19  yes, its a valid prescription?

20        MR. TEHRANI:  Objection.  Mischaracterizes his

21  testimony.

22        THE COURT:  Overruled.

23        You may answer.

24  A.  Actually, no.  That's not my testimony in complete.  That's

25  not what I testified to.

Fafdwis2                    Winsley - recross

1   Q.  Well, you testified that if a pharmacist takes a look at a
2   prescription, the prescription looks valid on its face, that
3   there's really -- and he has no questions as to the
4   prescription itself, that calling the doctor's office is not
5   useful; is that what you said?
6   A.  That's closer.
7   Q.  Let me make it precise.  What did you say?
8   A.  If the pharmacist asks the question, one of the things they
9   need to do is call and verify that the script was written, but
10  that in itself does not verify that the prescription is
11  legitimate.  So if all they do is call every time on a
12  controlled substance prescription, that is meaningless because
13  we know that the doctors who write prescriptions not for a
14  legitimate medical purpose are going to verify that they did
15  write the prescription.
16  Q.  So a person walks into a Walgreens pharmacy and has never
17  been there before and gives a prescription for a controlled
18  substance, a pain medication, a Schedule II, right, if the
19  prescription is valid, his identification is valid, and the
20  pharmacy checks the PMP that he has either a history of that
21  medication or there is no history there yet, there is really
22  nothing that that pharmacist can do to satisfy what you
23  consider what's necessary before filling that prescription; is
24  that right?
25  A.  No.

1224
Fafdwis2                    Winsley - recross

1   Q.  What could that pharmacist do at that time?

2   A.  It depends upon whether or not the pharmacist knows the

3   doctor, do they have other prescriptions from the doctor, do

4   they recognize the signature.  If so, then they don't need to

5   call and say did you write it.  Pharmacists are pretty good at

6   that.

7          You said either they do or they don't have a history

8   in the PMP in your question.  Well, if they do, then maybe they

9   need to call the doctor if that history is extensive.  If they

10  have no history in the PMP, if they recognize the doctor's

11  signature, if the prescription seems to be legitimate, if they

12  have done all their other duties in terms of checking the

13  profile, there is no need for them to call.

14  Q.  So you start with what if he doesn't know the doctor, he

15  should check to see the doctor is legitimate?

16  A.  Yes.

17  Q.  Say if the person on the PMP 30 to 60 days earlier had a

18  similar script that was filled in a nearby Walgreens, is there

19  something else that that doctor should do -- that pharmacist

20  should do?

21  A.  If it's the same doctor?

22  Q.  The same doctor.

23  A.  Probably not.

24  Q.  And so what else would need to be done?

25  A.  I think I've covered it --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Fafdwis2                    Winsley - recross

1    Q.  So basically we just went through would satisfy the

2    doctor -- would satisfy the pharmacist he should fill it?

3    A.  If all of those factors were positive, yes.

4    Q.  What if he doesn't recognize the doctor or the doctor is

5    50 miles -- the address is like 50 miles south of the pharmacy,

6    what should he do?

7    A.  If he doesn't recognize --

8    Q.  Other than what we've already said.

9    A.  Well, that's pretty much it.  If he has any questions, he

10   should call the doctor, but he could do most of those other

11   steps that we talked about.

12   Q.  Now, if a prescription for diabetic medication is written

13   by a doctor who has a specialty in treating diabetes, would it

14   be fair to say that a pharmacist would have less reason to make

15   great efforts to verify everything other than to make sure it

16   is valid, the script?

17            MR. TEHRANI:  Objection, your Honor.  This is well

18   beyond the scope of redirect.  We are redoing cross-examination

19   now.

20            THE COURT:  Sustained.

21            MR. SCHMIDT:  Excuse me?

22            THE COURT:  Sustained.

23            MR. SCHMIDT:  Your Honor, Mr. Fisher went into this on

24   his cross-examination, right, and I am going further, asking

25   questions relating to the things that he asked on

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1226

Fafdwis2                    Winsley - recross

1    cross-examination.

2             THE COURT:  Step up, please.

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fafdwis2                    Winsley - recross

1          (At the sidebar)

2          THE COURT:  So what was it that Mr. Fisher went into

3     concerning noncontrolled substances?

4          MR. SCHMIDT:  No.  On what needs to get done to

5     satisfy the pharmacist under certain reasons before he fills

6     the prescription.  He went through the whole thing about

7     verifying stuff and went through some things and, no disrespect

8     to Mr. Fisher, I think that there are things that needed to be

9     followed up based on the questions and answers that I did not

10    raise, that he raised.  So I should have the ability to

11    complete what I think would be necessary based on some of the

12    points that he raised.

13         THE COURT:  So my recollection is that he covered

14    controlled substances and you were just talking about diabetes.

15         MR. SCHMIDT:  I just used that as an example.  I will

16    do another example.  I will do another controlled substance.

17         MR. TEHRANI:  Your Honor, that is not the way this

18    works.  If the government had not redirected, Mr. Schmidt would

19    not have an opportunity to stand up and redo his entire

20    cross-examination.  I don't think Mr. Schmidt can realistically

21    come before this Court and say that he has been unfairly

22    limited in the length and scope of his cross-examinations.  We

23    have been through this for hours.

24         THE COURT:  What exactly do you plan to cover?

25         MR. SCHMIDT:  I plan to cover what is necessary to

Fafdwis2                    Winsley - recross

1    verify under the certain circumstances that is relevant to this

2    case, right, that Mr. Fisher began going into and I don't think

3    he completed it.  It is not a lot.  I apologize for using a

4    noncontrolled substance as an example but I will go into it

5    with a controlled substance.

6              THE COURT:  All right.  I think you have covered the

7    area.  I am going to allow you to ask some questions.  I hope

8    that they will be pointed and that there won't be long pauses

9    in between the questions.

10             MR. SCHMIDT:  I will try my best not to have long

11   pauses, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Fafdwis2                        Winsley - recross

1              (In open court)
2    BY MR. SCHMIDT:
3    Q.  Would a pharmacist expect to receive prescriptions that was
4    written by a physician in a pain clinic that would include
5    opioids?
6    A.  Yes.
7    Q.  Would they expect prescriptions that included ibuprofen?
8    A.  Possibly.
9    Q.  Would they expect prescriptions written for constipation?
10   A.  Yes.
11   Q.  Now, of those three that I mentioned, only one is a
12   controlled substance, right?
13   A.  That is correct.
14   Q.  And it is the controlled substance that requires the little
15   bit more -- the additional effort on the part of the pharmacist
16   to verify, is that right?
17   A.  Yes.
18   Q.  Now, if it is written by a physician that the pharmacist
19   has previously filled for another patient and knows that that
20   physician is licensed and working at a pain clinic and receives
21   a prescription for pain medication from an individual, what
22   else should that pharmacist do before filling that prescription
23   other than the things that we've just discussed?
24   A.  Still has to look at the dose, the directions for use, the
25   history of the physicians prescribing that they have available

Fafdwis2                    Winsley - recross

1    to them, the patient's history, all of those things that I

2    discussed previously.

3    Q.  And for a patient that has one previous prescription filled

4    that they could find on the PMP for opioids either the month

5    before or two months before for the same amount, would that

6    require additional verification?

7    A.  For the part of the patient, probably not.  The physician

8    prescribing practices still are something that's of concern.

9    Q.  And you, your opinion, is that a pain clinic that

10   provides -- predominantly treats a patient with opioids is

11   automatically in your mind suspicious and requires a lot more

12   verification for a pharmacist; is that your -- would that be an

13   accurate statement?

14   A.  Not completely, no.

15   Q.  What is the "not completely" part?

16   A.  That treats patients only with drugs, including opioids,

17   but the keyword being "only."

18   Q.  Now, how would a pharmacist know that --

19   A.  Talk to the patient -- oh, I'm sorry.

20   Q.  -- where he only gets prescriptions to fill and he doesn't

21   know what other things that that doctor may do?

22   A.  Talk to the patient.  One of the things he is required to

23   do is to talk to the patient to obtain a profile, including

24   disease states and other treatments.  And so if the pharmacist

25   has a concern, that's one of the things they would want to ask

Fafdwis2                    Winsley - recross

1    the patient.

2    Q.  And if the patient says that I don't know what else the

3    doctor does, I went in there, I was examined, and he gave me a

4    prescription for this; would that satisfy the pharmacist?

5    A.  No.

6    Q.  How is he going to find out what else the doctor does?

7    A.  He is going to ask the patient and he will ask two or three

8    patients, and if none of them have a clue what physical therapy

9    is or what massage therapy or relaxation techniques or

10   electrical stimulation, if the clinic is not doing anything but

11   writing drugs, I've already testified that makes it

12   questionable in my mind.

13   Q.  A long-term chronic, severe pain patient, wouldn't that --

14   withdrawn.

15           Do long-term chronic, severe pain patients --

16   withdrawn.

17           Is it appropriate or inappropriate in your mind that a

18   long-term chronic, severe pain patient would be receiving

19   opioids for an extended period of time?

20   A.  It could be appropriate.

21   Q.  Now, you did talk about the PMPs and the nationwide -- I

22   forgot what word you used -- the nationwide program now for

23   what these PMPs are?

24   A.  Yes, Interconnect.

25   Q.  When did that start?

1232
Fafdwis2                     Winsley - recross

1    A.  It started shortly before I retired in 2011, and it's been

2    expanding since then.

3    Q.  When you say "expanding," because many states did not join

4    that right away, did they?

5    A.  They were not able to, right.

6    Q.  And, in fact, there was a whole big discussion in the State

7    of Florida where the Governor of the State of Florida did not

8    want to have a PMP for many, many years, is that right?

9    A.  That is absolutely correct.

10   Q.  In fact, the first time that Florida started developing a

11   PMP was in 2013, wasn't it?

12   A.  I don't remember the date but it was just recent.

13   Q.  So when you told us now, on redirect examination, you

14   explained what a pharmacist should do in examining a PMP to

15   find out the history of that patient, it had no meaning for the

16   State -- for the patients in the State of Florida in 2011, 2012

17   and until it got started in 2013, isn't that right?

18   A.  Oh, yes.

19   Q.  So someone treating -- so a pharmacist had no -- wherever

20   they are located, in the State of Florida or the State of New

21   Jersey, had no way to check on a PMP for a patient who saw a

22   doctor in the State of Florida, is that right?

23   A.  If the patient lived in Florida, that is correct.

24   Q.  The patient filled the prescription in Florida.

25   A.  I'm sorry.

Fafdwis2                    Winsley - recross

1   Q.  No matter where the patient lived, right?

2   A.  Yes.  I believe that's correct.

3   Q.  It is the pharmacist who is supposed to put the information

4   in the PMP, is that right?

5   A.  Well, the pharmacy system.

6            MR. SCHMIDT:  I have no further questions.

7            MR. FISHER:  Just very briefly.

8            THE COURT:  OK.

9   RECROSS-EXAMINATION

10  BY MR. FISHER:

11  Q.  When Mr. Tehrani got up and asked you some questions, we

12  heard a lot about some of your life experience, right?

13  A.  Yes.

14  Q.  Things that you know, right?

15  A.  Yes.

16  Q.  Things that have obviously shaped your view on this

17  subject, correct?

18  A.  Yes.

19  Q.  Have you ever worked in Florida in the last five years?

20  A.  We had one of those DEA talks in Florida to over 1200

21  pharmacists.

22  Q.  How long were you there on that occasion?

23  A.  Two days.

24  Q.  Besides those two days, have you ever worked in Florida

25  over the last five years?

1234

Fafdwis2                     Winsley - recross

1    A.  I have not.

2    Q.  Have you ever reviewed the patient charts in this case?

3    A.  No.  I already said that.

4    Q.  Have you ever reviewed the prescriptions that were filled

5    by Plainfield Pharmacy in this case?

6                MR. TEHRANI:  Objection.  We have been over this.

7                MR. FISHER:  I have three more questions.

8                THE COURT:  Overruled.

9                You may answer.

10   A.  No.

11   Q.  Have you ever inspected the doctors' offices or the pain

12   clinics that were involved in this case?

13   A.  No.

14   Q.  Have you ever been to Medical Specialists, that pain

15   clinic, that particular one in south Florida?

16   A.  No.

17   Q.  Have you ever gone down to south Florida in the last five

18   years and actually talked to the patients, the people that were

19   suffering from chronic, severe pain?

20   A.  No.

21                MR. FISHER:  Thank you.

22                THE COURT:  All right.  Thank you, sir.  You may step

23   out.

24                THE WITNESS:  Thank you.

25                (Witness excused)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300