UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                             :

UNITED STATES OF AMERICA,               :

                                             :

              – v –                   :  Case No. 14 Cr. 810 (CM)

                                             :

MOSHE MIRILISHVILI, *et al.*,         :

                                           :

                       Defendants.        :

                                           :
------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## MOSHE MIRILASHVILI'S MOTIONS *IN LIMINE*

Henry E. Mazurek
Wayne E. Gosnell, Jr.
CLAYMAN & ROSENBERG LLP
305 Madison Avenue
New York, New York 10165
T. 212-922-1080
F. 212-949-8255

*Counsel for Defendant*
    *Moshe Mirilashvili*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT ............................................................................................................. 1

I.     THE COURT SHOULD PRECLUDE THE GOVERNMENT'S EXPERT WITNESSES
BECAUSE ITS RULE 16(a)(1)(G) NOTICE IS INSUFFICIENT ................................... 1

     A.    Rule 16 Notices Provided by the Government ...................................... 1

     B.    Rule 16's Expert Notice Requirement ................................................. 5

II.    THE COURT SHOULD PRECLUDE OR LIMIT DR. GHARIBO'S EXPECTED
OPINION TESTIMONY IN THOSE INSTANCES WHERE SUCH OPINIONS ARE
NOT BASED ON OBJECTIVE RELIABILITY OR ARE NOT RELEVANT TO THE
CONTESTED ISSUE OF WHETHER DR. MIRILASHVILI ACTED AS A MEDICAL
PROFESSIONAL OR COMMON DRUG DEALER.  ALTERNATIVELY, THE
COURT SHOULD GRANT A *DAUBERT* HEARING. .................................................. 7

     A.    The Admissibility Standard for Expert Testimony Requires Both a Reliability and
Heightened Relevance Review ............................................................. 7

     B.    Dr. Gharibo's Opinions About Dr. Mirilashvili's General Practices for Prescribing
Controlled Substances are Unreliable and Should be Excluded ........................... 11

     C.    Dr. Gharibo's Opinions Related to Medical Best Practices or Adequate Standards
of Care Should be Excluded Because They Are Not Relevant to Whether Dr.
Mirilashvili Was Acting As a Drug Dealer ............................................................ 17

     D.    The Government Apparently Will Ask Dr. Gharibo to Extrapolate A General
Opinion About Dr. Mirilashvili's Practice Based on a Selected Sample of Specific
Patient Files; Such Testimony is Inherently Unreliable and Should be
Excluded .............................................................................................. 23

III.   THIS COURT SHOULD PRECLUDE LAW ENFORCEMENT WITNESSES FROM
OFFERING "OPINIONS" ABOUT CASE RELATED MATTERS, INCLUDING
MEDICAL FINDINGS OR PAIN TREATMENT ........................................................ 28

IV.   THIS COURT SHOULD EXCLUDE EVIDENCE OBTAINED FROM A LAW
ENFORCEMENT DATABASE MAINTAINED BY THE NEW YORK STATE
BUREAU OF NARCOTICS ENFORCEMENT ........................................................... 29

     A.    Evidence From the BNE Database is Inadmissible Hearsay ............................ 30

     B.    In the Alternative, if the Government Seeks to Admit Data from the BNE
Database as a Summary Chart of Voluminous Records, the Government Must

Produce the Underlying Documents Pursuant to Rule 1006 of the Federal Rules of Evidence ............................................................................................................................. 33

V.      THIS COURT SHOULD EXCLUDE EVIDENCE OF THE AMOUNT OF CONTROLLED SUBSTANCES PRESCRIBED BY DR. MIRILASHVILI COMPARED TO OTHER PHYSICIANS ...................................................................... 34

VI.     THIS COURT SHOULD ORDER THE GOVERNMENT TO MAKE ADDITIONAL BRADY DISCLOSURES ................................................................................................. 37

VII.    THIS COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING EVIDENCE RELATING TO DR. MIRILASHVILI'S INCOME OR THE AMOUNT OF CASH SEIZED AT HIS HOME ........................................................................................ 39

VIII.   THIS COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING EVIDENCE ABOUT DR. MIRILASHVILI OR HIS CLINIC'S REPUTATION .......... 43

        A.    Testimony About Dr. Mirilashvili or His Clinic's Alleged Reputation Constitutes Improper Character Evidence Under Rule 404 .................................................... 43

        B.    Testimony About Dr. Mirilashvili or His Clinic's Alleged Reputation is Unfairly Prejudicial Under Rule 403 .................................................................................... 44

IX.     THE COURT SHOULD EXERCISE ITS DISCRETION AND ORDER THE GOVERNMENT TO PRODUCE A PROFFER OF CO-CONSPIRATOR STATEMENTS THAT IT WILL SEEK TO INTRODUCE UNDER THE NON-HEARSAY RULE .............................................................................................................. 44

X.      THIS COURT SHOULD PRECLUDE THE USE OF ALIASES ........................................ 47

CONCLUSION ................................................................................................................................ 49

**TABLE OF AUTHORITIES**

Pages

Cases

Algarin v. N.Y. City Dep't of Corr., 460 F. Supp. 2d 469 (S.D.N.Y. 2006) ........................ 14, 17

Allgood v. GMC, No. 1:02-cv-1077-DFH-TAB, 2006 U.S. Dist. LEXIS 70764 (S.D. Ill. Sept. 18, 2006) ........................................................................................................................ 26

Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334 (S.D.N.Y. 2005) ................ 15, 17

Bourjaily v. United States, 483 U.S. 171 (1987) .......................................................... 9

Brady v. Maryland, 373 U.S. 83 (1963) ...................................................................... 38

Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303 (D. Me. 2005) ........................................ 10

Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993) ................... 7, 8, 9, 10, 11, 13, 18, 23, 24

Daubert v. Merrell Dow Pharms., 43 F.3d 1311 (9th Cir. 1995) .......................................... 8

El Vocero de P.R. v. Puerto Rico, 508 U.S. 147 (1993) ............................................... 38

GE v. Joiner, 522 U.S. 136 (1997) ...................................................................... 15, 17

Giglio v. United States, 508 U.S. 150 (1972) ........................................................... 38

Gonzales v. Oregon, 546 U.S. 243 (2006) ................................................................ 18, 19, 39

In re Diet Drugs Prods. Liab. Litig., No. MDL DOCKET NO. 1203, 2000 U.S. Dist. LEXIS 9037 (E.D. Pa. June 20, 2000) ............................................................................ 14

In re Neurontin Mktg., 612 F. Supp. 2d 116 (D. Mass. 2009) ............................................ 10, 11

In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................... 9, 12

Kipperman v. Onex Corp., 411 B.R. 805 (N.D. Ga. 2009) .................................................. 10, 11

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) ..................................................... 8, 11

Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) .......................................................... 38

Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794 (N.D. Ill. 2005) .............. 24

McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418 (D. Mass. 2008) ..................................................................................................... 13, 17

Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661 (7th Cir. 2004) ....................... 24

Menasha Corp. v. News Am. Mktg. In-Store, Inc., 238 F. Supp. 2d 1024 (N.D. Ill. 2003) ........ 24

Moore v. Ashland Chem.,Inc., 151 F.3d 269 (5th Cir. 1998) ............................................. 9

R&R Int'l v. Manzen, L.L.C., No. 09-60545-CIV-ZLOCH/ROSENBAUM, 2010 U.S. Dist. LEXIS 94550 (S.D. Fla. Sept. 10, 2010) .................................................................... 26

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77 (1st Cir. 1998) ......................... 10

Shepard v. United States, 290 U.S. 96 (1933) ........................................................... 42

Sommerfield v. City of Chi., 254 F.R.D. 317 (N.D. Ill. 2008) .......................................... 27

Strickler v. Greene, 527 U.S. 263 (1999) ............................................................... 38

United States v. Ahmed, No. 12-CR-661 (SLT) (S-2), 2015 U.S. Dist. LEXIS 46895 (E.D.N.Y. Apr. 9, 2015) ............................................................................................................. 5

United States v. Bagley, 473 U.S. 667 (1985) ..................................................................... 38

United States v. Bartee, 479 F.2d 484 (10th Cir. 1973) ....................................................... 21

United States v. Carnagie, 533 F.3d 1231 (10th Cir. 2008) ................................................. 46

United States v. Chandler, 326 F.3d 210 (3d Cir. 2003) ...................................................... 41

United States v. Cilia, No. 05 Cr. 231 (RCC), 2005 U.S. Dist. LEXIS 9804 (S.D.N.Y. May 20, 2005) ................................................................................................................................. 40

United States v. Daugerdas, 09 Cr. 581 (WHP), 2011 U.S. Dist. LEXIS (S.D.N.Y. Feb. 16, 2011) ................................................................................................................................. 46

United States v. Day, 524 F.3d 1361 (D.C. Cir. 2008) .......................................................... 6

United States v. Deutsch, 987 F.2d 878 (2d Cir. 1993) ........................................................ 40

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2002) ....................................................... 28

United States v. Elder, 682 F.3d 1065 (8th Cir. 2012) ......................................................... 20

United States v. Feingold, 454 F.3d 1001 (9th Cir. 2006) ........................................ 18, 19, 20

United States v. Frazier, 387 F.3d 1244 (11th Cir. 2004) .......................................... 8, 9, 15

United States v. Grayson, 166 F.2d 863 (2d Cir. 1948) ....................................................... 47

United States v. Hawkins, 360 F. Supp. 2d 689 (E.D. Pa. 2005) .................................... 40, 42

United States v. Hebshie, 754 F. Supp. 2d 89 (D. Mass. 2010) ............................ 9, 11, 12, 15

United States v. Hooker, 541 F.2d 300 (1st Cir. 1976) ........................................................ 20

United States v. Jackson-Randolph, 282 F.3d 369 (6th Cir. 2002) ...................................... 40

United States v. Jones, 570 F.2d 765 (8th Cir. 1978) .......................................................... 35

United States v. Kaplan, 895 F.2d 618 (9th Cir. 1990) ....................................................... 20

United States v. Lawson, No. 09-CR-203S(Sr), 2010 U.S. Dist. LEXIS 65315 (W.D.N.Y. July 1, 2010) ............................................................................................................................... 46

United States v. Lopez, 09 Cr. 525 (JFK), 2010 U.S. Dist. LEXIS (S.D.N.Y. Sept. 1, 2010) .... 46

United States v. Mahaffy, No. 05-CR-613 (S-3) (ILG), 2007 U.S. Dist. LEXIS 30077 (E.D.N.Y. Apr. 24, 2007) ....................................................................................................................... 5

United States v. Mejia, 545 F.3d 179 (2d Cir. 2008) ........................................................... 29

United States v. Mikos, No. 02 cr 137, 2003 U.S. Dist. LEXIS 22069 (N.D. Ill. Dec. 5, 2003) ........................................................................................................ 25

United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004) ....................................................... 10

United States v. Moore, 423 U.S. 122 (1975) ...............................................................18, 19

United States v. Nunez, No. 00 CR 121 (RCC), 2001 U.S. Dist. LEXIS 883 (S.D.N.Y. Jan. 31, 2001) ................................................................................................................................. 46

United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007) ..................................................... 38

iv

United States v. Rosen, 582 F.2d 1032 (5th Cir. 1978) ................................................... 21

United States v. Singh, 390 F.3d 168 (2d Cir. 2004) ..................................................... 20

United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940) ................................. 40

United States v. Stahl, 616 F.2d 30 (2d Cir. 1980) ................................................. 40, 42

United States v. Tin Yat Chin, 476 F.3d 144 (2d Cir. 2007) ........................................ 6

United States v. Valle, 807 F.3d 508 (2d Cir. 2015) .................................................... 5

United States v. Valle, No. 12 Cr. 847 (PGG), 2013 U.S. Dist. LEXIS 14864 (S.D.N.Y. Feb. 2, 2013) ........................................................................................................... 5, 23

United States v. Velez, 10 Cr. 147 (JBA), 2010 U.S. Dist. LEXIS . (D. Conn. Nov. 30, 2010) ........................................................................................ 47

United States v. Volkman, 736 F.3d 1013 (6th Cir. 2013) ........................................ 34

United States v. Wexler, 522 F.3d 194 (2d Cir. 2008) ........................................ 18, 34

United States v. Young, 745 F.2d 733 (2d Cir. 1984) ............................................... 41

Yapp v. Union Pac. R.R., 301 F. Supp. 2d 1030 (E.D. Mo. 2004) ............................ 24

## Statutes

21 U.S.C. § 841 (2012) ................................................................................................ 2

21 U.S.C. § 841(a)(1) (2012) ........................................................................... 2, 18, 19

21 U.S.C. § 841(b)(1)(C) (2012) .................................................................................. 2

## Rules

Fed. R. Crim. P. 16 ...................................................................................................... 6

Fed. R. Crim. P. 16(a)(1)(G) ............................................................................. 5, 7, 29

Fed. R. Evid. 401 ........................................................................................................ 39

Fed. R. Evid. 403 ................................................................................... 34, 36, 40, 44

Fed. R. Evid. 404 ........................................................................................................ 43

Fed. R. Evid. 404(a)(1) .............................................................................................. 43

Fed. R. Evid. 702 ...................................................................................................... 7, 8

Fed. R. Evid. 801(a)(2) .............................................................................................. 30

Fed. R. Evid. 802 ........................................................................................................ 31

Fed. R. Evid. 803(6) ................................................................................................... 32

Fed. R. Evid. 803(6)(E) .............................................................................................. 33

Fed. R. Evid. 1006 ..................................................................................................... 33

## Other Authorities

71 F.R. 52716 (September 6, 2006). ...........................................................................19

Fed. R. Evid. 701, Advisory Committee's Notes (2000)...................................6, 8, 52

Pain clinicians' ranking of aberrant drug taking behavior, 17 J. Pain & Palliative Care
  Pharmacotherapy, S.D. Passik et al. (2002)...................................................................16

The Investigation and Prosecution of Professional Practice Cases Under the Controlled
  Substances Act:  Introduction to Professional Practice Case Law and Investigations,
  Stephen E. Stone (Drug Enforcement Agency, Spring 1983) ...........................................19

Urine Toxicology Screening Among Chronic Pain Patients on Opioid Therapy:  Frequency and
  Predictability of Abnormal Findings, Edward Michna, et al., 23 Cin. J. Pain
  (Feb. 2007)....................................................................................................................16

## Motions *in limine*

Defendant Moshe Mirilashvili, by his undersigned counsel, respectfully submits this memorandum of law in support of his pre-trial motions *in limine* seeking (1) preclusion Of the government's proposed expert witnesses; (2) preclusion of certain opinions of the government's proposed expert witness or a *Daubert* hearing; (3) preclusion of improper opinions from law enforcement witnesses; (4) preclusion of evidence from a law enforcement database; (5) preclusion of evidence regarding the amount of controlled substances prescribed by Dr. Mirilashvili compared to other physicians; (6) additional *Brady* disclosures; (7) preclusion of evidence of Dr. Mirilashvili's income or the amount of money seized; (8) preclusion of reputation evidence; (9) production of any co-conspirator statements and a summary description of the basis of admissibility for each such statement; (10) preclusion of evidence of aliases; and (11) leave to file additional motions *in limine* upon the government's production of supplemental expert notice, marked exhibits, and Rule 3500 material.

## ARGUMENT

### I.   THE COURT SHOULD PRECLUDE THE GOVERNMENT'S EXPERT WITNESSES BECAUSE ITS RULE 16(a)(1)(G) NOTICE IS INSUFFICIENT

Dr. Mirilashvili respectfully moves *in limine* to preclude the testimony of government expert witnesses Dr. Christopher Gharibo and William T. Winsley, M.S. because the government has not provided sufficient notice as required under Rule 16 of the Federal Rules of Criminal Procedure.

#### A.   Rule 16 Notices Provided by the Government

The Indictment charges Dr. Mirilashvili with conspiring with members of various "drug crews" to distribute oxycodone by writing "more than 13,000 medically unnecessary

1

prescriptions" in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C), the Controlled

Substances Act (the "CSA").  (The government has informed us that it still intends to supersede

the current Indictment prior to trial and will add a substantive count of distribution of oxycodone

in violation of 21 U.S.C. § 841.)  Dr. Mirilashvili vehemently denies these claims and asserts that

he always acted within his license of being a medical professional.  To the extent that "drug

crew" members infiltrated his office either by bribing office staff, submitting false

documentation, or presenting patients who lied to Dr. Mirilashvili during patient examinations,

he did not knowingly conspire with these efforts.  In fact, he was another victim of the efforts of

these sophisticated actors.

       1.     *The Government's Notice as to Dr. Christopher Gharibo*

On January 16, 2016, the government filed a letter with Dr. Mirilashvili,

purporting to provide notice, pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal

Procedure, of its intent to call Dr. Christopher Gharibo to offer testimony on four "general

topics" including:

> (1) the legitimate practice of pain management medicine, including the use of physical therapy, surgery, non-surgical alternatives, and medications, including controlled substances;

> (2) Medically appropriate uses of oxycodone and other controlled substances in the treatment of pain;

> (3) Red flags of drug abuse and diversion, and a medical doctor's obligations with respect to detecting and avoiding drug abuse and diversion; [and]

> (4) Typical steps taken by medical doctors and providers to avoid drug abuse and diversion.

(Ex. A:  Govt's Expert Notice, dated Jan. 15, 2016 at 1.)

The government further noticed that Dr. Gharibo would opine about "certain aspects of [Dr. Mirilashvili's] practice and prescribing habits, including the practice of accepting cash payments for medical visits; the duration of appointments with the defendant; the defendant's notes and medical records; as well as the number and commonality of the oxycodone prescriptions written by the defendant."  (Ex. A at 2.)  Finally, the government equivocated that Dr. Gharibo "may testify about the medical legitimacy of certain specific prescriptions written by the defendant, based on, among other things, a review of patient records, to the extent those were recovered during searches of the defendant's medical clinic and residence in December 2014 and are thus available for review."  (Ex. A at 2.)

Just yesterday, the government supplemented its notice of "non-defendant specific subjects" that Dr. Gharibo *may* testify to by referring us to his prior testimony in a different criminal case involving allegations of another doctor's unlawful prescriptions of oxycodone. (Ex. B:  Govt's Supp. Expert Notice, dated Jan. 24, 2016; Ex. C: Testimony of Dr. Christopher Gharibo in *United States v. Kevin Lowe*, 14 Cr. 55 (LGS) (SDNY).)  The government, however, still has not identified the specific subjects that it will seek to elicit from Dr. Gharibo in *this case.*

2.    *The Government's Notice as to William T. Winsley, M.S.*

In its same January 16, 2016 expert disclosure letter, the government also gave notice of its intent to call William T. Winsley, M.S., a proposed expert in the field of pharmacology.  Again, rather than identify the specific opinions about which the government will seek to elicit from Mr. Winsley, it simply identified the "general topics" he may testify to:

> (1) A pharmacist's "corresponding responsibility" with respect to controlled substances, including a responsibility to ensure that any prescription for a controlled substance is written for a legitimate purpose and medically appropriate for the patient's condition;

3

(2) Red flags of drug abuse or diversion from the perspective of a pharmacy, including indications that a prescription written [may] not be medically appropriate or that a patient may be involved in drug diversion; [and]

(3) Steps legitimate pharmacies take to avoid filling medically unnecessary or otherwise illegitimate prescriptions.

(Ex. A at 2.)

The government further noticed that Mr. Winsley "may be asked to share his opinion on certain aspects of [Dr. Mirilashvili's] medical practice and prescribing habits, including the number and commonality of the oxycodone prescriptions written by the defendant, and the supposed practice of referring patients to particular pharmacies to fill prescriptions. (Ex. A at 2.) Of course, Mr. Winsley is not a medical doctor and it is unclear how his opinion is relevant to evaluate Dr. Mirilashvili's conduct and why it otherwise would not be redundant and cumulative to Dr. Gharibo's proffered testimony.

At the same time the government produced Dr. Gharibo's prior testimony, it also produced prior testimony by Mr. Winsley in another criminal case. (Ex. D: Testimony of William Winsely in *United States v. Wiseberg, et al*, 13 Cr. 794 (AT) (SDNY).) Similarly to Dr. Gharibo, however, the government still has not identified the specific opinions it will seek to elicit from Mr. Winsley in *this case.*

Unlike Dr. Gharibo, however, it is unclear what relevance Mr. Winsley's testimony will have at all here. In the prior case testimony produced by the government yesterday, Mr. Winsley offered testimony against pharmacist-defendants. In that case, he offered his specialized knowledge on such pharmacy-related subjects as mail-in and Internet prescriptions. Those issues are not relevant here. Unless the government can produce sufficient

4

notice under Fed. R. Crim. P. 16(a)(1)(G), and proffer the specific relevance of this testimony,

the Court should preclude admission of his testimony.

      B.      <u>Rule 16's Expert Notice Requirement</u>

      The government's discovery obligation as to any expert witness it intends to call

is governed by Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702 , 704, or 705 of the Federal Rules of Evidence [i.e., the rules governing admissibility of expert witness testimony] during its case-in-chief at trial. . . . The summary provided . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).

      Rule 16(a)(1)(G) requires that the government do more than merely identify "the

general topics about which the expert will testify"; it requires the government to "reveal the

expert's actual opinions." *United States v. Valle*, No. 12-Cr-847 (PGG), 2013 U.S. Dist. LEXIS

14864, at * 5 (S.D.N.Y. Feb. 2, 2013) (affirmed in part and reversed on other grounds by *United

States v. Valle*, 807 F.3d 508 (2d Cir. 2015)); *see also United States v. Mahaffy*, No. 05-CR-613

(ILG), 2007 U.S. Dist. LEXIS 30077, at *10 (E.D.N.Y. Apr. 24, 2007) (excluding testimony

"because the disclosure statement only proffered general topics and did not describe any

opinions that would be offered by the witness on these topics").  Likewise, the government fails

to meet its disclosure obligations when it only provides a defendant "with a list of sources from

which the experts drew their opinions" but does "not specify which sources the expert used to

reach the different opinions identified."  *United States v. Ahmed*, No. 12-CR-661 (SLT), 2015

U.S. Dist. LEXIS 46895, at *4 (E.D.N.Y. Apr. 9, 2015) (citation omitted).

Rule 16's expert disclosure provision exists in part to permit opposing counsel the opportunity to adequately prepare for cross-examination and to select appropriate rebuttal witnesses.  *See United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) ("purpose of Rule 16(b)(1)(C) [the analogous rule for a defendant's expert witnesses] is to 'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'") (quoting Fed. R. Crim. P. 16 Advisory Committee's Note); *Cf. United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007) (indicating that no attorney "no matter how experienced, can fairly be asked to cross-examine on a moment's notice a witness who comes clothed with all the impressive credentials and specialized training of an expert and whose opinions and methods with respect to the case at hand have been subject to no prior scrutiny").

In *Day*, the D.C. Circuit affirmed the district court's exclusion of expert testimony under analogous disclosures.  There, the government moved to strike a defendant's expert disclosure because "the two-page report was so vague that it did not meet the standards set forth in Rule 16."  *Day*, 524 F.3d at 1370-72.  The D.C. Circuit observed that "[a]lthough [the expert's] report provided a page-long list of tests he had performed on Day, interviews he had conducted, and other expert reports he had read, the report failed to state what [the expert] had concluded from any individual test result, interview, or expert report."  *Day*, 524 F.3d at 1371-72.  Given the failure to provide adequate disclosure close to the trial date, the court concluded that "it was not an abuse of discretion for the district court to conclude that the appropriate sanction for the Rule 16 violation was the exclusion of [the expert's] testimony.  *Day*, 524 F.3d at 1372.

6

The government's notice here as to the case-specific opinions about which its experts will testify is precisely the kind Rule 16 prohibits. It is devoid of the type of specific information that would be expected and necessary to render the summary useful. That is because it does not set forth a *single* case-specific opinion held by either expert—much less the basis for that opinion.

The government's feeble attempt to cure its deficient notice, at least on "non-defendant specific subjects" (whatever scant utility that might have), by producing prior testimony in other cases by the proffered experts, falls far short of satisfying its obligations under Rule 16 (although it begins to satisfy its obligations for witness statements under the Jencks Act). The government still has not provided "a written summary" of the experts' proposed testimony *in this case* and has not "describe[d] the witness's opinions, [and] the bases and reasons for those opinions." Fed. R. Crim. P. 16(a)(1)(G).

Accordingly, this Court should preclude the government's expert witnesses or alternatively, require sufficient notice to be produced immediately.

**II.   THE COURT SHOULD PRECLUDE OR LIMIT DR. GHARIBO'S EXPECTED OPINION TESTIMONY IN THOSE INSTANCES WHERE SUCH OPINIONS ARE NOT BASED ON OBJECTIVE RELIABILITY OR ARE NOT RELEVANT TO THE CONTESTED ISSUE OF WHETHER DR. MIRILASHVILI ACTED AS A MEDICAL PROFESSIONAL OR COMMON DRUG DEALER. ALTERNATIVELY, THE COURT SHOULD GRANT A *DAUBERT* HEARING.**

    A.   <u>The Admissibility Standard for Expert Testimony Requires Both a Reliability and Heightened Relevance Review</u>

Federal Rule of Evidence 702, as interpreted and applied in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), sets the bounds of admissible expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of *reliable* principles and methods; and

(d) the expert has *reliably applied the principles and methods to the facts of the case*.

Fed. R. Evid. 702 (emphasis supplied).

Thus, under *Daubert* courts do not admit expert testimony unless it meets three requirements. An expert's testimony: (1) must be reliable, including that it "rests on a reliable foundation;" (2) must be "relevant to the task at hand;" and (3) "the expert [must be] qualified" to provide the opinion. *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert's* application to testimony of non-scientific experts so long as their knowledge is based on "technical" or "other specialized knowledge").

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it' [and] . . . 'the expert's bald assurance of validity is not enough.'" *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (affirming exclusion of expert) (quoting Fed. R. Evid. 702, Advisory Committee's Note (2000 amends.) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995)).

The burden to demonstrate that an expert's proffered opinion meets the three *Daubert* requirements is on the proponent of that testimony. In response to a motion to exclude expert testimony, the proponent of that testimony must establish that it can surmount those hurdles by a preponderance of the evidence. Fed. R. Evid. 702 Advisory Committee's Note

8

(citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.,*151 F.3d 269, 276 (5th Cir. 1998).

> 1.    *Demonstrating Reliability Under Daubert*

To assess the requirement of reliability, *Daubert* and its progeny have set forth flexible, non-exclusive factors, among them:

- Testability, i.e. is the opinion subject to verification;
- Peer review or publication of the theory or technique;
- The known or potential rate of error; and
- Degree of acceptance within the relevant scientific community.

*In re Rezulin Prod. Liab. Litig.* 309 F. Supp. 2d 531, 539-40 (S.D.N.Y. 2004) (Kaplan, J.) (citing *Daubert*, 509 U.S. at 593-94) (noting that a district court must focus on the "principles and methodology" employed by the expert, not on the conclusions reached). *See also Frazier*, 387 F.3d at 1262 ("Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial.") (emphasis in original) (citation omitted); *United States v. Hebshie*, 754 F. Supp. 2d 89, 126-27 (D. Mass. 2010) (Gertner, J.) (vacating conviction because of ineffective assistance of counsel where counsel failed to request a *Daubert* hearing to exclude unreliable laboratory evidence that the Court subsequently found had a "reasonable probability" of being excluded).

As the Court in *Daubert* pointed out, whether an opinion can be tested is a key question when determining the admissibility of an expert opinion. *Daubert*, 509 U.S. at 593. "'Testability' has also been described as 'falsifiability.' A proposition is 'falsifiable' if it is

'capable of being proved false. . . .'" *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004). The Court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Further, a garbage-in, garbage-out rule applies: experts must ground their opinions in sound facts. Thus, although the "central focus of a *Daubert* inquiry" is an expert's methodology, a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *In re Neurontin*, *Mktg*., 612 F. Supp. 2d 116, 130 (D. Mass. 2009) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)).

2.      *Meeting Daubert's Heightened Standard for Relevance*

Ensuring that the opinion offered is "relevant to the task at hand" also is an essential requirement of the *Daubert* analysis. *Daubert*, 509 U.S. at 591. As the Supreme Court explains, Rule 702's requirement that an expert's testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" is one of relevance. *Daubert*, 509 U.S. at 591. In other words, Rule 702, as visualized through the *Daubert* prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592; *see, e.g., Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 310 (D. Me. 2005) (excluding expert opinions because those opinions were both irrelevant and unreliable); *Kipperman v. Onex Corp.*, 411 B.R. 805, 849 (N.D. Ga. 2009) (excluding opinions of plaintiff's expert because the relevant question was whether debtors received "reasonably equivalent value" and expert never analyzed whether the value of assets that debtors received was equivalent to what they gave). Thus, for example, if darkness on a certain night is a relevant issue, expert testimony about "[t]he

10

study of the phases of the moon . . . may provide valid scientific 'knowledge' about whether a certain night was dark," but the same expert testimony "will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night" and therefore be inadmissible. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.*

       3.    *The Importance of the Daubert Analysis*

      The Court's role in ensuring that purported expert testimony which does not pass muster under *Daubert* be kept out of earshot of the jury "is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach." *In re Neurontin*, *Mktg*., 612 F. Supp. 2d at 131; *see Daubert*, 509 U.S. at 595; *Kumho Tire*, 526 U.S. at 148.

      One federal district judge in Massachusetts, Judge Nancy Gertner, explained it this way: "a certain patina attaches to an expert's testimony unlike any other witness; this is science, a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." *Hebshie*, 754 F. Supp. 2d at 125 (D. Mass. 2010) (internal quotations omitted). For these reasons, "cross-examination suffices only when experts have reached different conclusions, but the underlying approach is sound. Where it is not, exclusion, or in some situations, limitations, is the only option." *Id.,* at 112-13.

      B.    <u>Dr. Gharibo's Opinions About Dr. Mirilashvili's General Practices for Prescribing Controlled Substances are Unreliable and Should be Excluded</u>

      As stated in the section above, the government has hardly provided any notice at all in response to its obligations under Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure. In presenting only the "general topics" of Dr. Gharibo's testimony, the

government has yet to produce what Dr. Gharibo's opinion testimony will be regarding Dr.

Mirilashvili's general practice or in response to his treatment of specific patients.  (Ex. A at

2.)  The government also has not stated the scientific or medical bases on which Dr. Gharibo

relied in reaching his opinions regarding the proffered "general topics," nor has the

government explained the relevance for expert testimony in the general area of "red flags of

drug abuse and diversion" or "typical steps taken by medical doctors" to avoid drug abuse

and diversion. (*Id.*)

However, because Dr. Gharibo recently testified as a government expert

witness in a case involving similar allegations of unlawful distribution of controlled

substances by a medical doctor, we have some indication of the opinions that the

government might seek to solicit from Dr. Gharibo here. *See United States v. Lowe,* 14 Cr.

55 (LGS) (S.D.N.Y. 2015).  We refer to these opinions now in an effort to predict his

testimony in this case and prevent the government from offering testimony that violates the

dictates of *Daubert* and its progeny.

     1.     *Dr. Gharibo's Opinions About Dr. Mirilashvili's General Practice*
           *Based on  Dr. Gharibo's Personal Way of Practicing Pain Medicine*
           *Are Not Based on Any Objective Standard and Are Therefore*
           *Inadmissible*

In the attached transcripts from Dr. Gharibo's prior testimony in the *Lowe* case

(Ex. C), it appears that many of Dr. Gharibo's opinions about the defendant doctor at that trial

were based on nothing more than comparisons with Dr. Gharibo's own way of practicing pain

medicine.  This opinion testimony is inadmissible because under *Daubert* experts may not offer

opinions based on nothing but their own say-so. *See In re Rezulin Prods.*, 309 F. Supp. 2d at 543

(precluding proffered expert doctor opinion testimony "based on their personal, subjective

views," finding that expert testimony must rest on "knowledge," a term that "connotes more than

subjective belief or unsupported speculation") (quoting *Daubert*, 509 U.S. at 590); *see also*

*McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 423-24 (D.

Mass. 2008) ("Expert testimony is the product of reliable principles and methods if the theory

employed by the expert to explain the meaning of her observations is shown to be valid and was

derived through the so-called scientific method.") (internal quotations omitted.)  Any differences

that Dr. Gharibo might have with the way Dr. Mirilashvili practiced pain medicine do not give

rise to admissible opinion testimony unless they are testable and based on an objective standard.

*Daubert*, 509 U.S. at 591.

      The group of opinions that Dr. Gharibo testified to in *Lowe* (transcript references

below are to Ex. C), which based on the trial record there were never challenged by defense

counsel and were admitted without objection, include the following:

- Oxycodone is not a "first-line medication" for Dr. Gharibo's patients (Tr. 745), partly because he finds the medication to be "dangerous" (Tr. 746);

- Dr. Gharibo assesses several "risk factors" (Tr. 748) before deciding to prescribe oxycodone to his patients, including: (1) not prescribing it to first-time patients, but only to those patients the doctor has been "treating for some time that you can trust" (Tr. 750); (2) performing a "psychological evaluation" of the patient first (*id.*); and (3) also a "social evaluation" of the patient (Tr. 751);

- Dr. Gharibo only prescribes oxycodone to "one to two percent" of his patients (Tr. 751);

- Dr. Gharibo is personally "aware of an illegal market" for oxycodone and he thinks it is the "most desirable [opioid] on the street" (Tr. 752);

- Dr. Gharibo likes to "keep dosages low" (Tr. 754-55) of prescribed oxycodone, and does not "let the pill count get too high" for fear of drug diversion and abuse (Tr. 756);

- Dr. Gharibo believes that receiving money orders or cash for a visit to a pain specialist is a "red flag" (Tr. 764) to drug diversion; and

- If he were a supervising doctor to a pain specialist who only prescribed oxycodone and saw "40 patients per day," he would "report [the doctor] to the medical center and to the state" (Tr. 765).

All of these opinions appear to be based on Dr. Gharibo's own experience, and while we do not contest that the doctor has considerable experience in his field, that alone is not a proxy for reliability. *See In re Diet Drugs*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *37 (E.D. Pa. June 20, 2000) (holding that the court "can easily preclude from a *Daubert* viewpoint, the rendering of opinions by either of these witnesses as to . . . what doctors in general think, because the witnesses are not qualified for that").

The government has proffered no scientific basis behind Dr. Gharibo's opinions that arise out of evidence-based medical standards on how best to treat patients who present chronic pain complaints, including how generally to prescribe oxycodone to such patients.  In his prior testimony, Dr. Gharibo did not provide an objective basis for his opinions that oxycodone is not a "first-line medication" for chronic pain patients, or why it is relevant that he prescribed oxycodone to only "one to two percent" of his patients, or from where his own "risk factors" were derived and whether these factors were medically generally accepted or created "obligations" on prescribing doctors during the relevant times charged in the Indictment.

Absent testable and peer-reviewed evidence-based standards, opinions such as the ones identified above, are simply inadmissible.

>    **a.      Opinions about the Quality of Medical Care Based Only on an Expert's Say-So or Personal Views of Best Practices Are Inadmissible**

Courts across the country regularly exclude expert opinions about medical care where, as here, the opinions are based upon nothing but the expert's *ipse dixit* because such opinions are unreliable. *See, e.g., Algarin v. New York Dep't of Corr.,* 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding as unreliable expert opinion that assessments resulting in psychiatric commitment "were not performed in conformity with the standards of the medical profession,"

because the expert was not relying on any objective standards but only how he thought the assessment should have been conducted); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) (excluding expert opinion "which appears to be based on no scientific support other than his own personal experience" that defendant-physician's failure to respond to discharge of synovial fluid following operation fell below the standard of care).

        As described above, *Daubert* set out a handful of non-exclusive considerations to determine whether an expert's opinion is reliable, including the testability of the opinion.  These considerations are vital because if experts could pontificate without regard for the scientific method, testable standards, or other indicia of reliability, opinions without any reliable basis at all could multiply without end.  To allow this would confuse jurors who are naturally inclined to trust experts, and would upend the essential balance of *Daubert* – which allows the admissibility of opinion testimony, but only after satisfying threshold objective reliability standards.  *See e.g., Hebshie*, 754 F. Supp. 2d at 125.  As the Supreme Court explained, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Indeed, "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

        **b.**    **The Government's Expert Disclosures and Dr. Gharibo's Prior Testimony Do Not Provide Adequate Information to Determine Whether His Opinions Are Objectively Based or Simply the Result of His Own Personal Practice**

        The government's scant expert disclosures do not give any explanation about how Dr. Gharibo arrived at his opinions.  In his prior testimony in the *Lowe* case, Dr. Gharibo was not challenged and did not offer in his direct examination any citations or evidence-based medical

standards that led him to his conclusions.  He simply testified to how he practiced medicine. (*See e.g.,* Ex. C at 745-56.)  Nowhere in the government's disclosure does it provide a source or peer-reviewed article supporting the existence of so-called "red flags"; or pain specialist "obligations"; or explanations for what constitutes "medically appropriate" uses of oxycodone; or whether "typical steps taken by medical doctors" are based on accepted standards in the medical community during the relevant times charged in the Indictment. (Ex. A at 2.)  Dr. Gharibo's prior testimony does not enlighten us on these issues either, because he cites to no authority at all in his direct examination when offering his opinions. (*See* Ex. C at 745-765.)

It is not surprising that the government's expert has not supported his opinions with citations to established standards of care or "obligations" of practice.  Even after recent public outcries for stricter regulations governing pain medication, there are few firm standards for how to treat patients with chronic pain.  As S.D. Passik, a preeminent voice in pain management first explained in 2002:  "The 'norms' of drug taking and the epidemiology of aberrant drug-taking behavior have not been clearly established.  Therefore, clinicians generally lack information to guide assessment of the severity of aberrant clinical occurrences." S.D. Passik et al., *Pain clinicians' ranking of aberrant drug taking behavior,* 17 J. Pain & Palliative Care Pharmacotherapy 39, at 41 (Feb. 2002) (annexed as Exhibit H).  Since that time, while there has been some movement to standardize care, consensus has been hard to reach.

In 2007, another pain management specialist, Dr. Edward Michna, complained that treatment guidelines when a patient misuses opioids is a "largely unexplained research area." Edward Michna, et al., *Urine Toxicology Screening Among Chronic Pain Patients on Opioid Therapy:  Frequency and Predictability of Abnormal Findings,* 23 Cin. J. Pain 2, p. 173, at 177 (Feb. 2007) (annexed as Exhibit I).  Dr. Michna pointed out that reliance on "red flags" such as

16

patients "who are preoccupied with opioids, request certain drugs, and require a high dosage of medication . . . may prove to be incorrect." *Id.* When discussing how eight different physicians responded to an abnormal drug screen, Dr. Michna noted that each one of them "ha[d] their own treatment style for addressing these behaviors. In general, patients are seldom 'fired,' but opioids *may* be discontinued and the patient *may* be referred for substance abuse treatment if needed." *Id.* at 176 (emphasis supplied).

Given the paucity of information related to Dr. Gharibo's proffered "topics," and the great concern that these opinions are based more on Dr. Gharibo's personal experience than tested, peer-review standards, Dr. Mirilashvili respectfully requests the Court to preclude these opinions absent a greater showing of a reliable set of objective measures. *Berk*, 380 F. Supp. 2d at 354; *Algarin*, 460 F. Supp. 2d at 477; *McGovern*, 584 F. Supp. 2d at 424-25.

C.     Dr. Gharibo's Opinions Related to Medical Best Practices or Adequate Standards of Care Should be Excluded Because They Are Not Relevant to Whether Dr. Mirilashvili Was Acting As a Drug Dealer

In Dr. Gharibo's prior trial testimony, he opined on the defendant doctor's level of medical care, stating at various times that the doctor on trial for criminal distribution of controlled substances exhibited practices "not consistent with good medical care," (Ex. C at 757.); that the doctor's "pill count and daily milligram dosing [of oxycodone] was excessive" (Ex. C at 758); that the cost of an office visit the doctor charged the patient ($300) was an "outlier" (Ex. C at 764); and that if he were the defendant doctor's supervisor, he would have "reported him to the medical center and to the state," (Ex. C at 765).

To the extent that these opinions might be supported by reliable, generally accepted, objective pain specialist measures (which, as stated above, based on the current disclosures, we cannot evaluate), these opinions are simply not relevant to the "task at hand" –

17

determining whether Dr. Mirilashvili distributed oxycodone as a common drug dealer, not as a medical professional. *Daubert*, 509 U.S. at 523-24.  *See also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (explaining that to be convicted under the CSA a physician must have acted as a "drug dealer as conventionally understood"); *United States v. Feingold*, 454 F.3d 1001, 1011 (9th Cir. 2006).  As the federal Drug Enforcement Agency ("DEA") explained in guidance to its officers, when assessing whether medical professionals were acting "in the course of professional practice,"  "*[i]t matters not that such acts [of medical professionals] might constitute terrible medicine or malpractice*.  They may reflect the grossest form of medical misconduct or negligence.  They are nevertheless legal." Stephen E. Stone, *The Investigation and Prosecution of Professional Practice Cases Under the Controlled Substances Act:  Introduction to Professional Practice Case Law and Investigations* (Drug Enforcement Agency, Spring 1983) (emphasis added) (annexed as Exhibit J).  Thus, any proffered opinion relying on sources that relate to preferred or best practices or the quality of care, but which do not bear on the question of whether a medical professional acted as a drug dealer should be inadmissible. *Daubert*, 509 U.S. at 591-92.

        1.      *The "Task At Hand" Under 21 U.S.C. § 841(a)(1) is to Determine Whether a Medical Practitioner Prescribed Controlled Substances as a Drug Dealer*

Under 21 U.S.C. § 841(a)(1), a medical practitioner with a DEA license can be criminally convicted only if he intentionally distributes controlled substances for other  than "a legitimate medical purpose in the usual course of professional practice."  *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (quoting *United States v. Moore*, 423 U.S. 122, 124 (1075)).  The terms "course of his professional practice" and "legitimate medical purpose" are not defined by either statute or regulation.  Indeed, the DEA has refused to clarify what is meant by

"legitimate medical purpose in the usual course of professional practice" as contained in 21 C.F.R. § 1306.04(a). When asked by practitioners to provide guidelines regarding the dispensing of controlled substances for the treatment of pain, the DEA declined to do so stating that: "Federal courts have long recognized that it is not possible to expand on the phrase 'legitimate medical purpose in the usual course of professional practice,' in a way that will provide definitive guidelines that address all the varied situations physicians might encounter." 71 F.R. 52716, 52717 (Sept. 6, 2006). This is because physicians require some latitude in determining what course of action should be taken in the care of their patients, and the government does not want to limit physicians' freedom to engage in legitimate medical practice and research. *See id.,* at 52719; *see also United States v. Moore*, 423 U.S. 122, 143 (1975).

There is consensus, however, that a medical professional may be convicted under 21 U.S.C. § 841(a)(1) "not when he is a bad or negligent physician, but when he ceases to be a physician at all." *Feingold*, 454 F.3d at 1011. In other words, to be found guilty of violating the CSA, a physician must have acted as a "drug dealer as conventionally understood." *Gonzales*, 546 U.S. at 270. Thus, in *Moore*, the Supreme Court upheld the conviction of a physician because "[i]n practical effect, he acted as a large-scale 'pusher' not as a physician." 423 U.S. at 143.

As the DEA has explained: "[T]he types of cases in which physicians have been found to have dispensed controlled substances improperly under Federal law generally involved facts where the physician's conduct is not merely of questionable legality, but instead is a glaring example of illegal activity." *See* 71 F.R. at 52717. Because of the absence of well-defined guidelines, physicians should only be prosecuted for "blatant criminal conduct." *See id.*, at 52720. Thus, for Dr. Mirilashvili to be found guilty under the CSA, the government must make

19

"the higher showing that the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice." *Feingold*, 454 F.3d at 1010.

Federal courts, including the Second Circuit, do not apply guidelines from the state boards of registration of medicine or other sources indicating a standard of care, since the question of whether a physician is acting like a drug dealer is not about whether a doctor met any standard of care. *See, e.g., United States v. Hooker,* 541 F.2d 300, 305 (1st Cir. 1976) (upholding conviction of physician-defendant without reference to anything having to do with any standard of care, but instead because the physician-defendant knew that the controlled substances he prescribed were not going to be used for therapeutic purposes and did not even try to discern what medical problems a patient might have). As explained above, the government still has not referenced any set of testable standards in its expert disclosures, let alone how those standards might make it more likely than not that the defendant acted as a drug dealer, rather than a medical professional.

Case law suggests that federal courts look to objective markers of whether a medical practitioner is acting like a common drug dealer. *See United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) (defendant-physician convicted where he developed scheme for nurses to see patients without the doctor, and defendant-physician signed prescriptions without even knowing identity of patients); *United States v. Elder*, 682 F.3d 1065, 1072 (8th Cir. 2012) (upholding conviction of physician-defendant where he did not maintain *any* patient files and *rarely* saw patients himself, yet prescribed medication to 544 patients in a five-month period); *United States v. Kaplan*, 895 F.2d 618, 620-21 (9th Cir. 1990) (failure of defendant-doctor to *ever* conduct physical exam or to take medical histories was sufficient evidence to convict defendant-doctor

20

under CSA); *United States v. Bartee*, 479 F.2d 484, 485-87 (10th Cir. 1973) (finding there was sufficient evidence to support conviction under CSA where defendant-doctor told patient to go to "different drugstores each time [the patient filled a prescription]," because of pressure from law enforcement, used same terms for controlled substances as drug crews, and *never* performed a physical examination); *United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (setting out list of factors for determining validity of conviction under CSA, including that a physician warned patients to fill prescriptions at different drug stores and referred to pain medication under code name).

The objective markers that have developed over the past 40 years in evaluating criminal convictions of physician-defendants under the CSA include:

- doctor did not maintain patient records of any kind;

- rarely, if ever, saw patients before prescribing narcotics;

- never conducted physical examinations;

- instructed patients to fill prescriptions at different drug stores each time;

- knew that patients were not using controlled substances for therapeutic or medical purposes; and

- used code terms in discussing narcotics with fake "patients."

It is this set of objective markers that may be useful to a jury in determining whether a physician-defendant was dealing drugs rather than practicing medicine.

2.    *Dr. Gharibo's Testimony in Lowe Referred to Medical Practices Falling Below Best Standards of Medical Care, Not Practices of Common Drug Dealing, and Therefore Should be Precluded*

Dr. Gharibo's prior trial testimony did not refer to the above or similar set of objective markers previously relied upon by federal courts in affirming criminal convictions of physician-defendants under the CSA.  Instead, Dr. Gharibo testified to standards of "good

21

medical care" (Ex. C at 757), that are simply not relevant under the federal criminal law in this particular context of a physician-defendant.

The expected expert testimony of Dr. Gharibo is based largely on subjective evaluations of how good a pain doctor the defendant was, *rather than whether he was acting like a drug dealer.*  For instance, Dr. Gharibo may seek to criticize Dr. Mirilashvili for, among other things: (1) using oxycodone as a "first-line medication" (Tr. 745) for chronic pain patients; or (2) not assessing patients on a complex "risk factor" (Tr. 748) scale, based on the length of time being treated, the level of "trust" built in the doctor-patient relationship, or on "psychological" or "social" cues (Tr. 750-51); or (3) for not fluctuating dosages of oxycodone or letting the "pill count get too high" with patients (Tr. 754-56).  In offering these opinions, the government is conflating evaluations of good medical care with criminal conduct as a drug dealer.

This case, however, is not a malpractice or medical licensing proceeding.  It is a criminal case where the doctor's very liberty is at stake.  Even if the Court were to conclude that Dr. Mirilashvili was practicing bad medicine, he could not be convicted of dealing drugs unlawfully.  The federal law does not criminalize a doctor for the kinds of practice for which the government seeks to condemn him through their expert witness, including: (1) standardizing pain prescriptions, rather than seeking more individualized solutions; or (2) not offering patients other forms of pain management, such as injections or surgeries; or (3) even for taking cash for office visits, rather than only accepting private or public insurance plans.

The course the government is taking with its proposed expert testimony is a dangerous one.  The various opinions of Dr. Gharibo described above will certainly act to prejudice a jury against the defendant-doctor for not following best medical practices, but that is exactly the risk that federal courts have not allowed in evaluating the admissibility of expert

testimony.  Because the *quality* of medical care[1] is not relevant in determining the doctor's criminal conduct under the CSA (rather only if he was acting as a doctor at all as opposed to a drug dealer), the opinions that Dr. Gharibo testified to without objection in *Lowe*, should not be admitted here.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

D.    The Government Apparently Will Ask Dr. Gharibo to Extrapolate A General Opinion About Dr. Mirilashvili's Practice Based on a Selected Sample of Specific Patient Files; Such Testimony is Inherently Unreliable and Should be Excluded

At this late stage of the proceedings, the government has yet to identify the specific patient files it will seek to have its expert doctor review and opine about regarding Dr. Mirilashvili's record of "medical legitimacy." (*See* Ex. A at 2.)  This raises a number of problems.

First, given that Dr. Mirilashvili saw approximately 3,500 patients during the 26-month period charged in the Indictment, it simply is not feasible for defense counsel to prepare its expert in response to the government's inadequate notice to be ready to react to this entire universe of patients.[2]  If the government's expert is going to opine on specific patient files, his review and the basis for his opinions on "medical legitimacy" must be produced to the defense reasonably in advance of trial to allow for a similar review by any defense rebuttal expert and to provide a fair opportunity to prepare for meaningful cross-examination.  *See Valle*, 2013 U.S.

---

[1] Indeed, Dr. Mirilashvili does not concede that his medical treatment fell below *any* objective, generally accepted standard of care of pain management. In fact, as the evidence at trial will likely show, there remains very little consensus today on many areas of pain management, including overall drug testing platforms and aberrant patient behavior, and experts continue to disagree on how to handle the many patient challenges in this area.

[2] This Court has previously made clear to the government its position, in the context of the year-long "pole video" created by law enforcement, that "[a]nything that the government intends to rely on it can cull out and give to defense counsel." (Ex. K: Transcript from January 28, 2015 in *United States v. Moshe Mirilishvili, et al.*, 14 Cr. 810 (CM) at 8.)

Dist. LEXIS 14864, at *5.  On such specialized topics as pain management and medical diagnoses and treatment, this criminal case should not be tried by ambush.

Second, the government is not permitted to cherry-pick a weighted, non-representative sample of patient files, supply them to its expert, and then elicit manifestly unreliable expert opinions about Dr. Mirilashvili's general medical practices. *See Daubert*, 509 U.S. at 591.

Federal courts have made clear that under *Daubert* a small sample size or a sample chosen without any specific methodology is not a reliable basis for a general opinion.  *Id.* This makes sense:  for example, a sampling of a selected group of young children who received a regimen of vaccines and were also found to display signs of autism is not a reliable basis for an opinion that vaccines administered to young children in general cause autism.  Courts therefore routinely exclude opinions based on unreliable samples under *Daubert*, whether because the sample was too small, unrepresentative of the general population, or because an unscientific methodology was used to select the sample. *See e.g., Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 811-14 (N.D. Ill. 2005) (rejecting seller's expert on damage caused to buyer based on lost profits because expert failed to rely on comparable samples, making his analysis unscientific and unreliable); *Yapp v. Union Pacific R. Co.*, 301 F. Supp. 2d 1030, 1036-37 (E.D. Mo. 2004) (holding that employer's expert opinion based on survey regarding employer's hiring qualification and processes was not scientific or inherently reliable where survey consisted of employees selected by employer's counsel and study was based on non-random sample of departments and limited jobs); *Menasha Corp. v. News America Marketing In-Store Inc.,* 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (journalist's survey excluded in part because he failed to gather responses from a sample accurately representing the

target population), *aff'd*, 354 F.3d 661 (7th Cir. 2004); *United States v. Mikos*, 2003 U.S. Dist. LEXIS 22069 (N.D. Ill. Dec. 5, 2003) (finding that FBI database of bullet samples could not serve as the basis for expert testimony; database could not satisfy *Daubert* requirements where there was no evidence "that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole").

Here, the Indictment charges that the entirety of Dr. Mirilashvili's prescriptions of oxycodone was unlawful.  (*See* Indictment, ¶ 3, at 2:  "the defendant wrote more than 13,000 medically unnecessary prescriptions resulting in the unlawful distribution of nearly 1.2 million oxycodone tablets.")  The government, thus, will ask Dr. Gharibo to render an opinion regarding Dr. Mirilashvili's entire practice based on a tiny selected sampling of patient files.  This creates error for several reasons.

First, although the government will claim that Dr. Mirilashvili's prescription recommendations were nearly always the same, this fact alone does not allow for general extrapolation about whether his practice reduced to common drug dealing.  The simple fact of prescribing consistent dosages of oxycodone to a patient population claiming chronic pain does not alone rise to the level of abandoning medical judgment.[3]  Indeed, we do not expect Dr. Gharibo to claim as much.  As explained above, what matters more in a review of whether Dr.

---

[3] Dr. Mirilashvili's oxycodone prescriptions were also supplemented with other medications, such as anti-inflammatories, muscle relaxants, anti-seizure medication, and anti-depressants. The government seeks to overlook this fact in its presentation of the oxycodone evidence. Curiously, in recent conversations with the prosecutors, the government suggested that it might introduce the expert testimony of the proposed pharmacological expert, William T. Winsley, to opine that the group of medications prescribed by Dr. Mirilashvili was intended to "mask" his actual drug dealing in oxycodone.  It is unclear on what basis Mr. Winsley might have reached this conclusion because we were given no written disclosures on this point.  Even if one were to conclude that Dr. Mirilashvili was over-prescribing several different medications to patients, unless he did it consciously to unlawfully distribute controlled substances, his treatment practice might be bad medicine but not criminal under the CSA.

Mirilashvili acted as a medical professional as opposed to a drug dealer is what he did with the patients. More specifically, whether the records showed he: (1) physically examined patients; (2) received prior medical histories and diagnostics including impressions of MRIs, nerve conduction tests, EMGs, and other tests; (3) checked New York State databases for a patient's prior record of opioid usage; (4) kept notes of his observations and a patient's subjective complaints of pain; and (5) recommended physical therapy or visits to orthopedic doctors contemporaneously with a pain management regimen. Dr. Mirilashvili did all of these things. These markers are the important indicia of acting as a medical professional. If the doctor's note-keeping for a certain patient was completely lacking among the 3,500 he saw over the course of his practice, or he overlooked the result of a particular MRI image, or missed a database result indicating the patient had recent opioid usage, such results on a small, selected sampling scale are unreliable from which to extrapolate to the universe of patients.

        Second, the government's attempt to find the worst of Dr. Mirilashvili's files to give to its expert to use to condemn the entire practice creates undue prejudice based on unscientific results and improperly shifts the burden to the defense to prove that, in fact, the government only cherry-picked the best files for its case while ignoring others. This is not the process that *Daubert* contemplates. Indeed, the selection of a sample is an issue of methodology, the *central focus* of a court's inquiry under *Daubert*. *Allgood v. General Motors Corp.,* No. 02-cv-1077 (DFJH), 2006 U.S. Dist. LEXIS 70764 at *35 (S.D. Ill. Sept. 18, 2006); *see R&R Intern., Inc. v. Manzen LLC*, 09-60545-Civ. (Zloch/Rosenbaum), 2010 U.S. Dist. LEXIS 94550, at *34-*35 (S.D. Fla. 2010) (excluding expert opinion on lost profits where sampling of distributors to determine lost profits was deficient and unreliable because expert did not use any scientific method to choose the sample and thus sampling method did not "constitute scientific

testing that can be duplicated by another researcher.")  The reliability that a prosecutor selects for her expert is especially suspect, since the prosecutor is incentivized to pick a sample more likely to support her position. *See e.g., Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321-22 (N.D. Ill. 2008) (excluding expert's testimony where it was based on lawyer's summary of a sampling of depositions because the sample chosen "is 1% of the available deposition transcripts, that the plaintiff's lawyer selectively chose to summarize – hardly a representative sampling of the information that an expert should have wanted to see and which ought to have been reviewed so that an expert opinion would be reliable.").

Where here, we expect the evidence to show that sophisticated "drug crews" infiltrated Dr. Mirilashvili's medical practice through various insidious ways, including bribing his office workers to alter records, contaminating urine samples, changing test results, and otherwise preventing the doctor from discovering certain facts about a sampling of his patients, it is important not to present this singular group of patients sent in by the drug crews as indicative of the doctor's entire patient universe.  This is the specific danger of the government's cherry-picking of patient files in this case, especially where the government is being informed on what patients to select for its expert review by cooperating witnesses from the "drug crews" who sought to dupe Dr. Mirilashvili.

The biased picture that the government's "drug crew" witnesses will seek to draw is that they worked together with Dr. Mirilashvili to "paper the file" of the drug-dealing practice to make him appear to be a medical professional performing real medical duties, rather than the other way around.  It would be egregious for the government to allow its cooperating witnesses to help enhance their own testimony through the corroboration and verification of a respected, expert doctor from New York University Hospital.  That is exactly what the government would

27

be doing if it presented Dr. Gharibo only the list of patients that its "drug crew" witnesses knew included falsified medical records, phony patient referrals, and contaminated urine tests, and then asked its expert to generalize from these few files about the entire medical practice. Using this tainted sample of self-selected patients for Dr. Gharibo to review for purposes of generalizing about the entire medical practice would be a completely improper and inadmissible use of expert testimony.

Absent a more fair and reliable sampling of Dr. Mirilashvili's patients,[4] merely using certain cooperating witnesses' files to generalize about Dr. Mirilashvili's conduct as a physician should be precluded.

## III.   THIS COURT SHOULD PRECLUDE LAW ENFORCEMENT WITNESSES FROM OFFERING "OPINIONS" ABOUT CASE RELATED MATTERS, INCLUDING MEDICAL FINDINGS OR PAIN TREATMENT

Dr. Mirilashvili respectfully further moves to preclude the government from offering "opinions" from its law enforcement witnesses that are based less on their expertise in generalized areas of narcotics trafficking and more on their specific, case-related knowledge based on interviews with witnesses and other hearsay-based information. *See United States v. Dukagjini*, 326 F.3d 45, 53-56 (2d Cir. 2003) (rejecting use of case agent to testify as an expert "largely from his knowledge of the case file and upon his conversations with co-conspirators,

---

[4]     The government also informed us last week that it recently executed a search warrant on a vendor called Practice Fusion, which is a web-based medical practice software program on which Dr. Mirilashvili kept much of his physician notes. These "EMRs," or electronic medical reports were not seized during the searches of the doctor's medical office and home. However, the government has been aware that these additional records, which also make up the doctor's patient files, existed because they received samples of these EMRs from Dr. Mirilashvili's prior counsel. We have not yet received the electronic copies that have been seized pursuant to the Practice Fusion search, but have access to the doctor's EMRs on-line within the software program. To the extent technologically feasible, we intend to work with the government to ensure that any expert review of patient files consider both the paper copies collected during government searches and the Patient Fusion EMR records. Looking at one without the other presents an incomplete picture of the medical records at issue here.

rather than upon his extensive general experience"); *United States v. Mejia*, 545 F.3d 179, 191-94 (2d Cir. 2008) (expounding upon the ruling in *Dukagjini* to preclude agents from providing expert testimony in the form of a summary fact witness).

The Indictment in this case arose out of a joint investigation by the New York City Police Department and the DEA.  Among other investigative actions, law enforcement surveilled the area around Dr. Mirilashvili's clinic—both actively and by way of a "pole camera"—and employed a confidential source to infiltrate Dr. Mirilashvili's clinic.  These law enforcement techniques are consistent with other investigations of doctors' practices in prescribing oxycodone, including the previously cited case of *United States v. Lowe*, 14 Cr. 55 (LGS).  Our recent review of the *Lowe* trial transcripts revealed the government's past practice of eliciting expert opinion testimony from its law enforcement witnesses.  We specifically seek to preclude that practice here unless the government first complies with its expert discovery obligation under Fed. R. Crim. P. 16(a)(1)(G), and does not run afoul of the holdings in *Dukagjini* and *Mejia*.  Particularly, we seek to preclude law enforcement from repeating information they might have heard from medical professionals or others about the contents of medical records.  This is clearly an impermissible area of testimony by case agents or other investigative officers.

## IV.   THIS COURT SHOULD EXCLUDE EVIDENCE OBTAINED FROM A LAW ENFORCEMENT DATABASE MAINTAINED BY THE NEW YORK STATE BUREAU OF NARCOTICS ENFORCEMENT

Dr. Mirilashvili respectfully moves to preclude the government from introducing evidence obtained from a law enforcement database maintained by the New York State Bureau of Narcotics Enforcement ("BNE") because such evidence is hearsay and inadmissible pursuant to Rule 802 of the Federal Rules of Evidence.  Even if evidence from the database was not

hearsay, it should still be precluded because the government has failed to comply with its obligations under Rule 1006.

      A.    <u>Evidence From the BNE Database is Inadmissible Hearsay</u>

      In its Indictment, the government accuses Dr. Mirilashvili of writing more than 13,000 medically unnecessary prescriptions for oxycodone. According to the discovery provided thus far, the government could only arrive at this number if it were to rely on summary records from the BNE database.  We expect that the government will seek to introduce BNE database printouts or a summary exhibit related to those records.  Because the BNE records are offered for the truth, they are inadmissible hearsay.[5]

      A proper analysis of the information the government seeks to introduce begins when a patient goes to a pharmacist seeking to have a prescription filled.  The patient makes a statement—often by the nonverbal act of providing a written prescription—to the pharmacist that doctor X has prescribed him or her prescription Y.  At this point, the statement by the patient to the pharmacist is hearsay if the government offered it to prove that doctor X in fact prescribed the patient medication Y.  <u>See</u> Fed. R. Evid. 801(a)(2) ("nonverbal conduct of a person, if it is intended by the person as an assertion," is a "statement" within the meaning of the hearsay rule).

      Next, the pharmacist transmits that hearsay statement to the BNE database where it joins countless other hearsay statements.  It does not magically transform from hearsay to non-hearsay because it has been compiled with other offending statements.  The physical copy of the prescription remains on file at the pharmacy.

---

[5] If the BNE records are *not* offered for the truth, then they are irrelevant and must be precluded under Rules 402 and 401.

The government contends that each entry in the BNE database represents an *actual* prescription written by Dr. Mirilashvili. That argument assumes the truth of the patient's representation to the pharmacist, an assumption that the rule against hearsay prohibits. *See* Fed. R. Evid. 802.  The government's argument that the BNE database is accurate falls away when one looks at the very discovery it has produced.[6]  Two examples make the point.

First, in June 2013, the Port Jervis Police Department ("PJPD") arrested K.A. for filling a fraudulent prescription for oxycodone.  (Ex. L:  Redacted DEA-6 Report.)  Detective Sergeant Michael Myers of the PJPD contacted Dr. Mirilashvili to determine whether he had issued the prescription.  He had not.  Nevertheless, the BNE records reflect the inaccurate information provided by K.A. to the pharmacist—to wit, that Dr. Mirilashvili actually prescribed her 90 pills of 30 mg strength oxycodone on June 5, 2013.  (Ex. E:  BNE Records Sorted by K.A.)

Second, according to the BNE records, Dr. Mirilashvili prescribed oxycodone to A.F. 32 times over 13 months.  The government obtained some of these prescriptions and conceded that at least the prescriptions from March 28, 2013 and July 19, 2012 appear to "have been faked or forged."  (Ex. F:  Email from Edward Diskant to Henry Mazurek, dated January 21, 2016.)  Nevertheless, these prescriptions are listed in the BNE printouts as prescriptions issued by Dr. Mirilashvili.  (Ex. G:  BNE Records Sorted by A.F.)

---

[6] Reliability of hearsay statements is, of course, irrelevant unless the statement is excluded from the rule against hearsay or falls into an exception to the hearsay rule.  Neither apply here.

Thus, it is at least clear that the BNE records in this case are not completely accurate.[7]  More critically, however, for evidentiary purposes, the BNE spreadsheets violate the rule against hearsay.

Prior to seeking relief from this Court, we discussed the BNE database with the government.  The government indicated that it would seek to admit these records under the "business records" exception to the hearsay rule pursuant to Federal Rule of Evidence 803(6).  Rule 803(6) provides that a *record of an act or event* is admissible if it was (1)"made at or near the time by . . .  someone with knowledge," (2) "kept in the course of a regularly conducted activity of a business," and (3) was made in the "regular practice of that activity."  The business record exception provides no relief for the government because it only applies to the *act of the business*—that the pharmacy filled a particular prescription.

The fact that a pharmacy filled a prescription for opioids, standing alone, is irrelevant.  It becomes relevant only when it is coupled with the underlying patient-to-pharmacist statement that Dr. Mirilashvili issued the prescription.  But, as set forth above, no hearsay exception applies to this hearsay-within-hearsay statement.

Under the government's theory, the business record exception could lead to the introduction of all sorts of clearly inadmissible hearsay statements.  For example, the government's position here would admit into evidence, for the truth of the matter, customer complaints of product defects submitted to manufacturers and kept in the regular course of that manufacturer's business.  Clearly, these complaints are hearsay statements by complaining

---

[7] In addition to these examples, at least two blank prescriptions pads were stolen from Dr. Mirilashvili during a gunpoint robbery of his clinic in September 2013.  The BNE records may also include prescriptions from these stolen pads.  Because the government did not subpoena the underlying prescriptions held by the pharmacies, we can only speculate about the extent of forgeries, duplicates, and the presentation of stolen prescriptions under Dr. Mirilashvili's name.

customers and represent a second level of hearsay in the company's business records.  The

complaint itself is not made by someone at the business with knowledge, nor is it part of the

declarant's regular practice at the business. Fed. R. Evid. 803(6).  The customer's complaint

contains an additional level of hearsay.  While the record of the complaint could be admitted for

the purpose of showing the company received the complaint, it could not be admitted for the

truth of the complaint itself.  This is exactly what the government seeks to do here with the

report of BNE data.  It seeks to use the patient's embedded hearsay statement for the truth that

Dr. Mirilashvili issued the filled prescription.

      Of course, even if both the uploaded BNE record and the underlying statement by

the presenting patient are together considered to fall under the business record hearsay exception,

which they are not, this Court should still not permit the BNE record into evidence for the truth

of the matter asserted because we have "show[ed] that the source of information or the method or

circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(E).  As set

forth above, the BNE database is unreliable because it includes inaccurate information from the

patient source.

      In any event, the accuracy of the BNE database is irrelevant to the question of

whether, in the first instance, the government has satisfied a proper hearsay exception for the

second level of hearsay in the record – the patient's statement.  Plainly, the government cannot

do so.

    B.    <u>In the Alternative, if the Government Seeks to Admit Data from the BNE
Database as a Summary Chart of Voluminous Records, the Government Must
Produce the Underlying Documents Pursuant to Rule 1006 of the Federal Rules of
Evidence</u>

      Pursuant to Rule 1006, if the government wants to "use a summary . . . to prove

the content of voluminous writings . . . that cannot be conveniently examined in court" it must

"make the original or duplicates available for examination or copying" at a reasonable time and place.  Fed. R. Evid. 1006.  To the extent that the BNE database is only a summary of the "voluminous writings" of submitted patient prescriptions, the proponent of this evidence has the burden of producing the underlying documents before the summary data may be admitted.  If the government fails to produce the underlying records in a timely fashion, we respectfully ask the Court to preclude the summary data.

## V.     THIS COURT SHOULD EXCLUDE EVIDENCE OF THE AMOUNT OF CONTROLLED SUBSTANCES PRESCRIBED BY DR. MIRILASHVILI COMPARED TO OTHER PHYSICIANS

Dr. Mirilashvili respectfully moves to exclude all evidence concerning the amount of controlled substances he prescribed as compared to other physicians.  As set forth above, this testimony should first be excluded pursuant to Rule 802 of the Federal Rules of Evidence because it is based on inadmissible hearsay.  Even if the government could satisfy the rule against hearsay, which it cannot, the evidence should still be excluded pursuant to Fed. R. Evid. 403 because any comparison of the number of prescriptions issued has little probative value, is inherently misleading, and would give rise to unfair prejudice against Dr. Mirilashvili.  For the reasons that follow, this Court should exclude such evidence.

Evidence about the amount of oxycodone prescribed by Dr. Mirilashvili as compared to other pain management practitioners offers minimal, if any, probative value because the volume of opioids prescribed is not a fact that makes it more or less probable that Dr. Mirilashvili acted as a drug dealer rather than a medical professional on any single prescription.  In this case, the central contested issue is whether the government can prove beyond a reasonable doubt that Dr. Mirilashvili acted outside his license as a medical professional and more akin to a common drug dealer in prescribing oxycodone to his patients.  The volume of opioids alone does

not speak to this issue.  *See Wexler*, 522 F.3d at 206 (so long as the defendant doctor acted within

the honest exercise of professional judgment and a reasonable belief as to proper medical

practice, it does not matter if his prescriptions were the result of bad medicine, however gross);

*United States v. Volkman*, 736 F.3d 1013, 1021 (6th Cir. 2013) ("'Good faith' in this context

means good intentions and an honest exercise of professional judgment as to a patient's medical

needs.  It means that the defendant acted in accordance with what he reasonably believed to be

proper medical practice.").

       In addition, any comparison of the amount of opioids prescribed by Dr.

Mirilashvili as compared to other practitioners is inherently misleading and unfair for several

reasons.[8]  An assessment of the propriety of prescribing pain medication necessarily entails

consideration of many factors, including, the patient's medical condition and treatment history,

the availability of alternatives for treatment, and the information and advice shared in the context

of the physician-patient relationship.  A comparison of raw numbers of pills prescribed by

different practitioners ignores all such information.

       In *United States v. Jones*, 570 F.2d 765 (8th Cir. 1978), the Eighth Circuit

considered such evidence.  The defendant in *Jones* was convicted of one substantive count of

distributing a controlled substance based on a prescription written to an undercover police officer

posing as a patient.  Over the defendant's objection, the government elicited testimony about an

additional 478 prescriptions it alleged had been issued outside the legitimate and proper scope of

medical practice while at the same time not introducing "any evidence concerning the doctor-

patient relationship existing with respect to th[o]se prescriptions [or] other proof that the

prescriptions had not been issued for a proper medical purpose."  *Jones*, 570 F.2d at 768.  The

---

[8] And, as discussed above, if the comparison is based on the records in the BNE database, it is
based on inadmissible hearsay.

Eighth Circuit held that admission of this evidence was error, finding that evidence of raw numbers of prescriptions, in the absence of "evidence concerning the physician-patient relationship existing with respect to these prescriptions, . . . [and] other proof that the prescription had not been issued for a proper medical purpose" violates Rules 404(b) and 403 of the Federal Rules of Evidence. *Jones*, 570 F.2d at 78.

A comparison of the overall volume of oxycodone prescribed by Dr. Mirilashvili, if it can be accurately calculated, to other practitioners is misleading because of the wide variety of specialties and sub-specialties among physicians, wide disparities in the demographics and size of patient populations, the types of referrals available to the physician, and the types of maladies treated by various practitioners. Any such comparison would therefore necessarily be based on conjecture and require jury speculation, both prohibited by Fed. R. Evid. 403.

Moreover, any such comparison would be flawed for the additional reason that a physician's diagnosis and treatment of pain conditions is relatively subjective and susceptive to a reasonable amount of variation within the bounds of reasonable medical judgment. There is no step-by-step instruction manual on how to treat chronic pain. Consequently, even with respect to patients presenting with similar conditions, any two pain management physicians may reasonably disagree as to the proper course of treatment. The fact that the treatment of individuals suffering from intractable pain necessarily involves a certain amount of medical judgment and discretion renders any type of comparison between the amount of controlled substances prescribed by Dr. Mirilashvili and other unknown practitioners, both misleading and unfairly prejudicial.

There is an overwhelming risk of prejudice to Dr. Mirilashvili and confusion of the jury if the government is permitted to draw a blanket conclusion about the volume of

controlled substances prescribed by Dr. Mirilashvili compared to other practitioners.  Hearing

large numbers will provoke exactly the type of emotional response against which Rule 403

protects.  Jurors will wrongly assume that if someone prescribes a high number of opioids, he

must have done something illegal.  Admitting this evidence creates a high risk that jurors will

conclude that Dr. Mirilashvili wrote medically unnecessary prescriptions based on the out-of-

context prescription figures, rather than evidence relating to the actual course of his patients'

treatment.  Accordingly, this Court should preclude such evidence.

## VI.   THIS COURT SHOULD ORDER THE GOVERNMENT TO MAKE ADDITIONAL <u>BRADY</u> DISCLOSURES

Dr. Mirilashvili further moves this Court to order the government to produce all

*Brady* material in its actual or constructive possession.[9]  After our review of the discovery, Dr.

Mirilashvili moves for the production of the following specific items:

(1) *Any* statement by any witness interviewed by the government, including the New

York Police Department, DEA, or any other law enforcement agency that is part of

the "prosecution team" that discusses the robberies of Dr. Mirilashvili and his clinic;

(2) *Any* evidence pertaining to stolen, lost, or forged prescriptions that were purportedly

written by Dr. Mirilashvili;

(3) *Any* statement by any witness or co-defendant exculpating or separating Dr.

Mirilashvili from participating in any effort to alter or manipulate medical records,

test results, urine samples, or any other effort to mask the actual condition and history

---

[9] Dr. Mirilashvili joined in co-defendant Tasheen Davis' pre-trial motion to compel *Brady* disclosures.  In its October 2, 2015 Order, this Court declined to take any action regarding that motion because the government indicated its awareness and compliance with its constitutional obligations.  At the same time, this Court observed that the government "acts at its peril if it fails in its *Brady* or *Giglio* obligations by taking too narrow a view of what constitutes 'exculpatory' evidence."  (October 2, 2015 Order at 30-31.)

of a patient —including but not limited to proffer statements, deferred prosecution or

other submissions to the government;

(4) *Any* statement of any witness that the government is contemplating calling at trial that

has changed in any material way, regardless of whether that statement was made

orally, in writing, or has been recorded or not in the government's notes.[10]

As this Court knows, the Due Process Clause of the Fifth Amendment requires the

prosecution to disclose favorable, material evidence to a defendant. *Brady v. Maryland*, 373

U.S. 83, 86 (1963). Exculpatory evidence *and impeachment material* are "favorable evidence."

*Strickler v. Greene*, 527 U.S. 263, 281-82(1999); *United States v. Bagley*, 473 U.S. 667, 676

(1985); *Giglio v. United States*, 508 U.S. 150, 154-55 (1972). Put simply, favorable evidence is

information "of a kind that would suggest to any prosecutor that the defense would want to know

about it" because it helps the defense. *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001).

We specifically seek from the government any evidence that exists in New York

Police Department files about the perpetrators of two robberies committed against Dr.

Mirilashvili and his clinic in September 2013 and October 2014. In this case, the federal

government is working jointly with the local New York City Police Department ("NYPD").

Therefore, it cannot reasonably claim that it has no access to local police department records.

We believe that any evidence linking any of the government's cooperating witnesses or other

"insiders" at Dr. Mirilashvili's office to these robberies constitutes material-favorable evidence

because it undermines the government's claims here that the "drug crews" were working in

concert with the doctor. If the jury were to hear evidence that Dr. Mirilashvili's staff participated

---

[10] *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (rejecting the concept that "[w]hen the government is in possession of material information that impeaches its witness or exculpates the defendant [it can avoid] the obligation under *Brady* to disclose the information by not writing it down").

with outside "drug crews" to rob him of money and property, including prescription pads, this information would tend to make it less probable that Dr. Mirilashvili joined a conspiracy to deal drugs with these same perpetrators who committed violent acts against him.

The government earlier informed us that it did not have access to local NYPD investigative files regarding these violent robberies.  This answer is not adequate.  We respectfully ask this Court to order the government to obtain and review these police files to determine if the above-suggested material-favorable evidence exists, or any other similar evidence suggesting adverse positions between the doctor and the drug dealers at issue or his office staff or security contractors.

## VII.    THIS COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING EVIDENCE RELATING TO DR. MIRILASHVILI'S INCOME OR THE AMOUNT OF CASH SEIZED AT HIS HOME

Dr. Mirilashvili respectfully moves *in limine* to preclude the government from offering evidence of or making any reference to the income or degree of financial success of Dr. Mirilashvili or his clinic.  Such evidence is irrelevant to the issues in this case, as it is entirely divorced from the question of whether Dr. Mirilashvili distributed controlled substances as a doctor.  If admitted, such evidence would serve no purpose other than to unfairly prejudice the jury by suggesting that simply by earning a living through operating a pain management practice Dr. Mirilashvili acted illegally.

Any evidence of or reference to the income of Dr. Mirilashvili or his clinic does not have "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Accordingly, it must be excluded.  As stated several times above, to convict Dr. Mirilashvili of violating the CSA, the government must prove that he acted as a common drug dealer and not as a medical professional.  *See Gonzales* 546 U.S. at 270

39

(noting that the CSA only "bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood").  If and how much income one earns has no bearing on whether one has distributed controlled substances as a drug dealer.  No court has found otherwise.  Indeed, a legitimate medical professional may be far more financially successful than one who conspires with drug dealers.

        Even if this Court finds that evidence of income has some minor relevance to whether Dr. Mirilashvili practiced as a medical professional or a drug dealer, the evidence is still inadmissible under Rule 403 because any minimal probative value is substantially outweighed by the danger of substantial, unfair prejudice.  Fed. R. Evid. 403.  Evidence is generally deemed unfairly prejudicial if it has "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."  *United States v. Deutsch*, 987 F.2d 878, 884 (2d Cir. 1993) (citation omitted).  Courts recognize that the prosecution's introduction of wealth evidence can be highly improper and deprive a defendant of a fair trial.  Indeed, "[t]he general rule is that a criminal defendant's financial condition . . . is not admissible, if only because allowing the prosecution to introduce such evidence in the normal case would almost certainly be prejudicial."  *United States v. Hawkins*, 360 F. Supp. 2d 689, 694 (E.D.Pa. 2005); *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940) ("[A]ppeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them."); *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002) (recognizing that "prosecutorial appeals to wealth and class biases can create prejudicial error" and that "it is illogical and improper to equate financial success and affluence with greed and

40

corruption"); *United States v. Stahl*, 616 F.2d 30, 31 (2d Cir. 1980) (holding prosecution's arguments on class-status were "improper and have no place in a court room").[11]

The circumstances under which courts have permitted evidence of income and/or financial status, such as when a defendant has substantial assets or spends extravagantly without claiming any income, are not present here. *See, e.g., United States v. Young*, 745 F.2d 733, 763 (2d Cir. 1984) (permitting evidence of unexplained wealth coupled with the failure to file tax returns as relevant to the inference that the income was ill-gotten). This is not a case involving unexplained wealth (Dr. Mirilashvili's income came, indisputably, from his work at the clinic).

Nor does the fact that the government seized large amounts of cash in Dr. Mirilashvili's house make his income any more probative. While there are cases that suggest that the possession of large amounts of cash may be indicative of drug trafficking, these cases turn on the issue of a defendant's desire to conceal the financial payment in exchange for unlawful narcotics. *See e.g., United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003) ("The touchstone of the admissibility inquiry is not the amount of money in the defendant's possession, but whether defendant's failure to account for its source tends to support the government's claim that the money was obtained through illegitimate means."). Here, Dr. Mirilashvili never concealed the source of his income. Indeed, because most people knew he was involved in a cash-heavy business, he was robbed twice. Dr. Mirilashvili's patient population largely consisted of lower income people, who often did not have health insurance or even bank

---

[11] Indeed, the government has advanced successfully the same argument to preclude a defendant from offering evidence of his financial condition in circumstances where the legal issues confronting the jury do not involve a defendant's financial condition. *See United States v. Cilia*, 05 Cr. 231 (RCC), 2005 U.S. Dist. Lexis 9804, at *1 – 2 (S.D.N.Y. May 20, 2005) (granting government's motion to preclude defendant offering evidence of his sound financial condition where the question before the jury was whether defendant used extortionate means to collect on a loan).

accounts.  The fact that he received $200 per office visit and additional amounts for physical

therapy visits, and that he received these payments largely in cash or money orders should not be

of any evidentiary moment.  It certainly is not probative of his desire to conceal income from

illegitimate sources.  The fact that Dr. Mirilashvili kept the cash at his home, rather than in

banks, or investing it in stocks, or buying luxury items does not make it more or less probable

that he acted outside his professional conduct in prescribing oxycodone – together with other

medication – to any particular patient.

        The government has no need to prove the source of Dr. Mirilashvili's income, as

it is undisputed that it came from his medical practice.  Instead, the government will seek to

introduce the evidence of cash payments and large sums of money in Dr. Mirilashvili's

possession as a means of biasing the jury against him.  There is a considerable risk that if jurors

learn of Dr. Mirilashvili's income or assets they will consider it improperly and will view him in

a class of wealth often accompanied today by prejudice.  They may view Dr. Mirilashvili as a

rich and greedy doctor, and "[e]quate [his] wealth with wrongdoing," exactly as feared by courts.

*Stahl*, 616 F.2d at 31.

        Further, evidence of Dr. Mirilashvili's income without context poses a danger of

confusing and misleading the jury by placing emphasis on a collateral issue, a danger which

considerably outweighs any benefit of the jury's knowledge of income. *See Hawkins*, 360 F.

Supp. 2d at 695 ("Recognizing that "an individual's net worth can be difficult to generalize, and

the issue can be confusing to the jury.")  Courts have held that "[w]hen the risk of confusion is so

great as to upset the balance of advantage, the evidence goes out." *Shepard v. United States*, 290

U.S. 96, 104 (1933).

To defend against the misconception that Dr. Mirilashvili's salary was high or aberrant from other doctors operating pain management clinics in a major metropolitan area, Dr. Mirilashvili will need to counter with evidence of salaries of other doctors, or payments generally obtainable from insurance plans for the same services, to put the amount of his income into a reasonable context for the jury.  This will result in a mini-trial on the collateral issue of whether Dr. Mirilashvili's income was comparable to others in his field, an inefficient use of the Court's resources and time, and absolutely irrelevant to the issue of whether Dr. Mirilashvili acted as a doctor or drug dealer when he prescribed oxycodone to his patients.

## VIII.  THIS COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING EVIDENCE ABOUT DR. MIRILASHVILI OR HIS CLINIC'S REPUTATION

Dr. Mirilashvili respectfully moves this Court to exclude all pejorative testimony concerning his reputation or that of his clinic that seeks only to smear his character and is not based on actual proof.   Any pejorative terms suggesting the running of a "pill mill," being a "drug kingpin," or any other pejorative terms have no place in evidence at this trial. For the reasons that follow, we ask that this Court issue an order precluding such blatantly improper evidence.

### A.   Testimony About Dr. Mirilashvili or His Clinic's Alleged Reputation Constitutes Improper Character Evidence Under Rule 404

Testimony by any witness regarding the alleged reputations of Dr. Mirilashvili or his clinic is inadmissible because it constitutes an improper use of character evidence. Therefore, it is inadmissible.  *See* Fed. R. Evid. 404.  "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith."  Fed. R. Evid. 404(a)(1).  The government will seek to offer this evidence—which is the equivalent of saying that Dr. Mirilashvili was a drug dealer who distributed controlled substances other than

43

for a legitimate medical purpose—to show that Dr. Mirilashivili's actions on the occasions charged in the Indictment were in conformity with that alleged "reputation."   This is precisely the type of testimony that Rule 404(a) is intended to exclude.[12]

> B.   Testimony About Dr. Mirilashvili or His Clinic's Alleged Reputation is Unfairly Prejudicial Under Rule 403

Evidence of Dr. Mirilashvili's or his clinic's alleged reputation has little to no probative value but it has a disproportionate risk of confusing and misleading the jury and prejudicing Dr. Mirilashvili.  First, there will be no evidence that the "community" from which such evidence arises has any medical training and, therefore, is qualified to determine whether Dr. Mirilashvili is providing medically legitimate treatment to his patients.  Second, such evidence would lead the jury to conclude that this reputational evidence is based in truth, and that Dr. Mirilashvili acted in conformity therewith for the time period charged in the Indictment. Such evidence lacks substantial probative force on the issue of improper medical practice in the transactions charged, yet it will most certainly cause the jury to speculate that the alleged reputations establish the wrongful conduct of Dr. Mirilashvili.  That would be improper, and such evidence should be precluded.  *See* Fed. R. Evid. 403.

## IX.   THE COURT SHOULD EXERCISE ITS DISCRETION AND ORDER THE GOVERNMENT TO PRODUCE A PROFFER OF CO-CONSPIRATOR STATEMENTS THAT IT WILL SEEK TO INTRODUCE UNDER THE NON-HEARSAY RULE

In this case, the government charged 11 defendants in the Indictment.  The Indictment itself discusses other unindicted co-conspirators, such as "Doctor-2" and "Doctor-3." (Indictment, ¶¶ 12-13, at 6-7.)  On top of this, the government also recently informed us of its belief that unindicted pharmacists and patients are also considered to be co-conspirators in Dr.

---

[12] This evidence may also be precluded because the government failed to provide notice that it would intend to introduce it pursuant to Rule 404(b) as directed by this Court.

Mirilashvili's charged conduct.  Because of the voluminous amount of discovery involving more than 40 different pharmacies that filled prescriptions under Dr. Mirilashvili's name and his record of approximately 3,500 patients, there are significant practical implications to the government's growing conspiracy claim.  Foremost among these is the fact that it permits the government to offer otherwise inadmissible hearsay statements into evidence from a multitude of declarants without the unpleasant necessity of calling them as witnesses and subjecting them to cross-examination.

Under these circumstances, this Court plainly has the discretion to order the government to disclose in advance of trial the statements it intends to offer under the non-hearsay rule, together with a summary explanation of the government's basis for claiming the declarant is a co-conspirator and how the statement furthered the conspiracy.  Given the uncertain contours of the charged conspiracy, information about alleged co-conspirators is needed to assess the admissibility of their statements before trial.   Moreover, it is unclear how the government will seek to link any of these alleged out-of-court declarations to Dr. Mirilashvili.  To the extent that the government might prove a conspiracy *around* him, it must eventually connect the statements to his knowledge and intent to join.

The government's theory appears to be that "drug crew" members infiltrated Dr. Mirilashvili's practice and sought to divert patient prescribed oxycodone to street sales.  The conduct of these "drug crew" members included such conduct as bribing Dr. Mirilashvili's office workers, paying off pharmacists to fill multiple prescriptions, forging additional prescriptions or getting pharmacists to fill duplicate prescriptions.  All of this conduct, however, appears to exist outside the activities and without the knowledge of the doctor.  Thus, the government should be put on notice that if it intends to expand the charged conspiracy to include these many other

45

"spokes," it must first show that it has evidence of a connecting "rim" that links these alleged statements back to a conspiracy that includes Dr. Mirilashvili.  *See e.g., United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008) (reversing conspiracy conviction finding no single conspiracy where two "hub" bank loan defendants worked with their own set of bank loan officers and real estate agents and the two groups were not interdependent with each other).

        Because it is still difficult to gauge the contours of the government's proposed conspiracy based either on the Indictment's own terms or remarks by the prosecutors about discovery, it would be particularly helpful here to evaluate the alleged admissibility of co-conspirator statements prior to trial.  There are many examples within the Second Circuit where the district court used its discretion to require the government to give more particular pre-trial notice of what co-conspirator statements it sought to introduce so that the parties and the Court could evaluate their admissibility outside the heat of trial testimony and avoid substantial trial error.  *See e.g., United States v. Daugerdas,* 09 Cr. 581 (WHP), 2011 U.S. Dist. LEXIS, at *3-*4 (S.D.N.Y. Feb. 16, 2011) (granting defense request for pretrial notification of co-conspirator statements in tax shelter case involving dozens of alleged unindicted co-conspirator tax clients); *United States v. Lopez*, 09 Cr. 525 (JFK), 2010 U.S. Dist. LEXIS, at *17  (S.D.N.Y. Sept. 1, 2010) (district court declining to allow, even conditionally, "the admissibility of co-conspirator statements until such time as the government identifie[d] the relevant declarants and [ ] established by a preponderance of the evidence that 'there was a conspiracy involving the declarant and the non-offering party, and that the statement was made during the course and in furtherance of the conspiracy.").  *See also United States v. Nunez*, 00 Cr. 121 (RCC), 2001 U.S. Dist. LEXIS 883, at *17 (S.D.N.Y. Feb. 1, 2001) (government agreed to turn over co-conspirator statements pre-trial); *United States v. Lawson*, 09 Cr. 203S (SR), 2010 U.S. Dist. LEXIS 65315,

at \*3-\*4 (W.D.N.Y. July 1, 2010) (government stated, "[c]ertainly, the United States will proffer evidence in support of the admission of out-of-court co-conspirator statements at the time designated by the trial court"); *United States v. Velez*, 10 Cr. 147 (JBA), 2010 U.S. Dist. LEXIS, at \* 21 (D. Conn. Nov. 30, 2010) ("Although the government correctly points out the Rule 16 does not encompass statements of co-conspirators . . . it nonetheless promises to identify which co-conspirator statements it intends to use against [defendant] three weeks in advance of the start of evidence.").

The interests of judicial efficiency, the integrity of the proceedings, and avoiding jury confusion are all clearly served by requiring such pre-trial notice.

## X.  THIS COURT SHOULD PRECLUDE THE USE OF ALIASES

Dr. Mirilashvili respectfully moves *in limine* to preclude the government from eliciting testimony about aliases of co-defendants and/or purported co-conspirators unless it first shows that the testifying witness only knew the person's alias.  In the Indictment, the government has included aliases for almost all of Dr. Mirilashvili's co-defendants.  Such evidence is irrelevant unless the government can first show that Dr. Mirilashvili referred to that person by his or her alias.  As Judge Learned Hand wrote more than 65 years ago, when there is no issue as to a person's identity, "[a]n alias—even a single alias—can serve no purpose but to arouse suspicion that the accused is a person who has found it useful or necessary to conceal his identity."  *United States v. Grayson*, 166 F.2d 863, 867 (2d Cir. 1948).  Nothing has changed since he wrote those words—people still view aliases as untoward and suggesting criminality. And permitting the government to imply that Dr. Mirilashvili should have known his alleged co-conspirators were criminals—by having its witnesses refer to them by their aliases—is improper and should be precluded pursuant to Rule 403 of the Federal Rules of Evidence.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, Dr. Moshe Mirilashvili respectfully requests that

this Court grant all of the relief requested herein.

Dated:    January 25, 2016
          New York, New York


                                        Respectfully submitted,

                                        CLAYMAN & ROSENBERG LLP


                                        By: _____/S/_____
                                               Henry E. Mazurek
                                               Wayne E. Gosnell, Jr.
                                               305 Madison Avenue
                                               New York, NY  10165
                                               T. 212-922-1080
                                               F. 212-949-8255

                                        *Counsel for Defendant Moshe Mirilashvili*