G1sWmirC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                 v.                          14 Cr. 810 (CM)


MOSHE MIRILISHVILI,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        January 28, 2016
                                        3:15 p.m.


Before:

                     HON. COLLEEN MCMAHON,

                                          District Judge


                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EDWARD B. DISKANT
BROOKE E. CUCINELLA
     Assistant United States Attorneys

CLAYMAN & ROSENBERG LLP
     Attorneys for Defendant
HENRY E. MAZUREK
WAYNE E. GOSNELL

G1sWmirC

1          (Case called)

2          MR. DISKANT:  Good afternoon, your Honor.  Edward

3     Diskant and Brooke Cucinella, for the government.  With us at

4     counsel table is Elizabeth Joynes, a paralegal in our office.

5          MR. MAZUREK:  Good afternoon, your Honor.  Henry

6     Mazurek and Wayne Gosnell from the law firm Clayman &

7     Rosenberg, on behalf of Dr. Mirilishvili, who is present before

8     the Court.

9          THE COURT:  Good afternoon, everybody.  I brought you

10    all in before things got too crazy.

11         THE CLERK:  Judge, there's a superseding indictment.

12         THE COURT:  Then we'll deal with that first.

13         THE CLERK:  Dr. Mirilishvili, the United States

14    Attorney for the Southern District of New York has filed a

15    superseding indictment, S1 14 CR 810.  Have you received a copy

16    of that indictment?

17         THE DEFENDANT:  Yes.

18         THE CLERK:  Have you discussed it with your counsel?

19         THE DEFENDANT:  Yes.

20         THE CLERK:  Counsel, do you waive formal reading?

21         MR. MAZUREK:  We do.

22         THE CLERK:  Dr. Mirilishvili, the grand jury has

23    indicted you on three counts.  Count One charges conspiracy to

24    distribute narcotics.  Counts Two and Three charge you with the

25    substantive count of distribution and possession with intent to

G1sWmirC

distribute a controlled substance.  How do you plead now to those counts?

        MR. MAZUREK:  We enter a not guilty plea as to each count.

        THE COURT:  Thank you very much.  Now what did you do, government?  You added a substantive narcotics count?

        MR. DISKANT:  Two substantive counts, your Honor.

        THE COURT:  You couldn't possibly have done that before?

        MR. DISKANT:  Your Honor, I apologize.  We've done it in advance of trials and we have been in talks with defense counsel.

        THE COURT:  I understand you did it in advance of trial.  You could have done it on the same day you indicted him on the conspiracy charge.  There's nothing new here.  First, I gather I have some *in limine* motions that just came in.  The government, I gather, wants to let the jury know that Dr. Mirilishvili had been suspended from the practice of medicine twice, or something like that?

        MR. DISKANT:  Yes, your Honor, that he had been expelled from the Medicaid program and then lost his medical license.

        THE COURT:  OK.  That's the government's motion *in limine*.  And the defendant wants to preclude the testimony of the government's witnesses.  Basically it wants to prevent the

G1sWmirC

1  government from putting in its case; that's the motion you want

2  to make?

3        MR. MAZUREK:  The expert witness, your Honor, without

4  more sufficient disclosure.

5        THE COURT:  A Brady motion is not a motion in limine.

6  You can object to any document as hearsay when it's introduced.

7  OK.  The government can respond to this.

8        From the government, in addition to the in limine

9  motions, which are really 404(b) motions, what else do we have

10  going?

11        MR. DISKANT:  Your Honor, only two other very brief

12  matters, from the government's perspective.  The first is that

13  we had notified defense counsel after they were retained that

14  Mr. Gosnell was clerking for.

15        THE COURT:  That who?

16        MR. DISKANT:  Mr. Gosnell, Wayne Gosnell.

17        THE COURT:  Oh, hi.

18        MR. DISKANT:  Had been clerking for Judge Pauley at a

19  time when Judge Pauley authorized or approved an application

20  relevant to this case.  The government doesn't foresee any sort

21  of conflict.  We just brought that to defense counsel's

22  attention, and we understand they have discussed that with

23  their client and agree with that assessment.

24        THE COURT:  Oh, how interesting.  That's one way to

25  find out whether judges show things to their law clerks when

G1sWmirC

1    they're in part 1.

2             MR. DISKANT:  And the second somewhat related matter

3    is we just wanted to put on the record at this point that we

4    have extended a plea offer to the defendant.  We understand the

5    offer has been conveyed by counsel to the defendant, and it has

6    been rejected by the defendant.

7             MR. MAZUREK:  That is correct, your Honor.

8             THE COURT:  All right.  Now from the defense, hello.

9             MR. MAZUREK:  Hello.  Nice to meet you, Judge.

10            THE COURT:  Nice to meet you too.

11            MR. MAZUREK:  First introduction.

12            THE COURT:  Nice to meet you too.

13            MR. MAZUREK:  Your Honor, last week, under an *ex parte*

14   presentation to the Court, we submitted or requested Rule 17(c)

15   subpoenas, and after further discussion, we have agreed to put

16   on notice a few of those to the government.

17            THE COURT:  Right, because I won't hear some of them

18   unless they're on notice.

19            MR. MAZUREK:  That's correct.  I thought that that

20   would be prudent.

21            THE COURT:  That would be very prudent.

22            MR. MAZUREK:  And the specific subpoenas that we've

23   requested are subpoenas to various medical providers that were

24   providing medical treatment to, or at least we have records

25   indicating that they were providing medical treatment to some

G1sWmirC

1    of the patients whom the government has put at issue or

2    informed us whose records may be at issue in their case in

3    chief.  Specifically, I should say, your Honor, that with

4    respect to the requests of the subpoenas for medical providers

5    who were providing contemporaneous or about-the-same-time

6    treatment of the patients at issue, the patient at issue that

7    we presented to your Honor or at least those medical providers

8    who provided for those patients were based not on a

9    presentation by the government of that, These are the only

10   patients that we're going to present or even that we're sure

11   that we're going to present these patients at trial, but more

12   generally, This is the group or universe of potential patient

13   files that may be relevant in the government's case in chief.

14             THE COURT:  I don't understand what that means.

15             MR. MAZUREK:  I don't really either, other than the

16   fact that the government did not want to or did not believe at

17   this time they could identify --

18             THE COURT:  They haven't given you a witness list yet,

19   so you don't know who they're going to call.

20             MR. MAZUREK:  I don't know who they are.

21             THE COURT:  And they haven't given you 3500 material

22   so you don't know what medical records of those people they

23   already have, because whatever they have, they have to turn

24   over, and they'd be fools if they hadn't already gotten these

25   people's medical records, so it wouldn't be the first time.

G1sWmirC

1        MR. MAZUREK:  And the problem that we have, from the

2   defense perspective, is that for the two-year period of the

3   conspiracy charge, there are about 3,500 patients.  Obviously

4   we're not going to be in a trial about all 3,500 patients.

5        THE COURT:  That's correct.  We're not.

6        MR. MAZUREK:  So there is some universe of patients

7   that the government has to identify as to whether it could be

8   relevant here, and that becomes even a bigger issue in this

9   case, your Honor, because these are medical records that are

10  going to be the subject probably of expert testimony.  And the

11  government has an expert who is going to be reviewing patient

12  files and opining on that review as to whether in this case,

13  because the defendant is a doctor who violated the Controlled

14  Substances Act, the government has to prove two things,

15  basically, beyond a reasonable doubt: that Dr. Mirilishvili

16  acted without reasonable medical judgment and outside the usual

17  course of his professional conduct.  To do that, I imagine that

18  the government is going to present this expert witness that

19  they've given us notice of.

20       THE COURT:  The one whose testimony you want to strike

21  anyway.

22       MR. MAZUREK:  Your Honor, I want to strike it in the

23  sense that if we don't know what he's going to say, he

24  shouldn't be able to say it, because 16(a)(1)(G) of Rule 16

25  says that there's a heightened discovery requirement for very

G1sWmirC

1    good reason of experts.

2            THE COURT:  Right.

3            MR. MAZUREK:  So that we can have an expert look at

4    what he's looking at and see if he has different opinions,

5    because if Dr. Gharibo gets on the stand and starts testifying

6    that an MRI looks like there was no problem of the L4/L5 lumbar

7    spine of this particular patient, I went to law school, not

8    medical school, and I have no idea what that is.

9            THE COURT:  Basically what you are really telling me

10   is that if the government gets to do what it wants to do, I

11   suspect, which is give you as 3500 material a few days before

12   the trial the information that serves as the basis of the

13   expert's opinion, you're going to come in and ask me for an

14   adjournment because you're going to need to retain your own

15   expert and it's going to take longer than the seven days that

16   it's going to take the government to put in its case --

17           MR. MAZUREK:  For her to review, though --

18           THE COURT:  -- for the expert to review those.

19           MR. MAZUREK:  And also, we have an expert, obviously,

20   and this case involves a medical doctor who has practice

21   obligations and other obligations, and to do this on very short

22   notice is almost impossible.

23           THE COURT:  And I imagine that the other thing I

24   gleaned from your original request was that it was also

25   possible that there would be additional medical records of

G1sWmirC

1    those patients that you would want to try to locate.

2              MR. MAZUREK:  Right.

3              THE COURT:  And being forced to do that after 5 p.m.

4    while you're on trial would be impossible, so once again, you

5    would want to have an adjournment.

6              MR. MAZUREK:  And that's the reason why we submitted

7    it as a Rule 17(c) subpoena, because we need it in advance of

8    trial to reasonably prepare and to show records, and there may

9    be litigation from some of these medical providers who are

10   claiming privacy issues.

11             THE COURT:  One of the reasons that I wasn't prepared

12   to sign wholesale willy-nilly subpoenas is my life is too short

13   to be inundated with a thousand motion-to-quash subpoenas.

14             MR. MAZUREK:  I understand.

15             THE COURT:  And then there was HIPAA.

16             MR. MAZUREK:  Now, your Honor, Mr. Gosnell has just

17   informed me, which is correct, that one of the dates that has

18   been added as a substantive count, January 1, 2013, none of the

19   patients are --

20             THE COURT:  January 1, 2013?  I'd hope his office was

21   closed on January 1.

22             MR. MAZUREK:  January 10.  Sorry.

23             THE COURT:  Most of us close our offices on January 1.

24             MR. MAZUREK:  None of those patients from January 10,

25   2013, thank you, are patients that we submitted subpoenas on

G1sWmirC

1    because we just received notice, based on the superseding

2    indictment, that that is now a relevant date of patient

3    population.  So there are a lot of patients that are now

4    relevant, and a lot of patient files that need to be reviewed,

5    and I still don't think that the government has provided

6    adequate notice of what its expert opinion testimony would be

7    with respect to any specific files, any specific patients, or

8    even really generally.

9              THE COURT:  Has it given you any notice at all?

10             MR. MAZUREK:  They provided a two-page letter, which

11   identifies general topics that these two proposed experts will

12   testify about, and they've also provided former testimony.

13             THE COURT:  Did I get a copy of that letter?  No,

14   because the judge is always the last to know.

15             MR. MAZUREK:  It's an exhibit to our motion *in limine*.

16             THE COURT:  To your motion.

17             MR. MAZUREK:  Exhibit A, in fact.  And they've also

18   provided prior testimony, which I've also included as exhibits

19   to the motion *in limine*, of these two individuals who testified

20   in prior trials.

21             THE COURT:  OK.  I don't have the motion *in limine*.  I

22   only have the briefs, so I don't have the exhibits.

23             MR. MAZUREK:  And, your Honor, while it is some 3500

24   material with respect to the prior trial testimony of these two

25   witnesses, a doctor and a pharmacist, that doctor and

G1sWmirC

1    pharmacist testified in prior trials about records of that

2    defendant who was on trial, so it certainly doesn't provide us

3    the opinions that these proposed experts would provide as to

4    the specific facts in this case.  And I think the general

5    topics that are identified doesn't satisfy 16(a)(1)(G), because

6    it does not tell us what the specific opinions or findings and

7    the basis of those findings are under Daubert.  And without

8    that, we also have asked for a Daubert hearing until we can

9    determine what the objective bases for the opinions are and

10   whether they satisfy the Daubert requirements for expert

11   testimony.

12        THE COURT:  That's not how you get a Daubert hearing.

13   You have to make much more of a showing than that.

14        MR. MAZUREK:  Yes.

15        THE COURT:  Let's start with, Has the government

16   satisfied its obligations under Federal Rule of Criminal

17   Procedure 16 concerning expert disclosures?  Let's look at the

18   section.  Which section are you relying on, expert witnesses?

19        MR. MAZUREK:  16(a)(1)(G).

20        THE COURT:  16(a)(1)(G):  At the defendant's request,

21   the government must give to the defendant a written summary of

22   any testimony that the government intends to use under Rules

23   702, 703, 705, during its case in chief.

24        This letter is not a written summary of the

25   government's testimony.  It is not, it is not, it is not.  A

G1sWmirC

1    real expert report is a summary of testimony.  Saying he's

2    going to testify about particular subjects without saying what

3    he's going to say is not a summary of the testimony.  Sorry.

4         MR. DISKANT:  Your Honor, if I may, just briefly, we

5    anticipated responding in writing to this and all the other

6    defendants' motions *in limine*.  We produced, at the defendant's

7    request, to supplement our initial disclosure the full

8    testimony of Dr. Gharibo in a very, very similar trial in

9    April, which we believe goes actually well beyond a summary of

10   his testimony.  It is, in fact, his testimony, what he has

11   previously said on each of the subjects, and so we feel it

12   fulfills that requirement.

13        With respect to the specific files that we are going

14   to ask Dr. Gharibo to examine, as we have been telling defense

15   counsel on almost a daily basis for the last week and a half,

16   we are in the process of culling that list, and part of the

17   reason that we have superseded and added two specific dates as

18   dates of substantive counts is that those are the dates we are

19   planning to ask our expert and probably focus our trial

20   testimony on.  There are a total of about 50 patients seen on

21   those two days combined.  Those are the primary starting point,

22   certainly.

23        THE COURT:  January 10, 2013, and?

24        MR. DISKANT:  October 28, 2014.

25        THE COURT:  OK.  Those two dates.

1          Yes?

2          MR. MAZUREK:  Judge, the concern here is that the

3    reason that we have been honestly pestering the government over

4    the last week and a half for this information is we're only a

5    month out from trial, and it's a time-consuming process to go

6    over all of these medical records, and not just the medical

7    records.  The universe that the government has are medical

8    records that were seized at Dr. Mirilishvili's medical office.

9          THE COURT:  How do you know?  They may have actually

10   gone out and gotten other records.  They may have actually gone

11   out and found out something about the people who are going to

12   testify at the trial.  They don't always do that, I'll grant

13   you that, but they might have.  A prudent lawyer would do that.

14         MR. MAZUREK:  We've requested, under Rule 16, and no

15   additional medical records have been provided, and this case

16   has been outstanding, as you know, for two years.  I suspect

17   that there are no additional records at this stage that the

18   government provided.

19         Let me say a little bit about what I think the

20   government's going to say in response.

21         THE COURT:  Don't you say anything about what the

22   government's going to say in response.  I'd rather the

23   government said what the government's going to say in response.

24         MR. DISKANT:  Thank you, your Honor.  As an initial

25   matter, just so the Court knows, defense counsel and the

G1sWmirC

1    defendants actually have access to more records than we do,

2    because defense counsel and the defendant have access to a

3    system called Practice Fusion, which the Court got a letter

4    about today and which we have sought to obtain the contents of.

5    They have had access to it for some time.

6              THE COURT:  What is it?  I haven't read the letter.

7              MR. DISKANT:  Practice Fusion is a Cloud-based, like a

8    Gmail-type system that the defendant could log into from his

9    computer when he was working in the clinic or at home and input

10   certain data regarding his patients.  So to the extent there

11   are additional files that the defendant had or additional

12   information that the defendant had on the patients he was

13   treating above and beyond the hard copy paper files, which of

14   course, we all have, only the defendant has access to that

15   material.  They are at an informational advantage in that

16   respect.  They have not shared that information with us,

17   despite our requests for it, and we have now sought a search

18   warrant for it, which is pending with Practice Fusion.  We have

19   not yet gotten the results back.

20             I should also note just so the Court understands what

21   we expect the evidence in this case will turn on, I think it's

22   highly relevant both to the expert issue and the records, most

23   of these records are demonstrably fraudulent on their face.

24   This is an example from October 24, 2014.  It's ostensibly an

25   MRI for a patient named Larry Ashby, except Larry Ashby is very

G1sWmirC

1   visibly cut and pasted in, and the rest of the document refers

2   to the female as a she, and in one place says "below is an

3   explanation of Ms. Bronte's evaluation."  The doctor signing it

4   on one side is different from the doctor on another side.  It

5   comes from a phone number that is not actually active and

6   indeed is an out-of-the-city area code.  These are the sorts of

7   things we expect the jury is going to learn about, so the

8   records are not terribly voluminous.  They are not going to

9   require a terrible amount of time to evaluate.

10          THE COURT:  The records that you have which you're

11   going to turn over as 3500 material.

12          MR. DISKANT:  We've already produced all of this

13   information, your Honor.

14          THE COURT:  You've already produced it.

15          MR. DISKANT:  Yes.

16          THE COURT:  That's not what you want.  You want to go

17   to all these doctors everywhere in the world and find out

18   everything you can about these patients' medical histories,

19   like in a medical malpractice case.

20          MR. MAZUREK:  In fact, I want to make sure that this

21   does not become a medical malpractice case, because it's a

22   criminal case that has a much greater standard than obviously a

23   medical malpractice case does.

24          THE COURT:  I'm not worrying about the evidentiary

25   standard, but you're looking to subpoena the kind of records

G1sWmirC

1    that you would obtain if you were defense counsel in a medical

2    malpractice case so that you would know absolutely everything

3    about the medical histories of these patients: he fell 20 years

4    ago and he broke his spine, that he did this, that he did that.

5           MR. MAZUREK:  I think I can clarify what exactly it is

6    that we're looking for, and here's the crux of the problem, I

7    think, in this case.  The government claims that

8    Dr. Mirilishvili ran what's called a pill mill.

9           THE COURT:  A pill mill.

10           MR. MAZUREK:  Right.  That he was not acting as a

11    doctor at all, and that's why we're not in civil court, we're

12    in criminal court, and that his entire practice was a

13    fraudulent practice, that he was just writing prescriptions and

14    papering the file to make it look like a medical practice.

15    Now, we obviously have a very different view of things.  We

16    believe very strongly that the evidence will show that

17    Dr. Mirilishvili was working as a doctor, as a real doctor,

18    examining patients, as he did the confidential source that went

19    in with the recording device and where it shows the kind of

20    examination that Dr. Mirilishvili conducted.

21           What happened, the evidence, I think, will also show,

22    is that because of the nature of the drug that was being

23    prescribed under this pain management practice, it was

24    infiltrated by a drug organization because the value of these

25    pills is very high on the street; the resale value is very

G1sWmirC

1   high.  The problem as I see it and with respect to how the

2   government wants to present this case is to say, Look, and

3   they've said that to us, Defense counsel, you don't need to go

4   and look to other medical records or histories of referrals or

5   contemporaneous treatment by other doctors of these patients,

6   because this whole thing was a fraud, they're fake documents,

7   they're all fake.  But the problem is, your Honor, that they're

8   not all fake.

9           THE COURT:  And anyway, they can't tell you how to try

10   your case.

11          MR. MAZUREK:  And it's absolutely relevant.

12          THE COURT:  I would be shocked if you looked at the

13   evidence the same way as the government.

14          MR. MAZUREK:  Get it the same way?

15          THE COURT:  I would be shocked if you looked at the

16   evidence in the same way as the government, so the government's

17   interpretation of the evidence is not likely to be persuasive

18   to you.

19          MR. MAZUREK:  Obviously.  But the problem is that we

20   need access to the information, because here's the problem.  If

21   the government presents a document and says it's false, we have

22   no way to determine whether it is, because the government

23   hasn't gone out and obtained or sought to obtain the records

24   from this patient population, from the medical providers.

25   There are documents in each of these files that come from

G1sWmirC

places as Mount Sinai Hospital, Harlem Hospital, but real

places that exist, and we should at least have the opportunity

to subpoena the records of those facilities.  And why is this

relevant?  Because one of the prongs of the test that the

government has to prove is that Dr. Mirilishvili was not

exercising reasonable medical judgment.  Let's say, for

example, if there is a contemporaneous doctor, primary care

physician, or hospital where the patient went to around the

same time that he went --

THE COURT:  Mount Sinai Hospital.  Let's say Mount

Sinai Hospital.

MR. MAZUREK:  Let's say Mount Sinai Hospital, and he

got an MRI test and also was prescribed, for example,

oxycodone.  There's a patient that, for instance, on one of the

dates that the government superseded and had told us about,

October 28, 2014, patient by the name of Pete Phoebean.

THE COURT:  Let's not do the names.  OK?

MR. MAZUREK:  Sorry.

THE COURT:  Thank you.

MR. MAZUREK:  There's a patient there who indicates

that there was a referral from Mount Sinai Hospital, just what

we were talking about, where the individual was currently being

treated for oxycodone, and a referral was made.

THE COURT:  Currently being treated for oxycodone?

MR. MAZUREK:  No.  Was receiving oxycodone as a pain

G1sWmirC

1    management treatment.

2              THE COURT:  OK.

3              MR. MAZUREK:  This is one of the patients from the

4    dates now in the superseding indictment.  Clearly, if there was

5    someone at Mount Sinai or a referring physician who had treated

6    or was treating the same patient at the same time, in 2013,

7    with oxycodone treatment, that's relevant to show

8    Dr. Mirilishvili's intent; that is, that he was acting in good

9    faith as a real medical doctor, and this corroborates that.  So

10   we are seeking highly relevant and admissible documents that

11   are relevant to the specific issues that the government is

12   going to present in its case in chief.  I mean, it has to be

13   made available to us because otherwise we can't counter the

14   government's claim that everything in this pill mill was a

15   fraud, that all these documents were fake.  It's absolutely

16   relevant to show that Dr. Mirilishvili, they can't just pick

17   and choose a selected few patient files and say, See, he knew

18   he was running a pill mill because these are fake documents.

19             They can make the argument that, OK, these few fake

20   documents, he should have known about, but in the context of

21   his practice, the defense needs to be able to show the

22   relevance of the fact that for all of these patients around

23   him, he was doing the things that a medical doctor believed in,

24   in a reasonable judgment, and in fact is corroborated by other

25   medical providers who were seeing the same patients at

1    basically the same time.

2            THE COURT:  OK.  Do you want to just jump out of your

3    chair?

4            MR. MAZUREK:  I can also address the other issue that

5    Mr. Diskant raised, because I do think it's a significant issue

6    in the case.  It has to do with this Cloud-based electronic

7    management or medical records that are being kept by

8    Dr. Mirilishvili on something called Practice Fusion.  This is

9    the software program that is provided for doctors.  It already

10   has templates to enable them to input notes, upload medical

11   records and histories and prescriptions and also keep a

12   calendar.  It has many, multiple functions.  When we got on the

13   case at the beginning of this year, the software in this

14   program was sold to us by prior counsel, and I admit that

15   initially I was confused by it because we had a whole set of

16   hard copy records that the government had produced and

17   initially I had, incorrectly now, believed that those were just

18   the hard copies or the scans of what was inside this Practice

19   Fusion software program, but subsequently, I've discovered that

20   that's not true, that these are a whole different set of

21   records.  Some of them are duplicative of what was in the paper

22   copies that were seized during the search of my client's

23   medical office and home, but there were many, many other

24   records that were held on this Cloud server that were not part

25   of those records.

G1sWmirC

1          Now, first of all, the government was aware of this

2     fact even before Dr. Mirilishvili was arrested, because one of

3     the agents interviewed him and he explained that he kept

4     medical records on Practice Fusion.  Second of all, prior

5     counsel submitted a very lengthy and detailed deferred

6     prosecution memo in the middle of last year that included

7     printouts from this Practice Fusion database.  And when we got

8     into the case, the one thing, when we learned that this

9     database is more extensive than the documents that were

10    provided by the government in discovery about

11    Dr. Mirilishvili's practice, we immediately sought from the

12    software company, we requested that they export all the data,

13    and the reason to do that is because the way it's on this

14    software program, it's not very user-friendly.  It's not

15    searchable.  Documents aren't searchable.  Words within

16    documents aren't searchable.  All of the patients are not in

17    one place.  So it's very, very time-consuming and cumbersome to

18    try and track down relevant information on this software

19    program.

20          Now, last week, we received or actually this week, on

21    Tuesday, we received a copy of the search warrant and search

22    warrant affidavit that the government told us they were going

23    to execute and the government did execute on this software

24    company Practice Fusion.  And I've spoken to the government

25    about some of the issues that I think exist.  The government

G1sWmirC

1    suggested first that we just give a password so that they can

2    access the program the same way that we've been able to access

3    the program.  The problem with that, your Honor, is that I've

4    since learned that with respect to the software itself, it

5    includes histories of searches and information that would be, I

6    believe, attorney work product at this point, because we have

7    been doing searches based on our view in preparation for the

8    case since we got on the case.

9        The better way to handle the data that's on there, I

10   believe, is to export it so that none of the information of the

11   party accessing the software program, which searches they're

12   conducting, what documents they downloaded, what are they

13   looking at on the database.  And since we've looked at the

14   search warrants that the government's executed, it seems, on

15   January 15 of this year, I think, I mean I know, one of the

16   problems I see is once Practice Fusion is sent over to the

17   government, it may include privileged information or at least

18   attorney work product of the searches and downloads that we've

19   done since we've gotten in the case and I imagine that prior

20   counsel for Dr. Mirilishvili may have done as well.

21       All of this is, I guess, a long-winded way of saying

22   that there are issues with respect to how to deal with this

23   electronic data.  I'm happy to work through it with the

24   government.

25       THE COURT:  I think you should.  Just so you know, and

G1sWmirC

1     I think you do know, but so you know, the whole search warrant

2     thing is all news to me because I was halfway around the world

3     until January the 20th.

4              MR. MAZUREK:  It's relatively new, I mean, to us as

5     well, obviously.  But having looked at the warrant, there are a

6     couple of things.  I think there may be an overbreadth

7     challenge to the information that's requested and how the rider

8     was drafted.

9              THE COURT:  If somebody wants to make a motion, make

10    the motion.  I'm back.

11             MR. MAZUREK:  OK.

12             THE COURT:  But I can't deal with this orally because

13    I don't have any idea really what you're talking about.  You've

14    explained it a little bit, but I'm a Luddite when it comes to

15    technological matters, I clearly confess it.  I can be taught,

16    but I have to be taught very carefully and very thoroughly, and

17    I'm not the person who signed off on the warrant, because I

18    wasn't here.

19             MR. MAZUREK:  I understand.  We'll do that as

20    expeditiously as possible, along with the million other things

21    that are going on.

22             THE COURT:  That's the problem with being defense

23    counsel, in the month before trial, you're always doing a

24    million things.

25             MR. MAZUREK:  Yes.

G1sWmirC

| | |
|---|---|
| 1 | THE COURT:  But I just want to suggest that with |
| 2 | respect to the privilege issue you talk to the government. |
| 3 | MR. MAZUREK:  I put them on notice of it so that |
| 4 | there's no taint that happens in terms of if they get the |
| 5 | material, it likely will include, if they get it, and I don't |
| 6 | know in what kind of form they're going to get it, but if they |
| 7 | get full access to the program, they certainly will be able to |
| 8 | see our work product in terms of searches we've conducted, |
| 9 | documents we downloaded, and other things that we have been |
| 10 | doing. |
| 11 | THE COURT:  They're not entitled to see your work |
| 12 | product. |
| 13 | MR. MAZUREK:  Yes. |
| 14 | THE COURT:  The government is going to have to work |
| 15 | out a way so that it doesn't see your work product. |
| 16 | MR. MAZUREK:  Again, with respect to this database of |
| 17 | files, it includes within it all of Dr. Mirilishvili's notes |
| 18 | and other documents relating to patient histories and |
| 19 | prescriptions and calendaring issues, so there's a lot of |
| 20 | material there.  I mean, I can't even begin to imagine what the |
| 21 | entire volume is because of the way it's stored; it's |
| 22 | impossible to tell.  It would be impossible for us just to |
| 23 | print the whole thing.  I mean, it would take forever, first of |
| 24 | all, because there's just no way to do it, unless Practice |
| 25 | Fusion exports all the data and then perhaps it could be sent. |

G1sWmirC

```
 1              THE COURT:  I don't know what that means.  I mean, I
 2     told you, I'm a Luddite.  Unless they export the data?
 3              MR. MAZUREK:  Yes, all of the information.
 4              THE COURT:  Because all information is in the Cloud
 5     somewhere.
 6              MR. MAZUREK:  It's on a specific software where it's
 7     not like you can just say to that software, Tell me everything
 8     about patient X, and it will just print it all for you.  There
 9     are tabs and places you have to go for different types of
10     documents, and if you had to do that for each of the patients,
11     it would take, honestly, months to do.
12              THE COURT:  And how did the information get there?
13              MR. MAZUREK:  It was uploaded by Dr. Mirilishvili
14     during his practice.
15              THE COURT:  Fine.  As somebody pointed out, this case
16     has been going on for two years.  There's been plenty of time.
17              MR. MAZUREK:  And we will make available to the
18     government what we intend to use from those Practice Fusion
19     files as soon as we know what the relevant patient population
20     is.  I think it comes down to basically understanding which
21     patients are at issue in the case.
22              THE COURT:  I think I just heard January 10, 2013, and
23     October something, 2014.  That's what I think I just heard.
24              MR. MAZUREK:  I don't know if that's what the entire
25     case is about.  Maybe we could inquire of the government about
```

G1sWmirC

1   that.

2              MR. DISKANT:  Your Honor, I think there may be a

3   limited number of additional individual documents that we'd

4   choose to mark as exhibits.

5              THE COURT:  Good.  Tell me what they are by next

6   Wednesday.  Thank you.

7              MR. DISKANT:  Your Honor, could we do that in

8   connection with the production of 3500 material as well?

9              THE COURT:  No.  You can tell me what they are by next

10   Wednesday.

11              MR. DISKANT:  Thank you, your Honor.

12              MR. MAZUREK:  And can we have a date by which we're

13   going to receive the written summary of testimony of their

14   expert witnesses?

15              THE COURT:  I think what the government said is the

16   written summary of the testimony is the testimony in the prior

17   case.  That's the written summary of the kinds of opinions that

18   are going to be given, and if you want to say that that's

19   insufficient, tell me that it's insufficient.  I guess I'll

20   then have to read the testimony in the prior case.

21              MR. MAZUREK:  I mean, I understand all the general

22   stuff about what oxycodone is and what it's used for and all of

23   that.  That's the easy part.  The hard part is what opinions he

24   may have about how Dr. Mirilishvili kept his medical files,

25   what the medical files said, and what he thinks about that, or

G1sWmirC

1   if he seeks to opine that the way he conducted his practice was

2   not in line with reasonable medical.

3        THE COURT:  I've essentially told the government that

4   the way I read the rule, summary of testimony is the same thing

5   as an expert report in a civil case.  Anything you're going to

6   give an opinion about, your opinion has to be in the summary.

7        MR. MAZUREK:  Right.

8        THE COURT:  This is not something that the government

9   is allowed to keep secret.

10        MR. MAZUREK:  The prior testimony is useful like a

11   smidge, but a lot of the testimony is talking about that other

12   doctor, what that other doctor did, Dr. Lowe, in that case.

13   But what these guys might testify in this case about what

14   Dr. Mirilishvili did or didn't do is not in that prior trial

15   transcript.

16        THE COURT:  Obviously.

17        MR. MAZUREK:  So I don't think it's really that

18   helpful, and I don't think it complies with Rule 16(a)(1).

19        MR. DISKANT:  Your Honor, I disagree with defense

20   counsel's assessment there, but we do intend to provide

21   specific files, as we told the Court, to our expert this week,

22   and we can endeavor to produce a supplemental report on the

23   scope of his testimony in connection with the 3500 material on

24   the 12th.  And I'd also note that defense counsel has not

25   notified any experts in this case at all and has not provided

1    any notice with respect to that issue at all.

2              MR. MAZUREK:  We talked about that when we first came

3    in, and I told the government that I would give them notice of

4    my expert by the end of the month.  We plan on doing that,

5    which is tomorrow.

6              THE COURT:  I was going to say, we're really close.

7              MR. MAZUREK:  But part of the problem is that, I mean,

8    I can give notice the person.  However, the person has nothing

9    to do until --

10             THE COURT:  That's correct.  I totally appreciate your

11   position on that, and I would not bar your expert from

12   testifying on the ground that tomorrow you're unable to tell

13   them what the expert's going to say because you have no idea

14   what the expert's going to say, and I understand that.

15             MR. MAZUREK:  Again, your Honor, because, look, I

16   mean, this is obviously a very serious case.

17             THE COURT:  They're all serious.

18             MR. MAZUREK:  They are.  He's looking at basically a

19   life sentence if you look at the Pimentel letter that he was

20   given.  Now that the government has superseded, the maximum

21   statutory sentence in this case is 720 months, so this is very

22   serious, and I take my obligations very seriously.  I know the

23   government does as well, but if the government is having their

24   expert review next week files, and I don't know when we're

25   going to get his opinions, and then having to get them to my

G1sWmirC

1    expert, I will do everything I can to do this as reasonably and

2    expeditiously as possible.

3            THE COURT:  This is real simple.  This is not a civil

4    case.  Your expert doesn't have to start until the government's

5    expert report is in.  If the government doesn't get information

6    about your expert until substantially into the trial, that's

7    quite all right with me.  This is not a case where we're

8    dealing with Rule 26 with an early exchange of expert reports

9    by both sides.

10           MR. MAZUREK:  I appreciate that, and I will do

11   everything I can.  When dealing with experts, particularly

12   doctors, who are very busy, I foresee that I may get some

13   complaints by my expert, but I will do everything I possibly

14   can to make this happen pursuant to the schedule.

15           THE COURT:  It's always a problem dealing with

16   professionals.

17           MR. MAZUREK:  Yes.

18           THE COURT:  I appreciate it.  I wish they wouldn't

19   undertake the commission unless they were prepared to cooperate

20   with the schedule.

21           MR. MAZUREK:  And that was one other thing, your

22   Honor, with respect to the schedule that I talked about with

23   your deputy clerk.  It took us some effort, and I'd say we got

24   in the case in the beginning of January.  Prior counsel had not

25   found an expert at that point in time, so we were starting the

G1sWmirC

1    search anew or afresh, and we interviewed several potential

2    experts, and trying to find an expert that had time allotted in

3    the next couple of months to do this kind of time intensive

4    work was very difficult.  We found one who is available.

5    However, she has a travel schedule that's during the first part

6    of the trial that she says she cannot change.  It's from March

7    3rd through the 11th.  I alerted the clerk of that and I

8    alerted the government.  I think the government's case is going

9    to take us through that period of time, and she's going to be

10   available to testify on Monday, March 14.  And I would just

11   ask, given how hard it was to find any expert, to indulge us

12   with that schedule.

13          THE COURT:  How long does the government anticipate

14   its case in chief will take to put in?

15          MR. DISKANT:  I think our present estimate is perhaps

16   four or five days.

17          MR. MAZUREK:  Judge, I have to say that's almost

18   mind-boggling.  I mean, I have a chance to cross-examine, and

19   there's two experts that they have proposed and the two dates

20   of patients.

21          THE COURT:  We have eight days in the first two weeks,

22   because we don't sit on Friday.

23          MR. MAZUREK:  Right.

24          THE COURT:  So we have eight days in the first two

25   weeks.  The first day will undoubtedly be consumed with jury

G1sWmirC

```
1    selection, and then we'll have opening statements.  And I am
2    known for running a tight ship, but if the government says five
3    days, we'll make it work.  I told you I would not put off the
4    trial.
5              MR. MAZUREK:  Yes.
6              THE COURT:  And the reason I will not put off the
7    trial is, A, my trial calendar, and B, this is an unfortunate
8    year.  We have religious holidays in two different months five
9    weeks apart, and so we're going to have a problem with the week
10    of the 21st of March and then I'm going to have a problem again
11    late in April.  I always like it when the spring religious
12    holidays coincide, it makes my life a lot easier, but this is
13    the year when they do not coincide, so I've had to jigger my
14    trial schedule around the fact that a large number of people
15    will not be available, whether lawyers or jurors, during
16    particular weeks on the calendar for those reasons.
17              MR. MAZUREK:  I understand.  I just wanted to alert
18    the Court.
19              THE COURT:  OK.
20              MR. MAZUREK:  I just wanted to alert the Court so that
21    I'm not springing it on you.  I know that would not be a good
22    thing.
23              THE COURT:  I know.  I've actually been alerted.  I
24    was even alerted to that in Australia or New Zealand, or
25    something like that.  All right.
```

G1sWmirC

1          MR. MAZUREK:  I think we just need to resolve the

2    issue of whether you are granting the subpoenas to get the

3    medical records.

4          THE COURT:  The government's going to respond to your

5    request.  On notice means on notice.  I assume that the

6    government's going to put in a response on the subpoenas issue.

7          MR. DISKANT:  Your Honor, we haven't actually received

8    a copy of the subpoenas.

9          THE COURT:  I know that.

10          MR. DISKANT:  But we don't anticipate the government

11    objecting to them being issued.

12          THE COURT:  Great.

13          MR. MAZUREK:  There we go.

14          THE COURT:  Why don't you take 24 hours and make

15    absolutely sure of that.  And now we have dates for patients.

16          MR. MAZUREK:  Yes, we need to supplement ours.

17          THE COURT:  Yes, forgive me, because you wanted many

18    more than two dates, or so it seemed to me when I read the

19    application.  Perhaps I misread it or read too much into it.

20          MR. MAZUREK:  But there's two different days now.  We

21    have to replace one day with another day.

22          THE COURT:  OK.

23          MR. MAZUREK:  But otherwise, it's pretty much, there

24    are a lot of patients.

25          THE COURT:  Why don't you do the replacing, get it to

G1sWmirC

1  the government, and by Wednesday morning at 10 o'clock let me

2  know if there are no problems.  I will assume that there will

3  be no problems.  I will pray there are no problems.

4           MR. MAZUREK:  By when?

5           THE COURT:  The government has to get back to me by

6  Wednesday morning at 10 o'clock.

7           MR. MAZUREK:  Next Wednesday?

8           THE COURT:  No, no.  What am I saying?

9           MR. MAZUREK:  Today is Thursday.

10          THE COURT:  Monday morning at 10 o'clock.  I don't

11  know why I think it's Monday.  I do know why I think it's

12  Monday.

13          MR. MAZUREK:  Oh, yes.  We would ask that, and I think

14  the government should not have a problem with this, just giving

15  us a list of the patients for those two days to make sure we're

16  all on the same page as to who those patients are.

17          THE COURT:  I think you people should be able to work

18  that out.

19          MR. DISKANT:  Yes, of course, your Honor.  Your Honor,

20  if I can just clarify, the Court had asked us to make available

21  to defense counsel certain documents by next Wednesday.  My

22  understanding is that what we're going to endeavor to identify

23  by next Wednesday are the end patient files.

24          THE COURT:  Other than on those two days.  For two

25  days, if you give them a list of who those patients are, that

G1sWmirC

1    would be helpful, and by next Wednesday you should know what

2    patients from July 20, 2014, you're going to add to that list.

3               MR. DISKANT:  Understood.

4               MR. MAZUREK:  And, your Honor, just to make clear that

5    one of the issues in the motions *in limine* with respect to the

6    expert testimony that we believe may violate some of the

7    requirements of <u>Daubert</u>, and I know the government has not had

8    a chance to respond yet, is that the cherry-picking of

9    particular files --

10              MR. DISKANT:  Are you kidding me?

11              THE COURT:  Believe me, you're going to lose that.

12   You just go ahead and you file that brief.  You file it, trust

13   me, you're going to lose that.  OK?

14              MR. MAZUREK:  But I just don't want to be precluded

15   from introducing additional files.

16              THE COURT:  You can take that up to the Second Circuit

17   if you are unlucky enough to end up there.  You're going to

18   lose.  I've gone through your motion.  I don't give it a high

19   likelihood of being granted.

20              MR. MAZUREK:  OK.  But we will provide to the

21   government any patient files that we intend to introduce in our

22   case in chief as well.

23              MR. DISKANT:  Can we have those by Wednesday as well,

24   your Honor, so we can have our expert review them?

25              THE COURT:  That would be helpful.  If you want your

G1sWmirC

```
1    expert to get to work, you've got to help his expert get to
2    work.
3              MR. MAZUREK:  All right, but I haven't even started
4    looking at these patient files that are being introduced now,
5    or the patient files that the government is going to be
6    introducing.
7              THE COURT:  The following Wednesday.  A week from
8    Wednesday.  OK?
9              MR. MAZUREK:  Very good.
10             THE COURT:  Two weeks from yesterday.  This is
11   Thursday.
12             Anything else?
13             MR. DISKANT:  Not from the government, your Honor.
14             THE COURT:  From the defense, anything else?
15             MR. MAZUREK:  Your Honor, we talked about the medical
16   provider subpoenas.  There are also subpoenas to pharmacies
17   where we have a good faith belief that there were forgeries or
18   fraudulent prescriptions filled with our doctor's name on them,
19   so we have asked for you to sign those subpoenas as well.  I
20   don't think the government has a problem.
21             THE COURT:  Same thing.  I said that would be on
22   notice to the government.  Show the government the subpoena
23   requests.  Let the government weigh in if it's going to have a
24   problem with it.
25             MR. MAZUREK:  OK.  That's all.
```

G1sWmirC

1               THE CLERK:  When is our final pretrial conference?

2               MR. MAZUREK:  I think February 18.

3               THE CLERK:  The 18th?  Do you want to keep that,

4    Judge?

5               THE COURT:  I do.

6               THE CLERK:  4 o'clock on the 18th.

7               THE COURT:  All right.  I will see you then.

8               (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25