UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                            :

UNITED STATES OF AMERICA         :        (S2) 14 Cr. 810 (CM)

       – v. –                 :

MOSHE MIRILASHVILI,          :

                Defendant.   :

-----------------------------------------------------------X

 

**MEMORANDUM OF LAW IN RESPONSE AND OPPOSITION TO
DEFENDANT MOSHE MIRILASHVILI'S  MOTIONS *IN LIMINE***

 

 

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
             of America

EDWARD B. DISKANT
BROOKE E. CUCINELLA
Assistant United States Attorneys
      - Of Counsel -

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
UNITED STATES OF AMERICA                               :          (S2) 14 Cr. 810 (CM)
                                                       :
           – v. –                                      :
                                                       :
                                                       :
MOSHE MIRILASHVILI,                                    :
                                                       :
                          Defendant.                   :
                                                       :
-------------------------------------------------------X

The Government respectfully submits this memorandum of law in opposition to the

defendant Moshe Mirilashvili's thirteen-point motion *in limine* which, as the Court correctly noted

during the January 28, 2016 status conference, amounts to a blanket attempt "to prevent the

Government from putting in its case."   For the reasons that follow, the Government submits that

substantially all of these motions can and should be denied as meritless, moot, or both.

**I, II.       The Expert Testimony of Dr. Christopher Gharibo**

First, the defendant seeks to exclude the testimony of the Government's noticed expert, Dr.

Christopher Gharibo, on the grounds that (1) the Government's expert notice does not satisfy the

requirements of Rule 16(a)(1)(G); (2) certain of the opinions to be offered by Dr. Gharibo do not

satisfy the standard set forth in Rule 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 588 (1993).

As an initial matter – and at a trial at which one of primary issues in dispute at trial will be whether the defendant believed himself to be engaged in the "legitimate practice of medicine" – there does not appear to be any dispute that the testimony an expert on the legitimate practice of pain management medicine would "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Indeed, as the defendant himself argues, in his motions *in limine*:

> An assessment of the propriety of prescribing pain medication necessarily entails consideration of many factors, including the patient's medical condition and treatment history, the availability of alternatives for treatment, and the information and advice shared in the context of the physician-patient relationship.

(Br. at 35.)[1]  The Government submits that the jury should hear this sort of information from an expert, since it is clearly the sort of testimony based on "specialized knowledge" contemplated by Rule 702.  Both parties have now noticed, as experts, medical doctors with advanced training in the field and capable of providing such testimony.   The Government submits both experts should be permitted to testify and to opinion on the standards for the legitimate practice of medicine in the field of pain management as well as on the treatment provided by the defendant on particular occasions.[2]

---

[1] Citations to "Br." refer to the defendant's memorandum of law in support of his motions *in limine*, dated January 25, 2016.

[2] The defendant has not, to date, provided any summary of the anticipated testimony of his noticed expert.

A. <u>Relevant Facts</u>

    *1. Dr. Gharibo's Background and Anticipated Testimony*

    Dr. Christopher Gharibo is a physician who has spent his entire career practicing, studying and advancing the fields of anesthesiology and pain management.[3]  He maintains an active license to practice medicine in New York, and is also licensed by the Federal Drug Enforcement Administration.  His training and vast experience, as detailed in his attached *curriculum vitae* ("CV")(*see* Exhibit 1), establish him as a leader in the field.  Since 1997, Dr. Gharibo has been an instructor at New York University School of Medicine and is currently an Associate Professor of Anesthesiology, Perioperative Care & Pain Medicine and an Associate Professor of Orthopedic Medicine.  While on faculty at NYU, he has been responsible for, among other things, implementing educational programs and policies and procedures to improve pain medicine systems of care at NYU Medical Center and compliance with the Joint Commission on the Accreditation of Healthcare Organizations Pain Management Standards.  Dr. Gharibo has been publishing  on a multitude of topics relating to pain management for decades, and all of his reviews, articles, abstracts and book chapters are listed on the attached CV.  He is currently on the editorial board of Pain Medicine and Pain Physician, and belongs to an array of professional associations.   Dr. Gharibo also regularly sees patients through his own medical practice.

    Along with seeing patients, publishing and teaching at NYU, Dr. Gharibo is also regular speaker at conferences and trainings in the field of pain management around the country.  Indeed,

---

[3] On or about January 16, 2016, the Government noticed the testimony of Dr. Christopher Gharibo and William T. Winsley, M.S.  The Government no longer intends to call Mr. Winsley during its case-in-chief but reserves the right to call him as a rebuttal witness, depending on the arguments made and/or evidence offered by the defendant at trial.

the defendant himself appears to have attended one such conference in Phoenix, Arizona in September 2014, as evidenced by a conference brochure recovered during the search of the defendant's home, certain pages of which are attached as Exhibit 2.

At trial, Dr. Gharibo will testify about the importance of confirming that a patient has the proper biological, psychological, and social indications for opioid therapy, and the importance of monitoring a patient's compliance once on that therapy.  He will explain to the jury how opioids— and specifically, oxycodone—work, including their physiological impact on the body, and how that impact can result in addiction and abuse.  He will also testify about his conclusions based on his review of certain "patient" files recovered from the defendant's home and clinic, including explaining to the jury the significance of certain documents in those files to determining whether a patient had the proper indications for opioid therapy.  Finally, based on his review of those files, as well as his review of New York State Bureau of Narcotics Enforcement ("BNE") data regarding the number and types of prescriptions written by Dr. Mirashvili, Dr. Gharibo will opine on the number of the defendant's "patients" who appeared to be receiving the exact same type of opioid therapy for extended periods of time.

## 2.  *The Government's Expert Notice*

Consistent with the schedule set by the Court, on January 15, 2016, the Government provided notice that it intended to call Dr. Christopher Gharbio to testify both to "general topics" such as the "legitimate practice of pain management medicine, including the use of physical therapy, surgery, non-surgical alternatives, and medications, including controlled substances," the "medically appropriate uses of oxycodone and other controlled substances in the treatment of

pain," and "red flags of drug abuse and diversion."  That notice also stated that the Dr. Gharibo would be asked to opine on "certain aspects of the defendant's practice and prescribing habits" including "the medical legitimacy of certain specific prescriptions written by the defendant based on, among other things, a review of patient records."

On January 24, 2016, the Government supplemented that notice with a transcript of Dr. Gharibo's prior testimony in a case raising similar issues, *United States* v. *Lowe*, 14 Cr. 055 (LGS).  The transcript of that testimony contained far more than a summary of the opinions Dr. Gharibo has expressed in the past, and is expected to present at this trial, on all of the general subjects detailed above, along with the bases for those opinions.

On February 3, 2016, the Government supplemented that notice again with a list of approximately 14 "patients" whose files Dr. Gharibo was being asked to review and opine on at trial.  As conveyed to defense counsel, the Government expects to provide a written summary of the opinions Dr. Gharibo will offer on those files by Monday, February 15, 2016.[4]

B.  Applicable Law

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

---

[4] As noted above, as part of the defendant's motion, the defendant seeks to preclude the testimony of Dr. Gharibo on the ground that the Government has failed to comply with its notice obligations under Rule 16(a)(1)(G).  As set forth above, the Government has supplemented its initial notice to provide considerable additional detail on the opinions Dr. Gharibo is expected to offer at trial and will continue to do so.

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the drafting history of Rule 702 reflects the "liberal thrust" of the Federal Rules of Evidence and their "general approach of relaxing the traditional barriers to 'opinion testimony.'" 509 U.S. 579, 588 (1993) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Indeed, the Second Circuit has instructed that "*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). *Daubert* also "emphasizes the need for flexibility in assessing whether evidence is admissible . . . permit[ting] the trial judge to weigh various considerations pertinent to the issue in question." *Id.* In determining whether to admit or exclude expert testimony, the district court "has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." *Amorgianos v. National R.R. Passenger Corp*., 303 F.3d 256, 265 (2d Cir. 2002).

Under Rule 702, a trial judge must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 589. Thus, the central task of the trial court is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 152 (1999).

In order to determine whether a witness qualifies as an expert, a court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject

7

matter of the proffered testimony." *United States* v. *Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The advisory committee notes to Rule 702 make clear that to be admissible as expert testimony, the testimony need not be scientific, but instead may be based on "experience alone – or experience in conjunction with other knowledge, skill, training or education." Fed. R. Evid. 702, Advisory Committee's Note (2000). The Supreme Court has verified that an expert can draw conclusions from observations based on "extensive and specialized *experience*." *Kumho Tire Co.*, 526 U.S. at 156 (emphasis added).

In *Daubert*, the Court laid out a list of nonexclusive factors to assist the trial court in its determination of whether the expert's opinion is grounded in "methods and procedures of science," and whether it is more than "subjective belief or unsupportive speculation." *Daubert*, 509 U.S. at 589-93 (factors include whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the standards that control the technique's operation, and the general acceptance of the theory or technique in the scientific community). The Court emphasized that this inquiry should be a "flexible one" focusing "solely on the principles and methodology, not the conclusions that they generate." *Id.* at 594-95. *Daubert* further instructs that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. In particular, if an expert's testimony is within "the range where the experts might reasonably differ," the jury, not the trial court, should be the one to decide among the conflicting views of different experts." *Kumho Tire*, 526 U.S. at 153. "Only if the expert's testimony is so fundamentally unsupported that it can offer no assistance to

the jury must such testimony be excluded." *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (internal quotations omitted).

      C.  <u>Discussion</u>

Dr. Gharibo's testimony, which is rooted in his vast experience and training in the field of pain management, including years teaching and publishing on the subject and participation in seminars and conferences nationwide, including at least one attended by the defendant, will unquestionably help the jury to "understand the evidence" and to determine a "fact in issue," Fed. R. Evid. 702, namely whether the defendant intentionally prescribed controlled substances for other than a "legitimate medical purpose" or outside of "the usual course of professional practice." *See United States* v. *Moore*, 423 U.S. 122, 124 (1975); *see also* Sand, Mod. Fed. Jury Instruc. § 56.15 (Government must prove that "the defendant dispensed the drug other than for a legitimate medical purpose and not in the usual course of medical practice").

 Dr. Gharibo will be able to do so in at least two different ways.  First, Dr. Gharibo will be able testify, with more specificity, about the very issues raised by the defendant in the pending motion, namely that legitimate practice of pain medicine "necessarily entails consideration of many factors, including the patient's medical condition and treatment history, the availability of alternatives for treatment, and the information and advice shared in the context of the physician-patient relationship."  (Br. at 35).  Second, Dr. Gharibo will evaluate a handful of specific "patient" files relevant to this case, including things like MRI reports and urinalysis reports – that is, things that are without question beyond the knowledge of a typical lay juror.   The suggestion that such testimony is not relevant at this trial borders on the absurd, and is starkly belied by the fact that, as

noted above, the defendant has also noticed an expert, Dr. Carol Warfield, whose qualifications and CV are substantively similar to that of Dr. Gharibo, and who is expected to opine on very similar issues.[5]

Nor should there be any serious question that these opinions – which will be based on established standards of practice in the field, and Dr. Gharibo's considerable training and experience, including his personal involvement in developing the standards of pain management care for one the largest and most prestigious hospitals in the Southern District of New York, meet the flexible standard set forth in *Daubert*.  To the contrary, the Supreme Court has made abundantly clear that the very sort of "extensive and specialized experience" that Dr. Gharibo has is a sufficient basis for offering an expert opinion.  *Kumho Tire Co.* v. *Carmichael,* 526 U.S. at 155; *see also Arista Records LLC* v. *Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (court must "must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert"); *Johnson & Johnson Vision Care, Inc.* v. *CIBA Vision Corp.*, 2006 U.S. Dist. LEXIS 51869, at *5 (S.D.N.Y. July 28, 2006) ("In considering a witness's practical experience and educational background as criteria for qualification, the only matter a court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.")

Similarly, the Second Circuit, among other courts, has frequently stressed both the relevance and admissibility of testimony akin to that Dr. Gharibo is expected to offer in a narcotics

---

[5] While, as noted, the Government has yet to receive any summary of Dr. Warfield's anticipated testimony, the Government has no intention of challenging Dr. Warfield's qualifications to testify under *Daubert*.

trial such as this involving a medical practitioner, *see, e.g., United States* v. *Wexler*, 522 F. 3d 194,

204 (2d Cir. 2008) ( "While failure to comply with the standard of care applicable to a medical

specialty does not alone provide a basis for concluding that a physician's activities fall outside the

usual course of professional practice, it is surely relevant to that determination"); *United States* v.

*Feingold*, 454 F. 3d 1001, 1011 (9th Cir. 2006) (instructing "that it is appropriate [in narcotics

cases] for the jury to consider the practitioner's behavior against the benchmark of acceptable and

accepted medical practice" and that "knowing how doctors generally ought to act is essential for a

jury to determine whether a practitioner has acted not as a doctor, or even as a bad actor, but as a

'pusher' whose conduct is without  a legitimate medical justification"); *United States* v.*Chube,*

538 F. 3d 693, 698 (7th Cir. 2008)(holding "it is impossible sensibly to discuss the question

whether a physician was acting outside the usual course of professional practice and without a

legitimate medical purpose without mentioning the usual standard of care"), and Dr. Gharibo

himself has repeatedly been qualified as an expert in the field .[6]

　　　To the extent the defendant seeks to challenge the rigor of Dr. Gharibo's methods or

training, or the accuracy or reliability of the opinions being offered, he is of course free to do so

through cross examination.  *See, e.g.*, *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,

---

[6] In his motion, the defendant specifically challenges the ability of Dr. Gharibo to testify as to his "personal way of practicing pain medicine" which the defendant contends is "not based on any objective standard."  (Br. at 12).  As an initial matter, the Government would elicit testimony about Dr. Gharibo's personal practices only insofar as they inform, or are relevant to, the bases for expert opinions he is offering, itself an entirely appropriate and permissible practice.  *See, e.g.*, *Kumho Tire Co.* v. *Carmichael,* 526 U.S. at 155; *Johnson & Johnson Vision Care, Inc.* v. *CIBA Vision Corp.*, 2006 U.S. Dist. LEXIS 51869, at *5 (S.D.N.Y. July 28, 2006).  Moreover, to the extent the defendant seeks to challenge the "objective standard," or lack thereof, underlying that personal practice, that is a topic the defendant is free to explore on cross examination.

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") ; *Borawick* v. *Shay*, 68 F.3d 597, 610 (2d Cir. 1995).

Finally, to the extent the defendant seeks to preclude the Government from "cherry-pick[ing]" files for Dr. Gharibo to review, the argument should be rejected out of hand.  As the defendant himself stresses in the instant motions, the defendant saw approximately 3,500 patients during the course of the charged conspiracy, and it would be an inefficient use of the jury's time to review 3,500 files one by one during the course of the trial.   To the extent the defendant wishes to test or challenge the validity of any opinions offered by Dr. Gharibo on the basis of the limited number of files being reviewed, the defendant is free to do so on cross examination.[7]

In sum, because Dr. Gharibo is a highly qualified expert with practical experience in the field of pain management, and because his testimony will aid the jury in making that determination, the Government respectfully submits that his testimony should be allowed, and the defendant's request for a *Daubert* hearing should be denied.

---

[7] Moreover, the defendant's reliance on case law discussing sample selection methodology, typically in the context of civil litigation, is completely inapposite because unlike any of those cases, the Government here has no burden of establishing the representativeness or fairness of the sample it has selected.  To meet its burden at trial with respect to Counts Two and Three – which charge the defendant with the unlawful distribution of narcotics on two separate dates – the Government need only show that the defendant issued a single medically unnecessary prescription on the date giving rise to each charge.  Similarly, with respect to Count One, which charges the defendant with conspiring to distribute narcotics, the Government need only show that the defendant agreed with at least one other person on at least one occasion to write a medically unnecessary oxycodone prescription.  Indeed, even if the defendant could establish that the sample selected by the Government was demonstrably *unrepresentative* – that is, that each of the other 3,400 patient files was entirely legitimate – that Government's "sample" would nonetheless be relevant to issues in dispute at trial.

### III.    Law Enforcement Witnesses and "Medical Opinions"

Next, the defendant moves to preclude "law enforcement witnesses from offering 'opinions' about case related matters, including medical findings or pain treatment" and in particular "seek[s] to preclude law enforcement from repeating information they might have heard from medical professionals or others about the contents of medical records."   (Br. at 28-29.)  The Government has no intention of asking its law enforcement officers to offer medical opinions or to repeat information they heard from medical professionals.  To the contrary, the Government intends to call a medical professional, Dr. Christopher Gharibo, to offer medical opinions at trial.

As such, this aspect of the defendant's motion should be denied as moot.

### IV.    BNE Records

The defendant next moves to preclude the government from offering records obtained from the New York State Bureau of Narcotics Enforcement ("BNE") at trial on the grounds that it constitutes hearsay.  The argument is without merit because BNE records are classic "records of regularly conducted activity" Fed. R. Evid. 803(6) – and have been repeatedly been admitted as such by Courts in this Circuit.[8]

By way of background, and as a BNE custodian of records would testify at trial, the BNE is a part of the State Department of Health and collects, as a core part of its regularly conducted business activity, certain information on every prescription for a controlled substance filled in the

---

[8] Because the Government does not seek to offer the BNE records pursuant to Rule 1006, it does not address the defendant's arguments in this respect.  However, it bears mention that the underlying records supporting the BNE data are already entirely within the *defendant's* possession. As discussed at the status conference on January 28, 2016, the defendant alone has access to his computer-based record system, Practice Fusion, which he ostensibly used to document every "patient" visit and which the defendant can therefore use to check or confirm the BNE data should he chose to do so.

State of New York.  In particular, each time a pharmacy fills a prescription for a controlled substance, it reports to the BNE (1) the name and address of the patient; (2) the name and license number of the prescribing doctor; (3) the medication and dosage dispensed; and (4) the method of payment.  BNE collects this information for every prescription filled in the State, and it is capable of generating a report indicating only that information relevant to a particular doctor or patient or pharmacy.

　　　　At trial, the Government intends to offer BNE records documenting each prescription for a controlled substance written by the defendant and filled at a New York pharmacy.  Those records were made at or near the time the prescription was filled from "information transmitted by[] a person with knowledge" – that is, the dispensing pharmacist or pharmacy – and were both made as "the regular business practice of" the BNE and "kept in the course of [BNE's] regularly conducted business activity."  Fed. R. Evid. 803(6).  They thus meet every criteria of "record of regularly conducted activity."  *See also United States* v. *Komasa*, 767 F.3d 151 (2d Cir. 2014) (proper foundation for business record established where "custodian or other qualified witness . . . testif[ies] that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].") (internal quotations omitted, second alteration omitted) (collecting authorities).  Nor do the BNE records raise Confrontation Clause concerns because they are entirely non-testimonial in nature.  *Cf. United States* v. *Feliz*, 467 F.3d 227, 234 (2d Cir. 2006) (Noting that "[t]he essence of the business record exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are by

14

their nature not prepared for litigation") (internal quotations omitted); *id.* at 236 ("[W]here a statement is properly determined to be a business record as defined by Fed. R. Evid. 803(6), it is not testimonial within the meaning of Crawford, even where the declarant is aware that it may be available for later use at trial.").

Indeed, for just these reasons, BNE records (or their equivalents from other states) have routinely been admitted. *See, e.g.*, *United States* v. *Lowe*, 14 Cr. 055 (LGS) (admitted BNE records as business records); *United States* v. *Wiseberg et al.*, 13 Cr. 794 (AT) (admitting New Jersey State Prescription Monitoring Program ("PMP") data as business records); *see also United States* v. *Cooper*, 868 F.2d 1505, 1514 (6th Cir 1989) (no error in admitting pharmacy prescription log book as business record in prescription drug diversion trial). Tellingly, the defendant cites no authority to the contrary, nor is the Government aware of any.

To the extent the defendant wishes to test the accuracy or significance of BNE data – for example, by suggesting that BNE data may capture forgeries or fake prescriptions – that is something the defendant can do through cross-examination of the appropriate witness.[9]

## V.     Comparative BNE Records

Next, the defendant seeks to preclude the Government from offering any comparative BNE data – that is, BNE records of the defendant vis-à-vis other prescribers in the state, data the

---

[9] While the Government does not believe the Court needs to reach the issue given the above, the defendant's analysis of the hearsay rule and its application in this context is simply incorrect as a matter of both fact and law. In particular, the information reflected in the BNE records consists almost exclusively of (1) the defendant's own statements (that is, the content of the prescription), which are not themselves hearsay, *see* Fed. R. Evid. 801(d)(2); and statements of the "patients," many of whom are alleged to be co-conspirators, *see* Fed. R. Evid. 801(d)(2)€ or who if "legitimate" are providing the information as part of their medical treatment. *See* Fed R. Evid. 803(4).

defendant presumably knows would confirm that he was among the most prolific writers of oxycodone prescription in the state. While the Government does not seek to offer such data at this time, it reserves the right to do so should the defendant, through argument of counsel or otherwise, mislead the jury on this issue by, for example, suggesting that the defendant's prescribing habits were in line with those of other doctors in the State.[10]

## VI.   *Brady* Disclosures

Next, the defendant renews a motion to compel the Government to make certain disclosures, all of which it contends are compelled by *Brady* v. *Maryland*, 373 U.S. 83 (1963).  In particular, and among other things, the defendant seeks "any evidence that exists in New York Police Department files about the perpetrators of two robberies committed against Dr. Mirilashvili and his clinic in September 2013 and October 2014."  (Br. 38)  As we have previously conveyed to defense counsel, that material – investigative files created and maintained by members of the 33rd Precinct – is not within the Government's possession, custody or control.

However, and since the filing of the defendant's motion, the Government has relayed those requests to the New York City Police Department which has agreed to provide copies of its files on both robberies to the Government which has, in turn, produced those materials to the defendant rendering any motion on that basis moot.

---

[10] Moreover, and as detailed above and consistent with the notice provided to the defendant, the Government does expect that its expert witness will opine on the volume and commonality of the oxycodone prescriptions written by the defendant during the period of the charged conspiracy as information relevant to the opinions about the defendant's practice that the expert is likely to offer.

To the extent the defendant seeks prior statements of anticipated Government witnesses, that material will be produced consistent with the schedule previously set by the Court on February 15, 2016.

### VII.   Evidence of the Defendant's Income and the Cash Seized from His Home

Next, the defendant moves to preclude the government from "making any reference to the income or degree of financial success of [the defendant] or his clinic" or from offering evidence of the approximately $1.75 million in cash recovered from the defendant's residence at the time of his arrest.  (Br. at 39, 41.)  According to the defendant, this evidence is not relevant because it has "no bearing on whether [the defendant] distributed controlled substances as a drug dealer."  (*Id.* at 39.) The argument borders on the absurd – evidence of the cash-nature of the defendant's practice has always been a core component of the Government's theory of the case, and the defendant's sudden accumulation of wealth through the Clinic and failure to properly report that income to the IRS is entirely appropriate evidence of the defendant's knowing participation in the charged conduct.[11]

At trial, the Government intends to offer evidence that: (1) the defendant charged his "patients" cash, cash the defendant himself personally collected at the start of each "patient" visit; (2) those cash payments made the defendant, who reported a net *loss* of $5,559 on his 2011 tax return, or the last full year before the period of the charged conspiracy, very, very wealthy, as evidenced by the $1.75 million in cash recovered from the defendant's residence at the time of his

---

[11] Because the Government only received the defendant's tax returns on January 29, 2016, after filing its own motion *in limine*, it did not address this issue in its opening brief.  However, it has since provided notice to the defendant of its intent to offer evidence at trial of the defendant's non- or under- reporting of cash income from his medical practice during the years 2012, 2013, and 2014.

arrest, and (3) the defendant failed to fully disclose that cash income derived from the Clinic to the IRS during the period of the charged conspiracy.  As detailed below, the Government submits all of the above is properly admissible as direct evidence of the charged conspiracy and, in particular, of the defendant's motive to use his medical license to break the law and knowledge of the illegitimate and illegal nature of his medical practice.

First, the fact that the defendant personally collected cash payments from his "patients" is highly relevant to what the parties appear to agree is a core issue at trial – namely, whether the defendant believed he was engaged in the legitimate practice of medicine.  In particular, the fact that these "patients" were handing the defendant himself $200 in currency – rather than using insurance, or at least paying a receptionist or assistant with a check or credit card, for example – is clearly relevant to the jury's evaluation of legitimacy of the defendant's Clinic as well as the nature of the defendant's relationship with his "patients," and it should be admitted for just those reasons.

Second, the total income derived from the defendant's practice – and in particular the sudden and drastic change in the defendant's earnings over time – is clearly relevant as direct evidence of the defendant's motive and intent with respect to the charged criminal conduct.  The Government expects its trial evidence to establish that the defendant, who as the Court knows had lost his license for a period of time and remained on probation with the State through December 30, 2010, was reporting very modest earnings in the years prior to the offense conduct, reporting just $45,292 in total income in 2010 and a *loss* of approximately $5,559, in 2011.  Suddenly, in 2012, with the opening of the Clinic that changed dramatically.  As the trial evidence will show,

18

during the period of the charged conspiracy, the defendant drove a Mercedes and amassed $1.75

million in cash, money the defendant does not dispute came from his operation of the Clinic.

(*E.g.*, Br. at 41-42). That sudden accumulation of wealth from the Clinic – by a doctor whose prior

employment was not nearly as profitable – is plainly probative of the defendant's knowledge of the

improper and illegitimate nature of the Clinic.  *See, e.g.*, *United States* v. *Barnes*, 604 F.2d 121,

147 (2d Cir. 1979)("It has long been the rule that 'where a defendant is on trial for a crime in

which pecuniary gain is the usual motive, evidence of the sudden acquisition of money by the

defendant is admissible . . . .'") (*quoting United States* v. *Jackskion*, 102 F.2d 683, 684 (2d Cir.

1939)); *See also United States* v. *Tramunti*, 513 F.2d 1087, 1105 (2d Cir. 1975) ("[E]vidence of

sudden acquisition of large amounts of money is . . .  admissible to prove criminal misconduct

when pecuniary gain, as here, is the basic motive.") (collecting authorities); *United States* v.

*Bulgin*, 563 Fed. Appx. 843 (2d Cir. 2014) (same).

     Moreover, that the defendant was stockpiling cash earned from the Clinic in his home –

rather than depositing that money in the bank – is also probative of the defendant's knowledge that

the money was unlawfully obtained.  That is particularly true given that the Government's trial

evidence will also show that the defendant did, in fact, have bank accounts which were active and

which he used during the period of the charged conspiracy, all further evidence of the defendant's

knowledge that the cash income he was choosing *not* to deposit in those accounts but instead store

in zip lock bags in his home was derived from unlawful and illegitimate conduct.

     Finally, the Government will seek to offer, as direct evidence or, in the alternative,

pursuant to Rule 404(b), the defendant's tax returns for 2010 through 2014 which document both

the state of the defendant's finances prior to the onset of the charged conduct, and his substantial

under-reporting of the cash income derived from the Clinic.  In particular, the defendant's tax

returns for 2012, 2013, and 2014 – that is, the years in which the Clinic was open – report a total of

$1,378,112 in gross receipts, and just $541,025 in total profits over the course of those three years.

In fact, the Government believes its trial evidence will establish that the defendant reaped

considerably more than that off of his operation of the Clinic, writing approximately 13,557

prescriptions for oxycodone which, at $200 per patient, would represent closer to $2.7 million in

gross income during that time period.[12]  Indeed, for 2013 – a year in which the defendant reported

$563,000 in total gross income – the defendant's bank records alone document nearly $700,000 in

credits/deposits, a figure which obviously would not include any cash income stored in the

defendant's residence and never deposited into the banking system.

The fact that the defendant under-reported the cash income earned from the Clinic – and

has no legitimate, reported source of income sufficient to explain the $1.75 million in cash

recovered from his apartment – is properly admissible as probative of the defendant's knowing

participation in unlawful activity.  Indeed, it is "well established that in narcotics prosecutions, a

defendant's possession and expenditure of large sums of money, as well as his or her failure to file

tax returns, are relevant to establish that the defendant lacked a legitimate source of income and

that, in all probability, the reason for the failure to report this income is due to the defendant's

participation in illegal activities."  *United States* v. *Eng*, 997 F.2d 987 (2d Cir. 1993); *see also*

---

[12] As the Court will learn at trial, the true number is likely higher given that the defendant occasionally charged patients additional fees for things like "physical therapy" and for a period of the charged conspiracy increased his fee from $200 per visit to $300 per "patient" visit.

*United States* v. *Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) ("The tax returns were obviously probative to refute [the] defense that the contested funds were legitimate compensation for work [the defendant] performed[.]"); *United States* v. *Falley*, 489 F.2d 33, 39 (2d Cir. 1973) (affirming admission of tax returns and noting that "proof that a defendant is living far above the means provided by his disclosed income is of great probative value in a case involving a crime where the motive is financial gain"); *see also United States* v. *Monaco*, 194 F.3d 381, 388 (2d Cir. 1999) (same).

  Cases cited by the defendant only further support the admissibility of this evidence because contrary to the defendant's assertion that he "never concealed the source of his income" (Br. at 41), the Government expects its evidence at trial to establish just the opposite – that is, that the defendant took steps to shield substantial portions of his cash income from the Clinic from banks and financial institutions as well as from the IRS.  As detailed above, that is a common and entirely permissible basis for introducing such evidence.  *See, e.g.*, *United States* v. *Young*, 745 733, 763 (2d Cir. 1984) (affirming conviction in narcotics case where defendant was found to have access to $1.3 million and other valuables "for which no legitimate explanation existed") (Br. at 41); *United States* v. *Chandler*, 326 F.3d 210, 215 ("The touchstone of the admissibility inquiry is not the amount of money in the defendant's possession, *but whether the defendant's failure to account for its source tends to support the government's claim that the money was obtained through illegitimate means*.") (emphasis added) (Br. at 41).

  To be clear, the Government has no intention of arguing to the jury that the defendant's wealth *alone* warrants any particular consideration.   Instead, as set forth above, it is the manner in

which that wealth was accumulated – through cash payments from "patients" seeking and receiving oxycodone prescriptions – and the steps the defendant took to conceal the true scope of his earnings from banks and the IRS that the Government believes to be relevant and admissible at trial.

### VIII.   Evidence of the Defendant's "Reputation"

Next, the defendant asks the Court to prevent the Government from offering "all pejorative testimony concerning [the defendant's] reputation or that of his clinic."  (Br. at 43.)  It is not entirely clear what the defendant seeks to preclude at the defendant's trial, which will necessarily involve what he will undoubtedly view as  "pejorative testimony" about both him and his Clinic.

Rule 404(a), the only authority relied upon by the defendant in making this request, prohibits the Government from offering "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." The Government does not intend to do so at trial.

The Government does intend to meet its burden at trial by calling witnesses to offer their first-hand observations of the defendant and the Clinic and the charged conduct at issue; conversations with the defendant; and interactions with co-conspirators relevant to the defendant, the Clinic, and the charged conduct here.  It intends to call an expert to offer opinions about the defendant and the Clinic and the charged conduct at issue here.  None of that is precluded by Rule 404, nor by Rule 403.

Nor should the Court enter a blanket order precluding the use of the term "pill mill" at trial. While the Government anticipates that any use of that term is more likely to be reserved for

argument (rather than trial testimony), to the extent a witness has established a foundation for offering a personal observation about the operation or nature of the defendant's Clinic or for using a term such as "pill mill" to describe it, the Court should not preclude him or her from so doing.

### IX.     Co-Conspirator Statements to Be Offered at Trial

Next, the defendant seeks a proffer of all co-conspirator statements the Government will seek to introduce at trial.  The Government believes that the 3500 material it intends to produce on February 15, 2016, consistent with the schedule previously set by the Court, will substantially address this issue.  In particular, the 3500 material will identify (1) the co-conspirators who will be testifying at trial, and the substance of any statement they have previously made to the government; (2) additional co-conspirators the testifying witnesses worked with as part of the conspiracy, including any "patients," office staff, or pharmacies, and the substance of their interactions, and the substance of their interactions with those individuals or entities.

### X.      The Use of Aliases

Finally, the defendants seek to preclude the Government from eliciting testimony about the aliases of co-defendants.   As an initial matter, none of the aliases of co-defendants charged in this case – "Obama," "Black," "Big Gina," "Dogs," "PK," and "Hollywood," for example – is itself inherently prejudicial. *Cf. United States* v. *Smith*, 2012 U.S. Dist. LEXIS 84988, at *8 (D. Conn. June 18, 2012) (denying similar motion because "the alias 'Weedy' is not as strongly suggestive of a criminal disposition" as other aliases more frequently struck such as "'Murder.'").  None implies criminal behavior, for example, or is likely to unduly inflame the jury.

23

Moreover, the Government expects its evidence will establish that many of these co-conspirators were known and referred to primarily (if not exclusively) by their aliases.  As such, they are an entirely appropriate subject of trial testimony.  *See, e.g.*, *United States* v. *Greenfield*, 2001 U.S. Dist. LEXIS 13049, at *8 (S.D.N.Y. Aug. 28, 2001)("Aliases or nicknames should not be stricken from an indictment where the defendants used, or were known by, such aliases or nicknames and where the Government intends to offer evidence in which the defendants are referred to by such aliases or nicknames.") (collecting cases); *United States* v. *Elson*, 968 F. Supp. 900, 909 (S.D.N.Y 1997) ("[A]liases and nicknames should not be stricken from an Indictment when evidence regarding those aliases or nicknames will be presented to the jury at trial.")

While the Government does not believe any of these aliases is likely to be a topic of substantial testimony at trial, it does anticipate that some witness will likely refer to co-conspirators by their aliases because that was how the witness referred to that co-conspirator during the period of the charged conspiracy.  Consistent with the above, the Government submits these witnesses should be permitted to do so.

## XI.    <u>CONCLUSION</u>

For the reasons set forth above, the defendant's motions *in limine* should be denied.

Dated:  New York, New York
        February 5, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:    _____/s/_____
                                         Edward B. Diskant/Brooke E. Cucinella
                                        Assistant United States Attorneys
                                        (212) 637-2294/2477