# EXHIBIT C

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA
                                   11-CR-213


          -against-           :
                                   United States Courthouse
                                   Central Islip, New York
LEONARD STAMBLER,
                                   September 26, 2013
     Defendant.          :         2:00 p.m.

- - - - - - - - - - - - - - X

                TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JOSEPH F. BIANCO
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        LORETTA E. LYNCH
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  ALLEN BODE
                           Assistant United States Attorney




For the Defendant:         GARY SCHOER, ESQ.




Court Reporter:            Perry Auerbach
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6103


          Proceedings recorded by mechanical stenography.
               Transcript produced by computer.

2

1           THE CLERK:  Calling 11-CR-812, United States of

2 America versus Leonard Stambler.

3           Please state your appearances for the record.

4           MR. BODE:  Allen Bode for the government.  Good

5 afternoon, your Honor.

6           THE COURT:  Good afternoon.

7           MR. SCHOER:  Good afternoon, your Honor.  For

8 the defendant, Gary Schoer.

9           THE COURT:  Good afternoon.  The defendant is

10 present as well.  You can be seated.

11           The conference was scheduled to deal with the

12 motions -- the in limine motions that have been filed.  So

13 I wanted to discuss those, give you a chance to add

14 anything you'd like to add to your papers, and rule on

15 some of them.  Although I don't think -- you can talk a

16 little bit about the character evidence, but I think

17 that's one of those things that we're going to have to

18 sort of wait until I have a better feel for who the

19 witnesses would be.  But I appreciate, obviously, the

20 briefing of the issues so that I can think about it in

21 advance.

22           Why don't we just go issue by issue, I'll give

23 you a chance to add anything that you want to add to your

24 papers and then I'll state my ruling for the ones that I'm

25 going to rule on.

1      The first one was the government's motion to

2    admit evidence of the defendant's marijuana transaction

3    with Chris Adams.  Is there anything that you want to add

4    to your papers on that, Mr. Bode.

5      MR. BODE:  Just one thing, your Honor, in terms

6    of in looking at Mr. Schoer's response.  I didn't write a

7    reply, but the one thing that I would note is it seems

8    clear that the defense here is -- and Mr. Schoer and I

9    have talked and we get along great with one another, it

10    seems like the defense is going with that this was a

11    lawful medical treatment, the usual course and practice.

12      What this evidence of this marijuana

13    distribution buy Chris Adams to defendant Stambler slows

14    is that as early as November of 2010, defendant Stambler

15    knew that Chris Adams was distributing false substances;

16    marijuana.  He was on notice to that.

17      Frankly, my expert witness will testify that if

18    you know that your witness -- that your person is

19    distributing controlled substances, you should take other

20    precautions which he didn't do.

21      I also note that although Mr. Schoer talks about

22    the stigma, I submit that stigma as to marijuana use in

23    society today is nearly nil.  This is a violation, not a

24    crime.  And the stigma, as conspired to oxycodone is

25    drastically less.

4

1        So that is what I would argue, your Honor, in

2    terms of why it's important to the relationship beyond

3    what I stated in my papers and in terms of the stigma.

4        THE COURT:  It wasn't clear to me at what point

5    in the relationship this occurred.  This says late 2010,

6    but I don't know when the relationship started.

7        MR. BODE:  I think in July 24th of 2010 or

8    thereabouts, the defendant Stambler started prescribing

9    oxycodone to Chris Adams.  So it was in July.  In like

10   November, Chris Adams gets in an auto accident, the

11   prescription continue.  And then December approximately is

12   when the marijuana occurred.  So it's about five months

13   into their relationship.

14       THE COURT:  Okay.  Do you want to respond to

15   that, Mr. Schoer?

16       MR. SCHOER:  Judge, I would just say that

17   your Honor has the letter that I submitted.  But just in

18   response to what Mr. Bode said, it seems to me he's

19   arguing that there is no stigma, but he wants to use it to

20   show distribution of controlled substances which would

21   clearly be the stigma.  And so it's our position that, as

22   I've argued, that any probative value of this marijuana,

23   again, would be outweighed by the prejudice or potential

24   prejudice.

25       THE COURT:  Okay.  After considering the

5

1   arguments, I am going to preclude this piece of evidence

2   under 403 for the following reasons.

3           Just to make clear what the evidence is, it's

4   one transaction in late 2010 regarding a small quantity of

5   marijuana that was allegedly provided by the witness to

6   Mr. Stambler.

7           The government accurately cites the law, which

8   is that other criminal acts can be used to explain how a

9   criminal relationship developed to provide background

10  information to help the jury understand the basis for the

11  co-conspirator's relationship of mutual trust.

12          The government cites a case United States versus

13  Williams, 453 Fed FTPS 74 Second Circuit 2011, which

14  recites what is well-settled Second Circuit authority.

15          However, when applying that standard to this

16  particular piece of evidence and the reason that the

17  government is offering it in this case, I find the

18  probative value to be low for a couple of reasons.

19          First, it's alleged to be one transaction on one

20  date involving a personal use level of marijuana.  So I

21  don't think it's highly probative and a major event in

22  relationship between the two or a development of trust

23  between the two.  I distinguish this from, for example, in

24  Williams, although it dealt with marijuana, it dealt with

25  a relationship of guns and large quantities of marijuana.

1    So this is not -- that is not case where it involved one

2    transaction of huge quantities of marijuana.

3            I think lack of probative value is highlighted

4    by the fact that, as Mr. Schoer points out, there is other

5    evidence that the government has available to it to

6    establish the background relationship, how the trust

7    developed.  And as I just tried to determine, that wasn't

8    like the beginning of the relationship between the two.

9            So I think in light of those facts, it has low

10   probative value.  I do recognize the fact that the

11   government's other evidence establishes the background to

12   the relationship and the trust that developed independent

13   of this alleged transaction and I understand there's some

14   significance when a relationship crosses into criminal

15   conduct and that has some added probative value.  But I

16   just don't believe it is high under these circumstances

17   for the reasons that I've indicated.

18           And in contrast to that, whatever probative

19   value it does have, I do believe that it is substantially

20   outweighed by the danger of unfair prejudice under 403 for

21   the following reason.  I think, although Mr. Bode is

22   correct in terms of that it is simply a violation and

23   there's not a kind of stigma attached to this type of

24   criminal activity that there would be other situations,

25   the Court has to take into account what the nature of this

1    case is.

2            This is not a murder case where a cooperator is

3    going to say before he committed the murder we smoked

4    marijuana together.  In that type of situation I think the

5    government would have a very strong argument that it's not

6    going to have a -- that the jury is not going to convict

7    someone of murder simply because they -- even if the

8    believed they smoked marijuana with a cooperating witness,

9    they're not going to make that unfair prejudicial

10    conclusion.

11            Here, you have a doctor who's charged with

12    providing prescription drugs without legitimate purpose.

13    So I believe that there's a heightened danger of unfair

14    prejudice when you introduce drug use or possession by

15    that doctor, illegal drug use and possession, that you run

16    the risk that a jury may say, well, he's a doctor, he's

17    willing to receive marijuana illegally, he's going to be

18    more than willing to do other things illegally such as

19    prescribe medication when he's not to.

20            So you do run the risk because it is a case

21    involving a doctor and his practices with respect to

22    prescribing medication, that it will unfairly prejudice

23    him even though in and of itself it is not a major

24    criminal offense.

25            So for those reasons I believe under 403, any

8

1    probative value has in terms of the relationship is

2    outweighed by the danger of unfair prejudice.

3            I will reserve on one issue.  I don't think I'll

4    change my mind at all on this, but to the extent Mr. Bode

5    erases something I hadn't thought about before coming out

6    here which is it has some probative value because it shows

7    that he was aware that the person he was prescribing drugs

8    to was distributing marijuana, and how it's impacted his

9    prescribing OxyContin.  Is that basically what you're

10   arguing?

11           MR. BODE:  Exactly.  That they would need to

12   take precautions.

13           THE COURT:  I'll reserve on that.  I don't want

14   the witness to go into that until I have a chance to think

15   about it more and consider it.  I think my ruling would be

16   the same under 403.  There could potentially be -- that

17   would be the same, it would have a way of having him

18   explain out loud, explaining how he knew that.

19           MR. BODE:  The defense could stipulate,

20   your Honor, that Mr. Stambler knew about that marijuana

21   distribution.

22           THE COURT:  I don't know if they'd stipulate to

23   that.  I'm thinking out loud here.  There could be a

24   scenario where if I allowed you to elicit from the

25   cooperator that was Dr. Stambler aware that you had

1    marijuana and would give it to other people, or something

2    like that, without making it clear that it was the

3    defendant.  And obviously if Mr. Schoer wanted to

4    challenge him on that, it would open the door to explain

5    how he knows how the defendant knew that.  So then it

6    wouldn't have the unfair prejudice in terms of the jury

7    knowing that he was providing to the defendant, but it

8    would still come out that the defendant was aware of it.

9    I have to think about it.

10             MR. BODE:  I'm not going to open on it and I

11   Chris Adams won't be the first witness.

12             Alternatively, if your Honor, isn't going to --

13   I would ask that I be allowed to ask if Dr. Stambler was

14   aware that he had the marijuana distribution and leave it

15   at that.

16             Alternatively, if your Honor were to decide we

17   couldn't do that, although I don't see how it stigmatizes

18   him at all, alternatively then I would ask that the

19   defense be precluded from talking about marijuana at all.

20             THE COURT:  You mean from an impeachment

21   standpoint?

22             MR. BODE:  Yes.  We can think about it.

23             THE COURT:  Let me think about it.

24             In the context of their relationship, did the

25   issue of marijuana get discussed, other than the context

10

1   of getting it to him on one occasion?  Is that
2   basically --
3           MR. BODE:  He gave it to him on more than one
4   occasion.  Other than that, I have to think about that.
5   But it is basically, this is when he figures out that
6   they'd be comfortable with one another and that's when it
7   gets worse from there.  So that was my purpose of doing
8   that.  Obviously not the stigma.
9           THE COURT:  Obviously.  Again, I stated my
10  reason, I think under 403 the danger is too great even for
11  that probative reason that you've articulated.
12          MR. BODE:  I accept that, your Honor.
13          THE COURT:  On the second issue raised in the
14  letter, Mr. Schoer, I don't think we have disagreement on
15  that, but think Mr. Bode's point is well-taken, which is
16  that obviously it's fair game to discuss what the
17  prescription monitoring program was at the time of the
18  alleged criminal activity.  But I just think getting into
19  what it is now and how it's different and how they
20  improved it, will potentially confuse the jury.
21          You can point to what defects there were at the
22  time, what it didn't do, without making reference to what
23  it does now.  I don't know that that's help the jury to
24  say -- to start comparing it to the current system.
25          Do you understand what I'm saying?

1    MR. SCHOER:  I do.  I think that was always my

2    intent.  I think this came up because I provided as a main

3    exhibit, a document from the Attorney General's office

4    State of New York which talks about the problems with the

5    old system and what they were proposing with respect to

6    the new system.

7    But while I gave it to Mr. Bode in an abundance

8    of caution, I don't think I'm going to introduce it.  I

9    will -- if in my head I'm rethinking, it's probably going

10   to be used on cross-examination to just raise issues with

11   respect to the problems with the prior system.

12   THE COURT:  The same issue would apply on

13   cross-examination with whatever witness you have up there.

14   It would be completely fair game to say wasn't there a

15   problem with this, the system couldn't do this.  But then

16   to ask the next questions, well, like now, don't they have

17   this and that.

18   MR. SCHOER:  I understand, your Honor's ruling.

19   And I'm not disagreeing.  I think that I can do it, it was

20   what I intended to do.

21   THE COURT:  Okay.  And then on the character

22   evidence, again, I think if you want to have a discussion

23   about that, we can discuss it now, but I don't think that

24   I'm going take make any rulings.

25   I am just going to provide some general guidance

1  so that you can think about, which is I think -- and I

2  don't know if you're intending to call certain patients or

3  how you intend to put on this character evidence, but I

4  think in terms of the character traits that you start

5  talking about in your letter, Mr. Schoer, in terms of the

6  ones that are pertinent, I think that traits related to

7  the things like directions that the medications be

8  prescribed properly, his concern that they not divert or

9  abuse medications, I think those types of character traits

10 would be relevant, those are, I think, relevant to what

11 the charges are here.

12        I would have some concern if you start bringing

13 in patients that have nothing do with OxyContin or similar

14 prescription drugs and his interactions with them on that,

15 which is something for ailments for them to say he's a

16 good doctor to me.  I don't know what character traits

17 those would provide to the jury.

18        And there's obviously 430 concerns in terms of

19 sympathy, once you start wanting patients to come in to

20 say he saved my life or he's a good doctor.  That's the

21 type of thing that I have on this issue, but we can

22 discuss it further.

23        MR. BODE:  I'm not asking your Honor to rule now

24 either.  I just wanted to raise an issue, in terms of

25 Mr. Schoer's reply, I'll say, that he was going to be

1   opening on specific instances with other patients, I think

2   is clearly not character evidence and at least as we -- in

3   reply, Mr. Schoer cited 406.  But in looking for the

4   reasons in 406, this doesn't appear to be anything that

5   would fall under 406.

6           So we don't need a ruling now, I wanted to bring

7   it up specifically because I didn't know what he would be

8   arguing.

9           THE COURT:  Again, I have to think about it.  I

10  didn't get a chance to look at the cases on this issue and

11  these types of traits obviously don't come up within a

12  normal trial, the doctor-related traits.  So I'd have to

13  give it more thought.

14          I assume you're not going to open on character

15  witnesses, are you?

16          MR. SCHOER:  No, I don't intend to open on

17  character witnesses.  The concept, perhaps.  But not a

18  particular witness that's going to testify.

19          MR. BODE:  That's fine.  That's fine.

20          THE COURT:  Okay.  Then the last issue that I

21  have in terms of the in limine motions was the defense's

22  -- the motion by the government to preclude the defense

23  from offering the August 19th and September 20th

24  recordings between the defendant and the informant and

25  undercover.  So I'll give you a chance to add anything

14

1    that you want to add on that.  Mr. Bode.

2            MR. BODE:  Your Honor, I did a -- the motion and

3    I even did the reply to the defendant's response, so I'll

4    just rest on that.  I've already had my chance to reply to

5    Mr. Schoer's response.  I'll leave it at that.

6            THE COURT:  Okay.

7            MR. BODE:  The government believes, you know, in

8    essence it's proving something that's not an issue.  Just

9    so the record is very clear, I think I made this clear in

10   my letter, we specifically identify five patients about

11   which we were going speak.  Three of them were engaged in

12   criminal activity.  Christopher Adams, his girlfriend,

13   Nancy Cook and Anthony Rinaldi.  And then two other

14   patients that were relevant, not because they were engaged

15   in criminal activity, but because defendant Stambler

16   discussed the fact that he was interested in these two

17   women romantically and he was prescribing them oxycodone.

18   So, obviously those relationships would be outside the

19   usual course of medical practice.

20           So those are the only five patients we've

21   indicated that we are going to be discussing in terms of

22   the -- based on all that, we believe that the risk of

23   confusion to the jury is great and the -- as I point out

24   in my reply, the exceptions that the defense cites clearly

25   seem applicable to the present sense impression for the

1    phone call.

2              THE COURT:  I think many of the proposed grounds

3    by Mr. Schoer created were not strong, but the one that

4    I'm focused on that I do believe is strong is the state of

5    mind, the intent of the defendant.  Obviously that's a

6    central issue in this case, especially when you're dealing

7    with prescription drugs and the government's theory is

8    that he was involved in that conspiracy where his intent

9    was to distribute OxyContin without any legitimate medical

10   purpose, and that was his intent with respect to these

11   individuals that you're putting on the stand.

12             So I don't know why, if they have these

13   recordings in which he's not doing that, he's showing some

14   intent to try to determine whether or not these particular

15   individuals really need the OxyContin, why that's not

16   relevant as to his state of mind during the time period of

17   the alleged conspiracy.

18             I don't understand why you think that doesn't

19   have any probative value.  That probative value of intent

20   is only limited to the patients that you select.

21             MR. BODE:  It is, your Honor, because that's the

22   crime.  Saying -- we're not alleging that everything he

23   did as a doctor was criminal.  What he did as to these

24   patients was criminal.  The fact that with some other

25   patient he didn't commit a crime is interesting, but as

1    the example I've put forth, I think the best analogies in

2    a bank robbery, he robs bank A on date X saying, well, on

3    date Y he didn't rob bank B, I submit is not probative of

4    when he robbed bank A.

5            We're alleging the criminal activity --

6            THE COURT:  But that hypothetical is kind of not

7    completely analogous.  It's not just putting on proof that

8    he didn't rob a bank on another day.  If you want to use

9    the bank analogy, it would be that you allege a conspiracy

10    to rob banks and the government is alleging he robbed a

11    bank on Sunday, but the informant came in on Monday and it

12    was recorded the day after the robbery where the informant

13    says, hey, we're going to rob a bank tomorrow and the

14    recording -- on the recording the defendant says, what are

15    you talking about, I don't rob banks, I would never rob

16    banks, that's something I would not do.

17            That would be analogous to what we have here, at

18    least according to their proof.  It's a little more

19    complicated than a bank robbery, because it deals with a

20    doctor's procedures for evaluating legitimate medical

21    uses.  It's a very complicated question that has to be

22    addressed.

23            So I don't know that the bank robbery analogy is

24    perfect.  How else is he supposed to prove his intent, if

25    you're suggesting he's only limited to proof as to these

1 patients and he can't try to show what the intent or state

2 of mind was with respect to prescribing OxyContin during

3 that time period other than the witnesses we select.  It

4 seems a pretty narrow view of the state of mind.

5          MR. BODE:  It's the crime, your Honor.  It's --

6 for example, if you want to make it a drug sale analogy,

7 if we want to take it back to the street corner drug sale;

8 on this day, the defendant took prerecorded buy money and

9 did a drug transaction or is the defendant then -- can

10 they introduce that on some other day the defendant went

11 to church, he didn't sell drugs that day, or on some other

12 day.

13          You know, in this case they're patients and

14 where does it stop?  Are we going to hear evidence for

15 every other patient?  He's seeing 80 patients a month, are

16 we going to hear 75 other stories as to what he did with

17 these other patients?

18          There's a reason why the hearsay rules work in

19 one direction, and that's so the defendants can't create a

20 self-serving hearsay to protect themselves.

21          In this case, we're going to show at trial that

22 he knew that he was being investigated.  So we believe

23 that these were self-serving statements that he knows --

24 he knows he's under investigation and he's on to the

25 undercover.  So that's why we believe, and that's why the

18

1    hearsay rules are the way they are.

2         I submit that in the bank robbery example, that

3    that self-serving statement would likewise, you know,

4    after the robbery, the self-serving statement, I don't rob

5    banks, would be similarly inadmissible, your Honor,

6    because of the hearsay rule.

7         This isn't a case where he's seeing a certain

8    type of patient, a singular type of patient.  Let's say

9    he's only seeing cancer patients and he treats them all in

10   the same way.  He's seeing anybody and everybody, he has a

11   phone call, he has no office, he comes to you.  That's why

12   we believe that this is inadmissible.

13        THE COURT:  Okay.  Mr. Schoer.

14        MR. SCHOER:  Judge, there's not a lot I have to

15   add except that I think the time line, the last argument

16   that Mr. Bode made in that is that he knew that he was

17   under investigation.  The videotape of the confidential

18   informant was not the first time that Dr. Stambler had

19   treated that patient and he continued to treat him after

20   the videotape.  And so there's no evidence that he knew

21   that that person was a confidential informant.

22        And in addition, there's no evidence that he had

23   any idea that the undercover police officer who was

24   introduced to him by that confidential informant, when she

25   called, was a police officer or that he was even under

1  investigation at that time in September.

2        I submit that your Honor is correct; this goes

3  clearly to his state of mind and his intent to distribute,

4  the dispense of outside medical judgment.

5        THE COURT:  I do have some concern of -- I

6  think, as you can tell from my question to Mr. Bode, I

7  understand the theory of state of mind, because I don't

8  think the other theories that you have are winners.

9        But Mr. Bode is correct, if that theory, though

10 then theoretically you can start marching in any patient

11 who is under treatment with OxyContin and try to argue

12 that the jury should be able to hear all the other people

13 that he treated without over-prescribing or he examined

14 legitimately and that does concern me.  I don't think that

15 that's appropriate.

16       MR. SCHOER:  I don't intend to do that, Judge.

17 My intent is to introduce these -- this video and this

18 audio that were, that are part of the government's

19 investigation, and not go further than that.

20       THE COURT:  And just explain, I got a little bit

21 of the flavor from your letter and Mr. Bode's letter, the

22 first one, the informant asks him to have something

23 prescribed and he examines him for 45 minutes.

24       MR. SCHOER:  Correct.  It's in the informant's

25 home, he visits him, he brings his medical equipment and

1   he does the examination, and the undercover police officer

2   is there at that time and they were talking.

3          And then the second time is a telephone call

4   from the undercover, in which the undercover indicates

5   that she would like him to see her and treat her and he

6   asks what are your ailments and she states some ailments

7   and he says, I can't give you oxycodone.  She says I got

8   it down in Florida.  And he said in Florida they hand out

9   those to anyone.  I can't give it to you based upon what

10  you're telling me.

11         THE COURT:  What happened with respect to the

12  informant after he examined the informant that he

13  prescribed --

14         MR. SCHOER:  He wrote a prescription to the

15  informant that day.

16         MR. BODE:  Just so it makes more sense to the

17  Court, the informant undercover visit was an attempt to

18  introduce the undercover cop to Dr. Stambler.  And the

19  phone call -- I disagree with Mr. Schoer's description in

20  terms of the phone call, in terms of how it ended.  He did

21  continue, I think you're right, he did continue to see the

22  informant after that.

23         MR. SCHOER:  I think he did.  And he prescribed.

24  And the way that I understand it, I may be wrong, is that

25  when the informant first became a patient of his, he was

1  not an informant.  He became an informant --

2          MR. BODE:  He's not a paid informant at all.  He

3  was never paid.  He was just someone who agreed to attempt

4  to help us introduce the undercover.

5          THE COURT:  So the informant is not an

6  example -- the government is not offering the informant of

7  as an example of someone who was abusing in terms of

8  prescribing, that was the mechanism for the introduction

9  of the undercover.

10          MR. BODE:  Yes.

11          THE COURT:  Okay.  Okay.  I'm going to state the

12  Court's ruling on the record.

13          The admissible purpose for this evidence would

14  be, as I said earlier, I think the state of mind exception

15  is the one that would apply here.  The Second Circuit has

16  talked about this in the context of, I wouldn't say

17  exactly analogous situation, but I think it makes clear

18  that the rule can be applied in situations like this.

19          For example, some of these are the ones where

20  they affirm the District Court's exclusion of evidence,

21  but nevertheless, they set forth the fact that this is

22  admissible grounds and I'll set forth what the facts are.

23          Recently in a case called United States versus

24  Kadir, K-A-D-I-R, 718 F. 3d 115 Second Circuit 2013, that

25  had dealt with excluding a tape recording.  And the Second

1    Circuit said a defendant may not introduce his own prior

2    out-of-court statements because they are hearsay and not

3    admissible.  However, a statement of the declarant's then

4    existing state of mind, such as motive, intent or plan is

5    exempted from the hearsay rule, 803 subsection 3.

6           And the Second Circuit says, in this particular

7    case, therefore, the statements unrecorded would be

8    admissible because the defendant would show they reflect

9    his own intent, and in this case they found it did not

10   reflect that.

11          Similarly, in United States versus L-A-W-A-L,

12   736 F. 2d 5, Second Circuit 1984, this deals a little bit

13   with Mr. Bode's argument about self-serving statements by

14   a defendant shouldn't be admitted, and this was one where

15   the argument was that certain statements by a defendant

16   should be on the state of mind.  And the trial court ruled

17   that self-serving statements of the defendant could not be

18   placed before the jury through the agents.

19          And the Second Circuit rejected that, saying the

20   trial court's blanket ruling that the defendant's

21   self-serving statements cannot come in prevented the --

22   through the agent, prevented the jury from hearing

23   evidence of something that he had said to the agent that

24   reflect his intent.

25          And they cite a prior case of theirs; DiMaria,

1    D-I-M-A-R-I-A, where he had dealt with a defendant's

2    statement regarding cigarettes that were subject to that

3    prosecution that he said disproved the state of mind that

4    the government was alleging.

5            And in DiMaria, the Second Circuit held that it

6    to be admissible in the defendant's favor under 803

7    subsection 3.  And this is now the court summarizing

8    DiMaria:

9            DiMaria held that while declarations which fall

10   within the parameters of 803 subsection 3 are

11   categorically admissible, even if they are self-serving

12   and made under circumstances which undermine their

13   trustworthiness, the truth or falsity of such declaration

14   is for the jury to determine and their self-serving nature

15   goes only to their weight.

16           And then it cautioned that only the Court ruled

17   that they didn't exhibit the state of mind related to

18   something in the past could be properly excluded.

19           And the final case, is a Seventh Circuit case

20   that dealt with almost the situation, it dealt with a

21   recording between the defendant and informant, although

22   there were other recordings of that same informant coming

23   in.  But this particular recording, the defendant argued,

24   were exculpatory because it reflected a favorable state of

25   mind for the defendant.  And the Seventh Circuit

1    ultimately upheld the trial court's ruling excluding it,

2    but did so in the following way; it disagreed with the

3    ruling, but it found them not to be an abuse of

4    discretion.

5         It said the following with respect to that

6    recording.  We think the February 11 -- United States

7    versus Giles, G-I-L-E-S, 246 F. 3d 966, Seventh Circuit

8    2001, and this is now a quote from the case:

9         "We think the February 11 tape should have been

10   admitted, especially in this case where the defendant was

11   going to and did testify.  The government's argument that

12   the tape was a product of the defendant's reflection and

13   attempt to cover his tracks in case he got caught should

14   have been made to the jury, not the judge.

15        "On a close evidentiary call like this, we think

16   it's best to err on the side of inclusion rather than

17   exclusion if an error at all is to be made."

18        I think that's the situation that we have here.

19   The defendant obviously -- the government's theory of the

20   case in terms of the intent which relates to the patients

21   that they are selecting is that his intent to provide

22   OxyContin without any legitimate medical purpose and the

23   defendant wants to show that his state of mind in the same

24   time period as it is reflected to prescribing OxyContin,

25   is to take affirmative measures to prevent the use by

25

1    examining the person and tracking them, or refusing

2    treatment in the case of the undercover.

3         And I believe that that state of mind, that it

4    does go to the state of mind.  The government has two

5    arguments in response to that.  One is it's different

6    people, and they're not alleging that he engaged in

7    criminal behavior as to the informant or the undercover.

8         However, I still believe that even though it's

9    different patients, that it is probative of the --

10   potentially probative, it's believed, and the jury -- as

11   the Second Circuit said, it gets to the jury to decide

12   whether it demonstrates a lack of intent with respect to

13   the people the government has selected to not make any

14   inquiry as to whether they really needed it or not.  It's

15   in the same time frame, it deals with the same drug, and

16   how he handled those other situations, it's probative of

17   his overall state of mind.

18        So -- and then in terms of 403 issues, the

19   government, I don't -- to the extent the government's

20   argument is the reason he treated these people differently

21   or the undercover, is he knew at the time the government

22   was watching him.  And the jury can certainly understand

23   that's true and they're not going to be confused by it.

24        I could give them an instruction when Mr. Schoer

25   seeks to put the recording in, that the government is not

1   charging that he illegally prescribed medications to the

2   undercover, offered the issue of the defendant's state of

3   mind, perhaps some instruction, if the government wanted

4   me to do that.

5          So I have examined it under 403 as well, and I

6   don't believe the jurors are going to be confused because

7   they're hearing evidence of individuals that are not

8   subject of the government's theory as to which patients

9   were illegally prescribed medication, especially when it

10  deals with an informant and an undercover working for law

11  enforcement.

12         I do want to make clear that I don't want this

13  ruling to -- and this is why I said what I did to

14  Mr. Schoer -- to be interpreted that my view would be --

15  my ruling would be the same if we started having -- if the

16  defense tried to parade the patients coming in to try to

17  show the lack of intent with respect to the patients the

18  government has selected.  But I'll deal with that

19  situation if Mr. Schoer seeks to do that.

20         But I think this ruling is limited at this point

21  to the informant and the undercover in terms of these two

22  particular recordings.  I'll deal with any other

23  situations as they arise.

24         Okay.  I don't have any other issues.  I know

25  there's back and forth about the jury questions.  I'm

1    still going through them.  You'll get a copy on Monday of

2    my proposed questions and you can object or comment at

3    that point, unless there's something you want to highlight

4    in particular, I don't plan on going through question by

5    question.

6              MR. BODE:  No, your Honor.

7              MR. SCHOER:  No, your Honor.

8              MR. BODE:  I gave over to the defense -- I'll

9    hand up to the Court -- a list of proposed, it includes

10   both witnesses and names that we expect to come up during

11   the trial so we can see IF the jurors know any of these

12   people.  Mr. Schoer and I spoke about this.

13             Just in terms of a couple of those people on the

14   list, your Honor, it indicates -- and the reason we're

15   filing this under seal and the reason why, is the fourth

16   and fifth names, Eva and Ellen on the list, those are the

17   two women I mentioned that the defendant Stambler was

18   romantically interested in.  We don't believe there's

19   anything criminal that those two women did.  I've spoken

20   to Mr. Schoer and the defense doesn't have any objection;

21   we're just going to call them by their first names.  But

22   we should see them to know them, obviously.  And any

23   medical record to come in, we'd like to have it come in

24   under seal so the public can't go through the record.

25             THE COURT:  You said during the jury selection,

28

1    I ask the jurors if they know the people.

2              MR. SCHOER:  We have to use their first and last

3    name when they testify.

4              MR. BODE:  When they're testifying, we just ask

5    they be use their first name, because I do expect media --

6    and they are innocent victims in this.

7              THE COURT:  As long as there's an agreement on

8    that, I don't have a problem with that.

9              MR. SCHOER:  I don't have an objection.  No

10   objection.

11             THE COURT:  Okay.

12             MR. BODE:  Couple of other things, your Honor.

13   One --

14             THE COURT:  I just want to think about a little

15   more.  I never had that.

16             MR. BODE:  We have until morning, that's fine.

17             THE COURT:  I'm just wondering whether I should

18   say something to the jury then, too, if I am going it

19   allow that, it is going to be strange.  You know, your

20   Honor, we call Eva.  It's going to be strange.

21             MR. BODE:  Yes.  I'm --

22             THE COURT:  Has that come up before?

23             MR. BODE:  I've never had a medical case --

24             THE COURT:  Not just a medical case, but a case

25   there was some agreement not to use the witness' last

29

1    name.

2            MR. BODE:  The whole reason is medical privacy.

3    That's why it hasn't come up with any other case I've had.

4            MR. SCHOER:  Mr. Bode just raised it today.  I

5    see the logistical problems, but I don't have any problems

6    with the concept.  And with respect to submitting any

7    medical records under seal for any of the witnesses, I

8    have no objection.

9            THE COURT:  You have an objection?

10           MR. SCHOER:  I have no objection.

11           THE COURT:  So for those two witnesses, you do

12   believe that there will be medical records?

13           MR. BODE:  As to all five of the folks, Judge,

14   there are prescription records, as to what they're taking

15   and everything, as to all five of them.  And then as to

16   Nancy Cook, there's some medical records.

17           And actually as to all five of them, the

18   defendant Stambler made notes, your Honor, as to their

19   conditions and their blood pressures, and their family

20   history of things.  So all those medical records, as well.

21   We'd ask that all of that be admitted under seal.

22           I don't want somebody's medical details ending

23   up in the newspaper.  I don't think that's appropriate.

24           THE COURT:  Again, I have to think about that

25   issue more because even if there's an agreement on that, I

1  have to weigh public access to the information, I have

2  concerns about that.  To the extent there's unrelated

3  medical information that doesn't deal with the subject

4  matter of the testimony in open court, in terms of the

5  reason that they be prescribed for what their ailment was,

6  that's going to come out in open court.

7          For the medical record that talks about the

8  ailment they have, it's unfortunate that it has to come

9  out, but it's going to come out in testimony.  So I don't

10  understand why we'd be sealing the documents.

11          If there's some unrelated ailment or information

12  in the document, you wouldn't seal the whole document, you

13  would redact that information out.

14          MR. BODE:  My concern, your Honor, isn't so

15  much -- sealing now in the Internet age is why we care

16  more about these things, I guess.  Because what I don't

17  want is that 30 years from now, people are able to go

18  online -- and I'll give you an example.  Nancy Cook has a

19  daughter, the daughter's name, I don't want people, she's

20  looking for a job 30 years from now, people will be able

21  to go online and find her birth records, a number of

22  records regarding her birth.  The circumstances of her

23  birth.

24          THE COURT:  I'll have to look into it.  I'll be

25  curious, even if you haven't done any of these cases, I'd

1    be surprised if there were cases where, along with medical

2    fraud or prescription drugs, that the trial exhibits that

3    the jury is going to view were shielded from the public by

4    some sealing order.  I'd be surprised at that.

5              MR. BODE:  In your Honor's example, your Honor,

6    I know has done some recent cases where people are killed.

7    I think the autopsy photos, photos of people when they're

8    at the crime scene, the body, I know those aren't open to

9    the public.

10             THE COURT:  We did seal them in the two MS-13

11   trials, there was not a single exhibit placed under

12   seal --

13             MR. BODE:  I guess we're trusting the newspapers

14   that they are not going to publish that.

15             THE COURT:  No, but they -- I take that back.

16   Obviously I have some concerns about this from the public

17   standpoint.

18             MR. BODE:  I'll see if I can find any statutes

19   or anything that deal with it.

20             THE COURT:  Or if you can say -- if another

21   judge in this district has done that, I'd be curious to

22   see whether they explained what their legal reasoning was

23   for that.

24             I don't fault you for raising it.  I understand

25   the concern.  And I agree with the concern.  But I'm just

1    not sure that there's a legal mechanism for doing that.

2          I think, this may not be what the government

3    wants to hear, but I think to the extent the government is

4    concerned about that for particular witnesses, that

5    information is going to have to be redacted out, that you

6    can't seal the whole document because if witnesses are

7    testifying about it, and the jury is seeing it, the strong

8    argument is going to be made that any reporter or member

9    of the public who wants to see it should be able to.  But

10   I'm going to look into it.

11         MR. BODE:  Okay.  Thank you, your Honor.

12         A couple of other things while we're here.  One,

13   I had a conversation with Mr. Schoer last week because I

14   was thinking that we might need a motion in limine and he

15   assured me we don't.  I want to put it on the record.

16         There's two ways a doctor could give someone a

17   controlled substance; they could prescribe it or they

18   could dispense it directly.  And on November 21, 2011,

19   when everything kind of breaks down and the law

20   enforcement comes swooping in, Chris Adams gives 20 pills

21   to Anthony Rinaldi that day in a cigarette -- and the

22   defendant -- but I talked to Mr. Schoer and he indicated

23   he's not going that the defendant Stambler was dispensing

24   pills to Rinaldi that day.

25         So I wanted to put that on the record because if

33

1    that was the defense, you'd have to make a motion in

2    limine as to that defense, your Honor.

3                THE COURT:  Okay.

4                MR. SCHOER:  I assured Mr. Bode that the

5    defendant did not dispense, that he gave a -- that he

6    provided prescription -- with a proper prescription under

7    the law.

8                MR. BODE:  And that's fine.  With that, I did

9    decided not to do that, I just wanted to put that on the

10   record.

11               THE COURT:  Okay.

12               MR. BODE:  Just a couple of more things.  So

13   your Honor is aware, in terms of scheduling, Mr. Schoer

14   his and I have been very agreeable in terms of I think

15   stipulations.  We should have at least two stipulations,

16   so we can avoid calling a few witnesses.

17               And just to remind the Court, because I don't

18   want the Court to be surprised, we're going to start on

19   Monday.  On Thursday I have to be in the circuit and then

20   next Tuesday again I have to be in the circuit again.  I

21   have two appellate arguments on three different briefs.

22               THE COURT:  We're going to lose a whole day?

23               MR. BODE:  I'm going to ask your Honor to have

24   us lose the whole day because I don't have a trial

25   partner.  Usually, as your Honor knows, in my office

1   there's two attorneys, if not three.  So there's just me

2   on this one.  I can't have someone here getting witnesses

3   ready and getting things ready while I'm at the circuit.

4   So I'd ask that we take off those two days.

5           Even with that, I think we're going to be able

6   to get this trial done in two weeks, if not a day longer

7   into the following week.  It's not going to be that long.

8           THE COURT:  In terms of the jury panel, I was

9   going to say three weeks to play it safe.

10          MR. BODE:  Yes.

11          THE COURT:  I think we are hoping to have a

12  hundred jurors, sometimes we lose more people once you get

13  beyond two weeks.  But I'd rather say three and lose some

14  more people rather than have people upset if it goes over

15  two weeks.

16          MR. SCHOER:  You're not going to work on Friday.

17          THE COURT:  We're not working on Friday.

18          MR. SCHOER:  So the first week we're talking

19  three days and the next week we're talking three days.

20  It's possible we might go to three weeks.

21          THE COURT:  Okay.

22          MR. BODE:  Just for the record, Mr. Schoer had

23  asked me to accommodate, your Honor, his defendant's

24  doctor, Dr. Weingarten, on Monday the 7th.

25          MR. SCHOER:  But again, if it's going to be a

35

1   fourth day of trial, I may not.  We've had discussions

2   about taking witnesses out of order.

3                 MR. BODE:  I'll talk to Mr. Schoer about that

4   more, Judge.

5                 THE COURT:  On Tuesday, this next Tuesday, I

6   think I'm going to have to end, I'll check, we're going to

7   end a little bit early, 3:30, 4:00, I'll let you know on

8   Monday.  Okay.

9                 MR. SCHOER:  And -- are you finished, Mr. Bode.

10                MR. BODE:  One of the things, but it's a

11  different issue.

12                One of the things, Judge, us to bring up.

13  Your Honor clearly doesn't have to decide this now, but I

14  am just concerned, in the defendant's jury instructions he

15  had "knowingly and intentionally and willfully," it seems

16  to be, based upon my research and the instructions I

17  submitted, it's just knowingly and intentionally, that

18  willful mens rea is not required.  It's not something that

19  the government has to prove.

20                So I was just concerned, as long as Mr. Schoer

21  isn't opening on willfulness, we don't have to cross that

22  bridge now.  And I'll just hand up to the Court, to

23  counsel, two of the cases, I think that I cited these in

24  my authority for the charges.

25                For a case such as this, in fact, willful

36

1    blindness is sufficient, so in terms of willfulness of the

2    defendant, a willful mens rea to break the law is enough.

3    As long as the defense is opening on that, there's no

4    issue.

5             MR. SCHOER:  I won't open on that, but I think

6    we're going to have arguments as we go along to willful

7    blindness, conscious avoidance.

8             THE COURT:  I certainly will have plenty of time

9    to debate that, as long as you're not going to use the

10   word willfulness in your opening, we're fine.

11            MR. SCHOER:  I won't.  If Mr. Bode's finished.

12            MR. BODE:  I am.

13            MR. SCHOER:  I have just one issue, Mr. Bode and

14   I talked about it before your Honor came out.  We had --

15   if your Honor remembers, many months ago you signed a

16   subpoena for me, an ex parte subpoena for the New York

17   State Department of Health with respect to the patient

18   monitoring program that existed and Dr. Stambler's use of

19   the patient monitoring program.

20            And I received a spreadsheet from them with --

21   in the column that related to the individual patient who

22   Dr. Stambler may have been inquiring about, had just

23   codes.  And I had e-mails back and forth with counsel for

24   the Department of Health as to whether or not they could

25   identify the individuals themselves who he had inquired

1    about, and I was told that those are algorithms and they

2    couldn't do it.

3            And I provided Mr. Bode the e-mails back and

4    forth, just so that he could understand what I tried to do

5    and what was going on.

6            In the government's exhibits, they have three

7    exhibits relating to the five patients who they're

8    focusing on.  And while -- they were able to get from the

9    Department of Health the same sort of spreadsheet, but

10   with names of those five individual.

11           So I asked Mr. Bode, when he provided that to

12   me, to attempt to use his good offices to find out why he

13   could get it and I couldn't.  And today he indicated to me

14   what he's learned is that you have to ask for the patient

15   names, and not based upon the doctor who's requesting it.

16           So I'm going to again provide Mr. Bode, as

17   quickly as I can, about 10 or 11 names of people that we

18   believe relate to the chart that I have.  And he's

19   indicated to me that he will --

20           MR. BODE:  It's easier if I -- so the difference

21   between what Mr. Schoer requested and what I requested is

22   I requested the same thing that he requested, but I added

23   "including but not limited to" and I put in five names.

24   And apparently if you search by name you can find things.

25   For the five people, Dr. Stambler had computer checks as

1    to three of them, two of them he did not.

2            So I indicated to Mr. Schoer that obviously

3    we're in a very last minute stage, but if he gives me

4    those names I can get them turned around and back out to

5    them within a couple of hours probably.  And the witnesses

6    come in to testify from BNE, Bureau of Narcotics

7    Enforcement, full arguments can be made -- so I can get

8    them together.

9            As long as it's a limited number, if I wanted

10   200 names, I couldn't do it.  But if it's a smaller batch,

11   I'm sure that I can get them together.

12           MR. SCHOER:  I'm not raising this to force

13   Mr. Bode to do anything that he's uncomfortable with

14   doing.  And I'm not raising it to bind him to any policies

15   that he hasn't spoken to.  But I'm raising it so that

16   your Honor is aware that if he can't do what he's

17   reporting to help me with, then I'm going to have to ask

18   for a subpoena and we may get into some sort of issue.

19           THE COURT:  It sounds to me, since you're only

20   requesting 10 or so names, it sounds like Mr. Bode is

21   going to get it done.  If he doesn't, then bring it to my

22   attention and we'll figure out what subpoenas need to be

23   issued.

24           I appreciate that you're obviously working well

25   together, as I expect it to make the trial run efficiently

39

1  without any delay or up necessarily witnesses for that

2  matter. Okay.

3            MR. SCHOER: Yes.

4            THE COURT: Okay. Anything else from the

5  government?

6            MR. BODE: No.

7            THE COURT: Defense?

8            9:30. Usually the panel is not ready. Come up

9  here, 9:30 we'll have a copy of the proposed questions

10  that you can review and usually the panel comes in at

11  10:30 and I expect that we have the jury hopefully before

12  lunch, if not before lunch, soon after lunch. And we'll

13  have the openings.

14            Who will be your first witness, Mr. Bode?

15            MR. BODE: The detective.

16            THE COURT: Anything else, Mr. Schoer?

17            MR. SCHOER: No, your Honor.

18            THE COURT: Thank you. See you Monday.

19            (Matter concluded.)

20

21

22

23

24

25