

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Partner
mazurek@clayro.com

March 12, 2016

Via ECF

Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  *United States v. Moshe Mirilashvili*, S2 14 Cr. 810 (CM)

Dear Judge McMahon:

We represent Dr. Moshe Mirilashvili in the above-referenced case.  We respectfully submit this letter brief in support of several motions at trial.  For reasons that follow, Dr. Mirilashvili moves:  (1) for mistrial; (2) for admission of additional recordings between the CS and Dr. Mirilashvili; and (3) to preclude a jury charge on conscious avoidance within the conspiracy instructions.

## I.

## Motion for Mistrial

Dr. Mirilashvili submits this letter motion seeking a mistrial with prejudice, following the introduction of government exhibits GX559, 559-A, and 560, because the government failed to provide advance notice as required by the Court's prior orders and because the late notice of these exhibits (at the time they were offered) unfairly prejudiced Dr. Mirilashvili and misled the jury.

As the Court knows, during the testimony of DEA Analyst Adrian Castro, at the end of the court day last Thursday, the government introduced Exhibits GX543 through GX550 and GX559, 559-A, and 560 (collectively "the Castro Exhibits") over Dr. Mirilashvili's objection.  The latter three exhibits contained "original" documents of about 35 pages seized from Dr. Mirilashvili's apartment.  These documents were not previously disclosed in this form to the defendant prior to their being offered in evidence.

The very reason for the Court's earlier order to produce marked exhibits prior to trial was to avoid the problem that the government has now created.  In a case that

Hon. Colleen McMahon
March 12, 2016
Page 2 of 9

involves literally a mountain of documentary and electronic discovery, the government selected approximately 35 pages of documents to offer as exhibits on the same day of trial when they were introduced.  These documents were among literally tens of thousands of pages of documents that were seized from the defendant's apartment.  While scanned copies of these documents were apparently produced within a document dump of Rule 16 discovery, the "original" form of these carefully selected 35 pages were never marked as exhibits or shown to the defense prior to trial.  As the Court indicated in one of the early pre-trial conferences in this case, the government does not satisfy its Rule 16 obligations by the mere dumping of an overwhelming amount of data on defense counsel. The Court made the government's discovery obligations clear in this case to include the pre-marking of trial exhibits so that defense counsel could have adequate time to review the exhibits, conduct any investigation about them prior to trial, make any evidentiary objections, and prepare for cross-examination.  The government's disregard of the Court's instructions in this regard has now prejudiced the defendant.

The government's apparent deliberate disregard of the Court's prior instructions is both serious and irretrievably prejudicial to the defendant.  For the reasons that follow, this Court should grant a mistrial with prejudice.

On December 11, 2014, the DEA executed a search warrant on Dr. Mirilashvili's two-bedroom apartment in Great Neck, New York.  The DEA recovered approximately 38,000 pages of documents in its search and packaged them up in boxes.  No agent ever photographed or memorialized the specific locations of these documents.  More importantly, the original condition of the documents was not preserved.  For example, either the DEA or the government's third-party vendor reorganized the documents prior to scanning and copying them, so that it is impossible to know how the documents were kept in Dr. Mirilashvili's home.  Thus, the documents – as produced – no longer show where they were found or how they were organized in Dr. Mirilashvili's apartment.

Previously, the government introduced some copies of records recovered from Dr. Mirilashvili's apartment for the purpose of allowing the jury to compare the physical records to those records uploaded to or created on Practice Fusion.  For example, GX501 – GX524 all contain the physical records relating to patients whose Practice Fusion files were produced (GX201 – GX224).  The parties had exchanged the names of these patients prior to trial according to a schedule set by the Court.  The patient lab reports introduced last Thursday at trial as GX 559, 559-A, and 560, included a group of patients whose files were not marked and exchanged prior to trial.

Presumably, the government introduced the Castro Exhibits to prove either (1) that Dr. Mirilashvili was creating false documents himself, or (2) that he *saw* them before issuing prescriptions for oxycodone to these patients and, in so doing, was not acting as a doctor.  Under those circumstances, the original condition of the records is paramount for the jury properly to evaluate the evidence.  But, as discussed, the government obliterated that context.

Hon. Colleen McMahon
March 12, 2016
Page 3 of 9

Offering the Castro Exhibits in the form in which they were presented to the jury violated the defendant's constitutional due process rights and Federal Rule of Evidence 403 because of the way that the government manipulated the collection and reproduction of the documents. The DEA's sorting of the 38,000 pages of documents and not preserving their original order and condition prevents the jury from knowing the context and circumstances in which these few pages of documents were found. Moreover, because of the way the government grouped these documents in its exhibits, the jury has been given a prejudicial and confusing presentation of them that cannot be undone by cross-examination alone. The government agents created the problem that they now will rely upon to prevent the defense from soliciting information about how the documents were originally found.

Because of the government's failure previously to disclose the Castro Exhibits at GX 559, 559A and 600, and its failure to preserve the evidence in its original form, Dr. Mirilashvili was substantially prejudiced and this prejudice cannot now be adequately cured. Thus, we respectfully move for mistrial with prejudice. *See Oregon v. Kennedy*, 456 U.S. 667, 677 (1982) (finding that Double Jeopardy Clause bars retrial where a defendant shows intentional government action that "goad[s]" a defendant into moving for mistrial).

## II.

### The Defendant Renews His Motion to Offer Additional Recordings of Dr. Mirilashvili's Patient Visits with Jose Lantigua

As the Court knows, Jose Lantigua is a confidential source of the DEA, who presented himself as a patient of Dr. Mirilashvili, and recorded several patient visits over a period of time from June 2013 through March 2014. On its direct case, the government introduced recordings pertaining to Mr. Lantigua's June 27th, August 12th, and September 12th, 2013 patient visits. We moved *in limine* seeking a ruling on the admissibility of additional patient-doctor encounters, which represent a continuation of the treatment of this same patient, and which Dr. Mirilashvili seeks to introduce in evidence. Transcripts of those recordings are attached at Exhibit A. (Transcripts of CS-Doctor Encounters: October 18, 2013 and November 20, 2013.) On March 2, 2016, the Court reserved ruling on this issue until the defense case.

Dr. Mirilashvili respectfully claims that the government cannot use these recordings as both a sword and shield, picking and choosing those it prefers and preventing the defense from giving the jury a complete picture of the doctor's medical treatment of the DEA's CS. As set forth in our *in limine* motion, these recordings are admissible by the defense under several evidentiary theories, including (1) Fed. R. Evid. 803(3), under the "state of mind" exception to the hearsay rule; (2) Fed. R. Evid. 803(4), as statements for purposes of medical diagnosis or treatment; (3) Fed. R. Evid. 803(1) for

Hon. Colleen McMahon
March 12, 2016
Page 4 of 9

the non-hearsay purpose of showing the effect Mr. Lantigua's statements had on Dr. Mirilashvili.[1]

## A.      State of Mind

The question of whether a defendant may, under Rule 803(3), introduce statements that were made contemporaneously to the offense conduct for the purpose of showing the defendant's then state of mind is a long-settled issue in the Second Circuit. *See United States v. DiMaria*, 727 F.2d 265, 272 (2d Cir. 1984) (reversing defendant's conviction because trial court erroneously precluded introduction of defendant's statements under state-of-mind exception); *United States v. Harris*, 733 F.2d 994, 1003-04 (2d Cir. 1984) (holding defendant's statements should have been admitted under the state-of-mind hearsay exception because they were statements of the defendant's present state-of-mind during the alleged offense conduct).  The basis for the state of mind exception focuses on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation. *Harris*, 733 F.2d at 1004.  As the Court explained in *Harris*, the likelihood that the declarant is misrepresenting his state of mind is **not** an additional qualification to the admissibility of state of mind hearsay statements. *Id.* at 1005.  "Instead, the self-serving nature of a statement is considered when the jury weighs the evidence at the conclusion of the trial." *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991).

The government has now admitted three of the eight patient visits that were recorded between the CS and the doctor.  The remainder of the visits should now be fair game for the defendant to admit to show the ongoing course of treatment and contemporaneous state of mind of Dr. Mirilashvili regarding his examination and treatment of a patient, including the decision to prescribe oxycodone, during the period of the charged conspiracy.  There is absolutely no chance that the doctor was deliberately or consciously creating self-serving hearsay statements because he did not know that the patient presenting himself was a wired government cooperator.  Also, the doctor was not commenting on past conduct, but was speaking only about the present examination of the patient with whom he was meeting.  Indeed, the context of a doctor's examination of a patient, who was secretly recording him, has a higher likelihood of not being an intentional misrepresentation than the statement by the defendant DiMaria, who knew he was speaking to law enforcement at the time he made his out-of-court statement.[2]

---

[1] We also rely on our *in limine* brief which discusses the "verbal act" doctrine and the rule of completeness as alternative grounds for admissibility of the recordings.

[2] In any case, the reliability of the statements is not an additional condition for the admissibility of state of mind hearsay statement. *United States v. Harris*, 733 F.2d at 1005.

Hon. Colleen McMahon
March 12, 2016
Page 5 of 9

The government has already offered in evidence some of the CS recordings to show Dr. Mirilashvili's state of mind.  In doing so, it necessarily conceded that the recordings are probative of the doctor's state of mind.  The defense now seeks to supplement the three recordings already in evidence with additional patient visit recordings of the same patient to complete the picture of the doctor's state of mind in prescribing oxycodone as an ongoing course of medical treatment.[3]

### B.      Effect on the Listener

As stated before, the additional recordings are *not* being offered for the truth.  As the testimony has made clear, at the direction of the DEA, Mr. Lantigua was faking his symptoms and pain complaints to Dr. Mirilashvili so as to receive pain medication.  Mr. Lantigua's follow-up visits on October 18, 2013 and November 20, 2013 had the same purpose.  Indeed, Mr. Lantigua piled on lies about his medical condition in these subsequent visits by telling the doctor that he visited an orthopedic doctor who scheduled a date for surgery.  Thus, the defense offers these recordings to show the effect that Mr. Lantigua's continued and more elaborate lies had on Dr. Mirilashvili during the subsequent patient visits. *See* Fed. R. Evid. 801(c).[4]

### III.

### The Trial Evidence Does Not Support a Conscious Avoidance Conspiracy Instruction

Dr. Mirilashvili respectfully objects to the Court giving the jury a conscious avoidance instruction within its conspiracy charge.

A conscious avoidance instruction "***may only be given*** if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, . . . and (2) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact."  United States v. Ferrarini, 219 F.3d 145, 154 (2d Cir. 2000) (emphasis added)

---

[3] Fed. R. Evid. 803(4) provides an alternative ground for admissibility of the recordings. Because the statements we seek to offer are out-of-court statements "made for—and [are] reasonably pertinent to—medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause," they squarely fit within the hearsay exception of out-of-court statements made for the purpose of medical diagnosis and/or treatment.

[4] Throughout trial the Court has admitted other out-of-court statements for this same purpose.  *See, e.g.* Tr. at 596-597 (holding that Damon Leonard could testify that "Mr. Coleman told [him] that [he] could make more money" because it "[a]lso explains why [Mr. Leonard] took an action" and is therefore "[n]ot hearsay.")

Hon. Colleen McMahon
March 12, 2016
Page 6 of 9

(internal quotations omitted).  Neither of these elements is satisfied; indeed, the erroneous submission of such a charge to the jury would constitute clear reversible error.

The government has failed to present a factual predicate supporting a conscious avoidance instruction.  The government's opening statement relied on evidence it expected to show of the doctor's actual knowledge and multiple affirmative steps he took to further the conspiracy, and **not** that the doctor deliberately looked the other way to avoid knowledge from others.  The government's allegations include:

1. ***That Dr. Mirilashvili ran a visibly fake medical office***:

   ▪ "[It] looked and operated like no medical office you have ever been to, a place where drug dealers congregated on a daily basis, place that had a bouncer at the front door, but no nurses or medical assistants, a place where few records were kept and many of the documents that were there were fakes."  (Tr. 28.)

   ▪ ". . . Dr. Moshe Mirilashvili, wrote more than 13,000 identical prescriptions for oxycodone.  He did so in return for cash, $200 to $300 in cash that the patient would hand directly to the defendant at the beginning of their appointment in the examination room."  (Tr. 28.)

   ▪ "[P]eople . . . came from all over the city, Staten Island, Crown Heights, the Bronx, to see this particular doctor, and people who are willing and able to pay cash . . .The defendant hired a bouncer to do crowd control, to check IDs at the door."  (Tr. 30.)

   ▪ "[D]efendant even hired two of these drug traffickers, two of these crew chiefs, to work as his own employees."  (Tr. 32.)

2. ***That Dr. Mirilashvili did not perform real medicine***:

   ▪ "You will learn the defendant never took blood pressure, checked vitals, took a patient's weight.  You will learn that none of that mattered. Virtually all of the defendant's patients were getting the same thing, the oxycodone prescription that they had paid for, no matter the medical condition they supposedly had, no matter their age, no matter their history."  (Tr. 31.)

   ▪ "You'll see the defendant make no diagnosis and take no notes at all for a patient he writes oxycodone prescriptions for month after month." (Tr. 35.)

Hon. Colleen McMahon
March 12, 2016
Page 7 of 9

> ▪ "[W]hen a doctor writes prescriptions with no good-faith belief that he is engaged in a legitimate practice of medicine, he is no longer acting as a doctor.  He is acting as a drug dealer and he is guilty of a crime." (Tr. 35.)

### 3.   *That Dr. Mirilashvili implemented specific procedures to facilitate the distribution of narcotics*

> ▪ ". . . while the defendant accepted a few insurance patients each day, the overwhelming majority of patients paid cash and the insurance patients typically had to wait until all of the cash patients had been seen first."  (Tr. 30.)

> ▪ Defendant "steered his patients away from mainstream pharmacies, like the Rite Aid down the street from his clinic, and steered them instead towards pharmacies the defendant knew, pharmacies that defendant guaranteed would fill the prescriptions. . . " (Tr. 34.)

> ▪ By writing 20, 30, 40 of these oxycodone prescriptions a day at $200 a pop, the defendant's profits soared.  At $200 a prescription the defendant could collect 4,000, 5,000, 6,000, $7,000 in cash a day." (Tr. 31.)

It strains credulity to suggest that there is a factual predicate here to warrant a conscious avoidance instruction.  The government's allegations and cooperators' testimony present a factual predicate consistent **only** with actual knowledge.  The government argues that Dr. Mirilashvili opened an office for the purpose of drug dealing; hired drug traffickers to work with him; met with "crew chiefs" behind closed doors; intentionally prescribed oxycodone to each and every patient; participated in creating and storing falsified medical records; and gave instructions to staff about how to "paper" the file.  The government's view of the evidence is not only that Dr. Mirilashvili **knew** that he was dealing drugs and not practicing medicine, but that he took affirmative steps to cover up that drug dealing by creating false medical records.

Case law does not support a conscious avoidance charge where the government presents evidence of intentional conduct to cover one's tracks.  Indeed, the two ideas cannot be logically reconciled.  Taking steps to create false documents to give "cover" for what was actually being done necessarily requires a predicate of actual knowledge.  If the defendant deliberately ignored the facts around him, then he would not know them for the purpose of creating fake records to cover them up.

The conflicting position between an alleged "cover up" and conscious avoidance can be seen through an example of the typical drug courier case, where the courier does not look into the bag to see its contents before he intentionally carries it for delivery to an unknown third party.  Consider the hypothetical of a drug courier who travels under a

Hon. Colleen McMahon
March 12, 2016
Page 8 of 9

fake identity and disguise when he is transporting a bag of drugs. These facts would not support a conscious avoidance charge because the fact of the "cover up," *i.e.,* the disguise and fake identity, is only consistent with a predicate of ***actual*** knowledge. Without knowing the contents of the bag, there would be no need to create a fake identity and disguise.

Further, the Second Circuit has instructed that a conscious avoidance instruction should not be given where "the evidence does not show that the [defendant] deliberately avoided learning the truth." *See United States v. Ferrarini*, 219 F.3d 145, 157-58 (2d Cir. 2000). In *Ferrarini*, for example, the Second Circuit concluded that the evidence did not establish the requisite factual predicate for the charge because it tended to show the defendant's actual knowledge of the fraud loans, and "was not sufficient to show that the defendant consciously avoided confirming them." *Id.* at 156. The Court reasoned:

> The fact that a jury can – on the evidence – find actual knowledge does not mean that it can ***also*** find conscious avoidance. If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance charge where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth. Since we have held that *conscious avoidance cannot be established* when the factual context "*should have apprised* [the defendant] of the unlawful nature of [his] conduct, *Rodriguez*, 983 F.2d at 458 (quoting *United States v. Joyce*, 542 F.2d 158, 161 (2d Cir. 1976) – and have instead required that the defendant should have been "shown to have *decided* not to learn the key fact" *Id.* – such a result might constitute reversible error.

*Id.*at 157 (emphasis added.)

Here, the government seeks to present its theory in the alternative. It argues that even if the jury does not find actual knowledge by the doctor, it could still convict under a theory that he decided not to learn "the key fact" of the sale of his oxycodone prescriptions.[5] The government, however, has failed to identify the factual predicate for claiming that the doctor decided not to learn a "key fact" about his practice.

---

[5]     The typical conscious avoidance case (and nearly half of the opinions cited by the government in its proposed charge) involves the illegal transport of drugs, where the defendant claims he did not know what he was transporting. *See e.g.*, *United States v.*

Hon. Colleen McMahon
March 12, 2016
Page 9 of 9


The government is largely relying on testimony in this case from two cooperating witnesses, who claim they were "guaranteed" to get oxycodone prescriptions without regard to any specific facts about a patient they presented to the doctor.  Damon Leonard also testified that the doctor relied on him to find patients to bring to the doctor.  This evidence does not support a theory that the doctor deliberately avoided knowing a "key fact" of the conspiracy.  This evidence is only consistent with the doctor's actual knowledge.


Under the facts of this case, the government has failed to establish a factual predicate for a conscious avoidance instruction and one should not be given to the jury.


Respectfully submitted,


/S/


Henry E. Mazurek
Wayne E. Gosnell
*Counsel for Defendant Moshe Mirilashvili*


cc:     AUSA Edward Diskant
        AUSA Brooke Cucinella

---

*Aina-Marshall*, 336 F.3d 167(2d Cir. 2003) (defendant who transported bag for someone claimed she did not know it contained 50 pounds of heroin); *United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) (defendant poised to receive bag containing illegal drugs); *United States v. Feroz*, 848 F.2d 359 (2d Cir. 1988) (defendant carried bag with drugs to airport).  The rest of the opinions cited involve fraud charges, where the defendant asserts lack of knowledge of a specific, discrete fact that rendered the statement or transaction fraudulent.  *See e.g., United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007) (defendant charged with defrauding a real estate developer about the status of his projects); *United States v. Hopkins*, 53 F.3d 533 (2d Cir. 1995) (defendant convicted of falsifying company's discharge sampling methods); *United States v. Kaufman*, 2014 U.S. Dist. LEXIS 68512 (2d Cir. 2014) (defendant claimed lack of knowledge about fraudulent contracts that made her statements an obstruction of justice); *United States v. Reyes*, 302 F.3d 48 (2d Cir. 2002) (defendant claimed lack of knowledge that goods sold were stolen).  Here, the government has not identified any specific or discrete fact that the doctor deliberately decided not to know.  On the contrary, the government has relied on evidence that the doctor intentionally created false patient notes, assisted in the falsifying of drug lab reports, hired drug traffickers, and met and communicated by telephone with known "crew chiefs."  This is not a factual predicate for a conscious avoidance theory.