

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 13, 2016

**BY E-MAIL and ECF**

The Honorable Colleen McMahon
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Mirilashvili et al., S2 14 Cr. 810 (CM)**

Dear Judge McMahon:

      The Government writes in response to the latest series of motions filed by the defendant, seeking: (1) a mistrial, (2) to admit certain hearsay statements of the defendant, and (3) to preclude a conscious avoidance charge.  For the reasons that follow, all of these motions should be denied.

## I.    The Mistrial Motion Should Be Denied

      At the end of the trial day on Thursday, the Court properly admitted, over the defendant's objection, GX 559, 559-A, and 560, each of which consisted of Aegis lab reports recovered from the defendant's home at the time of his arrest. The defendant now moves for a mistrial "with prejudice," alleging that the Government failed to "provide advance notice" that the documents would be offered and because the late notice somehow "unfairly prejudiced" the defendant.  The motion should be rejected as meritless because the defendant identifies no form of undue prejudice from their admission.  To the contrary, the documents in question were probative and relevant and were properly and legally recovered from the defendant's home, and as the Court correctly ruled, when hearing these issues at side bar in the first instance, "I don't see any reason to keep them out."  (Tr. at 1071).[1]

---

[1] At the time the Government sought to introduce GX 559, 559-A, and 560, the Court rejected many of these arguments at side bar:

      MR. MAZUREK:  Judge, it's the first time that we're seeing these documents.
      MR. DISKANT:  That's not true, your Honor.

"Courts have the power to declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated" *United States* v. *Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (omission in original) (internal quotation mark omitted). This Court's power to grant a mistrial should be used only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* (quoting *United States* v. *Perez*, 22 US. (9 Wheat.) 579, 580 (1824)).

By way of background, and as the defense cannot and does not dispute, these documents were produced, consistent with the Government's obligations, as a part of Rule 16 discovery on May 13, 2015. These documents were produced in the exact order in which they were found, organized by patient last name, with blank documents included in certain patient files. We have attached, as Exhibit 1, a sample of these documents reflecting the control numbers under which they were originally produced. While these documents were produced in scanned format, it is obvious, even in digital format, that the documents were altered or, in certain instances, are blank. Moreover, at defense counsel's request, the Government made all of the documents recovered from the defendant's home – as well as documents from the clinic — available, in their original form, for defense counsel's review at the U.S. Attorney's Office. Indeed, on February 12, 2016, Mr. Mazurek, Mr. Gosnell, and at least one other person from their firm spent approximately 3 hours reviewing these documents with the assistance of a DEA Agent present to facilitate that review by, among other things, answering questions about where specific documents were found.

While these documents were thus unquestionably made available to the defendant months well before the beginning of trial, they were a late addition to the Government's exhibit list (added in response to arguments raised through the cross examination of Damon Leonard about Aegis and "fake" urine reports more generally) and were not produced as marked exhibits prior to DEA Analyst Adrian Castro taking the stand. That fact alone, however, does not justify a mistrial, as it did not actually prejudice the defendant. To the contrary, and as noted by the Court

---

> THE COURT: I don't care whether it's first time you're seeing them or not because I can't adjudicate that. They say that's not true, that they have turned them over. You say –
>
> MR. GOSNELL: They certainly haven't marked them as exhibits, which they were required to do.
>
> THE COURT: I don't care about that either. I don't see any reason to keep them out.
> …
> MR. GOSNELL: Your Honor, I'm going to request, especially since we haven't seen these documents before, that we be given the weekend to analyze these.
>
> THE COURT: You're going to have it. Don't worry. I wasn't really going to keep us here until 9 o'clock tonight, but I wanted the government to get done. OK.
>
> MR. DISKANT: Thank you, your Honor.
>
> THE COURT: I assume it will come out in examination where these documents came from. You're certainly free to cross if it doesn't, or you want voir dire, you can have voir dire.

(Tr. 1070-1071).

last week in admitting the documents, the concerns raised by defense counsel in the instant motion can all be addressed through cross examination, for which counsel has now had a full weekend to prepare.

For example, to the extent defense counsel claims prejudice because the documents were not presented to the jury in the same order in which they were found, this, of course, is something they are free to explore on cross-examination of Analyst Castro, who was present for the search of the apartment and can testify to where these particular documents were located, and how they were stored. The Government has also offered photographs of the home, at least one of which clearly depicts the location and storage of these documents. A copy of that photograph, Government Exhibit 5-A, is attached as Exhibit 2. It bears mention that the defense has not raised this concern about any of the other documents found in the defendant's home and offered in a similar fashion -- including MRI referrals introduced (in their original form) through Dr. Gregory Lawler at GX 552-556, as well as the other original patient documents offered through Analyst Castro, GX 501-524, and GX 543-50 – all of which were admitted without objection, but the defendant remains free to explore this issue with respect to these documents on cross. Similarly, to the extent defense counsel believes that the condition of the documents was somehow altered or changed through the process of scanning them – an issue that, again, has never raised with respect to any of the other original-format documents offered in this case – they are again free to explore this on cross examination

In sum, because there was no manifest injustice here or other significant prejudice warranting a mistrial, the defendant's motion should be denied.[2]

## II.     The Additional CS Recordings

Next, the defendant renews his motion to admit certain of the additional recordings made by a confidential source (the "CS") who posed as a patient and saw the defendant on approximately eight occasions. During the direct examination of Abraham Correa, the Government offered the first three of these recordings, during all of which Correa was present. Correa did not participate in any of the subsequent recordings.

The defendant now seeks to offer the next two recorded visits – those occurring on October 18, 2013 and November 20, 2013 – contending that the government "cannot use these recordings as a sword and a shield, picking and choosing those it prefers." (Def. Br. at 3). The defendant further argues the recordings should be admitted to show the defendant's "state of mind" pursuant to Rule 803(3), or for their "effect on the listener" – that is, presumably, the defendant. (*Id.* at 4, 5.)

---

[2] In his motion seeking a mistrial with prejudice, the defendant cites exclusively to *Oregon* v. *Kennedy*, 456 U.S. 667, 677 (1982). While it is somewhat unclear as to why or how the defendant is relying on this case in this motion, it is certainly clear that the facts of that case—in which a mistrial is granted after a prosecutor continues to ask questions in the face of sustained objections, and then proceeds to ask a witness if they failed to take an action "because the defendant was a crook?"—are inapposite here, and have absolutely no relevance to the issue currently before the Court.

3

For substantially the reasons set forth in the Government's opening brief on this issue, the Government submits these recordings are not properly admissible by the defendant. *See generally United States* v. *Demosthene*, 334 F. Supp. 2d 378, 381 (S.D.N.Y. 2004) ("[A] defendant generally may not introduce his own prior statement for the truth of the matters asserted therein . . . . By seeking to introduce such statements, [the defendant] is, in essence, attempting to present a second version of his own admissions in order to permit the jury to decide which of the two versions to credit . . . . [s]uch a substantive comparison . . . would not be admissible under either Federal Rule of Evidence 801(d)(2)(A) or the Second Circuit's holding in *Marin*."). In particular, the defendant has not identified specific statements on the recordings which fall within the "narrow" state of mind exception, and as the Court has already noted with respect to some of the recordings at issue, "[t]he spoken words in those transcripts don't reflect the doctor's state of mind in the way that the spoken words did in cases like *United States* v. *De Maria*, where the defendant said: I thought I was coming down here to get cheap cigarettes; or *United States* v. *Harris*, where the defendant said to his probation officer: I think the government is trying to set me up." (Tr. at 11.) That remains equally true of the two additional recordings the defendant now seeks to offer.

Moreover, the *facts* of what is happening on these recordings – *i.e.*, the defendant conducting a brief examination, for example, or asking the CS questions – are before the jury, because all of those things happened on the three recordings that have been offered, and all of those subjects were the subject of direct and cross-examination of Correa, in particular. There is nothing different or new on the additional recordings. As such, there is no need for these additional recordings to somehow "complete [the] picture of the doctor's medical treatment" of the CS. (Br. at 3).

### III.   The Conscious Avoidance Charge

Finally, the defendant objects to the Court's proposed instruction on conscious avoidance, arguing that the threshold requirements for such a charge have not been met. For the reasons that follow, the Government submits those requirements have plainly been established in this case, and thus, the Court should give a conscious avoidance charge not only with respect to the conspiracy count, but with respect to all three counts of the Indictment.

"A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact." *United States* v. *Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (citing *United States* v. *Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994)). As the Second Circuit has explained "[t]he test for when a conscious avoidance charge is permissible has two prongs. First, the defendant must 'assert[] the lack of some specific aspect of knowledge required for conviction.'" *United States* v. *Fofanah*, 765 F.3d 141, 144 (2d Cir. 2014) (quoting *United States* v. *Ferrarini*, 219 F.3d at 154). Second, "there must be an 'appropriate factual predicate for the charge . . . , *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided

4

confirming that fact.'" *United States* v. *Fofanah*, 765 F.3d at 144-45 (quoting *Ferrarini*, 219 F.3d at 154).

With respect to the first criteria, there can be no serious dispute that the defendant has put his knowledge (or lack thereof) at issue – that is, he has disputed that he knowingly wrote prescriptions for drug dealers, or as part of a scheme to distribute narcotics. Indeed, the defendant's knowledge of the criminal nature of his activity is arguably the *only* material issue in dispute in this case. The defendant did so through opening, telling the jury that the case was about "a doctor who practiced old-world medicine but became the target of modern day criminals" adding "[y]ou are going to hear that when Dr. Mirilashvili opened that office he didn't open it to be a drug dealer, as the government suggests. He opened it to be a doctor." (Tr. at 38, 40).

Similarly, in opening, the defendant directly challenged the significance of the fake medical documents the Government has since offered, telling the jury: "And you are going to hear that a doctor in the usual course of practice is not a detective . . . They're a doctor, and they build relationships with their patients. And you are going to hear that's what Dr. Mirilashvili did, and he believed his patients as they came before him. And he tried every which way to make sure that he ran a medical office that he was proud of." (Tr. at 44.)

The defendant similarly suggested, in opening, that much of the criminal activity as his clinic was happening behind the defendant's back, telling the jury: "keep your eye on what the evidence is going to show in terms of what was going on outside of Dr. Mirilashvili's office versus what was going on inside the clinic." (Tr. at 47) The defendant returned to this theme again, telling the jury that the defendant did not know the medications he was prescribing were being diverted "[b]ut the people in the office knew that. And you are going to hear how they undermined him." (Tr. at 49.)

The defendant has also challenged his knowledge of the criminal aspects of the conspiracy operating at his clinic so through cross-examination of the Government cooperators, cross-examination that has focused on facts the cooperators are alleged to have hidden or concealed from the defendant, thereby putting at issue the defendant's actual knowledge of many of the facts the Government would submit establish actual knowledge. For example, during the cross of Abraham Correa, the defendant questioned the witness as follows:

Q. And isn't it a fact that Augustine Cruz would also make fake MRI reports?
A. Yes.

[ . . .]

Q. And he would do this outside of the office and keep these reports on a thumb drive.
A. Yes.
Q. And isn't it a fact that he did this so that there would be no evidence on the computer system at the office?
A. He never did MRIs at the office.

5

> Q. Now, sir, you never told Dr. Mirilishvili the whole time you knew him that you were a convicted drug dealer, right?
> A. No.
> Q. You never told him you were buying fake MRIs, did you?
> A. No.
> Q. You never told him you were accepting bribes from patients to get an appointment.
> A. No.

(Tr. at 541-42.)  Similarly, in cross-examining Damon Leonard, the defendant went to great lengths to try to suggest that Leonard or Jomaris Javier had been involved in doctoring paperwork behind the defendant's back or taking other steps to conceal facts from the Doctor. (*E.g.*, Tr. at 763-64; 778-79; 817).  The Government submits that the above, which is just a very small sample of lengthy cross-examinations that have focused on these issues, is more than sufficient to meet the first prong of the applicable standard.

With respect to the second prong, that is an "appropriate factual predicate," that prong is also satisfied here because there is abundant evidence from which a rational juror could conclude that "the defendant was aware of a high probability" of the criminal activity happening all around him but deliberately and consciously avoided confirming some of the key facts.  For example, the Government has offered dozens of purported medical documents that appear to be visibly doctored or forged – documents the defendant used to justify the prescriptions he wrote – and documents the defendant has suggested were created to "fool" the defendant.  The jury could reasonably find that, by effectively looking the other way in return for cash payments those patients were making, the defendant deliberately avoided confirming facts that were otherwise obvious – that these patients, that their documents were fake, and that the prescriptions the defendant was writing had no legitimate medical purpose.  *Cf. United States* v. *Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994) ("The rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to "do no evil."")

Similarly, with respect to the conspiracy charge, both Correa and Leonard have testified to developing criminal relationships with the defendant, aspects of which the jury could reasonably conclude the defendant deliberately avoided confirming.  For example, both Correa and Leonard testified that they were "patients" and that the defendant observed them in the Clinic on a daily basis before hiring them to be employees, all the while writing oxycodone prescriptions for the cash-paying "patients" they each brought in.  A rational juror could conclude that the defendant, by allowing Correa and Leonard to hang out in his office on a daily basis – even encouraging them to do so by hiring them as employees – in return for the cash-paying patients they were bringing him (all of whom sought and obtained oxycodone prescriptions), formed a criminal agreement with Correa and Leonard, while deliberately avoiding learning the full details of what they were doing.  *See, e.g.*, *United States* v. *Svoboda*, 347 F.3d 471, 479 (2d Cir. 2003) ("[T]he jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy") (quoting *United States* v. *Reyes*, 302 F.3d at 55).  The same could be said of many of the "patients" who presented the fake paperwork described above and nonetheless continued to obtain oxycodone prescriptions from the defendant month after month in return for cash payments.  A rational juror could conclude

that the defendant formed an agreement with these patients, while deliberately avoiding learning details of what they were doing with the prescriptions once written.

These are but a few examples in a case in which the defendant's knowledge of the criminal activity unfolding all around him is, as noted, essentially the only material issue in dispute in this case. Moreover, that the Government opened on a theory of actual knowledge – and will argue actual knowledge to the jury – does not preclude a conscious avoidance charge. To the contrary, it is well-established that where, as here, "the evidence could support both a finding of actual knowledge and a finding of conscious avoidance, the government may present conscious avoidance as an argument in the alternative." *United States* v. *Nektalov*, 461 F.3d 309, 316 (2d Cir. 2006); *see also United States* v. *Wong*, 884 F.2d 1537, 1542 (2d Cir. 1989) (same). Here, as noted above, the defendant has sought to discredit the Government's evidence of knowledge and to offer innocent explanations for some of conduct at issue, thereby asserting the "lack of specific knowledge" required to justify a conscious avoidance charge. *Cf. United States* v. *Gabriel*, 125 F.3d 89, 98 (2d Cir. 1997) ("A conscious-avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance.")

In sum, the Government believes both prongs of the applicable standard have been met here – and have been met with respect to all three counts – and thus would respectfully request that the Court give a conscious avoidance instruction with respect to all three counts of the Indictment.

## **Conclusion**

For the reasons set forth above, the Government respectfully submits that the defendant's latest round motions should be denied.

                                                        Respectfully submitted,

                                                        PREET BHARARA
                                                        United States Attorney

                              By:     /s/_____
                                                        Brooke E. Cucinella/Edward B. Diskant
                                                        Assistant U.S. Attorneys
                                                        212-637-2477/2294

Cc:     Henry Mazurek, Esq.
         Wayne Gosnell, Esq.