```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                             S2 14 Cr. 810 (CM)

MOSHE MIRILISHVILI,

              Defendant.                  Trial

------------------------------x

                                          New York, N.Y.
                                          March 2, 2016
                                          9:45 a.m.


Before:

                    HON. COLLEEN McMAHON,

                                          District Judge


                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EDWARD DISKANT
BROOKE CUCINELLA
     Assistant United States Attorneys

HENRY MAZUREK
WAYNE GOSNELL
     Attorneys for Defendant


ALSO PRESENT:  MICHAEL MULLER, DEA
               ELIZABETH JOYNES, Paralegal
               MICHAEL DOMANICO, Paralegal
```

1              (Trial commenced)

2              MR. DISKANT:  Good morning, your Honor, Edward Diskant
3    and Brooke Cucinella for the government.  With us at counsel
4    table is Elizabeth Joynes, a paralegal at our office, and
5    Special Agent Michael Muller of the DEA.

6              MR. MAZUREK:  Good morning, your Honor, Henry Mazurek.
7    Also at counsel table Wayne Gosnell; our paralegal, Michael
8    Domanico; and Dr. Moishe Mirilishvili.

9              THE COURT:  Good morning, everyone.  First thing I
10   have to do is apologize.  I have a very sore throat this
11   morning.  It's a bad day to have a sore throat, but I will do
12   the best I can with what I've got.

13             We have had some late-breaking motions.  Let me get
14   some rulings on the record.

15             With respect to the BNE documents, the government
16   correctly identifies the defendant's last-second request for
17   clarification of the denial of its motion to suppress the BNE
18   records that detail all prescriptions for controlled substances
19   filled by New York pharmacists upon submission of prescription
20   forms bearing the name and physician ID number of Dr. Moishe
21   Mirilishvili as a motion for reargument.  But whether
22   reargument or clarification, the motion is denied.

23             BNE collects data on every prescription from a
24   controlled substance that is filled by a New York State
25   pharmacist.  Pharmacists are required by law to report to the

1    BNE the following information every time they fill a
2    prescription for a controlled substance:  The name and address
3    of the patient, the name and license number of the prescribing
4    doctor, the medication and dosage dispensed, and the method of
5    payment.  This compendium of information is transmitted to BNE
6    by pharmacists.  It's a business record of BNE.  The BNE data
7    is collected in the ordinary course of regularly conducted
8    business activity of BNE and it is the BNE's regular business
9    practice to collect and maintain the database containing this
10   information about all prescriptions of controlled substances.
11   Indeed BNE is required by law to collect and keep this
12   information.
13           The information contained in BNE records is itself
14   collected and transmitted to BNE by a person with knowledge;
15   that is, the pharmacist who filled the prescription.  The
16   pharmacist has knowledge because he knows what is written on
17   the prescription form that causes him to fill the prescription.
18   The information he is transmitting to the BNE is the very
19   information that causes him to act.  The pharmacist is under a
20   legal duty to transmit accurately the information he is given
21   by his customer, including specifically the name and license
22   number of the prescribing doctor that is imprinted on the
23   controlled substances prescription form, as well as the drug
24   and the amount prescribed.  He can lose his license if he does
25   not comply with his legal duty.  The BNE source of information

1    thus cannot be said to be untrustworthy.  Quite the contrary.

2    Therefore, the BNE data qualifies as a business record and is

3    admissible as an exception to the hearsay rule.

4            The defendant's insistence that there is a second

5    layer of hearsay to be considered is not persuasive and rests

6    on an incorrect characterization of the purpose for which the

7    government can offer the evidence.  When pharmacists report to

8    the BNE, they are simply telling the BNE what they did and what

9    information was given to them in order to induce them to do

10   what they did.  It is true that the information pharmacists are

11   given by their customers may not be accurate in that, for

12   example, the pharmacist may have been given a forged

13   prescription.  That has apparently occurred several times using

14   Dr. Mirilishvili's information to the knowledge of the

15   government.

16           But unless I misunderstand something, the BNE record

17   is being offered to prove and indeed can only prove that

18   pharmacists were presented with and, as a result, filled

19   prescriptions that were ostensibly written by someone named

20   Moishe Mirilishvili, who had a particular physician number, and

21   I will assume that the physician number on the BNE's report

22   about the defendant is in fact Dr. Mirilishvili's prescription

23   number.  I should say his identification number.  That is the

24   fact asserted by the BNE report, that pharmacists in New York

25   State filled a certain number of prescriptions during a certain

period of time after being presented with prescription forms that purported to come from this particular doctor. And I imagine that someone from the BNE is going to be testifying about what's required to be printed on controlled substance prescription forms.

It is important to note that BNE keeps track of the activities of pharmacists. It tracks what prescriptions are being filled and on the basis of what information. Only indirectly does it track the activities of particular physicians. Without more, the only fact that is proved by the BNE records, the filling of prescriptions for controlled substances by pharmacists who receive particular information from their customers, is actually insufficient to prove that the doctor whose name was given to the pharmacist actually wrote the prescription.

But when coupled with other evidence, the fact that the pharmacist was told that a particular doctor wrote the prescription is certainly relevant to a determination of whether the doctor did in fact write the prescription. It's just not sufficient. And here the government will not simply be relying on the BNE reports when it asks the jury to infer that Dr. Moishe Mirilishvili wrote numerous prescriptions for Oxycodone. It will also be relying on the testimony of witnesses who dealt directly with the doctor or his alleged coconspirators on a day-to-day basis. Office staff, ostensible

patients, drug dealers, they will testify about their observation of the doctor's practices, that he performed perfunctory physical examinations, or none at, all of people who were plucked off the street and given obvious phony medical records and $200 and sent to the office to obtain a prescription for Oxycodone. That's what the government says it's going to prove. As I understand it, the government will also offer evidence that Dr. Mirilishvili only reported one prescription of his to have been stolen during the period encompassed by the alleged conspiracy. I assume some evidence about the law that requires doctors to report stolen prescription pads.

Taken together, this whole bevy of evidence, and any other evidence that the government may introduce, the judge of course is always the last to know what the evidence is going to be, the BNE records have some probative value about the practices of Dr. Mirilishvili. I admit that there is circumstantial probative value. The records are direct evidence only of the activities of the pharmacists and the information that, true or false, is provided to them by their customers.

The defense is perfectly free to attack the inference that the government asks the jury to draw as being unwarranted. Being required to expose the weakness of the government's evidence does not shift the burden of proof to the defense.

The defense can cross-examine BNE's witnesses about the inherent and obvious flaw in the proffered database. Its accuracy is only as good as the information that the pharmacists are given by their customers because the pharmacist was not present when the prescriptions were written and so cannot attest to the fact that the doctor whose name and ID number appears on the prescription form actually wrote them. The defense can also introduce evidence that there were instances in which Dr. Mirilishvili's name and physician number were misused. If the government doesn't beat the defense to it, which I rather expect will happen, it would then be for the jury to decide whether that likely happened as many as 1,000 times.

Furthermore, it should go without saying that none of this suggests that any of the Oxycodone that was handed out by these pharmacists was prescribed unnecessarily. The fact that numerous prescriptions were filled is not in and of itself proof that the drugs were prescribed unnecessarily. It only goes to the number of prescriptions that were filled at the apparent behest of Dr. Mirilishvili which, together with other evidence, such as the testimony of patients and office staff and others, will be the basis for the government to argue that the prescriptions were for drugs that were not medically necessary. I trust this clarifies matters for defense counsel. They have their exception.

 1　　　　　　　2.  The testimony of Benjamin Lopez, which, as I
 2　understand it, will consist of his observations of fact about
 3　the clinic and its surroundings, is relevant and will be
 4　admitted.
 5　　　　　　　3.  The Court will not be giving any preliminary
 6　instructions on the substantive law relating to the charged
 7　crimes.  Contrary to defendant's assertion, this is not a
 8　particularly complex case and I am sure the jurors will
 9　appreciate hearing the charge but once, at the conclusion of
10　the case when the concepts on which they are being instructed
11　will make sense in light of the evidence they have already
12　heard.
13　　　　　　　4.  And so we come to the tape recordings of the
14　interactions between Dr. Mirilishvili and one of the
15　cooperating witnesses.  This is somewhat confusing to me.  If I
16　understand correctly, the government was originally not
17　intending to introduce any of these tapes into evidence, which
18　to me means the government did not believe it was required to
19　introduce the tapes in order to meet its burden of proof.  But
20　in order to be nice to the defense, the government offered to
21　introduce selected tapes from among the universe of
22　conversations between the confidential source and the
23　defendant, using the good offices of the cooperating witnesses
24　who had served as a translator to explain the circumstances of
25　the conversations.

1    And then defense counsel turned around and bit the
2 hand that fed it, claiming that it should be allowed to
3 introduce other tapes of other conversations, both under the
4 rule of completeness, which of course doesn't apply, and in
5 order to show Dr. Mirilishvili's state of mind at the time he
6 wrote this particular confidential source's prescriptions.
7    As far as I can tell, the government should have left
8 well enough alone and it should forget about trying to do
9 favors for the opposition.  I'm not impressed either by its
10 magnanimity or by its outrage.  My advice to the government is
11 to introduce such evidence as is necessary to prove its case
12 beyond a reasonable doubt and then rest.  Then let the defense
13 decide what to do next.
14    And sufficient unto the day, this motion is way
15 premature.  The government has no idea what information will
16 come in on the government's case that may obviate the need for
17 the defense to want to introduce any tapes or that may actually
18 assist the defense in making its argument, which, as I
19 understand it, is that the doctor's actions as recorded on the
20 tapes are indicative of his state of mind at the time he was
21 dealing with the confidential source.
22    The state of mind rule goes something like this:
23    A defendant is ordinarily precluded from offering his
24 own prior statement for the truth of the matters asserted
25 therein.  Because that out-of-court statement is hearsay.

1            However, in some instances defendants may be able to
2    introduce statements they made prior to trial in order to prove
3    what their state of mind was when they made those statements.
4    The exception is a narrow one.  As the late Judge Cardamone,
5    whose memorial will be held this very afternoon, held in <u>United
6    States v. Cardascia</u>, 951 F.2d 474 (2d Cir. 1991), the state of
7    mind exception is a specialized application of the excited
8    utterance and present sense impression exceptions to the
9    hearsay rule.  In order to decide whether a particular
10   statement falls within the state of mind exception, one must
11   look to the precise words spoken, decide whether they relate to
12   a then existing state of mind or to a past memory or belief
13   that is being offered to prove the fact remembered or believed.
14   The latter, of course, does not fall within the exception.
15           The statement must relate to conduct that was
16   occurring at the time the statement was made, not conduct that
17   occurred at some earlier point in time.  As Justice Cardoza put
18   it in <u>Shepard v. United States</u>, 290 U.S. 96, 98, the statement
19   must be forward looking, not backward.  And it must relate to
20   an act of the speaker himself, not to an act of someone other
21   than the speaker.
22           Like all exceptions to the hearsay rule, the state of
23   mind exemption relies on a presumption of trustworthiness of
24   the statement, which gives a particular assurance of
25   credibility.  Because it would be easy to fake one's state of

1  mind, this justification seems rather tenuous, certainly more

2  so than with the excited utterance.  If a declaration falls

3  within a category defined in the hearsay rules as an exception,

4  it is admissible without any preliminary finding of probable

5  credibility by the judge.  That is for the jury.

6      I have reviewed the individual statements of

7  Dr. Mirilishvili as reported on the transcripts attached in the

8  February 29 motion as Exhibits A and B.  The spoken words in

9  those transcripts don't reflect the doctor's state of mind in

10 the way that the spoken words did in cases like United States

11 v. De Maria, where the defendant said:  I thought I was coming

12 down here to get cheap cigarettes; or United States v. Harris,

13 where the defendant said to his probation officer:  I think the

14 government is trying to set me up.  As the government argues,

15 on these tapes the doctor asks questions that seek to obtain

16 knowledge from his patient, makes statements that refer to his

17 memory of past events, and makes statements that provide the

18 patient with medical information, which is reflective not so

19 much of his state of mind, but as to his state of medical

20 knowledge.

21     This is how I understand defendant's argument.  The

22 fact that Dr. Mirilishvili was obtaining medical information

23 from the person sitting in his office, that he was directing

24 the patient to stand up, sit down, flex his feet, that he was

25 asking about symptoms and improvements over time, that he was

1  making referrals to orthopedists and physical therapists, all

2  of these being verbal acts tend to demonstrate that he believed

3  the person sitting across from him was a real patient whose

4  condition needed to be evaluated and treated, i.e., that was

5  his state of mind.

6        The defense also argues that these verbal acts give

7  rise to legal consequences, but that argument strikes me as

8  tenuous at best.  What the defense is really arguing is that

9  Dr. Mirilishvili must have believed, at the moment of the

10 office visits reflected in the tapes, that the person

11 confronting him was a real patient or else he would not have

12 asked for the films the fellow brought with him so he could

13 look at them, not have asked about his symptoms, not asked him

14 to stand up and sit down, not referred him to other medical

15 professionals, and not written any prescriptions for a bevy of

16 powerful drugs for pain, one of which was Oxycodone.

17       It is certainly the case that the defense can bring

18 before the jury the fact that Dr. Mirilishvili examined this

19 patient during his office visits if in fact he did examine the

20 patient.  That of course is a fact.  It's not a state of mind.

21 And those facts may well come out during the government's

22 presentation of its case.  For all I know, the jury may end up

23 hearing portions of the tapes before the government rests,

24 whether the government introduces them or not.  To take but one

25 example, Mr. Correa, I think his name is, the government

witness who was present during the visits and who served as the translator, will be on the stand. He can be cross-examined using leading questions about what happened during the visits of the confidential source and if he denies that the doctor examined the patient or asked him questions or made referrals. The witness can be impeached with the tapes. And via his testimony the jury will learn the facts that the jury needs to know, which is what happened in the interaction between the defendant and the confidential source, and the defendant can make its arguments to the jury and the government can't prevent the tapes from being used in this way.

My point is simply this: Much will play itself out during the government's case in chief. This aspect of the defense motion may never need to be decided because the defense cannot possibly decide what it wants to introduce until it sees what is played out by the close of the government's case. And by that time the jury may already know that Dr. Mirilishvili examined the confidential source in asking questions about his symptoms, which is all that it would need to know for the state of mind argument to be made. In that case the government would probably be on sounder ground when it argues that the only purpose of playing the tapes on the defense case is to get the doctor's voice before the jury without his taking the stand. Again, I can't know until the moment arrives. So the motion strikes me as prematurely made, and I won't rule on it until we

1    see what comes in on the government's case.

2              The government argues that the tapes the defense
3    wishes to introduce can be precluded pursuant to Rule 403
4    because their probative value is outweighed by their
5    prejudicial value.  In this case I assume prejudice to the
6    government.  Frankly, I fail to see what prejudicial value the
7    tapes have.  Whatever it is, the prejudice doesn't outweigh
8    their probative value either to the government, which would be
9    introducing them, I assume, to approve shoddy medical practice,
10   or to the defendant to prove state of mind.  I admit that were
11   I the trier of fact, I might not find the tapes particularly
12   probative of the defendant's state of mind.  It strikes me that
13   if you're part of a pill mill the logical thing to do is to
14   pretend to examine your patients or go through the motions.
15   But I'm just guessing that the people who worked in
16   Dr. Mirilishvili's office will testify that he had a practice
17   of going through the motions and, frankly, I've read the tape
18   transcripts and there is no way to tell from the transcripts
19   whether the doctor was performing a serious examination or not.
20   Although as I read Judge Friendly's opinion in De Maria, that
21   may be a question for the jury.  If the government is really
22   worried about the matter, I'm sure it has some doctor in
23   reserve to call on Dr. Mirilishvili's patient evaluation
24   practices and so to cast doubt on any state of mind defense.  I
25   don't see Rule 403 being particularly pertinent here.  Either

1     the tapes are state of mind evidence or they are not.  And
2     because the defense does not need to decide whether it wishes
3     to introduce them now, that need not be decided now.  Let's see
4     what comes in on the government's case before we start ruling
5     on requests concerning evidence that the defense may never need
6     or wish to introduce.
7              As for the motion to quash the subpoenas to defense
8     counsel for the cooperating witness, that motion is granted.
9     This case is indistinguishable from the case before Judge Lynch
10    in United States v. Arias and as I see nothing to quarrel with
11    that ruling, I simply adopt it here.
12             I am told we can get jurors relatively easily.
13             MR. MAZUREK:  Judge, can I put one thing on the
14    record.
15             THE COURT:  Anything you want.
16             MR. MAZUREK:  Thank you.  Hearing the judge's ruling
17    on the issue of the examinations between the doctor and the --
18             THE COURT:  I have not made a ruling.  I have not made
19    a ruling.  I've said I wasn't going to make a ruling because
20    the motion was premature.
21             MR. MAZUREK:  I apologize.
22             THE COURT:  The only ruling you've got is that the
23    motion is premature and I'll decide it later, if we need to.
24             MR. MAZUREK:  Understood.  But given that we are going
25    to wait to decide that, I just wanted to put on the record, we

1  have asked from the government to make available to us the
2  confidential source, the person who pretended to be the patient
3  during those visits.  His name is Jose Lantigua.  We would like
4  the opportunity to at least have the chance to call him as a
5  witness, but we can't find him.  He's a confidential source and
6  the government is obviously is in the best position to make him
7  available.  I wanted to put on the record that we still reserve
8  our right to call Mr. Lantigua.
9           THE COURT:  You can call anybody you want.
10          MR. MAZUREK:  And ask the government for their
11 assistance so we could or ask them to accept the service of a
12 subpoena --
13          THE COURT:  The government is not going to accept
14 service of a subpoena on somebody and the government is not
15 required to give you any assistance.
16          MR. MAZUREK:  To provide us the real name and location
17 of this person or any ability to call him?  I would make that
18 request because do I think that he has --
19          THE COURT:  I'm sure the government will take it under
20 advisement.
21          MR. MAZUREK:  Thank you, Judge.
22          (Jury selection ensued)
23          (Adjourned to March 3, 2016, at 10:00 a.m.)
24
25