```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        S2 14 Cr. 810 (CM)

5   MOSHE MIRILISHVILI,

6              Defendant.                Trial

7   ------------------------------x

8                                        New York, N.Y.
                                         March 3, 2016
9                                        10:30 a.m.

10
    Before:
11
                        HON. COLLEEN McMAHON,
12
                                         District Judge
13                                       and a Jury

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    EDWARD DISKANT
17  BROOKE CUCINELLA
         Assistant United States Attorneys
18
    HENRY MAZUREK
19  WAYNE GOSNELL
         Attorneys for Defendant
20

21
    ALSO PRESENT:  MICHAEL MULLER, DEA
22                 ELIZABETH JOYNES, Paralegal
                   MICHAEL DOMANICO, Paralegal
23

24

25
```

1          (A panel of 12 jurors and three alternates was

2    impaneled and sworn)

3          THE COURT:  Ladies and gentlemen, now have that you've

4    been sworn, I am going to give you some preliminary

5    instructions that should guide you during the course of your

6    deliberations.  As I told you all yesterday, it is your job to

7    decide the issues of fact in the case and issues of fact are

8    going to be decided solely on the basis of the evidence.

9          Nothing that I say to you is evidence.  I'm not a

10   witness in this case.  I didn't participate in or observe any

11   of the events in this case that you'll be hearing about, so

12   what I say is not evidence.  What the lawyers say is not

13   evidence either.  Their questions are not evidence.  It's only

14   when a question is answered that the combination of the

15   question and the answer becomes evidence.  The objections that

16   the lawyers make are not evidence.  Sometimes a witness will

17   blurt out something and there will be a motion to strike it.

18   And if I grant that strike, the testimony that I have excluded

19   is not evidence.  Even though you heard it, you'll be told to

20   disregard it.  All those things are not evidence.

21          What is evidence?  The evidence in the case is the

22   testimony of the witnesses who will take the stand and they

23   will swear or affirm to tell the truth and they will be

24   questioned by the lawyers and the testimony that they give is

25   evidence.  There will be documents or things that will be

1    introduced into evidence.  We call those exhibits.  Exhibits

2    are evidence.  And the parties may come to some agreement that

3    a particular fact is true, that a particular fact exists.

4    That's called a stipulation and stipulations are evidence.  So

5    testimony, exhibits, stipulations.  That's the sum total of the

6    evidence.

7         There are two kinds of evidence.  One kind is called

8    direct evidence.  Direct evidence is the testimony of what a

9    witness saw, heard, touched, smelled, tasted, what the witness

10   observed using his or her five senses.  I was standing on the

11   street corner and I saw the red Toyota Corolla run a red light,

12   put the brakes on, there was a loud squeal and it smashed into

13   the UPS truck.  That's the testimony of someone who saw and

14   heard something that happened.  That's direct evidence.

15        The other kind of evidence is circumstantial evidence.

16   Circumstantial evidence is direct evidence of fact A from which

17   you can infer or reach the conclusion that fact B exists or is

18   true.  Let's assume this room was hermetically sealed off from

19   the outside world so we could not see the weather.  Obviously,

20   it's a beautiful day when all of us walked into the courtroom.

21   But suppose that as the day wore on people arrived to do

22   business in other cases and as they came into the courtroom you

23   could see that they were wearing rain gear and their hair was

24   plastered down and it was wet and maybe one of them was shaking

25   an umbrella.  You couldn't see and you couldn't hear what the

1    weather was like outside, but you could see or hear people who

2    looked like they just come in out of the rain.  And from that

3    you could draw the conclusion that the weather had changed

4    outside and that it had begun to rain.  That's circumstantial

5    evidence.  The appearance of the people walking through the

6    room is direct evidence of their appearance and circumstantial

7    evidence of a change in the weather.  That's what

8    circumstantial evidence is.

9         Direct evidence and circumstantial evidence are both

10   admissible.  One is not necessarily better than the other and

11   you may consider both direct and circumstantial evidence as you

12   deliberate and reach your verdict.

13        So one of the key functions that jurors perform is to

14   decide on the credibility, the believability of the witnesses

15   that they see and the documents that they are shown.  How do

16   you decide whether a witness is credible?  Well, we don't

17   really think much about this, but subconsciously we do it all

18   the time.  I just want you to do consciously what you

19   ordinarily do pretty much without thinking about it.  Look at

20   the person, assess the person's demeanor, think about what the

21   person is saying.  Does that person seem to know what he or she

22   is talking about.  Was that person in a good position to be

23   able to observe the things about what he or she is testifying.

24   Does the person strike you as being candid and forthcoming.

25   Does the person seem like he or she has something to hide.

1   Does that person have a reason to falsify or exaggerate what he

2   or she is saying to you.  Think about those things, and I'm

3   sure there are others, but those kinds of things as you look

4   and listen to witnesses and assess whether they are in fact

5   telling you the truth.  And you'll use your common sense and

6   your good judgment to evaluate the testimony of the people who

7   are called to the stand and you'll make a decision about

8   credibility and it is your decision about the credibility of

9   the witnesses that controls in this case.

10          Now, I told you yesterday that it's very important

11  that you keep an open mind and not reach a decision about the

12  issue that you have to decide.  Remember, that issue is whether

13  the government has overcome the presumption of innocence beyond

14  a reasonable doubt is what you have to decide.  You are not

15  going to be in a position to do that until you have gotten all

16  the information you need in order to do that.  You need to hear

17  all the witnesses.  You need to have a chance to look at all

18  the exhibits.  You need to listen to the arguments of the

19  lawyers, even though the lawyers are not themselves witnesses,

20  because their arguments may cause you to think differently

21  about some of the evidence that you've seen or heard.  And you

22  need to listen to my instructions on the law because my

23  instructions on the law will be your guide for how to assess

24  what you have seen and heard in order to reach a verdict.

25          So keep an open mind throughout the trial.  Don't

1    start making up your mind about whether the government has or

2    has not met its burden of proof until we get to the moment when

3    I say, ladies and gentlemen, you can go and deliberate about

4    the case.

5         And that, of course, is why we have the rule that you

6    can't communicate in any manner, shape, or form with anybody

7    about what's going on in this courtroom and what you see and

8    hear and your thoughts about this case until after your

9    deliberations are concluded.  I explained yesterday we do that

10   for a reason.  It seems very unnatural, but the reason is to

11   help you to keep an open mind throughout the entire trial.

12        Because it's so important that you not communicate

13   with anybody about this case in any manner, shape, or form

14   until you have reached your verdict, please let Jim know if you

15   are acquainted with anybody who comes to court to watch the

16   proceedings.  Sometimes jurors' family members or friends like

17   to come down and see what they are doing, and there is nothing

18   wrong with that.  This is a public courtroom.  Anyone and

19   everyone is welcome to attend.  But if you have family or

20   friends sitting out in the peanut gallery, as I still call it,

21   although there are not many of us left who remember what that

22   is, if you know people that are out there, it's important for

23   us to tell them, please don't try to talk to your friend or

24   your relative, the juror, about the case.  And if something

25   happens in the courtroom when you are excused, under no

1   circumstances tell them what was discussed.

2          Remember, you are not a detective.  You are not

3   Sherlock Holmes.  It's not your job to solve this case.  Don't

4   do any research about this case.  Don't go on the Internet and

5   look up stuff about oxycodone.  Don't go looking for recent

6   newspaper articles on the subject.  Don't Google the people who

7   are involved in this case.  Don't do any of those things.

8   Don't do research.

9          I have no idea whether there is going to be any press

10  coverage of this case or not.  I don't have a clue.  If you

11  should be reading the newspaper and you see Dr. Mirilishvili's

12  name, turn the page.  Those of you who listen to 1010 WINS

13  radio and you should hear anything about the Southern District

14  prosecution of an oxycodone case, change the channel.  If

15  anybody should try to talk to you outside of the courtroom

16  about the case, cut them off, walk away.  And in all such

17  instances let Jim know.  If you caught wind of something in the

18  newspaper, you didn't read it, but you saw it, that you heard

19  something on the radio, you turned it off, let him know that

20  somebody tried to talk to you.  Because we need to know that.

21          Now, this courthouse is a very magnificent building.

22  It was built just before someone had the bright idea to provide

23  a separate entrance and elevator for jurors.  As you know, we

24  don't have a separate entrance for jurors.  As you know, you

25  use the same elevators that I use and that the lawyers use and

that the doctor uses and that the witnesses use.  We all use

the same elevators and the same corridors.  You will have your

own restroom facilities, as you will see, in the jury room.

As a result we may encounter each other in the halls.

The lawyers and I have a professional obligation not to have

any kind of interchange with you except in this room with all

of us present and the court reporter taking down everything

that happens.  If we run into you in the elevator, if I look up

and I see that you're in my elevator car, I will probably look

down like this and look away, and I'm not being rude.  I'm

really trying to be professional.  Same thing with the lawyers,

same thing with the witnesses.  Don't hold it against us.  If

those things happen, and they do happen in this building, it's

an awkward moment for us and we really feel bad that we can't

be nice to you, but we can't be nice to you.  Don't hold it

against any of us.

I would strongly urge that if you are for some reason

in the corridors that you not strike up a conversation with a

stranger because you really have no way of knowing if that

person is the next person who is going to get on the witness

stand.  There is a total of 15 of you.  Each of you has 14 new

people to get to know.  You can't talk about the case, so you

may as well talk to each other about everything else.  And

don't bother talking to other strangers in the building.  That

way, we will not have any possibility of any inadvertent

1     encounter with a person you shouldn't talk to.

2          Let's talk about what's going to happen.  First we are

3     going to have opening statements.  A number of you have been on

4     juries and you know this.  The lawyers are going to talk to you

5     for a few minutes, half an hour, more or less, and they are

6     going to tell you what they think the evidence is going to

7     show.  They are going to give you a roadmap or an outline to

8     keep in mind as the evidence begins to come in in the case.

9     They are not going to argue the case to you.  That's for the

10    end of the case.  But these opening statements can be very

11    useful to you in giving you a frame of reference as you go

12    through the trial.  Remember, they are not evidence because

13    what the lawyers say is never evidence.

14          By the way, I just want to say something.  I will tell

15    the government to open.  I will ask the defense if it wants to

16    open.  Tell the government to open, ask the defense if it wants

17    to open.  It's my first opportunity to remind you, as I will

18    over and over again, that the defense has nothing to prove here

19    because we are presuming Dr. Mirilishvili to be innocent.  So

20    at every step along the way I tell the government, which has

21    the burden of proof, do this, do that, and then I ask the

22    defense, do you want to do anything?  And I just want to call

23    that to your attention because I think it's an important thing

24    to keep in your mind at all times, that the government has the

25    entire burden of proof in this case.  It has the burden to

1   overcome the presumption of innocence beyond a reasonable

2   doubt.

3           After the opening statement or statements, the

4   government will call its witnesses.  Those witnesses will

5   testify.  The government will ask questions, the witnesses will

6   answer.  Then I will ask if there is cross-examination of those

7   witnesses.  I would rather imagine there will be for most of

8   the witnesses.  And the defense will have an opportunity to

9   cross-examine the witnesses.  And then the government has an

10  opportunity to ask some rebuttal questions on what we call

11  redirect.

12          When the government is done calling witnesses and

13  introducing exhibits, the government will stand up and it will

14  say, the government rests, and at that point we will excuse you

15  so that I can have a discussion about legal issues with the

16  lawyers, which I am required to do out of your presence.  You

17  will then come back and I will ask the defense, which has

18  nothing to prove, if the defendant wishes to put on a case.

19          Remember, if the defense decides to call any witnesses

20  or to introduce any exhibits, they are not taking the burden of

21  proof from the shoulders of the government.  They just have an

22  opportunity to introduce any information that they think will

23  be useful to you in deciding the case or that will help them to

24  make arguments that are relevant to the case.  If the defense

25  puts on a case, the government may have an opportunity to call

1    what are called rebuttal witnesses, depending on what the

2    defense does.

3            When all the witnesses are done and all the exhibits

4    have been introduced, everything is through, the lawyers will

5    have an opportunity to argue the case to you.  They will talk

6    about the evidence with you.  They will suggest conclusions

7    that they think you should draw from the evidence, which you

8    are free to accept or to reject.  But it's the lawyers'

9    opportunity to take the evidence and to paint a picture with

10   that evidence, and it will come as no surprise to you that the

11   government and the defense will paint very different pictures

12   with the evidence.

13           At the end of the closing arguments I will put a frame

14   around those pictures by giving you my instructions of law and

15   that's the law that you will apply to the evidence in order to

16   reach your verdict.

17           You know who has the burden of proof.  It's the

18   government.  You know what the government has to do.  It has to

19   overcome the presumption of innocence that cloaks

20   Dr. Mirilishvili as this moment and at every moment until all

21   12 jurors conclude beyond a reasonable doubt that he is in fact

22   guilty.

23           Is the government ready?

24           MR. DISKANT:  Yes, your Honor.

25           THE COURT:  Is the defendant, Dr. Mirilishvili, ready?

 1            MR. MAZUREK:  Yes, your Honor.

 2            THE COURT:  You may open.

 3            MR. DISKANT:  Thank you, your Honor.

 4            THE COURT:  The microphone is not working.

 5            MR. DISKANT:  It is working.

 6            THE COURT:  You should be able to talk to the jurors

 7    pretty well right in front of you.

 8            MR. DISKANT:  Over the course of two years, this man,

 9    the defendant, Dr. Moishe Mirilishvili, wrote more than 13,000

10    identical prescriptions for oxycodone.  He did so in return for

11    cash, 200 to $300 in cash that the patient would hand directly

12    to the defendant at the beginning of their appointment in the

13    examination room, and he did so at a medical office that I

14    expect you will learn looked and operated like no medical

15    office you had ever been to, a place where drug dealers

16    congregated on a daily basis, place that had a bouncer at the

17    front door, but no nurses or medical assistants, a place where

18    few records were kept and many of the documents that were there

19    were fakes.

20            Through the course of those prescriptions you will

21    learn that the defendant caused more than a million oxycodone

22    tablets to be dispensed in that two-year period, drugs that had

23    a street value they sold of up to $20 million and drugs that

24    made the defendant a very wealthy man.

25            I expect you will learn that when the defendant was

1    arrested in December of 2014, agents found more than $1.75

2    million in cash, cash the defendant had earned by writing those

3    prescriptions hidden in Ziploc bags in the defendant's home.

4    That is what this case is about, oxycodone prescriptions in

5    return for cash.  And that is why we are here today because, as

6    I expect you will learn through the evidence that comes in over

7    the next few weeks, the defendant used his prescription pad as

8    the foundation for a multimillion dollar drug distribution

9    enterprise.

10           Let me tell you a bit more about what we expect the

11   evidence during this case will show.  I expect you will learn

12   that the defendant is a licensed medical doctor who focused on

13   an area known as pain management.  As I expect you will learn

14   during this trial, legitimate pain management medicine focuses

15   on the treatment of some of the most chronic and most severe

16   kinds of pain, cancer patients, for example, patients

17   recovering from debilitating injuries or significant surgery.

18   As I expect you will learn, legitimate pain management medicine

19   involves a variety of types of treatments, including, when

20   appropriate, pain medication.

21           But between 2012 and 2014, the defendant's practice of

22   pain management medicine focused on one particular kind of

23   treatment, one particular kind of medication, oxycodone, the

24   powerful narcotics that shares the same common ingredient as

25   heroin, a drug highly subject to addiction and abuse, and a

1   drug that has a street value for people willing to sell their

2   prescriptions, rather than taking them, of up to $20 a pill.

3       You will learn that before 2012, the defendant had

4   written relatively few prescriptions for oxycodone.  But that

5   began to change in the fall of that year, the fall of 2012,

6   when the defendant opened a new medical office, an office on

7   West 162nd Street here in Manhattan.  There the defendant began

8   prescribing oxycodone on a daily basis because as the defendant

9   came to learn, people would wait on line for hours and pay

10  virtually any price for a doctor willing to write an oxycodone

11  prescription.

12      The defendant opened that clinic in the fall of 2012

13  and, as you will learn, crowds began to gather there on a daily

14  basis.  Cars would park and double-park outside of the

15  defendant's office, sometimes dropping off entire groups of

16  people going in to see the defendant, people who came from all

17  over the city, Staten Island, Crown Heights, the Bronx, to see

18  this particular doctor, and people who are willing and able to

19  pay cash because, as I expect you will learn, while the

20  defendant accepted a few insurance patients each day, the

21  overwhelming majority of patients paid cash and the insurance

22  patients typically had to wait until all of the cash patients

23  had been seen first.

24      The defendant hired a bouncer to do crowd control, to

25  check IDs at the door.  For those who would make it inside

1    patients would have to wait sometimes several hours to see the

2    defendant for an appointment that would virtually always result

3    in the defendant writing them a prescription for 90 oxycodone

4    tablets.

5         You will learn that inside of the defendant's medical

6    office there are no nurses, no medical assistants, little by

7    way of medical equipment.  You will learn the defendant never

8    took blood pressure, checked vitals, took a patient's weight.

9    You will learn that none of that mattered.  Virtually all of

10   the defendant's patients were getting the same thing, the

11   oxycodone prescription that they had paid for, no matter the

12   medical condition they supposedly did, no matter their age, no

13   matter their history.  In fact, you will learn that that

14   oxycodone prescription was such a core part of the defendant's

15   practice, on those rare occasions when the defendant declined

16   to write an oxycodone prescription, he would give the patient a

17   refund, give them their money back.

18        By writing 20, 30, 40 of these oxycodone prescriptions

19   a day at $200 a pop, the defendant's profits soared.  At $200 a

20   prescription the defendant could collect 4,000, 5,000, 6,000,

21   and $7,000 in cash a day.  In fact, you will learn that the

22   defendant, who reported no income to the IRS in 2011, the year

23   before that clinic opened, was soon on his way to becoming a

24   millionaire.

25        I expect you will learn during this trial that the

1   defendant wasn't the only one making money off of these

2   prescriptions.  You will learn that drug traffickers quickly

3   seized on the opportunity to gather up these oxycodone

4   prescriptions and fill them so that the pills could be resold

5   in bulk.  These drug traffickers, who are referred to inside of

6   the defendant's clinic as crew chiefs or bosses, obtained

7   oxycodone prescriptions by gathering groups of friends or

8   neighbors or relatives, sending them in to see the defendant

9   and then collecting the prescriptions the defendant wrote so

10  the prescriptions could be filled and the pills resold.  It was

11  these drug traffickers, these crew chiefs who could afford to

12  pay the 200 or $300 the defendant charged, cash they put in the

13  patient's hand and send them in to see the defendant and then

14  collecting the prescription on the way out the door.

15           You will also learn that some of these drug

16  traffickers, some of these crew chiefs, worked directly with

17  the defendant, hanging outside the office, going inside to talk

18  to the defendant when they are having difficulty getting their

19  patients in, getting their prescriptions filled, calling the

20  defendant at home.  In fact, you will learn that the defendant

21  even hired two of these drug traffickers, two of these crew

22  chiefs, to work as his own employees.

23           You'll also learn that as the defendant began writing

24  these oxycodone prescriptions, his clinic, his practice, drew

25  unwanted attention, complaints from neighbors about the noise

1   and the crowds, questions from local law enforcement about

2   patients or prescriptions that seemed suspicious, a call from a

3   prosecutor's office in southern New Jersey wanting to know why

4   the defendant's patients were trying to fill prescriptions some

5   two hours away.

6           To make this scheme work you will learn the defendant

7   and the drug traffickers that he worked with took steps to

8   cover themselves, to make the doctor's office seem a bit more

9   legitimate.  For example, you will learn that the defendant

10  required all of his patients to submit certain paperwork, an

11  MRI report, a referral from another doctor, paperwork meant to

12  show the medical need for the oxycodone prescriptions he was

13  writing.

14          You will also learn that many of these documents were

15  fake, visibly and obviously so, because you will learn that

16  many of these documents were being created by the scheme

17  participants themselves.  You will see some of these documents,

18  typed MRI reports where the name of the patient is handwritten

19  in, documents where portions appear to have been cut and pasted

20  onto the page, places where the name of the patient is in a

21  font completely different from the rest of the document.  And

22  you will learn because the defendant was in on the scheme, the

23  defendant routinely accepted these visibly fake documents

24  without asking any questions, and that he wrote a prescription

25  for the patient who handed it to him.

1    The evidence will further show that to conceal the

2 criminal nature of the practice the defendant also steered his

3 patients away from mainstream pharmacies, like the Rite Aid

4 down the street from his clinic, and steered them instead

5 towards pharmacies the defendant knew, pharmacies the defendant

6 guaranteed would fill the prescriptions, and pharmacies that,

7 like the defendant, took cash.

8    Most of all, you will learn that the defendant took

9 great care to hide the most obviously criminal aspect of the

10 practice, the cash payments, lying to federal agents about his

11 practice, telling them he took just three to four cash patients

12 a day, the rest insurance, carefully hiding the millions he was

13 collecting in Ziploc bags in his home rather than in a bank

14 account. Even lying to the IRS by substantially underreporting

15 the amount of money he was making from his practice. Because

16 as I expect you will learn during this trial, the defendant was

17 concerned all along that this day would come. In fact, you

18 will even learn that the defendant would ask some of his

19 patients if they were police and kick them out if he was

20 suspicious that they were.

21    The defendant was arrested in December of 2014 and he

22 was charged with conspiring to distribute narcotics. Because

23 as I expect you will learn during this trial, while a doctor is

24 permitted to prescribe drugs, including oxycodone, as part of a

25 legitimate practice of medicine, when a doctor just provides

1   drugs in return for cash, when a doctor writes prescriptions

2   with no good-faith belief that he is engaged in a legitimate

3   practice of medicine, he is no longer acting as a doctor.  He

4   is acting as a drug dealer and he is guilty of a crime.

5        That's what we expect the evidence will show.  Let me

6   tell you a bit about how we are going to prove all that.

7   First, you are going to hear from some of the people in the

8   neighborhood, people who live down the block from the

9   defendant, who witnessed the crowds gathering and some of the

10  chaos around the clinic.

11       You are also going to see the way in which the

12  defendant's practice changed over time.  You will learn that

13  the defendant, who had just been writing a handful of

14  prescriptions for oxycodone in 2010 and 2011, began writing

15  them daily in 2012, ultimately writing more than 5,000 of these

16  prescriptions a year during the period that office was open.

17       You will also see inside of that office.  You will see

18  the fake MRI reports and the referrals.  And you'll see some of

19  the defendant's own notes and records.  For example, you will

20  see the defendant write an oxycodone prescription for neck

21  pain, for a patient who has handed him an MRI that says his

22  lower back is the problem.  You'll see the defendant make no

23  diagnosis and take no notes at all for a patient he writes

24  oxycodone prescriptions for month after month after month.  And

25  you'll see patients who use a Medicaid benefits card as their

1    ID, but somehow choose to pay cash when they see this

2    particular doctor.

3            Third, you are going to hear from an expert, a doctor

4    named Christopher Gharibo, who works at NYU and helped develop

5    the pain management program at NYU Medical Center here in New

6    York.  He will explain to you how legitimate pain management

7    works, the various treatments that pain management doctors use,

8    including, when appropriate, oxycodone.  He will tell you about

9    the devastating effects of oxycodone when it is not used

10   correctly, the potential for abuse or worse.  Most of all,

11   Dr. Gharibo will explain to you that there was nothing

12   legitimate with the way the defendant was treating the patients

13   and the oxycodone prescriptions that he was writing for them.

14           Finally, you are going to hear from some of the people

15   inside of the defendant's office, from two of the defendant's

16   former employees, a bouncer named Abraham Correa and a former

17   office worker Damon Leonard, men who worked for and with the

18   defendant who saw the entire operation, the fake MRIs, the drug

19   traffickers, the cash payments.

20           You will learn that both Correa and Leonard were hired

21   because they were familiar to the defendant.  They were already

22   in the clinic on a daily basis because they were already

23   working as drug traffickers, as crew chiefs, bringing patients

24   of their own in so that they could get prescriptions and fill

25   them to sell the pills.  The defendant hired these people

1  because he knew them, because they were in the office.  They

2  will tell you about the defendant's medical practice, about the

3  defendant's direct relationships with some of these drug

4  traffickers, some of these crew chiefs, including both of them,

5  and they will tell you that the defendant was well aware that

6  the overwhelming majority of his patients weren't real patients

7  at all.  In fact, you will learn that when the defendant fired

8  Mr. Correa in 2013, he told him, you can't work here anymore,

9  but you can still bring patients in.

10        To be clear, both Leonard and Correa are criminals.

11  They were participants in the same drug trafficking scheme in

12  which the defendant is charged and they will be testifying

13  before you during this trial in the hopes of receiving a

14  benefit, in hopes of receiving leniency in their own cases.

15  You should keep that in mind as you evaluate their testimony

16  and you should ask yourself whether it is consistent with the

17  other evidence in the case, whether it's consistent with your

18  own common sense.  Do that and I expect you will see the many

19  ways in which their testimony overlaps with the other evidence

20  in the case, the testimony of other witnesses, the documents,

21  the records that you see for yourselves.

22        As Judge McMahon has told you, this is not going to be

23  a long trial, but it is an important one.  For the next few

24  weeks we would ask you to do three things.  First, pay careful

25  attention to the evidence as it comes in:  The testimony, the

1    documents, the records, the photographs.  Second, follow Judge

2    McMahon's instructions on the law and how it applies in this

3    case.  And, third, and most important, if you do those things,

4    make sure to use your common sense, same common sense you use

5    to make decisions in your everyday lives.  Do those things and

6    the defendant will receive a fair trial and you will reach the

7    only verdict consistent with the evidence, that the defendant

8    is guilty.

9            THE COURT:  Mr. Mazurek, does the defendant wish to

10   open.

11           MR. MAZUREK:  We do, your Honor.  Thank you.

12           May it please the Court, counsel, Dr. Mirilishvili,

13   members of the jury, the judge mentioned a little bit earlier

14   this morning that you are likely to hear two very different

15   perspectives of the evidence from the two sides, and she is

16   absolutely right about that.  This case, ladies and gentlemen,

17   is about a doctor who practiced old-world medicine but became

18   the target of modern-day criminals.  You are going to hear over

19   the course of the next couple of weeks evidence about

20   Dr. Mirilishvili's practice.  You are going to hear a little

21   bit about pain management and what that means in the world of

22   medicine.

23           You are also going to hear from people that the

24   government is going to bring before you who are drug criminals,

25   who have received agreements with the government called

1    cooperation agreements, that in exchange for their testimony

2    they are hoping to get leniency from the government's request

3    to the judge at sentencing.  All of this is the evidence you

4    are going to hear over the next couple of weeks.

5           And the judge explained opening statements are a

6    roadmap, a roadmap to help you expect what to see during the

7    course of the trial and I'm hoping to give you a little

8    overview.  The government has just promised you lots about what

9    you are going to hear, but I am going to ask that as they call

10   each of their witnesses, you don't stop and listen just to how

11   they answer questions on direct examination, when the

12   government asks them questions, because then we, as the defense

13   lawyers, have the opportunity to cross-examine those witnesses,

14   and that cross-examination is very important because it's not,

15   you will hear, that the government witnesses and their

16   cooperators, that they have a chance to prepare their testimony

17   with the government.  In many instances you are going to hear

18   for the very first time we, as the defense lawyers, are going

19   to have a chance on cross-examination to ask questions of these

20   same witnesses.

21          And when you look at them from this witness box, after

22   they have sworn their oath, you are going to be able to judge

23   their demeanor, the way they respond on direct versus

24   cross-examination and, from that and the common sense that the

25   prosecutor is asking you to use, I'm asking it as well because

1   then you are going to hear what actually happened over the

2   course of the two years that this case is about.

3        Let me introduce myself.  My name is Henry Mazurek and

4   together with our defense team of Wayne Gosnell and Michael

5   Domanico, we have the privilege and honor of representing this

6   man, Dr. Mirilishvili.  You are going to hear through the

7   evidence that Dr. Mirilishvili, as the judge previewed a little

8   bit yesterday, is an immigrant from the Republic of Georgia,

9   the former Soviet Union.  You will hear that he's a licensed

10  anesthesiologist.  You will hear that he opened up his own pain

11  management practice at the young old age of 65, and he opened

12  it in Washington Heights, in upper Manhattan, on West 162nd

13  Street.  You are going to hear that when Dr. Mirilishvili

14  opened that office he didn't open it to be a drug dealer, as

15  the government suggests.  He opened it to be a doctor.  And he

16  had a license to prescribe medicine.

17       And you are going to hear that he is an old-world guy

18  who prescribed medicine for pain management and you are going

19  to hear evidence of how he met with patients and what he did as

20  a doctor.  You are going to hear that he received documents

21  from patients such as MRI reports or CAT scans, things you

22  would expect a doctor to receive.  You are going to hear that

23  he asked questions of his patients about their prior medical

24  histories, their family histories, whether they have any

25  disease in their family, diabetes.  You will hear many of his

1    patients were diabetic.  You are going to hear that he gave a

2    physical examination of the patients when they were in his

3    office.

4            Let me say something here because you are going to get

5    a little bit of a tutorial about what pain management medicine

6    is.  You heard from the government that you are going to hear

7    from Dr. Gharibo from the NYU Langone Hospital, and we are also

8    calling an expert witness in our case, her name is Dr. Carol

9    Warfield, and she practices at the Beth Israel Hospital in

10   Boston.  Through these expert witnesses, they are like every

11   other witnesses, but because they have a special expertise and

12   training, they are going to be able to give their opinions

13   about certain things, and you are going to hear a little bit

14   about how pain management works.

15           Why is that important?  It's important because in this

16   case Dr. Mirilishvili had a license to distribute controlled

17   substances.  That's what he's charged with in this case

18   unlawfully.  The charge in the indictment is he unlawfully

19   distributed controlled substances.

20           (Continued on next page)

21

22

23

24

25

 1          MR. MAZUREK:  So, why when a doctor has a license to

 2   do it, when can it become a crime?  The judge is going to

 3   instruct you on the law at the end of the case, but it's when a

 4   doctor is working outside of the usual course of medical

 5   practice and not using medical judgment in making his decisions

 6   on what a treatment should be.

 7          Now, let's be clear this is not a medical malpractice

 8   case; you are not asked to decide whether he used the best

 9   practices of care on each and every patient.  The question

10   that's going to be before you at the end of this case, that

11   frame that the judge talked about, it's going to be whether Dr.

12   Mirilishvili provided medical care or was acting as a drug

13   dealer.  That's the question that's going to be posed to you at

14   the end of this case.

15          And during that road map that I'm talking about, in

16   following the evidence as it comes in, and hearing the

17   testimony -- both the direct and cross-examination of each of

18   these witnesses -- keep that question in mind.  Does the

19   evidence show that Dr. Mirilishvili was acting in good faith as

20   a doctor and trying to do what he was trained to do as a pain

21   management specialist, provide a care to help someone overcome

22   chronic injuries or disabilities that they had?  Was he working

23   to find out what their problems were?  Was he reviewing medical

24   reports?  Was he asking the questions that you expect a doctor

25   to ask in an office visit?  And was he trying to come up with a

1   way to treat these people so, one, they could relieve their

2   pain and, two, they could function in their daily lives?

3        Or, as the government says, oh, he was just giving

4   scripts of oxycodone?  Well pay attention to the evidence of

5   what in fact happened and what treatment Dr. Mirilishvili gave.

6        You will hear about his patient visits.  You will hear

7   that he didn't give just prescriptions of oxycodone and have a

8   patient come in and say here is your script and give me 200

9   bucks.

10        You are going to hear the investigator for two years

11   through the course of his practice.  You are going to hear they

12   had surveillance outside of his practice on a telephone pole

13   that overlooked the practice, and they had hundreds of

14   thousands of hours, a full year of surveillance.

15        You are going to hear that they placed recording

16   devices on a patient to go in and find out what kind of

17   practice Dr. Mirilishvili was giving, what kind of medical care

18   he was giving.  You are not going to hear that he just wrote a

19   script for $200.

20        you are going to hear that he took the time with the

21   patient to do the things a doctor does in the usual course of

22   medical practice, and asked what is your family history, what

23   is wrong with you, let me explain the MRI report that you sent

24   to me from another hospital or doctor, let me measure your

25   range of motion, let me look at the physical problems that you

 1  have.

 2          And now you're going to hear from the expert witnesses

 3  pain management is not about doing surgery or fixing a broken

 4  bone; it's something that is subjective from the perspective of

 5  the doctor.  And the doctor can only do what the patient

 6  informs him of in order to help that patient.

 7          And you are going to hear from the expert witnesses

 8  that a doctor in the usual course of practice is not a

 9  detective, they are not supposed to be police officers and

10  question everything that a patient tells them and say you're

11  not telling me the truth, or I don't think this document is

12  correct.  They're a doctor, and they build relationships with

13  their patients.  And you are going to hear that's what Dr.

14  Mirilishvili did, and he believed his patients as they came

15  before him.  And he tried every which way to make sure that he

16  ran a medical office that he was proud of.

17          You are going to hear from these medical experts that

18  this field of pain management, there are different ways that

19  doctors can treat people with chronic or long-term pain.  The

20  government mentioned cancer pain.  You are going to hear that

21  that's not usually the type of pain that chronic pain

22  management people take care of; it's usually lower back

23  injuries, people who suffer from an accident, who long after a

24  surgery is done for a knee replacement, for example, who still

25  have lingering pain.  It's to help those people in their daily

1    lives long after they have had a traumatic injury, in order so

2    that they can do two things:  They can live without pain and

3    they can function in their daily lives.

4           You are going to hear Dr. Warfield, and I am sure that

5    even the government expert, Dr. Gharibo is going to have to

6    admit that.

7           So when Dr. Mirilishvili saw the patients, he used

8    medicine, and, yes, oxycodone was one of the elements, but the

9    government is wrong, the evidence will show he used other

10   medications called coanalgesics.  He always described

11   anti-inflammatories or antidepressants, depending on the

12   patient, or muscle relaxants, or seizure medicine called

13   Neurontin.  Because when you have nerve or tissue damage, you

14   are going to hear that muscle spasms is also an issue.  He

15   never just gave oxycodone.  Never.

16          And the government is saying you are going to hear

17   from the pharmacies he used.  You are going to hear that he

18   never told a patient you have to go to this pharmacy.  There

19   are hundreds of pharmacies who filled Dr. Mirilishvili's

20   prescriptions.  And, guess what, they checked with him before

21   they would fill a prescription.  They would call, and they

22   would make sure.  And the doctor said, make sure, you can't

23   just fill oxycodone, you have to fill all the medications that

24   I prescribe, because he was performing medical care.

25          And the other thing you are going to hear, the

 1  government said he was just taking case, cash this, cash that.

 2  You are going to hear that he took Medicaid.  A lot of his

 3  patients were Medicaid patients.  They billed hundreds of

 4  thousands of dollars to Medicaid.

 5          You are also going to hear that sometimes on follow-up

 6  visits he didn't even ask the person -- if they said they

 7  didn't have insurance, he believed them.  Why would they not

 8  tell him the truth about that?  But if they didn't have money

 9  on a follow-up visit, sometimes he didn't even ask for that

10  money.

11          So why is Dr. Mirilishvili really here?  Why is he

12  here?  Because you are going to hear that this particular

13  controlled substance, oxycodone, has, as the government said, a

14  big street value.  It's a lot of money for other people to sell

15  it on the street and make money.

16          And why Dr. Mirilishvili is here is because the

17  government and the DEA investigated and found out that a lot of

18  people who were getting prescriptions from him were being

19  accosted by people out on the street who wanted to make money

20  off of these patients, and so they would buy the prescriptions

21  from them.  It's called drug diversion.

22          And from outside on the street when the patients were

23  accosted and said, you know, we will give you 500 bucks for

24  that prescription, a lot of these people, the patients that

25  went to Dr. Mirilishvili's office, were working class people,

 1   some of whom are low income people, and when they were given

 2   the opportunity of making a quick $500 versus living with that

 3   pain, that's a tough choice, it's a tough choice, and many of

 4   them ended up when the drug dealer said I'll give you the

 5   money, they took the money, and a lot of these pills then get

 6   on the street.

 7        But keep your eye on what the evidence is going to

 8   show in terms of what was going on outside of Dr.

 9   Mirilishvili's office versus what was going on inside the

10   clinic.

11        The DEA agents, you will hear, they did all this

12   surveillance, they saw that these people would come up and

13   steer patients in and when they came out, rush up to them and

14   try to take their prescriptions.  They were doing it in the

15   open street, not inside the clinic.

16        Now, the problem that Dr. Mirilishvili had was that he

17   trusted people.  He hired people from the neighborhood.  And

18   some of his former patients -- you already heard the government

19   mentioned the names you are going to hear and see on this

20   witness stand -- Abraham Correa, Damon Leonard, Jomaris Javier,

21   Augustine Cruz -- these are people that the doctor trusted just

22   like his patients, and he hired them.  And all they ended up

23   doing was making this man's life a nightmare that brings him

24   now before you, because they lied, they cheated, they stole

25   from him, they even staged robberies.  There were two armed

1    robberies of his own clinic.  Gunmen came in and put a gun to

2    Dr. Mirilishvili.

3          Now, Dr. Mirilishvili didn't run, he didn't say I'm

4    quitting this practice.  He stayed, and he wanted to continue

5    to be a doctor.

6          Now in terms of listening to the evidence over the

7    course of the next two weeks, when Correa and Leonard get up

8    there on that witness stand, listen carefully to what they have

9    to say, because you are going to hear that there are

10   conversations that Leonard had with Correa.  Correa became a

11   cooperator with the government before Leonard, so Correa was

12   wired up and had conversations with Leonard.  And you are going

13   to hear what those conversations were like, about how they

14   talked about the doctor, about how Correa said he was easy to

15   fool; we've got him so bad.  This is at the time when they

16   weren't coming to the stand; this was when they were believing

17   that what they were doing was deceiving the doctor, stealing

18   from him and making a fortune off of him.

19         You are going to hear how Damon Leonard -- he was the

20   office manager; he is going to come before you -- he worked his

21   way, he endeared himself to the doctor, he would come to the

22   office, I need a job, I have young kids, I can help you out, I

23   can be a good guy, I know how to run computers.  And at the end

24   of the day you are going to hear what kind of a deception he

25   performed, about every time there were lab tests, that he would

 1    find ways in his words to override the lab tests, to change the

 2    results, to upload into the system to make it look like the

 3    patient that the doctor was seeing was taking the medication as

 4    prescribed.  Because the doctor was taking the measures that he

 5    was supposed to -- or not even that he was required to under

 6    the law, because you are going to hear pain management had no

 7    standards.  Even in New York State at the time that Dr.

 8    Mirilishvili was practicing there was still no draft guidelines

 9    that were in place to say how many pills you can prescribe,

10    what you have to do in order to look to make sure that patients

11    aren't abusing drugs or diverting them.

12          But he took steps anyway.  He took steps that he

13    learned along the way.  He took steps like requiring patients

14    on follow-up visits to give urine tests so that he could check

15    to make sure they're taking the medication and it's not being

16    diverted elsewhere.  But the people in the office knew that.

17    And you are going to hear how they undermined him.

18          The doctor had to change labs not once, not twice but

19    three times.  He had three different labs, because he couldn't

20    figure out why are some results coming in not the right way.

21    And he wanted to correct it, so he got another lab and a third

22    lab.  And you are going to hear Damon Leonard each time trying

23    to find ways to further deceive the doctor.  Oh, first time

24    we'll just make fake reports.  But the doctor says something is

25    wrong, we're changing the lab, the reports are not right.  Then

1    he said, ok, what we're going to do is we're going to have

2    people drop urine, in his words, bring them to the office --

3              THE COURT:  Are you standing for a reason?

4              MR. DISKANT:  To object, your Honor.

5              THE COURT:  If you're standing for a reason, you

6    should say something.

7              MR. DISKANT:  Objection.

8              MR. MAZUREK:  This is what the evidence I expect will

9    show, your Honor.

10             THE COURT:  You are being very argumentative.

11             MR. MAZUREK:  You are going to hear from Damon Leonard

12   about how he changed the urine on patients and hid it from the

13   doctor.

14             You are going to hear that on the final lab how he

15   decided I can't do it anymore, he would tell Abraham Correa his

16   coconspirator, because now the doctor is getting smart and

17   putting the labs directly in a secured portal on his website.

18             So all along I want you, members of the jury, to

19   listen to what was going on in the office.  Because the

20   government is saying, oh, Correa, Leonard, they're all working

21   together with the doctor.  But I submit to you if you listen to

22   their testimony, everything that they do along the way in their

23   jobs is to deceive him, deceive him so they can make the big

24   money in this illegal drug trading.

25             Now, the government has mentioned about the money that

 1   Dr. Mirilishvili made and the fact that he charged $200 for an

 2   office visit, which you will hear from the experts in this case

 3   is not out of line about how much a doctor visit costs in the

 4   City of New York.  In fact, you will hear that some doctors

 5   charge a lot more, and the insurance payments that he did

 6   receive, he received an average of less than $100 per

 7   prescription.

 8         But you are going to hear that Damon Leonard and

 9   Abraham Correa and Jomaris Javier -- the government says there

10   was no medical assistant in the office.  Jomaris Javier was a

11   licensed medical assistant -- how much they were making,

12   because they are going to testify that they were making about

13   $1800 per prescription.  $1800 per prescription.  That's drug

14   dealing.  Medical care is what Dr. Mirilishvili was giving.

15         Now, the other thing the government said at the time

16   of his arrest is that they found a lot of cash in his

17   apartment.  They did.  They found $1.7 million.  You are also

18   going to hear about the bank account that Dr. Mirilishvili

19   kept, and you are going to see that he didn't keep balances in

20   his bank account except enough what he needed for his expenses.

21   He is an immigrant from the former Soviet Union, 65 years old,

22   and he had his money in his apartment close to him.

23         Ladies and gentlemen, the government will say, that's

24   it, that's a sign of drug dealing.  A sign of drug dealing is

25   Damon Leonard and Abraham Correa.  You are going to hear from

1    them.

2            MR. DISKANT:  Objection.

3            THE COURT:  Wind up.

4            MR. MAZUREK:  Yes.  You are going to hear from them

5    the fact that they didn't declare any income on their taxes,

6    and the government still has not unrecovered a single dollar

7    from that.  That is drug dealing, the evidence will show.

8            Now, ladies and gentlemen, as the court told you at

9    the beginning, the defense has no burden of proof.  The burden

10   of proof is entirely on the government.  They have to prove

11   beyond a reasonable doubt that Dr. Mirilishvili acted not as a

12   physician in the usual course of professional conduct, and he

13   didn't exercise medical judgment in doing his job, that he

14   acted as a drug dealer.  That's their burden.

15           They're not going to be able to satisfy that burden

16   through the course of the testimony and evidence that you are

17   going to hear in this case, because every step of the way Dr.

18   Mirilishvili tried to be a doctor and do the best that he

19   could.

20           And the government's witnesses, the ones that they're

21   going to put in front of you with these cooperation agreements

22   in hopes of leniency, are going to testify they did everything

23   to deceive the doctor.  That's not working together.

24           So at the end of the case, the judge is going to ask

25   you to answer that question:  Was Dr. Mirilishvili trying to be

 1    the best doctor he could?  Did he make mistakes along the away?

 2    Did he not keep the best notes?  But did he do things in the

 3    regular course of medical practice based on the records that

 4    you are going to see?  Or was he this drug dealer that was just

 5    taking cash to put drugs on the street?  The only answer, the

 6    only answer that you are going to be able to give at the end of

 7    this trial is that Dr. Mirilishvili was a doctor.  Thank you.

 8            THE COURT:  OK, ladies and gentlemen.  What we are

 9    going to do is we're going to get the first witness on the

10    stand.  Jim is going to take you back to the jury room for a

11    minute.  We will take a little break now.  You can put your

12    stuff down.  That room belongs to you for the duration of the

13    trial.  Make yourselves comfortable.

14            We are going to pass out notebooks that will be on

15    your seats when you come back.  Those notebooks are for your

16    use to take notes about whatever you might wish to jog your own

17    memory about when you hear the evidence.

18            You don't have to take any notes.  Can you take as

19    many as you want.  We allow you to take notes on the

20    understanding that your notes are for your personal use during

21    the course of the trial.

22            When you are deliberating, if two or more of you

23    disagree about what a witness said, you don't resolve that

24    dispute by looking at somebody's notes; you resolve that

25    dispute by sending me a note asking for a read-back of the

1    testimony, because the repository of the memory of the trial is

2    our amazing court reporters.  OK?

3             So, with that caveat, we will take a short -- real

4    short -- break.

5             The government should get its first witness.

6             Don't discuss the case.  Keep an open mind.  (NOTE:

7    Benjamin Lopez.

8             (Recess)

9             (Jury present)

10            THE COURT:  Call your first witness, please.

11            MS. CUCINELLA:  The government calls Benjamin Lopez.

12     BENJAMIN LOPEZ,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15            DEPUTY COURT CLERK:  Tell us your name.

16            THE WITNESS:  Benjamin Lopez.

17   DIRECT EXAMINATION

18   BY MS. CUCINELLA:

19   Q.  Good morning, Mr. Lopez.

20   A.  Good morning.

21   Q.  What do you do?

22   A.  I am an energy trader, VP, vice president.

23   Q.  Where do you work?

24   A.  I work at SCS Commodities Corp., Jersey City.

25   Q.  Where do you live?

 1   A.  Washington Heights.

 2   Q.  On what street do you live?

 3   A.  On 162nd Street.

 4   Q.  162nd Street?

 5   A.  162nd, yes.

 6   Q.  Do you live with anyone?

 7   A.  I do, my wife.

 8   Q.  Does anyone else in your family live nearby?

 9   A.  Yes.

10   Q.  Who?

11   A.  My son.

12   Q.  Does the neighborhood in which you live have a name?

13   A.  Yes, Morris-Jumel Historic District.

14   Q.  For how long have you lived in the Morris-Jumel Historic

15   District?

16   A.  I have been there since August 2007.

17   Q.  Why did you move there?

18   A.  I wanted to purchase a townhouse at a reasonable price, and

19   I wanted to be in a neighborhood that was diverse and up and

20   coming.

21   Q.  Are you familiar with the demographics of your

22   neighborhood?

23   A.  I am.

24   Q.  What are they?

25   A.  Very diverse.  Hispanics, African American, Anglo, young,

1  elderly, families.

2  Q.  When you moved to the neighborhood, was your block

3  primarily residential?

4  A.  Yes.

5  Q.  Was it quiet?

6  A.  Very quiet.

7          MS. CUCINELLA:  Your Honor, may I approach?

8          THE COURT:  You may.

9  Q.  I am showing you, Mr. Lopez, what has been marked for

10 identification as Government Exhibits 3-D, 3-E, 7-E and 7-F.

11 What are those?

12 A.  The first one is some townhouses and residential building

13 450.

14         THE COURT:  Is there a reason why these are being

15 shown on the screen already?

16         MS. CUCINELLA:  My understanding is they should not be

17 being shown to the jury but just the witness.

18         THE COURT:  And me.

19         MS. CUCINELLA:  And you.

20 A.  The second picture primarily 450 --

21         THE COURT:  Is there any objection to the introduction

22 of these, Mr. Mazurek?

23         MR. MAZUREK:  I'm not sure what 7-E or --

24         THE COURT:  In that case, go ahead.  Finish.

25 A.  And also the avenue.

 1            THE COURT:  I'm sorry.  What is 7-E?

 2            THE WITNESS:  OK.  7-E is the oldest structure in

 3   Manhattan, the Jumel mansion.

 4   Q.  And is that down the street from your home?

 5   A.  That is around the corner.  And I guess it's considered a

 6   museum at this point.

 7   Q.  And do you recognize what is depicted in 7-F?

 8   A.  Yes.  That is Sylvan Terrace.  And the picture leads to the

 9   avenue on St. Nicholas.  And on the opposite direction would be

10   a view of the mansion.

11   Q.  Do these photographs fairly and accurately depicted what

12   those structures look like in your neighborhood?

13   A.  That is correct, yes.

14            MS. CUCINELLA:  The government offers Government

15   Exhibit 3-D, 3-E, 7-E and 7-F.

16            MR. MAZUREK:  No objection.

17            THE COURT:  Admitted.

18            (Government's Exhibits 3-D, 3-E, 7-E and 7-F received

19   in evidence)

20            MS. CUCINELLA:  Permission to publish?

21            THE COURT:  Just blanket -- just show it.

22            MS. CUCINELLA:  Ms. Joynes, please pull up Government

23   Exhibit 3-D.

24   Q.  Mr. Lopez, as soon as it comes up for the jury, can you

25   explain to the jury what they see in this picture.

1   A.   In this picture is some townhouses on 162nd Street, of

2   which one of them happens to be mine, which is the second to

3   the right.  And right next to the townhouses is the residential

4   building 450 on 162nd Street.

5   Q.   450 162nd Street?

6   A.   Correct.

7   Q.   Turn to Government Exhibit 3-E.

8   A.   Similar picture, except you see the avenue where some of

9   the businesses like furniture store, Rite Aid, are located

10  across the street.

11  Q.   Is that a Rite Aid in the bottom right-hand corner?

12  A.   Yes.

13          THE COURT:  What avenue is that?

14          THE WITNESS:  That's St. Nicholas.

15  Q.   Turning to Government Exhibit 7-E.

16  A.   That is Morris-Jumel mansion, which is on Jumel.

17          THE COURT:  J-U-M-E-L.

18          THE WITNESS:  Yes.

19  Q.   And that is the structure that your neighborhood is named

20  after?

21  A.   That is correct, yes.

22  Q.   And turning to 7-F.

23  A.   That is Sylvan Terrace, which are townhouses that lead to

24  the avenue, St. Nicholas.  And in the opposite direction you

25  see the mansion.

1   Q.  Mr. Lopez, did there come a time when you learned that a

2   commercial business was going to open up on your block?

3   A.  Yes.

4   Q.  How did you learn that?

5   A.  I learned that from the super of 450 West 162nd Street.

6   Q.  Did you also make any observations that led you to that

7   conclusion?

8   A.  Well, primarily there was no structure there, and then they

9   built something prior, and I was inquiring what was going to go

10  on there, and I was told that they were looking for a

11  commercial tenant, something to the effect of a doctor's

12  office.

13          MS. CUCINELLA:  Ms. Joynes, will you please put

14  Government Exhibit 3-E back on the screen.

15  Q.  Can you please indicate for the jury on Government Exhibit

16  3-E the area that you were just talking about.

17  A.  It's where you see the blue awning.  And prior to that

18  structure, that's where the tenants in 450 would put their

19  garbage.

20  Q.  And did there come a time -- before I move on to that,

21  approximately how far away is your home from the space where

22  the blue awning is?

23  A.  I would say about probably 100 feet or a little bit more.

24  Q.  Did there come a time when you learned that a medical

25  doctor would be moving into that space?

 1   A.   Yes.

 2   Q.   And do you recall when the doctor's office actually opened?

 3   A.   In October 2012.

 4   Q.   Mr. Lopez, did the doctor's office opening have an impact

 5   on your neighborhood?

 6   A.   Immediately.

 7   Q.   What impact, if any, did you observe after the doctor's

 8   office opened in October of 2012?

 9   A.   A large influx of people on 162nd Street trying to get in.

10   They were on the side of the office.  We are a very wide

11   street.  They were on the side of the office.  There were

12   people across the street, there were people on the avenue, on

13   Jumel, as far as away as Edgecombe, which is the next avenue by

14   the park.  I saw a lot of cars double parked, sometimes even

15   triple parked.

16                MR. MAZUREK:  Can I ask for a time reference as to

17   when this was, your Honor?

18                THE COURT:  He answered that.  He was quite specific.

19   He was asked after the doctor's office opened.  If you want to

20   be more specific, you can cross-examine him later.

21                MS. CUCINELLA:  Your Honor, may I approach?

22                THE COURT:  You have blanket permission.

23   Q.   Mr. Lopez, I am showing you what has been marked for

24   identification as Government Exhibit 2-A, 2-E, 2-F, 2-G, 2-H,

25   2-I, 2-J, 4-A, 4-Q and 4-R.  Do you recognize these

1  photographs?

2  A.  I do.

3  Q.  Are they photographs that you have seen before in

4  connection with your involvement in your neighborhood

5  association?

6  A.  Yes.

7  Q.  Do they fairly and accurately represent the scene that you

8  often observed outside the clinic on 162nd Street?

9  A.  They do, but there were a lot more people than this.

10         MS. CUCINELLA:  Your Honor, the government offers

11  Exhibits 2-A, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J, 4-A, 4-Q and 4-R.

12         MR. MAZUREK:  No objection.

13         THE COURT:  Admitted.

14         (Government's Exhibits 2-A, 2-E, 2-F, 2-G, 2-H, 2-I,

15  2-J received in evidence)

16         (Government's Exhibits 4-A, 4-Q and 4-R received in

17  evidence)

18         MS. CUCINELLA:  Permission to publish?

19         THE COURT:  Yes.

20         MS. CUCINELLA:  Ms. Joynes, if you can put up the

21  first one, Government Exhibit 2-A.

22  Q.  Mr. Lopez, if we can look through these stack of pictures I

23  just handed to you.  What are we looking at here?

24  A.  This is in the morning, even before the doctor's office was

25  opened, and people just waiting around just waiting for him.

1    Q.   And turning to 2-E, what is this a picture of?

2    A.   This is the doctor's office and people waiting around

3    waiting to get in.

4    Q.   2-F?

5    A.   Again, people waiting in front of the office trying to get

6    in.

7    Q.   2-G?

8    A.   This could be someone trying to tell -- it almost looks

9    like someone trying --

10            MR. MAZUREK:  Objection, speculation.

11            THE COURT:  Yes, you can't speculate.  I'm sorry.

12   A.   Doctor's office and patients or people trying to get in.

13   Q.   Mr. Lopez, in your observations of the doctor's office,

14   were you able to see how the front door worked, so to speak?

15   A.   I did.

16   Q.   Can you explain that to the jury.

17   A.   They seemed to have had someone who --

18            MR. MAZUREK:  Objection.  Calling for speculation.

19            THE COURT:  Read the question back, please.

20            MS. CUCINELLA:  I can rephrase.

21            THE COURT:  Thank you.

22   Q.   Mr. Lopez, were you able to observe what was happening in

23   and around the front door of the clinic on 162nd Street?

24   A.   Yes.

25   Q.   Describe for the jury what you saw.

1   A.  Patients trying to get in.  And they had someone at the

2   door which was basically allowing them to get in, or telling

3   them to wait outside or wait by the avenue.

4   Q.  Thank you.  Moving to Government Exhibit 2-H, what does

5   this show?

6   A.  People waiting by the doctor's office trying to get in.

7   Q.  2-J?

8   A.  Basically the same thing.

9   Q.  4-A.  What is shown in this picture?

10  A.  Patients or people trying to get in as well.

11  Q.  4-Q, is that the same thing?

12  A.  Same thing.

13  Q.  And 4-R?

14  A.  The same thing.

15  Q.  I believe you testified earlier when you first looked at

16  these pictures that they didn't reflect the typical scene.  Is

17  that right?

18  A.  That is correct, there were a lot more people than that.

19  Q.  Were there people out there every day?

20  A.  Every day, yes, but not the same amount of people.

21  Q.  It would vary?

22  A.  Very much so.

23  Q.  You also testified earlier that you saw cars in the

24  neighborhood.  Can you explain a little bit more to the jury

25  what you meant by that?

1  A.  These were cars that were not in the neighborhood prior to

2  that.  And a lot of these cars were dropping people off to the

3  clinic, but they would remain double parked, sometimes even

4  triple parked on 162nd and sometimes even Jumel.  And we would

5  see cars -- I would see cars that were basically from different

6  states.  I would see cars that were either just ordinary cars

7  or some that were luxury cars like a Lexus, BMW, Cadillac

8  Escalade, those type of cars.

9  Q.  I am now approaching you with what has been marked for

10  identification as Government Exhibits 6-C, 6-D, 6-E, 6-F, 6-G,

11  6-I, 6-J, 6-K, 6-L, 6-O and 6-Q.  Are these photographs of cars

12  that you had seen outside the clinic?

13  A.  That is correct, yes.

14  Q.  Do they fairly and accurately represent those cars that you

15  saw outside the clinic?

16  A.  The cars as well as the plates.

17        MS. CUCINELLA:  Your Honor, the government offers

18  Government's Exhibits 6-C, 6-D, 6-E, 6-F, 6-G, 6-I, 6-J, 6-K,

19  6-L, 6-O and 6-Q.

20        MR. MAZUREK:  Object to lack of foundation with

21  respect to these photographs that he took or where these

22  photographs --

23        THE COURT:  Do you have voir dire?

24        MR. MAZUREK:  Yes.

25        THE COURT:  Voir dire the witness.

1          MR. MAZUREK:  Thank you.

2

3   VOIR DIRE EXAMINATION

4   BY MR. MAZUREK:

5   Q.  Mr. Lopez, the photographs that have been put in front of

6   you with regard to the 6 series with respect to these cars, did

7   you take these photographs?

8   A.  I did not.

9   Q.  Were these provided to you by the government?

10  A.  They were not.

11  Q.  Who provided them to you?  When did you first see these

12  photographs.

13  A.  I saw these -- these were actually taken by the association

14  of my neighborhood.

15  Q.  The association?  The homeowner's association?

16  A.  No, it's the neighborhood association.

17  Q.  OK.  And when you say the association, they were given to

18  you by the association, that means other people took them and

19  gave them to your community group?

20          THE COURT:  Did representatives of your community

21  group take these photographs, to your knowledge, or did someone

22  else take them and give them to representatives of your

23  community group?

24          THE WITNESS:  Community group took the pictures.

25          THE COURT:  In other words, it's your testimony that

 1  people who were involved in the community group began taking

 2  pictures?

 3           THE WITNESS:  Exactly, yes.

 4           THE COURT:  Anything else?

 5  Q.  Just with respect to when these people started taking these

 6  photographs, do you know the timeframe?

 7  A.  Immediately after the doctor's office opened and

 8  thereafter.

 9  Q.  And the first time you saw them was in the community

10  group's archives or in the community group's meetings that you

11  had?

12  A.  I knew of them.  I saw them recently, I think it was

13  yesterday.

14  Q.  For the first time.

15  A.  First time.

16           MR. MAZUREK:  Your Honor, I don't know that he has

17  personal knowledge about how these particular photographs were

18  taken and what they actually show other than cars and license

19  plates, so I will object.

20           THE COURT:  The objection is overruled.

21           MS. CUCINELLA:  Are the exhibits admitted, your Honor?

22           THE COURT:  Yes.

23           MS. CUCINELLA:  May they be published?

24           THE COURT:  Yes.

25           (Government's Exhibits 6-C, 6-D, 6-E, 6-F, 6-G, 6-I

 1    received in evidence)

 2            (Government's Exhibits 6-J, 6-K, 6-L, 6-O and 6-Q

 3    received in evidence)

 4            MS. CUCINELLA:  Ms. Joynes, if you could show just

 5    show on the screen the exhibits.

 6    Q.  What kind of car is this, Mr. Lopez?

 7    A.  Mercedes SUV.

 8    Q.  What kind of car is this?

 9    A.  Ford Expedition.

10    Q.  And can you read where that license plate is from.

11            THE COURT:  The picture shows what it shows.  It's in

12    evidence.

13    Q.  If we can just flip through a few more of these.  6-E, what

14    kind of car is this?

15    A.  Cadillac.

16    Q.  6-E?

17    A.  Mercedes.

18    Q.  Sorry, 6-I.

19    A.  Mercedes.

20    Q.  6-G?

21    A.  BMW.

22    Q.  6-J?

23    A.  BMW.

24    Q.  6-L?

25    A.  Lexus.

1   Q.   6-O?

2   A.   BMW.

3   Q.   And 6-Q?

4   A.   Mercedes.

5   Q.   And, Mr. Lopez, just to clarify for the record, these are

6   all cars that you actually saw yourself in the neighborhood; is

7   that correct?

8   A.   That is correct.

9   Q.   You testified that there were a number of people that would

10  gather around the clinic.  What, if anything, did you observe

11  those people doing?

12  A.   Well, a lot of waiting and loitering.  And just waiting.

13  Just a lot of waiting.  These are the people that are actually

14  outside of their vehicles.  And there was a point where there

15  were so many people that you couldn't even walk the sidewalk on

16  the side of the clinic.  And there were people waiting in cars

17  that were sitting and waiting.  And I observed that they would

18  be there for a while eating, drinking and again just waiting

19  for patients that they either dropped off or had patients that

20  were in the car waiting to go in.

21  Q.   Did individuals ever come onto private property?

22  A.   Yes, they have.

23  Q.   What did you observe?

24  A.   People sitting on our stoops, sitting in front of the

25  townhouses by the courtyard.  We had issues where people were

1    going to the courtyard to urinate, blocking some of the

2    entrances to the townhouses and 450.

3    Q.  Did the clinic's opening have an impact on your life in the

4    neighborhood?

5    A.  It did.

6              MR. MAZUREK:  Objection.  Relevance.

7              THE COURT:  Overruled.

8    A.  It did.

9    Q.  What was that impact?

10   A.  The safety of our neighborhood, the inability to walk from

11   Edgecombe, which is the opposite side of the street.  Let me

12   rephrase that.  You have St. Nicholas, and if you go through

13   162, at the end of the block is Edgecombe.  So anybody who was

14   coming from there going in the direction of St. Nicholas had a

15   hard time doing that, or felt intimidated to go in that

16   direction.

17             MR. MAZUREK:  Objection.  Speculation.  Move to

18   strike.

19             THE COURT:  You can't tell about what your neighbors

20   felt.  OK?

21             THE WITNESS:  OK.

22             THE COURT:  Let's move on, please.

23   Q.  Mr. Lopez, did you ever observe the doctor going to or from

24   the clinic?

25   A.  I did.

1   Q.  And what did you observe?

2   A.  At the end of the day is normally when I would see the

3   doctor leave.  Someone would go get his car, bring it to the

4   front at 450, and give him the car keys, and he would get in,

5   and he would leave.

6   Q.  What kind of -- do you recall what type of car Dr.

7   Mirilishvili drove?

8   A.  Yes.

9            MR. MAZUREK:  Objection.  Relevance.

10           THE COURT:  Overruled.

11  Q.  You may answer.

12  A.  Yes.

13  Q.  And what did he drive?

14  A.  A white Mercedes.

15  Q.  I'm showing you what has been marked for identification as

16  Government Exhibit 4-I, 4-G, 4-H and 4-J.  Do those photos

17  fairly and accurately represent the scene that you just

18  described and that you observed?

19  A.  That is correct, yes.

20           MS. CUCINELLA:  The government offers 4-I, 4-G, 4-L

21  and 4-J.

22           DEFENDANT ATTORNEY:  No objection.

23           THE COURT:  Admitted.

24           (Government's Exhibits4-I, 4-G, 4-L and 4-J received

25  in evidence)

1              MS. CUCINELLA:  Ms. Joynes, if you can put up

2    Government Exhibit 4-I.

3    Q.  Mr. Lopez, what does this picture show?

4    A.  It shows the car that the doctor drove and one of his

5    employees.

6    Q.  Turning to 4-G, what is in this picture?

7    A.  The employee opening the car for the doctor to his vehicle.

8    Q.  4-H and 4-J?

9    A.  Doctor getting into his car.

10   Q.  Mr. Lopez, did there come a time when you confronted Dr.

11   Mirilishvili about what you observed going on in the

12   neighborhood?

13   A.  I did.

14   Q.  How did that come about?

15   A.  Very early on when the clinic opened, I met with some of my

16   neighbors in the afternoon, very concerned of what was going on

17   in our neighborhood, and as the doctor came out I had a word

18   with him with my neighbors around me and voiced my concern, and

19   basically I told him that this was unacceptable in that

20   neighborhood, this is not a practice I had ever seen.  Given

21   the fact that I lived by Columbia Hospital which has a lot of

22   different clinics and private practices, and I have never seen

23   anything like this before.

24   Q.  Mr. Lopez, would you be able to recognize Dr. Mirilishvili

25   if you saw him today?

1    A.  Yes.

2    Q.  Do you in fact see Dr. Mirilishvili?

3            MR. MAZUREK:  Your Honor, we will stipulate he can

4    identify Dr. Mirilishvili.

5            THE COURT:  That's fine.  Finish this line, please.

6            No, no.  Do you see him in the courtroom, sir?

7            THE WITNESS:  I do.

8            THE COURT:  Can you tell us where he is sitting?

9            THE WITNESS:  He is sitting second row to the right.

10           THE COURT:  OK.  Indicating Dr. Mirilishvili.

11   Q.  Mr. Lopez, following your encounter with Dr. Mirilishvili,

12   what, if anything, happened next?  Did you and your neighbors

13   take any additional steps?

14   A.  Well, we started an association, neighborhood association,

15   primarily focused on removing this practice from our

16   neighborhood.

17   Q.  Who joined the neighborhood association?

18   A.  It was inclusive to anyone who wanted to join.  It was

19   neighbors who rent, neighbors that own, that lived on 162nd

20   Street, Jumel, Sylvan Terrace and 160th, which is considered

21   the historic neighborhood.

22           (Continued on next page)

23

24

25

1   Q.  What other steps, if any, did you take towards shutting

2   down the clinic in your neighborhood?

3   A.  Primarily, the first course of action was to have a meeting

4   with the 33rd Precinct and its commander and his staff.  We --

5   I contacted Gail Brewer's office, Manhattan president.

6          MR. MAZUREK:  Judge, I am going to object on relevance

7   grounds.

8          THE COURT:  Overruled.

9   A.  I think we took a couple of other courses of action, but

10  those are the primary.

11  Q.  You stated that you met with the 33rd Precinct.  Were you

12  happy with any steps that the 33rd Precinct then took to help

13  you with your problem?

14  A.  Not really.

15  Q.  Did the clinic continue to operate on your block?

16  A.  That is correct, yes, it did.

17  Q.  Did anything change over time?

18  A.  We did get some NYPD presence here and there, but given

19  their resources, that stopped.  And then we had a couple of

20  situations there that we thought made the situation there even

21  more grave for the neighborhood.

22  Q.  What do you mean by that?

23  A.  There were two armed robberies that occurred in the

24  doctor's office, and actually in one of them, the second time.

25  I actually thought the office was being closed and then I found

1    out it was a robbery.

2    Q.  Did there come a time when the clinic did in fact shut

3    down?

4    A.  Yes.

5    Q.  What changes, if any, did you notice in the neighborhood

6    after the clinic shut down?

7               MR. MAZUREK:  Objection.

8               THE COURT:  Overruled.

9    A.  One more time, please.

10   Q.  What changes, if any, did you notice in the neighborhood

11   after the clinic shut down?

12   A.  Vast difference.

13   Q.  In what way?

14   A.  The neighborhood no longer had an influx of people waiting

15   around, loitering, dropping off their garbage, double-parked

16   cars.  It was a vast difference.

17   Q.  Is there a business in that space today, in the 450

18   building at 162nd Street?

19              MR. MAZUREK:  Objection, relevance.

20              THE COURT:  The objection is sustained.  I think he

21   has testified everything he needs to testify to.

22              MS. CUCINELLA:  One moment, your Honor.  Nothing

23   further at this time.

24              MR. MAZUREK:  Your Honor, may I inquire.

25              THE COURT:  You may.

1   CROSS-EXAMINATION

2   BY MR. MAZUREK:

3   Q.  Good afternoon, Mr. Lopez.

4   A.  Good afternoon.

5   Q.  Mr. Lopez, you said on direct examination you purchased

6   your townhouse some time in August 2007, is that right?

7   A.  Precisely, yeah.

8   Q.  And you paid almost a million dollars for it, correct?

9   A.  No.

10  Q.  How much?

11  A.  Under that.

12  Q.  How much?

13          THE WITNESS:  Do I have to disclose that?

14          THE COURT:  Yes, sir.

15  A.  900.

16  Q.  $900,000.  You bought in that area because you thought it

17  was a residential up-and-coming area, as you said, is that

18  right?

19  A.  No.  Mainly because it was diverse.

20  Q.  Mainly because it was diverse?

21  A.  Correct.

22  Q.  You also have tenants in your building, correct?

23  A.  That is correct, yes.

24  Q.  You have two tenants in your building?

25  A.  That is correct.

 1   Q.  You generate income from this $900,000 property as well,

 2   correct?

 3   A.  Yes.

 4   Q.  And you testified looking at some of the photographs that

 5   the government showed you that this was mainly a residential

 6   area, right?

 7   A.  Correct.

 8   Q.  And that's the commercial part of the area was down on the

 9   avenue, St. Nicholas Avenue?

10   A.  That is correct.

11   Q.  You preferred it that way, correct?

12   A.  Yes.

13   Q.  When you learned that one of the property owners on the

14   block was building this structure between two buildings for a

15   commercial business, you didn't like that, right?

16   A.  I wouldn't say I wouldn't like it.  I just inquired about

17   it, wanted to know what was going on there.

18   Q.  You helped to start an association to prevent the

19   commercial business from opening there, correct?

20   A.  Incorrect.

21   Q.  Well, didn't you and the association challenge the initial

22   certificate of occupancy on that particular structure?

23   A.  Yes.

24   Q.  And that was before anybody even knew who was moving in,

25   correct?

 1   A.  No.  Incorrect.

 2   Q.  You knew at that point it would be a medical office.  You

 3   knew at that point it would be a medical office?

 4   A.  I had an idea.  That's the type of tenant they were looking

 5   for.

 6   Q.  But you didn't know who the tenant was at that point?

 7   A.  No, negative.

 8   Q.  The association started right around the time when this

 9   structure was being built?

10   A.  Incorrect.

11   Q.  The commercial structure?

12   A.  No.

13   Q.  At what time did it start?

14   A.  After we saw the impact of the opening of the clinic,

15   that's when we organized and started to create an association.

16   Q.  The association challenged the initial certificate of

17   occupancy before anyone moved in, correct?

18   A.  No.

19   Q.  Isn't that what you wrote in a letter to the Manhattan

20   borough president in June of 2014?

21   A.  I did not write a letter.

22   Q.  You signed a letter on behalf of the Morris-Jumel

23   Neighborhood Association, didn't you?

24   A.  Quite possibly, but I did not write the letter.

25            MR. MAZUREK:  Your Honor, I am going to premark for

 1    identification as Defense Exhibit DM-5.  May I approach?

 2              THE COURT:  You may.

 3    Q.  I'm showing you what's been premarked for identification as

 4    DM-5.  If you could just look at the first two pages, see if

 5    you recognize your signature on the second page.

 6    A.  My signature, that is correct.  That is my signature.

 7    Q.  You read this letter -- you may answer.  Did you finish

 8    answering?

 9    A.  I'm saying, that is my signature.

10    Q.  And you read the letter before you signed it, correct?  You

11    wouldn't sign a letter without reading it first, is that

12    correct?

13    A.  That is correct.

14    Q.  And this is a letter that the association sent to the

15    Manhattan borough president when you were complaining about the

16    medical office that's on your block, right?

17    A.  Right.  2014.

18    Q.  In June of 2014?

19    A.  Right.

20    Q.  In the letter, and I'm just directing you to the third

21    paragraph, it indicates that we challenged, we meaning the

22    association, is that right, we challenged the initial

23    certificate of occupancy and the landlords renting to the

24    tenant, correct?

25    A.  That is correct.

1   Q.   Challenging the certificate of occupancy is before the

2   landlord even had the opportunity to move anybody in --

3   A.   Incorrect.

4   Q.   What's a certificate of occupancy?  Do you understand what

5   that means?

6   A.   To a certain extent I do.  We were challenging whether this

7   was a proper structure that was built there under code.

8   Q.   Why were you doing that?

9   A.   Because after the fact, that we saw the doctor's office

10  open --

11  Q.   I'm sorry.  I'm asking, why did you challenge that the

12  initial certificate of occupancy that was going up before you

13  even knew who was going --

14  A.   That's incorrect again.  This took place after the doctor's

15  office opened.  So we figured that would be an angle to

16  challenge whether that structure was viable.  And if it wasn't,

17  we would have asked the department of buildings to close it

18  down.

19  Q.   You testified just I think five minutes ago, if I'm

20  correct, that the association challenged the landlord at the

21  time that you determined that it was going to be a medical

22  office before there was even a lease on the property?

23  A.   We didn't challenge anybody before that.  We asked

24  questions, but we didn't challenge anybody.

25  Q.   When you challenged the certificate of occupancy, you tried

1  to do everything you could to get a commercial property off of

2  your block, correct?

3  A.   That's incorrect again.

4  Q.   The fact that you were challenging -- you didn't want the

5  commercial property on the block, did you?

6  A.   After the doctor's office opened.

7  Q.   Before it was a doctor's office it was ok.  You were happy

8  for any other kind of commercial property going into that

9  space?

10  A.   We were not even concerned at that point about anything.

11  They built a structure.  We were not concerned when the initial

12  structure was built.  We challenged it after the doctor's

13  office opened.

14  Q.   Your concern was the medical office that opened there?

15  That was your concern?

16  A.   No.  We weren't concerned it was a medical office.  We were

17  concerned with the influx of people trying to get in there, and

18  our feeling was, this was not a legitimate practice.

19  Q.   You never went inside the medical practice, did you?

20  A.   I did not.

21  Q.   When you say you thought it was not a legitimate practice,

22  you're basing that on the fact that you just didn't like all

23  the people hanging outside, correct?

24  A.   No.

25  Q.   When you say it wasn't a legitimate practice, the only

1   basis for you to say that is what you were observing on the

2   outside on the street, right?

3   A.  Correct.

4   Q.  You didn't like all those people there?

5   A.  That wasn't the main issue.

6          THE COURT:  Did you like the people there, yes or no?

7          THE WITNESS:  I did not.

8          THE COURT:  Thank you.  That was the question.  Next.

9   Q.  You were shown a bunch of photographs by the government of

10  four or five people hanging out outside the office, so to

11  speak, is that right, or trying to get into the office.  Is

12  that accurate?

13  A.  As I testified, it is a small --

14  Q.  That's not my question, sir.  The photographs that you saw

15  were about four, five people outside of sometimes a gated and

16  sometimes an opened door, correct?

17  A.  Yes.

18  Q.  And those are photographs that you said your association

19  gathered evidence of what a terrible place this was, that

20  medical office?

21  A.  Correct.

22  Q.  Did you bring any of those photographs of people going down

23  on lines all the way down to the edge of the avenue?  Do you

24  have any of those photographs?

25  A.  I do not.

 1   Q.  Do you have any photographs of people wrapped around going

 2   all the way to Edgecombe?  Did you bring any of those?

 3   A.  No, we did not.

 4   Q.  The only ones you brought were the ones that we saw today,

 5   correct?

 6   A.  That's correct.

 7   Q.  And all of these cars that you saw, fancy cars -- what kind

 8   of car do you have, sir?

 9   A.  I have a MINI Cooper.

10   Q.  That's made by BMW, right?

11   A.  Correct.

12   Q.  And there are people on the block who are fairly

13   well-established like yourself with nice jobs as you are,

14   correct?

15   A.  Maybe so.

16   Q.  And sometimes they may buy a nice car like a MINI Cooper,

17   right?

18   A.  Possibly.

19   Q.  And the cars that you saw in these photographs, you don't

20   know whose cars these were, do you?

21   A.  Do I know them personally, no.

22   Q.  These are just cars that your association members brought

23   to you or collected by the association, right?

24   A.  I saw them for myself.

25   Q.  You saw some of these cars?

1   A.  I saw these cars for myself, yes.

2   Q.  You didn't think these cars belonged on your neighborhood?

3   A.  When you say belong, meaning are they normally the cars

4   that were parked in our area, or are you saying that are these

5   cars that I have seen for the very first time?

6   Q.  I'm asking, you didn't believe -- that's my question.  Did

7   you believe those cars belonged on your block, yes or no?

8   A.  I am not quite sure what you mean.

9   Q.  In your mind, was it wrong for those cars to be there?

10  A.  Yeah.

11  Q.  Because why, they were blocking your parking spaces on the

12  block?

13  A.  Because they were double parked.  First of all, that's

14  illegal.  They were triple parked sometimes.  And then these

15  cars, by the time they left, deposited a lot of garbage in our

16  neighborhood.

17  Q.  And you reported this to NYPD, correct?

18  A.  Yes, I did.  Numerous times.

19  Q.  And the NYPD, you weren't happy with their response.  They

20  weren't able to get the people off your block?

21  A.  They could not.

22  Q.  Now, you were talking about Dr. Mirilishvili.  You met just

23  as he moved in basically, correct?

24  A.  I just met him one time.

25  Q.  A day or two after he moved in?

1   A.   That is correct, yes.

2   Q.   And a take or two after he moved in you told him you wanted

3   him off the block.  You thought the association did, correct?

4   A.   That's how big an impact that office had in that

5   neighborhood.

6   Q.   You say in the first 24 hours of opening the doors that

7   happened?

8   A.   In two days.

9   Q.   In two days.  In two days' time you were already in

10  Dr. Mirilishvili's office saying, I want you out of here, this

11  is not a legitimate medical practice, is that correct?

12  A.   We did not go in.

13  Q.   On the outside?

14  A.   On the outside.

15  Q.   Did Dr. Mirilishvili end up getting a security person

16  outside of the medical office to help with the traffic outside

17  the office?

18  A.   That's what I observed.

19  Q.   You thought that was a positive step.  The association

20  wanted a security person out at the office, correct?

21  A.   Negative.

22  Q.   You didn't think --

23  A.   We didn't request it and we didn't -- that was

24  insignificant to us.  It didn't make a difference if they had

25  security outside or inside.  The amount of people in the

1   neighborhood did not change.

2   Q.  The fact that Dr. Mirilishvili went through the effort of

3   putting a security person outside the office to you was not a

4   helpful step?

5   A.  No.

6   Q.  Did you want NYPD to be outside that office all the time?

7   Would that be your preference?

8   A.  That would have been my preference, and they did post a

9   police officer on several occasions and it helped.

10  Q.  Do you know that Dr. Mirilishvili, did he object to having

11  a police officer outside if that was what the association

12  wanted?

13  A.  I had no conversation with him about that.

14  Q.  Now, you talked about armed robberies that took place at

15  the medical office, correct?

16  A.  Yes.

17  Q.  You know Dr. Mirilishvili was the victim of those two armed

18  robberies in 2013 and 2014, correct?

19  A.  I was.

20  Q.  And do you know that after those armed robberies that

21  Dr. Mirilishvili requested also to have NYPD assistance?

22  A.  Ironically, yes.

23  Q.  I'm sorry?

24  A.  Yes.

25  Q.  Did you say ironically?

 1   A.   Ironically, yes.

 2   Q.   There is nothing ironic about a person who is a victim

 3   wanting to get support of the police, is there?

 4   A.   I agree, but I never saw a doctor's office get robbed

 5   twice.

 6   Q.   The fact that he was robbed, in your mind, did that make

 7   him less of a legitimate medical practice?

 8   A.   Yeah.

 9   Q.   You say that without knowing anything, what he was doing in

10   examining his patients, right?

11   A.   I had no idea what he was doing in there.

12   Q.   And the biggest concern for you was not to have these four

13   people, four or five people that you saw in the photographs,

14   standing around on your block, right?

15   A.   That's incorrect.  As I said in testimony, that is a small

16   number that's pictured.  Those pictures only give you a small

17   number of the amount of people that were in that neighborhood.

18   Q.   That's the only evidence that the association collected

19   during that time period, correct?

20   A.   That's correct.

21   Q.   Sir, your biggest concern is that your $900,000 property

22   maintains its level of value in your neighborhood, right?

23   A.   Incorrect.

24   Q.   That's one of your concerns, isn't it?

25   A.   In the bottom of my concern.  Safety was number one.

 1    Q.  And you want to be able to continue to rent your apartments

 2    in your building to tenants, right?

 3    A.  That was in jeopardy.

 4    Q.  I'm sorry?

 5    A.  That was in jeopardy.

 6    Q.  Because of the fact that there is an influx of a commercial

 7    business on your block that you didn't like, right?

 8    A.  Negative.  Because my tenants were concerned of what was

 9    going on.

10    Q.  Now, when you testified about the things that you saw on

11    the block, you worked full time, correct?

12    A.  I do.

13    Q.  And what are your hours of work?

14    A.  Normally, 7:30 to 2:30.

15    Q.  You work in Jersey City?

16    A.  That's right.

17    Q.  When you are saying that you observed every day these

18    streams of people outside of Dr. Mirilishvili's office, most of

19    the time you weren't there?

20    A.  I didn't say every day, but I would see, by the time I got

21    home, the continuation of people trying to get in and on the

22    avenue, on 162th Street, and Jumel.  I would see this at the

23    end of the day.  Because I'm very flexible with my job, I take

24    numerous days off and I would see this during the day as well.

25    Q.  When you saw these streams of people when you got home from

1   your job, that disturbed you, you didn't take any photographs,

2   did you?

3   A.  I'm not -- yeah.  I did not do that.  No.

4   Q.  Do you know that some neighbors took matters into their own

5   hands and vandalized Dr. Mirilishvili's car?

6   A.  I was aware of that.

7   Q.  They keyed his car?

8   A.  Yes.

9   Q.  Because they wanted him out of the neighborhood?

10  A.  I don't know what the motive was.

11  Q.  Is it fair to say that Dr. Mirilishvili did take the step

12  of putting a security person in front of the office shortly

13  after the association voiced their concerns about traffic on

14  the street?

15  A.  When you say outside, this particular person, through my

16  observation, was inside and outside directing traffic.

17  Q.  But he did take that step, correct?

18  A.  Directing traffic, yes.

19  Q.  Traffic, meaning the foot traffic that's coming by?

20  A.  The people that were waiting outside.

21  Q.  That was to allay the concerns of the association about too

22  many people hanging out on your block?

23          MS. CUCINELLA:  Objection.

24  A.  Negative.

25          THE COURT:  The objection is sustained.

 1   Q.  Let me ask you this.  In addition to that, you knew that at

 2   some point after the first or second robbery that

 3   Dr. Mirilishvili even hired off-duty NYPD officers --

 4   A.  I did not know that.  I was aware that he had an armed

 5   guard and that's when we became very concerned.

 6   Q.  When you say that he had an armed guard, did you witness

 7   someone with a weapon in front of the office?

 8   A.  My neighbors expressed that to me.

 9           MR. MAZUREK:  Move to strike, your Honor, on hearsay.

10           THE COURT:  Motion is granted.  Ignore that question

11   and answer, ladies and gentlemen.

12   Q.  It's safe to say that you are now -- I believe you

13   testified on direct examination you are happy because now you

14   don't have to see these people on your block anymore, is that

15   correct?

16   A.  That's correct.

17           MR. MAZUREK:  Nothing further, your Honor.

18           MS. CUCINELLA:  Your Honor, brief redirect.

19   REDIRECT EXAMINATION

20   BY MS. CUCINELLA:

21   Q.  Mr. Lopez, is there a business in the space today at 450

22   162nd Street?

23   A.  Yes.

24           MR. MAZUREK:  Objection, relevance.

25           THE COURT:  The objection is overruled.

 1   Q.   What kind of business is it?

 2   A.   It's a cardiologist and a dermatologist.

 3   Q.   A doctor's office?

 4   A.   That is correct, yes.

 5   Q.   Do you have any of the same issues you had when

 6   Dr. Mirilishvili's pain clinic was up and running?

 7   A.   Negative.

 8             MS. CUCINELLA:  Nothing further.

 9             MR. MAZUREK:  Very briefly.

10             THE COURT:  It would have to be.  She only asked four

11   questions.

12   RECROSS EXAMINATION

13   BY MR. MAZUREK:

14   Q.   Now that you have the cardiologist or radiologist, do you

15   know how much that they charge their patients for their

16   services?

17             MS. CUCINELLA:  Objection.

18             THE COURT:  The objection is sustained.  That's beyond

19   the scope.

20             MR. MAZUREK:  Nothing further.

21             THE COURT:  Thank you.  You may step down, sir.

22             (Witness excused)

23             THE COURT:  Call your next witness, please.

24             MR. DISKANT:  Yes, your Honor.  The government calls

25   Special Agent Michael Muller of the DEA.

 1    MICHAEL MULLER,

 2         called as a witness by the Government,

 3         having been duly sworn, testified as follows:

 4    DIRECT EXAMINATION

 5    BY MR. DISKANT:

 6    Q.  Good morning, Special Agent.

 7    A.  Good afternoon.

 8    Q.  Where are you currently employed?

 9    A.  I'm currently employed as a special agent with the Drug

10    Enforcement Administration in the New York field division.

11    Q.  Drug Enforcement Administration, also known as the DEA?

12    A.  That's correct.

13    Q.  How long have you been with the DEA?

14    A.  Little over 10 years.

15    Q.  And you mentioned you're currently a special agent?

16    A.  Yes.

17    Q.  How long have you been a special agent?

18    A.  Little over 10 years.

19    Q.  Were you employed prior to joining the DEA?

20    A.  I was.

21    Q.  What was your employment?

22    A.  I was in the Marine Corps for a little over 10 years as

23    well.

24    Q.  What kind of work were you doing for the Marine Corps?

25    A.  I was in the special operations community.

1   Q.   In your work with the DEA, have you been assigned to any

2   particular group or unit?

3   A.   Yes.

4   Q.   What is that group?

5   A.   It is called the tactical diversion squad.

6   Q.   What sorts of cases or investigations does the tactical

7   diversion squad work on?

8   A.   Our primary focus is to investigate violators that divert

9   pharmaceutical controlled substances from their normal course.

10  Q.   Let's talk through that step by step.   What are

11  pharmaceutical controlled substances?

12  A.   Pharmaceutical controlled substances are those drugs

13  covered under the Controlled Substance Act that are allowed to

14  be prescribed to patients by physicians.

15  Q.   Can you give us some examples?

16  A.   Oxycodone, 30 milligram.

17  Q.   Any others?

18  A.   Vicodin, Percocet, Roxicet, things like that.

19  Q.   You mentioned these are all drugs that are allowed to be

20  prescribed by doctors?

21  A.   Correct.

22  Q.   What is diversion?

23  A.   Diversion is when something is taken off its intended

24  course in the sense of diversion as far as drug diversion.

25  That is when a drug that is created by a manufacturer and then

 1    sent to a distributor ultimately sent to a pharmacy to be

 2    prescribed by a physician to a patient, at some point in that

 3    path it gets diverted away from its legal course.

 4    Q.  Can you give us some examples of common ways in which drugs

 5    are diverted into the investigations that you work on?

 6    A.  Sure.  The more common investigation we investigated were

 7    drugs that were diverted via prescriptions, typically in two

 8    different matters:  One when the prescriber has no knowledge of

 9    the diversion taking place, and a couple examples of that would

10    be prescription forgeries, stolen prescription pads.  We have

11    instances where violators will take a written prescription, put

12    substances on it to remove the ink and then put their own --

13    write their own drug on there that they desire.  The other

14    manner would be where the physician is aware of the diversion

15    taking place.  Typically, the physician is writing

16    prescriptions for cash is what we have seen.

17    Q.  During the course of your work as a special agent with the

18    tactical diversion squad, have you become familiar with

19    Dr. Moishe Mirilishvili?

20    A.  I have.

21    Q.  How did you become familiar with him?

22    A.  We opened a criminal investigation of him.

23    Q.  Very briefly, can you identify him in court today?

24    A.  I can.

25    Q.  Please do so.

1   A.   The defendant is seated in the fourth position in the

2   second table.

3            MR. DISKANT:   Indicating the defendant.

4   Q.   What was your role in the investigation of

5   Dr. Mirilishvili?

6   A.   I was one of the agents working on the case.

7   Q.   How many agents were there working on the investigation?

8   A.   We have 18 law enforcement personnel in my group.

9   Q.   You're one of them?

10  A.   Yes.

11  Q.   When did that investigation begin?

12  A.   Early spring 2013.

13  Q.   And can you talk to us about some of your early

14  investigative steps?

15  A.   Sure.   Some of the early investigative steps were database

16  queries, surveillance, interviewing witnesses, things of that

17  nature.

18  Q.   What is a DEA license?

19  A.   That is the registration required for a physician to have

20  to be able to prescribe controlled substances.

21  Q.   Were you able to determine whether or not the defendant had

22  a DEA license?

23  A.   He did.

24  Q.   Special Agent Muller, I am handing you what has been marked

25  for identification purposes as Government's Exhibits 1207 and

1   1206.  If we can start with 1207, you recognize that document?

2   A.  I do.

3   Q.  What is it?

4   A.  That is the certificate provided to the practitioner by the

5   DEA.

6   Q.  DEA license?

7   A.  Yes.

8   Q.  For which doctor?

9   A.  For Moishe Mirilishvili.

10  Q.  Where did this document come from?

11  A.  Comes from DEA headquarters.

12  Q.  Regular practice of the DEA to keep a document like this?

13  A.  Yes.

14          MR. DISKANT:  Your Honor.  The government offers

15  Government Exhibit 1207.

16          MR. GOSNELL:  No objection.

17          THE COURT:  Received.

18          (Government Exhibit 1207 received in evidence)

19          MR. DISKANT:  If you can put that up.

20  Q.  Special Agent Muller, we are going to talk about this

21  document in just a moment.  Very briefly, can you tell us the

22  difference between a DEA license and a medical license?

23  A.  Medical license is different in the sense that each state

24  issues individual medical licenses to practitioners allowing

25  them to practice medicine.  What the practitioner has to do at

1   that point is then acquire the DEA registration, which then

2   allows them to prescribe specific drugs that are scheduled

3   under the Controlled Substance Act.

4   Q.  According to the license that we are looking at here, the

5   defendant was located at 450 West 162nd Street?

6   A.  Yes, sir.

7   Q.  Were you able to identify prior addresses of the defendant?

8   A.  Yes, sir.

9   Q.  How were you able to do that?

10  A.  Through his history.

11  Q.  Is that also information the DEA collects?

12  A.  That's correct.

13  Q.  If I could direct your attention to what's been marked as

14  Government Exhibit 1206, do you recognize that document?

15  A.  I do.

16  Q.  What is that?

17  A.  This is the certification of registration history.

18  Q.  For the defendant?

19  A.  Yes.

20          MR. GOSNELL:  We have no objection to this, your

21  Honor.

22          MR. DISKANT:  The government offers 1206.

23          THE COURT:  It's admitted.

24          (Government Exhibit 1206 received in evidence)

25          MR. DISKANT:  If you could focus on the bottom half of

1    this page, Ms. Joynes.

2    Q.  It looks like the defendant had several prior addresses all

3    in the Bronx there?

4    A.  That's correct.

5    Q.  Let's go back to the beginning stages of the investigation.

6    You mentioned doing database queries and gathering information.

7    What were some of the other things that you did in the early

8    part of the investigation?

9    A.  We conducted surveillance.

10   Q.  Where did you conduct surveillance?

11   A.  At 450 162nd Street an the vicinity around it.

12   Q.  That's the defendant's office?

13   A.  That's correct.

14   Q.  Can you describe 162nd Street to us briefly?

15   A.  Primarily residential community.  Some brownstones,

16   apartment buildings.  Across the street from the office there

17   is a church.  At the very top of the block, closer to St. Nick

18   and Amsterdam, there is a hardware store.

19   Q.  And focusing on that early part of your investigation in

20   early 2013, can you tell us some of the things you observed

21   while engaging in surveillance at the defendant's clinic?

22   A.  Sure.  Early surveillance there, we could just tell things

23   didn't look right.

24   Q.  What do you mean by that?

25   A.  Large amount of vehicles, double parked, multiple occupants

1    in the vehicles.  Those vehicles would deliver passengers to

2    the clinic.  They would then pick passengers up at the clinic.

3    Volumes of people in front of the office waiting, things like

4    that.

5            MR. DISKANT:  If we could bring up what's in evidence

6    as Government's Exhibit 2A.

7    Q.  Special Agent Muller, do you recognize what we are looking

8    at?

9    A.  I do.

10   Q.  What is that?

11   A.  That is the opening to the clinic in question.

12   Q.  Going back to the time period that you were just speaking

13   about, the early part of your investigation in 2013, is that a

14   typical or atypical scene?

15   A.  That represents that time period, yes.

16   Q.  By the way, before we go any further, do you recognize the

17   white vehicle in the foreground of that photograph?

18   A.  I do.

19   Q.  How do you recognize that?

20   A.  That vehicle is the vehicle belonging to the defendant.

21           MR. DISKANT:  If we could go to Government Exhibit 2G.

22   Q.  Again, do you recognize what we are looking at?

23   A.  I do.

24   Q.  What is that?

25   A.  That is, once again, the opening to the clinic.

1   Q.  Again, focusing your attention on sort of the early part of

2   your investigation in 2013, was that a typical or atypical

3   scene?

4   A.  This was a typical scene.

5   Q.  During what time period did you engage in surveillance

6   during the full course of your investigation?

7   A.  Myself, I was there once, two times a week over the course

8   of the almost two years that we were investigating the case.

9   Q.  And over the course of the two years that you were

10  investigating the case, did the scene outside the defendant's

11  clinic change?

12  A.  It did.

13  Q.  How?

14  A.  As time went on, we noticed that the crowds would start to

15  diminish from being in front of the building.  We would notice

16  that in the colder months people would stay inside --

17          MR. GOSNELL:  Objection to we, your Honor.

18  A.  I observed.

19          THE COURT:  Thank you, sir.

20          THE WITNESS:  Sorry.  Apologies.

21  A.  I observed myself -- in the colder months individuals would

22  stay crowded into vehicles in the area surrounding the clinic.

23  They would also move to locations, to Edgecombe Avenue, which

24  is just to the east of the clinic, and to the west of the

25  clinic that is where the commercial area was, where there were

1   a couple of restaurants; the hardware store we talked about,

2   and areas like that.

3          MR. DISKANT:  If we can put up for the witness only

4   Government Exhibit 4T.

5   Q.  Do you recognize that photograph?

6   A.  I do.

7   Q.  How do you recognize it?

8   A.  That was taken by one of the task force officers in my

9   group.

10  Q.  Do you know when that photograph was taken?

11  A.  I don't recall the exact date.

12  Q.  Do you remember the year?

13  A.  It was summer of 2014.

14  Q.  Were you engaged in surveillance in the summer of 2014 at

15  the clinic?

16  A.  We were.

17  Q.  Does this fairly and accurately --

18         THE COURT:  You are both talking softly and you're

19  talking rapidly.  It's a double whammy.

20  Q.  Let me just take a step back then.  You mentioned that you

21  were engaged in surveillance during the summer of 2014?

22  A.  Yes, sir.

23  Q.  And this photograph was taken in the summer of 2014?

24  A.  Yes, sir.

25  Q.  Does it fairly and accurately depict what you had observed

 1   while engaged in the surveillance during that time period?

 2   A.  It was, yes.

 3          MR. DISKANT:  Your Honor, the government offers

 4   Government Exhibit 4T.

 5          MR. GOSNELL:  No objection.

 6          THE COURT:  Admitted.

 7          (Government Exhibit 4T received in evidence)

 8   Q.  Special Agent Muller, if you could just give us a sense of

 9   what we are looking at here.

10   A.  This is individuals out in front of the clinic.  If you can

11   look into the photo and see the individual in the checkered

12   shirt to the right behind the gentleman wearing the black

13   outfit, that is an employee of the clinic.  The gentleman in

14   the foreground of the picture wearing the white T-shirt with

15   the black pants is one of the crew chiefs.

16          MR. GOSNELL:  Objection.  Lack of foundation about

17   crew chief.

18          THE COURT:  The objection is sustained.  One.

19   A.  One of the codefendants.

20   Q.  Do you know his name?

21   A.  I do.

22   Q.  What is his name?

23   A.  Raymond Williams.  Sorry.

24   Q.  How did a day at the clinic typically start, based on what

25   you observed?

1    A.   My observations, an employee of the clinic would open up

2    the clinic in the morning.   Depending on the time of year,

3    there may be people waiting for him there, gathered around

4    cars, sometimes gathered right around the railing you saw on

5    the ramp that led down to the door.   The colder months you

6    would see various vehicles parked with occupants in the

7    vehicles waiting.   Whoever the employee was would open the gate

8    and at that point in time certain individuals would start

9    approaching an entering the clinic.

10   Q.   Would the defendant arrive?

11   A.   A short period of time later the defendant would arrive in

12   his vehicle.   The employee would then exit the office and the

13   defendant would enter the office and the employee would then

14   drive his vehicle to parking garage in the area.

15   Q.   And when the defendant's day was done, what would you

16   observe?

17   A.   Pretty much reverse.   The employee would leave the office,

18   walk to the parking garage, get the car, brick it back.

19         MR. DISKANT:   If we can put up for the witness only

20   Government Exhibits 4L, 4M, 4N, and 4O.

21   Q.   Do you recognize these photographs?

22   A.   I don't see anything.

23         THE COURT:   He's not seeing them.

24   A.   There we go.

25         MR. GOSNELL:   Your Honor, I have no objection to

 1   these.

 2          MR. DISKANT:  Government offers 4L, M, N, and O.

 3          THE COURT:  Admitted.

 4          (Government Exhibits 4L, M, N, and O received in

 5   evidence)

 6   Q.  Let's start with Government Exhibit 4L.  What are we

 7   looking at?

 8   A.  The front of the clinic.  One of the employees of the

 9   defendant and the defendant exiting the clinic.

10   Q.  Let's go to 4M.

11   A.  Kind of the next step in the progression of leaving the

12   office.

13   Q.  4N.

14   A.  Defendant's vehicle double parked, employee still escorting

15   the defendant to his car.

16   Q.  And 4O?

17   A.  There is the defendant opening the car door -- excuse me.

18   The employee opening the car door, defendant getting in his

19   vehicle.

20   Q.  During the course of your investigation, I want to return

21   for a moment to the people that you had seen outside of the

22   clinic.  During the course of your investigation were you able

23   to identify any of them?

24   A.  Yes, we were.

25          MR. DISKANT:  If we can put up for the witness only

Government Exhibit 6A.

Q.  Do you recognize that individual?

A.  I do.

Q.  Who is that?

A.  That is Thomas White.

Q.  Is that a fair and accurate depiction of Thomas White
during the course of the investigation?

A.  It is.

MR. DISKANT:  The government offers 6A.

MR. GOSNELL:  No objection.

THE COURT:  Admitted.

(Government Exhibit 6A received in evidence)

Q.  Special Agent Muller, do you know where this photograph was
taken?

A.  That picture was taken, if you are on 162nd Street looking
south, St. Nick comes around and meets up with Amsterdam kind
of at a converge right at 162nd Street.  This particular
vehicle is parked right in front of the hardware store, sits
right at the top of the block.  Right next to it is the
Laundromat and this vehicle is parked right in front of the
Laundromat, right on St. Nick.

Q.  In the vicinity of the clinic?

A.  Yes.  Just up the block.

Q.  And Mr. White, the individual we are looking at, how
frequently would you observe Mr. White outside or in the

1   vicinity of the clinic?

2   A.   Daily; if not daily, every other day.

3   Q.   And the vehicle that he is standing next to, how frequently

4   would you see that vehicle?

5   A.   That vehicle, not as frequent as the other vehicles he

6   drove around, but periodically we would see that vehicle.

7   Q.   When you would see Mr. White daily, what would you see him

8   doing?

9   A.   He would be parked in the vicinity of the clinic.  He would

10  engage with other individuals that were parked in the vicinity

11  of the clinic as well.  And what I observed was individuals

12  after meeting with him, they would either walk to the clinic or

13  walk to meet other individuals that were going into the clinic.

14  Q.   You mentioned just a moment ago other vehicles.  If you

15  could bring up what's in evidence as Government Exhibit 6F.

16            Who is this individual?

17  A.   That is Thomas White again.

18  Q.   And the vehicle that he is standing next to?

19  A.   That is the vehicle that we observed the most on

20  surveillance with him operating.

21  Q.   And just to situate us, where are we as we are looking at

22  this photograph?

23  A.   This photograph would be, if you were on 162nd Street and

24  you were looking west, that is Amsterdam right there where

25  those stoplights are.  There is the Jimbo's Hamburgers there,

1    which is on Amsterdam, and you will see the Rite Aid sign for

2    the Rite Aid right off to the right.

3    Q.  Would you ever engage in surveillance of vehicles like the

4    vehicle we are looking at after they would leave the

5    defendant's clinic?

6    A.  Yes, we did.

7    Q.  Where did they go?

8    A.  Typically pharmacies.

9    Q.  Were there other people in addition to Mr. White that you

10   would see at or around the clinic on a daily or frequent basis?

11   A.  Yes.

12        MR. DISKANT:  If we can show the witness only what's

13   been marked for identification purposes as Government Exhibit

14   4D.

15   Q.  Do you recognize these individuals?

16   A.  I do.

17   Q.  Who are they?

18   A.  The gentleman on the right with no watch cap on his head is

19   Raymond Williams and the gentleman on the left with the hooded

20   jacket and the watch cap is Abraham Correa.

21   Q.  Is that a fair and accurate depiction of those two men as

22   you observed them while engaged in surveillance?

23   A.  Yes.

24        MR. DISKANT:  Your Honor, the government offers

25   Government Exhibit 4D.

 1          MR. GOSNELL:  No objection.

 2          THE COURT:  Admitted.

 3          (Government Exhibit 4D received in evidence)

 4  Q.  Focusing your attention first on the gentleman on the right

 5  side of the photograph, tell us who that is.

 6  A.  Raymond Williams.

 7  Q.  And how frequently would you see Mr. Williams at or around

 8  the clinic?

 9  A.  Three to four days out of the week.

10  Q.  Can you tell us what you would observe him doing while he

11  was there?

12  A.  Mr. Williams would meet with individuals as well outside

13  the clinic.  Mr. Williams would also enter the clinic

14  frequently.

15  Q.  And the individual on the left side of the photograph, who

16  is that?

17  A.  Abraham Correa.

18  Q.  What would you observe Mr. Correa doing while you were

19  there?

20  A.  At this time Mr. Correa was also meeting with individuals

21  at or -- inside the clinic.  Similar conduct to what

22  Mr. Williams was doing as well.

23  Q.  Going back to Mr. Williams for just a moment, during the

24  course of the investigation did you recover anything from

25  Mr. Williams?

1   A.  Yes, we did.

2   Q.  I'm handing you what's been marked for identification

3   purposes as Government Exhibit 8.  Take a look at that and let

4   me know if you recognize it.

5   A.  I do.

6   Q.  What is that?

7   A.  This is the cellular telephone that belonged to Raymond

8   Williams.

9   Q.  How do you recognize it?

10  A.  My signature is signed as the witness on the evidence bag.

11          MR. DISKANT:  Your Honor, the government offers

12  Government Exhibit 8.

13          MR. GOSNELL:  No objection.

14          THE COURT:  Admitted.

15          (Government Exhibit 8 received in evidence)

16  Q.  Going back to your surveillance of the individuals you

17  would see at the clinic --

18          MR. DISKANT:  If we could show the witness only what's

19  been marked for identification purposes as Government Exhibit

20  2D.

21  Q.  Do you recognize those individuals?

22  A.  I do.

23  Q.  Who are they?

24  A.  That is Jomaris Javier on the left -- on the right wearing

25  the brown top, green bottoms, and Joseph Gray walking next to

1    her wearing the gray hoodie and the black watch cap.

2    Q.  Fair and accurate depiction on the way they looked when you

3    were engaged in surveillance?

4    A.  Yes.

5              MR. DISKANT:  Your Honor, the government offers

6    Government Exhibit 2D.

7              MR. GOSNELL:  No objection.

8              THE COURT:  Admitted.

9              (Government Exhibit 2D received in evidence)

10   Q.  You mentioned that the female on the right side of the

11   photograph was someone named Jomaris Javier?

12   A.  That is correct.

13   Q.  Can you tell us what you would observe about Ms. Javier?

14   A.  At this point Ms. Javier was an employee of the clinic.  We

15   would observe her enter the clinic because she was an employee,

16   she would spend extended periods of time inside.  But we would

17   also notice her exit the clinic to meet with individuals

18   outside.

19   Q.  And Mr. Gray on the left?

20   A.  Mr. Gray on the left.  We would see him at the clinic two

21   to three times a week.

22   Q.  What would you observe when he was there?

23   A.  Similar conduct to the other individuals we have discussed.

24   Meeting with individuals outside the clinic and then those

25   individuals would then go and enter the clinic.

1    Q.   In addition to the surveillance, did you and other agents

2    take any other investigative steps during the course of your

3    investigation?

4    A.   Yes, we did.

5    Q.   What sorts of things did you do?

6    A.   We employed undercover operations as well.

7    Q.   Tell us a little bit about the undercover operations.

8    A.   Sure.  So in this particular instance we employed a

9    confidential source.

10   Q.   What is a confidential source?

11   A.   That's an individual that we utilize to infiltrate a

12   particular organization.

13   Q.   And did you use a confidential source in this particular

14   case?

15   A.   Yes, we did.

16   Q.   Are you familiar with someone named Jose Lantigua?

17   A.   I am.

18   Q.   Is he the official source you used here?

19   A.   Yes.

20   Q.   What did you have Mr. Lantigua do?

21   A.   We had Mr. Lantigua pose as a patient and enter the clinic

22   with the hopes of getting an appointment with the defendant.

23   Q.   Was he able to obtain an appointment with the defendant?

24   A.   He was.

25   Q.   Was he able to do so on his first try?

 1  A.  No.

 2  Q.  When was the first time he was able to successfully see the

 3  defendant?

 4  A.  June 27, 2013.

 5  Q.  2013?

 6  A.  Yes.

 7  Q.  Prior to Jose, Mr. Lantigua, going in to see the defendant

 8  that day, did you and other agents have a meeting with him?

 9  A.  We did.

10  Q.  Without getting into anything that was said, can you just

11  tell us what happened during that meeting?

12  A.  We met with Mr. Lantigua, we provided him with recording

13  equipment, we provided him with cash, and we provided him with

14  documents to enter the clinic.

15  Q.  What kind of documents?

16  A.  We provided him with an MRI and referral.

17  Q.  Were these real MRI and referrals?

18  A.  No.

19  Q.  Where did they come from?

20  A.  From me.

21  Q.  We are going to talk about them in just a moment.  Why did

22  you give Mr. Lantigua those documents?

23  A.  It was our understanding they were required.

24          MR. DISKANT:  If we can put up for the witness only

25  what has been marked as Government Exhibit 1205.

1          MR. MAZUREK:  No objection, your Honor.

2          MR. DISKANT:  The government offers 1205.

3          THE COURT:  All right.

4          (Government Exhibit 1205 received in evidence)

5          MR. DISKANT:  If we can zoom in, Ms. Joynes.

6   Q.  Special Agent Muller, you testified a moment ago that you

7   made this document?

8   A.  I did.

9   Q.  How did you do that?

10  A.  I whited out the name -- first I obtained the document.  It

11  was obtained from a separate confidential source used in a

12  separate investigation, and I whited out the name and the date

13  of birth, and I put Mr. Lantigua's name and date of birth in

14  his place.

15  Q.  That would be next to the letters RE in the top left-hand

16  side of the page?

17  A.  Yes, sir.

18  Q.  How long did that process take you?

19  A.  Five, ten minutes.

20  Q.  Did you make any effort to have the font conform with the

21  rest of the document?

22  A.  No.

23  Q.  Why not?

24  A.  Because we didn't want it to look authentic.

25  Q.  Why was that important?

1    A.   Because the purpose of this was to conduct a test.

2    Q.   Of who?

3    A.   Of the physician, of the defendant.

4    Q.   What kind of test?

5    A.   To see if the document would be accepted.

6              MR. DISKANT:  If we can go to the third page, zoom in

7    on this.

8    Q.   Do you recognize this?

9    A.   I do.

10   Q.   What is it?

11   A.   That's the actual MRI report.

12   Q.   For Mr. Lantigua?

13   A.   Yes.

14   Q.   Did you create this document as well?

15   A.   I did.

16   Q.   How did you do that?

17   A.   Same thing as the other document.  I removed the patient

18   identifier, name and date of birth, and I put Mr. Lantigua's

19   name and date of birth on it.

20   Q.   You mentioned that the purpose of the undercover operation

21   was a test?

22   A.   Correct.

23   Q.   Did you meet with Mr. Lantigua after his appointment with

24   the defendant?

25   A.   Yes.

1   Q.  Again, without getting into anything that was said, what

2   happened during that meeting?

3   A.  We recovered the recording equipment that we had provided

4   to him, we recovered the unspent U.S. currency that we had

5   provided to him, and we recovered a prescription for oxycodone,

6   30 milligram, 90 pills.

7   Q.  Just focusing on the currency for a moment, you had

8   testified that you had given Mr. Lantigua currency to pay for

9   the appointment?

10  A.  That's correct.

11  Q.  How much did the appointment cost?

12  A.  I can't recall right now.

13  Q.  Was Mr. Lantigua sent back to see the doctor again?

14  A.  He was.

15  Q.  How many times?

16  A.  Eight more times.

17  Q.  And during those operations, without getting into anything

18  that was said, how did all of those operations begin?

19  A.  Similar to the one I just described.  We provided recording

20  equipment, we provided U.S. currency.

21  Q.  And did you meet with the CS at the end of those meetings?

22  A.  Yes.

23  Q.  What happened in those meetings?

24  A.  We recovered our recording equipment, we recovered any

25  unspent currency, and we recovered a prescription for

1   oxycodone, 30 milligram.

2   Q.  Jose got a prescription for oxycodone for each of the

3   visits to the defendant?

4   A.  He did.

5   Q.  Was there ever a visit where he was not given oxycodone?

6   A.  No.  He got an oxycodone prescription every time.

7   Q.  During the course of the investigation were you able to

8   obtain any of the defendant's documents or medical files?

9   A.  We were.

10  Q.  How?

11  A.  We conducted two search warrants in December of 2014, one

12  at his medical office that we have been talking about on 162nd

13  Street and one at his residence.

14  Q.  Any other ways?

15  A.  Later, as time went by, we conducted a search warrant also

16  of a web-based service called Practice Fusion where the medical

17  records were electronically uploaded to a cloud-based service

18  much similar to Facebook, things like that, that you can access

19  through the Internet.

20  Q.  And through Practice Fusion were you able to obtain some of

21  the defendant's documents and records?

22  A.  Yes.

23  Q.  Records relating to Jose Lantigua?

24  A.  Yes.

25          MR. DISKANT:  Your Honor, at this time I'd like to

1    read a stipulation between the parties.

2              THE COURT:  No.  Give it to me.  I'll read it.

3              Ladies and gentlemen, I told you that a stipulation

4    was an agreement between the lawyers for two sides.  There are

5    two kinds of stipulations.  One is a stipulation that a

6    particular fact is true and the other is a stipulation that if

7    a particular witness were called, the witness would say certain

8    things.  It's called a testimonial stipulation.  It saves us

9    the trouble of having to bring in the witness and it's a lot

10   faster.

11             It is hereby stipulated and agreed, by and between the

12   United States of America, by Preet Bharara, United States

13   Attorney, Edward B. Diskant and Brooke Cucinella, United States

14   Attorneys, of counsel, and Moishe Mirilishvili, defendant, by

15   and with the consent of his attorneys, Henry Mazurek and Wayne

16   Gosnell that:  If called to testify, a custodian of records

17   from Practice Fusion, Inc. would testify that Government

18   Exhibits 201 through 224 and Government Exhibits 241 and 242,

19   including all parts and subdivisions thereof, are true and

20   correct copies of records obtained from Practice Fusion

21   regarding data maintained by Practice Fusion in the account

22   opened and maintained by Moishe Mirilishvili, the defendant,

23   that the original records were all made at or near the time, by

24   or from information transmitted by an employee of Practice

25   Fusion with knowledge of the matters set forth in the records,

1   that they were kept in the ordinary course of Practice Fusion's

2   regularly conducted business activity and that it was the

3   regular practice of Practice Fusion to make these records.  It

4   is further stipulated and agreed that this stipulation, which

5   is Government Exhibit 1003, may be received into evidence as a

6   government exhibit at the trial.

7           Are you also stipulating to the admissibility of the

8   underlying documents?

9           MR. DISKANT:  We are not, your Honor.

10          THE COURT:  This stipulation is now received in

11  evidence as Exhibit 1003.

12          (Government Exhibit 1003 received in evidence)

13          THE COURT:  Is this a good time to break for lunch?

14          MR. DISKANT:  We certainly can, your Honor.  I have

15  five more minutes on this particular line.

16          THE COURT:  Then let's do five more minutes.

17  Q.  Special Agent Muller, I'm handing you what has been marked

18  for identification purposes as Government Exhibit 201 through

19  224 along with 241 and 242.  Do you recognize those documents?

20  A.  I do.

21  Q.  Are these Practice Fusion files pertaining to the

22  defendant's patients?

23  A.  Yeah.  They are some of the files, yes.

24  Q.  Including Jose Lantigua?

25  A.  Yes.

 1              MR. DISKANT:  Your Honor, the government offers

 2    Government Exhibits 201 through 224, along with 241 and 242.

 3              MR. GOSNELL:  No objection, your Honor.

 4              THE COURT:  Admitted.

 5              (Government Exhibits 201-224 and 241-242 received in

 6    evidence)

 7              MR. DISKANT:  Ms. Joynes, if we can bring up

 8    Government Exhibit 210.

 9    Q.  Just focusing up on the top, Special Agent Muller, you

10    recognize the patient name there?

11    A.  I do.

12    Q.  What is it?

13    A.  Jose Miguel Lantigua.

14    Q.  That's the confidential source we have taken talking about?

15    A.  Yes, it is.

16              MR. DISKANT:  Ms. Joynes, if we can go down to the

17    bottom of that page.

18    Q.  Under insurance it indicates a patient preference.  It says

19    self pay, is that right?

20    A.  That's correct.

21              MR. DISKANT:  Let's go to the second page.

22    Q.  Special Agent Muller, did the defendant's charts indicate

23    any diagnosis for Mr. Lantigua?

24    A.  None.

25    Q.  Any historical diagnosis?

 1    A.   None.

 2    Q.   Any drug allergies or food allergies?

 3    A.   No.

 4            MR. DISKANT:  If we could go to the next page of the

 5    document.

 6    Q.   Special Agent Muller, there seemed to be a series of active

 7    medications listed:  Elavil, Robaxin, Neurontin.

 8            THE COURT:  You are going to have to give this to him

 9    over lunch so he can get the spellings.

10            MR. DISKANT:  Glad to, your Honor.

11    Q.   Do you see any medications list missing from this list?

12    A.   Oxycodone, 30 milligram.

13            MR. DISKANT:  If you could go to page 7 of this

14    exhibit.

15    Q.   Do you recognize that?

16    A.   I do.

17    Q.   What is that?

18    A.   That is a prescription written by the defendant to our

19    confidential source on June 27, 2013 for oxycodone, 30

20    milligram and 90 tablets.

21    Q.   That was the first undercover operation you were talking

22    about just a moment ago?

23    A.   That's correct.

24            MR. DISKANT:  Your Honor, with that, if the Court

25    wants to take a lunch break now.

G33MMIR3                          Muller - direct

 1                THE COURT:  I think it's time to take a lunch break.

 2    I will see you folks back here, we will start right at 2:15.

 3                Don't discuss the case over lunch.  Keep an open mind.

 4    The notebooks should be taken back to the jury room.  They have

 5    to stay in the jury room.  Don't take them to lunch with you.

 6                At some point, Jim, have you talked to them about

 7    contact information and all that?

 8                THE DEPUTY CLERK:  Yes.

 9                THE COURT:  That's all done.  We will see you after

10    lunch.

11                (Jury not present)

12                THE COURT:  See you after lunch.

13                (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

 1                    A F T E R N O O N   S E S S I O N

 2                              2:15 p.m.

 3              (Jury not present)

 4              MR. DISKANT:  Before we do that, we have one brief

 5    issue.

 6              THE COURT:  Parties and counsel are present; the

 7    jurors are not present.  Should the witness be on the stand for

 8    this?

 9              MR. DISKANT:  I think it's fine.

10              MR. MAZUREK:  Fine.

11              THE COURT:  OK.  What's the issue?

12              MR. DISKANT:  Your Honor, we intend to offer through

13    Special Agent Muller a number of documents that were recovered

14    from the search of the defendant's clinic.  One of those is a

15    notebook which contains a handwritten letter to the defendant

16    from his employee Jomaris Javier.  We believe it is relevant

17    and probative and should come in, and I understand defense

18    counsel has an objection to it.

19              THE COURT:  Well, that's nice.  I have never seen it.

20              MR. DISKANT:  I can hand up a copy, your Honor.

21              THE COURT:  OK.  And you are seeking to admit it as

22    coconspirator hearsay?

23              MR. DISKANT:  One, as coconspirator hearsay.  We

24    believe there is going to be a lot of testimony about Ms.

25    Javier's role.  Second is state of mind, given the opening.

1   The opening was all about how the defendant was being deceived

2   by his employees, and this is a letter from his employee who he

3   has hired back after finding out that she was quote unquote

4   deceiving him.  And we think it's directly relevant to rebut

5   the argument that the defendant is somehow in the dark about

6   what his employees were doing.

7           MR. MAZUREK:  Judge, the purported author of this

8   letter, Ms, Javier, is not the government's witness list; I

9   don't think she is going to be testifying.

10          THE COURT:  That would be correct; he is seeking to

11  introduce it as coconspirator hearsay.

12          MR. MAZUREK:  Right.  But, your Honor, it's hard for

13  me to see how this letter is in any way in furtherance of the

14  charged conspiracy.

15          THE COURT:  Oh, really?

16          MR. MAZUREK:  It's a letter apologizing for doing

17  something wrong in the office.  And there is a lot of language,

18  and the problem is that the government may suggest that this

19  language means a certain thing.  It's ambiguous language.  It's

20  basically saying I've done wrong, I want to continue to produce

21  solid work that will benefit the clinic.

22          THE COURT:  You know what, here is what we're going to

23  do.  He can authenticate the document.  It's not going to be

24  shown to the jury at the present time.  We will see how the

25  evidence comes in, and we will see if it becomes relevant,

1   necessary.  Maybe it will be part of the government's rebuttal

2   case.  I don't know.  The document can be authenticated now.

3          MR. DISKANT:  Just so the court knows, I expect there

4   will be testimony about that letter.  We won't show it to the

5   jury because the defendant made statements about the letter --

6   or the apology, I should say --

7          THE COURT:  Well, when that testimony is about to come

8   in, we will --

9          MR. DISKANT:  It's about to come in.

10          THE COURT:  No, he is not going to testify about this

11   letter.

12          MR. DISKANT:  No, he is going to testify that the

13   defendant in an interview with law enforcement said that he had

14   fired Jomaris and then rehired her back.  I just wanted the

15   court to be aware that testimony is coming in.

16          THE COURT:  Oh, that testimony can come in, sure.

17          MR. DISKANT:  Thank you, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

G337MIR4                        Muller - direct

 1                  (Jury present)

 2                  THE COURT:  Hello, everybody.  I hope everybody had a

 3     great lunch.  I had soup, so I don't know how long it's going

 4     to be before we're going to be taking a break.  Have a seat.

 5                  You are still under oath, agent.

 6                  THE WITNESS:  Yes, your Honor.

 7                  THE COURT:  Let's continue.

 8     MICHAEL MULLER, resumed.

 9     DIRECT EXAMINATION (Continued)

10     BY MR. DISKANT:

11     Q.  Special Agent Muller, when we took our lunch break we were

12     talking about the undercover operation that you had done with

13     respect to the defendant's practice.

14     A.  That's correct.

15     Q.  OK.  And I want to transition now and talk about the

16     defendant himself.  Did you have an opportunity to interview

17     him during the course of your investigation?

18     A.  I did.

19     Q.  Once or more than once?

20     A.  More than once.

21     Q.  Let's focus on the first of those interviews.  When did

22     that occur?

23     A.  September 2013.

24     Q.  Where did it take place?

25     A.  At the 33rd Precinct.

1    Q.  Why were you and the defendant at the 33rd Precinct?

2    A.  The defendant's location had an armed robbery occur there,

3    and the defendant was at the precinct being interviewed by

4    detectives of the 33rd precinct.

5    Q.  When you say the defendant's location, what are you

6    referring to?

7    A.  The medical clinic, 450 West 162nd Street.

8    Q.  Were you and the DEA investigating that robbery?

9    A.  No.

10   Q.  So why were you present at the 33rd precinct?

11   A.  We took the opportunity to learn about his practice.

12   Q.  And you interviewed the defendant at that time?

13   A.  Yes, we did.

14   Q.  Who was present?

15   A.  Myself, TFO Victor Lebron and the defendant.

16   Q.  So another member of the investigative team?

17   A.  Yes.

18   Q.  How long did the interview last?

19   A.  35, 40 minutes.

20   Q.  What general subjects were discussed?

21   A.  We discussed the practice.  We discussed the robbery.

22   Q.  So starting with the robbery, what did you say to him and

23   what did he say to you?

24   A.  We asked him what was taken.  The defendant indicated to us

25   that he had had $4,000 in cash taken from him and a

1    prescription pad.

2    Q.   And with respect to the cash, did he indicate why he had

3    $4,000 in cash on him?

4    A.   He did.

5    Q.   What did he say?

6    A.   He told us that he had just recently moved, and he and his

7    wife were going to purchase furnishings for their new home.

8    Q.   With the cash?

9    A.   Yes.

10   Q.   With respect to the practice itself, what sort of subjects

11   were discussed?

12   A.   We discussed method of payment, we discussed some

13   employees.

14   Q.   OK.  So let's start with the method of payment.  What did

15   you say to him and what did he say to you?

16   A.   We asked him what kind of forms of payment he accepts for

17   his visits.  The defendant indicated to us that he did accept

18   certain forms of insurance, and those individuals that weren't

19   covered by those forms of insurance, they paid a $200 cash fee

20   for the visit.

21   Q.   And with respect to other aspects of the practice, did you

22   discuss prescriptions?

23   A.   We did.  We discussed some prescription writing practices

24   as well.

25   Q.   Tell us about that.  What did you say to him and what did

G337M1R4                  Muller - direct

1    he say to you?

2    A.   We asked him about his prescriptions for oxycodone 30

3    milligrams.

4    Q.   And what did he indicate?

5    A.   He indicated that that wasn't the only drug he prescribed

6    for pain.

7    Q.   Can you describe the defendant's demeanor during the course

8    of this interview?

9    A.   Pleasant.

10   Q.   Did it change at any point?

11   A.   It did.

12   Q.   Tell us about that.

13   A.   When we asked the question about his writing prescriptions

14   for oxycodone.

15   Q.   How did it change at that point?

16   A.   The defendant became very agitated.

17   Q.   You mentioned that one of the other subjects that came up

18   were employees.

19   A.   Yes.

20   Q.   Can you tell us a little bit about that.

21   A.   We discussed a former patient and former employee of his,

22   Omar Sanders, how Mr. Sanders started out his relationship with

23   the defendant as a patient.  That relationship then

24   transitioned into Mr. Sanders being employed by him at his

25   clinic, and then Mr. Sanders was let go.

1   Q.   You mentioned that there was a second time when you

2   interviewed the defendant.

3   A.   We did.

4   Q.   When was that?

5   A.   In October of 2014.

6   Q.   And where did that interview take place?

7   A.   Once again at the 33rd Precinct.

8   Q.   Why were you and the defendant at the 33rd Precinct?

9   A.   The clinic was once again -- an armed robbery had occurred

10  at the clinic.

11  Q.   When did this occur?

12  A.   In October of 2014.

13  Q.   Who was present for this interview of the defendant?

14  A.   Myself, Task Force Officer Victor Lebron and Special Agent

15  Robert Polimeno and the defendant.

16  Q.   Other members of the investigative team and the defendant?

17  A.   Yes.

18  Q.   And again was the DEA investigating this robbery?

19  A.   We were not.

20  Q.   So why were you present?

21  A.   Once again in an effort to learn more about the practice.

22  Q.   OK.   And let's talk through that interview.   How long did

23  the interview last?

24  A.   Similar timeframe, between 30 and 40 minutes roughly.

25  Q.   And what subjects were discussed during that interview?

1    A.   Briefly discussed the robbery.  We discussed issues at the

2    clinic regarding employees.  We discussed methods of payment

3    again, how the doctor was dealing with some of the issues at

4    the clinic.

5    Q.   Let's talk through each of those a bit.  You mentioned

6    patients.  What was the conversation with respect to patients?

7    A.   The doctor indicated to us that he saw between ten and 20

8    patients a day.

9    Q.   And let me just stop you there.  Was that statement

10   consistent or inconsistent with what you were observing?

11   A.   It was not consistent with what we were observing.

12   Q.   You talked about method of payment.

13   A.   Correct.

14   Q.   What did you say to him and what did he say to you?

15   A.   We once again inquired about the method of payment that he

16   accepted.  He indicated to us that he did accept limited forms

17   of insurance, and for those individuals that weren't covered by

18   those forms of insurance, they had to pay $300 in cash for a

19   visit.

20   Q.   So the price had gone up from $200 to $300 at this point?

21   A.   That's correct.

22   Q.   Did he indicate how much cash he was collecting a day?

23   A.   He told us that he collected about $1,000 a day.

24   Q.   So at $300 a patient, that would be three to four patients

25   in cash a day?

1   A.  That's correct.

2   Q.  Did you discuss physical therapy?

3   A.  Yes.  The doctor indicated to us that he gets a hundred

4   percent involvement in physical therapy and hydrotherapy.

5   Q.  So that's a hundred percent of his patients?

6   A.  That's what he said.

7   Q.  You mentioned that one of the other subjects that came up

8   were employees.

9   A.  Yes.

10  Q.  Tell us a little bit about that.

11  A.  We discussed a couple of former employees of his and

12  briefly discussed a present employee at that time.

13  Q.  Let's start with the present employees.  Who are some of

14  the present employees that the defendant identified?

15  A.  The defendant indicated to us that an individual by the

16  name of Damon Leonard was currently employed at his clinic.

17  Q.  And former employees?

18  A.  Former employees were Jomaris Javier and Augustine Cruz.

19  Q.  In what context did Mr. Cruz and Ms. Javier come up?

20  A.  In the context of employees that he has had problems with

21  in the past.

22  Q.  What sorts of problems did the defendant indicate he had

23  had with these employees?

24  A.  With -- can I do one at a time?

25  Q.  Please.

C337MIR4                    Muller - direct

1   A.  With Ms. Javier he had an initial issue with her where he

2   observed her involved in something on the computer manipulating

3   patients' files, so she was fired for that.  She wrote an

4   apology letter to the doctor, and at that point the doctor then

5   rehired her, only to then refire her again for similar conduct

6   in the office.

7           While discussing Ms. Javier, he also indicated that he

8   suspected that she might have had something to do with the

9   first robbery at the clinic.

10  Q.  The robbery in September of 2013?

11  A.  That's correct.

12  Q.  Anything else about Ms. Javier?

13  A.  Not that I can recall.

14  Q.  How about Mr. Cruz?

15  A.  Mr. Cruz was discussed in the same light as Ms. Javier as

16  part of a problem employee.  Mr. Cruz was employed to be the

17  computer IT guy at the clinic.  The doctor indicated to us that

18  he had suspicions that Mr. Cruz had involvement in turning off

19  a security panic button in the office, which he indicated to us

20  that led him to believe that he was involved in potentially

21  planning the robbery.

22  Q.  So the defendant thought that both Mr. Cruz and Ms. Javier

23  were involved in planning the robbery in 2013?

24  A.  He also suspected a former security guard as well.

25  Q.  And who was that former security guard?

1   A.  It wasn't indicated at that time by name.

2   Q.  You mentioned that one of the things the defendant talked

3   about in addition to that were sort of issues at the practice?

4   A.  Yes.

5   Q.  What were some of the issues the defendant highlighted?

6   A.  The defendant told us that he was aware that he had fake

7   patients in his clinic; he was aware they were also presenting

8   fake paperwork where MRIs were being whited out.  He told us

9   that he tries to make an effort every day to clean house, and

10  he had expelled anywhere from 100 to 200 of these fake

11  patients.

12  Q.  Did he indicate how he tried to identify fake patients?

13  A.  The defendant indicated to us that he used psychology to

14  try to identify fake patients.  He would analyze people over a

15  period of time.  He would watch their pupils and try to

16  determine their levels of aggression, all the while trying to

17  determine whether they were a fake patient or not.

18  Q.  Did you discuss security at the clinic?

19  A.  A little bit.

20  Q.  So what did he say to you and what did you say to him?

21  A.  We asked him if there was security.  He indicated to us he

22  had a panic button, he had an alarm system in there now.  And I

23  can't recall further.

24  Q.  How about security guards?

25  A.  He previously employed a security guard that he said he had

1  to watch for over a 30 day period analyzing his behavior.  And

2  he also fired that individual thinking that he had something to

3  do with the robbery as well.

4  Q.  Did you discuss the use of the New York City Police

5  Department?

6  A.  He indicated to us that he would have liked to have had a

7  New York City police officer work for him.

8  Q.  In what capacity?

9  A.  As a security guard.

10  Q.  How about with respect to the defendant's role within the

11  clinic, what did he say about that?

12  A.  The defendant indicated to us that it was his job to watch

13  and analyze everything.  We asked him the question:  There is

14  nothing in this practice that goes on without your knowledge?

15  And he indicated to us yes.

16  Q.  Yes, there is nothing that goes on in his practice without

17  his knowledge?

18  A.  That's correct.

19  Q.  Now, you mentioned as part of the investigation you and

20  other agents engaged in search warrants.

21  A.  We did.

22  Q.  What's a search warrant?

23  A.  A search warrant is a court authorized order to search a

24  particular location.

25  Q.  And which locations did you search?

1  A.   We executed search warrants on December 2014 at the clinic

2  and at the residence of the defendant.

3  Q.   Did you participate in either of those searches?

4  A.   I did.

5  Q.   With which did you participate in?

6  A.   At the clinic.

7  Q.   When did that search occur?

8  A.   In the morning hours of December 11, 2014.

9  Q.   And can you describe in general terms what you saw when you

10  came in the clinic.

11  A.   Upon opening the door, you would immediately to your right

12  see lined-up plastic chairs commonly seen in various waiting

13  rooms.   Immediately to your left there was a closed door.

14  Immediately to your front there was a wooden reception desk

15  that was L shaped.   Next to the chairs along the right wall

16  there were three doors.   At the time of the search warrant the

17  first two rooms were being utilized for storage.   The third

18  room was the private office of Dr. Mirilishvili.   At the very

19  back of the office, past the reception desk, there was a door

20  that led to a bathroom where a refrigerator was.   And there was

21  a TV wall mounted in the corner of the office.

22  Q.   Did you guys take any photographs while executing the

23  search?

24  A.   We did.

25        MR. DISKANT:   If we can bring up for the witness only

1   what have been marked for identification purposes as

2   Government's Exhibits 1-A, B, C, D, E, F and G.

3   Q.  Special Agent Muller, do you recognize these photographs?

4   A.  I do.

5   Q.  What are they?

6   A.  Those are photos from inside the office on the day of the

7   search warrant.

8   Q.  Are they fair and accurate depictions of what you saw

9   inside the office during that search warrant?

10  A.  Yes, sir.

11          MR. DISKANT:  Your Honor, the government offers

12  Government's Exhibits 1A through G.

13          MR. GOSNELL:  No objection.

14          THE COURT:  Admitted.

15          (Government's Exhibits 1-A through 1-G received in

16  evidence)

17  Q.  You mentioned, Special Agent Muller, that as you came in

18  there was sort of a main area.

19  A.  Correct.

20  Q.  Can we go to 1-E.  What are we looking at here?

21  A.  What you are looking at right there is what I stated

22  before, when you entered the office that wooden reception desk

23  is that dark desk you see right in front of you.  And you can

24  see the chairs that are lined up next to your right as you are

25  standing in the entranceway of the clinic.

1   Q.  If we can go to 1-F.

2   A.  Once again, this is a little bit better point of view of

3   that area where you can see those two doorways and the rows of

4   chairs.

5   Q.  So let's talk about the doorways.  It looks like there is

6   an initial doorway right in front.  What was in that room?

7   A.  Just used for storage is what appeared to us.

8   Q.  Then it looks like a second doorway just past the no

9   smoking sign.

10  A.  That's correct.

11  Q.  What was inside that room?

12  A.  That room did contain one of the shorter exam tables that

13  are typically in a physician's office, but there were boxes on

14  top of it that had rubber gloves and that kind of stuff.

15  Q.  OK.  And the third door all the way furthest down?

16  A.  That's the doctor's office.

17  Q.  So if we could go to 1-C.  What are we looking at here?

18  A.  That's Dr. Mirilishvili's actual office.

19  Q.  So this is what was inside that third door?

20  A.  That's correct.

21  Q.  And roughly how large is this room?

22  A.  Pretty small, like maybe six foot by eight foot maybe.

23          MR. DISKANT:  Ms. Joynes, if we could go back to

24  Government Exhibit 1-E.

25  Q.  Special Agent Muller, we have been talking about the

1   doorways that are on I guess the right side of this photograph;

2   is that right?

3   A.  Yes.

4   Q.  Is there any doorway on the left side of this wall that the

5   desk is on?

6   A.  Yes.

7   Q.  What did they lead to?

8   A.  So if you are that picture right now, right to your

9   immediate left there is a closed door that's right next to the

10  entrance door.  Right on the other side of the reception desk

11  there is another door right to your left kind of right -- you

12  can see the outline of the frame of it there in the photo.

13  Q.  OK.  Towards the very back of the wall?

14  A.  Right, on the left-hand wall, flush on the left-hand wall.

15  Q.  Did you go inside that room?

16  A.  I did.

17  Q.  Bring up Government Exhibit 1-B.  What are we looking at?

18  A.  This is if you were to enter that door that's just past the

19  reception desk, you would be looking immediately to the right

20  as to what was behind the door.  You would see these two

21  physical therapy beds there.

22  Q.  And if you looked to the left, would you see anything?

23  A.  Yes.

24  Q.  What would you see?

25  A.  Various equipment, like a stair stepper, elliptical

1   machines, that kind of stuff.

2   Q.  If you can go to 1-G.  What are we looking at now?

3   A.  Yes, some physical therapy equipment that was in there.

4   Q.  How big is this room?

5   A.  Probably like train car size wide, maybe a little bit more

6   narrow than that, and then maybe 25 foot deep approximately.

7   Q.  Or long?

8   A.  Yeah.

9   Q.  In addition to taking photographs during this search, did

10  you find anything else?

11  A.  Yes.

12  Q.  What did you find?

13  A.  We found documents.  We found two computers, two DVR

14  recorders.

15  Q.  And starting with the document, what sorts of documents did

16  you find?

17  A.  We found documents that would be part of a patient file.

18  We found some receipts for money orders, things like that.

19  Q.  You should have in front of you, Special Agent Muller, what

20  I have marked for identification purposes as Government's

21  Exhibits 401 through 424.

22  A.  OK.

23  Q.  Do you recognize those documents?

24  A.  Correct.

25  Q.  Are these some of the documents you recovered from the

1   defendant's clinic during the search?

2   A.  That's correct.

3          MR. DISKANT:  The government offers Government's

4   Exhibits 401 through 424.

5          MR. GOSNELL:  No objection.

6          THE COURT:  Admitted.

7          (Government's Exhibits 401 through 424 received in

8   evidence)

9   Q.  Special Agent Muller, you should also have Government

10  Exhibit 443, 444 and 445 in that folder as well.

11  A.  I do.

12  Q.  Do you recognize those?

13  A.  I do.

14  Q.  What are those?

15  A.  443 are the receipts for money orders.  444 is like a

16  patient roster, patient list.  And 445 is an appointment notice

17  form.

18  Q.  Additional documents you recovered from the defendant's

19  office?

20  A.  That's correct.

21          MR. DISKANT:  The government offers Government

22  Exhibits 443, 444 and 445.

23          MR. GOSNELL:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibits 443, 444 and 445 received in

1    evidence)

2    Q.  The documents we have just been talking about, where were

3    they recovered from?

4    A.  From the reception desk area of the office.

5            MR. DISKANT:  If we can go back, Ms. Joynes, for a

6    moment to Government Exhibit 1-E.

7    Q.  You are referring to that black table.

8    A.  That's correct.

9    Q.  Did you find anything from inside the defendant's office?

10   A.  We did.

11   Q.  What did you find?

12   A.  Inside the defendant's office we found a computer, two DVR

13   recorders, and as far as documents goes we found a couple

14   little notebooks.

15   Q.  OK.  All right.  I am handing you what have been marked for

16   identification purposes as Government Exhibit 441 and 442.  Do

17   you recognize these?

18   A.  I do.

19   Q.  How do you recognize them?

20   A.  It's my signature on the evidence voucher affixed to the

21   bag as saying I acquired them.

22   Q.  And these are notebooks that were recovered from the

23   defendant's office?

24   A.  That's correct.

25           MR. DISKANT:  At this time the government would offer

 1   Government Exhibit 442.

 2              MR. GOSNELL:  No objection.

 3              THE COURT:  Admitted.

 4              (Government's Exhibit 442 received in evidence)

 5              MR. DISKANT:  If we can bring up, Ms. Joynes,

 6   Government Exhibit 442 for just a moment, and go to page 4 of

 7   that exhibit.

 8   Q.  Focusing on the bottom half of the screen, Special Agent

 9   Muller, where it says "probably more predictive," and below

10   that it says "selling prescription drugs" and "prescription

11   forgery," do you see that?

12   A.  I do.

13   Q.  Can you read the fifth at the bottom?

14   A.  "Obtaining prescription drugs with no" -- "from nonmedical

15   source".

16   Q.  If you go to the next page.  Can you read number 7.

17   A.  "Concurrent abuse of elicit drugs."  I can't --

18   Q.  Is there a word in between there?

19   A.  Yeah, but I can't -- "related illicit drugs"?

20   Q.  Let's go to page 30 of the notebook.  Special Agent Muller,

21   just starting on the top left under the word liver.  Vicodin.

22   Do you know what Vicodin is?

23   A.  I do.

24   Q.  What is that?

25   A.  A Schedule 2 controlled substance.

1   Q.  Just moving down that list a little bit more, do you

2   recognize any of the other names there?

3   A.  I do.

4   Q.  What are they?

5   A.  Dilaudid, Percocet, Percodan, Roxicet, Tylox, Endocet,

6   Opana.  These are all opioid-based painkillers.

7   Q.  Controlled substances?

8   A.  Yes.

9   Q.  You mentioned, by the way, that there were computers

10  recovered during the search?

11  A.  There were.

12  Q.  Did you review them?

13  A.  I did.

14  Q.  What did you find?

15  A.  There wasn't a lot of material on the computers.  Some

16  scanned copies of some lab reports, some scanned copies of

17  prescriptions, things like that.

18  Q.  Where were the computer located?

19  A.  There was one in the reception desk, and then there was

20  one -- if you remember the photo of the doctor's office, you

21  could you see the computer on the table.

22  Q.  OK.  And just going back to the patient issues.  We talked

23  a little bit 401 through 424.  Did you recover patient files or

24  documents from any other location during the course of the

25  investigation?

1    A.  We did.

2    Q.  From where?

3    A.  From the residence.

4    Q.  Did you participate yourself in that search?

5    A.  I did not.

6    Q.  Have you reviewed the documents that were recovered from

7    that search?

8    A.  I have.

9    Q.  Directing your attention to what is marked as Government's

10   Exhibits 501 through 524, do you recognize those?

11   A.  I do.

12   Q.  What are they?

13   A.  These are some of the patient files that were recovered

14   from the house.

15           MR. DISKANT:  At this time the government would offer

16   Government's Exhibits 501 through 524 subject to connection.

17           MR. GOSNELL:  No objection subject to connection.

18           THE COURT:  OK.  What that means, ladies and

19   gentlemen, is I'm going to admit them temporarily, and we're

20   going to see -- we are expecting some other evidence to come in

21   later that will allow me to admit them fully and finally.  All

22   right?  If it doesn't come in, you will never see it.  Admitted

23   subject to connection.

24           (Government's Exhibits 501 through 524 received in

25   evidence)

```
 1              MR. DISKANT:  Thank you, your Honor.
 2   Q.  Special Agent Muller, were you able to identify Jose
 3   Lantigua's file?
 4   A.  Yes.
 5              MR. DISKANT:  Ms. Joynes, if we can bring up page 3 of
 6   Government Exhibit 510.
 7   Q.  And, Special Agent Muller, this appears to be a scanned
 8   copy.  Do you have the original in front of you?
 9   A.  OK.
10   Q.  You do?
11   A.  I do.
12   Q.  OK.  Can you describe what you are looking at.
13   A.  This is a document that was recovered.  It has a bunch of
14   it looks to be it has body types and then it has codes written
15   next to them.  On the back page there is a yellow sticky.
16   Q.  Other than the yellow sticky on the back page, is there any
17   other handwriting on this sheet?
18   A.  There are.
19   Q.  Where?
20   A.  At the very top of the front page it has Lantigua, Jose
21   written, birth date of 5/6/1975, indicates the date he was at
22   the clinic and the word cash written at the top.
23              MR. DISKANT:  Ms. Joynes, if we can just go to the
24   next page of this.
25   Q.  You mentioned that Mr. Lantigua went in multiple times.
```

1    A.  Correct.

2    Q.  If we can go to page 16 of this exhibit.  Was 9/12/13,

3    September 12, '13, one of one of those dates?

4    A.  Yes.

5    Q.  Can we go to the next page.  Special agent, you testified a

6    few moments ago about a Post-it.  Is there a Post-it on that

7    page as well?

8    A.  It is.

9    Q.  Is that the square?

10   A.  It's a yellow Post-it note.

11   Q.  And can you read what it says.

12   A.  It says "VASN-0."  I can't make out the first letters.

13   "Side of" it looks like, and then it says "ortho hydro" -- and

14   I can't make out the last word.

15   Q.  Any other notes on that page other than that and the word

16   cash?

17   A.  Could you say that again, please.

18   Q.  Sure.  Is there any other handwriting on the documents you

19   are looking at other than that Post-it and the words cash up

20   top?

21   A.  Just his name, his date of birth and the date he was seen.

22   Q.  OK.

23          MR. DISKANT:  Your Honor, may I have a moment?

24          Nothing further.

25          THE COURT:  You may inquire.

 1              MR. GOSNELL:  Thank you, your Honor.

 2   CROSS EXAMINATION

 3   BY MR. GOSNELL:

 4   Q.  Special Agent Muller, you would agree with me as a DEA

 5   agent that for a doctor to prescribe oxycodone that's something

 6   that can be a legal thing for a doctor to do, right?

 7   A.  Yes.

 8   Q.  And for a patient to receive oxycodone pursuant to a

 9   prescription, that's also something that's legal to do.

10   A.  Correct.

11   Q.  That's part of the intended use of oxycodone, correct?

12   A.  That's correct.

13   Q.  And you indicated during your direct examination that it

14   had the same active ingredient as heroin; is that right?

15   A.  It's semisynthetic.  It's an opioid-based drug, yes.

16   Q.  And there is no legal use for heroin.

17   A.  No.

18   Q.  It's a very different drug from oxycodone in the sense that

19   the DEA allows doctors to prescribe oxycodone under certain

20   circumstances, correct?

21   A.  Two separate drugs, two separate schedules under the

22   Controlled Substance Act, yes.

23   Q.  And oxycodone can be used to treat chronic pain?

24   A.  I'm not a physician, so I don't think I can answer that

25   question.

 1   Q.  You don't know the difference medically speaking between

 2   chronic pain, cancer pain, and other types of pain, correct?

 3   A.  Well, I'm sure they're all very different in their own way.

 4   Q.  You don't have any --

 5   A.  I don't know if I can answer that question.  Can you phrase

 6   it in maybe a different way?

 7   Q.  Sure.  Do you have any medical training in the differences

 8   between cancer pain, chronic pain and other types of pain?

 9   A.  No.

10   Q.  And you would agree with me that the only legal way for a

11   patient to receive oxycodone would be to get a prescription

12   from a doctor and to go to a pharmacy and fill it.

13   A.  Providing that all the appropriate steps that take place,

14   each of those events occur, then that would be a legal drug

15   order, yes.

16   Q.  A patient can't just walk inside of a pharmacy and ask for

17   oxycodone and get it; that wouldn't be legal.

18   A.  Correct.

19   Q.  And you're aware obviously because of your affiliation with

20   the DEA that oxycodone can be diverted from its legal use,

21   correct?

22   A.  Very much so.

23   Q.  It can be stolen?

24   A.  Correct.

25   Q.  It can be sold on the street?

 1   A.  Correct.

 2   Q.  A prescription, a blank prescription pad can be stolen?

 3   A.  Absolutely.

 4   Q.  And somebody can write in the prescription and go to a

 5   pharmacy and try to get it filled?

 6   A.  That's correct.

 7   Q.  And a legitimately written prescription can be stolen,

 8   correct?

 9   A.  That's correct.

10   Q.  Those are all different forms of diversion.

11   A.  Correct.

12   Q.  It's also diversion if let's say I were to get an oxycodone

13   prescription legitimately, and I were to go to the pharmacy and

14   I were to fill my prescription, and I took most of the pills,

15   but at the end there are a couple left over and I didn't feel

16   any pain anymore, I can't sell those, right?

17   A.  No.

18   Q.  That would be illegal?

19   A.  That would be illegal, yes.

20   Q.  You couldn't give them away to somebody.  That wouldn't be

21   legal.

22   A.  That would be not advised either.

23   Q.  It wouldn't be legal.

24   A.  That's correct.

25   Q.  And you are aware because oxycodone is such a regulated

1   commodity that it has a lot of value on the street, correct?

2   A.  Yes.

3   Q.  You are aware that a single pill can fetch up to $20 on the

4   street.

5   A.  Or more.

6   Q.  Or more.  But at least $20.

7   A.  Correct.

8   Q.  And you saw that in this case with some of the witnesses

9   outside the clinic, correct?

10  A.  Correct.

11  Q.  Some people outside the clinic were buying pills upwards of

12  $20 a pill.

13  A.  Correct.

14  Q.  And for a prescription for 90 pills, that's somewhere in

15  the neighborhood of $1800 per 90 pill prescription?

16  A.  Roughly on the black market about that.

17  Q.  And you would agree with me that prescriptions that aren't

18  filled yet -- even if they are legitimate prescriptions --

19  they're not worth as much on the street as the actual pills

20  themselves.

21  A.  Prescriptions themselves for an oxycodone prescription

22  unfilled can still be quite valuable.

23  Q.  But not as valuable as the pills themselves, on average.

24  A.  Look, I'd love to give you the yes answer on that, but the

25  thing is that in different parts of the country that can be a

1   very different circumstance.

2   Q.  I'm talking about -- we are in New York.

3   A.  Even in different parts of New York City that can be a very

4   different circumstance.  It all depends on the violater's

5   ability to move that prescription to the black market.

6          Because what happens is as prescriptions begin to be

7   identified as being fraudulent either through their face value

8   or the prescriber is known to be involved in criminal conduct,

9   these prescriptions and pharmacies will identify them, and they

10  will immediately say we're not filling those prescriptions.

11  So, when you can find somewhere that will fill that

12  prescription, that prescription is very valuable.

13  Q.  OK.  But again you have to go to the pharmacy to fill it,

14  right?

15  A.  Yes.

16  Q.  And there are certain safeguards at pharmacies, correct?

17  A.  They're guidelines, yes.

18  Q.  And some pharmacists follow them better than others.

19  A.  Correct.

20  Q.  And you would agree with me you can also have a stolen

21  blank prescription pad and you can write it in.  Again that's

22  diversion?

23  A.  It is.

24  Q.  It can be valuable?

25  A.  Exactly.

1    Q.   OK.  And you can also just create a complete forgery.

2    A.   Yes.

3    Q.   And that has a different value on the street, but it's

4    still a way you can divert oxycodone, correct?

5    A.   If you can fill it, it's got value.

6    Q.   Because oxycodone, the pills and the prescriptions, are so

7    valuable on the street, patients and doctors can be targeted by

8    people who want to obtain those pills and prescriptions, right?

9    A.   Targeted in which sense?

10   Q.   They can be targeted by people who want to obtain the pills

11   illegally, right?

12   A.   In kind of a loose sense, yes.  I mean more specifically

13   Joe Schmoe doctor on the corner --

14   Q.   Special agent, it's a yes or no question.

15   A.   I disagree.

16          THE COURT:  OK, the answer is no.  Next question.

17          He is going to ask you questions that can be answered

18   yes or no, and if you disagree, say no.

19   Q.   But you agree that people who can obtain a legitimate

20   oxycodone prescription can be harassed by other people who want

21   to obtain them.

22   A.   I have never been aware of people being harassed for their

23   oxycodone prescriptions.

24   Q.   You said that you did physical surveillance in this case?

25   A.   That's correct.

1   Q.  You said that you were outside of Dr. Mirilishvili's clinic

2   twice a week for years?

3   A.  For almost two years, one or two days a week.

4   Q.  And you saw patients go inside.

5   A.  Correct.

6   Q.  You saw patients leave?

7   A.  Correct.

8   Q.  And when you saw them leave, you saw people approaching

9   them, asking them questions?

10  A.  Those patients that were being approached were bringing

11  those prescriptions back to the individual who paid for their

12  visit to go in the office.

13  Q.  You saw them pay for the visit to go in the office; is that

14  your testimony, yes or no?

15  A.  We saw them --

16  Q.  No, no, not we.

17          THE COURT:  No, no.  Did you see money change hands?

18          THE WITNESS:  We did not see money change hands

19  outside, no, but we saw the individual exit the clinic, meet

20  with individuals --

21  Q.  So the answer was no.

22          THE COURT:  You've answered his question.  He asked if

23  you saw money change hands, and the answer was no.

24  Q.  The patient would leave the clinic, and you would go, and

25  you would see them give their prescription to somebody else,

1   correct?

2   A.   No.

3   Q.   You would see them get in other people's cars.

4   A.   Correct.

5   Q.   And you would see them hand over prescriptions at that

6   point.

7   A.   Well, I can't see in the car; I'm not in the car.

8   Q.   You would see them travel to a pharmacy, correct?

9   A.   We would follow the car, go to the pharmacy, yes.

10  Q.   And you specifically did that.

11  A.   I specifically watched vehicles leave the clinic and

12  followed them right to pharmacies, yes.

13  Q.   And you saw the patient get out and come back from the

14  pharmacy -- get out, go in the pharmacy and come back from the

15  pharmacy.

16  A.   Correct.

17  Q.   And it was your assessment at that point that that person

18  was diverting oxycodone.

19  A.   When seeing things like that take place, yes, that was our

20  assessment.

21  Q.   And when you would go down the street, or down the block,

22  or to other places where the pharmacies were, was Dr.

23  Mirilishvili with you when you were doing that?

24  A.   I don't understand.

25  Q.   Was Dr. Mirilishvili in the car with you when you were

1  following people to pharmacies?

2  A.  No.

3  Q.  Was he on foot with you when you would walk behind people

4  to pharmacies?

5  A.  No.

6  Q.  You would agree with me that people who are able to obtain

7  a legitimate prescription for oxycodone, that sometimes people

8  will try to steal those from them?

9  A.  Steal the prescription after a legitimate prescription has

10 been obtained?

11 Q.  Correct.

12 A.  I'm not aware of --

13        THE COURT:  Have you ever known that to happen, yes or

14 no?

15        THE WITNESS:  No, I've never known that to happen.

16        THE COURT:  Next question.

17 Q.  You are aware in this case that there were two robberies of

18 Dr. Mirilishvili's clinic, correct?

19 A.  That's correct.

20 Q.  A robbery on September 23 of 2013?

21 A.  Correct.

22 Q.  There was a robbery on October 16 of 2014?

23 A.  Correct.

24 Q.  Both of those robberies involved multiple individuals

25 entering the clinic?

 1   A.  That's correct.

 2   Q.  Both of those robberies involved multiple people with guns?

 3   A.  Correct.

 4   Q.  And both of those robberies occurred when both Dr.

 5   Mirilishvili was there as well as patients of his.

 6   A.  That's correct.

 7   Q.  Would it be fair to say that violence can be used to try to

 8   obtain prescriptions?

 9   A.  Yes.

10   Q.  Now, you would agree with me that doctors who are

11   prescribing oxycodone can also be targeted by individuals who

12   want to obtain those prescriptions illegally.

13   A.  Yes.

14   Q.  People, for example, posing as patients?

15   A.  It could happen, yes.

16   Q.  And it happened here, correct?

17   A.  People posing as patients bringing in fake documents to get

18   to obtain a prescription for oxycodone, after the document they

19   bring in is reviewed by the doctor and they get issued the

20   prescription.

21   Q.  Special Agent Muller, the answer to my question is a yes or

22   a no.  Which is it?

23   A.  Can you say your question again, please.

24           THE COURT:  Read the question, please.

25           (Record read)

1   A.   Yes.

2   Q.   You are aware that people can go into a patient visit with

3   a doctor --

4           THE COURT:  Can I just interrupt?  This is simply a

5   matter of form.  Anybody can do anything.  All right?

6           MR. GOSNELL:  I will rephrase, your Honor.

7           THE COURT:  Thank you.

8   Q.   In this case you are aware that someone that was working

9   for the DEA as an informant had a patient visit with Dr.

10  Mirilishvili.

11  A.   Yes.

12  Q.   And he was instructed -- that's Jose Lantigua.

13  A.   Yes.

14  Q.   He was instructed to speak to the doctor?

15  A.   Correct.

16  Q.   He was instructed to provide Dr. Mirilishvili with

17  paperwork.

18  A.   Correct.

19  Q.   He was instructed -- and again instructed by you, correct?

20  A.   That's correct.

21  Q.   He was instructed by you to provide Dr. Mirilishvili with

22  his medical history.

23  A.   Not his medical history, just an MRI and a referral that

24  were fake.

25  Q.   And he was supposed to -- according to your instructions

1    then, he was supposed to go in and remain mute throughout the

2    patient visit.

3    A.  The instructions given to him were to bring these documents

4    into the clinic.

5    Q.  And what was he supposed to do according to your

6    instructions after that?

7    A.  I wasn't in the clinic.  I don't know what was taking place

8    in the clinic.

9    Q.  According to your instructions, what was he supposed to do

10   after that?

11   A.  He was to instruct the doctor when being questioned by the

12   doctor that he was not in pain.

13   Q.  All right.  We will get back to that.

14           You said that with respect to Jose Lantigua, that he

15   would go inside on multiple occasions -- eight occasions you

16   said -- and he would be seen by Dr. Mirilishvili, and he would

17   come outside with an oxycodone prescription, correct?

18   A.  That's correct.

19   Q.  And on each of those occasions he recorded those

20   encounters, correct?

21   A.  Correct.

22   Q.  You listened to those encounters.

23   A.  No.

24   Q.  You never listened to the encounters between Dr.

25   Mirilishvili and Jose Lantigua?  Yes or no.

1    A.  I have listened to the recording which is in Spanish.  I've

2    read the transcript that was produced from that Spanish

3    recording -- from the Spanish conversation.

4    Q.  For each of those recordings, correct?

5    A.  Correct.

6    Q.  OK.  And you would agree with me that the actual recording

7    and the transcript are actually the best evidence of what

8    happened during the patient visit between Dr. Mirilishvili and

9    Jose Lantigua.

10   A.  I think, yes, I think it's a good snapshot of what

11   happened, yes.

12   Q.  It only shows of course what is going on inside, and it's

13   only audio, correct?

14   A.  There is instances of video as well.

15   Q.  Inside the patient room with Dr. Mirilishvili?

16   A.  Yes.

17   Q.  OK.  So you watched those.

18   A.  Correct.

19   Q.  And you would agree with me that when Jose Lantigua was

20   inside during a patient visit with Dr. Mirilishvili, he

21   indicated that he was in pain on the initial visit?  Yes or no.

22            MR. DISKANT:  Objection.

23            THE COURT:  The objection is sustained.  And don't try

24   it again.

25   Q.  Now, you said that -- earlier you said that doctors can be

G337M1R4                    Muller

1   targeted by people who want to obtain prescriptions.

2   A.  They can.

3   Q.  You would agree that it's reasonable for a doctor to want

4   to take precautions to protect himself and to protect his

5   patients, correct?

6   A.  I agree.

7          MR. GOSNELL:  Can we bring up Government Exhibit 4-S.

8          Your Honor, I'm offering Government Exhibit 4-S.

9          MR. DISKANT:  Without objection.

10         THE COURT:  It's admitted.

11         (Government's Exhibit 4-S received in evidence)

12  Q.  Special Agent Muller, what are we looking at here?

13  A.  This is the front of the clinic.

14  Q.  This is the outside of Dr. Mirilishvili's clinic?

15  A.  Yes.

16  Q.  As you see here, there is a ramp leading down, correct?

17  A.  Correct.

18  Q.  So if somebody had a wheelchair, they could go down the

19  ramp with a wheelchair?

20  A.  That's what the ramp was designed for, yes.

21  Q.  And you have a front door there?

22  A.  Correct.

23  Q.  You have tinted windows?

24  A.  Correct.

25  Q.  You have blinds?

1   A.  Correct.

2   Q.  You would agree with me that tinted windows and blinds at a

3   medical office are appropriate?

4   A.  I would disagree with that.  I'm not so sure why the

5   windows to the lobby need to be tinted.

6   Q.  Well, is it your position that people from the outside

7   should be able to see who is going inside to a medical office?

8   A.  I mean the doctor's office inside there is a private office

9   with a door.

10  Q.  So it's your position that people should be able to be

11  identified from the street when they go into a doctor's office,

12  yes or no?

13  A.  I don't think that that's a concern, so my answer would be,

14  yes, they should be able to be identified.  I don't see why

15  there is the need for privacy.

16          THE COURT:  OK, fine, enough.

17  Q.  There also was a security guard at the clinic, correct?

18  A.  Yes, there was.

19          MR. GOSNELL:  Can we bring up Government Exhibit 2-I.

20  Q.  Now, do you see Exhibit 2-I?

21  A.  I do.

22  Q.  And you would agree there are two people standing outside

23  of the clinic?

24  A.  Yes.

25  Q.  One person standing inside of the clinic?

 1   A.  Yes.

 2   Q.  And that's Abraham Correa?  Are you able to tell?

 3   A.  I can't tell if that's him or if that's the previous guy

 4   that was there before.  I'm not sure.

 5   Q.  OK.  But that person was working as a security guard,

 6   correct?

 7   A.  Correct.

 8   Q.  That's something that you observed when you were watching

 9   the clinic on physical patrol and later on by the pole camera,

10   correct?

11   A.  Correct.

12   Q.  And you are also aware that after the first robbery in

13   September of 2013 that Dr. Mirilishvili fired Abraham Correa?

14   A.  Yes.

15   Q.  And he installed a buzzer door system, correct?

16   A.  Correct.

17   Q.  And at some point he had internal surveillance video

18   installed, correct?

19   A.  Correct.

20   Q.  And all of those things would be measures that could

21   protect against people going inside and stealing or hurting

22   people, correct?

23   A.  Correct.

24   Q.  Now obviously that only protects inside the clinic; it

25   doesn't protect what's going on outside, correct?

C337M1R4                          Muller - Cross

1    A.  That's correct.

2    Q.  OK.  So, for example, it doesn't protect -- it doesn't have

3    any effect on what's going on down the block.

4    A.  I would not expect it would, no.

5    Q.  You wouldn't expect it to have any effect inside of a car

6    outside.

7    A.  Correct.

8    Q.  It wouldn't have any effect on what's going on at

9    pharmacies, correct?

10   A.  Correct.

11   Q.  Now, in terms of people going in and posing as patients,

12   you said that people would go in -- in your experience somebody

13   who is trying to pose as a patient would provide fake

14   documentation, correct?  That's one of the things.

15   A.  In this circumstance specifically, or in general?

16   Q.  Let's talk for example Mr. Lantigua.  You created documents

17   for him.

18   A.  I did.

19   Q.  And you created those in order for him to give those to Dr.

20   Mirilishvili.

21   A.  Correct.

22   Q.  And on June 27, 2013 he provided those to Dr. Mirilishvili?

23   A.  I didn't catch the last part.

24   Q.  On June 27, 2013 Jose Lantigua provided those documents to

25   Dr. Mirilishvili.

1   A.  I don't know specifically if he handed those documents to

2   Dr. Mirilishvili.  I know he went into the clinic with those

3   documents in his possession, yes.

4   Q.  Again he came out with a prescription for oxycodone.

5   A.  Correct.

6   Q.  And you filled that prescription for oxycodone, correct?

7   A.  That particular prescription we did.

8   Q.  All right.  And you are aware that whenever a prescription

9   for oxycodone is filled in New York State, there should be a

10  record of it.

11  A.  There is.

12  Q.  Well, there should be.

13  A.  There should be, correct.

14  Q.  And you did -- you filled that prescription in part because

15  you understood that there was a system in place called a

16  prescription monitoring program, correct?

17  A.  Correct.

18  Q.  And the prescription monitoring program is a program that

19  was created by New York State, or that was imposed by New York

20  State that requires doctors to search.

21  A.  Yeah, they have a requirement to query their patient to

22  make sure they're not doctor shopping.

23  Q.  And that requirement began in August of 2013, correct?

24  A.  I don't know when New York State actually put that into

25  effect, I'm not sure.

 1   Q.  You're a DEA agent working in New York, correct?

 2   A.  Right.

 3   Q.  And you are not sure when that was instituted?

 4   A.  I don't have access to New York State record databases

 5   outside of a subpoena.

 6   Q.  OK.  You were aware though when you went to send Jose

 7   Lantigua back inside Dr. Mirilishvili's clinic in August of

 8   2013 that there could be a review of his records on the

 9   prescription monitoring program, correct?

10   A.  Correct.

11   Q.  And so that was in part why you filled the prescription

12   from June 27, 2013, correct?

13   A.  Correct.

14   Q.  You are aware though that the prescription monitoring

15   program is very sensitive in terms of the information that is

16   inputted, correct?

17   A.  You know, it could be -- the data being input could be

18   variations in that, yes.

19   Q.  So, for example, if someone were to input the name Jose

20   Lantigua, that may provide different results if you were to

21   query Lantigua Jose.

22   A.  Correct.

23   Q.  And Mr. Lantigua's full name was Jose Miguel Lantigua

24   Castro, correct?

25   A.  I'm not aware of his last name adding Castro on the end of

1   it.  I was not aware of that.

2   Q.  So if there was ever a prescription filled with Jose Miguel

3   Lantigua Castro, you are not sure if that's the same Jose

4   Lantigua that you were dealing with.

5   A.  The Jose Lantigua we were dealing with --

6            THE COURT:  That's a yes or no question.

7   A.  Could you say it again, please.

8            THE COURT:  He said if a prescription were filled and

9   the name on the bottle was Jose whatever Lantigua Castro.

10  A.  Sorry.  Yes, there could be -- you would have difficulty

11  querying those two.

12  Q.  Is that why you picked Jose Lantigua to go in and be your

13  fake patient?

14  A.  No.

15  Q.  You picked him in part because he was a DEA informant.

16  A.  Correct.

17  Q.  And to become a DEA informant, that's not generally

18  something you do just by calling up on the phone.  It's not

19  done out of the goodness of someone's heart, correct?

20  A.  That's a very, very rare occurrence.

21  Q.  And that did not occur here with Mr. Lantigua, fair to say.

22  A.  Fair to say.

23  Q.  Mr. Lantigua did something that put him in a bad position,

24  and that's why he became a DEA informant, correct?

25  A.  I'm not aware of Mr. Lantigua's onset of being a DEA

1   informant.  He was being handled by other investigators prior

2   to me.

3   Q.  When did he first become an informant?

4   A.  I am not sure of the exact date.

5   Q.  And when did he first become your informant?

6   A.  We started utilizing Mr. Lantigua right prior to this

7   visit.

8   Q.  So sometime in 2013 is when you were dealing with him.

9   A.  Correct.

10  Q.  And again he wasn't doing this out of the goodness of his

11  heart, was he?

12  A.  Well, Mr. Lantigua, we were able to pay him, pay for his

13  phone bill, that kind of thing.

14  Q.  How many phone bills did you pay for?

15  A.  Well, just so we could communicate with him.

16  Q.  How many did you pay for him?

17  A.  I can't remember exactly.  We would buy him minutes for his

18  card.

19  Q.  And that was the only payment that you gave to Mr. Lantigua

20  was putting minutes on a phone?

21  A.  No, he earned payment in other manners as well for

22  gathering information.

23  Q.  So when he would go out on an operation, you would pay him

24  for the information, correct?

25  A.  Correct.

1    Q.  And if you didn't receive information, you wouldn't pay

2    him.

3    A.  No, that's not true.

4    Q.  How many times did you pay him?

5    A.  I don't remember how many times.

6    Q.  How much did you pay him?

7    A.  The amount varied.  I'm not sure.

8    Q.  Are there any reports that would reflect how many times you

9    paid him?

10   A.  Are there reports?  Yes, there would be a DEA report that

11   would reflect he was paid.

12   Q.  And that's something that you would have to fill out.

13   A.  Whomever was handling him at that point in time, yes.

14   Q.  So in 2013, from the time you began handling him until you

15   stopped, you had to fill out reports reflecting how much he was

16   paid and when he was paid, correct?

17   A.  Correct.

18   Q.  And did you that in this case.

19   A.  Yes.

20   Q.  Now, getting back to the testing that can be done on

21   patients who return to doctors, you are aware that another way

22   to check up on a patient to determine whether or not they're

23   diverting oxycodone or not is to do drug testing of the

24   patient.

25   A.  That can be done, yes.

 1   Q.  That was done here.

 2   A.  Yes.

 3   Q.  And Dr. Mirilishvili required that every patient who

 4   returned for a follow-up visit was drug tested.  Yes or no.

 5   A.  That was a requirement.  Drug testing was done, yes.

 6   Q.  And you are also aware though that drug testing isn't

 7   foolproof.

 8   A.  I suppose.

 9            THE COURT:  Isn't what?

10            MR. GOSNELL:  Isn't foolproof.

11            THE COURT:  Isn't foolproof.

12   A.  I suppose there could be deviations in that as well.

13   Q.  Well, people can buy fake urine, for example.

14   A.  Sure.

15   Q.  Right?

16   A.  Correct.

17   Q.  That happened here.

18   A.  Correct.

19   Q.  You are aware that, for example, Damon Leonard who was an

20   office manager at Dr. Mirilishvili's clinic was selling fake

21   urine.  Yes or no.

22            MR. DISKANT:  Objection, your Honor.

23            THE COURT:  The objection is sustained.

24   Q.  Did you observe Damon Leonard with fake urine?  Yes or no.

25   A.  No.

 1   Q.  Did you observe Damon Leonard with a bottle -- an empty

 2   bottle that previously contained urine?

 3   A.  I did not observe him with one, no.

 4   Q.  Did you observe Damon Leonard with pill bottles that had

 5   previously contained urine?

 6   A.  I don't recall seeing that, no.

 7   Q.  You are aware though that he was selling urine to your DEA

 8   informant, yes?

 9            MR. DISKANT:  Objection.

10            THE COURT:  The objection is sustained.

11   Q.  Did you ever instruct Jose Lantigua to buy urine from Damon

12   Leonard?  Yes or no.

13   A.  No.

14   Q.  Did you ever instruct Jose Lantigua to buy fake urine from

15   anybody?

16   A.  No.

17   Q.  Did you ever instruct Jose Lantigua to buy a fake urine

18   report?

19   A.  No, I don't recall that, no.

20   Q.  Sir, you are aware that in order for Jose Lantigua to go

21   back to Dr. Mirilishvili's clinic on August 12, 2013, that he

22   was going to have to provide a urine sample for drug testing,

23   correct?

24   A.  He was asked to provide one urine sample at one period in

25   time.

1    Q.  And he did that.

2    A.  He did it.

3    Q.  And which visit was that?

4    A.  I don't recall.

5    Q.  In the physical records that you have for Jose Lantigua,

6    and in the Practice Fusion records that relate to him, there is

7    a urine test for every single visit.  Yes or no.

8    A.  I -- I don't know specifically.  I could look if you would

9    like me to.

10   Q.  Just whether or not you know.

11   A.  I don't know.

12   Q.  You said on direct examination that the DEA's investigation

13   into Dr. Mirilishvili's clinic began in March of 2013.

14   A.  It was early 2013.  It could have been a month before.

15   Q.  Didn't in fact you begin doing physical surveillance in

16   November of 2012, just a month after it opened?

17   A.  I did not.

18   Q.  Did the DEA?

19   A.  Members of the investigative team had, yes.

20   Q.  Again, Dr. Mirilishvili's clinic opened in October of 2012?

21   A.  Correct.

22   Q.  It opened in Washington Heights?

23   A.  Correct.

24   Q.  As we have seen with the various pictures, it's residential

25   on one side, and if you go further down the block there are

1    some businesses there, right?

2    A.   That's correct.

3    Q.   It's about four doors down from where the business area is?

4    A.   About that, yes.

5    Q.   And it was at the time the only private pain management

6    office there, correct?

7    A.   On this --

8    Q.   In that zip code.

9    A.   I'm not aware if there were any others.

10   Q.   The only other place for pain management in that zip code

11   was Columbia Hospital.  Yes or no.

12   A.   I did not know that.

13   Q.   Again, when the DEA began its surveillance of the area, and

14   when you started your surveillance, you were doing physical

15   surveillance in the area?

16   A.   Correct.

17   Q.   Twice a week, driving around, watching people, taking

18   photographs, that type of thing?

19   A.   That's correct.

20   Q.   And you took thousands of photographs.

21   A.   There were a large number of pictures taken, yes.

22   Q.   More than a thousand?

23   A.   I don't know the exact number.

24   Q.   Close?

25   A.   I honestly don't know the amount.  I'm sorry, I apologize.

1   Q.   There were recordings done, correct?

2   A.   Yes.

3   Q.   And there was a lot of recordings done, correct?

4   A.   Yes.

5   Q.   And you sifted through all of those recordings and all of

6   those photographs, and you presented to us the best ones you

7   had.  Yes or no.

8   A.   We presented -- yes.

9   Q.   And you said on direct examination that sometimes there

10  were people outside of the clinic during the day, correct?

11  A.   Correct.

12  Q.   And there were cars with out of state license plates?

13  A.   Yes.

14  Q.   There were cars with several people inside?

15  A.   Yes.

16  Q.   Again, you couldn't see what was going on inside the car.

17  A.   Yes.

18  Q.   And there were people outside who you knew at some point,

19  correct?

20  A.   Could you rephrase that, please.

21  Q.   Sure.  There were people that were outside the clinic, for

22  example, Omar Sanders, Ray Williams, some other individuals,

23  that you were able to identify.

24  A.   Yes.

25  Q.   OK.  And you never went inside and told Dr. Mirilishvili

1    about your observations of what was going on outside of the

2    clinic, did you?

3    A.   No.

4               (Continued on next page)

G33MMIR5                      Muller - cross

1    Q.  This is Government Exhibit 1207.  You testified about this

2    on direct examination, correct?

3    A.  Yes.

4    Q.  And if you go to the bottom portion of this, the controlled

5    substance registration certificate, there is a DEA

6    registration, correct?

7    A.  Correct.

8    Q.  And there are two numbers there.  There is a BM8 number and

9    XM8 number, correct?

10   A.  Correct.

11   Q.  Those are two different types of DEA licenses?

12   A.  That's correct.

13   Q.  Both of these numbers are specific to Dr. Mirilishvili?

14   A.  That's correct.

15   Q.  So the BM8 number is a normal DEA license, correct?

16   A.  Correct.

17   Q.  And the XM8 license number represents a higher DEA --

18   A.  It's an enhancement to his license.

19   Q.  It allows a doctor to prescribe in different cases than

20   would ordinarily be prescribed under a BM number?

21   A.  It allows him to prescribe certain types of drugs because

22   of that designation.

23   Q.  That otherwise he would not be able to do?

24   A.  Correct.

25   Q.  And you are also aware that because of the XM portion of

 1   the license, that allows the DEA to do additional things that

 2   it wouldn't ordinarily not be able to do?

 3   A.  No.  I don't understand you.

 4   Q.  Because of the XM portion of the license, is the DEA

 5   allowed to do an onsite inspection of Dr. Mirilishvili's

 6   clinic?

 7   A.  They are able to, yes.

 8   Q.  And you were aware that on January 4 of 2013, just three

 9   months after Dr. Mirilishvili's clinic opened, that the DEA

10   inspected his clinic?

11   A.  Yes.  Diversion investigators inspected the clinic, yes.

12   Q.  They met with Dr. Mirilishvili?

13            MR. DISKANT:  Objection.  Foundation.

14            THE COURT:  The objection is sustained.

15   Q.  Are you aware that they met with Dr. Mirilishvili?

16            MR. DISKANT:  Same objection.

17            THE COURT:  Are you aware if there --

18   A.  Yes, I became later that there was, yes.

19   Q.  Are you aware that Dr. Mirilishvili was there and met with

20   the DEA inspectors?

21   A.  I haven't read the report in reference to this --

22            THE COURT:  I don't want to know what anybody told

23   you.  I don't want to know what you read from another source.

24   This is something you know of your own knowledge.  Did you

25   participate in this?

1           THE WITNESS:  I would assume he was there for the

2   interview, yes.

3   Q.  The clinic was open?

4   A.  Once again, yes, I would assume.

5           MR. DISKANT:  Your Honor.

6           THE COURT:  No assumptions.  Strike the answers.  No

7   assumptions.

8           MR. DISKANT:  I think it might help if the witness was

9   asked if he was present for this.

10          THE COURT:  Were you present for this?

11          THE WITNESS:  No, I was not.

12          THE COURT:  Then don't ask him any more questions

13  about it.  Thank you.

14  Q.  Now, you testified that in March of 2013 you were trying to

15  get a DEA informant inside of the clinic to have a patient

16  visit, beginning in March of 2013.

17  A.  The investigation began in March of 2013.

18  Q.  The point of your investigation was to get someone inside

19  to see Dr. Mirilishvili as a patient?

20  A.  That was the ultimate goal, yes.

21  Q.  Again, you had this physical surveillance going on, you

22  were watching people, you were taking photographs, you were

23  taking video, yes?

24  A.  Yes.

25  Q.  And you saw patients coming out of the clinic, being

1   harassed by other people, yes or no?

2   A.   I did not observe that.

3   Q.   In all of the photographs that were presented that you

4   testified about on direct examination, did any of those

5   photographs involve people exchanging money for pills?

6   A.   No.

7   Q.   Did any of those photographs involve people exchanging

8   prescriptions for money?

9   A.   No.

10  Q.   And was Dr. Mirilishvili in any of the photographs other

11  than getting into his car and getting into the medical clinic?

12  A.   No.

13  Q.   As part of your investigation into Dr. Mirilishvili, you

14  became aware of investigations by other authorities, correct?

15  A.   I don't understand.

16  Q.   You said that one of the things that the diversion squad is

17  involved with is checking up about people faking prescriptions,

18  correct?

19  A.   I'm not -- as far as another investigation?

20  Q.   Same investigation.  You were investigating

21  Dr. Mirilishvili's clinic and his practices, correct?

22  A.   Yes.

23  Q.   You were investigating oxycodone prescriptions that were

24  reported to be written by him, correct?

25  A.   Correct.

 1    Q.  So it was important for you, if there were prescriptions

 2    that weren't written by him that were somehow showing up in

 3    your query database, that you ran those leads down?

 4    A.  Not always, no.  It depends on the focus of the

 5    investigation at the time.

 6    Q.  And the focus of your investigation throughout this entire

 7    time was on Dr. Mirilishvili's prescription writing procedures?

 8    A.  Correct.

 9    Q.  If a prescription was not actually written by him that

10    would be important to you?

11    A.  It could, once again, depending on what our focus was at

12    the present time.

13    Q.  You didn't investigate any forged prescriptions in this

14    case, did you?

15    A.  I did not.

16    Q.  Did anybody on your team, that you're aware of?

17    A.  Others on my team may have looked at forged prescriptions,

18    yes.

19    Q.  Who were those people?

20    A.  I don't know.

21    Q.  You are aware though that there were several other

22    investigations regarding forged prescriptions relating to

23    Dr. Mirilishvili's prescriptions, correct?

24    A.  By what law enforcement agencies?

25    Q.  You're aware of the Port Jervis Police Department?

G33MMIR5                          Muller - cross

1    A.  I've never talked to anybody from Port Jervis.

2    Q.  You are not aware that there was an investigation into a

3    forged prescription on June 6 of 2013?

4              MR. DISKANT:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  Again, you testified about Jose Lantigua's June 27, 2013,

7    meeting with Dr. Mirilishvili?

8    A.  Yes.

9    Q.  You sent him in past the security guard?

10   A.  He made his way into the office, yes.

11   Q.  That was Abraham Correa who was working as the security

12   guard, correct?

13   A.  Correct.

14   Q.  And in order for him to get past Abraham Correa you

15   instructed Jose Lantigua to bribe Mr. Correa, yes?

16   A.  Bribes needed to be paid.  It wasn't necessary -- we

17   instructed him that if he was asked for money to gain access,

18   we gave him money to do so, yes.

19   Q.  And he in fact paid money to Mr. Correa, correct?

20   A.  Correct.

21   Q.  He did that outside of the clinic?

22   A.  Correct.

23   Q.  Away from the clinic?

24   A.  Right in the vicinity of the clinic.

25   Q.  He didn't do it in front of Dr. Mirilishvili, did he?

1   A.  I don't know if the doctor was present in that area at the

2   time.  I didn't see him there, no.

3   Q.  Again, you never saw Dr. Mirilishvili on 162nd Street other

4   than getting into his car or getting out of his car and going

5   into the clinic?

6   A.  That's correct.

7   Q.  You provided Mr. Lantigua with, as you said, a fake MRI

8   report?

9   A.  That's correct.

10         MR. GOSNELL:  Can we bring up Government Exhibit 1205.

11  Q.  This was the referral form that you gave Mr. Lantigua?

12  A.  Yes.

13  Q.  Your instruction to Mr. Lantigua was to provide this to

14  Dr. Mirilishvili?

15  A.  To use it to get into the clinic, yes.

16  Q.  To provide it to Dr. Mirilishvili?

17  A.  Yes.

18  Q.  And other than changing his name and his date of birth, you

19  didn't change anything else about this document from the way

20  you received it, correct?

21  A.  Not at all.

22  Q.  For example, Dr. Samarneh, you didn't change that portion

23  of it?

24  A.  Not at all.

25  Q.  The Montefiore Hospital portion, you didn't change that?

 1   A.  Not at all.

 2   Q.  Montefiore is a real hospital?

 3   A.  Yes.

 4   Q.  Dr. Samarneh is a real doctor?

 5   A.  I don't know.

 6   Q.  Did you try to find out if Dr. Samarneh was a real doctor?

 7   A.  I didn't.

 8   Q.  You didn't contact Dr. Samarneh that and letting him know

 9   that you would be using his name in a document?

10   A.  I did not.

11        MR. GOSNELL:  Can we just highlight the third portion,

12   the clinical data portion.

13   Q.  Under clinical data that says pain management, correct?

14   A.  Correct.

15   Q.  Under main complaint, it's lower back pain?

16   A.  That's correct.

17   Q.  Diagnosis is a lumbar spine disc herniation?

18   A.  Correct.

19   Q.  You are not a medical doctor, but you would agree that that

20   is not a normal diagnosis?

21   A.  That's a diagnosis from somebody who has got an issue, an

22   issue, yes.

23   Q.  A lower back issue?

24   A.  Yes.

25        MR. GOSNELL:  Can we go to the second page.  I'm

1    sorry.  The third page.

2    Q.  And this is the MRI report that you provided to Jose

3    Lantigua for him to provide to Dr. Mirilishvili?

4    A.  Yes.

5    Q.  And, again, the only thing you changed here was the

6    patient's name and his date of birth?

7    A.  That's correct.

8    Q.  And the date of this is June 5, 2013?

9    A.  Correct.

10   Q.  Just a couple of weeks before he was set to go see

11   Dr. Mirilishvili?

12   A.  Correct.

13           MR. GOSNELL:  And if you could just blow up the

14   impression part of it.  I am not going to go through the other

15   part.

16   A.  I wouldn't understand it anyways.

17   Q.  So the first impression says that the L1/L2 disk level is

18   posterior disk bulging, is that correct?

19   A.  That's correct.

20   Q.  There is a disk bulge of some sort, whatever it is?

21   A.  Yes.

22           MR. DISKANT:  Your Honor --

23           THE COURT:  It says what it says.

24   Q.  You're not a medical doctor?

25   A.  No.

 1  Q.  You didn't check with a medical doctor before you gave this

 2  to Mr. Lantigua?

 3  A.  No.

 4  Q.  When you handed this to him you didn't know what it said.

 5  You understood there were words on the page, but you didn't

 6  understand what they actually meant to a medical doctor,

 7  correct?

 8  A.  As a lay person reading this, it clearly says that there

 9  is -- somebody would have an issue, yes.  Other than that, the

10  other matters, I would not understand that.

11  Q.  At the bottom it says thank you, signed by Dr. Epstein?

12  A.  Yup.

13  Q.  That's his real signature?

14  A.  I don't know.

15  Q.  Dr. Epstein is a real doctor?

16  A.  I don't know.

17  Q.  St. Barnabas is a real hospital?

18  A.  That is a real hospital, yes.

19  Q.  Dr. Epstein works at St. Barnabas?

20  A.  I don't know.

21  Q.  The address for St. Barnabas that you have listed down

22  there is St. Barnabas' real address?

23  A.  I don't know if that's the real address.  I'm not sure.

24  Q.  The phone number is the real phone number for St. Barnabas,

25  one of them?

1   A.  I don't know.

2   Q.  I assume then, again, you didn't contact Dr. Epstein or

3   look him up to see if he actually existed and ask him whether

4   you could use his paperwork?

5   A.  No.

6   Q.  Now, when you instructed Jose Lantigua to go in and to

7   speak with Dr. Mirilishvili, you show him these documents and

8   reviewed them with him before he went in, correct?

9   A.  We gave him the documents.  As far as reviewing them, other

10  than handing them to him and saying, this is the MRI report,

11  this is the referral, that is it.

12  Q.  You told him to tell the doctor that he suffered a sports

13  injury?

14  A.  No, I don't recall that, no.

15  Q.  You told him to tell Dr. Mirilishvili that he was seen in

16  the emergency room at the hospital?

17  A.  I don't recall instructing him to do that, no.

18  Q.  Again, it was recorded, his meeting with Dr. Mirilishvili?

19          MR. DISKANT:  Your Honor, objection.

20          THE COURT:  Ground.

21          MR. DISKANT:  It seems like in this line of

22  questioning he is trying to sneak in hearsay.

23          THE COURT:  If you hear a question that calls for an

24  answer that would require him into divulging hearsay, please

25  call it to my attention.  That question does not.

 1   A.  Can you say the question again.

 2              MR. GOSNELL:  I'll withdraw it.

 3              THE COURT:  Great.  How much more do you have with

 4   this witness or can we take our afternoon break?

 5              MR. GOSNELL:  I think we can take our afternoon break.

 6              THE COURT:  Let's take our afternoon break, folks.

 7   Don't discuss the case.  Keep an open mind.

 8              (Jury not present)

 9              THE COURT:  Take a break.

10              (Recess)

11              THE COURT:  Are we ready?

12              MR. DISKANT:  We are ready, your Honor.

13              THE COURT:  Don't try to get in hearsay through him

14   because I will get angrier and angrier and angrier.  And what

15   you don't want is for me to get angry in front of the jury.

16              MR. MAZUREK:  You seem angry.

17              THE COURT:  I'm getting there.  Don't push me on this.

18              (Jury present)

19              THE COURT:  Have a seat.  You are still under oath.

20   Q.  Special Agent Muller, I want to go back again to the June

21   27, 2013, patient visit with Dr. Mirilishvili.

22   A.  Ok.

23   Q.  Before you sent Jose Lantigua inside to see

24   Dr. Mirilishvili you gave him a number of instructions?

25   A.  We gave him instructions, yes.

1   Q.  Did you instruct him to tell Dr. Mirilishvili that he

2   injured himself playing basketball?

3   A.  I did not instruct him to tell him that.

4   Q.  Are you aware of anyone else who did?

5   A.  No.

6   Q.  Did you physically inspect Jose Lantigua before he went

7   into see Dr. Mirilishvili?

8   A.  Did I physically, no, I did not physically inspect him.  As

9   far as like if there is -- we do an inspection as far as making

10  sure he doesn't have any contraband on him.  Yes, we do that.

11  As far as any other sort of inspection, no.

12  Q.  Let's take those step by step.  You have a contraband

13  search.  Did you that?

14  A.  Yes.

15  Q.  There was no contraband on him before you sent him in?

16  A.  Correct.

17  Q.  And you did not do a physical inspection of his body before

18  he went inside, correct?

19  A.  No.

20  Q.  Did you see any varicose veins on Mr. Lantigua at any time?

21  A.  No.  I have never seen those parts of his body, no.

22  Q.  That wasn't something that you would have searched in your

23  contraband search?

24  A.  No.

25  Q.  When Jose Lantigua came back to you after he went into the

G33MMUR5                    Muller - Cross

1    clinic and came out, he came back to you and you observed him

2    physically leave the clinic and come back to you, correct?

3    A.  I did not physically observe him.  Others in the

4    surveillance team did.

5    Q.  Were they over the radio to you saying, he's coming to us?

6    A.  Correct.

7    Q.  Then he got into the car with you?

8    A.  No.  He got into one of the other TFO's cars.  Then they

9    drove and we met at an offsite location.

10   Q.  Did you search him again at that time?

11   A.  Yes, we did.

12   Q.  This is a contraband search?

13   A.  Correct.

14   Q.  When you did a contraband search did you seize any

15   paperwork present him?

16   A.  We seized the prescription off him.

17   Q.  Did you seize anything else from him?

18   A.  I don't recall seizing anything off him, no.

19   Q.  Did you seize any referral paperwork?

20   A.  No, I don't remember seizing any other paperwork other than

21   the prescription off of him.

22   Q.  Did you seize a prescription for Elavil off of him?

23   A.  No.

24   Q.  Did you seize a prescription for Neurontin off of him?

25   A.  No.

1   Q.  Did you seize a prescription from Robaxin off of him?

2   A.  No.

3   Q.  You are aware that those are medications?

4   A.  Correct.

5   Q.  You're not a doctor, so you don't know what they are for?

6   A.  Exactly.

7        MR. GOSNELL:  Can we bring up Government Exhibit 210.

8   Q.  Again, this is the Practice Fusion records?

9   A.  Correct.

10  Q.  From Dr. Mirilishvili, is that correct?

11  A.  Yes.

12  Q.  You described on direct examination that these are kind of

13  like Facebook?

14  A.  Like a cloud-based Internet-based services.

15  Q.  It's not something?

16  A.  Not the greatest explanation.  I apologize.

17  Q.  It's not something where the information is posted publicly

18  for people to see?

19  A.  No.

20  Q.  It's uploaded and it's on a site so that a doctor's office

21  can protect that information, right?

22  A.  Yes.  A means of storage, yes.

23  Q.  There are federal laws that require patient health

24  information to be protected?

25  A.  Correct.

1   Q.  You can't just send it out to people or send it to people

2   in the mail if you feel like it, right?

3   A.  No.

4   Q.  So this system, this Practice Fusion system was a protected

5   system, correct?

6   A.  Because of the HIPAA regulations that you just described,

7   yes.

8   Q.  And Dr. Mirilishvili was using that system?

9   A.  Correct.

10  Q.  He had put that in place?

11  A.  Yes.

12  Q.  He told you about that in one of your interviews?

13  A.  Correct.

14  Q.  And on this particular page --

15          MR. GOSNELL:  If we can blow up the information about

16  Jose Lantigua.

17  Q.  It says first name of Jose Miguel?

18  A.  Correct.

19  Q.  Obviously, Jose Miguel is not his first name; it's Jose,

20  correct?

21  A.  Correct.

22  Q.  And Lantigua was his last name?

23  A.  Correct.

24  Q.  His date of birth is there?

25  A.  Correct.

 1   Q.  His contact information is there, his address and phone

 2   number?

 3   A.  That address, I'm not sure if that was his legitimate

 4   address or not.

 5   Q.  Did you instruct Jose Lantigua to lie about his address?

 6   A.  I did not.

 7   Q.  Did you provide him with any documentation that provided

 8   him with a false address?

 9   A.  No.

10   Q.  Had you ever seen Jose Lantigua at his home?

11   A.  No.

12   Q.  Did you ever drive him to or from his home?

13   A.  No.

14   Q.  So you don't know whether or not that is in fact his real

15   address?

16   A.  I don't know.

17   Q.  There is also a mobile telephone number?

18   A.  Correct.

19   Q.  You mentioned before that part of your paying Mr. Lantigua

20   was to pay for his phone minutes?

21   A.  Correct.

22   Q.  Was that the telephone number that he would contact you on?

23   A.  He never contacted me.  I don't speak Spanish.

24   Mr. Lantigua doesn't speak English.  I was never the point of

25   contact.

 1   Q.  When you say he doesn't speak English, does he speak any
 2   English?
 3   A.  It's rough.  It's very arduous to have a conversation with
 4   him.
 5   Q.  And on June 27 of 2013, you were aware that someone was
 6   going to be acting as a translator in the patient meeting with
 7   Dr. Mirilishvili?
 8   A.  I was not aware of that.
 9   Q.  When you spoke with Dr. Mirilishvili on September 23, 2013,
10   after he had been robbed at gunpoint and on October 16, 2014,
11   after he had been robbed at gunpoint, did you speak to
12   Mr. Mirilishvili in English or in Spanish?
13   A.  In English.
14   Q.  Dr. Mirilishvili, to your knowledge, does not speak Spanish
15   very well?
16   A.  I don't know what his level of the grasp of the Spanish
17   language is.
18   Q.  You have never heard him speaking Spanish fluently.  Would
19   that be accurate?
20   A.  I have never heard him speaking Spanish.
21   Q.  At all?
22   A.  At all.
23            MR. GOSNELL:  If we can go to the third page here and
24   blow up the first one.
25   Q.  Now, these are active medications for Mr. Lantigua?

1    A.  Prescribed medications, yes.

2    Q.  Say that again.

3    A.  Prescribed medications, yes.

4    Q.  And you testified on direct examination that there were

5    prescriptions for Elavil and Neurontin and Robaxin for each of

6    the patient visits that Dr. Mirilishvili had with Jose

7    Lantigua?

8    A.  Correct.

9    Q.  If you could just read for us the first prescription there

10   and what it actually says.

11   A.  Amitriptyline.  Is that what you're looking for?

12   Q.  Next to the first dash.

13   A.  EScript, 6/27/13; prescriber, Moshe Mirilishvili; refill,

14   zero; quantity, 60.

15   Q.  Do you know what eScript is?

16   A.  Yes.

17   Q.  It's an electronic prescription?

18   A.  Yes.

19   Q.  In June of 2013, oxycodone was not available through an

20   ePrescription, was it, in New York?

21   A.  No.

22   Q.  When you testified on direct examination that there were no

23   oxycodone prescriptions in the active medications for Jose

24   Lantigua, that wasn't actually surprising to you, was it?

25   A.  It wasn't -- later in the medical record there are

1   scanned-in copies of the oxycodone prescriptions.

2   Q.  Of every single one, right?

3   A.  Yes.

4   Q.  We are going to go through them.  But there is an

5   ePrescription for Elavil on June 27, 2013?

6   A.  Yes.

7   Q.  That was the first meeting between Jose Lantigua and

8   Dr. Mirilishvili?

9   A.  Correct.

10   Q.  August 12, 2013?

11   A.  Correct.

12   Q.  That was the first follow-up visit?

13   A.  Yes.

14   Q.  September 12?

15   A.  Yes.

16   Q.  That's the third visit?

17   A.  Yes.

18   Q.  October 18?

19   A.  Yes.

20   Q.  November 20?

21   A.  Correct.

22   Q.  January 16 of 2014?

23   A.  Yes.

24   Q.  February 25 of 2014, and March 25, 2014.  There are

25   ePrescriptions for each of one of those dates, correct?

1   A.  Correct.

2   Q.  There are three ePrescriptions per date, isn't that

3   correct?

4   A.  Correct.

5   Q.  There is one for Elavil, one for Neurontin, and one for

6   Robaxin?

7   A.  Correct, yes.

8   Q.  Again, on each of those dates there is a fourth medication

9   Dr. Mirilishvili prescribed?

10  A.  Correct.

11  Q.  That's oxycodone, correct?

12  A.  Correct.

13  Q.  You are not aware of how these different drugs may interact

14  with one another?

15  A.  No.

16  Q.  Again, no medical training, not sure how they work?

17  A.  None.

18  Q.  But, again, on each of those dates there were four

19  prescriptions that were issued by Dr. Mirilishvili?

20  A.  Correct.

21  Q.  Now, after Dr. Mirilishvili issued these prescriptions to

22  Jose Lantigua and you recovered the oxycodone prescription, you

23  said that you filled it?

24  A.  Correct.

25  Q.  How did you fill it?

1   A.   We gave the particular confidential source money to go to a

2   pharmacy to fill it.

3   Q.   You went to Mana Pharmacy?

4   A.   That's correct.

5   Q.   Where is Mana Pharmacy?

6   A.   It's in Queens.

7   Q.   Why did you choose Mana Pharmacy?

8   A.   That's where Dr. Mirilishvili sent the prescriptions to.

9   Q.   When you say that Dr. Mirilishvili sent him there, that's

10  because Jose Lantigua told you that that's where he sent him?

11          MR. DISKANT:   Objection.

12          THE COURT:   How about, why did you go to Queens?   Why

13  did you go to Queens?

14          THE WITNESS:   The defendant sent the eScripts to Mana

15  Pharmacy in Queens to be filled.

16  Q.   Did you instruct Jose Lantigua to tell Dr. Mirilishvili

17  that he wanted to have the prescriptions filled at Mana

18  Pharmacy in Queens?

19  A.   No.

20  Q.   Now, on the second date, the August 12, 2013 date, after

21  Jose Lantigua went inside the clinic and came out with the

22  recording and gave you the oxycodone prescription that had

23  Dr. Mirilishvili's signature on it, did you fill that

24  prescription?

25  A.   I've got a report written for that day, so I can't exactly

 1   recall.  Can I see my report?

 2   Q.  You don't have a memory one way or the other?

 3   A.  It happened quite some time ago, so I'd like to refresh my

 4   memory.

 5   Q.  You don't have a memory one way or the other, is that

 6   correct?

 7           THE COURT:  He asked to refresh his recollection.

 8   Would you so him his report, please.

 9           MR. GOSNELL:  Your Honor, I'll move on.

10   Q.  Did you give Mr. Lantigua instructions before he went in to

11   see Dr. Mirilishvili on August 12?

12   A.  Yes.

13   Q.  Did you instruct him to tell Dr. Mirilishvili that he

14   wanted to fill the prescription at Mana Pharmacy?

15   A.  I don't recall that.

16   Q.  Would you agree that part of the reason why oxycodone is

17   prescribed is to relieve pain?

18   A.  That's its purpose.

19   Q.  And so when you send Jose Lantigua in to tell

20   Dr. Mirilishvili that he's in pain on the initial visit, did

21   you tell him to tell Dr. Mirilishvili anything different on the

22   follow-up visit?

23   A.  The initial visit we told him to tell him he wasn't in

24   pain.

25   Q.  That he was not in pain at all?

1   A.  Correct.

2   Q.  That he had a zero pain?

3   A.  That's what the instructions were.

4   Q.  And on the second visit did you tell him to tell

5   Dr. Mirilishvili that he was not in pain?

6   A.  Correct.

7   Q.  And you told him to tell Dr. Mirilishvili that he was also

8   not taking the medication?

9   A.  I don't recall that, no.

10  Q.  Did you tell him to tell Dr. Mirilishvili that he was

11  taking the medication?

12  A.  I don't recall that either as well.

13  Q.  Did you tell Jose Lantigua to tell Dr. Mirilishvili that

14  when he was taking the medication, the oxycodone, the

15  Neurontin, the Robaxin, and the Elavil, that at that point he

16  was feeling no pain, yes or no?

17  A.  No, we did not tell him that.

18  Q.  You don't recall receiving any referral paperwork from

19  Mr. Lantigua, do you?

20  A.  No, I don't recall that.

21          MR. GOSNELL:  Can we bring up Government Exhibit 510.

22  Q.  Have you ever seen this document before?

23  A.  I don't remember this document, no.

24  Q.  This is a patient demographic information document?

25  A.  I just don't recall specifically.

1    Q.  Government Exhibit 510, which is what you're looking at,

2    these are physical files that you recover?

3               MR. DISKANT:  Objection to that, your Honor.

4               THE COURT:  I'm sorry?

5               MR. GOSNELL:  I'll rephrase.

6               THE COURT:  The objection is overruled.

7    Q.  As part of the investigation in this case, Government

8    Exhibit 510 were physical documents that were recovered by the

9    team?

10   A.  Correct.

11   Q.  They were recovered at Dr. Mirilishvili's home, correct?

12   A.  Correct.

13   Q.  And you weren't part of the search team that went in there;

14   you did the search of the clinic?

15   A.  Yes, sir.

16   Q.  I am not going to ask you where specifically this was

17   found, but you would agree with me that this wasn't the only

18   file that was found at Dr. Mirilishvili's home?

19   A.  No, it was not the only one.

20   Q.  There were boxes and boxes and boxes and boxes and boxes of

21   files?

22   A.  There were lots of files, yes.

23   Q.  Thousands.

24   A.  There were a lot, yes.  There were a few boxes, yes.

25   Q.  This represents a tiny fraction?

1    A.  Correct.

2    Q.  And this pain management patient demographic information,

3    this is the same information that we saw from Practice Fusion

4    about the patient, correct?

5    A.  Correct.

6    Q.  Jose Lantigua's date of birth, things like that?

7    A.  Yes.

8              MR. GOSNELL:  Can we go to the next page.

9    Q.  Have you ever seen this document before?

10   A.  I have not reviewed this document specifically, but I know

11   this from looking at the computer, it's -- I want to say it's

12   an agreement.

13   Q.  It's an agreement that was signed by Jose Lantigua?

14             MR. GOSNELL:  Go to the second page.

15   Q.  Is that Mr. Lantigua's signature?

16   A.  Yes, it would be.

17   Q.  Did he give you this document when he came out of

18   Dr. Mirilishvili's clinic on June 27, 2013?

19   A.  I don't recall seeing this document ever before.

20   Q.  The second signature that's down there, the witness, that's

21   Jomaris Javier?

22   A.  I don't know if that's what that says.  I'm not a

23   handwriting expert, so I don't know if that's her signature or

24   not.

25   Q.  It's certainly not clear?

1   A.  It's very messy, yes.

2   Q.  It's not the same as Dr. Mirilishvili's signature on the

3   prescription that you got from Jose Lantigua, is it?

4   A.  No.

5   Q.  And you said this is an agreement that Jose Lantigua

6   signed.  Did you instruct him to sign this?

7   A.  No.

8   Q.  And you didn't review this with him before he went in --

9   A.  I didn't have this document before we sent him in.  This

10  was not something that we had in our possession.

11  Q.  And you've seen many, many, many documents like this once

12  you recovered physical documents, correct?

13  A.  From this particular search warrant we saw documents that

14  were agreements, yes.

15  Q.  Now, you also testified, you showed us the first two pages

16  of a June 27 physical file here, correct?

17  A.  For Jose Lantigua?

18  Q.  Yes.

19          MR. GOSNELL:  Let's go to page 3 of the exhibit.

20  Q.  This was one of the pages that you walked us through?

21  A.  Yes.

22  Q.  This is a super bill, isn't that right?

23  A.  I don't know what's that's called.  It looks like some sort

24  of coding type sheet, I would suspect.

25  Q.  At the upper left it's got Dr. Mirilishvili's name above

1    the kind of boxes there?

2    A.   Yes.

3    Q.   It's got pain management interventional pain management?

4    A.   Yes.

5    Q.   Above that it's got Jose Lantigua's name?

6    A.   Yes.

7    Q.   It says cash?

8    A.   Yes.

9    Q.   You sent Jose Lantigua in with cash?

10   A.   Correct.

11   Q.   And you instructed him to pay Dr. Mirilishvili --

12   A.   That is what has to happen.  The patient, when they are not

13   covered by insurance, they pay cash.

14   Q.   That's what you instructed Jose Lantigua to do, was to pay

15   cash?

16   A.   Correct.

17   Q.   Yes?

18   A.   He does not have insurance, so he pays cash.

19   Q.   And you then skipped to the August 12 date, correct?  That

20   was next thing you covered in this exhibit?

21   A.   If that was the next page that was asked for me to look at,

22   then yes.

23   Q.   Let's look at page 6.  Do you have the document up there

24   with you, the physical document?  Should be a Post-it.

25   A.   Yup.

 1   Q.  Do you see the Post-it note?

 2   A.  Yes.

 3   Q.  It's attached to the original document with the June 27,

 4   2013 date?

 5   A.  Yes.

 6   Q.  This is handwriting obviously?

 7   A.  Yes.

 8   Q.  Did you instruct Jose Lantigua to tell Dr. Mirilishvili

 9   that his injury and his pain lasted eight months?

10   A.  No.

11   Q.  Did you tell him to tell Dr. Mirilishvili that he had a

12   spinal injury?

13   A.  No.

14   Q.  Did you tell him to tell Dr. Mirilishvili that he went to

15   Harlem Hospital?

16   A.  No.

17   Q.  Did you tell Mr. Lantigua to tell Dr. Mirilishvili that he

18   had no allergies?

19   A.  No.

20   Q.  And that he had no prior medical history?

21   A.  No.

22   Q.  And no prior social history?

23   A.  No.

24   Q.  Did you tell Mr. Lantigua to tell Dr. Mirilishvili that he

25   was single?

 1  A.  No.

 2  Q.  Was he?

 3  A.  I don't know if Mr. Lantigua is single or not.

 4  Q.  Did you tell Mr. Lantigua to tell Dr. Mirilishvili that he

 5  had three children?

 6  A.  No.

 7  Q.  Do you know whether or not he had three children at the

 8  time that he went in to go see Dr. Mirilishvili?

 9  A.  No.  I don't know.

10          MR. GOSNELL:  Can we go to page 5.  Can we blow that

11  up.

12  Q.  In between the two lines there, you see some writing there?

13  A.  N-E-R-Oxy.

14  Q.  Do you know whether or not that stands for Neurontin,

15  Elavil, Robaxin, oxycodone?  Do you know one way or the other?

16  A.  The Oxy would -- yes, in my opinion, would refer to Oxy.

17  Q.  You are not sure about the other ones, but you're aware

18  that Mr. Lantigua got each of those medications on June 27,

19  2013?

20  A.  Yes.

21  Q.  And you are also aware that he was referred to St. Luke's

22  Hospital for orthopedic evaluation?

23  A.  I was not aware of that.

24  Q.  Did you ever tell Mr. Lantigua to tell Dr. Mirilishvili

25  that he went to an orthopedic appointment?

 1    A.  No.

 2    Q.  So did you tell Mr. Lantigua to tell Dr. Mirilishvili that

 3    he went to hydrotherapy?

 4    A.  No.

 5    Q.  Then after this June 27 meeting there was the August 12

 6    meeting, correct?

 7    A.  If that's the next date, then yes.

 8    Q.  Did you tell Mr. Lantigua to tell Dr. Mirilishvili that he

 9    had gone to Harlem Hospital prior to his August 12, 2013

10    meeting?

11    A.  No.

12    Q.  Did you tell him to tell Dr. Mirilishvili that he had an

13    appointment to see a specialist in October?

14    A.  No, we did not.

15    Q.  Did you tell him to tell Dr. Mirilishvili that he had gone

16    to orthopedic classes and hydrotherapy?

17    A.  No.

18    Q.  Did you tell him to tell Dr. Mirilishvili that he had

19    gotten an appointment but he had to reschedule?

20    A.  No.

21    Q.  But the meeting between Dr. Mirilishvili and Mr. Lantigua

22    was recorded, yes or no?

23    A.  Yes.

24    Q.  Did you tell Mr. Lantigua to tell Dr. Mirilishvili that he

25    was doing exercises, rehabilitative exercises at home?

1   A.   No, we did not instruct him to tell that.

2   Q.   Again, after the August 12 meeting Mr. Lantigua provided

3   you with the oxycodone prescription and you continued your

4   investigation, correct?

5   A.   Correct.

6   Q.   You sent him back in on September 12, 2013?

7   A.   Yes.

8   Q.   And at that point you had filled one oxycodone prescription

9   for Mr. Lantigua?

10  A.   Yes.

11  Q.   You might have filled a second?

12  A.   I don't recall.

13  Q.   And did you tell Mr. Lantigua to tell Mr. Mirilishvili that

14  he was not suffering any side effects from oxycodone?

15  A.   No, we did not instruct him to say that.

16  Q.   That he wasn't suffering itchiness or vomiting or nausea?

17  A.   No.

18  Q.   Did you instruct him to tell Dr. Mirilishvili that he was

19  taking all of his medication, the oxycodone, the Robaxin, the

20  Elavil, and the Neurontin?

21  A.   We did not instruct him to say that.

22  Q.   Did you tell Mr. Lantigua to tell Dr. Mirilishvili that if

23  he was taking all those four medications that only then was he

24  not in pain?

25  A.   No, we did not say that.

1    Q.  Did you tell Mr. Lantigua how to respond if

2    Dr. Mirilishvili asked about referrals?

3    A.  No, we did not.  I don't recall specifically instructing

4    him on responses to referral questions, no.

5    Q.  Did you tell him to tell Dr. Mirilishvili that he had

6    gotten an appointment with a bone doctor?

7         MR. DISKANT:  Your Honor, I think he has already

8    answered this question.

9         THE COURT:  The objection is overruled.

10   A.  No.  Our instructions to him each and every visit were very

11   limited in the sense of, you are not in pain.  They were very,

12   very basic instructions.

13   Q.  He was supposed to go inside and only say the words, I'm

14   not in pain?

15   A.  Well --

16   Q.  According to your instructions?

17   A.  His instructions, when asked the question if he was in pain

18   his instructions were to say, I'm not in pain.

19   Q.  If he was asked a different question, though, if he was

20   asked a different question --

21        THE COURT:  Let's cut to the chase.  Did you give him

22   any instructions other than that one?

23        THE WITNESS:  No, your Honor.

24        THE COURT:  Did you go through a litany of questions

25   with him and say, answer this one this way and answer this one

G33MMIR5                        Muller                         Cross

```
 1   that way?
 2              THE WITNESS:  No, your Honor.
 3              THE COURT:  Then let's move on.
 4              MR. GOSNELL:  Yes, your Honor.
 5   Q.  Did you ever tell Mr. Lantigua to tell Dr. Mirilishvili
 6   that he had been scheduled for surgery, yes or no?
 7              MR. DISKANT:  Your Honor, didn't we just cover this.
 8              THE COURT:  The objection is overruled.
 9   A.  No.
10              THE COURT:  The answer is no.  Move on.
11   Q.  Now, on each of the dates that you sent Jose Lantigua in he
12   came out with an oxycodone prescription, right?
13   A.  Correct.
14   Q.  You didn't send any other informants in for the same
15   purpose that you sent Mr. Lantigua in for, did you?
16   A.  We did.
17   Q.  And did you record those?
18   A.  We did.
19   Q.  How many individuals did you send in?
20   A.  Specifically I remember one other individual.
21   Q.  Was that David?
22   A.  Yes.
23   Q.  What's David's last name?
24   A.  David Gardner.
25   Q.  David Gardner?
```

```
 1    A.  Yes.

 2    Q.  What was his date of birth that he provided to

 3    Dr. Mirilishvili?

 4    A.  I don't recall.

 5    Q.  Is Jose Lantigua still working for the DEA?

 6    A.  He's not working for our group specifically.  I'm not sure

 7    if he's doing confidential source work for other groups.  I'm

 8    not sure.

 9    Q.  You have a way of contacting him, correct?

10    A.  I do.

11    Q.  And in fact you contacted him not so long ago?

12    A.  It wasn't me specifically, but it was members of the team

13    that did, yes.

14    Q.  That was done because we wanted to talk to them?

15              MR. DISKANT:  Objection, your Honor.

16              THE COURT:  The objection is sustained.  You will move

17    on to another line of questioning.

18              MR. GOSNELL:  Yes, your Honor.

19    Q.  Now, you testified earlier during cross and on direct

20    examination that there was a robbery at Dr. Mirilishvili's

21    clinic on September 23 of 2013, is that right?

22    A.  Correct.

23    Q.  That was a gunpoint robbery?

24    A.  Yes.

25    Q.  Fair to say, it was a fairly traumatic experience for those
```

1   people involved?

2   A.   I'm sure it was.

3   Q.   And you were not a part of that investigation, were you?

4   A.   No.

5   Q.   You and detective Victor Lebron took some action that day,

6   right?

7   A.   We conducted an interview.

8   Q.   An interview of Dr. Mirilishvili?

9   A.   Yes.

10  Q.   Who, just prior to your interview on the same day, had a

11  gun pointed at him?

12  A.   Yes.

13  Q.   And Detective Victor Lebron, he's a detective with the New

14  York City Police Department, correct?

15  A.   Yes, he is.

16  Q.   And in addition to interviewing Dr. Mirilishvili, you also

17  took the opportunity that the robbery presented to photograph

18  the interior of his clinic?

19  A.   Correct.

20          MR. GOSNELL:  Your Honor, may I approach the witness.

21          THE COURT:  Yes.

22  Q.   I've handed you a number of exhibits.  These are marked

23  DM200 through DM210 for identification.

24  A.   Ok.

25  Q.   Do you recognize those?  Just take a moment to look at

G33MMIR5                          Muller - cross

1    them.

2    A.  I do.

3    Q.  These are the photographs that were taken by the DEA on or

4    about September 23, 2013, following the robbery, yes or no?

5    A.  Yes.

6           MR. GOSNELL:  Your Honor, I move the admission of

7    DM200 to 210.

8           THE COURT:  You are offering it?

9           MR. GOSNELL:  Yes.

10          MR. DISKANT:  No objection.

11          THE COURT:  Admitted.

12          (Defendant's Exhibits DM200-DM210 received in

13   evidence)

14   Q.  Let's look at DM200.  You described with respect to a

15   different exhibit the entrance of Dr. Mirilishvili's clinic?

16   A.  Yes.

17   Q.  This is another view of that entrance, correct?

18   A.  Yes.

19   Q.  And this shows the physical therapy room which is directly

20   to the left when you walk in?

21   A.  That's another doorway into that room, yes.

22   Q.  There was a doorway there and there was an exit or another

23   doorway at the other end of the reception area?

24   A.  Correct.

25   Q.  And the lights are on, the lights inside of the clinic are

1    on?

2    A.  Correct.

3    Q.  And that's because after the robbery Dr. Mirilishvili and

4    the rest of the staff rushed out, correct?

5    A.  I don't know if they rushed out.  I don't know.

6    Q.  Did you turn the lights on?

7    A.  I wasn't in the clinic after the robbery.

8                THE COURT:  Can we please move on.

9                MR. GOSNELL:  Yes, your Honor.

10               Can we go to DM201.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  This is the waiting area?

2    A.  Yes.

3    Q.  It doesn't look very different from how it looked when you

4    conducted your search warrant?

5    A.  Correct.

6    Q.  And you've still got the two doors and the door in the

7    back.

8    A.  Yes.

9    Q.  Still have the chairs?

10   A.  Yes.

11           MR. GOSNELL:  Can we go to DM202.

12   Q.  This is beyond the physical therapy door; this is the

13   physical therapy room.

14   A.  Correct.

15   Q.  And on September 23, 2013 you are aware that the clinic was

16   open.

17   A.  Yes.

18   Q.  The day that you conducted your search warrant, the clinic

19   was not open.

20   A.  It had yet to be opened for the day.  No, it was still

21   closed.

22   Q.  So everything had been put away before -- if things were

23   going to be put away, they had been put away before you got

24   there.

25   A.  They looked like they hadn't been put away from the day

G337MIR6                      Muller - cross

 1   before.

 2   Q.   OK.   On September 23, 2013 this is how the physical therapy

 3   room looked.

 4   A.   I would agree.

 5   Q.   Chairs weren't bunched together, were they?

 6   A.   No, they are clearly not.

 7   Q.   And there is a treadmill?

 8   A.   There is a treadmill.

 9   Q.   The treadmill worked back then, and it worked when you

10   conducted your search warrant?

11   A.   I didn't test the treadmill.

12   Q.   Did anybody test the bike in the back?

13   A.   None of the equipment got tested, no.

14   Q.   None of the medical equipment got tested at a medical

15   office?

16   A.   We didn't test the physical therapy equipment at all.

17   Q.   Physical therapy equipment is medical equipment.

18              MR. DISKANT:   Objection, your Honor.

19   A.   No.

20   Q.   There is a computer in the physical therapy room.

21   A.   Correct.

22   Q.   Did you seize that computer?

23   A.   That computer was not there during the search warrant.

24   Q.   OK.   So you didn't seize any computer from the physical

25   therapy room during the search warrant.

 1   A.  No.

 2   Q.  And you didn't seize the bike or the treadmill or any of

 3   the medical equipment.

 4   A.  No.

 5   Q.  Can we go to DM203.  This is another view, kind of the back

 6   side of where we were just looking at.

 7   A.  Correct.

 8   Q.  And there are tables there, physical therapy tables?

 9   A.  Yes.

10   Q.  You didn't seize any of those in the search warrant?

11   A.  No.

12   Q.  There is an NCV machine.  Are you aware of what that is?

13   A.  I have no idea what an NCV machine is.

14   Q.  So then you didn't seize it.

15   A.  No.

16   Q.  Let's go to DM204.  This is the reception desk?

17   A.  Yes.

18   Q.  And you can see out to the front beyond the front door?

19   A.  Yes.

20   Q.  OK.  And you can see the reception area?

21   A.  Yes.

22   Q.  And you can see what looks like the same types of

23   documents, those physical -- the super bills?

24   A.  Yes.

25   Q.  And you also see a keyboard to a computer.

1    A.   Yeah, it's kind of tough to make out, but it looks like it,

2    yes.

3    Q.   That's generally the area where the computer was -- or

4    where a computer was -- when you seized the computer in 2014.

5    A.   Correct.

6    Q.   Can we go to DM205.  These are business cards mostly,

7    right?

8    A.   Yes.

9    Q.   And some Post-it notes?

10   A.   Post-it notes, yeah.

11   Q.   And those are business cards to pharmaceutical -- to

12   pharmacies.

13   A.   Yes, it looks to be pharmacies, yes.

14   Q.   Do you know how those business cards got there?

15   A.   No.

16   Q.   Let's go to DM206.  This is Dr. Mirilishvili's private

17   office.

18   A.   Correct.

19   Q.   This is where you instructed Jose Lantigua to try to get

20   to.

21   A.   Correct.

22   Q.   In the background there are skeletal diagrams?

23   A.   Yes.

24   Q.   And diagrams of other bone areas?

25   A.   It looks to be that way, yes.

 1   Q.  Let's go to DM207.  This is an examination table?

 2   A.  Correct.

 3   Q.  And again there are a bunch of diagrams on the right?

 4   A.  Correct.

 5   Q.  There is a printer on the desk?

 6   A.  Yes.

 7   Q.  You didn't seize any of those diagrams when you conducted

 8   your search warrant, did you?

 9   A.  No, on the search warrant day that room did not look like

10   that.

11   Q.  Did you take a photograph of the room that day, that side

12   of the room?

13   A.  I did not do photographs at the scene; that was someone

14   else's responsibility.  If you haven't seen one, then we didn't

15   take one.

16   Q.  DM208, these appear to be skeletal or nervous system

17   diagrams of some sort?

18   A.  Correct.

19   Q.  You didn't seize any of these, did you?

20   A.  Once again those weren't present on the day of the search

21   warrant.

22           MR. GOSNELL:  If we can bring up only for the witness,

23   the court and the attorneys what has been marked as DM403 for

24   identification.

25   Q.  Special Agent Muller, do you recognize this photograph?

 1   A.  I do not.

 2   Q.  Was this a photograph that was taken on September 23, 2013

 3   when you and the team were taking photographs?

 4   A.  I have never seen this photo before.

 5           THE COURT:  Move on, please.

 6   Q.  Are you aware that -- withdrawn.

 7           Jomaris Javier was a worker at Dr. Mirilishvili's

 8   clinic?

 9   A.  Yes, for a period of time, yes.

10   Q.  She was a medical assistant?

11   A.  I didn't know that she had actual qualifications as a

12   medical assistant.  I knew she was an employee of the clinic.

13   Q.  So you had no awareness that she was a medical assistant.

14           MR. DISKANT:  Objection.

15           THE COURT:  Objection sustained on about 15 different

16   grounds.

17           MR. GOSNELL:  Can we go to GX 2-D.  Can you zoom in on

18   the female.

19   Q.  Just quickly, that's Jomaris Javier?

20   A.  It is.

21   Q.  And in the picture she is wearing medical scrubs?

22   A.  It appears to be medical scrubs, yes.

23   Q.  Now, back to the September 23, 2013 robbery.  You

24   interviewed Dr. Mirilishvili.

25   A.  Yes.

G337MIR6                    Muller - cross

1    Q.  And he spoke with you voluntarily?

2    A.  Yes.

3    Q.  He told you that a prescription pad had been stolen from

4    his medical clinic?

5    A.  Yes.

6    Q.  He told you that $4,000 in cash had been stolen from him?

7    A.  Yes.

8    Q.  And despite the fact that you were not conducting the

9    investigation into the robbery, you would provide information

10   to the New York City Police Department if information came into

11   your possession relating to that robbery.

12   A.  If during the course of our investigation, yes.

13   Q.  Did you ever provide the New York City Police Department

14   with any information about that robbery that you obtained

15   during your investigation?  Yes or no.

16            MR. DISKANT:  Objection.  Relevance.

17            THE COURT:  The objection is sustained.

18   Q.  You know Abraham Correa is, right?

19   A.  Yes.

20   Q.  You testified on direct examination that Dr. Mirilishvili

21   told you that he fired him because he believed he was involved

22   in the robbery.

23   A.  He among others, yes.

24   Q.  And he was one of those individuals.

25   A.  Yes.

 1   Q.  And did you ever investigate that allegation by Dr.

 2   Mirilishvili?

 3            MR. DISKANT:  Objection.  Relevance.

 4            THE COURT:  The objection is sustained.

 5   Q.  In addition to your investigation into this, there were

 6   other investigations that you conducted relating to robberies.

 7            THE COURT:  The objection is sustained.

 8   Q.  You interviewed Dr. Mirilishvili on October 16, 2014.

 9   A.  Correct.

10   Q.  Again that was after a second robbery of his establishment.

11   A.  Yes.

12   Q.  He had been traumatized by having a gun pointed at him

13   again.

14            MR. DISKANT:  Objection.

15            THE COURT:  The objection is sustained.

16   Q.  Did he appear traumatized to you after having a gun pointed

17   at him?  Yes or no.

18            THE COURT:  The objection is sustained.  Just think

19   about the way you just asked that question, and then don't do

20   it again.

21            MR. GOSNELL:  Yes, your Honor.

22   Q.  There came a point when you arrested Abraham Correa.

23   A.  Yes.

24   Q.  And when you arrested Abraham Correa, that was based on

25   several operations that you had instructed Jose Lantigua to

1    undertake.

2              MR. DISKANT:  Objection.  Relevance.

3              THE COURT:  The objection is sustained.

4    Q.  When you arrested Abraham Correa, that was after Dr.

5    Mirilishvili had told you that he believed Mr. Correa had been

6    a part of the September 23 robbery.

7              MR. DISKANT:  Objection.  Relevance.

8              THE COURT:  The objection is sustained.

9    Q.  After you arrested Mr. Correa, did he become a DEA

10   informant?  Yes or no.

11   A.  Yes.

12   Q.  And you used him in operations much like you used

13   Mr. Lantigua.

14   A.  Yes.

15   Q.  Different types but --

16   A.  Yes.

17   Q.  -- you used him as a DEA informant.

18   A.  In undercover operations, yes.

19   Q.  And you gave him instructions again.

20   A.  Yes.

21   Q.  And he would go out and he would do operations, and he

22   would come back to you.

23   A.  Yes.

24   Q.  And in fact despite the fact that you knew that Dr.

25   Mirilishvili had told you that he believed Abraham Correa had

 1  been involved in a robbery at his establishment, one of the

 2  operations that you had with Mr. Correa was to send him back

 3  inside to Dr. Mirilishvili's medical clinic.  Yes or no.

 4  A.  That's incorrect.

 5  Q.  You never instructed Mr. Correa to go back inside the

 6  clinic?  Yes or no.

 7  A.  He went back inside the clinic, yes.

 8  Q.  Was that on your instruction?

 9  A.  It was on our instructions, but Dr. Mirilishvili was not

10  present.

11  Q.  You didn't want Mr. Correa to be in the medical clinic at

12  the same time that Dr. Mirilishvili was there.

13  A.  It's not that we didn't want.  It's that Abraham Correa

14  told us that it couldn't happen.

15  Q.  Because Dr. Mirilishvili thought he was involved in the

16  robbery.

17  A.  Right, he didn't want him in the office.

18  Q.  Dr. Mirilishvili didn't want Mr. Correa in the office.

19  A.  Correct.

20  Q.  Did you pay Mr. Correa money for this operation?

21  A.  Mr. Correa only received money to purchase evidence; he

22  didn't receive any money for services.

23  Q.  How many operations did you have Mr. Correa conduct for

24  you?

25  A.  I can't remember the exact number.

```
 1   Q.  More than five?

 2   A.  Beg your pardon?

 3   Q.  More than five?

 4   A.  I can't -- I would like to -- I would like to reference a

 5   report before I pin a number on that.

 6           THE COURT:  It's OK.

 7   A.  I would say --

 8   Q.  You would say what?

 9   A.  Under eight maybe, in that ballpark.

10   Q.  And DEA informants can be used, as you said, by other DEA

11   agents.

12   A.  Correct, it's a DEA informant; it's not my informant.

13   Q.  Did Mr. Correa ever do operations for other DEA agents?

14   Yes or no.

15           MR. DISKANT:  Objection.

16           THE COURT:  The objection is sustained.

17   Q.  Did you ever instruct Mr. Correa to be involved with

18   operations by other DEA agents?

19           MR. DISKANT:  Same objection.

20           THE COURT:  Overruled.

21   A.  No.

22   Q.  During your physical surveillance of the outside of Dr.

23   Mirilishvili's clinic, one of the individuals that you began to

24   recognize was an individual by the name of Damon Leonard.

25   A.  Correct.
```

 1   Q.  Damon Leonard was, as you described, the person that would

 2   drive Dr. Mirilishvili's car?

 3   A.  Yes, he would chauffeur the car to and from the parking

 4   garage.

 5   Q.  Ordinarily that was the only way he would drive the car.

 6   A.  Correct.

 7   Q.  And you understood that he wasn't allowed to drive cars.

 8           MR. DISKANT:  Objection.

 9           THE COURT:  The objection is sustained.

10   Q.  Did you ever instruct the 33rd Precinct to arrest

11   Mr. Leonard for driving Dr. Mirilishvili's car?

12   A.  I specifically did not.

13   Q.  Are you aware -- withdrawn.

14           Did there come a time in April of 2014 that the 33rd

15   Precinct contacted you about evidence in this case?

16   A.  I don't recall.

17   Q.  Did the 33rd Precinct ever contact you regarding a thumb

18   drive that was recovered from Damon Leonard?

19   A.  There was a thumb drive recovered from Damon Leonard after

20   he was stopped by members of the 33rd Precinct, yes.

21   Q.  And were you given assurances by the 33rd Precinct that

22   they could keep --

23           MR. DISKANT:  Objection.

24   A.  I was given assurances by detectives --

25           THE COURT:  Wait a minute.  There was an objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   OK?  It's hard to do, but I really like to do it.

2             Would you read back the question.

3             (Record read)

4             THE COURT:  Oh, well, the question wasn't complete.

5   The objection I assume --

6             MR. DISKANT:  Your Honor, I think maybe the court

7   reporter missed it.  The question was completed.

8             THE COURT:  Well, in that case ask your question

9   again.

10            MR. GOSNELL:  Sure, your Honor.

11            THE COURT:  Ask it completely.  I will get the

12  objection.  We will rule.

13  Q.  Were you given assurances by the 33rd Precinct that they

14  would hold onto and safe keep the thumb drive that they

15  recovered?  Yes or no.

16            MR. DISKANT:  Same objection.

17            THE COURT:  The objection is sustained.

18  Q.  Did you ever receive from the 33rd Precinct the thumb drive

19  that they recovered from Mr. Leonard?  Yes or no.

20  A.  No.

21  Q.  Did you ever inquire before two or three weeks ago about

22  where that thumb drive was?  Yes or no.

23            MR. DISKANT:  Objection.

24            THE COURT:  Overruled.

25  A.  Could you ask your question again?

1   Q.  Did you ever inquire of the 33rd Precinct the location of

2   the thumb drive before two or three weeks ago?

3   A.  Members of the team inquired shortly after the event took

4   place, and we were informed that the property had been

5   returned.

6   Q.  And who had that property been returned to, if you know?

7   A.  I don't know who picked it up.

8   Q.  And you didn't get any documentation regarding who picked

9   it up, correct?

10  A.  I didn't.  I believe that something may have been

11  forwarded, that there is a property receipt that somebody

12  signed for something.

13  Q.  You don't have it, do you?

14  A.  I personally don't have it.

15  Q.  Now, when Damon Leonard had contact with the 33rd Precinct,

16  did you go inside and talk to Dr. Mirilishvili about that?

17  A.  I did not, no.

18  Q.  Did you instruct anyone else on your team to go inside and

19  talk with Dr. Mirilishvili about that?

20  A.  No.

21  Q.  When you spoke Dr. Mirilishvili both on September 23, 2013

22  and October 16, 2014, after the robberies, both of those times

23  you spoke to him with Detective Lebron present.

24  A.  Correct.

25  Q.  And Detective Lebron is a New York City police officer.

1   A.  Yes, he is.

2   Q.  And he has a badge, correct?

3   A.  Yes.

4   Q.  He showed that badge to Dr. Mirilishvili prior to you

5   questioning Dr. Mirilishvili?

6   A.  I can't recall if he showed him the badge or not.

7   Q.  OK.  Did you show Dr. Mirilishvili your badge?

8   A.  No, I did not.

9   Q.  Did you have to read him his Miranda rights?

10  A.  No, he wasn't in custody; he was there voluntarily.

11  Q.  And he cooperated with you?  He spoke with you?

12  A.  Yes.

13  Q.  He answered all of your questions?

14  A.  Yes.

15  Q.  And you said on direct examination that he got agitated --

16  you said very agitated -- when you were talking to him about

17  his generous oxycodone prescription writing practices.

18  A.  Correct.

19  Q.  And he made a point to tell you that it's not just

20  oxycodone that he prescribes; isn't that right?

21  A.  That's what he said, yes.

22  Q.  And based on your review of Mr. Lantigua's records, that he

23  had e-prescriptions for Elavil and Robaxin and Neurontin on

24  each of the separate patient visits.  That's consistent with

25  what Dr. Mirilishvili told you, right?

 1   A.  Yes.

 2           MR. GOSNELL:  Can I just have one moment, your Honor?

 3           THE COURT:  Yes.

 4           MR. GOSNELL:  I have no more questions at this time,

 5   your Honor.

 6           THE COURT:  Any redirect?

 7           MR. DISKANT:  I think very briefly.

 8   REDIRECT EXAMINATION

 9   BY MR. DISKANT:

10   Q.  Special Agent Muller, on cross-examination you were asked

11   some questions about the documents that you prepared for Jose

12   Lantigua, Government Exhibit 1205.  Do you remember those

13   questions?

14   A.  Yes, the referral and the MRI?

15   Q.  Yes.  Can you remind us where you got those documents from?

16   A.  We got those from another confidential source from another

17   investigation.

18   Q.  So these are documents that had been used in another

19   investigation previously?

20   A.  I don't know if they were used specifically in that

21   investigation.

22   Q.  You were also asked some questions about additional

23   individuals, individual names that have come up in your

24   testimony, and whether those individuals were arrested.  Do you

25   remember those questions?

1   A.  No.  Can you please --

2           THE COURT:  Sure.

3   Q.  You were asked about Damon Leonard.  Do you remember that?

4   A.  Yes.

5   Q.  And you indicated he had been arrested?

6   A.  Yes.

7   Q.  And you were asked about Abraham Correa, and had indicated

8   he had been arrested?

9   A.  Yes.

10  Q.  Were there other arrests made in the case?

11  A.  There were.

12          MR. GOSNELL:  Objection.

13          THE COURT:  The objection is sustained.

14  Q.  Was the defendant the only target of this investigation?

15  A.  No.

16          MR. GOSNELL:  Objection.

17          THE COURT:  I will allow it.

18          MR. DISKANT:  Nothing further.

19          MR. GOSNELL:  Very, very brief.

20  RECROSS EXAMINATION

21  BY MR. GOSNELL:

22  Q.  You said on redirect examination that the documents you

23  instructed Mr. Lantigua to provide to Dr. Mirilishvili had been

24  used in other investigations?

25  A.  No, I said I'm not sure if they had been used in other

 1   investigations.  We acquired those from another confidential

 2   source.

 3   Q.   OK.  Did you tell Dr. Mirilishvili that they were fake

 4   documents, as you say?

 5           MR. DISKANT:  Objection.

 6           THE COURT:  Objection sustained.

 7   Q.   Did you tell Dr. Mirilishvili that you had obtained those

 8   documents -- excuse me.  Did you tell anyone -- withdrawn.

 9           Did you tell Dr. Mirilishvili that you had obtained

10   those documents from another confidential source?

11           MR. DISKANT:  I think that's the same question.

12           THE COURT:  The objection is sustained.

13           MR. GOSNELL:  Nothing further.

14           THE COURT:  Anything else?

15           MR. DISKANT:  No, your Honor.  Thank you.

16           THE COURT:  How convenient.

17           You may step down.

18           (Witness excused)

19           THE COURT:  Folks, we are done for the week.  We are

20   going to start I hope 9:45 a.m. on Monday morning.  We are off

21   and running, but I would like to keep us going.  I'd like to

22   keep us going.  In large measure that depends on us, but in

23   some small measure it depends on you guys and your ability to

24   get here on time.  OK?  So, I'd really like you to aim to be

25   here at 9:30, and then hopefully we will be able to bring you

1    out here by 9:45, and we will be ready to go with a witness on

2    the stand.

3          Have a very nice weekend.  I understand it's supposed

4    to snow.  I don't know what season it is anymore.  We will

5    continue to look into our air conditioning problem.

6          Meanwhile, remember, don't discuss the case -- discuss

7    in the broadest sense of the term.  Keep an open mind.  You

8    have just begun to hear the evidence.  All right?  I will see

9    you next week.

10          I should tell you that on Monday I was invited months

11   ago to teach a class at one of our local law schools, that we

12   will be breaking at 3:20, so what that means is that we are

13   going to break for lunch about 12:15 probably and be back at

14   1:15.  OK?

15          (Jury not present)

16          THE COURT:  OK.  Who is up next?

17          MR. DISKANT:  Next Abraham Correa.

18          THE COURT:  After that?

19          MR. DISKANT:  I apologize, I just thought about this,

20   and we will likely call Joel Galanter first.  He is a very

21   brief fact witness who is flying in Monday morning.  We think

22   then will Abraham Correa.

23          THE COURT:  After that?

24          MS. CUCINELLA:  I think after that it will be Dr.

25   Gregory Lawler.  If we are not done with Abraham Correa on

1    Monday, we may ask if we can take a break to squeeze him in on

2    Monday, just to allow for his schedule.

3              THE COURT:  OK, because Monday is going to be a little

4    shorter that would otherwise be the case, only because I made a

5    commitment to Cardozo Law School in November.

6              MS. CUCINELLA:  We can see if he can do Tuesday

7    morning instead.

8              THE COURT:  OK, great.  All right.  Thank you.

9              (Trial adjourned to March 7, 2016 at 9:30 a.m.)

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   BENJAMIN LOPEZ

 4   Direct By Ms. Cucinella . . . . . . . . . . .54

 5   Cross By Mr. Mazurek . . . . . . . . . . . . .75

 6   Redirect By Ms. Cucinella . . . . . . . . . .89

 7   Recross By Mr. Mazurek . . . . . . . . . . . .90

 8   MICHAEL MULLER

 9   Direct By Mr. Diskant . . . . . . . . . . . .91

10   Cross By Mr. Gosnell . . . . . . . . . . . . 146

11   Redirect By Mr. Diskant . . . . . . . . . . 227

12   Recross By Mr. Gosnell . . . . . . . . . . . 228

13                     GOVERNMENT EXHIBITS

14   Exhibit No.                              Received

15   3-D, 3-E, 7-E and 7-F  . . . . . . . . . . .57

16   2-A, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J  . . . . .61

17   4-A, 4-Q and 4-R . . . . . . . . . . . . . .61

18   6-C, 6-D, 6-E, 6-F, 6-G, 6-I   . . . . . . .66

19   6-J, 6-K, 6-L, 6-O and 6-Q . . . . . . . . .67

20   4-I, 4-G, 4-L and 4-J  . . . . . . . . . . .70

21   1207   . . . . . . . . . . . . . . . . . . .95

22   1206   . . . . . . . . . . . . . . . . . . .96

23   4T   . . . . . . . . . . . . . . . . . . . 101

24   4L, M, N, and O  . . . . . . . . . . . . . 103

25   6A   . . . . . . . . . . . . . . . . . . . 104
</pre>

233

1    4D    . . . . . . . . . . . . . . . . . . . 107

2    8    . . . . . . . . . . . . . . . . . . . . 108

3    2D    . . . . . . . . . . . . . . . . . . . 109

4    1205    . . . . . . . . . . . . . . . . . . 112

5    1003    . . . . . . . . . . . . . . . . . . 117

6    201-224 and 241-242    . . . . . . . . . . 118

7    1-A through 1-G    . . . . . . . . . . . . . 135

8    401 through 424    . . . . . . . . . . . . . 139

9    443, 444 and 445    . . . . . . . . . . . . 139

10   442    . . . . . . . . . . . . . . . . . . . 141

11   501 through 524    . . . . . . . . . . . . . 143

12   501 through 524    . . . . . . . . . . . . . 143

13   4-S    . . . . . . . . . . . . . . . . . . . 159

14                    DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16   DM200-DM210    . . . . . . . . . . . . . . . 210

17

18

19

20

21

22

23

24

25