G397MIR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                        S2 14 Cr. 810 (CM)
 5   MOSHE MIRILISHVILI,
 6              Defendant.                Trial
 7   ------------------------------x
 8                                        New York, N.Y.
                                          March 9, 2016
 9                                        10:00 a.m.
10
     Before:
11
                        HON. COLLEEN McMAHON,
12
                                          District Judge
13
14                         APPEARANCES
15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17   BROOKE CUCINELLA
          Assistant United States Attorneys
18
     HENRY MAZUREK
19   WAYNE GOSNELL
          Attorneys for Defendant
20
21
     ALSO PRESENT:  MICHAEL MULLER, DEA
22                  ELIZABETH JOYNES, Paralegal
                    MICHAEL DOMANICO, Paralegal
23
24
25
```

G397MIR1

1              (Trial resumed; jury not present)

2              THE COURT:  So, for substantially the reasons

3    articulated in the government's letter, Dr. Mirilishvili's

4    renewed motion is denied.

5              Can we get our witness back on the stand?

6              MR. DISKANT:  Your Honor, with the court's permission

7    and the consent of defendant, we're going to interrupt the

8    testimony of Damon Leonard to begin with Timothy Dewey, who is

9    a custodian from the New York State Bureau of Narcotics

10   Enforcement.

11             THE COURT:  OK.  Are we also go on to your other

12   witnesses here just for the day?

13             MR. DISKANT:  We are, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court)

 2          (Jury present)

 3          THE COURT:  Good morning.  So as you sit down you will

 4    notice that this is not Mr. Leonard.  The reason is that we

 5    have a couple of witnesses who have come in from out of town.

 6    One of the pleasant things about this trial is that the lawyers

 7    have been so wonderfully cooperative to work with, and they

 8    have agreed with one another that we will interrupt the

 9    testimony of Mr. Leonard to get these people on and off the

10    stand so that they can go back to wherever they came from, and

11    then we will go back to Mr. Leonard.

12          So, would you call your next witness, please.

13          MR. DISKANT:  Yes, your Honor.  The government calls

14    Timothy Dewey.

15     TIMOTHY DEWEY,

16        called as a witness by the government,

17        having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MR. DISKANT:

20    Q.  Good morning, Mr. Dewey.

21    A.  Good morning.

22    Q.  Where are you currently employed?

23    A.  I'm employed with the New York State Department of Health,

24    Bureau of Narcotic Enforcement.

25    Q.  The Bureau of Narcotic Enforcement, that's a state agency?

G397MIR1                        Dewey - direct

1    A.  Yes.

2    Q.  Is it also sometimes referred to as BNE?

3    A.  It is.

4    Q.  What is your title with the BNE?

5    A.  I'm a senior investigator, sir.

6    Q.  And what sorts of things do you do as a senior investigator

7    for BNE?

8    A.  I investigate crimes concerning prescription controlled

9    substances, diversion of controlled substances, loss of

10   prescriptions, etc.

11   Q.  And how long have you been a senior investigator for BNE?

12   A.  Since 2013, sir.

13   Q.  And how long have you been with BNE in total?

14   A.  Almost ten years.

15   Q.  Were you employed prior to joining BNE?

16   A.  I was.

17   Q.  What were you doing then?

18   A.  I'm a retired special agent from the United States Air

19   Force, Office of Special Investigations.

20   Q.  And how long were you with the Air Force?

21   A.  I was with the Air Force a little over 20 years.

22   Q.  Let's go back to BNE.  Can you tell us a little bit about

23   what it is that BNE does as a state agency.

24   A.  We're the agency that regulates and controls controlled

25   substances throughout New York State.  We issue prescriptions

1    to providers in New York State.  The official New York State

2    prescription is the prescription that only providers in New

3    York State can use.  We investigate crimes for incidents

4    surrounding those.

5    Q.  In addition to issuing prescriptions -- by prescriptions

6    you're referring to prescription pads --

7    A.  Yes, sir.

8    Q.  -- to providers, does BNE collect any data or information

9    on prescriptions once filled?

10   A.  Yes, we do.

11   Q.  Can you tell us a little bit about that?

12   A.  We collect information from the pharmacies on a daily basis

13   with regards to controlled substance when a prescription is

14   written in New York State.  That information includes things

15   like the serial number, the provider's name, the patient's

16   name, their dates of birth, the substance for which the

17   prescription was written, etc.

18   Q.  And you mentioned that BNE does this for controlled

19   substance prescriptions?

20   A.  Yes.

21   Q.  What is a controlled substance?

22   A.  A controlled substance is a substance that is regulated or

23   controlled by the government that deemed upon its medical use

24   or the possibility for its addition properties.

25   Q.  Can you give us some examples of controlled substances?

1    A.  Oxycodone, hydrocodone, Ambien, Xanax, things of that

2    nature.

3    Q.  Let's talk a little bit about those two different sets of

4    areas or functions you described, the first being the issuance

5    of prescription pads to prescribers.  Can you talk us through

6    the process for how it is a doctor in the State of New York

7    obtains blank prescription pads.

8    A.  A provider would go on to the New York State Health

9    Commerce account, provide it with their information and order

10   prescription pads or prescriptions, and the prescriptions are

11   then sent to the provider's address.

12   Q.  Can a New York State prescriber obtain them from any source

13   other than the BNE?

14   A.  No.

15   Q.  Mr. Dewey, if you could take a look at what has been marked

16   for identification purposes as Government Exhibit 902 and let

17   me know if you recognize that.

18   A.  I do.

19   Q.  What are you looking at?

20   A.  This is an example of blank prescription pads.

21            MR. DISKANT:  The government offers 902.

22            MR. GOSNELL:  No objection.

23            THE COURT:  Admitted.

24            (Government's Exhibit 902 received in evidence)

25            MR. DISKANT:  If we can publish that, Ms. Joynes.

G397MIR1                           Dewey - direct

1    Q.  Mr. Dewey, you were saying this is an example of what four

2    blank prescription pads side by side might look like?

3    A.  Correct.

4    Q.  And an individual sheet, how many individual sheets or

5    prescription pages would be contained in a pad?

6    A.  A pad contains 100 prescriptions.

7    Q.  So this would be a total of 400 prescriptions if it was

8    four pads?

9    A.  Correct.

10   Q.  Does BNE impose any security features on a typical

11   prescription pad?

12   A.  We do, yes.

13   Q.  What sorts of security features does BNE impose?

14   A.  So, we use a sole source provider, and the prescriptions

15   have forge resistance characteristics built in the

16   prescriptions.

17        If you were to photocopy an official New York State

18   prescription, the word void shows up in numerous areas across

19   the front of the prescription.

20        The key factor that we use is on the lower right-hand

21   corner, we impose an eight digit sequence of numbers or

22   alphanumeric sequence that is individualized for each

23   prescription, so it's a serial number that's specifically for

24   that prescription.

25   Q.  And, Mr. Dewey, perhaps to make this easier, if I could

 1    direct your attention to what has been marked for

 2    identification purposes as Government Exhibit 903.  It should

 3    be in that Redwell in front of you.

 4    A.  Yes, sir.

 5    Q.  Do you recognize this?

 6    A.  I do.

 7    Q.  What is it?

 8    A.  This is another example of some of the forge resistant

 9    characteristics of official New York State prescriptions.

10              MR. DISKANT:  The government offers 903.

11              MR. GOSNELL:  No objection.

12              THE COURT:  Admitted.

13              (Government's Exhibit 903 received in evidence)

14    Q.  Mr. Dewey, you were just explaining to the jury some of the

15    typical security features imposed on a prescription pad.  The

16    last one you were talking about was that serial number.  Does

17    the serial number appear -- or where on 903 would the serial

18    number appear?

19    A.  The lower right-hand corner where it says void 00.

20    Q.  So in an actual prescription, rather than the example we're

21    looking at, what would appear where it says void 00?

22    A.  It would have a sequence of letters or numbers, eight

23    letters or numbers.

24    Q.  And I believe you testified before that that was a unique

25    sequence?

G397MIR1                         Dewey - direct

1    A.   It is.

2    Q.   Do any two prescription sheets issued by the BNE have the

3    same eight digit sequence?

4    A.   No, they do not.

5    Q.   Does BNE when it issues blank prescription pads to

6    prescribers maintain any data on those pads?

7    A.   We keep a record of the prescriptions that are shipped out

8    to the providers, yes.

9    Q.   Do you maintain a record of the serial numbers for those

10   pads?

11   A.   We do.

12   Q.   If you could take a look at what should be before you as

13   Government Exhibit 905 and let me know if you recognize it.

14   A.   I do.

15   Q.   What is it?

16   A.   This is a BNE record of Dr. Mirilishvili's ordering

17   practices for prescriptions in New York State.

18   Q.   And so this is for a particular provider whose name is Dr.

19   Mirilishvili?

20   A.   Correct.

21           MR. DISKANT:  The government offers 905.

22           MR. GOSNELL:  No objection.

23           THE COURT:  Admitted.

24           (Government's Exhibit 905 received in evidence)

25           MR. DISKANT:  Ms. Joynes, if we could focus on just

1    the left half of the page where the text appears, and perhaps

2    even zoom in a little bit further just on that top green box.

3    Great.

4    Q.  So, Mr. Dewey, if you could just talk us through what we

5    are looking at.  There is a name and address indicated sort of

6    towards the top of the document that we are looking at.  What

7    is the name?

8    A.  Moshe Mirilishvili.

9    Q.  And that's the name of the doctor making the order?

10   A.  Correct.

11   Q.  And the address below is what?

12   A.  I believe the address that he was practicing out of.

13   Q.  If we go up to the top portion of that same section of the

14   document where it says Proc date, do you see that?

15   A.  Say that -- oh, process date, yes, sir.

16   Q.  Process date is what that means?

17   A.  Correct.

18   Q.  And what is the date that follows that?  What does that

19   indicate?

20   A.  That's the date that the order was processed.

21   Q.  And just below that date there are two eight alphanumeric

22   sequences separated by a dash, 0S07J500 and then 0S07J599.  Do

23   you see that?

24   A.  Yes, sir.

25   Q.  What are those?

1   A.  Those are the serial numbers of the 2,000 prescriptions

2   that are indicated below.  Those 2,000 prescriptions fall in

3   between those two numbers.

4   Q.  So the 2,000 blank prescription sheets that were issued to

5   defendant on this date would fall within those serial number

6   ranges?

7   A.  They would.

8           MR. DISKANT:  Ms. Joynes, if we can move over to the

9   purple side of the document.

10  Q.  What are we looking at here, Mr. Dewey?

11  A.  We are looking at the Petitioner's information.

12  Q.  Would any of this information appear on the prescription as

13  issued by BNE?

14  A.  Yes, they would.

15  Q.  What of this information would appear?

16  A.  The name, the address, the DEA number should appear, or a

17  box where the DEA number can be placed.

18          MR. DISKANT:  We can take that down, Ms. Joynes.

19  Q.  Sir, we talked a little bit about BNE's role in issuing

20  blank prescription pads.  You testified a few moments ago that

21  the other thing BNE does is collect data on prescriptions once

22  filled.

23  A.  Yes.

24  Q.  Can you tell us a little bit about how BNE does that.

25  A.  Pharmacies in New York State when they dispense a

1    controlled substance are required to report that information to

2    the Department of Health, Bureau of Narcotic Enforcement, and

3    the information is reported via the prescription serial number

4    normally through electronic means on a daily basis.

5    Q.   Let's go through that step by step.  You said that a

6    pharmacy is required to report information when the

7    prescription is filled?

8    A.   Yes.

9    Q.   What information does a pharmacy report?

10   A.   They need to report the serial number of the prescription

11   that they filled, the provider who wrote the prescription, the

12   substance for which the prescription was written, the method of

13   payment for the prescription, the amount prescribed, the days

14   for the prescription, as well as the patient's name, the date

15   of birth and identifying information.

16   Q.   And how does the pharmacy gather that information before

17   reporting it?

18   A.   They gather it off the prescription as it enters through

19   their business' official business records.

20   Q.   Do BNE or state law impose any requirements on pharmacies

21   in that regard?

22   A.   We do.

23   Q.   Can you tell us about that?

24   A.   Yeah, it's required that they report on a daily basis for

25   what we consider real-time.

1   Q.  Has a pharmacy always been required to report that on a

2   daily basis?

3   A.  No.  Previously to this they were required to report

4   biweekly.

5   Q.  And when did that change occur?

6   A.  It was August of 2013.

7   Q.  Does BNE collect data on prescriptions for noncontrolled

8   substances?

9   A.  No, we do not.

10  Q.  For example, if a New York State pharmacy was to fill a

11  prescription for Penicillin, would that be reported to BNE?

12  A.  No.

13  Q.  How about prescriptions that are written by New York

14  doctors but filled at a pharmacy out of state; is that reported

15  to BNE?

16  A.  No, it's not.

17  Q.  To give you an example, if a prescription was written by a

18  New York doctor but filled in a pharmacy in New Jersey, would

19  that be collected by BNE?

20  A.  No, we don't collect that information.

21  Q.  Does BNE have the ability to source the data that it

22  collects by a prescribing physician?

23  A.  We do.

24  Q.  How does BNE do that?

25  A.  Well, there are several different ways.  We can sort the

G397MIR1                    Dewey - direct

1   information by name.  We can sort the information by DEA

2   registrant number, or we can collect the information or sort

3   the information through the New York State license, physician

4   license or provider license.

5   Q.  I'm going to direct your attention to what has been marked

6   for identification purposes as Government Exhibit 901.  Let me

7   know if you recognize that.

8   A.  Yes, I do.

9   Q.  How do you recognize it?

10  A.  By my initials and the date that I placed on this disk.

11  Q.  Before dating and initialing the disk, did you review it?

12  A.  I did.

13  Q.  What is on it?

14  A.  This is prescribing data for Dr. Moshe Mirilishvili.

15  Q.  Is that data that was gathered by the BNE?

16  A.  It was, yes.

17  Q.  Where was it collected from?

18  A.  From reporting pharmacies.

19  Q.  Was the data collected at or near the time the

20  prescriptions were filled?

21  A.  It was.

22  Q.  Was the report made to BNE by someone with knowledge of the

23  prescription filled?

24  A.  The pharmacy, yes, sir.

25  Q.  Was the data collected by the BNE as part of its regularly

1    conducted business activities?

2    A.  Yes, sir, that's what we do.

3               MR. DISKANT:  The government offers Government Exhibit

4    901.

5               MR. GOSNELL:  No objection.

6               THE COURT:  Admitted.

7               (Government's Exhibit 901 received in evidence)

8               MR. DISKANT:  Ms. Joynes, if we can publish the

9    contents of 901 and take a look together at line 3959.

10   Q.  Mr. Dewey, what are we looking at here?

11   A.  This is a reflection of the data that's BNE collects from

12   the pharmacist.

13   Q.  And I have asked Ms. Joynes to highlight just one example

14   of that.  Let's walk through it together.  What is the

15   information indicated in column A?

16   A.  Column A would be the individual prescription number, that

17   prescription that entered that pharmacy.

18   Q.  We were talking a few moments ago about that unique eight

19   digit alphanumeric sequence.  Is that what we're looking at in

20   column A?

21   A.  Yes.

22   Q.  Column B?

23   A.  Column B indicates the day that the prescription was

24   actually written.

25   Q.  And column C?

G397MIR1                           Dewey - direct

 1   A.  C is the actual date that the pharmacy filled the

 2   prescription.

 3   Q.  How about column F?

 4   A.  F would be the provider's name.

 5   Q.  So what we are looking at would be a prescription written

 6   on January 10 by Dr. Mirilishvili?

 7   A.  Correct.

 8   Q.  If we could scroll over a little bit.  Let's take a look at

 9   column H and J and L.  Starting with H, what is H?

10   A.  This is the substance for which the prescription was

11   written.

12   Q.  So this particular prescription was for oxycodone

13   hydrochloride 30 milligram tablets?

14   A.  Yes, it was.

15   Q.  And column K, what does that indicate?

16   A.  Sorry, sir?

17   Q.  Column K?

18   A.  Column K is the quantity.

19   Q.  OK.  And column L?

20   A.  Column L is the strength of the product.

21   Q.  So the entry we're looking at is a prescription that was

22   filled for 90 30 milligram oxycodone tablets?

23   A.  Correct.

24   Q.  Let's keep scrolling a little bit.  Directing your

25   attention, Mr. Dewey, to columns O and P, what are those?

1    A.  Those are the patients' names.

2    Q.  And column W?

3    A.  W is the method of payment.

4    Q.  And is that the method of payment fore seeing the doctor or

5    for filling the prescription?

6    A.  That's the method of payment for the pharmacy or filling

7    the prescription.

8    Q.  Does BNE collect data on the method of payment for seeing

9    the doctor?

10   A.  No.

11   Q.  Just keep scrolling and take a look at column Z.  What is

12   that?

13   A.  Column Z is the pharmacy that filled the prescription.

14   Q.  Thank you.

15           If we can just scroll all the way down to the bottom

16   of this spreadsheet.

17           Mr. Dewey, what time period is reflected on this

18   spreadsheet?

19   A.  This is 2012 I believe through 2014.

20   Q.  Let's go all the way up to the top.

21   A.  I'm sorry, 2010.

22   Q.  January 2010 to December 2014?

23   A.  Correct.

24   Q.  And how many controlled substance prescriptions were

25   reported as written by Dr. Moshe Mirilishvili to BNE?

1    A.  16,711.

2    Q.  Mr. Dewey, are you familiar with the issue of prescription

3    forgeries?

4    A.  I am.

5    Q.  Can you tell us a little bit about that.

6    A.  Well, in New York State some people have a tendency to

7    forge prescriptions to garner controlled substances for illicit

8    use.

9    Q.  And does BNE have any way, based on the data it collects,

10   to monitor for prescription forgeries or potential forgeries?

11   A.  We do.

12   Q.  How do you do that?

13   A.  Many times we will compare the serial number of a

14   prescription that's sent to the pharmacy to the provider to

15   ensure that they're the same, that that prescription pad was

16   actually issued to that provider.

17   Q.  So just to break that down a bit, the serial numbers in

18   column A you testified previously were unique?

19   A.  Correct.

20   Q.  And when you issue a prescription pad to the provider, do

21   you maintain a record of the serial numbers on those pads?

22   A.  We do.

23   Q.  And you are able to compare those two items?

24   A.  We do.

25   Q.  If the serial number in column A matches a serial number on

1  a prescription pad issued to the prescriber, what does that
2  mean to BNE?
3  A.  It would indicate that the prescription was written by the
4  provider.
5  Q.  If the prescription number as reported in column A does not
6  match a pad issued to that prescriber, what does that mean to
7  BNE?
8  A.  It could mean that it's a possible forgery.
9  Q.  Are there other potential implications?
10  A.  It could mean that the provider was working at an
11  institution where their pads weren't being used.
12  Q.  Let's talk a little bit about that.  In addition to issuing
13  prescription pads to providers, does BNE issue prescription
14  pads to anyone else?
15  A.  We issue to institutions, hospitals, clinics, multiple
16  provider locations.
17  Q.  So if a practitioner was working at a hospital, for
18  example, would a practitioner be entitled to write a
19  prescription on a pad that was ordered by the hospital?
20  A.  It would be.
21  Q.  You talked a bit about forged prescriptions.  Are you
22  familiar with the issue of stolen prescriptions?
23  A.  I am.
24  Q.  Is there any way, based on BNE data for the BNE to monitor
25  the potential of stolen prescriptions?

1    A.  Yes.

2    Q.  How does BNE do that?

3    A.  We require -- it's a law in New York State that providers

4    must report lost or stolen prescriptions to the BNE.

5    Q.  Mr. Dewey, if I could direct your attention to what has

6    been marked for identification purposes as Government Exhibit

7    904.

8    A.  Yes, sir.

9    Q.  Do you recognize that?

10   A.  I do.

11   Q.  What is that?

12   A.  This is a lost or stolen prescription report.

13   Q.  For whom?

14   A.  For Dr. Mirilishvili.

15   Q.  Is this a record kept and maintained by the BNE?

16   A.  It is.

17           MR. DISKANT:  The government offers 904.

18           MR. GOSNELL:  No objection.

19           THE COURT:  Admitted.

20           (Government's Exhibit 904 received in evidence)

21           MR. DISKANT:  Ms. Joynes, can you just zoom in on the

22   top of this document.

23   Q.  So, Mr. Dewey, according to the document, how many total

24   prescriptions had Dr. Mirilishvili reported as stolen?

25   A.  14.

1    Q.  And in addition to reporting a total number of

2    prescriptions stolen, are physicians required to report any

3    other sort of information?

4    A.  The prescription range, the individual serial numbers.

5    Q.  Those unique numbers we were talking about before?

6    A.  Correct.

7              MR. DISKANT:  Ms. Joynes, if we can go to the second

8    page of this document.

9    Q.  What is this, Mr. Dewey?

10   A.  This indicates the DEA registrant number in the beginning,

11   the date that the lost or stolen prescriptions were reported,

12   and then the end would be the prescription serial numbers

13   themselves, the range.

14   Q.  For the range that was reported as stolen?

15   A.  The range, yes.

16   Q.  And this report was made on September 24, 2013?

17   A.  Yes, sir.

18   Q.  For the time period that we have been talking about, 2010

19   to 2014, does BNE have any additional records of prescriptions

20   reported as stolen by this practitioner?

21   A.  No, sir.

22   Q.  Using this information, that is, the information on the

23   reported stolen prescriptions --

24              If we can go back, Ms. Joynes, to 901.

25              -- were you able to determine whether any of the

G397MIR1                          Dewey - direct

 1   prescriptions reported as stolen were subsequently filled at a
 2   pharmacy?
 3   A.  Yes, I was.
 4   Q.  How many of the 14 stolen prescriptions were then reported
 5   as filled?
 6   A.  12.
 7   Q.  And additionally we were talking about the ability of BNE
 8   to compare the unique serial numbers reported as filled to the
 9   serial numbers on the pads issued to the provider, in this case
10   Dr. Mirilishvili.  Have you been able to do that with the
11   16,711 prescriptions reported in Government Exhibit 901?
12   A.  Yes.
13   Q.  How did you do that, by the way?
14   A.  Actually I went line by line through the prescriptions.
15   Q.  Let's take it by time period if we can.  Focusing your
16   attention on the time period January 1 of 2012 to December 31,
17   2014, approximately how many controlled substance prescriptions
18   were reported to BNE as being written by Dr. Mirilishvili?
19   A.  Over 15,000.
20   Q.  And of those more than 15,000, how many of them were you
21   unable to match to a prescription pad issued to Dr.
22   Mirilishvili?
23   A.  216.
24   Q.  So with respect to the remaining, all other than the 216,
25   you were able to match the serial number reported by the

1   pharmacy to a prescription pad issued to Dr. Mirilishvili?

2   A.  I was.

3   Q.  If I can direct your attention, Mr. Dewey, to the disk

4   that's been marked as Government Exhibit 901-A.  Do you

5   recognize that?

6   A.  I do.

7   Q.  How do you recognize it?

8   A.  By my initials and the date that I placed on the disk.

9   Q.  And what is contained on Government Exhibit 901-A?

10  A.  This is the BNE data from the period of 2012 through 2014

11  for the doctor.

12  Q.  Is anything omitted from Government Exhibit 901-A?

13  A.  Yes, we omitted the 216 prescriptions that cannot be

14  matched as well as the 12 stolen prescriptions that were

15  reported.

16          MR. DISKANT:  The government offers 901-A.

17          MR. GOSNELL:  No objection.

18          THE COURT:  Admitted.

19          (Government's Exhibit 901-A received in evidence)

20  Q.  Were you able to conduct a similar analysis for the time

21  period 2010 and 2011?

22  A.  I was.

23  Q.  OK.  Is it fair to say there are approximately 1299

24  controlled substances prescriptions reported to BNE and written

25  by the defendant during that time period?

1   A.  That is correct.

2   Q.  Of those, what percentage were you able to match to a

3   prescription pad issued to the defendant?

4   A.  49 percent.

5   Q.  And again how did you do that?

6   A.  Line by line, checking the serial numbers to the order to

7   prescriptions that were provided to the doctor.

8   Q.  And I am directing your attention to what has been marked

9   for identification purposes as Government Exhibit 901-B.

10  A.  Yes, sir.

11  Q.  Do you recognize that?

12  A.  I do.

13  Q.  How do you recognize it?

14  A.  By my initials and the date that I placed on the CD.

15  Q.  And before initialing and dating the CD, did you review its

16  contents?

17  A.  I did.

18  Q.  What does it contain?

19  A.  It contains the prescribing BNE data history from 2010

20  through 2011.

21  Q.  And with respect to -- does it contain all of the data or

22  just a subset?

23  A.  This is all of the data.

24  Q.  We talked just a moment ago, Mr. Dewey, about the process

25  that you are going through of segregating out the prescriptions

1    you were able to match.

2    A.   Correct.

3    Q.   Did you segregate out the 49 percent?

4    A.   That's correct, these are the prescriptions written on the

5    doctor's pads.

6    Q.   So just to be clear, the Government Exhibit 901-B is the 49

7    percent of the prescriptions reported in 2010 and 2011 that you

8    were able to match to a pad issued to the defendant?

9    A.   It is.

10            MR. DISKANT:   The government offers 901-B.

11            MR. GOSNELL:   No objection.

12            THE COURT:   Admitted.

13            (Government's Exhibit 901-B received in evidence)

14   Q.   With respect to the remaining 51 percent of the controlled

15   substance prescriptions reported during that time period, were

16   you able to identify the source of the prescription pads for

17   any of those?

18   A.   Yes, I was.

19   Q.   If I can direct your attention, Mr. Dewey, to what has been

20   marked for identification purposes as Government Exhibit 906.

21   A.   Yes, sir.

22   Q.   Do you recognize that?

23   A.   I do.

24   Q.   What is it?

25   A.   This is an order history for prescriptions for La Casa De

1     Salud.

2     Q.  Is this a record of the BNE?

3     A.  Yes, it is.

4                MR. DISKANT:  The government offers 906.

5                MR. GOSNELL:  No objection.

6                THE COURT:  Received.

7                (Government's Exhibit 906 received in evidence)

8                MR. DISKANT:  Ms. Joynes, can we publish that.  Let's

9     focus on the left-hand side, that top left green area, Ms.

10    Joynes, if we can.  Actually just a little bit higher if you

11    don't mind so we get those tabs.

12    Q.  So, Mr. Dewey, here we're looking at a tab on the top that

13    says institution.  Do you see that?

14    A.  Yes.

15    Q.  And towards the bottom of the screen as we are looking at

16    it now it says product institution RX?

17    A.  Correct.

18    Q.  What sort of a prescription pad order is this?

19    A.  This is a prescription pad for the institution itself that

20    apparently has multiple providers at that location.

21    Q.  When we were talking a few moments ago about the fact that

22    BNE issued prescriptions both to providers and to institutions,

23    is this an example of the latter category?

24    A.  It is.

25    Q.  And this particular institution, where is it located?

1   A.  This is in the Bronx, I believe.

2   Q.  966 Prospect Avenue?

3   A.  Yes.

4   Q.  And if we go up to the top, do you see again the eight

5   digit alphanumeric sequence followed by a dash, followed by

6   another eight digit sequence?

7   A.  Correct.

8   Q.  What is that?

9   A.  That's the range of prescription that the 5,000

10  prescription total falls between.

11  Q.  And were you able to associate Dr. Mirilishvili with this

12  particular institution?

13  A.  I was.

14  Q.  If we can bring up what is in evidence as Government

15  Exhibit 1206 and just focus down on that bottom half.  Do you

16  see the address of Case De Salud here?

17  A.  Yes, do.

18  Q.  That is the 966 Prospect Avenue, Bronx, New York address?

19  A.  Yes.

20  Q.  Mr. Dewey, in your line-by-line analysis, what percentage

21  of the prescriptions reported as written by the defendant

22  during the period 2010 to 2011 were you able to correspond to

23  prescription pads issued to La Casa De Salud?

24  A.  It was approximately 46 percent of the prescriptions.

25  Q.  And I'm directing your attention to what has been marked as

1   Government Exhibit 901-C.  If you could take a look at that.

2   A.  Yes, sir.

3   Q.  Do you recognize that?

4   A.  I do.

5   Q.  How do you recognize it?

6   A.  By my initials and the date that I placed on the CD.

7   Q.  And the contents of the CD, did you review that before

8   initialing it?

9   A.  I did.

10  Q.  What does that contain?

11  A.  This contains the 2010 to the 2011 La Casa De Salud

12  prescriptions.

13  Q.  Written by the defendant?

14  A.  Correct.

15          MR. DISKANT:  The government offers 901-C.

16          MR. GOSNELL:  No objection.

17          THE COURT:  Admitted.

18          (Government's Exhibit 901-C received in evidence)

19  Q.  Mr. Dewey, just to put those two analyses together, it

20  sounds like you were able to identify 49 percent as written on

21  pads issued to the defendant; is that right?

22  A.  Correct.

23  Q.  And 46 percent is issued on pads written -- excuse me --

24  written on pads issued to Casa De Salud?

25  A.  Correct.

1   Q.  One final subject, Mr. Dewey.  Are you familiar with

2   something called the ISTOP program?

3   A.  I am.

4   Q.  What is the ISTOP program?

5   A.  The ISTOP is the prescription monitoring program that New

6   York State administers that stands for the Internet System to

7   Track Overprescribing.  It's to ensure that providers go on to

8   the PDMP or the PMP program and to ensure that their patients

9   have not received -- or it gives them a snapshot of the

10  controlled substances that their patients have received in the

11  last six months.

12  Q.  Very briefly, how does it work?

13  A.  The providers are authorized to go on to the PDMP and check

14  the patient's name, their date of birth, to ascertain whether

15  or not they have received controlled substances from any other

16  providers in that time period.

17  Q.  And why is that important to BNE?

18  A.  Well, it's public safety and public health, because we had

19  quite a few people that were out doctor shopping from doctor to

20  doctor, garnering prescriptions and taking them out onto the

21  streets.

22  Q.  For prescribers in the State of New York is participation

23  in the PMP program optional?

24  A.  No, it's mandatory.

25  Q.  And when did PMP or ISTOP take effect?

1    A.  August 27, 2013 is the date it went in place.

2    Q.  And does the BNE have any way of monitoring whether or not

3    a prescriber is complying with PMP?

4    A.  We can, yes.

5    Q.  How do you do that?

6    A.  We can go on by doctor's name and check to see -- it gives

7    us a listing of the patients that the doctors checked.

8              MR. DISKANT:  Your Honor, if I can just have a moment.

9              Nothing further.

10             THE COURT:  Cross?

11             MR. GOSNELL:  May I inquire, your Honor?

12             THE COURT:  You may.

13   CROSS EXAMINATION

14   BY MR. GOSNELL:

15   Q.  Good morning, Mr. Dewey.

16   A.  Good morning.

17   Q.  I'm Wayne Gosnell.  I represent Dr. Mirilishvili.  We

18   haven't met before, have we?

19   A.  No.

20   Q.  I want to start where we kind of left off with the PMP

21   program.  You said that doctors are required as of August 2013

22   to run checks on their patients before prescribing a controlled

23   substance, correct?

24   A.  Correct.

25   Q.  And they're also allowed to designate someone in the office

G397MIR1                         Dewey - cross

1    to run that check for them.

2    A.  Correct.

3    Q.  You are aware that the prescription monitoring program, the

4    PMP program, is a very sensitive program.

5    A.  It is.

6    Q.  So, for example, if a name is entered incorrectly either by

7    the pharmacy or by the doctor searching for it, you may not

8    find all the results.

9    A.  The provider may not find all the results, correct.

10   Q.  BNE would have a record of the prescription being filled,

11   but if you're searching in the PMP system it may not show up if

12   you're using a name backwards, for example.

13   A.  Correct, you would get not the information for the patient

14   you were looking for.

15   Q.  OK.  And the PMP system -- and in fact BNE records

16   themselves -- they don't collect -- sorry, the New York BNE

17   records, they don't collect information if a patient has filled

18   a prescription in a different state.

19   A.  No.

20   Q.  And they don't collect information if a patient has filled

21   their prescription through the VA hospitals, correct?

22   A.  No.  But we have given the VA authorization to use the PDMP

23   program, so there are people in the VA checking the systems.

24   Q.  But if a doctor was checking on a patient who had filled

25   their prescription through the VA system, they would not be

G397MIR1                         Dewey - cross

 1   able to see that because the VA doesn't report that information

 2   to the BNE.

 3   A.  That's correct.

 4   Q.  And the PMP records themselves, they only show you a

 5   snapshot of about six months for the patient, correct?

 6   A.  The provider can see six months.  BNE itself can see back

 7   five years.

 8   Q.  OK.  But the provider, if the provider is doing a check on

 9   a patient, they're only going to see six months.

10   A.  That's correct.

11   Q.  And that's to the day.

12   A.  Correct.

13   Q.  Now, you said that one of the things that the Bureau of

14   Narcotics Enforcement does is that you investigate stolen

15   prescriptions.

16   A.  That's correct.

17   Q.  And a provider, if he is aware that prescriptions have been

18   stolen, is required by law to report that information to the

19   Bureau of Narcotics Enforcement.

20   A.  That's correct.

21          MR. GOSNELL:  Can we bring up Government Exhibit 904.

22   Q.  Do you have 904 in front of you?

23   A.  Yes, sir, I do.

24   Q.  You testified on direct examination that this was a record

25   that the Bureau of Narcotics Enforcement made regarding

G397MIR1                          Dewey – cross

1    prescriptions that were stolen from Dr. Mirilishvili.

2    A.   That's correct.

3    Q.   And the date of the report is September 24th of 2013,

4    correct?

5    A.   I believe that's on the reverse side, sir.

6    Q.   Sorry, we're having a little technical difficulties here.

7           In the upper left-hand corner it says report date?  Is

8    that a little clearer now?

9    A.   Yes, sir.

10   Q.   It indicates it was reported on September 24th of 2013.

11   A.   Correct.

12   Q.   And once a report of prescriptions being stolen are made,

13   the Bureau of Narcotics Enforcement sends an alert out to

14   pharmacies?

15   A.   We place the information on our website, which allows the

16   pharmacies to look at those prescriptions.

17   Q.   And pharmacies are required to look at that before they

18   fill a prescription.

19   A.   I don't know about the requirement, sir, but it certainly

20   is encouraged.

21   Q.   It's something they should do.

22   A.   Correct.

23   Q.   And you are aware from your review of the records that --

24   well, withdrawn.

25           If the prescriptions were stolen on September 23rd of

G397MIR1                              Dewey - cross

1   2013, and it was reported on September 24th of 2013, that would

2   be a timely reporting by Dr. Mirilishvili, correct?

3   A.  I would agree with that, yes, sir.

4   Q.  OK.  And between the time that the -- assuming the

5   prescriptions were stolen on the 23rd, between the time that

6   those were stolen and the time that they were reported and the

7   time that you put the alert up on your website, you're aware

8   based on your review of the records that those prescriptions

9   were filled.

10  A.  I didn't get in that detail, sir.

11  Q.  OK.  But that's something that you can check by looking at

12  the particular prescription pad numbers that were reported

13  stolen and going back to Government Exhibit 900, correct?

14  Which was the entire BNE records.

15  A.  You could, I believe.

16  Q.  You didn't personally do that, but it can be done.

17  A.  No, I did not.

18  Q.  OK.  You also testified on direct examination that the BNE

19  records only show controlled substance prescriptions.

20  A.  Correct.

21  Q.  OK.  And it doesn't just show oxycodone.  That is,

22  oxycodone is a controlled substance, correct?

23  A.  It is.

24  Q.  And so if a prescription is issued for oxycodone and is

25  filled, that's going to show up on the BNE records.

G397MIR1                         Dewey - cross

1    A.  Yes, sir.

2    Q.  Oxycontin is a different type of controlled substance.

3    A.  Yes.

4    Q.  That would show up on the BNE records.

5    A.  Yes.

6    Q.  Lyrica is a different type of controlled substance,

7    correct?

8    A.  Correct.

9    Q.  That's used to treat nerve damage caused by diabetes.

10   A.  To my understanding, yes, sir.

11   Q.  OK.  And that would show up on the BNE records that that

12   was a prescription that was issued and filled.

13   A.  Yes, sir.

14   Q.  Opana is a different type of controlled substance.

15   A.  Yes.

16   Q.  That would show up on the BNE records?

17   A.  It should.

18   Q.  Methadone is a different type.

19   A.  Yes, sir.

20   Q.  And that would show up?

21   A.  It should.

22   Q.  And Endocet and Percocet, which is a mixture of oxycodone

23   and Tylenol, that would also show up?

24   A.  It should, yes, sir.

25   Q.  OK.  And that's something that if you were to look through

1  the spreadsheet, you can sort through it, and you can tell

2  whether or not there are those different prescriptions issued

3  and filled under Dr. Mirilishvili's prescriptions, correct?

4  A.  Yes, sir.

5  Q.  The other thing that you mentioned was the method of

6  payment.  That's something that shows up on the BNE records.

7  A.  Yes, sir.

8  Q.  And that would show whether or not the person filling the

9  prescription was paying in cash, was paying insurance and

10  sometimes it's more specific and it said Medicaid, correct?

11  A.  Yes, sir.

12  Q.  And again that has nothing to do with the method of payment

13  for the doctor's visit, only how they were paying for the

14  prescription itself.

15  A.  It's how the prescription was paid for at the pharmacy,

16  yes.

17  Q.  It also indicates where the pharmacy was that filled it,

18  correct?

19  A.  Yes.

20  Q.  It indicates -- from your review it indicates smaller

21  pharmacies and larger pharmacies.

22  A.  I didn't drill down to that detail, sir.

23  Q.  You saw that there were Rite Aid pharmacies, there were MNS

24  pharmacies, things like that?

25  A.  I saw that there were multiple pharmacies.

1   Q.  OK.  Several hundred.

2   A.  Again, I did not drill down into that detail.

3   Q.  OK.  That's something though if you were to do an analysis

4   of the BNE data that was presented and that you testified to,

5   that's something that could be done if you were to pull all

6   that data and collect it.

7   A.  Correct.

8           MR. GOSNELL:  One moment, your Honor.

9           Nothing further, your Honor.

10          THE COURT:  Anything else?

11          MR. DISKANT:  No, your Honor.  Thank you.

12          THE COURT:  Thank you, sir.  You may step down.

13          (Witness excused)

14          THE COURT:  Call your next witness, please.

15          MS. CUCINELLA:  The government calls Mr. Poremba.

16   MICHAEL POREMBA,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MS. CUCINELLA:

21   Q.  Good morning, Mr. Poremba.

22   A.  Good morning.

23   Q.  Where do you work?

24   A.  I work at a company called Practice Fusion.

25   Q.  What is Practice Fusion?

1    A.   Practice Fusion is a provider of on-line medical records

2    maintenance for physicians.

3    Q.   When you say on-line medical records, what do you mean?

4    A.   It's a web-based service that allows doctors, medical

5    practices to maintain medical records on a cloud-based computer

6    system.

7    Q.   Do physicians have to pay for this service?

8    A.   They do not.  The service is free for physicians to use.

9    Q.   For how long has Practice Fusion been in business?

10   A.   Practice Fusion was founded back in 2006.

11   Q.   And for how long have you worked at Practice Fusion?

12   A.   I joined Practice Fusion in 2011, so about five years ago.

13   Q.   What is your job at Practice Fusion?

14   A.   I'm director of data architecture, that's my role.

15   Q.   What does that mean?

16   A.   I help programmers to design and implement data structures

17   to store medical data in the on-line medical records system.

18   Q.   Approximately how many healthcare providers use Practice

19   Fusion as of today?

20   A.   On a normal business days we will have tens of thousands of

21   healthcare practitioners using the system to maintain medical

22   records.

23   Q.   Is that nationwide?

24   A.   Yes, the users are across the country.

25   Q.   What kind of records would a physician be able to maintain

1    or upload into the Practice Fusion platform?

2    A.   The system allows physicians to maintain a variety of

3    things about a patient and the care that they give to the

4    patient.  For example, the general patient information, their

5    name, their birth date, their Social Security number, these

6    types of things are recorded in the foundation of who the

7    patient is.

8              In addition, they would keep track of a patient's

9    medical history through the interview.  They could maintain a

10   history of even their family members for diseases, for

11   instance, that might be inherited.

12             The doctor can also maintain notes in the system about

13   the care that they provide to the patient.  So, for instance,

14   when they visit with the patient they can use it to transcribe

15   information.

16             The system also allows doctors to submit orders for

17   labs, medical labs, and receive those results back from the

18   labs.

19             It allows doctors to communicate with one another; it

20   has messages back and forth.  It allows doctors to exchange

21   medical records with one another.

22             And it allows doctors to maintain a list of

23   medications that the patient is taking or has taken in the

24   past.  It allows the doctors to record prescriptions that

25   they've made for these patients, and for those to be

1    electronically transmitted, prescriptions to be transmitted to

2    a pharmacy.

3    Q.  I want to go through just a couple of those things that you

4    mentioned.  You mentioned records from other doctors and lab

5    results.  How does that work with the platform?

6    A.  When a doctor, say a primary care physician, needs the help

7    of a specialist, they're able to share the medical record that

8    they have created for this patient with another physician who

9    might not have any information about the patient.  So, another

10   user of Practice Fusion could receive those medical documents;

11   the primary doctor's documents could be shared with another

12   physician on the platform.  Another way that this could happen

13   is that a fax could be sent to another physician's fax number.

14   Q.  And how does it work with respect to lab results?

15   A.  With respect to lab results, a physician chooses to engage

16   with a particular laboratory that they have a working

17   relationship with, and they can fill out orders for medical

18   tests, to take a sample from a patient, perform analysis of

19   that sample, get the results back from that lab, and so the

20   system allows the doctor to fill out the order and get those

21   results back.

22   Q.  Is that a secure system?

23   A.  It is a secure system, yes.

24   Q.  You also mentioned prescriptions.  How does the platform

25   keep track of prescriptions that a physician writes?

1  A.  When a physician wants to prescribe medication to a

2  patient, first the medication itself is added to the patient's

3  record.  Next the prescription is filled up with some details

4  around the dosage, the start and end date, the anticipated

5  start date, the particular medication.  So in one sense it's a

6  form of an order that is created, and we record the

7  prescription in the system that can then be either printed out

8  or sent electronically to the pharmacy to be filled.

9  Q.  Are there state regulations that sometimes prohibit doctors

10  from sending prescriptions for certain medicines to pharmacies?

11  A.  There are.

12  Q.  So, for instance, in New York State, do you know if you can

13  send a prescription for a controlled substance to a pharmacy

14  through an e-script?

15  A.  My understanding about New York regulation is that in the

16  past it's been prohibited, and in the near future it will be

17  required.

18  Q.  You mentioned sending them automatically.  Is there also a

19  way to keep track of handwritten prescriptions in the Practice

20  Fusion platform?

21  A.  It would be up to the physician to do this, but there is a

22  facility where any document associated with patient care can be

23  scanned in and saved on-line and viewed later.

24  Q.  Does the platform offer any other services relating to

25  medications?

1    A.   Medications?  For example, we have an alerting system that

2    allows physicians to be warned if the medication that's being

3    prescribed has interactions with other medications the patient

4    might be on.

5         So, if a patient is already on a medication, or if a

6    physician is prescribing more than one medication, those are

7    analyzed by a knowledge-based system that will alert the

8    physician as they're prescribing whether there are any

9    warnings, health risks associated with the combination of

10   medications.  It's up to the provider then to decide what to do

11   with those warnings.

12   Q.   And in order for those alerts to appear, the medication has

13   to be entered into the platform system; is that right?

14   A.   That's right.  So, for example, if it was scanned in as a

15   document, it would not be incorporated into that alerting

16   mechanism; it would have to be entered more explicitly as a

17   medication.

18   Q.   When a physician signs up for the Practice Fusion platform,

19   how do they learn to use it?

20   A.   We have a number of ways to gain familiarity with how the

21   system works and how to use it.  It's an on-line system, so

22   doctors are offered articles, blog posts that describe various

23   work flows that the physician might go through in the system.

24        So, for instance, the prescription work flow might

25   have some pages that describe the usage of the system and also

1  some screen shots that would illustrate what the sample section

2  might look like.

3        In addition, we have videos on-line where someone is

4  voicing over the video, instructing how to use the system and

5  then illustrating that video, and you can actually see the

6  transition of the screens as the worker is working through the

7  system.

8        Lastly, there is a customer support team that is

9  available on call to help answer questions that a physician may

10 have, walk them through things that might not be documented

11 through those other means, help them with any questions they

12 might have about the system.

13 Q.  You testified earlier that a doctor can keep track of notes

14 in the system.  What are some kinds of notes that a physician

15 can enter into your platform?

16 A.  That's right.  Maintaining notes is a common usage of the

17 system.  A doctor could keep a number of different types of

18 notes, for instance, logging a telephone call that they had

19 with a patient, logging a very generic note, which is just a

20 place to enter text.

21       Then there is a more structured note that's very

22 commonly used in the industry called the SOAP note.  A SOAP

23 note is like the textual note except it's formed in four parts:

24 The S section, the O section, the A section and the P section.

25 SOAP.  S stands for subjective.  O stands for objective.  A

G397MIR1                        Poremba - direct

1    stands for assessment.  P stands for plan.  So this type of

2    note is helpful for the doctor thinking through subjective,

3    what did the patient report to me; objective, what did I

4    observe of the patient that maybe wasn't described by

5    themselves; assessment, meaning what is it that I conclude

6    about the patient's condition; and plan, what do I intend to do

7    to help the patient get past what has been identified as a

8    health problem.

9    Q.  Those notes that are entered into Practice Fusion, those

10   are notes of the physician, not records of Practice Fusion; is

11   that fair?

12   A.  Correct, the Practice Fusion platform is used by doctors to

13   maintain their notes; practice Fusion doesn't contribute to

14   those notes.

15   Q.  Does Practice Fusion keep track of a physician's activity

16   within the platform?

17   A.  One of the features in the system is to record actions

18   taken by users in the system, yes.

19   Q.  How does it do that?

20   A.  When actions are taken on the system, it's implemented in

21   such a way that there is an audit record taken of who performed

22   what action at what time.  And if there is a patient record in

23   the context of that action, then which patient record.

24   Q.  You called it an audit record.  Is there another name that

25   you have used to describe that audit record?

G397MIR1                    Poremba - direct

1   A.  We call that subsystem the activity feed.

2   Q.  You also just mentioned that the audit record or the

3   activity feed monitors who performs what action at which time

4   and on which patient record.  How do you monitor who performs

5   the action?

6   A.  Well, it's an on-line system, so users can access medical

7   records for their practice on-line.  They log into our system

8   by hitting a specific URL and providing their user name, their

9   unique user name that identifies them.  They provide a

10  password, which is the secret only they should know.  And the

11  first time they're using a specific browser they are challenged

12  with a code that is sent to their mobile phone.  Those pieces

13  of information can be entered into the log-in screen, and then

14  they are granted access to the medical records that they have

15  permission to use.

16  Q.  Does the software allow for a physician to set specific

17  permissions for different individuals within their practice?

18  A.  Yes.  So, when the initial user, the first user, signs up

19  for their practice, they are considered an administrator with

20  master rights over the system.  They can then go ahead, they

21  are free to create additional users in the system who can

22  access that same set of patient medical records, so, for

23  example, a staff member or another physician.  It's possible to

24  configure the security level of those additional users to

25  restrict them from certain activity on the system.

G397MIR1                         Poremba - direct

1    Q.  Let's turn back to the activity feed.  How is the

2    information about who is performing what action reflected in an

3    activity feed?

4    A.  The activity feed entries store the name of the user who

5    performed the action, and also behind the scenes stores a

6    unique identifier that is used to link back to that user's

7    record.

8    Q.  Can a physician who is using the Practice Fusion platform

9    edit an activity feed?

10   A.  No.  Activity feed is by design not modifiable.  From

11   healthcare regulations, federal regulations through HIPAA, the

12   audit log is by design meant to be a definitive record of who

13   performed what action on the system.

14       So, if a database user were behind the scenes trying

15   to modify the data store that makes up the activity feed, they

16   would be prevented from either changing or deleting entries,

17   and an alert would be sent to our security team.

18       MS. CUCINELLA:  Ms. Joynes, can you please place on

19   his screen what has been marked for identification as

20   Government Exhibit 1212.

21   Q.  Mr. Poremba, do you recognize this document?

22   A.  So, these --

23   Q.  Before you look at it, is this a document that reflects a

24   typical activity feed that would be maintained by Practice

25   Fusion?

1   A.   Yes.  And these appear to be activity feed entries.

2   Q.   And the user name on this and the patient names have been

3   redacted; is that right?

4   A.   I see, yes, they have been.

5            MS. CUCINELLA:  The government offers Exhibit 1212.

6            MR. GOSNELL:  No objection as a demonstrative aid.

7            THE COURT:  It's offered as an exhibit, not as a

8   demonstrative aid.  Do you have an objection?

9            MR. GOSNELL:  No objection.

10            THE COURT:  Admitted.

11            By the way, folks, redacted means we have covered over

12   the names of people as patients, which is confidential

13   information, and you don't need it to decide this case.

14            MS. CUCINELLA:  Ms. Joynes, if you can pull it up on

15   the big screen and blow up the top section.

16   Q.   Mr. Poremba, can you tell the jury what they are looking

17   at?

18   A.   So, this is a list of activity feed entries.  On the

19   right-hand side you will see some English text that describes

20   an action that was performed.

21            This blown-up section here, the gray section now on

22   the left-hand side would be where the user took an action.

23   Their name would show up there.  There is a textural

24   description there that indicates what action that user took.

25   And there is a little bit of contextual information on the

right-hand side.  The grayed-out portion would be the patient's

name.  Then just to the right of that it gives a little bit

more context as to what information in the medical records

was -- the subject or the action that the user took.

Q.  Can we walk through a couple of these, and can you explain

to us what it means, what the action that's reflected in the

activity feed means.

        Turning to the first one, updating an existing SOAP

note chart for, as you said, that would presumably be a

patient's name, date of service 6/24/2014.

A.  Yes.  The updated and existing SOAP note, chart note,

refers to a user taking action on a note that already exists in

the system, meaning it had been created sometime in the past.

The user is accessing that SOAP note and has decided to change

it by altering, for example, some of the text, maybe changing

that date of service.  There are some other pieces of

information associated with the SOAP note that would

potentially be modified and that would then generate this

event.

        The patient's name would appear there on the

right-hand side.  And the "with date of service" indicates the

date of the patient's encounter that the doctor would have been

recorded in chair chart note.

Q.  And for updated a diagnosis, the second entry on this

sample?

G397MIR1                          Poremba – direct

1    A.  Yes, updated a diagnosis, again this would have been a

2    diagnosis the doctor had previously recorded associated with

3    the patient's medical record and medical history.

4           Updated means something about that diagnosis was

5    modified.  Diagnosis record includes, for instance, a start

6    date and an end date and some other fields.  So one of those

7    fields would have been modified on the existing diagnosis.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. CUCINELLA:

2    Q.  Is it fair to say that when the activity feed reflects the

3    word updated, it means something has been modified?

4    A.  Yes.

5    Q.  Turning to the next entry, started a new SOAP chart note

6    for date of service, what does it mean to start a new note?

7    A.  If the patient medical record contained one SOAP note prior

8    to this action, after the action the user would have two SOAP

9    notes.  So it's a matter of creating or adding a new SOAP chart

10   note to an existing patient medical record.

11   Q.  And going down a little bit further, what does it mean to

12   delete a document?

13   A.  Delete a document.  So a document, so for instance the

14   example we had before was a manual prescription, that could be

15   scanned into the system and uploaded and associated with a

16   patient.  Documents can be flagged for deletion, meaning

17   they're no longer visible to the user.

18   Q.  What does it mean to sign an existing SOAP chart note?

19   A.  A common practice is for doctors once they're finished

20   documenting a patient encounter is to mark it as completed.

21   Signing activity records the user who performed the signing,

22   thereby taking ownership for or approving the documentation

23   associated with that chart note.  It records the date and time

24   that that signing took place.  And once the signing is

25   completed, the chart note is then no longer modifiable.  It can

1   be amended with additional comments, but it's from that point

2   on cannot be modified in our system.

3   Q.  Once a chart note or another document has been signed as

4   the term is used in your platform, can it then be deleted?

5   A.  It cannot be.  A signed note cannot be deleted.

6   Q.  Finally at the bottom it says inserted a medication.  What

7   does it mean for something to be inserted into a medical

8   record?

9   A.  The medical record, again, contains a list of the

10  medications that patient was on.  This would be adding a

11  medication that wasn't on the record before.  So if a patient

12  had one medication listed, after inserting a medication it

13  would have two medications on their record.

14  Q.  After a note has been signed, can you insert anything

15  additional into that SOAP note?

16  A.  You cannot modify the medications associated with a SOAP

17  note after it has been signed.

18  Q.  So once it's been signed, nothing can be changed?

19  A.  Correct.

20  Q.  Or deleted?

21  A.  Correct.

22          MS. CUCINELLA:  One moment.

23          Nothing further.

24          MR. GOSNELL:  May I inquire, your Honor?

25          THE COURT:  Yes.

1    CROSS-EXAMINATION

2    BY MR. GOSNELL:

3    Q.  Good morning, Mr. Poremba.

4    A.  Good morning.

5    Q.  I'm Wayne Gosnell.  I represent Dr. Mirilishvili.  We

6    haven't met before, right?

7    A.  Correct.

8    Q.  You work for Practice Fusion?

9    A.  That's right, I work for Practice Fusion.

10   Q.  How long have you worked for Practice Fusion?

11   A.  Since August of 2011.  It's about four and a half years.

12   Q.  And what is your position again with Practice Fusion?

13   A.  I'm director of data architecture.

14   Q.  You're the head of data architecture?

15   A.  That's right.

16   Q.  And part of what's involved with data architecture is kind

17   of the back end computing for Practice Fusion?

18   A.  That's right.

19   Q.  It's not something that a user of Practice Fusion would

20   typically see?

21   A.  The data involves data that the user would -- we store the

22   data the user would see, as well as other data that is not

23   visible to the user.

24   Q.  Things like the activity log on a typical matter are not

25   viewable by the user?

G39LMIR2                        Poremba - cross

1    A.  We have reports within the system which are available to

2    the users to see the activity trail for their practice.

3    Q.  Are those the activity feed within a chart?

4    A.  The actions that a user takes throughout the system are

5    recorded in the activity feed.  The reports shows a listing of

6    the activities that a user has performed, or the activities

7    associated with a patient performed by any user, or all of the

8    activity across the practice.

9    Q.  And the point behind Practice Fusion or the structure of

10   Practice Fusion is it's a cloud based computing system,

11   correct?

12   A.  Correct.

13   Q.  And it's something that you try to make as user friendly as

14   possible?

15   A.  We try to make it as user friendly as possible.

16   Q.  You understand, obviously, that certain people have

17   different familiarity with computers and with computing in

18   general?

19   A.  Yes.

20   Q.  There's some people that are very fluent in it and some

21   people that are Luddites?

22   A.  Correct.

23   Q.  You said there were different ways to kind of learn how to

24   use Practice Fusion?

25   A.  Yes.  We offer a number of ways to learn about Practice

1    Fusion.

2    Q.   Online videos, customer support, things like that?

3    A.   That's right, yes.

4    Q.   You would agree it's harder for people who aren't as

5    familiar with technology to use Practice Fusion?

6    A.   Yes.

7    Q.   Now, you also said it's a secure platform for medical

8    records?

9    A.   Yes.

10   Q.   So if a doctor or if a user, an initial administrative

11   user, is setting up a Practice Fusion account for his practice

12   and he inserts notes, Practice Fusion doesn't actually have

13   access to those notes, correct?

14   A.   Ask your question another way.

15   Q.   Sure.  Do you actually have access to the medical records

16   themselves on Practice Fusion?

17   A.   In maintenance of the system, Practice Fusion employees

18   need to have access to databases, for example, that store the

19   information.  Very few number of employees are granted access

20   to the medical records, but some employees are granted access

21   to view records in order to support and maintain the system.

22   Q.   And that's only for supporting and maintaining.  They're

23   not allowed to go on and look through people's medical records?

24   A.   That is strictly prohibited.

25   Q.   Because medical records are supposed to be maintained

G39LMIR2                          Poremba - cross

1   securely?

2   A.   Absolutely.

3   Q.   And in terms of the user, the Practice Fusion user who sets

4   up an account, the initial user you said is an administrator?

5   A.   Yes.  They're initially created with administrative level

6   privileges, that's right.

7   Q.   And they're allowed through the program to start other

8   users as part of the program?

9   A.   Yes, that's true.  They can add additional users, give them

10  a password, and share that password with them.

11  Q.   Sorry for interrupting.  So for each person they were to

12  create a new user name for, that person would have to accept

13  the EHR license agreement, correct?

14  A.   Yes.

15  Q.   And that's a code that would be found on the activity feed

16  that you testified about?

17  A.   There's an event around acknowledging the user license

18  agreement.

19  Q.   That would reflect that that person had been added as a

20  user to -- under that account for Practice Fusion?

21  A.   Yes.

22  Q.   And if you were then -- and then once that person is added

23  as a user, Practice Fusion, the activity feed would track any

24  type of activity that that additional user did so long as they

25  did it under their user name?

1   A.   Yes.   There are a few hundred types of activities that it

2   would record.

3   Q.   Can you just generally, very generally tell us what

4   categories of information are captured in the activity feed?

5   A.   Oh, there are events such as log-in and log out.   There's

6   no patient associated with that.   The action that is recorded

7   would be that the user logged in at a certain date and time.

8   There's the creation and editing of all subparts of the medical

9   document.   What do I mean?   An example would be the chart

10  notes, creation of diagnoses, editing of existing

11  prescriptions.   Faxing information to another provider.   I

12  don't have comprehensive list of categories, but those are some

13  examples.

14  Q.   That's fine.   Just generally.

15          Now, the Practice Fusion, when somebody is going to

16  Practice Fusion itself as a user, they don't see the kind of

17  Excel sheet that we had up there on the screen, right?

18  A.   That's right.

19  Q.   They see a user interface, correct?

20  A.   They do see a user interface, correct.

21  Q.   There's like a home page to the Practice Fusion?

22  A.   There is a home page, yes.

23  Q.   And within Practice Fusion, then if a user wanted to access

24  a particular patient's chart, they would go to kind of a menu

25  on the left-hand side, they would click chart, and then they

1    would be taken to a search screen?

2    A.  That's right.

3    Q.  And when they went to the search screen, if they typed in

4    the name of the patient, kind of a pop-up would pop up with

5    that particular patient's name and then they could click

6    through and see the chart, correct?

7    A.  That's right.

8    Q.  Now, if there are patients who had the same name but

9    different identifying information, such as a different date of

10   birth, and you were to type in the same name in the search

11   category, you would see both of those names, correct?

12   A.  Offhand I don't remember the pop-up and how it shows the

13   search results.  It may include for instance, for example, the

14   birth date.  It may not.  I don't recall.

15   Q.  Are you able to search by birth date?

16   A.  I don't recall the search functionality.

17   Q.  OK.  But once you saw, once you clicked through to the

18   patient's chart, you would see the entire chart of the patient?

19   A.  That's right.  Once you select that patient chart, you

20   would be able to examine other details, for example, the

21   patient birth date.

22   Q.  And you'd be able to see the entire patient chart?

23   A.  If you have adequate permissions, yes.

24   Q.  Let's talk about that for just a moment.  You said that

25   there are different permissions that an administrator can give

1   to different users?

2   A.   Correct.

3   Q.   You don't know whether or not that was done with

4   Dr. Mirilishvili's account, do you?

5   A.   I have no idea.

6   Q.   So you don't know whether or not any particular user had

7   full or incomplete access to the charts?

8   A.   Correct.

9   Q.   Let's assume though that you have -- you're the

10   administrator logging in, you have full permission to see

11   everything.  If you were to click through to the patient's

12   chart, you would see the entire chart?

13   A.   The entire chart.  There would be no hidden portion that

14   would be -- the user would be not permitted to see.

15   Q.   And once you're inside the patient chart, you said that one

16   of the things that a user can do, assuming they have

17   permission, is they can enter an encounter note or a SOAP note,

18   as you said?

19   A.   A user with administrative level access would be definitely

20   able to create a chart note.

21   Q.   I guess for the rest of my questions, let's just assume

22   that the user has permission to do all these things.

23   A.   Very good.

24   Q.   I'm asking generally if you can do these things.

25   A.   Perfect.

G39LMIR2                        Poremba - cross

1    Q.  So one of the things a user can do, assuming he has

2    permission, is he can start a SOAP note?

3    A.  Correct.

4    Q.  Can we bring up Government Exhibit 205.  While he's doing

5    that, I'm going to ask a couple questions about that.

6            You said on direct examination that starting a new

7    SOAP chart note, that entry occurs if the patient already had a

8    SOAP note entered.

9    A.  Please repeat your question.

10   Q.  On direct examination, when you were looking at the Excel

11   sheet, one of the entries was started a new SOAP chart note for

12   a particular patient on a particular service date, and you

13   indicated that that meant that the patient already had an

14   existing SOAP note?

15   A.  Maybe you misunderstood my comment.

16   Q.  OK.  What does it mean when it says started a new SOAP

17   chart note?

18   A.  That event should be saved in the activity feed when a new

19   soap note is added to the patient chart.

20   Q.  OK.  Let's look now at Government Exhibit 205.  You said on

21   direct examination that one of the things a user can do is they

22   can print out the chart; is that correct?

23   A.  There is an ability to print out the chart, correct.

24   Q.  And I know you're not familiar with this particular

25   patient, but is this how it looks when you print out a patient

1   chart?

2   A.  Frankly, I'm not familiar with the printout.

3   Q.  OK.  All right.  Then we'll take this down.  You've never

4   printed out a chart?

5   A.  I have not printed out a chart.

6   Q.  Now, there are also, in terms of new patient charts, there

7   are places you can input demographic information for a patient,

8   correct?

9   A.  Correct.

10  Q.  Places you can input the patient's contact information,

11  address, things like that?

12  A.  Correct.

13  Q.  And there's also -- there's an activity code that's

14  associated when a new patient is entered into the system?

15  A.  Correct.  There's an activity feed entry for when a new

16  patient is entered into the system.

17  Q.  And that activity feed is inserted name as a new patient,

18  correct?

19  A.  I'm not familiar with the exact English text, but that

20  sounds plausible.

21  Q.  And since you've been at Practice Fusion, you understand

22  that some of the codes at Practice Fusion have changed over

23  time?

24  A.  It's true that the activity feed entries evolve as a

25  product evolves.

1   Q.  They've gotten a little more specific as your product has

2   gotten more sophisticated?

3   A.  The changes come from a variety of reasons and some of them

4   are expanding the capabilities, adding new capabilities to the

5   system, adding clarification where it might not be clear.

6   Q.  So as you refine your system, you change or you update your

7   activity codes and what they mean?

8   A.  The changes are -- there are changes but they're intended

9   to be fairly minor, meaning the gross meaning of the event is

10  not meant to change over time.  If a behavior in the system is

11  significantly modified, I would expect a new activity feed

12  entry would be created rather than modifying an existing one.

13  Q.  So, for example, when you began working at Practice Fusion,

14  there was an activity code that was associated with a user

15  accessing a chart, just accessing?

16  A.  I'm not familiar with the historical form of the activity

17  feed of all of the activity feed entries.

18  Q.  That particular type of entry, so and so accessed a chart,

19  is no longer an activity event that's used by Practice Fusion?

20  A.  I'm not familiar with the changes that have happened to

21  that particular activity event.

22  Q.  You don't know if that was used and you don't know if it's

23  still used?

24  A.  Correct.

25  Q.  Now, if a user is creating a SOAP note or an encounter

G39LMIR2                    Poremba - cross

1    note, if there are multiple users on an account, assuming they

2    have permission to do so, there are different users can create

3    a SOAP note?

4    A.  Correct.

5    Q.  So, for example, if a physical therapist was given

6    permission to create SOAP notes, that user would have the

7    ability to do so?

8    A.  Correct.

9    Q.  And the administrator would have the ability to review

10   those SOAP notes?

11   A.  Correct.

12   Q.  And the administrator would have the ability to sign those

13   SOAP notes?

14   A.  Correct.

15   Q.  And once signed, they're permanent on the system?

16   A.  They're not modifiable once signed.

17   Q.  It can't be deleted, can't be modified, can't be updated?

18   A.  It can be amended.

19   Q.  You can amend it or you can actually add an addendum as

20   well, correct?

21   A.  That's right.

22   Q.  That would show up as a new type of activity log?

23   A.  Correct.

24   Q.  You mentioned that there are alerts that occur with if

25   there are, for example, drug interactions, there will be alerts

1    that occur?

2    A.  Correct.

3    Q.  There can be?

4    A.  There can be alerts.  That is one of the features of the

5    application is to provide alerting.

6    Q.  That's based upon kind of your back end system, your

7    knowledge based system of just information that you have

8    generally about drugs interacting with one another?

9    A.  It's actually another company that provides us that

10   information.  It's not knowledge that Practice Fusion

11   maintains.

12   Q.  And it's something that's automatic?

13   A.  It is automatic.

14   Q.  So if a doctor or a user were to put in two prescriptions

15   that had some type of interaction, whatever it was, an alert

16   would be generated?

17   A.  If the system has an alert for that combination of

18   medications for that patient's criteria, an alert would be

19   shown to the user.

20   Q.  But it would be ultimately up to the doctor or up to the

21   user to determine what the course of treatment is, right?

22   A.  Correct.  The alert does not prevent the doctor from going

23   ahead and proceeding past the alert.

24   Q.  Now, if a SOAP note chart is created by one user, let's say

25   a physical therapist, and the SOAP note chart is saved and but

1    not signed yet and there are alerts that are associated with

2    that SOAP note chart, the way the alerts work is they're kind

3    of these little pop-ups at the top of the screen, right?

4    A.   Yes.   They're visible to the user in kind of an obvious

5    fashion.

6    Q.   And they have -- they're kind of a yellow background?

7    A.   Highlighted in yellow.

8    Q.   And there's a little X box on -- check mark or X on the

9    right-hand side?

10   A.   I believe there is and this allows the user to respond to

11   the alert.

12   Q.   And by -- that's acknowledging that they've clicked the box

13   and they've seen the alert, right?

14   A.   Correct.

15   Q.   It doesn't necessarily mean they read it; they just saw

16   there was some box up there?

17   A.   They can choose to take action on the alert.   We record

18   what action they took.

19   Q.   That would also update the chart?

20   A.   There is a log of the alert responses.

21   Q.   That would also update the chart if you were taking out the

22   alerts?

23   A.   I'm not familiar with the behavior of the chart update

24   mechanism being associated with alerts.

25   Q.   You don't know one way or the other?

1    A.  I don't know one way or the other.

2    Q.  Now, if there is a user who created the SOAP note chart

3    that has the alerts and saves it and a second user logs in and

4    views that SOAP note chart, the alerts are going to pop up for

5    the second user as well?

6    A.  I'm not familiar with what would happen for the second

7    user.  I would expect so.

8    Q.  OK.  And if the second user were to X out one of those

9    alerts, that would also qualify as an update, correct?

10   A.  I'm not familiar with if that would qualify as an update to

11   the SOAP note.

12   Q.  You don't know either way?

13   A.  Correct.

14   Q.  Just the fact that a second user is viewing the alerts and

15   is now being associated with that SOAP note as having access to

16   that SOAP note, that updates the chart as well, doesn't it?

17   A.  When the second user views the SOAP note, there would be an

18   audit entry for them viewing the SOAP note.  Is that what you

19   meant?

20   Q.  What I meant was the fact that there is now a second user

21   who's associated with that SOAP note, user who didn't create

22   the SOAP note in the first instance has now seen the SOAP or

23   has now accessed the SOAP note, that would reflect as an update

24   on the SOAP note information?

25   A.  There are separate audit events for viewing versus updating

1    the SOAP note.

2    Q.   OK.

3    A.   So if the second user merely viewed the SOAP note, I would

4    not expect an update event.

5    Q.   Have you ever tested that?

6    A.   I have not tested that.

7    Q.   So you don't know for certain whether that is or is not the

8    case?

9    A.   Correct.  I would have to test it to confirm.

10   Q.   Now, you also testified about that Practice Fusion allows a

11   user to upload a document?

12   A.   Correct.

13   Q.   And when a user uploads a document, there is an activity

14   entry that's made for that particular user, time, and which

15   document it was that was uploaded?

16   A.   That's right.

17   Q.   And it also, if it's associated with a particular patient,

18   that's going to reflect on the activity feed?

19   A.   Correct.

20   Q.   Now, if -- going back to what we were talking about

21   earlier, if you have two patients with the same name --

22   A.   Yes.

23   Q.   -- for the activity feed, does it just reflect the name of

24   the patient on the kind of substantive summary?

25   A.   The visible summary lists just the name.  However, when a

1   user clicks on that name, it goes to that patient's record.  So

2   it's very possible to discern exactly which of those two

3   patients was accessed.

4   Q.  But you can't do that from the Excel sheet that was up

5   there?

6   A.  The Excel sheet does -- I don't believe there was enough

7   information on the Excel sheet that you showed that would be

8   allow you to discern which patient.

9   Q.  OK.  The Excel sheet that you reviewed with the government,

10  that was just the full activity log, right?

11  A.  Ask your question again?

12  Q.  At any point did you review in any portion an activity log

13  that was produced in this case, any portion?  Not asking if you

14  reviewed the whole thing.

15  A.  During preparation for questioning, a subset of events were

16  shown to me in order to get a better understanding of what the

17  meaning was.

18  Q.  You weren't able or you didn't try or weren't able to click

19  through by looking at the patient name and going back to the

20  event?

21  A.  Correct.

22  Q.  Now, you said that updating a SOAP note includes any type

23  of change to the SOAP note?

24  A.  Ask your question again?

25  Q.  Sure.  If the activity feed indicates that a SOAP note or

1   encounter note has been updated, all that means, all that you

2   can glean from that activity log is that something has been

3   changed on the SOAP note?

4   A.  Correct.

5   Q.  It could be that a typo was fixed?

6   A.  That's correct.

7   Q.  It could be a space was added, somebody had back spaced, it

8   could be anything, correct?

9   A.  Correct.

10  Q.  There's no way for you to see from the activity log what

11  type of change was made at all?

12  A.  Correct.

13  Q.  That wouldn't be something that you as the director of data

14  architecture would be able to show?

15  A.  Ask your question another way.

16  Q.  That's not something that you as the head of the data

17  architecture at Practice Fusion, that's not something that you

18  would be able to know based on looking at the activity log?

19  A.  Correct, not through looking at the activity feed.

20  Q.  Now, in terms of uploading documents, when you upload a

21  document, there's a notation on the activity feed that a

22  particular document was uploaded for a particular patient?

23  A.  Correct.

24  Q.  And it reflects which user uploaded the document?

25  A.  Correct.

G39LMIR2                          Poremba - cross

1   Q.  And when we were talking about before when you go to

2   Practice Fusion itself, you have kind of the home screen and

3   you have charts on the left-hand side, right?

4   A.  Correct.

5   Q.  And there's also on the home screen, there's a different

6   menu to get to the document section?

7   A.  Correct.

8   Q.  And if you go into the document section, there are kind of

9   two menus that are there, there's the pending menu and the

10  signed menu?

11  A.  That sounds familiar.

12  Q.  When a user first uploads a document onto Practice Fusion,

13  it goes into the pending folder?

14  A.  I believe that's the correct work flow, yes.

15  Q.  And once -- and another user, let's say the administrator,

16  can then sign the document?

17  A.  Correct.

18  Q.  And that's the same thing that we talked about earlier when

19  you sign a document, it doesn't mean you're physically signing

20  it.  It means that you're memorializing, you're keeping it

21  secure in the system?

22  A.  Correct.

23  Q.  And one of the things that can be done on the pending menu,

24  there are let's say 50 documents to sign, there's a click all

25  button, correct?

1   A.  I'm not familiar with the click all functionality.

2   Q.  You're not familiar one way or the other?

3   A.  Correct.

4          THE COURT:  Do you have much more with this witness?

5          MR. GOSNELL:  Just a few more minutes, your Honor.

6   Q.  There are also entries regarding if a user inputs a

7   particular document, they can also provide details about the

8   document, what type of document it is?

9   A.  That's right.

10  Q.  So, for example, they can indicate that it's a laboratory

11  report?

12  A.  That's an option.

13  Q.  They can indicate that it's a referral?

14  A.  That's an option.

15  Q.  They can indicate that it's other?

16  A.  Yes.

17  Q.  Obviously, that's a general category, can be a lot of

18  things, right?

19  A.  Can be a lot of things.

20  Q.  You can update that information and that would be reflected

21  on the activity feed?

22  A.  Correct.

23  Q.  I think the final area I want to get into is with

24  prescriptions.  You said that there would be an activity log

25  for when a prescription was entered into a patient's chart?

1  A.  Correct.

2  Q.  And there would be an activity log for when if a provider

3  sent a prescription to a pharmacy?

4  A.  Electronically, electronically sent a prescription.

5  Q.  That would be an e-prescription?

6  A.  Correct.

7  Q.  That was not, to your knowledge, that was not something

8  that was able to be done in New York State for controlled

9  prescriptions in 2013, 2014?

10  A.  To the best of my knowledge that's right.

11  Q.  And if a provider wanted to memorialize that there was an

12  oxycodone prescription, a controlled substance prescription

13  that he wrote, he could upload that into the document area,

14  sign it, and it would be in Practice Fusion?

15  A.  Yes.  That would be a viable approach for a prescription

16  that was written and not being able to be electronically sent.

17          MR. GOSNELL:  One moment.

18  Q.  Going back to the alerts very quickly, you said there are

19  alerts for drug interactions?

20  A.  There are.

21  Q.  Are there alerts for immunization records or the patient

22  needs to be immunized?

23  A.  I'm not familiar with that subsystem.

24  Q.  Are there -- do you know what other alerts there are one

25  way or the other, other than drug interactions?

1    A.  No, not at this moment.

2              MR. GOSNELL:  Nothing further, your Honor.

3              THE COURT:  Any redirect?

4              MS. CUCINELLA:  No redirect, your Honor.

5              THE COURT:  Thank you.  You may step down.

6              (Witness excused)

7              THE COURT:  Time for us to take a break.  Don't

8    discuss the case.  Keep an open mind.

9              (Recess)

10             THE COURT:  OK.  Get comfy.  There's another hour this

11   morning.

12             You're still under oath, sir.

13             You may continue your examination.

14    DAMON LEONARD, resumed.

15   DIRECT EXAMINATION (cont'd)

16   BY MS. CUCINELLA:

17   Q.  Good morning, Mr. Leonard.

18   A.  Good morning.

19   Q.  We left off yesterday and you talked about how you had been

20   hired to work at the clinic; do you recall that?

21   A.  Yes.

22   Q.  Do you recall when you started to work at the clinic?

23   A.  October 2013.

24   Q.  What were your responsibilities when you first started at

25   the clinic?

1   A.   Responsibilities were to learn everything from Jomaris

2   Javier, maintain the clinic, clean up, run errands, park the

3   doctor's car occasionally.

4   Q.   You testified that your responsibility was to learn

5   everything from Jomaris Javier?

6   A.   Yes.

7   Q.   What do you mean by that?

8   A.   Learn all the BS that she was taught.  So basically was to

9   upload information, urinalysis reports, take IDs, scan

10  paperwork.

11  Q.   And did Jomaris tell you why she was teaching you those

12  things?

13  A.   Yeah, she told me.  She said that's the way the doctor

14  wanted me to do the work.  That's the way she was taught.

15  That's the way I was supposed to be taught, that way.

16  Q.   When a patient came in for a visit, what were you expected

17  to do?

18  A.   At that time, I was just helping out at the time.  My job

19  was to just scan all documents and take the patient's ID and to

20  also let them know about how much it costs per visit.

21  Q.   Was Jomaris at that time responsible for preparing the

22  paperwork the doctor would get?

23  A.   Yes.

24  Q.   Can you tell the jury what paperwork the doctor would get?

25  A.   Yes.  The first initial visit required MRI, referral, a

1   copy of your ID, and the receipt for the payment receipt.

2   Q.  Did there come a time when that became your responsibility?

3   A.  Yes, after Jomaris Javier was fired.

4   Q.  And that paperwork, was it given to the doctor in hard copy

5   or did you upload it into the computer?

6   A.  Both.  It was hard copy and it was uploaded.

7   Q.  How did that paperwork change for a follow-up visit?

8   A.  The follow-up visit only required the receipt, the PMP --

9   the PMP is a prescription monetary program -- and your

10  urinalysis report.

11  Q.  When you say the PMP, what were you supposed to do with

12  respect to the PMP?

13  A.  The PMP was supposed to be uploaded by your name and once

14  you program the name inside the computer, it would pop up all

15  information, all narcotics that you took in the past or you're

16  taking presently.

17  Q.  Mr. Leonard, do you know what an override is?

18  A.  Yes.

19  Q.  How do you know what an override is?

20  A.  An override is basically --

21  Q.  I'm going to stop you for a second.  My question was how do

22  you know what an override is?

23  A.  Yes.  From Jomaris Javier.  She taught me about that.

24  Q.  Can you tell the jury what an override is?

25  A.  An override is basically a patient that comes in, if he

1    gets impatient for waiting, Jomaris says she'll override.  Or

2    if your urinalysis report is not good, what she will do, last

3    month, if the urine was good, she'll just switch it.  She put

4    that paperwork there from last month and last month's

5    urinalysis report there for the present visit this month.

6    Q.  Why would Jomaris -- do you have an understanding of why

7    Jomaris would do this?

8    A.  Yes.

9    Q.  What is that understanding based on?

10   A.  She would do it --

11   Q.  I'm going to stop you again.  My question is what is your

12   understanding based on?

13   A.  Basically so that way she wouldn't get in trouble with the

14   people that was outside.

15   Q.  Is that something Ms. Javier said to you?

16   A.  Yes.

17   Q.  OK.  So tell the jury again why would Ms. Javier do the

18   overrides?

19   A.  She would do the overrides only because the fact that she

20   didn't have no problems with the people outside and also just

21   to keep the numbers up, just to keep the numbers up for the

22   doctor.  It wasn't really too much of nothing else.  She would

23   get a bonus for that.  She'll get a couple dollars from the

24   people outside.

25   Q.  When you say a couple dollars from the people outside, tell

1    the jury what you mean?

2    A.  Sometimes it varies.  Sometimes some people come in and

3    they'll hand $50 in an envelope or envelope or it could be

4    $100, depending on what they wanted to give.

5    Q.  You also mentioned keeping the numbers up.  What do you

6    mean by that?

7    A.  The doctor expected, the expectation of us at that time, we

8    was told, we was asked he wanted 30 people per day.

9    Q.  How did the doctor communicate this to you?

10   A.  A number of different ways.  Some days, most days after the

11   end of the day, he would go, he would check his paperwork.  He

12   look at his numbers and he'll have a problem with that.  If the

13   number was under 30, he said something to you.  What's the

14   problem today?  Why are we seeing under what I asked you to do?

15          And I'll explain to him, Doc, you threw some people

16   out or some people didn't make it today.  He didn't want to

17   hear that.  He didn't want to hear that.  My job was and our

18   job was at that time, I don't give a damn.  Call people,

19   whatever it may be, call them, get them in here.  All right, no

20   problem.

21          At that time, for me, all I cared about was giving him

22   the numbers because ultimately I cared about my job.  So

23   whatever made him happy, I did.

24   Q.  Mr. Leonard, did the doctor ever discuss with you the

25   difference between insurance patients and cash patients?

1    A.  Yes.

2    Q.  Tell the jury about your conversations on that topic.

3    A.  I was told that the difference between insurance and cash

4    patients is he only want to see ten insurance patients per day.

5    Cash patients were different.  He wanted to see them in the

6    morning first.  That was the first thing.  He didn't want to

7    see no insurance patients early in the morning, meaning the

8    start of the day.  If you came in 9 o'clock, between nine and

9    9:30, if you put an insurance patient there first, you had a

10   problem.  He had a problem.  He let you know real quick.  You

11   know better than that.  I don't want to see this patient.  Cash

12   patients first.

13   Q.  Were there any other differences between cash patients and

14   insurance patients that you noticed based on your work in the

15   clinic?

16   A.  I notice the fact that cash patients just, they just go

17   first.  That was all really.  They just go first.  They have

18   preference.  Those are who he wanted to see first, cash

19   patients, no more, no less.

20   Q.  Did both cash and insurance patients go to physical

21   therapy?

22   A.  The difference between that was insurance patients, they

23   went to physical therapy because he had a chance, the insurance

24   covered, covered the physical therapist, physical therapy.

25   Cash patients, you wasn't required to go because they didn't

1    pay.  They didn't pay.  There is no way they pay, so they

2    wasn't required to go.

3    Q.  Did there come a time when that changed?

4    A.  Yes.

5    Q.  Tell the jury about that.

6    A.  It changed with first our numbers, the numbers, they fell

7    down.  From 30 to 15 to 22.  And the doctor, he called me in

8    the office one day and he told me, says, I have a way where I

9    think that this will work for everybody.  I said OK.  Let me

10   hear it.  He told me I'm going to push the visit up to $300.

11   He told me why.  He says for one, the physical therapist.  It

12   costs a lot to have them in here.  No problem.  He says, well,

13   the cash patients, we can get them to go in based on four times

14   a month.  We'll charge them $25 per visit.  That's where the

15   other hundred dollars came in at.  So it became from 200 to

16   $300.

17   Q.  Mr. Leonard, was there a time that you had a conversation

18   with the doctor about the Astramed clinic?

19   A.  Yes.

20   Q.  What was that conversation?

21   A.  The fact that one day, we were slow that day and he asked

22   me, he says, told me to come in.  I came into his office.  He

23   told me did I recently hear the Terdiman situation.

24   Q.  Do you have an understanding who Terdiman is?

25   A.  Yes.  He was another doctor located in the Bronx.

G39LMIR2                           Leonard - direct

1    Q.  Continue.

2    A.  I told him yes.  I didn't go into it.  He went into it.  He

3    said, well, the first thing we need to do is start cleaning up

4    the office, meaning get rid of these fools, these drug addicts,

5    these drunks, whatever, bums, get them out of the office.  So I

6    said OK, OK, Doc.  But in my head I said to myself how much can

7    I get rid of them.

8                MR. MAZUREK:  Objection.

9                THE COURT:  I'm sorry?

10               MR. MAZUREK:  Objection as to what he's saying to

11   himself.

12               THE COURT:  Overruled.

13               MR. MAZUREK:  It's not spoken to the doctor.

14               THE COURT:  Overruled.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  You can continue.

2   A.  And that was basically it.  I said, OK, no problem, I'll

3   find ways to get rid of people.  So the only way we can get rid

4   of people was not taking new people.  So we explained that

5   we're not going to take new people for a while, no problem, we

6   didn't take new people.

7   Q.  During your conversation with the doctor about Dr.

8   Terdiman, did he show you anything?

9   A.  Can you ask me that question again?

10  Q.  Sure.  When you were talking to the doctor about Dr.

11  Terdiman and the Astromed Clinic, did he show you anything?

12  Where were you when this conversation took place?

13  A.  Oh, we were inside his office.  Yeah, he just showed me --

14  he showed me the newspaper article.  He showed me that.

15  Q.  What was that article about?

16  A.  It was about Dr. Terdiman, that's all it was about.

17  Q.  What about Dr. Terdiman?

18  A.  That he was selling oxycodone pills to patients and he was

19  in a conspiracy, that's what he showed me.

20  Q.  You have testified about the doctor talking to you about

21  wanting to get the numbers up.  Did there come a time when you

22  took steps to help get the numbers up?

23  A.  Yes.

24  Q.  What did you do?

25  A.  My thing that I did was I just -- what I did was I just --

G397MIR3                         Leonard - direct

1   I started just calling refills.  My job, what he wanted me to

2   do was whenever I looked at the schedule if it wasn't 30, I

3   would get nervous, I would call people that had appointments

4   five days earlier, or later, I'll call them in.  I'll call

5   them, come, they'd say my appointment is in five days, fuck it,

6   just come.  As long as it was cash, I didn't care, I did it.

7   Q.  Did you also start bringing in your own patients?

8   A.  That's another reason.  Yes, I felt pressure.  I felt

9   pressure, so I felt that some of my family members weren't

10  working at the time, I said, what the hell, everybody else is

11  doing it, I will start bringing some of my family members, just

12  to help the numbers go up.

13  Q.  Who specifically did you ask to come in?

14  A.  I had my nieces, my brothers, my sisters.

15  Q.  And what specifically did you tell them to do?

16  A.  Basically just I gave them an MRI report and I told them to

17  read it, and I told them exactly what to go in there and do.  I

18  said this is what I did, you have to do the same.  First thing

19  you do is you go in there, put the money on the table, act like

20  you have a problem with your lower back and that's it.  Just

21  answer the question, don't say too much, and that's it.

22  Q.  Were you making money off this?

23  A.  Yes, I was making some money off this, yes.

24  Q.  How would you make money off this?

25  A.  Well, they -- after they received the oxycodone

G397MIR3                    Leonard - direct

1   prescription, I would send them to the pharmacy, and they would

2   pick up their prescription, they will come back to me, and they

3   will sell it to me, I will give them $300 for it.

4   Q.  Then what would you do?

5   A.  I would sell it to the guy that I dealt with.

6   Q.  Did you sell it always to the same person, or were there

7   occasions where you sold it to other people?

8   A.  I sold it -- on occasion I sold it to another person.

9   Q.  How much money would you make off a bottle of pills?

10  A.  Well, at the beginning, at the beginning it was only like

11  12.50 per pill.

12  Q.  Did it change over time?

13  A.  Yes.

14  Q.  How did it change?

15  A.  Well, it went up to $18, but that was when I sold my pills

16  directly to Mr. Correa.

17  Q.  And what profit did you make off a bottle of pills?

18  A.  It varied.  1200, $1300, $1400, that was it.  After cost

19  you really only made like 3 or $400, because at the time

20  pharmacies were charging -- they was ballooning the numbers.

21  You can go to pharmacy, one pharmacy charges $700, another

22  charges $800, some charge $450.  It varied like that.  So after

23  costs, paying the patient, paying for the doctor's fees, which

24  was $300, you amounted to like $300.  So what I learned was

25  more people you had go, the more money you made.  If you only

1    had two people going today, you really only grossing about

2    $600.

3    Q.  You testified that you sent in your family members.

4    A.  Yes.

5    Q.  Were those people that you then -- what did you do after

6    your family members came in?

7    A.  I don't understand.

8    Q.  When your family members came in, did they get

9    prescriptions from Dr. Mirilishvili?

10   A.  Yes.

11   Q.  What prescriptions did they get?

12   A.  Oxycodone.  At that time that was the only prescription he

13   was giving, oxycodone.  All the other prescriptions as far as

14   muscle relaxers were e-script.

15   Q.  And do you know specifically how many pills your family

16   members would get?

17   A.  Each patient would receive 90 pills.

18   Q.  Did the doctor ever say anything to you about your family

19   members coming in?

20   A.  Well, one time he told me -- he told me that he spoke to my

21   niece, because I guess he had a conversation, and I know he had

22   a conversation because my niece came out and told me, yeah, the

23   doctor knows I'm your niece.  I didn't say too much to him, but

24   he knew that was my niece.

25   Q.  You also testified earlier that there were times when the

1   doctor would kick out certain patients.  Is that right?

2   A.  Yes.  That was only -- that was only after really basically

3   after the Terdiman situation really.  A lot of patients started

4   getting kicked out for numerous reasons.  One reason was for

5   cash.  You're going there, the visit was initially $300.  If

6   you went in there trying it play games with him trying to say

7   you only had $200, he kicked you out.  If you didn't follow

8   your paperwork to the T, he kicked you out.  And then also if

9   he felt if you asked too much questions, the patient would come

10  out, I would ask them what happened, and they would say he

11  thought I was a cop.  That's what they will say to me.

12          MR. MAZUREK:  Objection.  Move to strike.  Hearsay.

13          THE COURT:  Strike everything after the word yes.

14          MS. CUCINELLA:  Coconspirator statement?  Statement of

15  a coconspirator?

16          THE COURT:  Excuse me.  You asked a leading question;

17  he answered it yes; and everything else is stricken.  Stop

18  asking leading questions and find out a way to get it in

19  otherwise.

20  Q.  Mr. Leonard, what would happen when the doctor could kick

21  out patients?

22  A.  He would kick them out.  After that they'll leave or, you

23  know, he will tell them they can come back.  Or sometimes like

24  I said your paperwork is not right, meaning like, for instance,

25  if he started asking you questions about your paperwork, and

1    you didn't know, he'll tell you right in their face, look you

2    right in your face, this is not your paperwork, what's going

3    on, you know, seriously.  Doctor that is my paperwork.  No, do

4    me a favor, leave, go get your actual MRI and come back.

5    Q.  Did the patients ever say anything to you after they were

6    kicked out?

7              MR. MAZUREK:  Objection.  Calls for hearsay.

8              THE COURT:  That's a yes or no question.  Did patients

9    say anything to you?

10             THE WITNESS:  Yes.

11   Q.  What did they say?

12             MR. MAZUREK:  Objection.

13             THE COURT:  Sustained.

14   Q.  Did there come a time when the doctor --

15             THE COURT:  Do you went to come over here for a

16   second.

17             (Continued on next page)

18

19

20

21

22

23

24

25

G397MIR3                          Leonard – direct

1              (At the side bar)

2              THE COURT:  Your problem, Ms. Cucinella, is the word

3     patients is so overinclusive.  Not every patient of the

4     doctor's is alleged by the government to have been a

5     coconspirator, so I can't tell if that's coconspirator hearsay.

6              MS. CUCINELLA:  Totally understood.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2    BY MS. CUCINELLA:

3    Q.  Mr. Leonard, did there come a time when the doctor asked

4    you or Jomaris to verify MRIs?

5            MR. MAZUREK:  Objection.  Leading.

6            THE COURT:  Overruled.  An introductory question.

7    A.  Yes.

8    Q.  Can you tell the jury about that?

9    A.  Well, this was basically -- basically it was after, really

10   after the PMP started, really he started asking for that, and

11   the Terdiman situation, he really started asking us --

12           THE COURT:  Sir, can you slow down a little bit?

13   Because I'm having difficulty understanding you, and the court

14   reporter has to take this down, so please slow down a bit.

15   A.  OK.  Yes, it was mainly after the PMP started, and when Dr.

16   Terdiman went down.  He called us in the office, and he just

17   told us you got to start verifying each MRI.  We agreed, no

18   problem.

19   Q.  What happened after that?

20   A.  When patients would come in, you know, he would ask us did

21   you verify.  But it wasn't every, every MRI he asked us to

22   sign.  The only way he felt, well, did you verify this one?

23   Yes, doc.

24   Q.  For how long did that go on?

25   A.  Until I got tired, and I told him I wasn't verifying no

1    more -- wasn't putting my name on anymore MRIs.  I told him he

2    had to help out and do it.

3    Q.  Why did you tell the doctor that?

4    A.  Because I felt it's my name on the line, and he knows

5    exactly what's going on.  So, you know what, you're going to be

6    a part of this too; I'm not just going to be the only one going

7    down for this BS, so ...

8    Q.  Mr. Leonard, did there come a time when the doctor fired

9    Jomaris?

10   A.  Yes.

11   Q.  Do you know why he fired her?

12   A.  Yes.

13   Q.  How do you know that?

14   A.  Because there was a phone call from --

15          THE COURT:  How do you know the reason?

16          THE WITNESS:  Because the pharmacist called and told

17   me.

18          THE COURT:  The pharmacist called and told you.

19   Q.  Were you present when Jomaris was fired?

20   A.  Yes.

21   Q.  What happened when Jomaris was fired?

22   A.  What happened was around 9:30, ten o'clock in the morning

23   Frank from Ascan's Pharmacy called and asked to talk to the

24   doctor.  I told him the doctor is busy right now.  I told him

25   can I help him?  He says --

G397MIR3                         Leonard - direct

1              MR. MAZUREK:  Objection.  Calls for hearsay.

2              THE COURT:  I'm sorry, we don't want to hear your

3    conversation with the pharmacist.  We don't want to hear that.

4    OK?  We want to hear what, if anything, you heard Dr.

5    Mirilishvili say to Jomaris when he fired her.  Did you hear

6    what he said to Jomaris when he fired her?

7              THE WITNESS:  No.

8              THE COURT:  OK.  Well, then let's move on.

9    Q.  After Jomaris left, who worked in the office?

10   A.  Just me and Augustine Cruz.

11   Q.  Did you continue to do overrides?

12   A.  No.

13   Q.  Did you sell urine to patients?

14   A.  No.

15   Q.  Can you explain for the jury how it worked when a patient

16   dropped off urine for a urine test.

17   A.  The patients were supposed to drop their urine off ten days

18   from their appointment slips.  Each month, ten days before each

19   visit you are supposed to drop off your urine.  That's what you

20   were expected to do every month.  They will bring it in any way

21   they could.  They will bring in by hand from the street; some

22   of them went inside the bathroom.  Most of them came in with

23   it.

24   Q.  When they came in with the urine, what would happen?

25   A.  They would come, they will fill out paperwork.  They was

G397MIR3                          Leonard - direct

1    instructed that the lab had to get paid for the work to get

2    done, and they was instructed from me to go across the street

3    and get a $50 money order so the urine can get tested.

4    Q.  When they dropped off urine specimens, was the doctor ever

5    present?

6    A.  Sometimes whenever we were slow.  If we were slow, he was

7    out there, yes.  Because there are times -- we only took -- we

8    only took urine after one o'clock in the afternoon.  So I mean

9    there was times we were slow, and the doctor would be sitting

10   out there talking to me and, boom, the doorbell ring, I let

11   them in, OK, we come to drop off urine, four or five people

12   come at one time.  They put the urine right on the table right

13   there.

14   Q.  Mr. Leonard, when you first started working at the clinic,

15   what urinalysis lab were you using?

16   A.  At the time we were using Empire Labs.

17   Q.  Did there come a time when you switched labs?

18   A.  Yes, only because Empire Lab refused to --

19   Q.  I'm going to stop you.  Did there come a time when you

20   switched labs?

21   A.  Yes.

22   Q.  Why?

23   A.  Because Empire Lab, they didn't want to work with us no

24   more because they weren't getting paid.

25            MR. MAZUREK:  Objection.

G397MIR3                                    Leonard – direct

1              THE COURT:  They didn't want to work with you anymore,

2      period, end.

3      Q.   Do you know what lab the clinic used after Empire?

4      A.   Yes.

5      Q.   I'm going to direct your attention to the summer of 2014.

6      Do you recall -- I apologize, I didn't ask the follow-up

7      question.  What lab did the clinic use after Empire?

8      A.   Aegis.

9      Q.   I'm going to direct your attention now to the summer of

10     2014.  Do you recall an Aegis sales rep coming into the office?

11     A.   Yes.

12     Q.   Did he come in twice?

13     A.   Yes.

14     Q.   I want to talk to you about each of those times.  Can you

15     tell the jury what happened during the first time he came in?

16     A.   Well, the first time he came in he brung in a list of

17     names -- I don't know how many was on there -- where he brought

18     a list of names.  He came in, he asked to talk to the doctor.

19     He spoke to the doctor briefly.  The doctor came out.  After

20     that the doctor called me in the office; he showed me a list of

21     names and told me I want to get rid of them right now.

22     Q.   What happened the second time the Aegis rep came?

23     A.   The second time he came, he just told us that he could no

24     longer take --

25              MR. MAZUREK:  Objection.

G397MIR3                          Leonard – direct

1           THE COURT:  Hang on.  Hang on, please.

2           I'm sorry but, ladies and gentlemen, I have to hear

3    his answer before I can decide if you can hear it.  OK?  Thank

4    you.  Don't discuss the case.  Keep an open mind.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MS. CUCINELLA:  Your Honor, I can ask a clarifying

3     questioning did the doctor tell you what the Aegis rep said the

4     second time.

5          THE COURT:  Well, that wouldn't really solve the

6     problem.

7          Can I hear the answer to the question?  Because I

8     don't know if it's hearsay or not.  I'd like to hear the answer

9     to the question.  That's why I sent the jury out of the room.

10         A lot of things people say out of court are not

11    offered for the truth of the matter asserted or offered for

12    some other reason, like to prove what a witness did, or what

13    happened next, and those things aren't hearsay.  So I'd like to

14    hear what the answer to the question is.

15         Ask the question again, and then let him answer it.

16    Q.  When the Aegis rep came to the office the second time, what

17    happened?

18    A.  He asked to speak to the doctor.  I told him he was busy.

19    When he got finished, he went in there.  I don't know what the

20    conversation was.  When he came out, I said, Charles, is

21    everything OK?  He said, no.  He said I can't take your

22    business anymore.  That's what he said to me.  After that the

23    doctor came in, he said, Damon, you heard, we're not going to

24    be able to use this lab anymore; you're going to have to find a

25    new lab, point blank.

1            THE COURT:  OK, the objection is overruled.  Bring the

2      jury in.

3            (Jury present)

4            THE COURT:  OK, folks, the objection is overruled.

5      BY MS. CUCINELLA:

6      Q.  Mr. Leonard, was there a time when the Aegis rep came back

7      a second time that summer?

8      A.  Yes.

9      Q.  What happened when he came back to the clinic?

10     A.  Well, he came in, he asked to speak to the doctor.  I asked

11     him can I help him.  He said I just want to speak to the

12     doctor.  I said no problem, the doctor is busy.  When the

13     doctor got finished, he went in.  I didn't hear the

14     conversation.  I just know when he came out in ten minutes I

15     asked him, Charles, is everything OK?  He says, no, I just

16     can't take your business anymore.  No problem.  That was it.

17     Q.  Do you know what lab the clinic used after that?

18     A.  Yes, ATS Labs.

19     Q.  Is there anything different about that lab?

20     A.  Other than the doctor, no.

21     Q.  Did there come a time when the doctor fired Augustine Cruz?

22     A.  Yes.

23     Q.  Tell the jury what happened.

24     A.  Well, over the weekend we had a real bad rain storm, and

25     the office got bombarded, got flooded out.  So, when the doctor

G397MIR3                          Leonard – direct

1    came in, we explained to the doctor what was going on.  He said

2    we need to get ahold of the super.  We couldn't get -- he asked

3    Augustine.

4                MR. MAZUREK:  Your Honor, on relevance grounds and

5    hearsay.

6                THE COURT:  The objection is overruled.

7    Q.  You may keep going, Mr. Leonard.

8    A.  OK.  So we couldn't get in touch with the super.  By the

9    early afternoon we located the super, we told the doctor.  The

10   super came in, and at that time he was pissed off about the

11   situation.

12   Q.  When you say he was pissed off?

13   A.  He was pissed off about the water coming into the office.

14   Q.  Who do you mean?

15   A.  The doctor, he was pissed off about the water coming in the

16   office.  So when the super came in, the doctor and Augustine

17   Cruz met him, and he immediately went off on the super.  He

18   told the super --

19               MR. MAZUREK:  Objection.  401, 403.

20               THE COURT:  Do you want to come over here for a

21   minute, please?  I'm getting tired of having these side bars.

22               (Continued on next page)

23

24

25

G397MIR3                          Leonard – direct

 1          (At the side bar)

 2          THE COURT:  Why do I care about this?

 3          MS. CUCINELLA:  He gets into the altercation with the

 4   super, and he immediately fires the person who is working

 5   there, and he hires a patient who is waiting to see him to work

 6   security.

 7          THE COURT:  So what?

 8          MS. CUCINELLA:  So, he just hires someone who is

 9   supposedly waiting to see him and in chronic pain.

10          THE COURT:  And that goes to prove what element of

11   your case?

12          MS. CUCINELLA:  It goes to prove that he knew the

13   patients who were waiting to be treated were not actually there

14   for medical treatment.

15          THE COURT:  No, it doesn't.  Leave it.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Objection sustained.

3   BY MS. CUCINELLA:

4   Q.  Did there come a time when the doctor hired Jomaris back?

5   A.  Yes.

6   Q.  Did the doctor tell you why he hired her back?

7   A.  At the time, yes.

8   Q.  My question -- sorry, go ahead.

9   A.  Yes.

10  Q.  What did he tell you?

11  A.  Well, over the weekend it was his birthday and around the

12  same time was Father's Day.  She had gotten in contact with the

13  doctor through his personal phone, wished him a happy Father's

14  Day and happy belated birthday, and they talked about her kid.

15  So when Monday came in, he told me he had spoken to her and

16  that he was going to hire her back.

17  Q.  What were her responsibilities when she came back?

18  A.  Her responsibilities was to work -- her responsibilities

19  was to deal with the physical therapy patients and take care of

20  the urine.

21  Q.  Did there come a time when she was fired again?

22  A.  Yes.

23  Q.  Do you know why?

24  A.  Yes.

25  Q.  How do you know why?

1    A.  Because she lied to the doctor.

2              THE COURT:  Not why.  How do you know why?  Did

3    someone tell you?  Were you there in the room?  How do you

4    know?

5              THE WITNESS:  Because I witnessed it.

6              THE COURT:  Thank you.

7    Q.  Tell the jury what happened.

8    A.  There was a situation where the doctor came out to use the

9    facility, use the bathroom, and Jomaris Javier was in the back

10   with the refrigerator, the urine, where we put the urine at,

11   where the urine is stored at.  The refrigerator was opened.  He

12   asked her why is the refrigerator open.  She proceeded to lie

13   to him.  And quickly what he did was he went right -- she told

14   him that the physical therapist guy was in the refrigerator.

15   He proceeded to go right to the physical therapy, ask him a

16   question.  The physical therapist didn't know what the heck he

17   was talking about.  He told him I didn't do that.  From there

18   he went right back to the back and told her she's fired because

19   she lied to him.

20   Q.  Did there come a time when you and the doctor had a

21   conversation about it?

22   A.  Yes.

23   Q.  I am showing you what has already been marked for

24   identification as Government Exhibit 442.  It's 441.  My

25   apologies.

1            MR. MAZUREK:  Your Honor, I know you hate the side

2   bars.

3            THE COURT:  There will be no side bar.

4            MR. MAZUREK:  But --

5            THE COURT:  I'm done having side bars.  I'm done

6   having side bars.

7            MR. MAZUREK:  This is an exhibit that we discussed

8   earlier that we have an objection to.

9            THE COURT:  You have a continuing objection.  Have I

10   ruled?

11            MR. MAZUREK:  No.

12            THE COURT:  Fine.  Then when they try to introduce it,

13   object to it, and I will look at it.

14   Q.  Mr. Leonard, I just put an exhibit up on the counter for

15   you.  Do you recognize what that is?

16   A.  Yes.

17   Q.  You can open the bag.  What is it?

18   A.  It's the doctor's notebook.

19   Q.  Did there come a time when he showed you that notebook?

20   A.  Yes.

21   Q.  Why did he show it to you?

22   A.  He showed it to me because he wanted me to -- he wanted me

23   to know what Jomaris was doing, and I guess --

24            THE COURT:  What did he say to you when he showed it

25   to you?  What did he say to you?

1              THE WITNESS:  What he said to me was -- really he

2       didn't say too much to me about nothing.  He just told me why

3       he fired her, and this is what he got from her, so he knew all

4       along what she was doing.

5              THE COURT:  OK, he didn't say much.  I don't want him

6       to guess about what was in the doctor's mind, so let's move on.

7       Q.  Did he say anything specific about the letter?

8              MR. MAZUREK:  Objection.

9              THE COURT:  The objection is sustained.  The whole

10      issue is the letter.  We will have to do this after lunch, so

11      let's move on to an entirely new area.  OK?  Come on.

12      Q.  Mr. Leonard, did there come a time when the clinic was

13      robbed a second time?

14      A.  Yes.

15      Q.  Do you recall approximately when that was?

16      A.  That was -- I think it was July or August of 2014.

17      Q.  Were you at work when it happened?

18      A.  Yes.

19      Q.  Tell the jury what happened that day.

20      A.  It was a slow day, slow day.  I was told by the doctor to

21      make calls because we didn't have any patients.  I said, OK, no

22      problem.  I said do we start bringing in new?  He said, yeah,

23      we can did new.  Because at that time we wasn't doing new; we

24      were only doing follow-up on patients.

25              OK.  I got on the phone, made a few calls.  A few new

1   patients came in.  And after that a patient came in, he rung

2   the bell, I asked him can I help you?  He says, yes, I'm a new

3   patient.  When I opened, buzzed the door, three other guys

4   came, barged in right behind him.

5   Q.  What happened after that?

6   A.  They told us -- two guys -- one guy had a hammer, the other

7   guy had a gun, and he told us don't move, the office is being

8   robbed.

9   Q.  What happened after that?

10  A.  He told me to stand still.  Actually at the time they told

11  me to go behind the desk, still behind the desk.  After that

12  they took the doctor inside the office.

13  Q.  Could you hear what went on inside the office?

14  A.  Yes.

15  Q.  And what did you hear?

16  A.  Well, the robbers kept asking the doctor where is the

17  fucking money.  Then the doctor proceeded to tell them I don't

18  have no money.  What are you guys doing?  I look out for your

19  guys, take care of your families.  I'm just a poor -- I'm an

20  immigrant.  That was all he said.

21  Q.  Did the robbers take anything that you are aware of?

22  A.  No.

23  Q.  Changing topics, Mr. Leonard, while you were working in the

24  office did you ever witness the doctor interact with any of the

25  bosses or crew chiefs?

G397MIR3                          Leonard - direct

1   A.  Yes.

2   Q.  Can you tell the jury what a boss or a crew chief is?

3   A.  Well, a crew chief is just a guy who is in charge of the

4   patients outside.  Like, you know, he doesn't really come in

5   much unless something is wrong, but he is just a guy that's in

6   charge of his patients.

7   Q.  And you said you saw the doctor interact with crew chiefs.

8   What did you see?

9   A.  Well, basically one in particular, name Ray Williams, every

10  now and then he will come in and speak to the doctor, he will

11  say, is the doc busy?  No, he ain't busy.  OK, he'll go in.

12  Hey, how you doing, doctor?  And they go and close the door.

13           MR. MAZUREK:  Objection.

14           THE COURT:  The objection is overruled.

15           MR. MAZUREK:  Withdrawn.

16  Q.  Was Ray Williams known to you by any other names?

17  A.  Well, they called him Obama.

18  Q.  After Mr. Williams would go in and speak with the doctor,

19  did he come out and speak with you?

20  A.  Not all the time, nope, not at all.

21  Q.  Did he ever do that?

22  A.  A few times he will come crack a joke here and there.

23  Q.  Were you ever able to learn what the doctor and

24  Mr. Williams were talking about?

25           MR. MAZUREK:  Objection.

1          THE COURT:  It's a yes or no question.

2     A.  No.

3     Q.  I'm showing you for identification -- it actually may

4     already be in -- what is marked as Government Exhibit 4-D.  Do

5     you recognize this person?

6     A.  Yes.

7     Q.  Who is it?

8     A.  There are two guys there.

9     Q.  Who are the two people in the picture?

10    A.  One is Abraham Correa, which is known as Buck and the other

11    guy is Ray Williams known as Obama.

12    Q.  Mr. Leonard, who is Tasheen Davis?

13    A.  Tasheen Davis was one of Dr. Moshe's patients.  Also she

14    was one of the young ladies that I had assist me on taking

15    patients to and from the pharmacy.

16    Q.  Did you consider Tasheen Davis a crew chief?

17    A.  Yes.

18          MS. CUCINELLA:  Just one moment.

19    Q.  I am showing you on your screen what has been marked for

20    identification as Government Exhibit 4-V.  Do you recognize the

21    individual in this picture?

22    A.  Yes.

23    Q.  Who is it?

24    A.  Tasheen Davis.

25          MS. CUCINELLA:  The government offers 4-V.

1          MR. MAZUREK:  In objection.

2          THE COURT:  Admitted.

3          (Government's Exhibit 4-V received in evidence)

4     Q.  Mr. Leonard, that's Tasheen Davis?

5     A.  Yes.

6     Q.  When you said that you would have Tasheen assist you, what

7     did you mean?

8     A.  To and from the pharmacy.  What I would ask her to do was

9     assist me on -- if a patient was going out to Brooklyn to the

10    pharmacy, I would ask her, OK, well, where are you going?  I'm

11    going to Brooklyn also.  OK, can you do me a favor and run this

12    patient out there for me, to the pharmacist?

13    Q.  Did you pay her?

14    A.  Yes, I paid her -- the only way I paid her was basically

15    through gas or gave her money for lunch.  I didn't even have to

16    give her any money, just pay her gas.

17          MS. CUCINELLA:  You can take that down, Ms. Joynes.

18    Thank you.

19    Q.  Mr. Leonard, after Jomaris was fired the second time, did

20    your salary increase?

21    A.  Yes.

22    Q.  What did it increase to?

23    A.  750.

24    Q.  Were there ways for you to earn additional money at the

25    clinic?

1    A.  I don't understand you.

2    Q.  Did you sometimes get more money as part of your weekly

3    paycheck?

4    A.  Yes.  If we had a good week, he will give me a bonus, $100.

5    Or, you know, if like the holidays are coming up, he will give

6    me $100 for that, go buy a gift or get are family a bigger

7    turkey, stuff like that.

8    Q.  When you say he, who do you mean?

9    A.  The doctor.

10   Q.  Mr. Leonard, how would you describe your relationship with

11   the doctor?

12   A.  Well, at that time it was pretty good; it was pretty good

13   at that time.

14   Q.  Were there times when you got angry with him?

15   A.  Of course.

16   Q.  Why would you get angry?

17   A.  Because he expected so much, and when he didn't get his way

18   he would get pissed off, so there were times that I just swore.

19   I didn't swear directly at him but, you know.

20   Q.  Would you call him names?

21   A.  Yes.

22   Q.  Would you complain about him?

23   A.  Yes.

24   Q.  To whom would you complain?

25   A.  In particular it would be Correa, Mr. Correa.

G397MIR3                        Leonard - direct

1    Q.  Mr. Leonard, did there come a time when the doctor drove

2    you home one day?

3    A.  Yes.

4    Q.  Did you have a conversation with the doctor during that

5    drive?

6    A.  Yes.

7    Q.  Tell the jury about that.

8    A.  Well, basically he just asked me about my kids, how was

9    everything, and then --

10              MR. MAZUREK:  Objection.  Relevance and 403.

11              THE COURT:  The objection is overruled.

12   Q.  You may keep going.

13   A.  And when we got to my house, we picked up the key that I

14   left, the job keys that I left.  After we drove back, told me,

15   doesn't worry, stick with me, you'll be OK.  I didn't say

16   nothing after that.  I didn't really know how to take that.

17   Q.  Mr. Leonard, did there come a time when you were arrested

18   in connection with your work at the doctor's office?

19   A.  Yes.

20   Q.  When was that?

21   A.  December 2014.

22   Q.  When you were arrested, where were you taken?

23   A.  The 33rd Precinct.

24   Q.  Did you go somewhere after that?

25   A.  I came down to 500 Pearl, 500 Pearl Street.

1   Q.  Did you see the doctor during this period of time?

2   A.  Yes.

3   Q.  Did you have a conversation with him?

4   A.  Yes.

5   Q.  To the best of your recollection, tell the jury what you

6   said to the doctor and what the doctor said to you in response.

7   A.  Well, after I saw my lawyer, I was sent back downstairs.  I

8   saw the doctor, I greeted him, I asked him how was he feeling,

9   he told me OK.  And the next thing he said to me was –– I asked

10  him, I said what's the matter?  Your face looks kinda –– he

11  said this fucking guy is talking.  I said, well, who are you

12  talking about in particular?  He said Obama, Ray Williams.  I

13  said I didn't say anything; I didn't say anything to him about

14  it.

15          MS. CUCINELLA:  One moment.

16          Your Honor, I have no other questions except about ––

17          THE COURT:  So we need to deal with my evidence issue.

18          You go to lunch.  See you at 2 o'clock.  Don't discuss

19  the case; keep an open mind.

20          The witness may step down.

21          (Continued on next page)

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  I need a proffer from the government

3    about what this letter is supposed to prove.

4           MS. CUCINELLA:  Certainly, your Honor.  After the

5    doctor fired Ms Javier, he came out and he told Mr. Leonard, he

6    showed him the letter and said this is what I had her do.  And

7    Mr. Leonard alluded to that.

8           THE COURT:  After he fired her –- I don't understand

9    what you just said.  After he fired her --

10          MS. CUCINELLA:  –- the first time --

11          THE COURT:  –- the first time --

12          MS. CUCINELLA:  –- he then hired her back, and he had

13   her write this letter, and this letter acknowledges that she

14   was altering paperwork.  And when he shows it to Mr. Leonard,

15   he says this is what I had her write.

16          THE COURT:  So, what you want to do –- put the letter

17   back up on the screen.

18          So, it's the government's contention that the

19   defendant caused Ms. Javier to write this letter and that he

20   admitted –- he said to Mr. Leonard I had her write this letter.

21          MS. CUCINELLA:  Additionally, your Honor, it shows

22   that the defendant knew what the staff was doing.  And this is

23   in April of 2014.  The conspiracy then continues through

24   December.  And it was in his office the whole time, and it was

25   recovered in his office the day of the arrest.

```
 1              THE COURT:  It certainly shows that the doctor was
 2     aware that Ms. Javier was switching the names and dates of
 3     birth of patients, because that's what the letter says.  You
 4     have a tendency to make these really overbroad statements like
 5     "the patients," and you can't do that.  You can't do that in a
 6     coconspirator case.
 7              MS. CUCINELLA:  Understood.
 8              THE COURT:  OK.  And Ms. Javier is alleged by the
 9     government to be a coconspirator here?
10              MS. CUCINELLA:  Yes.
11              THE COURT:  So it's a coconspirator statement, and
12     it's offered for two reasons:  One is to prove that the doctor
13     knew what a coconspirator was doing.  And then the statement
14     that the doctor allegedly made to Mr. Leonard is to prove that
15     he made her write this letter?
16              MS. CUCINELLA:  Just that he instructed her to write
17     it, how the letter came about.
18              THE COURT:  And that proves?
19              MS. CUCINELLA:  The defendant's knowledge that this is
20     what was happening.
21              THE COURT:  What this?
22              MS. CUCINELLA:  I'm sorry, the conduct that's written
23     in the letter.
24              THE COURT:  OK.  And your problem is?
25              MR. MAZUREK:  Judge, I don't know how this is in
```

 1    furtherance of the alleged conspiracy, which is the second

 2    prong of 801.

 3         THE COURT:  Well, I get how it's in furtherance of the

 4    alleged conspiracy.  She says this, he then hires her back.

 5    The government's position is that this is in furtherance of the

 6    alleged conspiracy because?

 7         MR. DISKANT:  We believe it's in furtherance of the

 8    conspiracy because it he gets her back in the office and so it

 9    allows them to continue to work together in furtherance of the

10    conspiracy.

11         THE COURT:  OK.

12         MR. MAZUREK:  Although, the testimony is that she was

13    hired back as a result of -- I mean as a result of, according

14    to this witness's testimony, that there was a phone call to the

15    doctor where she asked for her job back sometime after this.

16         THE COURT:  And this witness is apparently going to

17    say that the doctor told me I made her write this letter and

18    then I hired her back.

19         Look, I'm not saying this is the strongest evidence in

20    the entire world or the strongest evidence in furtherance of

21    the conspiracy, but an argument can be made that it's in

22    furtherance of the conspiracy.

23         It's a statement by a coconspirator during the period

24    of time of the conspiracy.  It certainly relates to some

25    unusual behavior, since if I were a doctor and somebody in my

1   employ confessed in writing to altering patient records, I

2   wouldn't be taking that person back.

3            So, I think the government can get it in.  I think the

4   government can get it in.  I will see you after lunch.

5            (Luncheon recess)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                             2:11 p.m.

 3             (Jury present)

 4             THE COURT:  OK.  You're still under oath, sir.

 5             The objection that was made before lunch is overruled.

 6   BY MS. CUCINELLA:

 7   Q.  Mr. Leonard, you have before you to the side of the podium

 8   a letter that's been marked as Government Exhibit 441.  Have

 9   you seen this before?

10   A.  Yes.

11   Q.  When did you see it?

12   A.  After Jomaris Javier was fired.

13             MS. CUCINELLA:  Government offers Government

14   Exhibit 441.

15             MR. MAZUREK:  Continuing objection.

16             THE COURT:  The objection is overruled.  It's

17   admitted.

18             (Government's Exhibit 441 received in evidence)

19   Q.  How did you see it?

20   A.  I saw it after Jomaris was fired for the second time.

21   Q.  And did someone show it to you?

22   A.  Yes.  The doctor showed it to me.

23   Q.  Did the doctor say anything when he showed it to you?

24   A.  He told me he read it after she was fired the first time.

25             MS. CUCINELLA:  I'm going to give the jury a minute
```

1    while the exhibit is displayed.

2    Q.  Mr. Leonard, I'm now showing you what's been marked for

3    identification as Government Exhibit 9.  Do you recognize this?

4    A.  Yes.

5    Q.  What is it?

6    A.  The doctor's bag that he takes home every afternoon.

7            MS. CUCINELLA:  The government offers Exhibit 9.

8            MR. MAZUREK:  No objection.

9            THE COURT:  Admitted.

10           (Government's Exhibit 9 received in evidence)

11   Q.  Mr. Leonard, have you ever touched that bag before?

12   A.  Hell no.

13           MS. CUCINELLA:  Nothing further.

14           THE COURT:  You may inquire.

15           MR. MAZUREK:  Can I say hell no?  Just kidding.

16   CROSS-EXAMINATION

17   BY MR. MAZUREK:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  My name is Henry Mazurek, Mr. Leonard, and I represent

21   Dr. Mirilishvili.  We've never met before, right?

22   A.  No.

23   Q.  You met with the government many times before this,

24   correct?

25   A.  Yes.

1   Q.  And would you say you met with them maybe over about a

2   dozen times preparing for your testimony here today?

3   A.  Yes.

4   Q.  And you informed me through your attorney that you did not

5   want to answer any questions by me, correct?

6   A.  Can you explain that again, please?

7   Q.  Yes.  I made a request to your attorney, your attorney, to

8   interview you, but it was denied, correct?

9   A.  I never heard of nothing like that.  Never heard of that.

10  Q.  You didn't?

11  A.  No.

12  Q.  But we've never talked, right?

13  A.  No.

14  Q.  This will be our first time?

15  A.  Yes, sir.

16  Q.  You were first arrested in December, I think December 11 of

17  2014, correct?

18  A.  Not sure, sir.

19  Q.  Is that about the right time?

20  A.  December of 2014.  That's all I remember.  I don't know the

21  date.

22  Q.  And on direct examination, you were asked questions about a

23  statement that you gave or answers that you gave to the

24  arresting agents at that time, do you remember that, do you

25  remember that, sir?

1   A.  Can you ask that question again, please?

2   Q.  Yes.  I'll ask it this way.  After you were arrested in

3   December of 2014, you were brought down you said to the 33rd

4   Precinct, right?

5   A.  Yes.

6   Q.  And at that 33rd Precinct, the agents sat you down and

7   asked you some questions, right?

8   A.  I don't remember.

9   Q.  You don't remember that happening?

10  A.  I don't remember the questions.

11  Q.  I'm sorry?

12  A.  I don't remember the questions that they asked me.

13  Q.  Do you remember them asking you questions?

14  A.  Yes.

15  Q.  And do you remember giving answers?

16  A.  Yes.

17  Q.  OK.  And those answers you said yesterday were not truthful

18  answers, correct?

19  A.  Yes, at the beginning.

20  Q.  At the beginning you lied to the agents?

21  A.  Yes.

22  Q.  But now you're telling the truth; is that your testimony?

23  A.  Yes.

24  Q.  And I'd like to go over what happened in between those

25  times, December 2014 and your testimony starting yesterday.  In

G39LMIR4                          Leonard - cross

 1   December 2014, did you accept responsibility and plead guilty

 2   to the crime of distributing oxycodone?

 3   A.  Say it again, please.

 4   Q.  In December of 2014, did you accept your responsibility and

 5   plead guilty to the crime of distributing oxycodone illegally?

 6            THE COURT:  Did you take a guilty plea in this court,

 7   sir?

 8            THE WITNESS:  Yes.

 9            THE COURT:  What crime did you plead guilty to?

10            THE WITNESS:  Possession -- a conspiracy to possess

11   and sell oxycodone.

12            THE COURT:  OK.

13   Q.  When did you do that?

14   A.  I'm not sure when I did it, sir.

15   Q.  Well, it was just a few weeks ago, wasn't it?

16   A.  Yes.

17   Q.  Don't you remember just a few weeks ago?

18   A.  Yes.

19   Q.  It was a pretty important moment, right, you're in court

20   and you have to say that you're guilty of a federal felony

21   offense, right?

22   A.  Yes.

23   Q.  It's not something you'd forget, right?

24   A.  So much been going on, sir, I just forgot.

25   Q.  But it was just I believe February, was it February 17 or

1    thereabouts?

2    A.  I'm not sure the date, sir.

3    Q.  I'm just asking.

4          THE COURT:  It was in the last few weeks, are you

5    saying that was in the last few weeks?

6          THE WITNESS:  Yes.

7          THE COURT:  Fine.  Can we move on, please.

8          MR. MAZUREK:  Yes.

9    Q.  So it took you two years to come to that decision to plead

10   guilty, right, from the time of your arrest until you pled

11   guilty a few weeks ago?

12   A.  No.

13   Q.  You didn't plead guilty in between, right?

14   A.  No.

15   Q.  In between you worked out a cooperation agreement with the

16   government, correct?

17   A.  Yes.

18   Q.  And you didn't work out that cooperation agreement until

19   very recently too, right?

20   A.  Yes.

21   Q.  And so you decided to plead guilty, you started meeting

22   with the government sometime early this year, the beginning of

23   the year in January or so to answer the questions and to seek

24   the cooperation agreement?

25   A.  Can you explain that again, please.

1    Q.  You first started meeting with the government at the

2    beginning of this year to answer their questions and seek a

3    cooperation agreement, correct?

4    A.  No.

5    Q.  When was it then?

6    A.  I'm not sure what date it was, but it wasn't beginning of

7    the year.

8    Q.  Tell me roughly when.

9    A.  I'm not sure, sir.  I'm not sure what date it was.

10   Q.  Sir, when you first started meeting with the government,

11   you met with them several times, right, I think you testified,

12   correct?

13   A.  Yes.

14   Q.  You met with them on -- let's see.  There is a time late

15   2015, November 18, 2015, is that about the time you first met

16   with them, roughly a year after you were arrested?

17   A.  2015?

18   Q.  Yes.

19            THE COURT:  Do you remember when the first time you

20   met with the government was?

21            THE WITNESS:  I think it was in January, ma'am.

22            THE COURT:  In January of this year?

23            THE WITNESS:  Yes.

24            THE COURT:  Just a couple months ago?

25            THE WITNESS:  Yes.

1   Q.  OK.  And you met with them.  At that point in time you had

2   a trial date, right?  You were going to go to trial, contest

3   the charges.  You had a date you had to come back to court for

4   trial.  Right?

5   A.  I didn't have a trial date yet, sir.

6   Q.  You didn't have a trial date yet.  You had been arrested in

7   December 14.  It's now January 2016, and you make a decision

8   you want to start cooperating.  Right?

9   A.  I didn't make it right at the beginning, sir.

10  Q.  You wanted to try, right?  You wanted to come in and answer

11  the questions and see if the government were interested in your

12  answers?

13  A.  No.

14  Q.  No.  That's what you did though, right?  You met with them?

15  A.  Yes, eventually, down the line.

16  Q.  In January of '16, correct?

17  A.  Yes.

18  Q.  And you wanted a cooperation agreement, right?

19  A.  Not at the beginning, sir.  I didn't know what I was going

20  to do.

21  Q.  No.  Why did you enter into a cooperation agreement?

22  A.  Only because I wanted to be able -- I wanted to tell my

23  side of the story, take accountability for what I did.

24  Q.  Your answer yesterday on direct examination is you wanted

25  to stay out of jail, that was your first answer, right?  You

1    just gave it 24 hours ago.

2              THE COURT:  You know, please.  Stop arguing with him.

3              MR. MAZUREK:  Sorry, your Honor.

4    Q.  Your first answer yesterday, sir --

5              THE COURT:  Yesterday, sir, did you say that you

6    signed that cooperation agreement in the hope that you wouldn't

7    have to go to jail?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Fine.

10             MR. MAZUREK:  Thank you, Judge.

11   Q.  Now, when you started meeting with the government in

12   January of 2016, you met with the agents and the prosecutors

13   and they asked you a lot of questions and they asked you a lot

14   of questions about Dr. Mirilishvili, right?

15   A.  No.  They asked me questions about what I did.

16   Q.  And you answered those questions?

17   A.  Yes.

18   Q.  And then they asked you questions about what you knew about

19   Dr. Mirilishvili, right?

20   A.  They asked me questions about what I did in the office.

21   That's what they asked me.

22   Q.  Did that involve questions about what you knew, what you

23   could tell them about Dr. Mirilishvili's practice in the

24   office, yes or no?

25   A.  Yes.

1    Q.  And you knew at that point in time that Dr. Mirilishvili

2    pled not guilty and was going to trial, right?

3    A.  I didn't know that, sir.

4    Q.  You didn't know that.  You didn't know that in the case --

5    you were arrested together, right, you made some comment about

6    being in the jail cell together the day you were arrested,

7    right?

8    A.  We wasn't arrested together.

9    Q.  You ended up in a jail cell together; is that your

10   testimony on direct?

11   A.  Yes.

12   Q.  And you knew you were charged in the same case, right?

13   A.  Yes.

14   Q.  And you also knew that for you to get a cooperation

15   agreement, you had to provide assistance to the government in

16   their investigation of other people, right?

17   A.  Can you ask that question again, please.

18   Q.  In order to get a cooperation agreement with the

19   government, you had to provide assistance to them in the

20   investigation of other people?

21   A.  Yes.

22   Q.  And you knew that if you provided information about

23   Dr. Mirilishvili, that could assist you in getting the

24   cooperation agreement you signed a couple weeks ago, right?

25   A.  Yes.

G39LMIR4                          Leonard - cross

1    Q.  And when you were meeting with the government since January

2    of this year, you didn't tell them, you didn't tell them about

3    the story of, oh, when we were in the jail cell together,

4    Dr. Mirilishvili talked about Ray Williams, you didn't tell

5    that, you didn't tell the government that until February 20,

6    just a couple weeks ago, right?

7    A.  Yes.

8    Q.  You didn't say it back in December of 2014 when you were

9    arrested, right?

10   A.  I wasn't asked that question, sir.

11   Q.  You didn't volunteer it either?

12   A.  No.

13   Q.  And by the time that you made that statement about

14   Dr. Mirilishvili to the government, you had already met with

15   them what, eight, nine, ten times before that?

16   A.  I met with them quite a few times.  I wasn't counting, sir.

17   Q.  Now, and the only one, the only one, you didn't have any

18   document or recording, it's just your word of that happening,

19   right, that so-called conversation in the time of the jail

20   cell?

21   A.  Can you ask that question again?

22   Q.  There's no recording, there's no documentation, there's

23   only your word that that conversation took place, right?

24   A.  Yes.

25   Q.  Let me ask you about your time working at the clinic.  You

1    testified yesterday about hanging out in the office.  Do you

2    remember that?

3    A.  Yes.

4    Q.  And you also were a patient for a few times, right?

5    A.  Yes.

6    Q.  And your first, I think we saw yesterday your first patient

7    visit was on November 15, 2012, correct?

8    A.  Yes.

9    Q.  And you know that and that patient visit was at

10   162nd Street, right, the office in Washington Heights?

11   A.  Yes.

12   Q.  And you know that that office just opened the beginning of

13   the month in November, correct?

14   A.  I didn't know that.

15   Q.  You didn't know that?

16   A.  No.

17   Q.  You weren't there previously to November 2012, right, you

18   didn't go to the office in September or October of 2012?

19   A.  I did go to the office.

20   Q.  When was the first time that you remember going to the

21   office on West 162nd Street?

22   A.  During the fall time.

23   Q.  I'm sorry?

24   A.  During the fall of 2012.

25   Q.  During the fall?

1    A.  Yes.

2    Q.  Were you there months before your first patient visit?

3    A.  Yes, I was there months before my first patient visit.

4    Q.  I'm sorry?

5    A.  Yes, I was there at the office before my first patient

6    visit.

7    Q.  For how many months were you visiting there, one month, two

8    months, three months in the office before you finally decided

9    to be a patient?

10   A.  I don't know how many months, sir.  I wasn't counting.  I

11   didn't know how many months I was there before that.

12   Q.  Did it seem like a very long time to you?

13   A.  Yes.

14   Q.  Now, when -- the beginning, you had a friend by the name of

15   John Coleman, right?

16   A.  Yes.

17   Q.  And this John Coleman was someone who was bringing you or

18   was asking you to bring patients to the office, right?

19   A.  Yes.

20   Q.  And John Coleman is actually someone who is close or you

21   knew for a long time because his wife grew up with your wife,

22   right?

23   A.  I didn't say that.  I said he was a family -- friends of

24   the family.

25   Q.  Is that correct, isn't it a fact that your wife -- his wife

1   grew up with your wife?

2   A.  I didn't say that, no.

3          THE COURT:  He didn't ask you what you said.  Did the

4   man's wife grow up with your wife?

5          THE WITNESS:  No.

6          THE COURT:  OK.

7   Q.  No.

8          THE COURT:  Sir, you need to listen to his questions.

9   Q.  What's the relationship between Coleman and your family?

10  A.  Say it again?

11  Q.  What is the relationship between John Coleman and your

12  family?

13  A.  He's just a friend to the family.

14  Q.  How did you get to know each other?

15  A.  Just a friend of the family, met him, you know, through

16  friends, mutual friends.  That's how I met him.

17  Q.  You knew he was a drug dealer?

18  A.  No.

19  Q.  You didn't know he was a drug dealer prior to the time that

20  he asked you to bring patients to the office?

21  A.  No.

22  Q.  When he asked you to do that, were you surprised that he

23  was in that business?

24  A.  Ask that again.

25  Q.  At the time that he asked you to bring patients to the

```
 1    clinic, were you surprised that John Coleman was in the drug
 2    business?
 3    A.  I didn't know he was in the drug business, sir.
 4    Q.  OK.  When he asked you to do that, you figured it out?
 5    A.  Not at the beginning, no, not at the beginning.
 6    Q.  Why did you think that John Coleman was asking you to bring
 7    patients and paying you $100 a time to bring patients to the
 8    office?
 9    A.  I didn't ask.  I just didn't ask.
10    Q.  You didn't ask?
11    A.  No.
12    Q.  You just did it.  How many times had you seen John Coleman
13    prior to him asking you to do this?
14    A.  Every once in a while.
15    Q.  How many years had you known him?
16    A.  About five years, six years.
17    Q.  And how did the offer come about for you to do this, how
18    did it take place?
19    A.  He just asked me that -- he asked me I can help him out and
20    help him out, do some things.  And I asked him, I asked him
21    what was it.  He'll let me know.  He just wanted me to help
22    bring some patients to a clinic.  That was it.  That was all he
23    said to me.
24    Q.  And then you had to take those patients after the clinic
25    and bring them to pharmacies?
```

G39LMIR4                      Leonard - cross

1   A.  Not at the beginning, no.

2   Q.  What would you do, you would leave after you dropped them

3   off at the clinic?

4   A.  No.

5   Q.  You'd just wait for them to finish?

6   A.  Yes, sir.

7   Q.  And then leave together?

8   A.  No.

9   Q.  What would you do?

10  A.  I would stay there.

11  Q.  I'm sorry?

12  A.  I was told to stay there, stay at the clinic.

13  Q.  Right.  Until the patient was done?

14  A.  Yes.

15  Q.  And then where would you go?

16  A.  I was told to stay there for other patients to come.

17  Q.  And just sit there?

18  A.  And just sit there, yes.

19  Q.  When did that change?

20  A.  Later down the line.

21  Q.  How long later down the line?

22  A.  About three months, four months.

23  Q.  So for three or four months, you weren't going to any

24  pharmacies?

25  A.  No.

1   Q.   Just getting paid $100 to sit with patients in the office;

2   is that your testimony?

3   A.   I wasn't getting paid every day $100.  It varied, sir.

4   Q.   It varied.  That was the job as you understood it?

5   A.   That was the agreement.

6   Q.   When did you first learn that John Coleman was selling

7   these patients prescriptions?

8   A.   After about a month.

9   Q.   And how did you learn that?

10  A.   By seeing it, witnessing it.

11  Q.   You were with John Coleman when he was buying the

12  prescriptions off of the patients?

13  A.   Sometimes.

14  Q.   Is that the first time that you saw that kind of drug

15  transaction?

16  A.   Yes.

17  Q.   And is that how you learned how to sell oxycodone, is that

18  your beginning into the drug business of selling oxycodone on

19  the streets?

20  A.   Can you ask that again?

21  Q.   Was that the first time that you were introduced to the

22  selling of prescriptions on the street?

23  A.   Yes.

24  Q.   And you eventually decided to take up that particular

25  business, right?

1   A.  Yes.

2   Q.  Now, you thought it would be helpful to work in the clinic,

3   at Dr. Mirilishvili's clinic, so that you could be like John

4   Coleman and have a business of selling prescriptions on the

5   street, right?

6   A.  No, sir.

7   Q.  You didn't have that in mind?

8   A.  No, sir.

9   Q.  Well, prior to you accepting that job, you started bringing

10  in your own patients, right?

11  A.  Down the line, yes.

12  Q.  Prior to you taking the job at the clinic, yes or no?

13  A.  Say that again, please?

14  Q.  You started bringing in your own patients prior to you

15  working at Dr. M's clinic, right?

16  A.  Prior you mean?

17  Q.  Before.

18  A.  Before I started working there?

19  Q.  Yes.

20  A.  I was a crew chief before that, sir.  I wasn't bringing my

21  own patients.

22  Q.  You were a crew chief?

23  A.  I was bringing in patients for Mr. Coleman.

24  Q.  Did Mr. Coleman introduce you to that term, crew chief?

25  A.  Yes, sir.

1   Q.  And when you were doing that, did you have any

2   conversations with Dr. Mirilishvili about your role as a crew

3   chief?

4   A.  No.

5   Q.  Now, when you began seeing Dr. Mirilishvili as a patient on

6   November 15, 2012, you didn't tell him -- were you a crew chief

7   at that point?

8   A.  Yes.

9   Q.  You didn't tell him you were a crew chief then, right, when

10  you showed up in his exam room?

11  A.  No.

12  Q.  You didn't tell him that you didn't have a basketball

13  injury, did you?

14  A.  Yes, I did tell him that.

15  Q.  You told him you had one, but it wasn't true?

16  A.  No, sir.

17  Q.  And you continued to lie throughout that examination

18  because you wanted to get a prescription of oxycodone?

19  A.  Yes, sir.

20  Q.  And you continued to lie to him on subsequent visits and

21  follow-up visits, correct?

22  A.  Yes, sir.

23  Q.  You told him that you didn't have much cash, right, you

24  didn't have much money, you didn't have a job, right?

25  A.  I didn't tell him no sort of thing.

1    Q.  You didn't tell him that you didn't have a job?

2    A.  He never asked me that question.  I was never asked that

3    question.

4    Q.  Did he ask you whether you had children?

5    A.  Not at the beginning, no, sir, no.

6    Q.  During the initial patient examination, did he ask you

7    questions about your family history?

8    A.  No.

9    Q.  You don't remember that?

10   A.  He never asked me that, sir.

11   Q.  He never asked.  By the way, that initial visit was about

12   one hour long?

13   A.  No.

14   Q.  No.  About 60 minutes, no?

15   A.  No.

16   Q.  Well, in one of the meetings that you had with the

17   government on January 21, 2016, I refer the Court and the

18   government to 3504-24, isn't it true that you said that the

19   examination lasted about 60 minutes or an hour?

20   A.  No, sir.  I don't remember me saying that.

21   Q.  And at that visit, the doctor performed a physical

22   examination, right?

23   A.  To me?

24   Q.  I'm sorry?

25   A.  To me?

1    Q.  Yes.

2    A.  Yes, sir.

3    Q.  And in your subsequent visits, your next visit that lasted

4    about 20 minutes; is that right?

5    A.  About 15, ten to 15 minutes.

6    Q.  On that same day, on January 21, 2016, in your meeting with

7    the government agents, the prosecutors, isn't it true you told

8    them the next visit was 20 minutes?

9    A.  I'm not sure.  I don't remember me telling them that, sir.

10   I remember just saying ten to 15 minutes.

11   Q.  OK.  And that was about the average time that you had taken

12   each of the follow-up visits that you had, right?

13   A.  It varied, sir.  Sometimes it took ten minutes.  Sometimes

14   15.  It varied.

15   Q.  And you said that you had health insurance back then but

16   you didn't use it; is that right?

17   A.  At the beginning, yes, I had health insurance.

18   Q.  And where did you have that health insurance from?

19   A.  At the time, it was United Healthcare at the time.

20   Q.  Did you get that through your wife's employment?

21   A.  Yes, sir.

22   Q.  You didn't tell that to the receptionist when you got to

23   Dr. Mirilishvili's clinic, right?

24   A.  I wasn't asked.

25   Q.  And you didn't want to use your insurance at that point,

G39LMIR4                         Leonard - cross

1    right?

2    A.  I wasn't asked, sir, and that was just -- I wasn't asked

3    about using my insurance and at the time I think at that time

4    they wasn't taking that healthcare at the time.

5    Q.  The doctor wasn't in the United Healthcare plan?

6    A.  Yes, sir.

7    Q.  You didn't ask about insurance on the November visit,

8    right?

9    A.  No.

10   Q.  And it never came up at all during that visit?

11   A.  What do you mean never came up?

12   Q.  It was never discussed, you never talked about insurance?

13   A.  I never talked about it.  I never was asked about it.

14   Q.  With anyone in the office or the doctor, right?

15   A.  Nobody, not the receptionist, not the receptionist.

16   Q.  How did you know they didn't take United Healthcare?

17   A.  Because other patients had had United Healthcare and they

18   wasn't -- they couldn't use it.  That's what I know.

19   Q.  You were -- at that point in time, the office was just a

20   few weeks old; isn't that right?

21   A.  I'm not sure if it was.  I didn't know when it opened up.

22   Q.  Were you having conversations with people about the

23   insurance plans that the office was using at that time?

24   A.  I wasn't having no conversations.  I just overheard it.

25   Q.  You overheard it while you were sitting there?

```
 1   A.  Yes, sir.
 2   Q.  And that's why you decided not use United Healthcare, your
 3   insurance plan for your visit?
 4   A.  No, not really, no, not at all, sir.  I just wasn't going
 5   to use insurance because I was told to pay cash.
 6   Q.  By John Coleman?
 7   A.  Yes, sir.
 8   Q.  Now, when did you start selling prescriptions on the
 9   street?
10   A.  I don't remember, sir, what particular time.
11   Q.  You don't know the year, the month, anything?
12   A.  It was 2014 really.  That's when I started selling
13   prescriptions on the street.
14   Q.  So that was after you were working as an office manager, a
15   few months after you were working as an office manager at the
16   clinic?
17   A.  Yes, sir.
18   Q.  So your testimony is before that, you weren't doing any
19   illegal drug business?
20   A.  My testimony, before that I was just helping out as a crew
21   chief.
22   Q.  But you weren't making any money on your own patients?
23   A.  I didn't have any patients at that time, sir.
24   Q.  So you started bringing in patients in sometime in 2014?
25   A.  Yes.
```

G39LMIR4                    Leonard – cross

1   Q.  And but prior to that, you were taking money for overrides

2   in the office I think you testified to, right?

3   A.  No, sir.

4   Q.  You didn't take money for overrides; is that your

5   testimony?

6   A.  Can you ask me that question again?

7   Q.  Do you understand what I mean when I say the word override?

8   A.  I understand what you mean.  I'm trying to figure out the

9   time period.

10  Q.  Let me make sure I understand.  An override, I think you

11  testified there were two things, right?

12  A.  Yes.

13  Q.  The first thing was trying to have people jump the line,

14  right, that is you could put a patient into the appointment

15  earlier so they wouldn't have to sit there, right?

16  A.  And the other?

17  Q.  Well, you have to answer the question first.

18  A.  Yes.

19  Q.  And the other was to help with the urine, that is either

20  put a false report in or change a report that came back in a

21  bad way?

22  A.  Yes.

23  Q.  And you were taking money for doing those things, right?

24  A.  No, sir.

25          MR. MAZUREK:  One moment, your Honor.

G39LMIR4                    Leonard - cross

1   Q.  When you were doing overrides, you weren't getting $150 and

2   giving Jomaris about $50?

3   A.  No, sir.

4   Q.  You remember, do you not, having conversations with a guy

5   you call Buck who was Abraham Correa?

6   A.  Yes.

7   Q.  And at that time, you later learned that he was wired for

8   the government, that he was wearing a secret recorder on him

9   during those conversations, right?

10  A.  Say that again, please.

11  Q.  You later learned that during the conversations you had

12  with Buck in July and September of 2014 that he was wearing a

13  recorder for the government, secret recording device?

14  A.  Only learned that after I was arrested.

15  Q.  After you were arrested.  In fact, you listened to some of

16  those recordings with the government in your preparation for

17  testimony, right?

18  A.  Yes.

19  Q.  Now, you're saying that you never got overrides of $150 and

20  giving Jomaris $50, right?

21  A.  I never got overrides for over $150, sir.

22          MR. MAZUREK:  Your Honor, I would like to play a

23  portion of the recording from September 11, 2014 at time stamp

24  12:45.

25          THE COURT:  Do I have a transcript of that?

1          MS. CUCINELLA:  Can we do a side bar?  We don't think

2     this is inconsistent.

3          THE COURT:  Guess what.  You've now given me an

4     opportunity to explain something to the jury and to you.

5          Ladies and gentlemen, what's going to happen is you're

6     going to hear a portion of a tape recording.  And it's not

7     evidence, what's on the tape recording.  It's being played

8     because Mr. Mazurek takes the position that something that this

9     gentleman said on this tape is inconsistent with something that

10    he has said here to you at the trial.  This is his evidence,

11    not the tape statement, but this.

12         Now, the government stands up and says objection, not

13    inconsistent.  I can't decide if it's not inconsistent.  I'm

14    not the trier of fact.  You are the triers of fact.  You have

15    to decide whether there's an inconsistency between what

16    Mr. Leonard said to you here and what Mr. Leonard said on this

17    earlier occasion.

18         If you decide that there is no inconsistency, let me

19    tell you, it often happens that jurors don't see any

20    inconsistency where a lawyer sees an inconsistency.  But if you

21    guys decide there was no inconsistency, you'll forget you ever

22    heard this tape.  And if you decide that there is an

23    inconsistency, the only reason you can think about that is in

24    deciding whether what you hear from Mr. Leonard here on the

25    stand is true, not what the tape is true, but you can consider

1     the fact that he said different things on different occasions

2     as you decide whether you believe him here today or not.

3              All right.  That's the reason for this.  And I'll

4     explain it again when I give you my final jury instructions.

5              OK.  Page and line, please.

6              MR. MAZUREK:  Page 5 of the September 11, 2014.

7              THE COURT:  That's DM603 for identification.

8              MR. MAZUREK:  Yes.  And there aren't specific lines,

9     but the attribution at 12:45.

10             (Audio recording played)

11    Q.  Mr. Leonard, when you were doing it, you were getting 150

12    every time, right?

13    A.  That was for something else, sir.  That wasn't for

14    overrides, sir, at all.

15    Q.  What were you getting 150 for?

16    A.  I was getting $150 for something I was doing that had

17    nothing to do with overrides at all.  That's -- go ahead.

18    Q.  Well, you were discussing at the time with Mr. Correa the

19    issue about you being upset because Jomaris was not sharing or

20    in the past did not share with Mr. Correa any of the money that

21    she was charging for either jumping the line or for urine

22    tests, right?

23    A.  I wasn't upset at all.  I wasn't upset at all, no.

24    Q.  You weren't upset?

25    A.  No.

```
 1   Q.  But you were telling Mr. Correa that when you were doing

 2   shit or I was getting, if I get 150, I'm giving you $50 every

 3   time.  What are you sharing the $50 for?

 4   A.  That's during that time, during that time, it was when I

 5   would get for moving people up, I would get a couple dollars

 6   and it wasn't for overrides, sir.

 7   Q.  What do you mean moving people up?

 8   A.  Well, at the time, at the time it was moving, somebody

 9   would ask me, people ask, patients ask me a question and

10   they'll say here, Damon, here's $150, can I be moved up from

11   this point.  It wasn't no overrides.

12   Q.  It was just to move people up so they could see the doctor

13   quicker?

14   A.  Yes.  That was it.

15   Q.  And you don't call that an override?

16   A.  That wasn't override, sir.  The override, that was not an

17   override, sir.

18   Q.  Were you getting $100 each time to help with Augustine Cruz

19   and Jomaris's patients?

20   A.  No.

21   Q.  Did you tell Mr. Correa on September 11, 2014, sometimes

22   you have to do that much for a rap.  I'm going to get Augie to

23   give me $100?

24   A.  I don't remember that, sir, at all.  I don't remember

25   saying that at all.
```

1  Q.  You didn't say that?

2  A.  I don't remember saying that at all.

3  Q.  And you would share that amount sometimes with Jomaris,

4  right?

5  A.  I don't remember saying that at all, sir, either.

6  Q.  Is it something that happened, when you were working at the

7  office, were you taking money from people in order for them to

8  jump the line, yes or no?

9  A.  Yes.

10  Q.  Were you taking money from people to change their urine

11  reports or create a false report?

12  A.  No, sir.

13  Q.  You never did that?

14  A.  I didn't say never.  I said I never did that.  No, I have

15  not did that, no.  I have not did that.

16  Q.  Did you know it was happening in the office?

17  A.  Yes.

18  Q.  And was Augustine Cruz taking money to change urine

19  reports?

20  A.  I was not sure.  I don't know, sir.  Not sure.

21  Q.  Were overrides something that were happening on a regular

22  basis when you were working there?

23  A.  Not on a regular basis, no.

24  Q.  How often?

25  A.  Every now and then.

 1    Q.  So once a week or five times a week or ten times a week?

 2    A.  I'm not sure how many times, sir.  I never count.

 3    Q.  But it was something that you were aware of that was

 4    happening, right?

 5    A.  Yes.

 6    Q.  And you talked about on direct examination that there

 7    was -- there were these different urine labs that were being

 8    used, right?

 9    A.  Say it again, please?

10    Q.  There were different labs that were being used to test the

11    urine, right?

12    A.  Yes.

13    Q.  There was Empire, right?

14    A.  Yes.

15    Q.  And then there was Aegis, correct?

16    A.  Yes.

17    Q.  And then there was AFTS, right?

18    A.  Yes.

19    Q.  And when you first started working there, Empire was the

20    lab that was being used by the clinic, right?

21    A.  Yes.

22    Q.  Now, did you have things -- Empire set up in the computer

23    so you could do overrides?

24    A.  At the beginning, sir, I was not working there, so I wasn't

25    doing anything.

1   Q.   I'm asking when you were there, sir.

2   A.   We didn't -- when I came aboard, Empire, we already -- when

3   I came aboard, Empire, we, it was a fall out with Empire.   We

4   no longer used Empire when I started as an employee.

5   Q.   When you started in September 2013?

6   A.   Yes.

7   Q.   At that point in time there was no more Empire; is that

8   your testimony?

9   A.   Excuse me?

10  Q.   You're saying that the clinic didn't use Empire anymore at

11  that point in time?

12  A.   Yes, when I started, yes.

13  Q.   And so what lab were they using at that time?

14  A.   Before I started was Empire.   When I became on board, we

15  had to get a new lab which was Aegis.   That's who came on board

16  when I was hired.

17  Q.   So when you were first hired, you were not working with

18  Empire in September, October 2013?

19  A.   Say that again?

20  Q.   In September, October 2013, when you first started with the

21  labs, you had to upload the lab reports, right?

22  A.   Yes.

23  Q.   What lab reports were you uploading?

24  A.   That was Aegis.

25           MR. MAZUREK:   We're going to put on the screen what's

G39LMIR4                        Leonard - cross

1   been already admitted into evidence as GX223.  Is it on

2   everyone's screen?  And if we can blow up the first half of it

3   or the top, first top.

4          THE COURT:  You mean like above the shaded boxes?

5          MR. MAZUREK:  That's fine.

6   Q.  This is a lab report for Empire City Laboratories, correct?

7   A.  Yes.

8   Q.  And you see the collection date towards the -- on the

9   middle of the page, there's the word accession, a number, and

10  then a COLL.date.  Do you see that, sir?

11  A.  Yes.

12  Q.  Can you read it for me?

13  A.  January 27, 2014.

14  Q.  And the clinic that was using this Empire City Laboratory

15  report was Dr. Mirilishvili's, right?

16  A.  It says his name on there, yes.

17  Q.  And there was the patient name is Ira Sheppard, correct?

18  A.  Yes.

19  Q.  And this is after -- this is about four months after you

20  started working there, correct?  Correct?

21          THE COURT:  Is that after you started working there,

22  sir?

23          THE WITNESS:  Yes.  That was after I started working

24  there, yes.

25          THE COURT:  Thank you.

1   Q.  So Empire lab was still being used months after, many

2   months after you started working there, right?

3   A.  Yes, it was still being used.

4   Q.  In fact, I mean you said there were about 30 patients a day

5   going into the office at that time?

6   A.  A little more, about 30, 35, 40, yes.

7   Q.  And any follow-up visit required a urine lab report, right?

8   A.  Yes.

9   Q.  So there were literally hundreds, hundreds of urine lab

10  reports being done on a weekly basis, right?

11  A.  Yes.

12  Q.  And one of your few jobs was to scan documents up onto the

13  computer system, right?

14  A.  Yes.

15  Q.  And one of the few documents you had to scan on the

16  computer system were lab reports, right?

17  A.  Yes.

18  Q.  And so you were doing literally hundreds of scans, hundreds

19  of lab reports around this time and they were all Empire labs,

20  weren't they?

21  A.  Yes.

22  Q.  Now, there came a time when you couldn't do any more

23  overrides of urine reports, right, while you were still working

24  at the office?

25  A.  I don't remember that, sir.  No.

G39LMIR4                         Leonard – cross

1   Q.  As far as you know, there were always overrides being done

2   at the office?

3   A.  No.

4   Q.  I'm sorry?

5   A.  No, sir.

6   Q.  There was a time when the overrides stopped?

7   A.  You asked the question was it the time override was always

8   working, right?  That was the question you asked me?

9   Q.  Let me ask you this.  Did you know a time when the

10  overrides stopped in the office, which I thought was my first

11  question?

12  A.  Yes.

13  Q.  OK.  And that happened when the labs changed from Aegis to

14  AFTS, right?

15  A.  No.

16  Q.  It didn't happen then?

17  A.  No, sir.

18  Q.  In about September of 2014?

19  A.  I don't remember what day it was or what month or what day,

20  I don't know.  But that's not when they stopped.

21  Q.  Well, on September 11, 2014, when you were speaking to

22  Mr. Correa, you were telling him that there's no more

23  overrides.  He was looking for an override.  You said there's

24  no overrides.  Right?

25  A.  Yes.

1    Q.  And that's because the labs were changing, right?

2    A.  That's when Aegis came aboard.

3    Q.  This is in September of 2014?

4    A.  September 2014, I don't remember the date, sir.  I don't

5    remember.

6    Q.  But people still wanted you to do overrides at this time,

7    like Mr. Correa at the time he was asking, right?

8    A.  Correa wasn't asking for override at the time because he

9    was no longer an employee at the office or a patient.  He

10   wasn't asking for no overrides.

11   Q.  He was coming to you in order to see whether you could get

12   him new patients in the office, right?

13   A.  He didn't come to me to ask me, no, sir.

14   Q.  He didn't come to you September 2014 to try to get new

15   patients?

16   A.  No, sir.

17          MR. MAZUREK:  Just a moment, your Honor.

18   Q.  Were you sending Mr. Correa to Madison MRI on September 11,

19   2014 to get some MRI reports?

20   A.  Say that again?

21   Q.  Were you directing Mr. Correa to go to an MRI center called

22   Madison MRI on Fifth Avenue and 122nd Street?

23   A.  I remember telling him that that was a place he can go to

24   to get MRIs done.

25   Q.  That they would hook him up there; is that right?

1   A.  No, sir.

2   Q.  That he could get an MRI for about 40 bucks and they can

3   put it in the system, right?

4   A.  Put what in what system, sir?

5   Q.  In their own system so that if you called them, it would

6   look legit and if the doctor called to verify, it would be

7   right in the system and it would be an MRI report that could be

8   verified?

9   A.  I'm not sure.  I don't remember him telling him that

10  particularly, particular thing, sir.  I don't remember telling

11  him that.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

G397MIR5                          Leonard - cross

1    Q.  Well, would it refresh your memory to hear the recording of

2    what you told him then?

3    A.  No problem.

4            THE COURT:  You're going to have to show him a

5    transcript, because you can't hear the recording unless I

6    excuse the jury.

7            MR. MAZUREK:  Yes, your Honor.

8            I'm referring to page 16, the attributions from

9    between 41 minutes and 45 seconds and the attribution at 43:13.

10           May I approach, your Honor?

11           THE COURT:  You may.

12           MR. MAZUREK:  I'm just marking it so you can see.

13           If you can read just to yourself, OK.

14           THE COURT:  Just read that to yourself, sir, and then

15   tell us if it jogs your memory that you said.

16           MR. MAZUREK:  Tell me when you're ready Mr. Leonard.

17           THE WITNESS:  I don't remember seeing this.

18           THE COURT:  That isn't the issue.  Do you remember --

19   do you remember saying that?

20           THE WITNESS:  I remember saying that, yes.

21           THE COURT:  You do.

22           He remembers saying that, OK.

23   Q.  So you remember that in your conversation with Mr. Correa

24   on September 11, 2014 you had information about an MRI center

25   on Madison and 122nd who were putting false MRIs into their

1   system.

2   A.  I didn't have information.  This is what I was told from

3   somebody else on the street.

4   Q.  But you related it to Mr. Correa.

5   A.  Yes.

6   Q.  And you were talking about a person named Heidi.

7   A.  Yes.

8   Q.  Who was Heidi?

9   A.  She was a former -- she was a patient of Dr. Moshe's.

10  Q.  And she was working at that MRI place now?

11  A.  Which?

12  Q.  The one on Madison that you were directing Mr. Correa to go

13  to?

14  A.  No, sir.

15  Q.  Who was working there that you knew in order to help you

16  with getting those false MRIs?

17  A.  I didn't know nobody, and nobody was getting me no false

18  MRIs, sir.

19  Q.  All right.  That was just information that you were passing

20  on?

21  A.  Yes, sir.

22  Q.  And who was J?  Was that someone who was working there?

23  Was that Jomaris?  Or she knew somebody who was working there?

24  A.  Where?  At Madison?

25  Q.  Yes.

G397MIR5                    Leonard - cross

1   A.  No.

2   Q.  Well, when you were telling Mr. Correa that you can get

3   those false MRIs, they could be legitimately put into the

4   system, you mentioned J, her and what's her name.  She said

5   send them over there, and they will do whatever.

6   A.  Well, at that time, sir, Jomaris was working at another

7   place, another office at that time.  That's what I told Mr.

8   Correa.

9   Q.  And so you knew that Jomaris was the person that had the

10  connection at the MRI place in Madison for you to get -- to

11  send people to?

12  A.  I didn't know that, sir.  That's just what I was told, that

13  she can -- I was told that you can send them there.  That's all

14  I was told.

15  Q.  And you were telling other crew chiefs this at this time?

16  A.  I wasn't telling any crew chiefs that at any time.  I only

17  spoke to Mr. Correa.

18  Q.  Only to Mr. Correa.

19  A.  Yes.

20  Q.  Were you speaking to Jomaris at the time to get information

21  about how she could get false paperwork for your patients?

22  A.  No, sir.

23  Q.  You still had patients there, right?

24  A.  At Dr. Moshe's office?

25  Q.  Yes.

1    A.   Yes.

2    Q.   And were you going to assist Mr. Correa to try to get some

3    paperwork or use some old paperwork to try to get him new

4    patients at the doctor's office in September of 2014?

5    A.   I wasn't going to assist him on anything.  I just told him,

6    I told him what to do, and that was it; it was up to him to do

7    the rest.

8    Q.   Were you going to put the paperwork through for him?

9    A.   Can you ask me that question again?

10   Q.   On the meeting on September 11, 2014 you were helping Mr.

11   Correa to get new patients in the office, right?

12   A.   I wasn't helping him do anything.  I was just telling him

13   the system, tell him what he can do in order to get new people.

14   Q.   Well, one of the thing you told him was to go to this MRI

15   place on Madison Avenue who would legitimately put in an MRI so

16   that when it was verified it would come up clean, right?  That

17   was one of the things you told him?

18   A.   Yes.

19   Q.   And another thing is you will try to jump up or push --

20   push forward for him two, three, pick it, new patients if he

21   wanted; you will do him that favor.

22   A.   No, sir, I never told him how many patients.  We never

23   talked about how many patients he would get put in.

24            MR. MAZUREK:  Your Honor, I ask to play another

25   recording.  This one is at page 15 of DM 603, starting at 40

1    minutes 45 seconds under the third from the bottom attribution.

2              THE COURT:  What was the page again?

3              MR. MAZUREK:  15.

4              THE COURT:  OK.

5              MR. MAZUREK:  The time marker is 40:45.

6              THE COURT:  Thank you.

7              (Audio recording played)

8    Q.  So you agreed to get in two, three, maybe not all in one

9    day, but two or three patients for Mr. Correa, right?

10   A.  That's what we talked about.

11   Q.  Now, that new lab that you talked about earlier, that

12   stopped the overrides in the office, right?  You weren't able

13   to do it anymore?

14   A.  Which new lab, sir?

15   Q.  The one where the lab reports were going directly to a

16   secured portal.

17   A.  I don't know which one was that.  Which one are you talking

18   about?

19   Q.  Could it have been ATS?

20   A.  Can you ask that question again?

21   Q.  There were three labs, right, at the time that you worked

22   there.  There was an Empire Lab, there was an Aegis Lab and an

23   AFTS lab, right?

24   A.  Yes.

25   Q.  In September 2014, when you were meeting, one of the many

1   times that Correa had a wire on him, you were talking to him

2   that the overrides stopped, we can't do it anymore, right?

3   A.  Yes.

4   Q.  And that was because there was then a secured portal that

5   was being used by the new lab, and that new lab was AFTS,

6   right?

7   A.  It wasn't AFTS; it was Aegis Labs.

8   Q.  It was Aegis Labs, that's fine.  And what that was was that

9   once the doctor opens that port up, there is nothing you can

10  did about overriding the report.

11  A.  That's what I told him, yes.

12  Q.  And there were people, crew chiefs who were getting upset

13  with you because you couldn't do any more overrides.

14  A.  They were just getting upset period.  They wasn't getting

15  upset with me per se; they were just getting upset period.

16  Q.  Because the patients would get kicked out if the doctor

17  opened up the secured port and they had a bad lab report,

18  right?

19  A.  Not necessarily.  Patients weren't getting kicked out

20  necessarily for just lab reports, no.

21  Q.  Well, there is one particular patient that you talked about

22  with Mr. Correa that got kicked out, right, because the doctor

23  opened up the port and that was the end, right?

24  A.  Yes, I remember that conversation, yes.

25  Q.  You remember that conversation.  And you were laughing with

1   Correa because it's, like, oh, she just had to pay me $50 but

2   she didn't do that and, therefore, she got screwed -- in a

3   little bit more colorful language -- and now she's out,

4   couldn't be a patient anymore.  Right?

5   A.  No, sir, I never -- no.

6   Q.  Well, how would $50 -- if she paid $50, how would that have

7   changed the situation from the doctor kicking her out because

8   of that lab report?

9   A.  It wouldn't have changed nothing but I wouldn't have took

10   anything.  It wouldn't have changed anything.

11   Q.  Well, you said that $50 screwed her up.  It only cost her

12   $50 which would have taken care of it, right?

13   A.  $50 was for the urine to get tested.  If that's what I

14   mentioned, that's what the lab -- it cost the lab to test the

15   urine.

16   Q.  Right.  It cost the patient $50 for the lab to test.

17   A.  Yes.

18   Q.  But once the doctor opened up the secured portal, saw that

19   it was a bad test, she got kicked out, right?

20   A.  Yes.

21   Q.  And then you were laughing with Correa because you were

22   like, it's crazy, she could have avoided all of that with just

23   $50 -- for just $50 -- because that $50 was going to go to you,

24   right?

25   A.  No, sir.

1    Q.  Well, what were you talking about then?

2    A.  That had nothing to do with that, sir.  That had nothing to

3    do with that.

4    Q.  So how did $50 screw up to be out of the system?

5    A.  Sir, that was something else, it was misinterpreted.

6    Q.  Well, that's what you said, right?

7    A.  It was misinterpreted, sir.

8    Q.  By whom?

9    A.  By me to Mr. Correa.  That's not what --

10   Q.  Sir, my question is this:  What did you mean when you said

11   that the patient can't come back anymore.  Once the doctor

12   opens that port up again, there is nothing you can do about

13   it -- and without the swear words -- and $50 screwed her butt?

14   What did you mean?

15   A.  She knew she was messing around.  The patient knew that her

16   urine was dirty, so she just wasted $50.  That's what I was

17   mentioning to Mr. Correa.

18   Q.  But there were times when the $50 could go to you or to

19   Tamaris or Augustine and you guys would change it; you would

20   make a false report, right?

21   A.  No, sir.

22   Q.  That never happened?

23   A.  It happened, sir, but it didn't happen on that occasion,

24   sir.

25   Q.  No, I'm saying before that, right?

G397MIR5                    Leonard – cross

1   A.  Before that, yes.

2   Q.  And then when the secured portal came, you weren't able to

3   do that; you weren't able to make that extra money, right?

4   A.  It wasn't about extra money, sir.  It wasn't about extra

5   money.

6   Q.  You couldn't did the overrides to falsify the findings in

7   the lab report, right?  You couldn't do it anymore.  That's

8   what you're telling Correa, right?

9   A.  Yes, I couldn't did it anymore, yes.

10          MR. MAZUREK:  Your Honor, might this be a good time to

11  take an afternoon break?

12          THE COURT:  It is a good time to take an afternoon

13  break?  Yes, fine, we will take an afternoon break.  Don't

14  discuss the case; keep an open mind.

15          Take a stretch break, sir.

16          (Jury not present)

17          (Recess)

18          (Jury present)

19          THE COURT:  OK.  You are still under oath, sir.

20          MR. MAZUREK:  Thanks, Judge.

21  DAMON LEONARD, resumed.

22  CROSS-EXAMINATION (Continued)

23  BY MR. MAZUREK:

24  Q.  Mr. Leonard, before the break we were talking about the

25  labs and the changing of the labs and the secure portal.  The

1    way you thought about it at the time in September of 2014 was

2    that, well, now the doctor is getting smarter, he doesn't want

3    you to do the paperwork anymore; it's going to go directly to

4    the portal, right?

5    A.  No, not necessarily.  What I meant by that is by the doctor

6    getting smarter, he is getting tech savvy.  That's what I

7    meant, by him getting tech savvy meaning he is getting smarter,

8    everything is going it him, tech savvy.  The fact that he

9    didn't want to get caught, so that's the reason why he wanted

10   everything to come to that portal now, because he wanted to be

11   able to protect himself.

12   Q.  Well, let's break that down a little.  Prior to the doctor

13   changing the lab, you were able to go into the system and

14   falsify reports, correct?

15   A.  No, sir.  Say that again to me.

16   Q.  Prior to the lab change, where the doctor -- the doctor

17   hired a new lab where the information can go directly through

18   to a secure portal, right?

19   A.  That's after Aegis, yes.

20   Q.  And before that, the office staff -- you included -- were

21   able to change lab reports, right?

22   A.  Yes.

23   Q.  And when you said that the doctor is getting smarter, he no

24   longer wants me to put in the paperwork, you were talking about

25   the fact that, oh, now we can't change the paperwork; it goes

1    directly to him, right?

2    A.  That's not exactly what I was saying at all, no, sir.

3    Q.  No?  You think you said that because you were just

4    commenting on the fact that the doctor was getting more tech

5    savvy?

6    A.  Yes, and the fact, and also, like I said --

7    Q.  There is no question pending.

8    A.  OK.

9    Q.  But that's what happened, right?  When the lab changed from

10   Aegis, he didn't want you to put it in the packet anymore that

11   you prepared.

12   A.  That we prepared.  He didn't want it in no more because it

13   was less paperwork too.  We also talked about that, he wanted

14   less paperwork also.  That's why he wanted it to come to his

15   portal.  That's another reason why he agreed.

16   Q.  So then he just wanted the PMP to go on the computer,

17   right?

18   A.  He wanted the PMP, he wanted the patient's ID.

19   Q.  And you had to tell other -- your crew chief, so called

20   crew chief friends, that if you drop your urine and it's not

21   good, I can no longer help you?

22   A.  I didn't have to tell them anything.

23   Q.  Well, that's what you told Correa at the time that that's

24   what you're telling people now.

25   A.  That was just me talking.  I never said that to anybody.

G397MIR5                    Leonard - cross

1   That was just me talking with Correa.

2   Q.  So, you were just talking to Correa about the fact that if

3   patients drop a urine and it's not good, that you can't help

4   them anymore.

5   A.  Meaning before that I was told by the doctor if your

6   urine -- if the urine is no good, no need to send them in there

7   with me, I don't want to waste my time, you tell them.

8              So, ultimately down the line I thought -- I said to

9   myself that's not my job to tell the patients if their urine is

10  no good; that's the doctor's job.

11  Q.  But for some patients if the urine was no good, you just

12  switched it out with a false report, right?

13  A.  Not true.  Not true.

14  Q.  You never did that?

15  A.  I did that, but it's not true like that.  That's not how it

16  went, sir.

17  Q.  Well, I mean you knew or you had experiences with a bunch

18  of these guys that were coming to the office bringing in

19  patients, right?

20  A.  Yes.

21  Q.  You knew some guys named Dogs and Obama I think you said,

22  right?

23  A.  Yes.

24  Q.  And these were people that you got to know hanging around

25  Dr. Moshe's clinic, right?

G397MIR5                          Leonard - cross

1   A.  Yes.

2   Q.  And you also knew when you started that Jomaris would get

3   bribed by some of these guys to do overrides, right?

4   A.  Yes.

5   Q.  Which would be changing reports, right?

6   A.  Yes, not all the time though, sir.  That didn't happen all

7   the time.

8   Q.  I'm not saying all the time; I'm just trying to figure out

9   what happened here.  And the reports that she would change

10  would be MRIs or referrals, right?  Not all the time, but she

11  would change those.

12  A.  Yes.

13  Q.  She would change urine reports, right?

14  A.  Yes.

15  Q.  And she would also take bribes to jump people in line, have

16  them go in sooner to see the doctor so they wouldn't have to

17  wait around that long.

18  A.  Only when asked by the patient or -- only when asked.

19  Q.  Only when asked.  She took the money, right?

20  A.  I suppose so.  I don't know, sir.  I'm not sure if she took

21  it.  I didn't see her take it hand to hand, no.

22  Q.  There would be no money exchanged for that kind of business

23  in the office.  You didn't want to get caught that way.

24  A.  I never witnessed it, sir, as far as whatever agreement she

25  had.  I knew she was taking it, but I never seen it.

1   Q.  How much do you know she was taking?

2   A.  I'm not sure, sir.  I'm not sure.  I never discussed that

3   with her.

4   Q.  Did you think that at some point that she was making maybe

5   $1,000 a week on that stuff?

6   A.  I'm not sure.

7   Q.  No?  Did you ever tell that to Mr. Correa?

8   A.  That was just an estimated guess.

9   Q.  That was just an estimated guess.

10  A.  Yes.

11  Q.  But it was one with knowledge, right?  Because you were

12  working along side her.

13  A.  It wasn't with knowledge.  It was just an estimated guess

14  when I was talking to Mr. Correa about, just an estimated

15  guess.  I didn't know how much she was getting.

16  Q.  Sometimes people would come into the office, and they would

17  also talk to Augustine Cruz, right, about doing overrides?

18  A.  I never heard nobody come and talk to Mr. Cruz about that,

19  sir.

20  Q.  You knew Augustine Cruz was doing overrides, right?

21  A.  I knew he was taking overrides, but I didn't know when,

22  sir.  Those conversations were never in front of me; they was

23  always to the side.

24  Q.  Always to the side.

25  A.  Um-hum.

1    Q.  But people had conversations with you about doing overrides

2    directly, right?

3    A.  Yes.

4    Q.  And you did them on occasion.

5    A.  Only on occasion, sir.

6    Q.  Only on occasion.  You knew how to do it?

7    A.  I was taught by Ms. Javier, yes.

8    Q.  How do you do an override on a urine test?

9    A.  The only thing that you do is you just switch the

10   paperwork.  Last month's urine analysis that was good, you put

11   it to this month's urinalysis report.

12   Q.  Did you ever see that anyone would change it on the

13   computer, changing the name, the patient name, and the results

14   of the test?

15   A.  I haven't seen that like that, sir, no.

16   Q.  And the whole time you were hanging around the office or

17   working around the office, you never learned that Augustine

18   Cruz was changing -- or Augustine and Jomaris were changing and

19   falsifying reports, to put reports that looked like reports

20   from the lab but weren't?

21   A.  Say that again.

22             THE COURT:  Yes, say it again.  I don't understand it.

23             MR. MAZUREK:  Thank you.  It was long.

24   Q.  There was a system in the office, right, that sometimes if

25   a report came back and it was bad, you just pulled the report

1   and replaced it by making it up, right?

2   A.  Yes.  The only reason why was the fact was the ultimate

3   goal was numbers, so...

4   Q.  Whose numbers?

5   A.  The doctor's numbers.

6   Q.  So you were falsifying lab reports of urine tests to help

7   the doctor increase his numbers in the office; is that your

8   testimony?

9   A.  Yes, sir.

10  Q.  Now, you were selling -- I mean you sold multiple bottles

11  of pills to Abraham Correa in September of 2014, right?  You

12  sold two or three bottles of pills to him?

13  A.  I'm not sure what month it was.

14  Q.  Just roughly, sir.  Roughly.  Do you remember that event

15  happening?

16  A.  Yes, I remember it happening, yes.

17  Q.  And you got $1800 for 90 pills, right?

18  A.  I didn't get $1800.  I got $18 per pill, sir.

19  Q.  So, you got 18 times 90.  My math is not that great, but 18

20  times 90 for each bottle of pills, correct?

21  A.  Say it again.

22  Q.  $18 per pill and the bottles were 90 pills.

23  A.  Yes.

24  Q.  And that wasn't the only person you sold that to, Abraham

25  Correa, right?  You were selling pills to other people.

1    A.  One more person, yes.

2    Q.  One other person?

3    A.  Yes, sir.

4    Q.  That was your total -- that was the person who was

5    purchasing all of your supply?

6    A.  Yes, sir.

7    Q.  And who was that?

8    A.  It was a Spanish guy, that was it.

9    Q.  A Spanish guy.  Do you know his name?

10   A.  The name I called him was Papi.  That was it.

11   Q.  You never knew who it was that you were selling pills to?

12   A.  No.  I ultimately didn't care what was his name; I didn't

13   care who he was really.

14   Q.  You're not just trying to protect someone right now in

15   court?

16   A.  No, sir.

17   Q.  About how many pills did you sell to this person?

18   A.  I don't know, sir.

19   Q.  Tens of thousands?

20   A.  I'm not sure, sir.

21   Q.  Well, how many so-called patients did you have that you say

22   you brought into Dr. Mirilishvili's office?

23   A.  About maybe eight or nine.

24   Q.  For how long a time period?

25   A.  I'm not sure.  Maybe about like about a year.

1   Q.  About a year?

2   A.  Um-hum.

3   Q.  And nobody was taking those pills as medicine, right?

4   A.  No.

5   Q.  You were selling each and every one of those prescriptions.

6   A.  Yes, sir.

7   Q.  And each of those persons came in and had monthly visits?

8   A.  Yes, sir.

9   Q.  So, you were getting for eight or nine people for 12 times

10  a year, that's about 100 prescriptions in one year, right?

11  A.  I'm not sure, sir.  It could be.  I'm not sure.

12  Q.  More or less.  Do I have it correct my math?

13  A.  I'm not sure, sir.  It could be, could be right.

14  Q.  And even if you didn't get $18 a pill, if you got $16 a

15  pill, that's a lot of money.  It's a lot of money, right?

16  A.  I didn't get $16 per pill.  I only got usually $18 when I

17  dealt with Mr. Correa.  Previously before that it was $12 a

18  pill, $12.50.

19  Q.  Maybe you got a little bit less, but it's still a lot of

20  money, right?

21  A.  After costs, not really.

22  Q.  And the cost being you had to put out for the

23  prescriptions.

24  A.  The prescription, the pharmacy and the patient.

25  Q.  You didn't have to pay for any overrides, because you were

1   the office staff, right?

2   A.  There were no overrides at that time, sir.

3   Q.  You didn't have to jump the line, because you were the guy

4   making the decision of when your patients would go in, right?

5   A.  My patients waited just like everybody else did.

6   Q.  So according to my calculations here, with some help from

7   friends, having eight or nine people with monthly prescriptions

8   of pills for an entire year is about, if you're selling it at

9   around $17 or $18 a pill, it's about $175,000.  Now, I

10  understand that you may have gotten less than that.

11  A.  I have gotten less than that, sir, so that estimate is off.

12  Q.  Well, you remember talking to Mr. Correa about the fact

13  that Augustine Cruz was bragging about having 200 racks.  Do

14  you remember that?

15  A.  Yes, I remember that.

16  Q.  And what did you understand 200 racks to mean?

17  A.  It could have meant anything.

18  Q.  Well, you knew, you understood it to be $200,000, right?

19  A.  Yes, but that was just a conversation that he had, so I

20  don't know what that really means.

21  Q.  You were having a conversation with Mr. Correa about the

22  fact that Auggie was bragging about having $200,000 from his

23  pill sales, right?

24  A.  He never said pill sales, sir.

25  Q.  Well, that's what you understood, right?

1   A.  No, sir.

2   Q.  Well, where was Augustine Cruz getting $200,000?  From

3   working for Dr. Mirilishvili at $500 a week?

4   A.  Frankly, sir, I didn't care.  I didn't know.  I didn't

5   care.

6   Q.  Well, you did care because he was bragging to your wife

7   about it, right?

8   A.  I only cared because that was something my wife told me,

9   but it wasn't a big deal.  I never really even worried about

10  that.  It was just something I told Correa.  It was pish posh,

11  gone.  It wasn't nothing.

12  Q.  Well, the reason you were telling Mr. Correa you were upset

13  is because now your wife is going to think you have a stash of

14  hundreds of thousands of dollars, right?

15  A.  No, not really, not at all.

16  Q.  Well, wasn't that the conversation you were having with him

17  on September 11, 2014?

18  A.  Well, if I may say, we was just goofing around, fucking

19  around, just talking.  It wasn't really nothing.

20  Q.  Well, but that is what you were talking about, that you

21  were upset because your wife, you don't tell females that

22  stuff.  Isn't that what you said?

23  A.  You don't tell females that because at the end of the day

24  what was the reason why I was telling my wife that?  We could

25  have just been F'ing around.  But, you know, hey, but that's

1    something I told to Correa; that was just whatever.

2    Q.  You didn't say that at the time.  At the time you're

3    telling Correa the problem is now she's going to come home

4    thinking that you are sitting on all of that money.  That's

5    what you said, right?

6    A.  That's just what I told him, sir.  That wasn't true.

7    Q.  That wasn't true.

8    A.  No, it was just a conversation, sir.

9    Q.  And, by the way, Augustine Cruz was also someone who was

10   close to you.  You considered him like family, right?

11   A.  Well, because my wife knew him for a long time.

12   Q.  And you had a cousin who was going out with his brother?

13   A.  Yes, had a previous kid by his brother, yes.

14   Q.  So when you saw Augustine Cruz in Dr. Mirilishvili's

15   medical clinic in 2012, that wasn't the first time you met him.

16   A.  I don't think he was there, sir, in 2012, sir.

17   Q.  He started in 2013?

18   A.  I'm not sure, but I know it wasn't 2012.

19   Q.  OK.  But when Augustine Cruz got the job at Dr.

20   Mirilishvili's clinic, you knew who he was; he was a long time

21   family friend.

22   A.  I knew who he was, but I wasn't the one who hired him, so

23   ...

24   Q.  No, but you knew before you got hired that your family

25   friend was working there, right?

1    A.  Yes.

2    Q.  And he was also in a relationship with Jomaris Javier,

3    right?

4    A.  I didn't know that at the time, at the beginning.  I didn't

5    know he was in a relationship.  That was kept quiet, so if they

6    were, I didn't know that.

7    Q.  You later learned that.

8    A.  Yes, sir.

9    Q.  Now, I want to ask you about the times when the doctor

10   would verify information relating to a couple things.  We will

11   start with pharmacies.  OK?

12   A.  Um-hum.

13   Q.  In September 2014 you knew that around that time the doctor

14   was verifying everything, so if a pharmacy called, you had to

15   click it right over to him, click the phone call right over to

16   him, right?

17   A.  Can you ask me that question again?

18   Q.  Yes.  In or about September of 2014 the doctor was

19   verifying everything, so if the pharmacy called, you had to

20   click it over to him; you couldn't take that call; you had to

21   give it to the doctor.

22   A.  I was told by the doctor that he would verify everything,

23   because I wasn't a doctor, so I couldn't verify anything.

24   Q.  OK.  When I say verify if a pharmacy calls, it's that the

25   prescription was written to a certain patient and what the

1    prescription was, right?

2    A.  Yes, sir.

3    Q.  Now, you were telling Mr. Correa that there was one guy

4    named Mitch who got mad at you because he had somebody who was

5    I guess one of his patients, and he got caught because the call

6    went through to the doctor, and you didn't help him out, and he

7    got mad.

8    A.  Yes, sir, I remember that conversation.

9    Q.  And you were telling Mr. Correa it's not my fault, now the

10   doctor requires this.  Right?  He's got to verify.

11   A.  That's not what I meant, sir.  That's not what I meant at

12   all.

13   Q.  Well, isn't that what was happening, that the doctor

14   required you to click the calls from the pharmacy to verify,

15   and you couldn't talk to the pharmacist?

16   A.  I couldn't talk to the pharmacists because that's what the

17   doctor required, he wanted to talk to them.  That was it.

18   Q.  Thank you.  Now, in addition to pharmacies, the doctor was

19   also checking the MRIs, correct?

20   A.  Say again.

21   Q.  In addition to pharmacy calls, the doctor was also

22   verifying MRIs.

23   A.  Not all MRIs, only after the Terdiman situation, that's

24   when he wanted to start checking MRIs.

25   Q.  Well, he would check them.  He wouldn't let you check all

1    of the MRIs, right?

2    A.   The only reason why he wasn't checking all of them is

3    because I was told that was my job to check all of them.  After

4    a while, when I decided I didn't want to put may Hancock on it

5    no more, I told him he had to help me do it.  Because I already

6    knew at that point he was already setting up to say, well, you

7    know what, if it hits the fan I'm going to put it on my office

8    staff.  So I eventually told him you have to help me out too;

9    I'm not verifying no more.

10   Q.   You were dealing in hundreds of thousands of dollars of

11   pills on the streets, and you were concerned that your

12   signature on an MRI was going to get you somehow in trouble?

13   Is that what your testimony is?

14   A.   No, that's not my testimony.

15   Q.   That was part of your job, wasn't it?

16   A.   It was part of my job, sir, yes.

17   Q.   And all you had to do was call the number on the MRI and

18   ask if the person was a patient there, right?  That was part of

19   the verification process?

20   A.   That was part of it.

21   Q.   OK.  And if the person on the other end of the phone said,

22   yes, this person is a patient, then you would sign and say

23   verify, right?

24   A.   That's what I was told by the doctor, sir.

25   Q.   Well, that was your job, right?

1    A.  Yes, sir.

2    Q.  Now, you knew that Jomaris in the past had just told the

3    doctor that, oh, it's verified, whether she didn't verify it

4    with the office where the MRI came from, right?

5    A.  No, sir.

6    Q.  You didn't know that?

7    A.  No, sir.

8    Q.  You didn't know that she was actually creating her own

9    documents and so that in verifying it she knew that those

10   documents weren't true?

11   A.  Sir, in the beginning I didn't know what she was doctoring

12   up.  The paperwork was going to the doctor.  I frankly didn't

13   care.  It was going to him.  Patients still were receiving

14   their oxycodone prescriptions.

15   Q.  But my question is really simple.  It's that you knew there

16   was a system in place by the office staff to send in paperwork

17   to the doctor, the MRIs and the referrals, that were falsified,

18   right?  You knew that.

19   A.  I didn't know anything at the beginning, sir.  I didn't

20   know that at the beginning.  That only happened after he told

21   us we had to verify it.  At the beginning, there was no such

22   thing, just view the MRI referrals, send them in to me.

23   Q.  But you had your own fake MRI in November of 2012, right?

24   A.  Yes.

25   Q.  So, you knew what the system was from the very beginning,

1   right?

2   A.  I knew what it was at the beginning, sir, yes, I knew, but

3   he also knew hisself.

4   Q.  Well, let me ask about that.  Because when the doctor would

5   verify or would call -- I mean we are talking about a lot of

6   patients, right?  There are a lot of patients every day you

7   said, correct?

8   A.  Yes.

9   Q.  He asked the staff initially to be the people who would

10  verify the paperwork, right?

11  A.  Yes.

12  Q.  On occasion he would check and do it on his own, right?

13  A.  Like I said again, the only time he did that is when I told

14  him that I wasn't verifying no more.  Before that that was our

15  job to verify.  He didn't do it until after I told him I told

16  him I wasn't going to do so much to verify, he had to help me

17  out.  Before that it was the office staff.

18  Q.  Well, let me ask you this.  There came a time in September

19  2014 when another one of your friends was mad at you because

20  the doctor came to you and said he wanted to talk to the doctor

21  on the MRI paperwork.  Do you remember that?

22  A.  I don't remember that, sir.  I don't remember that.  You

23  will have to refresh my memory.  I don't remember that.

24  Q.  Well, you talked about it with Mr. Correa, right?

25  A.  Like I said, again, sir, I don't remember that.

G397MIR5                         Leonard - cross

1    Q.  Well, you do remember that every now and then the doctor

2    would bring you into the office, call you and say, look, I want

3    to get the doctor on the phone and verify the MRI, right?

4    A.  Every now and then you said?

5    Q.  Yes.

6    A.  Every now and then, yes.

7    Q.  And this one instance that you were talking about with

8    Correa, the doctor caught you because he said this is fake

9    paperwork and that there was just someone on the other line

10   sitting there waiting for you to call, and at the end of the

11   day there was no doctor.  Right?

12   A.  I can elaborate on that, sir.  It wasn't -- it's not that I

13   got caught.  The fact is he asked me to verify, I told him yes,

14   he received a call himself, and the person who picked up hung

15   up.  He told me, Damon, this person is just playing games.  But

16   he didn't throw the patient out; he still saw him.

17   Q.  Well, then why was your friend Dogs getting mad at you for

18   losing the patient?  Why are you saying, oh, he is mad at me

19   but he's not listening, I can't do this anymore?

20   A.  At the end of the day, sir, that was just me and Correa

21   talking, sir.  There was nobody mad.

22   Q.  Well, it was just you and Correa talking, but Correa had a

23   recording device on.  That's the difference, right?

24   A.  Exactly.

25   Q.  You didn't know he had a recording device on him.

1    A.  No.

2    Q.  And so that instance when your friend Dogs lost his

3    patience, you're like I don't understand, why is he mad?  He's

4    getting his other patients, he's getting two or three, you

5    know, he shouldn't be greedy, he should be happy.

6    A.  Well, I remember saying -- I remember having that

7    conversation with Mr. Correa.  I remember saying that to him.

8    Q.  Because he lost a patient, and Dogs was complaining to you,

9    right?

10   A.  You can complain, sir, but at the end of the day, what is

11   that going to help?  I'm not the one that's writing the

12   prescriptions.

13   Q.  But the person who is seeing the patient is no longer

14   seeing a patient once they found there was fake paperwork,

15   right?

16   A.  Sir --

17   Q.  Right?  Yes?

18   A.  No.  No.  No.

19   Q.  He discharged -- the doctor discharged patients when he

20   found out they had fake paperwork, right?

21   A.  Not all the time, sir, not at all.  Only after, like I tell

22   you, after certain instances.  After Dr. Terdiman, after the

23   PMP was in.

24   Q.  When did this Terdiman incident happen?

25   A.  Oh, February 2014.

G397MIR5                          Leonard - cross

1   Q.  That you remember clearly.

2   A.  Of course.  Yeah, of course.

3   Q.  Because you were upset about it, right?

4   A.  About what?

5          THE COURT:  The Dr. Terdiman incident.

6          THE WITNESS:  No, ma'am.  No, ma'am.

7   Q.  Well, you were a patient of that doctor, weren't you?

8   A.  But I had been long gone, stopped.  I been stopped way

9   before that.

10  Q.  You stopped going in as a patient before he got arrested.

11  A.  I decided, yes.

12  Q.  To stay away from that, right?

13  A.  I just stopped going, because now --

14  Q.  But you knew you were a patient of his, and now that he was

15  arrested your name might come up in the investigation, right?

16  A.  Sir, I had been stopped going, so that was way after, so I

17  been stopped going way before that whole Terdiman situation

18  went down, sir.

19  Q.  Well, you did know that when Dr. Mirilishvili discovered

20  fraudulent MRIs, he would kick the patient out, and he would

21  scream at both you and Javier because it was not verified,

22  right?

23  A.  No.

24  Q.  That happened at least on the occasion when you were

25  talking about it with Mr. Correa when he had a wire on, right?

1   A.  Only -- like I said, like I mentioned earlier, only people

2   started really getting kicked out after he felt he was going to

3   get caught, so he started kicking certain people out.  It

4   wasn't everybody.  Still people was getting prescriptions like

5   crazy.

6           After a while, when he saw the Terdiman situation, he

7   talked to me about it, and he felt that if he needed to start

8   getting rid of people, that's what he did.  But other than

9   that, he didn't kick nobody out.  The rate was very low.

10  Q.  The rate was very low?

11  A.  Very low.

12  Q.  Then why even have this conversation with Correa about the

13  fact that your man Dogs is losing a patient, if it didn't

14  matter, if the rate is low?

15  A.  Well, just for one, Mr. Correa, the reason I spoke to Mr.

16  Correa like that is because he used to be an ex-employee, so I

17  could, you know -- I can talk with him and, you know -- you

18  know, we can talk, and we can have a conversation, so he

19  understood what I went through.  So that's the real reason why

20  most of the time why we had the conversation.  Most of the time

21  it was BS but, you know.

22  Q.  Well, at that point in time in September 2014 you were at

23  the helm of the operation to try to get your crew chiefs

24  prescriptions, right?

25  A.  Absolutely not, no.  That wasn't my job, sir.

G397MIR5                          Leonard - cross

1   Q.  You wouldn't say that you were at the helm?

2   A.  At the helm of what?

3   Q.  At the helm of what you were up to in the office.

4   A.  No, sir.  The only thing that I was at the helm is the fact

5   that I was the only guy working in the office, so of course if

6   you call that the helm, yeah.

7   Q.  Well, let me ask you this.  In your conversation with Mr.

8   Correa on September 11 you used the words -- when you used the

9   words you were at the helm, you weren't talking about being the

10  only employee of Dr. Mirilishvili's clinic, were you?

11  A.  Absolutely.

12  Q.  Well, when you used those terms, you talked about from the

13  fact that you got to keep all the crew chiefs happy because

14  they could put you in a hole.

15  A.  Sir, I never mentioned that.  I never remember me saying

16  that to Mr. Correa.

17          MR. MAZUREK:  Your Honor, if I could go to the

18  transcript.  It's DM 603, page 11, September 11 recording,

19  attribution at the top of the page starting at about 27 minutes

20  and 38 seconds.

21          MS. CUCINELLA:  Can you repeat that?

22          MR. MAZUREK:  Sure.  Page 11.

23          THE COURT:  Top of the page.

24          MR. MAZUREK:  Top of the page, starting at the time

25  marker 27 minutes 38 seconds.

 1          MS. CUCINELLA:  I believe the witness said he didn't

 2    remember.

 3          MR. MAZUREK:  He said he didn't say it.

 4          THE COURT:  I heard him.  Could you read back the

 5    witness' very last answer.

 6          (Record read)

 7          THE COURT:  He said both.  So let's ask the clarifying

 8    question.

 9          Do you not remember what you said?  Or do you remember

10    what you didn't say that?

11          THE WITNESS:  I remember -- I don't remember that,

12    ma'am.

13          THE COURT:  No, no.  Listen to me.  Did you say those

14    words?  Yes or no.

15          THE WITNESS:  No.  No, ma'am.

16          THE COURT:  You did not say those words.

17          MR. MAZUREK:  Then play the tape, your Honor.

18          THE COURT:  Play the tape.

19          (Audio recording played)

20    Q.  What did you mean when you said they put me in a hole?

21    A.  What that meant was I'm talking about as far as going out,

22    sir.

23    Q.  Sorry?

24    A.  I'm talking about as far as going out.

25          THE COURT:  I don't understand what you are saying.

G397MIR5                         Leonard - cross

1    What words are you saying?

2              THE WITNESS:  I mean talking about going out.  I'm

3    talking about going out.

4              THE COURT:  You're telling him you're going out?

5              THE WITNESS:  No, he is asking me what that meant.

6    I'm telling him I turned up going out.

7              THE COURT:  But, see, you're mumbling or something,

8    and I can't understand the words that you are saying.  I'm

9    really sorry.

10             THE WITNESS:  OK.

11             THE COURT:  Very slowly.

12             THE WITNESS:  He asked me, ma'am, what did I meant by

13   them putting me in a hole.

14             THE COURT:  Yes, that was the question.  What did you

15   mean when you said they put me in a hole?

16             THE WITNESS:  Meaning going out, ma'am.  That's what I

17   meant, meaning going out.  I never was going to go out with

18   them.  That's what they were putting me in the hole.  I never

19   go out with them?  That's what I was explaining to Mr. Correa.

20   It was ebonics really; it never meant that at all.

21             (Record read)

22             THE COURT:  OK.

23   Q.  I'm afraid to ask the question, but what did you mean by

24   I'm at the helm here.

25   A.  Just that I was the only one at the office right now and

G397MIR5                         Leonard – cross

1   meaning if I was to go out and get myself in trouble, who is

2   going to work at the office.  That's what I meant.

3   Q.  That you're irreplaceable.

4   A.  Oh, yeah, at that time of course I was irreplaceable, of

5   course, with the shenanigans going on, of course.

6   Q.  Well, you were upset with Augustine Cruz because at one

7   point in time he was telling stories about you, trying to get

8   you nervous so that maybe you would leave the job.  Do you

9   remember that?

10  A.  Yes, I remember that, sir.  I remember having that

11  conversation.

12  Q.  And that made you upset, right?

13  A.  Actually, sir, I wasn't really upset.  I was just annoyed

14  that it was a bunch of stories that was being sent out.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MR. MAZUREK:

2   Q.  Well, the stories that you were upset about was that

3   Mr. Cruz was trying to get you nervous about going to jail,

4   right?

5   A.  Well, I gathered the fact that he wanted, he wanted to be

6   in the office himself.  So that's the reason why I thought he

7   started putting out lies.

8   Q.  So he could be at the helm of running the operation, right?

9   A.  No, not at the helm.  Just be in the office himself and do

10  whatever he wanted to do.  That's all.

11  Q.  You didn't say that the reason he was telling this stuff to

12  you was because so that you could leave so he could take the

13  helm?

14  A.  I did mention saying that, sir, just being the only one in

15  the office.  That's what I meant by the helm, to clarify.

16  Q.  That's because of the job of office manager being at the

17  helm?

18  A.  Yes, sir.

19  Q.  It wasn't so that you would have access to the ability to

20  direct, to obtain scripts to sell on the street and overrides

21  and make, you know, close to $200,000?

22  A.  I wouldn't know that.  Only he would know that, sir.  I

23  wouldn't know that.

24  Q.  Now, you really wanted to keep this job as office manager,

25  you didn't want to get fired, right?

1    A.  No.

2    Q.  No, you didn't want to get fired?

3    A.  No, because I had a family to feed at home and at that

4    time, I just, you know, it was a job.

5    Q.  You said you were making at that point what, about six,

6    $700 a week?

7    A.  About 750 to be exact.

8    Q.  750.  Now, you said you had your own patients that were

9    getting obtaining prescriptions at that time?

10   A.  Yes, sir.

11   Q.  So you could make that amount of money on just one

12   prescription per month, right?

13   A.  Not exactly.  After costs, like I explained to you, after

14   costs, it wasn't as much the doctor was paying me at all.

15   Q.  But is it your testimony, sir, that you didn't want to lose

16   that job because of the 750 per week, that's your testimony?

17   A.  Yes, sir.

18   Q.  It wasn't that you were able to control the operations of

19   all these crew chiefs and having the ability to make tons more

20   money?

21   A.  Well, let's clarify.  I wasn't controlling no crew chiefs.

22   Q.  But you were at the helm, so you could help those crew

23   chiefs change paperwork, right?

24   A.  No, sir.  I was at the helm actually to help the doctor.

25   That's what I was at the helm for, to help him.

1    Q.  Well, let me ask you this.  In September of 2014, when you

2    were telling Mr. Correa about the fact that Black was upset

3    because there's no overrides; do you remember that?

4    A.  Yes, I remember that.

5    Q.  OK.  That he wasn't going to be able to pressure you

6    because if you started doing or trying to do overrides and got

7    caught --

8                MS. CUCINELLA:  Objection, your Honor.

9                THE COURT:  I'm sorry.  I can't hear two voices at

10   once.  Let him finish the question.

11               MS. CUCINELLA:  He's reading from a document.

12               THE COURT:  I don't care.  He's asking a question.

13               MR. MAZUREK:  Now I forgot my question.

14               THE COURT:  Start over again.

15               MR. MAZUREK:  Thank you.

16   Q.  So in September 2014, you were saying that you remember a

17   guy named Black being upset because you're telling him there's

18   no overrides, right?

19   A.  I don't remember that, sir.  I just don't remember that

20   conversation.  I don't remember that.

21   Q.  You just talked about it a second ago.

22               THE COURT:  Please don't fight with the witness.

23               MR. MAZUREK:  Sorry, Judge.  I'm trying my best.

24   Q.  You were telling Mr. Correa that on September 20 and

25   September 2014 that you were not going to do any overrides

1    because if you get caught, then you're walking, you're walking,

2    and the next thing is you're doing something for somebody else

3    but not for yourself?

4    A.  I don't remember that conversation neither, sir.  I don't

5    remember me telling Correa that, sir, at all.  I don't remember

6    that.

7    Q.  Well, when your -- you do remember about what we talked

8    about the overrides coming to an end and that was causing

9    concern for some of the crew chiefs, right?

10   A.  Say that again?

11   Q.  The fact that the overrides were coming to an end were

12   upsetting people who were crew chiefs?

13   A.  They were, sir, they were.

14   Q.  And they were trying to put pressure on you to still do it,

15   right?

16   A.  Yes.

17   Q.  OK.  And you were saying no, I can't do it because then I'm

18   going to be, I'm going to lose my job and I got to stay here.

19   I'm not letting them take me out of this position?

20   A.  No, not really, sir.  That wasn't exactly entirely it like

21   that at all.  I'm glad, I was glad that the fact that you

22   couldn't override anything anymore from what I learned from

23   Jomaris or whatever.  I was just happy about that.  So them

24   being mad, I didn't really care about that really being mad

25   because ultimately, hey, as long as the doctor was still

G39LMIR6                    Leonard - cross

1   writing prescriptions, these people got over that just like

2   that.

3   Q.   Well, sir, the reason you were having this conversation

4   with Mr. Correa was because you were upset that you're feeling

5   pressure to have to be able to change paperwork so these crew

6   chiefs can continue to get -- to fool the doctor, right?

7   A.   Wrong.  You keep saying to me upset.  I wasn't upset, sir,

8   at all.  Eventually, like I said again and again, he's going to

9   write the prescription anyway.  So it didn't matter.  There was

10  a bunch of patients, follow-up patients that was still was

11  going to be seen regardless.

12  Q.   But if the paperwork were not right, the doctor would kick

13  out the patient?

14  A.   That was only for new patients, sir.

15  Q.   Only for new patients?

16  A.   Only for new patients, MRI referral.

17  Q.   What about the patient that you talked to Mr. Correa about

18  who had the bad urine test after the secured portal?

19  A.   That was for urine.  We're talking about kicking out when

20  there was new people, basically that's when he would kick

21  people out.  For urine, sir, that didn't happen a whole lot.

22  That didn't happen a whole lot at all.

23  Q.   It just so happened the time Correa was on a wire is when

24  it happened?

25  A.   That's because it probably happened that week so I

1    remembered that.

2              THE COURT:  OK.  I think we've exhausted this subject.

3              MR. MAZUREK:  Yes.

4    Q.  Now, you had talked on direct examination about the

5    prescription monitoring program; do you remember that?

6    A.  PMP, yes.

7              MR. MAZUREK:  And if we could put something on the

8    screen, GX206, which is already admitted into evidence, and at

9    page 58 of the exhibit.

10   Q.  Is this an example, sir, of what a PMP printout looks like?

11   A.  Yes, sir.

12   Q.  If we can just expand the top portion, the printed portion

13   of the page.  And you understood that this was a database that

14   was maintained by New York State to report on controlled

15   substance prescriptions, right?

16   A.  Yes, sir.

17   Q.  And you were taught about this by Jomaris Javier?

18   A.  Yes.

19   Q.  And your job, sir, was to input the patient's name and

20   conduct a search on the PMP, right?

21   A.  Yes.

22   Q.  And, for example, in this case we see the patient name on

23   the left-hand side of the page, about a third of the way up, is

24   Kevin Creighton; do you see that?

25   A.  Yes, sir.

1    Q.  And there are prescriptions that are shown in the box below

2    from Dr. Mirilishvili, right?

3    A.  Yes.

4    Q.  Now, originally you were told to upload this kind of

5    document into the Practice Fusion, right, which was the

6    computer system?

7    A.  Yes.

8    Q.  And you understand when I say Practice Fusion, that was the

9    electronic medical records that were maintained by the office,

10   right?

11   A.  By the doctor, yes.

12   Q.  And you had your own password to the Practice Fusion

13   system, correct?

14   A.  Given to me by the doctor.

15   Q.  Yes.  So you had access under your user name and password?

16   A.  Yes.

17   Q.  And you knew that other staff members were also given user

18   names and passwords, right?

19   A.  Yes.

20   Q.  And by the way, that included the physical therapists in

21   the office, correct?

22   A.  They didn't have access to this, sir.

23   Q.  I'm sorry?

24   A.  They didn't have access to the PMP.

25   Q.  You don't believe that the physical therapists had access?

1    A.   That wasn't his job.

2    Q.   I'm sorry, to the Practice Fusion.

3    A.   He had access to Practice Fusion, but he didn't see this.

4    Q.   Because the physical therapist had more limited access to

5    the Practice Fusion database?

6    A.   Come again?

7    Q.   Because the physical therapist did not have full access to

8    everything that's in the patient file on Practice Fusion?

9    A.   Well, I believe the physical therapist wasn't even looking

10   into that.  He was just doing his part.  So whatever he had

11   access to, that's what he was looking into.  He wasn't going to

12   anything else.

13   Q.   Now, Jomaris Javier had a user name and password to

14   Practice Fusion?

15   A.   Yes, until she was fired.

16   Q.   Until she was fired.  And Augustine Cruz the same?

17   A.   The same.

18   Q.   Until he was fired, right?

19   A.   Yes.

20   Q.   Now, there came a time and you understood that one of the

21   reasons that Ms. Javier was fired was because the doctor found

22   out that she was inputting information incorrectly on some of

23   the PMPs?

24   A.   Yes.

25   Q.   And there came a time when the doctor didn't want you to

1    input on the PMPs as well, correct?

2    A.  Can you clarify that?

3    Q.  There came a time when the doctor also didn't want you to

4    print this out and put it up on -- I'm sorry.  Withdrawn.

5           There came a time when the doctor didn't want you

6    simply to verify that you checked the PMP?

7    A.  Sir, I didn't have to verify anything.  Once you put the

8    patient name in, it pops up.  Whatever information is there is

9    going to him.  Pretty simple.

10   Q.  There was a time when in fact you could just write on the

11   patient chart or file that you checked the PMP, you viewed it

12   at the desk?

13   A.  I could elaborate on that.  The only reason why that was

14   done was because the doctor told me -- we made the call to the

15   DEA about the situation.  We had situations where certain

16   patients names wouldn't come up accurately.  So I was told by

17   the doctor call DEA.  We called DEA.  I spoke to the young lady

18   myself.  She told me, she says, I asked her.  I said we're

19   having a problem.  The doctor wants to know why the patient

20   name is not coming up, why is nothing coming up.  It could be

21   one or two things she told me.  Either the patient never been

22   nowhere before or it's been the last six, seven months hasn't

23   been anywhere so it's not coming up.  That's why.

24   Q.  Let me interrupt you there for a second.

25          You had that conversation with someone from the New

1   York State DEA because the doctor asked you to do that?

2   A.  Yes, sir.

3   Q.  Because he wanted to make sure that the information on

4   these PMPs was correct and accurate?

5   A.  Yes.

6   Q.  And sometimes there were people who called him to let him

7   know if there was a mistake, for example, I think you mentioned

8   a pharmacist by the name of Frank from Ascan Pharmacy, right?

9   A.  Yes.

10  Q.  Now, you thought that if nothing comes up, you can just

11  write it, you write on the thing, you reviewed it at the desk

12  and send it off and that was enough?

13  A.  I didn't think nothing.  That is what I was told do.  If I

14  viewed it and nothing came up, write that you viewed it and

15  give it to the doctor.  That's what I was told by the doctor.

16  Q.  The doctor wanted the actual printed version uploaded,

17  right?

18  A.  What actual printed version, of the PMP itself?

19  Q.  As opposed to you just writing down that you saw it and

20  nothing came up and send it off?

21  A.  Sir, everything was getting scanned.  So he saw everything

22  was scanned to his computer.  Nothing went to the doctor

23  without being scanned.  That's what he wanted.  So whatever I

24  viewed from the PMP, if I wrote on it, he knew it because he

25  told me, plus it was scanned.  So he had the information, the

1   data in his computer.

2   Q.  He didn't want to just take your word on the verification.

3   He wanted you to also put the scan in the system.  Right?

4   A.  Well --

5   Q.  Both?

6   A.  To tell you the truth, like I said before, he actually

7   spoke to them too.  So it wasn't just like I spoke to them and

8   hung up.  He spoke to them also.  That's what they told him.

9   That's when he told me.  OK, they're saying if you viewed it

10  and nothing came up, just write that you viewed it.  OK.  No

11  problem.

12  Q.  But that wasn't enough.  It had to be scanned.  That's what

13  I'm saying.  You wanted to just say it's enough to just write

14  it on the patient chart.  But the doctor said no, no, no.  I

15  want this scanned and put into the system.  Right?

16  A.  Sir, that sound crazy.  It was getting scanned regardless.

17  That was part of my job.  Everything was getting scanned.  ID,

18  urinalysis, PMP, everything was getting scanned.  So how is

19  that the doctor saying he wanted to scan no matter what.  I

20  never told him I wasn't going to scan.

21  Q.  In September 2014, when you spoke to Mr. Correa, you used

22  very similar language because you were upset that the doctor

23  was thinking, he was getting crazy, you were getting crazy like

24  J and that you were upset because he's like -- you called him a

25  name -- because you spoke to the DEA and if nothing comes up,

1    you can just write that.  Just write off on the thing and send

2    it off.

3           Right?

4    A.  Can I elaborate on that, sir, again?

5           THE COURT:  No.  You can't elaborate.

6           THE WITNESS:  OK.

7    A.  Well, no, sir.

8    Q.  That's what you were saying to Mr. Correa in

9    September 2014, right?

10   A.  I was saying that because like I told you, he wanted me to

11   call, we called.  That was it.  And he told me.

12   Q.  But you were upset with him that if nothing comes up, that

13   you should just be able to write down that you saw the screen

14   and that is enough and send it off on the patient chart?

15   A.  We never agreed to that.  He was upset because of the fact

16   that nothing was coming up, so that's why we agreed to call the

17   DEA.

18   Q.  My question, sir, is that you were upset that the doctor

19   didn't just want to take your word?

20   A.  That's wrong, sir.

21   Q.  Well, that's what you said to Mr. Correa, isn't it?

22   A.  That's not exactly what I said to him.  That wasn't in

23   those words.

24   Q.  It's not what you said?

25   A.  You're still not listening.  I said that wasn't in the

822

G39LMIR6                          Leonard - cross

1   words I said.  He was upset because the fact that --

2            MR. MAZUREK:  Your Honor, I'm going to ask to play on

3   DM603 -- 602, I'm sorry.  July 10, 2014, the bottom of page 3.

4            THE COURT:  OK.  Starting at 22:22?

5            MR. MAZUREK:  I think a little bit further down.  So

6   let's start about 22:30 of page 3 of DM602.

7            (Audio recording played)

8   Q.  So, sir, what the doctor wanted was what we saw on the

9   screen, right, that you scan in the printed page even if

10  nothing came up, right?

11  A.  I did scan it, sir.  You keep asking me he didn't want it

12  scanned.  I did scan it.  There's nothing in there telling me I

13  didn't scan it.

14  Q.  And the reason -- let me just point something out.  If we

15  can expand on the exhibit on the screen from the confidential

16  drug utilization report title, down to the line data detail

17  level.

18            Looking now on the screen.  Do you see the search term

19  is Kevin Cravey, male, and date of birth?  And there's a search

20  data date, I guess, 8/28/2013.  Do you see that there's a time

21  stamp?

22  A.  Yes.

23  Q.  And then there's a line that says, the drug utilization

24  report below displays all of the controlled substances

25  prescriptions, if any, that your patient has filled in the last

1   six months.  The information displayed on this report is

2   compiled from pharmacy submissions to the department and

3   accurately reflects the information as submitted by the

4   pharmacies.

5           Do you see that, that shows up on every report, right?

6   A.  Yes.

7   Q.  And then the next line, this report was requested by Moshe

8   B. Mirilishvili, right?

9   A.  Yes.

10  Q.  And his name appears because in order to access this

11  database, you needed to enter into a user name and password,

12  right?

13  A.  Yes.

14  Q.  And he gave you the user name and password to use?

15  A.  Yes, for me, yes.

16  Q.  And then the next part is a reference number, do you see

17  that, 346081?

18  A.  Yes.

19  Q.  And that is a number that is kept by the New York State PMP

20  referencing this particular search, right?

21  A.  Yes.

22  Q.  And so if you had kept, if you keep the printed version of

23  that, you would be able to reference that search or know

24  exactly the search that was conducted, right?

25  A.  I guess so.  I'm not sure.  I never even looked at that

1   like that, sir.  I don't know.  That's something new.

2   Q.  So when you were writing, just if you were writing to say

3   nothing showed up, there would not be a reference number on

4   that note, right?

5   A.  Wait a minute.

6   Q.  You never wrote a note that said nothing showed up on the

7   PMP and then put a reference number?

8   A.  Again, sir, this is what I was told by the doctor.

9   Q.  My question is before, if you were just writing down, OK, I

10  checked PMP, nothing showed up, that would be the extent of

11  your note.  Right?

12  A.  Yes.

13  Q.  Thank you.  Now, in September 2014, you were telling the

14  crew chiefs, you can't do, you can't do any fake paperwork

15  anymore, right?

16  A.  I don't remember that.  I don't remember me saying that,

17  sir.  I don't remember that.  I don't remember that.

18  Q.  You don't remember telling them that you're not doing any

19  new patients, you're not doing any new patients because we've

20  only got fake paperwork?

21  A.  I don't remember saying it just like that, sir.  I don't

22  remember exactly the way you're saying it.  I don't remember

23  that.

24  Q.  In sum and substance was that what happened, you were

25  telling Mr. Correa that you're not doing any new patients

1   because you only have fake paperwork?

2   A.  Like I said, again, sir, I can't remember actually what I

3   said to him.

4   Q.  Do you remember telling him at that time in September 2014,

5   you're telling the crew chiefs that the only people who could

6   come in now are people who really got real shit because that's

7   all that I can get past the doctor?

8   A.  I never said that, sir.  I never said that's the only thing

9   that I can get past the doctor.  Never said that.

10  Q.  You said people -- we're not doing any new patients, you're

11  not doing any new patients because you only have fake paperwork

12  and the only people really got real shit?

13  A.  Like I said again, sir, I can't remember exactly what I

14  said.  I can't remember that.

15  Q.  You don't remember that?

16  A.  I don't remember that.

17  Q.  If you saw the transcript, would it help to refresh your

18  memory?

19  A.  Show me something.

20  Q.  I'm going to show you what's been marked as PM603.  I think

21  it's still in front of you.

22  A.  Yeah.  What page?

23  Q.  Page 16.  I'll show you.  Same page.  Just up to here.

24  Read it to yourself.  Let me know when you're done.

25  A.  OK.

1   Q.   Does that refresh your recollection that you were telling

2   Mr. Correa that you were telling other crew chiefs like Dogs

3   that you're not doing new, you're not doing new because you

4   only have fake paperwork?

5   A.   Sir, I only talked to Correa.  I didn't talk to Dogs about

6   anything.

7   Q.   But you were relaying a conversation that you had with

8   Dogs, that's what you were talking about at the time with

9   Correa?

10  A.   I only relayed that conversation to Correa because, you

11  know, just like I said, we just BSing again, just bullshitting

12  really.

13  Q.   What you were talking to Correa about was the fact that

14  Dogs was asking you to do new patients and you said you can't

15  because you only have fake paperwork, right?

16  A.   No, sir.  The reason why we couldn't do new patients is

17  because the doctor didn't want to take new patients.

18         MR. MAZUREK:  Your Honor, then I'm going ask to play

19  the tape.

20         THE COURT:  Which one?

21         MR. MAZUREK:  Yes.  This one is September 11, DM603,

22  page 16.  We could start the attribution at 41 minutes, 31

23  seconds.

24         (Audio recording played)

25         MR. MAZUREK:  I'm sorry.  41 minutes, 31 seconds from

G39LMIR6

| | |
|---|---|
| 1 | 9/11.  I'm sorry.  It's a misprint here.  Looks like it's |
| 2 | 42:31. |
| 3 | (Audio recording played) |
| 4 | Q.  And when you said fake paperwork, you're meaning paperwork |
| 5 | that could not be verified from an MRI facility or referral? |
| 6 | A.  Again, like I said, I was just talking to Mr. Correa about |
| 7 | that.  That was BS.  That's what I'm trying to say. |
| 8 | MR. MAZUREK:  Your Honor, I'm moving on to a new |
| 9 | subject.  Would this be a good breaking point? |
| 10 | THE COURT:  Yes.  How much more do you have with this |
| 11 | witness? |
| 12 | MR. MAZUREK:  I'm not quite sure, but not lengthy. |
| 13 | THE COURT:  Well, here's what I'm hoping folks.  If we |
| 14 | take a break for the day now, he'll look over his questions and |
| 15 | decide he doesn't really need to ask them.  That happens more |
| 16 | than you could possibly imagine.  The flip side is sometimes |
| 17 | they find more questions that they want to ask, so it's a crap |
| 18 | shoot, you know, but. |
| 19 | MR. MAZUREK:  I'll err on the former side. |
| 20 | THE COURT:  So we'll give Mr. Mazurek an opportunity |
| 21 | to look over his questions and see how quickly he can complete |
| 22 | the cross-examination of this witness and you'll go home and |
| 23 | I'll see you in the morning, quarter to ten.  Don't discuss the |
| 24 | case.  Keep an open mind. |
| 25 | (Continued on next page) |

G39LMIR6

1          (Jury not present)

2          THE COURT:  Sir, you can stand down.  You can't talk

3   to the folks at the government overnight.  Don't have any

4   conversation with them.  OK?

5          THE WITNESS:  I can go down?

6          MS. CUCINELLA:  Your Honor, can we just clarify about

7   logistics in terms of him coming back tomorrow.

8          THE COURT:  You have to come back here tomorrow.  You

9   have to be here at 9:30 tomorrow morning.

10         MS. CUCINELLA:  And to the extent he needs a letter

11   for his employer, is that something I can have my agent send to

12   him?

13         THE COURT:  Yes.  We'll get you a letter for your

14   employer.  Don't worry.  You'll be out of here long before

15   noon, I hope.  OK.

16         THE WITNESS:  OK, ma'am.

17         MS. CUCINELLA:  Thank you, Judge.

18         THE COURT:  OK.

19         (Witness not present)

20         THE COURT:  Yes.  The agent can give him a letter for

21   his employment.  The agent can't talk to him about his

22   testimony, all right.

23         MS. CUCINELLA:  Thank you, Judge.

24         THE COURT:  Mr. Mazurek.

25         MR. MAZUREK:  I know it's tedious.

G39LMIR6

1          THE COURT:  There's only so much beating the dead

2     horse can take.

3          MR. MAZUREK:  I understand.

4          THE COURT:  Some of this we're going over for the

5     seventh, eighth time.

6          MR. MAZUREK:  I understand.  There's just a lot of

7     material.

8          THE COURT:  Or not.

9          OK.  Who's up tomorrow?

10          MS. CUCINELLA:  The government intends to call our

11     expert, Dr. Gharibo; two very short witnesses, a Detective

12     Beers, a paralegal from our office, Molly Rosen; and then

13     ending with Adrian Castro.  We're hopeful to be able to rest

14     tomorrow.

15          THE COURT:  I'm hopeful too.  OK.  I'll see you in the

16     morning.

17          (Adjourned to March 10, 2016, at 9:45 a.m.)

18

19

20

21

22

23

24

25

830

                        INDEX OF EXAMINATION

Examination of:                                Page

TIMOTHY DEWEY

Direct By Mr. Diskant  . . . . . . . . . . . 631

Cross By Mr. Gosnell . . . . . . . . . . . . 658

MICHAEL POREMBA

Direct By Ms. Cucinella  . . . . . . . . . . 665

Cross By Mr. Gosnell . . . . . . . . . . . . 680

DAMON LEONARD

Direct By Ms. Cucinella  . . . . . . . . . . 700

Cross By Mr. Mazurek . . . . . . . . . . . . 741

                        GOVERNMENT EXHIBITS

Exhibit No.                                Received

 902   . . . . . . . . . . . . . . . .634

 903   . . . . . . . . . . . . . . . .636

 905   . . . . . . . . . . . . . . . .637

 901   . . . . . . . . . . . . . . . .643

 904   . . . . . . . . . . . . . . . .648

 901-A  . . . . . . . . . . . . . . . .651

 901-B  . . . . . . . . . . . . . . . .653

 906   . . . . . . . . . . . . . . . .654

 901-C  . . . . . . . . . . . . . . . .656

 4-V   . . . . . . . . . . . . . . . .732

 441   . . . . . . . . . . . . . . . .740

 9   . . . . . . . . . . . . . . . .741