G3ALMIR1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          S2 14 Cr. 810 (CM)

 5    MOSHE MIRILISHVILI,

 6                  Defendant.              Trial

 7    ------------------------------x

 8                                          New York, N.Y.
                                            March 10, 2016
 9                                          9:57 a.m.

10
      Before:
11
                       HON. COLLEEN McMAHON,
12
                                            District Judge
13

14                          APPEARANCES

15    PREET BHARARA
           United States Attorney for the
16         Southern District of New York
      EDWARD DISKANT
17    BROOKE CUCINELLA
           Assistant United States Attorneys
18
      HENRY MAZUREK
19    WAYNE GOSNELL
           Attorneys for Defendant
20

21
      ALSO PRESENT:  MICHAEL MULLER, DEA
22                   ELIZABETH JOYNES, Paralegal
                     MICHAEL DOMANICO, Paralegal
23

24

25
```

G3ALMIR1

1          THE DEPUTY CLERK:  Case on trial continued.  The

2    government and defendant are present.  The jurors are in the

3    jury room.

4          MR. MAZUREK:  Good morning.

5          THE COURT:  Good morning.  So where's the witness?

6    How much cross do we have?

7          MR. MAZUREK:  I've cut it down.

8          THE COURT:  Everybody always does, just it always

9    happens.

10          (Continued on next page)

 1              (Jury present)

 2              THE COURT:  OK.  Good morning.

 3              Sir, you're still under oath.

 4              Mr. Mazurek.

 5              MR. MAZUREK:  Thank you, Judge.

 6              Good morning, everyone.

 7    DAMON LEONARD, resumed.

 8   CROSS-EXAMINATION (cont'd)

 9   BY MR. MAZUREK:

10   Q.  Mr. Leonard, I want to speak to you this morning about

11   Jomaris Javier.  OK?

12   A.  Yes.

13   Q.  You remember her, right?

14   A.  Yes.

15   Q.  She was your coworker for some time at the clinic, right?

16   A.  Yes.

17   Q.  And she was fired for the first time in or about

18   February 2014, right?

19   A.  Yes.

20   Q.  And at that time she was pregnant with her baby that she

21   was having with Augustine Cruz, right?

22   A.  Yes.

23   Q.  And she was fired for inputting information incorrectly on

24   the PMP database, right?

25   A.  I'm not sure, sir.  That's not what I was told, so I'm not

G3ALMIR1                          Leonard – cross

1    sure, no.

2    Q.  Sorry?

3    A.  I don't know, sir.

4    Q.  You don't know?

5    A.  I don't know.

6    Q.  Well, yesterday you were shown a letter that was signed by

7    Ms. Javier?

8    A.  Yes.

9    Q.  And in that letter, Government Exhibit 442, it indicates

10   that she was apologizing for her unprofessional conduct of

11   putting in information incorrectly on the PMP database?

12   A.  Yes.

13   Q.  Did you help her write that letter?

14   A.  No.

15   Q.  Did you see her write that letter?

16   A.  No.

17   Q.  Was it in her handwriting?

18   A.  Yes.

19   Q.  And did she sign it?

20   A.  Yes.

21   Q.  When is the first time you saw that letter?

22   A.  After she was fired the second time.

23   Q.  Where did you see it?

24   A.  In the doctor's office.

25   Q.  Did he show it to you?

G3ALMIR1                          Leonard – cross

1    A.  Who?

2    Q.  Did he show it to you?

3    A.  Who is he?

4    Q.  The doctor.

5    A.  Yes.

6    Q.  You didn't know anything about it before then?

7    A.  No.

8    Q.  Was it in a notebook of Ms. Javier's?

9    A.  It wasn't Ms. Javier's book.

10   Q.  If we could put on the screen Exhibit 442 –– 441.  I'm

11   sorry.  This is a copy of the letter, Mr. Leonard?

12   A.  Yes.

13            MR. MAZUREK:  May I approach, your Honor?

14            THE COURT:  You may.

15   Q.  OK.  Do you see the notebook in front of you?  Take a look

16   at this and see if you recognize it.

17   A.  I recognize it.

18   Q.  Is that Ms. Javier's notebook?

19   A.  No, sir.  It's the doctor's notebook.

20            MR. MAZUREK:  One moment.

21            Your Honor, I'm going to put on the screen a copy of

22   the notebook which is Government Exhibit 441, I'm sorry, 442.

23   Q.  The first page it says urine.  Do you see that?

24   A.  Yes.

25   Q.  Let's turn to the second page.  You see what's written on

G3ALMIR1                         Leonard - cross

1   this page, there's Practice Fusion, ePACES, and some user names

2   and passwords?

3   A.  Yes.

4   Q.  Do you recognize the handwriting?

5   A.  No, sir.

6   Q.  You don't recognize that handwriting?

7   A.  No.

8   Q.  Do you know the handwriting of the doctor?

9   A.  Yes.

10  Q.  Does it look like the handwriting of the doctor?

11  A.  Not sure, sir.

12  Q.  On this page there are user names and passwords for a

13  couple of things.  We talked about Practice Fusion yesterday,

14  right?

15  A.  Yes.

16  Q.  And that's for entry of documents or notes into the medical

17  records, right?

18  A.  Yes.

19  Q.  All right.  And there's user names and passwords for both,

20  correct?

21  A.  Yes.

22  Q.  For Practice Fusion, yes?

23  A.  Yes.

24  Q.  And you had access, as we talked about yesterday, to that

25  system, correct?

G3ALMIR1                           Leonard - cross

1  A.  Yes.

2  Q.  You have a user name for O Hernandez.  Do you know who that

3  is?

4  A.  No.

5  Q.  When you first visited the doctor as a patient on

6  November 15, 2012, did you know who the receptionist was who

7  was sitting at the front desk?

8  A.  I knew of her.

9  Q.  Did you know her name?

10  A.  Yes.

11  Q.  What was her name?

12  A.  Oneida.

13  Q.  Did you know her last name?

14  A.  Nope.

15  Q.  And below the Practice Fusion user name and password is

16  ePACES; do you see that?

17  A.  Yes.

18  Q.  Are you familiar with that system?

19  A.  Yes.

20  Q.  That system is to check for a patient's insurance

21  information, right?

22  A.  Yes.

23  Q.  And you were given the user name and a password to access

24  that system, correct?

25  A.  Yes.

1    Q.  And that was something that you were taught by Ms. Javier

2    to do for patients?

3    A.  Yes.

4    Q.  Do you know where this notebook was kept, the notebook

5    that's in front of you, Government Exhibit 442?

6    A.  On the screen or this notebook here?

7    Q.  Well, the screen is just a copy of what's in front of you.

8    Do you know where it was kept?

9    A.  I'm not sure, sir.  I don't know if it's the same book.

10   I'm not sure.

11   Q.  Well, just look at the book itself.  You are familiar with

12   that book, right?

13   A.  Yes.

14   Q.  Where did you see it?

15   A.  In the doctor's office.

16   Q.  You didn't see it in the front desk and it wasn't used by

17   Ms. Hernandez -- I mean Ms. Javier?

18   A.  No, sir.  That book was in the doctor's room.

19   Q.  That's the only time you've seen it is in the doctor's

20   office?

21   A.  Yes, sir.

22   Q.  Did you have to access the user name and passwords for the

23   systems that we talked about?

24   A.  Say that again?

25   Q.  Did you have to access Practice Fusion, ePACES, PMP with

1   user names and passwords?

2   A.  Just the user name that was given to me, yes.

3   Q.  And where did you keep those?

4   A.  I didn't keep it nowhere.  I kept it in my head.

5   Q.  When Ms. Javier -- I'm going to go back to when Ms. Javier

6   was fired for the first time.  She never talked to you about

7   the reasons she was fired?

8   A.  No, sir.

9   Q.  Did you share any money with her at the time for overrides?

10  A.  I wasn't sharing anything with her at that time, sir.  She

11  wasn't giving me anything.  I didn't ask for anything from her.

12  Q.  Did you give her money for helping your patients out?

13  A.  I didn't have patients at that time, sir.

14  Q.  This is in February 2014?

15  A.  Yes.

16  Q.  So at that period of time, you weren't selling any

17  prescriptions at all?

18  A.  Not at that time, sir.  I was still helping out with

19  Mr. John Coleman.

20  Q.  You were getting just a little bit of money from him, $100

21  a time still at that point?

22  A.  From time to time.

23  Q.  So when did you start -- withdrawn.

24          Yesterday you said you had about a year of having

25  eight or nine patients in the office?

G3ALMIR1                         Leonard - cross

1    A.  Somewhere around there, yes.

2    Q.  You were arrested in December 2014?

3    A.  Yes.

4    Q.  So would this be around the time you started bringing

5    patients in the office?

6    A.  Around what time?

7    Q.  February 2014.

8    A.  Somewhere in there, yes.

9    Q.  This was a big period of time for you because you

10   remembered that date specifically as to with respect to

11   Dr. Terdiman, right?

12   A.  Yes.

13   Q.  So it your testimony that after you heard about

14   Dr. Terdiman is when you started bringing in patients?

15   A.  No, sir.

16   Q.  Before or after?

17   A.  It was after.

18   Q.  After you heard about Dr. Terdiman that you decided you're

19   going to start bringing in your own patients?

20   A.  Yes.

21   Q.  Are you just guessing?

22   A.  No, sir.  That was the during the time when the numbers

23   started dropping, so I was kind of trying to help out to bring

24   the numbers back up, what I was told.

25   Q.  So you were helping the doctor by bringing in your own

G3ALMIR1                         Leonard - cross

1    patients, eight or nine patients, right, you said yesterday?

2    A.  I was helping him bring the numbers up at that time, sir.

3    That's all.

4    Q.  You said at that point in time, there were like 30 patients

5    a day; is that right?

6    A.  That's what the doctor wanted, about 30 to 35 patients.

7    Q.  How many patients were coming in?

8    A.  At that time, sir, it varied.

9    Q.  But over the course of the year or more that you worked

10   there, was it fair to say there were over a thousand patients?

11   A.  Could have, sir, could.

12   Q.  And your eight or nine patients was helping the doctor out;

13   is that your testimony?

14   A.  It was helping the numbers out, sir.

15   Q.  Your numbers, right?

16   A.  His numbers.

17   Q.  You were making we said yesterday a lot of money off

18   selling those scripts, right?

19   A.  I wasn't making a whole lot of money, sir.

20   Q.  You were making money, yes or no?

21   A.  Yes.

22   Q.  Ms. Javier, there came a time when after she was fired, she

23   had her baby with Mr. Cruz, right?

24   A.  Yes.

25   Q.  You continued to stay in contact with her after she was

G3ALMIR1                          Leonard - cross

1    fired?

2    A.   She called me, sir, numerous times.

3    Q.   She called you to talk to you about trying to get her job

4    back?

5    A.   Occasionally.

6    Q.   And you realized that she wasn't doing well, right?

7    A.   Meaning?

8    Q.   That she was overusing pills and she just had a baby and

9    claimed to be suicidal?

10   A.   That's what she told me.

11   Q.   And then you learned that you spoke to the doctor, right?

12   A.   Who spoke to the doctor?

13   Q.   Javier.

14   A.   Yes.

15   Q.   And you said it was around in June of 2014, right?

16   A.   Somewhere around that time, yes.

17   Q.   And he felt bad for her and rehired her?

18   A.   I didn't rehire her, sir.

19   Q.   He rehired her?

20   A.   Who is he?

21   Q.   The doctor.

22   A.   Yes, sir.

23   Q.   In June of 2014, she returned to the office?

24   A.   Probably around that time, probably.  I'm not sure what

25   time it really was.

1    Q.   You testified yesterday that she called the doctor on

2    Father's Day, around his birthday, to ask for her job back,

3    right?

4    A.   That's what I was told by the doctor.

5    Q.   And Father's Day is in June each year?

6    A.   Somewhere, yeah.

7    Q.   And she returned to the office shortly after that?

8    A.   Yes.

9    Q.   And when she was rehired, you were told that she would only

10   work in the physical therapy area?

11   A.   I was told by the doctor she would work outside his office

12   right beside his door.

13   Q.   Yesterday you testified that with physical therapy; is that

14   still true?

15   A.   She would work with physical therapy.  Her job title is to

16   work with the physical therapy and take urine samples.

17   Q.   And she was not to have any keys to any of the secured

18   areas in the office, correct?

19   A.   I don't remember that, sir.  That's not what I was told.

20   Q.   You gave her a key because she didn't have one, right?

21   A.   I gave her a key because she was taking urine samples, sir.

22   Q.   She wasn't allowed by the doctor to have that key?

23   A.   I did not know at that time she wasn't allowed.  I wasn't

24   told that by the doctor.

25   Q.   Well, the doctor told you that he doesn't know why you gave

G3ALMIR1                        Leonard - cross

1    her keys because he didn't trust her after that, she wasn't to

2    have a key, right?

3    A.  Sir, he told me after that situation.

4    Q.  But you gave her the key to go in the refrigerator for the

5    urine, right?

6    A.  I gave her the keys to open up the refrigerator because

7    patients were bringing in their urine.  That was her job at the

8    time.

9    Q.  And that's the reason she got fired the second time?

10   A.  That wasn't the reason she got fired, sir.

11   Q.  She got fired because the doctor saw her opening the door

12   for the refrigerator and she wasn't supposed to be in there,

13   right?

14   A.  No, sir.  He never saw her open up the refrigerator.  The

15   refrigerator was open when he came to go to the bathroom and he

16   asked her why is the refrigerator open.

17   Q.  Yes, and he fired her because she lied to him and she said

18   somebody else opened it, right?

19   A.  Yes, sir.

20   Q.  Because she wasn't supposed to be in there according to the

21   doctor's orders, right?

22   A.  No, sir.  I didn't know that at the time that that was

23   doctor's orders.

24   Q.  That's what you learned after, right, that's what he was

25   upset with her about?

1    A.   That's what I learned after he told me, yes.

2    Q.   And when she disobeyed his orders and lied to him, he fired

3    her again, the doctor fired Javier again?

4    A.   Yes, sir.

5    Q.   Now, you talked about the physical therapist.  There were

6    physical therapists who were retained or employed at the office

7    during the time that you worked there, correct?

8    A.   Yes.

9    Q.   And patients used the physical therapy room, correct?

10   A.   Occasionally.

11            MR. MAZUREK:  Can we put on the screen just for the

12   witness what's been premarked for identification as DM402.  Can

13   we just scroll through.

14   Q.   Do you recognize the forms that are shown to you on the

15   screen, Mr. Leonard?

16   A.   Yes.

17   Q.   Do you recognize those as physical therapy forms?

18   A.   Yes.

19   Q.   That would be completed by the physical therapist to log

20   times when the patients would be in the physical therapy room?

21   A.   Yes.

22            MR. MAZUREK:  Your Honor, move for admission of DM402.

23            THE COURT:  Offered.

24            Anything from the front table?

25            MS. CUCINELLA:  Is it possible to see the entire

846

1   exhibit?  We've never seen this before.

2                  THE COURT:  Sure.  Give them a copy.  You have to show

3   your opponent a copy.  That's the rule.

4                  MR. MAZUREK:  Your Honor, we don't have a physical

5   copy.  It was taken off of the government's discovery.

6                  THE COURT:  Are there additional documents besides

7   this as part of the exhibit?  Is it a one-page exhibit?

8                  MS. CUCINELLA:  It's not a one-page exhibit.

9                  MR. MAZUREK:  It's a multiple-page exhibit of forms

10  like the one on the screen.

11                 MS. CUCINELLA:  We can't tell what patients are in

12  there --

13                 THE COURT:  One patient?

14                 MS. CUCINELLA:  There's more than one patient.  It's

15  actually numerous patients.

16                 MR. MAZUREK:  I'll just offer the one patient.

17                 THE COURT:  This page that relates to one patient,

18  patient name, Tracy Brown.  One patient, OK.

19                 MS. CUCINELLA:  No objection to that one page.

20                 THE COURT:  Thank you.  One page.  Admitted.

21                 (Defendant's Exhibit DM402 received in evidence)

22                 MR. MAZUREK:  Thank you, Judge.  Permission to

23  publish?

24  Q.  This form, Mr. Leonard, is the type of form that was kept

25  in the physical therapy room?

1    A.  Yes.

2    Q.  And it includes at the top part a patient name, you see

3    it's in this particular case is Tracy Brown?

4    A.  Yes.

5    Q.  And it includes a date, if we could highlight or enlarge

6    the top third of the page?

7    A.  Yes.

8    Q.  It includes a date, in this instance it's June 3, 2014,

9    correct?

10   A.  Yes.

11   Q.  That would indicate the date that the patient went to

12   physical therapy, correct?

13   A.  Yes.

14   Q.  And then there are some diagrams of the body and

15   evaluations below that, correct?

16   A.  Yes.

17   Q.  If we could now go back to the full page view and enlarge

18   the second half of the page, the bottom half.

19          And then it's signed at the bottom by the PT.  Do you

20   recognize that as physical therapist?

21   A.  Yes.

22   Q.  So it's signed by the physical therapist?

23   A.  Yes.

24   Q.  And this particular instance the name of the physical

25   therapist was Yongha Kim?

G3ALMIR1                      Leonard - cross

1    A.  Yes.

2    Q.  Do you remember Yongha Kim in the office?

3    A.  Yes, I remember.

4    Q.  And are you aware that the physical therapists were rotated

5    through by a service company called Oasis?

6    A.  Who is that?

7    Q.  You're not familiar with that?

8    A.  I'm not familiar with the name.

9    Q.  You're not familiar with the employment service that the

10   doctor used to retain the different physical therapists who

11   worked there?

12   A.  Which is the staffing company?

13   Q.  Yes.

14   A.  Yes.

15   Q.  So during the time that you worked there, there were

16   several physical therapists who came and worked for a couple of

17   months and then left?

18   A.  Yes.

19   Q.  And this form that is on the screen admitted as DM402, this

20   was something that the physical therapists were supposed to log

21   each time that there was a patient visit, right?

22   A.  Yes.

23   Q.  And they were supposed to upload their information onto

24   patient fusion from the written documents, correct?

25   A.  Yes.

G3ALMIR1                          Leonard - cross

1              MR. MAZUREK:  You can take that down.

2    Q.  I want to refer you to the testimony yesterday you gave

3    regarding the Aegis lab.  Do you remember that?

4    A.  Yes.

5    Q.  There was a representative, I think you called him Charles;

6    is that right?

7    A.  Yes.

8    Q.  And you saw him you said twice in the office, correct?

9    A.  Yes.

10   Q.  The first time he came there the clinic was not using Aegis

11   labs, correct?

12   A.  The first time he came there?

13   Q.  Yes.

14   A.  When he came, when Charles came, we was at that time we

15   were using Aegis labs.

16   Q.  Do you know how the doctor got in touch with Aegis labs?

17   A.  We called Aegis labs.

18   Q.  Who is we?

19   A.  I did.

20   Q.  OK.  You called Aegis labs in order to ask them to be the

21   lab company for the clinic?

22   A.  Yes, because at the time I was directed by the doctor we

23   needed, after Empire fell out, we had to get a new lab.

24   Q.  Do you know that the Empire lab account remained active

25   throughout until the time of your arrest in December 2014?

G3ALMIR1                           Leonard - cross

1    A.  I did not know that.

2    Q.  So you never met Charles before, you didn't see Charles in

3    the office before Aegis was retained by the clinic?

4    A.  No, sir.

5    Q.  So you're saying he never came to introduce what the lab

6    would offer, how the lab would collect specimens or anything

7    like that?

8    A.  He came to introduce himself to the doctor.

9    Q.  And that was his first visit?

10   A.  His first visit, yes.

11   Q.  And that in that visit, did he have that piece of paper

12   you're talking about?

13   A.  No.

14   Q.  So there was a visit first where he introduced himself to

15   the doctor?

16   A.  Yes.

17   Q.  And the services that Aegis would provide?

18   A.  Yes.

19   Q.  At that point in time, you learned that the doctor had been

20   incorrectly interpreting lab results prior to that?

21   A.  Say that again?

22   Q.  You learned at that time, that first visit, that the doctor

23   was reading the lab reports from Empire incorrectly and was

24   misinterpreting the lab result?

25        MS. CUCINELLA:  Objection, hearsay.

G3ALMIR1                        Leonard - cross

1        THE COURT:  Objection is sustained.

2   Q.  You learned, sir, I mean with respect to the Aegis lab, the

3   lab reports had different information than the Empire labs,

4   right?

5   A.  Meaning?

6   Q.  Meaning that they had words about compliant or not

7   compliant on the face of the lab report?

8   A.  I'm not sure, sir.  I don't know what that means.  I'm not

9   sure.

10  Q.  Well, you've seen literally hundreds of these lab reports,

11  right?

12  A.  Yes.

13       THE COURT:  I think we're way beyond the scope of the

14  direct.

15       MR. MAZUREK:  Judge, this came up in the direct.

16       THE COURT:  Tell me where.

17       MR. MAZUREK:  I will move on.  I'm sorry.

18       THE COURT:  You better tell me where because I don't

19  remember it.

20       MR. MAZUREK:  There was testimony regarding two visits

21  by the representative of Aegis.

22       THE COURT:  That has nothing to do with, sorry, with

23  the contents of the report with this witness.  Move on, please.

24  Q.  Now, the last time that Charles Meyers came to the office

25  that you testified to yesterday, you said he came to the doctor

G3ALMIR1                         Leonard - cross

1   and canceled the service?

2   A.  He asked to speak to the doctor.

3   Q.  Was that the time that the service by Aegis was canceled?

4   A.  Yes, that's what I was told by the doctor, yes.

5   Q.  And that was in August of 2014?

6   A.  Not sure, could be, sir.  Not sure the date and time, I'm

7   not sure.

8   Q.  Do you recollect in August of 2014 there was a week that

9   the doctor was not in the office?

10  A.  Not sure, sir.  I'm not sure.  I can't remember that.  I

11  can't remember that.

12  Q.  Well, if the doctor was not in the office, would you still

13  go to the office to do your work?

14  A.  If the doctor wasn't in the office, I was told I still had

15  to work.

16  Q.  So you would open the office because you had a key, right?

17  A.  Yes.

18  Q.  And you would be in the office even when the clinic was

19  closed?

20  A.  I would be in the clinic, I would be in the clinic when the

21  clinic was closed for a reason.

22  Q.  And do you remember a time in August 2014 that the doctor

23  went on a family vacation to Croatia?

24  A.  I never learned that he went to Croatia.  I don't know

25  where he went.

G3ALMIR1                    Leonard - cross

1   Q.  But you remember him being away the week of August 15 to

2   21st of 2014?

3   A.  He could have.  I'm not sure the date, not sure the date.

4   Q.  In fact, when Charles Meyers came to the office, he wasn't

5   there, you were the only one in the office; isn't that right?

6   A.  That's not true, sir.

7   Q.  You were only doing cash receipts from the patients for or

8   money orders from the patients to pay for the urine, correct?

9   A.  We were also doing copies of insurance, sir.

10  Q.  With Aegis labs?

11  A.  Yes, sir.

12  Q.  Now, you were, when Jomaris Javier was rehired in the

13  office in around June of 2014, you were upset with her because

14  she was telling people they could use insurance for to pay for

15  the urine, right?

16  A.  That wasn't how it went, sir, no.  I was upset because she

17  was telling people certain information and they were coming

18  back thinking I was telling them that they couldn't use

19  insurance and that wasn't the story at all.

20  Q.  You were upset with her that she was telling people that

21  they could use insurance to pay for the urine, correct?

22  A.  I was upset with her because, like I said, she told people

23  outside that I was the one that wasn't allowing people to use

24  insurance.  But those particular people was only cash basis at

25  the time, so I never had to tell them anything about the

G3ALMIR1                          Leonard - cross

1    insurance.  They wasn't using insurance.  They was using cash.

2    Q.  That particular people meaning friends of yours like the

3    guy named Black?

4    A.  That wasn't my friend, sir.

5    Q.  He was one of the crew chief you were dealing with, right?

6    A.  That was one of the crew chiefs that Ms. Javier was dealing

7    with, sir.

8    Q.  You had nothing to do with his patients?

9    A.  I had nothing to do with his patients at that time, sir.

10   Q.  OK.  Well, the fact that Ms. Javier was rehired, she was

11   only in the office for a couple of weeks at most, right?

12   A.  At most.

13   Q.  And after that, you were there by yourself, correct?

14   A.  I wasn't by myself at that time, sir.

15   Q.  After she was fired a second time, you were the only office

16   staff, correct?

17   A.  Yes.

18   Q.  You were dealing with every crew chief then, right?

19   A.  I wasn't dealing with every crew chief, sir.  I was doing

20   my job at the office.

21   Q.  How many crew chiefs did you know who were hanging around

22   the office at that time?

23   A.  Sir, frankly, I didn't care.

24   Q.  Did you have any idea at that point?  Were you dealing with

25   anyone?

G3ALMIR1                        Leonard - cross

A.  I didn't know how many crew chiefs were outside, sir.  I
didn't count.
Q.  You were dealing with -- you were talking to Mr. Correa
yesterday about Black and Dogs and a couple of other people,
right?
A.  That's just a few names that I heard of, sir, so I didn't
know how many was out there.
Q.  They weren't just people you heard of; they were people you
talked to?
A.  They was people that I knew, sir, from being around the
office.  That's it.
Q.  And those people are the people that you were making sure
that you could help in order to keep their patients at the
office, correct?
A.  Wrong.
Q.  Wasn't that what we saw yesterday that you were at the helm
of?
A.  Sir, the helm means I was in the office by myself.  That's
what it meant.
Q.  You were by yourself and so that the only people that these
so-called crew chiefs could deal with was you, right?
        MS. CUCINELLA:  Objection, asked and answered
yesterday.
        THE COURT:  The objection is overruled.  Let's just
get it done.

G3ALMIR1                        Leonard - cross

1    Q.   The only person that these so-called crew chiefs could deal

2    with was you after Javier was fired a second time, yes or no?

3    A.   No.

4    Q.   Who else?

5    A.   Nobody had to deal with me at all.

6    Q.   By the way, when the third lab was hired in September of

7    2014, insurance was regularly used for the payment of urine,

8    correct?

9    A.   Which lab?

10   Q.   AFTS.

11   A.   It wasn't only insurance.  It was cash too, sir.

12   Q.   Right.  It was both.  There was still cash, but insurance

13   as well.  Correct?

14   A.   Yes, sir.

15   Q.   And that was the way it was with Aegis?

16   A.   Yes, sir.

17   Q.   The patients that you talked about that you brought into

18   the office, you said there were about eight or nine?

19   A.   Approximately around there, yes.

20   Q.   And that was a typical amount for the people that you knew

21   who were crew chiefs in the office?

22   A.   No, sir.

23   Q.   You didn't know, you didn't know about what their business

24   was?

25   A.   Sir, I didn't really care about what their business were,

1   sir.  I didn't ask.

2   Q.  But they asked you, right, for help?

3   A.  They didn't ask me for no help, sir.  They already knew.

4   This was going on way before I started there, so they knew

5   exactly what to do.

6   Q.  They knew they had to bribe the office staff, correct?

7   A.  They didn't have to bribe me at all, sir.

8   Q.  You took overrides, you testified to that just yesterday?

9   A.  I took overrides, sir, for just moving people up.  That was

10  it, sir.

11  Q.  And you falsified urine test reports?

12  A.  I didn't have to falsify no urine test, no urinalysis

13  service.  Just to move people up.  I didn't have to falsify no

14  urine.

15  Q.  There came a time when you couldn't falsify it anymore,

16  correct?

17  A.  Wrong.

18  Q.  Because the lab results were going through a secure portal?

19  A.  Because, like I told you yesterday, doctor was getting tech

20  savvy.  He wanted less paperwork he wanted to see.  He wanted

21  it come to his portal because that's what he wanted.  Tech

22  savvy.  That's what it was.

23  Q.  You never told the doctor you were bringing patients into

24  the office, correct?

25  A.  No.

G3ALMIR1                         Leonard - cross

1    Q.   And you used measures to hide the fact that you had

2    patients in the office, correct?

3    A.   What measures?

4            THE COURT:   Did you use measures to hide, did you take

5    steps to hide that fact from the doctor?

6            THE WITNESS:   No.

7    Q.   You would never walk out with the patients, correct?

8    A.   How can I, sir?   I was the office staff.   I was working by

9    myself.   How can I walk anybody out?

10   Q.   You would never give money to the patients in the office

11   for their prescriptions?

12   A.   I never gave nobody no money in the office when I was the

13   office staff, sir.   How can I do it?   I'm right behind the

14   desk.

15   Q.   You didn't want anybody to see you do that, right?

16   A.   Wrong.

17   Q.   That's the reason you didn't make any payments in the

18   office, correct?

19   A.   Wrong.

20   Q.   In fact, you employed your mother to run the patients to

21   the pharmacy?

22   A.   Come again?

23   Q.   You employed your mother to run patients to the pharmacies?

24   A.   Be careful.   I never used my mother to do anything.

25   Q.   That's what you told Abraham Correa on September 11 of

G3ALMIR1                        Leonard - cross

1    2014; isn't it true?

2    A.   That's wrong, sir.   I never told Abraham Correa I would use

3    my mother.   My mother is 75 years old, sir.

4         MR. MAZUREK:   Your Honor, I ask to play a tape at

5    DM603, page 12, the attribution beginning 31 minutes, 46

6    seconds.   It's a third of the way, first Leonard attribution on

7    the page.

8         (Audio recording played)

9    Q.   That's your voice on the tape, correct?

10   A.   Yes.

11   Q.   Saying that you basically have your mother take people,

12   that's the patients?

13   A.   Wrong, sir.   That's not what I said.   It's not what I said.

14   I didn't say I would use my mother.   I never said that in

15   there.   You don't hear use my mother.   You didn't hear that.

16   Q.   The recording will speak for itself.

17        And so the program was that the patients would be

18   taken to the pharmacy and the prescription would come back to

19   your home, correct?

20   A.   It wouldn't come back to my home, sir.   It wouldn't come

21   back to my home.

22   Q.   Isn't that what you just said on the tape?   My mother would

23   take them, get the shit, she go home.   She don't come back over

24   here or nothing.   Correct?

25   A.   Sir, it wasn't my mother.

1    Q.   Then why did you use the term mother in the tape?

2    A.   Ebonics again, sir.  Talking to Correa.  It wasn't my

3    mother.

4              THE COURT:  I'm sorry.  Again, would you repeat that

5    sentence?

6              THE WITNESS:  Judge, it was Ebonics.  I didn't mean my

7    mother.

8              THE COURT:  When you use the word Ebonics, do you mean

9    you said something but it wasn't the real truth?

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  That's what you mean when you say Ebonics?

12             THE WITNESS:  Yes.

13             THE COURT:  OK.

14   Q.   And when your patients -- one of your patients was Amanda

15   Nunez; is that right?

16   A.   Yes.

17   Q.   When your patients refused to sell you their prescription,

18   you would threaten violence against them, right?

19   A.   Just talk, sir, just talk.

20   Q.   Just talk?

21   A.   Just talk.

22   Q.   Well, the talk that you gave to Amanda Nunez was that if

23   she doesn't give you the bottle of pills, she'll see what

24   happens, right?

25   A.   Sir, that was just talk.

G3ALMIR1                     Leonard - cross

1    Q.  You said that, right?

2    A.  Yes.

3    Q.  And you said, you told her you know where she lives, right?

4    A.  Yes.

5    Q.  And you told her that you used to go to school close to the

6    forest where she lives, right?

7    A.  Close to what forest?

8    Q.  I don't know what forest.  It's the word you used.  Did you

9    go to school close to some place called forest?

10   A.  Yes.

11   Q.  Where is that?

12   A.  In the Bronx.

13   Q.  Forest Avenue or what was your reference to forest?

14   A.  Around Forest Avenue.

15   Q.  And you know a bunch of people who don't play around,

16   right?

17   A.  That was just talk, sir.

18   Q.  And you talked to her and you told her that you can ask for

19   a favor and a guy can come late and floor her, right?

20   A.  I don't remember that, sir, me saying that.  I don't

21   remember me saying exactly like that.

22   Q.  You don't remember using that language in telling

23   Mr. Correa what you told Ms. Nunez?

24   A.  I can't remember what else I said to him, sir.  I just

25   can't remember it.

G3ALMIR1                              Leonard – cross

1   Q.  Would it refresh your memory to see the transcript, sir?

2   A.  Yes, sir.

3   Q.  Going to show to the witness what's been premarked for

4   identification as DM604 and specifically page 17.  Just read

5   the highlighted portion to yourself.

6           Are you ready, sir?

7           MS. CUCINELLA:  One moment.

8   Q.  Did you have a chance to read it?

9   A.  Yes.

10  Q.  Does that refresh your memory, sir, about what it is that

11  you were telling Mr. Correa you told Ms. Nunez?

12  A.  Yes.

13  Q.  And that you told her that you can ask for a favor and a

14  guy can come late and floor her, correct?

15  A.  I never asked that.  I never -- I don't remember telling

16  her that.  I told Correa that.  I never told Amanda Nunez that.

17  Q.  You remember saying that?

18  A.  To Correa, yes.

19  Q.  Because she wouldn't sell you her prescription, correct?

20  A.  At the time she was just playing games, sir.  That's all.

21  Q.  You don't like it when people play games with you, right?

22  A.  I like games.  No problem.

23  Q.  Do you think this is a game?

24  A.  No, sir.

25  Q.  Mr. Leonard, you lied to the doctor when you were a

863

G3ALMIR1                          Leonard - cross

1    patient, right?

2    A.  Yes.

3    Q.  You never told the doctor you were bringing patients to the

4    clinic, did you?

5    A.  When?

6    Q.  Ever.

7    A.  No.

8    Q.  You never told the doctor that you were doing overrides

9    with Augustine and Javier?

10   A.  At that time, sir, I was not doing overrides with Javier

11   and Mr. Augustine Cruz at that time.

12   Q.  Well, you never told the doctor that Javier and Augustine

13   Cruz were doing overrides?

14   A.  At the time --

15            THE COURT:  This is a yes or no question, sir.

16   A.  No, sir.

17            THE COURT:  No.  Thank you.  That's all you need to

18   say.

19   Q.  You never told the doctor you were selling his

20   prescriptions?

21   A.  No.

22   Q.  You never told the government about the drug income you

23   made over the course of a year selling prescriptions?

24            THE COURT:  Did you?

25   A.  I told them.

G3ALMIR1                         Leonard – cross

1   Q.  You told them where the money is?

2   A.  What money?

3   Q.  The almost $200,000 you made.

4   A.  Sir, I never made 200,000.

5   Q.  Did you tell them how much you made?

6   A.  Yes, I did tell them.

7   Q.  How much did you make?  How much did you tell them you

8   made?

9   A.  I made approximately about $5,000.

10  Q.  Total?

11  A.  Around there, yes.

12  Q.  You never reported any taxes on this drug income, any drug

13  income, right?

14  A.  No.

15  Q.  You don't want to go to jail?

16  A.  No, sir.

17  Q.  That's why you signed the cooperation agreement?

18  A.  No.  I signed the cooperation agreement just for me to tell

19  the truth and take my part in what I did.

20  Q.  You didn't need to sign a cooperation agreement to do that,

21  did you?

22  A.  Yes.

23  Q.  You could have just told them the truth, right?

24  A.  I could have.

25  Q.  But instead you signed an agreement that said if you come

G3ALMIR1                    Leonard - cross

1   in here and testify against the doctor, you might have a chance

2   of not going to jail, right?

3   A.  Not true.

4   Q.  Isn't that what you're hoping for?

5   A.  I'm hoping for that.

6   Q.  Isn't that what you want to happen?

7   A.  I'm hoping for that.  That's all.

8   Q.  And when you're hoping for that is the only people in this

9   room who could make that happen for you is the government,

10  right, if they file a letter to the Court?

11  A.  No.  At the end of the day, it's the judge.  The judge is

12  going to determine that, sir.  They can't do anything.

13  Q.  You pled guilty to a crime with a maximum penalty of 20

14  years, correct?

15  A.  Yes.

16  Q.  You expect to go to jail unless you get some kind of

17  cooperation leniency from the Court, correct?

18  A.  Say that again?

19  Q.  You would expect to go to jail unless you get leniency from

20  the Court in exchange for your cooperation, correct?

21  A.  I don't understand, sir.  I'm trying to understand.

22  Q.  If you pled guilty without a cooperation agreement, did you

23  expect that you would spend time in prison, yes or no?

24  A.  I'm trying to figure it out, sir, that's all.  Give me a

25  minute, please.

G3ALMIR1                    Leonard - cross

1  Q.  If you don't -- the way you cannot go to prison is if you

2  get cooperation leniency from the Court?

3  A.  That's not true, not true, sir.

4  Q.  You think you can -- withdrawn.

5         Do you remember your friend John Coleman?

6  A.  Yes.

7  Q.  Did you speak to him after you were dealing with him, after

8  your arrest?

9  A.  No.

10  Q.  No.  You didn't speak to him about his cooperation?

11  A.  Sir, he's locked up.  I don't speak to him.

12  Q.  And he was locked up because of dealing drugs, right?

13  A.  I don't know, sir.  Just locked up.

14  Q.  You don't know.  Do you know that if you plead guilty to a

15  federal felony, there's a good chance you're going to prison,

16  sir, yes?

17  A.  Yes.

18  Q.  And you don't want to go to prison, right?

19  A.  I'm hoping not to, sir.

20  Q.  And that's the reason you're here today, correct?

21  A.  Yes.

22         MR. MAZUREK:  Nothing further.

23         THE COURT:  Any redirect?

24         MS. CUCINELLA:  Very briefly.

25  REDIRECT EXAMINATION

 1    BY MS. CUCINELLA:

 2    Q.  Mr. Leonard, who is Amanda Nunez?

 3    A.  She was one of my patients.

 4    Q.  What was your relationship with her?

 5    A.  Just patient, friend, that was it.

 6    Q.  Do you have an understanding of why she wasn't selling you

 7    her pills in the conversation that Mr. Mazurek referenced on

 8    your cross-examination?

 9    A.  Yes.

10    Q.  What was that?

11    A.  The reason was because she didn't want to go to the

12    pharmacist with somebody else.  Another young lady was supposed

13    to assist her that day.  She didn't want to go.  She wanted to

14    go by herself.  She was upset about that.

15              MS. CUCINELLA:  One moment.

16    Q.  Mr. Leonard, on your cross, Mr. Mazurek showed -- played

17    for you a conversation where you referenced your mother.  Who

18    were you referring to when you talked about your mother on that

19    tape?

20              MR. MAZUREK:  Objection, leading.

21              THE COURT:  No, it's not.  It's not leading.  And it's

22    not asked and answered.  The objection is overruled.

23    Q.  You may answer.

24    A.  At that time it was Rozalin Hill.

25              MS. CUCINELLA:  Nothing further.

1   RECROSS EXAMINATION

2   BY MR. MAZUREK:

3   Q.  Why didn't you give that answer when I asked the question?

4   A.  You didn't ask me that answer, sir.  You didn't ask me that

5   question.

6   Q.  You said --

7           THE COURT:  You are not going to get into an argument

8   with him about this.  I am sorry.

9   Q.  One last question.  For Amanda Nunez, she was, you said she

10  was a friend?

11  A.  She was one of my patients, yes, sir.

12  Q.  You said she was also a friend?

13  A.  Yes.

14  Q.  And if she didn't do what you wanted, you would threaten

15  her with guys going to her apartment to floor her; is that what

16  you do?

17  A.  Sir, that was just talk.

18          THE COURT:  Yes or no.

19  A.  No, no.

20  Q.  That's what you said though, right?

21  A.  Yes.

22  Q.  When you didn't know you were recorded, right?

23  A.  I didn't know, no.  I was just talking to Mr. Correa.

24          MR. MAZUREK:  Nothing further.

25          MS. CUCINELLA:  Nothing further.

G3ALMIR1                          Beers - direct

1              THE COURT:  You may step down, sir.

2              (Witness excused)

3              THE COURT:  Call your next witness.

4              MS. CUCINELLA:  The government calls Detective Beers.

5     JOSHUA BEERS,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8              MS. CUCINELLA:  May I inquire?

9              THE COURT:  You may inquire.

10    DIRECT EXAMINATION

11    BY MS. CUCINELLA:

12    Q.  Good morning, Detective Beers.

13    A.  Good morning.

14    Q.  Who do you do?

15    A.  I'm a detective with the Warren County Prosecutor's Office

16    in Warren County, New Jersey.

17    Q.  Are you in a specific unit in the prosecutor's office in

18    Warren County?

19    A.  I'm currently assigned to the juvenile unit.

20    Q.  Prior to being in the juvenile unit, were you in another

21    division?

22    A.  Yes, ma'am.

23    Q.  What division?

24    A.  I was in the narcotics task force.

25    Q.  What were some of your duties and responsibilities on the

G3ALMIR1                         Beers - direct

1   narcotics task force?

2   A.  I was involved in overt and covert investigation of

3   narcotics trafficking in Warren County.

4   Q.  Did you work on diversion cases?

5   A.  Yes, ma'am.

6   Q.  Detective Beers, I'm going to draw your attention to the

7   fall of 2013.  Were you on the narcotics task force at that

8   time?

9   A.  Yes, ma'am.

10  Q.  Did there come a time when you were demoted?

11  A.  Yes, ma'am, it did.

12  Q.  Can you explain to the jury why you were demoted?

13  A.  I was demoted from the sergeant supervisor of the unit for

14  an improper romantic relationship with a subordinate.

15  Q.  As part of your demotion, were you also transferred units?

16  A.  Yes, ma'am, I was.

17  Q.  Is that how you ended up in the juvenile unit where you are

18  today?

19  A.  Yes, ma'am.

20  Q.  I'm going to turn your attention to specifically October 10

21  of 2013.  Were you working that day?

22  A.  Yes, ma'am, I was.

23  Q.  And as you just testified, you were on the narcotics task

24  force?

25  A.  Yes, ma'am.  At that time I was supervising.

G3ALMIR1                        Beers - direct

1   Q.  Do you recall what happened on October 10, 2013?

2   A.  We got a request for assistance from the Greenwich Township

3   Police Department.

4   Q.  What kind of assistance?

5   A.  Assisting them with a fraudulent script investigation.

6   Q.  Do you recall what the fraudulent prescription was for?

7   A.  It was a prescription for oxycodone.

8   Q.  What did you do after you received that call?

9   A.  We responded down to the Greenwich Township Police

10  Department and met with a patrolman there where he gave us the

11  details of his case.

12  Q.  What happened after that?

13  A.  We met with the suspect in the investigation, Tanisha

14  Davis, and conducted a taped interview with her.

15  Q.  What was the name of the suspect?

16  A.  Tasheen Davis I think it is.

17  Q.  And you met with her in person?

18  A.  Yes, ma'am, I did.

19         MS. CUCINELLA:  Ms. Joynes, if you could please bring

20  up what's already in evidence and marked as Government

21  Exhibit 4-B.

22  Q.  Do you recognize the individual in photo?

23  A.  Yes, I do.

24  Q.  Who is it?

25  A.  That would be Ms. Davis.

G3ALMIR1                          Beers - direct

1    Q.  After you met with Ms. Davis, what happened?

2    A.  We advised the Greenwich Township Police Department to

3    retain the prescription while we continue our investigation.

4    Q.  In the days that followed, what steps, if any, did you take

5    as part of your investigation?

6    A.  We submitted a grand jury subpoena to the doctor's office

7    for medical records regarding Ms. Davis.

8    Q.  How did you determine which doctor to submit a grand jury

9    subpoena to?

10   A.  Utilizing the provided prescription sheet that was retained

11   as evidence.

12   Q.  And to which doctor did you send that grand jury subpoena?

13   A.  Dr. Mirilishvili.

14   Q.  Do you recall the date on which that grand jury subpoena

15   was sent?

16   A.  Yes.  It was October 15.

17   Q.  After the grand jury subpoena was sent, what additional

18   steps did you take, if any?

19   A.  Contacted the doctor's office and eventually spoke with the

20   doctor.

21   Q.  Do you recall approximately when that was?

22   A.  I believe it was between the 15th and the 24th when we

23   received the medical records.  I'm not sure the exact date.

24   Q.  You spoke with the doctor?

25   A.  Yes, ma'am, I did.

G3ALMIR1                         Beers - direct

1   Q.   During that conversation, do you recall what the doctor

2   said to you and what you said in response?

3   A.   He went ahead and verified that the script was legitimate

4   and I accepted that.

5   Q.   Do you recall anything else about the conversation?

6   A.   His response to my inquiry was very cavalier.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3A7MIR2                          Beers - direct

1   Q.  Did there come a time when you received documents in

2   response to the grand jury subpoena that had been served on Dr.

3   Mirilishvili?

4   A.  Yes, ma'am.

5           MS. CUCINELLA:  May I approach?

6           THE COURT:  You may.

7   Q.  I am handing you what has been marked for identification as

8   grand jury exhibit -- excuse me -- Government Exhibit 1208.  Do

9   you recognize these documents?

10  A.  Yes, ma'am, I do.

11  Q.  What are they?

12  A.  They are photocopies of the medical records provided after

13  the grand jury subpoena.

14          MS. CUCINELLA:  The government offers Government

15  Exhibit 1208.

16          MR. GOSNELL:  No objection.

17          THE COURT:  Admitted.

18          (Government's Exhibit 1208 received in evidence)

19          MS. CUCINELLA:  Ms. Joynes, can you highlight the top

20  of the first page.

21  Q.  Detective Beers, looking at the medical records, can you

22  see the date of the first time that Dr. Mirilishvili saw

23  Tasheen Davis.

24  A.  Yes, ma'am, I can.

25  Q.  When was that?

1    A.  I believe it's Tuesday the 12th of February, 2013.

2    Q.  And can you also see on what date the medical record that

3    was sent to the prosecutor's office was signed?

4    A.  Yes, ma'am, I can.

5    Q.  And when was that?

6    A.  That would be Friday, the 18th of October, 2013.

7    Q.  And turning to the SOAP note -- which I believe is page 3

8    of Government Exhibit 1208 -- the second visit, skipping ahead,

9    Dr. Beers, were you able to determine, one, what date each of

10   the notes in the records that were sent to you were signed?

11   A.  All the records that were submitted reflected the 18th of I

12   believe it was October 2013.

13   Q.  Detective Beers, how far away is Greenwich, New Jersey from

14   Washington Heights?

15   A.  Traffic time is longer than mileage, so it's about two and

16   a half hours, give or take traffic.

17            MS. CUCINELLA:  Nothing further.

18            THE COURT:  Cross?

19            MR. GOSNELL:  Yes, your Honor.

20   CROSS EXAMINATION

21   BY MR. GOSNELL:

22   Q.  Detective Beers, I just want to talk to you briefly about

23   your investigation into Tasheen Davis.

24   A.  Yes, sir.

25   Q.  That began on October 10th of 2013?

G3A7MIR2                         Beers - cross

1   A.  That's correct.

2   Q.  And you said that you received a call from a different

3   county?

4   A.  No, sir.

5   Q.  You received a call from a different police department.

6   A.  Correct, sir.

7   Q.  And you responded, and you began your investigation once

8   you got there.

9   A.  That's correct, sir.

10  Q.  You spoke with Ms. Davis?

11  A.  Yes, sir.

12  Q.  And you also seized as part of your investigation a

13  prescription.

14  A.  Well, we had Greenwich seize it, yes, sir.

15  Q.  And that was a prescription for oxycodone that had been

16  written by Dr. Mirilishvili.

17  A.  Correct, sir.

18  Q.  And the prescription was written for October 8th of 2013,

19  correct?

20  A.  I would have to refresh my memory with the actual

21  prescription, if you don't mind.

22          MR. GOSNELL:  OK.  Can we bring up Government Exhibit

23  1208.

24  Q.  Do you recognize this?

25  A.  Yes, sir.

1    Q.  Is that the prescription that you were investigating as

2    part of your investigation?

3    A.  It's a photocopy of the same one, yes, sir.

4    Q.  And that's dated October 8th, 2013?

5    A.  Yes, sir.

6    Q.  It's got Dr. Mirilishvili's signature there at the bottom

7    under the prescriber's signature?

8    A.  I am assuming that's his signature.

9    Q.  You hadn't met him before?

10   A.  No, sir.

11   Q.  In fact you never actually met with him face to face?

12   A.  No, sir, I have not.

13   Q.  You have only spoken with him over the phone.

14   A.  Yes, sir.

15   Q.  The prescription is for oxycodone 30 milligrams?

16   A.  Yes, sir.

17   Q.  90 pills?

18   A.  Yes, sir.

19   Q.  In the upper left-hand corner there are some numbers there,

20   correct?

21   A.  Yes, sir, there is.

22   Q.  And those are diagnosis codes.

23            THE COURT:  Do you know what those numbers are?

24            THE WITNESS:  No, ma'am, I did not.

25            THE COURT:  Fine.

G3A7MIR2                         Beers - cross

1    Q.  So those have no independent meaning for you other than

2    they're on the page.

3    A.  No, sir, they have none.

4    Q.  Can we go to page 13 of the document.  This is another

5    prescription, this is from April 5th of 2013?

6    A.  Yes, sir.

7    Q.  And this is again part of the document that you received

8    from Dr. Mirilishvili as part of the grand jury subpoena

9    response, correct?

10   A.  Yes, sir.

11   Q.  And again the patient's name is Tasheen Davis; it's dated

12   April 5, 2013?

13   A.  Say that again.  April 5?

14   Q.  Yes, 2013.

15   A.  Yes, sir.

16   Q.  Again it's got the same prescriber signature, and it's got

17   those same numbers in the upper left-hand corner.

18   A.  I don't know if they're the same, but there is a bunch of

19   numbers up there, yes, sir.

20   Q.  And you have no independent knowledge of what those mean.

21   A.  No, sir, I do not.

22           MR. GOSNELL:  If you can blow up the last paragraph

23   there under diagnoses.

24   Q.  Do you see that portion of the document?

25   A.  Yes, sir, I do.

1    Q.  And you see that there are some medical terms there

2    presumably?

3    A.  Yes, sir.

4    Q.  And there are some numbers there?

5    A.  Yes, sir.

6    Q.  OK.

7           Can we go to the next page as well, and blow up the

8    top portion.

9           And again those are presumably some medical terms

10   followed by some numbers, correct?

11   A.  Yes, sir.

12   Q.  Now, you said that the SOAP notes were all electronically

13   signed on October 18th of 2013?

14   A.  Yes, sir.

15   Q.  And those were all typed-in notes, correct?

16   A.  I don't follow your meaning, sir.

17   Q.  All of the notes there, I mean this is from a computer

18   printout, correct?

19   A.  OK.

20   Q.  And so all of those notes are somehow entered into the

21   computer and then printed out.

22   A.  Correct, sir.

23   Q.  Those aren't handwritten notes, correct?

24   A.  They don't appear to be, sir.

25   Q.  And given what you already said about not being able to

1   read the signature, handwriting sometimes is difficult to read,

2   correct?

3   A.   Absolutely.

4   Q.   You would prefer to receive records in a form that you can

5   actually read, correct?

6   A.   Whatever their reporting process is what I prefer to take.

7   Q.   And you have no independent knowledge about what it means

8   to electronically sign a document such as this, correct?

9   A.   Not this particular document, no, sir.

10  Q.   And the other documents, the prescriptions that we've gone

11  through -- the October 8th prescription, the April 5

12  prescription -- there were other prescriptions that were

13  produced as a part of the grand jury subpoena, correct?

14  A.   That's correct.

15  Q.   And do you have any independent knowledge as to whether or

16  not those documents had been uploaded into Practice Fusion?

17  A.   No.

18  Q.   Do you have any independent knowledge as to whether or not

19  those documents had been downloaded or printed as part of the

20  grand jury response?

21  A.   No, sir.

22  Q.   After you received these documents from Dr. Mirilishvili,

23  the result of your investigation was to close the

24  investigation, correct?

25  A.   Correct, sir.

G3A7MIR2                          Gharibo - direct

1    Q.  And you instructed the police department to return the

2    prescription to Ms. Davis, correct?

3    A.  Yes, sir.

4             MR. GOSNELL:  Nothing further.

5             MS. CUCINELLA:  No redirect.

6             THE COURT:  Thank you.

7             (Witness excused)

8             MS. CUCINELLA:  The government calls Dr. Gharibo.

9     CHRISTOPHER GHARIBO,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MS. CUCINELLA:

14   Q.  Good morning, Dr. Gharibo.

15   A.  Good morning.

16   Q.  Where are you employed?

17   A.  NYU Medical Center.

18   Q.  Are you a physician?

19   A.  Yes.

20   Q.  What kind of physician are you?

21   A.  I'm an anesthesiology-trained pain medicine specialist.

22   Q.  What is a pain medicine specialist?

23   A.  We focus on acute and chronic pain, combining nonmedication

24   approaches, medication approaches, interventional approaches

25   such as injections.

G3A7MIR2                    Gharibo - direct

1    Q.  Will you tell the jury a little bit about your educational

2    background.

3    A.  I went to Rutgers University for undergrad.  That was

4    followed by New Jersey Medical School in Newark, New Jersey.

5    That was followed by one year of internal medicine at Robert

6    Woods Johnson University Hospital.  After that I came to New

7    York University for an anesthesiology residency, and that was

8    followed by one year of pain medicine fellowship at Thomas

9    Jefferson University in Philadelphia.

10   Q.  What did you do after your fellowship?

11   A.  I joined the faculty at NYU Medical Center, practicing

12   full-time pain medicine.

13   Q.  Do you recall approximately when that was?

14   A.  About 1997.

15   Q.  Are you still a faculty member there?

16   A.  Yes, I am.

17   Q.  What is your current role?

18   A.  I am the medical director of pain medicine at NYU Hospital

19   for Joint Diseases.  I'm also an associate professor of

20   anesthesiology, pain medicine and orthopedics.

21   Q.  What are some of your duties and responsibilities

22   associated with your role that you just described?

23   A.  I'm mostly clinical.  Depending on the week, essentially

24   the entire week is seeing patients mostly in the office.  It's

25   an outpatient setting, office setting, receiving patients for a

G3A7MIR2                    Gharibo - direct

1    variety of musculoskeletal and nerve pain related complaints.

2    There are also some teaching duties and administrative duties

3    as well.

4    Q.   With respect to your teaching duties, do you actually teach

5    classes?

6    A.   I give lectures, I give talks.  Sometimes I'm involved in

7    classes for the medical students as well.

8    Q.   What kind of lectures or talks do you give?

9    A.   It ranges from how to assess pain in acute and chronic

10   setting, what are the elements of a history and physical

11   examination, what are the elements of a functional pain

12   management plan that incorporates physical therapy, injections,

13   nonopioids, opioids, as well as how to prescribe opioids

14   specifically, when they should be prescribed, how they should

15   be prescribed, how to minimize risk, as well as a whole variety

16   of interventional pain medicine presentations as well.

17   Q.   Since joining the faculty at NYU, have you been responsible

18   for any initiatives?

19   A.   Yes.

20   Q.   Will you describe those initiatives to the jury.

21   A.   A whole variety of initiatives, from fellowship education,

22   resident education, medical student education, to clinical

23   pathways, for example, how to take care of patients who have

24   had a knee replacement or a hip replacement, what are the

25   pathways that are best for patients that are getting back

G3A7MIR2                        Gharibo - direct

1    surgery; quality assurance and patient satisfaction initiatives

2    that give their patients their function back as early as

3    possible while keeping them satisfied with their care.

4    Q.   Are you board certified?

5    A.   Yes.

6    Q.   What does it mean to be board certified?

7    A.   Board certified means that you're licensed to practice

8    medicine, you've finished at the minimum a residency, for

9    example, in anesthesiology, and that was followed by an

10   examination process.  For my specialty it means taking a

11   written exam and an oral exam.

12   Q.   What is your specialty?

13   A.   I am an anesthesiologist with a subspecialty certification

14   in pain medicine.

15   Q.   Have you been published in the field of pain management?

16   A.   Yes.

17   Q.   Can you tell the jury about that.

18   A.   I've published articles with other authors, including other

19   faculty and other residents, sometimes across the country,

20   focusing on pain assessments, how to prescribe opioids.

21        I have been part of guideline development panels in

22   appropriate opioid prescribing, as well as publications on

23   interventional pain management.

24   Q.   Are you on any editorial boards?

25   A.   Yes.

G3A7MIR2                         Gharibo - direct

1    Q.   Which ones?

2    A.   I am the section editor for Pain Physician as well as for

3    Pain Medicine News.

4    Q.   Do you conduct research?

5    A.   Yes.

6    Q.   What kind of research?

7    A.   It involves anywhere from pharmacological research, postop

8    pain management research, as well as chronic pain research, for

9    example, as it pertains to management of low back pain,

10   musculoskeletal pain, and how to go about treating that type of

11   pain, with a variety of approaches, for example, such as

12   intervention, such as injections, for example.

13   Q.   You testified that you see patients out of what is

14   generally an office practice; is that right?

15   A.   That is correct.

16   Q.   Are you also affiliated with any hospitals in connection

17   with your clinical practice?

18   A.   Yes.

19   Q.   What hospital?

20   A.   I'm affiliated with Bellevue Hospital Center, NYU Hospital

21   for Joint Diseases and NYU Langone Medical Center.

22   Q.   You also testified earlier that most of your time during

23   the week is spent seeing patients.  For how long have you been

24   treating patients?

25   A.   About 18 years.

G3A7MIR2                        Gharibo - direct

 1   Q.  And you currently work in a practice.  Are there other

 2   physicians as part of that practice?

 3   A.  Yes.

 4   Q.  Approximately how many?

 5   A.  There are over ten us, about 12 of us practicing pain

 6   medicine, and I'm also practicing with other specialists as

 7   well.

 8   Q.  Have you served on any committees relating to pain

 9   management?

10   A.  Yes.

11   Q.  What committees?

12   A.  On a whole variety of different committees within the

13   hospital and outside the hospital, in terms of quality

14   assurance, in terms of pathway development, in terms of

15   interventional pain medicine, acute pain medicine and opioid

16   pharmacotherapy.

17   Q.  Do you present at conferences?

18   A.  Yes, I do.

19   Q.  What types of conferences?

20   A.  It ranges from giving local talks within my institution at

21   NYU to New York City talks, regional talks, national talks, as

22   well as international talks.

23   Q.  And what kind of talks do you give at these conferences?

24   A.  There is a lot of focus.  I think my two main areas of

25   focus have been how to go about prescribing opioids in an

 1    effective functional fashion, how to minimize risk to the

 2    patient, how to combine therapies between nonmedication,

 3    medication and interventional therapies, as well as talks on

 4    interventional pain management.

 5    Q.  Dr. Gharibo, have you ever been recognized as an expert in

 6    a court of law, and, if so, on what topic or topics?

 7    A.  Yes, I have.  The topics range from medication management

 8    in the acute and chronic setting as well as procedural pain

 9    management.

10             MS. CUCINELLA:  Your Honor, at this time the

11    government moves to qualify Dr. Gharibo as an expert in the

12    field of pain management.

13             MR. MAZUREK:  No objection, your Honor.

14             THE COURT:  OK.  So, ladies and gentlemen, the doctor

15    is going to give some testimony about the field of pain

16    management in which we are going to deem him an expert.

17             I want to talk to you a little bit about that, because

18    that word is a loaded word.  Expert, you might think, OK, so

19    the doctor knows a lot about pain management, and the judge

20    says he is an expert, so I have to accept what it is that he

21    says.

22             Ladies and gentlemen, you are the triers of fact in

23    this case, and ultimately all decisions on matters of fact --

24    including matters that people go to school for a long time to

25    learn about -- are going to be your decision.  But it is our

1    practice when we are dealing with a scientific or a technical

2    field -- something that people do go to school to learn

3    about -- to allow someone who is well qualified in that field

4    to talk to you about issues in the field, and even to offer

5    opinions -- which we don't normally allow witnesses to do --

6    about matters relating to that field.  They are only allowed to

7    testify in the field of their expertise as certified by me,

8    which the doctor has been offered, and I am certifying him as

9    an expert in the field of pain management.

10         Now, I don't like the word "expert" precisely because

11   you are the ultimate deciders of fact, so I like to refer to

12   these people as designated opinion givers.  And the reason that

13   I do that is to remind you that you are free to accept the

14   doctor's testimony or say I think the doctor is full of baloney

15   and not accept his testimony.  You will make that decision

16   after you have heard all the evidence from all of the

17   witnesses, and you get to consider what everyone has had to

18   say, and you will decide if what the doctor says to you seems

19   to make sense.  You will decide what you think of his

20   credentials, whether you thing they're good credentials or

21   inferior credentials.  You will decide whether his opinions

22   make sense to you in light of the facts as you find them to be.

23   And you will decide what weight to give the testimony that he

24   is giving you.

25         All those are matters within your discretion, and

1    that's why you shouldn't put so much weight on that word

2    "expert".  We just use that word to designate people who we are

3    going to allow to talk to you about a scientific or technical

4    field and to offer some opinions limited to their area of

5    expertise.

6            OK, with that caveat the doctor has been qualified,

7    and we can continue with his testimony.

8    BY MS. CUCINELLA:

9    Q.  Dr. Gharibo, you just testified that you have been

10   certified as an expert or a certified opinion giver before.

11   Approximately how many times have you testified in that role?

12   A.  I have testified approximately 50 times or so.

13   Q.  Is that the criminal and civil cases?

14   A.  Yes.

15   Q.  Approximately how many of those have been civil cases?

16   A.  The vast majority.

17   Q.  In those cases, have you testified on behalf of defendant

18   doctors?

19   A.  Yes.

20   Q.  Have you also testified on behalf of a plaintiff?

21   A.  Yes.

22   Q.  Of the criminal cases, have you ever testified on behalf of

23   a defendant doctor?

24   A.  No.

25   Q.  Dr. Gharibo, before we get into the specifics of Dr.

G3A7MIR2                         Gharibo - direct

1    Mirilishvili's practice, I want to ask you some questions on

2    your field of specialty.  What types of patients do pain

3    management doctors see?

4    A.   Most pain management doctors such as myself,

5    anesthesiologists, we commonly see low back pain.  About 60

6    percent of our patients have some type of low back pain.  About

7    30 percent of our patients have some type of neck and arm pain

8    or a headache type of pain.  And about 50 percent of our

9    patients have some type of neurological pain of some kind, and

10   that could be just generalized neurological pain or pain such

11   as, for example, carpal tunnel syndrome that is neurological in

12   nature.

13   Q.   How does a patient typically end up in pain management?

14   A.   They can make an appointment directly in some practices,

15   and in other practices it's by referral only, where another

16   clinician refers the patient to the pain specialist.

17   Q.   How bad is an individual's pain before they are typically

18   referred to pain management?

19   A.   It varies from practice to practice, but I would say at the

20   minimum often it's been a couple of months or so before they

21   are referred to us.  Often the pain has been there for many

22   years.

23   Q.   What is a pain management physician's goal for his or her

24   patients?

25   A.   Our goal is to provide effective pain relief that is also

G3A7MIR2                        Gharibo - direct

1    safe and well tolerated, while we try to minimize the risk to

2    the patient and to society as much as possible.

3              But here the underlying drive here is to give the

4    patient their life back, and do that as simply as possible

5    without overburdening the patient with medications.  But it

6    comes down to not so much pain reduction but return of function

7    to the patient.

8    Q.   Based on your experience, your review of the literature,

9    and your own practice, can you walk the jury through what would

10   be the expected conduct of a pain management physician during

11   an initial appointment with a patient?

12   A.   Yes.  It starts with the history.  In fact, most of the

13   time that's what drives the diagnosis.  And the physical exam

14   is just to support that.  And any tests you order is just to

15   confirm your initial impression and diagnosis.  The history is

16   paramount, and what you are focused on with that is that you

17   are trying to determine the type of pain that the patient is

18   experiencing.

19             Now, we can divide the pain into three separate

20   subtypes:  There is let's call it musculoskeletal pain --

21   orthopedic pain, pain of a torn muscle, pain of arthritis of

22   the knee, for example -- versus nerve pain or neuropathic pain,

23   versus other pain, such as emotional pain or drug-induced pain,

24   and so on and so forth.

25             So, in your interview you are focused on what the

G3A7MIR2                        Gharibo - direct

1    complaints of the patient are, and then you get into some

2    detail with respect to those complaints.

3            So, it starts with location, and then it goes on to

4    the referral pattern, does the pain go anywhere.  What is the

5    severity of the pain?  What makes it better?  What makes it

6    worse?  What are the effects on function?  What is the most

7    painful activity or position, and what the most comfortable

8    activity or position?  And that have they tried?  What has

9    worked and what has failed?  And what kind of diagnostic

10   studies have been obtained?

11           So with that you get information is the pain of an

12   orthopedic nature, or is it of a neurological nature, or is it

13   a medication-related nature.

14           So, if somebody has, for example, arthritis of the

15   hip, let's say, you need to sort out is that pain neurological

16   in nature?  Is it orthopedic?  Is there a position that makes

17   it worse?  Is there a position that makes it better?  Or is it

18   nerve pain of the leg where it doesn't matter what position

19   you're in, the pain is just there all the time?  And that

20   determines your medication plan and your physical therapy plan

21   and interventional plan, which are combined.

22   Q.  I'm going to stop you there.  Before we get to the

23   treatment plans, you just mentioned getting a thorough

24   history -- or excuse me -- a thorough understanding of the

25   nature of the pain.  Do you need to know about a patient's past

G3A7MIR2                      Gharibo - direct

1    medical history to make a diagnosis as well?

2    A.  Yes.

3    Q.  How in-depth does that conversation need to be?

4    A.  That needs to be considerable, because past medical history

5    is important.  There are some medical diseases that can cause

6    chronic pain.  For example, diabetes can cause diabetic

7    neuropathy; osteoporosis can cause musculoskeletal pain.

8    Q.  You also mentioned a physical exam.  Does the doctor need

9    to do a physical exam before the patient can be diagnosed?

10   A.  Yes.

11   Q.  How thorough should that exam be?

12   A.  It depends on the patient.  It can be focused, or it can be

13   quite comprehensive, but I would say at the minimum you need to

14   examine the area that the patient is reporting of that is in

15   considerable pain, and also perform an orthopedic exam and a

16   neurological exam, where the point of the physical exam is also

17   to find the pain generator, that's what we call it, a pain

18   source.

19   Q.  When a patient arrives for their initial patient visit,

20   would you expect them to have paperwork?

21   A.  Yes.

22   Q.  What kind of paperwork?

23   A.  We ask them to bring what they think is relevant.  That

24   often includes MRIs, x-rays, nerve tests, other office notes.

25   Whatever they have, they are instructed to bring.

G3A7MIR2                      Gharibo - direct

1   Q.  In your practice, would you see someone who did not have an

2   MRI with them?

3   A.  Yes, I would.

4   Q.  Can you diagnose a patient based on an MRI report alone?

5   A.  No.

6   Q.  Why not?

7   A.  Because MRI has no context.  If you all had MRIs, you would

8   have a whole range of findings on the MRI.  It's an overly

9   sensitive test.  The whole thing needs input by the patient so

10  that you can make the MRI relevant.

11          So there are many findings on the MRI that are

12  completely irrelevant, but there may be one finding there that

13  is relevant, and that's determined by the patient's history.

14  Q.  After an initial exam and appointment with a patient as

15  you've described, can a pain management physician always form a

16  diagnosis?

17  A.  No.

18  Q.  What happens if you can't?

19  A.  It may require a series of visits every couple of weeks or

20  for a couple of months, as well as possibly referring to other

21  physicians or ordering additional diagnostic tests, such as

22  another MRI, or a different MRI, x-ray, nerve tests, blood

23  work, referral to rheumatology and so on and so forth.

24          You're trying to determine is this an orthopedic

25  problem that is peripheral on the joints, for example, in the

1    arms or the legs?  Is it a spinal problem?  Is it an autoimmune

2    medical problem such as rheumatoid arthritis, such as systemic

3    lupus erythematosus, fibromyalgia, or is it something that's

4    psychological, or is it something that is medication related?

5    Q.  Assuming that based on that initial appointment you have

6    enough information to form a diagnosis, what happens next?

7    A.  Then you go about treating the diagnosis in a comprehensive

8    fashion, not be overly simplistic about treating it.  Often

9    it's of orthopedic in nature, given the prevalence of

10   musculoskeletal pain out there, so there is some education with

11   respect to good posture, good body mechanics, how to sit,

12   stand, lift, bend, physical therapy.

13        And there is some medicational support of some kind

14   with the patient in pain.  Often that requires nonopioids,

15   like, for example, muscle relaxants or antiinflammatories, oral

16   steroids as examples, and sometimes it requires some

17   injections, such as, for example, Cortisone injections in the

18   knee or the back.

19   Q.  You just described a lot of different options.  In your

20   practice, do treatment plans for patients vary from patient to

21   patient?

22   A.  Yes, there is quite a range.

23   Q.  Before we get more detailed into treatment plans, is it

24   important to document a patient's visit?

25   A.  Yes.

1   Q.   Why?

2   A.   It's essential to document the patient's visit because

3   that's what you refer back to when you see the patient in

4   follow-up.  And the initial patient visit is essentially your

5   outcome marker; it's the baseline of the metrics that you are

6   trying to improve upon with your patient.  So what is limited?

7   Is it sitting?  Walking?  Standing?  Getting dressed in the

8   morning?  And that's what is documented on the initial visit,

9   for example.

10          So, on the follow-up visit you need to go back to that

11   initial visit and see what the problems were.  And the question

12   is have they improved or not.  So, if you haven't documented ed

13   that, you just do not know.

14          But that's not the only reason.  If you are referring

15   the patient to someone else, you may send your notes with the

16   patient to that other clinician, for them to have as a

17   reference and to convey to them your perspective on the

18   patient.

19   Q.   So, it's important to document both the initial visit and

20   the follow-up visits?

21   A.   All visits should be documented.  And also for insurance

22   company purposes and quality assurance purposes as well.  If

23   something goes wrong, you need to take a look at that record.

24   So what happened?  Why did something go wrong?  Why did the

25   patient get hurt and so on?

 1    Q.   Is it important for that documentation to be

 2    contemporaneous to the visit?

 3    A.   Essentially, it needs to be -- often it's done while you're

 4    speaking with the patient.  You're literally just writing or

 5    typing during the conversation.  But it can be done, it can be

 6    edited often later in the day.  And by the end of the day the

 7    visits are closed.  And what I mean by that is it's signed.

 8    Q.   In your practice, have you ever made notes of a patient

 9    visit a week after the visit occurred?

10    A.   No.

11    Q.   A month after?

12    A.   No.

13    Q.   Six months after?

14    A.   No.

15    Q.   Why not?

16    A.   Because I close my visits.  I sign my visits at the end of

17    the day.  And I would say the exceptions to that would be maybe

18    a day later, two days later max.  And I don't remember anything

19    beyond that, unless somehow it just escaped my memory and I

20    forgot.  But 99.99 percent of visits are closed within 24

21    hours.  If I'm going to add something to the record, it would

22    be an addendum with a new date on the date that I'm putting it

23    in.

24              THE COURT:  Her question was why.

25    A.   Can you repeat the question then?

1   Q.  Certainly.  Why is it important -- or excuse me.  Why do

2   you not fill out notes months after a patient visit?

3   A.  Because you can't, because you wouldn't remember.  There is

4   so much overlap in what we hear on a day-to-day basis.

5   Q.  What if you took shorthand notes during the visit and then

6   fill out the note months later?

7   A.  That would be grossly inadequate.  So whatever you put down

8   on a small four by four, for example, would lose a lot of

9   context within 24 hours.  You would not be able to elaborate on

10  that verbiage on that four by four.

11          And certainly you wouldn't remember anything about the

12  conversation within a couple of days and certainly within a

13  week.  There would be no elaboration in your memory.

14  Q.  Let's turn back to treatment plans.  You mentioned

15  medication earlier.  What types of medications do pain

16  management physicians typically use?

17  A.  Our medication armamentarium is quite diverse.  I think the

18  beginning of the beginning can be, for example, topical

19  medications, gels, for example, antiinflammatory gels or local

20  anesthetic patches, topical medications, followed by

21  nonopioids.  So these are, for example, some over-the-counter

22  medicines, such as acetaminophen, Aleve, Naproxin, as well as

23  some prescription antiinflammatories such as Celebrex or

24  Celecoxib, Meloxicam or Mobic.  Those are some examples of

25  musculoskeletal pain medications.

1              Sometimes they can be supplemented with muscle

2      relaxants.  Examples of that would be Flexeril or Zanaflex.

3      And that can further be supplemented if the pain is

4      neurological in nature, or given independently with nerve pain

5      medicines.  So these are medicines that just, for example,

6      Elavil or amitryptiline, Gabapentin, pregabalin, are examples

7      of nerve pain medicines.

8              There are other categories of medicines that work on

9      both musculoskeletal pain and neuropathic pain.  And

10     antidepressants are examples of that.  Medicines, for example,

11     such as Cymbalta or duloxetine are actually musculoskeletal

12     pain medicines.  There is literature to support that.

13             And there are also medicines such as opioids that come

14     in a range anywhere from short acting form, such as, for

15     example, lozenges and lollipops that work within 30 minutes, to

16     oral short acting forms that start at, let's say, Tramadol or

17     Ultram or Vicodin or Percocet.  If any of you have had surgery,

18     you probably received a prescription for them, Vicodin or

19     Percocet, or Tylenol number 3 being very common.

20             And then moving on to other short acting medicines

21     that are not that appropriate in chronic pain medicine, so

22     higher dose short acting, for example, oxycodone 30 milligrams,

23     and then moving on to long acting opioids that work for three

24     days at a time, seven days at a time, or 24 hours at a time, or

25     12 hours at a time.  So those are medicines such as Oxycontin,

G3A7MIR2                         Gharibo - direct

1   MS Contin and so on.

2   Q.  So and all of those opioids that you just described, those

3   are all legal and can be appropriate for pain management

4   physicians to prescribe, correct?

5   A.  Correct.

6   Q.  Are there any illegal drugs that are opioids?

7            MR. MAZUREK:  Objection.  Relevance.  403.

8            THE COURT:  The objection is sustained.

9   Q.  You talked a little bit about oxycodone.  Can you describe

10  to the jury how oxycodone works?

11  A.  Oxycodone is an opioid, it's a narcotic, it's like

12  morphine; it has several different effects.  It has an

13  excitatory effect, so that is an energizing feel good effect, I

14  can do anything, I feel great.  It has an inhibitory effect on

15  some people where I don't feel myself, I'm very drowsy, I can't

16  keep my eyes open, that kind of an effect.  Then it also has

17  what is called a psychoactive euphoric effect that can be

18  abused basically, and that can create dependence, and that can

19  create craving and withdrawal that is uncomfortable to the

20  patient.

21            So oxycodone can be a drug of enjoyment or a drug of

22  pain relief, and it can cause other organ effects such as

23  affecting our breathing and slowing down our body's function,

24  such as, for example, gastrointestinal motility and going to

25  the bathroom and other effects as well.

G3A7MIR2                         Gharibo - direct

1   Q.  You testified a moment ago that it can be appropriate for

2   pain management physicians to prescribe opioids.  Are there

3   guidelines for proper opioid prescribing practices?

4   A.  Yes.

5   Q.  Is there consensus in your field on the guidelines for a

6   proper opioid prescribing?

7   A.  There is a general consensus in when to prescribe opioids

8   and how to prescribe opioids.

9   Q.  For how long has there been a consensus on this topic?

10  A.  Over a decade.

11  Q.  Is there also a general consensus on inappropriate

12  prescribing of opioids?

13  A.  Yes.

14  Q.  For what purpose is oxycodone properly used?

15  A.  Oxycodone as a molecule can be used for postoperative pain

16  as well as chronic musculoskeletal pain or neuropathic pain or

17  nerve pain.

18  Q.  How do you define chronic pain?

19  A.  Chronic pain is pain due to chronic underlying disease.

20  So, for example, if somebody has what is called spinal

21  stenosis, that is a narrowing of the spinal canal, and they may

22  have chronic pain from that on a persistent basis.

23       Osteoarthritis of the hip and the knee can cause

24  chronic pain.  Some post-repetitive neuralgia can cause pain.

25  Any pain that is chronic in nature or due to chronic disease,

G3A7MIR2                          Gharibo - direct

1    or pain that is present after natural healing has occurred, is

2    by definition chronic pain and nonacute.

3    Q.   In your opinion, how severe must pain be to warrant a

4    prescription of oxycodone?

5    A.   The general consensus of that at the minimum it needs to be

6    moderately severe, so it needs to be within a severe category.

7    And I guess even within severe you can break that down further.

8    But it needs to be significant enough pain.  And I don't want

9    to just assign a simplistic number to that, but if it's severe

10   enough to get in their daily function, routine function, you

11   can consider prescribing oxycodone.  But it's not that simple,

12   because it's not so much a linear scale.  The threshold for

13   considering prescribing oxycodone is not just pain that is

14   severe enough, moderate severe, but also other treatments

15   should be tried and failed.  And if you are going to prescribe

16   oxycodone -- or any opioid -- you prescribe it with other

17   treatments concomitantly as well.

18   Q.   When you say concomitantly, what do you mean?

19   A.   It needs to be combination therapy.  Because if you just

20   rely on oxycodone, it would require an excessive dosing of

21   oxycodone.  And you would run into other potential problems

22   from a side effects standpoint -- high doses, oxycodone-related

23   pain, withdrawal, craving, loss of control -- and they would

24   all interfere with quality outcome.  So, it's always done as

25   part of combination therapy, physical therapy, nonopioids,

```
 1   opioids and injections.
 2   Q.  In your practice, what percentage of your patients are on
 3   oxycodone?
 4   A.  The percentages, a couple of percentage points.
 5            THE COURT:  What does that mean?
 6            THE WITNESS:  I would say less than five percent.
 7   Q.  Of those patients, how many of them are on long-term
 8   oxycodone treatment?
 9   A.  A majority are on -- oh, not long acting?
10   Q.  Not long acting.  Long term.
11   A.  They are all on long term.
12   Q.  You mentioned long acting.  What do you mean when you say
13   long acting versus long term?
14   A.  So, oxycodone when it's not engineered, where you just take
15   it as pure oxycodone, like Percocet, would work four hours, but
16   pharmaceuticals companies can engineer it to make it last 12
17   hours, so that is long acting oxycodone, which is Oxycontin.
18   Q.  You testified that none of your patients are on long-term
19   oxycodone treatment.  Are there certain situations in which it
20   is --
21            THE COURT:  I'm sorry.  Hang on a second.  I don't
22   believe that's accurate.
23            Did you testify that none of your patients are on
24   long-term oxycodone treatment?
25            THE WITNESS:  They are on long-term oxycodone.
```

G3A7MIR2                         Gharibo - direct

1            MS. CUCINELLA:  I apologize.  I thought you said they

2       are on long acting but not long term.

3            THE COURT:  No, he said, I believe -- we can go back

4       and read it, but I think you've got it wrong.

5            Why don't we take a break right now.  All right?  And

6       we are going to find this in the transcript.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3A7MIR2                          Gharibo - direct

1                (Jury not present)

2                THE COURT:  Doctor, you can step down.  We're going to

3      take about a ten minute break.

4                (Record read)

5                THE COURT:  Less than five percent of his patients are

6      on oxycodone treatment, and all of them are on long-term

7      treatment.

8                MS. CUCINELLA:  I apologize, I thought he said long

9      acting.  I have terrible hearing.

10               THE COURT:  It's an impediment in this line of work.

11               MS. CUCINELLA:  It is, I agree with you.

12               THE COURT:  OK.

13               (Recess)

14               (Jury not present)

15               MR. MAZUREK:  Judge, we have one issue.

16               THE COURT:  Yes?

17               MR. MAZUREK:  Your Honor, we received -- or I received

18     this morning Government's Exhibits 201-A through 224-A.

19               THE COURT:  Do I have them?

20               MS. CUCINELLA:  Yes, your Honor.

21               THE COURT:  OK.

22               MR. MAZUREK:  Which are characterized to me -- which

23     have been characterized to me as summary charts of the patient

24     files that --

25               THE COURT:  This really fries me.  This really fries

1    me.  I'm not doing this now.  No, you may not introduce them.

2              MS. CUCINELLA:  Your Honor, we --

3              THE COURT:  It has to be before, at least a couple of

4    days before, so that we can go through this, so that we can

5    have the objections.  He is on the stand.  They're in the room.

6    No, I'm done.  I'm through with the United States attorney's

7    office on this issue.  I will not have this happen again.

8              MS. CUCINELLA:  OK.

9              THE COURT:  You do not turn summary charts over five

10   minutes before the witness gets on the stand, knowing that the

11   defense is going to have no opportunity to look at them, and

12   then it's going to get up and object, and I'm going to have to

13   interrupt the trial.  I won't do it.

14             MS. CUCINELLA:  OK, your Honor.  Just so you know,

15   we're going to keep flipping through documents then just to so

16   that he can refer to --

17             THE COURT:  You can do what you want.

18             But this goes for you as well.  Anybody who thinks

19   they're going to introduce a summary chart has to give it to

20   the opponent, has to give it to the opponent with ample

21   notice -- I think 48 hours is a good idea, but certainly 24

22   hours -- but not 24 minutes, not to when the lawyer to whom the

23   chart is handed is going to be getting up and cross examining a

24   government cooperator and won't even have time to go through

25   it.  It's absolutely inappropriate.  And I have a jury in the

G3A7MIR2                        Gharibo - direct

1    box and a witness on the stand, and I'm not going to do it now.

2    So you do whatever you have to do.

3              MS. CUCINELLA:  Understood, your Honor.

4              THE COURT:  There will be no summary charts.

5              MS. CUCINELLA:  We were trying to streamline the

6    testimony, but I understand.

7              THE COURT:  Same rules back table.

8              MR. MAZUREK:  Of course, your Honor.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3A7MIR2                          Gharibo - direct

1              (Jury present)

2              THE COURT:  Folks, I figured by now you have learned

3     that we have two temperatures, too hot and too cold.  Those are

4     the only two temperatures we have in this building.  Yesterday

5     was plainly too hot.  We told the lawyers they could take their

6     jackets off if they wanted to.  We asked them if they would

7     please make it not too hot, and it turns out that the

8     alternative is too cold.  So, we will do our best.  OK?

9              We did go back to the transcript, and there was some

10    gobbledygook, but I think we are all agreed that what the

11    doctor said, the words long acting and long term got, they were

12    spoken over each other, but what he said was that fewer than

13    five percent of his patients were on oxycodone but all of them

14    were on long-term care.

15             OK.  So, I understand why the mistake was made, but we

16    got the mistake cleared up, so now let's go right on.

17             You are still under oath, sir.

18             MS. CUCINELLA:  Thank you, Judge.

19

20    CHRISTOPHER GHARIBO, resumed.

21    DIRECT EXAMINATION (Continued)

22    BY MS. CUCINELLA:

23    Q.  Dr. Gharibo, you testified, as Judge McMahon just

24    clarified, that your patients on oxy are all on long-term

25    oxycodone care, correct?

1    A.   Correct.

2    Q.   In what situations is long-term oxycodone care appropriate?

3    A.   It is appropriate when the pain is significant enough to

4    interfere with the patient's quality of life and other

5    measures, such as physical therapy, injections and

6    nonnarcotic-type molecules and medicines and a combination of

7    them have failed.

8    Q.   Is it appropriate for treatment for cancer pain?

9    A.   Yes.

10   Q.   What about end of life care?

11   A.   Yes.

12   Q.   If a patient comes to you has never been on oxycodone

13   before, would you treat that patient differently than a patient

14   who has taken oxycodone before?

15   A.   Yes.

16   Q.   Why?

17   A.   That patient that has never been on oxycodone before would

18   need to be started at the lower end of the dosing generally

19   speaking.

20            First, you have a class of patients that are

21   completely opioid naive, that have not taken any opioid at all,

22   you can consider starting them on an opioid.  It may be

23   oxycodone, but it would be the starting dosage.  It could be,

24   for example, oxycodone five milligrams, which is typical of

25   Percocet.

1            If somebody is on oxycodone to begin with and they're

2     still not doing well, then you have a couple of different

3     options.  One of them is to increase the oxycodone dose, but it

4     needs to be done in a fashion that fits the patient's pain

5     pattern.  Most chronic pain patients have constant daily pain,

6     and for that they require long-acting opioids.  So, that would

7     be a medicine such as Oxycontin, for example.

8     Q.  Can oxycodone actually cause pain?

9     A.  Yes.

10    Q.  How?

11    A.  That is quite a prevalent phenomenon.  For example, if you

12    were to interview patients at other methadone clinics -- so

13    these are patient that are taking methadone for maintenance --

14    what you find out about them is that they have pain

15    sensitivity, they have amplified pain.  The body undergoes a

16    series of changes that result in pain sensitivity directly as a

17    result of an opioid, oxycodone or any other opioid.  It

18    actually has even a diagnostic term, it's called opioid-induced

19    hyperalgesia.

20            So, one of the mechanisms behind that is simple nerve

21    irritability, but another mechanism behind that pain

22    sensitivity is the withdrawal effect.  So, let's say I'm on

23    oxycodone, and I took 30 milligrams of oxycodone, so that would

24    give me some pain relief, but my pain would actually increase,

25    and I would be sensitized to pain as the medicine is coming off

1    my body.  So that's called withdrawal pain.

2    Q.  What does it mean for a patient to become oxy dependent?

3    A.  Dependence -- let's call it opioid dependence -- and

4    oxycodone dependence is a type of opioid dependence -- what

5    dependence means is that to feel normal you need to be on the

6    opioid; the opioid has become part of your biochemistry.  And

7    if the opioid has come off the body, you begin to withdraw.

8    You begin to get very uncomfortable, there is sweatiness, there

9    is twitchiness, your hair is standing on its end, your abdomen

10   is cramping, and now you're withdrawing, and there is no way to

11   come off the opioid.  The only way you are going to feel normal

12   is if you take the opioid on an ongoing basis.  That's what

13   methadone centers are for, so then you become dependent on the

14   opioid.

15   Q.  If a person has been categorized as oxycodone dependent, is

16   it appropriate to continue to prescribe them oxycodone?

17   A.  If somebody is oxycodone dependent, you can choose to

18   continue the oxycodone, but then you are going to put them on a

19   consistent long-acting medicine, because you don't want to

20   roller coaster them, because they would experience all those

21   side effects that I mentioned to you.  So if they're dependent,

22   they're going to withdraw if they're not on the oxycodone.  So

23   you can continue with the oxycodone, but you have to put them

24   on the long-acting oxycodone such as Oxycontin, or you can put

25   them on another opioid so that they don't withdraw.  That could

1    be, for example, methadone or other long-acting opioids.  But

2    you need to have a background level of an opioid so that they

3    don't withdraw, to address that dependence.

4    Q.  Is 90 milligrams of oxycodone a high dose?

5    A.  Generally speaking it's definitely above average.  90

6    milligrams of oxycodone if you're opioid naive, if you have

7    never been on an opioid, would be an extremely high dose.  It

8    could be enough to completely overdose somebody and maybe even

9    have somebody stop breathing.

10   Q.  Dr. Gharibo, in your experience as a pain management

11   physician, and in your training and your review of the

12   literature, are you aware of an illegal market for oxycodone?

13   A.  Yes.

14   Q.  Is it important as a pain management physician to be aware

15   of this illegal market for oxycodone?

16   A.  Yes.

17   Q.  Why?

18   A.  It's one of the risks of our specialty.  When we prescribe,

19   we have to prescribe responsibly, and we have to prescribe in a

20   fashion that doesn't feed the illegal market and the diversion

21   market.  It's also important that we don't create another

22   problem in our patient, such as dependence, addiction, misuse

23   and other related aberrant behavior.  That's why we do

24   combination therapy, physical therapy type approaches,

25   nonopioids, and some opioids in the right patient with the

1    right diagnostic indication and the psychosocial

2    appropriateness.

3    Q.   Is oxycodone a drug particularly susceptible to diversion?

4    A.   Yes.

5    Q.   Why?

6    A.   Oxycodone has been a problem for quite some time.  You

7    probably have read about it in the paper.  It's

8    disproportionately abused, misused and diverted.  It's

9    responsible for a large number of deaths, and it has a very

10   robust excitatory effect, feel good high type of an effect that

11   the addict enjoys, and that creates a high street value for it,

12   that makes it valuable.

13            So, we are aware in the clinical community that

14   oxycodone is diverted and sold on the street.  There are

15   specific parties that relate to oxycodone when it's mixed with

16   other medications as well.  The value of it is about dollar per

17   milligram.  So we need to be aware of that, and we need to

18   minimize it as much as possible rather than feed it and

19   exacerbate it.

20   Q.   You just said that pain management physicians need to

21   minimize the risk of diversion.  How can pain management

22   physicians do that?

23   A.   That's a big part of our training.  There is a concept in

24   pain medicine called an opioid sparing strategy and it's

25   essentially an integrated part of our training in many of the

G3A7MIR2                         Gharibo - direct

1    conferences that we attend.

2              Pain always has more than one mechanism; there is more

3    than one type of pain.  So, therefore, there has to be

4    different mechanistic approaches to treat those different

5    mechanisms of pain.  And as you address those different

6    approaches through other medicine and physical therapy and

7    injections, you're decreasing the amount of an opioid that your

8    patient would need.

9              So all of those other measures -- from Cortisone

10   shots, local anesthetic infiltrations, antiinflammatories --

11   all the nonopioids are reducing the overall pain, where in many

12   patients you may not even need an opioid.  So you need an

13   opioid if all of those combinations have failed.

14   Q.  Are there also steps that a pain management physician can

15   take in the way they run their clinic to avoid diversion?

16   A.  Steps you said?

17   Q.  Yes.

18   A.  Yes.

19   Q.  What are some of those steps?

20   A.  The steps is to maximize your nonopioid strategy, titrate

21   it aggressively, and minimize your opioid dosing and keep it as

22   simple as possible and as low as possible.

23             Because whatever you're prescribing to the patient,

24   the higher the dose and the higher the pill count, the higher

25   the latitude and the general pill count reserve and the dosing

G3A7MIR2                          Gharibo - direct

1    reserve that the patient has, that at some point they may

2    misuse, abuse or divert.  And individual units also matter.

3              So, for example, if I were to prescribe somebody

4    simple Percocet -- I'm sure many of you have been on Vicodin or

5    Percocet -- those are five milligrams of oxycodone or five

6    milligrams of hydrocodone, and I think that's within a medical

7    practice, it's very common to prescribe that.  But if I were to

8    up my dose -- for example, 30 milligrams of oxycodone is also

9    commercially available -- I am substantially increasing the

10   risk to the patient in terms of side effects, in terms of the

11   respiratory depression, but also in terms of tempting

12   addiction, tempting misuse, tempting a substantial withdrawal,

13   very uncomfortable unnerving withdrawal as well, you just put

14   the patient on a roller coaster with oxycodone 30 milligrams;

15   they fell very good and then they withdraw.  So what we do to

16   minimize that is to create a better steady state so they're not

17   going up and down with their levels of the medicine.

18   Q.  Dr. Gharibo, when it comes to the management of a pain

19   clinic, are there also steps that can be taken?  For example,

20   does the staff at the pain management clinic matter?

21   A.  Yes.

22   Q.  In what way?

23   A.  Well, the staffing is responsible for the scheduling, for

24   the observation of the urine drug tests, patient education, and

25   they supplement the physician in terms of opioid surveillance,

G3A7MIR2                        Gharibo - direct

1   compliance surveillance and patient education, and follow-up

2   phone calls and anything else that may come up.

3   Q.   Hypothetically, in your practice if you found out someone

4   was altering paperwork or not properly documenting a patient's

5   prescription history, would you fire them?

6   A.   They would get warnings.  They would be educated on not to

7   alter and change paperwork.  Certainly any falsification, any

8   deliberate falsification, would be extremely upsetting after a

9   warning.  They are compromising the practice and patient

10  safety, yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3ALMIR3                    Gharibo - direct

1    BY MS. CUCINELLA:

2    Q.  Have you in your practice ever asked a patient if they were

3    a cop or police?

4    A.  No.

5    Q.  Have you ever accepted cash from a patient in a treatment

6    room?

7    A.  No.

8    Q.  Dr. Gharibo, let's turn to the records that you reviewed

9    for this case.  In preparation for your testimony today, did

10   the government ask you to review certain files?

11   A.  Yes.

12   Q.  Was that just a subset of patient files?

13   A.  Yes.

14   Q.  Were you reviewing those records for the purpose of forming

15   certain opinions?

16   A.  Yes.

17   Q.  What types of records did you review?

18   A.  I reviewed primarily medical records, both paper and online

19   medical records, as well as bureau of narcotic enforcement

20   records and transcripts of office visits.

21   Q.  Did you also review the indictment in this case?

22   A.  Quite some time ago, but yes.

23   Q.  Did you in fact develop opinions based on those records?

24   A.  Yes, I did.

25   Q.  In doing so, did you form conclusions about

G3ALMIR3                      Gharibo - direct

1    Dr. Mirilishvili's practice?

2    A.  Yes, I did.

3    Q.  What is that opinion?

4    A.  In looking at the records, no opinion was formed until all

5    the records were reviewed.  But the way the review started, I

6    started forming quite negative opinions of the practice because

7    there was no documentation of any kind, virtually.  The

8    clinical documentation consisted of billing sheets with the

9    word cash on top, followed by some four by four with some

10   verbiage on it limited to let's say less than 15 words that

11   constituted the history and the physical examination.  So

12   that's not within a medical practice.  A medical practice does

13   not document like that on a four by four that's later pasted

14   onto a billing sheet.

15         So the history and the physical was not even in the

16   same ballpark.  It was grossly inadequate.  It didn't justify

17   even Acetaminophen prescription.  There was no attempt at

18   identifying, as I mentioned earlier, is the pain

19   musculoskeletal, is it neuropathic, is there some other

20   medication induced pain.  There is no physical exam and there

21   is no confirmation of what the patient is coming to you with in

22   terms of the existing medications that they're on.  And that

23   continued for a very large number of records.  Close to ten

24   records or so essentially had no documentation or were just the

25   four by four at best.

1          That problem was further compounded by looking at some

2     studies, for example, urine drug tests and MRIs that were just

3     inappropriate and grossly fake.  For example, looking at some

4     of the MRIs, I was seeing referral to the practice by a

5     radiology department at Lenox Hill, giving a patient history,

6     and also putting at the bottom what the patient is on.  It's

7     very uncommon to get a referral from radiology.  And looking at

8     some of the MRI reports where there's an MRI of the lumbar

9     spine, but the levels are not mentioned as part of the reading

10    of that MRI.  Just the whole formatting is very gimmicky.  It

11    doesn't look real.

12          The urine drug testing was also very suspicious.  Most

13    of the urine drug testing only checks for oxycodone and doesn't

14    check for other medicines.  Many of these patients are opioid

15    dependent.  They may be taking other opioids or using illicit

16    drugs such as cocaine, for example.  And many urine drug

17    testing only measures oxycodone and doesn't check for morphine,

18    Dilaudid, cocaine, other illicit drugs.  Some do, but many

19    don't.

20          And, furthermore, when the urine drug testing is done

21    and the oxycodone level is obtained, some of them only have

22    oxycodone in it.  So if somebody ingests oxycodone, oxycodone

23    is broken down into noroxycodone and oxymorphone and that's

24    what the urine drug test should measure.  It shouldn't just

25    show pure oxycodone, and some of these urine drug tests reflect

1     just oxycodone.  That's evidence that the patient took the

2     pill, pulverized it, and just dissolved it in the urine.  It's

3     an attempt to try to fool the physician or somebody else, for

4     example.

5           And, furthermore, the levels of the oxycodone and some

6     of the metabolites were just outrageously high, abnormally high

7     at levels that I've never seen before.  I don't think that

8     could be ignored.  If somebody has a sodium of, you know,

9     6,500, that is grossly high.  That would stand out.  A normal

10    sodium is 140.  And that's the level of these urine drug tests,

11    oxycodone levels as well.

12          Other issues with the practice with respect to

13    Practice Fusion documentation.  As I mentioned before, we're

14    seeing a high number of patients.  There's a tremendous amount

15    of overlap in what we hear.  If I don't document it at the same

16    time that I'm seeing the patient, personally I would probably

17    forget about it within an hour or so because other patients are

18    coming in, new history is being input into my brain, and I

19    would have no ability to create any notes even at the end of

20    the day or 24 hours later for many of these patients.  But,

21    nevertheless, what I saw was notes that are signed anywhere

22    from days to months to close to a year after the office visit

23    took place.  So those were some major red flags.

24          And another factor was that there were patients that

25    were coming to the office with -- that are very high risk for

1      opioid prescribing.  For example, patients with a history of

2      heroin abuse, intravenous drug abuse, and cocaine abuse, so

3      they're known addicts with high probability of a relapse that

4      were walking out with a prescription for not just any opioid,

5      not a low dose of an opioid, but oxycodone 30 milligrams.

6      That's six Percocets at a time three times a day, virtually up

7      to 18 Percocet like medications a day, but given in such a

8      potent form that it's only taken three times a day.

9            And other patients that have opioid dependence that

10     require clinical creation of a quality background of the

11     opioids so they're not on this analgesic and then withdrawal

12     roller coaster up and down, that's not done.  Instead what's

13     done is that the dependence is documented, it's totally

14     ignored, but patient is put on a roller coaster and not belted.

15     And what I mean by that is that they have the dependence, so

16     you know they're going to withdraw, and you're causing them to

17     withdraw multiple times a day because oxycodone 30 milligrams

18     is short acting.  It would last about three to four hours.

19     Well, that only covers about 12 hours of the day.

20           So it clearly wasn't a medical practice that is

21     occurring here, and that statement applies to the vast majority

22     of the patients that I looked at.

23     Q.  OK.  Let's break that down a little bit by showing the jury

24     some of the patient files that you reviewed.  Over the break I

25     placed some files up on the podium.  I'm going to direct your

1    attention to Larry Ashby's file, which consists of Government

2    Exhibit 202, which are documents from Practice Fusion relating

3    to Larry Ashby; Government Exhibit 402, which reflects

4    documents that were recovered from Dr. Mirilishvili's office;

5    and Government Exhibit 502, which are documents recovered from

6    Dr. Mirilishvili's home on December 11, 2014.

7    A.  I don't see Ashby here.

8            MS. CUCINELLA:  Your Honor, may I approach?

9            THE COURT:  Please.

10   A.  It's here.  Never mind.  It's on the monitor.

11   Q.  It's on the monitor.  OK.  All of these exhibits are in

12   evidence.  Turning to Government Exhibit in just a moment.

13           We're going to Government Exhibit 502, which were the

14   documents recovered from Dr. Mirilishvili's home.  We're going

15   to put it up on the big screen, 502.

16           What are we looking at here in Government Exhibit 502?

17   A.  This is an MRI of the lumbar spine.

18   Q.  And this is an MRI and it's for the patient Larry Ashby?

19   A.  Correct.

20           MS. CUCINELLA:  Ms. Joynes, if you can turn to page 2

21   and 3 of Government Exhibit 502.  If you can blow up not that

22   portion but the other side.

23   Q.  Dr. Gharibo, what is this document?

24   A.  Well, the page on the left appears to be some type of a

25   referral form to Dr. Mirilishvili, and this is actually what I

1   was referring to specifically because this is sent by a

2   radiology department.  It's on a radiology letterhead.  I am

3   referring Larry Ashby for treatment of her -- it's actually a

4   male -- chronic back pain.  I'm asking you to specifically

5   address her pain.  Below is an explanation of Ms. Printy's

6   evaluation, diagnostic, and MRI.

7           This may be OK coming from an orthopedist but not from

8   a radiologist.

9   Q.  This may be OK in the sense of a referral coming from an

10  orthopedist rather than a radiologist?

11  A.  Yes.  There are some errors there, but generally speaking,

12  sent by clinical physicians rather than radiologists.

13  Q.  If this document were presented to you by a patient in your

14  clinic, what would your response be?

15  A.  I'd probably call the referring radiologist and just

16  inquire.  And this seems to be a preprinted form that is filled

17  in later with the patient details, which makes me wonder that

18  this is probably not a common practice of a radiology

19  department that does MRIs and x-rays.  And certainly they would

20  not get into the medication history that you see at the bottom

21  of oxycodone 30 milligrams.  It's almost as if somebody crafted

22  it for justification for oxycodone.

23  Q.  Turning, Ms. Joynes, to the next few pages of Government

24  Exhibit 502.  Dr. Gharibo, did you find any records that

25  indicate notes that were taken during the initial exam in

1    Government Exhibit 502?  I can actually walk this up to you

2    now.

3    A.  Yes.

4    Q.  What did you see?

5    A.  So looking at this page, what you're looking at here, I

6    believe the jury has this in front of them.  This is a billing

7    sheet and the four by four that I was referring to earlier is

8    on the right lower corner that is grossly inadequate with

9    respect to history, especially the psychosocial history which

10   is very important in these patients, and there's barely any

11   physical exam here.  The physical exam is literally a line and

12   a half.  This is not medical documentation.

13   Q.  Dr. Gharibo, did you also review the documents in

14   Government Exhibit 202 which would be the documents from

15   Practice Fusion?

16   A.  Yes.

17   Q.  In the Practice Fusion documents, was there any

18   documentation of patient encounters between Larry Ashby and

19   Dr. Mirilishvili?

20   A.  No.

21   Q.  What was included in the Practice Fusion documents?

22   A.  Can I access it?

23   Q.  It's in front of you in the folder I just handed up.  It

24   should be labeled 202.

25   A.  This one?

G3ALMIR3                         Gharibo - direct

1   Q.  Yes, inside the Redweld.

2   A.  So this is 502.  I got it.

3   Q.  Great.

4   A.  This was the electronic recordkeeping, the Practice Fusion

5   files.  What is included is a demographic form and then a list

6   of prescriptions that are given to the patient, the MRI report,

7   and the form that you just saw, a referral form to orthopedics.

8   Q.  What is -- do you have any opinions on the referral form

9   located in that exhibit?

10  A.  Yes, I do.

11  Q.  What is your opinion?

12  A.  This is not an appropriate referral form.  When doctors

13  refer to orthopedists or any other specialty, it just requires

14  more detail.  So let's take for example orthopedist.  There are

15  so many different types of orthopedists.  There are

16  orthopedists that do, for example, carpal tunnel surgery all

17  the time.  There are those that work on the spine.  There are

18  those that work on the shoulder and the elbow.  There are those

19  that work on the hip and the knee.

20          There is no detail on this referral.  Who does the

21  patient go to, who, what, where, when, what type of orthopedist

22  should he or she see?  We need to help the patient more than

23  that.  It's like telling the patient, go see another doctor.

24  There's so many different types of doctors.  Some of them don't

25  even practice medicine.  That's what it essentially amounts to.

1    It needs to be at least specifying the subspecialty of

2    orthopedics.  Is it a spine problem, then send to an

3    orthopedist surgeon that does spine surgery, not orthopedics.

4              MS. CUCINELLA:  Ms. Joynes, if you could put up the

5    document that ends in DM0092 so the jury can see the referral

6    form.

7    Q.  Is that what you're describing to the jury?

8    A.  Yes.  As you can see, orthopedics is checked there with no

9    further detail on the referral.

10   Q.  Anywhere in Practice Fusion has Dr. Mirilishvili noted any

11   medical history?

12   A.  No.

13   Q.  Any psychosocial history?

14   A.  No.

15   Q.  Does it reflect any allergies to medicines in the Practice

16   Fusion documents?

17   A.  No.

18   Q.  Based on the Practice Fusion documents, was Mr. Ashby

19   prescribed oxycodone?

20   A.  Yes.

21   Q.  Was he prescribed oxycodone 90 pills of 30 milligrams?

22   A.  Yes.

23   Q.  Repeatedly?

24   A.  Yes.

25   Q.  Was he also prescribed other medications?

G3ALMIR3                    Gharibo - direct

1   A.  Yes.

2              MS. CUCINELLA:  Ms. Joynes, if you can turn to page 3

3   of Government Exhibit 202.

4   Q.  Are these the other medications that Mr. Ashby was

5   prescribed?

6   A.  Yes.

7   Q.  Can you tell the jury what each of these things are?

8   A.  I couldn't hear that.

9   Q.  Will you tell the jury what each of these different

10  medicines are, these three medicines?

11  A.  These medicines are tapping into some of the other

12  mechanisms that we spoke about earlier.  Elavil, for example,

13  is an antidepressant.  It can be used in neuropathic pain.

14  Gabapentin, also known as Neurontin, is also for nerve pain.

15  And methocarbamol, Robaxin, is a muscle relaxant.

16  Q.  With respect to the dosing, is there anything that you

17  noticed about the doses that are prescribed to Mr. Ashby?

18  A.  Yes.

19  Q.  What did you notice?

20  A.  The main issue here that I have with this plan is that it's

21  upside down.  So as I mentioned earlier, the foundation of a

22  good pain treatment plan is you maximize the physical therapy,

23  injection type of approaches.  You build a effective or partly

24  effective combination plan with your gabapentin, Elavil, and

25  Robaxin.  Let's assume that.  But then it needs to be dosed

G3ALMIR3                        Gharibo - direct

1    appropriately.

2              A typical gabapentin dosage, for example, would start

3    at 1200 milligrams and can go as high as 2400 milligrams and

4    that applies to the vast majority of patients.  Here gabapentin

5    is put there at hundred milligrams twice a day.  So not the

6    1800 milligrams that is most commonly efficacious, but 200

7    milligrams.  So there's no foundation there for this to be

8    effective.  It's not going to be effective.

9    Q.  Why is that important?

10   A.  It's important because as you go up on the dose, you're

11   going to decrease the reliance on the opioid and you may be

12   able to capture the pain by just going up on the gabapentin,

13   but the gabapentin is not adjusted between May 2014 and

14   November 2014.  It's just there's no management here.  We call

15   our specialty, some people call it pain management.  Well,

16   where is the management?  There's just a stamp of prescribing

17   three separate medications at the same dosage, but oxycodone

18   30 milligrams at a very disproportionate dose, at a very high

19   dose, 18 pills of Percocet virtually a day is being given.

20   That's certainly very strong.  Why is the gabapentin dose so

21   weak?

22   Q.  Just to clarify for the jury, Dr. Gharibo, the oxycodone

23   prescriptions are not reflected here.  Were you able to see

24   actual prescriptions that were scanned into Practice Fusion?

25   A.  I saw the prescriptions.  I'm not sure if they were scanned

G3ALMIR3                          Gharibo – direct

1    or not.

2    Q.  OK.  They were in the Practice Fusion paperwork though; is

3    that fair?

4    A.  Yes.

5    Q.  Based on your review of Mr. Ashby's files -- the files in

6    Practice Fusion, the files recovered from his home, and the

7    files recovered from his office -- were you able to draw any

8    conclusions about Dr. Mirilishvili's treatment of Larry Ashby?

9    A.  Yes.

10   Q.  And what were those conclusions?

11   A.  The treatment was not within standard of practice.  It was

12   not even close.  The documentation is grossly inadequate.  The

13   treatment plan is very high risk.  It is designed to cause

14   withdrawal and designed to cause patient dissatisfaction and

15   has high street value.  There is no diagnosis.  There is no

16   backup here to even prescribe Tylenol, let alone the

17   combination plan that is high risk that you see here.

18             MS. CUCINELLA:  We can take that down, Ms. Joynes.

19   Q.  Dr. Gharibo, you testified earlier that you had reviewed

20   transcripts of recordings of a patient visit.  Is that right?

21   A.  Yes.

22   Q.  And that was a patient visit done by a confidential source

23   in this case; is that correct?

24   A.  Yes.

25   Q.  And that patient name, the patient who presented to

1    Dr. Mirilishvili, was named Jose Lantigua; is that right?

2    A.  Yes.

3    Q.  Did you also review Jose Lantigua's physical file?

4    A.  Yes.

5    Q.  And did that include Government Exhibit 210, which are the

6    documents from Practice Fusion, as well as Government

7    Exhibit 510, which were the documents found in

8    Dr. Mirilishvili's home on December 11, 2014?

9    A.  Yes.

10   Q.  Let's talk about the recordings first.  Taken alone, what

11   are your opinions of those transcripts that you reviewed and

12   the care that was administered in those patient visits?

13   A.  There is some history and physical exam that has taken

14   place as per reading of the transcript.  I think it could be

15   further detailed.  It can get into the type of pain that the

16   patient is experiencing and the medication history further just

17   so you know what you're dealing with as far as your starting

18   point as to what you can prescribe to make things better.  So

19   there's some history and physical, but I think it still is on

20   the low end of the acceptable range.

21   Q.  In your opinion was the medical history thorough enough to

22   make a diagnosis?

23   A.  No.

24   Q.  Was the physical exam thorough enough to make a diagnosis?

25   A.  No.

1   Q.  After reviewing Dr. Mirilishvili's documentation of these

2   encounters, did you draw any additional conclusions?

3   A.  Yes.

4   Q.  What are those conclusions?

5   A.  There was no clinical note that's documented.  I was

6   essentially looking at a transcript as if it's a court

7   document, for example.  But there was no clinical history in

8   the chart and that's not consistent with a medical practice.

9   Q.  I'm going to draw your attention to a file that I'm hopeful

10  is on the podium, Government Exhibit 510.  It should be in a

11  file that's labeled with Mr. Lantigua's name.  I'm happy to

12  come up.  Do you have it?

13  A.  I have the file.

14  Q.  Looking at Government Exhibit 510, which reflects the

15  documents that were found in Dr. Mirilishvili's home on

16  December 11, 2014, can you walk the jury through whether

17  there's anything there that reflects the initial appointment

18  with Mr. Lantigua?

19  A.  What was the date of the initial appointment?

20  Q.  I believe it's June 27 or 3rd -- June 27 of 2013.

21  A.  Yes.  I'm sorry, there's no notes.  I found the billing

22  sheet that pertains to the -- that initial visit on June 27,

23  2013.

24          MS. CUCINELLA:  May I approach?

25          THE COURT:  Yes.

1           MS. CUCINELLA:  Ms. Joynes, is it possible to pull up

2    on the screen the copy of the Post-it note.  There we go.

3    Q.  Do you remember reviewing that Post-it note?

4    A.  I do.

5    Q.  What's reflected on that note?

6    A.  It says low back bilateral.  There's a history here,

7    clinical history.  Left is less than the right.  Above knee.

8    Eight months.  There's five over five, decreased.  Sports

9    injury.  Oxycodone.  Past surgical history negative.  Family

10   history negative.  No something.  Single, three childs.

11   Q.  Does this Post-it note reflect adequate documentation of an

12   initial patient encounter?

13   A.  No, not at all.

14   Q.  Can you draw any conclusion about the fact that this

15   Post-it note was recovered from the doctor's home on

16   December 11, 2014, almost a year and a half after this initial

17   patient encounter?

18   A.  It needs to be part of the medical records in the office.

19   I don't think we should be taking our medical records home.

20   Q.  Was this information ever uploaded into the Practice Fusion

21   file that you reviewed?

22   A.  It was not.

23   Q.  Turning back to Government Exhibit 210, which should be,

24   Ms. Joynes, if you can turn to what I believe would be page 3.

25          Dr. Gharibo, this is a summary of the non-oxycodone

G3ALMIR3                         Gharibo - direct

1    prescriptions Dr. Mirilishvili wrote for Mr. Lantigua; is that

2    right?

3    A.   Yes.

4    Q.   Can you draw -- did he also prescribe oxycodone?

5    A.   Yes.

6    Q.   For each time that these prescriptions were prescribed?

7    A.   Yes.

8    Q.   What can you tell based on these prescriptions and the

9    concurrent oxycodone prescription?

10   A.   This is a pattern that pretty much goes throughout the

11   practice with just about every single patient encounter.  There

12   is no range within the practice.  Essentially patients are

13   getting under-dosed with a non-opioid.  Again, for example,

14   here the gabapentin is at a hundred milligrams twice a day.

15   That is not adjusted.  Same low dosing is given over and over.

16   But the oxycodone prescription is extremely disproportionate

17   and it's given at a high dose over and over.  There is once the

18   prescription starts for this patient, it doesn't change.  It's

19   the same thing.

20        And we're not so static in our physiology and in our

21   pain.  These patients, generally speaking, require some

22   adjustment.  Maybe two months will be the same but the third

23   one will be different and that doesn't apply here, in addition

24   to the low dosing that we're seeing and there should be an

25   effort to decrease the oxycodone dosage over time.

1    Q.  Is there a term that physicians use for that?

2    A.  To decrease or to adjust, titrate is the term, to adjust

3    the medication to effect.  And then we try to wean off the

4    opioid, which is just a higher risk for the patient and to the

5    community as a whole, which is not being done here.  And I

6    think there's room for improvement.

7    Q.  With respect to Mr. Lantigua, does this prescribing that

8    you were seeing, is that reflective of appropriate opioid

9    prescribing?

10   A.  No.

11   Q.  Dr. Gharibo, you just talked about two files, neither of

12   which had any SOAP notes at all in the Practice Fusion

13   platform; is that right?

14   A.  Yes.

15   Q.  The government asked you to review 14 files of patients; is

16   that correct?

17   A.  Yes.

18   Q.  Of the ones they asked you to review, how many of them had

19   no SOAP notes entered into Practice Fusion at all?

20   A.  I remember eight.

21   Q.  There were some files that you reviewed that had SOAP notes

22   filled out; is that right?

23   A.  Correct.

24   Q.  Let's turn to one of those.  I'm going to direct your

25   attention to the patient file for Kevin Cravey, Government

1    Exhibit 206, which is the Practice Fusion documents; 406, which

2    are documents recovered from the clinic; and 506, which were

3    documents recovered again from Dr. Mirilishvili's home.

4             Based on your review of these documents, were you able

5    to draw conclusions about Dr. Mirilishvili's treatment of this

6    patient?

7    A.   Yes.

8    Q.   What were some of those conclusions?

9    A.   I'd like to just briefly review.

10   Q.   Certainly.

11            MS. CUCINELLA:   Ms. Joynes, while he's reviewing, can

12   you pull up on the screen the document ending in Bates No. 290,

13   DM290.   Can you blow up the top portion.   Thank you.

14   A.   This is my conclusions are high risk patient with history

15   of opioid tolerance and variety of nerve pain and

16   musculoskeletal conditions that is prescribed high risk opioid

17   pharmacotherapy that is monitored through urine drug testing,

18   where urine drug testing reveals presence of other controlled

19   substances or illicit substances where it creates the risk of

20   addiction and potential for misuse of the medication such as,

21   for example, amounts of amphetamine and benzodiazepines that

22   can be taken in combination with the oxycodone to enhance the

23   feel good effect that oxycodone produces.

24   Q.   I'm going to stop you for a minute and let's walk through

25   some of the documents to explain these conclusions to the jury.

1          Starting with DM290, which is up on the screen, this

2     is a SOAP note.  What's the date of service of the SOAP note?

3     A.  This note was -- it's reflecting an office visit from

4     July 29, 2013.

5     Q.  And when was the SOAP note signed?

6     A.  February 2, 2014.

7     Q.  Does that lead you to any conclusions about the reliability

8     of these notes?

9     A.  Yes.

10    Q.  What conclusions?

11    A.  It makes me suspect the accuracy of the note, was it just

12    sort of made up on the fly as it's being read or signed.

13    Q.  You also referred to Mr. Cravey as a high risk patient.

14    What did you mean by that?

15    A.  It's a patient that has a history of opioid tolerance or

16    dependence, as we spoke about.  So those patients are in many

17    ways high risk in terms of experiencing the withdrawal between

18    the doses of oxycodone, for example, so they need to be managed

19    at a better steady state.  Otherwise, there's craving or loss

20    of control that occurs during short-acting oxycodones.

21         MS. CUCINELLA:  I'm going to ask Ms. Joynes now to put

22    up Government Exhibit 406.

23    Q.  This was a document that was recovered from

24    Dr. Mirilishvili's clinic.  Dr. Gharibo, what is this?

25    A.  This is a supposed electromyogram.  It's a nerve test.

G3ALMIR3                          Gharibo - direct

1    Q.   When is a nerve test administered?

2    A.   A nerve test is administered when you're trying to

3    distinguish between pain that's coming from a nerve in the

4    spine versus pain that's coming from a nerve in the let's say

5    the leg or the arm -- is it central or is it peripheral.

6    Q.   Who is listed as having administered this nerve test?

7    A.   Dr. Michael Mirilishvili.

8    Q.   Are anesthesiologists permitted to administer nerve tests?

9    A.   We're not trained, we're not trained in how to perform

10   nerve tests.

11   Q.   Are you able to read them?

12   A.   Yes.

13   Q.   Reading this test, were you able to draw any conclusions

14   about this test?

15   A.   Yes.

16   Q.   What are those conclusions?

17   A.   Can we open the conclusion on this report?

18   Q.   Is that what you're referring to?

19   A.   Yes.

20        MS. CUCINELLA:   Thank you, Ms. Joynes.

21   A.   This nerve test, along with all the other nerve tests that

22   are performed by Dr. Mirilishvili, overstate the diagnosis.

23   I've never seen nerve tests where so many nerves are implicated

24   in causing the patient's pain, which makes me question the

25   accuracy of the nerve test.  Not only anesthesiologists are not

G3ALMIR3                    Gharibo - direct

1   trained, but the nerve test just overreports so many nerves

2   that I've never seen such nerve tests that just light up so

3   much for so many nerves implicated.  And there's no correlation

4   on the MRI that would show potential damage to all these nerves

5   that are being discovered on the EMG.

6           MS. CUCINELLA:  Ms. Joynes, if we can turn back to the

7   first page of Government Exhibit 206 and highlight the section

8   chronic diagnoses in the middle of the page.

9   Q.  Dr. Gharibo, when are these diagnoses entered into, when do

10  they purportedly start according to the Practice Fusion record?

11  A.  December 12, 2012.

12  Q.  Are those diagnosis consistent with a patient who would

13  then be prescribed high levels of oxycodone?

14  A.  They could be consistent or not consistent.  But if you're

15  going to prescribe the oxycodone, you got to prescribe it

16  differently and not the way it's being prescribed because

17  patient has documented history of the tolerance and the

18  dependence.

19  Q.  So what do you mean?

20  A.  The details of how we prescribe oxycodone matter.  So there

21  is dependence there, so we shouldn't subject the patient to a

22  day where they're going to be miserable most of the day because

23  of the withdrawals that they're experiencing.  So if it is

24  taken as prescribed and they have dependence, which this

25  patient has, they're going to get this tremendous boost in

G3ALMIR3                         Gharibo - direct

1      their blood levels, they're going to feel good, and then

2      they're going to crash, they're going to withdrawal, they're

3      not going to feel themselves.  They're going to appear to

4      whoever they're appearing to sweaty, uncomfortable.  And it's

5      going to have a psychological effect on them.  And then to feel

6      normal, they're going to take the pill again.  And that's going

7      to happen multiple times a day.

8              So this is not the way to prescribe oxycodone.  This

9      is not pain management either because the prescriptions are not

10     managed.  It's just almost rubber stamped from visit to visit.

11     So that's not medical practice.

12             MS. CUCINELLA:  Ms. Joynes, can we turn to the

13     document that ends with the Bates number DM00328 in Government

14     Exhibit 206.

15     Q.  Is this one of the documents you reviewed in connection

16     with Mr. Cravey's file?

17     A.  Yes.

18     Q.  What conclusions can you draw or did you draw from this

19     document?

20     A.  I looked at this particular report and all the other urine

21     drug tests, but what you're seeing here is results that show

22     presence of amphetamine and benzodiazepine and oxycodone as you

23     see here.  The oxycodone level is substantially high, but

24     what's important here is that it's oxycodone.  This is the

25     ground oxycodone into the urine.  It's not the metabolites.  So

1    when we ingest oxycodone, it's broken down into oxymorphone and

2    noroxycodone.  This is somebody tampering with the urine and

3    tampering with the pill.

4    Q.  This urinalysis report reflects testing for a number of

5    different substances.  Is that consistent with the majority of

6    urinalysis reports that you reviewed?

7    A.  No.

8    Q.  What did you see in the typical urinalysis reports in

9    Dr. Mirilishvili's patient files?

10   A.  A typical urinalysis report is just looking at oxycodone

11   and not looking at anything else, which defeats the whole

12   purpose of a urine drug test because the purpose of a urine

13   drug test is to get a panel so that patient has taken what

14   they're prescribed and they're not taking any other opioid from

15   any other physician or anybody else or from the street,

16   including not doing cocaine and amphetamines and

17   benzodiazepines and Xanaxes, whatever may be abused.  That's

18   what a urine drug test is for.  You want to screen all these

19   other substances as well that could be abused in this high risk

20   population, which is not the case in the majority of the urine

21   drug tests.

22        Furthermore, the urine drug tests that are oxycodone

23   only have these outrageous oxycodone concentrations or

24   metabolite concentrations or some of them are just measuring

25   oxycodone.  Again, evidence of tampering with the urine.  And

1    some of them just they're fake.  They're not real urine drug

2    tests.  You can tell just by looking at the report.

3    Q.  How can you tell just by looking at the report from a

4    physician's perspective?

5    A.  Well, first you kind of question why is it just oxycodone.

6    This is very atypical for a pain practice.  There's something

7    wrong here where the doctor is deliberately ordering something

8    that's not something that we commonly order.  Why is he so

9    limited in scope as to what he's looking at?  And just the way

10   the rest is, it's in some ways it's subjective.  But looking at

11   it, I would have to take a look at a specific one and I guess

12   this is one of them.

13   Q.  What's the Bates number on the page you're looking at?

14   A.  It's 32 on one side, but I need to be on the other side

15   which doesn't have a number.

16   Q.  Can you just describe what you're seeing, and we'll show

17   another example at another time.

18   A.  Just the general report in terms of, for example, in

19   looking at these Empire State Lab urine drug tests, there are

20   three dates and times -- the time it's collected from the

21   patient, the time it's received by the lab, and the time it's

22   printed and I assume sent.  And what I notice in some of these

23   cases, for example, is it's received by the lab before it's

24   collected from the patient.  The alignment on the page is way

25   off.  And there are misspellings on the lab result.

1          Now, anybody can misspell.  But this is a computer

2     generated form after a test is run and those are spell checked

3     pretty thoroughly.  And certainly I can accept a single

4     misspelling, but there's misspelling in just about all of them

5     that are just looking at oxycodone.  So just a whole array of

6     red flags in the urine drug test here.

7          And even when the urine drug test is appropriate in

8     this patient, Kevin Cravey, some of them are picking up

9     cocaine.  Some of them are picking up the other molecules that

10     you see here, which should have been gotten all along in all

11     the patients, and they're not being responded to.

12     Q.  Moving on to Anna Torres, which is Government Exhibit 224,

13     424, and 524, which are all already in evidence.  You had

14     mentioned with respect to Mr. Cravey the dates, the difference

15     between the dates of the encounter and the date the notes were

16     signed and you said that that made you question the reliability

17     of the records.

18          Turning to DM001530, Ms. Joynes, and DM001527, and

19     this is in Government Exhibit 224, 1527 is the second one.  Do

20     you have those in front of you, Dr. Gharibo?

21     A.  I have it on my monitor.

22          MS. CUCINELLA:  One moment.

23     A.  I have it on paper as well.

24     Q.  If you have it on paper, are there two SOAP notes

25     reflective of the same date?

G3ALMIR3                        Gharibo - direct

1    A.  Yes.

2    Q.  And what date?

3          MS. CUCINELLA:  Is it possible to blow up the top

4    portions of both documents?

5    Q.  What dates are reflected for those SOAP notes?

6    A.  The visit date is December 7, 2012.

7    Q.  On both encounters?

8    A.  Yes.

9    Q.  And are they electronically signed by the doctor?

10   A.  Yes.

11   Q.  On what date?

12   A.  One of them is signed on February 16, 2013, at 9:38 a.m.

13   The other one is signed on February 16, 2013, at 9:46 a.m.

14   Q.  Does that reflect that there are two notes for this patient

15   encounter?

16   A.  Yes.

17   Q.  What conclusions, if any, did that draw you to cause -- did

18   that cause you to draw?

19   A.  Two separate notes that are being generated with different

20   content.  I mean just looking at them, the subjective is

21   different.  It kind of makes you question the whole record, not

22   just for this patient, but within a practice as a whole.  For

23   example, looking at the history, the pain score in the hands is

24   six to seven.  There's low back pain.  And the histories don't

25   match up, generally speaking, basically.  There are

1    discrepancies between the two notes, as well as in the

2    objective section, which is the physical exam section.

3            MS. CUCINELLA:  We can take those down, Ms. Joynes.

4    Q.  Dr. Gharibo, did you also review a file for a patient named

5    Antonio Pedraza?

6    A.  Yes.

7    Q.  Turn to Government Exhibit 221.

8            To be clear, Anna Torres, is that a file that defense

9    counsel asked you to review?

10   A.  Yes.

11   Q.  And Antonio Pedraza, is that also a file that defense

12   counsel asked you to review?

13   A.  Yes.

14   Q.  Looking at Mr. Pedraza's file, were you able to draw

15   conclusions based on your review of the record?

16   A.  Yes.

17   Q.  What conclusions did you draw?

18   A.  I'd like to review the record briefly.

19           MS. CUCINELLA:  Ms. Joynes, if you can put up

20   DM0001215.

21   A.  My conclusion here is that this is somebody that's coming

22   in referred by primary care with history of hepatitis C,

23   history of IV drug use with heroin and cocaine abuse, with pain

24   complaints in the elbows and other parts of the body.  But the

25   point I'm making here is that this is somebody who's high risk,

1   who abused intravenous drugs and has done heroin and cocaine.
2   This is about as high risk as it gets.
3          So you can prescribe an opioid to such a patient, but
4   it just needs to be done very cautiously, not upside down where
5   the opioids are being maximized as opposed to minimized.  And
6   in these patients, you also need good urine drug testing as
7   well.  But I think clinically speaking, if you're going to put
8   the patient on an opioid, it needs to be as simple as possible.
9   It can be, for example, once a day or twice a day methadone.
10  It can be a low dose of oxycodone.
11         But instead what's done here is the prototypical
12  oxycodone prescription of 30 milligrams, 90 pills a month.  You
13  might as well just make him an addict again by injecting him
14  because that's the effect that's going to have.  It is quite
15  reckless.  It's very dangerous.  This patient is going to
16  relapse if they take it as prescribed.  Or this is somebody
17  who's already been on the street buying cocaine and may have --
18         MR. MAZUREK:  Objection, calls for speculation.
19         THE COURT:  The objection is sustained.  Strike that,
20  please.
21  Q.  Dr. Gharibo, I'm going to direct your attention to two
22  documents that Ms. Joynes is going to put on the screen.  These
23  are urinalysis reports from February of 2013 and April 8 of
24  2013.  These are documents that were part of Mr. Pedraza's
25  file; is that right?

1   A.  Yes.

2   Q.  What can you tell based on these urinalysis reports?

3   A.  This is a high risk patient that is still taking medicines

4   in a high risk fashion, including taking illicit medicines.  So

5   the urine drug test shows amphetamine, it shows cocaine and it

6   shows ecstasy, as well as the oxycodone that you see here.  So

7   there is ongoing use of illicit drugs.

8   Q.  After both of these urinalysis reports were provided to the

9   doctor, Dr. Mirilishvili, was Mr. Pedraza still issued

10  oxycodone prescriptions?

11  A.  Yes, same prescriptions.

12  Q.  Did there come a time when Dr. Mirilishvili discontinued

13  Mr. Pedraza's care?

14  A.  Yes.

15  Q.  Do you recall approximately when that was based on the

16  records?

17  A.  About mid-2013.

18  Q.  Was that appropriate since he cut him off?

19  A.  The patient should have been cut off at the onset, once the

20  cocaine was detected.  The prescriptions should have never gone

21  out in the first place the way they went out.  But ultimately

22  that was appropriate too.

23          MS. CUCINELLA:  We can take that down, Ms. Joynes.

24  Q.  Dr. Gharibo, were you able to draw overall conclusions

25  about the entire group of records that you reviewed?

1    A.   Yes.

2    Q.   Briefly, can you state those conclusions?

3    A.   The practice is not consistent with the practice of

4    medicine.  It's essentially it appears to be a pill mill.  It

5    does not document appropriately.  It does not find the source

6    of the pain.  It doesn't perform an adequate physical

7    examination or reach a good robust clinical diagnosis that

8    enables a physician to treat the patient.

9         There is no failure of conservative management, such

10   as injections and non-opioids.  There's no optimization of the

11   non-opioids.  But patients are given these rubber stamp

12   prescriptions of very low dose of some combination non-opioid

13   and a very high dose of oxycodone molecule at a very high dose,

14   and that is not consistent with the overall practice.

15        And it's furthermore the documentation is highly

16   suspect and notes are signed months later which is, which makes

17   me question their accuracy.  But there are fake MRIs, fake

18   urine drug tests, inappropriately ordered urine drug tests, and

19   valid drug tests with suspicious findings that should cause

20   somebody to terminate care, at least terminate the oxycodone

21   prescription and that's not being done as well.

22   Q.   Dr. Gharibo, hypothetically, if a patient were to come into

23   a clinic and was able to fake his or her pain in a way that

24   legitimately fooled a doctor, would Dr. Mirilishvili's

25   prescribing practices have been appropriate?

1   A.  No.

2   Q.  Why not?

3   A.  Because it's still upside down.  It's still

4   disproportionately high on the opioid and it's very automated,

5   kind of robotic.  There's no range.  Everybody gets the 90 of

6   oxycodone 30 and there is no adjustment of the other

7   foundational medicines, the gabapentin, the muscle relaxant and

8   so on.  It would not have been appropriate.

9   Q.  Did you draw any conclusions about whether Dr. Mirilishvili

10  was practicing medicine?

11  A.  Yes.

12  Q.  What was that conclusion?

13  A.  He was not for the vast majority of patients.

14          MS. CUCINELLA:  One moment.

15          Nothing further.

16          THE COURT:  OK.  We're going to take a break for lunch

17  now and we'll be back at 2 o'clock.  Don't discuss the case.

18  Keep an open mind.

19          (Continued on next page)

20

21

22

23

24

25

G3ALMIR3

1            (Jury not present)

2            THE COURT:  All right.  See you after lunch.

3            MR. MAZUREK:  Judge, can I put one thing on the

4    record?

5            THE COURT:  Yes.

6            MR. MAZUREK:  The Court is aware the government filed

7    last night a letter under seal relating to a proposed defense

8    witness.  I think Dr. Gharibo --

9            THE COURT:  The doctor can leave if it's under seal.

10   I didn't know it was under seal.  You may go, Doctor.  We'll

11   see you after lunch.

12           THE WITNESS:  What time should I be back?

13           THE COURT:  We'll start at 2 o'clock.

14           (Witness not present)

15           MR. MAZUREK:  Your Honor, it involved a proposed

16   witness in the case, a pharmacist by the name of Frank Fata.

17           THE COURT:  I don't have that letter.

18           THE DEPUTY CLERK:  That was the one that is mooted.

19           THE COURT:  I was told that letter is moot.

20           MR. MAZUREK:  I just wanted to put it on the record.

21   The reason I guess it was mooted is that after I consulted with

22   Mr. Fata or at least I showed him the government's letter, he

23   decided to retain counsel and I got a call from counsel and

24   they said, you know, I'm advising him not to testify.

25           I guess the only reason I'm putting it on the record

G3ALMIR3b

1    is just as someone who spent my entire career in criminal

2    defense, it just is another example of the difficulties we face

3    in terms of the ability to present witnesses on behalf of our

4    clients.

5            THE COURT:  Mr. Fata has an absolute constitutional

6    right to hire a lawyer, to figure out what his interests might

7    be.  He's not a party here and he has a lawyer who's advising

8    him not to testify.  You wish to subpoena him, he can come here

9    with his lawyer.  He can exercise his constitutional rights.

10   That won't be in the presence of the jury.

11           But don't complain to me because people who get

12   involved in criminal cases hire lawyers because only smart

13   people who get involved in criminal cases hire lawyers.

14           MR. MAZUREK:  I understand, Judge.  As soon as the

15   government writes a letter, that's what happens.

16           THE COURT:  That's certainly nothing you can complain

17   about.

18           MR. MAZUREK:  Witnesses are not available.

19           THE COURT:  Certainly nothing you can complain about.

20           MR. MAZUREK:  Thank you, Judge.

21           THE COURT:  OK.  See you after lunch.

22           (Pause)

23           THE COURT:  We'll have a charge conference the minute

24   the government tells me they don't have a rebuttal.

25           Here's the general timing.  The government tells me

1    it's going to rest today.

2              MR. DISKANT:  I think at this point it may be Monday

3    morning.  We're still largely on track.

4              THE COURT:  They're either going to rest today or

5    they're going to rest first thing Monday morning.  And then

6    we'll discharge the jury.  And it would be nice if the

7    government could rest today because then we could discharge the

8    jury for the week.  Otherwise, we have to send them out of the

9    room.  You'll make your motions.  Then we'll come back and

10   you'll call your witnesses.  I know of one witness that you're

11   planning to call.

12             How many witnesses are you planning to call?  It's

13   about time you started to tell me.

14             MR. MAZUREK:  Well, your Honor, we lost one today, so

15   at this point it may just be Dr. Warfield.

16             THE COURT:  Maybe Dr. Warfield.  Obviously,

17   Dr. Mirilishvili has a right to testify.  He has a right not to

18   testify.  I'm going to ask him if he wants to testify, but he

19   doesn't have to make that decision today.  If that's the

20   case -- the reason I'm going to pass out a proposed charge is

21   that the minute that everybody has rested, we will be having a

22   charge conference.  If you really only have one witness, I

23   guess I anticipate we'll be summing and charging on Tuesday.

24   OK.

25             (Luncheon recess)

G3A7MIR4                          Gharibo - cross

1              A F T E R N O O N   S E S S I O N

2                          2:00 p.m.

3              (Jury present)

4              THE COURT:  OK, let's get back to it.

5              Doctor, have a seat.  You are still under oath.

6    Mr. Mazurek?

7     CHRISTOPHER GHARIBO, resumed.

8    CROSS EXAMINATION

9    BY MR. MAZUREK:

10   Q.  Good afternoon, Dr. Gharibo.

11   A.  Good afternoon.

12   Q.  My name is Henry Mazurek, and I represent Dr. Moshe

13   Mirilishvili.  We never met before, correct?

14   A.  Yes.

15   Q.  I'd like to start by asking you about a -- a little bit

16   about your prior testimony.  On direct examination you

17   indicated that you testified in over 50 cases more or less?

18   A.  Correct.

19   Q.  And some of those were criminal cases, correct?

20   A.  Yes.

21   Q.  Similar to the allegations in this case, correct?

22   A.  Correct.

23   Q.  Allegations of the unlawful distribution of oxycodone by a

24   medical doctor.

25   A.  They were similar.

1    Q.  And in all of those case, those criminal cases, you

2    testified on behalf of the government.

3    A.  Correct.

4    Q.  And you get paid for your services of course?

5    A.  Yes.

6    Q.  For example, for today you are earning $4,000 from the

7    government, correct?

8    A.  Correct.

9    Q.  And also for your out-of-court review of files you charge

10   $400 per hour, correct?

11   A.  Yes.

12   Q.  And what was your billing in this particular case?  Do you

13   recall?

14   A.  I haven't billed yet.

15   Q.  How many hours have you spent on the case?

16   A.  Close to 20.

17   Q.  And that is exclusively on the review of files?

18   A.  Yes, and discussions, and meetings.

19   Q.  Discussions and meetings with whom?

20   A.  With the attorneys.

21   Q.  The prosecuting attorneys.

22   A.  Yes.

23   Q.  You've never talked to Moshe Mirilishvili.

24   A.  Correct.

25   Q.  You never talked to any of his patients?

G3A7MIR4                         Gharibo - cross

1    A.  Correct.

2    Q.  Your review is just based on the cold file.

3    A.  Yes.

4    Q.  Now, I want to talk about your practice a little bit that

5    you have described on direct examination.  You are a clinician,

6    right?

7    A.  Yes.

8    Q.  That means you actually see patients.

9    A.  Yes.

10   Q.  You see patients roughly on a daily basis?

11   A.  Yes.

12   Q.  And is it fair to say that on a given day you could see

13   anywhere from between 15 and 40 patients?

14   A.  That's reasonable.

15   Q.  It's not unreasonable or uncommon for a physician to see

16   upwards of 30 patients in a day.

17   A.  Correct.

18   Q.  Now, you have a specialty practice, correct?

19   A.  Yes.

20   Q.  The thing that you like to do and you do a lot of are

21   interventional procedures, correct?

22   A.  Yes.

23   Q.  And when I say interventional procedures, I'm talking about

24   in common parlance what most of us dread, needles, right?

25   A.  Yes.

G3A7MIR4                          Gharibo - cross

1   Q.   And these are including things like nerve blocks that you

2   inject into people?

3   A.   Correct.

4   Q.   You do epidurals in the spine?

5   A.   Yes.

6   Q.   You inject steroids, for example?

7   A.   Yes.

8   Q.   And would you say this occupies a majority of your

9   practice?

10  A.   I do it three half days a week.

11  Q.   Majority.  Three and a half in a five day week, right?

12  A.   Three half days.

13  Q.   Sorry?

14  A.   Three half days.

15  Q.   I thought you said three and a half days.  Sorry.  So three

16  half days is when you actually do the procedures.

17  A.   Correct.

18  Q.   And the other times you have office visits.

19  A.   Yes.

20  Q.   What percentage of your patients are on interventional

21  treatment?

22  A.   Depends on the time period, but they probably all have

23  received -- almost all -- I'm going to say close to 80 percent

24  of them have received some intervention at some point over the

25  years.

1   Q.  It's something you firmly believe in in terms of the pain

2   management practice, that particular modality.

3   A.  Depends on the patient, as indicated.

4   Q.  But more than 80 percent of your patients have received it

5   at some point in their treatment.

6   A.  Yes.

7   Q.  As opposed to what we talked earlier opioid treatment,

8   correct?

9   A.  Yes.

10  Q.  Where only five percent of your patients receive it.

11  A.  Correct.

12  Q.  You would characterize yourself as a conservative

13  practitioner with respect to opioid treatment, correct?

14  A.  I would.

15  Q.  Now, there are also pain management specialists who are

16  less conservative but they're still providing real care,

17  correct?

18  A.  Yes.

19  Q.  And there is a spectrum within the pain management

20  community of people, practitioners, believing what is the

21  long-term effectiveness of opioid treatment, correct?

22  A.  Can you repeat that, please?

23  Q.  Yes, it was not well worded.

24          In pain management there is a spectrum of

25  practitioners who have different views in terms of the

G3A7MIR4                         Gharibo – cross

1     effectiveness of long-term opioid treatment.

2     A.   There is an acceptable range, perception range, among

3     clinicians.

4     Q.   But it is a range.

5     A.   Yes.

6     Q.   And certainly you would agree with me that in pain

7     management, long-term opioid treatment is an acceptable medical

8     practice.

9     A.   Correct.

10    Q.   In fact, you perform it yourself.

11    A.   Yes.

12    Q.   Your issues or concerns are largely how that treatment is

13    effected for a patient.

14    A.   Well, documentation is one of the concerns I expressed, and

15    how the treatment is carried out.

16    Q.   You are speaking now about this particular case, Dr.

17    Mirilishvili's records?

18    A.   Yes, my concerns, right.

19    Q.   OK.  But in terms of -- I guess my question is more

20    general, which is you believe that long-term opioid treatment

21    can be effectively used to treat chronic pain, correct?

22    A.   Correct.

23    Q.   Your concern -- one of your concerns -- I'll put it that

24    way -- in this case is how that treatment was implemented by

25    the doctor.

1    A.  And whether it was indicated at all; not just how but if

2    too.

3    Q.  And that's based on what you're reading in the medical

4    records.

5    A.  Correct.

6    Q.  Let me go back to your testimony regarding patient visits.

7    OK?  You indicated on direct examination that an initial

8    patient visit should begin with a conversation with the

9    patient, right?

10   A.  Yes.

11   Q.  And that's the talk about why they are in front of you,

12   right?

13   A.  Yes.

14   Q.  And in your specialty, the pain management specialty, there

15   is an assumption that one makes that if someone has reached out

16   to someone like you, that they have been experiencing pain for

17   some time.

18   A.  Correct.

19   Q.  And the issues then that you have that conversation about

20   with the patient is about the types of pain that they're

21   experiencing, right?

22   A.  Yes.

23   Q.  And the other thing that you want to accomplish, if you

24   can, in the patient visit is a diagnosis, right?

25   A.  Yes.

G3A7MIR4                    Gharibo - cross

1    Q.  And the things that you use for making a diagnosis, one of

2    the things you use is a diagnostic test.

3    A.  Yes.

4    Q.  Such as an MRI, a CAT scan, an x-ray.

5    A.  Yes.

6    Q.  And it's not unusual, is it, for patients to bring an MRI

7    image or report with them to your doctor visit.

8    A.  It's not.

9    Q.  Now, you can review that imaging study, or at least the

10   report or the impression that the radiologist gave you, and

11   that will start to inform you about some of the issues that the

12   patient might be experiencing, right?

13   A.  No.

14   Q.  It's not correct that it is not giving you any information

15   about what you might expect to hear from the patient?

16   A.  No.

17   Q.  Why is that?

18   A.  Because MRI doesn't predict pain, it doesn't predict what

19   the clinical representation is going to be by the patient.

20           Actually on direct I went over this.  It needs

21   clinical correlation, and you need to talk with the patient and

22   then see if there is anything pertinent on the MRI.

23   Q.  So, for example, it wouldn't be unusual for you if a

24   patient came before you with, let's say, a lower back MRI and

25   they clinically expressed pain that was emanating from the

1  neck.

2  A.  It wouldn't be unusual.  That happens.

3  Q.  So, you would review the diagnostic tests; you wouldn't

4  just ignore it.  It would be part of the process of the patient

5  visit.

6  A.  It may be.  Really discussion comes first, and then you

7  review the tests.  I may not pay much attention to a neck MRI

8  if the discussion is low back pain.

9  Q.  Right, right.  So you might put that aside if you hear from

10  the patient that, oh, in fact what I've been experiencing seems

11  to come from the neck, right?

12  A.  Whatever the patient reports would come first, and then we

13  would look at whatever the patient brought, and then assign

14  relevance to it.

15  Q.  So you have introduced yourself, you began a conversation

16  with the patient, you reviewed the diagnostic tests, and then

17  you would perform a physical exam, right?

18  A.  Sounds like a common sequence.

19  Q.  And in your practice in pain management, does a physical

20  exam require you always to disrobe your patient?

21  A.  No.

22  Q.  Does it require that you take things like blood pressure

23  and weight and those kinds of typical signs that you get at

24  your primary care physician?

25  A.  We often do, but it doesn't require it.

1   Q.   Now, the physical exam that you give, you don't have every

2   patient do the same things, right?

3   A.   Correct.

4   Q.   Because you want to target your physical exam to the area

5   of the body that the patient is expressing -- that he or she is

6   experiencing pain.

7   A.   You could target it or be more comprehensive with it; both

8   is OK.

9   Q.   And you would also then take a past medical history of the

10  patient, whether they have had a history of diabetes or

11  allergies or anything like that?

12  A.   Yes.

13  Q.   You would take a family history?

14  A.   Yes.

15  Q.   A past surgical history?

16  A.   Yes.

17  Q.   And then, after you completed the physical exam, sometimes

18  a diagnosis may be apparent to you through the course of the

19  conversation, the diagnostics and physical exam, right?

20  A.   Yes.

21  Q.   And you could make that diagnosis on the spot, if that were

22  the case.

23  A.   Correct.

24  Q.   Sometimes it's more complicated, and you are going to have

25  to think about it or order tests that might help you with the

1   diagnosis.

2   A.   Yes.

3   Q.   For example, for neurological pain, you may want an EMG or

4   nerve conduction test taken.

5   A.   Correct.

6   Q.   Now, the length of the initial visit is anywhere -- can be

7   anywhere from typically 20 minutes to an hour?

8   A.   Sounds right.

9   Q.   And everything that I just described for you is things that

10  Dr. Mirilishvili did in the recording or at least the

11  transcript that you reviewed, right?

12  A.   To a certain degree, yes and no.  It wasn't detailed

13  enough, and it certainly needs to be documented as well.  And

14  it didn't get into the extent of detail that one would normally

15  get into.  But history and physical were obtained.

16  Q.   Let me ask you a little bit about that.  You're familiar

17  with the phrase standard of care?

18  A.   Yes.

19  Q.   And you would say after you reviewed the transcript of the

20  patient visit between Dr. Mirilishvili and Jose Lantigua that

21  it probably didn't reach the best practices level of standard

22  of care, right?

23  A.   Correct.

24  Q.   And you understand best practices are those that the ones

25  that you aspire to.  That's like the top of the line, like I'm

1    sure you do at NYU Langone Hospital, right?

2    A.   There are best practices.

3    Q.   Did I accurately define best practices?

4    A.   Sorry?

5    Q.   Did I accurately define best practices?

6    A.   It really depends.  I mean there is -- whatever that term

7    means, I think.

8              THE COURT:  That's not your term, is that correct,

9    best practices?

10             THE WITNESS:  No.

11             THE COURT:  That's not your term.  OK.

12   Q.   You don't use that term?

13   A.   I have probably used it, but I don't know what it exactly

14   means.

15   Q.   Then you agree with me that we will use it for the purposes

16   of this examination, talk about the top of the line, which you

17   aspire to.

18             THE COURT:  You are bound by his testimony.  I didn't

19   hear a word best practices come out of his mouth this morning;

20   perhaps I missed something.  But you can cross-examine him

21   about his testimony; you can't change his testimony.  All

22   right?

23             MR. MAZUREK:  All right.  Yes, your Honor.

24             THE COURT:  The same is true of any person, any expert

25   who testifies.

G3A7MIR4                         Gharibo - cross

1    Q.  I guess what I'm trying to get at -- and I will avoid using

2    terms that you don't use -- but that there is a range of care

3    when you are evaluating medical care that you experience --

4    that you have experienced.

5    A.  Correct.

6    Q.  And you would agree with me that in evaluating doctors,

7    there may be things that the doctor could have done better but

8    that it is the kind of thing that you will see in a typical

9    doctor's practice in your experience.

10   A.  Yes.

11   Q.  And then in that spectrum there are going to be a bunch of

12   doctors that fit in sort of the middle part, like the average

13   practitioner, right?

14   A.  Yes.

15   Q.  And those people, they could do things better, but at

16   least for your evaluation it fits within legitimate medical

17   practice, correct?

18   A.  I don't call it that they could do better.  It really

19   depends as far as how the patient is presenting or how simply

20   diagnoseable the patient is.  And you are going to adjust your

21   intake to the individual.  Some are straightforward, some are

22   much more complicated.  It's not always the same thing.

23   Q.  But there are certain, I guess, indications that you are

24   looking for, for example, as we talked about in the initial

25   patient visit, that you would expect to see in the usual course

1    of practice.

2    A.  What are you referring to?

3    Q.  The things like we just referred to, such as conversation

4    with the patient, reviewing diagnostic tests, performing a

5    physical exam, reviewing family and social history, and then

6    trying to make a diagnosis.

7    A.  Correct.

8    Q.  And in Dr. Mirilishvili's case, I think your testimony was

9    that in that recording, in that transcript, that he could have

10   done things more detailed and more thorough but that there was

11   that kind of practice in the recording.

12   A.  There was a reasonable intake on the transcript.

13   Q.  And the visit was, the length, about 20, 25 minutes.  That

14   is in the range of a normal -- a typical medical practice?

15   A.  I'll accept that.

16   Q.  Let me talk about -- well, I have one other question about

17   that.  With respect to the kinds of things that you reviewed on

18   the transcript and the recording of that visit, that was the

19   only time in terms of the files that you had before you that

20   you could actually determine what was done in each of those

21   visits, correct?

22   A.  Correct.

23   Q.  All right.  Now, let me ask you about long-term opioid

24   treatment.  I know we had some confusion on direct examination,

25   but that basically means that the patient is being put on a

1    regimen of opioid treatment for a long period of time, correct?

2    A.  Correct.

3    Q.  That could last months, it could last years, correct?

4    A.  Yes.

5    Q.  And with respect to long-term opioid treatment, you said

6    that there has been a general consensus for over a decade in

7    the pain management community?

8    A.  Yes.

9    Q.  And a consensus, by the nature of the word, means that

10   there is at least a majority of people who believe in certain

11   standards but it's not unanimous.  Is that fair?

12   A.  Those that agree on chronic opioid pharmacotherapy have

13   some general principles as to how to go about it.  Some people

14   disagree with the whole thing, that we shouldn't give any

15   opioids, which I disagree with myself.

16   Q.  So, the answer is yes.

17   A.  Yes.

18   Q.  OK.  Now, in terms of the kinds of things that doctors

19   would typically do for long-term opioid treatment, there are no

20   regulations that are required of doctors with respect to, for

21   example, specific dosages of pills to patients, correct?

22   A.  There are no hard regulations.

23   Q.  There are no regulations that govern, for example, whether

24   a doctor should or how a doctor should perform urine drug

25   testing, correct?

1   A.  Correct.

2   Q.  In fact, there is no requirement at all that Dr.

3   Mirilishvili ever had to test any of his patients, correct?

4   A.  That's correct.

5   Q.  And in fact there are no specific guidelines that a

6   long-term opioid-treating physician is required to follow,

7   correct?

8   A.  There is nothing that's required to be followed.

9   Q.  There are just things out there that a practitioner can

10  read and study and take whatever he or she thinks is best for

11  the treatment of his individual patient.

12  A.  There are some consistent principles that prescribing

13  physicians need to apply, as we went over prior.

14  Q.  Consistent general principles that don't in any way

15  restrict a physician from taking a certain course of treatment

16  depending on what clinically he or she sees from the patients.

17  A.  It does restrict how you go about -- who you prescribe it

18  to, and how you prescribe it, and how to combine it.

19  Q.  Well, again, when you say that it does, the "it" that

20  you're referring to are these principles that form this sort of

21  consensus?

22  A.  Correct.

23  Q.  In the community, correct?

24  A.  Correct.

25  Q.  Now, are you familiar with New York's Board for

1    Professional Medical Conduct's pain management guide for

2    physicians?

3    A.  I've seen it.

4    Q.  I'm going to ask you some questions about it.  Would it be

5    helpful if I give you a copy?

6    A.  Yes.

7                MR. MAZUREK:  Your Honor, may I approach?

8                THE COURT:  You may.

9    Q.  I am showing you what has been premarked for identification

10   as DM 700.  This is a pamphlet that the New York Board for

11   Professional Medical Conduct publishes, correct?

12   A.  Yes.

13   Q.  A guide for physicians, right?

14   A.  Yes.

15   Q.  And if you can turn to the introduction part of this

16   pamphlet.  I'm going to direct your attention to the second

17   sentence in the first paragraph.

18              Would you agree with the statement written here that

19   inadequate pain control may result from a physician's lack of

20   knowledge about pain management, inadequate understanding of

21   addiction, or fear of investigation or action by the Board or

22   other federal, state or local regulatory agencies?

23   A.  Yes.

24   Q.  And one of the things that the Board is expressing here is

25   that there may be undertreatment of pain patients for reasons

1    other than trying to give legitimate care, correct?

2    A.  Yes.

3    Q.  And one of the identified areas is the fear of

4    investigation or action by federal, state or local regulatory

5    agencies, right?

6    A.  Yes.

7    Q.  And part of that fear is that if you prescribe controlled

8    substances, you might one day end up in court charged with a

9    crime, right?

10   A.  Yes.

11   Q.  And that may dampen a practitioner's judgment in terms of

12   medically what they think might be necessary, correct?

13   A.  For some individuals it may.

14   Q.  Now, if we can continue on the column entitled "controlled

15   substances" in the pamphlet.  The New York Medical Board also

16   says in the first sentence that it recognizes that controlled

17   substances, including opioid analgesics, are often essential in

18   the treatment of acute and chronic pain, both malignant and

19   nonmalignant.  Do you see that?

20   A.  Yes.

21   Q.  Do you agree with that statement?

22   A.  It depends on the patient.  For some patients it's

23   essential.  I don't know about the word "often".  Most of the

24   time they're not essential.

25   Q.  And so you might have a disagreement with the New York

G3A7MIR4                          Gharibo - cross

1    Board for Professional Medical Conduct with respect to the fact

2    that they're saying that it's often essential to treat acute

3    and chronic pain with opioids.

4    A.  Yeah, I disagree with the word "often".

5    Q.  And again that shows that there may be a spectrum.  Here

6    you disagree with the Professional Board of Conduct in the

7    State of New York, right?

8    A.   It just needs more explanation and discussion.

9    Q.  Now, it continues to say -- I'm skipping now to the last

10   sentence in that same paragraph, beginning with "The board..."

11            "The Board also recognizes that tolerance and physical

12   dependency may be pharmacological effects of sustained use of

13   opioid analgesics and are not synonymous with addiction."

14   Right?

15   A.  Correct.

16   Q.  Do you agree with that statement?

17   A.  Yes.

18   Q.  And what they're saying there is that long-term opioid

19   patients who have been on a regimen of medical treatment for

20   some extended time are not all addicts, right?

21   A.  Correct.

22   Q.  Addiction more refers to a mental and emotional state of

23   the patient, right?

24   A.  Yes.

25   Q.  And that even if a patient has come before you and has said

1  that they had a history of opioid use, that's no reason to turn

2  them away from opioid treatment, right?

3  A.   Correct.

4  Q.   You need to make an assessment first to determine whether

5  that use was legitimate for medical treatment purposes, right?

6  A.   Dependency is not a contraindication to opioid use.

7  Q.   Sorry?

8  A.   Dependency is not a contraindication to treatment with

9  opioids.

10 Q.   Contraindication.  Can you just explain what you mean by

11 that.

12 A.   If someone is dependent, you can still prescribe them

13 opioids in a long-acting fashion.

14 Q.   And in fact even if a patient comes before you, doctor, who

15 has had some history of recreational drug use, that doesn't

16 prevent you from prescribing opioid treatment, right?

17 A.   It certainly raises the bar substantially.  And there is a

18 subset that you would not prescribe into.

19 Q.   But there is no regulation or requirement or restriction

20 that a medical doctor cannot prescribe to someone who has had

21 some history of substance abuse in the past.

22 A.   There is no law against prescribing to substance abusers.

23 Q.   In fact if we look at the Board of Professional Medical

24 Conduct's guide that I have in front of you -- and specifically

25 reading from the sixth bullet point down under the column

1   "points of information" -- the Medical Board of New York

2   actually expresses the following:  That the definition of

3   addict under the Controlled Substance Law excludes patients

4   using controlled substances for legitimate medical purposes.

5   Right?

6   A.   Legitimate medical purpose as defined, for example,

7   somebody in postoperative pain, who just had surgery and is

8   getting rehabilitation and yet they're addicts, that would be

9   an appropriate use in the addict.

10          THE COURT:  That wasn't the question.  Try the

11   question again.  There is nothing wrong with the question.  You

12   can ask the question.

13          MR. MAZUREK:  Thank you.

14          THE COURT:  If you'll answer his question, doctor,

15   that will speed things along.

16          THE WITNESS:  Yes, your Honor.

17   Q.   OK.  The question that I asked is that the Medical Board of

18   New York has informed doctors that the definition of addict

19   under the Controlled Substances Law excludes patients using

20   controlled substances for legitimate medical purposes.  Right?

21   A.   That's correct.

22   Q.   So under the Controlled Substances Law in New York you

23   can't be arrested if you are prescribing opioids to addicts for

24   legitimate medical treatment.

25   A.   Correct.

G3A7MIR4                    Gharibo - cross

1   Q.  And then the last thing I'd like to just cover on this
2   particular guide from the New York Medical Board, the last
3   bullet, do you agree with the statement:  The Board evaluates
4   inappropriate versus appropriate prescribing, not the quantity
5   of drugs prescribed?
6            THE COURT:  Can you read that one again?
7            MR. MAZUREK:  Yes.
8   Q.  Do you agree or disagree with the statement:  The Board
9   evaluates inappropriate versus appropriate prescribing, not the
10  quantity of drugs prescribed?
11  A.  It depends on the circumstances.  Quantity matters as well.
12  If you have an outstanding quantity that could be --
13           THE COURT:  Could you just answer his question?  Do
14  you agree with that statement?  Yes or no.  It's a statement of
15  what the Board does.  Do you agree that that's what the Board
16  does?
17           MS. CUCINELLA:  Objection, foundation.  I don't know
18  that there has been any testimony that he knows what the Board
19  does.
20           MR. MAZUREK:  I'm reading from the Board's statement.
21           THE COURT:  The objection is overruled.  The doctor
22  can take care of himself.  OK?
23           So, he just asked if you agreed with the statement
24  that the Board evaluates inappropriate versus appropriate
25  prescribing, not the quantity of drugs prescribed.

G3A7MIR4                        Gharibo - cross

```
 1              Is the Board in business to evaluate appropriate
 2     versus inappropriate prescribing?
 3              THE WITNESS:  I think they are, but --
 4              THE COURT:  Fine, then let's move on.  No buts.  It's
 5     a yes or no question.
 6              THE WITNESS:  I can't answer the question as asked
 7     then, because quantity --
 8              THE COURT:  No, no, no explanations.  OK?  Please.
 9     Q.  You can put that aside -- which I'm sure everyone is very
10     happy about.
11              The next thing I want to ask you about is you've heard
12     of an organization called the American Academy of Pain
13     Medicine, right?
14     A.  Yes.
15     Q.  Are you a member?
16     A.  Not this year.
17     Q.  You let your Membership lapse?
18     A.  Yes.
19     Q.  It is a national organization for pain management
20     practitioners, right?
21     A.  Correct.
22     Q.  And they have published a particular document -- I'm
23     reading from it -- it's called The Use of Opioids for the
24     Treatment of Chronic Pain.  Are you familiar with that?  It was
25     approved February 2013.
```

1    A.   I've looked at it multiple times.

2    Q.   And February 2013 is within the relevant period of this

3    case, correct?

4    A.   Yes.

5    Q.   Would you like a copy?  Would it help you if I gave you a

6    copy?

7    A.   Sure.

8    Q.   I am showing you what has been premarked for identification

9    as DM-706.  You would agree with me that the American Academy

10   of Pain Medicine is an accredited source for practitioners in

11   the pain management community, correct?

12   A.   Correct.

13   Q.   And it wouldn't be -- it would be actually something

14   positive for a medical practitioner to review what guidelines

15   the American Academy of Pain Medicine publishes.

16   A.   I agree.

17   Q.   So, the American Academy of Pain Medicine during the time

18   of this case, in February 2013, said -- quoting from the second

19   paragraph, next to last sentence -- "However, there is

20   currently no nationally accepted consensus for the treatment of

21   chronic pain not due to cancer."

22        Do you see that?

23   A.   Yes.

24   Q.   So, the American Academy of Pain Medicine, at least in the

25   time of this indictment, had a different view than you did,

1    doctor, correct?

2    A.  Not nationally accepted, but there are other guidelines,

3    and there is a general consensus, but nothing at the national

4    level, or whatever that means nationally accepted.  What does

5    that mean?

6    Q.  Well, that there is no consensus statement that has been

7    issued that has been accepted nationwide among all pain

8    management practitioners.  Is that a fair characterization?

9    A.  There is no statement for any such thing in medicine.

10   Q.  There isn't?

11   A.  What does nationally accepted mean?  I just don't

12   understand the phrase, as if there is ever such a consensus.

13             THE COURT:  I think you used a phrase this morning

14   general consensus.

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  There is a general consensus?

17             THE WITNESS:  Yes.

18             THE COURT:  Is that what you mean by nationally

19   accepted?

20             MR. MAZUREK:  Well, I'm having trouble understanding

21   what that consensus that you talked about this morning -- the

22   American Academy of Pain Medicine in February 2013 said there

23   is currently no nationally accepted consensus.  That would seem

24   to be general consensus.

25             THE COURT:  Do you agree or disagree with that

1   statement?

2              THE WITNESS:  I disagree, your Honor.  I don't know

3   what that means.

4              THE COURT:  OK, he disagrees with the statement.

5   Next.

6   Q.  So, just to finish the point, I mean at that point in time,

7   in February 2013, for those pain management practitioners who

8   were following the American Academy of Pain Medicine, they

9   could believe that there are no consensus standards with

10  respect to long-term opioid management, correct?

11  A.  Incorrect.  The American Academy of Pain Medicine outlines

12  those general principles that I went over earlier.  That may

13  not be nationally accepted because some people think opioids

14  should not be prescribed for chronic pain at all.

15  Q.  But that's what was published in The Use of Opioids for the

16  Treatment of Chronic Pain by the AAPM in February 2013,

17  correct?

18  A.  Correct.  Maybe that's what they meant with the word

19  "nationally accepted".  Some people disagree with it.

20             MR. MAZUREK:  Your Honor, I move to strike for

21  speculation.

22             THE COURT:  The objection is sustained.

23  Q.  Now, you talked about on your direct testimony that the

24  prescription of long-term opioids is appropriate for moderate

25  to severe pain, correct?

1    A.  Correct.

2    Q.  Are you familiar with something called a visual assessment

3    scale?

4    A.  Visual analog scale.

5    Q.  So you are familiar with that.

6    A.  Yes.

7    Q.  And that's a scale that generally runs from zero to ten,

8    correct?

9    A.  Yes.  Well that's the numerical ratings scale, but the

10   visual assessment scale is zero to 100 millimeters.

11   Q.  And these different scales are used by practicing

12   physicians to determine where along the spectrum of pain, so

13   you can classify them as moderate to severe, correct?

14   A.  It's one of the assessment tools.

15   Q.  And the numbering system of zero to ten is something that

16   is typically used; is that right?

17   A.  It's one of the typical measuring tools.

18   Q.  And for moderate to severe findings of pain, that would be

19   anywhere on that scale from five to ten; is that fair?

20   A.  Moderate to severe would be seven to ten.

21   Q.  Seven to ten.  So, in the course of reviewing Dr.

22   Mirilishvili's notes, if he is putting down any number on that

23   scale between seven to ten, that would indicate that would be

24   an appropriate time to think about using opioid treatment.

25   A.  No.

1    Q.  Putting aside other --

2              You're saying no, but I'm just wanting to know putting

3    aside other types of conditions, if moderate to severe pain can

4    be treated by long-term opioid care, that would be indicated on

5    the VAS scale anywhere from seven to ten.

6    A.  Considering everything else is OK, it can be a

7    consideration.

8    Q.  Let me ask you, you also testified on direct examination

9    about something called the opioid sparing effect.

10   A.  Yes.

11   Q.  And is that changing the dosages of the medication that you

12   may give over time?

13   A.  No, that's titration.

14   Q.  Titration.  How would you define opioid sparing?

15   A.  Opioid sparing effect is giving other medicines that are

16   not opioids to cut down on the opioid, for example, giving

17   somebody Ibuprofin so that you can give less oxycodone.

18   Q.  And is that other medication sometimes called coanalgesics?

19   A.  It may be in some texts.  No, but coanalgesic -- no, it's

20   not.  It's an analgesic.

21   Q.  So, it would be giving nonanalgesic drugs in addition to

22   analgesic drugs.

23   A.  No, it would be giving nonopioids in addition to opioids.

24   Q.  OK.  Things such as Gabapentin?

25   A.  Yes.

1    Q.  Elavil?

2    A.  Yes.

3    Q.  Neurontin?

4    A.  Yes.

5    Q.  Mobic?

6    A.  Yes.

7    Q.  Flexeril.

8    A.  Yes.

9    Q.  Let me ask you, in terms of medically acceptable reasons to

10   prescribe a patient with opioid treatment, one of the

11   principles is to improve functionality; is that correct?

12   A.  Yes.

13   Q.  And when we say functionality -- or you say it -- in the

14   medical world, it has a certain meaning, correct?

15   A.  Yes.

16   Q.  And it basically means to improve your satisfaction,

17   overall satisfaction in your daily life.

18   A.  No.

19   Q.  No?  Well, improving functionality would be things such

20   as -- I will use examples -- improving your sleep pattern?

21   A.  Yes.

22   Q.  Job performance?

23   A.  Yes.

24   Q.  Family relationships?

25   A.  Yes.

1    Q.   Activities of daily life?

2    A.   Yes.

3    Q.   Overall satisfaction.

4    A.   That's different, but that could be patient satisfaction.

5    But functionality is physical and psychosocial function, not

6    satisfaction.

7    Q.   Sorry?

8    A.   Functionality assesses physical and psychosocial function.

9    Satisfaction is different.

10   Q.   And improving a person's functionality is one of the things

11   that you try to do as a doctor, right?

12   A.   Correct.

13   Q.   And if you put a patient on a particular medication

14   regimen, and they come back to you for follow-up visits after

15   they've been on that treatment, and you assess improved

16   functionality, there is a tendency that the practitioner does

17   not want to disrupt that treatment, correct?

18   A.   It depends.

19   Q.   It depends.  But clinically from the perspective of the

20   doctor who is making that judgment at that call whether to keep

21   the treatment going, it might be OK to keep the treatment

22   going, right?

23   A.   It depends on the treatment that's making that possible for

24   the patient.  If it's a high-risk therapy, you have to consider

25   to change it and make it less high risk.

G3A7MIR4                          Gharibo - cross

1   Q.  But you're not acting as a drug dealer if you are keeping

2   the patient on the treatment, correct?

3   A.  You're predisposing the patient to risk.

4           MR. MAZUREK:  That's not my question.

5           MS. CUCINELLA:  Objection.

6           THE COURT:  The objection is overruled.  I want him to

7   answer the question yes or no.

8   Q.  You're not acting as a drug dealer if you see improved

9   functionality and you keep the patient on the treatment.

10  A.  You're not acting as a drug dealer, but it would be

11  inappropriate therapy to continue a high-risk treatment.

12  Q.  Let me ask you now some questions about some of the files

13  that you reviewed.  When we talked earlier, we mentioned that

14  your review was based only on the file and not based on any

15  interviews with patients, correct?

16  A.  Correct.

17  Q.  And as a clinician, the part of interviewing the patient is

18  a very important part of what you do, correct?

19  A.  Yes, it is.

20  Q.  Because, as you mentioned earlier, the diagnostic tests, it

21  actually may end up being completely irrelevant.

22  A.  Correct.

23  Q.  So you are missing that component in all of the cases that

24  you filed -- you reviewed -- except for Jose Lantigua, right?

25  A.  I only had it to the extent that it's documented.

1    Q.  So the answer is yes.

2    A.  Not anything beyond what's documented, yes.

3              THE COURT:  Sir, listen to me.  There are basically

4    four answers that you can give to the question:  Yes, no, I

5    dent recall -- if it asks for something you don't remember --

6    or I can't answer the question yes or no.  OK?  And then be

7    quiet, and let him ask his next question.

8              THE WITNESS:  Yes, your Honor.

9    Q.  I'm going to direct your attention to your review of the

10   transcripts in the Lantigua patient visits, OK?

11   A.  All right.

12   Q.  We talked a little bit about the initial patient visit.

13   Did you also review the subsequent patient visits?

14   A.  I don't recall.

15   Q.  Sorry?

16   A.  I don't recall.

17   Q.  I'm going it show you what has been premarked for

18   identification as DM-01 and DM-02.

19             MS. CUCINELLA:  Are these in evidence?

20             MR. MAZUREK:  No.

21   Q.  My only question is:  Did you review the transcripts of

22   recordings for the follow-up patient visits for Jose Lantigua

23   on October 18, 2013 and November 20, 2013?

24   A.  I don't remember.

25             THE COURT:  And reading those does not jog your

1    memory?

2              THE WITNESS:  Correct.

3              THE COURT:  Thank you.  Next question.

4    Q.  But I mean in evaluating the course of treatment, you would

5    want to know exactly what happened during the beginning to the

6    end of that treatment, correct?

7    A.  Yes.

8    Q.  And if, for instance, in a subsequent follow-up visit with

9    the patient there was conversation between the doctor and the

10   patient about the referrals that were made to a patient, that

11   would be something interesting for you in terms of evaluating

12   the medical legitimacy of the treatment, correct?

13   A.  It would be a component.

14   Q.  For example, if the patient seems not to be following the

15   doctor's recommendations with respect to seeing an orthopedic

16   surgeon for his diagnosed problem, I mean that's acting as a

17   doctor, correct?

18   A.  Yes.

19   Q.  And you experience that as a clinician all the time, I

20   mean, that patients sometimes don't follow up on the things

21   that you prescribe.

22   A.  Correct.

23   Q.  And the only thing that you can really do with respect to

24   that as a clinician is to keep after the patient, to say, you

25   know, I can't help you unless you help yourself, right?

G3A7MIR4                         Gharibo - cross

1    A.  Correct.

2    Q.  And Dr. Mirilishvili acted that way with respect to Jose

3    Lantigua.  He was acting like a doctor, correct?

4    A.  Correct.

5    Q.  And then in a subsequent visit Mr. Lantigua indicates to

6    Dr. Mirilishvili that he obtained a date for surgery, and it's

7    only going to be, you know, two months away.  That's an

8    important thing for you to evaluate in terms of the medical

9    treatment that was given, right?

10   A.  Yes.

11   Q.  For example, if he was prescribing, as in this case here, a

12   set of treatment to regulate Mr. Lantigua's pain during that

13   period, you may want to continue that treatment up until the

14   time of the surgery.

15   A.  Depends on the treatment.

16   Q.  Depends on the history of that treatment and how the

17   patient is feeling, right?

18   A.  That factors in as well.

19   Q.  So if a patient is telling you I'm doing OK with this

20   treatment, I don't have side effects, and I have surgery in two

21   months, it's a clinically acceptable result to continue the

22   treatment, right?

23   A.  It may or may not be.

24   Q.  So, I guess my question then is:  By continuing the

25   treatment, is Dr. Mirilishvili acting as a drug dealer in that

G3A7MIR4                         Gharibo – cross

1   case?

2   A.  No, I don't have an expertise to determine whether he is a

3   drug dealer.

4   Q.  Well, does that seem to be consistent -- is his continuing

5   the treatment consistent with exercising some medical judgment?

6   A.  It could be.

7   Q.  I'm going to ask you to look at some files here.

8           If we could put on the screen GX 221, page 29, which

9   was the Finecare lab report for Anthony Pedrata.  And if we

10  could just expand the middle portion of the screen.

11          OK this was the fellow who had some indication that he

12  may be recreationally using drugs, right?

13  A.  Correct.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MAZUREK:

2   Q.  And this drug test report you said would be an indication

3   of that, correct?

4   A.  Could be.

5   Q.  It could be.  Because there are positive numbers that

6   appear under the rows amphetamine and cocaine metabolite and

7   ecstasy, right?

8   A.  Yes.

9   Q.  Now, there's also a far right-hand column called expected

10  values; do you see that?

11  A.  Yes.

12  Q.  And there are terms cutoff and then that equal a certain

13  number, right?

14  A.  Yes.

15  Q.  These are threshold levels in the report; would you agree

16  with that?

17  A.  Yes.

18  Q.  And so the results of the positive findings for

19  amphetamine, cocaine metabolite, and ecstasy are all below the

20  cutoff thresholds indicated by Finecare Lab, correct?

21  A.  Correct.

22  Q.  And in the usual course of medical practice, that would not

23  be wrong for clinician not to consider the below threshold

24  results as a reason to terminate ongoing treatment?

25  A.  It depends.  I can't answer.  It depends on the

1    circumstances.

2    Q.  Let me just clarify it a little bit for you.  Putting other

3    circumstances of that patient's condition aside, the simple

4    reading of this report would not give a reason or would not be

5    wrong for a medical doctor to continue treatment based on this

6    report's findings alone?

7    A.  It depends on everything else.  I can't answer.

8    Q.  I'm asking --

9              THE COURT:  He's answered the question.  He says it

10   depends on everything else, so he can't answer it yes or no.

11   Next question.

12             MR. MAZUREK:  OK.

13   Q.  The next question is that a clinician who's reviewing this

14   report, if they're below threshold levels, that indicates that

15   it's not a reliable finding of that particular chemical in your

16   system?

17   A.  I would call the lab and ask what that means.

18   Q.  Would it be below -- it would show no medical judgment if

19   the doctor just relied on this report and not called the lab?

20   A.  I can't answer.  It needs more detail.  You can't just

21   isolate.

22             THE COURT:  Don't say anything.  He wants to ask a

23   follow-up question, he will.

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  If the government wants to ask a follow-up

1    question, it will.

2              THE WITNESS:  Yes, your Honor.

3    Q.  So, in other words, you can't make an opinion one way or

4    the other as to whether it would be exercising no medical

5    judgment by accepting the results of below threshold findings

6    in a lab report without calling the lab?

7    A.  Or some kind of follow-up, repeating the test, talking with

8    the patient.  You need to take it to the next step in your

9    discovery.

10   Q.  And that would be best practices, correct?

11   A.  That would be a practice.

12   Q.  But it would also be a practice to rely on the lab report,

13   correct, yes or no?

14   A.  The way it stands in front of me, no.  It requires

15   investigation.

16   Q.  And that investigation from your perspective would be to

17   call the lab?

18   A.  Or other things.

19   Q.  OK.  I'd like to turn to another page in this report.

20             One last question on this because I can't let it go is

21   that you were relying on other lab reports that had indications

22   of less than the threshold requirements for oxymorphone to make

23   the determination that there were no metabolites in a patient's

24   urine, right?

25   A.  Correct.

1    Q.  And you made that opinion without hesitation or without

2    condition to say I've got to call the lab to see if maybe it's

3    really in the urine, right?

4    A.  Correct, but the oxycodone listing was disproportionately

5    high.  So there's something that's related to oxycodone in the

6    urine.

7    Q.  Well, there's no indication on Mr. Pedraza's results here,

8    below threshold results for these different chemicals that

9    would give you cause to believe that these below threshold

10   findings are invalid?

11   A.  That's I would call the lab to get their opinion.

12   Q.  And were there indications, do you remember indications

13   actually in Dr. Mirilishvili's records that indicated that he

14   called the urine labs on occasion?

15   A.  There was some follow-ups as such, yes.

16   Q.  And that would be certainly within the standard of care?

17   A.  Yes.

18   Q.  Let me ask you about or turn to GX221, Bates stamp number

19   DM1217.  And if we can expand the middle portion of the page.

20   This also belongs to the file of Antonio Pedraza.

21          Now, if we can look at No. 3 listed down there under

22   the subjective column; do you see that?

23   A.  Yes.

24   Q.  It says, I'm reading, New York State PMP drug utilization

25   report with a reference number done today revealing the

G3ALMIR5                          Gharibo - cross

 1   following.  Evidence of abnormal activity by the patient are

 2   present.  Patient discharged from our pain management clinic.

 3   Patient is opioid shopping.

 4           Do you see that?

 5   A.  Yes, I do.

 6   Q.  Let's start first, you're familiar with the New York State

 7   PMP, right?

 8   A.  Yes.

 9   Q.  You're also aware that it came into effect on or about

10   August 27 of 2013?

11   A.  Yes.

12   Q.  It's a database where you put in the patient's name and

13   date of birth and it will pop up other provider's prescriptions

14   of controlled substances within the State of New York, right?

15   A.  Yes.

16   Q.  OK.  So in this instance, this indicates that

17   Dr. Mirilishvili's office conducted the PMP search, right?

18   A.  Yes.

19   Q.  And that this revealed a history of this patient receiving

20   controlled substances from multiple providers, right?

21   A.  Yes.

22   Q.  And the action that Dr. Mirilishvili took at that time was

23   to discharge the patient, correct?

24   A.  Correct.

25   Q.  And would you agree with me that discharging the patient is

1   within a standard of care?

2   A.  Yes.

3   Q.  One other thing about this is it looks like there was this

4   history all the way back from February through June, correct?

5   A.  Yes.

6   Q.  And if we could go back down to the full page and highlight

7   the top third, the date of service of this visit was August 1,

8   2013; do you see that?

9   A.  Yes.

10  Q.  And so is it fair to say that given when you testified

11  earlier about when the PMP became effective, this is just about

12  the time that the database was launched.  So it would be the

13  first time that you'd really be able to get PMP data.  Right?

14  A.  Yes.

15  Q.  In fact, Dr. Mirilishvili was employing the PMP before it

16  was legally required, correct?

17  A.  Yes.

18  Q.  OK.  Now let's look to the file of Anna Torres which you

19  testified to on direct examination and I believe that is GX224.

20  And specifically there were a couple of Practice Fusion notes

21  looked at at pages 1527 and 1530.

22          Let's start with 1527.  And OK.  It's on your screen.

23  If we could just highlight the top third up until the I guess

24  the objective findings.

25          Do you see that on your screen, Doctor?

1    A.  I do.

2    Q.  So this is the patient note for Anna Torres dated, for date

3    of service December 7, 2012, right?

4    A.  Yes.

5    Q.  OK.  We talked -- I mean you talked a lot about Practice

6    Fusion and the electronic records on direct.  You're familiar

7    with the term EMR, right?

8    A.  Yes.

9    Q.  And that means electronic medical record, correct?

10   A.  Yes.

11   Q.  And a lot of practitioners today use electronic records,

12   correct?

13   A.  Yes.

14   Q.  And it sort of simplifies the storage of information in a

15   central place.  That's one of its many functions.  Correct?

16   A.  Yes.

17   Q.  And it also enables or has enabled practitioners to

18   communicate with one another electronically, right?

19   A.  Yes.

20   Q.  Has enabled you to get lab reports directly to your medical

21   files from different labs, correct?

22   A.  Yes.

23   Q.  It also enables practitioners to communicate with one

24   another with respect to patient histories and records, right?

25   A.  Yes.

1    Q.   Now, if you look here on this particular file, you said it

2    was for the date of service of 12/7/2012, right?

3    A.   Yes.

4    Q.   This was in the typical SOAP format in the Practice Fusion

5    template?

6    A.   Yes.

7    Q.   When I say SOAP format, that stands for subjective

8    findings, objective findings, assessment, and then treatment

9    plan, correct?

10   A.   Correct.

11   Q.   And you testified on direct that it was curious there was

12   this particular file for the date of service of December 7,

13   2012, and then a second one which is at DM1530, if we could

14   turn to that one.  And we can also expand the top portion up to

15   the objective findings.

16          And if I could direct your attention to the

17   subjective, under the subjective title, it starts with Dear

18   Doctor.  Do you see that?

19   A.   Yes.

20   Q.   And it reads, the following is a narrative report which

21   includes my evaluation, diagnostic studies, opinion, prognosis,

22   and treatment rendered by me to the above named patient.  If

23   you have any questions in reference to this evaluation, please

24   feel free to contact me.  Thank you again for the courtesy of

25   your referral.

995

1              Do you see that?

2    A.  I do.

3    Q.  In your experience, Doctor, this could be the kind of

4    document that can be transmitted to the referring primary care

5    physician or whoever it is to give that doctor a report of how

6    their patient is doing, correct?

7    A.  Misformated, but it's possible.

8    Q.  Misformated.  But misformatting is not outside of

9    legitimate medical conduct, correct?

10   A.  Correct.

11   Q.  Now I'm going to ask to look at the file of Anna Torres,

12   which is at GX224, same file.  OK.  I want to look now to

13   page 40 of that file for date of service May 10, 2013, and if

14   we could expand the top half of the page, OK.

15              Again, this is the same patient we were just looking

16   at, right?

17   A.  Yes.

18   Q.  Ms. Torres.  And here it is for date seen of May 10, 2013?

19   A.  Yes.

20   Q.  And indication on the top right hand corner that Ms. Torres

21   was seen on this date by someone by the name of Arthur Estrada,

22   correct?

23   A.  Yes.

24   Q.  And then there are subjective and objective findings.

25              In your review of this particular file, is this

1   consistent with an encounter with a physical therapist?

2   A.  It can be.

3   Q.  And, in fact, there were a number of these documents that

4   you reviewed in the several files that you reviewed of

5   Dr. Mirilishvili's practice, right?

6   A.  Yes.

7   Q.  And physical therapy is one of the modalities of treatment

8   for pain management, correct?

9   A.  Correct.

10  Q.  It's something that you employ in your practice in terms of

11  referrals?

12  A.  Yes.

13  Q.  Do you have an in-house physical therapy session or

14  physical therapists for your patients?

15  A.  It's a level below us.

16  Q.  So you have also in-house, you have a place for them to go

17  to?

18  A.  Yes.

19  Q.  So it's acting within legitimate medical judgment to put

20  your pain management patients on physical therapy, correct?

21  A.  Correct.

22  Q.  Now I want to turn to page 72 of the same file at DM1568.

23  This is the referral that you testified on direct examination

24  as not being specific enough, right?

25  A.  Yes.

G3ALMIR5                          Gharibo - cross

1   Q.  And the file, this referral is in Anna Torres's case which

2   is PT, which you understand to be physical therapy, correct?

3   A.  Yes.

4   Q.  And orthopedic, correct?

5   A.  Yes.

6   Q.  And hydrotherapy?

7   A.  Correct.

8   Q.  Now, you said this referral does not communicate sufficient

9   medical information for referring -- for physician who receives

10  the referral, right?

11  A.  No.

12  Q.  You didn't say that?

13  A.  Correct.

14  Q.  That it's not detailed enough, it should be more detailed?

15  Let me ask it that way.

16  A.  It needs to be detailed enough for the patient, not the

17  receiving physician.

18  Q.  Well, the receiving physician is going to want to know a

19  little bit about what the patient, why the patient is coming to

20  him or her, right?

21  A.  They can or -- you don't have to send a history with the

22  patient.  You have to refer the patient to somebody more

23  specific or at least give them a couple of options within

24  orthopedics is what I said.

25  Q.  But if Ms. Torres were to go to Lincoln Hospital with an

G3ALMIR5                    Gharibo - cross

1   orthopedic referral, they would be able to help her, direct her

2   to specific, the specific specialties within orthopedic doctors

3   to get her to where she needs to go, right?

4   A.  No.

5   Q.  They couldn't?

6   A.  Correct.

7   Q.  But they could at least call the pain management office and

8   ask, right?

9   A.  Which pain management office?

10  Q.  That's listed on the letterhead, the referring physician,

11  Dr. Mirilishvili?

12  A.  Who's the patient going to call to make the appointment,

13  which orthopedist, which orthopedic office?

14  Q.  Doctor, you don't need to have a certain person in mind.

15  If a doctor doesn't know who is the best person to treat this

16  person within Lincoln Hospital, it's not acting like a drug

17  dealer to refer someone to Lincoln Hospital, is it?

18  A.  It has nothing to do with being a drug dealer.  You need to

19  be somewhat subspecialty specific in your referral.  Is it a

20  pain orthopedist, is it a spine orthopedist, or is it a hip or

21  knee orthopedist?

22  Q.  Some of that information is provided, at least to the

23  referring facility at Lincoln Hospital, under something called

24  the diagnostic ICD9 code?  If we could expand the bottom half

25  of the page.

1    A.  Yes.

2    Q.  You're familiar with what that means, the diagnostic ICD9

3    code, right?

4    A.  Yes.

5    Q.  These are codes that all doctors use for purposes, for

6    example, billing certain procedures, for purposes of insurance

7    or Medicare, Medicaid, correct?

8    A.  Yes.  And there are multiple code here.  Which one is the

9    patient being referring for?  He may have to go to different

10   orthopedists for each code.

11   Q.  That would provide that information, these codes refer back

12   to specific diagnoses, correct?

13   A.  Correct.  But who does the patient call?  They don't know

14   how to follow up on the advice is my point.

15   Q.  It may not be that all the information is just in a single

16   page piece of paper that the patient is relying on, right?

17   A.  It may not be.

18   Q.  There's also oral communication, correct?

19   A.  There could be.

20   Q.  In fact, making diagnoses on the referral is at least is

21   giving you, the referring doctor, some starting information

22   before -- they're going to call the doctor anyway, correct?

23   A.  I don't understand the question.

24   Q.  The information, although it's not readily apparent to a

25   layperson, has different diagnoses based on the codes that are

G3ALMIR5                        Gharibo - cross

1  on this referral, correct?

2  A.  Correct.

3  Q.  And in the files that you've seen with Dr. Mirilishvili, I

4  mean he often referred patients to specific additional pain

5  management modalities, correct?

6  A.  Physical therapy type modalities were more specific.

7  Q.  And pain interventionists, you saw that on occasion as

8  well, correct?

9  A.  Generally no.  Interventional pain management was put down,

10  but the intervention was not specified.

11  Q.  But I think we talked earlier that interventional pain

12  management, you understand, is usually involving injection

13  therapy, correct?

14  A.  Correct.

15  Q.  What he didn't specify is what kinds of specific injection

16  therapy the patient may need?

17  A.  Correct.

18  Q.  In fact, he may leave it to the intervention specialist

19  like yourself to make that determination, correct?

20  A.  Yes.

21  Q.  You testified on direct examination about the fact that

22  medical records were found in Dr. Mirilishvili's home was

23  disturbing to you?

24  A.  Disturbing?

25  Q.  It was a bad thing?

G3ALMIR5                        Gharibo - cross

1   A.  They were inadequate.

2   Q.  They're inadequate.  Did you testify on direct that the

3   fact that they were located in his home, that they should have

4   been in his office; is that right?

5   A.  Yes.

6   Q.  Now, it's not acting outside of legitimate medical practice

7   to bring your files home at night so you can work on them, is

8   that below medical judgment?

9   A.  No.

10  Q.  I want to talk to you about urine drug testing, because you

11  mentioned on direct examination that you found very high

12  numbers in concentration of oxycodone in some of the lab

13  reports that you reviewed, correct?

14  A.  Yes.

15  Q.  Now, you would agree with me that the issue of urine drug

16  testing is one that has been slow developing, is that a fair

17  characterization, in the pain management community?

18  A.  You said still developing, is that what you said?

19  Q.  Slow developing.

20  A.  Slow developing?

21  Q.  Slow developing.

22  A.  I'm mishearing.

23  Q.  The issue of urine drug testing within pain management

24  community has not been -- there hasn't been a lot of guidance

25  that's been given to pain management clinicians?

G3ALMIR5                         Gharibo - cross

1    A.  It's evolving.

2    Q.  It's evolving.  And there's still no set standards with

3    respect to how to test and who to test and what to do as a

4    result of certain testing findings?

5    A.  There's nothing nationally accepted.

6    Q.  OK.  And in fact, there has been surprising results of

7    surveys, medical surveys that have been conducted by pain -- in

8    the pain management community to indicate that many

9    practitioners can't interpret their own lab reports or the lab

10   reports that they've ordered, right?

11   A.  Yes.

12   Q.  In fact, you've written about that, right?

13   A.  Yes.

14   Q.  You've written an article called the Role of Urine Drug

15   Testing for Patients on Opioid Therapy, coauthored with a bunch

16   of other practitioners, correct?

17   A.  Correct.

18   Q.  That was published in or about 2010, right?

19   A.  Sounds right.

20   Q.  And you reported that a total of 99 attendees at the

21   American Congress of Pain Medicine were surveyed about their

22   urine testing practices for patients on opioid therapy; do you

23   remember that?

24   A.  Yes.

25   Q.  And the results of that you described surprising, right?

1   A.   Yes.

2   Q.   That more urine testing was motivated by a desire to detect

3   undisclosed substances than to evaluate appropriate opioid use?

4   A.   Correct.

5   Q.   But I thought you testified on direct examination that you

6   would -- surprising that some of the lab reports that

7   Dr. Mirilishvili ordered was only for opioid use?

8   A.   Right.  You need to go into undisclosed urine drug tests as

9   well in that not just what you're prescribing, but anything

10  else that the patient may be exposed to.  Don't overfocus your

11  urine drug testing is the message.

12  Q.   One of the messages of the article you wrote back in 2010

13  was that, you know, you shouldn't just focus on other drug use

14  by the patient but you should also -- you should really focus

15  on the opioid use, right?

16  A.   Both.  You got to focus on both is what I'm saying.

17  Q.   But without standards, the fact that he even took -- he

18  even had his patients do a urine drug test is something that

19  goes beyond what was required of him, right?

20  A.   It's beyond what's required.

21  Q.   And then the other thing about that survey that you

22  reported about from the American Congress of Pain Medicine that

23  were taken by different pain management doctors was the

24  following, that some respondents never urine tested their

25  opioid patients and about two-thirds, two-thirds of respondents

G3ALMIR5                    Gharibo - cross

1   had no formal training in urine testing of patients on opioid

2   therapy.

3           That's what you reported as a result of the survey

4   that was conducted for purposes of your own article, correct?

5   A.  Correct.  It doesn't --

6           THE COURT:  Correct.  Yes.  Thank you.

7   Q.  In the time period that we're talking about in this

8   indictment, it is not, it wasn't outside of two-thirds of

9   respondents in your survey to not know or have formal training

10  about how to interpret the results of a urine test, correct?

11  A.  They may not have been opioid prescribers.

12  Q.  That's not what my question is.  My question is based on

13  the survey that you conducted and wrote about, more than

14  two-thirds of the respondents, pain management people, didn't

15  know how to interpret their own drug tests, right?

16  A.  That's correct, because they may be nonprescribers.

17  Q.  But you don't know that?  You took the survey, right?

18          THE COURT:  Are you arguing with him?

19          MR. MAZUREK:  No.  I'm sorry.

20          THE COURT:  It sure sounds like it.

21  Q.  Doctor, all I'm asking is based on this survey and what you

22  wrote about in your own article, The Role of Urine Drug Testing

23  for Patients on Opioid Therapy, more than two-thirds of pain

24  management physicians didn't know how to interpret their test;

25  is that correct?

1    A.  That's correct.  That means they may not be ordering it as

2    well.

3    Q.  But now you're speculating.  The last part of your answer

4    is speculation?

5    A.  No, it's not speculation.

6    Q.  Well, that wasn't indicated in your article?

7    A.  I would like to take a look at the article and comment

8    then.

9          MR. MAZUREK:  Your Honor, may I approach?

10          THE COURT:  Can he take a look at the article at the

11   break, which will be in about a few minutes.  Want to do a

12   break now?  Yes, they want to do a break now.  He can take a

13   look at the article during the break.  Don't discuss the case.

14   Keep an open mind.

15          (Recess)

16          THE COURT:  OK.  Sir, you're still under oath.

17          Mr. Mazurek.

18          MR. MAZUREK:  Thank you, your Honor.

19   Q.  Doctor, before the break we were talking about the survey

20   that was conducted as part of your article on the role of urine

21   drug testing for patients on opioid therapy, and maybe I can

22   shortcut this by asking this question:  Fair to say based on

23   the results of your -- the survey that was conducted in this

24   article that it's not unusual during that time period to find

25   pain management practitioners not fully understanding the

G3ALMIR5                        Gharibo - cross

1    results of their drug tests?

2    A.  I disagree.

3    Q.  You disagree.  But that is contrary to -- your disagreement

4    is contrary at least to the survey that you reported in your

5    own article, correct?

6    A.  No.

7    Q.  All right.  Well, I'm just going to ask again the question

8    about the survey.  Is it not true, and I'm reading from the

9    first page of your article, that a total of 99 attendees at the

10   American Congress of Pain Medicine were surveyed in 2008 about

11   the urine testing practices for patients on opioid therapy; is

12   that correct?

13   A.  Yes.

14   Q.  OK.  And I'm going to skip a sentence to the results of

15   that test, the results of that survey showed that some

16   respondents never urine tested for opioid patients, correct?

17   A.  Correct.

18   Q.  And about two-thirds of respondents had no formal training

19   in urine testing for patients on opioid therapy.

20          Is that also correct?

21   A.  Correct, no formal training.  It doesn't mean they didn't

22   have training.

23   Q.  They have no formal training in urine testing, correct,

24   more than two-thirds of respondents?

25   A.  Correct, nothing formal.

G3ALMIR5                    Gharibo - cross

1    Q.  And most respondents did random rather than scheduled

2    testing, right?

3    A.  Yes.

4    Q.  And few had any urine testing protocol, correct?

5    A.  Yes.

6    Q.  And the study found motivations for urine testing and

7    testing practices varied widely among these practitioners,

8    right?

9    A.  Correct.

10   Q.  And urine testing, despite its clinical utility, is not

11   used consistently, right?

12   A.  Correct.

13   Q.  And that was reported in your own article, correct?

14   A.  Correct.

15   Q.  Now, in recordkeeping, just a couple of questions.  I know

16   we spoke a lot about the electronic medical records, right?

17   A.  Yes.

18   Q.  A physician is not required to keep records in multiple

19   forms; is that right?  Let me ask it more clearly.

20          If you upload your records onto a electronic database,

21   you're not required to also keep them in another form, such as

22   hard copy?

23   A.  Correct.

24   Q.  I'm going to put on the screen what's already been admitted

25   into evidence as GX442, which was a notebook that was found in

G3ALMIR5                        Gharibo - cross

1    Dr. Mirilishvili's office, and ask you to turn to page 7 which

2    is No. 014827.  Were you asked to -- let me give you a copy of

3    this.

4            Were you asked to review this notebook as part of your

5    review of Dr. Mirilishvili's files?

6    A.  No.

7    Q.  If you could just peruse it quickly.  It's in evidence.

8            Does it appear to be a series of notes regarding

9    pharmacological treatment or uses of different kinds of

10   medicines, including opioids?

11   A.  I don't know.  Just a lot of pages here.  It does cover

12   medicines.

13   Q.  Let's look at the page that's on the screen, and I'm going

14   to ask you to read from the middle portion.

15           Does it appear to read considering to opioid

16   tolerance, do you see that line?

17   A.  Yes.

18   Q.  And then there are a series of different medicines and

19   dosages --

20   A.  Yes.

21   Q.  -- do you see that.  The first is 60 milligram morphine

22   sulfate OD.  Do you see that?

23   A.  Yes.

24   Q.  25 milligrams of fentanyl?

25   A.  Yes.

1   Q.   30 milligrams oxycodone?

2   A.   Yes.

3   Q.   And 8 milligrams of hydromorphone?

4   A.   Yes.

5   Q.   These are all different types of opioids?

6   A.   Yes.

7   Q.   And the 30 milligrams of oxycodone is what you saw

8   predominantly prescribed, the dosage you found prescribed by

9   Dr. Mirilishvili, right?

10   A.   He prescribed 90 milligrams, not 30.  These are ODs or QD,

11   daily.

12   Q.   The dosages on this list are all dosages that are

13   considering to opioid tolerance?

14   A.   These are daily dosages of an opioid that suggests build up

15   of tolerance.  Not unit dosages, the entire day.

16            THE COURT:  What do you mean by unit doses?

17            THE WITNESS:  Per pill, your Honor.

18            THE COURT:  OK.

19   Q.   And the issue of opioid tolerance we talked about before,

20   that is someone who was previously had been on opioid

21   medication; is that right?

22   A.   It can be.

23   Q.   Tolerance, meaning they built up to some type of level

24   where they can take in higher dosages of the opioid, correct?

25   A.   Correct.

G3ALMIR5                         Gharibo - cross

1    Q.  And the other types of opioids that are listed here, they

2    are opioids that are sometimes used in chronic long-term pain

3    management?

4    A.  Yes.

5    Q.  Some of them have also illicit drug uses, correct?

6    A.  Yes.

7    Q.  Fentanyl, for example, is something that you know has a

8    very high street value; is that right?

9    A.  Not in a patch form.  In IV form.

10            THE COURT:  I'm sorry, you said not in patch form.  In

11   what?

12            THE WITNESS:  Intravenous, your Honor.

13            THE COURT:  Intravenous form.

14            THE WITNESS:  Injectable form.

15   Q.  Is it fair to say that the fentanyl and morphine are higher

16   risk drugs than oxycodone?

17   A.  No.

18   Q.  Let me ask it this way.  Before you start recommending

19   fentanyl or morphine, you're going to require that the patient

20   have more careful monitoring, you want to see a patient more

21   than once per month, right?

22   A.  No.

23   Q.  Why not?

24   A.  They only require comparable monitoring, not one more than

25   the other.  They all have comparable risk.  I would say

G3ALMIR5                        Gharibo - cross

1    oxycodone probably has the greatest risk and fentanyl patch the

2    lowest risk.

3    Q.  Well, it would depend in terms of how you're prescribing

4    and what levels you're prescribing, correct?

5    A.  That too.  But demographically speaking, oxycodone is the

6    most abused and diverted, by far.

7    Q.  Now you're just speaking in terms of diversion?

8    A.  Abused and diverted, by far.

9    Q.  But in terms of your acting as a medical doctor in terms of

10   the treatment that you're providing, fentanyl and morphine are

11   very, very strong drugs, correct?

12   A.  Not as prescribed.  Morphine is weaker than oxycodone.

13   Fentanyl is more potent than oxycodone, but instead of

14   milligrams, it's prescribed as micrograms.  So these are all

15   about equally potent, equally analgesic.

16   Q.  At the levels that they're defined, that they're given

17   here?

18   A.  Yes.

19   Q.  In the files -- you can take this off.

20          In the files that you reviewed, you saw in the patient

21   files that Dr. Mirilishvili used something called a controlled

22   substance patient agreement?

23   A.  Yes.

24   Q.  And that is something that you recommend using, correct?

25   A.  Yes.

1012

G3ALMIR5                         Gharibo - cross

1   Q.   And because it shows that or it gives information to the

2   patient with respect to informed consent, right?

3   A.   Yes.

4   Q.   To use controlled substances?

5   A.   Yes.

6   Q.   And that is not required, but to be given by doctors,

7   correct?

8   A.   Correct.

9   Q.   And it is -- certainly it's exceeds the minimum level of

10  standard care, correct?

11  A.   Yes.

12  Q.   Now, one of the recommendations that or guidelines that are

13  given in the pain management community or consensus on is that

14  if you're going to prescribe controlled substances to a patient

15  that it's recommended that the patient use a single pharmacy;

16  is that right?

17  A.   Yes.

18  Q.   And the reason for that is quite simply that the pharmacy

19  and pharmacist can develop a relationship with the patient and

20  monitor their regular treatment of the controlled substances,

21  correct?

22  A.   Yes.

23  Q.   And by recommending that, a physician would be operating

24  under the standard of care?

25  A.   Correct.

 1              MR. MAZUREK:  I have nothing further, your Honor.

 2              MS. CUCINELLA:  Brief redirect, your Honor.

 3   REDIRECT EXAMINATION

 4   BY MS. CUCINELLA:

 5   Q.  Dr. Gharibo, on cross-examination Mr. Mazurek showed you a

 6   urinalysis report for a patient Antonio Pedraza, whose file you

 7   had reviewed, correct?

 8   A.  Yes.

 9   Q.  That was for February of 2013.  Ms. Joynes, can you pull

10   that up.  On cross-examination Mr. Mazurek asked you if you

11   could put everything aside and say whether it was appropriate

12   to continue opioid treatment based on this urinalysis exam or

13   report.

14              THE COURT:  Is there a question?

15              MS. CUCINELLA:  Apologies, your Honor.  I was waiting

16   for it to pop up on his screen.  I think there's technical

17   difficulties.

18   Q.  Do you see that on your screen, Dr. Gharibo?

19   A.  Yes.

20   Q.  So Mr. Mazurek asked you whether it was appropriate to

21   continue opioid treatments if you put everything aside, and you

22   responded that you couldn't answer that question.  Why couldn't

23   you answer that question?

24   A.  Because you need to consider other factors.  And certainly

25   this would make me pause and probably not prescribe just

1   because of the presence of cocaine metabolite, which would be

2   an absolute no-no in terms of going forward with the oxycodone.

3   But we never just look at these tests in a vacuum.  It's the

4   whole circumstances that matter.  So I would have to do a

5   clinical evaluation, talk with the patient, and challenge them

6   on the urinalysis.

7            MS. CUCINELLA:  Thank you.  You can take that down,

8   Ms. Joynes.

9   Q.  Mr. Mazurek also showed you what's been marked for

10  identification as Defendant's Exhibit DM706; do you recall

11  that?  It's the Use of Opioids for the Treatment of Chronic

12  Pain from the American Academy of Pain Medicine.

13  A.  I do.

14  Q.  Do you still have that document before you?

15  A.  Yes.

16  Q.  How many pages is that document?

17  A.  Four.

18  Q.  Mr. Mazurek directed you to one sentence in the second

19  paragraph; is that right?

20  A.  Yes.

21  Q.  And he asked you about that one sentence; is that right?

22  A.  Yes.

23  Q.  And he asked you whether you agreed with what it said.  I'm

24  going to direct you now to page 3 of that document,

25  paragraph 4.

G3aemir6                         Gharibo – recross

1   BY MS. CUCINELLA:

2   Q.  It reads, opioids should be prescribed only after a

3   thorough evaluation of the patient, consideration of

4   alternatives, development of a treatment plan tailored to the

5   needs of the patient and minimization of adverse effects and

6   ongoing monitoring and documentation.

7           Do you agree with that?

8   A.  Yes.

9   Q.  It also goes on to say that the American Academy of Pain

10  Medicine believes that guidelines for prescribing opiates

11  should be an extension of the basic principles of good

12  professional practice.  Do you agree with that?

13  A.  Yes.

14  Q.  Up above where it says diversion, it says, diversion of

15  controlled substances should be a concern of every health

16  professional.

17          Do you agree with that?

18  A.  Yes.

19          MS. CUCINELLA:  Nothing further.

20          THE COURT:  Anything else?

21          MR. MAZUREK:  Very briefly.

22  RECROSS EXAMINATION

23  BY MR. MAZUREK:

24  Q.  And would you agree with the statement that taking the last

25  question that putting into place a urine drug testing system

G3aemir6                    Gharibo - recross

1    and checking the PMP are two steps that you can take to try to

2    avoid drug diversion?

3    A.  Yes.

4    Q.  And the questions about Mr. Pedraza, some of the

5    circumstances that might be interesting to know about the

6    fellow is whether, while on opioid treatment, he was actually

7    improving his functionality, correct?

8    A.  One of them that is, yes.

9    Q.  And that he had been suffering from two bullet wounds in

10   his right leg and an abdominal stab wound, that would be

11   something you'd want to consider, too, right?

12   A.  It still doesn't justify the treatment.

13   Q.  Well --

14          THE COURT:  The question is:  Is it something you

15   would want to consider?

16          THE WITNESS:  It would be considered.

17   Q.  And if, after being put on the treatment, he said he was

18   feeling better with respect to the pain that he had been

19   feeling from these wounds, that would be something you'd want

20   to consider, right?

21   A.  It would be considered, but the treatment would be changed.

22          MR. MAZUREK:  Your Honor, nothing further.

23          THE COURT:  Anything else?

24          MS. CUCINELLA:  Nothing from the government.

25          THE COURT:  Thank you, Doctor.  You may step down.

1          (Witness excused)

2              THE COURT:  Call your next witness.

3              MR. DISKANT:  The government calls DEA analyst Adrian

4    Castro.

5     ADRIAN CASTRO,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. DISKANT:

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  Where are you currently employed?

13   A.  Drug Enforcement Administration.

14   Q.  What is your title?

15   A.  Intelligence research specialist.

16   Q.  What is an intelligence research specialist?

17   A.  Analyze multiple documents to include bank records, phone

18   records, prescription laundering program data.

19   Q.  Records collected during DEA investigations?

20   A.  Correct.

21   Q.  And how long have you done that?

22   A.  For the last seven years.

23   Q.  Prior to that were you employed?

24   A.  Yes.

25   Q.  How were you employed?

G3aemir6                          Castro - direct

1    A.  With the United States Army.

2    Q.  What did you do for the Army?

3    A.  I was an intelligence officer for eight-and-a-half years.

4    Q.  As part of your responsibilities with the DEA, are you

5    assigned to a particular group or unit?

6    A.  Yes.

7    Q.  Which group or unit are you assigned to?

8    A.  The tactical diversion squad.

9    Q.  And as part of your work as an analyst with the tactical

10   diversion squad, have you been involved in the investigation of

11   Dr. Moshe Mirilishvili?

12   A.  Yes.

13   Q.  What sorts of things have you done as part of that

14   investigation?

15   A.  I've reviewed prescription monitoring data from New York

16   State.  I've looked at bank records, tax records, phone

17   records, Medicaid claims and reviewed patient files.

18   Q.  And in addition to doing those things, have you

19   participated in any searches?

20   A.  Yes.

21   Q.  Searches of what?

22   A.  Of the defendant's residence.

23   Q.  We're going to talk more about that search in a bit, but I

24   want to start with some of the documents and the records that

25   you have reviewed.  You mentioned BNE data?

G3aemir6                        Castro - direct

1   A.   Yes.

2   Q.   What is BNE data?

3   A.   It's prescriptions reported to the State of New York by the

4   pharmacy as written by the defendant.

5   Q.   And during the investigation did you obtain BNE data

6   pertaining to Dr. Mirilishvili?

7   A.   Yes.

8   Q.   Have you had a chance to review that data?

9   A.   Yes.

10  Q.   Have you created any charts or summaries of the data based

11  on your review?

12  A.   Yes.

13            MR. DISKANT:  Your Honor, may I approach?

14            THE COURT:  You may.

15  Q.   I've handed you what's been marked for identification

16  purposes as Government Exhibits 101 through 105.  If you could

17  take a look at those.

18            Do you recognize those?

19  A.   Yes.

20  Q.   Did you participate in the production of them?

21  A.   Yes.

22  Q.   Do they fairly and accurately summarize the data obtained

23  by your group from the BNE?

24  A.   Correct.

25            MR. DISKANT:  The government offers Government

1020

G3aemir6                          Castro - direct

1    Exhibits 101 through 105.

2              MR. GOSNELL:  No objection.

3              THE COURT:  Admitted.

4              (Government's Exhibit 101 through 105 received in

5    evidence)

6    BY MR. DISKANT:

7    Q.  What period of time is covered by the BNE data obtained by

8    the government regarding Dr. Mirilishvili?

9    A.  From 2010 to 2014.

10   Q.  And did you break down the data by subsets of that time

11   period?

12   A.  Correct.

13   Q.  So if we could bring up Government Exhibit 101.

14             Analyst Castro, this is one of the charts that you

15   created?

16   A.  Correct.

17   Q.  Now, let's start with the source of this information.  You

18   said that you gathered data from the BNE regarding

19   Dr. Mirilishvili?

20   A.  Yes.

21   Q.  Did you use all of that data in creating this summary

22   chart?

23   A.  No.

24   Q.  What data did you exclude?

25   A.  Any prescription that we could not match to pads associated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G3aemir6                        Castro - direct

1   to the defendant were removed.

2   Q.  Okay.  And with respect to stolen prescriptions, were there

3   any stolen prescriptions you were able to identify?

4   A.  Yes.

5   Q.  How many?

6   A.  There was 12 that were reported by the pharmacies that

7   appeared on the defendant's BNE.

8   Q.  And any of the stolen prescriptions you identified

9   included -- are any of those included in any of these summary

10  charts?

11  A.  No, they are not.

12  Q.  Okay.  So looking back to Government Exhibit 101 here,

13  looks like there are approximately 591 total controlled

14  substance prescriptions that were reported as written by the

15  defendant in 2010?

16  A.  Yes.

17  Q.  And moving to the pie chart below that, can you just

18  explain to the jury the work that you've done there.

19  A.  So I broke down by type of drug.  The oxycodone is

20  approximately 68 percent of the overall controlled substances

21  written that year.  And the other schedule two through five

22  make up the remainder.

23  Q.  Okay.  And with respect to the oxycodone prescriptions

24  themselves, there's a box that indicates a list of them.  What

25  is that?

1    A.   That's the breakdown by milligram for the oxycodone.

2    Q.   So focusing your attention on the red box where it says

3    oxycodone, 30 milligrams, what percentage of the defendant's

4    prescriptions for controlled substances in 2010 were for that

5    particular drug and dosage?

6    A.   Approximately 3 percent.

7    Q.   Did you conduct a similar analysis for the year 2011?

8    A.   Yes.

9    Q.   If we could go to Government Exhibit 102.  Analyst Castro,

10   it looks like for the year 2011, approximately 61 percent of

11   the reported prescriptions associated with the defendant were

12   for oxycodone, is that right?

13   A.   Correct.

14   Q.   And of those, of all of the controlled substance

15   prescriptions, about 18 percent were for oxycodone,

16   30-milligram tablets?

17   A.   Yes.

18           THE COURT:  Would you mind not asking leading

19   questions, please.

20           MR. DISKANT:  I'm sorry.

21           THE COURT:  Thank you.

22   Q.   What percentage written were oxycodone, 30 milligrams?

23   A.   18 percent.

24   Q.   Analyst Castro, did you do a similar chart for the year

25   2014?

G3aemir6                          Castro - direct

1   A.  Yes.

2   Q.  If you could go to Government Exhibit 103.

3           Analyst Castro, could you walk us through some of the

4   changes you identified in 2014 as opposed to the two prior

5   charts we've been talking about?

6   A.  So in 2014 there's a total of 5,800 controlled substance

7   scripts, prescriptions reported to the State of New York by the

8   pharmacies as written by the defendant.  Of that number,

9   99 percent were written for oxycodone.

10          MR. DISKANT:  Ms. Joynes, is it possible to bring up

11  as a split screen Government Exhibit 101 through Government

12  Exhibit 103.

13  Q.  So, Analyst Castro, in terms of the total number of

14  prescriptions written, what's the comparison between 2010 and

15  2014?

16  A.  It's approximately 10 times larger in 2014.

17  Q.  And in terms of the makeup of the prescriptions and the

18  percentage of them that are oxycodone 30-milligram

19  prescriptions, what is the change over time?

20  A.  It's about a 95 percent difference.

21          MR. DISKANT:  Ms. Joynes, if we could bring up

22  Government Exhibit 104.

23  Q.  Now, Analyst Castro, this says at the top October 2012 to

24  December 2014?

25  A.  Yes.

G3aemir6                           Castro - direct

1   Q.  Why did you focus on that time period?

2   A.  To my knowledge, that is the time frame when the new office

3   on 162nd Street was open.

4   Q.  And for this particular time frame what total number of

5   prescriptions were reported as written by the defendant?

6   A.  13,613.

7   Q.  And of those, what percentage of them were written for

8   oxycodone?

9   A.  99 percent.

10  Q.  And what percentage were written as 90 pills of

11  30-milligram oxycodone tablets?

12  A.  95 percent of the total.

13  Q.  And one final chart, Analyst Castro.  If we could go to

14  105.  What are we looking at here?

15  A.  This is just for the oxycodone 30 milligrams written from

16  2012 to 2014.

17  Q.  Charted by month?

18  A.  Yes.

19  Q.  Analyst Castro, are you familiar with the facility known as

20  Astramed?

21  A.  Yes.

22  Q.  Where is Astramed located?

23  A.  It was located on Southern Boulevard and Freeman in the

24  Bronx.

25  Q.  Is it still open?

G3aemir6                    Castro - direct

1    A.  No, it is not.

2    Q.  Do you know when it closed?

3    A.  On February 4, 2014.

4    Q.  And prior to closing do you know who the doctor was there?

5    A.  Yes.  Dr. Robert Terdiman.

6    Q.  In addition to evaluating the number and type of

7    prescriptions, did you look at the pharmacies that were

8    reporting these prescriptions or filling the prescriptions?

9    A.  Yes.

10   Q.  Did you prepare any summary charts analyzing those

11   findings?

12   A.  Yes, I did.

13           MR. DISKANT:  Ms. Joynes, if we can show the witness

14   what's been marked for identification purposes as Government

15   Exhibit 106 and 108.

16   Q.  Do you recognize those?

17   A.  Yes.

18   Q.  Did you participate in the creation of these?

19   A.  Yes.

20   Q.  Do they fairly and accurately summarize the data contained

21   in the BNE records produced to the government?

22   A.  Yes.

23           MR. DISKANT:  The government offers Government

24   Exhibits 106 and 108.

25           MR. GOSNELL:  No objection.

G3aemir6                          Castro - direct

1             THE COURT:  Admitted.

2             (Government's Exhibit 106 and 108 received in

3     evidence)

4     BY MR. DISKANT:

5     Q.  We can start with Government Exhibit 106.  Analyst Castro,

6     if you could talk the jury through the work that you've done

7     here.

8     A.  So, for this, this is the top five pharmacies that recorded

9     filling prescriptions as written by the defendant from

10    January 2012 to December 2014.

11    Q.  And what is the number one pharmacy?

12    A.  MNS pharmacy.

13    Q.  Just reading across the column, it appears the second

14    column is the number of prescriptions?

15    A.  Correct.

16    Q.  What's the fourth column all the way over?

17    A.  It's the percentage of overall controlled substances

18    written by -- as reported written by the defendant.

19    Q.  So 12 percent of the overall prescriptions were filled at

20    MNS, is what that indicates?

21    A.  Yes.

22    Q.  Are you familiar with MNS pharmacy?

23    A.  Yes, I am.

24    Q.  How are you familiar with it?

25    A.  I've been to the location.

1   Q.   Where is it located?

2   A.   Approximately seven blocks away from the clinic.

3   Q.   Have you looked at data, BNE data, for other pharmacies in

4   and around that general location?

5   A.   Yes.

6   Q.   Let's go to Government Exhibit 108.  And what are we

7   looking at here?

8   A.   This is a breakdown of the zip code, all the pharmacies

9   that have reported prescriptions filled to the State of

10  New York as written by the defendant.

11  Q.   And how many of those were sent to MNS pharmacy?

12  A.   Well, 1,853.

13  Q.   Have you been to the location of the defendant's clinic?

14  A.   Yes, I have.

15  Q.   Are you familiar with the closest pharmacy in physical

16  proximity to the clinic?

17  A.   Yes.

18  Q.   What is that?

19  A.   It's a Rite Aid.

20  Q.   How far away is that?

21  A.   It's right down the street.

22  Q.   How many of the defendant's prescriptions as reflected in

23  the BNE data were filled at that Rite Aid?

24  A.   None.

25  Q.   If we can show what's been marked for identification

G3aemir6                          Castro - direct

1    purposes as Government Exhibits 110 and 111.

2              Analyst Castro, do you recognize these?

3    A.  Yes.

4    Q.  What are they?

5    A.  These are the prescriptions reported to the State of

6    New York BNE as written by the defendant for 10/28/2014 and

7    January 10, 2013.

8    Q.  Do they fairly and accurately summarize the underlying BNE

9    data?

10   A.  Yes.

11             MR. DISKANT:  The government offers 110 and 111.

12             MR. GOSNELL:  No objection.

13             THE COURT:  Admitted.

14             (Government's Exhibit 110 and 111 received in

15   evidence)

16             MR. DISKANT:  Ms. Joynes, if we could just briefly

17   publish each of those.  Ms. Joynes, if we could bring up what's

18   in evidence as Government Exhibit 1302.

19   BY MR. DISKANT:

20   Q.  Analyst Castro, do you recognize this document?

21   A.  Yes.

22   Q.  What do you understand it to be?

23   A.  Document provided by Aegis Medical Lab.

24   Q.  And are a list of individual names on the list?

25   A.  Correct.

G3aemir6                        Castro - direct

1    Q.  What, if anything, did you do with those names?

2    A.  I ran those individuals in the New York State BNE for

3    prescriptions written by the defendant.

4    Q.  Did you focus on any particular time period in your

5    analysis?

6    A.  Yes.  After August 1, 2014.

7    Q.  And why did you focus on that time period?

8    A.  It was my understanding that this letter was published or

9    it was created in July of 2014.

10             MR. DISKANT:  If we can show the witness only what has

11   been marked for identification purposes as Government

12   Exhibit 109.

13   Q.  Do you recognize this, Analyst Castro?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's a document of the individuals listed on the Aegis

17   paperwork, followed by prescriptions that they received after

18   that date.

19   Q.  Is this based on information that you obtained from

20   Government Exhibit 1302, as well as the BNE data?

21   A.  Yes.

22             MR. DISKANT:  The government offers 109.

23             MR. GOSNELL:  No objection.

24             THE COURT:  Admitted.

25             (Government's Exhibit 109 received in evidence)

1    BY MR. DISKANT:

2    Q.  Now, Analyst Castro, other than the name on the list that

3    we were just looking at, how many of them, according to the BNE

4    data, obtained prescriptions from the defendant on or after

5    August 1st of 2014?

6            Can we go to the second page, please.

7    A.  Twenty-seven.

8    Q.  And just sticking with what we're looking at here, reading

9    the first one, the name Michael Thompson, how many additional

10   prescriptions for oxycodone did he receive after August 1st?

11   A.  Four.

12   Q.  On the dates indicated on the summary chart?

13   A.  Correct.

14   Q.  And for Peyton Branson it would be two?

15   A.  Yes.

16   Q.  And what were the prescriptions for, according to the BNE

17   data?

18   A.  For oxycodone, 30 milligrams.

19   Q.  Ninety tablets?

20   A.  Correct.

21   Q.  Is that true of all of these patients?

22   A.  Yes.

23   Q.  Let's switch gears a little bit and talk about Medicaid

24   data, which was another area of -- or type of document you

25   referenced looking at.

1    A.  Yes.

2    Q.  Were you able to obtain information regarding Medicaid or

3    Medicaid-eligible insurance programs with respect to the

4    defendant?

5    A.  Yes.

6             MR. DISKANT:  Your Honor, at this time the government

7    would seek to offer a stipulation, which I can hand up, if the

8    Court would like to read it.

9             THE COURT:  Thank you.

10            You will remember, ladies and gentlemen, that a

11   stipulation is an agreement by both sides either that a

12   particular fact is true or that a particular person would

13   testify to certain things, if that person were called as a

14   witness.  And it looks like this stipulation is of the latter

15   variety.

16            One, if called as a witness at trial, a custodian of

17   records from the Department of Health and Human Services Office

18   of Inspector General, referred to as HHS, would testify that

19   Government Exhibits 1209 and 1210 are true and accurate copies

20   of records obtained from HHS; that the original records were

21   all made at or near the time, by or from information

22   transmitted by a person with knowledge of the matters set forth

23   in the records; that they were kept in the ordinary course of

24   HHS's regularly conducted business activity; and that it was

25   the regular practice of that business activity to make the

G3aemir6                              Castro - direct

1    records.

2            Two, the HHS custodian of records would further

3    testify that Government Exhibit 1209 reflects all claims

4    submitted by Moshe Mirilishvili, the defendant, for patient

5    visits between January 1, 2011, and December 31, 2014, and paid

6    for through the Medicaid and/or Medicare programs administered

7    by HHS; that column 41 of Government Exhibit 1209 reflects the

8    name of the patient; that column 56 of Government Exhibit 1209

9    reflects the date of the visit; that column blank?

10           There's a column that's blank.

11           MR. DISKANT:  I apologize, your Honor.  The parties

12   may have signed the incorrect version.

13           THE COURT:  The wrong copy?  What's the column that

14   reflects the name of the insurance company?

15           MR. DISKANT:  Perhaps we could offer these subject to

16   connection on the stip and clean that up out of the presence of

17   the jury.

18           THE COURT:  Okay.  There's another column that

19   reflects the name of the Medicaid or Medicare-eligible

20   insurance plan the patient was a member of; and that columns 50

21   and 53 reflect any payment made to the defendant in connection

22   with the visit.

23           Three, the HHS custodian of records would further

24   testify that Government Exhibit 1210 reflects all pharmacy

25   claims submitted for prescriptions reported to HHS as written

G3aemir6                         Castro - direct

1   by Moshe Mirilishvili, the defendant, between January 1, 2011,

2   and December 31, 2014, and paid for through the Medicaid and/or

3   Medicare programs administered by HHS; that column M of

4   Government Exhibit 1210 reflects the name of the patient; that

5   columns AH and AI reflect the medication and the dosage

6   prescribed respectively; and that column AK of Government

7   Exhibit 1211 indicates the date on which the prescription was

8   filled.

9           It is further stipulated and agreed that this

10  stipulation, Government Exhibit 1004, may be received into

11  evidence.

12          And it is received into evidence as a government

13  exhibit at trial.

14          (Government's Exhibit 1004 received in evidence)

15          MR. DISKANT:  Thank you, your Honor.

16          The government would additionally move Government

17  Exhibits 1209 and 1210.

18          THE COURT:  Offer them?

19          MR. DISKANT:  Offer them.

20          MR. GOSNELL:  No objection.

21          THE COURT:  Admitted.

22          (Government's Exhibit 1209 and 1210 received in

23  evidence)

24  BY MR. DISKANT:

25  Q.  Analyst Castro, did you review the Medicaid data that we

G3aemir6                      Castro - direct

1    just heard the Court discussing?

2    A.  Yes.

3    Q.  And then you prepared charts summarizing what you found?

4    A.  Yes.

5    Q.  I'm handing you what have been marked for identification

6    purposes as Government Exhibits 117 and 118.  Do you recognize

7    those?

8    A.  Yes.

9    Q.  What are they?

10   A.  They're summary charts for the date -- the Medicaid data

11   that was reviewed.

12   Q.  Okay.  Medicaid data we were just talking about?

13   A.  Correct.

14   Q.  Do they fairly and accurately summarize that data?

15   A.  Yes.

16           MR. DISKANT:  The government offers 117 and 118.

17           MR. GOSNELL:  No objection.

18           THE COURT:  Admitted.

19           (Government's Exhibit 117 and 118 received in

20   evidence)

21   BY MR. DISKANT:

22   Q.  Let's start with 118.  Analyst Castro, if you could just

23   talk us through the work you did in creating this chart.

24   A.  So the Medicaid claims and managed care visits are depicted

25   in the third column.  That is patient -- unique patient visits

G3aemir6                          Castro - direct

1    that were paid for by either Medicaid or one of the managed

2    care providers totaling 4,388.

3    Q.  Okay.  And then the fourth column to the right of that?

4    A.  That's the amount of -- that Medicaid or the managed care

5    plans paid out to the defendant.

6    Q.  And the second column, where does that come from?

7    A.  That information comes from the New York State BNE data.

8    Q.  BNE data we were just talking about?

9    A.  Yes.

10   Q.  So, for example, in 2012 it looks like -- the first column

11   indicates the number of total oxycodone prescriptions reported

12   as written by the defendant?

13   A.  Yes.

14   Q.  And the second column indicates the number of patient

15   visits to the defendant reported as paid by Medicaid or

16   insurance company?

17   A.  Correct.

18        MR. DISKANT:  If we can look, then, at 117,

19   Ms. Joynes.

20   Q.  Analyst Castro, what are we looking at here?

21   A.  This is the amount of Medicaid patient visits paid for in

22   comparison to the oxycodone 30-milligram prescriptions reported

23   to the state, as written by the defendant.

24   Q.  And in doing this comparison, focusing your attention on

25   the left side of the chart here, what did you observe during

G3aemir6                         Castro - direct

1    the early part of 2012?

2    A.   The patient visits and the oxycodone were roughly even.

3    Q.   And how about in 2013 and 2014?

4    A.   The gap begins to widen.

5    Q.   In addition to looking at Medicaid and BNE data, you

6    mentioned looking at phone records?

7    A.   Yes.

8    Q.   Did you obtain phone records during the investigation?

9    A.   Yes.

10   Q.   Who did you obtain phone records for?

11   A.   For the defendant.

12            MR. DISKANT:  Your Honor, at this time the government

13   would offer another stipulation, which I can hand up.

14            THE COURT:  Does it have all its parts?

15            MR. DISKANT:  I certainly hope so.

16            THE COURT:  Okay.  It's stipulated and agreed by the

17   usual suspects that, one, if called as a witness at trial, a

18   custodian of records from AT&T Wireless would testify that

19   Government Exhibits 701 and 707, including all parts and

20   subdivisions thereof, are true and correct copies of records

21   obtained from AT&T regarding accounts associated with cell

22   numbers (516)429-4539 and (917)523-1804 respectively; that the

23   original records were all made at or near the time, by or from

24   information transmitted by a person with knowledge of the

25   matters set forth in the records; that they were kept in the

G3aemir6                          Castro - direct

1   ordinary course of AT&T's regularly conducted business

2   activity; and that it was the regular practice of that business

3   activity to make those records.

4           You keep hearing those words, ladies and gentlemen.

5   And let me explain to you that that incantation is necessary to

6   qualify these as business records and, therefore, admissible as

7   an exception to the hearsay rule.

8           Two, if called as a witness at trial, a custodian of

9   records from CableVision would testify that Government

10  Exhibit 702, including all parts and subdivisions thereof, is

11  true and correct copies -- is, no, are -- true and correct

12  copies of records obtained from CableVision regarding the

13  account associated with the call number (516)558-7453; and that

14  the original records qualified as business records.

15          Three, if called as a witness at trial, a custodian of

16  records from Sprint would testify that Government Exhibits 703,

17  704, 705 and 706, including all parts and subdivisions thereof,

18  are true and correct copies of records obtained from Sprint

19  regarding accounts associated with the call numbers

20  (646)538-1651, (516)669-7919, (845)531-1746 and (917)557-8455

21  respectively, and that the original records qualify as business

22  records.

23          Four, if called as a witness at trial, a custodian of

24  records from T-Mobile would testify that Government

25  Exhibit 708, including all parts and subdivisions thereof, is a

G3aemir6                        Castro - direct

1    true and correct copy of records obtained from T-Mobile

2    regarding the account associated with the call number

3    (516)978-0693, and that the original records qualify as

4    business records.

5              Five, if called as a witness at trial, a custodian of

6    records from Time Warner would testify that Government

7    Exhibit 709, including all parts and subdivisions thereof, is a

8    true and correct copy of records obtained from Time Warner

9    regarding the account associated with the call number

10   (646)559-1515, and that the original records were all made at

11   or near the time, by or from information transmitted by a

12   person with knowledge of the matters set forth in the records;

13   that they were kept in the ordinary course of Time Warner's

14   regularly conducted business activity; and that it was the

15   regular practice of that business activity to make those

16   records.

17             And it is stipulated and agreed that this stipulation,

18   Government Exhibit 1001, may be, and hereby is, received into

19   evidence as a government exhibit in this case.

20             (Government's Exhibit 1001 received in evidence)

21             MR. DISKANT:  Thank you, your Honor.

22   BY MR. DISKANT:

23   Q.  Analyst Castro, have you reviewed all of the exhibits that

24   you just heard the Court discuss?

25   A.  Yes.

G3aemir6                        Castro - direct

1    Q.  Let's start with the defendant's phone.  Have you reviewed

2    records for the defendant's phone?

3    A.  Yes.

4    Q.  How many phones of the defendant's did you review?

5    A.  Two.

6    Q.  And based on your review of that, were you able to identify

7    phones, phone numbers in contact with the defendant?

8    A.  Yes.

9         MR. GOSNELL:  Objection.

10        THE COURT:  I'm sorry?  What is the --

11        MR. GOSNELL:  The last part of the question.  The

12   contact with the defendant, as opposed to the phone numbers.

13        THE COURT:  I think you need to -- he's absolutely

14   right.  You need to clarify that question.

15   BY MR. DISKANT:

16   Q.  Were you able to identify phone numbers that were in

17   contact with the defendant's phone numbers?

18   A.  Yes.

19   Q.  Were you able to identify the subscribers or users of the

20   phone numbers in contact with the defendant's phone numbers?

21   A.  Yes.

22        MR. DISKANT:  At this time the government would offer

23   Government Exhibits 701 through 709.

24        MR. GOSNELL:  No objection.

25        THE COURT:  Admitted.

G3aemir6                          Castro - direct

1                    (Government's Exhibit 701 through 709 received in

2      evidence)

3      BY MR. DISKANT:

4      Q.   In addition to obtaining phone records, were you able to

5      identify the users or subscribers associated with the phone

6      numbers in other ways?

7      A.   Yes.

8      Q.   I'm showing you what is in evidence as Government

9      Exhibit 8.  Do you recognize this?

10     A.   Yes.

11     Q.   What is it?

12     A.   It's a telephone seized from Raymond Williams at the time

13     of his arrest.

14     Q.   And were you able to identify the call number associated

15     with Government Exhibit 8?

16     A.   Yes.

17     Q.   Are you familiar with an entity known as Ascan Pharmacy?

18     A.   Yes.

19     Q.   Were you able to identify a call number associated -- or a

20     call number, I should say, associated with Ascan Pharmacy?

21     A.   Yes.

22               MR. DISKANT:  Ms. Joynes, if you could show the

23     witness only what has been marked for identification purposes

24     as Government Exhibit 1203.

25     Q.   Analyst Castro, do you recognize that document?

G3aemir6                          Castro - direct

1   A.   Yes.

2   Q.   What is it?

3   A.   It's the DEA registration for Ascan Pharmacy.

4   Q.   Is this a document that came from DEA's files?

5   A.   Yes.

6   Q.   Was it made in the ordinary course of the DEA's business?

7   A.   Yes.

8           MR. DISKANT:   The government offers 1203.

9           MR. GOSNELL:   No objection.

10          THE COURT:   Admitted.

11          (Government's Exhibit 1203 received in evidence)

12   BY MR. DISKANT:

13   Q.   Finally, were you able to identify call numbers or phone

14   numbers based on the defendant's patient files?

15   A.   Yes.

16   Q.   Analyst Castro, did you prepare summary charts of all of

17   the phone records and information that we have just been

18   talking about?

19   A.   Yes.

20          MR. DISKANT:   If we can show the witness only what

21   have been marked for identification purposes as Government

22   Exhibits 115 and 116.

23   Q.   Analyst Castro, do you recognize these?

24   A.   Yes.

25   Q.   Are these summary charts that you prepared of the exhibits

1    that we've been discussing just now?

2    A.  Yes.

3    Q.  Do they fairly and accurately summarize the contents of

4    those exhibits?

5    A.  Correct.

6            MR. DISKANT:  The government offers 115 and 116.

7            MR. GOSNELL:  No objection.

8            THE COURT:  Admitted.

9            (Government's Exhibits 115 and 116 received in

10   evidence)

11           MR. DISKANT:  Ms. Joynes, if we can start with

12   Government Exhibit 116.

13   BY MR. DISKANT:

14   Q.  Analyst Castro, if you can talk us through what you've done

15   here.

16   A.  So this is for the cellular telephone associated to the

17   defendant, which is number (516)429-4539.

18   Q.  And that's what we're looking at in the center?

19   A.  Correct.

20   Q.  Okay.  Keep going.

21   A.  The rest of the -- the rest are individuals that were in

22   contact with the telephone number associated to the defendant.

23   Q.  So starting at the top, it looks like a phone number

24   associated with Raymond Williams placed 15 calls to the

25   defendant?

G3aemir6                        Castro - direct

1    A.   Yes.

2    Q.   And there's an arrow connecting Mr. Williams' name to the

3    defendant's name?

4    A.   Those were all incoming calls from Raymond Williams into

5    the telephone associated with the defendant.

6             MR. GOSNELL:  Objection.

7             THE COURT:  Overruled.

8             MR. GOSNELL:  Your Honor, he's testifying as to the

9    person who's calling, as opposed to the phone number that's

10   calling.

11            THE COURT:  It will be easier if we all just imagine

12   that when he says the name of the person, he means the phone

13   number associated with that person.  Okay?

14            Keep going.

15            MR. DISKANT:  Thank you, your Honor.

16   BY MR. DISKANT:

17   Q.   With respect to the second number associated with Raymond

18   Williams, the number (516)669-7919, do you see that?

19   A.   Yes.

20   Q.   In this instance the arrow between the two of them appears

21   to be going in both directions?

22   A.   Correct.

23   Q.   What is the significance of that?

24   A.   That is ingoing and outgoing calls from telephones

25   associated to Raymond Williams to a telephone associated by the

G3aemir6                        Castro - direct

1    defendant.

2    Q.  So some of these calls were placed by each of the two

3    numbers the arrow is connecting?

4    A.  Correct.

5    Q.  With respect to each of these, you've included a date --

6    dates or date ranges and a duration.  Can you just explain to

7    the jury what those mean.

8    A.  The date range covers the first time that that telephone

9    number made communication or reached out to the phone number

10   associated to the defendant.  And the duration is as reported

11   by the telephone companies.

12   Q.  So, for example, using that Raymond Williams' (646)538-1651

13   number that we were just talking about?

14   A.  Yes.

15   Q.  You'd indicated duration of zero to 255 seconds.

16   A.  Correct.

17   Q.  What is that meant to signify?

18   A.  The range is from zero seconds to 255 seconds.

19   Q.  The shortest call that is reflected in the phone records is

20   zero seconds and the longest is 255?

21   A.  Correct.

22   Q.  And the remaining calls are somewhere in the middle?

23   A.  Yes.

24   Q.  You mentioned that you also conducted a similar analysis

25   for the defendant's home phone number?

G3aemir6                          Castro - direct

1    A.  Yes.

2              MR. DISKANT:  Ms. Joynes, if we can go to Government

3    Exhibit 115.

4    Q.  Analyst Castro, starting at the top left, that name Raymond

5    Williams there, I should say the number we're looking at is the

6    number that we were talking about before.

7              But if we can move around the chart, on the top right

8    side there's a name Tasheen Davis and a phone number below

9    that.  Do you see that?

10   A.  Yes.

11   Q.  Where did that number come from?

12   A.  From Practice Fusion.

13   Q.  The defendant's medical file?

14   A.  Correct.

15   Q.  And do you know what time of day on October 18, 2013, that

16   call was placed?

17   A.  Yes.

18   Q.  How do you know that?

19   A.  From the telephone records.

20   Q.  What time was that call placed?

21   A.  At 7:15 p.m.

22   Q.  On October 18, 2013?

23   A.  Correct.

24   Q.  Analyst Castro, you had mentioned that the number

25   associated with Tasheen Davis came from her Practice Fusion

G3aemir6                        Castro - direct

1   file?

2   A.  Correct.

3           MR. DISKANT:  Ms. Joynes, if we can go to Government

4   Exhibit 218, page 11.  Just zoom in on that top section.

5   Q.  Analyst Castro, you testified that the call to the

6   defendant's home was recorded, or the number associated with

7   the defendant's home was recorded as being around 7:15 p.m. on

8   October the 18th, 2013?

9   A.  Correct.

10  Q.  Do you see the time and the date that this document is

11  electronically signed by the defendant?

12  A.  Yes.

13  Q.  What is that?

14  A.  It's on 10/18/2013 at 8:09 p.m.

15  Q.  And what is the date of the patient visit this report

16  pertains to?

17  A.  It's February 12, 2013.

18          MR. DISKANT:  Ms. Joynes, if we can go to page 27 of

19  this exhibit.

20  Q.  And this appears to be a date of May 3, 2013.  What is the

21  date and time this is signed?

22  A.  October 18, 2013, at 8:45 p.m.

23  Q.  If we can go to page 29 of this exhibit.  Try 34.

24          What's the date of this visit?

25  A.  It's July 11, 2013.

G3aemir6                          Castro - direct

1    Q.  And when is this document signed?

2    A.  October 18, 2013, at 9:02 p.m.

3    Q.  Finally, page 38.  When is this signed?

4    A.  This is for an October 8, 2013, visit and it was signed on

5    October 18, 2013, at 9:13 p.m.

6          MR. DISKANT:  Your Honor, I would like to move on to

7    another subject.

8          THE COURT:  We're going to finish this witness today.

9    We're not going anywhere until this witness is done, direct and

10   cross.

11         MR. DISKANT:  Okay.

12   Q.  You mentioned that you had also obtained bank tax return

13   documents for the defendant?

14   A.  Yes.

15         MR. DISKANT:  Your Honor, we have another stipulation

16   at this time.

17         THE COURT:  It is hereby stipulated and agreed, by the

18   usual suspects, that, one, if called as a witness at trial a

19   custodian of records from JP Morgan Chase bank would testify

20   that Government Exhibit 601, 602, 603, 606 and 607, including

21   all parts and subdivisions thereof, are true and correct copies

22   of records obtained from Chase regarding accounts opened and

23   maintained at Chase and bearing account numbers ending in 1606,

24   6725, 9203, 6819 and 7619 respectively; that the original

25   records were all made at or near the time, by or from

G3aemir6                          Castro - direct

information transmitted by a person with knowledge of the

matters set forth in the records; and that they were kept in

the ordinary course of Chase's regularly conducted business

activity; and that it was the regular practice of that business

activity to make the records.

        If called as a witness at trial, a custodian of

records from Astoria Federal Savings Bank would testify that

Government Exhibits 604, 605 and 608, including all parts and

subdivisions thereof, are true and correct copies of the

records obtained from AFSB regarding accounts opened and

maintained at AFSB and bearing account numbers ending in 0038,

5314 and 2608 respectively, and that the original records

qualify as business records.

        Three, if called as a witness at trial, a custodian of

records from the Internal Revenue Service would testify that

Government Exhibits 801 through 805, including all parts and

subdivisions thereof, are true and correct copies of the

documents submitted to the IRS by or on behalf of Moshe

Mirilishvili, the defendant, and that the original records were

all -- qualify as business records.

        It is further stipulated and agreed that this

stipulation, which is Government Exhibit 1002, may be and

hereby is received into evidence as a government exhibit at the

trial.

        (Government's Exhibit 1002 received in evidence)

G3aemir6                         Castro - direct

1    BY MR. DISKANT:

2    Q.  Analyst Castro, did you review the bank records that you

3    just heard the Court describe?

4    A.  Yes.

5           MR. DISKANT:  The government offers Government

6    Exhibits 601 through 608.

7           MR. GOSNELL:  Continuing objection from the in limine

8    motions.

9           THE COURT:  The objection is overruled.

10          (Government's Exhibits 601 through 608 received in

11   evidence)

12   BY MR. DISKANT:

13   Q.  Did you prepare an analysis of your findings?

14   A.  Yes.

15   Q.  A summary, I should say.

16          MR. DISKANT:  If we could bring up for the witness

17   what's been marked for identification purposes as Government

18   Exhibit 112.

19   Q.  Do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a summary chart of the bank records that we just

23   discussed.

24   Q.  And you participated in the creation of it?

25   A.  Yes.

1    MR. DISKANT:  The government offers 112.

2    MR. GOSNELL:  Continuing objection.

3    THE COURT:  You have a continuing objection.  It's

4    admitted.

5    (Government's Exhibit 112 received in evidence)

6    BY MR. DISKANT:

7    Q.  So, Analyst Castro, if we can start at the top.  And you

8    can just briefly explain the work you have done here.

9    A.  So these are different bank accounts associated to the

10   defendant.  The first account is the Astoria savings federal --

11   Astoria savings account ending in 5314.  It's -- the account

12   name is MDM Woodcrest Family, Limited.

13   Q.  Let me stop you there.  You mentioned this was associated

14   with the defendant?

15   A.  Yes.

16   MR. DISKANT:  Ms. Joynes, if we can bring up

17   Government Exhibit 605A for just a moment.

18   Q.  Analyst Castro, what is this?

19   A.  This is the signature card for that account.

20   Q.  And who is indicated as a signatory?

21   A.  Moshe Mirilishvili and Dali Mirilishvili.

22   Q.  Do you have an understanding of who Dali Mirilishvili is?

23   A.  Yes, his spouse.

24   MR. DISKANT:  We can go back, Ms. Joynes, to 112.

25   Q.  Analyst Castro, it looks like four different accounts are

1    reflected in this summary chart.

2    A.  Yes.

3    Q.  And just to use the first one as an example, focusing your

4    attention on the column all the way to the right, where it says

5    total deposits, what is reflected in that column?

6    A.  That includes the total amount of cash or checks that were

7    deposited into the account.

8    Q.  So, for example, in that top year 2012 there were roughly

9    $209,000 in total deposits?

10   A.  Correct.

11   Q.  And the next column over to the left, where it says ending

12   balance, what does that reflect?

13   A.  That's the balance that was left over at the end of the

14   year.

15   Q.  And just moving all the way down to the grand total,

16   1.25 million or thereabouts, what is that the grand total of?

17   A.  That's the amount of total deposits from these four

18   accounts.

19   Q.  Let's talk about the tax returns now.  I'm handing you what

20   have been marked for identification purposes as Government

21   Exhibits 801 through 805.  Do you recognize these?

22   A.  Yes.

23   Q.  Are these the tax returns paid to the IRS from the

24   defendant?

25   A.  Correct.

G3aemir6                          Castro - direct

1          MR. DISKANT:  The government offers 801 through 805.

2          MR. GOSNELL:  Continuing objection.

3          THE COURT:  Overruled.

4          (Government's Exhibits 801 through 805 received in

5    evidence)

6    BY MR. DISKANT:

7    Q.  Did you have a chance to review these returns?

8    A.  Yes.

9          MR. DISKANT:  Ms. Joynes, if we can bring up

10   Government Exhibit 804.  Turn to page two of that exhibit.

11   Actually, let's go back for a moment to page one.

12   Q.  Just starting at the very top, who's the listed filer for

13   the return?

14   A.  Moshe and Dali Mirilishvili.

15   Q.  Now, if we can go to page two.  And focusing in on that top

16   half.  That's fine.

17          There's an amount listed for business income.  Do you

18   see that?

19   A.  Yes.

20   Q.  What's the amount listed?

21   A.  It's 232,410.

22   Q.  And then if we can go to page 14 for just a moment.

23   Analyst Castro, what is this?

24   A.  This is the schedule C to that same tax return.

25          MR. DISKANT:  So, Ms. Joynes, if we can zoom in on

G3aemir6                          Castro - direct

1   parts one and two.

2   Q.   Analyst Castro, the first line, what does that reflect?

3   A.   That is the gross amount received, or as claimed by the

4   defendant.

5   Q.   And here that's a little over $563,000?

6   A.   Yes.

7   Q.   And below it there's an entire section headed expenses.  Do

8   you see that?

9   A.   Yes.

10  Q.   What does that reflect?

11  A.   Business costs and deductions.

12  Q.   Did you prepare a summary chart of the tax returns that you

13  reviewed?

14  A.   Yes.

15          MR. DISKANT:  Ms. Joynes, if we can show the witness

16  what's been marked as Government Exhibit 114.

17  Q.   Analyst Castro, do you recognize this?

18  A.   Yes.

19  Q.   What is it?

20  A.   It's a summary of -- summary chart I created of the taxes

21  filed for 2010 to 2014 by the defendant.

22  Q.   Does it fairly and accurately summarize those exhibits?

23  A.   Yes.

24          MR. DISKANT:  The government offers 114.

25          MR. GOSNELL:  Continuing objection.

G3aemir6                          Castro - direct

1           THE COURT:  It's admitted.

2           (Government's Exhibit 114 received in evidence)

3           MR. DISKANT:  Okay.  If we can publish that,

4    Ms. Joynes.

5    BY MR. DISKANT:

6    Q.  So, Analyst Castro, we were just looking at the 2013 tax

7    return.  And can you just indicate where some of the numbers we

8    were looking at appear on this summary chart?

9    A.  So the first column is the year.  The second column is the

10   gross amount -- gross income.  So under 2013 you see the

11   563,000 as the gross reported.  And then the total income is

12   the 232,410.

13   Q.  And just to be clear, when we say 2013, you're referring to

14   the tax return that would be filed early in 2014 referring to

15   the prior year?

16   A.  Correct.

17   Q.  Did you make an attempt to estimate the defendant's income

18   during this time period?

19   A.  Yes.

20   Q.  How did you do that?

21   A.  First I looked at the BNE data for all -- all the

22   prescriptions for oxycodone, 30 milligrams, that were reported

23   to the state by the pharmacies for the defendant.  Then I

24   subtracted all the Medicaid claims from that total number.  And

25   the remaining amount I multiplied by 200 for patient visits.

G3aemir6                              Castro - direct

1    Q.  Did you create a chart reflecting that work?

2    A.  Yes.

3           MR. DISKANT:  If we can show the witness what has been

4    marked for identification purposes as Government Exhibit 113.

5    Q.  Analyst Castro, do you recognize this document?

6    A.  Yes.

7    Q.  Is this the chart that you were just discussing?

8    A.  Correct.

9           MR. DISKANT:  The government offers 113.

10          MR. GOSNELL:  Continuing objection.

11          THE COURT:  Overruled.

12          (Government's Exhibit 113 received in evidence)

13          MR. DISKANT:  You can bring that up, Ms. Joynes.

14   BY MR. DISKANT:

15   Q.  So, Analyst Castro, I want to just quickly talk through

16   that process in the context of an example.  If we can look at

17   the year that we've been talking about, that is 2013.  The

18   first column indicates oxycodone, 30-milligram prescriptions.

19   Where does that come from?

20   A.  That's based on the BNE data we reviewed.

21   Q.  So there were approximately 6,700 in that year?

22   A.  Correct.

23   Q.  What is the next column over to the right?

24   A.  That's how many visits were paid for by Medicaid, unique

25   visits during that time frame.

G3aemir6                         Castro - direct

1    Q.  And the column just next to that?

2    A.  That's how much Medicaid paid out during that year.

3    Q.  For those claims?

4    A.  Correct.

5    Q.  Okay.  How did you arrive at the estimated cash payments in

6    column four?

7    A.  I multiplied $200 -- well, first I took the total

8    prescriptions for oxycodone, 30 milligrams, from the first

9    column, subtracted the Medicaid paid claims from -- in the

10   second column, and then the remainder I multiplied by $200,

11   added the standard patient visit --

12            MR. GOSNELL:  Objection.

13            THE COURT:  Overruled.

14   Q.  Okay.  So this would be 6,761 minus 2,160?

15   A.  Correct.

16   Q.  And then $200 times that?

17   A.  Correct.

18   Q.  And that's the estimated cash payments?

19   A.  Yes.

20   Q.  What's your estimate of the total income the defendant

21   earned in 2013?

22   A.  2,046,400.

23   Q.  I'm sorry.  Is that for 2013?

24   A.  Sorry.  For 2013 the estimated cash payments was 920,200.

25   Q.  And the estimated total income?

G3aemir6                        Castro - direct

1    A.  1,090,215.

2    Q.  How much did the defendant declare in gross income 2013?

3    A.  563,112.

4    Q.  For the total time period you looked at in 2012, 2013,

5    2014, what was your estimate of total income?

6    A.  2.4 million.

7    Q.  The defendant declared approximately 1.378 million in that

8    time period?

9    A.  Correct.

10   Q.  Analyst Castro, when you took the stand, you mentioned that

11   in addition to reviewing documents and records, you also

12   participated in a search?

13   A.  Yes.

14   Q.  When did that search occur?

15   A.  On December 11, 2014.

16   Q.  Where did you search?

17   A.  The defendant's residence.

18   Q.  And where is that located?

19   A.  In Great Neck, New York.

20   Q.  You were present for that search?

21   A.  Yes, I was.

22           MR. DISKANT:  If we can bring up for the witness only

23   what's been marked for identification purposes as Government

24   Exhibit 5-M.

25   Q.  Analyst Castro, do you recognize that?

G3aemir6                           Castro - direct

1   A.  Yes.

2   Q.  What is that?

3   A.  That's the living room and dining room area of the

4   defendant's residence.

5   Q.  Fair and accurate depiction of that space?

6   A.  Yes.

7              MR. DISKANT:  The government offers Government

8   Exhibit 5-M.

9              MR. GOSNELL:  Objection.  401, 403.

10             THE COURT:  Admitted.

11             (Government's Exhibit 5-M received in evidence)

12  BY MR. DISKANT:

13  Q.  Analyst Castro, can you describe the general layout of the

14  defendant's residence?

15  A.  It's a two-bedroom apartment.

16  Q.  And what are we looking at here?

17  A.  This is the living room leading into the dining room area.

18  Q.  Did you find anything of evidentiary value in this room?

19  A.  Yes.

20  Q.  Where did you find it?

21  A.  A black bag on the dining room table.

22  Q.  I'm showing you what is in evidence as Government

23  Exhibit 9.  Do you recognize that?

24  A.  Yes.

25  Q.  What is that?

G3aemir6                              Castro - direct

1    A.   That's the bag that was located on the dining room table.

2    Q.   Did you find anything in this bag?

3    A.   Yes.

4    Q.   What did you find?

5    A.   Patient files and $6,600 in cash.

6    Q.   You mentioned this was a two-bedroom apartment?

7    A.   Yes.

8    Q.   I want to start with -- did one of the bedrooms have a

9    computer in it?

10   A.   Yes.

11   Q.   Can we start with that bedroom.

12            MR. DISKANT:  Ms. Joynes, if we can bring up what is

13   in evidence -- or what is not in evidence.  Show the witness

14   only what has been marked for identification purposes as

15   Government Exhibits 5-A, 5-B, 5-C and 5-N.

16   Q.   Analyst Castro, do you recognize these?

17   A.   Yes.

18   Q.   What are they?

19   A.   These are photographs taken of the second bedroom, which

20   appeared to be a home office.

21            MR. DISKANT:  The government offers 5-A, B, C and N.

22            MR. GOSNELL:  No objection.

23            THE COURT:  Admitted.

24            (Government's Exhibits 5-A, 5-B, 5-C and 5-N received

25   in evidence)

G3aemir6                        Castro - direct

1    BY MR. DISKANT:

2    Q.  I'm going to start with 5-A.  Analyst Castro, what did you

3    recover in this particular bedroom?

4    A.  Patient files.

5    Q.  If we can go to 5-B.  What are we looking at here?

6    A.  Blank prescriptions associated to the defendant.

7    Q.  Looks like this is in a drawer of some sort?

8    A.  Correct.

9    Q.  5-C, back to that.  And let's go to 5-N.  What are we

10   looking at here, Analyst Castro?

11   A.  This is a desktop computer with a multifunction scanner,

12   telephone, some more patient files.

13   Q.  And which is the item you identified as the multifunction

14   scanner?

15   A.  It's to the right of the computer screen.

16   Q.  With what appear to be some additional documents on top of

17   it?

18   A.  Correct.

19   Q.  You mentioned just a moment ago, we talked about the

20   patient files that were found in this room.

21   A.  Yes.

22   Q.  In addition to patient files, did you find other sorts of

23   documents?

24   A.  Yes.

25   Q.  I'm showing you what's been marked for identification

G3aemir6                         Castro - direct

1    purposes as Government Exhibit 542.  If we can bring that up.

2              Do you recognize this?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's the closing documents for the apartment.

6              MR. DISKANT:  The government offers 542.

7              MR. GOSNELL:  Objection.

8              THE COURT:  Overruled.

9              (Government's Exhibit 542 received in evidence)

10             MR. DISKANT:  If we can publish that to the jury.

11   BY MR. DISKANT:

12   Q.  Analyst Castro, were you able to determine by reviewing 542

13   when the defendant purchased the apartment that you were

14   searching?

15   A.  Yes.

16   Q.  When did he purchase it?

17   A.  It closed on August 19, 2013.

18   Q.  If we can go to page seven of the document.

19             How much did the apartment cost?

20   A.  It cost approximately $355,000.

21   Q.  Based on your review of this document, were you able to

22   determine whether the defendant obtained financing for this

23   purchase?

24   A.  It was paid for in cash, or in checks.

25   Q.  I want to go back now to the patient files.  Have you had a

G3aemir6                        Castro - direct

1   chance to review the patient files that have been previously

2   offered subject to connection as 501 through 524?

3   A.  Yes.

4   Q.  Are those some of the documents that you recovered from the

5   defendant's home office?

6   A.  Correct.

7           MR. DISKANT:  Your Honor, the government now reoffers

8   as connected Government Exhibits 501 through 524.

9           MR. GOSNELL:  No objection.

10          THE COURT:  Admitted.

11          (Government's Exhibits 501 through 524 received in

12   evidence)

13  BY MR. DISKANT:

14  Q.  Analyst Castro, have you had a chance to review some Doshi

15  Laboratory documents that have been previously been offered

16  subject to connection as Government Exhibits 552 through 556?

17  A.  Yes.

18  Q.  Were those documents also recovered from this defendant's

19  home office?

20  A.  Correct.

21          MR. DISKANT:  Your Honor, the government also reoffers

22  Government Exhibits 552 through 556 as connected.

23          MR. GOSNELL:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 552 through 556 received in

G3aemir6                          Castro - direct

1   evidence)

2   BY MR. DISKANT:

3   Q.  One other document I want to show you.

4           MR. DISKANT:  If we can show the witness only what has

5   been marked for identification purposes as Government

6   Exhibit 541.

7   Q.  Analyst Castro, do you recognize this document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's paperwork for a medical conference.

11  Q.  Where was it found?

12  A.  In the defendant's home.

13          MR. DISKANT:  The government offers 541.

14          MR. GOSNELL:  No objection.

15          THE COURT:  Admitted.

16          (Government's Exhibit 541 received in evidence)

17  BY MR. DISKANT:

18  Q.  If you can go to page 32 of the document.  Did the DEA

19  create these Xs or X?

20  A.  No.

21  Q.  That's the way you found it?

22  A.  Yes.

23  Q.  This appears to be the agenda for the conference?

24  A.  Yes.

25  Q.  If we can go to page 13 of the document.  Do you recognize

G3aemir6                        Castro - direct

1    any of the names in this conference?

2    A.  Yes.

3    Q.  Which one?

4    A.  Dr. Gharibo.

5    Q.  I want to talk about some of the other patient files that

6    you recovered, Analyst Castro.  We may come up with another

7    copy in a minute.  For now I'm showing you what has been marked

8    for identification purposes as Government Exhibits 543 through

9    550.  Let me know if you recognize those documents.

10   A.  Yes.

11   Q.  Are these some of the patient files recovered from the

12   defendant's home office?

13   A.  Yes.

14           MR. DISKANT:  The government offers 543 through 550.

15           MR. GOSNELL:  No objection.

16           THE COURT:  Admitted.

17           (Government's Exhibit 543 through 550 received in

18   evidence)

19           MR. DISKANT:  Ms. Joynes, let's start with Government

20   Exhibit 543.

21   BY MR. DISKANT:

22   Q.  Analyst Castro -- sorry.  Let's just swap.

23           This is pertaining to a patient by the name of Johnny

24   Adams?

25   A.  Yes.

1              MR. DISKANT:  Ms. Joynes, if we can go to page nine.

2    Q.  Analyst Castro, you have the original document in front of

3    you?

4    A.  Yes.

5    Q.  Since this is a scan or a copy, can you just describe what

6    you see when you look at the original version, at the patient

7    name and date after birth section.

8    A.  The name seems to be taped over where it would say patient

9    name.  And the name itself is in a different font than the rest

10   of the paper, and it's clearer than the rest of the actual

11   paperwork.

12   Q.  And with respect to the section of the document that says

13   date of service and session number below that, what do you

14   observe on the original?

15   A.  Both of those are blank.

16   Q.  Have you seen this document anywhere else?

17   A.  Yes, I have.

18             MR. DISKANT:  Ms. Joynes, I'm not sure we're going to

19   be able to do this, but if you could bring up the split screen

20   with Government Exhibit 544, page 11.

21   Q.  Analyst Castro, if you could just look at those two

22   documents.  Starting again, because you have the original, with

23   the patient name and date of birth section.

24   A.  The patient name is handwritten.

25   Q.  And with respect to the body of the report, starting at MRI

1   of the cervical spine, is it fair to say that the documents are

2   identical?

3   A.  Correct.

4   Q.  If we could look now at Government Exhibit 550 at page

5   eight.  What is this?

6   A.  This is the same document that we just reviewed for the two

7   other patients.

8   Q.  But a different name?

9   A.  Correct.

10  Q.  Handwritten in?

11  A.  Yes.

12  Q.  And 547, page nine.  Do you recognize this?

13  A.  Correct.  It's also the same paperwork, but the name

14  appears to be taped over where it says patient name.

15  Q.  Remind us, these documents were all found where?

16  A.  At the defendant's residence.

17  Q.  Were you able to determine, based on a review of the BNE

18  data that we've been talking about, whether any of these

19  patients obtained prescriptions from the defendant?

20  A.  Yes.

21  Q.  How many of them did?

22  A.  All of them.

23          (Continued on next page)

24

25

G3ALMIR7                           Castro - direct

1    BY MR. DISKANT:

2    Q.   Sticking with 547, which is up, if we can look at page 8 of

3    this exhibit, Ms. Joynes.

4         Analyst Castro, what is this?

5    A.   This is a New York State benefit health insurance card.

6    Q.   If we can go to page 3 of this exhibit, try page 2.  And go

7    to page 4.  What's the method of payment indicated?

8    A.   Cash.

9    Q.   Let's take a look at Government Exhibit 550, page 8.  Let's

10   go to Government Exhibit 545, look at page 4 of that exhibit.

11        And Analyst Castro, do you have the original in front

12   of you?

13   A.   Yes.

14   Q.   And just focusing on the name and the date of birth, what

15   do you observe on the original?

16   A.   The name is off center from the rest of the page.  It's in

17   a different font.  It's also clearer than the other fonts.

18   Q.   And here it's indicated that Ms. Brown is a female?

19   A.   Correct.

20   Q.   Can we go to the next page of the exhibit and just go to

21   the top half.

22        And, Analyst Castro, based on the original, what are

23   you observing where the patient and date of birth appear?

24   A.   The name and the date of birth seem to be off.  They're not

25   in line with the actual patient name or the DOB blocks.  It

1    also lists Tiffany Brown as a male.

2    Q.  If we can go to Government Exhibit 546.  Just quickly look

3    at page 3.

4            Analyst Castro, do you recognize this document?

5    A.  Yes.  It's the same document as the one for Tiffany Brown.

6    Q.  And here Clarence Dawson is referred to by what gender?

7    A.  As a female.

8    Q.  Can we go to the next page, just look at the top.

9            Again, do you recognize this document?

10   A.  Correct.

11   Q.  How do you recognize it?

12   A.  It's the same paperwork as Tiffany Brown.

13   Q.  Just focusing your attention on the patient and date of

14   birth, what you are observing on the original?

15   A.  The patient name is now bigger.  It's off centered again,

16   and it lists the individual as a male.

17   Q.  And, finally, if we go to Government Exhibit 549 and go to

18   page 6.  This is for a patient named Danell Square?

19   A.  Correct.

20   Q.  And, again, if we can focus on the name of the patient and

21   if you can let us know what you're observing there on the

22   original?

23   A.  It appears to be taped over the previous document.  It also

24   lists Danell Square as a male.

25   Q.  And if we can go to page 7 of the exhibit.  Is that a

1    driver's license?

2    A.  Correct.

3    Q.  What is the gender of Danell Square?

4    A.  It's a female.

5    Q.  Were these all of the documents you recovered or just some

6    of them?

7    A.  Just some of them.

8    Q.  Did you find any additional documents pertaining to the

9    medical lab Aegis?

10   A.  Yes.

11   Q.  I'm showing what you have been marked as Government

12   Exhibits 559 and 559-A.  Do you recognize these?

13   A.  Yes.

14   Q.  Are these those exhibits?

15   A.  Yes.

16           MR. DISKANT:  Government offers 559 and 559-A.

17           MR. GOSNELL:  I'd like to see them first.

18           MR. MAZUREK:  Judge, can we have a side bar?

19           THE COURT:  Sure.

20           (Continued on next page)

21

22

23

24

25

G3ALMIR7                              Castro - direct

1          (At the side bar)

2          THE COURT:  OK.  Yes.

3          MR. MAZUREK:  Judge, it's the first time that we're

4    seeing these documents.

5          MR. DISKANT:  That's not true, your Honor.

6          THE COURT:  I don't care whether it's first time

7    you're seeing them or not because I can't adjudicate that.

8    They say that's not true, that they have turned them over.  You

9    say --

10          MR. GOSNELL:  They certainly haven't marked them as

11    exhibits, which they were required to do.

12          THE COURT:  I don't care about that either.  I don't

13    see any reason to keep them out.

14          MR. GOSNELL:  Your Honor.

15          THE COURT:  Now let me ask you a question.  How many

16    million documents were you planning to introduce through this

17    witness?

18          MR. DISKANT:  This is the last one.

19          THE COURT:  Good.  OK.

20          MR. GOSNELL:  Your Honor, I'm going to request,

21    especially since we haven't seen these documents before, that

22    we be given the weekend to analyze these.

23          THE COURT:  You're going to have it.  Don't worry.  I

24    wasn't really going to keep us here until 9 o'clock tonight,

25    but I wanted the government to get done.  OK.

G3ALMIR7                         Castro - direct

1            MR. DISKANT:  Thank you, your Honor.

2            THE COURT:  I assume it will come out in examination

3       where these documents came from.  You're certainly free to

4       cross if it doesn't, or you want voir dire, you can have voir

5       dire.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3ALMIR7                    Castro - direct

1              (In open court)

2     BY MR. DISKANT:

3     Q.  Analyst Castro, where did you find these documents?

4     A.  At the defendant's residence.

5     Q.  And were these the only Aegis documents you found or were

6     they just two examples?

7     A.  Just two examples.

8     Q.  Can you tell you what you observe on the first one of the?

9     A.  The first one --

10             THE COURT:  I need to admit them.

11             MR. DISKANT:  I'm sorry.  The government offers 559

12    and 559-A.

13             THE COURT:  They're admitted.

14             (Government's Exhibits 559 and 559-A received in

15    evidence)

16    Q.  Can you tell us what you observe on the first one?

17    A.  On the first one, the name is actually taped over a

18    previous name.  There's some white-out on it for the name below

19    it.  The same thing with the date of birth.

20             MR. DISKANT:  Your Honor, with the Court's permission,

21    I'd just like to pass these around the jury box.

22    Q.  Analyst Castro, you testified that one of the documents you

23    were just looking at was blank, there was no name on it?

24    A.  Correct, one of them is completely blank.

25    Q.  Did you find one of those documents or many of those

G3ALMIR7                        Castro - direct

1    documents?

2    A.  Many of those documents.

3    Q.  Were you just looking at one example?

4    A.  Yes.

5    Q.  And similarly, with respect to the ones with the patient

6    name was taped on, is that the only one you found or just an

7    example?

8    A.  Just an example.

9    Q.  All right.  The final subject I want to discuss with you is

10   the cash that you said you found in the apartment?

11   A.  Yes.

12   Q.  Where did you find that cash in the apartment?

13   A.  In both the master bedroom and the home office.

14   Q.  So starting with the home office, if we can bring up what

15   has been marked for identification purposes as 5-D and 5-E.

16          Analyst Castro, do you recognize these?

17   A.  Yes.

18   Q.  What are they?

19   A.  They're the cash found within the home office.

20          MR. DISKANT:  Government offers 5-D and 5-E.

21          MR. GOSNELL:  Continuing objection.

22          THE COURT:  Admitted.

23          (Government's Exhibits 5-D and 5-E received in

24   evidence)

25   Q.  Starting with 5-D, if we can publish that for the jury,

1    where was the money found?

2    A.   In the closet within the home office bedroom.

3    Q.   Did the DEA put it into Ziploc bags?

4    A.   No.

5    Q.   This is the way you found it?

6    A.   Correct.

7    Q.   Did you count this money?

8    A.   Not at that location.

9    Q.   Have you since counted it?

10   A.   Yes.

11   Q.   If we can go to Government Exhibit 5-E.  How much money in

12   total was found in the closet in the defendant's office?

13   A.   Approximately 650,000.

14   Q.   And you mentioned you also found money in the master

15   bedroom?

16   A.   Correct.

17   Q.   If we can go to Government Exhibit 5-I.  Excuse me, show

18   the witness only what have been marked for identification

19   purposes as Government 5-I, 5-G, and 5-J.

20           Do you recognize these?

21   A.   Yes.

22   Q.   What are they?

23   A.   The money that was found within the master bedroom.

24           MR. DISKANT:  Government offers 5-I, G and J.

25           MR. GOSNELL:  Continuing objection.

1            THE COURT:  Overruled.  Admitted.

2            (Government's Exhibits 5-I, 5-G, and 5-J received in

3    evidence)

4    Q.  Can we start with 5-I.  Analyst Castro, what are we looking

5    at?

6    A.  This is the money that was found within the headboard in

7    the master bedroom.

8    Q.  And is this the way you found it?

9    A.  Correct.

10   Q.  If we can go to 5-G.  What is this?

11   A.  Those are bands for the money.

12   Q.  Where did you find these?

13   A.  In the closet within the master bedroom.

14   Q.  And finally if we can go to 5-J.  What is this?

15   A.  This was all the money found within the master bedroom.

16   Q.  And did you subsequently count this money?

17   A.  Yes.

18   Q.  Approximately how much is it?

19   A.  1.1 million.

20           MR. DISKANT:  So, Ms. Joynes, if we can bring up 5-J

21   and 5-E together.

22   Q.  Analyst Castro, in total, adding up the two bedrooms, how

23   much in total cash did you find in the defendant's residence

24   during this search?

25   A.  Approximately 1.75 million.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G3ALMIR7

1   Q.  And just to focus on it, it appears the money is wrapped in

2   bands of some sort.  Did the DEA do that?

3   A.  No.

4   Q.  This captures the way the money was found?

5   A.  Correct.

6          MR. DISKANT:  Your Honor, if I could just have a

7   moment.

8   Q.  Analyst Castro, just handing you to complete this, on the

9   Aegis documents that you looked at before, you testified that

10  they were just among the examples?

11  A.  Yes.

12  Q.  I'm handing you the remainder of those, if you could look

13  at those.  Tell me if you recognize them.

14  A.  Yes.

15         MR. DISKANT:  Mark those for identification purposes

16  collectively as 560.  Government offers 560.

17         MR. GOSNELL:  Continuing objection.

18         THE COURT:  Overruled.  Admitted.

19         (Government's Exhibit 560 received in evidence)

20         MR. DISKANT:  Nothing further.

21         THE COURT:  OK.  So we're not going to do

22  cross-examination tonight.  We're going to send you home for

23  the weekend and let me explain what's likely to happen on

24  Monday.  I think we'll have the cross-examination of the

25  analyst.  And I know we will have that.  And I believe the

G3ALMIR7

1    government has one more witness.  And at that point, I'm

2    expecting that the government will rest its case.

3            And when the government rests, I will excuse you for a

4    bit because I'm required by law to have a conversation with the

5    lawyers about legal matters out of your hearing.  And then I

6    will bring you back and I will ask the defense if the defense

7    wishes to put on a case.  Remember that if the defense puts on

8    a case, it's not assuming the burden of proof.  I have some

9    reason to believe that Mr. Mazurek may wish to put on one or a

10   few witnesses.  I don't know how many or anything.  That's a

11   decision they have to make over the weekend.  But to the extent

12   that we have a defense case, it will probably be completed on

13   Monday as well.  And then when the defense case is over, I'll

14   ask the government if they have any rebuttal.  And if it

15   doesn't have any rebuttal, then we'll have all the evidence and

16   I'll send you home.

17           So Monday, I don't know.  I can't predict how long

18   Monday is going to be, OK.  I don't know it we'll go a full day

19   or if it will be a little short.  But my anticipation is that

20   on Tuesday of next week, we will have the summations and

21   charge, which if you will recall back almost two weeks from

22   that is exactly when I said they will be.  That is because the

23   lawyers have done everything I've asked them to do keep this

24   thing on track.

25           So you're going to work real hard next week.  Enjoy

G3ALMIR7

1    your weekend.  Get caught up on stuff.  Get a lot of rest.

2    Don't discuss the case.  I hear the weather is going to be nice

3    all weekend and it's going to get bad on Monday, so that's

4    perfect.  Keep an open mind all weekend and we'll finish this

5    up next week.

6              (Jury not present)

7              THE COURT:  OK.  You can step down.  We'll see you on

8    Monday.

9              (Witness not present)

10             THE COURT:  OK.  Mr. O'Neill will pass out a decision

11   outlining the contours of what Dr. Warfield will and will not

12   be permitted to testify about.

13             Have you emailed the charges to them or do you have

14   copies?

15             THE DEPUTY CLERK:  It's ready to.

16             THE COURT:  He's ready to press the button and deliver

17   the charge to you.  So I've done my work.  I'm now going to

18   leave you for the weekend.

19             MR. MAZUREK:  You didn't need my response?

20             THE COURT:  I had your very clear two letters

21   outlining like line by line.  You couldn't have done anything

22   more helpful.  You could not possibly have done anything more

23   helpful.  That said, as you want to reargue it on Monday,

24   you're free to do so.  Don't think you'll find a lot to quarrel

25   with.  Anyway, I would never shut you up, Mr. Mazurek.

G3ALMIR7

1          MR. MAZUREK:  I don't know about that.

2          THE COURT:  I'll never foreclose you from making an

3     argument.  But I actually, the reason I did this is I had this

4     incredibly detailed submission from the government, but of the

5     defense's expert disclosure, and I think it's only fair to tell

6     you how I'm thinking not five minutes before you put her on the

7     stand, but four days before you put her on the stand.  I just

8     think that's the fair thing to do.

9          OK.  So I will see you on Monday.

10          MR. MAZUREK:  Are you going to circulate the draft

11     charge?

12          THE COURT:  The draft charge is being emailed to you.

13          MR. MAZUREK:  Just to complete the record, I think

14     when Agent Castro was offered GX101 through 105, I just want to

15     be clear why we didn't object at the time.  We have continuing

16     objections based upon our previously denied motion letter from

17     earlier this week.

18          THE COURT:  Yes.  And you should know that all

19     objections that have been made in letters, I assume that when I

20     make a ruling that you don't like, you object to it.  It's kind

21     of a done thing.  OK.  Great.

22          (Adjourned to March 14, 2016, at 9:30 a.m.)

23

24

25

1      INDEX OF EXAMINATION

2   Examination of:                              Page

3   DAMON LEONARD

4   Cross By Mr. Mazurek . . . . . . . . . . . . 833

5   Redirect By Ms. Cucinella  . . . . . . . . . 867

6   Recross By Mr. Mazurek . . . . . . . . . . . 868

7   JOSHUA BEERS

8   Direct By Ms. Cucinella . . . . . . . . . . 869

9   Cross By Mr. Gosnell . . . . . . . . . . . . 875

10  CHRISTOPHER GHARIBO

11  Direct By Ms. Cucinella . . . . . . . . . . 881

12  CHRISTOPHER GHARIBO

13  Cross By Mr. Mazurek . . . . . . . . . . . . 952

14  Redirect By Ms. Cucinella  . . . . . . . . .1013

15  Recross By Mr. Mazurek . . . . . . . . . . .1015

16  ADRIAN CASTRO

17  Direct By Mr. Diskant . . . . . . . . . . .1017

18      GOVERNMENT EXHIBITS

19  Exhibit No.                            Received

20   1208     . . . . . . . . . . . . . .874

21   101 through 105  . . . . . . . . . 1020

22   106 and 108  . . . . . . . . . . . 1026

23   110 and 111  . . . . . . . . . . . 1028

24   109  . . . . . . . . . . . . . . . 1029

25   1004  . . . . . . . . . . . . . . . 1033

1    1209 and 1210   . . . . . . . . . . 1033

2    117 and 118   . . . . . . . . . . 1034

3    1001    . . . . . . . . . . . . . 1038

4    701 through 709   . . . . . . . . . 1040

5    1203    . . . . . . . . . . . . . 1041

6    115 and 116   . . . . . . . . . . . . . .1042

7    1002    . . . . . . . . . . . . . 1048

8    601 through 608   . . . . . . . . . . . .1049

9    112   . . . . . . . . . . . . . . 1050

10   801 through 805   . . . . . . . . . . . .1052

11   114   . . . . . . . . . . . . . . 1054

12   113   . . . . . . . . . . . . . . 1055

13   5-M   . . . . . . . . . . . . . . 1058

14   5-A, 5-B, 5-C and 5-N   . . . . . . . . . .1059

15   542   . . . . . . . . . . . . . . 1061

16   501 through 524   . . . . . . . . . . . .1062

17   552 through 556   . . . . . . . . . 1062

18   541   . . . . . . . . . . . . . . 1063

19   543 through 550   . . . . . . . . . 1064

20   559 and 559-A   . . . . . . . . . . . . .1072

21   5-D and 5-E   . . . . . . . . . . . . . .1073

22   5-I, 5-G, and 5-J   . . . . . . . . . . .1075

23

24

25

1   560   . . . . . . . . . . . . . . . 1076

2                    DEFENDANT EXHIBITS

3   Exhibit No.                                Received

4   DM402   . . . . . . . . . . . . . .846

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25