G3F7MIR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                    S2 14 Cr. 810 (CM)

MOSHE MIRILISHVILI,

              Defendant.               Trial

------------------------------x

                               New York, N.Y.
                               March 15, 2016
                               10:00 a.m.


Before:

                  HON. COLLEEN McMAHON,

                               District Judge


                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
EDWARD DISKANT
BROOKE CUCINELLA
    Assistant United States Attorneys

HENRY MAZUREK
WAYNE GOSNELL
    Attorneys for Defendant


ALSO PRESENT:  MICHAEL MULLER, DEA
              ELIZABETH JOYNES, Paralegal
              MICHAEL DOMANICO, Paralegal

G3F7MIR1

1            (Trial resumed; jury not present)

2            MR. MAZUREK:  Your Honor, there is one issue.  There

3     is a document the government objects to that we would like to

4     put into evidence.

5            THE COURT:  Then introduce it.  Why should I deal with

6     that now?

7            MR. MAZUREK:  It's not coming through a witness,

8     unless I have to call for custodial purposes.  I think the

9     government's objection is a business record objection.  It's a

10    set of documents that were seized at the medical office at the

11    time of the government's search.

12           THE COURT:  Well, why don't you give them to me, and I

13    will look at them.

14           MR. MAZUREK:  I handed them up yesterday.  402-A.

15    It's a stack of documents.

16           MS. CUCINELLA:  The objection is actually a relevance

17    objection.

18           THE COURT:  OK.  I'm going to deal with this when this

19    witness is off the stand.  OK?  I'd like to get her back to her

20    normal pursuits.  She is not involved in this.

21           MR. MAZUREK:  OK.

22           (Continued on next page)

23

24

25

G3F7MIR1                        Warfield - cross

1           (Jury present)

2           THE COURT:  Hi, everybody.

3           Doctor, have a seat.  OK.  Dr. Warfield is still on

4      cross.

5           Ma'am, you are still under oath.  You may continue.

6       CAROL WARFIELD, resumed.

7      CROSS EXAMINATION (Continued)

8      BY MS. CUCINELLA:

9      Q.  Good morning, Dr. Warfield.

10     A.  Good morning.

11     Q.  Yesterday you testified that Dr. Mirilishvili was acting

12     legitimately when he wrote over 13,000 oxycodone prescriptions;

13     is that right?

14     A.  Correct.

15     Q.  Now, that conclusion is based on the medical records you

16     reviewed; is that right?

17     A.  And the transcript, yes.

18     Q.  And you would agree that if the documents you relied on to

19     arrive at your conclusions were inaccurate or somehow false,

20     that would affect your opinion, right?

21     A.  Possible.

22     Q.  It's possible?  If the documents you relied on were false,

23     it may affect your opinion?

24     A.  Yes.

25     Q.  OK.  Because it's your view that you have to rely on the

G3F7MIR1                       Warfield - cross

1   medical record, right?

2   A.  Yes, I relied on the medical records.

3   Q.  OK.  So if what is in them isn't true, then you can't rely

4   on that; is that fair?

5   A.  Well, it depends on the physician's viewpoint.  From the

6   physician's viewpoint I'm talking about.

7   Q.  OK.  Do you remember testifying in a trial in the Southern

8   District of Florida, United States America v. Alishagan?

9   A.  Yes.

10  Q.  And do you remember testifying there that:  Obviously I

11  have to rely on the medical record.

12  A.  Yes.

13  Q.  And if you're telling me what is in the medical record

14  isn't true, then, you know, obviously I can't rely on that if

15  that's what you're asking.

16          Do you remember testifying to that?

17  A.  Yes.

18  Q.  I asked you yesterday about an individual named Damon

19  Leonard, and you testified you didn't know who he was, right?

20  A.  Correct.

21  Q.  Have you ever met Jomaris Javier?

22  A.  No.

23  Q.  Have you ever met Abraham Correa.

24  A.  No.

25  Q.  Have you ever met Ray Williams?

1    A.  No.

2    Q.  What about Joseph Gray?

3    A.  No.

4    Q.  You have never been to the defendant's clinic on 162nd

5    Street, right?

6    A.  That's correct.

7    Q.  Dr. Warfield, you would agree with me that oxycodone is a

8    highly addictive pain killer, right?

9    A.  Any of the opiates are.

10         THE COURT:  But she didn't ask any of the opiates.

11   A.  Yes.

12   Q.  Oxycodone is a highly addictive painkiller.

13   A.  Yes.

14   Q.  If you are treating someone and they are purportedly taking

15   oxycodone, especially high doses of oxycodone regularly, you

16   would need to taper them off of that, right?

17   A.  No.

18   Q.  You can just stop them cold turkey?

19   A.  It depends.  You didn't say anything about stopping them.

20   Could you ask the question again.

21   Q.  Sure.  If you are treating someone and they are purportedly

22   taking oxycodone, especially high doses of it regularly, if you

23   are going to stop the treatment of oxycodone, you need to taper

24   them off, right?

25   A.  It depends on the situation.

G3F7MIR1                        Warfield - cross

1  Q.  But you can't just cut them off cold turkey; is that fair?

2  A.  Depends on the situation.

3          THE COURT:  So sometimes you can, sometimes you can't.

4          THE WITNESS:  Yes.

5          THE COURT:  OK.

6  Q.  In what situations can you just cut a patient off cold

7  turkey?

8  A.  Well, again depends on how long the patient has been taking

9  the drug.  It depends on whether you think the patient really

10  is taking the drug.  If you suspected that someone was selling

11  the drug, for example, and you were prescribing --

12  Q.  I'm going to stop you.  My question was if you believe that

13  they're taking the oxycodone, can you just cut them off?

14  A.  Again, it depends.

15  Q.  On what?

16  A.  I was just answering that.

17          THE COURT:  No.  But we don't want to talk about

18  people who are selling the drug, distributing the drug, not

19  taking the drug.  Her question is very clearly focused on

20  people who are taking the drug.

21  A.  For people who are taking the drug, it depends on how long

22  they've been on the drug, it depends on what they're going to

23  do after they leave you.  Some physicians don't do drug

24  detoxification, so they send patients elsewhere, or the patient

25  goes elsewhere for drug detoxification.  So it very much

G3F7MIR1                         Warfield - cross

1   depends on a number of things.

2   Q.  But you would agree with me that something needs to happen

3   like a detoxification program.  You can't just cut someone off

4   if you believe they're taking oxycodone, right?

5   A.  Again, it depends.

6   Q.  OK.  It depends if you're going to do detoxification or if

7   you're going to send them to someone else to do the

8   detoxification; is that fair?

9   A.  Or you may not send them to someone else; they may go

10  somewhere else and do detoxification, or it depends on the dose

11  they are on, it depends on how long.  It's not a cut and dry

12  thing.  It depends.

13  Q.  In most circumstances that person would need to be

14  detoxified; is that fair?

15  A.  In many circumstances.

16  Q.  Now, you are here today to testify that Dr. Mirilishvili

17  was legitimately practicing medicine, correct?

18  A.  That's my testimony.

19  Q.  You have testified before in approximately six criminal

20  trials, is that right?  Or is it more than that now?

21  A.  That sounds right.

22  Q.  And in each time in those trials you testified on behalf of

23  the defendant doctor, correct?

24  A.  I've testified for the government before also.

25  Q.  And in the six criminal trials you testified in, have you

1    ever testified on behalf of the government?

2    A.  I guess I'm not a lawyer, so I don't know which were

3    criminal and which weren't criminal.  I can just tell you I

4    have testified for the government before.  I don't know what

5    you would call them.

6    Q.  You don't know if you were testifying in criminal trials or

7    civil trials?  Is that your testimony?

8    A.  I guess --

9             THE COURT:  I think we don't need to argue with the

10   witness.

11            MS. CUCINELLA:  OK, I'll move on.

12   Q.  In most of the criminal trials you testified in, is it fair

13   to say that you were testifying on behalf of the defendant

14   doctor?

15   A.  Yes.

16   Q.  OK.  And that's because you are an advocate for a doctor's

17   right to prescribe opiates, right?

18   A.  No.

19   Q.  Here you talked about the legitimate practice of medicine,

20   right?

21   A.  Yes.

22   Q.  It's your view that in certain circumstances it can be the

23   legitimate practice of medicine -- again under certain

24   circumstances -- if a doctor meets a patient for an initial

25   patient visit in a Starbucks, right?

G3F7MIR1                    Warfield - cross

1   A.  For an initial patient visit?

2   Q.  Yes.

3   A.  No, not for an initial patient visit.

4   Q.  Do you recall testifying in United States v. Cadet?

5   A.  Correct, that wasn't an initial visit.

6   Q.  Give me one moment.

7           THE COURT:  The question was do you recall testifying

8   in that case?

9           THE WITNESS:  Yes.

10          THE COURT:  Fine.  Then that's the answer.  The rest

11  of it can be stricken.

12  Q.  OK.  So if it's not an initial patient visit, it's

13  legitimate medicine to meet a patient in a Starbucks.

14  A.  In a very rare circumstance, which that was.

15  Q.  OK.  And you would also agree that it's your view that it's

16  legitimate medicine to conduct a random urine drug test in a

17  Starbucks bathroom, correct?

18  A.  In an unbelievably rare circumstance where someone's office

19  was closed down and they needed to take care of a patient, I

20  would say that's OK.

21  Q.  But that was your view, right?

22  A.  Yes.

23  Q.  And it's also your view that there is no need for a doctor

24  to be aware of what is going on outside the treatment room in

25  order for you to find that a doctor is practicing legitimate

1    medicine, right?

2    A.  A doctor often doesn't know what's going on outside.

3    Q.  OK.  And do you recall testifying that if a security guard

4    was standing outside the treatment room screaming at the

5    patients about shooting up, that it wouldn't change your

6    opinion of whether a doctor was appropriately prescribing

7    oxycodone?

8    A.  Well, that's I guess --

9              THE COURT:  Yes or no.

10   A.  Ask the question again.

11   Q.  Sure.  Testifying that if a security guard was standing

12   outside a treatment room screaming at the patients about

13   shooting up, that it wouldn't change your opinion of whether a

14   doctor was appropriately prescribing oxycodone.

15   A.  Well, I'd have to know more about that to answer.

16             THE COURT:  The question was did you so testify?

17             MS. CUCINELLA:  It was.

18             THE COURT:  Did you so testify?

19             THE WITNESS:  I don't remember.  I'd have to know

20   more.

21             THE COURT:  She does not remember.  So why don't we

22   refresh her recollection.

23             MS. CUCINELLA:  I'm going to refresh your

24   recollection.

25             THE COURT:  Let's see if this jogs your memory as to

1    whether you said this on another occasion.

2              THE WITNESS:  May I have a minute to check this?

3              THE COURT:  Of course.  Take as long as you like.

4              THE WITNESS:  OK.  This isn't what you just asked me.

5              THE COURT:  Excuse me.  Excuse me.  The question,

6    ma'am -- and you are an intelligent woman.

7              THE WITNESS:  Thanks.

8              THE COURT:  A highly trained physician.  So you can

9    understand what she is saying.

10             THE WITNESS:  Yes.

11             THE COURT:  You are not to fight with her.  You are

12   not here to try to win the case.  You are not to try to score

13   points.  That's not your job.  Your job is to answer the

14   question you are asked.

15             Her question was:  Did you so state on another

16   occasion?  Actually her real question was looking at that

17   document -- which I'm going to take away from you, please --

18   does that jog your memory that you so testified on another

19   occasion?  Either it jogs your memory that you did, or it

20   doesn't jog your memory that you did.  That's the question.

21             THE WITNESS:  No.

22             THE COURT:  It does not.

23             THE WITNESS:  No.

24   Q.  Do you recall testifying -- pardon me.  Do you recall being

25   asked the question:

G3F7MIR1                    Warfield - cross

1   "Q.  Well, assume that the head of security was standing in the

2   front reading room screaming at the patients about if I find

3   you shooting up I'm going to take your money and throw you out

4   of here.  Would that change your opinion?"

5        And giving the answer:

6   "A.  It wouldn't change my opinion of the way that Dr. Cadet

7   treated her patients.  Whatever else was going on outside of

8   there would not change my opinion."

9        Do you remember so testifying?

10  A.  Yes.

11       THE COURT:  Do you want to object?  Please get up on

12  your feet and say objection.

13       MR. MAZUREK:  Sorry.

14  Q.  Do you recall also testifying that if large amounts of cash

15  were maintained in garbage cans in open view, that that also

16  wouldn't affect your view of a doctor's treatment of her

17  patients?

18  A.  Correct.

19  Q.  You have also testified previously, Dr. Warfield, that

20  there is simply no way to tell if a patient is lying to a

21  doctor, correct?

22  A.  No way to reliably tell, yes.

23  Q.  Do you recall testifying that you've reviewed all the

24  literature, and try as a doctor might a doctor can't tell if a

25  patient is trying to fool them?

G3F7MIR1                          Warfield - redirect

1    A.  Reliably, correct.

2              MS. CUCINELLA:  One moment.

3              Nothing further.

4    REDIRECT EXAMINATION

5    BY MR. MAZUREK:

6    Q.  Good morning, Dr. Warfield.

7    A.  Good morning.

8    Q.  You were just asked questions on cross-examination about

9    the number of prescriptions that Dr. Mirilishvili wrote.  Do

10   you recall those successive questions?

11   A.  Yes.

12   Q.  Can you make a determination merely based on the number of

13   prescriptions a pain doctor writes to determine whether they

14   were acting outside the usual course of medical practice?

15   A.  No, absolutely not.

16   Q.  You were also asked questions relating to false documents.

17             If we could put on the screen what has been admitted

18   into evidence as Government Exhibit 1205, and turn to page 2.

19             Is that on everyone's screen?

20             Do you recall reviewing this document that's on your

21   screen within the patient file of a patient by the name of Jose

22   Miguel Lantigua?

23   A.  Yes.

24   Q.  Did this document appear to you to be an MRI report?

25   A.  Yes.

G3F7MIR1                    Warfield - redirect

1   Q.  And based on your review of the document, what does this

2   report seem to indicate?

3   A.  Give me a minute just to read it:  This would indicate that

4   this patient had a disk which was pushing on a nerve at two

5   different levels in the spinal area, which could cause severe

6   pain.

7   Q.  And does this appear to you to be a document that is issued

8   by a radiologist, based on your experience?

9   A.  Yes.

10  Q.  Is this the kind of document that you would rely upon in

11  making a medical judgment?

12  A.  Definitely, yes.

13  Q.  In your opinion, in the review of this particular file, was

14  this document a factor that you used in making a determination

15  whether the doctor's treatment of Mr. Lantigua was appropriate?

16  A.  Yes.

17  Q.  Did you have any idea that this document was prepared by

18  the DEA and not Barnabas Health?

19  A.  No, it looks like a real document to me; it looks like a

20  typical document.

21  Q.  You were asked on cross-examination about the patterns of

22  Dr. Mirilishvili's prescriptions.  Based on your medical

23  experience and training, is it within the usual course of

24  medical practice for a doctor to continue a treatment, a set of

25  medicine treatment, if the patient is informing the doctor that

1   they are performing well under that treatment?

2   A.  Yes, that would be one of the reasons you would continue

3   the medications.

4   Q.  You were asked a lot of questions on cross-examination

5   about your opinion relating to whether Dr. Mirilishvili's

6   prescriptions and the review of the files indicated that he was

7   still working within the usual course of medical practice.  Do

8   you remember those questions?

9   A.  Yes.

10  Q.  Would you agree with me if I said that there is a big range

11  of types of practices that a doctor may have in the usual

12  course of medical practice?

13  A.  No question, there are many, many different types of

14  practices.

15  Q.  And in terms of the level of care that a doctor gives

16  within that range, could that go from the best possible down to

17  he could be doing better?  Is that still within the usual

18  course?

19  A.  Yes.  There are lots of different practices and ways to

20  practice that are all within the usual course.

21  Q.  And can you make a determination based solely on numbers,

22  just the numbers of patients and the numbers of prescriptions

23  filed, can you make a determination based solely on that that a

24  doctor is acting outside of the usual course?

25  A.  Absolutely not.

G3F7MIR1

1   Q.   And every day in this country, it's your experience that

2   pain doctors are prescribing dosages of oxycodone similar to

3   those that you found in these files?

4   A.   Yes.

5           MR. MAZUREK:  I have nothing further.

6           THE COURT:  Anything else?

7           MS. CUCINELLA:  Not from the government.

8           THE COURT:  I'm truly sorry that we could not have

9   finished that yesterday, but I hope you had an enjoyable

10  evening in New York.

11          THE WITNESS:  Thank you.

12          (Witness excused)

13          THE COURT:  Mr. Mazurek?

14          MR. MAZUREK:  Yes, Judge.  There are just some

15  documents that the defense wishes to offer in evidence.

16          THE COURT:  I'm going to take them back to the robing

17  room for a second.  Stand up for a minute.

18          (Continued on next page)

19

20

21

22

23

24

25

G3F7MIR1

1          (In the robing room)

2          THE COURT:  OK.  So these look like a bunch of

3    documents from the 162nd Street clinic, like forms that were

4    filled out on various people who came to the doctor.

5          MR. MAZUREK:  Yes.  And, your Honor, they were seized

6    pursuant to the search warrant.

7          THE COURT:  I know what they were.  I just need to

8    know why the government doesn't think they are admissible.

9          MR. DISKANT:  I think our concern is that they're not

10   completed by the defendant; they pertain to a subject that's

11   not of particular relevance to the case; they pertain to

12   patients and activity that there has not really been any

13   witness testimony about.

14         THE COURT:  Well, I see, these were done by the

15   physical therapist?  Somebody would have to testify to

16   authenticate these.  Someone would have to explain what they

17   were and who did them.

18         MR. MAZUREK:  Judge --

19         THE COURT:  We don't even know the physical

20   therapist's name.  I'm sorry.

21         MR. MAZUREK:  Well, Judge, DM 402, which is one of

22   these sheets, was already admitted into evidence and

23   authenticated by Damon Leonard as physical therapist sheets

24   that were kept at the office.

25         THE COURT:  Which one is 402?  I have 402-A here.

G3F7MIR1

 1      That's all I have.

 2                  MR. MAZUREK:  402 is just a single sheet of the 402-A

 3      compilation.

 4                  THE COURT:  Could I have a copy of DX 402?  I don't

 5      have DX 402 here.  I don't have it.  I don't have the document

 6      that's been admitted into evidence.

 7                  DEPUTY COURT CLERK:  I won't have that.

 8                  THE COURT:  Where is the document?  Did the government

 9      introduce it?

10                  MR. MAZUREK:  No, I introduced it through Damon

11      Leonard.

12                  THE COURT:  With no objection.

13                  MS. CUCINELLA:  It was over objection.

14                  MR. MAZUREK:  But it was admitted.

15                  THE COURT:  I see.  So I didn't understand what was

16      going on.

17                  MR. MAZUREK:  Judge, he laid the foundation as to what

18      it was; he was the office manager.

19                  THE COURT:  Where is the transcript?

20                  DEPUTY COURT CLERK:  What day?

21                  MR. MAZUREK:  It was Damon Leonard's

22      cross-examination.

23                  THE COURT:  You're not prepared to show me the

24      transcript?  Did you come back here to argue this or not?

25                  MR. MAZUREK:  I don't have a copy of the transcript.

G3F7MIR1

1          MS. CUCINELLA:  There are certain of these documents

2     that are also included in the patient files that were entered

3     into evidence through stipulation, and we would argue that

4     those are the relevant ones, and they came in already by

5     stipulation through the patient files.  So, to the extent that

6     these are other random ones that were collected in the

7     office --

8          THE COURT:  Look, I assume that the government is

9     going to argue -- at least I always assumed the government was

10    going to argue that the issue here isn't whether the doctor had

11    some legitimate patients in the course of this practice, and

12    you don't know anything about who these people are, or they're

13    not the people who are the subject of the indictment.  So, OK,

14    he is trying to prove that the --

15         It is clearly the case, folks, that you can be

16    operating a legitimate medical practice and you can write

17    prescriptions that are for no medical purpose and are outside

18    the scope of a legitimate medical practice.

19         So, if this is being offered to prove that the man was

20    running a legitimate medical practice, you're perfectly free to

21    point out the fact that these are not the people who are the

22    subject of the indictment.  All right?  You're perfectly free

23    to do that.  I'm sorry I didn't quite understand what the

24    defense was doing when they got this document in, but I think

25    I'll let them put it in, and I think I'll let you argue.

G3F7MIR1

1    Because the case you have put on -- if I've heard it

2    correctly -- is not a case of every single prescription that

3    this man wrote from 162nd Street was in fact a prescription for

4    no legitimate medical purpose.  I didn't hear that.

5              MR. MAZUREK:  I heard that --

6              THE COURT:  I didn't hear that.

7              MR. MAZUREK:  -- through the charts.  I mean they've

8    put in all of these charts and numbers and saying 15,000

9    scripts, it was all a sham, every single one.  I mean that is

10   what they opened on.

11             THE COURT:  No, they did not open on that, but it will

12   be interesting to hear the closings.

13             I will let you get them in.  OK?

14             MR. MAZUREK:  I think the remaining documents you

15   don't have objections to.  DM 403, DM 606, and DM 607.

16             MS. CUCINELLA:  Fine.

17             THE COURT:  OK.  So let's go do this on the record.  I

18   thought this was going to go on a little longer, of course, so

19   I've been messing with the charge.  But, fine, we will just do

20   it while the jurors are sitting in the back.  OK.

21             MR. MAZUREK:  So how are we going to proceed now?

22             THE COURT:  You are going to introduce your documents,

23   you are going to rest.  Do you have a rebuttal case?

24             MS. CUCINELLA:  We do not.

25             THE COURT:  OK.  Then we are going to have a charge

G3F7MIR1

1    conference.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3F7MIR1

1          (In open court)

2          THE COURT:  OK.  The defense wants to introduce some

3    exhibits?

4          MR. MAZUREK:  Yes, your Honor.  The defense seeks to

5    offer what has been premarked for identification as DM 402-A.

6          THE COURT:  The government objects.  The objection is

7    overruled.  It's admitted.

8          (Defendant's Exhibit 402-A received in evidence)

9          MR. MAZUREK:  May I just publish it on the screen,

10   your Honor?

11         THE COURT:  Sure.  And this is a multi-page document.

12         MR. MAZUREK:  And this is a multi-page document.

13         THE COURT:  There are a number of pages that look like

14   this, ladies and gentlemen.

15         MR. MAZUREK:  Defense offers DM 403 into evidence.

16         THE COURT:  Any objection?

17         MS. CUCINELLA:  No objection.

18         THE COURT:  Admitted.

19         (Defendant's Exhibit 403 received in evidence)

20         MR. MAZUREK:  If we may publish that.

21         The defense offers what has been premarked for

22   identification as DM 606.

23         THE COURT:  Any objection?

24         MS. CUCINELLA:  No objection.

25         MR. MAZUREK:  And if we may publish that.  This is a

G3F7MIR1

1     patient file for Tawanda Esther.  It's again a multi-page

2     document.

3              (Defendant's Exhibit 606 received in evidence)

4              MR. MAZUREK:  And the defense offers DM 607.

5              MR. DISKANT:  No objection.

6              MS. CUCINELLA:  No objection.

7              THE COURT:  Admitted.

8              (Defendant's Exhibit 607 received in evidence)

9              MR. MAZUREK:  And if we may publish that.  This is a

10    patient file for a patient by the name of Angel Hernandez.

11    Again, it's a multi-page document.

12              With that, your Honor, the defense rests.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

G3FMMIR2

1          THE COURT:  Does the government wish to put on any

2     rebuttal case?

3          MS. CUCINELLA:  No, your Honor.

4          THE COURT:  Ladies and gentlemen, we have heard all of

5     the evidence.  We wouldn't have broken yesterday no matter how

6     tired they were if I thought that was all that was going to be.

7     But I will tell you it not infrequently happens when we take a

8     break and the lawyer has overnight to think about it, it gets

9     shorter the next morning.

10          I need to talk to the lawyers now about the charge.

11     What I want you to do is, I want you to take half an hour, take

12     a coffee break.  I want you to run out to Starbucks or

13     something and be back here in the jury room in half an hour.

14     Don't discuss the case.  Keep an open mind.

15          (Jury not present)

16          THE COURT:  Do we have motions?  Do we have defense

17     motions?  We should get that on the record first.

18          MR. MAZUREK:  Yes, your Honor.  We renew our motion

19     that we made at the end of the government's case with respect

20     to insufficiency of evidence as to Counts One, Two, and Three.

21          Again, just to specify, with respect specifically to

22     the substantive counts, I think now that we have the additional

23     testimony of Dr. Warfield to rebut the government's expert

24     testimony that the government has failed to establish, even in

25     a light most favorable to the government, evidence

1    sufficient --

2                THE COURT:  Come on.  I can't believe you are actually

3    making that argument.  We have one expert that says one thing

4    and one expert that says something else.  That's classic for

5    the jury.  The jury could disbelieve everything she said, in

6    which case the government's expert stands unrebutted.  That's

7    why we have juries.  That's not a legitimate argument.

8                MR. MAZUREK:  Judge, there is very little evidence, as

9    indicated, in any of the individual patients that are charged

10   in Counts Two and Three.  Except for Abraham Correa in Count

11   Two, none of those other patients have been specified

12   throughout this trial except in passing remarks about

13   individual pages within their files.

14               THE COURT:  It's the government's job on summation to

15   make it clear to the jury what patients are involved in Count

16   Three.  I'll be listening closely.  The motion is denied.

17               You guys need to give me five minutes because I'm

18   playing around with something.

19               (Recess)

20               THE COURT:  What you have is pages 25 and 26.  This is

21   like now 25, 26, and 27.  This is an insert.  We will talk

22   about it.  I am not going to print out the whole charge.

23               Can we focus on this page for a moment and then we

24   will go back and do what I usually do, which is ask the

25   government -- I took to heart -- I want Mr. Mazurek to know

G3FMMIR2

1    that I don't actually ignore what he says.  I took to heart

2    what you said in so impassioned a way last night and I came in

3    this morning undertaking to beef up a little, this is not a

4    malpractice case.  So I think I've beefed that part up a

5    little.  I've also inserted several of the good faiths that you

6    asked for in the letter that was on my chair this morning.  I

7    didn't do it the eight times that you wanted me to, but I

8    certainly have inserted it several more times.  My goal is to

9    say things once, if at all humanly possible.  Why don't you

10   read these pages.

11          This is never going to solve everybody's problems, but

12   does this work better?  Does anybody have any particular beefs

13   with it?

14          MR. DISKANT:  From the government, one very small

15   point, your Honor.  In the first paragraph on the new 26 in the

16   sentence beginning, that is, the government must prove beyond a

17   reasonable doubt the doctor knew, the government would propose

18   eliminating the word conscious before purpose and objective

19   since in the next paragraph you explain we can either prove it

20   through actual or through conscious avoidance.  Otherwise, the

21   government has no objection to this.

22          THE COURT:  You are right.

23          MR. MAZUREK:  Judge, I would object only because I

24   think conscious is appropriate in this instance because you are

25   talking about the, he knowingly and intentionally acted outside

G3FMMIR2

1    the course of legitimate medical practice.  You can't

2    deliberately ignore whether you're acting within or without

3    medical practice.

4              THE COURT:  It's not true.  It's not true.

5              MR. MAZUREK:  In order for the government to prove

6    that he didn't act in good faith, it's his subjective belief.

7              THE COURT:  It's not his subjective belief.  It is an

8    objective standard.  I didn't get into that all this.  But the

9    Second Circuit has made it very clear, it is an objective

10   standard.  His belief, he may have held a belief, but if it was

11   not a reasonable belief, if it was not reasonable for a doctor

12   to believe, the Second Circuit is very clear about that.

13             MR. MAZUREK:  I know those cases.  I think it's a

14   parsed a little bit more carefully than that and that is the

15   belief that the defendant doctor has to have has to be based on

16   reasonable medical judgment, but it's not replaced by a

17   reasonable person standard.  It's that that doctor believed he

18   was acting within reasonable medical judgment.

19             THE COURT:  The Second Circuit has already blessed the

20   language of that reasonableness.  We are not talking about

21   that.  I'm going to eliminate the adjective conscious before

22   the words purpose and objective on page 26 because I agree with

23   the government, and you have your objection to that.  If we are

24   going to talk about good faith --

25             MR. MAZUREK:  Before we leave that page, just one

G3FMMIR2

1  small note.  On the top of page 26, the last line before the

2  first paragraph it should be I think, instead, knowingly and

3  intentionally acted instead of acting.

4          THE COURT:  You are right.  Thank you.

5          MR. MAZUREK:  Then also at the bottom of that page,

6  your Honor, the last paragraph, the second line from the

7  bottom, we ask that you strike the word best because that's

8  confusing as --

9          THE COURT:  You are right.  I'll take that out.  A

10  doctor acts in good faith when he exercises his professional

11  judgment.

12          MR. GOSNELL:  Your Honor, are you ready to move on to

13  page 27?

14          THE COURT:  Yeah.  I want to do this.  Yes.

15          MR. GOSNELL:  In the last paragraph there is one

16  typographical issue which it should be Counts Two and Three.

17          THE COURT:  You are right.

18          MR. GOSNELL:  The other thing, with respect to that

19  particular paragraph, as we set forth in our letter --

20          THE COURT:  Can I have the letter back, please.

21          MR. GOSNELL:  This is on page 2 of our letter.  I

22  believe as it's worded --

23          THE COURT:  You are right.  It should say, then as

24  long as the government has proved all other -- I am not going

25  to go through it 50,000 times, but you are absolutely right.  I

1   noticed that in your letter.  It was bothering me yesterday.

2   I'll confess that.  I will insert something to say.

3          MR. GOSNELL:  It's not just good faith.  It's the

4   other two elements as well.

5          THE COURT:  Right.

6          MR. DISKANT:  Your Honor, it does go on to say that

7   this is specific to the third element.

8          THE COURT:  Relax.  Don't worry.

9          MR. MAZUREK:  Judge, in an effort that might prove my

10  overpersistence, I would ask that on page 25, the section that

11  you beefed up relating to negligence and malpractice, that you

12  add a sentence that we proposed on page 15 of our charge which

13  reads:  In making a medical judgment concerning the right

14  treatment for an individual patient, medical professionals have

15  discretion to choose among a wide range of available options.

16         THE COURT:  I'm not saying any of that.  Yes.  Because

17  that's not the issue that's being tried here.  No.  You have

18  your objection.

19         I am going to type this in.  Now, I want to work from

20  the copies that you have with the old pagination.  We have

21  inserted a page.  We have taken care of that.  Let's go back to

22  the beginning and now I will ask, does the government have any

23  changes it would like me to make in the charge?

24         MR. DISKANT:  Yes, your Honor.  The government.

25         THE COURT:  Page.

G3FMMIR2

1          MR. DISKANT:  The first one comes up on page 17.

2      These are both omissions.  The second one doesn't have a page

3      number.  The government in its initial request requested that

4      the Court --

5          THE COURT:  My page 17 says you may not draw any

6      inference, favorable or unfavorable, toward the government or

7      the defendant.

8          MR. DISKANT:  The persons not on trial charged.

9      That's correct.  We had additionally requested an uncalled

10     witnesses charge.  It hasn't come up yet.

11         THE COURT:  I'm not giving you any uncalled witness

12     charge.  They can't draw any inferences, period, the end.

13     Let's see what happens in the closings.  I'm not putting it in

14     here.

15         MR. DISKANT:  Understood.  The second point the

16     government would draw may be the same issue, which is a

17     particular investigative techniques not required charge.

18         THE COURT:  You want that stuff.

19         MR. DISKANT:  That's all.

20         THE COURT:  That's a different charge than this.  That

21     has nothing to do with persons not on trial.  You want, the

22     government doesn't have to do any particular thing in order to

23     prove its case charged.  Fine.  I'll throw that in.

24         MR. DISKANT:  Thank you, your Honor.

25         THE COURT:  It will be between pages 16 and 17.  We

G3FMMIR2

1    have a standard one of those.  We will throw that in.

2              Anything else?

3              MR. DISKANT:  The only final one, your Honor, we have

4    brought to the defendant's attention, to the extent he would

5    like an other act evidence charge with respect to the tax

6    returns, the government has no objection to such an

7    instruction.

8              THE COURT:  As I recall, it wasn't asked for by the

9    defendant and we didn't put it in.

10             MR. MAZUREK:  I'm sorry.

11             THE COURT:  You didn't ask for an other acts charge,

12   did you?

13             MR. MAZUREK:  No, we did not.

14             THE COURT:  So I didn't put it in.  I'll put it in if

15   you want it in.

16             MR. MAZUREK:  Yes.  Now that I've considered what the

17   evidence does show, and I imagine they are going to make some

18   arguments relating to his tax returns, I think it makes sense

19   to include it.

20             THE COURT:  We will put it in.

21             MR. MAZUREK:  Thank you, Judge.

22             THE COURT:  I think what we will do is, we will put it

23   in just before the venue charge or just after the venue charge,

24   in the back, at the end.

25             Does the defendant have any other particular

G3FMMIR2

1    peccadilloes or objections or changes it wants me to make in

2    the charge?

3            MR. MAZUREK:  Yes, your Honor.  We have an exception

4    to the good-faith language in the charge.

5            THE COURT:  At my page 26, 27.

6            MR. MAZUREK:  Right.  And I guess wherever else it

7    would subsequently appear in the conspiracy charge.  We would

8    ask that the Court give the instruction that we proposed in

9    request No. 11 on page 17 of our charge.

10           THE COURT:  You have your objection.  I am going to

11   say what I am going to say.  It came out of a Second Circuit

12   case.  I think that what I say is clearer, more concise.

13           What else?

14           MR. MAZUREK:  Just a moment.  We have our continuing

15   objection with respect to the conscious avoidance charge.

16           THE COURT:  Correct.  Absolutely.  Make sure the

17   record is very clear.

18           MR. MAZUREK:  And also now that it's been added to

19   Counts Two and Three in the Court's proposed charge, we believe

20   that it's even less of a factual predicate with respect to the

21   subsequent charges where the government has not introduced

22   evidence relating to the particular patients that are specified

23   in those counts.

24           THE COURT:  Certainly if they have introduced no

25   evidence, and that will become clear during the summations, if

G3FMMIR2

1      they really have introduced no evidence, then they are going to

2      have a big problem.  But I believe that there is evidence in

3      the record.

4              MR. MAZUREK:  Just to be clear, with respect to

5      conscious avoidance, they have to show that there is a factual

6      predicate to suggest that the doctor did something or had a

7      high probability of knowledge with respect to those patients

8      and did something to not ask the final question to deliberately

9      ignore that evidence that was presented before him, and we

10     think there is an absence of that.

11             THE COURT:  I'll grant you this.  It's a lot easier to

12     deal with Count Two than it is to deal with Count Three.  I

13     will be listening with great interest to hear about the

14     discussion of Count Three, great interest.

15             Let's clean this up so you've got clean copies.

16             Anything else?

17             MR. GOSNELL:  Not about the charge.

18             THE COURT:  I want to clean this up so we all have

19     clean copies.

20             MR. MAZUREK:  Judge, for scheduling purposes, will the

21     government be giving its opening closing argument --

22             THE COURT:  Then we will be breaking for lunch and we

23     will come back and the government will do its rebuttal

24     summation.  How long do you think -- how would you know.

25             MR. DISKANT:  Ms. Cucinella's opening closing should

G3FMMIR2

1    be about an hour.  I anticipate my rebuttal will be

2    approximately 30 minutes.

3              THE COURT:  You don't know what your rebuttal is going

4    to be because you don't know what he is going to say.

5              An hour, hour and a half?

6              MR. MAZUREK:  I think that's probably right, hour and

7    a half.

8              THE COURT:  Don't make it two.  Give me five minutes.

9              MR. MAZUREK:  Am I allowed to use a Power Point for

10   closing argument?

11             THE COURT:  Yes.  Absolutely.  The evidence is in.

12             (Recess)

13             MR. DISKANT:  Your Honor, one housekeeping matter.

14   Government Exhibit 1204 was offered through government witness

15   Joel Galanter.  For whatever reason it is not reflected in the

16   transcript.  We have consulted with defense counsel and the

17   parties agree it's in evidence, and I wanted to put that on the

18   record before closings.

19             THE COURT:  Do you have a problem with that?

20             MR. GOSNELL:  No.

21             We did have two other issues that we wanted to deal

22   with before the government begins its summations.

23             THE COURT:  Yes.

24             MR. GOSNELL:  One of the things that came up yesterday

25   during Mr. Diskant's cross-examination of Chris Dillon was a

G3FMMIR2

1    suggestion that there were armed guards at the medical clinic.

2    There is in fact no evidence of that.  The only two times that

3    that ever came up was during the direct examination, I believe,

4    of Ben Lopez.  The Court struck that from the record because it

5    was based on hearsay testimony and then there was the

6    questioning from Mr. Diskant yesterday which, again, the Court

7    sustained objections as to that.  I just wanted to be clear

8    that there shouldn't be any suggestion that there were armed

9    guards at the clinic because there is no evidence of that in

10   the record.

11            MS. CUCINELLA:  There won't be.

12            THE COURT:  Thank you.

13            MR. GOSNELL:  The other thing is, with respect to

14   Government Exhibits 559, 559A, and 560, these were the

15   documents that kind of came up at the end of the day on

16   Thursday where we objected.  This was also the subject of our

17   mistrial motion.

18            In the government's response to that mistrial motion

19   they said that they had offered photographs of the home, at

20   least one of which clearly depicts the location and storage of

21   these documents.  And they referenced back to Government

22   Exhibit 5A, which is a photograph of documents on a windowsill

23   in the home office area.  The suggestion that that is the

24   location where those documents were found is actually not

25   supported by the trial evidence.

G3FMMIR2

1          The trial evidence, analyst Castro testified that he

2     recovered patient files in the bedroom which were depicted in

3     Government Exhibit 5A.  But when he was specifically asked

4     about the location of those documents, he testified that they

5     were found at the defendant's residence, not specifically in

6     that room.

7          THE COURT:  I'm sorry.  Make whatever argument about

8     the weight you want to make to the jury.

9          MR. GOSNELL:  Your Honor, I think the argument the

10    government is going to make is that that photograph shows where

11    those particular documents were found.

12         THE COURT:  Let them make the suggestion and then you

13    undercut it with whatever evidence you think undercuts it.

14    That's what closing arguments are for.

15         Is everyone ready?

16         MS. CUCINELLA:  Yes, your Honor.

17         (Jury present)

18         THE COURT:  Ladies and gentlemen, folks, we have heard

19    the evidence.  We are now going to hear the arguments that the

20    lawyers are going to make to you.  They are going to take the

21    evidence and each of the lawyers is going to paint a picture

22    with that evidence and it's going to come as no surprise to you

23    that the lawyers for the two sides will paint very different

24    pictures with the evidence.

25         What the lawyers are going to do is, they are going to

G3FMMIR2

1   call your attention to certain evidence and they are going to

2   ask you to adopt their view of the evidence and of the

3   inferences, the conclusions that you should draw from the

4   evidence.  If what a lawyer suggests to you seems to you

5   logical and rational and if it's supported by evidence that you

6   find to be credible, then you are free to adopt the inference

7   that the lawyer asks you to draw.  If what the lawyer says to

8   you doesn't strike you as particularly logical or reasonable or

9   if the evidence that the lawyer says supports inferences that

10   you don't find to be particularly believable or persuasive,

11   then you are free to reject the lawyer's suggestion of what

12   inference to draw and to draw your own conclusions based on

13   your belief about the credibility and the weight of the

14   evidence that you have not heard.

15           Remember that what the lawyers say to you is not

16   evidence.  The lawyers are bound in their summations by what is

17   in evidence.  And if you were to perceive that a lawyer went

18   beyond the evidence and added something that was not in

19   evidence, it would be your duty to ignore it.

20           Now, that said, from time to time a lawyer will jump

21   up during his or her opponent's summation and say objection,

22   that's not in evidence.  I can't tell you what's in evidence.

23   How am I supposed to rule on that objection.  I can't tell you

24   what's in evidence and what's not in evidence.  It's your

25   recollection of the evidence that controls.  But just remember

G3FMMIR2

that the lawyers are bound by the evidence and can't go beyond it.

During the course of the summations the lawyers will say things like, I think and I believe and they don't really mean that. They are not witnesses. They mean, I'm submitting the following for you to consider. And you should take it as such.

The fact is, we say I think at the beginning of sentences very frequently. It's a very common way that we have evolved in our speech patterns. I am not going to stop the lawyers every time and say, would you please change that to I submit the following for your consideration. Just know in your head that that's what the lawyer is really saying to you.

Remember, ladies and gentlemen, that as you form your view of the evidence and your recollection of the evidence, which is what controls everything, if there is a disagreement or a dispute among you about what the evidence actually contains, you are going to resolve that dispute not by going to your notebooks and saying, juror number 3 says it's this, therefore it must be that; you are going to ask for a read-back of the testimony or you are going to consult the documents that are in evidence, which will be back in the jury room with you.

Now, I intimated that the lawyers sometimes jump up and object during summations. They are allowed to do that. In fact, they would be derelict in their duty if they didn't

G3FMMIR2

object if the other lawyer was doing something that broke the

rules for summations.  It's their job to call that to my

attention.  Don't take offense if a lawyer jumps up and

objects.  I don't think you'll hear it very often if you hear

it at all.  I'll make a ruling on the objection.

          And let me take this opportunity to explain to you

that when I make a ruling I'm not suggesting that this side

ought to win the case and the other side ought to lose the

case.  I'm not suggesting that this side is right and that side

is wrong.  All I'm doing is acting as the referee.  All I'm

doing is saying, that broke the rules or that didn't break the

rules, all technical and lawyerly, and you don't need to know

what the rules are and you don't need to know in order to

decide the case.  Just remember that's all I'm doing and don't

draw any conclusions from my rulings about how you should rule

in this case because I'm not sending you secret signals.

          Here are the rulings for summations.  We know that the

government has the burden of proof.  We have heard all the

evidence, but even at this moment the defendant is presumed

innocent.  That's your mindset.  So the government has the

burden of overcoming that presumption beyond a reasonable

doubt.

          The government will, therefore, put its case to you

first.  It will have the opening summation.  Then the defense

will have an opportunity to sum up and to argue its case.

G3FMMIR2                    Summation - Ms. Cucinella

1   Remember, the defense does not assume the burden of proof by

2   arguing its case.  The burden of proof always rests with the

3   government.  And because the government has the entire burden

4   of proof we let the government have the last word.  So there

5   will be a final or rebuttal summation of shorter duration that

6   you will hear from the government this afternoon.  We will have

7   the government's summation this morning, then we will have a

8   lunch break, and then we will have the defense summation and

9   the rebuttals this afternoon.

10          Ms. Cucinella, is the government ready to close?

11          MS. CUCINELLA:  The government is ready, your Honor.

12          THE COURT:  You may have the floor.

13          MS. CUCINELLA:  Moishe Mirilishvili is a drug dealer.

14   He's not the type that stands on a street corner or uses

15   couriers to sneak drugs in over the border.  He's not the type

16   you see in movies or on Netflix.  He is worse.  He is a drug

17   dealer who hides behind a white coat and his medical degree and

18   uses the guise of practicing medicine to write medically

19   unnecessary prescriptions, prescriptions that cause and enable

20   addiction, to people he knew didn't need them and to people he

21   knew weren't taking them.  He ran his clinic not like a doctor

22   but like a drug trafficker, and by doing so he profited

23   millions of dollars off the backs of the addicts he created and

24   the criminals he associated himself with.

25          (Continued on next page)

1    I'm not going to refer to the defendant as a doctor in

2    this closing, because you and I both know that with respect to

3    the majority of the patients that he gave prescriptions to, he

4    wasn't acting as one.

5        Let me make clear there may have been some patients in

6    pain, some patients who needed oxycodone.  That is not the

7    question for you.  The question for you is whether, based on

8    all of the evidence you have seen, that the defendant also

9    issued medically unnecessary prescriptions for no legitimate

10   reason outside of the usual course of practice.

11       You have sat very patiently through all of the

12   evidence that has come in in the past two weeks.  You have been

13   diligent in the attention that you have paid to the witnesses

14   on the stand.  You know what happened here.  You know who had

15   almost $2 million stashed in his home, and you know who drove

16   that white Mercedes to and from Washington Heights every day.

17   You know who walked past the crowds of patients waiting outside

18   every morning and who walked out at the end of every day

19   carrying that bag of cash.  You know despite all of the systems

20   he put in place, despite all of the things he did to hide his

21   involvement, you know who was the architect of this scheme.

22   You know who operated it, and you know who profited the most

23   from it, and that's why we're here today.  We're here to

24   finally hold the defendant, that man, accountable.

25       Because of what the defendant did, he is charged in a

G3F7MIR3                    Summation - Ms. Cucinella

three count indictment.  All three counts at their core allege

that when the defendant wrote prescriptions for oxycodone he

acted outside the usual course of medical practice and without

a legitimate medical purpose, that there was no good faith.  I

will come back to the specifics of the three counts at the end,

and we will talk about what I expect Judge McMahon will

instruct you.

          Now, I'm not going to repeat or summarize everything

that you heard over the last two weeks.  I know you have been

listening.  I'm going to use this time instead to talk to you

about how you can be sure beyond any reasonable doubt that the

defendant not only knew what was going on in his clinic, but

that it was by design.  Because when it comes down to it,

that's all that is actually in dispute here.

          First, let's talk about what is not in dispute.  There

is no real dispute that crowds of patients would line up out in

front of the clinic in the morning.  There is no dispute that

no nurses worked at this clinic, nor is there a dispute that

after the one individual who purportedly had medical training

was fired, that there was no effort to hire an actual medical

staff.

          There is no real dispute that the defendant accepted

documents that were fake, like the ones from Doshi Diagnostic

that Dr. Lawler -- remember him -- walked you through on the

stand, and the urinalyses reports that had names handwritten or

G3F7MIR3                    Summation - Ms. Cucinella

1    literally cut and pasted on.

2              There is no dispute that the defendant wrote the exact

3    same oxycodone prescription for 95 percent of the people who

4    came through his door.  Indeed, there is no real dispute that

5    there were patients being brought into the defendant's clinic

6    for the purpose of getting prescriptions that would be sold on

7    the street.

8              And there is no dispute that the vast majority of the

9    patients paid cash, $200, that they handed directly to the

10   defendant in the treatment room before he would begin treating

11   them.

12             In fact, the only issue in dispute is whether the

13   defendant knew as he was collecting those cash payments and

14   writing identical oxycodone prescription after oxycodone

15   prescription for those patients who didn't need it, whether he

16   knew that he was writing medically unnecessary prescriptions

17   outside of the usual course of practice and not in good faith.

18             I submit to you that when you use your common sense,

19   and when you look at the evidence, there is no doubt -- no

20   doubt -- that this man knew exactly where and more specifically

21   who his cash was coming from, and that he was doing everything

22   in his power to make sure that that cash kept coming.

23             First let's look at how he ran the 162nd Street

24   clinic.  As you know, the clinic in Washington Heights wasn't

25   where the defendant was practicing at the beginning of the

1    charged conspiracy.  He had been at a couple of other locations

2    located around the Bronx, places where he began to develop some

3    of the relationships with patients, and the places where we

4    would argue he started to earn his reputation as a doctor who

5    would freely give out oxycodone.

6           You heard from Ms. Rosen that based on the activity

7    feed from Practice Fusion, the doctor started approximately 700

8    patient files during that nine-month timeframe.  But from

9    October 2012 to December 2014 he had almost four times as many

10   patients.  Why?  He opened his own clinic in the fall of 2012.

11   No more oversight, no more accountability.  He moved to Jumel

12   Terrace, the neighborhood that Mr. Lopez told you about in

13   Washington Heights.

14          Mr. Lopez told you that the moment the doctor arrived

15   and opened his doors in Mr. Lopez's neighborhood, things

16   started to change.  Both expensive and inexpensive cars with

17   out-of-state license plates, dropping off groups of patients

18   and driving away, the same cars time and again, people lining

19   up to wait in the mornings before the clinic even opened,

20   people hanging around, coming into his neighbors' property and

21   urinating on their porches, armed robberies, things that

22   Mr. Lopez had never seen in his neighborhood before, and

23   notably after the defendant's shop was shut down, things he has

24   never seen since, even though there is now a doctor's office

25   open in that same location.

G3F7MIR3                    Summation - Ms. Cucinella

1          It was obvious to everyone, everyone in that

2    neighborhood, that this wasn't a doctor's office; it was a drug

3    den.  It was obvious from the outside, and it was even more

4    clear once you got past the tinted windows, past that security

5    guard, and you took a look at what was going on inside.

6          Here was a purported doctor's office where at one

7    point in time there was one person working there who

8    purportedly had any medical training at all.  Ladies and

9    gentlemen, ask yourselves is that a coincidence?  The fact that

10   the defendant hired Abraham Correa and Damon Leonard to help

11   him run his clinic tells you almost everything that you need to

12   know.

13         Let's start with Correa.  Before he was a bouncer at

14   the doctor's office, he was a patient of the defendant's.  He

15   got four prescriptions of, you know, 90 tabs of 30 milligrams

16   of oxycodone.  That was before the defendant cut him off to

17   work for him as security, a man for whom he had written a

18   prescription for a cervical collar, a man who defense counsel

19   has suggested fooled the defendant with his convincing story

20   about falling from scaffolding.  Within three months on

21   oxycodone he was healthy enough to play the role of security

22   guard.

23         Now, remember that the defendant writes Correa one

24   last prescription after he hires him.  It was on January 10th

25   of 2013, a date that we're going to come back to.  After

1    January 10 Correa -- with pain supposedly so severe as to

2    warrant that high of a dose of oxycodone -- is simply cut off.

3    Even Dr. Warfield would say that someone whom a doctor actually

4    believed had been taking the drug for four months would suffer

5    from withdrawal, would need to go to some sort of detox.

6            But the defendant didn't take any steps to wean Mr.

7    Correa off the oxy.  He wasn't tapered; his doses weren't

8    titrated down.  Why?  Because the defendant knew all along that

9    Correa wasn't taking the medicine, that he didn't need it.  The

10   defendant wasn't acting as a doctor.  There was no good faith

11   here.  Mr. Correa said it best himself:  He was a drug dealer,

12   and Dr. Moshe was his supplier.

13           Correa took that stand, and he was honest with you

14   about who he is and what he was doing.  He did not hide his

15   history with drug dealing; he owned it.  He also introduced you

16   to some of the other bosses or the crew chiefs as they were

17   sometimes called during this trial, the other people who would

18   gather at the clinic daily and who were all bringing in groups

19   of people to see the defendant so that they could collect the

20   oxycodone prescriptions which the defendant was guaranteed to

21   write and to sell the pills.

22           For example, he told you about Joseph Gray, whom he

23   knew as Dogs, and about Thomas White.  He told you they were

24   each there basically every day getting their patients in to see

25   the defendant.

G3F7MIR3                       Summation - Ms. Cucinella

1     He also told you about Raymond Williams who was known

2  as Obama.  He told you that Ray Williams was doing the same

3  thing, bringing in groups of patient daily.

4     And more important Correa told you about Obama's

5  relationship with the defendant, about how Obama introduced

6  Correa to the game even before the defendant moved to the new

7  location on 162nd Street, and about how Obama kept coming back,

8  even after Correa was hired, to speak privately with the

9  defendant.

10     Correa told you what those meetings were about, about

11  how Obama was having difficulty getting the prescriptions the

12  defendant wrote filled, about the success of the conspiracy

13  that these men were in.

14     And you know that the defendant counted on Correa to

15  bring in his patients.  You know that because the defendant

16  said it.  He told Correa after he fired him that he could still

17  bring his patients there, patients guaranteed to get an

18  oxycodone prescription from the defendant, because, as Mr.

19  Correa told you, the defendant wasn't a doctor; he was a

20  supplier.

21     And the testimony that you heard from Damon Leonard

22  corroborates that.  Damon Leonard, he started out as a crew

23  chief working for a family friend, bringing patients into the

24  clinic, people he described as having bloodshot eyes, red eyes,

25  reeking of booze.  He told you they were addicts and

G3F7MIR3                    Summation - Ms. Cucinella

1   alcoholics, homeless people, people that John Coleman had

2   rounded up off the street to pose as patients, to trick the

3   doctor.

4          Damon was there day after day repeatedly before he got

5   his first oxycodone prescription from the defendant, and the

6   defendant had no issue with it, none.  Why?  Because the

7   defendant wasn't making money off of patients with real pain;

8   the defendant was making money off the people the crew chiefs

9   were bringing in by the car load, cash patient after cash

10  patient.  He wasn't treating them.  He was giving them exactly

11  what they wanted, and he was getting exactly what he wanted in

12  return:  Cash.  This wasn't a doctor's office.  It was a pill

13  mill.

14         Now, you know that the defendant hired Damon exactly

15  the way he hired Mr. Correa.  Damon didn't come to him begging

16  for a job.  The defendant offered him one.  Now, you have to

17  ask yourself why Damon?  Why?  I think we can agree that the

18  defendant wasn't exactly in the position to post an ad in the

19  paper or to put up a help wanted notice up at Columbia Medical

20  School, which is only a few blocks away.  He wanted someone who

21  knew the game, who understood what was happening and who wasn't

22  going to get in his way.  He wanted someone that Jomaris could

23  train, someone that would keep the cash coming.

24         Damon Leonard testified before you over the course of

25  three days.  You watched him, listened, and you know exactly

1    why the defendant hired him.  He thought Damon would be loyal

2    to him until the end.  Don't worry, stick with me; you will be

3    OK.  He didn't think Damon would turn on him.  The defendant

4    was wrong.

5        Damon told you about the defendant's nightly routine.

6    He told you that he would go into his office, and he would

7    count up how many cash patients he had and how many insurance

8    payments, and if there weren't enough cash payments, he would

9    tell Damon to get on the phone, that he hadn't done his job,

10   and he needed to get patients in there for the next day.

11       No one here believes that Damon had a stash of

12   legitimate chronic pain patients at his fingertips.  And to be

13   clear, neither did the defendant.  He knew exactly what he was

14   doing when he told Damon to get the numbers up.  He knew

15   exactly the people he would be writing prescriptions for the

16   very next day.

17       And Damon, knowing how angry the defendant would get,

18   brought his family in, his brothers, his sisters, his niece.

19   Did Damon make money on this?  Absolutely.  Damon pled guilty.

20   He knows what he did, and he has taken responsibility.

21       Look at how the defendant reacted.  He told Damon that

22   he had met his niece.  He wrote oxycodone prescriptions for

23   her.  Nothing to see here, no questions asked.  Again, ladies

24   and gentlemen, that's not good faith, that's not medicine; it

25   was cash in exchange for oxy prescriptions, nothing more.

1          Let's talk about the cash patients for a minute.

2     Damon told you that insurance patients would have to wait to be

3     seen until after the cash patients had been seen, that the

4     defendant would get angry if there wasn't enough cash patients

5     in a day.  That information was corroborated by an unlikely

6     source, Anna Torres, one of the defendant's witnesses and one

7     of the defendant's few insurance patients.  She told you about

8     her long history of pain, and she told you why she ultimately

9     stopped seeing the defendant, because she was sick of the

10    crowds and of the office staff telling her to come back the

11    next day because all of the cash patients got to go ahead of

12    her.  Do you really believe that that was Damon Leonard's call?

13    You saw the cash in the defendant's home.  Do you think it

14    mattered to Damon Leonard whether or not the patient was paying

15    with insurance or cash?

16         And you know why else it mattered.  You heard Dr.

17    Warfield.  She gives presentations in which she tells doctors

18    about insurance companies and how they're doing more vigilant

19    reviews and that those reviews can lead to criminal

20    investigations.  That wasn't Damon's call.

21         Damon also told you about the fact that the defendant

22    would kick out certain patients.  But I want you to think hard

23    about what Damon actually said about that.  He testified that

24    when he was a patient, the defendant, he asked him if he was a

25    cop.  He said that he watched the defendant kick out patients

1   after the PMP program had started or sometimes if their

2   paperwork wasn't quite right, all things that risked the

3   defendant getting caught.  How do you know?  Because when he

4   would kick patients out for not having the right paperwork, he

5   would tell them they could come back, that he would see them

6   the same day.  He didn't care if they were actually hurt.  He

7   didn't care if they were legitimate patients.  He wanted a

8   piece of paper to put in the file to cover himself, for the

9   same reason he had Jomaris and Damon start signing off on those

10  reports.

11          Look at the reports with Damon's name on them.  They

12  are so obviously fake, no one could take them seriously.  The

13  doctor had Damon put his name on them so he could have someone

14  he could point the finger at when this day came.

15          But, again, you know too much.  You see right through

16  that.  Think about what Damon told you about February of 2014.

17  Yes, it's a date he remembered.  Why?  It stood out to him,

18  because the defendant called him into his office, and he talked

19  to him about the fact that Dr. Terdiman had been arrested, and

20  that they had to start kicking the addicts and the bums out of

21  their clinic.

22          You don't need to take Damon's word for that, although

23  I submit you can.  You can also look at the BNE data.  It shows

24  in February of 2014 a dip in the number of prescriptions the

25  doctor was writing.  Why?  Because he was scared, because he

1    knew what he was doing was illegal because he wasn't practicing

2    medicine.

3            And you don't have to take Damon or Correa's word on

4    this.  To be clear, again I submit that you can, but

5    Mr. Diskant and I are not the ones who chose those two as

6    witnesses.  The defendant did.  He is the one who conspired

7    with them to keep his pill mill running, and they are the two

8    eye witnesses to how the defendant ran his drug trafficking

9    operation.  I suggest you take their stories and you match them

10   up with everything else you know about this conspiracy.  You

11   will find that their stories are corroborated not only by each

12   other but by all of the other evidence in this trial.

13           Now, as you know, and as you will hear multiple times

14   today, I must remind you that the defendant has no burden in

15   this case and that the burden is entirely the government's.

16   It's a burden we take very seriously and it's not something we

17   shy away from.

18           But when the defense puts on a case -- as they have

19   here -- when they make arguments through the cross-examination

20   of witnesses, through their own witnesses and in jury

21   addresses, the government has the right and in fact the

22   obligation to comment on those arguments.  And you, ladies and

23   gentlemen, you must scrutinize those arguments just as you will

24   every argument in this case.

25           Here you heard Mr. Mazurek's opening, and you know

1    what he was trying to show through the cross-examination of

2    witnesses.  Their position is that the defendant was duped,

3    that he relied on his office staff and his security team to vet

4    his patients, and that he did everything in his power to

5    prevent these modern day criminals from infiltrating his old

6    world practice.  The evidence doesn't support any of that.

7    Look at the evidence.

8            Let's start with the fake paperwork.  Damon told you

9    that at times Jomaris would alter it, she would do overrides.

10   At times he would alter it.  Patients would come in with fake

11   paperwork provided by crew chiefs.  There is no question that

12   the paperwork, those radiologist referral forms, they were

13   fake.  Damon didn't discuss this explicitly with the defendant,

14   but these are the documents that the defendant saw, and the

15   idea that he saw them and relied on them to make any kind of a

16   legitimate diagnosis is absurd.

17           This is a man who took a pen and checked to make sure

18   that the cash that his patients were handing over to him at the

19   beginning of each appointment was legitimate.  He then accepted

20   documents that were fraudulent on their face and used them to

21   justify prescription after prescription of 90 pills of 30

22   milligrams of oxycodone.  This is not medicine; this is drug

23   dealing.

24           Now, significantly Damon also testified that there

25   came a time when he stopped doing overrides, when Damon told

G3F7MIR3                    Summation - Ms. Cucinella

1    the crew chiefs he couldn't help with the urine anymore.  So,

2    what happened?  What happened when the defendant couldn't count

3    on Damon anymore?  You know what happened.  Look at

4    Government's Exhibits 559, 559A and 560.  We passed these

5    around.  The defendant went from practicing old world medicine

6    to old world arts and crafts.  This is old school tape and

7    white-out.

8          When his hands-off techniques failed, when he could no

9    longer leave everything to Jomaris and Damon and let his

10   patients bring in urine from the outside -- which, by the way,

11   have you ever heard of such a thing -- the defendant took

12   matters into his own hands and he altered the documents

13   himself.

14         How do you know?  There wasn't one blank document

15   found in the defendant's home; there is a group of them.

16   Examine those documents.  They're not scans homemade by Damon

17   Leonard.  The white-out is not still wet, but you can still

18   feel it.  Look at the picture taken of the defendant's home

19   office, the window sill with stacks of medical records and the

20   multipurpose scanner on the defendant's desk.  You know what

21   was going on here.  You know what the defendant was doing.

22         Now, there has been a lot of talk in this case about

23   urinalyses reports.  You heard Dr. Warfield say that despite

24   her years at Harvard, she found them endlessly confusing.  You

25   heard both Dr. Gharibo -- excuse me -- you heard Dr. Gharibo

G3F7MIR3                        Summation - Ms. Cucinella

say that a doctor who is looking to prevent diversion would

test for more than just opiates.  I submit that everything that

you need to know about urinalyses reports comes from Aegis and

AFTS.

        Joel Galanter testified that Aegis communicated to the

doctor that there were a number of samples that appeared to be

coming from the same source, meaning that the urine samples

were no good.  Aegis gave him a list of patients for this.

It's Government Exhibit 1204.

        To be clear, the doctor went through the motions of

kicking those patients out.  Did he follow through?  Of course

not.  You saw Government Exhibit 109 when analyst Castro was on

the stand.  Almost every single one of those patients got

oxycodone prescriptions again.  What happened?  Aegis had

enough; they discontinued the service; they told the doctor

they wouldn't work with him anymore.

        And Chris Dillon, a witness for the defense,

corroborated all of this.  He told you that even after the

defendant was kicked out by Aegis, even after the defendant was

confronted with evidence that some of his patients were taking

other illicit drugs and needed to test for those, the defendant

went right back to testing his patients for oxycodone only.

        Remember Mr. Dillon's testimony on that front?

Notwithstanding the hundreds of pain management doctors he

caters to, he couldn't remember a single other instance of a

G3F7MIR3                    Summation - Ms. Cucinella

1    doctor only testing for oxy.  He also told you that two thirds

2    of the defendant's patients paid cash.  That's not a doctor

3    trying to prevent diversion or to make sure his patients were

4    taking oxy.  It's not medicine.  That's the defendant trying to

5    paper the file.  That's not good faith.

6         Let's also look at Jose Lantigua.  You have heard some

7    of the recordings of his visits with the defendant.  You heard

8    Dr. Warfield testify that these visits were well within the

9    practice of medicine, which is a different standard.  That's a

10   hard opinion to square with the facts.

11        You know, for example, that Jose Lantigua went in and

12   asked for M30s, slang for oxycodone.  The defendant, he didn't

13   blink.  More important, you know things that Dr. Warfield

14   doesn't, because you heard all of the other testimony in this

15   case.  You know also what that exam actually looked like.  You

16   saw Damon Leonard step off of that witness stand and

17   demonstrate how he faked his pain for the defendant.  You saw

18   him limp.  You know that Jose Lantigua, that his exam went

19   similarly.  This wasn't the kind of targeted or thorough exam

20   that a patient who is about to be prescribed highly addictive

21   narcotics deserves.  The defendant was focused on checking the

22   boxes, getting just enough to fill out a Post-it note, write a

23   diagnostic code on his prescription pad and get the patient out

24   the door.  He didn't care about treating patients; he cared

25   about the cash.

G3F7MIR3                    Summation - Ms. Cucinella

1           How else do you know that?  He never translated those

2      notes to Practice Fusion.  He didn't even bother.  This wasn't

3      an insurance patient; no one was likely to look.

4           How else do you know that?  Because the defendant gave

5      Mr. Lantigua the same exact dosage and the same exact medicines

6      that he gave almost everyone else who came to see him.  Dr.

7      Warfield even had to admit that there is tremendous variation

8      in the amount of medicine that a patient would need to relieve

9      their pain.

10          Let's talk a little bit just briefly about the

11     experts.  You heard from Dr. Gharibo who helps design the pain

12     management center at Langone Medical Center here in New York.

13     He told you a little bit about how legitimate pain management

14     medicine works, about the variety of treatments that a real

15     pain management physician would use in the normal course of

16     practice.  Because, as he told you, every person's pain is

17     different and treating that pain requires an individual

18     approach.

19          Now, you also heard from Dr. Warfield, and I would

20     submit to you that on those core points, on the fundamentals of

21     what pain management should be, her testimony was entirely

22     consistent with Dr. Gharibo's.  She also conceded that pain

23     typically requires an individual approach.  She reached a

24     different conclusion, and I would submit to you, as you saw for

25     yourself on cross-examination, that those conclusions don't

1    follow from her discussion of what pain management should be.

2                And more important, as she told you herself, she

3    doesn't know the facts of this case, she doesn't know what you

4    know.  She didn't know who Damon Leonard is.  Evidently they

5    hire a different kind of staff at the pain management clinics

6    at Harvard.  Your common sense tells you that her conclusion

7    should be rejected.  The defendant wasn't practicing medicine;

8    he wasn't issuing prescriptions in the usual course of

9    practice; and he wasn't acting in good faith either.

10               As I expect Judge McMahon will instruct you at the end

11   of this trial, a doctor acts in good faith when he exercises

12   his best professional judgment about a patient's medical needs

13   in accordance with the --

14               MR. MAZUREK:  Objection.

15               THE COURT:  Here is the problem.  I forgot to tell

16   you, I'm in charge of the charge, and she was out of the room

17   preparing when we had the charge conference.  OK?  When he

18   exercises his professional judgment.  OK?  That's what you're

19   going to hear.

20               MS. CUCINELLA:  Thank you, Judge.

21               THE COURT:  But you can't blame her because my draft

22   had the other word in it.  Forget it.  Thank you.

23               MS. CUCINELLA:  It means that the doctor acts in

24   accord with what he reasonably believed should be proper

25   medical practice.

G3F7MIR3                    Summation - Ms. Cucinella

1           A doctor who is actually practicing medicine in good

2      faith would not be prescribing the same dosages of oxycodone to

3      every patient he sees; he wouldn't write the same scripts for

4      76 year old Altagracia Medina as he would for Abraham Correa.

5      He wouldn't be writing same scripts for a patient who had never

6      taken oxycodone as a patient who was oxy dependent.  And, most

7      important, he wouldn't be prescribing oxycodone for patients

8      who give him documents where the name is literally cut and

9      pasted onto the page.  That is not medicine; it's certainly not

10     good faith.  That is prescribing oxycodone for the purpose of

11     causing addiction or for patients who you know are selling the

12     pills.  It's drug dealing.

13          How else do you know that?  Look at the defendant's

14     relationships with the crew chiefs who came into the clinic.

15     Let's start with Tasheen Davis.  Damon told you that she was

16     both a patient and a crew chief.  We know from Tasheen Davis'

17     Practice Fusion file and from her BNE that the doctor

18     prescribed her seven oxycodone prescriptions, all for 90 pills,

19     all 30 milligrams, from February 2 through October 8 of 2013.

20     You also know that on October 10 of 2013 she was stopped trying

21     to fill an oxycodone prescription in Greenwich, New Jersey,

22     which is about two to two and a half hours outside the city,

23     according to Detective Beers.  You heard from Detective Beers

24     that they sent a grand jury subpoena to the doctor on October

25     15.

G3F7MIR3                    Summation - Ms. Cucinella

1          You also heard from analyst Castro that the

2    defendant's home got a call from Ms. Davis' cell phone at 7:15

3    p.m. on October 18.  Immediately after that call what does the

4    defendant do?  Does he print out the records he has,

5    comfortable that a Post-it note for each follow up visit and

6    diagnostic codes on a prescription pad will do the trick?  No.

7    Why?  You know why.  Because he knows that that's not good

8    enough.  He knows that if you're prescribing oxy, you're

9    expected to keep records.

10         You know what happened on that phone call.  One of his

11   crew chiefs called him, told him that she was arrested and that

12   they were looking for her records.  He needed to cover his

13   tracks.  What he didn't realize, however, was that the activity

14   feed in Practice Fusion couldn't be edited, and that there was

15   an audit trail showing that when he sat down that night moments

16   after he got that call from Ms. Davis to fill out his notes for

17   all of her visits in one sitting, that you would be able to see

18   that here in this courtroom two years later.  Those records he

19   wrote that night, that's what went to the Warren County

20   prosecutor's office.  That's not documenting the care and

21   treatment of a patient.  That's altering records so that you

22   look legitimate when the subpoena arrives.  It's not medicine;

23   it's not good faith.

24         It's also worth noting that the defendant never wrote

25   Ms. Davis another prescription for oxycodone after that.  If he

G3F7MIR3                          Summation - Ms. Cucinella

1    had believed in good faith that she was a patient who needed

2    it, you would think that the pattern would have continued or

3    that she would have at least been sent to detox.  But none of

4    that happened.  He just stopped seeing her because she became a

5    liability.  She wasn't worth risking his whole operation over,

6    so she too was cut off.  It's not medicine; that's a conspiracy

7    to distribute oxycodone.

8            You also need to look at the defendant's relationship

9    with Ray Williams, Obama.  You heard testimony from both Damon

10   Leonard and Abraham Correa that the defendant would have

11   closed-door meetings with Williams.  Look at the phone records

12   too.  Not only did Obama call the defendant, but the defendant

13   also called Obama.  Why?  Because the defendant counted on

14   Obama to bring him his patients, and Obama counted on the

15   defendant to write the oxycodone prescriptions.  This was their

16   agreement.  They talked about it openly, more so than the

17   defendant did with anyone else, more so than with Correa or

18   even Damon Leonard.

19           Ray Williams was the person that the defendant

20   believed knew too much, and he said so to Damon on the day of

21   his arrest.  Damon told you I saw the doctor, I greeted him, I

22   asked him how he was feeling; he told me OK.  And the next

23   thing he said to me was, I asked him, I said what's the matter?

24   Your face looks kind of -- he said this fucking guy was

25   talking.  I said, well, who are you talking about in

G3F7MIR3                    Summation - Ms. Cucinella

1    particular?  And he said Obama, Ray Williams.

2            Who did the defendant blame on the date of his arrest?

3    It wasn't Jomaris, it wasn't Damon, it wasn't Augustine Cruz or

4    anyone else who worked in that office.  Those were the people

5    that the doctor knew he could point the finger at.  He knew he

6    had cover with them.  He was scared of Ray Williams, because

7    Ray Williams was not only a patient -- he received 12 oxycodone

8    prescriptions himself -- but because Ray Williams could connect

9    the defendant directly to the crew chiefs.

10           Before I sit down I want to briefly address the three

11   counts in the indictment.  Count One of the indictment alleges

12   that the defendant did this as part of a conspiracy.

13           Now, as you know, Judge McMahon is going to instruct

14   you on the law at the end of this trial, and what she says

15   goes.  I expect that she will tell you that a conspiracy is

16   nothing more than an agreement with one other person.  I submit

17   that in this case you can find that agreement with Abraham

18   Correa, the security guard who was told he could no longer work

19   there but still welcome to bring his patients.

20           I submit that you can find that agreement with Damon

21   Leonard -- who the defendant trusted to keep things running and

22   make sure that the files were properly papered -- you can find

23   that agreement with Raymond Williams, or Tasheen Davis, or

24   Thomas White, or Joseph Gray, or any of the other bosses or

25   crew chiefs whose patients went in to see the defendant, or you

G3F7MIR3                    Summation - Ms. Cucinella

 1    can find that agreement with any one of the patients who came

 2    in time and again and got medically unnecessary prescriptions.

 3         Counts Two and Three are each what are referred to as

 4    substantive counts.  They each allege that on two separate days

 5    within the time period of the conspiracy the defendant wrote at

 6    least one medically unnecessary script outside of the usual

 7    course of practice.

 8         Government Exhibit 110 shows you who the patients were

 9    on January 10, 2013.  The defendant wrote 18 prescriptions for

10    oxycodone that day, including one for Abraham Correa.  This was

11    after Mr. Correa had already started working for him.  There is

12    no question that Mr. Correa did not need oxycodone at this

13    point and that the defendant knew it.

14         With respect to Count Three you know from Damon

15    Leonard what was going on in the clinic during the fall of

16    2014.  On October 28, 2014 the defendant wrote 33

17    prescriptions, all of them for 90 pills of 30 milligrams of

18    oxycodone, and all of them in exchange for cash, every single

19    one.

20         And while we haven't discussed all of them, you will

21    remember Larry Ashby, or you may recall him as Miss Prunty, for

22    whom the defendant accepted a document that was again

23    fraudulent on its face.  He purported to make a diagnosis for

24    this patient based on this document, and then he proceeded to

25    write seven oxycodone prescriptions for him, including one on

G3F7MIR3                     Summation - Ms. Cucinella

1   October 28th of 2014.  You will recall that there are no notes

2   in Practice Fusion for this patient, despite seven visits to

3   the doctor.

4           You can also look through the Aegis documents found in

5   the defendant's home at Government Exhibit 360.  You can see

6   the fake urinalysis created for a patient named Marco Varella.

7   He too got an oxycodone prescription on October 28, 2014.

8           You can look at Government's Exhibits 202 and 402 for

9   a patient named Brian Alex Champion.  He too got a medically

10  unnecessary prescription on October 28, 2014.

11          Ladies and gentlemen, based on all of this evidence,

12  it is unmistakable, beyond a reasonable doubt, that the

13  defendant knew exactly what was going on in his clinic and, as

14  I stated earlier, that he was counting on it.

15          But there is also another way for the government to

16  prove the defendant's knowledge.  I expect that Judge McMahon

17  will instruct you on conscious avoidance, and she will tell you

18  that if the defendant deliberately closes his eyes to what

19  would otherwise have been obvious to him, if he acted with a

20  conscious purpose to avoid learning the truth, then he acted

21  knowingly; like, for example, consciously avoiding the fact

22  that he was writing medically unnecessary prescriptions for

23  homeless people and addicts that the crew chiefs were bringing

24  in off the street, and not for legitimate pain patients in the

25  usual course of practice.

G3F7MIR3                        Summation - Ms. Cucinella

1           So, even if you believe his story that Damon Leonard

2     and modern day criminals infiltrated his clinic, and that he

3     played no role in doctoring those documents, the government

4     submits to you that he is still guilty under a theory of

5     conscious avoidance, because he should have known what was

6     going on right under his nose.

7           To be clear, ladies and gentlemen, the evidence

8     supports either theory.  Whether you find the defendant was

9     willfully blind or that he was the architect of this

10    conspiracy, he is guilty just the same.

11          I refer you, however, to the statement the defendant

12    made to law enforcement who responded the second time the

13    doctor's office was robbed.  He told agents that it was his job

14    to watch and analyze everything in the clinic, and that there

15    was nothing that went on there without his knowledge.  And of

16    course there wasn't.  He had too much riding on it.  He had

17    about $1.7 million in drug money to be exact, the cash he took

18    home and bundled with money wrappers and stashed around his

19    house in Ziploc bags, the cash he was hiding from the IRS by

20    underreporting his income, the same cash he lied to the police

21    about when they came in that day for the robbery, when he told

22    them that he took in just $1,000 in cash a day, the equivalent

23    of seeing three or four cash patients.  The defendant was

24    running a drug spot, and he was making money hand over fist.

25          Think about that, ladies and gentlemen, when you go

G3F7MIR3                          Summation – Ms. Cucinella

1   back to the jury room.  Think about who was running the show.

2   Who had the most to lose and who had the most to gain?  It was

3   the defendant.  It's time to hold him accountable.

4               THE COURT:  OK, ladies and gentlemen.  We are going to

5   take our lunch break now, and we are going to be back here at I

6   think 1:30.  OK?  And we will have the defense summation, and

7   then we will have the government's rebuttal summation.  It

8   wouldn't be fair to start the defense summation now, so you may

9   as well go to lunch now.  Don't discuss the case; keep an open

10  mind.  And I will see you at 1:30.

11              (Luncheon recess)

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         AFTERNOON SESSION

2                             1:30 p.m.

3              (Jury present)

4              THE COURT:  Mr. Mazurek, are you ready to close?

5              MR. MAZUREK:  I am, your Honor.  May it please the

6     Court, counsel, Doctor, and ladies and gentlemen of the jury.

7              I stood before you almost exactly two weeks ago and

8     told you that the government would not prove its case by

9     evidence beyond a reasonable doubt.  They would not prove its

10    case against Dr. Mirilishvili and they certainly have to the.

11             Ladies and gentlemen, very simply, the government

12    wants you to convict Dr. Mirilishvili on three basic grounds:

13    1, that they found $1.7 million in cash in his apartment; 2,

14    that he wrote over 13,000 scrips of oxycodone; and, 3, based on

15    the cooperating witness testimony of Damon Leonard and Abraham

16    Correa.  Neither alone nor in combination do they provide proof

17    beyond a reasonable doubt.  They don't come close.

18             The government wants to blind you, blind you with big

19    numbers and statistics and pie graphs and charts, 13,000

20    scrips, $1.7 million, and have you ignore the gaping holes in

21    their evidence.  They want you to convict a man in this

22    criminal court because he decided to keep his life savings in

23    cash in his apartment and because he truly believed in good

24    faith, as a medical doctor, that oxycodone, combined with other

25    medications, worked to temporarily relieve pain.  Please,

1    members of the jury, do not let the government blind you, do

2    not let them fool you in the same way that Damon Leonard and

3    Abraham Correa fooled this man.

4          The government in its closing remarks to you this

5    morning, they said things about addicts, homeless people.  They

6    referred to the patients of Tasheen Davis and Raymond Williams

7    and asked you to speculate about things.  Where was the

8    testimony?  Where was the evidence?  Where were the documents?

9    They were not in evidence.

10         Let me say something straight away.  The evidence does

11   not show and did not show throughout this trial that

12   Dr. Mirilishvili woke up one day at age 65 and decided to

13   become a drug dealer.  That never happened.  The very idea is

14   preposterous.  The evidence does not show that it happened.

15   The evidence showed that Dr. Mirilishvili practiced a very

16   specific and certain way.  He adopted a standard group of

17   medicines to relieve a very standard set of pain.  He believed,

18   the evidence showed, that 60 to 90 milligrams of oxycodone per

19   day, combined with a group of other medication, had the best

20   chance to temporarily relieve that pain.

21         Let me say something else.  He was not performing

22   brain surgery.  He was prescribing pain medicine to people who

23   presented to him that they needed it.  It was for temporary

24   relief and he always told the patients that they needed to see

25   other specialists, orthopedists and interventionalists to get

G3FMMIR4                     Summation - Mr. Mazurek

1  more lasting relief.  He never pretended to be more than he

2  was, a pain doctor who prescribed some of the most popular

3  medicines on the market.  That alone is not criminal.  That is

4  not throwing away medicine and suddenly becoming a drug dealer.

5  He did nothing less than what we do when we go to our family

6  doctor who finds, for example, that we have high cholesterol

7  and prescribes every one of us 40 milligrams of Lipitor per

8  day.

9         The government tries to use, throughout this trial

10  they tried to use these meaningless statistics to try and

11  convict a man.  Think about this cholesterol doctor.  What if

12  the evidence showed 99 percent of his patients are getting 40

13  milligrams of Lipitor.  According to the government, he must be

14  a drug dealer.  The statistics show it.  That is what the

15  government is trying to do here in this case.  Too much of the

16  same drugs, he must be guilty.

17         But the medical experts say no.  It is not the

18  quantity that matters.  You even heard that from the government

19  expert, Dr. Gharibo, when he was presented with the standards

20  of the New York State medical board.  It's how the doctor

21  conducts his practice.  And the evidence here of all the

22  patient visits that were presented to you throughout this

23  trial, they show only one thing, that Dr. Mirilishvili always

24  treated his patients as a doctor, not a drug dealer.

25         Now, the judge is going to instruct you on the law,

G3FMMIR4                     Summation - Mr. Mazurek

1    but I expect that she is going to tell you that you can't

2    criminally convict a doctor if he reasonably believed that he

3    was exercising legitimate medical judgment and acting within

4    generally accepted practice.  This is really important.  We are

5    sitting in this courtroom today in a criminal case, not in a

6    medical malpractice case, not a review of whether

7    Dr. Mirilishvili should keep his medical license.  This is a

8    criminal drug case.  And you cannot convict a doctor if you

9    believe that all the evidence showed was that he just wasn't a

10   very good doctor.  You cannot convict this man even if you

11   believe he was a bad doctor.  As the Court I expect will

12   instruct you, you can only convict Dr. Mirilishvili if his

13   practice amounted to not being a doctor at all.  Only if you

14   believe that the government proved beyond a reasonable doubt

15   that he rejected medicine entirely and became suddenly a drug

16   dealer, and they did not prove that from the evidence presented

17   in this case.  They did not prove beyond a reasonable doubt

18   that he suddenly abdicated his role as a doctor at age 65.

19        Let me tell you that the government spoke a lot in

20   their closing statement this morning in gross exaggeration

21   about speculation that they want you to think about, about what

22   Tasheen Davis' patient visit was like, what Raymond Williams

23   was talking to the doctor behind closed doors about, what

24   conversations may have been made on a telephone call that was

25   not recorded.  I want to ask you, and I know you have listened

1    to me way too long in this case as it is, but I wanted to ask

2    for your attention just in the next hour or so to review

3    something not based on exaggeration and speculation.  I want to

4    focus on the evidence that came in at this trial and what you

5    have taken oaths as jurors that you are going to review, not

6    with prejudice or bias about maybe what you think about

7    oxycodone or whether the doctor was too free in his

8    prescriptions of an opioid or whether opioid treatment would be

9    right for you or me.  That's not what we are talking about.

10   What your job as a juror to do, each and every one of you, is

11   to review the evidence that came in in this case and whether

12   the government proved beyond a reasonable doubt the elements of

13   this crime, with the most disputed evidence or the most

14   disputed issue being whether Dr. Mirilishvili did not act like

15   a doctor and whether the government proved that in this case.

16          What I am going to ask is that you think about all of

17   the evidence that you have heard about what Dr. Mirilishvili

18   did in his patient visits, in his examinations.  And that

19   evidence, the evidence that you heard on the tape of Jose

20   Lantigua, in the doctor's own words, in the testimony of Anna

21   Torres, in the testimony of Altagracia Medina.  You heard the

22   doctor was acting like any one of us would expect a doctor to,

23   that he really believed he was taking care of their pain.

24          Remember that moment in one of the recordings with

25   Jose Lantigua, the follow-up visit, when Jose Lantigua just

 1    lied because he was acting on behalf of the DEA and said that

 2    the medication, you know, helped his pain.  The natural

 3    reaction -- the doctor just shouted out halleluiah because

 4    that's what he wanted to do.  He wanted to take care of his

 5    patients' pain.  That's what this man has done all his life.

 6            Even the government witnesses.  The only patients we

 7    have heard in this entire trial from the government are two

 8    cooperating witnesses, two convicted felons who have every

 9    motivation in the world to lie to every one of us.  And you

10    know what they said, Mr. Leonard and Mr. Correa.  They said

11    they lied to the doctor in their own patient visits.

12            Now, think about this for a moment.  Think about what

13    the government wants you to believe.  They want you to believe

14    that in an office, in a small office room -- you saw pictures

15    of it -- that is no more than half the length of this

16    courtroom, that when Abraham Correa and Dr. Mirilishvili are

17    alone, just the two of them, in an examination room and the

18    government says that Dr. Mirilishvili, he's in on this, he

19    wants to help Correa sell his prescriptions.  What happens

20    inside that room when it's just the two of them?  Abraham

21    Correa, the testimony in this case, the evidence in this case

22    is that Abraham Correa says, I lied to the doctor.  He lied on

23    his initial patient visit.  He lied in his follow-up visits and

24    that last visit that the government says is the crux of their

25    Count Two of this indictment on January 10, 2013, he has lied

G3FMMIR4                    Summation - Mr. Mazurek

1    to him then.  That's the testimony in the case.

2           Whatever reason, if the doctor is in on it, would

3    Abraham Correa continue to lie to the doctor in these patient

4    visits?  No one is there.  No one is there.  It's just the two

5    of them.  But that's the testimony in the case.  It does not

6    make sense unless one thing, ladies and gentlemen, unless

7    Dr. Mirilishvili is just believing that he is prescribing

8    medication to someone who needs it and acting within the course

9    of medical practice.  Why else?  Why else would Correa have to

10   lie?  After he has already gotten the job as a security guard.

11   It does not make sense.

12          There is no evidence, no evidence presented in this

13   trial that Dr. Mirilishvili ever intentionally prescribed

14   oxycodone outside the usual course of practice, no evidence

15   that he sold scrips without a physical examination, no evidence

16   that he gave prescriptions to sell to other people or told

17   office staff to go out and sell it to others, no evidence that

18   he was collecting money for pills.

19          For goodness sake, what the evidence does show is that

20   he worked with four different urine labs and he was being

21   undermined every step of the way by his office staff with those

22   urine lab reports.  We heard it continuously from Correa and

23   Leonard.  We are going to look at some of that testimony

24   shortly.

25          But you heard from Dr. Gharibo, the government's

G3FMMIR4                    Summation - Mr. Mazurek

1    expert.  He didn't even have to hire a urine lab.  It wasn't

2    even required.  What kind of cover is that where he's making it

3    more difficult for himself and he keeps trying to do it better?

4    And the government says, that's just evidence.  That's evidence

5    right there that he's trying to make it harder for us, the

6    government, to find him.  That's certainly looking through

7    someone's conduct through dirty lenses, right.

8          What the evidence shows, it is not just a cover.  It

9    just trying to do the right thing.  It's hiring a lab that's

10   going to be more transparent.  It's getting to AFTS and you

11   heard we brought Chris Dillon to the stand, the sales

12   representative for AFTS, and the doctor said, oh, a secured

13   portal, directly linked us to Practice Fusion.  Made things

14   better.

15         You know what.  You heard from Damon Leonard, what

16   that action of the doctor did?  Didn't help a conspiracy.  It

17   didn't make it easier for the drug guys who are trying to

18   infiltrate Dr. Mirilishvili's practice.  It didn't make it

19   easier for them to sell.  It stopped the overrides.  How does

20   that further a conspiracy?  It in fact made it harder to

21   accomplish its criminal objective.  Dr. Mirilishvili did not

22   enter into any criminal conspiracy with Damon Leonard or

23   Abraham Correa.  It did not happen.

24         The government presented not a single independent

25   patient witness in this entire trial out of the thousands that

1    he treated, not one.  And their whole theory of this case is

2    based on the fact that his practice was an overwhelming sham

3    where no medicine was being conducted.  Otherwise, why would

4    they show that big pie chart that showed 13,000 prescriptions

5    were written.  It has only the relevance if you believe that

6    the government has shown that the entire practice or at least

7    the overwhelming majority, as they say, was based on drug

8    dealing and not medical practice.  But where is the evidence?

9    Where is the evidence of that?  We heard from two people and

10   they were both cooperating witnesses and not a single

11   independent patient.

12          Now, we don't have a burden, you heard the judge say

13   that over and over again in this case, because that's the law.

14   The government has the burden of proof throughout this trial.

15   But we presented two witnesses, two patients.  Compare our two

16   patients with the government's two patients, Anna Torres and

17   Altagracia Medina.  Do you have any doubt, any doubt at all,

18   ladies and gentlemen, that these two witnesses were patients

19   who had real pain, who had real injuries and were given real

20   medical attention by the doctor?  Indeed they had no motive to

21   lie, no bias in favor of the doctor.  They were truly

22   independent witnesses.

23          And they told you something that in fact you already

24   expected to hear, that Dr. Mirilishvili treated them according

25   to his good-faith belief about pain meds.  You expected to hear

G3FMMIR4                        Summation - Mr. Mazurek

1    it because you had already heard it in his own voice during the

2    government's case and that is how Dr. Mirilishvili performed an

3    examination with the undercover Jose Lantigua.  You heard how

4    he would read medical records, how he would converse with the

5    patient about their past family history and surgical history,

6    how he would make referrals out to physical therapy or

7    orthopedists, how he would determine if the pain had been long

8    term and then he would put them on, yes, a fairly standard pain

9    management regimen.  But you also heard from Dr. Warfield that

10   that was within the usual course of treatment.  Prescribing

11   everyone Lipitor is not acting as a drug dealer.

12           Now, again, I want you to compare both Anna Torres and

13   Altagracia Medina's testimony with Damon Leonard and Abraham

14   Correa.  They were drug dealers, confessed drug dealers.

15   Correa was a career criminal and Leonard, he appeared to be an

16   eager protege.  Both now seek from their testimony in this

17   trial a get-out-of-jail card.  Both have incredible motive to

18   lie.  In fact, from this witness stand in this case we know

19   they both lied from that witness stand.  We heard Damon Leonard

20   deny even recordings in his own voice of what was taped of him

21   before.  Brazen.  Brazen to say right in this court when you

22   swear to tell the truth, and that's what you are supposed to be

23   basing for evaluation of, that he would lie even when he heard

24   his voice on recorded tape.  And that is the evidence that the

25   government wants you to rely upon to convict Dr. Mirilishvili.

You can discount.  You will hear their testimony entirely if
you believe they lied to you.  And I suggest you should.

          Now, I am going to review on the screen the evidence
of the patient visits that you heard about in this case with
Dr. Mirilishvili.  And I ask you when you are back in the
deliberation room to review that evidence, to review the
recordings, to hear Dr. Mirilishvili in his own words and
whether those words sound like the words of a drug dealer or a
medical doctor who is acting in good faith, how he asks the
patient about pain.

          Now, you heard Agent Muller on the stand the very
early parts of his trial saying that he was giving instructions
to his confidential source, Mr. Lantigua, not to talk about
pain, but we know that that's not what happened in that
interview, that Dr. Mirilishvili asked about whether Lantigua
felt the pain in your lower back sitting down, which leg, left
or right.  And this transcript, CS is the words of Jose
Lantigua, and he does say sometimes both.  And when he's asked
how long, how long did you have that pain, Mr. Lantigua
responded, it's been a while already.  I think it's been more
than almost eight months or a year.  Again, the kind of thing
that you want to know if you are a doctor, not a drug dealer.
Did he have electronic pain?  He asked Mr. Lantigua to describe
that pain, what kind of sensation was felt?  Was it electrical,
pulsating, shocks or stabbing, and Mr. Lantigua continued to

G3FMMIR4                    Summation - Mr. Mazurek

1    lie to the doctor.  He said:  It's like electricity and like

2    shocks.

3              You heard Dr. Warfield in her testimony.  Doctors are

4    not meant to be detectives.  They are not supposed to doubt

5    what their patients are telling them.  They are actually there

6    to help the patient in response to what the patient tells them.

7    And Mr. Lantigua was clearly telling the doctor, as was

8    Mr. Correa, as was Mr. Leonard, as was Ms. Medina, as was

9    Ms. Torres, that they were in pain.  And the doctor performs a

10   diagnosis.  He actually tells Mr. Lantigua, based on the MRI

11   report that he reviewed, which earlier this morning

12   Dr. Warfield reviewed right in front of your eyes and said that

13   it looked to her to be MRI report that suggested a pinched

14   nerve and disk, and to her it indicated that the person would

15   feel pain.

16             So based on that and the doctor's review of questions

17   that he asked his patient, he said, you should think about

18   surgery.  Then he explains why, because your nerve was

19   rumbling, your nerve was damaged.  This is the evidence in the

20   case.  The times that the government used the secret device of

21   putting a recording on someone is when we heard the truth

22   because you can't change the recording.  And you heard it in

23   the direct words of Dr. Mirilishvili, you heard it before in

24   the words of Damon Leonard.  But the recordings, I ask you, go

25   back in the jury deliberation room and think of what you know

G3FMMIR4                         Summation - Mr. Mazurek

1    is true and what you have heard from these recordings.

2           The patient visit continued.  By the way, according to

3    Dr. Gharibo, 20 to 30 minutes is how much an initial patient

4    visit is normally how long it normally is.  And that's how long

5    the recording is of Dr. Mirilishvili's initial patient visit

6    with Mr. Lantigua.  If he's really just be being a drug dealer,

7    why is he doing it?  He doesn't know that Mr. Lantigua is

8    wearing a recording device.  He also says, I'm going to refer

9    you out to a specialist, interventional pain management and an

10   orthopedic doctor.  Because you see that's what the practice

11   was.  Dr. Mirilishvili was not going to cure you.  He was going

12   to give you a set of pain medication that you heard from expert

13   doctors was the most popular around in opioid treatment and has

14   been the longest around according to Dr. Warfield.  He was

15   going to refer you to other places so that maybe you can get

16   better through surgery or therapy.

17          But his role was a temporary one.  And the fact that

18   he had a standard set of medications to give, that, ladies and

19   gentlemen, doesn't make him a drug dealer.  In fact, the

20   recording shows that the doctor, he explained each and every

21   one of the medicines that he gave for the prescription.  He

22   didn't base it on speculation or, let's just -- I'm throwing

23   these prescriptions in.  He explained the medical reasons why

24   he was prescribing Neurontin, in order to shut down the chronic

25   pain down your spinal cord.  And then the Elavil of 10

1    milligrams twice a day to shut down for descending pain.  He is

2    explaining it as a doctor would, as a doctor would.  And you

3    heard that each one of these medications that he prescribed

4    were typical medications used in the pain management doctor's

5    practice.

6          A lot has been said from the government about

7    insurance versus cash payment as if getting cash payments was

8    somehow enough to convict a man.  He even asked Mr. Lantigua

9    about insurance.  Do you have insurance to balance the expense?

10   And the man said no.  Now, talk about insurance in a little

11   bit.  But think about it.  The record shows not that the doctor

12   said I'm not taking any insurance.  He was on Medicaid and HMOs

13   for Medicaid.  He was able to provide and he did provide and

14   the records are in the government's evidence, there are

15   spreadsheets that you can look at in Government Exhibits 1209

16   and 1210 which showed that he bills hundreds of thousands of

17   dollars a year in insurance claims.  The government's view is,

18   he is staying away from insurance so he is not going to get

19   audited, but he's submitting claims to the government in

20   Medicaid insurance.  He's even asking about insurance on the

21   very recording in this case.  That, ladies and gentlemen, is

22   medical care.  That is the evidence that the government has

23   presented to you that can't be rebutted on cross-examination

24   because it's what was reported on tape.

25          Now, the government said in its closing remarks, I

G3FMMIR4                     Summation - Mr. Mazurek

1    think Ms. Cucinella said, you know, is this what pain

2    management should be.  That's not the question before you.  As

3    I've said earlier, that's not the question in this criminal

4    case.  We are not deciding what is the best pain management for

5    all people who come to a pain management center.  We are here

6    to see whether what Dr. Mirilishvili was doing during the time

7    of the indictment was practicing medicine at all.

8           The other thing that the government said in its

9    closing argument was, look at what the doctor did, compare the

10   medications that he prescribed for Abraham Correa versus that

11   nice old woman, Altagracia Medina.  Put the government to the

12   test of fact checking their evidence because the reality is, if

13   you go to Government Exhibit 220, you will know that that's not

14   true.  Altagracia Medina was prescribed 60 milligrams, not 90

15   milligrams a day of oxycodone, when she went to the doctor.

16   Different from Abraham Correa.  Altagracia Medina was

17   prescribed Mobic, which the evidence was that it was a

18   nonsteroidal antiinflammatory drug, not Abraham Correa.  Correa

19   was prescribed Neurontin, Elavil, and Ms. Medina was not.

20   That's acting in medical judgment.  That is making a

21   difference.  Don't let the government simply exaggerate the

22   facts and say, it's all the same.  The evidence does matter in

23   this trial.  It matters because the man's life is at stake in

24   this criminal case.

25          Now, the evidence shows that Dr. Mirilishvili's

1344

1   medical practice changed.  From January 12 through November 12

2   he was in a group practice in the Bronx called Rampin Medical

3   Care and he was one of several doctors there.  In November 2012

4   is when he opened his practice on West 162 Street in Washington

5   Heights.  His effort was to become a solo practicer and he

6   would have to hire his own staff.

7           Couple of points that I would like to make out.

8   First, the government, and we will review these in a little

9   bit, had these charts that show the number of prescriptions --

10  again, what the government does over and over in this case,

11  relying on statistics and data to inundate you, to prejudice

12  you, to blind you to think that what Dr. Mirilishvili was doing

13  must have been criminal.

14          We know nothing.  There is no evidence in this case

15  what Dr. Mirilishvili's case was in 2010 or 2011, when the

16  first numbers on the government's series 100 charts came out.

17  We don't know his patient population.  We don't know whether he

18  was one of several doctors.  We know he was at the beginning of

19  2012.

20          The government asks you to speculate and say, his

21  practice changed, his prescription levels went way up in 2012

22  through 2014 than it was it was in 2010 or 2011.  But there is

23  no evidence to suggest what kind of practice he even had back

24  then.  You cannot speculate, ladies and gentlemen.  This case

25  requires you to evaluate the evidence that came on this witness

G3FMMIR4                       Summation - Mr. Mazurek

1    stand and the documents that have come into evidence.

2            Now, the government also has said a lot about the fact

3    that when he moved to West 162 Street, they presented the

4    testimony of Ben Lopez that this was not a medical office.  It

5    was a drug den.  You remember the testimony of Mr. Lopez.  He

6    testified that, remember on cross-examination he said that

7    within 24 hours Dr. Mirilishvili had not even hardly opened his

8    doors, his neighborhood association was railing him, had a

9    meeting with Dr. Mirilishvili and told him to get out within 24

10   hours.  What possible information could Mr. Lopez and his group

11   have known about the doctor in 24 hours?  They just didn't want

12   him there.  And where are all those lines of people that

13   stretched down to Edgecombe Avenue?  Where is the evidence of

14   that?  The few photographs that Ben Lopez came with from his

15   homeowner's association showed a couple of fancy cars, one of

16   which he probably owned, and a few people standing in front of

17   the storefront.  Where were the lines that stretched all the

18   way down the avenue?  There is no evidence of that.

19           And the person who was cross-examined by the

20   prosecutor that we brought in, Christopher Dillon, was asked

21   about, oh, security, that must be the evidence of a drug den.

22   But when pressed, this is what Chris Dillon testified to.  He

23   said, just sort of generally speaking, in my experiences as a

24   medical salesperson in New York City, it was, I encountered

25   offices that had security people.  The prosecutor said thank

G3FMMIR4                    Summation - Mr. Mazurek

1   you.  Having security at a medical office doesn't give you

2   reason to believe that this man stopped being a doctor and

3   became a drug dealer.  Where is the evidence?  Ladies and

4   gentlemen, I'm just asking you to think and review the evidence

5   back in the deliberation room.

6        What is the evidence that the government actually put

7   on in this case?  It came largely from two witnesses:  Abraham

8   Correa and Damon Leonard.  And both of them in Government

9   Exhibits 1201 and 1202 have these so-called cooperation

10  agreements that you heard them testify about.  The main

11  provision that was repeated by both of these witnesses on the

12  stand that they were most concerned about is highlighted on the

13  screen.

14       And if this office, and this office is defined as the

15  U.S. Attorney's Office, determines that the defendant has

16  provided substantial assistance in an investigation or

17  prosecution, this office will file a motion, and we heard about

18  it, pursuant to Section 5K1 of the guidelines.  This motion

19  that they are hoping not to go to jail.

20       You heard the testimony of Abraham Correa explaining

21  what he meant in his cooperation via the cooperation agreement

22  that he signed.  And this question was asked of him.  And so

23  the quid pro quo, if you will, with the government was that if

24  I do tell you what you may want to know, then you have to

25  promise me something.  And that's what is embodied here in this

G3FMMIR4                    Summation - Mr. Mazurek

 1   agreement, 1201.  He said, yes.  That was the deal, right?

 2   Yes.  And the only reason you have not been sentenced yet is

 3   because you had to testify in this case pursuant to the

 4   cooperation agreement, right?  Yes.  And at the time of your

 5   sentence you are hoping to get probation, right?  Answer, yes.

 6   You are not going to look to the judge and say I'm ready to go

 7   prison.  You want probation, right?  That's the motive for

 8   Abraham Correa to come in and testify the way he did.

 9            And Damon Leonard had the same motivation, ladies and

10   gentlemen.  Now, he, remember when it was posed on

11   cross-examination, was asked, did you decide to cooperate right

12   away?  No.  Why did you ultimately decide to cooperate?

13   Because I didn't want to go to jail.  You heard he was arrested

14   back in December 2014 and he didn't start cooperating until the

15   end of last year, the beginning of this year.  And he did it at

16   that point because he knew he could get one of these

17   cooperation agreements.  Think of what the government has

18   already told you about or relied upon in its closing argument.

19   They said, rely upon the fact that Damon Leonard said, and this

20   came out in the evidence, that on February 20, of this year,

21   just a few weeks ago, for the first time, Damon Leonard said to

22   these government agents and prosecutors, when I was in the cell

23   with Dr. Mirilishvili he was saying, there was this guy,

24   Raymond Williams, and I can't believe he was fucking talking.

25   That was the first time, first time, first time that Damon

G3FMMIR4                    Summation - Mr. Mazurek

1    Leonard said -- a few weeks ago he already had his cooperation

2    agreement.  That's why he was saying those things.  He wanted

3    to get that deal so that when he was on the witness stand and

4    he helps the government get what they want, which is a

5    conviction, he doesn't have to go to jail.  But where is the

6    evidence?  The voice of a man that we heard lied.  Denied a

7    recording of his own voice.  That's what the government wants

8    you to rely upon to convict my client?  That is not proof

9    beyond a reasonable doubt.

10         And Damon Leonard said it as well.  He knows that if

11   he pleads guilty to a federal felony there is a good chance you

12   are going to prison, right?  Yes.  You don't want to go to a

13   prison, right?  I'm hoping not to, sir, he said.  That's the

14   reason you are here today.  Yes.

15         Now, the other things that Damon Leonard would talk to

16   you about and the government mentioned, the counterfeit pen

17   that Dr. Mirilishvili used to check the cash and that's

18   evidence of, of course, a drug dealer and not a medical doctor.

19   But you know what, if that counterfeit pen was something that

20   really existed, then you would have heard it from Abraham

21   Correa, too, right, since he was the one who was also with the

22   government and worked at Dr. Mirilishvili's office.  You only

23   heard it from Leonard.  Would you be surprised if Leonard just,

24   as a spur-of-the-moment thing started exaggerating?  Did he

25   seem to come across as that kind of witness to you?

1          Now, both of these individuals, both of them, Correa

2     and Leonard, throughout the case, continued, continued to say

3     they lied to the doctor.  Even with their cooperation

4     agreements they said, yeah, we lied to him.  And why?

5          Well, when Abraham Correa was a patient, he knew that

6     the doctor had records of what was in the file.  We showed you

7     those records on cross-examination with Abraham Correa.  And on

8     the screen you see that he was asked about what was written

9     there.  Did you tell the doctor following the accident that you

10    were LOC, loss of consciousness, and awaken in Mt. Sinai

11    Hospital, where he's kept two weeks for observation and later

12    on discharged from the hospital following a negative diagnostic

13    test.  That's what was in the notes of the doctor.  Did you say

14    that?  Yes.  And he told that you, right?  Yes.  That's the

15    evidence in this case.  That's why it's in the notes, right?

16    Yes.  And that was a lie?  Yes.  Abraham Correa confirmed what

17    was in the doctor's note that that's what he told him.

18    Remember when he was asked in the notes, it said, accidental

19    falling from scarf steers, and it was determined that

20    Dr. Mirilishvili's English, written English is always not the

21    best.  And Abraham Correa from the witness stand admitted that

22    that meant what he told the doctor was falling from scaffolding

23    stairs.  Why did he need to tell him this exaggerated story if

24    the doctor is in on it?  It does not make sense.

25          The other thing I want to talk about Correa's patient

G3FMMIR4                    Summation - Mr. Mazurek

 1   visit, Correa made a big deal on the witness stand about the
 2   fact that, oh, I had a lower back MRI and doctor kept putting
 3   down that I hurt my neck and I never said that.  But remember
 4   when an interesting moment in the case happened when
 5   Dr. Gharibo was testifying.  I asked him, do you always just
 6   listen to what's on the MRI or do you listen to what the
 7   patient says?  And I asked him that very question.  What if you
 8   as a pain doctor received an MRI that showed a lower back
 9   injury and the patient said that they have pains in the neck?
10   He said he would listen to the patient more than relying on the
11   MRI.
12            That's the evidence in the case and that's what
13   happened here.  That's what happened here.  The government's
14   own expert corroborates that.  As I said before, with only two
15   people in the room, being Correa and the doctor, what potential
16   reason is there for Correa to continue to lie if he's in
17   cahoots with the doctor?  Absolutely none.
18            Now, he continued to lie to the doctor.  Remember
19   there is a series of questions that asked him about whether he
20   was -- when the doctor asked him if he wanted to be a security
21   guard, whether he told the doctor the truth about his past.
22   And he said, I have nothing to hide.  I'm not ashamed of my
23   past.  Then I asked, well, did you volunteer the information?
24   If you had nothing to hide, would you tell him, listen, I have
25   got a bad back, I'm on probation, I am trying to make a better

1    life?  Did you tell him that?  The answer was no, I did not.

2    My objective was to get an oxycodone prescription, so nothing

3    else really mattered at the time.

4           That's the point, ladies and gentlemen, that these

5    guys, Correa and Leonard, they were looking to make their own

6    way, make their own money.  They knew if they told the doctor

7    the truth, they wouldn't get it.  That's why they continued to

8    lie.  That's what the evidence was at this trial.  And it was

9    repeatedly done in this trial.  It was not a single piece of

10   evidence that showed you directly from the patient notes, from

11   the recorded conversations anything other than the fact that

12   the doctor was lied to.

13          Another time a series of questions.  You never told

14   him you were a convicted drug dealer.  You never told him you

15   were buying fake MRIs.  You never told him you were accepting

16   bribes for patients to get an appointment.  The answer was

17   always no.

18          Let me say something about the government's argument

19   about fake documents.  You saw the MRI this morning for Jose

20   Lantigua.  I urge you to look at the MRIs for Abraham Correa

21   and Damon Leonard.  They are medical reports.  That suggests

22   not that everything is normal, but that people have injuries,

23   bulging disks, herniated disks, and pinched nerves.  The

24   government says, take a look.  It looks like the font is

25   different or there is spotty paper or the names are crooked on

G3FMMIR4                    Summation - Mr. Mazurek

1    the page.  It looks like it was cut and pasted.  That is not

2    proof beyond a reasonable doubt.

3          Dr. Warfield testified that she reviewed the files and

4    she didn't say, I noticed all of these fake documents that the

5    logos aren't right or the spacing is off, the formatting is

6    wrong.  That is not proof beyond a reasonable doubt.  Anyway,

7    the doctor had actual visits with people.

8          Larry Ashby, one of the patient files that the

9    government suggests had the name of a female patient within the

10   text of the MRI referral or just the referral letter, not even

11   the MRI report.  You even heard from Dr. Gharibo that there is

12   cut and pasting done all the time in medical records.  That

13   doesn't mean that you don't meet the patient and you don't

14   listen to what they have to say.  Plus, do we even know that

15   Larry Ashby was one of the patients that Dr. Mirilishvili tried

16   to verify by making a phone call or had his office staff make a

17   phone call?  That's not in evidence.  We don't know, but we

18   know it happened in the case because that's what even the

19   government witnesses testified about.  Not proof beyond a

20   reasonable doubt.

21         What we do know is that Abraham Correa, when he worked

22   there; Damon Leonard, when he worked there; Jomaris Javier,

23   when she worked there; and Augustine Cruz, when he worked

24   there, all took bribes from patients so they could line their

25   own pockets.  As Correa testified to, you were aware that it

G3FMMIR4                    Summation - Mr. Mazurek

1    was typical that what was going on at that point in time in the

2    office, that workers were all trying to make more money by

3    accepting bribes from patients who are wanting to get a visit

4    at the office.  Yes.  And it was you, it was Javier, it was

5    Cruz, and later it was Leonard, correct?  Yes.  And none of

6    you, did you ever tell the doctor that you were taking bribes

7    from his patients to get in?  No, I did not.  And the testimony

8    is the same for Damon Leonard.  No, I did not.

9            Damon Leonard was asked.  And you continued to lie

10   throughout the examination, the patient examination, because

11   you wanted to get a prescription of oxycodone?  Yes, sir.  And

12   you continued to lie to him on subsequent visits and follow-up

13   visits?  Yes, sir.

14           All the testimony in this case from these two

15   witnesses are the same.  Every bit of testimony said these

16   witnesses, patient witnesses, lied to the doctor.  They lied to

17   the doctor about bribes, about fake paperwork, but they never

18   told him about overrides, the money they were putting in their

19   own pockets.

20           And this morning the prosecutor stood up and said, oh,

21   you don't think Harvard would hire Damon Leonard?  Why not?

22   What makes Damon Leonard someone Harvard wouldn't hire.  You

23   heard he was college educated.  He had prior jobs.  He was

24   raising three kids.  Why wouldn't you hire him?

25           One thing I ask you to think about is how Damon

G3FMMIR4                     Summation - Mr. Mazurek

1    Leonard presents himself.  Damon Leonard would get on the

2    witness stand.  He was on the witness stand three days.  On the

3    first day he was quiet and timid and he seemed like he wanted

4    to help and he wanted to answer the questions.  And then as the

5    cross-examination went on, his demeanor changed.  He became

6    more aggressive, more defensive when he was challenged with his

7    own voice on recordings.  I would suggest to you that Damon

8    Leonard is very capable, a very educated young man, very

9    capable of coming across to someone, can you please give me a

10   chance and give me a job and I can be a responsible person to

11   help you.  I don't think that the government is right to say,

12   Harvard would not have hired Damon Leonard.

13           Why not?  Damon Leonard did not say when he was hired

14   by Dr. Mirilishvili, I'm being hired here so I could become a

15   drug dealer.  He was hired because he says I can be a

16   responsible person who can really work well in this office.

17   That's what happened.  That's what the evidence shows and the

18   evidence also in his own testimony that he continued to lie to

19   the doctor.

20           There was no conspiracy between Dr. Mirilishvili and

21   Correa or Leonard.  In their own testimony Abraham Correa was

22   asked, isn't it a fact that while you worked at the clinic that

23   Dr. Mirilishvili relied upon Javier to furnish him with a copy

24   of the PMP printout?  We have heard a lot of testimony about

25   the prescription monitoring program.  He said yes.

G3FMMIR4                    Summation - Mr. Mazurek

1            And Dr. Mirilishvili would get rid of any patients

2     that he would suspect were filling prescriptions in New York

3     and in other states at the same time from other doctors.  Yes.

4     That's not cover.  That's doing what he was supposed to be

5     doing and that's what the evidence showed.

6            Further, he was questioned, did you know while you

7     were working there that Dr. Mirilishvili would check or verify

8     MRI or referrals?  The answer was yes.  Yes, he did.  That's

9     not cover.  That's doing what he's supposed to be doing.  He

10    couldn't check every MRI, but the testimony from both

11    government cooperators said he did check and that's what he was

12    supposed to be doing.  He wasn't deliberately ignoring signs.

13    He was actually doing things that a doctor is expected to do

14    and that's the evidence in the case.

15           Damon Leonard was asked, did you have any

16    conversations with Dr. Mirilishvili about your role as a crew

17    chief?  He said no, no conversations.  Neither of these two

18    guys, who worked over a year with a doctor, they didn't come in

19    and say that they talked about how much money they were going

20    to make together in their drug conspiracy.  What kind of

21    conspiracy is that?  There is no evidence of it.  Only

22    deception.  Damon Leonard was asked, as Correa was, about the

23    PMPs and his answer was, you had a conversation with someone

24    from the New York State DEA because the doctor asked you to do

25    it.  Yes, sir.  Because he wanted to make sure the information

was correct and accurate on these.  Yes.  And sometimes there

are people who call the doctor to let him know if there was a

mistake.  For example, I think you mentioned a pharmacist by

the name of Frank from Ashcan Pharmacy, right?  Yes.  This is

evidence of what the doctor was doing in his own office to make

sure that the office was run as a medical office.  That's what

you would expect and that's what the testimony showed.  You

never told the doctor you were selling your prescriptions?

Still the answer is no.  Where is the evidence of a conspiracy?

With the doctor?

        Leonard was further asked, you never told the doctor

you were bringing patients to the clinic?  When?  Ever.  No.

You never told the doctor you were doing overrides with

Augustine and Javier?  And the Court said, this is a yes or no

question.  No, sir.  There is never any evidence to suggest

that what the office staff was doing was being communicated to

the doctor.

        And any time that fake paperwork was talked about or

discovered or PMPs came back positive, the evidence showed that

the doctor took what action you expected a doctor to take and

discharge patients.

        Damon was asked about the MRIs.  And the instruction

he was given by the doctor, you had to call the number on the

MRI and ask if the person was a patient there, right?  That was

part of the verification process.  That was a part of it.  If

G3FMMIR4                    Summation - Mr. Mazurek

1    the person on the other end of the phone said yes, this person

2    is a patient, then you would sign and say verify, right?

3    That's what I was told by the doctor.  Damon Leonard is not

4    saying on the witness stand the doctor told him, just put

5    verify and we will use it as cover for the files.

6            This is the testimony that even the government's

7    cooperators gave.  They were not working together.  They were

8    at odds with one another.  And the pharmacies, the same thing.

9    Damon Leonard was asked, in September 2014, and he was

10   challenged on this because he had to admit it because it was on

11   the recording.  If the pharmacy called, you had to click it

12   over to the doctor.  You couldn't take that call.  You had to

13   give it to the doctor.  Again, I was told by the doctor that he

14   would verify everything because I wasn't a doctor, so I

15   couldn't verify anything.  The doctor was doing things again he

16   was supposed to be doing.

17           Now, what the evidence shows in this case is that for

18   every witness like Altagracia Medina and Anna Torres, there may

19   have been a witness like Abraham Correa and Damon Leonard.  But

20   the doctor was not a detective and was not expected to be a

21   detective in his usual medical practice.  You heard that from

22   Dr. Warfield.

23           And what this case does not show you is that 13,000

24   prescriptions that the government generalizes about, an

25   overwhelming majority of them were people like Correa and

1    Leonard.  In fact, the evidence is actually the opposite

2    because I asked Abraham Correa the question about how much of

3    these crew chiefs were you working with.  He said about eight

4    or nine.  And he said each one had about 10 patients or so that

5    they were bringing in.

6            The numbers, the numbers, ladies and gentlemen, that's

7    not a whole lot of patients.  Maybe what, 80, 90, a hundred

8    patients at most?  How many patients did you hear went to

9    Dr. Mirilishvili's practice?  Thousands.  The government wants

10   to paint a certain picture, but that picture was not painted by

11   evidence.  It's painted by speculation which you cannot rely

12   upon in your review of the evidence in the case.  It just

13   didn't happen that way.

14           And Abraham Correa explained -- you heard from the

15   government and they put in an exhibit to show that with respect

16   to some patients who are found to have suspect urine screening

17   tests that John Galanter from Nevis Labs testified about.  You

18   heard that these patients later were put back into the system

19   and continued to see the doctor.  Abraham Correa explained to

20   you why.  He was asked the questions:  Did you also know the

21   office personnel routinely ignored the doctor's request and

22   rescheduled the patient anyway?  Yes.  And was that, sir,

23   because it was easy to fool the doctor and have the patient

24   return because of the volume of patients that he saw?  And

25   Correa, he hesitated, right?  Now, he's cooperating for the

1    government and he said, I don't know if he was being fooled,

2    but they just gave you appointments.  Then when he was

3    challenged with the words that he gave on the very day of his

4    arrest, on May 1, 2014, that's what he told the agents.

5         When he was confronted with his arrest and his

6    three-time felony and the fact that he was in a lot of trouble,

7    at that moment in time, before he had a chance to think about a

8    cooperation agreement and how I am going to spin this that's

9    going to be better for the prosecutors, he was asked, when you

10   talk to them on May 1, 2014, it was easy to fool the doctor and

11   have the patient return because of the volume of patients

12   Dr. Mirilishvili saw.  And his answer eventually was yes.

13   Because that's what they were really doing, these guys.  They

14   were seeking to fool the doctor so they could line their

15   pockets with money.

16        Damon Leonard, you heard him on the recording saying,

17   the doctor is getting smart, no more overrides.  He couldn't do

18   the overrides to falsify the findings in the laboratory report,

19   right?  He couldn't do it anymore.  That's what you are telling

20   Correa.  Yes, I couldn't do it anymore.  And that was on the

21   recording.  He couldn't do the overrides because of the actions

22   that this man took.  That's actually against the conspiracy

23   that people were having against him, the actions the doctor

24   took.  And that was on the recording.  If you are working

25   together you don't say the doctor is getting smarter when you

1   are talking between conspirators.  You don't say that because

2   the doctor didn't know.

3         Damon Leonard, you heard a lot of testimony from him

4   and you know that he could be ruthless and he is going to do

5   whatever it is that's right for him.  And when he doesn't like

6   the answer, this is what he always said.  It's just talk.  It's

7   just talk when he talks about on the recording that he labeled

8   as a friend Amanda Nunez.  He was asked, if she didn't do what

9   she wanted, you would threaten her with guys going to her

10  apartment to floor her.  Is that what you do?  He said, sir,

11  that was just talk.  That's what you said though, right?  Yes.

12  When you didn't know you were being recorded, right?  The

13  answer, I didn't know.  I was just talking to Correa.

14        These are the witnesses the government put before you

15  and they rely almost exclusively in this case to convict the

16  doctor.  It is not proof beyond a reasonable doubt.  It is just

17  talk in the words of Damon Leonard.

18        And I expect that the Court is going to instruct you

19  that if you find that any witness, including a cooperating

20  witness, has testified falsely as to any material fact in this

21  trial, the law permits you to disregard the entire testimony of

22  that witness.  And I suggest to you that based on the lies that

23  were told in this courtroom from this witness stand in

24  cross-examination, time and time again by Abraham Correa and

25  Damon Leonard, you should do exactly that.  It is not competent

G3FMMIR4                        Summation - Mr. Mazurek

1   and reliable evidence.

2           The people whom Dr. Mirilishvili hired in his pain

3   management staff when he moved over to 162nd Street, yes, there

4   is no question in any of our minds he should have gone to

5   Craigslist or maybe to Columbia Hospital, but he didn't.  He

6   took the easy route and he took people that he got to know as

7   patients in the office, and he hired them.  That didn't mean

8   that he was hiring them to join a criminal conspiracy.  In

9   fact, what were the actions that he actually took after he

10  hired them?  He fired them all except for Leonard, who was the

11  sole survivor.  He fired them all.  That is not acting in a

12  criminal conspiracy, ladies and gentlemen.  That is doing what

13  he should be doing once he found out information that they

14  weren't doing their jobs correctly.

15          And the fact that he rehired Jomaris Javier, you heard

16  about that testimony, the government didn't really speak a lot

17  about it in the closing argument, but you heard the testimony

18  from Damon Leonard that he had to admit, because of the

19  recording, that Javier was rehired because she had a baby, she

20  was out of work.  She was, according to Leonard's testimony,

21  almost suicidal.  She was taking pills.  She was down on her

22  luck.  And she called the doctor, you heard, on Father's Day,

23  which was also his birthday, and asked for the job back.  That

24  evidence is not evidence that Dr. Mirilishvili is a drug

25  dealer.  It's that he rehired her.  It's evidence that he's a

1    compassionate human being.  That's all it is.  Don't let the

2    government tell you otherwise.

3           Now, Damon Leonard.  Talked about him a lot.  What

4    does the evidence show?  He did become Dr. Mirilishvili's

5    trusted office manager because of the fact that he lied to him

6    or didn't tell him what he was doing.  He interacted with drug

7    labs.  You heard Chris Dillon say that, oh, yes, the young man

8    who assisted me in doing the requisition forms and getting the

9    specimen cups and doing the things to help out.  He interacted

10   with pharmacies in referring doctors.  He told the doctor he

11   could manage the office by himself.  What he didn't tell is

12   that he became the gatekeeper to the drug dealers, that he

13   falsified medical records and test reports, that he and the

14   fired staff had been taking overrides and bribes from patients.

15          The reason that Anna Torres had trouble getting in the

16   office was not because of Dr. Mirilishvili.  She was there

17   during the time that Abraham Correa was there.  He wasn't

18   letting her in because she probably didn't pull out an extra

19   $200 to give that guy extra money.  That wasn't something that

20   Dr. Mirilishvili knew about.  The evidence doesn't show that.

21          You heard the testimony of Damon Leonard.  He said he

22   was at the helm.  He said he was at the helm of the office as

23   the office manager.  That's not the helm that he was talking

24   about.  You remember him denying that it meant anything more

25   but you knew that all the patients had to come through him and

1    he was prospering the most, the most from his own operation,

2    not the doctor's.

3              You heard from him that he thinks he made $5,000.

4    That didn't make sense.  He said he had eight or nine patients

5    for almost a year that he was able to get through.  His niece.

6    Where is the file?  Do you see a file of a niece of Damon

7    Leonard presented in the case?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        No evidence, none.  A lot of evidence of charts that

2   the government has presented in the case, evidence of phone

3   calls between people.

4        Raymond Williams, who you heard a lot about, who was

5   Raymond Williams?  We really don't know other than the

6   testimony that Correa gave that he was a so-called crew chief

7   and that he showed up in the office every now and then and

8   sometimes behind closed doors, but we don't know what that was

9   all about.  There is no evidence of that.  Who was this guy

10  Raymond Williams?  What was his patient visits?  What happened

11  with respect to his relationship with the doctor?  We don't

12  know; they didn't come into evidence.

13       Carolyn Middleton, that name never even came up in the

14  trial.  We have no idea who she is or what she represents on

15  this chart, but apparently she called Dr. Moshe.  Other people

16  who were just randomly called.  He called pharmacies.  What

17  does this mean?  Well, I tell you what it does mean, ladies and

18  gentlemen, is that if you go back to the 700 series of the

19  government's exhibits, you are going to see that Dr. Moshe

20  called tons of people every single day, that he had an average

21  of 20, 30 calls, that he used his cell phone for business and

22  he had many calls.  So what?  It's not proof beyond a

23  reasonable doubt that he was a drug dealer.

24       And the same with his home calls.  You heard from

25  Agent Castro, he didn't check to see how many patients were

G3F7MIR5                        Summation - Mr. Mazurek

1   calling the doctor, but you also heard it's within usual

2   medical practice for a doctor to give out his number to

3   patients.  What does that prove?  What does that prove?

4           Another thing that the government presented in one of

5   its many charts, Government Exhibit 106, the top five

6   pharmacies.  This is evidence of Dr. Moshe being a drug dealer.

7   The top one had 12 percent of his entire prescriptions filled

8   out of that.  What does that mean?  That he somehow had a

9   special deal with a pharmacy?  That's how patients were filling

10  prescriptions?  That was not proven.  No evidence.  And the

11  government didn't even mention it in its closing argument.

12          But what we do know through the BNE records in

13  evidence at Government Exhibit 901 is that there were hundreds

14  of pharmacies that filled Dr. Moshe's prescriptions.  No

15  evidence of a conspiracy.  No evidence of drug dealing.  That's

16  what happens in a medical practice.

17          And you even heard from Dr. Gharibo and Dr. Warfield

18  that it's within the guidelines of the American Association of

19  Pain Management to tell a patient to use the same pharmacy in

20  the course of their treatment.  There is no evidence.  The

21  government is grasping for proof.

22          Now again I talked about the pie chart that they

23  presented about just the number, the quantity of prescriptions.

24  And they want to convict him on quantity alone.  In 2010 these

25  were the prescriptions that they showed.  As I said, there is

no evidence of what kind of practice -- no evidence in this

case whatsoever about what kind of practice Dr. Moshe had at

that period of time.  But they said, oh, his prescriptions

changed over type, you see, this is only 68 percent of

oxycodone.  Well, the 20 some percent of the other slice of

that pie was we heard the antiseizure medication Lyrica.

That's what Dr. Warfield testified.  It's a controlled

substance, and that's why it was on this pie chart and showed

up in the BNE records of New York State.

          Now, in 2012 to 2014, oh, this pie chart looks

terrible.  Right?  All of a sudden the doctor is giving out

only oxy, and therefore he is a drug dealer in oxycodone.

Well, you heard the testimony of Dr. Warfield -- and this is

really important, ladies and gentlemen -- that statistics are

not proof in and of themselves; you need to look at the

underlying facts.  Because what Dr. Warfield testified was that

during this time period, in her review of the records, that

what Dr. Moshe was prescribing at that time was the same type

of medication as Lyrica, an antiseizure medication called

Neurontin that wasn't a controlled substance, so it doesn't

show up on the government's pie chart.  But he was still

prescribing antiseizure medication.  The pie chart and the data

is misleading.  The underlying facts show that his prescription

practice really didn't change.

          The same if you look at the graph, the government said

1   earlier that there was a dip in the prescriptions in February,

2   and they connect that to the Dr. Terdiman situation, which was

3   only talked about by Damon Leonard.  But if you look carefully,

4   there was a dip in January.  That's before Damon Leonard says

5   that Terdiman was arrested and changed the practice.

6           And who cares about whether that is true or not true?

7   If in fact the doctor started taking steps to check his office,

8   to check his people, to check his documents, he is not acting

9   as a coconspirator in a drug conspiracy; he is acting like a

10  medical doctor, and he is not guilty.

11          Money.  Because this is the other big thing that the

12  government has said is the reason why my client is guilty as a

13  drug dealer.  He was charging $200 a visit for noninsurance

14  patients and receiving about below $100 on average for

15  insurance.  That's a medical standard.  And you heard the

16  testimony from Correa and Leonard, how much they were receiving

17  by selling scripts on the street without telling the doctor,

18  1500 to $1800 per prescription.  The government says he is at

19  the helm, he's the mastermind, the doctor is the mastermind of

20  this.  The mastermind is not making much money if he is a drug

21  dealer.  That's not consistent with being a drug dealer; it's

22  consistent with being a medical doctor.

23          Now the 1.7 million of cash in his house.  This is

24  what the evidence shows.  The government put in closing

25  documents that showed the Great Neck apartment that the doctor

1    and his wife bought was at $355,000.  The bank accounts that

2    are in evidence in Government Exhibits 605, 602 and 601 show a

3    grand total at the relevant times in this case of $5,974 in

4    their bank accounts.  And their retirement accounts that are in

5    evidence, 607 and 606, a grand total of $84.

6          So, I have a pie chart of my own -- it's not only in

7    the provenance of the government -- and it shows the total

8    holdings of the assets of the Mirilishvilis.  And, yes, most of

9    their money is in cash.  But for a 65, now 67 year old man, to

10   have this kind of asset compilation at this point in his career

11   as a professional, is that evidence of a drug dealer because he

12   kept it in cash, because this immigrant from the former Soviet

13   Union didn't put it in the bank?  We know the amount of money

14   he had in the bank was only under 6,000.  If he had $1.7 in the

15   bank, would they say he is a drug dealer?  No.  But only

16   because he has cash?

17         And where is the evidence that this $1.7 million came

18   from his drug dealing during the time of the conspiracy?  There

19   is none.  There is only evidence this is what he had in his

20   apartment and he is 65 years old.  It doesn't say when he got

21   it.  They didn't prove that.  This is his life savings, ladies

22   and gentlemen, he and his wife.  It doesn't prove that he was

23   acting not in the usual course of medical practice and not for

24   legitimate medical purposes.

25         And let me show you one last thing about the money.

1    The government says, oh, his tax returns, that shows you he is

2    a drug dealer, he was underreporting his income.  The tax

3    returns in evidence during this time period show that he in

4    2013 and 2014 declared more than half a million dollars of

5    receipts, and the government says that's underreporting because

6    we did this analysis of how many scripts were written and how

7    much money he would have made or should have made if he got

8    $200 per script, and combine that with insurance proceeds.

9    Well, there is no evidence, ladies and gentlemen, of accounting

10   records.  Where is the business records?  They want to do this

11   extrapolation and say now he is also a tax cheat.  He is not

12   even on trial for being a tax cheat.

13           This is not proof beyond a reasonable doubt.

14           Now know, they say he's the drug dealer?  Damon

15   Leonard and Abraham Correa, their witnesses, didn't even file

16   returns.  The government got no money and Damon Leonard

17   testified the most I made in my drug sales is $5,000; please

18   give me a get out of jail free card.  That is not appropriate,

19   it's not evidence in this case that is sufficient beyond a

20   reasonable doubt to convict Dr. Moshe for doing the things

21   which the evidence shows he did in every single patient visit.

22           Now, the standard that I have on the screen is the

23   legal standard that I expect that the court is going to

24   instruct you on, and it's going to require you to find that the

25   government proved beyond a reasonable doubt that Dr. Moshe did

G3F7MIR5                        Summation - Mr. Mazurek

1    not act in the usual course of medical practice and not for

2    legitimate medical purpose.  That's what the government must

3    prove.  You see because he had a license; he had a license to

4    prescribe.  And in this case the most that we ever learned

5    about in terms of a patient that he prescribed medicine to are

6    the two convicted felons from the government's witnesses and

7    the two patients we presented, and the 24 records out of over

8    3,000 that the two expert medical witnesses had a chance to

9    review.

10          The government says through speculation 13,000

11   prescriptions were done outside the course of medical practice

12   and not for legitimate purpose, or at least the overwhelming

13   majority.  There is no evidence of that.  Ladies and gentlemen,

14   this whole case is based upon exaggerations and statistics

15   instead of facts.

16          Now, the two medical doctors who testified before you

17   talked about different types of practice.  And again you are

18   going to be instructed that this is not a medical malpractice

19   case.  There are different types of practice of acting as a

20   doctor.  There is best possible practice.  There is an average

21   practice.  There is negligent practice.  There is sloppy

22   practice.  There is malpractice.  But it's all acting as a

23   doctor.  In this case that standard they just showed you has to

24   be outside of acting as a doctor, outside of the usual course.

25          THE COURT:  Do you want to take that down, please.

1          MR. MAZUREK:  Outside of the usual course of medical

2     practice and not for a legitimate medical judgment.

3          Now on Counts Two and Three what is the evidence that

4     Dr. Moshe acted outside the usual course for this list of

5     patients that are shown on these two days on Count Two of

6     January 10, 2013?  What evidence have you heard about the

7     patient visits for all of these patients and what Dr. Moshe did

8     in terms of the diagnosis, examination and treatment?  You

9     haven't heard anything except from the 12th person listed on

10    this column, Abraham Correa, on January 10, 2013, and he

11    testified that he lied to the doctor even at this point in his

12    treatment with the doctor.  That's not proof beyond a

13    reasonable doubt.

14         Count Three, all of these patients that are listed in

15    this chart, Government Exhibit 111, what have you heard about

16    them?  You haven't heard that they saw the doctor or what

17    problems they had, or whether the doctor made verified checks

18    on MRI referrals, or whether he checked their PMP or their

19    urine drug test.  You haven't heard anything other than some

20    random documents that may have been talked about as an aside

21    nor in some of the testimony of Dr. Gharibo.  But that's not

22    proof beyond a reasonable doubt.  You haven't hear that from

23    any of these witnesses, any of these patients, of what Dr.

24    Moshe actually did in the examination room.

25         Now, the judge is going to also talk to you about the

1   government's burden of proof beyond a reasonable doubt, and I

2   expect that she is going to describe that in some detail.  A

3   reasonable doubt is a fair doubt based on reason, logic, common

4   sense or experience.  It is a doubt that an ordinary reasonable

5   person has after carefully weighing --

6           THE COURT:  Do me a favor and don't charge reasonable

7   doubt to my jury, please.

8           MR. MAZUREK:  She is going to talk to you about in

9   some detail --

10          THE COURT:  She will talk to you about reasonable

11  doubt.  But I have very little to do at this trial, but I'm

12  kind of jealous.

13          MR. MAZUREK:  I won't take that away from you, Judge.

14          THE COURT:  Thank you so much.

15          MR. MAZUREK:  Ladies and gentlemen, when you think

16  about the evidence in this case, when you think about it, think

17  about the facts that have been presented before you about what

18  Dr. Moshe actually did, what the testimony said he did, what

19  evidence the government is relying on to meet that burden.

20          MS. CUCINELLA:  Objection.

21          THE COURT:  The objection is overruled.

22          MS. CUCINELLA:  To the photograph?

23          THE COURT:  There is absolutely nothing wrong with it.

24  They have been looking at him for the last two weeks; I think

25  they know what he looks like.

1          MR. MAZUREK:  And, ladies and gentlemen, I think when

2     you review the evidence and what the government has produced

3     about the things that their own witnesses said that Dr. Moshe

4     did, what he didn't do, what's in his own voice and recordings,

5     how he checked the PMP searches, how he asked Damon Leonard to

6     call the DEA, how he discharged patients like Antonio Pedraza

7     who was doctor shopping, how he verified prescriptions with

8     pharmacists, how he wanted a police presence at his own office

9     after the robberies at his office -- what drug dealer would

10    want the police at his own office?

11         Dr. Warfield testified that she found the review of

12    the 24 files out of the 3,000 were within the usual course of

13    medical practice.  How the doctor retained AFTS through the

14    help of Chris Dillon to secure the lab reports that were coming

15    to him directly, so that it could be uploaded to Practice

16    Fusion.  The government makes a big deal about the fact that

17    these few documents that were found in his apartment --

18    remember the Aegis report labs, they said they showed blank

19    places or tape over the patient name or the date of birth.

20    Think about how those were found and what the evidence is in

21    this case.

22         The government wants you to believe that suddenly Dr.

23    Moshe was uploading things to Practice Fusion from these few

24    documents that were found, according to Agent Muller in his

25    testimony, among the boxes and boxes of records that were found

1   in his home.  That doesn't make sense.

2          We know Practice Fusion, the government presented

3   evidence of an activity log that was provided by the Practice

4   Fusion people to show what actions were being done on Practice

5   Fusion.  It doesn't make any sense.  The doctor wasn't

6   uploading documents.  Look at those activity logs.  He didn't

7   know about those activity logs.  They were provided by Practice

8   Fusion after the fact and provided an audit trail that the

9   government talked about.  It was Damon Leonard and Jomaris

10  Javier that were uploading those documents.  The government

11  wants to you speculate that all of a sudden the doctor was

12  doing some grand scheme from his apartment on these few

13  documents.

14         You saw the computer in his room and the scanner.

15  Where is the evidence that any of the documents were uploaded

16  from that computer and scanner?  There is none.  Isn't it

17  really what happened -- and you know what happened in this

18  case -- is that Dr. Moshe would take medical records, stacks

19  and boxes and boxes, as Muller testified, and would bring them

20  home?  There is no evidence that he even saw these few

21  documents out of the tens of thousands of pages.

22         What is more likely -- and you can reasonably infer

23  from the testimony of Damon Leonard -- is that in the summer of

24  2014, when he is by himself in the office, and he is trying to

25  make good for the drug group guy that he is helping, that he

1    was overwhelmed, and he left these documents in the office, and

2    one day the doctor scooped them up and brought them home.

3    There is no evidence that anyone was overriding reports except

4    the testimony that Leonard and Correa and the other office

5    staff was doing it.  That's all the evidence proves.

6         The doctor in fact was taking steps by retaining

7    places like AFTS so that no more overrides could happen.  He

8    submitted thousands of Medicaid and HMO claims.  He followed up

9    with his patients regarding physical therapy and surgeries, as

10   a doctor should.  He discharged patients after he verified fake

11   MRI reports.  He conducted his own needle test, EMG and NCB

12   tests, in-house.  And he provided physical therapy there, and

13   he fired his staff when he discovered problems.  This is all

14   reasonable doubt.

15        And when you go back to the jury room and begin to

16   deliberate, and think of whether you can trust Damon Leonard

17   Abraham Correa to convict a man, think about it as you are

18   walking across a foot bridge.  Would you take that next step on

19   that next plank over a chasm below if it was based on what

20   Damon Leonard or Abraham Correa said?  That's the evidence the

21   government wants to use to convict Dr. Moshe, and it's

22   insufficient; it's not proof beyond a reasonable doubt.

23        Now, my time is coming to an end, and this is always

24   the hardest part of the case for me, because I can no longer be

25   the voice of my client.  I turn that over to you, each and

1    every one of you as the judges of the facts.  In a moment Mr.
2    Diskant is going to have an opportunity to stand up and rebut
3    the things I said, and I won't have another chance to come
4    back.  Some of you might not be upset with that.  But you will
5    know in your heart, and you will know it from the many times
6    that I have probably spoken too long, that what may answers
7    would be to Mr. Diskant.  Because I believe that as you've
8    heard in cross-examination, and our own witnesses, we have
9    presented to you what really happened in this case, and the
10   government has not met that burden.

11          So remember my words as Mr. Diskant speaks, because I
12   think you will know my rebuttal to him from the evidence that
13   you heard in this case.

14          Dr. Moshe was a medical doctor, and when he rehired
15   Jomaris Javier he showed you he was a compassionate man.  He
16   had $1.7 million in his house that amounted to his life
17   savings.  He may not have been the best doctor in the world,
18   and he doesn't have to be.  The question is whether he is a
19   drug dealer.

20          I submit to you, ladies and gentlemen, that the
21   government has not even come close to show that when he turned
22   65 and he moved to West 162nd Street he decided to become a
23   drug dealer.  It didn't happen, it never would happen, and he
24   is not guilty of all counts in this indictment.  Thank you.

25          THE COURT:  OK.  Why don't you take a 15 minute break.

G3F7MIR5                    Rebuttal - Mr. Diskant

1      Yes, yes says Juror 4.  By the way, do you all know that you

2      look like a Paas Easter egg coloring kit?  It's really quite

3      extraordinary.

4              And don't discuss the case.  This, by the way, is the

5      second to last time I'm going to tell you don't discuss the

6      case; keep an open mind.

7              (Jury not present)

8              THE COURT:  15 minutes will be sufficient?

9              MR. DISKANT:  Yes, your Honor.  Thank you.  I

10     appreciate it.

11             (Recess)

12             (Jury not present)

13             THE COURT:  Are we ready for the jury?

14             MR. DISKANT:  Yes, your Honor.

15             (Jury present)

16             THE COURT:  OK.  Is the government ready for its

17     rebuttal summation?

18             MR. DISKANT:  Yes, your Honor.  Thank you.

19             Ladies and gentlemen, Mr. Mazurek just spent the

20     better part of the last hour and a half trying to talk you out

21     of your common sense.  Has anyone ever walked into a doctor's

22     office and handed a wad of 20s to a doctor in a patient room?

23     Anyone?  Anyone used an MRI report or a lab report that they

24     had to cut and paste their name onto in order to get seen?

25     Anyone?  Anyone ever been in a doctor's office that looked

1   anything like the defendant's doctor's office?  Your common

2   sense tells you that something here was wrong.  Your common

3   sense tells you that a doctor actually engaged in the

4   legitimate practice of medicine wants to hire nurses or at

5   least people who have some relevant training in the field, not

6   Damon Leonard.  And your common sense tells you that a doctor

7   who thinks he is doing everything right, that a doctor who

8   thinks that his income is lawfully and legitimately earned, is

9   going to accurately report that income to the IRS and not save

10  it in Ziploc bags in his home.

11          Now, we are going to talk through the evidence in this

12  case and at least some of the arguments that Mr. Mazurek just

13  made to you.  And let me reemphasize that the defendant has no

14  burden; the burden rests on the government; and we embrace it;

15  and we believe, as I will set forth, that we have met it.

16          But if the defendant chooses to make arguments to

17  you -- as Mr. Mazurek clearly has in his case -- then you have

18  an obligation to look at those in the same way you look at the

19  government's evidence, and ask yourselves whether they make

20  sense, whether they're proven by evidence in the case, or at

21  least consistent with evidence in the case.  And I would submit

22  to you that much of what defense counsel just said is not quite

23  right.  Let's talk about a few of those.

24          First and foremost, let's be very clear on what the

25  issues in dispute in this case are, what it is you need to

G3F7MIR5                    Rebuttal - Mr. Diskant

1    find.

2              As you know, Judge McMahon is going instruct you on

3    the law, and with respect to Count One, the conspiracy to

4    distribute narcotics, I expect she will tell you that you need

5    to find that the defendant agreed with at least one other

6    person -- one -- to unlawfully distribute narcotics.  You don't

7    need to find that every single patient was illegitimate; you do

8    not need to find that the defendant had an agreement with each

9    and every person you have heard about in this trial.  Just one.

10             Similarly, with respect to Counts Two and Counts

11   Three, which focused on specific dates in question, I expect

12   Judge McMahon will tell you that you need to agree that at

13   least one of the prescriptions written on those dates was

14   illegitimate, was not for a legitimate medical purpose and not

15   written in good faith, just one.

16             Because, as the government has told you all along,

17   there were a number of insurance patients, and those insurance

18   patients were not really what this case is about.  And, yes,

19   the defendant put two of those on the stand, Ms. Medina and

20   Ms. Torres.  And as Ms. Cucinella explained to you earlier this

21   morning, much of what they told you is actually entirely

22   consistent with the other evidence in this case.

23             Remember, Ms. Torres is the insurance patient who told

24   you she got sick of the crowds and being told she had to wait

25   until all of the cash patients went before her.  Entirely

1    consistent with what Damon Leonard told you.

2         But take a look at Government Exhibit 113, because

3    Mr. Mazurek suggested the government is trying to wow you with

4    numbers.  Take a look at what it actually says.  Over the

5    period of the conspiracy 2012 to 2014 the defendant wrote more

6    than 14,600 oxycodone prescriptions.  Only 4300 patient visits

7    were billed to an insurance company.  That means that more than

8    10,000 of those prescriptions were paid for in cash.  The

9    government is going to ask you to focus on those when you go

10   back to the jury room, those 10,000 prescriptions, more than

11   two thirds of them were paid for in cash.

12        And, by the way, look at the next two columns of this

13   chart.  Mr. Mazurek talked to you about the hundreds of

14   thousands of dollars the defendant billed to insurance

15   companies.  Yeah, he got about $357,000 for those insurance

16   patients.  He got over $2 million from the cash patients.  No

17   surprise that he instructed Damon Leonard and Abraham Correa

18   and his office workers that he wanted them to bring in the cash

19   patients.

20        By the way, look at Government Exhibit 117.  This is a

21   chart comparing the BNE data for the prescriptions written with

22   those insurance patients.  Look first at the left-hand side of

23   the chart, that's the early part of 2012, back before the

24   defendant opens his own practice.  And look how the number of

25   prescriptions is roughly equal to the number of insurance

1   patients, almost one for one.  Look what happens once that

2   clinic opens on 162nd Street, the clinic that has been the

3   focus of the government's evidence in this case.  The numbers

4   are nowhere near each other.

5        Folks, this is not the government blinding you with

6   numbers; this is the government providing you evidence of

7   exactly what the defendant was doing.

8        Now, Mr. Mazurek talked to you about the phone

9   records, Government Exhibit 115, and he told you that the

10  government hadn't established who these people were or why

11  these calls mattered.  And you know that nothing could be

12  further from the truth, because you were paying attention to

13  the evidence in this case.  The top name on the left-hand side,

14  Raymond Williams, is familiar to you as Obama, the crew chief

15  who introduced Abraham Correa to the game, the crew chief who

16  came in to see the doctor privately when he had a problem

17  getting his prescriptions filled.  He is calling him 20 times

18  at home.

19       You heard about Curtis Sanders.  Abraham Correa

20  identified him as another one of the bosses at the clinic.

21       And going over to the top right-hand side you heard

22  about Tasheen Davis, and you know why this call matters,

23  because you heard Tasheen Davis places this call on October 18

24  at 7:15 p.m., after she had been stopped in New Jersey and her

25  prescription confiscated, and you have seen what the doctor

1   does immediately after this call.

2          Remember Government Exhibit 218?  That's Ms. Davis'

3   SOAP note, the Practice Fusion file for her.  Take a look at

4   page 11.  Zoom in on that top.  Look when this SOAP note is

5   signed.  This is for a patient visit in February.  The

6   defendant signs it October 18 at 8:09 p.m., just after the call

7   from Tasheen Davis, more than eight months after the visit, and

8   just before he sends this very record back to the police in New

9   Jersey.

10          Folks, this is the conspiracy in action, a patient who

11   has been caught red handed with a prescription a pharmacist

12   deemed suspicious, calling the doctor at home and saying, doc,

13   I've been caught with a prescription, I need you to back me up.

14          What does the defendant do?  He doesn't have any

15   actual patient files to support what he has been doing, so he

16   goes into his computer and he creates them.  And not just this

17   one.  Look at page 22, the next month patient visit created

18   October 18 at 8:37 p.m.  Look at page 27, the next patient

19   visit, this one in May.  When is it created?  October 18 at

20   8:45 p.m.  Look at page 30, June 7, 2013, at 8:53 p.m.  Look at

21   page 34, July 11, at 9:02 p.m -- I'm sorry the July 11 visit,

22   October 18 at 9:02 p.m.  And look at page 42 -- excuse me,

23   41 -- either way.  You have now seen five of them.  I submit

24   that in there is one more of those in which he does the exact

25   same thing.  He goes through that night after he gets the call

G3F7MIR5                    Rebuttal - Mr. Diskant

from Tasheen Davis, and he creates each and every one of those

patient files, and he then sends them to the police in New

Jersey -- detective Beers told you about that -- to confirm

that she was a patient.

        Folks, this is clear evidence that the defendant knew

exactly what he was doing, and that he was working with these

other people, bosses like Tasheen Davis, to get these drugs

distributed.

        Now, I want to talk a bit about the government's

cooperators Abraham Correa and Damon Leonard, because

Mr. Mazurek spent a lot of time calling them names.  He called

them liars.  He called them drug dealers.  He called them

career criminals.  Let's be very clear, the reason you heard

from these two men is because the defendant chose them as his

employees.  Let me say that again.  The only reason those two

people testified before you is because they were picked by the

defendant to work for him.  Yes, they were drug dealers.  They

were drug dealers at the time the defendant hired them.  In

fact that's why he hired them.

        Remember the testimony on this?  You know, for all of

the lies that Mr. Mazurek accuses them of, most of what they

told you is not actually in dispute.  Both Mr. Correa and

Mr. Leonard told you that they were hired by the defendant

because the defendant knew them; they were already hanging out

in the clinic on a daily basis.  Mr. Correa told you he was

1    there three to four times a week getting his patients in.

2            Mr. Leonard told you he was there even more

3    frequently, that the doctor recognized him as someone who was

4    in the office every single day.

5            The defendant knew exactly who they were, and he knew

6    what they were doing, and that is why he hired them.  Because

7    if he wanted to keep this scheme going, he couldn't hire anyone

8    legitimate, anyone who would look at these medical records and

9    know immediately that this place was bogus, who might report

10   him to the DEA.

11           Ladies and gentlemen, these people testified before

12   you exclusively because they were chosen by the defendant to

13   assume the jobs that he gave them.

14           Now, again Mr. Mazurek calls them liars, and I would

15   push you to question what exactly they were lying about.  Yes,

16   there was a lot of cross-examination about very specific

17   minutia of their testimony.

18           Damon Leonard was pushed on whether or not a woman he

19   called his mother was the woman who give birth to him or a

20   woman named Rosyln Hill that he refers to as his mother.

21           Abraham Correa was pushed on whether or not he

22   accepted money from one person as opposed to another, or to do

23   one thing and not another.  And I submit to you that none of

24   those issues are going to be relevant to the verdict you are

25   asked to return.

1          Mr. Mazurek pointed you to a jury instruction which

2     permits you to throw out the witness's entire testimony, but he

3     left out the second half of the instruction.  Take a look at it

4     for yourself.  The second half of the instruction

5     specifically --

6          THE COURT:  Could you take the instruction down?

7     Don't charge the jury.

8          MR. DISKANT:  Thank you, your Honor.

9          Listen to the judge's instruction on this.

10         THE COURT:  That's a good thing to tell them.

11         MR. DISKANT:  Very good thing.

12         I expect you will learn that there is a little bit

13    more to this story than defense counsel was letting you know,

14    and I expect Judge McMahon will tell you that you do not have

15    to throw the baby out with the bath water; you do not have to

16    throw out the entire testimony simply because of a minor and

17    completely irrelevant inconsistency.

18         So, again focus on the parts of their testimony that

19    really aren't seriously disputed.  Abraham Correa tells you

20    that he is hired by the defendant after seeing the defendant as

21    a patient for several months.  Now, there is some dispute about

22    whether Mr. Correa said that he had neck pain or he had back

23    pain, but here is what you know for sure:  When Abraham Correa

24    is hired by the defendant, he is not wearing that cervical

25    collar the defendant prescribed for him.  In fact, that never

G3F7MIR5                         Rebuttal - Mr. Diskant

1    shows up at all.

2              You saw some of the pictures of Mr. Correa outside the

3    office, for example, Government Exhibit 4-B.  Where is the

4    cervical collar?  This is him hanging outside the doctor's

5    office working for him.  It's not there, because the defendant

6    knew he didn't need it.

7              There is another even more important way for you to

8    know that the defendant knew all along that Mr. Correa wasn't a

9    legitimate patient.  Remember the patient file that he

10   completes for Mr. Correa?  He diagnoses Mr. Correa as opiate

11   dependent.  We will bring that document up for you in just a

12   minute.

13             And Dr. Warfield, the defendant's own expert, told you

14   what opioid dependence means.  It means the body comes to rely

15   on the drug; it means the body is going to be in real trouble

16   if you take that drug away.  What does the defendant do?  He

17   cuts Abraham Correa off cold turkey on January 10, 2013,

18   because at this point he has already hired Mr. Correa to work

19   for him, and even for this defendant it is just too ridiculous

20   to be prescribing oxycodone to your own bouncer.

21             He cuts him off cold turkey.  He doesn't wean him off,

22   he doesn't refer him to another doctor.  Why?  Because the

23   defendant knows Abraham Correa has never taken this his pills.

24   He knows exactly who Abraham Correa is, and he knows why he has

25   been writing these prescriptions:  These are drug deals.  It is

1    not legitimate medicine.

2           Now another argument Mr. Mazurek advanced to you is

3    that the office staff was somehow fooling the doctor.  And

4    there are any number of problems with this argument, but

5    perhaps the easiest is you know what the paperwork looked like

6    by the time it got back to the defendant's home.

7           This is the paperwork in the format that he looked at

8    it in, and the fake nature of it is completely obvious.  You

9    have seen these exhibits before, Government's Exhibits 543 and

10   544.  Just pause there.  Has anyone seen a handwritten MRI

11   report?  I mean this is just facially ridiculous.  Defendant

12   writes a prescription anyway.

13          550, same thing, different patient.  Exact same MRI.

14          Ladies and gentlemen, you don't need an expert to know

15   that these are fake, and you don't need to be a detective

16   either, because it doesn't exactly take a CSI lab to figure out

17   that these documents are fake.

18          Government Exhibit 547, 545, 546, 549, and most of all

19   Government's Exhibits 559 and 559A and 560.  You saw this for

20   yourself.  This document has White-out on it.  It's one of

21   many.  The defendant had these in his home.

22          So, ask yourself when you evaluate Mr. Mazurek's

23   argument that the doctor was being fooled by his office staff,

24   who is fooling the doctor on this one?  I submit to you no one

25   was.  The doctor knew exactly what he was doing, and he had

1    these in his home so that he too could create the fake reports

2    that he needed to keep in his file, so that if any day a jury

3    like you were to start combing through his files he could point

4    to his reports and say, yeah, I've got something in here.

5           That's not legitimate medicine, and it's certainly not

6    good faith.  Because any doctor who has a good faith belief

7    that they are engaging in the legitimate practice of medicine

8    is not going to accept a lab report that has a name cut and

9    pasted on it.  Any doctor who is operating in a good faith

10   belief that they are engaged in a legitimate practice of

11   medicine is not going to accept any of these documents at all,

12   because they are completely and obviously fiction.

13          Now, Mr. Mazurek talked to you a bit about the

14   recording, and again I would caution you be careful about what

15   the actual evidence in this case is, because I would submit to

16   you that while Mr. Mazurek focused your attention on parts of

17   the recordings, he carefully avoided some other parts.

18          Remember that first visit for Jose Lantigua, he goes

19   in to see the defendant?  Do you remember how that visit

20   starts?  It starts with the most important part:  He has to

21   pay.  Jose Lantigua hands him $200 in cash, and this is where

22   again, folks, your common sense tells you off the bat something

23   is very wrong here, because legitimate doctors engaged in the

24   legitimate practice of medicine are not collecting cash from

25   patient after patient in the waiting room.

G3F7MIR5                    Rebuttal - Mr. Diskant

1          Look what happens next.  Jose Lantigua tells him he is

2      on M30s.  And you heard a little bit of testimony about what

3      M30 is.  Abraham Correa told you it's a street term for

4      oxycodone.  He is referring to it by its street name.  The

5      defendant doesn't react to that at all.  In fact, leaving aside

6      the fact that the defendant is not at all phased by the use of

7      the term M30, he doesn't follow up with even obvious questions

8      a legitimate doctor would.  Where did you get M30s from?  What

9      doctor prescribed them to you?  What dosages are you taking?

10     How long have you been taking them for?  All these were

11     questions that Dr. Warfield -- the defendant's expert -- told

12     you would be important questions.  Do you remember her telling

13     you you want to know what works, what doesn't work, what has

14     been tried.  There is absolutely no way the defendant can know

15     that from this exam, because he doesn't follow up and ask any

16     basic questions.

17          The defendant then does a physical examination.  Take

18     a look at that.  Sure he says stand up, walk over, turn around.

19     But there is something missing.  The defendant is not asking

20     him if any of this is causing any pain.  He is not asking him

21     if it hurts.  This isn't an examination; this is going through

22     the motions.  That's what Mr. Correa told you.  And the

23     recording speaks for itself.

24          Finally we get to the end of this recording where a

25     patient who says he lives in New York and was seeing a doctor

G3F7MIR5                     Rebuttal - Mr. Diskant

1   in New York is sent to a random pharmacy in Queens.  Folks,

2   your common sense tells you this makes absolutely no sense at

3   all, no sense unless you understand what is going on here.

4         And Abraham Correa told you all about this, about the

5   pharmacies that the doctor liked to work with, the pharmacies

6   that would fill the defendant's prescription, that would take

7   them.  He is steering this particular patient away from, say,

8   the Rite Aid down the street to this particular pharmacy.

9         And, yes, Mr. Mazurek showed you some of the BNE data,

10  and, yes, some of the pharmacies all over the city filled these

11  prescriptions.  But the point here -- and it's the same point

12  in the government exhibit he showed you -- is that the majority

13  of these prescriptions were going to a handful of pharmacies

14  that the defendant had relationships with, pharmacies that were

15  willing to fill these prescriptions, pharmacies that were

16  willing to fill them in return for cash, which is what this

17  patient was paying.

18        I submit to you, ladies and gentlemen, this patient

19  visit, like the other two that follow it, is not legitimate at

20  all.  In fact, it's exactly like the fake MRI reports that you

21  have been looking at in this case.  If you take a quick look

22  at, it sort of looks like a medical visit, just like those sort

23  of look like medical documents.  But if you actually drill down

24  on what is going on, if you actually focus on the details, this

25  is just as fake as the paperwork.

1          Look at the second visit; look at how it begins.  Mr.

2     Correa starts asking questions without the doctor even asking

3     them.  He's not translating anything.

4          Go to the next slide:  After you take all the

5     medication, where do you feel?  I don't feel it the CS says,

6     zero.

7          There is no question posed by Dr. Mirilishvili.

8     Correa just starts going through the motions.  Remember Mr.

9     Correa testifying about this?  He would ask the question

10    without waiting for the doctor to do so, because it was a

11    script.  He knew what the next question was.  The doctor

12    doesn't stop him, by the way.  The doctor knows what is

13    happening too.

14         Go to the third visit.  Opens the same way:  When I

15    saw you the last time you were complaining of your lower back

16    pain.

17         Except it's not true.  The last time the CS was there,

18    the last time Jose was in the doctor's office, he says he has

19    zero pain.  He is not complaining of lower back pain.

20              (Continued on next page)

21

22

23

24

25

1          MR. DISKANT:  The doctor doesn't care.  None of these

2     answers matter and none of them are being written down because

3     you have seen Jose Lantigua's patient chart, Government Exhibit

4     210.  There is nothing here, folks, not a single thing.  No

5     diagnosis at all.  All of the things Dr. Warfield, the

6     defendant's expert, told you had to exist in order to have a

7     legitimate doctor/patient relationship, none of them are here.

8     Because none of them matter.  This is a game in which the two

9     most important moves are the patient paying the $200 in cash

10    when he steps into the office and the patient getting the

11    prescription the defendant writes at the end and that's what

12    Jose Lantigua got every single time he saw the defendant.

13          By the way, Mr. Mazurek told you about questions that

14    the defendant asked about referrals and about physical therapy

15    and about surgery and you saw, if you look at the recordings,

16    that none of those things ever happened.  The questions get

17    asked as part of the game, as part of the motions.  The answers

18    are always the same.  Yeah, I am going to do it in the future.

19    The prescriptions get written.  This is going through the

20    motions.  It is fake.  It is not legitimate medicine at all.

21          By the way, Mr. Mazurek also pointed out that some of

22    the defendant's patients would get prescriptions for

23    noncontrolled substances.  People like Jose Lantigua wouldn't

24    just get a prescription for oxycodone.  He would get three more

25    things.  You know why that happened, too.  Abraham Correa told

1    you that.  Remember this testimony?  It was the only way those

2    pharmacies the defendant worked with would fill the

3    prescription, because the pharmacies wouldn't fill just a

4    prescription for oxycodone.  That was far too much of a red

5    flag.  They required the defendant to write prescriptions for

6    other things.  That's how they get filled.  By the way, you

7    heard the same thing from Mr. Gharibo who told you that the

8    prescriptions the defendant was writing, in addition to

9    oxycodone, didn't make any sense.  They didn't seem to be

10   medically appropriate.  Abraham Correa told you the same thing,

11   by the way.  You remember that.  He told you that he was

12   familiar with all of the other prescriptions being written for

13   Jose Lantigua because he had gotten all of those prescriptions

14   himself, the exact same cocktail, the exact same set of four

15   drugs.  Folks, this is just another way for the doctor to cover

16   his tracks.  It is not evidence of a legitimate medical

17   practice.

18          Mr. Mazurek focused your attention on the second date,

19   the second specific date identified in the conspiracy, October

20   28, 2014.  That's the subject of Count Three and he told you

21   that there is absolutely no evidence of what the defendant was

22   doing at that time period, no evidence that any of the

23   prescriptions written on that date were medically unnecessary.

24          You know that's not true for a couple of reasons.

25   First, you know what happened just a week before October 28.

1   You know that the defendant was interviewed by members of the

2   DEA about his practice.  Special Agent Muller, the first

3   witness of the case, told you about that.  Remember what

4   happens in that interview.  This is very important.  The

5   defendant lies through his teeth about the most criminal

6   aspects of his practice.  He tells Special Agent Muller and the

7   DEA that he sees just 10 to 20 patients a day, that he's

8   collecting just a thousand dollars in cash.  He has full

9   participation in hydrotherapy and in physical therapy.  This is

10  a week before, early October 2014.  And you know that every

11  single one of those statements is false.  This is the defendant

12  trying to cover his tracks because you know what happens on

13  October 28, 2014.

14          Government Exhibit 111.  The defendant writes 33

15  identical prescriptions for oxycodone, not 10 to 20 patients;

16  33.  Each and every one of them pays him in cash.  And at this

17  point it is up to $300 a patient.  He is not collecting a

18  thousand dollars in cash a day.  He's collecting more than

19  $10,000 in cash a day and he is lying about that because he

20  knows that the number of patients he is seeing, the number of

21  prescriptions he is writing and the amount of cash that he is

22  collecting are devastating evidence of his guilt.

23          They did hear about at least one of the specific

24  patients seen on this day, gentleman by the name of Larry

25  Ashby.  Government Exhibit 202.  You took a look at some of

1    Mr. Ashby's paperwork.  Page 7 is his referral, for example.

2    Once again, folks, this document is just ridiculous on its

3    face.  Leaving aside the fact that Larry Ashby's name is in a

4    different font and it's crooked, just read it to yourself.  I

5    am referring Larry Ashby for treatment for her chronic back

6    pain.  I am asking you to specifically address her pain.  But

7    what was an explanation of Ms. Prunty's evaluation?  Is there

8    anyone here who would accept this document sight unseen and

9    deem it legitimate?  Give me a break.

10           Keep in mind that Judge McMahon is going to instruct

11   you that one way of you finding the defendant's knowledge is

12   what's known as conscious avoidance or willful blindness

13   because, as I expect she will tell you, a defendant cannot

14   willfully and intentionally remain ignorant of a fact important

15   to one's conduct in order to escape the consequences of

16   criminal law.

17           Folks, when the defendant accepted this document and

18   continued to write prescriptions for this patient month after

19   month after month, including on October 28, 2014, he was at the

20   very best intentionally choosing to remain ignorant of facts

21   that would be obvious to any one of us.  This document is fake

22   and this patient is not legitimate.

23           The final subject I want to talk to you about is that

24   subject of knowledge because it really is the most important in

25   this case.  How is it that you know?  As the defendant was

1    doing the things that you have heard about during this case.

2    How is it you know that the defendant knew at the time that

3    what he was doing was criminal, that what he was doing was

4    outside the course of medical practice?

5         I want to highlight four of them briefly.  The first

6    is one of these pie charts that Mr. Mazurek talked to you

7    about.  Take a look at Government Exhibit 101.  Government

8    Exhibit 101 is what the defendant was doing in 2010.  He's

9    right, you have not heard a ton of evidence about what the

10   doctor was doing at that time.  But you know that at the time

11   he had a license, and you know that at the time he was writing

12   a variety of different kinds of medications.  Mr. Mazurek

13   focused you on the Lyrica, but look at the oxycodone.  He

14   writes oxycodone, five kilograms; he writes oxycodone, 7.5

15   milligrams; he writes oxycodone, 10 milligrams; he writes

16   oxycodone, 15 milligrams.  He is writing a whole variety of

17   different types.

18        Why?  Because the defendant knows what Dr. Warfield,

19   his own expert, told you, which is that legitimate pain doctors

20   are going to treat pain individually.  Different people are

21   going to respond to pain individually.  This is not just about

22   volume, although we are going to talk about that in a minute.

23   It's about variety.  The defendant knows what legitimate pain

24   medication looks like because he was doing it in 2010.

25        Now compare that to Government Exhibit 104.  This is

1    2012 to 2014.  Again, folks, it's not just about the volume,

2    although the volume is important.  The defendant has gone from

3    writing 600, 700 prescriptions a year to writing nearly 14,000

4    in just over two years.  It's virtually all of them are for the

5    exact same thing, 90 30-milligram oxycodone tablets, the things

6    that the defendant knew his patients would pay for.

7            When you go back to the jury room and you ask

8    yourself, how do I know, how has the government proven to me

9    that the defendant knew he was engaging outside of the ordinary

10   course of legitimate medicine?  Remember these charts because

11   what these charts make clear is that the defendant knows what

12   legitimate medicine looks like.  He was engaged in 2010.  What

13   he was doing at the clinic was not the legitimate practice of

14   medicine.

15           The second way that you know that the defendant knew

16   all along that what he was doing was criminal is you know a bit

17   about why the defendant's prescribing habits changed and

18   changed so drastically over time because you have taken a look

19   at how much money the defendant was earning back in 2010, when

20   he was writing that variety of prescriptions.

21           Take a look at Government Exhibit 801, defendant's tax

22   return for 2010, the year when he wrote just 600 controlled

23   substance prescriptions.  He made $45,292, which is a perfectly

24   respectable income for a law-abiding doctor.  You know that

25   changed and changed very, very quickly during the period of the

charged conspiracy, when he was making almost 10 times that

much or more.  That's only according to his tax returns.

Look at what happens in 2011, Government Exhibit 802.

He reports a loss.  This is the year before the clinic opens.

He is not making any money at all.  Now look at the period in

the charged conspiracy.  $200 per prescription for those 10,000

or more prescriptions for which patients paid cash.  It's over

$2 million in cash alone.  How do you know that the defendant

knew all along that what he was doing was illegal?  How do you

explain why it is that the defendant's prescribing habits

changed so quickly?  It's the only story there is, money,

greed.

Third, you have seen the documents for yourself.  I am

not going to belabor them any further.  There is stacks of

them, visibly thick documents, documents in the defendant's

home, documents the defendant was putting in his files and

handling himself, and documents that make absolutely 100

percent clear that the defendant knew his patients were

illegitimate, at least some of them, and he was writing them

prescriptions anyway.

Fourth, you saw the cash, Government Exhibits 5E and

5J, more than $1.75 million in cash found in the defendant's

home in Ziploc bags.  Folks, this looks like drug money because

it is drug money.  That's precisely what it is.  Mr. Mazurek

told you this represented the defendant's life savings.  I

1    would ask you, where is the evidence of that?  You've already

2    heard that the defendant owned multiple homes.  You've heard

3    the defendant was driving a Mercedes.  Where is the evidence

4    that this constituted his life savings?

5              MR. MAZUREK:  Objection.  Burden shifting.

6              THE COURT:  Ladies and gentlemen, I think you know,

7    and the government has said repeatedly, that the defendant has

8    no burden to prove anything in this case.

9              MR. DISKANT:  By the way, Mr. Mazurek talked to you

10   about the defendant's bank accounts, told you the defendant

11   only kept $5,000 in the bank.  Go to Government Exhibit 112.

12   The story is a little bit more complicated than that.  Over the

13   period of the charged conspiracy the defendant moved more than

14   $1.25 million in and out of his bank accounts.  This was not a

15   person who was afraid of the banking system.  He did it every

16   time he needed to cut a check.  He did it for all of his

17   expenses.  He had bank accounts and he knew how to use them.

18   And he also knew how to keep drug money out of the banking

19   system.

20             That's what the evidence in this case shows.  When I

21   stood before you a few weeks ago on behalf of the government we

22   asked you to do three things:  To pay careful attention to the

23   evidence, which I know you have done; to follow Judge McMahon's

24   instructions on the law, which I know you will do; and, third,

25   and most important, to use your common sense, the same common

1   sense that you use to make decisions in your everyday lives.

2          If you do that, I submit to you this is not a hard

3   case because your common sense has been telling you all along

4   that there was nothing legitimate about the vast majority of

5   things going on in the defendant's clinic.  Your common sense

6   tells you that the defendant agreed with at least one other

7   person.  Take your pick, Abraham Correa, Damon Leonard, Tasheen

8   Davis, and that phone call, Joseph Gray, Raymond Williams and

9   all those calls to his home.  Your common sense tells you that

10  the defendant agreed with at least one person to write

11  medically unnecessary oxycodone prescriptions.  Your common

12  sense tells you that on January 10, the subject of Count Two,

13  the defendant wrote a prescription for Abraham Correa, after he

14  had already hired Correa to work for him, knowing full well

15  that Correa had no actual need for oxycodone.  Your common

16  sense tells you that the defendant, while writing 33 oxycodone

17  prescriptions on December 28, all in return for cash, including

18  one for Larry Ashby with his fake MRI, he knew all along what

19  he what is doing.  That's what makes him guilty and that's why

20  we are here.  Thank you.

21          THE COURT:  Ladies and gentlemen, you have had a long

22  day and you are going to have a harder and longer day tomorrow.

23  It's too late for me to start charging you.  You can't sit

24  through an hour and a half charge at this point and listen to

25  all this esoteric law stuff.  Tomorrow morning at 9:45 we will

G3FMMIR6

1    get you charged and then you will get the case to deliberate.

2           I want to remind you one last time, don't discuss the

3    case.  Keep an open mind.  And I especially want to urge you

4    all to have a very pleasant, stress-free evening this evening.

5    Don't think about this case.  Don't think about this place.

6    Get a lot of sleep.  You are going to work very hard, not that

7    you have not been all through the trial.  You are going to

8    start working very, very hard indeed tomorrow.  Take care of

9    yourselves.  I'll see you in the morning.

10          (Jury not present)

11          MR. MAZUREK:   Judge, I have two motions based on the

12   government's rebuttal summation.

13          The first is a motion for a mistrial on the grounds of

14   improper argument.  The government made lengthy argument in

15   rebuttal summation based on documents in evidence dating back

16   to 2010 and 2011, specifically tax returns and the kinds of

17   prescriptions that were written during that time period.  The

18   government is aware that during that time period that

19   Dr. Mirilishvili was still on probation based on his prior

20   medical proceeding and that he was working under completely

21   different circumstances.

22          We have previously objected to the 2010, 2011 evidence

23   coming into evidence.  We continue to maintain that was

24   improper to be admitted for the purposes of comparing it to his

25   practice in 2012 to 2014, especially when the government

G3FMMIR6

1    presented no evidence at all during trial regarding the

2    differences in the practices dating back to that time.  They

3    made the argument that he must have known that his income in

4    2012 to 2014 was illegal drug income because he was making so

5    little money in 2010 and 2011, full well knowing that his

6    circumstances were completely different and basing it on no

7    evidence presented at trial.

8            Secondly, I move to reopen the record to allow us to

9    offer DM01 and DM02, which are the follow-up visit recordings

10   of the Lantigua patient visit on the ground that in rebuttal

11   summation the government made the argument that the fact that

12   there were no medical records in the file indicated that

13   Dr. Mirilishvili was not medically treating this patient when

14   they know that there are in fact multiple additional recordings

15   and transcripts of all of the subsequent visits between the

16   doctor and Mr. Lantigua.  I believe that they have opened the

17   door to the request that those recordings be admitted into

18   evidence in order to complete the record of the medical

19   diagnosis and treatment that the doctor in fact gave to Jose

20   Lantigua.

21           THE COURT:  From the government.

22           MR. DISKANT:  Your Honor, with respect to the first, I

23   would note that the defendant was the first one to put those

24   charts up in the defense summation.  They were not highlighted

25   in the government's summation and the government was responding

G3FMMIR6

1    to the arguments defense counsel was making.

2              THE COURT:  Wait a minute.  We have got charts and we

3    have got tax returns.  There are two different things.  Let's

4    start --

5              MR. DISKANT:  The charts defense counsel put up first

6    and the government was responding to those.

7              The tax returns is an issue that the government moved

8    on and the Court ruled on several times before trial allowing

9    the government to offer them for the point of comparison, which

10   is precisely the manner which the government offered them in

11   rebuttal.

12             THE COURT:  As to the second motion.

13             MR. DISKANT:  As to the second motion, as the Court

14   has ruled in precluding --

15             THE COURT:  I ruled.  That was before you closed.

16             MR. DISKANT:  With respect to the additional

17   recordings, the reason, as I understand it, for the Court's

18   ruling was that they are substantively identical to the

19   recordings that are in evidence.  There is nothing about those

20   additional recordings that in any way undermine what the

21   government said in rebuttal or changes it.

22             MR. MAZUREK:  Judge, that's not true.  In fact, the

23   additional recordings that we have requested indicate that the

24   patient gave additional information to the doctor during those

25   recordings, including the fact that he had followed through on

G3FMMIR6

1    the doctor's request for an orthopedic referral, that he in

2    fact saw the orthopedic doctor and had a scheduled surgery

3    within the next couple of months.

4              The information also indicates in subsequent visits

5    that Dr. Mirilishvili was responding to the fact that at an

6    earlier visit that the patient did not follow through on the

7    referrals.  Dr. Mirilishvili in very strong terms said that, in

8    sum and substance, he's not doing -- that Dr. Mirilishvili is

9    not treating the patient for the fun of it, that the patient is

10   wasting his time, and in fact that he strongly said that if you

11   need to get better, you have to follow through with my

12   referrals, all the kinds of things --

13             THE COURT:  I hear what you are saying and I'm not

14   unsympathetic to your argument.  But how does that undermine

15   the government's point on the rebuttal summation?

16             I am going to get the transcript and I am going to

17   reread it, the point being that when you look at the medical

18   record, there is literally nothing.  You can listen to all the

19   transcripts in the world and there is still literally nothing

20   written on the medical record.

21             MR. MAZUREK:  That's the reason why it's necessary.

22   In fact, as Dr. Warfield testified, even Dr. Gharibo, looking

23   at the medical records alone would be insufficient to be able

24   to judge what in fact Dr. Mirilishvili did.  But when they each

25   reviewed the transcripts they both found that the examination,

G3FMMIR6

1    in Dr. Gharibo's view, while below what he may have done and

2    should have been more detailed, was within the standard of

3    care.

4         The subsequent visits continued to be within the

5    standard of care because Dr. Mirilishvili did things such as

6    follow up on the referral, insist on the patient going to those

7    referring doctors and, in fact, decided to continue the patient

8    on treatment because the patient informed him deceitfully that

9    he had a surgery scheduled with the orthopedic doctor who he

10   said he had seen.  All of these things are evidence of in fact

11   Dr. Mirilishvili acting within the usual course of medical

12   practice.

13        THE COURT:  Let me clarify one thing.  The reason they

14   were not admitted is because the government didn't choose to

15   introduce them.  They were not introducible under the rule of

16   completeness and from the defendant's perspective they were

17   hearsay.  That's the reason, not because they were

18   substantively identical.

19        MR. DISKANT:  Your Honor, I apologize if I misspoke.

20   I don't think.

21        THE COURT:  Misspoke?

22        MR. DISKANT:  Misphrased my answer.  The point I was

23   trying to make in rebuttal, and perhaps it does make sense to

24   wait for the transcript on this, is that you have heard the

25   recordings and it is the same thing on all of them, focusing

1406

G3FMMIR6

1    the jury's attention on all of them being the recordings in

2    evidence.  The government has never told in any substance the

3    jury about the additional recordings.  It has never asked the

4    jury to rely on them, and I then directed them to the patient

5    file which, as the Court noted, has nothing in it.

6            THE COURT:  I need the transcript of the government's

7    rebuttal summation.

8            I'll see you in the morning.  You are not going to get

9    a ruling tonight.

10           (Adjourned to Wednesday, March 16, 2016, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    CAROL WARFIELD

 4    Cross By Ms. Cucinella . . . . . . . . . . .1265

 5    Redirect By Mr. Mazurek  . . . . . . . . . .1275

 6                    DEFENDANT EXHIBITS

 7    Exhibit No.                            Received

 8     402-A  . . . . . . . . . . . . . . . . . .1284

 9     403   . . . . . . . . . . . . . . . . . . .1284

10     606   . . . . . . . . . . . . . . . . . . .1285

11     607   . . . . . . . . . . . . . . . . . . .1285
```

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```