```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          S2 14 Cr. 810 (CM)

 5   MOSHE MIRILISHVILI,

 6              Defendant.                  Trial

 7   ------------------------------x

 8                                          New York, N.Y.
                                            March 16, 2016
 9                                          9:50 a.m.

10

11   Before:

12                     HON. COLLEEN McMAHON,

13                                          District Judge

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17   BROOKE CUCINELLA
          Assistant United States Attorneys
18
     HENRY MAZUREK
19   WAYNE GOSNELL
          Attorneys for Defendant
20

21
     ALSO PRESENT:  MICHAEL MULLER, DEA
22                  ELIZABETH JOYNES, Paralegal
                    MICHAEL DOMANICO, Paralegal
23

24

25
```

1    (Trial resumed; in the robing room)

2    THE COURT:  I want to get a preliminary matter out of

3    the way and then I want to let the jurors go get coffee.  You

4    should just know that the lights go off in this building at

5    8:15.  I was here until 8:15 when the lights went off.  And to

6    the extent that stuff came in for me at 9:10 this morning, I've

7    had 20 minutes to look at it.  It's just not fair to me.  It's

8    just not right.

9    But I want to get one little matter out of the way.

10   Among the many extraneous things that were going on in my

11   chambers and in this case yesterday was the search for juror

12   No. 9.  We had various reasons for wanting to find juror number

13   9.  I was thinking about sending him a contempt citation

14   because never in my 20 years of being a judge had a juror

15   simply disappeared.  Mr. O'Neil, who is a much nicer person,

16   was worried that something might have happened to him, and the

17   jurors were pestering him with questions about juror number 9.

18   Was he ok.  He wouldn't just do this.  It's nice to know that

19   they have all become friends.  It's very lovely.

20   We did locate juror number 9 at the end of yesterday.

21   He is in the hospital and could not have contacted us on

22   Monday.  I could forget about sending him about a contempt

23   citation.  I would like to bring the jurors in, say good

24   morning, say I hear you are worried about your friend, juror

25   number 9.  Don't worry, he's fine.  We have been in contact.

1       MR. MAZUREK:  Is he ok?

2       THE COURT:  I don't want to get into his medical.  Let

3   me just say this.  We are all very lucky that he's not on this

4   jury, all of us.  Anyway, we didn't know quite everything there

5   was to know about juror number 9.  Anyway, the long and the

6   short of it is, I would just like to say, don't worry about him

7   anymore, he's ok, calm them down on that and send them out to

8   get coffee, and continue to deal with this.

9       MR. MAZUREK:  Agreed.

10      THE COURT:  Let's do that first.

11      (In open court; jury not present)

12      THE COURT:  We are going to bring the jurors out and

13  then we are going to send them out on a little coffee break.

14      (Jury present)

15      THE COURT:  Good morning.  We had some legal issues

16  come up at the end of the day.  I've had briefs that were

17  submitted to me at late as 9:25 this morning.  You should know

18  this is not rare.  At the very end there is always something.

19  As Roseanne Roseannadanna used to say on the old days on

20  Saturday Night Live, it's always something.  I need to thrash

21  some of those things out with the parties.  I am going to send

22  you out for some coffee.

23      I did hear through Jim that you were concerned about

24  juror number 9.  I have to say, it warms my heart to know that

25  you guys in this very short period of time have bonded and

1  become a team and that you care about all the members of the

2  team.  He's fine.  He did have a medical problem.  He wasn't

3  able to get in touch with us on Monday, but we were in touch

4  with him yesterday.  I just wanted you to know that so that you

5  wouldn't worry about it.  You can get that out of your heads.

6          I would like you to go away for half an hour to

7  Starbucks again and come back refreshed and ready to go.  Don't

8  discuss the case.  Keep an open mind.

9          (Jury not present)

10          THE COURT:  I am going to get rid of part of this

11  right now.  Sit down.  I've been confronted with multiple

12  mistrial motions.  The defense mistrial motion on the ground

13  that the government unfairly commented on the difference in the

14  defendant's prescribing patterns for 2010 to '13 is denied.  It

15  is absolutely true that the jury does not know anything about

16  the nature or circumstances of Dr. Mirilishvili's practice in

17  2010 and 2011 except that he prescribed a lot less oxycodone

18  during those years and not all of the prescriptions he wrote

19  were in the same amount.

20          The reason that the jury does not know anything more

21  is, I granted the defense pretrial motion to keep information

22  about his previous medical suspension and his probationary

23  status out of the record.  Otherwise, the government would and

24  could have argued that the minute that the defendant was out

25  from under the watchful eyes of the authorities, look what he

1    did, he set up a pill mill and started prescribing loads of

2    oxycodone in identical amounts.

3         I see nothing wrong with the government's arguing that

4    this change over time is evidence that can be considered in

5    connection with the jury's deliberations.  The fact that the

6    defendant began prescribing oodles of oxycodone and that every

7    single patient got the same amount is highly relevant to the

8    issue of whether he conspired with others to distribute

9    narcotic drugs in violation of the law.  In that sense, of

10   course, the evidence of his earlier prescribing patterns is

11   indeed prejudicial to the defendant, but because there is real

12   probative value to the change, because it goes to the elements

13   of the existence of a conspiracy and the defendant's knowledge

14   and intent, it is anything but unfair prejudice.

15        I will say this.  It is far less prejudicial to the

16   defendant that the jury does not know that he was on probation

17   and under supervision during the period when his prescription

18   pattern involved a lesser percentage of oxycodone prescription

19   and in varying amounts.  The defendant really shouldn't look a

20   gift horse in the mouth.  It asked me to preclude the

21   government from making that argument about the watchful eye of

22   the government, and I did so.

23        In any event, the defense had ample opportunity in

24   closing to comment on the weakness of the government's argument

25   due to the jury's lack of knowledge of any of the details about

 1   Dr. Mirilishvili's practice of medicine during those years

 2   other than his prescribing patterns.

 3          The mistrial motion, because of the introduction of

 4   the defendant's tax returns and the government's comments on

 5   his variance in income is denied for substantially the reasons

 6   that I have put on the record on the multiple, multiple times

 7   that we have dealt with this.

 8          That's out of the picture.  The only issue -- and all

 9   of the misconduct issues are going to be denied.  All of the

10   government misconduct motions are going to be denied.  Absurd.

11          I left here yesterday with one thing on my mind.  I

12   was concerned that Mr. Diskant had gone beyond the evidence in

13   his rebuttal summation.  I'll confess, I was concerned for the

14   wrong reason.  There were so many things going on.  I had

15   confused in my head Government Exhibits 1102 and 1103 and DM1

16   and DM2.  Believe it or not, I really did that.  I really did

17   that.  And for a moment I forgot.  Half an hour after you left,

18   I was disabused of this notion, that more than one tape had

19   actually been introduced into evidence.  To the extent that I

20   barked at Mr. Diskant yesterday because of what I was thinking,

21   it was unwarranted because I was making a mistake.  All right.

22   Fine.

23          I will say that the argument which was made yesterday,

24   which was that the comment on Government Exhibit 210, I think

25   it is, the patient records, the fact that it was blank somehow

G3CMMIR1

Case 1:14-cr-00810-CM   Document 270   Filed 04/04/16   Page 7 of 93

1    went beyond the evidence is patently erroneous and patently

2    unfair.  And I came in here this morning prepared to deny the

3    motion and we were going to go into the summation.

4            I now have a completely different mistrial motion.  I

5    have a completely different mistrial motion that's been made on

6    the ground of going beyond the evidence in summation.  I really

7    have to think some thicky things through, so excuse me for a

8    moment.

9            (Recess)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     (In open court; jury not present)

2         THE COURT:  The only mistrial motion that was

3   initially troubling to me -- which was the mistrial trial

4   motion based on allegedly improper argument concerning the

5   doctor's treatment of Jose Lantigua -- as I have explained, I

6   was originally troubled because of my mistaken recollection of

7   the record.  So, let's deal with DM-1 and DM-2.  I am now

8   actually quite clear about what DM-1 and DM-2 said, because I

9   have just read them five times.

10        A little background:  Prior to the trial I was advised

11  that the defendant might want to introduce tapes of additional

12  conversations into evidence marked as DM-1 and DM-2, which the

13  government did not wish to introduce into evidence.  The

14  government opposed that because the tapes were hearsay as to

15  the doctor since they contained his own out-of-court

16  statements, and it argued -- correctly, in my view -- that they

17  were not admissible under the rule of completeness simply

18  because they dealt with Jose Lantigua.

19        I did not rule on that motion on the merits prior to

20  trial; I said it was premature.  I said let's see how the trial

21  unfolds and whether the defense wants to introduce the tapes.

22        On Monday of this week I got to my office to find

23  letters from both sides on my desk, and in one of those letters

24  Mr. Mazurek renewed his motion to admit DM-1 and DM-2, and at

25  the beginning of the day on Monday I denied that motion --

1  that's at page 1084 of the transcript -- for substantially the

2  reasons articulated in the government's letter of opposition.

3       And since it came up yesterday in my own thinking, it

4  was not principally because DM-1 and DM-2 were duplicative of

5  the earlier tapes -- although in the main they are -- but

6  simply that because they were hearsay being offered by the

7  defendant to bolster his argument already amply supported by

8  other evidence, including the contents of the first three

9  tapes, that the defendant could not prove beyond a reasonable

10  doubt that he was not acting as a physician in his dealings

11  with Mr. Lantigua.  And, as I have noted before, they were not

12  admissible under the rule of completeness.

13       The new defense argument appears or appeared to me

14  last night to be more or less a variant on the rule of

15  completeness motion.

16       The defense argues that the government was asking the

17  jury to draw conclusions about Dr. Mirilishvili's dealings with

18  Mr. Lantigua based on just part of the interaction between the

19  two of them.  That's true as far as it goes, but there is no

20  rule which I am aware that the government has to introduce

21  everything about the interactions between the defendant and the

22  confidential informant before it can ask the jury to draw an

23  inference about the nature of their relationship.  There is no

24  rule of completeness that requires the government to tell what

25  the defendant thinks is the whole story.

 1          The rule of completeness only permits the opposing

 2    party -- in this case the defendant -- to introduce additional

 3    portions of an out-of-court statement so that portions

 4    introduced by the government will not be misleading due to the

 5    fact of their incompleteness.

 6          Assuming arguendo that this rule could be extended to

 7    entirely different conversations -- a proposition I reject --

 8    but assuming I were wrong, there is nothing about DM-1 and DM-2

 9    that clears up anything that would be otherwise misleading

10    about Government's Exhibits 1101, 1102 and 1103.

11          Turning to the argument that was made in open court

12    yesterday, to the extent that Mr. Diskant argued from the blank

13    patient record GX 10 that the doctor was not acting as a

14    physician, that record is in evidence, and it shows what it

15    shows, which is that the doctor did not bother to fill out a

16    pain record for this particular "patient" Mr. Lantigua, even

17    though he continued to prescribe oxycodone for him.

18          That argument -- which the government made in its main

19    closing without objection -- does not make the hearsay tapes

20    admissible.  No matter how many visits they had, Dr.

21    Mirilishvili never filled out a patient record for

22    Mr. Lantigua.  The government did not speak inaccurately or go

23    beyond the evidence in so asserting.

24          So, based on the record that was before me when I left

25    here last night, I was prepared to simply adhere to my original

1    ruling.  This morning, however, I was handed a bunch of new

2    letters, including a very long letter from the defendant, and

3    that letter contained a new and far more elaborate argument as

4    to the admissibility of DM-1 and DM-2.

5        Basically the argument is that Mr. Diskant said in

6    rebuttal that the defendant would ask his patients about

7    referrals and physical therapy and surgery, and none of those

8    things "ever happened".

9        The defense argument is that DM-1 and DM-2 indicate

10   that it was a misstatement of fact, because on at least one of

11   those tapes Mr. Mirilishvili was told that these things did in

12   fact happen; statements were made to him to the effect that the

13   confidential source went to an orthopedist.

14       The government responds that all it ever said was that

15   none of this ever happened "on those tapes," so it was fair

16   comment and all within the bounds of the evidence.  The

17   government happens to be technically correct about that.

18       But I nonetheless have looked at DM-1 and DM-2 in

19   considerable detail.  I have read them over multiple times to

20   see if there is anything on them that is arguably inconsistent

21   with anything that Mr. Diskant said.

22       There is nothing on DM-1 that is arguably inconsistent

23   with anything that was said.  DM-1 contains the same litany of

24   questions that Dr. Mirilishvili asked Mr. Lantigua on the tapes

25   that are in evidence.  It contains some indication that he

1    conducted the sort of examination of Mr. Lantigua that you can

2    tell about from the tapes that are already in evidence.  It

3    contains information about a prescription, a pharmacy and a

4    request that the urine sample be left next to the garbage; and

5    all of that you can find on the other tapes.  Lantigua's

6    responses to the doctor's questions on DM-1 are perfectly

7    consistent with the responses that were given on Government's

8    Exhibits 1101, 1102 and 1103.

9        The only thing that is arguably different -- and of

10   course that's what the defendant highlights in their letter

11   motion -- is that Dr. Mirilishvili gives a little speech

12   admonishing Mr. Lantigua to follow through on referrals --

13   which is why I'm sure that's what the defense wants the jury to

14   hear -- but there is nothing inconsistent between anything that

15   the doctor said on DM-1 and the government's rebuttal argument.

16       So, to that extent the motion for a mistrial lacks

17   merit, and the introduction of that tape would only bolster a

18   defense argument that can be made based on the evidence that's

19   already in the record and fully admissible, and so I see no

20   reason to alter my original ruling with respect to DM-1.

21       DM-2, however, contains a statement that is arguably

22   inconsistent with the government's argument, because during

23   that visit -- unlike all the other visits -- Mr. Lantigua tells

24   the doctor, yeah, yeah, he used a referral, and the doctor told

25   him he should have back surgery next year.  As a technical

1    matter this is not more of the same, although I do note that at

2    the end of this particular interaction Dr. Mirilishvili says we

3    will decide if you do the surgery, and he will send off for a

4    second opinion, which I'm sure the government will argue is the

5    same putting off.

6            But to the extent that the government said in rebuttal

7    in the most general of terms that none of those things about

8    the referrals ever happened, DM-2 has words on it that were

9    said to the doctor that might fairly imply otherwise.  And to

10   that extent, it could be said that the government's arguments

11   went beyond the evidence and were unfair because they were

12   inconsistent with something that was known to the government.

13           It's a very tiny point.  Of course the tape is only

14   admissible for the fact that the words about the orthopedic

15   surgery were said.  The statement's made by Mr. Lantigua, and

16   it's not admissible for the truth of what he was asserting, and

17   we all happen to know as a confidential source he didn't go to

18   any orthopedist.  We all know that.

19           But unfortunately I do think that the defense has

20   raised a fair enough point so that I will reopen the record to

21   permit the following portion of DM-2 to be played:  Page 2 of

22   the transcript, line 18 to page 3 of the transcript at line 19.

23           I considered admitting page 4, lines 4 and 5, but the

24   answer is unintelligible, and it can't be admitted if you don't

25   know what was said to the doctor, so I'm not admitting that.

1    I will also allow page 4, line 21 to page 5, line 3 to

2    be admitted.  The rest of the tape is not admitted for the same

3    reason that DM-1 is not admitted:  It does not even arguably

4    contradict anything that the government said in its rebuttal

5    summation.

6    I will give each side -- first the defense and then

7    the government -- exactly five minutes to comment on anything

8    it wishes to comment on in light of my introduction of that

9    portion of the tape.

10    There is no need to introduce any of Dr.

11    Mirilishvili's statement about prescribing drugs, because his

12    prescription records are already in evidence, so his hearsay

13    statements would only be bolstering.  Given this ruling, I see

14    no need for the government to attempt to reopen the record, but

15    I do want to address one other thing.

16    The defense again mentions in its argument that the

17    tapes are admissible as a whole because they are offered to

18    prove the truth of the defendant's state of mind.  But I spoke

19    about the state of mind exception at the beginning of the trial

20    when I did not rule.  I said at the time that no individual

21    statement of the defendant in the tapes appear to reflect state

22    of mind in the same way as was the case in DiMaria and Harris.

23    The defendant's position was and is that the entire

24    tape was admissible to show the defendant's state of mind

25    during his dealings with Lantigua.  He was not seeking to

1    introduce just selected statements by the doctor but the entire

2    interchange.

3        I respectfully disagree that the entire tape is

4    admissible to show state of mind.  The government has to prove

5    that the defendant was acting outside the normal scope of

6    medical practice, and the defense wants the jury to conclude

7    that the government has not proved that by offering evidence to

8    show that he was in fact acting like a doctor.

9        Whether the defendant was acting as a doctor in his

10   dealing was Lantigua is not his state of mind; it is a fact;

11   and it is indeed the ultimate fact at issue in the case.  It is

12   the thing the government must disprove beyond a reasonable

13   doubt.  That is why the defense wants the jury to hear those

14   tapes, not because his client is expressing a motion or a

15   belief on them -- which would indicate state of mind -- but

16   because it argues his client is acting like a doctor, from

17   which the defense argues -- as it has already argued, based on

18   the tapes the government did introduce, and on other evidence

19   as well -- that the defendant was prescribing drugs for

20   legitimate medical purposes and well within the scope of the

21   usual medical practice.

22       The Second Circuit has made it very clear that the

23   state of mind exception cannot be allowed to swallow up the

24   usual rule which prohibits the introduction by the defendant of

25   his own out-of-court statements in order to prove the truth of

1   the matter asserted.  That is effectively what the defense

2   seeks to do here.

3          The defense seeks to introduce the statements to rebut

4   the government's argument that it has proved beyond a

5   reasonable doubt that he was acting like a doctor.  All right?

6   The truth of the matter asserted in the tapes is that he was

7   acting as a doctor.  That is the truth of the matter asserted

8   by the tape as a whole, as opposed to by any individual

9   statement.  No individual statements are offered.  The tape as

10  a whole is being offered.

11         And I note that even if one could stretch the state of

12  mind rule in the manner proposed by the defendant, the

13  exclusion of these two tapes -- unlike the exclusion of the

14  defendant's statements in DiMaria and Harris -- does not

15  effectively preclude the defendant from making the argument he

16  want to make.  Indeed, he has already made it and most

17  forcefully.  He can make -- and has already made -- the

18  argument by relying on the tapes of his interactions of

19  Lantigua that are already in evidence, and on his

20  cross-examination of Correa, who was present during those

21  visits, and also on other evidence in connection with other

22  persons who presented themselves at his office.  By offering

23  these additional tapes, the defendant simply seeks to bolster

24  the argument he has already made with more of the same.

25         (Continued on next page)

 1          THE COURT:  And that was my ruling on Monday.  Were I

 2    to reverse course and admit the tapes in their entirety I would

 3    also have to permit the government to decide whether it wanted

 4    to reopen this case because I ruled them out on Monday.  So

 5    when the government was deciding about its rebuttal case, it

 6    assumed that the tapes were not going to be in evidence.  I

 7    don't really think that we need to go there because I think the

 8    right thing to do is to play very tiny portions of the one

 9    tape, DM5, and then reopen the argument for a brief period of

10    time and then charge the jury.

11          MS. CUCINELLA:  Your Honor, may we address one issue.

12          THE COURT:  You will.  Then they will.  You have one

13    minute.  30 seconds.  90 seconds.

14          MS. CUCINELLA:  Certainly.  The defense is obviously

15    looking to introduce the second tape with that statement on it.

16    The fact that Mr. Lantigua is seen two more times and is asked

17    about the same referrals and gives again evasive answers we

18    think is directly responsive to that and is relevant to the

19    fact --

20          THE COURT:  You know what, I take it back.  Why I have

21    wasted all this time.  We are going to put in all four tapes.

22    I assume if their tapes go in, your tapes go in because you

23    would have wanted to do it on rebuttal.

24          MS. CUCINELLA:  Exactly right.

25          THE COURT:  I'm done with this.  We are going to

 1    listen to all four tapes.  You still only have five minutes.

 2            Jim, we are going to listen to all four tapes because

 3    the government just really wants that to happen, all four tapes

 4    in their entirety.

 5            MR. DISKANT:  Your Honor, it's going to take us some

 6    time to get the transcripts.

 7            THE COURT:  It better take not very much time.  It's

 8    11:30.  Can we bring the jury in.

 9            THE DEPUTY CLERK:  Tell them within five minutes.

10            THE COURT:  I'd like them to come in and I am going to

11    explain to them what's going to happen.

12            MS. CUCINELLA:  We will go back to the original

13    ruling.  We don't have transcripts for the other two ready to

14    go.

15            THE COURT:  They can listen.  I'm not going back to

16    the other ruling.  Sorry.  Not me.  Bring the jurors in,

17    please.  Would you bring the jurors in.  You guys are two

18    minutes away from a Xerox machine.

19            (Jury present)

20            THE COURT:  Don't get too comfy.  What happened is, we

21    are going to have to reopen the record, basically, so you can

22    listen to four more tape recordings and listen to five minutes

23    of argument from each side about the implications of those tape

24    recordings.  That's what all this whoop dee do has been about.

25    Then you are going to have lunch because I am not going to

1    charge you until you have a full stomach.  Early lunch ready to

2    go.

3         You are not going to believe this, but they are moving

4    my office as we speak.  My furniture is being paraded through

5    the building.  It's been quite a morning.

6         What we are doing is, we are making photocopies of the

7    transcripts of the last two of those four tapes, maybe of all

8    of them.  I am not sure.  Of all four of them.  Give us like 10

9    minutes to get the Xerox machine cracked up so we can get you

10   transcripts.  I just wanted you to know what's happening.

11        Don't discuss the case.  Keep an open mind.

12        THE DEPUTY CLERK:  They want to know if they can go

13   out of the jury room.

14        THE COURT:  I would like to get this moving, folks.

15        (Recess)

16        THE COURT:  Good morning.  We are going to listen to

17   four tapes.  The first is labeled DM1.  I believe you have a

18   transcript.  It is the tape recording of a visit by the

19   confidential source to Dr. Mirilishvili's office on what date?

20        MR. MAZUREK:  On October 18, 2013.

21        THE COURT:  Please play.

22        (Audio recording played)

23        THE COURT:  The next tape you are going to hear is

24   another visit.  This is DM2 and that visit took place on

25   November 20, 2013.

1        (Audio recording played)

2        THE COURT:  The next tape is going to be Government

3   Exhibit 1104, and the date of this tape is, I believe, January

4   16, 2014.

5        (Audio recording played)

6        THE COURT:  Mr. Mazurek.

7        MR. DISKANT:  One more, your Honor.

8        THE COURT:  I forgot about the last one.  Sorry.

9        MR. DISKANT:  1105.

10        THE COURT:  It's February 25.

11        MR. DISKANT:  Yes, your Honor.

12        (Audio recording played)

13        THE COURT:  Mr. Mazurek.

14        MR. MAZUREK:  Thank you, Judge.  Good afternoon,

15   members of the jury.  I didn't expect to see you again, but

16   here I am.  Yesterday Mr. Diskant said in his rebuttal

17   summation that the questions that the defendant asked about

18   referrals and about physical therapy and about surgery, you

19   saw, if you looked at the recordings, none of those things ever

20   happened.  It's just part of the game.  When Mr. Diskant said

21   that, he wasn't being truthful with you.

22        You heard now the other recordings between the

23   confidential source and Dr. Mirilishvili, and one of the things

24   I am going to point your attention to, in the November

25   transcript of one of those visits, this is what the doctor

1   said:  This is for your benefit.  Why do you think I'm giving

2   you these referrals?  I just want to waste my time and your

3   time?  I want to know.  I want to know if they can remove the

4   cause of your pain and I want to know if you're rebuilding your

5   muscle ligaments.

6           Ladies and gentlemen, this is the words of a doctor

7   performing in the usual course of medical practice and

8   exercising medical judgment.  Just as I cross-examined Dr.

9   Gharibo, the government's expert, he said, would you want to

10  know, what can you do with respect to referrals.  You can coax.

11  You can try to urge your patients to go to the doctor and get

12  the referral and the other help that you can get.

13          And the subsequent visit you heard now in December --

14  I'm sorry.  I think in November in DM02.  Jose Lantigua tells

15  Dr. Mirilishvili that he has surgery scheduled with the

16  orthopedic for the next year.  And Dr. Mirilishvili says, ok.

17  Let's get the report.  When you are ready to get the surgery

18  you are going to have the second opinion.  These are the things

19  a doctor does.  The government didn't want to you hear those

20  recordings because they show that Dr. Mirilishvili was --

21          THE COURT:  The objection is sustained.  You will

22  disregard that comment, ladies and gentlemen.  You will

23  disregard that comment and you will not repeat it.

24          MR. MAZUREK:  Yes, your Honor.

25          These recordings show, ladies and gentlemen, that the

1    doctor was acting as a doctor and not as a drug dealer.  Each

2    of these visits, ladies and gentlemen, you will know are

3    actually recorded in GX510 in the handwritten notes of

4    Dr. Mirilishvili.  The surgery, the notes that surgery was

5    scheduled for the next year is in GM510 at page 26 on the

6    handwritten notations.  Dr. Mirilishvili was acting as a

7    doctor.  Each time at the beginning of each of these visits he

8    explains -- and I'm sure Mr. Diskant is going to come up and

9    say that what he was doing was saying, oh, the last visit you

10   said you had lower back, lower extremity pains.  Each time he

11   was explaining what the original complaint of the patient was.

12   And he also each time was asking how is your pain after being

13   on the medication.

14          The confidential source was instructed by the DEA how

15   to answer each of these questions.  He was saying the pain is

16   zero.  As Dr. Gharibo said on cross-examination, if the patient

17   is doing well in continued treatment, you keep that patient on

18   that medication and that's exactly what Dr. Mirilishvili did.

19   The fact that the surgery never happens is not surprising

20   because this is not a real patient.  There was someone brought

21   in by the DEA.  But the fact that Dr. Mirilishvili continued

22   the patient on the medication through the February visit is

23   actually in accordance with real medical judgment and real

24   medical practice.

25          THE COURT:  You have 30 seconds.

1    MR. MAZUREK:  Ladies and gentlemen, the follow-up

2    interviews, the follow-up responses of Dr. Mirilishvili saying

3    that why do you waste my time and your time.  He cared about

4    the patients.  He wanted to know from this patient that he was

5    doing the thing that could remove the cause of his pain.  Why

6    waste my time and your time.  I want to know that you can

7    eliminate your pain.  That is what acting like a doctor is.

8    This evidence is absolutely consistent with the fact that the

9    doctor was acting as a doctor and you must return a verdict of

10   not guilty.  Thank you.

11        THE COURT:  Mr. Diskant.

12        MR. DISKANT:  Thank you, your Honor.  What the

13   government has told you all along is that this was a script,

14   that the questions and answers don't matter.  And the

15   additional recordings you've heard this morning just confirm

16   that.

17        Yes, in one of those visits the CS, Jose, says that

18   he's having surgery.  Look at what happens in the next visit.

19   Jose comes back and they go through this again.  Look at the

20   fourth page of the January recording.  It's like we are

21   starting all over again.  Have you done anything with the

22   referral?  He says:  When is the appointment for?  Two months,

23   two months from now.  There is no mention of the surgery.  They

24   are back to him still waiting to see the doctor.

25        Let's go to the February one, the last one.  Keep in

1    mind at this point he has been seeing the defendant for eight

2    months, month after month after month.  Look at page 4 of this

3    one.  We do it all over again.  Did he use my referrals?  Did

4    see an orthopedic doctor, the defendant asks?  The CS asks:

5    I'm waiting to get back from vacation from work.  It's just the

6    same questions over and over again.  Why?  Because the answers

7    don't matter.

8            You heard him switch pharmacies, by the way.  He

9    didn't switch to any pharmacy.  He switched to another one of

10   the ones the defendant used.  Take a look at Government Exhibit

11   106.  Where does he send him?  The next one down the list,

12   Broadway Downtown Pharmacy, another one of the places the

13   defendant used.

14           By the way, in the 15 minutes worth of recordings you

15   listened to, the defendant made $800 in cash, and he wrote for

16   the day a prescription for 90 30-milligram tablets in each and

17   every one.  $800 in cash, 360 oxycodone tablets, 15 minutes of

18   the same questions and answers over and over again.  That's

19   what this case is about.  Thank you.

20           THE COURT:  I want it to be clear that I was asked to

21   and I reviewed and I reversed an evidentiary ruling yesterday,

22   last night, and this morning.  That's the reason that you heard

23   the additional tapes today.  You are not to speculate about why

24   I did it.  It's on me and that's the end of it.

25           I am actually going to start the charge, do the

1  beginning of the charge, because I have a 1:00 meeting that I

2  have to do today, as I was reminded by my courtroom deputy,

3  Maria.  She said you can't miss it.

4         THE COURT:  Here we go.  Let's get started.  By the

5  way folks, you are going to have copies of the charge back in

6  the jury room.  You don't have to take notes.  Sit back and

7  relax and listen.

8         Ladies and gentlemen, now that you have heard all of

9  the evidence that's to be received at the trial and arguments

10 of the lawyers, it is my duty to give you final instructions

11 about the law that's applicable to the case and that will guide

12 you in your decisions.

13        Remember that all of the instructions I give you, the

14 ones I gave you at beginning of the trial, during the trial,

15 and these final instructions, will have to guide and govern

16 your deliberations.

17        It is your duty as jurors to follow the law as stated

18 in all of the instructions of the Court and to apply these

19 rules of law to the facts as you find them from the evidence

20 that was received during the trial.

21        Counsel referred to some of the applicable rules of

22 law in their closing arguments to you.  It's not surprising

23 because we spent a lot of time talking about them before we

24 finished the charge.  However, if what counsel says about the

25 law differs from what I say about the law, you are to follow

1    the instructions given to you by the Court.

2            And the perfect example of that is that poor

3    Ms. Cucinella was out of the room when we made a change in

4    something that I was going to say.  She was working off an old

5    draft of the charge and she said something that I changed as a

6    result of the conversations we had in here.  So we corrected

7    her right away, but just remember, what I tell you about the

8    law is what controls.

9            You are not to focus on any single instruction but you

10    have to consider my charge as a whole in reaching your

11    decisions.

12            You must not be concerned with the wisdom of any rule

13    of law that I give you.  Regardless of any opinion you may have

14    about what the law ought to be, it would be a violation of your

15    sworn duty to base any part of your verdict on any view of the

16    law or any opinion of the law other than the one I am going to

17    give you in these instructions, just as it would be a violation

18    of your sworn duty as judges of the facts to base your verdict

19    on anything but the evidence that's been received in the case.

20            (Continued on next page)

21

22

23

24

25

1    THE COURT:  Now, as I told you at the beginning of the

2    trial, a criminal indictment is not evidence.  It merely

3    describes the charges that are made against the defendant.  An

4    indictment is a formal method of bringing a case into court for

5    trial and determination by a jury.  You may draw no inference

6    of any kind from the fact that the defendant was indicted.

7    Under our law, a person who has been accused of a crime is

8    presumed to be innocent.  Therefore, you may not consider the

9    fact that the defendant was accused of crimes as evidence of

10   his guilt.

11        The fact that the prosecution is brought in the name

12   of the United States of America entitles the government to no

13   greater consideration than you would give to any other party in

14   a litigation.  By the same token, the government is entitled to

15   no less consideration.  In your deliberations, you are to

16   perform your duty without bias or prejudice either to the

17   government or to the defendant.  Remember that all parties,

18   government and individuals, stand as equals before this court

19   of justice.

20        In this criminal case, I remind you one last time, the

21   burden is at all times upon the government to prove every

22   element of the crime charged.  That burden never shifts to the

23   defendant.  This means the defendant has no obligation to prove

24   anything, and so had no obligation to call or cross-examine any

25   witnesses, or to offer any evidence.  You and I, as the judges

1    of the facts and the law, respectively, are presuming the

2    defendant to be innocent, so he has nothing to prove.  The

3    government must convince you that the presumption is wrong

4    before you can find otherwise.  And the government can only

5    convince you that the presumption is wrong if it proves beyond

6    a reasonable doubt all of the elements of the crimes that are

7    charged in the indictment -- nothing more and nothing less.

8              So the question that naturally arises is what is a

9    "reasonable doubt"?  It is a doubt -- based on reason and

10   common sense -- that would cause a reasonable person to

11   hesitate to act in a matter of importance in his or her own

12   personal life.  Proof beyond a reasonable doubt is proof of

13   such convincing character that a reasonable person would not

14   hesitate to rely and act upon it in the most important of his

15   or her own affairs.

16             A doubt is only reasonable if it's based on the

17   evidence, or on a lack of evidence.  A doubt is not reasonable

18   if it's based on a caprice, or a whim or on speculation or on

19   sympathy.  And a doubt is not something that you dream up as an

20   excuse to avoid the performance of an unpleasant duty.

21             You will find the facts from one thing and one thing

22   only.  You will find them from the evidence in the case.

23             Now, the evidence in this case consists of the sworn

24   testimony of the witnesses; all of the exhibits that have been

25   received in evidence, regardless of who produced them; and all

1    facts that have been agreed to or stipulated, and you are to

2    regard those as proved.

3            Remember, nothing I say to you is evidence.  Nothing

4    any of the lawyers has said to you is evidence.  Questions by

5    themselves are not evidence.  Objections that the lawyers make

6    are not evidence.  You have to disregard any evidence to which

7    an objection was sustained by the court, and you have to

8    disregard any evidence that I ordered stricken.

9            Now, you need to understand that I am neutral in this

10   matter, because I don't get to decide the issues of fact.  That

11   is your job, and I leave it to you.  I tell my jurors all the

12   time my verdict is your verdict.  You will tell me what my

13   verdict is in this case.  My function has been to get the trial

14   concluded as fairly and promptly as possible, and to explain

15   the law to you.  The decision in the case is yours, so don't

16   get it into your head that I have a certain attitude or view

17   about the case.  I do not.

18           In making your findings based on the evidence that's

19   been received, you are permitted to draw reasonable inferences

20   from the facts that you find have been proved from the

21   evidence, from the testimony and the exhibits.  Inferences are

22   simply deductions or conclusions that reason and common sense

23   lead you to draw from all the evidence received in the case.

24           You should consider the evidence at a trial in the

25   same way that any reasonable and careful person would treat any

1    important question that involved facts, opinions, and evidence.

2    You are expected to use your good sense in considering and

3    evaluating the evidence in the case only for those purposes for

4    which it has been received and to give the evidence a

5    reasonable and fair construction in light of your common

6    knowledge of the natural tendencies and inclinations of human

7    beings.

8              Now, there are two types of evidence you may properly

9    consider in deciding whether the defendant is guilty or not

10   guilty.

11             One type of evidence is called direct evidence.

12   Direct evidence is evidence given by a witness who testifies to

13   what she saw, or heard, or observed, of her own knowledge --

14   not because somebody else told her -- acquired by virtue of her

15   own senses.

16             I was standing on the street corner on that day, and

17   suddenly a red Volkswagen Beetle careens around the corner,

18   went off the road, jumped the curb and smashed into a light

19   pole.  The witness is telling you what she saw.  That's direct

20   evidence.

21             Circumstantial evidence is evidence that tends to

22   prove a disputed fact by proof of other facts.  There is a

23   simple example of circumstantial evidence that is often used in

24   courts.  Assume that when you came into the courthouse this

25   morning the sun was shining and it was a nice day, but you

1    couldn't see outside and you couldn't hear anything outside

2    because this room was hermetically sealed off from the world,

3    and as you sat there, somebody walked in with an umbrella that

4    was dripping wet, and somebody else walked in with a raincoat

5    that was dripping wet.  Now, you could not look outside the

6    courtroom to see whether or not it was raining, so you would

7    have no direct evidence of that fact, but on the combination of

8    facts I asked you to assume, it would be reasonable and logical

9    for you to conclude that it has started to rain.  That is all

10   there is to circumstantial evidence.  You infer from

11   established facts -- a fact that's established by direct

12   evidence -- the existence or the nonexistence of some other

13   fact, on the basis of your reason, experience and common sense.

14        Now, remember that circumstantial evidence is of no

15   less value than direct evidence, and as a general rule that the

16   law draws no distinction between direct and circumstantial

17   evidence.  Both are admissible.  But the law requires that

18   before you convict the defendant, you must be satisfied of his

19   guilt beyond a reasonable doubt from all the evidence in the

20   case.

21        Audio recordings and photographs were admitted into

22   evidence in this case.  I instruct you that the recordings and

23   the photographs were made in a lawful manner.  No one's rights

24   were violated.  So, the government's use of this evidence is

25   entirely lawful.  Therefore, you should consider this evidence

 1    when deciding whether the government has proved the defendant's

 2    guilt beyond a reasonable doubt -- even if you disapprove of

 3    the way the evidence was collected.  Consider it the way you

 4    would any other evidence.  Of course what weight you give to

 5    the recordings and photographs, if any weight at all, is

 6    completely up to you.

 7            Now, in connection with the recordings, you have been

 8    provided with the transcripts of the conversations and those

 9    were given to you to assist you while listening to the

10    recording.  I instructed you then, and I remind you now, that

11    the transcripts are not evidence.  The transcripts were

12    provided only as an aid to you in listening to the tapes.  It

13    is for you to decide whether the transcripts correctly present

14    the conversations that were recorded as you heard them.

15            Now this is only true when the language you hear on

16    the tapes is English.  When the language is Spanish, it is the

17    translation into English, as it appears in the transcript, that

18    is the evidence.  If you happen to speak Spanish, you may not

19    substitute your own translation for the one that appears in the

20    transcript.

21            Now, you as the jurors are the sole judges of the

22    credibility, the believability of the witnesses, and of the

23    weight that their testimony deserves.  You may be guided by the

24    appearance and conduct of a witness, or by the manner in which

25    the witness testified, or by the character of the testimony

1    that's given, or by evidence you find to be credible that is

2    contrary to the testimony given.

3         You should carefully scrutinize all the testimony you

4    have heard, the circumstances under which each witness

5    testified, and every matter in evidence that tends to show

6    whether a witness is worthy of belief.  Consider each witness's

7    intelligence, his motive, state of mind, his demeanor while on

8    the stand, his manner.  Consider the witness's ability to

9    observe the matters as to which he or she has testified, and

10   whether the witness impresses you as having an accurate

11   recollection of these matters.  Consider any relation each

12   witness may bear to either side of the case; the manner in

13   which each witness might be affected by the verdict; and the

14   extent to which, if at all, each witness's testimony is either

15   supported or contradicted by other evidence in the case.

16        Now, ladies and gentlemen, inconsistencies or

17   discrepancies within the testimony of a witness may cause you

18   to discredit that person's testimony.  So may inconsistencies

19   between different witnesses.  But inconsistencies do not

20   necessarily indicate that someone is lying.  Two or more

21   persons who witness an incident or a transaction may see or

22   hear it differently; and innocent misrecollection, like failure

23   of recollection, is not an uncommon experience.  So, in

24   weighing the effect of a discrepancy, please consider whether

25   it pertains to a matter of importance or to an unimportant

 1    detail, and whether you believe it results from innocent error

 2    or intentional falsehood.

 3              After making your own judgment, you should give the

 4    testimony of each witness such weight, if any, as you may think

 5    it deserves.

 6              You heard evidence during the trial that a witness at

 7    some earlier time said something that was at least arguably

 8    inconsistent with his or her trial testimony.

 9              Statements made by witnesses in the past are not

10    evidence in the case.  So why do lawyers ask witnesses if they

11    made specific statements at some point in the past?  They do it

12    because, if a witness told a different story in the past, that

13    might help you decide whether to believe his or her trial

14    testimony.

15              It is for you in the first instance to decide whether

16    the witness' prior statement actually conflicts with his trial

17    testimony.  As I told you earlier in the trial when this matter

18    first came up, sometimes lawyers see conflicts where jurors do

19    not.  That's one of those many matters of fact that is for you

20    to decide.

21              But if you decide that there is in fact a conflict

22    between what a witness said in the past and what he told you at

23    trial, you may consider the fact of the inconsistency as you

24    decide whether you believe the testimony the witness gave

25    during the trial.  You may not consider the contents of the

allegedly inconsistent statement for the truth of what they
assert, or substitute the prior inconsistent statement for the
trial testimony even if what the witness said in the past seems
more credible to you.  The prior statement can never be
considered for its truth.  Its only relevance lies in assessing
whether you believe what the witness said here at trial.

         Let me give you a silly example to illustrate the
point.  Let's assume that the government had to prove beyond a
reasonable doubt that the color of a car that was involved in a
car crash -- let's assume the government had to prove that.
Suppose a witness testified here at trial that the car was
blue, and suppose that on cross-examination opposing counsel
confronts the witness with a statement he made on an earlier
occasion in which he said the same car was gray.  Now, you may,
if you wish, consider the fact that there is an inconsistency
between those two statements -- the fact that the witness said
different things at different times -- as bearing on his
credibility.  You may not, however, decide that the car was
gray, because the prior statement is not admitted to prove the
truth of the matter asserted.  The only evidence before you
about the color of the car is that it is blue.  That is what
the witness said here in court.  Either you believe him or you
don't.

         In making your credibility determination, you may
consider whether the witness purposely made a false statement

or whether it was an innocent mistake, whether the

inconsistency concerns an important fact, or had to do with a

small detail; whether the witness had an explanation for the

inconsistency, and whether that explanation appealed to your

common sense.

It is your duty, based on all the evidence and your

own good judgment, to determine whether the prior statement was

in fact inconsistent and, if so, how much, if any, weight to

give to the fact of the inconsistency as you decide whether to

believe all or part of the witness' trial testimony.

You have heard testimony from people who worked for

law enforcement.  The fact that a witness is employed by a

government agency as a law enforcement official does not mean

that his or her testimony is necessarily deserving of either

more or less consideration, or that it carries greater or

lesser weight than that of any other witness.

You heard testimony from what we call expert witnesses

or, as I call them, opinion givers.  Dr. Gharibo was called to

testify by the government and Dr. Warfield by the defense.

I remind you that experts are witnesses who by

education or experience have acquired learning in a science or

a specialized area of knowledge.  Such witnesses are permitted

give their opinions as to relevant matters in which they are

qualified experts, and give their reasons for their opinions.

Expert testimony is presented to you on the theory that someone

1    who is experienced in a specialized field can help you to

2    understand the evidence and can help you reach an independent

3    decision on the facts.  But an expert is not permitted to tell

4    the jury what conclusion to reach or to substitute his or her

5    judgment for your judgment.  Therefore, expert witnesses are

6    not allowed to express legal conclusions or state opinions or

7    inferences as to whether the defendant did or did not have the

8    mental state or condition constituting an element of the crime

9    charged or a defense thereto.  If you perceive that an expert

10   tried to do that, you must disregard that testimony.

11        Because you are the ultimate judges of the facts, your

12   role in judging the credibility and weight of testimony applies

13   to experts just like every other witness.  You should consider

14   the expert opinions that were received into evidence and give

15   them as much or as little weight as you think they deserve.  If

16   you decide the opinion of an expert was not based on sufficient

17   education, experience, or data, or if you conclude that the

18   trustworthiness or credibility of an expert is questionable for

19   any reason, or if the opinion of the expert was outweighed, in

20   your judgment, by other evidence in the case, then you might

21   disregard the opinion of the expert entirely or in part.

22        On the other hand, if you find that the opinion of the

23   expert is based on sufficient data, education and experience,

24   and the other evidence you have seen and heard does not give

25   you reason to doubt the expert's conclusions, you would be

1    justified in placing reliance on the expert's testimony.

2         You heard from witnesses who testified they committed

3    crimes.  One of those witnesses was used by the government as

4    an informant during the investigation of the case.  Both of

5    those witnesses testified that they have entered into

6    "cooperation agreements" with the government.

7         Now, the government frequently must rely on the

8    testimony of witnesses who admit participating in crimes, and

9    who agree to cooperate with the government in the hope of

10   receiving leniency at sentencing.  The government must take its

11   witnesses as it finds them and frequently must use such

12   testimony in criminal prosecution, because otherwise it would

13   be difficult or impossible to detect or prosecute wrongdoers.

14        Informants are used by the government to obtain leads

15   and to gain introduction to people suspected of violating the

16   law.  Because this law enforcement technique is entirely

17   lawful, your personal views on its use -- whether you approve

18   or disapprove -- is beside the point and must not affect your

19   evaluation of the evidence in the case.

20        Now, you may properly consider the testimony of an

21   informant or a cooperating witness.  Indeed, it is the law in

22   federal court that the testimony of a single cooperating

23   witness may be enough in itself for a conviction, as long as

24   you the jury believe that the testimony establishes guilt

25   beyond a reasonable doubt.

1       But it is also the case that cooperating witness

2  testimony is of such a nature that it must be scrutinized with

3  great care and viewed with particular caution as you decide how

4  much of it you believe.  The fact that a witness is cooperating

5  with the government can be considered by you as bearing upon

6  his or her credibility.  It does not follow, however, that a

7  person who has admitted participating in crimes is incapable of

8  giving truthful testimony.

9       As with the testimony of any other witness, a

10  cooperating witness and informant testimony should be given

11  such weight as you think it deserves in light of the facts and

12  circumstances before you, taking into account the witness's

13  demeanor and candor, the strength and accuracy of his

14  recollection, his background, and the extent to which his

15  testimony is or is not corroborated by other evidence in the

16  case.

17       You heard testimony about the agreement between the

18  government and the cooperating witnesses.  Ladies and

19  gentlemen, it's no concern of yours why the government made an

20  agreement with these people.  However, the existence of the

21  agreement, and any effect you think it had on the witness's

22  truthfulness, may be considered by you in determining

23  credibility.  You may consider whether a cooperating witness

24  who has an agreement with the government has an interest in the

25  outcome of the case, and if so, whether that interest affected

1   his or her testimony.  Your concern is with whether a witness

2   has given truthful testimony here in this courtroom.

3         In evaluating the testimony of a cooperating witness,

4   you should ask yourselves would that person benefit more by

5   lying or by telling the truth.  Was the witness's testimony

6   made up in some way because the witness believed or hoped that

7   he would somehow receive more favorable treatment by testifying

8   falsely?  Or did the witness believe that his or her interests

9   would be best served by testifying truthfully?  If you believe

10  that a witness was motivated by hopes of personal gain, was the

11  motivation one that would cause the witness to lie, or was it

12  one that would cause him to tell the truth?  Did this

13  motivation color the witness's testimony?

14        If you find that the testimony of the cooperating

15  witness was false, you should reject it.  If, however, after a

16  cautious and careful examination of the cooperating witness's

17  testimony, and his demeanor upon the witness stand, if you are

18  satisfied that the witness has told the truth, you should

19  accept it as credible and act upon it accordingly.

20        If you find that any witness -- any witness --

21  including a cooperating witness -- has testified falsely as to

22  any material fact, the law permits you to disregard the entire

23  testimony of that witness.  If I can put it a little

24  differently, if someone lies to you about a fact that you deem

25  to be important, then you can if you wish throw out that

1    witness's entire testimony, on the ground that somebody who

2    lied to you about one important thing really can't be trusted

3    in anything.  But the issue of credibility need not be decided

4    in an all-or-nothing fashion.  You may decide to accept as much

5    of the witness' testimony as you deem to be true and disregard

6    just the parts that you feel are false.  How you treat such a

7    witness is entirely up to you.

8            You heard reference in the arguments -- no.  Excuse

9    me, I'm going to take the first sentence out of this.

10           I want to caution you, ladies and gentlemen, there is

11   no legal requirement that the government prove its case through

12   any particular means.  While you are to carefully consider the

13   evidence that's been adduced by the government, you are not to

14   speculate as to why the government used the techniques it used

15   or why it didn't use other techniques.  The government is not

16   on trial, and law enforcement techniques are not your concern.

17           Your concern is to determine whether or not, on the

18   evidence or the lack of evidence, the guilt of the defendant

19   has been proved beyond a reasonable doubt.

20           You may not draw any inference, favorable or

21   unfavorable, toward the government or toward the defendant from

22   the fact that any person other than the defendant is not on

23   trial here.  You may not speculate about the reasons why other

24   people are not on trial.  Those matters are wholly outside your

25   concern; they have no bearing on your function as jurors.

1          Dr. Mirilishvili did not testify in this case.  Under

2     our Constitution, a defendant has no obligation to testify or

3     to present any evidence, because it is the government's burden

4     to prove the defendant guilty beyond a reasonable doubt.  That

5     burden remained with the government throughout the entire trial

6     and has never shifted to the defendant.  A defendant is never

7     required to prove that he is innocent.

8          You may not attach any significance whatever to the

9     fact that the defendant did not testify.  No adverse inference

10    against him may be drawn by you because he did not take the

11    witness stand.  In fact, you may not consider this against the

12    defendant in any way in your deliberations in the jury room.

13         In reaching your decision about whether the government

14    has sustained its burden of proof, I remind you that it would

15    be improper for you to consider any personal feelings that you

16    have about the defendant's race, religion, national origin, sex

17    or age.

18         It would be equally improper for you to allow any

19    feeling you might have about the nature of the crimes charged

20    to interfere with your decision-making process.

21         Any sort of bias, prejudice or sympathy for or against

22    either side, has no relevance to the matter before you and may

23    not be considered by you in reaching a verdict.

24         Finally, the question of possible punishment is no

25    concern of yours, and it should not enter into or influence

 1   your deliberations.  You haven't heard anything about

 2   punishment and that's for a reason.  The duty of imposing

 3   sentence rests exclusively with me, the court.  Your function

 4   is to weigh the evidence in the case and to determine whether

 5   the defendant has been proved guilty beyond a reasonable doubt,

 6   solely on the basis of that evidence.

 7            Conveniently, it is five minutes until one.  I say

 8   conveniently because I have finished the first part of the

 9   charge, and I'm about to turn to a summary of the charges

10   against the doctor.  It's a perfect time to break for lunch.  I

11   will be back on this bench at 2:15, and you will be ready to

12   go.  Don't discuss the case; keep an open mind.

13            (Jury not present)

14            THE COURT:  Have some lunch.  I should put one other

15   thing on the record, and then I want it see you guys for one

16   second back in the back.

17            As I said briefly, the motion for prosecutorial

18   misconduct is denied.  The government has comported itself in

19   full consistency with the highest and best traditions of its

20   office throughout this trial, and there was in my view

21   absolutely no deliberate effort made by Mr. Diskant to go

22   beyond the evidence in this case.

23            The government had a perfectly logical rationale for

24   what he said, that as I pointed out was technically correct.

25   The government at no point did anything any worse than

1  Mr. Mazurek did when he put up that chart that I said Dr.

2  Warfield couldn't testify about during the course of his

3  summation.

4       I think everyone has done a brilliant job trying this

5  case.  I think that the closing arguments, all three of them,

6  were simply phenomenally good.  The best thing that can happen

7  for me during one of these trials is I can go away from it

8  thinking that I've had a good and challenging professional

9  experience.  That doesn't happen all the time; it has

10  definitely happened in this case.  And I want to put that on

11  the record.  You guys just meet me at side bar for a second.

12       (Continued on next page)

13       (Page 1452 sealed)

1                          AFTERNOON SESSION

2                               2:15 p.m.

3            (Jury not present)

4            MS. CUCINELLA:  Your Honor, we have one issue.

5            THE COURT:  Have a seat.

6            MS. CUCINELLA:  It's not an actual issue.  We realized

7   we had not allocuted the defendant on his decision not to

8   testify, and we -- both parties -- would like to put it on the

9   record, if the court is so willing.

10           THE COURT:  I am fine about doing that.

11           Dr. Mirilishvili?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Good afternoon, sir.

14           THE DEFENDANT:  Good afternoon to you.

15           THE COURT:  You have heard me say repeatedly over the

16   past few weeks that the government has the entire burden of

17   proof in this case, that you have no burden to prove that you

18   are innocent.  And I have told the jury that you have no

19   obligation to testify in this case and that they can't draw any

20   negative conclusions about you if you don't.

21           By the same token, you have an absolute right if you

22   in your best judgment believe you should testify, to get on the

23   witness stand and to tell your side of the story and to subject

24   yourself to cross-examination from the government.

25           There are only two decisions that are not really

1    remitted to Mr. Mazurek and the defense team, and one of them

2    is the decision about whether or not you will testify.  So, it

3    was my understanding from Mr. Mazurek that you did not in fact

4    wish to testify, and I want to confirm that that is indeed your

5    decision.  Is that your decision?

6              THE DEFENDANT:  A hundred percent, your Honor.

7              THE COURT:  Made voluntarily and of your own free

8    will, sir?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  And you understand that I will stop

11   everything and let you get on the stand if you want to do so?

12             THE DEFENDANT:  I understood, ma'am.

13             THE COURT:  Thank you, Dr. Mirilishvili.

14             THE DEFENDANT:  You're quite welcome.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  OK.  I hope you had a good lunch.  Let's

3  get back to it.  Have a seat.

4    Now, there are three counts, or charges, that you must

5  consider, and you must consider each count separately, and you

6  must return a separate verdict of guilty or not guilty for each

7  count.

8    Count One alleges that Dr. Mirilishvili conspired with

9  others to distribute a controlled substance in violation of the

10  law.  The controlled substance is oxycodone.

11    Counts Two and Three charge Dr. Mirilishvili with

12  illegal distributing a controlled substance (oxycodone) to

13  certain individuals on certain dates.  Count Two relates to

14  January 10, 2013 and Count Three relates to October 28, 2014.

15    Now, I'm going to charge you on the substantive law

16  that relates to distribution of a controlled substance first,

17  because you need to understand that law before you can consider

18  whether the defendant "conspired" or agreed with others, to

19  violate that law.  So I'm go to charge you on Counts Two and

20  Three and then on Count One, in that order.

21    The first element that the government must prove

22  beyond a reasonable doubt in order to convict the defendant on

23  Counts Two and Three is that the defendant, Moshe Mirilishvili,

24  actually distributed controlled substances:

25    To "distribute a controlled substance" means to

transfer a controlled substance to another person.  A licensed

medical doctor who provides another person with a prescription

for a controlled substance to be filled at a pharmacy has

"distributed" the controlled substance within the meaning of

the law.

          Oxycodone is a controlled substance.

          The second element the government must prove beyond a

reasonable doubt is that, when Dr. Mirilishvili prescribed the

oxycodone, he did so knowingly and intentionally.

          An act is done "knowingly" and "intentionally" if it's

done deliberately and purposefully; that is, the defendant's

actions must have been his conscious objective rather than the

product of a mistake or accident or mere negligence or some

other innocent reason.

          Now, ascertaining whether a person acted knowingly and

intentionally involves discerning that person's state of mind.

Science has not yet invented a way for us to look inside

someone's head to see what he is thinking and intending and

knowing.  Direct proof of knowledge and intent is rarely

available.  But direct proof is not required.  Knowledge and

intent, while subjective, may be established by circumstantial

evidence, based on a person's outward manifestations, words,

conduct, and acts, that taken in light of all of the

surrounding circumstances that are disclosed by the evidence,

together with the rational or logical inferences that may be

1    drawn therefrom.  You should use your common sense when drawing

2    inferences from the circumstantial evidence.

3           The one thing I will not do during this charge is

4    regurgitate to you the arguments that have been made by

5    counsel.  You have heard them; they were quite clear; you may

6    consider them.

7           The law also allows you to find that the defendant had

8    knowledge of a fact when the defendant shows that he was aware

9    of a high probability of the fact but intentionally avoided

10   confirming the fact.

11          Can I see counsel over here for a second.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the side bar)
 2                THE COURT:  This always happens, but when we are
 3      talking about knowledge, he actually wrote a prescription for
 4      oxycodone knowingly, there is no contention here he didn't know
 5      that he wasn't writing ago I prescription for -- that he
 6      thought he was writing a prescription for something else, is
 7      there?
 8                Aren't we talking about actual knowledge in connection
 9      with this element, the second element?
10                MR. DISKANT:  I don't believe so, your Honor.  I
11      believe that you are instructing them on conscious avoidance
12      with respect to Counts Two and Counts Three.
13                THE COURT:  Correct.
14                MR. DISKANT:  And I think the charge --
15                THE COURT:  No, no.  When he prescribed the oxycodone
16      he did so knowingly and intentionally.  He prescribed oxycodone
17      knowing he was writing a prescription for oxycodone.  That was
18      his intention to write a prescription for oxycodone, right?
19                MR. DISKANT:  Right.
20                THE COURT:  Is there any conscious avoidance about
21      that at all?
22                MR. DISKANT:  No.
23                THE COURT:  No, right, this is in the wrong place.
24                MR. MAZUREK:  We have no objection.
25                THE COURT:  OK.
```

1    (In open court)

2    THE COURT:  Ladies and gentlemen, I made an editing

3  mistake; I put something on page 24 and it belongs on a later

4  page.  So, let me go back and say:

5    An act is done "knowingly" and "intentionally" if it

6  is done deliberately and purposefully; that is, the defendant's

7  actions must have been his conscious objective rather than the

8  product of a mistake or accident or mere negligence or some

9  other innocent reason.

10    All right.  Now I'm going to go to the third element.

11    The third element that the government must prove

12  beyond a reasonable doubt in connection with Counts Two and

13  Three, is that when Dr. Mirilishvili prescribed the oxycodone

14  as charged in Counts Two and Three, he did so other than for a

15  legitimate medical purpose, other than, other than in good

16  faith, and outside the usual course of medical practice.

17    It is not enough for you to find that the doctor

18  knowingly and intentionally wrote the prescriptions that are

19  the subject of these two counts.  Under the law, a doctor who

20  is licensed to prescribed controlled substances cannot be

21  convicted of illegal distribution of controlled substances if

22  he issued the prescriptions in good faith and in the regular

23  course of a legitimate professional practice.  The government

24  must prove beyond a reasonable doubt that the doctor acted

25  outside the usual course of medical practice, that he acted

other than in good faith, and without a legitimate medical

purpose when he wrote the prescriptions that are the subject of

the indictment.  And, as I said, and it must proffer that he

did so knowingly and intentionally.  This is a knowing and

intentional.  He must have known and intended that it should be

other than for a legitimate medical purpose, other than in good

faith and outside the usual course of medical practice.

In deciding whether Dr. Mirilishvili acted without a

legitimate medical purpose, you should examine the doctor's

actions and all the evidence about the circumstances

surrounding them.

You must remember this is not a medical malpractice

case.  It is not enough for the government to prove any degree

of negligence, malpractice, carelessness or sloppiness on Dr.

Mirilishvili's part.  You cannot convict the defendant if all

the government proves is that he is an inferior doctor, or that

he was running a medical office that was not a "center of

excellence," to use a term that you heard during the testimony.

What the government must prove beyond a reasonable doubt is

that, when the doctor wrote the prescriptions that are the

subject of the indictment, he was effectively not acting as a

doctor -- he was not writing those prescriptions for a

legitimate medical purpose but was instead writing them outside

the usual course of professional practice.  In order to meet

its burden of proof as to this element, the government must

1  prove beyond a reasonable doubt that the doctor effectively

2  ceased to act in good faith as a medical professional, but

3  instead knowingly and intentionally acted outside of the usual

4  course of professional practice, and not for a legitimate

5  medical purpose.

6         I already told you that the government must prove

7  beyond a reasonable doubt that Dr. Mirilishvili prescribed

8  oxycodone knowingly and intentionally, and I explained to you

9  what those terms mean.  The same definition of knowingly and

10  intentionally applies in connection with the third element.

11  That is, the government must prove beyond a reasonable doubt

12  that the doctor knew that he was acting outside the usual

13  course of medical practice, and not for a legitimate medical

14  purpose, and that it was his purpose and objective, his

15  intention, to act in this manner.  If all the government proves

16  is that the doctor was negligent, or made a mistake, or

17  accidentally acted outside of the usual course of medical

18  practice, you cannot find him guilty of violating the

19  Controlled Substances Act.

20         Now, the government can prove knowledge in two

21  different ways.  It can prove that Dr. Mirilishvili had actual

22  knowledge that he was acting outside the usual course of

23  medical practice and not for a legitimate purpose, or -- and

24  this is with respect to the third element -- or it can prove

25  that he consciously disregarded knowing a fact of which he was

1   aware there was a high probability.  This is where I put the

2   thing in the wrong place.

3       As an alternative to actual knowledge the law allows

4   you to find that the defendant had knowledge of a fact when the

5   evidence shows that he was aware of a high probability of that

6   fact but intentionally avoided confirming the fact.  The law

7   calls this "conscious avoidance" or "willful blindness."

8       In determining whether the government has proven

9   beyond a reasonable doubt that the defendant knowingly acted

10   outside the usual course of professional practice and not for a

11   legitimate medical purpose, you may consider whether he

12   deliberately closed his eyes to what would otherwise have been

13   obvious to him.  A person cannot willfully and intentionally

14   remain ignorant of a fact that's important to his conduct in

15   order to escape the consequences of the criminal law.

16       Accordingly, if you find beyond a reasonable doubt

17   that the defendant acted with the conscious purpose to avoid

18   learning some relevant fact, then you may treat the defendant

19   as though he actually knew the fact existed.  However, guilty

20   knowledge may not be established by demonstrating that the

21   defendant was merely negligent, foolish, or mistaken, and you

22   may not rely on willful blindness as the basis for treating the

23   defendant as though he was aware of the existence of a fact if

24   you find that the defendant actually believed that the fact did

25   not exist.

1  It is entirely up to you to decide whether the

2  defendant deliberately closed his eyes to a fact that he should

3  have known existed and to draw any inferences that are to be

4  drawn from the evidence on this issue.

5  Now, I have one more very important thing to explain

6  to you.  As part of its proof of this element, the government

7  must prove beyond a reasonable doubt that Dr. Mirilishvili did

8  not act in good faith when he prescribed the oxycodone to the

9  people who came to see him.

10  A doctor acts in good faith when he exercises his

11  professional judgment about a patient's medical needs in

12  accordance with the standard of medical practice as generally

13  recognized and accepted in the United States.  It means that

14  the doctor acted in accord with what he reasonably believed

15  should be proper medical practice.

16  If you find that Dr. Mirilishvili acted in good faith

17  in distributing the drugs that are the subject of either or

18  both of Counts Two and Three, then you must find him not guilty

19  on that count.

20  If, however, the government proves beyond a reasonable

21  doubt that the defendant did not act in good faith, as I have

22  defined that term for you, and for a legitimate medical purpose

23  when distributing the drugs that are the subject of either or

24  both of Counts Two and Three, but instead distributed them

25  outside the usual course of medical practice, then you may

1    conclude that the government has satisfied its burden with

2    respect to the third element.

3            Now, I want to say one thing.  Your verdict on Count

4    Two does not dictate your verdict on Count Three, and vice

5    versa.  When I say you have to consider these counts separately

6    and independently, I mean it.  Consider the evidence that

7    relates to Count Two, which talks about a particular date, and

8    you reach a verdict on that, and then you start all over again

9    clean slate, and you consider the evidence that relates to

10   Count Three which charges a different particular date.

11           In order to convict the defendant under either count,

12   or both of them, all 12 jurors have to agree beyond a

13   reasonable doubt precisely which prescription or prescriptions

14   the defendant wrote for other than a legitimate medical purpose

15   and outside the usual scope of a professional medical practice.

16           For example, let's say, when considering Count Three,

17   six of you thought that Dr. Mirilishvili did not have a good

18   faith medical reason for writing an oxycodone prescription for

19   Mary Smith but he did have a good faith medical reason for

20   writing an oxycodone prescription for Robert Jones -- I picked

21   names that aren't in the case -- and the other six of you

22   thought that the defendant had a good faith medical reason for

23   writing an oxycodone prescription for Mary Smith but did not

24   have a good faith medical reason for writing a prescription for

25   Robert Jones.  In that circumstance, you would not be unanimous

1    for the purpose of returning a verdict -- even though all 12 of

2    you thought that the doctor had written at least one

3    prescription that was not for a legitimate medical reason and

4    outside the scope of his practice.  You have to agree on what

5    prescription it was, who it was for.

6         OK.  I now turn back to Count One, which charges the

7    defendant with a drug conspiracy.

8         A conspiracy is an agreement between two or more

9    people to accomplish some unlawful purpose.  Conspiracy is an

10   entirely separate crime from the underlying substantive

11   offense.

12        The ultimate success of a conspiracy, and the actual

13   commission of the crimes that are the objects of the

14   conspiracy, are not relevant to the question of whether a

15   conspiracy existed.  You may find a defendant guilty of the

16   crime of conspiracy even if you find that the substantive crime

17   that was the object of the conspiracy was never actually

18   committed.

19        The first element the government must prove beyond a

20   reasonable doubt in order to prevail on Count One is that the

21   conspiracy charged in the indictment existed.  The charged

22   conspiracy is a conspiracy to distribute oxycodone.  That's the

23   object of the conspiracy, the distribution of oxycodone.

24        In order to show that such a conspiracy existed, the

25   evidence must show that two or more people, in some way or in

1    some manner, either explicitly or implicitly, came to an

2    understanding to violate the law and to accomplish an unlawful

3    plan -- in this case, a plan to distribute oxycodone.

4         Now, to prove the existence of a conspiracy, the

5    government is not required to show that two or more people sat

6    around a table and entered into a solemn pact, orally or in

7    writing, stating that they formed a conspiracy, an agreement to

8    violate the law and spelling out all the details.  It is rare

9    that a conspiracy can be proven by direct evidence of an

10   explicit agreement.  Common sense tells you that when people

11   agree to enter into a criminal conspiracy, much may be left to

12   unexpressed understanding.

13        So, in determining whether the unlawful agreement

14   alleged in Count One existed, you may consider the actions of

15   all the alleged coconspirators that were taken to carry out the

16   apparent criminal purpose.  The old adage, "actions speak

17   louder than words," applies here.  Often, the only evidence

18   that is available with respect to the existence of a conspiracy

19   is that of disconnected acts on the part of the alleged

20   individual coconspirators.  But when taken together and

21   considered as a whole, that conduct may warrant the inference

22   that a conspiracy existed just as conclusively as more direct

23   proof, such as evidence of an express agreement.

24        So, in considering whether a conspiracy existed, and

25   not just a conspiracy, but the charged conspiracy, you should

1  consider all the evidence that has been admitted about the

2  conduct and statements of each alleged coconspirator, as well

3  as inferences that may reasonably be drawn from that conduct

4  and from those statements.  It is sufficient to establish the

5  existence of the conspiracy, if, from the proof of all the

6  relevant facts and circumstances, you find beyond a reasonable

7  doubt that the minds of at least two alleged coconspirators met

8  in an understanding way, to accomplish the objective of the

9  conspiracy that's charged in Count One.

10       The object of a conspiracy is the illegal goal that

11  the coconspirators agreed or hoped to achieve.  The object of

12  the charged conspiracy here was the distribution of oxycodone.

13       I have already described for you the term

14  "distribution" during my instructions on Counts Two and Three.

15  That instruction applies equally here as it relates to Count

16  One.

17       In deciding whether the government has proved beyond a

18  reasonable doubt that the defendant knew that the object of the

19  conspiracy was the distribution of oxycodone using

20  prescriptions that were written outside the usual course of a

21  medical practice and that were not written for a legitimate

22  medical purpose, you may consider whether the defendant

23  deliberately closed his eyes to what would otherwise have been

24  obvious.  In other words, this is another instance where the

25  government can prove either that the defendant actually knew

1  the objective of the conspiracy or he consciously avoided

2  knowledge of the object of the conspiracy.

3      If the government proves beyond a reasonable doubt

4  that the defendant was aware that there was a high probability

5  that other people were referring patients to him who were not

6  really in need of his services, and were then taking

7  prescriptions written by him for these patients and selling the

8  oxycodone prescribed thereby on the street, and the defendant

9  continued to write prescriptions while deliberately and

10  consciously avoiding confirming that act, you may treat his

11  deliberate avoidance of positive knowledge as the equivalent of

12  actual knowledge.  However, if the defendant actually believed

13  that he was writing prescriptions for real people who needed

14  medication, then you cannot find that he was consciously

15  avoiding knowledge of the object of the conspiracy.

16      Similarly, if all the government proves is that the

17  defendant was negligent, careless or foolish, it has not proven

18  conscious avoidance.

19      Please note that the concept of conscious avoidance

20  cannot be used as a basis for finding that the defendant

21  knowingly joined the conspiracy.  It is logically impossible

22  for someone to join a conspiracy through conscious avoidance.

23      If, however, you find beyond a reasonable doubt that

24  the charged conspiracy existed, and that the defendant became a

25  member of the conspiracy, then the government can prove that

the defendant acted with knowledge of the illegal objectives of

the conspiracy either by proving that the defendant actually

knew what the purpose of the conspiracy was; or by proving that

the defendant deliberately closed his eyes to what otherwise

should have been obvious to him.

If you conclude that the government has proven beyond

a reasonable doubt that the conspiracy charged in Count One

existed, you must determine whether it has proved that the

defendant participated in the conspiracy with knowledge of its

unlawful purposes and in furtherance of its objectives.

In this regard, what the government must prove beyond

a reasonable doubt is that the defendant unlawfully,

intentionally, and knowingly entered into the conspiracy; that

he did so with criminal intent -- that is, with a purpose to

violate the law; and that he agreed to take part in the

conspiracy in order to promote and cooperate in one of its

unlawful objectives.

The term "unlawfully" simply means it's contrary to

law.  The government need not prove that the defendant knew he

was breaking any particular law or any particular rule.  The

government must only show that the defendant was generally

aware of the unlawful nature of his acts.

The defendant must have joined a conspiracy with

knowledge that he was doing so.  In this context, I remind you

again conscious avoidance is not a substitute for actual

1  knowledge.  Now, as I mentioned earlier in my instructions, you

2  remember that science has not yet devised a manner of looking

3  into a person's mind and knowing what a person's thinking.  I

4  wish they would have invented that machine, but they haven't

5  done it.  However, you have before you the evidence of certain

6  acts, conversations, and statements that are alleged to involve

7  the defendant and others.  And the lawyers made those

8  arguments, so I'm not going to make them again.

9          The government contends that these acts,

10  conversations, and statements show, beyond a reasonable doubt,

11  that the defendant knew of the unlawful purpose of the

12  conspiracy and that he agreed to enter into it in furtherance

13  of its purposes.

14          It is not necessary for the government to show that

15  the defendant was fully aware of every detail of the conspiracy

16  in order for you to conclude that the government has proved

17  guilty knowledge on his part.  Nor is it necessary for the

18  defendant to know every other member of the conspiracy.  A

19  defendant may know only one other member of a conspiracy and

20  still be a coconspirator with many people.

21          (Continued on next page)

22

23

24

25

1      THE COURT:  The duration and extent of a defendant's

2  participation has no bearing on the issue of the defendant's

3  guilt.  He need not have joined the conspiracy at its outset.

4  He may have joined it at any time in its progress:  At the

5  beginning, in the middle, or at the end.  But from the moment

6  he joins, he becomes responsible for everything that was done

7  before he joined and everything that he's done during the

8  conspiracy's existence as long as he was a member.

9      Each member of the conspiracy may perform separate and

10  distinct acts.  Some conspirators can play major roles, while

11  others play minor roles.  An equal role is not what the law

12  requires.  In fact, even a single act may be sufficient to draw

13  a defendant within the scope of a conspiracy.

14      I want to caution you, the defendant's mere

15  association with a member of a conspiracy does not make him a

16  member of that conspiracy, even if the defendant knew that the

17  other people were involved in a conspiracy.  In other words,

18  knowing about a conspiracy, without agreeing to participate in

19  it, is not sufficient.  By the same token, the defendant's mere

20  presence at the scene of criminal activity does not make him a

21  participant in that activity.  What is necessary is that the

22  defendant participated in the conspiracy with knowledge of its

23  unlawful purposes, and with the intent, the conscious purpose

24  or objective, to aid in the accomplishment of its unlawful

25  objectives.

1    A conspiracy, once formed, is presumed to continue

2    until either its objective is accomplished or there is some

3    affirmative act of termination by the members.  Once a person

4    is found to be a member of a conspiracy, he is presumed to

5    continue his membership in the venture until its termination.

6    Also it is shown by some affirmative proof that he withdrew and

7    disassociated himself from it at some earlier time.

8         Ladies and gentlemen, the indictment charges that the

9    conspiracy, that's the subject of Count One, existed in or

10   about from on or about January 2012 through on or about

11   December of 2014.

12        It is not essential that the government prove that the

13   conspiracy charged in Count One started and ended on the exact

14   date set forth in the indictment.  It is sufficient if you find

15   that in fact a conspiracy was formed and that it existed for

16   some of the time within the period set forth in the indictment.

17        The instruction on good faith that I gave you in

18   connection with Counts Two and Three applies here.  Even if you

19   conclude that the defendant was distributing oxycodone in

20   connection with the Count One conspiracy, the government must

21   prove beyond a reasonable doubt that the defendant was not

22   acting in good faith when he did so.

23        In addition to all the elements that I've just told

24   you for Counts One, Two, and Three -- by the way, Count One

25   gets considered separately from Counts Two and Three.  Your

 1    verdict on one count does not dictate your verdict on another

 2    count.  You really do have to deliberate on each count,

 3    separately and independently.

 4         As to each of the three counts, in addition to the

 5    other elements I have described for you, you have to decide

 6    whether any act in furtherance of the commission of the crime

 7    occurred within the Southern District of New York.  The

 8    Southern District of New York includes Manhattan, the Bronx,

 9    Westchester, Rockland, Putnam, Dutchess, orange, and Sullivan

10    Counties.  This means that with regard to each count you must

11    decide whether the charged crime or any lawful or unlawful act

12    that was committed to further or promote the charged crime

13    occurred within the Southern District of New York.

14         Now, I have made a big deal throughout this trial

15    about the words beyond a reasonable doubt.  Not only have I

16    emphasized that the government has the burden and the entire

17    burden and the eternal burden of overcoming the presumption of

18    innocence, but I have said it can only do that if it convinces

19    you of every element of the charged crime beyond a reasonable

20    doubt, except that as to venue, as to this requirement that

21    something have happened in the Southern District of New York,

22    the government only needs to prove it by a preponderance of the

23    evidence.  The government has satisfied its obligation as to

24    venue if it proves by a standard of essentially it's more

25    likely than not that the crime occurred in the Southern

1   District of New York or that some act in furtherance of the

2   crime occurred in the Southern District of New York.  Now, if

3   the government fails to prove venue as to any count, you have

4   to acquit the defendant on that count.

5          The government offered evidence about the defendant's

6   tax returns.  Let me remind you that the defendant is not on

7   trial for committing any acts that are not in the indictment,

8   so you can't consider evidence regarding the defendant's tax

9   returns as evidence of some crime that's not charged in the

10  indictment.  And the tax returns were admitted for a much more

11  limited purpose and you may consider them for that limited

12  purpose only.  You may but are not required to draw an

13  inference from the evidence regarding the tax returns, that the

14  defendant acted knowingly and intentionally in connection with

15  the crimes he is charged with in the indictment.  That's the

16  purpose for which the tax returns were admitted.  The evidence

17  may not be considered by you for any other purpose.

18  Specifically, you cannot consider any evidence about taxes as

19  proof that the defendant had a criminal personality or he had a

20  bad character.  It is offered for one reason and one reason

21  only.  I have told you what that purpose was.  And you

22  certainly cannot use that evidence to conclude that he must

23  have committed the crimes charged in the indictment.

24          You will note that the indictment alleges that certain

25  acts occurred on or about various dates.  It does not matter if

1  the evidence you heard at trial indicates that a particular act

2  occurred on a different date, as long as there is substantial

3  similarity between the dates alleged in the indictment and the

4  dates established by the evidence.  What is substantially

5  similar?  You tell me what you think it is.  Do you think they

6  are substantially similar.

7          Ladies and gentlemen, the verdict must represent the

8  considered judgment of all 12 deliberating jurors.  In order to

9  return a verdict it is necessary that you all agree with each

10 other.  Your verdict must be unanimous, unanimous on each

11 count.

12         With respect to Counts Two and Three, I told you you

13 had to be unanimous with respect to whatever prescription you

14 think the defendant issued in violation of the law if you reach

15 the conclusion that the government has met its burden with

16 respect to that count.

17         How do you get to unanimity.  It is your duty as

18 jurors to consult with each other and to deliberate, to

19 deliberate with a view toward reaching an agreement as long as

20 you can do that without violating your individual conscience.

21 What does it mean to deliberate?  A deliberating juror does two

22 things.  A deliberating juror is a juror who shares his or her

23 opinions about what the evidence shows with the other people in

24 the room.  A deliberating juror is one who will sit back and

25 listen to what everybody else who is sitting around the table

1    thinks the evidence shows and will weigh and consider those

2    views, will consider them with an open mind, a mind that's

3    capable of being changed.

4         I tell this story at every trial.  I have rarely had

5    serious problems with the jury.  But once many, many, years

6    ago, when I was a very young judge, we had a juror who went

7    back into the jury room and listened to the evidence.  He

8    listened to the charge.  He said he could be fair.  In voir

9    dire he said he would follow the judge's instructions.  He

10   walked back in and he said, this is the verdict.  The people

11   said:  No.  We want to talk about the evidence.  No.  He says:

12   This is the verdict.  My way or the highway.  I'll never change

13   my mind.  I don't care what you people say.  Eventually, after

14   not a very long period of time, he showed his contempt for the

15   whole process by pulling out his Wall Street Journal from his

16   briefcase and turning his chair to the wall -- I heard this

17   later.  I wasn't in the room obviously -- turning his chair to

18   the wall, opening the newspaper and refusing to be a part of

19   the conversation.  Guess what, ladies and gentlemen?  That jury

20   did not return a verdict.  And it did not return a verdict

21   because somebody wasn't willing to deliberate, to share his

22   views and to consider the views of the other people in the

23   room, to test your own views against the views of the other

24   people in the room.  That's what a deliberating juror does.

25        In the end each of you has to decide the case for

1  yourself, but you can only do that after you impartially

2  consider the evidence in the case in light of the views of your

3  fellow jurors.  So during the course of your deliberations

4  don't hesitate to re-examine your own views and change your

5  opinion if the other jurors can convince you that your original

6  view of the evidence is maybe not the right view.  By the same

7  token, do not surrender your honest conviction as to the weight

8  or the effect of the evidence just because the other jurors

9  want you to or merely for the purpose of returning a verdict.

10         Remember, ladies and gentlemen, at all times you are

11  not partisans in this process.  You are judges.  You are the

12  judges of the facts.  When you go back to the jury room the

13  first thing you should do is elect somebody to be your

14  foreperson.  Those of you who have been in state court, they

15  always give that to juror no. 1, but we will let you pick your

16  own foreperson.  Juror no. 1 generally tends to be more

17  grateful for that.  The foreperson is no more important than

18  any of the rest of you, and the foreperson's views are not any

19  more important than the views of the rest of you, and the

20  foreperson's vote counts for exactly as much as the votes of

21  the rest of you.  We need somebody back in the jury room who

22  will preside over your deliberations, organize things back

23  there, speak up for you here in court, perform some little

24  administrative tasks.  It's really an administrative position.

25  And you pick whoever you think you want to occupy that role.

1    If it becomes necessary for you to communicate with me

2    during your deliberations, here how it works.  You send me a

3    note.  The note should be signed by the foreperson.  If the

4    foreperson goes on strike, it's happened to me twice in 18

5    years, if the foreperson goes on strike and refuses to sign the

6    note, for whatever reason, some other juror can sign the note.

7    It needs to be signed.  And ask the question.  I'll answer it

8    and we will talk a little bit about how I'll answer it in a

9    minute.  Never try to communicate with me during these

10   deliberations by any means other than a signed writing.  Don't

11   tell Jim something, ok, so he can give me a message.  Don't do

12   that.  Don't tell the court security officer who will be up

13   here in a little bit.

14   If you see me in the elevator lobby -- I have really

15   tried to hide from you, but if you have seen me in the elevator

16   lobby, don't try to corral me.  By note.  And I will never

17   communicate with any members of the jury on any subject,

18   including subjects touching on the merits of the case, except

19   in writing or orally here in open court with all of the people

20   who are sitting in the well sitting in their accustomed

21   positions.

22   Now, your superintendent here is Jim.  I am going to

23   administer an oath to him, like the oath you took at the

24   beginning.  And you will note from his oath that he is not

25   allowed to talk to you about anything touching on this case

1      while you are deliberating.

2                  (Court deputy sworn)

3                  THE COURT:  Now, when you send me a note, if you send

4      me a note, don't tell me what the vote is.  Do not send a note

5      that says:  We are 7 to 5 for acquittal on Count Two and we

6      would like you to explain the difference between this and that.

7      I'm not supposed to know.  I'm not supposed to know about the

8      vote until the vote is 12 to nothing.  And it can actually

9      screw things up if you tell me too soon.  Don't tell me what

10     the vote is, please, when you write me a note.

11                 Now, most of the time when jurors write notes they

12     want to hear some testimony again.  If it should happen in your

13     deliberations that you want to review the testimony of a

14     witness, that can be done.  You should send out a note that

15     says what you want to hear.  And the more precise you can be,

16     the better.  If you know, for example, that you want to hear

17     the testimony about Mr. Smith about the hour when the clock

18     stopped and you want to hear the cross-examination, tell us

19     that, be as detailed as you can, and we will find what you

20     want.  I urge you not to ask for testimony unless you talk

21     among yourselves and exhaust your total memory because the

22     collective memory of 12 people is generally better than that of

23     any one of you.  If after discussing the matter you are still

24     in doubt about a particular point in the testimony and you want

25     to review it, I will have the court reporter gather that

1    testimony for you.  It will almost always happen that you will

2    want to hear testimony or read testimony because we can now

3    send it back.  We now have the ability, thanks to computers, we

4    now have the ability to actually instead of making you sit here

5    and listen to it, we actually have the ability to give it to

6    you, to hand it to you.

7         You will probably want it just as we are about to go

8    to lunch, when somebody has been called away to do something

9    else.  That's just the way it always works.  And when you ask

10   for testimony, the lawyers go through it with the court

11   reporter, they see if they can agree.  If they can't agree, I

12   have to come out and make rules, and then we have to prepare it

13   for you.  It's not a super time-consuming process, but it's

14   generally not a note we can answer in 10 minutes.  If you ask

15   for testimony, move on to another subject.  Know that it is our

16   highest priority and that we will be getting it together for

17   you as fast as humanly possible.  Then the lawyers and I may

18   decide to have you come out and here read back or we may send

19   you back a portion of the transcript.  I found that the jurors

20   like the latter.

21        You will have all of the exhibits with you admitted

22   into evidence with you in the jury room.  I think you can

23   assume if you don't have it in the jury room, it was not an

24   exhibit that was admitted into evidence.  And you should just

25   know that I can't send back things that aren't admitted into

1    evidence.

2            You will have a copy of the charge back in the jury

3    room and you are free to review it, but I want you to

4    understand, I have nothing better to do until you reach a

5    verdict than to give you whatever help I can.  If you are

6    confused about something in the charge, and I'll grant you that

7    since I found that I put something on the wrong page, you won't

8    have that.  You'll have it corrected.  But since I found I put

9    something on the wrong page, you might have been confused.  I

10   don't know.  You can ask me to clarify it.  And you should ask

11   me to clarify it.  And if you have a specific question that

12   arises about the law in the context of your deliberations, you

13   can ask the question and I'll talk about it with the lawyers

14   and I'll do my best to clarify.  I've been known to do it

15   better the second time around, I really have.  Don't assume

16   that you can't ask me to go over the instructions just because

17   I'm sending them back with you.  You can ask and I will comply.

18           When you retire to begin your deliberations, you are

19   going to be provided with a verdict sheet and the verdict sheet

20   is basically going to say, how do you find the defendant on

21   Count One, and it will tell you what Count One is.  And how do

22   you find the defendant on Count Two, and it will tell you what

23   Count Two is.  How do you find the defendant on Count Three,

24   and it will tell you what Count Three is.  Guilty or not

25   guilty, checkmark.  As you reach a verdict, check off guilty or

1    not guilty and move on to the next count that you have to

2    consider.

3              By the way, you don't have to consider them in the

4    order that they are written on the piece of paper.  You can

5    consider them in any way order you want.  But by the end of the

6    day you should have a checkmark under item 1, under item 2, and

7    under item 3.  It should be either guilty or not guilty.  And

8    when you have that, a verdict sheet that says that, you should

9    send me one more note and the note should say, we have reached

10   a verdict.  That's all it should say, we have reached a

11   verdict.  I'll bring you back into the courtroom, we will take

12   the verdict right here.

13             Now, I need to talk for a moment with the lawyers.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Start with, all of the objections from the

3   defense that were the subject of our discussion over the last

4   few days are preserved for appeal.

5          MR. MAZUREK:  Yes.

6          THE COURT:  From the government first.

7          MR. DISKANT:  I have no objections, your Honor.

8          THE COURT:  From the defendant.

9          MR. MAZUREK:  Judge, page 26.  In my hearing, in the

10  written version I have in the first line after, this is not a

11  medical malpractice case, this is a criminal case, I don't

12  remember hearing you say that.

13         THE COURT:  I thought I said it.

14         MS. CUCINELLA:  I thought you said it several times.

15         THE COURT:  I think I said it.

16         MR. MAZUREK:  I may have missed it.

17         THE COURT:  I can't imagine why you wanted me to say

18  those words.

19         MR. MAZUREK:  Then page 28, this was confusing to me

20  as is read and written here.  The defendant did not act in good

21  faith, as I have defined that term for you, and then it says in

22  my written version, and for a legitimate medical purpose.  I

23  think we need another not.  There is a double negative.

24         THE COURT:  If the government proves that the

25  defendant did not act in good faith.

 1          MR. MAZUREK:  And not act for legitimate medical

 2    purpose.

 3          THE COURT:  You are absolutely right.  And that he did

 4    not act.

 5          MR. MAZUREK:  That's confusing.

 6          THE COURT:  It's a little confusing.

 7          MR. MAZUREK:  Then on page 33, second line.  The

 8    object of the charged conspiracy here.  It says the

 9    distribution of oxycodone.  I think because of the nature of

10    this case it has to be the unlawful distribution of oxycodone,

11    only because he has a license.

12          THE COURT:  I know that.  But I've already said that.

13    I'll do something there.

14          MR. MAZUREK:  I don't know if we mentioned this

15    before, but on page 39, conscious avoidance is repeated a

16    number of times here.  In the charge it might be helpful to the

17    jury to hear about good faith again.

18          THE COURT:  I charged this.  I read this.  I said the

19    instruction on good faith.

20          MR. MAZUREK:  It just refers back --

21          THE COURT:  Please.  No.

22          MR. MAZUREK:  On my version on page 41 has different

23    language.  It may have been changed.

24          THE COURT:  I want the whole thing printed out because

25    you may not consider other statements.  I changed it because it

 1     was totally appropriate.

 2             MR. MAZUREK:  It needs to be changed.

 3             THE COURT:  We will.  We are going to get the

 4     transcript and what I said is going.

 5             MR. GOSNELL:  Your Honor, on page 37, the exhibits to

 6     the jury room, it's my understanding from talking with the

 7     government that the actual recordings are not going back to the

 8     jury room.

 9             THE COURT:  They usually do.

10             MR. DISKANT:  We defer to the Court.

11             MR. GOSNELL:  If they are actually going back then, I

12     think the only thing that we need to also provide then is kind

13     of a key to the jury because there are large portions of the

14     recordings that have nothing to do --

15             THE COURT:  I'll tell you what.  If they want to

16     listen to the recordings, I'll bring them out here.  I'll tell

17     them that.

18             MR. GOSNELL:  That was my only point.

19             (Continued on next page)

20

21

22

23

24

25

 1              (In open court)

 2         THE COURT:  Based on my chat with the lawyers, let me

 3   tell you a couple of other things.  With respect to Counts Two

 4   and Three, I think I left out a not.  You know we talked about

 5   good faith, that one of the things that the government must

 6   prove in connection with Counts Two and Three is that -- this

 7   is the problem.  The government must prove a negative.  The

 8   government must prove that the doctor did not act in good faith

 9   and that he did not act for a legitimate medical purpose and

10   that his actions were outside, therefore not within the usual

11   course of medical practice.  I trip over these things.

12         Only if the government proves beyond a reasonable

13   doubt that the defendant did not act in good faith, as I've

14   defined that term for you, and that he did not act for a

15   legitimate medical purpose when distributing the drugs that are

16   the subject of either or both Counts Two and Three, but instead

17   distributed them outside the usual course of medical practice,

18   only then may you conclude that the government has satisfied

19   its burden with respect to the third element.  Great.  That is

20   the one substantive correction.

21         The parties have asked me to tell you that if you want

22   to listen to any of the tapes, we are going to bring you out

23   into the courtroom to do that instead of sending a tape

24   recorder back with you because the way they are cataloged,

25   there is a whole lot of stuff on those tapes that have nothing

1  to do with this case.  I am not sure why, but I'm not the

2  person who made them.  We will bring you out here if you want

3  to listen to the tapes.

4      A couple of last-second notes.  Please deliberate only

5  when you are all together in the jury room.  If someone is in

6  the restroom, if someone is taking a smoking break, I hope

7  nobody of you is doing that, but if somebody is taking a

8  smoking break, if someone is out of the room for any reason,

9  before everybody gets here in the morning, don't deliberate.

10  The reason is, you just never know when someone is going to say

11  the thing that will cause the penny drop for everybody.  That's

12  the moment.  You all need to be together when deliberating.

13      There is no smoking in my jury room.  If anybody

14  smokes, I will never ask.  If anybody smokes, you will knock on

15  the door and either Jim or the court security officer will

16  arrange for a smoking break.

17      The one thing I beg of you, if you need to get away

18  from each other for a while, we will do that, too, but don't

19  take it upon yourselves to leave the jury room by the other

20  door.  Don't do that.  It only happened once.  It was one of

21  the worst days of my life.  It was like the ants had gotten out

22  of the ant farm, and I had no idea where my jury was.  We were

23  looking all over the courthouse.  It turned out that they just

24  needed a break from each other.  We get that and we will take

25  care of that for you.  We will do that for you.  Just don't do

1    it for yourself.

2           Could I ask the two remaining alternate jurors if

3    you'll go back into the jury room with Jim and get your stuff.

4           JUROR:  Can I ask a question.

5           THE COURT:  A note, please.  I'm sorry.

6           JUROR:  It's ok.  I'm just testing.

7           THE COURT:  Ladies and gentlemen, you are free to

8    retire and to deliberate in this case.  You may discuss the

9    case.  It's time to start making up your mind.

10          (At 3:16 p.m., the jury retired to deliberate)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  The last thing on the rolling basis is

2  going to be the charge.  I am going to get the transcript of

3  the charge so we are absolutely sure that everything goes back

4  depending on what kind of shape it's in, we may photocopy that

5  or we may make changes here.

6    Have you all got a set of exhibits that's a clean set

7  ready to go?

8    MR. DISKANT:  Yes.

9    MS. CUCINELLA:  Yes, your Honor.

10   THE COURT:  Is the verdict sheet here?  I am going to

11  pass this out.  I need that initialed by counsel for both sides

12  or you can object to it.  It's a pretty plain, vanilla verdict

13  sheet.

14   THE DEPUTY CLERK:  The parties agree that these are

15  all the exhibits.  Defense.

16   MS. CUCINELLA:  Yes.

17   MR. GOSNELL:  Yes.

18   MR. MAZUREK:  There are some changes.

19   THE COURT:  The parties have given me the verdict

20  sheet, which is always Court Exhibit 1.  We will correct this.

21  We have some changes here.

22   THE DEPUTY CLERK:  What are we doing with the binders?

23   THE COURT:  They can go back.

24   THE DEPUTY CLERK:  We got all the exhibits in.

25   MR. DISKANT:  Except for the binders.

 1              THE DEPUTY CLERK:  The binders are going to go back as

 2    well.

 3              THE COURT:  Correct.  That's on the record.

 4              THE DEPUTY CLERK:  The government and the defendant

 5    agree that what is in these binders are only those transcripts

 6    that are in evidence.

 7              MR. MAZUREK:  Yes.

 8              THE DEPUTY CLERK:  And they have been checked.

 9              MR. MAZUREK:  Yes.

10              THE COURT:  You swear it because I had this problem

11    once.

12              As soon as I can release the court reporter, which is

13    now.

14              THE COURT:  The alternates:  Hi, you are not going

15    home yet.  Jim is going to take you to a room in case someone

16    gets hit by a bus in the next hour.  There are no buses in this

17    building.  If something dreadful happened in the next few

18    minutes, we would want to have you here.  Don't discuss the

19    case.  Keep an open mind.

20              (Recess pending verdict)

21              THE COURT:  I will tell you what I think can come out.

22    This is the first time I have ever done this because I have

23    never had this many changes done on the fly.  This is a much

24    easier way to do this, not for the court reporter, but not to

25    try to correct our copy.

1    I believe the charge begins on page 1432 and

2   everything I said up until line 12 on page 1450, which is what

3   I said before lunch to the jury, should just go back to the

4   jury.

5        There was then at pages 1450 and 1451, we spoke out of

6   the presence of the jury.  That should not go back to the jury.

7   1452 is under seal and that will not go back to the jury.

8   Pages 1453 and 1454 were basically said before the jury

9   returned to the courtroom after lunch and should not go back to

10  the jury.

11       Then we pick up at page 1455.  I would strike on page

12  1457, line 7 to the end of the page.  What I would do is, I

13  would strike the first nine lines on the top of page 1459.

14  1458 is colloquy.  All it is, I went back and said something

15  all over again.  Rather than send it back to the jury, I would

16  rather say, I am done with that.  Let's just go on to the next

17  element.  I would take on pages 1 through 9 on 1459 and that

18  looks to me like everything that I would take out of what I was

19  handed.

20       That, by the way, includes the correction that I made

21  at the end because of the missing not.  It's at the end where I

22  said it to the jury.

23       MR. GOSNELL:  They are going to get both instructions.

24       THE COURT:  They will get both.  Otherwise, it will

25  make no sense.  I don't see anything wrong with the other one,

1    but I'm happy to do it your way, too.

2              THE DEPUTY CLERK:  The parties agreed?

3              MS. CUCINELLA:  No objection from the government.

4              MR. MAZUREK:  I'm just going through it.

5              THE COURT:  Are we?  Ok.

6              MR. MAZUREK:  I have one small correction, your Honor,

7    on page 1460, line 3.

8              THE COURT:  Did the court reporter make a mistake?

9              MR. MAZUREK:  I am not going to attribute anything to

10   anybody.  It says:  And as I said and --

11             THE COURT:  I said prove.  I didn't say proffer.  That

12   word should be changed to prove.  We are way beyond proffers

13   here.  On 1460.

14             He is going to go ahead and finish that.  I will let

15   the jurors go, first the alternates and then the regular

16   jurors, at 5.

17             I assume we are going to discharge the alternates.

18             MR. MAZUREK:  No objection.

19             MR. DISKANT:  Your Honor, we would prefer that they

20   not be discharged.

21             THE COURT:  Why?  I am never going to see them.

22             MR. DISKANT:  I have personally had an instance which

23   in the middle of deliberations --

24             THE COURT:  I have personally gone with 11 jurors

25   because it is the preference in this circuit not to seat jurors

1    in the middle of deliberations.  The Second Circuit has so

2    stated.  In other circuits they do it differently.  But in the

3    Second Circuit they seem to have this odd preference.  Maybe

4    they don't believe jurors can really restart deliberations.  I

5    don't know what they believe.  You can't deny that that's what

6    they have said.

7         MR. DISKANT:  No, your Honor, as long as the Court is

8    amenable --

9         THE COURT:  I have proceeded in that way in many of

10   most famous and well-known cases, always over the objection of

11   the offense and always being affirmed.  Gives me some

12   confidence in the procedure.

13        (Recess pending verdict)

14        THE DEPUTY CLERK:  There is a note, Court Exhibit 1,

15   Judge.

16        THE COURT:  Before we get to the note, Court Exhibit

17   1, we now have the charge which will actually be Court Exhibit

18   2 and I am going to sign it and I'll ask counsel to sign it

19   with the omissions as noted.  This is Court Exhibit 2.  Counsel

20   could initial that.  We will get that to the jurors.

21        The second thing that we have to deal with, I have a

22   jury note, Court Exhibit 1.  We need the copy of the transcript

23   by Abraham Correa.  Returning to Correa and Ray Williams having

24   worked with Dr. Mirilishvili in the Bronx before moving to

25   Manhattan.

1          I understand that the government has identified two

2     bits of transcript that the government believes are relevant

3     and that is page 322, line 6 through page 330, line 9, and then

4     page 333, line 10 through page 335, line 20.  Has the

5     government identified anything in the cross that would be

6     relevant to that?  This is all in the direct.

7          MR. DISKANT:  I don't believe it came up on cross.

8          MR. MAZUREK:  Judge, the question that the jury has

9     asked I think can simply be answered that there is none because

10    the question is whether the testimony from Mr. Correa referring

11    to Correa and Ray Williams having worked with Dr. Mirilishvili

12    in the Bronx, there is no testimony that Ray Williams and

13    Abraham Correa worked with Dr. Mirilishvili in the Bronx.

14    There is only testimony that Abraham Correa worked with

15    Dr. Mirilishvili in the Manhattan clinic.  I think that the

16    answer is fairly easy.

17         THE COURT:  Hang on a second.  Please explain the

18    Bronx reference to me in page 322.

19         MR. DISKANT:  Certainly, your Honor.

20         THE COURT:  I don't see the word Bronx.

21         MR. DISKANT:  If you keep scrolling through you will

22    get there.

23         THE COURT:  Let's get to the word Bronx and then I'll

24    work around it.  Where is the word Bronx?

25         MR. DISKANT:  It's the time period, your Honor.

1    THE COURT:  I'm not interested in time periods.  I'm

2  interested in the word Bronx.

3    MR. DISKANT:  Page 328, he identifies the location of

4  the events he has been testifying as 145th Street in the Bronx.

5    THE COURT:  When you first saw the defendant in

6  September of 2012, where were the defendant's offices located?

7  He had various offices in the Bronx.  I am going to assume that

8  the government's response is, it all depends on your definition

9  of working.

10    MR. DISKANT:  That's exactly right, your Honor.  I

11  don't think we need to resolve that issue.  It seems very clear

12  that the jury is asking for the testimony that pertained to

13  what Mr. Correa and Mr. Obama were doing with respect to the

14  defendant while the defendant was located in the Bronx and this

15  section is exactly that testimony.

16    MR. MAZUREK:  Your Honor, I object to that.  The

17  question is, having worked with Dr. Mirilishvili and there has

18  been testimony in this trial --

19    THE COURT:  If they are coconspirators, they were

20  working together.

21    MR. MAZUREK:  That's the government's interpretation.

22    THE COURT:  That's the government's interpretation and

23  for all I know it's the jury's.  I think it's a perfectly fair

24  interpretation of the note.

25    MR. MAZUREK:  I think the Court should inquire as to

1    what is meant by -- to me it's very clear.

2            THE COURT:  I am not going to inquire about what is

3    meant.  There is a fair and plausible interpretation of the

4    evidence.

5            MR. MAZUREK:  It's not the question that's asked.

6    There is testimony in the trial that Abraham Correa was

7    employed by the doctor.

8            THE COURT:  They didn't say employed.  They said

9    working with.

10            MR. MAZUREK:  Having worked with.

11            THE COURT:  Worked is not necessarily a synonym for

12    employed.  Coconspirators work together to violate the law.

13            MR. MAZUREK:  But you are assuming --

14            THE COURT:  I'm assuming nothing.

15            MR. MAZUREK:  The plain meaning of worked is to have

16    been a part of the organization and done things --

17            THE COURT:  The organization, according to the

18    government, is a pill mill.  The problem is --

19            MR. MAZUREK:  Not in the Bronx.  The Bronx is a group

20    practice that Dr. Mirilishvili was a part of.  This is before

21    moving to Manhattan.  There is no evidence that Ray Williams

22    and Abraham Correa worked with Dr. Mirilishvili in the Bronx.

23    The only evidence in the transcripts, your Honor, are that

24    Abraham Correa began to be a patient of Dr. Mirilishvili in

25    September of 2012.

 1            THE COURT:  But he didn't testify that he became a

 2   patient.

 3            MR. MAZUREK:  Yes, he did.

 4            THE COURT:  He testified that he got prescriptions

 5   from Dr. Mirilishvili, which he filled at a pharmacy.  He

 6   didn't testify that he took any at all.

 7            MR. MAZUREK:  He went to that location and lied and

 8   presented fake paperwork.

 9            THE COURT:  Excuse me.  There is nothing in this

10   testimony by Mr. Correa that indicates that Mr. Correa was

11   actually a legitimate patient.  He got involved in oxycodone

12   because it was Obama who told him it was a guaranteed way of

13   making money.

14            MR. MAZUREK:  But he also testified that he lied

15   throughout the examination and he gave information regarding an

16   injury that he sustained from falling off a scaffolding stairs.

17   That's also part of his testimony.  And that he gave testimony

18   that he had spent time in Mount Sinai Hospital before coming

19   there as a result of that injury.  And he also gave testimony

20   that he told Dr. Mirilishvili that he was in pain.

21            THE COURT:  Here is what I am going to show the jury

22   in the first thing.  I am going to start at page 322, line 6

23   and I am going to end at page 322, line 17.  If the jury wants

24   more, the jury can ask for more.

25            MR. DISKANT:  Your Honor, so the Court is aware, we

1  identified in response to the Court's question one instance on

2  cross-examination when it came up, so the Court is aware of it.

3          THE COURT:  I should be aware of it because they want

4  everything.

5          MR. DISKANT:  437 at line 5.

6          THE COURT:  I don't have 437.

7          MR. DISKANT:  It's the next day, your Honor.

8          THE DEPUTY CLERK:  We are talking the 9th?

9          MR. DISKANT:  The 8th.

10         MR. MAZUREK:  I have a lot more.  Any contact between

11 the doctor and Abraham Correa in the Bronx, there is a lot more

12 testimony.

13         THE COURT:  We are going to have to do this at 9:00

14 tomorrow morning because I have to leave.  I was here until

15 8:30 last night.  I have to leave.  I said the jury had to go.

16         What you will do is, you will identify for me

17 everything that you think is responsive, each of you.  I will

18 review the transcript when I come in in the morning.  I will

19 come in here and I will rule.  That will be it.  Let's start

20 with the alternates.  The government should tell me what the

21 next thing is it thinks should come in.

22         MR. DISKANT:  Yes, your Honor.  The cross.  437, line

23 5 through 439, line 1.

24         THE COURT:  While we are waiting for the alternates,

25 you can tell me what you think should come in, please.

1          MR. MAZUREK:  Obviously, I don't think any of this

2     should come in.

3          THE COURT:  Excuse me.  Tell me what you think should

4     come in.  If the answer is nothing, then there is nothing.

5     Then I can rule right now.

6          MR. MAZUREK:  I have not gotten through it all yet,

7     your Honor.  I have identified 426, line 14 through 18.  I do

8     need additional time.  I just haven't had a chance to go

9     through it.

10         THE COURT:  You have not had a chance to go through

11    it.  I will expect and it has to be in my office tonight in

12    e-mail form by 7 p.m. all of your proposed designations, an

13    e-mail to Mr. O'Neil by 7 p.m. tonight with all of your

14    proposed designations.  That gives you two hours.  You will

15    never have two hours again to engage in this exercise.

16         THE DEPUTY CLERK:  Alternates, bring them inside.

17         (Jury alternates present)

18         THE COURT:  I think there must be nothing more

19    frustrating than being an alternate juror.  But you saw,

20    because we had a juror who got sick, how important it is to be

21    an alternate juror, and you never know when that's going to

22    happen.

23         I'm going to at this moment let you go for the day.  I

24    am actually not going to do what I told the lawyers I was going

25    to do.  I am not going to discharge you.  The jury has been

1    deliberating for about an hour, an hour and 15 minutes.  And if

2    somebody did get hit by a bus on the way to court tomorrow, I

3    think I would stop everything and I would call you.  There will

4    come a point tomorrow when you will be officially discharged,

5    if nothing happens, once they are down the road in their

6    deliberations a little bit further.

7         It may be that I won't see you ever again, which is

8    very sad, because I have a special place in my heart for this

9    jury.  I loved the voir dire.  I had more fun during the voir

10   dire than I can remember having in a voir dire in the longest

11   time.  It was the nicest group of people.  And you've obviously

12   all bonded.  At the same time, we have been engaged in some

13   very hard work and you've been attentive and you've been prompt

14   and you've been there for me and for the parties and we are all

15   deeply grateful for that.

16        In the event that nobody gets hit by a bus and I don't

17   see you some time tomorrow morning, I will say a tentative

18   good-bye and thank you so very, very much.

19        I'll ask you tonight, don't discuss the case.  Keep an

20   open mind.  And I will also tell you this.  There are no two

21   people on the planet who have more right to know what the

22   verdict is than the two of you, and we will call you and let

23   you know after it's handed down.  We will not leave you

24   hanging.

25        JUROR:  We don't have to come in tomorrow.

1    THE COURT:  Don't bother to come in tomorrow.  Make

2  sure Jim knows where he can reach you.

3    THE DEPUTY CLERK:  Your contact information is good.

4    JURORS:  Yes.

5    THE COURT:  I am going to excuse you.

6    (Jury alternates excused)

7    THE COURT:  Can I get the rest of the jurors, please.

8    THE DEPUTY CLERK:  Yes, Judge.

9    (Jury present)

10    THE COURT:  It's 5 after 5.  We have more work to do

11  on this getting you the transcript thing, and it's late and I

12  am going to let you go for the day.  When you get in in the

13  morning, probably reasonably soon after you are all here, we

14  will have those transcripts back to you.

15    Don't discuss the case tonight.  Keep an open mind.

16  And when you arrive, you just go into the jury room.  When all

17  12 of you are present, knock on the door, Jim or the court

18  security officer will be here, poke your head out, say we are

19  all here, and then begin your deliberations.  We will be

20  working on this.

21    Thank you.  9:30 would be great, folks.

22    (Jury not present)

23    THE COURT:  See you in the morning.

24    (Adjourned to Thursday, March 17, 2016, at 9:00 a.m.)

25