UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
:
UNITED STATES OF AMERICA                    :            (S2) 14 Cr. 810 (CM)
:
– v. –                       :
:
MOSHE MIRILASHVILI,                          :
:
                    Defendant.          :
:
-------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
MOSHE MIRILASHVILI'S  RENEWED MOTION FOR A
JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America


EDWARD B. DISKANT
BROOKE E. CUCINELLA
Assistant United States Attorneys
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                    :
UNITED STATES OF AMERICA                            :            (S2) 14 Cr. 810 (CM)
                                                    :
            – v. –                                  :
                                                    :
MOSHE MIRILASHVILI,                                 :
                                                    :
                        Defendant.                  :
                                                    :
--------------------------------------------------------X


        The Government respectfully submits this memorandum of law in opposition to defendant

Moshe Mirilashvili's renewed motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.

In that motion, the defendant – who does not question that the properly impaneled, highly

attentive jury was correctly instructed on the law – challenges only the sufficiency of the evidence

presented by the Government, principally as to Count Three.  In so doing, the defendant not only

renews claims previously rejected by this Court but relies heavily on arguments presented to –

and necessarily rejected by – the jury in reaching its conclusion.  Because the evidence, especially

when viewed in the light most favorable to the Government, is sufficient to support the jury's

unanimous verdict, the motion should be denied.

    I.      RELEVANT FACTS

            A.  The Government's Case

        The defendant, a board certified medical doctor, was charged in Indictment S2 14 Cr. 810

(CM) with three counts, all stemming from his participation in a conspiracy to unlawfully

distribute oxycodone.   The defendant's role in that conspiracy entailed writing thousands of

medically unnecessary prescriptions for large dosages of oxycodone in return for cash payments –

typically $200 to $300 in cash handed directly to the defendant at the outset of each "patient" visit

– out of his pain management clinic on 162nd Street in Manhattan (the "Clinic").  Count One

charged the defendant with conspiring to distribute oxycodone at the Clinic between in or around

2012 and his arrest in December 2014.  Counts Two and Three charged the defendant with

unlawfully distributing oxycodone on specific dates during the period of the charged conspiracy –

Count Two focused on January 10, 2013, and Count Three focused on October 28, 2014.

      At trial, the Government called 13witnesses.  This included two cooperating witnesses,

Abraham Correa and Damon Leonard, both of whom worked for the defendant at the Clinic and

testified to their own participation in the unlawful conspiracy centered at the Clinic.  Correa, who

worked for the defendant from approximately December 2012 until September 2013, testified that

he had first met the defendant as a "patient" and Crew Chief, obtaining medically unnecessary

oxycodone prescriptions for himself and sending in friends and family members to obtain

additional medically unnecessary prescriptions from the defendant which Correa would then fill

so that the pills could be resold.  (*E.g.*, Tr  322-339, 395-97).  Correa testified to seeing the

defendant as a "patient" on at least four occasions, including on January 10, 2013 – the subject of

Count Two – and to receiving an identical oxycodone prescription on each occasion.  (*Id.* at 339 ).

      With respect to that January 10, 2013 appointment, in particular, Correa, who had had

already begun working for the defendant as a security guard at that point, testified that the

defendant wrote Correa a final oxycodone prescription before telling Correa, in substance, that he

could no longer continue to see the defendant as a "patient" now that he worked at the Clinic.

However, thereafter, Correa did continue to bring other members of his crew into the Clinic until

his own arrest in the spring of 2014.  (*Id.* at 339-40.)

      Damon Leonard similarly testified to first meeting the defendant as a "patient" and worker

for another crew chief, John Coleman.   (*Id.* at 590).  Like Correa, Leonard testified to then being

3

offered a job by the defendant who had gotten to know Leonard as someone who was regularly present in the office.   Leonard began working for the defendant in approximately October, 2013 and remained in the Clinic as an employee until his arrest in December 2014.  (*Id.* at 623-24). Leonard was thus employed in the Clinic during October 2014 and testified to the daily criminal activities occurring in and around the Clinic during that time period, including, among other things, the operation of Leonard's own crew of "patients," all of whom obtained medically unnecessary oxycodone prescriptions that Leonard was able to fill so that the oxycodone tablets could be resold.  (*E.g.*, *id.* at 709-12, 729-34).

With respect to Count Three, in particular, the Government also offered New York State Bureau of Narcotics Enforcement ("BNE") records indicating that on October 28, 2014, the defendant wrote 33 identical prescriptions for 90 30-milligram oxycodone tablets; insurance records indicating that a not a single one of those 33 patients paid with insurance; and the purported "medical files" the defendant maintained for at least some of those 33 patients, including an individual named Larry Ashby, whose MRI report and referral were both patently fake.  (GX 502).  The Government also offered, as evidence of consciousness of guilt, the defendant's statements to law enforcement in October  2014 – just days before the date covered by Count Three – in which the defendant brazenly lied about the most criminal aspects of his practice, telling the agents, for example, that he saw "between ten and 20 patients a day," that he accepted both insurance and cash, and that he saw only three or four cash patients a day.  (Tr. 129-30.)

Finally, the Government offered the testimony of an expert, Dr. Christopher Gharibo, who opined not only on the defendant's practices generally, but also on the legitimacy of specific patients and prescriptions, including prescriptions written on the date covered by Count Three.  In

particular, with respect to Larry Ashby – a "patient" who received an oxycodone prescription

from the defendant on October 28, 2014 – Dr. Gharibo opined that the paperwork presented by

Ashby was highly questionable, noting that it would highly unlikely that a radiologist would

indicate a "medication history" on an MRI report, adding that "[i]t's almost as if somebody

crafted it for justification for oxycodone."  (*Id.* at 923.)  Dr. Gharibo further opined that the

defendant's documentation with respect to Larry Ashby was "grossly inadequate," and on the

whole, his "treatment" of Ashby, who, like virtually all of the defendant's "patients" repeatedly

received prescriptions for 90 30-milligram oxycodone tablets, was "not within standard of

practice. It was not even close."  (*Id.* at 929.)

### B.  The Initial Rule 29 Motion

At the close of the Government's case, the defendant made an initial motion pursuant to

Rule 29, raising, among other arguments, many of the same ones raised in the instant motion.  (*Id.*

at 1113-14.).  After a brief oral argument, the Court denied the motion in its entirety, finding with

respect to Counts Two and Three, in particular, that:

> Count Two, forgetting about anything else [the defendant] did that day, Count
> Two is about the prescription that was written for Abraham Correa, a
> representative patient, in quotes.  Count Three is about a representative day. . . .
> The motion is denied. There is ample evidence to take all three counts to the
> jury.

(*Id.* at 1117.)  The defendant also renewed the motion at the close of the defendant's case, and the

Court denied the motion at that time as well.  (*Id.* at 1286-87.)

### C.  Rebuttal and Summation

In summation and rebuttal, the Government presented its evidence with respect to Count

Three in substantially the manner detailed above.  For example, in summation and with respect to

Count Three, the Government drew the jury's attention to Leonard's testimony about that general time period as well as some of the obviously fake patient files, stating:

> With respect to Count Three you know from Damon Leonard what was going on in the clinic during the fall of 2014. On October 28, 2014 the defendant wrote 33 prescriptions, all of them for 90 pills of 30 milligrams of oxycodone, and all of them in exchange for cash, every single one.
>
> And while we haven't discussed all of them, you will remember Larry Ashby, or you may recall him as Miss Prunty, for whom the defendant accepted a document that was again fraudulent on its face. He purported to make a diagnosis for this patient based on this document, and then he proceeded to write seven oxycodone prescriptions for him, including one on October 28th of 2014. You will recall that there are no notes in Practice Fusion for this patient, despite seven visits to the doctor.
>
> You can also look through the Aegis documents found in the defendant's home at Government Exhibit 360. You can see the fake urinalysis created for a patient named Marco Varella. He too got an oxycodone prescription on October 28, 2014.
>
> You can look at Government's Exhibits 202 and 402 for a patient named Brian Alex Champion. He too got a medically unnecessary prescription on October 28, 2014.

(*Id.* at 1324-25.)  With respect to the substantive counts, in particular, the Government also drew the jury's attention to the subject of conscious avoidance, noting that based on facts such as the cash payments and the obviously fake documents, all obviously relevant to Count Three, the defendant was "guilty under a theory of conscious avoidance, because he should have known what was going on right under his nose."  (*Id.* at 1327.)

In the defense summation, counsel highlighted what he viewed as the lack of evidence with respect to Count Three, raising many of the same arguments advanced in the instant motion, including the fact that the Government had not called any of the "patients" seen by the defendant on October 28:

> [W]hat have you heard about them? You haven't heard that they saw the doctor or what problems they had, or whether the doctor made verified checks on MRI

referrals, or whether he checked their PMP or their urine drug test. You haven't heard anything other than some random documents that may have been talked about as an aside nor in some of the testimony of Dr. Gharibo. But that's not proof beyond a reasonable doubt.

(*Id.* at 1371.)

In rebuttal, the Government responded to that argument by focusing the jury not only on the Ashby file and the BNE data reflecting 33 identical prescriptions, but also some of the other evidence relevant to that day, including the fact that the defendant had "lied through his teeth about the most criminal aspects of his practice" to law enforcement when interviewed in October 2014, just a week or two before the date in question:

He tells Special Agent Muller and the DEA that he sees just 10 to 20 patients a day, that he's collecting just a thousand dollars in cash. He has full participation in hydrotherapy and in physical therapy. This is a week before, early October 2014. And you know that every single one of those statements is false. This is the defendant trying to cover his tracks because you know what happens on October 28, 2014.

Government Exhibit 111. The defendant writes 33 identical prescriptions for oxycodone, not 10 to 20 patients; 33. Each and every one of them pays him in cash. And at this point it is up to $300 a patient. He is not collecting a thousand dollars in cash a day. He's collecting more than $10,000 in cash a day and he is lying about that because he knows that the number of patients he is seeing, the number of prescriptions he is writing and the amount of cash that he is collecting are devastating evidence of his guilt.

(Tr. at 1394.)

The Government also reminded the jury that it would be instructed – at the defendant's request – that the Government's burden on Count Three was to establish that "at least one of the prescriptions written on those dates was illegitimate, was not for a legitimate medical purpose and not written in good faith, just one." (Tr. at 1379.) And the Government focused the jury's attention, in that respect, on the Ashby file which was obviously fake, reminding the jury that it could convict the defendant on a conscious avoidance theory:

> Folks, when the defendant accepted this document and continued to write prescriptions for this patient month after month after month, including on October 28, 2014, he was at the very best intentionally choosing to remain ignorant of facts that would be obvious to any one of us. This document is fake and this patient is not legitimate.

(*Id.* at 1394-95.)

### D.  The Verdict

On March 17, 2016, the jury returned its unanimous verdict, finding the defendant guilty on all three counts.  (*Id.* at 1506.)  In subsequently remanding the defendant, the Court noted that the "evidence is overwhelming" and that there was "zero likelihood" that a motion for a judgment of acquittal would be granted.  (*Id.* at 1510-11.)

### E.  The Instant Motion

On April 18, 2016, the defendant filed the instant motion which focuses principally on Count Three.  In the instant motion, the defendant contends that the Government's evidence relied on "speculative inferences and extrapolations that fell well woefully short of satisfying its burden."  (Br. at 2.)

## II.    APPLICABLE LAW

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the 'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'"  *United States* v. *Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) (quoting *United States* v. *Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010)); *see also United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (noting the defendant's "heavy burden" on a Rule 29 motion); *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) (explaining that a jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").  In other words, "'[a] judgment of acquittal' is warranted 'only if

8

the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States* v. *Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States* v. *Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

When evaluating a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States* v. *Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *see also United States* v. *Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) (same). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States* v. *Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States* v. *Temple*, 447 F.3d 130, 137 (2d Cir. 2006)).

Thus, "[t]he task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not a reviewing court." *United States* v. *Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012) (quoting *United States* v. *Coppola*, 671 F.3d 220, 239 (2d Cir. 2010)); *see also United States* v. *Espaillet*, 380 F.3d at 718 ("[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." (quoting *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)); *id.* ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." (quoting *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999))); *United States* v. *Ulloa*, 511 F. App'x 105, 107 (2d Cir. 2013) (reasoning that a conviction must be affirmed, after "credit[ing] every inference that could have been drawn in the government's favor, . . . so long as, from the inferences reasonably drawn from

9

the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt" (quoting *United States* v. *Reifler*, 446 F.3d 65, 94 (2d Cir. 2006))).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States* v. *Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States* v. *Cherico*, No. 08 Cr. 786 (CM), 2012 WL 1755749, at *2 (S.D.N.Y. May 16, 2012) (same); *United States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States* v. *Guadagna*, 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954)); *see also United States* v. *Martinez*, 54 F.3d at 1042 ("[I]t is the task of the jury, not the Court, to choose among competing inferences.").

### III.   DISCUSSION

Here, when viewed in the light most favorable to the Government, the trial evidence was plainly sufficient to permit a rational trier of fact to find the essential elements of all Counts, including Count Three, beyond a reasonable doubt.

With respect to Counts One and Two, the testimony of Correa alone – if credited by the jury – was more than sufficient to support the jury's finding that the defendant was (1) engaged in a conspiracy to unlawfully dispense oxycodone at the Clinic and (2) that the defendant, in fact, unlawfully dispensed oxycodone on or about January 10, 2013, when the defendant wrote a medically unnecessary oxycodone prescription for Correa notwithstanding the fact that the defendant had recently hired Correa to be his security guard. Indeed, it bears mention that in the instant motion, the defendant does not seriously dispute that a rational trier of fact, viewing the

evidence in the light most favorable to the Government, could and did convict the defendant with respect to Counts One and Two.

With respect to Count Three, the Government's evidence was just as strong. The Government presented the testimony of Leonard, which, when viewed in the light most favorable to the Government, permitted the jury to conclude that the defendant's core criminal scheme to write medically unnecessary oxycodone prescriptions in return for cash payments was very much ongoing as of October 2014. The Government offered BNE and insurance records indicating that defendant acted in a manner consistent with that criminal scheme on October 28, 2014, writing 33 identical oxycodone prescriptions on that, all for cash payments. The Government offered specific "patient" files for individuals who received oxycodone prescriptions on that date, including the patently fake records relevant to Larry Ashby, and also offered the expert testimony of Dr. Gharibo that the treatment of Ashby, based on those records, was "not within standard of practice. It was not even close." Finally, the Government offered evidence that the defendant – essentially contemporaneous to his conduct on October 28, 2014 – lied to law enforcement about the most criminal aspects of his practice, including the number of patients he was seeing and the number of those patients paying him in cash, evidence it asked the jury to consider in evaluating the defendant's knowledge and intent at the time.

When viewed in the light most favorable to the Government, that evidence plainly could lead a rational juror to conclude that the defendant was knowingly and intentionally writing medically unnecessary oxycodone on or about October 28, 2014, and to select, as at least one example of such a medically unnecessary prescription, the Ashby prescription. The same evidence – the Ashby paperwork, in particular – could also lead a rational juror to conclude that the defendant was not acting in good faith and did not have a good faith belief that he was

engaged in the legitimate practice of medicine at the time he was accepting cash payments for prescriptions to individuals whose paperwork was evidently fake.

In urging a contrary conclusion, the defendant principally renews a series of arguments which were made to – and clearly rejected by – the trial jury.  For example, the defendant contends here as he did through counsel at trial that the "government called none of those patients to testify" and presented "no direct evidence establishing that Dr. Mirilashvili prescribed oxycodone to these patients without a legitimate medical purpose and outside the usual course of medical practice."  (Br. at 4.)  These arguments are easily disposed of in this context, because it is well established that a defendant cannot meet his "heavy burden" of establishing his entitlement to relief pursuant to Rule 29 by simply reiterating arguments the jury actually heard and necessarily rejected in returning its verdict.  *See*, *e.g.*, *United States* v. *Annabi*, 2012 U.S. Dist. LEXIS 161372, at *26 (S.D.N.Y. Nov. 7, 2012) (CM) ("Defendants' reiteration of an argument the jury rejected does not explain how 'no rational trier of fact could have found the defendant[s] guilty beyond a reasonable doubt.'") (citing *United States* v. *Cassese*, 428 F.3d 92, 98 (2d Cir. 2005)); *see also United States* v. *Kaufman*, No. 13 Cr. 411–02 (JMF), 2014 WL 2048198, at *6 (S.D.N.Y. May 19, 2014) (denying Rule 29 motion based on arguments presented to and rejected by the jury); *United States* v. *Preldakaj*, No. 08 CR 1054 (SAS), 2010 WL 3154560, at *4 (S.D.N.Y. Aug. 3, 2010) (denying Rule 29 motion based on arguments presented to the jury because "[w]hile the jury could have accepted [the defendant's] arguments, it did not"); *United States* v. *Scott*, No. 08 Cr. 360(HB), 2009 WL 36548, at *9 (S.D.N.Y. Jan. 7, 2009) ("It is quite true that the intent element would be lacking if the jury accepted [the defendant's] theory at trial . . . . However, in convicting [the defendant] of attempt at the first trial, the jury necessarily rejected this theory.") (internal quotations omitted); *United States* v. *Gotti*, No. S8 02CR.743

(RCC), 2005 WL 1214321, at *2 (S.D.N.Y. May 19, 2005) ("[The defendant] had his chance to make this credibility argument to the jury, and he did so.  That the jury did not agree with him is not a reason to grant a new trial."); *United States* v. *Baljit*, 202 F. Supp. 2d 196, 202 (S.D.N.Y. 2002) ("[T]his argument was made to the jury and rejected when it returned a conviction on Count Two.").

Critically, the defendant cites to no authority for the proposition that the Government was required to have called a specific patient to prove Count Three – or was required to have proven Count Three in any particular fashion – nor is the Government aware of any.  And even crediting the defendant's assertion in the instant motion that there was "no direct evidence" of guilt offered with respect to Count Three (Br. at 3), as the Court correctly instructed the jury – without objection – "circumstantial evidence is of no less value than direct evidence, and as a general rule that the law draws no distinction between direct and circumstantial evidence.  Both are admissible."  (Tr. at 1438.)

Similarly, to the extent the defendant in the instant motion now asks the Court to draw inferences based on snippets of witness testimony – the testimony of Dr. Gharibo, for example – or from aspects of the documents offered at trial, including the Ashby medical file (*e.g*, Br. at 3-4), those arguments are squarely foreclosed by the applicable and well-established standard governing a Rule 29 motion.  *See, e.g.*, *United States* v. *Martinez*, 54 F.3d at 1042 ("[I]t is the task of the jury, not the Court, to choose among competing inferences."); *United States States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."); *United States* v. *Rosa*, 17 F.3d at 1542 ("The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable.").

In short, and when viewed in the light most favorable to the Government, there was ample evidence to establish each element of Counts One, Two, and Three.   After hearing that evidence, rational, highly attentive, and properly instructed jurors could and did find each of those elements. Nothing in the instant motion disturbs that finding.

**IV.**   <u>**CONCLUSION**</u>

For the reasons set forth above, the defendant's motion for a judgment of acquittal pursuant to Rule 29 should be denied.

Dated: New York, New York
       May 2, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:      _____/s/_____
                                         Edward B. Diskant/Brooke E. Cucinella
                                        Assistant United States Attorneys
                                        (212) 637-2294/2477