UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x
                                                 :

UNITED STATES OF AMERICA,       :

                                                 :

           – v –                   :  Case No. 14 Cr. 810 (CM)

                                                 :

MOSHE MIRILASHVILI, *et al.*,     :

                                                 :

                  Defendants.       :

                                                 :
----------------------------------------------------------------------x

**SENTENCING MEMORANDUM
ON BEHALF OF
<u>DEFENDANT MOSHE MIRILASHVILI</u>**

Henry E. Mazurek
Wayne E. Gosnell, Jr.
CLAYMAN & ROSENBERG LLP
305 Madison Avenue
New York, New York 10165
T. 212-922-1080
F. 212-949-8255
mazurek@clayro.com
gosnell@clayro.com
*Counsel for Defendant
Dr. Moshe Mirilashvili*

## **TABLE OF CONTENTS**

Page

**Preliminary Statement**………………………………………………………1

**I.  STATUTORY FACTORS SET FORTH IN 18 U.S.C. § 3553(a)**…..…….....4

    A. History and Characteristics of Moshe Mirilashvili………………………6

        1.  This Court Should Put Aside Any Pre-Judgment
           of Dr. Mirilashvili's Sentence……………..……………………6

        2.  Dr. Mirilashvili's 66 Years of Law Abiding Life
           Should Matter…………………………………………………...9

        3.  Moshe Mirilashvili Had to Overcome Family Tragedy
           and Persecution in Georgia………………………………………..9

        4.  The Difficult Transition to a New Start in the
           United States………………………………………………..11

        5.  Dr. Mirilashvili's First Medical Jobs in the United
           States and Volunteering in Brooklyn and Queens………………13

        6.  Dr. Mirilashvili Is His Family's "Foundation,"
           "the Glue That Keeps Our Family Together"……………………15

        7.  Moshe Mirilashvili Has a Very "Good Heart"
           and Is an Eternal "Optimist"……………………………………..20

        8.  Dr. Mirilashvili's Prior Medical Disciplinary
           Issues in the 1990s Had a Profound Impact on
           His Mental State and Future Practice……………………..22

        9.  Moshe Mirilashvili's Physical Condition Makes
           It Unlikely that He Could Survive a Lengthy
           Prison Sentence…………………………………………………..29

<u>**TABLE OF CONTENTS (cont'd)**</u>

B.  Nature and Circumstances of the Offense………………………………29

  1.  The Consensual Recordings Between Leonard
      and Correa Reveal a Devious and Ruthless Set
      of Drug Dealers Intent on Keeping Their
      Schemes Secret…………………………………………………..32

  2.  The Government Engaged in a Form of Sentencing
      Entrapment By Not Confronting Dr. Mirilashvili
      With Evidence of Diversion Outside His Clinic in
      the Earliest Days of the Clinic's Opening………………………..37

C.  General and Specific Deterrence………………………………………..39

D.  Avoidance of Unwarranted Sentencing Disparity………………………43

**II. THE ADVISORY SENTENCING GUIDELINES**…………………..……...46

A.  Probation's Miscalculation of the Guidelines…………………………..47

B.  The Correct Guidelines Calculation……………………………………49

**III. CONCLUSION**………………………………………………..………………..53

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## Cases

*Gall v. United States,* 552 U.S. 38 (2007)…………………………………………5, 6

*Kimbrough v. United States,* 552 U.S. 85 (2007)………………………………..5

*Nelson v. United States,* 555 U.S. 350 (2009)………………………………..…5

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006), *aff'd,* 301 Fed.
Appx. 93, at **1 (2d Cir. Dec. 9, 2008)………………………………………..47

*United States v. Booker,* 543 U.S. 220 (2005)………………………………...4

*United States v. Broxmeyer*, 699 F. 3d 265 (2d Cir. 2012)………………………47

*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008)…………………………5, 42

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013)……………………………46

*United States v. Hamilton*, No. 07 Cr. 2874, 2009 WL 995576, at *3
(2d Cir. April 14, 2009) ……………………………………………………..41

*United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8
(E.D.N.Y. Feb. 12, 2009)……………………………………………………41

*United States v. Leung,* 40 F.3d 577 (2d Cir. 1994)………………………………..7

*United States v. Mangone,* 2016 U.S. App. LEXIS 10707, at *1
(2d Cir. Jun. 14, 2016)………………………………………………………...8

*United States v. Quattrone,* 441 F.3d 153 (2d Cir. 2006)…………………………..7

*United States v. Sanchez*, No. 99 Cr. 338, 2007 WL 60517, at *4
(S.D.N.Y. Jan. 8, 2007)……………………………………………………...41

*United States v. Stein,* 544 F.2d 96 (2d Cir. 1976)………………………………7

*United States v. Tutty,* 612 F.3d 128 (2d Cir. 2010)………………………………..5

*United States v. Wills*, 476 F.3d 103 (2nd Cir. 2007)……………………………...43

*United States v. Woltmann,* 610 F.3d 37 (2d Cir. 2010)…………………………....7

**<u>TABLE OF AUTHORITIES (cont'd)</u>**

**Statutes and Rules**

18 U.S.C. § 3553……………………………………………………………….*passim*

U.S.S.G. § 1B1.3…………………………………………………………………49

U.S.S.G. § 2D1.1………………………………………………………...44, 51

U.S.S.G. § 3B1.1…………………………………………………………………44

U.S.S.G. § 3B1.3……………………………………………………………………51

**Other Authorities**

*A General Theory of Crime* (Michael Gottfredson and Travis Hirschi, 1990)……41

American Youth Violence (Franklin E. Zimring, 1998)………………………….41

*Crime in the Making* (Robert Sampson and John Laub, 1993)…………………...41

David Farrington, "Age and Crime," Crime and Justice, Volume 7, 1987……….41

U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://www.ussc.gov/publicat/Recidivism-General.pdf..........................................................................................................41

Terri E. Moffitt, "Adolescence-Limited and Lifecourse-Persistent Antisocial Behavior," *Psychological Review*, 1993…………………………………………..41

## PRELIMINARY STATEMENT

We submit this memorandum on behalf of Moshe Mirilashvili, who is scheduled to be sentenced by this Court on September 28, 2016.  As the Court knows, Dr. Mirilashvili stands convicted of violations of the Controlled Substances Act after trial based on his prescription practice at his upper Manhattan medical office.

Moshe Mirilashvili was convicted of serious crimes and will receive just punishment for his conviction.  A Guidelines sentence, however, will not lead to a fair and just sentence for Moshe.  Over his entire lifetime, which now extends to 68 years, Moshe has demonstrated a deep capacity for generosity and kindness; care and love for family, friends and community; human optimism and the value of forgiveness; hard work and perseverance.  He also has suffered more than his fair share of tragedy and sadness, having lost his father at age 12 at the hands of murderous Soviet government officials who arrested, tortured and killed his father for being a religious and political opposition leader.  He also recently suffered the pain of losing his older brother while being in custody in this case and – as was the case with his father – not being able to say goodbye.

This Court will pronounce its sentence on September 28, but Moshe's true punishment began years ago, upon his arrest, as shame and humiliation have devastated his close-knit family, and torn at the good character that Moshe previously tried to exhibit every day of his life.  The evidence in this case may have clearly shown that Moshe was not a stellar physician or even a barely proficient one.  He failed to modulate prescriptions over time with patients and did not differentiate their conditions.  He stuck to a routine script based on generic medical textbook advice.  Experts could agree that this was not great medical practice, but his entire practice was not a crime.  Clearly, the defense witness patients who testified at trial underscored this point.

1

The evidence of his "looking the other way" on some patients' records or during patient visits was sporadically presented at trial and relied primarily on the biased testimony of witnesses with government cooperation agreements – and based on one witness, Damon Leonard, who had astoundingly contrary trial testimony from previously secretly recorded conversations with a government informant.  The government never presented credible evidence on the actual scope of Dr. Mirilashvili's known dealings with drug diverters or "fake" patients.  On this issue, the defense respectfully asks the Court to grant its objections to the Presentence Investigation Report, and determine the Guidelines score according to the calculations presented herein.  To the extent the Court needs additional evidence to resolve this Guidelines dispute, the defense requests a *Fatico* hearing.

This Court, during the sentencing hearing of cooperating witness Leonard expressed that Moshe Mirilashvili was "frankly [ ] as bad *a person* as I've ever encountered in a courtroom." (Emphasis added.)  This statement is frighteningly pre-judgmental, injudicious, and simply cannot be true.  This Court has sentenced international terrorists, organized crime "hit men," drug cartel murderers, and a score of people who committed heinous and ruthless acts of incredible violence.  It cannot be that the Court equates Moshe Mirilashvili – as a person – to these violent and murderous defendants.  As a matter of law, this Court must consider all the information presented to it at sentencing prior to passing judgment.  We respectfully request that if the Court cannot wipe clean its gross pre-judgment of this man – before hearing anything about him other than what was said by government cooperators – that it act with prudential courage and transfer this sentencing hearing to another judge who has not pre-judged him.

This Court should consider Moshe Mirilashvili's character as displayed during his entire life, his mental state and condition at the time of the offense conduct, his advanced age, foreign background and culture, and lack of prior criminal history.  Dr. Mirilashvili's personal history belies any penchant to hurt people for his own good fortune.  Indeed, Moshe's history expressly *contradicts* such conclusion.  It is unreasonable to believe that Moshe Mirilashvili woke up one day at age 64 and became "as bad a person as [the Court] ever encountered in a courtroom."

We respectfully submit that based on a fair evaluation of all of the Section 3553(a) factors which this Court is instructed to consider, a "sufficient but not greater than necessary" sentence in this case is no more than three years of imprisonment, together with a substantial period of home confinement and community service in a controlled health care environment.  This recommended length of imprisonment equals the term of custody imposed by this Court on co-defendant Raymond Williams, an admitted "crew chief" who managed several people in a drug diversion ring and who handsomely profited from the scheme.  Mr. Williams also presented as an elderly defendant with significant physical ailments and conditions.  In this way, Moshe Mirilashvili and Mr. Williams present as similarly situated defendants for whom a less lengthy prison term would be appropriate and still sufficient to satisfy federal sentencing goals.

## I.      STATUTORY FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

The federal sentencing system is ultimately governed by 18 U.S.C. § 3553(a).  *United States v. Booker*, 543 U.S. 220, 233-34 (2005).  According to that section:  "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [the federal sentencing statutes]."  According to those enumerated purposes, a fair and just sentence should:

> (A) Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  Section 3553(a) goes on to provide a list of seven factors for courts to consider in determining a reasonable sentence in addition to the general purposes set forth above.  Those factors include:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed [to reflect the above-stated general sentencing goals]; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such Guidelines by an act of Congress…; (5) any pertinent policy statement . . . issued by the Sentencing Commission subject to any amendments made to such policy statement by an act of Congress…; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a).  More significant than the sentencing range established by the advisory Sentencing Guidelines is consideration of the factors set forth in the statute against the

background of the directive to select a sentence "sufficient, but not greater than necessary" to accomplish these statutory purposes.

The Guidelines are not to be presumed to result in a sentence that complies with the statutory purposes of sentencing. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). The Court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that [policy] disagreement applies to a wide class of offenders or offenses." *Id.*at 191; *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (holding that a district court was entitled to conclude that the existing Guidelines provision for crack cocaine was greater than necessary to meet the standards of § 3553(a) because the provision "d[id] not exemplify the Commission's exercise of its characteristic institutional role."). Indeed, the Second Circuit has held that a district court commits procedural error when it concludes "that it could not consider a broad, policy-based challenge to the [applicable] Guidelines." *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010).

The justification for a non-Guidelines sentence need be only "sufficiently compelling" in light of the individualized assessment under § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). A sentence outside the Guidelines range does not require the sentencing court to find "extraordinary" circumstances, because such a requirement would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Gall*, 552 U.S. at 47. "District judges are, as a result, generally free to impose sentences outside the recommended range." *Cavera*, 550 F.3d at 189.

For the reasons discussed below, we respectfully submit that there is "sufficiently compelling" justification in Moshe Mirilashvili's case for a sentence below the exceedingly harsh advisory Guidelines range.  Under an individualized assessment of the 18 U.S.C. § 3553(a) factors, no more than a three-year sentence, together with a substantial period of home confinement and community service (as a nurse's aide, long-term care orderly, or senior center volunteer) is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.

The following section discusses several of the factors enumerated in the sentencing statute that previously have not been discussed at trial or other proceedings in this litigation.

**A. History and Characteristics of Moshe Mirilashvili**

18 U.S.C. § 3553(a)(1) provides that in determining a just and reasonable sentence, the sentencing judge is directed to consider "the history and characteristics of the defendant."  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).

> 1. This Court Should Put Aside Any Pre-Judgment of Dr. Mirilashvili's Sentence

Congress's directive under Section 3553(a) already has been put in jeopardy here.  In earlier sentencing proceedings of Dr. Mirilashvili's co-defendants, this Court appears to have pre-judged him prior to hearing *anything* about the man other than the conduct described at trial.  This raises the unfortunate appearance of a rush to judgment that will not give Dr. Mirilashvili a fair

opportunity to be sentenced on a full accounting of his background, character and personal history.[1]

Specifically, during cooperating witness Damon Leonard's sentencing on June 14, 2016, the court praised the testimony of Leonard for "play[ing] a very major role, quite possibly larger than you or I could ever know, in securing the conviction of Dr. Mirilashvili, who, *frankly, is as bad a person as I've ever encountered in a courtroom*, and allowing justice to be done." (Ex. 25, Leonard Sent. Tr. at 8 (emphasis added).) Ironically (given the recordings discussed *infra*), the Court lamented that Leonard's story: "breaks my heart because you were doing everything right, and somehow you still got involved in this mess with this *really bad man*. (*Id.* at 7 (emphasis added).)

During another co-defendant's sentencing, Raymond Williams, this Court noted that Dr. Mirilashvili "prescribed oxycodone for anybody who came in off the street." (Ex. 26, Williams Sent. Tr. at 6.) That statement was proven false at trial but it reinforces the inference that the Court has nonetheless judged Dr. Mirilashvili with an overbroad and biased brush.

---

[1] In determining reassignment of cases to a different district court judge after an adverse ruling on appeal, the Second Circuit has focused on the *appearance* of unfairness or personal bias, not whether the district court actually harbored such feelings. *See United States v. Stein*, 544 F.2d 96 (2d Cir. 1976) (recognizing the difficulty which the trial judge "may have in rejecting or modifying prior conclusions and the necessity of maintaining the appearance of justice"); *United States v. Woltmann*, 610 F.3d 37, 43 (2d Cir. 2010) (ordering reassignment "[i]n light of the scorn with which the [district court] approached the matters pertaining to sentencing"); *United States v. Quattrone*, 441 F.3d 153, 192-93 (2d Cir. 2006) (ordering reassignment despite not "find[ing] evidence that the trial judge made any inappropriate statements leading [the Circuit] to seriously doubt [the trial judge's] impartiality," because "portions of the transcript raise the concern that certain comments could be viewed as rising beyond mere impatience or annoyance"); *United States v. Leung*, 40 F.3d 577, 587 (2d Cir. 1994) ("Though we believe the District Judge could fairly sentence on remand, just as he undoubtedly did at the original sentencing, the appearance of justice is better satisfied by assigning the resentencing to a different judge.").

These comments raise the serious concern that Dr. Mirilashvili will not receive a fair hearing at sentencing.  This same concern was raised recently in the Second Circuit by another defendant who was sentenced by this Court.  In that case, *United States v. Mangone*, 2016 U.S. App. LEXIS 10707, at *1 (2d Cir. Jun. 14, 2016), a Second Circuit panel concluded that this Court's statements that Mr. Mangone's crimes made "her 'physically ill' and that she 'take[s] it very personally when a lawyer commits crimes,' because members of the judge's family and most of her personal friends are lawyers," went "beyond the entirely appropriate condemnation of a defendant's criminal conduct."  *Mangone*, 2016 U.S. App. LEXIS 10707, at *5.  It further noted that the comments "could be taken to indicate that the judge considered herself personally invested in the outcome, as if she or her friends or family were individually aggrieved by the defendant's crimes."  *Id.*  While the appellate court ultimately declined to reassign the case, it cautioned the Court in strong language to "put out of her mind her previously expressed views."  *Id.* at *8.

Apparently this Court gave the *Mangone* decision due consideration, because upon re-sentencing, the Court reduced its original sentence from 18 months to 12 months and one day – a one-third reduction of sentence based on the same facts known at the original sentencing. *See Mangone*, 10 Cr. 1170 (ECF No. 17) and 10 Cr. 007 (ECF No. 298).

Given the warnings in *Mangone*, we fully expect the Court to re-evaluate its prior statements regarding Dr. Mirilashvili, and to fashion a sentence based on the entire history and characteristics of this man, rather than only on the information received at trial about his offense conduct.  Clearly, this Court has been able to put aside its personal views in the past to carry out its responsibility under the law.  Dr. Mirilashvili deserves no less in his moment of judgment.

2. Dr. Mirilashvili's 66 Years of Law Abiding Life Should Matter

Dr. Mirilashvili is 68 years old and he was never charged with criminal conduct before his arrest in this case.

His life cannot be wholly defined by the government's indictment and the prescriptions he wrote in this case. Even for those who sat through each day of his jury trial, the information that emerged as to Dr. Mirilashvili's character was in the form of a barren and biased outline rather than a meaningful history.

Dr. Mirilashvili's family, including his wife, Dali, his two daughters, Nina and Margaret, and his sons-in-law, attended trial every day, evidencing a closeness that has always existed in Dr. Mirilashvili's family life. The impact that Dr. Mirilashvili has had in the lives of his wife and two daughters is best described by David Roket, Nina's husband, who writes the Court: "[T]he way Nina, Margie (Nina's sister) and Dali (Moshe's wife) are suffering and have been suffering since this nightmare began – it is indescribable and unimaginable. The important role Moshe plays in each of their lives cannot be replicated or replaced. He is the foundation for each of them. And the void they all now feel is extremely painful to see." (Ex. 3, Letter of David Roket.)

Moshe was always the bedrock of his family, and still is. He learned how to deal with hardship and loss early in life. From too young an age, he had to deal with the Soviet government's murder of his own father, and out of this tragedy he took on the steely task of being the reliable leader other family members could later count on.

3. Moshe Mirilashvili Had to Overcome Family Tragedy and Persecution in Georgia

Moshe Mirilashvili was born and raised in Soviet Georgia, a place where fairness under the law and religious tolerance did not exist. Dr. Mirilashvili's father was a prominent and outspoken member of the Georgian Jewish minority community. (*See* Ex. 2, Nina Roket Letter,

at 1.)  As such, he became a target of the communist leaders.  Moshe's older brother, Dr. Boris

Benson, who only recently passed away while this case was pending, wrote to the Court just

weeks before his own death:  "Moshe and I grew up in the Soviet Republic of Georgia.  When I

was 16 and Moshe was 12, our father was arrested and taken from our home, imprisoned, and

executed for political and religious reasons.  Governmental officials confiscated all of our

possessions, including our home." (Ex. 14, Dr. Boris Benson Letter, at 1.)

Despite being mere adolescents, Dr. Benson and his younger brother, Moshe, began

planning for the day they could take their families far from the place where their father was killed.

Dr. Benson explained how the brothers' family tragedy brought them closer:

> The difficulties Moshe and I endured following our father's
> execution, made Moshe and I inseparable.  Moshe became and
> remains most dearest to me.  Moshe and I managed to put
> ourselves through medical school in Georgia and in 1974, we
> immigrated to the United States.

(*Id.*)  Later, Moshe would feel the extreme heartache of losing his older brother – like he had his

father – without having a chance to say goodbye and without being able to comfort him in his last

days.  Dr. Benson died only weeks after Moshe was remanded after trial in this case.  Moshe's

brother was not physically able to visit the jail before succumbing to long-term illness.

Not all of Moshe's memories of his family in Georgia, however, are painful ones.  Before

he left the country, he met Dali, his now wife of 45 years.  Dali writes about her first memories

with Moshe:

> I met Moshe when I was 15 years old.  I was on vacation in
> Borjomi, a resort town in southern Georgia, with my family.
> Moshe and I began talking on the grass.  He was a medical student
> in Orenburg, Russia.  From the second we started to talk, I realized
> how he was a very loyal and honest person.  He taught me how to
> see the beauty in life.  He told me to pay attention to the little
> things:  the green grass, the blue sky, the clean air.  Simple things
> made him happy, and he helped people to see the simple beauty

10

around them.  That summer, he transferred schools, from Orenburg
to Tbilisi, to be closer to me and his family.  He loves the idea of
family being together.

(Ex. 1, Dali Mirilashvili Letter, at 2.)

Of course, Dali would later learn the reason for Moshe's appreciation of the "simple

things" in life.  She learned about the pain Moshe felt from losing his father before he had the

chance to grow up.  Moshe took nothing for granted.

For this reason, as soon as Dali had given birth to their first daughter, Nina, Moshe started

planning his family's exit from Georgia to a place much safer and free from religious and political

persecution.  Moshe took his family out of the country when Nina was only two years old. (Ex. 2,

Nina Roket Letter at 2.)  Dali Mirilashvili explains that "Moshe wanted to live in a place where

we could practice our religion freely and just live a free life." (Ex. 1, Dali Mirilashvili Letter at 2.)

Of course, moving his family, including his widowed mother and siblings, to the United States

was not easy.  Moshe, his brother Boris, and his two sisters were *all* medical doctors in their home

country by then.  In the United States, they could barely speak English and had to start over

completely.

4.      The Difficult Transition to a New Start in the United States

Benjamin Benson, a lawyer and Dr. Mirilashvili's nephew, explained the hardships that

Moshe and his siblings faced by immigrating to a new country:

> My uncle and all his siblings, including my father, were all young,
> successful physicians in the Soviet Union.  They gave that all up
> and left all of their worldly possessions behind in order to make the
> long trip to the United States and start a new life.  They came here
> with no money, had no place to live and absolutely no proficiency
> in the English language.  They literally came here with nothing and
> their medical degrees were worthless upon their arrival to the
> United States.

(Ex. 16, Benjamin Benson, Esq. Letter.)

Incredibly, Moshe and all three of his siblings eventually would obtain their second set of medical degrees in the United States.  As Nina Roket explains, her father not only had to learn English and medicine in a new country, he also financially had to support a growing family.  Ms. Roket described her father's early life in the United States:

> Although my father's English was very poor, [he] studied feverishly for his medical boards, which he ultimately passed. However, in the midst of his studies, my father worked very long and hard to earn a living.  He worked many different jobs and was proud to be able to provide for us all.  I don't recall all of the different jobs he had, but know that he drove a cab and worked in a prison, hospitals and nursing homes.  He worked very long and hard all of the time. . . . He had the responsibility of not only supporting his family and mother, but he also took it upon himself to provide financial assistance to my maternal grandparents, his mother-in-law and father-in-law, whom he insisted immigrate with him, because he would not leave them behind alone in Georgia. My father was always the protector and provider for our entire family.

(Ex. 2, Nina Roket Letter, at 2.)

Moshe's younger daughter, Margaret Chanchalashvili, provided her perspective of her father's work ethic and positive disposition throughout years of substantial hardship:

> After coming home in the mornings from his night shifts at the hospital, and after working long hours as a taxi driver, my dad would come home only to find piles of medical books to help him prepare for his exams.  He never complained.  He did everything with a smile on his face and tirelessly reassured us that everything would be okay.  He did everything he could to provide us with the best, and he always did this with sweetness in his soul and a smile on his face.

(Ex.5, Margaret Chanchalashvili Letter.)

5.      Dr. Mirilashvili's First Medical Jobs in the United States
        and Volunteering in Brooklyn and Queens

Once Moshe Mirilashvili passed his medical boards and completed his residency in the United States, he sought jobs in his specialty area as an anesthesiologist.  Medical positions for a foreign doctor, with less than fluent English abilities, who had been educated and trained at a faraway Soviet-era medical school, were not immediately forthcoming.  Moshe accepted part-time jobs in nursing homes, in local hospital emergency rooms, and eventually in small group medical practices within a Brooklyn community of immigrant Russians.  Initially, his practice involved providing epidurals and nerve blocks to resident patients in long-term care facilities.

Moshe also became the resident doctor in the neighborhood for immigrants without health care insurance.  They would go to him for advice on issues as far ranging as diabetes, obesity, child autism, high blood pressure, and sore backs and muscles.  Dr. Mirilashvili never refused to see anyone and always did his best to help with recommendations for treatment or gave referrals when the conditions were beyond his ken.

Dr. Mirilashvili's commitment to caring for others is witnessed by the many accounts of patients and neighbors for whom he treated or referred out in his early days of medical practice in the United States.  We highlight only some of these here:

- "A little over thirty years ago, without any medical coverage and much financial resources as a young mother of two children I had a severe episode of a ▮▮▮▮▮▮▮▮ . . . By pure luck, Dr. Mirilashvili was a resident doctor in the emergency room that night. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During my hospital recovery and long after,

13

Moshe continued offering his medical care, time, and undivided attention without any monetary reward." (Ex. 18, Letter of Lea Elashvili.)[2]

- "Moshe just wants to help people. . . . If anyone in the community needed any medical help or guidance, they knew they could go to him. They knew that even if they did not have the money, or medical insurance to pay for their visit, Moshe would never turn anyone away. He would treat them free of charge." (Ex. 9, Letter of Nodari Ajiashvili.)

- "[I]t was [Moshe's] relationship to his community and devotion to his widowed mother that always astounded me. He worked long hours taking care of his patients. He selflessly took care of those in his community who needed medical care and advice. Of course, he would do this for free for those who couldn't afford and who had just reached the shores of our great country. He developed an unparalleled reputation in the community for his dedication and devotion to the well being of his patients. He was known as a charitable man with a heart of gold." (Ex. 12, Letter of Steven Batash.)

- "The moment I met Moshe, I was struck by his sensitivity and deep compassion for others. Many of our [synagogue] members turned to Moshe when they needed medical care or advice. Whether it was 3 p.m. or 3 a.m. and whether it was his best friend or a stranger, Moshe was always quick to offer his guidance and knowledge." (Ex. 19, Letter of Rabbi Avraham Ashville.)

- "When we were new immigrants in the United States, Moshe and I were neighbors. Moshe was always there to offer his medical help to people in our neighborhood at any time of day." (Ex. 20, Letter of Joseph Patarkatsi.)

- "Moshe is a simple man, who people would turn to and ask for help and advice. He gave both selflessly and generously. What people will tell you is his amazing sensitivity to human pain and suffering, which he knows so much about literally and professionally. But due to his inner modesty, he never made any of them publicly celebrated, although these acts were well known." (Ex. 22, Letter of Dr. Timur Alasaniya.)

- "[Moshe] provided [my family] with medical help when we came to this country and had no medical insurance. It was such a relief to know that someone understood our struggle and was willing to help." (Ex. 23, Letter of Solomon Kobiashvili, former Georgian Assistant Secretary of Commerce.)

---

[2] We redacted portions of our submission to omit "sensitive information" and "information requiring caution" pursuant to the E-Government Act of 2002 and the Southern District's ECF Privacy Policy. We have highlighted those portions of our memorandum that contain redactions.

These are just some of the examples of Moshe Mirilashvili's generous and caring character and his desire to use his medical license to help others. These accounts of Dr. Mirilashvili's past conduct present a stark contrast to the biased and self-serving view of the government's cooperating witnesses who were presented at trial. The government did not present a single patient witness who did not have a cooperation agreement to testify about Dr. Mirilashvili's conduct during a patient visit. Instead, in the one instance that law enforcement had a Confidential Source record visits with Dr. Mirilashvili, the government fought hard to prevent the defense from introducing into evidence the recordings of follow-up visits with this patient until the prosecutor opened the door to them in rebuttal summation. None of these recordings revealed an intentional desire by Dr. Mirilashvili to "sell" oxycodone for diversion to the streets.

      6.    <u>Dr. Mirilashvili Is His Family's "Foundation," "the Glue That Keeps Our Family Together"</u>

Moshe Mirilashvili is now the proudest father and grandfather of two impressive adult daughters and three grandchildren. He also has married his soulmate, Dali, whose forced separation from her husband is the greatest punishment that Moshe has had to bear. Moshe places family values above all else and the adoring closeness of his daughters, granddaughters, sons-in-law, siblings, nephews and nieces, aunts and uncles, means they are all suffering from his incarceration. As his wife, Dali, explains: "I am still alive, but this kind of life, knowing and seeing the pain Moshe, my daughters and granddaughters are facing is worse than death for me." (Ex. 1, Letter of Dali Mirilashvili.)

Moshe Mirilashvili's top priority always remained his family, and it is easy to see why. He is deeply important to them. Moshe possesses an innate desire to bring people together and to care for them.

Dali Mirilashvili explains how her husband cared for his widowed mother and Dali's parents, especially as they aged:

> He helped my elderly parents adjust to life in America, and his own mother lived with us until her death. He was supporting his mother in every way possible until her death. He always practiced talking English with my parents to help them adjust to their new life. He would call them every day, visit a few times a week, and always kept an eye out for them. Many years after arriving to the U.S., my father was diagnosed with Parkinson's disease at age 53. Moshe stood by my father's side throughout his entire sickness. Of course, it wasn't his area of knowledge, but he still did a lot of research to find the best doctors and hospitals. When my father passed away, Moshe even wanted my mother to live with us. He did not want her to live alone. My mother is currently 83 years old and she is not aware of Moshe's conviction and incarceration. She always says she misses Moshe so much and always calls and asks to talk to him. She calls me crying almost every day because she thinks something must be wrong with Moshe. He always took such good care of my mother. He would call her every week, visit her often, and always monitor her. He always did this without me asking him. He did it from the goodness of his heart.

 (Ex. 1, Letter of Dali Mirilashvili.)

Moshe's eldest daughter, Nina Roket, who was born in the former Soviet Republic of Georgia, is now a partner at a large, corporate law firm in New York.  She entirely credits her career and personal success in life to her father:

> I am a partner at Olshan Frome Wolosky LLP, a general practice law firm in New York City, consisting of approximately 85 attorneys. I began working at Olshan as a 2nd year associate and have been at the firm for 18 years. After 7 years at the firm, I was promoted to non-equity partnership and 2 years after that, to equity partnership. I am the first woman in the firm's 50 plus year history to become an equity partner. A year after I became an equity partner, I was voted in by the partnership as a member of the firm's Executive Committee. . . . I am the first and only woman in the firm's history to be a member of the Executive Committee. . .  In addition, I founded and chair the firm's Women's Committee (a leadership initiative for the firm's women attorneys and their clients), chair the firm's Hiring Committee and am a member of the firm's Risk Management Committee.

> I am who I am today directly as a result of my father and the
> pivotal role he has in my life.  His life story, morals, teachings and
> character have inspired me tremendously and guided me in my life.

(Ex. 2, Letter of Nina Roket.)

Nina explains the many different roles her father played in her family's lives while she

was growing up:

> [My father] worked very long and hard all of the time. He always
> shared with me that nothing was beneath him and as long as he
> was earning an honest living, he would never have any shame in
> what he did. He had the responsibility of not only supporting his
> family and mother, but he also took it upon himself to provide
> financial assistance to my maternal grandparents, his mother-in-
> law and father-in-law, whom he insisted immigrate with him,
> because he would not leave them behind alone in Georgia. My
> father was always the protector and provider for our entire family.

(*Id.*)

Nina's daughter, Ashley, is now entering her second year of law school.  She writes the

Court to describe the unwavering kindness that her grandfather emanates:

> [Moshe] is an unconventional man full of life, wisdom, kindness,
> and above all, generosity. Everyone else's needs always come
> before his own. Every time I needed a ride to school, a supporter at
> a tennis match, someone to take me to the doctor or a companion
> to lean on, he was there, no matter what it was that he had to do for
> himself that day. . . . Something I have noticed about him from a
> young age is that his primary purpose in life is simply to make
> others happy, and to encourage them to succeed.

(Ex. 4, Letter of Ashley Roket.)

Margaret's daughter, Nicole, ████████████████████████████████

Moshe developed a particularly special bond with her.  Nicole explains it this way:





My grandfather would pick me up from school or call me after school every day, just to remind me not to give up. He was the only person in my life who actually took the time to always give me positive encouragement. He would remind me not to complain, and remind me that people in the world suffer from many different kinds of pain. I wanted to give up so badly. Passing a quiz was so difficult. Mikey [the name she calls her grandfather] was always concerned about my New York State Regents Exams. He encouraged me to seek extra help, talk to teachers for help, and ask questions in class. He would make sure I always studied. Without passing my state exams, I would not get a high school diploma and I would not be able to go to college. A few months ago, I passed all my exams. His smile was so big. I felt so accomplished. When he saw me preparing for college applications, he told me that it was his greatest happiness. I would have never even dreamed about going to college if it wasn't for Mikey's encouragement and advice.

(Ex. 8, Letter of Nicole Chanchalashvili.)

Poignantly, Moshe's older brother, Boris, recently passed away after the jury verdict in this case. As stated above, Moshe never had the chance to say goodbye. The older brother's last words to his younger brother ended up being those he penned in a sentencing letter to this Court. Boris's tribute to his younger brother is tinged with incredible sadness by his passing:

The difficulties Moshe and I endured following our father's execution, made Moshe and I inseparable. Moshe became and remains most dearest to me. Moshe and I managed to put ourselves through medical school in Georgia and in 1974, we immigrated to the United States.

***

Despite the fact the Moshe is my younger brother, he was the driving force that allowed me to overcome all of my difficulties in

18

life. For example, back in the Soviet Union, when I was a young medical graduate, I was called for military duty and Moshe took into his home my wife and 18 month old son and provided the best care for them until my return.

Also, about 25 years ago, I underwent complicated heart surgery. My brother closed his practice for 2 weeks and stayed with me and cared for me during my post-operative rehabilitation. He never left my side, and stayed with me day and night.

More recently, Moshe and his wife Dali stayed with me and my wife in our apartment in Florida. Their plan was to drive back to NY from Florida after their stay with us for a week. En route back to NY, after having driven for hours, my wife called Moshe in his car to let him know I had to undergo emergency surgery. Moshe immediately turned back his car and drove back to Florida to be with me and he stayed with me for another week while I recovered from that surgery.

We are four siblings. Two brothers and two sisters (unfortunately, my oldest sister recently passed away). We are all physicians. However, only Moshe volunteered to take in our mother and care for her when we came to the United States. He gave her the best possible care.

***

I am deeply saddened and hurt without my brother with me. Unfortunately, now when I need him the most, he is not there for me. The pain I am now feeling is far worse than the pain I feel from all of my medical ailments.

(Ex. 14, Letter of Dr. Boris Benson.)

Boris's widow, Riva Benson, has written a letter to the Court since her husband's passing.

She explains the intense suffering that Moshe experienced after being notified of his brother's

death:

[The family wasn't] sure what the impact would be on Moshe if we told him [of his older brother's passing] while he was in prison. For that reason, we kept his death a secret for fear of the emotional toll it would take on Moshe's self and well-being. About a month ago, he children told Moshe the news of his brother's passing. He did not take the news well. My brother-in-law has been there for

19

> me and my husband through every good and bad moment of our
> lives but he was not there to share in my grief.  Moshe has always
> taken care of our family.  Not having him there during the funeral,
> sitting shiva, and all the days that followed have been so hard.
> Moshe was not only a source of comfort for my husband during his
> trying medical issues but a great caregiver and friend.  Nothing
> will ever be the same for any of us again. . . . My greatest sadness
> is that the brothers did not see each other before my husband's
> death.

(Ex. 15, Letter of Riva Benson.)

Moshe has already served painful punishment for his conduct.  He is racked with guilt

knowing his own conduct prevented him from being with his brother at the time of his brother's

death.  He has endured the shame of his misdeeds being broadcast in the media, being aired to

people who have always trusted and relied on him.  He suffers knowing that incarceration will

inflict terrible hardship on his wife, daughters, elderly mother-in-law, and his granddaughters, all

of whom depend on him daily for his love and care.  The consequences of his actions have been

excruciating.

       7.    <u>Moshe Mirilashvili Has a Very "Good Heart" and Is an Eternal "Optimist"</u>

One thing that all of the letters written for Moshe Mirilashvili have in common is his

extraordinary spirit of generosity and optimism.  If you needed a job, Moshe would give it to you.

If you failed him or did something wrong, he would forgive, as he did with Jomaris Javier, whom

he re-hired even after she conceded deceiving him.  He always saw the very best in people and

ignored their shortcomings.

Nina Roket recalled one instance where her father gave a job to a woman, not because he

was looking for help, but because she was:

> My father would hire people based on their need, not his. I
> specifically recall asking him why he agreed to hire this woman
> who had recently emigrated from Russia, when he didn't need the

20

help in the office. He told me he hired her because she needed a
job. That was and is my father.

(Ex. 2, Letter of Nina Roket.)

She also recalled how many people used to come to her father's office on weekends,

sometimes just looking for advice:

I remember being in high school and helping out in his office on
the weekends and there being droves of people coming into the
office asking my father for jobs and assistance and guidance. I
didn't realize it at the time, but my father was the person in our
community to go to for assistance.

(*Id.*)

Moshe's younger daughter, Margaret, also witnessed her father's limitless kindness to

others:

Even now, when I go to events for the Georgian community,
people come up to me and tell me stories about how my dad saved
their life: how my dad never left their side in the hospital until he
knew they were okay, how my dad helped them find a job, or how
my father would treat them medically for free because he knew
they had no money. When people immigrate to a new country, the
only thing they can rely on to maintain their sense of normalcy is
their community. My father recognized this, and strived to make
his community better.

(Ex. 5, Letter of Margaret Chanchalashvili.)  One specific instance of kindness stood out to

Margaret:

When I was 17 years old, my best friend Michael was in a tragic
accident which led him to be paralyzed from the waist down.
Michael's parents were out of town at the time and his family was
suffering financially. I was with Michael during this tragic
accident. A car ran over him and dragged him down the road.
Instantly, I called my father. Without question or hesitation, my
father came to the hospital with us. He was constantly
communicating with doctors and making sure that Michael was
taken care of properly. My high school was raising money for
Michael's medical bills, and my father would always donate
money to help fund his medical bills.

21

(*Id.*)

Moshe now respectfully and humbly asks that his conviction here be utilized to give him another chance to make others' lives better. The Court should impose a lesser sentence of imprisonment and greater volume of community service, so that this man who knows so well how to help and care for others can use his latter years in life, not rotting away in prison being more of a financial burden on society, but as a continued asset even in his old age. Moshe could provide so much to others, even as a nurse's aide or home health care-worker for which he has some experience, if only given another chance. The Court should use this man's strong and kind spirit – while he is still with us – to benefit the community and turn his misdeeds into good ones.

> 8.    Dr. Mirilashvili's Prior Medical Disciplinary Issues in the 1990s Had a Profound Impact on His Mental State and Future Practice

By the 1990s, Dr. Mirilashvili's practice evolved into one where he was largely administering epidurals and nerve blocks to patients experiencing long-term or chronic pain. This practice was similar to that described by the government's expert witness, Dr. Gharibo, who daily injects patients with various steroid-based treatments. However, Dr. Mirilashvili was later practically precluded from this more typical practice due to an administrative medical board proceeding that revoked his license for negligent recordkeeping.

Dr. Mirilashvili's medical license was revoked by the New York State Office of Professional Medical Conduct ("OPMC") in 1996, following charges brought based on his treatment of six patients between 1990 and 1992, as well as a determination by the Department of Social Services that he violated Medicaid regulations.[3]

---

[3] As documented in the 2003 Report and Recommendation of the Peer Committee, Dr. Mirilashvili's expulsion from the Medicaid program for five years was prompted by his employment of an elderly physician, licensed in Russia, to assist with patient translation. Although Dr. Mirilashvili affirmed that he alone administered nerve blocks to patients, the

Following a hearing, the Committee sustained all charged instances of misconduct, concluding that Dr. Mirilashvili's "records for the initial patient history were inadequate and lacking in specified items of information essential for a history of a patient presenting these symptoms," that he was treating symptoms rather than the underlying causes, and in some of the cases, administering inappropriate treatments. His medical licenses in Pennsylvania and New Jersey were subsequently revoked in 1997 and 1999, respectively, based on the New York state revocation. However, none of that conduct was alleged to be malicious, and it certainly was not criminal in nature. The findings related to specific patients, and not to his practice as a whole. (Dr. Mirilashvili concedes his recordkeeping generally was deficient; due to language deficiencies, it took him much longer to create file records and he invariably fell behind on his patient visits. He makes no excuses for this conduct, but again it was neither criminal nor malicious.)

On April 25, 2001, after being out of the practice of medicine for five years, Dr. Mirilashvili applied for restoration of his license. Near the end of the following year, the peer committee issued a report, ████████████████████████████████████████ ████████████████████████████████ the re-education efforts and "extensive" volunteer work he undertook, and his expressed remorse for the conduct which necessitated the revocation of his license. The Committee recommended that the revocation of Dr. Mirilashvili's medical license be stayed pending completion of another five-year term of probation, at which point his license would be fully restored. (*See* Ex. 27, Report of the Peer

---

unlicensed physician also was taking patient history and blood pressure readings. As a result, the Department of Social Services concluded that Dr. Mirilashvili was fraudulently billing for services performed by an unlicensed physician and expelled Dr. Mirilashvili for a period of five years.

Committee.)

Ultimately, on December 30, 2010, following Dr. Mirilashvili's completion of the probationary period (which, as noted in the March 30, 2011 Investigative Report, was tolled several times, per the conditions of his probation while Dr. Mirilashvili looked for employment at qualifying Article 28 facilities), the OPMC restored Dr. Mirilashvili's license.

During the total time of license revocation and probation, which lasted in actuality for almost fifteen years, ███████████████████████. He battled bouts of self-doubt and worth as he reflected on his own shortcomings as a doctor. He had to mentally and emotionally overcome the embarrassment and humiliation among his peers, friends and colleagues. He finally had to accept the strong scolding and criticism of the administrators about his practices. Dr. Mirilashvili struggled with all of these things in the long years when he tried to become productive as a nurse's aide, a nursing home orderly, or a medicinal purchasing agent for long-term care facilities. The mental anguish of not being able to practice as a doctor, however, took its toll.

The bottom line is that Moshe Mirilashvili loves being a doctor. After the many years of education and training in two countries, and living among his siblings who also all became doctors, he felt that being a doctor defined him, almost as much as being a husband, father and grandfather. He vowed not to give up in his battle to restore his license. However, he was not the same person fifteen years later. Mentally, physically and emotionally, the prior disciplinary proceedings and their consequences weighed heavily on him. He could not find similar positions that he held prior to the license revocation. He could not get enrolled in insurance plans which were necessary to serve patients who were members in those plans. He could not get accepted in major medical groups or those that performed invasive procedures. But he

24

persistently believed he could succeed despite all of these obstacles.

Moshe Mirilashvili's decision, ultimately, to open a pain management practice that focused only on prescription medicine therapy had become his only remaining viable option.  He had to self-study the groups of narcotic and non-narcotic remedies and treatments used for various types of chronic pain.  And, of course, opiates were always the drug of choice – and still are – in this specific field.  Dr. Mirilashvili was not paving new ground in prescribing oxycodone or any of the other anti-inflammatory or anti-depressant medication that was used in his routine regimen.  His chosen cocktail of medicines was, in fact, pretty routine, as confirmed by both parties' experts.[4]

The government never proved, and Dr. Mirilashvili respectfully objects to, the claim that all of his patients paying cash were known to him to be "fake" or diverting prescriptions for resale.  Indeed, the defense presented specific evidence at trial to disprove this false premise.  The testimony of Anna Torres and Altagracia Medina, excerpts of which we reproduce here at Exhibits 28 and 29 respectively, provide actual proof that the government's extrapolation is overbroad and should not be the basis for increased punishment.  Dr. Mirilashvili accepts (although vigorously disagrees with) the jury's verdict.  However, that verdict does not support the government's overreaching claim (and Probation's robotic acquiescence to it) that the evidence proved Dr. Mirilashvili believed that over 70 percent of his patients were diverting oxycodone.  He should not be sentenced according to this heightened level of liability.

Indeed, the testimony of Torres and Medina – objective third-party patients as compared to the biased and self-motivated government witnesses who testified under cooperation

---

[4] Dr. Gharibo, the government's anesthesiologist expert, only took issue with Dr. Mirilashvili's failure to vary or modulate dosages during the treatment regimen.  He never indicated that the medicines themselves were inappropriate or novelly applied.

agreements – show that Dr. Mirilashvili acted like a doctor and not a drug dealer to these patients.  We respectfully submit that the undercover recordings of Jose Lantigua similarly show this.  The words of Dr. Mirilashvili, at a time when he did not know he was being recorded, reveal that he intended to prescribe narcotics only as a temporary relief of pain symptoms – not as an ultimate cure for underlying causes of pain.  (*See* Ex. 30, Transcript of Oct. 18, 2013 Patient Visit by Jose Lantigua.)

None of this history is recounted here to act as an excuse for Dr. Mirilashvili's conduct in this case.  It is relevant, however, in evaluating the venality of his intentions and the scope of the offense conduct.

The letters of former patients and community leaders who wrote the Court about their prior experiences with Dr. Mirilashvili, including his voluntary medical treatment of neighbors and fellow synagogue members and his desire to provide medical care in any way he could, cannot be easily squared with the government's sweeping claims here of a knowing, massive scheme to redistribute hundreds of thousands of oxycodone pills.  Evidence of Dr. Mirilashvili's prior history and conduct is also relevant in evaluating the government's over-generalizations.

While the jury convicted Dr. Mirilashvili of violating the law in his Washington Heights clinic, examples of his beneficial treatment of patients are plentiful, as are the repeated accounts of his sincere efforts to seek remedies for his patients' medical problems.  Even if in retrospect his repetitious prescription of medications was not the best medical practice, or even acceptable standard practice, Moshe believed in a fundamental way that temporary relief from pain offered by lawful medication was not harmful to his patients, and likely beneficial.  Whether he was right or wrong on this subject should not be relevant to his punishment, because he is not being judged on the skill of his abilities as a doctor but whether he performed his duties with medical

26

conditions in mind.  Indeed, the testimony of Anna Torres and Altagracia Medina confirmed these good intentions.  (*See* Exs. 28 and 29, Excerpt of Trial Transcripts of Ms. Torres and Medina.)

Dali Mirilashvili gives important insight into Moshe's perspective when interacting with neighbors, patients and medical staff:

> [I]n some respects, [Moshe] is naïve.  He trusts everybody – even when he shouldn't.  He couldn't imagine that someone would lie to him or do something bad, he only sees goodness in people, because he himself is good.

(Ex. 1, Letter of Dali Mirilashvili.)

Moshe Mirilashvili may have been a bad doctor because he believed he could treat people with the same group of medicines for any pain condition presented to him, but that does not make him a criminal who should remain behind bars for the rest of his life.  His failure to deviate at all in his prescribing practice was not because he had a constant criminal mind, but because he believed his routine was based on some prior learning he acquired somewhere along the arduous road between Soviet Georgia and the United States.  Clearly, Moshe Mirilashvili never pushed himself to develop some knowledge or metric to differentiate patients based on their specific circumstances or histories.  He repeated the same four basic prescriptions and dosages for each patient.  He repeated the need for these four medicines to be taken together based on a singular format that broadly was recommended in medical textbooks.  (*See* Ex. 39, Dr. Mirilashvili's Summary Sheet for Prescriptions.)  Again, maybe this was bad medicine, or at least a poorly executed and undifferentiated approach, but the evidence did not show a persistent criminal intent so substantial and extreme to require a life sentence as the Guidelines recommend here.  Indeed, the evidence did not come close to showing that Moshe Mirilashvili actually believed, or consciously avoided knowledge that over 70 percent of his patients were diverting oxycodone.  In fact, the evidence did not even show by a preponderance that, in fact, 70 percent did.

27

This court should consider the character, mental state, age, foreign background and simple approach of this man.  Moshe Mirilashvili's personal history belies any attempt to hurt people for his own good fortune.  Indeed, Moshe's history expressly *contradicts* such conclusions.  It is unreasonable to believe that Moshe Mirilashvili woke up one day at age 64 and became a master criminal.

The Court needs to consider the evidence presented not only at trial, but at this sentencing proceeding as well to fashion a fair sentence.  The government's cooperating witnesses' biased testimony alone did not present an honest portrait of this good and decent man.  In fact, Abraham Correa and Damon Leonard never intended to get to know Moshe or reveal themselves to him; they only wanted to exploit the simplicity and naïveté he displayed.

Moshe Mirilashvili and Damon Leonard and Abraham Correa were worlds apart.  Tragically, no one – not even the NYPD and DEA when they had the chance (*see* Section I.B.2 *infra* on sentencing entrapment) – expressly confronted Moshe Mirilashvili with the realities of the "street" world that Correa and Leonard brought to his medical practice.  If the NYPD detectives had raised the threat of street sales of pills by certain workers in his office, including Correa, Javier, Augustin Cruz, and Leonard, based on information the police had early on after the first neighborhood complaints in October 2012, fewer prescriptions would have been diverted and Dr. Mirilashvili would not be facing a life sentence.  Indeed, Dr. Mirilashvili's reaction to a direct confrontation about evidence of his staff re-selling patients' pills might have defused the need for a criminal prosecution at all.  While law enforcement had no obligation to present their suspicions and evidence to Dr. Mirilashvili at the outset, the practical consequences of not doing so were clearly devastating to all involved.

9.    Moshe Mirilashvili's Physical Condition Makes It Unlikely that He Could Survive a Lengthy Prison Sentence

A long prison sentence would be a life sentence for Moshe Mirilashvili. He recently turned 68 years old. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████ Up until the time of his incarceration, Moshe was also a heavy smoker. (*Id.*) Moshe's older brother and one sister already have died in their seventies (Boris, at age 72, and Maria, at age 76).

Regardless of anyone's view of the evidence in this case, punishment for this conduct should not result in a life sentence for this otherwise good and decent man. No reasonable and just society would exact such an extreme penalty.

**B.    Nature and Circumstances of the Offense**

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, courts should consider "the nature and circumstances of the offense." In the normal case, this factor is not particularly controversial or difficult to ascertain after trial. However, this is not the normal case. Indeed, the scope of the "offense conduct" in this case is highly disputed between the parties – even after conviction. (*See* Section II, *infra*, Advisory Sentencing Guidelines Calculation.) The government has not presented any credible evidence to support its overbroad claim that Dr. Mirilashvili knew or should have known that over 70 percent of his patients were actual diverters of oxycodone pills. Indeed, the government relies almost solely upon the fact that these patients paid in cash rather than insurance as proof of diversion. This does not pass even the preponderance test.

We do not even ask the Court to throw out the testimony of the government cooperators, Correa and Leonard, although there is ample ground to do so, as we explain below. But even if

you credit their testimony, the amount of patients and pills they testified about combined with the amount of pills which other co-defendants have admitted to distributing, total just shy of 90,000 pills – about two-thirds of which were obtained from unrelated doctors charged in other cases. Thus, the only number of pills that Dr. Mirilashvili could be held accountable for – in a view of the evidence most favorable to the government – is about 30,000 pills, which equates to 5,928 kilograms of marijuana under the Sentencing Guidelines.  This is a far cry from the over 920,000 pills that the government and Probation have calculated based solely from the number of prescriptions written for cash patients. (*See* PSR Second Addendum, at p. 22.)  The government's theory is unproven and contrary to its own evidence presented both at trial and during the guilty pleas and sentences of charged co-defendants.

While the Court has had the benefit of presiding over the trial in this case as a means to assess the nature and circumstances of the offense, there are two additional issues that are worth raising here.

First, the Court heard only the trial testimony of Damon Leonard and Abraham Correa and did not have the benefit of the recordings taken by Correa after he agreed to cooperate with the government.  There were three consensual recordings between Correa and Leonard:  (1) July 10, 2014; (2) September 11, 2014; and (3) September 15, 2014.  These recordings present an entirely different perspective of Damon Leonard, and Correa too.  We attach these transcripts here to give the Court additional evidence to evaluate Leonard's considerable ability to play different roles when needed:  at trial, he was the uncertain guy thrust into other people's schemes for which he wanted no part of, but when talking to Correa, his co-conspirator who was secretly recording him, Leonard's true colors were revealed.  His words were often chilling in their ruthlessness, their celebration of violence (particularly towards women), and in their deviancy to avoid detection in

the drug trade.  The jury never heard the majority of Leonard's musings because of hearsay objections by the government.  However, these conversations are now relevant at sentencing to judge the extent to which Leonard duped those around him, including those in these proceedings.

Leonard was a high-level drug dealer, but he played to Dr. Mirilashvili, the jury and this Court as an innocent kid caught up in other people's crimes.  Dr. Mirilashvili was initially duped into hiring Leonard and then Leonard used his guile to control the doctor's practice.  In the same way, Leonard later used his cooperation agreement to minimize his managing role as a crew chief and to paint Dr. Mirilashvili as a mastermind drug dealer.  Leonard's lack of credibility is only truly revealed in the attached recordings.  The Court should be aware of the astounding extent of Leonard's manipulations and lies.  Leonard's recordings are absolutely relevant in evaluating the government's deficient proof of scope of Dr. Mirilashvili's offense conduct.  Ironically, Leonard performed before this Court just as he had done at Dr. Mirilashvili's medical office dastardly vaudevillian acts with stunning consequences.

Second, we respectfully address the particular facts of how the New York Police Department and the federal DEA, had the opportunity to inform Dr. Mirilashvili from the very opening of his medical office in Washington Heights of the dangers of the people around him.  They could have confronted him immediately with evidence of drug diversion.  For reasons unknown, they decided not to.  Instead, they let the practice continue for two years, despite the public safety risks related to drug diversion (and security risks to Dr. Mirilashvili and those honest patients who visited his office) that this failure to act caused.  We can only surmise what Dr. Mirilashvili might have done if confronted early on with the prospect that some of the people who visited his office and asked for employment were leaders of violent drug crews and had criminal histories.  We do know that Dr. Mirilashvili had no prior history of any criminal conduct,

31

let alone violent and dangerous crimes.  It is reasonable to suspect that he might have moved or closed the office, or at least fired the problem staff (as he later did with Augustin Cruz and Jomaris Javier).

       1.    <u>The Consensual Recordings Between Leonard and Correa Reveal a Devious and Ruthless Set of Drug Dealers Intent on Keeping Their Schemes Secret</u>

Despite Leonard's trial testimony that attempted to show he was a mere pawn in Dr. Mirilashvili's "get-rich-quick" scheme, the secret recordings by Correa actually reveal a man who knew how to manipulate people and facts to ensure his personal gain on illegal drug deals. Leonard was the man in charge.  He helped push Jomaris Javier and Augustin Cruz out of their office positions by telling Dr. Mirilashvili about how they altered files and lied to him about doing the New York State PMP database checks.  Once Leonard gained the office manager position, he had control of setting up appointments, the ability to add to his patient list to obtain prescriptions that he later sold for $1,800 per prescription, and new power to demand "vigs" or fees from other people who wanted to add patients to the doctor's appointment calendar.  Leonard also collected fees for making appointments and ensuring good urine test results, known as "overrides."  Leonard even had his son's nanny escort his "controlled" patients to pharmacies to ensure that Leonard obtained the pills for diversion.[5]  When one patient under Leonard's control, Amanda Nunez, did not comply in giving her oxycodone pills to Leonard, he threatened to hire thugs to hunt her down and "nail her."

---

[5] Damon Leonard also spoke on the tapes about having his "mother" escort patients to pharmacies to ensure that the patients turned over their oxycodone pills to her in exchange for a fee.  At trial, Leonard gave the incomprehensible response that the term "mother" in the recordings was an example of Ebonics (defined in The Free Dictionary as "any of the nonstandard varieties of English spoken by African Americans").  Whomever Leonard referred to as "mother" in his recordings with Correa also accompanied patients under Leonard's direction and sold prescriptions for cash. (*See* Ex. 32, Transcript dated Sept. 11, 2014 of KEL Recording by Abraham Correa at 12.)

These are the things Leonard revealed when he thought no one was listening.  But to the jury and this Court he denied most of this, or panned it as "Ebonics," and got away with it – all in order to attain the goal he repeated on the tapes with Correa – "I don't, I ain't, jail ain't for me." (Ex. 32, Transcript dated Sept. 11, 2014 of KEL Recording by Abraham Correa at 12.)  And he, in fact, accomplished his goal.

The Leonard recordings are also relevant to evaluate his interactions with Dr. Mirilashvili. Leonard did everything he could to deceive the doctor and when the doctor "started getting smart" in catching up to some of these means of deception – like altering the New York State pharmaceutical database results, changing urine test reports, or forging MRI documents – Leonard found new ways to dupe the doctor.  For example, the recordings reveal that when Dr. Mirilashvili changed the vendor for conducting urine narcotics testing and learned that the results could be posted directly to a computer portal that he could access on-line, Leonard had to inform Correa and others that they could no longer "override" negative urine tests by altering hard copy reports.  They were stuck with the results, and bad urine test reports would get patients kicked out of the practice.  Nothing in Leonard recordings indicated a joint enterprise with Dr. Mirilashvili to divert pills.  In fact, the transcripts, which we strongly urge the Court to review prior to sentencing, show just the opposite.

We provide the following excerpts as examples of the honesty chasm between Leonard's trial testimony and his secretly recorded words:

- Leonard told Correa that he sells oxycodone prescriptions for $1,800 each after he buys them from "controlled" patients:  "I get 18, I get 18.  For that n**ga.". In that same conversation, Leonard tells Correa he can get more prescriptions for Correa: "I mean I can get you . . ."  (Ex. 31, Transcript dated July 10, 2014 of KEL Recording by Abraham Correa at 9.)

- Leonard persuaded others to use cash to pay for their patients' doctor visits and urine tests, and not insurance.  Leonard recounted on the tapes how this nearly got

33

him in trouble with some of the people directing patients to Dr. Mirilashvili's clinic when Jomaris Javier told these same people that Leonard was lying to them and that the doctor accepted insurance even for urine tests.  Leonard became furious at her:  "[S]he told Black [co-defendant Thomas White] and them that, 'Oh, you ain't gotta spend.'  I know she's probably thinking like this, 'you ain't gotta spend, you can use insurance for the urine.'  I never told Black because Black always paid cash.  He told you, 'I don't deal with . . . let me know.'  He felt some kind of way but he never told me.  Benny's talking to me, 'N**ga, Black felt some kind of way because you didn't tell him that he can use insurance.'  I said, 'this dumb mother***ker, he never said nothing about that.  He always used cash.'  And that was that.  So, that was an eye opener for me for, Jesse O'J [Jomaris Javier], it's been pretty good up here.  There's no overrides [changing urine test reports], everything is going good.  I don't do that because I keep telling them, 'this ain't no game.  This ain't no game, no.  N**gas get killed for this, don't play around, don't tell n**gas certain sh*t.'  And then I'm walking, I'm walking, the next thing I'm doing something they want . . ."  Correa understood that Leonard was keeping control of business and not letting Jomaris Javier screw up their side business of collecting fees or keeping cash.  Correa responded: "Keep it in a loophole for whatever you're trying to do on the side." (Ex. 32, Transcript of Sept. 11, 2014 KEL Recording by Abraham Correa at 4.)

- Leonard told Correa how Jomaris Javier tried to get patients to pay her money to make appointments for them, rather than paying Correa a fee to get in at the door.  Leonard later received the extra money for making appointments once Javier was fired and Leonard took "the helm":  "Because [Javier] was like, so then she told me, she was like but then she told me he told her, Auggie [Augustin Cruz] and her were like, 'Yeah, f*ck that, f*ck Buck [Correa] come give us the money."  I'm like d*mn.  Like, I'm sitting up . . . too like d*mn Jay [Javier].  So, I'm saying alright, 'Bi**ch you is f**ked up.'  I'm not saying that, I'm like, 'I don't give a f**k' because at the time I'm not at the helm but I don't care, but I'm like d*mn.  So, then I ask, I'm like, 'Yo, what was it to her?'  If Papi Shampoo's doin' 200 [to Correa], like doin' do.  I'm like, if he's doing them why would you not want Buck [Correa] to get that?'  That's nothing, that's supposed to be your ride, that's nothing to you.  All this f**king money you're making, why'd you not let him get that $300?  F**k that.  That's what you do.  I know her.  This is her, conniving b**ch." (*Id.* at 6.)

- Leonard explained to Correa that because Dr. Mirilashvili was changing the company that did the urine testing and was moving to a computerized reporting system, rather than faxed hard-copy reports, Leonard could no longer manually "override" or alter the report findings and protect patients with bad results:  "The doctor's getting smarter, he no longer wants me to put [the lab reports] in the paperwork.  This is a lab form, this is the last lab we used to deal with, he doesn't want this in the packet no more.  He wants just the PMP and this one [the lab report] goes to the computers so I told all these n**gas, I said 'Yo, fam, if you drop your urine and the sh*t ain't no good I can't no longer help you,' because it ain't like I can change it.  I can't do nothing.  The only thing I can do is alert you,

34

fam, this is no good, you've got to drop again.  That's the only thing.  I can't nothing.  [The doctor] wants to see it and I said, 'You see?  If you go in there and he pulls your sh*t, it's no good, he's throwing you out.  Now what do you do?'  So, I tell them, 'Yo fam, nothing I can do now, I can't put it in the packet and even warn you like [before] . . ." (*Id*. at 7.)

- Leonard explained how he had to be smart in his drug business to avoid jail.  He changed his phone monthly so it could not be traced:  "I've changed my number again and it's going to be changed again.  Papito, the ni**ga I f**k with, buy my phones.  He bought me a new one, every month he buy a new phone for me so I've got a new one and I need to change it.  He asked you . . . so, yeah, but that's what it's been like.  Like I try to keep my sh*t because, I don't, I ain't, jail ain't for me fam." (*Id*. at 12.)

- Leonard tells Correa and other "crew chiefs" how they needed to get real MRI paperwork because Dr. Mirilashvili wanted to verify the reports with the radiologist at the MRI clinic:  "The doctor's like, 'Damon did you verify [the MRI paperwork]?'  I'm like, 'Yeah Doc, I verified it.'  Okay, ok, no problem.  Then, he does it for 10-15 minutes, right, then he said, 'Damon come in.'  [The doctor] called, he said, 'I called,' and he said that there's always someone on the other line just waiting to pick up.  I want to talk to the doctor.'  I told Mitch and them, 'Fam, [the doctor] ain't gonna just wanna talk to the receptionist, he gonna want to talk to the doctor, the doctor's license number, see, asking questions.'  [Laughter] I told Mitch and them.  Mitch will be okay with it but it's Dogs, he's trying all types of sh*t. . ." (*Id*. at 12-13.)

- Leonard told Correa that he found an MRI clinic that would issue real MRI reports for a fee, and that Jomaris Javier and Leonard had the contacts to get new MRI reports so there would be no problem with verification by Dr. Mirilashvili:  "Send them to Madison.  To Madison, for their MRI.  It's right on Madison.  There's one on Fifth Avenue and 122nd or something like that. . . You can get that [MRI reports], it's legal sh*t or J [Javier], her and what's her name, she said send them over there and then they'll whatever, they'll do . . . Over there to their office and her and what's her name . . . to Heidi, you know what I'm saying?  When you call to verify, they'll pick up and have this sh*t in their system, like they really know me like that.  You know what I'm saying?" (*Id*. at 15-16.)

- Leonard bragged to Correa that he built an empire bigger than Augustin Cruz because his position at Dr. Mirilashvili's clinic enabled him to buy a lot more oxycodone prescriptions from patients than Cruz could:  "I'm like, this ni**a's a f**king idiot; this is what I said to myself, Aug [Augustin Cruz], you don't even had six people, right?  Now, that's good money because you don't have to deal with 15, 20.  So your money is like, once you get it, your money sits still.  I said bro, this is what I said to myself, I said 'Fam, if you're sitting on 200 racks [$200,000] then what the f**k am I sitting on?  Because I've got more people than you I've been adding on people, adding on people longer than you." (*Id*. at 21.)

35

- Leonard told Correa how he used his son's nanny, Rosie, to escort patients out of the clinic and fill prescriptions to be purchased by Leonard. He explained how he kept pills he bought out of the office so he would not get caught by the doctor: "I sent the lady [Rosie, the nanny], down there and then she . . . As soon as she called me, because she was picking up my son, and then she got two [prescriptions] for me. I tell you, she runs for me. I don't allow [the patients] to come back [to the office], I don't have none of them at the office, I walk out of here, nig**s try to run up on me." (Ex. 33, Transcript of Sept. 15, 2014 KEL Recording by Abraham Correa at 3.)

- Leonard told Correa how one patient, Amanda Nunez, was giving him a hard time and how he had to have Rosie make sure Nunez gave up her pills: "I told [Amanda Nunez], I told her today she was going down there to take care of business [fill the prescription] by herself but I had Rosie [Leonard's nanny] to go with her. I told Rosie to go with her because Rosie won't come back. Take her, pay her, and then boom. This bi**h gets mad. 'Oh, you told me you don't trust me. You told me you won't let me go by myself.' I said, 'Amanda, I don't want the medicine back in the office with me. Give it to Rosie, Rosie will do what she's got to do." (*Id.* at 6.)

- Leonard also told Correa that this same patient, Amanda Nunez, was keeping pills and not selling them to Leonard. He told Correa how he threatened her and intended to have her beaten up if she continued to refuse to produce the pills: "So now, [Amanda Nunez] is calling me and asking me why I left that mess of messages because I was calling and she wasn't picking up. 'You heard what the message is. You got it?' She was like, 'No, I got it. I'm in my house now. I got it. Don't make me mad because I'll get rid of it.' 'Oh no, no, go ahead, throw it away. You can do whatever you want to do. You can go ahead and do that. You can't come back. You can't come back. If I find out that you're busted and I don't get at least my 300 [dollars for paying for her doctor's visit and urine test], I'm a nail you. I'm not playing. I'm a nail you. I'm going to have some bi**hes nail her. I told her I'm not playing with her. 'You think this is a game?'" (*Id.* at 16.)

- Leonard continued to tell Correa in chilling detail his plans for Nunez: "You know what I'm saying? I was just going to dead her. I was going to tell her, 'yo, that's it.' You know what I mean? So that was it. So now, we are sitting there while I leave that. Take that. Take that what I just told you. If I don't have my sh*t in my hand [pills or money], don't worry about it. You'll see what happens. I know where you at. I know exactly where you're at. I used to go to school up there on Forest [Avenue, in Bronx], so I know a bunch of people who don't play around. I can make one call. Do me a favor, bro. The Spanish dude who lives in the building. He comes late. Around like ten o'clock mostly, nine. Yo, I asked him, yo. Here, floor this b**ch, just for f**king with us. Floor her. That's it. Two b**ches floor her. That's what we do. That's how we gonna do it. Then you won't know where it came from." (*Id.* at 16-17.)

We respectfully present these detailed and extensive excerpts of the Leonard recordings, not to excuse the convictions of Dr. Mirilashvili, but to put in clearer light the difference between what Leonard testified to at trial and what he actually said during the conspiracy. The difference is important. The Court must decide the scope of the conspiracy for which Dr. Mirilashvili was convicted. The Leonard recordings contradict much of the Leonard trial testimony in which he downplayed his role and indicated he was just doing the doctor's bidding. It is beyond question that based on the multiple recordings between Leonard and Correa that Leonard directed a much broader scheme of illicit pill sales which he did not share with the doctor. These recordings do not corroborate a claim by the government that Dr. Mirilashvili knew or should have known that more than 70 percent of his patients were diverting pills. Leonard, as others did, conducted their diversion business outside the office by buying prescriptions from the doctor's patients. It is totally left unproven how many patients were known or should have been known to be "fake" at the time of their doctor visits. Indeed, much of the Leonard recordings lay out the elaborate steps taken by Leonard in conjunction with others – Javier, Cruz, et al. – to deceive the doctor.

Given the compelling contrast and myriad contradictions between Leonard's trial testimony and what he said in secretly recorded conversations with Correa, this Court should not rely on Leonard's testimony as sufficient proof of the foreseeable scope of the conspiracy known by Dr. Mirilashvili.

2.   The Government Engaged in a Form of Sentencing Entrapment By Not Confronting Dr. Mirilashvili With Evidence of Diversion Outside His Clinic in the Earliest Days of the Clinic's Opening

The government's evidence shows that the government had evidence of drug divergence occurring outside of Dr. Mirilashvili's office "[s]ince in or around October 2012 . . . almost immediately after the Clinic began operation . . ." (See Ex. 37, Affidavit of Det. Victor Lebron,

DEA Tactical Diversion Squad dated Jun. 4, 2013, at 4.)  The government presented evidence at trial of neighborhood complaints about long lines of patients stretching down the street of the clinic, and these complaints ostensibly led to an investigation  by the New York Police Department.  Detective Lebron, who was an NYPD detective specially designated to the DEA, began an investigation of the Clinic almost on the day its doors opened.  He began "surveillance of the Clinic beginning in or around November 2012." (*Id.*)  This surveillance soon developed evidence of apparent hand-to-hand exchanges on the streets outside the Clinic, and also vehicles observed on the street were determined to be registered to individuals with criminal records. (*Id.* at 5.)  As early as December 2012, Detective Lebron obtained information from a Confidential Source ("CS") employed by law enforcement to infiltrate the Clinic. (*Id.* at 5.)  This CS posed as a "patient" and obtained information about being forced to pay the doorman to the Clinic $100 to gain entry, then having to pay an additional $100 to an office manager to get an appointment, and then said he obtained a prescription for oxycodone without any medical questioning or examination.  (*Id.*)  Despite having this information just weeks after the opening of the Clinic, the agents never informed Dr. Mirilashvili of the extortive conduct of his employees and what they observed about patients leaving the Clinic.  Notably, the agents did not make arrests of Dr. Mirilashvili and his staff until two years later in December 2014.

Also, in January 2013, DEA regulators conducted a regulatory office visit to Dr. Mirilashvili's clinic as a Practitioner in Schedule 2 – 5 Controlled Substances. (*See* Ex. 38, DEA-6 Report of Investigation, Jan. 9, 2013.)  This office visit and inspection occurred *after* the DEA and Detective Lebron had gained substantial evidence of drug divergence occurring outside the Clinic.  Despite being armed with this information, the DEA agents who inspected the clinic and questioned Dr. Mirilashvili did not inform the doctor of the results of the DEA's surveillance and

the possibility of a major public health risk as a result of the conduct of at least some of the employees at the Clinic and some patients.  Indeed, these issues were not raised at all.

Thus, the government intentionally let the Clinic continue to operate for two more years after its initial collection of evidence.  It could have confronted Dr. Mirilashvili with its evidence and put him on notice of the possible crimes being committed at least outside of the Clinic and the unusual actions being taken by his employees of extorting money from patients.  Its failure to do so had a substantial adverse impact on public health and could have prevented Dr. Mirilashvili from continuing to operate with criminal staff.

While these facts do not make out a typical case of sentencing entrapment, as far as that legal theory goes, the government's actions – or lack of action – should be considered by the Court in terms of what Dr. Mirilashvili knew or should have known about the full scope of the crimes being committed around the Clinic.  It is noteworthy that in a case where the government relied upon a conscious avoidance theory of guilty intent, the agents had an early opportunity to directly confront the doctor and gauge his response to specific information of drug diversion happening outside his clinic.  Such action certainly would have had an immediate impact on improving public safety and likely would have provided critical evidence to show whether Dr. Mirilashvili indeed had a deliberate intent to run a diversionary "pill mill" as the government subsequently over-broadly claimed.

Instead, law enforcement waited for over two years and 920,000 pills later before taking any action to shut down the Clinic.

## C. General and Specific Deterrence

According to 18 U.S.C. § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."

Analysis of "specific deterrent" factors should properly include the effects Dr. Mirilashvili has

already suffered and the fact that he will never be a licensed medical doctor again.  As to "general

deterrent" factors, the Court should consider the fact that, here, the public – and more particularly

pain medicine physicians specifically – have become well acquainted with the devastating

consequences of this and other similar cases, which already have sent a strong and unambiguous

message about the careless prescription of opiate narcotics.  The repeated drumbeat of changes in

national medical associations' protocols for administering opiates and proposed legislation

regulating these protocols have been blasted on front pages of newspapers and medical magazines

on an almost weekly basis.  The message has been sent regardless of the length of Dr.

Mirilashvili's prison sentence here.

 As to specific deterrence, there can be no doubt that Moshe Mirilashvili already has paid

an enormous price for the actions that were the subject of this case.  He has lost the ability to

practice medicine forever.  He cherished helping others understand their medical problems and

offering advice to solve them.  His identity was wrapped up in his profession.  This part of his life

is now dead.

 Moshe Mirilashvili has watched his family suffer hardship and agony at the hands of his

lost liberty and ability to be with them at their various family milestones or even in their daily and

weekly routines.   Moshe has suffered the seizure of basically all of the financial assets that he

accumulated for his family over nearly forty years of professional life.  He faces never spending

another day as a free man. He is 68 years old, a convicted felon and facing little hope to see his

children and grandchildren growing up in their homes and communities.

 These facts should be considered as part of the specific deterrence factor at sentencing,

because in this case not only is Moshe Mirilashvili more than sufficiently personally deterred by

the events charged here, but these events will actually prevent him from ever being in a position in which such conduct is even possible in the future.

As studies have repeatedly shown, recidivism rates also decrease markedly as an individual gets older.[6] For nearly all types of crimes, the probability of crime increases during the adolescent years, peaks in late adolescence, declines steadily throughout ages 20-35, and declines sharply after age 35. Dr. Mirilashvili is well beyond those years and is facing a period of life when he should be contemplating visiting grandchildren and quiet retirement, not imprisonment. At the time of sentencing, Dr. Mirilashvili will be at an age in which the statistical data suggest crimes are negligible; he is a well-worn 68 years old. *See United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-*Booker*, courts have observed that recidivism is markedly lower for older defendants" and collecting cases); *United States v. Sanchez*, No. 99 Cr. 338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'") (citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (2004) and collecting cases); *see also United States v. Hamilton*, No. 07 Cr. 2874, 2009 WL 995576, at *3 (2d Cir. April 14, 2009) (unpublished) (reversing and remanding for resentencing because "the district court abused its

---

[6] David Farrington, "Age and Crime," Crime and Justice, Volume 7, 1987; *A General Theory of Crime* (Michael Gottfredson and Travis Hirschi, 1990); *Crime in the Making* (Robert Sampson and John Laub, 1993); Terri E. Moffitt, "Adolescence-Limited and Lifecourse-Persistent Antisocial Behavior," *Psychological Review*, 1993; American Youth Violence (Franklin E. Zimring, 1998); *see also* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://www.ussc.gov/publicat/Recidivism-General.pdf: "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates").

discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines."); *United States v. Cavera*, 550 F.3d 180, 219 n. 4 (2d Cir. 2008) (noting that "when the district court varied from the Guidelines because of defendant-appellant's advanced age and the 'inverse relationship between age and recidivism,' the district court cited numerous cases, many of which, in turn, relied upon a recidivism study of over 6,000 individuals that was conducted in 2004 by the Sentencing Commission.").

As numerous letters enclosed herein have recounted, Moshe Mirilashvili is a man whose professional, intellectual and personal accomplishments earned him the respect of large numbers of neighbors, community members, religious clergy, and extended family. His achievements as a doctor pale in comparison to the love and protection he has showered on his own family since he was a young man. Now the respect that Dr. Mirilashvili had built over a lifetime of work as a medical doctor has been severely diminished, if not destroyed, and his capacity to protect his family has been exhausted. Since his arrest, he has endured the inability to guide his children and grandchildren through the emotional trauma of seeing him tried and convicted. Nothing can describe, much less rectify, the immeasurable suffering attendant upon these realities. As many who wrote on Moshe Mirilashvili's behalf have recalled from encounters and observation, the pain Moshe has felt during this time has been real and, at times, overwhelming.

Under these circumstances, the sentencing policy of specific deterrence, like that of general deterrence, has already been largely accomplished by these proceedings. Several years of incarceration are not necessary to amplify these messages.

### D. Avoidance of Unwarranted Sentencing Disparity

18 U.S.C. § 3553(a)(6) requires the Court to consider sentences afforded to defendants "with similar records who have been found guilty of similar conduct."  The primary purpose of this provision is to reduce unwarranted sentence disparities nationwide.  *United States v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007).  What the statute commands is for the Court to examine the criminal conduct upon which the defendant's conviction is based and, in sentencing the defendant, consider the sentences by other courts for similar criminal conduct.  Thus, the linchpin of the disparity analysis is the specific criminal conduct that formed the basis for the jury's verdict, not the criminal statutory provision that was violated and not every allegation in the indictment.

Two recent cases in the Southern and Eastern Districts of New York provide guidance here.  In this district, the government charged Dr. Kevin Lowe with running a massive oxycodone distribution conspiracy.  *See United States v. Kevin Lowe, et al.*, 14 Cr. 55 (LGS) (S.D.N.Y.).  Dr. Lowe recruited several doctors to work in bare office buildings throughout the city, ordered them to write oxycodone prescriptions in exchange for cash, and monitored their compliance by surveillance.  A jury convicted Dr. Lowe of conspiring to illegally distribute oxycodone.  At sentencing, he was held responsible for "nearly 35,000 medically unnecessary oxycodone prescriptions written by doctors under [his] control during the period of the charged conspiracy." (Gov't Sent. Mem. at 3; ECF No. 651.)  Dr. Lowe (and the doctors under this control) prescribed oxycodone typically in 180 pill quantities, resulting in him being held responsible for approximately *6 million* 30-mg pills of oxycodone.

Consequently, Dr. Lowe's Guidelines were calculated as follows:  his base offense level was 38 pursuant to U.S.S.G. § 2D1.1(c)(1) because 6 million 30-mg oxycodone pills is equivalent to 1.3 million kilograms of marijuana; and he received a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) for being an organizer of a criminal activity involving five or more participants.  Dr. Lowe's total offense level was 40.  He had no prior arrests and was in Criminal History Category I.  In the end, his Guidelines range was calculated as between 360 months to life imprisonment with a statutory maximum of 240 months.  Probation recommended a 240 month sentence while the government requested "a substantial term of incarceration."  (Gov't Sent. Mem. at 5; ECF No. 651.)  Nonetheless, the Honorable Lorna G. Schofield sentenced Dr. Lowe to 144 months.

Dr. Lowe's conduct is far more egregious than the conduct alleged to have been committed by Dr. Mirilashvili—even if the Court were to adopt the government's view of the evidence, which it should not.  Dr. Lowe recruited other doctors into his scheme and distributed more than 6 million pills.  He was facing a life sentence under the Guidelines.  And yet he received 144 months.  Dr. Mirilashvili, by contrast, did not recruit other doctors and is being held responsible for at most approximately 15% and at least 0.49% of Dr. Lowe's pill count.  Dr. Mirilashvili should not be sentenced anywhere close to Dr. Lowe's 144 months of imprisonment.

In a similar case in the Eastern District, the government charged Dr. Leonard Stambler with conspiring to illegally distribute oxycodone.  *See United States v. Leonard Stambler*, 11 Cr. 213 (JFB) (E.D.N.Y.).  He was similarly convicted after trial of prescribing vast sums of oxycodone to patients.  Among other things, the evidence established that he:  prescribed oxycodone to patients who were visibly suffering the effects of opioid addiction/withdrawal; witnessed patients snorting oxycodone; replaced forged prescriptions discovered by pharmacies

44

with real ones; provided prescriptions to co-conspirators in the names of other patients; discussed with co-conspirators where they should sell pills; and lied during his testimony at trial. His Guidelines range was calculated to be 188 to 235 months' imprisonment and the government recommended a sentence "at the high end" of that range. (Gov't Ltr. dated Jun. 27, 2014; ECF No. 124). The Honorable Joseph F. Bianco sentenced Dr. Stambler to 120 months.

Again, the contrasts here are stark. Dr. Stambler didn't just prescribe oxycodone illegally; he actively facilitated and directed his co-conspirators in their pill-selling. And he used other patients' identities to cover up his crime. And he lied under oath at trial. All of these things suggest that the sentence he received also far exceeds the type of sentence that is appropriate here.

There are, of course, other cases involving doctors convicted of conspiring to illegally distribute oxycodone.[7] For example, in *United States v. Resnick*, *et al.*, 14 Cr. 412 (CCB) (D.Md.)—a case involving *multiple* pain management clinics and the deaths of several patients— the harshest sentence handed down was 36 months imprisonment. Another example is *United States v. Edward Feldman*, *et ano*, 14 Cr. 521 (JDW) (M.D.Fl.). There, a jury convicted a doctor of illegally distributing oxycodone and held him responsible for causing the deaths of three patients. Dr. Feldman was sentenced to 300 months imprisonment (just 8 months longer than Probation's recommendation here). Cases involving patient deaths are far more serious than the conduct alleged here and the sentences should reflect that difference as well.

---

[7] In this case, the Court already has sentenced many of the charged co-defendants. A chart listing these sentences is attached as Exhibit 40. Notably, the highest sentences to date were 108 and 115 months imprisonment—and those sentences were imposed on "crew chiefs" in Criminal History Category VI.

45

## II.   THE ADVISORY SENTENCING GUIDELINES

Dr. Mirilashvili's position with regard to the advisory Sentencing Guidelines is two-fold.

<u>First</u>, we object to the Guidelines calculation in the PSR Second Addendum, as expressed in Dr. Mirilashvili's multiple letters to the Probation Department, dated June 2, 2016 and August 4, 2016 (attached respectively as Exhibits 34 and 35).  Probation repeatedly denied our objections, stating repeatedly that it "conferr[ed] with the government" and "no changes will be made." (PSR dated July 1, 2016 , p. 20-21.) (On September 9, 2016, Probation issued a Second Addendum to the PSR which purports to, but does not in fact, address our objections.)  Probation failed to identify the specific facts it relied on in denying our objections.  In addition to our Guidelines calculation objection (discussed herein), we reiterate our objections to the PSR contained in our attached letters—specifically as to Paragraphs 19, 21, 22, 24, 27 – 36, 39 – 43, 61, 67, and 75 of the July 1, 2016 PSR (Probation renumbered paragraphs 67 and 75 to 68 and 76 respectively in the PSR Second Addendum).

<u>Second</u>, we respectfully submit that on a more fundamental level the Guidelines offer no meaningful guidance in this case, and after being calculated and considered, should ultimately be disregarded with respect to the determination of a "reasonable" sentence.  As often happens in narcotics cases, the mere quantity of drugs leads to an offense level that reaches an absurd result – here (as calculated in the PSR Second Addendum), a recommended sentence of 24 to 30 years. *See* PSR Second Addendum, pgs. 24-25.) (recommending a sentence of 24.3 years or 292 months in custody).

The Guidelines in this case are so far out of line with fundamental fairness and proportionality in sentencing that, we submit, the ultimate sentence should be determined on entirely separate grounds. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) ("When

the Guidelines range zooms off the sentencing table, sentencing judges are discouraged from

undertaking close examination of the circumstances of the offense and the background and

characteristics of the offender. . .") (Underhill, J., concurring).  As Judge Jacobs concluded after

evaluating the arithmetic computations of the Guidelines in a case involving possession of child

pornography, where the calculation yielded a practical life imprisonment recommendation:

"something needs to be re-thought when in a case like this, the Guidelines calculation yields a life

sentence.  That is the sentence imposed on Jeffrey Dahmer, who killed people, and ate them."

*United States v. Broxmeyer*, 699 F. 3d 265, 303 (2d Cir. 2012) (Jacobs, J., dissenting).

Without minimizing the seriousness of the convictions in this case, it is beyond question

that in a fair and decent society, a recommendation of life imprisonment for Dr. Mirilashvili lacks

any relation to proportional justice.  This unreasonable result stems from a problem inherent in

the Guidelines formulas, which have become unmoored to empirical data and experience relating

to sentencing goals of fair punishment and deterrence.

Sentencing courts in this district have described "the utter travesty of justice that

sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that

guideline calculations can visit on human beings if not cabined by common sense."  *United States

v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93, at **1 (2d Cir.

Dec. 9, 2008).

### A.  Probation's Miscalculation of the Guidelines

Probation begins its Guidelines calculation with its wildly speculative and unproven claim

that Dr. Mirilashvili's offense conduct involved the unlawful distribution of "920,970 30-mg

oxycodone pills."  (PSR Second Addendum ¶ 68.)  That number isn't supported by "facts" in the

PSR Second Addendum, bears no relation to the trial evidence, and contradicts other information

that the government provided to Probation about the charged conspirators.  In short, the PSR Second Addendum does not support its calculation with any proven facts.

Probation explains that it reached its 920,970 pill number as follows: it determined that Dr. Mirilashvili wrote 14,621 oxycodone prescriptions between 2012 and 2014, subtracted prescriptions where the visit involved Medicaid or Managed Care coverage (4,388 prescriptions), and then multiplied each prescription by 90 pills.  (PSR Second Addendum ¶19.)  At bottom, Probation asserts that Dr. Mirilashvili knowingly acted outside the course of usual medical practice and without medical judgment in prescribing oxycodone to *each and every* patient who paid him cash for their visit (as opposed to using insurance).  (*See* PSR Second Addendum ¶ 19, 61.)

But the trial evidence does not support that conclusion.  In fact, that conclusion was proven false at trial by the testimony of two patients—Altagracia Medina and Anna Torres.  Both Ms. Medina and Ms. Torres paid Dr. Mirilashvili largely in cash.  They testified that Dr. Mirilashvili conducted real examinations of them during which they reported to Dr. Mirilashvili their actual painful conditions, and they took the medication he prescribed them (including oxycodone) for pain relief.  (*See* Exs. 28 and 29, Excerpts of Medina and Torres trial testimony, respectively).  The Torres and Medina patient files are part of the trial record and contain no fraudulent paperwork.  Consequently, there should be no dispute that the Guideline calculation cannot be based solely on the method of payment for the doctor's visit.  Accordingly, Probation's Guidelines calculations should be stricken and replaced with the calculations proposed below,

which are based on the trial record and the data provided by the government in other places of the

PSR Second Addendum.[8]

### B.  The Correct Guidelines Calculation

Our Guidelines calculation relies on the trial record and on additional assertions by

Probation which have been utilized by the Court in other defendant's sentencings in this case.

(*See generally* Ex. 40, Chart of Co-Defendant's Sentences)

Dr. Mirilashvili was convicted of a conspiracy to distribute oxycodone.  Accordingly, his

sentencing Guidelines must account for his own conduct as well the conduct of his co-

conspirators that was "in furtherance of the jointly undertaken criminal activity" and "reasonably

foreseeable" to Dr. Mirilashvili.  *See* U.S.S.G. § 1B1.3.  But the government has never

contended—nor does the trial evidence support a conclusion—that Dr. Mirilashvili worked with

other doctors to unlawfully distribute oxycodone.  Nor did the government contest that Dr.

Mirilashvili lawfully distributed oxycodone to patients paying by insurance.  Instead, the

government limited its allegations to cash-paying patients[9] who were either "crew chiefs" or

worked for "crew chiefs."  Dr. Mirilashvili, therefore, should be held responsible only for the

quantity of pills distributed to "crew chiefs" or their workers, to wit:  approximately 29,493 pills.

The most that can be said from the trial evidence is that the "crew chiefs" consist of some

of Dr. Mirilashvili's co-defendants and Abraham Correa.  Correa accounts for approximately

---

[8] Despite our numerous objections to Probation on this point, it failed both to address the
testimony by Ms. Medina and Ms. Torres specifically or our discussion of the evidence generally.

[9] As demonstrated above, Probation is wrong to assert that any prescription issued to a patient
who paid in cash was unlawful.

10,000 pills.[10]  He testified that he controlled a total of "ten or so" patients who were directed *to multiple* doctor's offices.  (Ex. 36, Excerpts of Correa Trial Testimony at 514.)  By March 2014, Correa testified that the number of "patients" he was still sending to Dr. Mirilashvili's clinic had shrunk to "[m]aybe three or four, if that."  (Ex. 36 at 519-520.)  All of his "patients" were seeing another doctor after May 2014.  (Ex. 36 at 396.)  Thus, estimating liberally that Correa had on average of seven patients that he sent to *multiple* doctor's offices, including Dr. Mirilashvili's clinic, over about a year-and-a-half, each receiving a 90-pill prescription each month, the total number of pills for which Correa could be responsible is approximately 10,000.

The remaining "crew chiefs" are also co-defendants and the PSR Second Addendum sets forth pill totals for each of them.  But those totals are misleading because Dr. Mirilashvili's co-defendants were held responsible for unlawfully distributing oxycodone pills obtained from Dr. Mirilashvili *and two other doctors*.  Those other doctors wrote, respectively, 17,000 and 15,000 oxycodone prescriptions while Dr. Mirilashvili wrote at most approximately 14,000 (his total includes insurance patients and cash patients not working as/under "crew chiefs").  (*See* PSR Second Addendum ¶¶ 27 – 36.)  The PSR Second Addendum does not distinguish between pills attributable to different doctors in arriving at its pill counts for Dr. Mirilashvili's co-defendants.  Consequently, Dr. Mirilashvili should only be accountable for at most one-third of the pills attributable to each of his co-defendants (and Correa).

The PSR Second Addendum attributes 42,600 pills to Joseph Gray; 9,900 pills to Damon Leonard; 9,600 pills to Tasheen Davis; 9,120 pills to Thomas White; 3,240 pills to Dorian Avery;

---

[10] We are not privy to Correa's PSR so we are unaware of the number of pills that the government seeks to hold him accountable for distributing.  To the extent that number is lower, the Court should substitute that number here.

2,160 pills to Raymond Williams; and 1,860 pills to Kevin Frye.[11]  (*See* PSR Second Addendum

¶59.)  As noted above, each of these pill counts includes pills obtained from Dr. Mirilashvili and

two other doctors.[12]  Their pill total is 78,480 (combined with Correa, it is 88,480).  Because Dr.

Mirilashvili is responsible for, at most, one-third of those pills, the correct sum is 26,160.

Combined with Correa's pills, which should also be reduced in similar fashion because he

obtained prescriptions from "multiple" doctors, the final pill count attributable to Dr. Mirilashvili

is 29,493 (which represents a total of approximately 327 90-pill prescriptions).[13]

Section 2D1.1 of the Guidelines applies here.  It provides that an offense involving

29,493, 30-mg oxycodone pills is equivalent to 5,928 kilograms of marijuana.[14]  Because the total

amount of marijuana (equivalent) is between 3,000 and 10,000 kilograms, the base offense level

is 32.  *See* U.S.S.G. § 2D1.1(c)(4).  Two levels are added because Dr. Mirilashvili used a special

skill (his medical license) in committing the offense.  *See* U.S.S.G. § 3B1.3; PSR ¶ 70.  No other

adjustments apply.  That results in a total offense level of 34.  Because Dr. Mirilashvili has never

been convicted of a crime before (and therefore has 0 criminal history points), his criminal history

category is I.  (*See* PSR Second Addendum ¶¶ 79-80.)  Thus, we respectfully submit that Dr.

---

[11] The PSR Second Addendum also attributes 6,240 pills to Carolyn Middleton.  However, the PSR also notes that she "assisted [Thomas] White in bringing Crew Members to the medical offices and to nearby pharmacies to fill the oxycodone prescriptions."  (PSR Second Addendum ¶ 36.)  Middleton's pill count is thus a subset of White's and should not be double counted.

[12] (*See, e.g.*, PSR Second Addendum ¶ 30 (Avery); 31 (Davis); 33 (White); 34 (Gray); 35 (Frye) and 36 (Middleton).)

[13] In our submission to Probation we indicated a slightly lower pill count number due to a miscalculation.  It does not affect our proposed Guideline calculation.

[14] 29,493 30-mg oxycodone pills contain 884.79 grams of oxycodone.  The Sentencing Guidelines provide that 1 gram of oxycodone (actual) is equivalent to 6,700 grams of marijuana.  (*See* U.S.S.G. § 2D1.1 App. Note 8(D).)

Mirilashvili's properly calculated Guidelines range is between 151 and 188 months of imprisonment.

Of course, for the reasons explained in Section I, *supra*, even this sentence is not a reasonable one.  Because of Dr. Mirilashvili's personal history of leading a law abiding life in his first 64 years, his laudable character, advanced age, physical condition, and the disparity of facts of his case compared to other "pill mill" cases in this district and others across the country, the Court should reasonably impose no more than a three-year sentence of incarceration, together with a substantial period of home confinement and community service in a controlled health-care environment.  This recommended length of imprisonment would be equal to the term of custody imposed by this Court on co-defendant Raymond Williams, an admitted "crew chief" who managed several people in a drug diversion ring and who handsomely personally profited from the scheme.  Mr. Williams also presented as an elderly defendant with significant physical ailments and conditions.  In this way, Dr. Mirilashvili and Mr. Williams present as similarly situated defendants for whom a less lengthy prison term would be appropriate but still sufficient to satisfy federal sentencing goals.

This recommended sentence is more consistent with a complete evaluation of the Section 3553(a) factors, including the need to impose reasonable punishment, respect for the law, and adequately assure general and certainly specific deterrence.  Most importantly, it does not translate into a practical life sentence for this 68-year-old husband, father and grandfather.

## **CONCLUSION**

For all of the reasons set forth above, we respectfully urge the Court to impose a sentence of no more than 36 months imprisonment on Dr. Mirilashvili, together with a substantial period of home confinement and community service.

At the core of this Court's sentencing decision, it must pass judgment on another human being: Moshe Mirilashvili. The stakes at sentencing are high for any defendant. Given Moshe's age, they are even more so here. At bottom, this Court is faced with the prospect of fashioning a just but fair sentence or, as Probation has recommended, sending Moshe away to die in prison. We respectfully submit that such a death sentence would not serve the best interests of justice, and certainly would be greater than necessary to accomplish federal sentencing goals.

Dated:  September 14, 2016
      New York, New York

Respectfully Submitted,


_____/S/_____
Henry E. Mazurek
Wayne E. Gosnell, Jr.
Clayman & Rosenberg LLP
305 Madison Avenue, Suite 1301
New York, New York 10165
Phone: 212-922-1080
mazurek@clayro.com
gosnell@clayro.com
Counsel for Dr. Moshe Mirilashvili