

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Partner
mazurek@clayro.com

June 2, 2016

Jill Jefferies
U.S. Probation Officer
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: *United States v. Moshe Mirilashvili*, S2 14 Cr. 810 (CM)

Dear Officer Jefferies:

Please accept this letter as defendant Dr. Moshe Mirilashvili's objections to his draft Presentence Investigation Report ("PSR") dated May 13, 2016. We reserve the right to supplement these objections on receipt of additional information from the government.

Dr. Mirilashvili's primary objection to the draft PSR is its proposed Guidelines calculation, which results in a *life sentence* (or more accurately a death-in-prison sentence) for this nearly 69-year-old defendant. The PSR finds a total offense level of 40, which for this first-time offender, results in a proposed sentence of 292 to 365 months (or 24 1/3 to 30 years). (*See* PSR, ¶ 107.) This calculation is based upon the wildly speculative and unproven claim that Dr. Mirilashvili's offense conduct involved the unlawful distribution of "924,300, 30-mg oxycodone pills." (PSR, ¶ 67.) This number bears no relation to the evidence presented at Dr. Mirilashvili's trial, nor the information that the U.S. Attorney's Office gave to the Probation Department about the charged conspirators. (*See* PSR, ¶ 59.) This fantastical number should be stricken from the PSR.[1]

The draft PSR summarily concludes that: "MIRILASHVILI is only [*sic*] being held responsible for the prescriptions he wrote for cash payments, which is approximately 10,233 prescriptions." (PSR, ¶ 61.) First, this number is not tied to any evidence identified in the PSR. It appears to originate from the overbroad premise that Dr. Mirilashvili knowingly acted outside the course of usual medical practice and without medical judgment in prescribing oxycodone to *each and every* patient who paid him for their visit with cash (as opposed to using insurance). This giant leap is not supported by the trial evidence, does not logically flow, and was actually

---

[1] It appears that the PSR's offense conduct section merely tracks the language used in the government's original Indictment, which of course represents only allegations and not evidence.

proven false at trial based on the testimony of two patients (Altagracia Medina and Ana Torres), who paid Dr. Mirilashvili largely with cash and who testified that they received real examinations, had reported to the doctor their actual painful conditions, and took the medication prescribed for pain relief. (*See* Exhibits A and B, Excerpts of Medina and Torres trial testimony, respectively.) Thus, not only is the PSR's blunderbuss approach of calculating Dr. Mirilashvili's Guidelines not based on the evidence, it is specifically contradicted by witness testimony. Thus, these Guidelines calculations should be stricken and replaced with the calculations proposed herein, which are based on the data provided by the U.S. Attorney's Office in paragraphs 27, 28, and 59. The trial record and the government's own submissions to Probation lead only to a calculation of no more than approximately 29,198 pills of 30-milligrams of oxycodone.

      The only quantity of pills controlled by so-called "crew chiefs" that the government has proffered to date is found in paragraph 59 of the draft PSR. The sum total of the pills that the government places at the hands of the co-conspirators in this paragraph is 78,480.[2] The only other charged co-conspirator "crew chief" not identified in paragraph 59 is Abraham Correa. Based on his trial testimony, however, we can estimate that the most pills for which he could be responsible is approximately 10,000.[3] Thus, the total number of pills for which any evidence of unlawful distribution has been produced is *at most* 88,480. Since the draft PSR also notes that these co-conspirators sent fake patients to two other doctors identified in the original Indictment (Doctor-2 and Doctor-3), the total number of pills attributed to Dr. Mirilashvili must be reduced to reflect the pills prescribed by these other doctors. (*See* PSR, ¶¶ 27-36.) The PSR indicates that Doctors 2 and 3 wrote *more* prescriptions than Dr. Mirilashvili (17,000 and 15,000 oxycodone prescriptions, respectively). Further, the government never alleged that Dr. Mirilashvili had any knowledge or participation with these other doctors (in fact, the government removed these allegations from Dr. Mirilashvili's Superseding Indictment, on which he proceeded to trial.) Thus, the total pills attributed to the co-defendant "crew chiefs" should be reduced by 2/3 to reflect a reasonable estimate of pills distributed by Dr. Mirilashvili. One-third

---

[2] For reasons explained below, none of the 6,240 pills attributed to co-defendant Middleton should be counted in this calculation. *See infra,* paragraph 36.

[3] Correa testified that he controlled a total of "ten or so" patients, who were directed to multiple doctor's offices. (Ex. C: Excerpts of Correa Trial Testimony at 514.) By March 2014, Correa testified that the number of "patients" he was still sending to Dr. Mirilashvili's clinic had shrunk to "[m]aybe three or four, if that." (Ex. C at 519-520.) And all of Correa's patients were seeing another doctor after May 2014. (Ex. C at 396.) Thus, estimating conservatively that Correa had on average seven patients that he sent to Dr. Mirilashvili's clinic over about a year-and-a-half, who received mostly 90-pill monthly prescriptions, the total number of pills for which Correa would be responsible is approximately 10,000.

of 88,480 equals approximately 29,198 pills. This converts to approximately 875 grams of oxycodone.[4]

Applying the conversion factor for marijuana equivalency as required in U.S.S.G. § 2D1.1, this equates to approximately 5,862 kilograms of marijuana.[5]

Thus, the maximum marijuana equivalency that can be attributed to Dr. Mirilashvili based on government proffers and trial testimony corresponds to a base offense level of 32 (between 3,000 and 10,000 KG). *See* U.S.S.G. § 2D1.1(c)(4). We ask that the drug amounts identified in Dr. Mirilashvili's PSR be revised to reflect these evidence-based calculations.

We also ask that the Probation Department make the following changes as indicated below.

## Specific Objections

**Paragraph 18:**

*Suggested Change*: Strike: "a Board-certified" physician.

*Reason for Change*: Dr. Mirilashvili was not Board certified.

**Paragraph 19:**

*Suggested Change*: The quantities of prescriptions and pills associated with Dr. Mirilashvili's convicted conduct of prescribing medically unnecessary oxycodone should be changed to reflect the calculations and evidence identified in our opening paragraphs above. Thus, we ask that this paragraph read as follows:

> In total, between October 2012 and December 2014, the government proffered evidence that MIRILASHVILI illegally distributed approximately 29,198 pills of 30-mg oxycodone. MIRILASHVILI predominantly received $200 per patient visit.

*Reason for change:* The substituted quantities of pills conform to the calculations presented above. Also, the total revenue received by Dr. Mirilashvili at his Manhattan clinic of $2.6 million should be stricken because it relies on the grossly overstated and unsupported

---

[4] $29{,}198 \text{ pills} \times 30 \text{ milligrams} \times \dfrac{1 \text{ gram}}{1000 \text{ milligrams}} = 875$ grams of oxycodone.

[5] $875 \text{ grams of oxycodone} \times \dfrac{6{,}700 \text{ grams of Marijuana}}{1 \text{ gram of Oxycodone}} \times \dfrac{0.001 \text{ kilograms of Marijuana}}{1 \text{ gram of Marijuan}} = 5{,}862$ kilograms of .

assumption that all money paid to him at the clinic was part of an unlawful distribution scheme. We recommend instead that the known amount of payment for each patient visit should be substituted.

**Paragraph 21:**

*Suggested Change:* Strike: "a 30-mg oxycodone pill has a street value of approximately $30 per pill in New York City," and replace with: "at the time of this conspiracy, a 30-mg oxycodone pill had a street value of approximately **$12.50 to $18 per pill** in New York City."

*Reason for Change:* Trial testimony of government's cooperating witnesses Abraham Correa (Ex. C at 322) and Damon Leonard (Ex. F: Excerpt of Leonard Trial Testimony at 701-702).

**Paragraph 22:**

*Suggested Change:* Strike: "Health insurance was rarely accepted by MIRILASHVILI for these transaction."

*Reason for Change:* The trial evidence established that Dr. Mirilashvili accepted insurance for approximately 30% of all patient visits. *See* Exhibit G: GX 118 (Summary chart reflecting that 4,388 patient visits (out of 14,621) were paid for by health insurance during the charged conspiracy). Further, Dr. Mirilashvili would have accepted additional insurance payments from patients but for the fact that he previously had his medical license revoked and was subsequently denied acceptance into most major insurance carrier plans. The only plans that accepted Dr. Mirilashvili after his license revocation were Aetna, United Healthcare, Health First and Metro Plus.

**Paragraph 23:**

*Suggested Change:* Strike the clause: "MIRILASHVILI sometimes asked "patients" for medical documentation, such as MRI reports, purporting to document injuries or urinalysis reports, purporting to show that the "patient" was taking oxycodone, and thus not obtaining it for the purpose of distribution."

*Reason for Change:* The trial evidence, including the testimony of Correa and Leonard, showed that Dr. Mirilashvili *always* required his patients to provide medical documentation at an initial patient visit. (*See* Ex. C at 322; Ex. F at 701-702.)

**Paragraph 24:**

*Suggested Change:* Strike the phrases: "vast majority of these individuals" and "most [of] these individuals."

    *Reason for Change:* As indicated in the initial paragraphs of this letter, the government failed to prove that the "vast majority" or "most" of Dr. Mirilashvili's patients were fake or under the control of the charged co-conspirator "crew chiefs." Because the sum of oxycodone pills attributed to these charged "crew chiefs" was substantially less than that attributed to Dr. Mirilashvili in the draft PSR, these exaggerated and unproven quantities should be stricken from the report.

**Paragraphs 27 and 28:**

    *Suggested Change:* Strike both paragraphs in their entirety.

    *Reason for Change:* The government has never alleged that Dr. Mirilashvili had knowledge of or participated in the unlawful activities of Doctor-2 and Doctor-3.

**Paragraph 29:**

    *Suggested Change:* Strike this paragraph in its entirety, or conform it to the evidence proffered in paragraph 59.

    *Reason for Change:* The government failed to present proof that co-defendant WILLIAMS brought "approximately 30 "patients" each month to obtain unnecessary prescriptions from MIRILASHVILI." This estimate was not proven at trial. Indeed, it conflicts with the low amount of total unlawful pills that the government offered it could prove against WILLIAMS, especially relative to other charged co-conspirators. *See* PSR ¶ 59 ("WILLIAMS distributed 2,160, 30-mg. oxycodone pills.") It is unclear over how long a time period these pills were distributed, but dividing this total number of pills by 90, which is the amount of pills issued per prescription, this results in a **total number of 24 prescriptions** attributed to WILLIAMS. Moreover, on cross-examination, Abraham Correa, a government cooperating witness, testified that he knew of only four to five "bosses" who brought into the clinic at most 10 fake patients each. (*See* Ex. C at 514-515.)

**Paragraph 30:**

    *Suggested Change:* Strike this paragraph in its entirety, or conform it to the evidence proffered in paragraph 59.

    *Reason for Change:* The government failed to present proof that co-defendant AVERY brought "approximately 20-to-30 "patients" each month to obtain unnecessary prescriptions from MIRILASHVILI and Doctor-2." First, as stated above, evidence related to the conduct of Doctor-2 is not relevant to Dr. Mirilashvili. Second, the government's proffered evidence against AVERY in paragraph 59 contradicts this estimate, and no evidence of AVERY's conduct was introduced at Dr. Mirilashvili's trial. According to PSR ¶ 59, "AVERY is responsible for conspiring to distribute 3,240, 30-mg oxycodone pills." Dividing this total number of pills by

90, which was the typical amount of pills issued per prescription, results in **36 prescriptions** attributed to AVERY.

**Paragraph 31:**

*Suggested Change:* Strike all references to Doctor-2 as not relevant to Dr. Mirilashvili. Also, strike: "DAVIS frequently posed as a "patient" to obtain oxycodone prescriptions."

*Reason for Change:* Based on conversations with DAVIS's counsel, DAVIS denies "faking" her physical injuries and has presented proof of her medical condition and causes of pain. Based on counsel's representations, DAVIS had undergone multiple surgeries, was the victim of a debilitating car accident, and had difficulty coping with pain resulting from her injuries.

**Paragraph 32:**

*Suggested Change:* Strike this paragraph in its entirety.

*Reason for Change:* The actions of "Doctor-3 and the Southern Boulevard Office" are not relevant to the charged conduct against Dr. Mirilashvili.

**Paragraph 33:**

*Suggested Change:* Strike this paragraph in its entirety, or conform it to the evidence proffered in paragraph 59.

*Reason for Change:* The government failed to present proof that co-defendant WHITE "directed approximately 30 "patients" each month to obtain unnecessary prescriptions from MIRILASHVILI, Doctor-2, and Doctor-3." This estimate was not proven at trial. First, the amounts of prescriptions obtained from Doctor-2 and Doctor-3 are not relevant to Dr. Mirilashvili's offense conduct. Second, the number of prescriptions cited in this paragraph conflicts with the amount of total unlawful pills that the government attributed to WHITE. *See* PSR ¶ 59 ("WHITE is responsible for conspiring to distribute 9,120, 30-mg. oxycodone pills.") Third, this number does not separate the total pills obtained and attribute a quantity to each of the three doctors from whom WHITE and his patients received prescriptions. Pursuant to paragraph 59, the total number of prescriptions the government held WHITE responsible for was 101. Paragraph 33 should be limited to this number of prescriptions with the caveat that those prescriptions attributable to Doctors 2 and 3 should not be included against Dr. Mirilashvili.

**Paragraph 34:**

*Suggested Change:* Strike this paragraph in its entirety, or conform it to the evidence proffered in paragraph 59.

*Reason for Change:* The government failed to present proof that co-defendant GRAY brought in "more than 30 "patients" each month to obtain unnecessary prescriptions from MIRILASHVILI and Doctor-2." This estimate was not proven at trial. First, the number of prescriptions obtained from Doctor-2 is not relevant to Dr. Mirilashvili. Second, this number and frequency of patients conflicts with the total number of unlawful pills that the government offered it could prove against GRAY. *See* PSR ¶ 59 ("GRAY is responsible for conspiring to distribute 42,600, 30-mg. oxycodone pills.") Third, the "30 patients" number fails to divide the obtained prescriptions between the two doctors. Pursuant to paragraph 59, the total number of prescriptions the government held GRAY responsible for was 473. Thus, paragraph 33 should be limited to this number of prescriptions, with the caveat that those prescriptions attributable to Doctor 2 should not be included against Dr. Mirilashvili.

**Paragraph 35:**

*Suggested Change:* Strike this paragraph in its entirety, or conform it to the evidence proffered in paragraph 59.

*Reason for Change:* The government failed to present proof that co-defendant FRYE "directed dozens of "patients" each month to obtain unnecessary prescriptions from MIRILASHVILI and Doctor-2." This estimate was not proven at trial. Initially, the number of prescriptions obtained from Doctor-2 is not relevant to Dr. Mirilashvili. Second, this number of patients conflicts with the total amount of unlawful pills that the government attributed to FYRE. *See* PSR ¶ 59 ("FYRE is responsible for conspiring to distribute 1,860, 30-mg. oxycodone pills.") Third, the aggregate number does not attempt to divide the obtained pills between the two doctors from whom FRYE and his patients received prescriptions. Pursuant to paragraph 59, the total number of prescriptions the government held FRYE responsible for was approximately 20. Paragraph 33 should be limited to these prescriptions, with the caveat that those prescriptions attributable to Doctor 2 should not be included against Dr. Mirilashvili.

**Paragraph 36:**

*Suggested Change:* Strike this paragraph in its entirety.

*Reason for Change:* The government failed to present proof that co-defendant MIDDLETON posed as a "[fake] patient" to obtain unnecessary prescriptions from MIRILASHVILI, Doctor-2, and Doctor-3." In fact, MIDDLETON was involved in a car accident in 2010, suffers from severe pain from herniated discs and other ailments (confirmed by various MRIs) and suffered a partially torn ACL. (Exhibit D: Middleton Sentencing Submission at 4.) Most significantly, MIDDLETON claimed that she was "legally prescribed oxycodone for her pain." (*Id.*) Dr. Mirilashvili should not be held responsible for *illegally* distributing

oxycodone to someone who had a real medical ailment for which pain medication was appropriate.

In addition, the PSR reports that "MIDDLETON assisted WHITE in bringing Crew Members to the medical offices and to nearby pharmacies to fill the oxycodone prescriptions." Because Middleton assisted White's "patients," the number of pills attributed to her in paragraph 59 (6,240) must necessarily be a subset of those attributed to WHITE (9,120). It is not proper to double count those pills.

**Paragraph 39:**

*Suggested Change*: Strike this paragraph in its entirety.

*Reason for Change*: The government failed to prove that MIDDLETON *illegally* obtained oxycodone from Dr. Mirilashvili. As noted in our objection to Paragraph 36, Middleton was properly prescribed oxycodone. Moreover, the allegations regarding Doctor-2 and Doctor-3 are not relevant to Dr. Mirilashvili.

**Paragraph 40:**

*Suggested Change*: Strike this paragraph entirely, or conform it to the suggested changes to paragraph 35 as discussed above.

*Reason for Change*: The allegations regarding Doctor-2 are not relevant. This paragraph should include reference only to the number of pills received from Dr. Mirilashvili during the month.

**Paragraph 41:**

*Suggested Change*: Strike this paragraph entirely, or conform it to the suggested changes to paragraph 34 as discussed above.

*Reason for Change*: The allegations regarding Doctor-2 are not relevant. This paragraph should include reference only to the number of pills received from Dr. Mirilashvili during the month.

We assert a general objection to including in Dr. Mirilashvili's PSR any information about prescriptions written by other doctors, in particular because these other prescriptions appear to improperly increase the oxycodone pill count attributable to Dr. Mirilashvili.

**Paragraph 42:**

*Suggested Change*: Strike the sentence: "These funds represented money collected by MIRILASHVILI at the Clinic for that month in connection with unnecessary prescriptions issued for oxycodone."

*Reason for Change*: The government failed to prove that all of the money received by Dr. Mirilashvili for his medical services was obtained from the issuance of "unnecessary prescriptions." As discussed above, the government has conceded that prescriptions paid for by insurance should not be counted as part of the charged scheme. We also have shown here that the government has attributed only a percentage of other prescriptions to those charged co-conspirators responsible for re-distributing oxycodone. Thus, the government has not shown that the total of $195,800 deposited by Dr. Mirilashvili was generated from the charged scheme.

**Paragraph 43:**

*Suggested Change*: Strike this paragraph in its entirety.

*Reason for Change*: This allegation has nothing to do with conduct related to Dr. Mirilashvili. It involves only events regarding Doctor-2 and his office.

**Paragraph 44:**

*Suggested Change:* Strike the clause: "CS-1 informed MIRILASHVILI that CS-2 had "no pain.""

*Reason for Change:* This representation is taken completely out of context and grossly distorts what was recorded during the patient visit. In fact, as reflected in the audio recording and stipulated transcript, CS-1 indicated that he felt "no pain" *after he took his medication as prescribed. See* Ex. H: Transcript of Recording by Jose Lantigua at 3.[6] This paragraph should be changed to reflect this critical context. The paragraph as now written leaves the misimpression that Dr. Mirilashvili prescribed oxycodone to a patient who first presented himself as having no pain, rather than a patient who was returning for a follow-up visit and who reported that the medication was working because he felt "no pain" after taking the medicine.

---

[6] Exhibit H is a copy of the parties' stipulated transcript of the January 16, 2014 patient visit between Dr. Mirilashvili and the confidential source, Jose Lantigua. As noted on page 3, Mr. Lantigua only indicated that he felt "no pain" *after* taking the oxycodone prescribed to him by Dr. Mirilashvili.

**Paragraph 61:**

*Suggested Change:* Conform the total number of oxycodone pills attributed to Dr. Mirilashvili's convicted offenses to those presented in our opening Guidelines objection, *i.e.,* approximately 29,198 30-milligram pills.

*Reason for Change:* As explained in our general Guidelines objection in this letter's opening paragraphs, Dr. Mirilashvili wrote legitimate prescriptions for patients who paid in cash—including those patients whom the defense called as witnesses at trial. Also, the government's own proffer of the total pills for which each "crew chief" was responsible, results in a much smaller sum of pills attributable to the conspiracy than reported in this paragraph. The government should be held to its own reported totals.

As to Counts Two and Three, the total number of prescriptions written by Dr. Mirilashvili on the charged dates overstates the number of pills reasonably attributed to the scheme. In fact, the government only presented proof of a medically unnecessary prescription relating to a single patient (Abraham Correa) on the date charged in Count Two, and presented no specific patient testimony related to Count Three. In any case, the numbers calculated for the conspiracy represent the sum total of evidence presented as to "unnecessary" prescriptions, including pills distributed on the dates charged in Counts Two and Three. Because the prescriptions charged in Counts Two and Three are subsumed in the conspiracy, adding them separately to the conspiracy total represents impermissible double-counting.

**Paragraph 67:**

*Suggested Change:* Strike the phrase: "924,300, 30-mg oxycodone pills, which has a marijuana equivalent of 185,849 kilograms of marijuana, has a base offense level of 38." Replace it with: "29,198, 30-mg oxycodone pills, which has a marijuana equivalent of 5,862 kilograms of marijuana, resulting in a base offense level of 32."

*Reason for Change:* To conform to evidence identified in general Guidelines objection above.

**Paragraph 75:**

*Suggested Change:* Strike "40" and replace it with: "34."

*Reason for Change:* To conform the total offense number to the change in base offense level identified in paragraph 67 above.

**Paragraph 83:**

*Suggested Change:* Strike "Shmelashvili Rizinashvili" and replace it with: "Tziporah Shamelashvili."

*Reason for Change:* The true and correct name of Dr. Mirilashvili's mother is Tziporah Shamelashvili. The draft PSR misstates the name.

**Paragraph 84:**

*Suggested Change:* Strike "suffers with kidney failure" and replace it with: "suffers from both heart and kidney disease."

*Reason for Change:* Dr. Mirilashvili informs us that his brother has long had both chronic heart and kidney disease.

**Paragraph 85:**

*Suggested Change:* Strike "Dali, age 63," and replace it with: "Dali, age 64." Strike Nina and Margaret's residence as "Kings Point, New York," and replace with: "Great Neck, New York."

*Reason for Change:* Dr. Mirilashvili informs us that his wife, Dali, is currently 64 years old. Dr. Mirilashvili's daughters (Nina and Margaret) and their families both reside in Great Neck, New York, which is adjacent to Kings Point.

**Paragraph 87:**

*Suggested Change:* Strike the second sentence and replace with: "Starting at age 55, Dr. Mirilashvili was diagnosed with type-II diabetes, high cholesterol, hypertension, coronary heart disease and rheumatoid arthritis. He still suffers from these conditions." Also add the sentence: "Up until the time of Dr. Mirilashvili's remand into custody, he also was a heavy smoker."

*Reason for Change:* To state more clearly Dr. Mirilashvili's various medical conditions.

**Paragraph 106:**

*Suggested Change:* Please add a clarifying statement that the stock investments are maintained in an I.R.A. retirement plan in Dr. Mirilashvili's name. At the time of his PSR interview, Dr. Mirilashvili failed to recollect this account.

**Paragraph 117:**

The paragraph suggests that the costs of prosecution should be imposed on Dr. Mirilashvili. However, the crimes for which he stands convicted are not those enumerated in U.S.S.G. § 5E1.5. We request that the first sentence of paragraph 117 be deleted.

**Paragraph 123:**

*Suggested Change:* Strike the phrase "Stipulated Guideline Range."

*Reason for Change:* The parties have not reached any agreement on the advisory Guidelines calculation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

If you have any questions about any of these proposed revisions, please do not hesitate to contact us.

    Very truly yours,

    CLAYMAN & ROSENBERG LLP

    /S/HEM

    By:  Henry E. Mazurek
           Wayne E. Gosnell, Jr.

Encl.

cc:  Brooke Cuccinella, A.U.S.A.
     Edward B. Diskant, A.U.S.A