EXHIBIT C

G377MIR3                    Correa - direct

1    Q.  Has there been any action on that order of violation yet?

2    A.  No.

3    Q.  Do you have an understanding of why or why not?

4    A.  To my understanding, they're waiting to see the outcome of

5    this case.

6    Q.  You mentioned that you first got involved in oxycodone in

7    2012.

8    A.  Yes.

9    Q.  How did that happen?

10   A.  I had a friend of mine named Obama, and he told me about a

11   guaranteed way of making money.  He had a doctor by the name of

12   Moshe, and we were guaranteed to take patients to get oxycodone

13   prescriptions.

14   Q.  Do you know Obama by any other names?

15   A.  Raymond Williams.

16   Q.  How long have you known Obama?

17   A.  For about four or five years.

18   Q.  And in addition to giving you this information on the

19   doctor guaranteed to write prescriptions, did Obama tell you

20   anything else about what you might need?

21   A.  He also told me that I would need an MRI and a referral.

22   Q.  Why?

23   A.  Because that's what the doctor required to see a patient.

24   Q.  Did you end up seeing Dr. Moshe as a patient?

25   A.  Yes.

335

G377MIR3                    Correa - direct

1   Q.   And what would you do with the prescriptions for oxycodone?

2   A.   I would take the patients with the prescription to a

3   pharmacy that they were directed to.  And in return they would

4   give me the oxycodone tablets, and I would pay them $200.

5   Q.   And what would you do with the tablets?

6   A.   I would sell them myself.

7   Q.   And how much would you sell them for?

8   A.   All the way up to $16.

9   Q.   $16 a pill?

10  A.   Yes.

11  Q.   So for a 90 tablet prescription that would be about 1440,

12  is that right?

13  A.   Yes, it is.

14  Q.   When did you start sending patients in to see the

15  defendant?

16  A.   August of 2012.

17  Q.   OK.  Around the same time that you started going in as a

18  patient yourself?

19  A.   First I sent the patients, then I went behind them,

20  following them up.

21  Q.   Now you mentioned that you paid $50 for urine.

22  A.   Yes.

23  Q.   OK.  Were you or your patients ever required to provide a

24  urine sample?

25  A.   Yes.

395

G377MIR5                        Correa - direct

1    defendant?

2    A.  For about nine months.

3    Q.  And so if you started in the end of December, that would

4    take us to about September 2013?

5    A.  Yes.

6    Q.  What happened at that time?

7    A.  About September 2013 the clinic was robbed, and I was let

8    go at that time, after that time.

9    Q.  You were fired?

10   A.  Yes.

11   Q.  Did you have a conversation with the defendant about being

12   fired?

13   A.  Yes, I did.

14   Q.  What is your understanding of why you were fired?

15   A.  I arrived Monday morning, and I asked to speak to Dr.

16   Moshe.  We went into the office.  He told me that he no longer

17   needed my services.  And then I asked him if I could come back

18   to him as a patient.  He told me, no, I couldn't because I had

19   too long of a time not being a patient, but he told me that I

20   could continue to bring patients to see him.

21   Q.  What did you understand him to mean by that?

22   A.  He meant that even though --

23            MR. MAZUREK:  Objection.  Calls for speculation.

24            THE COURT:  The objection is sustained.

25   Q.  Mr. Correa, at that point when he has fired you but told

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

396

G377MIR5                         Correa - direct

1    you you can continue to bring your patients in, did you believe

2    you had an understanding with the defendant?

3    A.  Yes, I did.

4    Q.  What was that understanding?

5    A.  The understanding was that I couldn't work for him no more,

6    but I could continue to bring patients, I could continue to get

7    some type of income.

8    Q.  And, by the way, you mentioned the robbery.  Did you

9    understand why you were fired in connection with the robbery?

10   A.  Yes, I do.

11   Q.  What was that?

12   A.  The doctor believes that I had something to do with the

13   robbery.

14   Q.  Did you have something to do with the robbery?

15   A.  No, I did not.

16   Q.  After getting fired, did you continue to bring patients

17   into the clinic?

18   A.  Yes, I did.

19   Q.  For how long?

20   A.  Up to my arrest in May 2014.

21   Q.  And what would you do with the prescriptions once you got

22   them?

23   A.  I would take patients to the pharmacy to get the

24   prescription, and then I would take them, pay my patients, and

25   then sell the pills.

1    Q.  But he introduced you to how to get a patient visit with

2    pain management doctors, right?

3    A.  Yes, he did.

4    Q.  And he told you what you needed in order to fool the

5    doctor, right?

6    A.  To fool is an understatement.  To fool means he didn't know

7    what was going on at the time, which is inconclusive.

8    Q.  I don't know what you mean by inconclusive, but let me ask

9    you this.  What Mr. Williams originally told you was that you

10   needed to get an MRI and a referral, is that some of the

11   paperwork that you needed?

12   A.  Yes.  He said we needed that because that way we can get a

13   guarantee that we would get a oxycodone prescription.

14   Q.  So you needed to get that paperwork, right?

15   A.  Yes, we did.

16   Q.  And it had to look good so that the doctor would believe

17   that it was real papers, right?

18   A.  Yes.

19   Q.  And in fact, you were willing to spend a lot of money to do

20   that, $500 for each referral or MRI, right?

21   A.  Yes.

22   Q.  And that was money that would be coming out of your profits

23   from your drug business, right?

24   A.  Yes, it was.

25   Q.  And Mr. Williams also told you that when you go in to see a

428

G38LMIR1                    Correa - cross

1    doctor that you have to answer questions in a certain way,

2    right?

3    A.  No, because there really wasn't any question that were

4    really asked.

5    Q.  Well, you had to say that you were in pain from an injury,

6    correct?

7    A.  Negative.

8    Q.  That's not true?

9    A.  That's not.

10   Q.  Well, each and every time that you saw Dr. Mirilishvili, at

11   least in the initial patient visit, we'll start with that, you

12   would lie to the doctor and say you were in pain, correct?

13   A.  Incorrect.

14   Q.  Well, sir, the day of your arrest on May 1 of 2014 in this

15   case, you were immediately sat down and asked a bunch of

16   questions by a bunch of DEA agents and NYPD detectives, right?

17   A.  Yes, I was.

18   Q.  And that was just really shortly after you were picked up,

19   late in the afternoon on that day, right?

20   A.  Yes.

21   Q.  And at that point in time, that was in 2014, that was

22   closer in time to the events that we're talking about today,

23   two years later, right?

24   A.  Yes, it is.

25   Q.  And when you were answering those questions, you were at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G38LMIR3                    Correa - cross

1              MR. MAZUREK:  I'll rephrase, your Honor.

2    Q.   There came a time when you were working with the doctor,

3    you would see that the doctor would discharge patients, no

4    longer treat them because he found out there was a problem,

5    right?

6              THE COURT:  Did there come a time that you became

7    aware that the doctor would cut off patients, stop seeing them?

8              THE WITNESS:  Yes.

9              THE COURT:  OK.  Now, did you know why that happened?

10             THE WITNESS:  No.

11   Q.   You saw it happen, right?

12   A.   Yes.

13   Q.   It happened to some of your patients?

14   A.   Yes.  They were a patient for too long, the doctor would

15   get rid of them.

16   Q.   Now you know what the answer is --

17             MR. DISKANT:  Objection.

18   Q.   -- of why patients were discharged, do you know or not?

19   A.   Of my patient, yes.  Of others, I don't.

20   Q.   For your patients, your testimony is that oh, because they

21   were being seen for too long?

22   A.   Yes.  That's what the doctor told them.

23   Q.   You were only there ten months, right?

24   A.   Yes.

25   Q.   And there are patients that you know were seen for longer

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

G38LMIR3                    Correa - cross

 1    than ten months at a time, right?

 2    A.  I have no idea how long the patient were there.

 3    Q.  Did any of your patients stay for more than ten months?

 4    A.  There's a possibility, yes.

 5    Q.  You were not in the room with the doctor when he's talking

 6    to your so-called patients, right?

 7    A.  No.

 8    Q.  Now, did there come a time where you were trying to get

 9    patients in, back in to see the doctor after they had been

10    discharged?

11    A.  No.

12    Q.  Did you ever know of occasions where the doctor would say

13    that because he checked the phone number on the MRI or

14    referral --

15            THE COURT:  The objection is sustained.

16    Q.  Did you ever know --

17            THE COURT:  By the way, while it's nice to see the

18    government stand, I would appreciate it if you would put a word

19    on the record.

20            MR. DISKANT:  Yes, your Honor.

21    Q.  Did there come a time when you knew that Dr. Mirilishvili

22    was checking, verifying MRIs or referrals?

23    A.  In my ten months of working there, I can only recall him

24    checking maybe about eight or nine of all the time that I was

25    there.  And when he did check them, he would come out screaming

514

G38LMIR3                    Correa - cross

1              THE COURT:  The question isn't whether it was the

2    right word or the wrong word.   The question is did you say that

3    to the agent?

4              THE WITNESS:  Yes.

5              THE COURT:  Thank you.

6              MR. MAZUREK:  Thank you, Judge.

7    Q.  Now, did you know also that in bringing patients back,

8    sometimes the office staff would change the name of the patient

9    in order to fool the doctor, did you know that?

10   A.  I don't understand the question.

11   Q.  Did you know that in the circumstance that we just talked

12   about, when a patient that the doctor kicked out, the office

13   staff would change the name of the patient sometimes to get the

14   patient back in, did you know about that?

15   A.  No, not for those circumstances, no.

16   Q.  Did you know multiple names were being used for the same

17   patient?

18   A.  Some patients would come in posing as other patients.

19   Q.  You talked yesterday about a number of patients that you

20   directed to the office.  How many patients did you have, about

21   ten or so, is that about right?

22   A.  Yes.

23   Q.  And you knew other people who were bringing in about ten

24   patients during the course of time that you worked there?

25   A.  Yes.

G38LMIR3                    Correa - cross

1   Q.  And how many of these bosses did you know?

2   A.  Probably like four or five.

3   Q.  Four or five.  And let's say that they each had about ten,

4   that would be about 50 patients, and you, let's say 60

5   patients.  Is that fair?

6   A.  Yes.

7   Q.  And the number of patients that you also testified about

8   yesterday that Dr. Mirilishvili was seeing at the time were

9   about 30 to 40 a day?

10  A.  Yes.

11  Q.  Five days a week; is that right?

12  A.  Yes.

13  Q.  That's about 150 patients a week; is that fair?

14  A.  Yes.

15  Q.  And he worked maybe 50 out of 52 weeks; is that also fair?

16  A.  Excuse me?

17  Q.  He took maybe two weeks vacation during the year, right,

18  the time that you were there?

19  A.  Not that I can remember.  I believe he took a one-week

20  vacation when I was there.  That was about it.

21  Q.  He would come to the office mostly every day, right?

22  A.  Yes.

23  Q.  About 8 o'clock in the morning and leave sometime between

24  five and six at night?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

519

G38LMIR3                         Correa - cross

1    Q.  Did you have any patients, your patients continue to go to

2    the office after April or May of 2014?

3    A.  No.

4    Q.  But you wanted them, right, you wanted to have patients

5    there?

6    A.  No.  At that time I was already arrested.

7    Q.  Before you got arrested, sir?

8    A.  Yes.

9    Q.  And you were dealing with in the spring of 2014 with Jose

10   Lantigua selling scripts or pills?

11   A.  Of the spring of 2014?

12   Q.  Yes.  March, about March of 2014.

13   A.  I believe so, yes.

14   Q.  And you were telling him that your patients were getting

15   kicked out of Dr. Mirilishvili's office, right?

16   A.  Yes.

17   Q.  And you were going to another doctor, right, because

18   Dr. Mirilishvili was being too difficult?

19   A.  Well, I went to a different doctor for myself.

20   Q.  And that was a Dr. Lucas?

21   A.  Yes.

22   Q.  But you told Jose Lantigua that all your patients, the

23   patients, you couldn't get any patients in to Dr. Mirilishvili

24   anymore, right?

25   A.  At that time I still had some but not a lot.  Maybe three

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

520

G38LMIR3                        Correa - cross

1    or four, if that.

2    Q.  My question though is did you tell him that your

3    connections were getting kicked out because they were waiting

4    too long to fill their prescriptions and then the doctor can

5    check that on the PMP and will kick out a patient because of

6    that?

7    A.  I don't recall that conversation.  When the doctor had the

8    PMP, the patient was going to several different doctors, then

9    he would kick them out, or if they were there for too long.

10   Q.  If I show you a report, might it refresh your recollection?

11   A.  Yes.

12   Q.  Referring the government to 3501-16, specifically page 2.

13   I highlighted a portion for you to read.  Read to yourself.

14          Does that report help refresh your recollection, sir?

15   A.  Yes.

16   Q.  And so isn't it true that you learned that Dr. Mirilishvili

17   was receiving a paper with the patient's information and date

18   of birth and that information informs the doctor if the

19   patients are seeing other doctors, right?

20   A.  Yes.

21   Q.  That if a patient waits two weeks to fill the

22   prescription --

23          MR. DISKANT:  Objection.

24          THE COURT:  The objection is sustained.

25   Q.  And you also knew at that time that patients were being

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300